**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

### APPENDIX IN SUPPORT OF DEFENDANT SKIPLAGGED, INC.'S MOTION TO DISMISS PLAINTIFF AMERICAN AIRLINES, INC.'S FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND ALTERNATIVE REQUEST TO TRANSFER VENUE AND BRIEF IN SUPPORT

William L. Kirkman
State Bar No. 11518700
billk@kirkmanlawfirm.com
Preston B. Sawyer
State Bar No. 24102465
prestons@kirkmanlawfirm.com
KIRKMAN LAW FIRM, PLLC
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone:    (817) 336-2800
Facsimile:    (817) 877-1863

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

1

**INDEX**

Page Range

**SECTION I:**        **Declaration**

1      Declaration of Aktarer Zaman                                    APP 04


**SECTION II:**        **Non-Published Cases Cited in *Motion***

2      *BidPrime, LLC v. SmartProcure, Inc.*, 2018 U.S. Dist. LEXIS        APP 09
       180546, *1 (W.D. Tex. October 22, 2018)

3      *Digitalway Servs., LLC v. Blue Ridge Healthcare*, 2023 U.S. Dist.  APP 13
       LEXIS 85203, *1 (N.D. Tex. May 16, 2023)

4      *Elevacity U.S., LLC v. Schweda*, 2022 U.S. Dist. LEXIS 154111,     APP 16
       *1 (E.D. Tex. August 26, 2022)

5      *Heavy Duty Prods., LLC v. Band Wdth, LLC*, 2015 U.S. Dist. LEXIS   APP 29
       183124, *1 (W.D. Tex. July 21, 2015)

6      *Heavy Duty Prods., LLC v. Bandwdth, LLC*, 2015 U.S. Dist. LEXIS    APP 31
       62252, *1 (W.D. Tex. May 12, 2015)

7      *Honus Wagner Co. v. Luminary Grp. LLC*, 2017 U.S. Dist. LEXIS      APP 38
       210097, *1 (S.D. Fla. December 21, 2017)

8      *Southwest Airlines Co. v. Kiwi,* 2021 U.S. Dist. LEXIS 207508, *1  APP 51
       (N.D. Tex. August 10, 2021)

9      *Wilson v. Wilson*, 2016 U.S. Dist. LEXIS 64564, *1 (W.D. Tex.      APP 55
       May 17, 2016)

Respectfully submitted,

By:      /s/*William L. Kirkman*
         William L. Kirkman
         State Bar No. 11518700
         billk@kirkmanlawfirm.com
         Preston B. Sawyer
         State Bar No. 24102465
         prestons@kirkmanlawfirm.com
         KIRKMAN LAW FIRM, PLLC
         201 Main Street, Suite 1160
         Fort Worth, Texas 76102
         Telephone:    (817) 336-2800
         Facsimile:    (817) 877-1863

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 2, 2023, a true and correct copy of the foregoing

was served via the Court's ECF system upon all counsel of record as indicated:

Messrs. Dee J. Kelly, Jr., Lars L. Berg, and
 Tyson Lies and Ms. Julia G. Wisenberg
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Ms. Bina Palnitkar
Greenberg Traurig LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

Mr. Nathan J. Muyskens
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037

                              /s/*William L. Kirkman*
                              William L. Kirkman

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**DECLARATION OF AKTARER ZAMAN SUBMITTED IN SUPPORT**
**OF DEFENDANT SKIPLAGGED, INC.'S MOTION TO DISMISS**
**PLAINTIFF AMERICAN AIRLINES, INC.'S FIRST AMENDED**
**COMPLAINT FOR LACK OF PERSONAL JURISDICTION**
**AND ALTERNATIVE REQUEST TO TRANSFER VENUE**

I, Aktarer Zaman, declare under the pains and penalties of perjury as follows:

1.     At all relevant times in this case, I have been the Chief Executive Officer and founder of Defendant, Skiplagged, Inc. ("Skiplagged"). I submit this declaration in support of Skiplagged's *Motion to Dismiss* this action for lack of personal jurisdiction over Skiplagged, and Skiplagged's *Motion to Transfer Venue*. The information contained in this declaration is true and correct based on my personal knowledge. I am above the age of eighteen years and competent to testify.

2.     I am a resident of the State of New York and have been so at all relevant times in this suit.

3.     Skiplagged was incorporated in Delaware on March 3, 2015, and has always been headquartered in New York, New York. Skiplagged has been in business since that date.

1

4.     No Skiplagged employee lives or works in Texas.

5.     All Skiplagged employees knowledgeable about Skiplagged.com's use of public information concerning Plaintiff American Airlines, Inc. ("American") are located in New York City or work remotely from locations outside of Texas.

6.     Skiplagged has no computer servers located in Texas. Skiplagged's website, Skiplagged.com, is hosted on computer servers in South Carolina and New York, and has no connection with or to Texas.

7.     All Skiplagged documents are stored electronically and located on its computers in New York City or in Internet back-up storage through Google servers., none of which are located in Texas.

8.     Skiplagged is not registered to do business in Texas, nor does Skiplagged have a bank account in Texas, nor own any other property in Texas.

9.     No Skiplagged personnel have traveled to Texas in an attempt to further the Skiplagged business or goals or for any other business-related reason.

10.     Skiplagged has not collected and does not have non-public information about airline routing and pricing, including American's routing and pricing.   Instead it aggregates publicly available flight information from a variety of sources to inform consumers who visit Skiplagged.com over the Internet of cost-effective ways to travel.

11.     Skiplagged has not and does not obtain any information about American's routes and fares or other American services from American's website or from American's computer servers.  I have no knowledge as to the location of American's servers. Skiplagged obtains American flight and fare information from publicly available sources such as online travel

2

agencies, global distribution systems, and other travel metasearch engines. Skiplagged has also not obtained any of the alleged "American Marks" from American's website.

12.     Skiplagged.com provides a wide range of travel information to users over the Internet, including for persons interested in booking commercial airline flights. Skiplagged uses a unique algorithm to enable customers to identify affordable rates for airline or hotel accommodations and then refers the user to on-line travel agents to complete the bookings.   In some instances Skiplagged.com offers a "Book Now" feature that offers users the opportunity to utilize Skiplagged.com to facilitate the user's purchase of a given flight.   When the user selects the "Book Now" option for an American flight the user is interested in booking, Skiplagged.com then prompts the user to input their passenger information and payment details through an on-line form. Skiplagged.com then automatically opens a Google Chrome browser in the Skiplagged computer servers to input user's information into the booking Uniform Resource Locator or "URL" on AA.com on the user's behalf.   Skiplagged does not purchase or sell American tickets to anyone and does not claim that it is an agent of American or any other airline.

13.     Skiplagged does not specifically direct its Internet-based travel informational services into Texas.   Skiplagged engages in no advertising or marketing focused on Texas.   Instead, Skiplagged's services are offered to anyone anywhere in the World who has access to the Internet and who may prompt Skiplagged.com to provide information about airline routing and fares.

14.     Skiplagged has never agreed to American's terms and conditions or contract of carriage on the AA.com website or anywhere else.   I have never read American's user agreement or contract of carriage or gained access thereto.

3

15.     Nothing in Skiplagged's workflow requires a visitor to Skiplagged.com to purchase the routing or fare published on Skiplagged.com. Skiplagged has no control over or even visibility into the pricing that the consumer might ultimately pay for any ticket purchased after a referral to an on-line travel agent. Skiplagged is not a party to any agreement that a customer may enter into with American or any other airline.

16.     To my knowledge, Skiplagged has not induced anyone to breach their "agreements" (whatever those "agreements" may be) with any airline.

17.     Litigating in Texas would be unduly and unfairly burdensome on Skiplagged.   For example, it would require Skiplagged to maintain local counsel in Texas, require Skiplagged's officers and employees to travel more than 100 miles from their homes and business in New York City to Texas for participation in the litigation, and require Skiplagged to litigate in a state where it has had no business contacts or presence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

SUBSCRIBED TO, SWORN TO, AND EXECUTED on this 2nd day of October, 2023, in New York, New York.

Aktarer Zaman
_____
Aktarer Zaman

4

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 2, 2023, a true and correct copy of the foregoing

was served via the Court's ECF system upon all counsel of record as indicated:

> Messrs. Dee J. Kelly, Jr., Lars L. Berg, and
>   Tyson Lies and Ms. Julia G. Wisenberg
> Kelly Hart & Hallman LLP
> 201 Main Street, Suite 2500
> Fort Worth, Texas 76102
>
> Ms. Bina Palnitkar
> Greenberg Traurig LLP
> 2200 Ross Avenue, Suite 5200
> Dallas, Texas 75201
>
> Mr. Nathan J. Muyskens
> Greenberg Traurig, LLP
> 2101 L Street, N.W., Suite 1000
> Washington, D.C. 20037

> */s/William L. Kirkman*
> William L. Kirkman

APP 08



Positive
As of: October 2, 2023 8:22 PM Z

## *BidPrime, LLC v. SmartProcure, Inc.*

United States District Court for the Western District of Texas, Austin Division

October 22, 2018, Decided; October 22, 2018, Filed

1:18-CV-478-RP

**Reporter**
2018 U.S. Dist. LEXIS 180546 *; 2018 WL 5260050

BIDPRIME, LLC, Plaintiff, v. SMARTPROCURE, INC., d/b/a SmartProcure, and JEFFREY RUBENSTEIN, Defendants.

**Prior History:** *BidPrime, LLC v. SmartProcure, Inc., 2018 U.S. Dist. LEXIS 101654 (W.D. Tex., June 18, 2018)*

## Core Terms

personal jurisdiction, servers, forum state, purposefully, allegations, minimum contact, nonresident, intentional torts, argues, shield, fiduciary, resident

**Counsel: [*1]** For BidPrime, LLC, Plaintiff: Santosh Aravind, Stephanie Kover, LEAD ATTORNEYS, Scott Douglass & McConnico LLP, Austin, TX; Cynthia Lyons Saiter, Scott Douglass & McConnico, Austin, TX.

For SmartProcure, Inc. doing business as GovSpend, Defendant: Jason Scott Boulette, Steven H. Garrett, LEAD ATTORNEYS, Boulette Golden & Marin L.L.P., Austin, TX; Michael Dennis Marin, LEAD ATTORNEY, Boulette Golden & Marin LLP, Austin, TX.

**Judges:** ROBERT PITMAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT PITMAN

## Opinion

### ORDER

Before the Court is Defendant Jeffrey Rubenstein's ("Rubenstein") Motion to Dismiss. (Dkt. 38). Plaintiff BidPrime, LLC ("BidPrime") sued Rubenstein and Defendant SmartProcure, Inc. ("SmartProcure"), a rival company, alleging that SmartProcure hacked BidPrime's website and scraped information. (Am. Compl., Dkt. 34,

at 16). Rubenstein is SmartProcure's founder and CEO; BidPrime sued Rubenstein individually for his alleged role in the hacking. (*See* Resp. Mot. Dismiss, Dkt. 44, at 10). Rubenstein, a Florida resident, seeks to dismiss BidPrime's claims against him for lack of personal jurisdiction under *Federal Rule of Civil Procedure 12(b)(2)*. (Mot. Dismiss, Dkt. 38, at 2). Having considered the motion, the parties' responsive briefing, the evidence, **[*2]** and the relevant law, the Court will deny the motion.

### I. LEGAL STANDARDS

The Federal Rules of Civil Procedure allow a defendant to assert lack of personal jurisdiction as a defense to suit. *Fed. R. Civ. P. 12(b)(2)*. "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan, 772 F.2d 1185, 1192 (5th Cir. 1985)*. When, as here, the court considers a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the plaintiff need only present a *prima facie* case that personal jurisdiction is proper. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 241 (5th Cir. 2008)*. Even if the court receives discovery materials, unless there is a full and fair hearing, a district court should not act as a factfinder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts and uncontroverted allegations. *Id.; Latshaw v. Johnston, 167 F.3d 208, 211 (5th Cir. 1999)*. Nevertheless, a court need not credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 869 (5th Cir.2001)* (per curiam).

### II. DISCUSSION

*A. Due Process*

Because Rubenstein is not a Texas resident, (*see* Am. Compl., Dkt. 34, at 2), BidPrime has the burden to establish a *prima facie* case for this Court's personal jurisdiction over [*3] him. *Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001)*. A federal district court may exercise personal jurisdiction over a nonresident defendant if "(1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of personal jurisdiction comports with the *Due Process Clause of the Fourteenth Amendment*." *McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009)*, *cert. denied, 562 U.S. 827, 131 S. Ct. 68, 178 L. Ed. 2d 23 (2010)*. Because Texas's long-arm statute extends as far as constitutional due process allows, the two-step inquiry "collapses into one federal due process analysis." *Sangha v. Navig8 ShipManagement Private Ltd., 882 F.3d 96, 101 (5th Cir. 2018)*

Exercising personal jurisdiction over a nonresident defendant is compatible with due process when "(1) the defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Walk Haydel, 517 F.3d at 243* (cleaned up). There are two types of minimum contacts: those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction. *Lewis, 252 F.3d at 358*. BidPrime argues only that Rubenstein is subject to this Court's specific jurisdiction. (Resp. Mot. Dismiss, Dkt. 44, at 7).

In this circuit, specific personal jurisdiction is a claim-specific inquiry; [*4] a plaintiff bringing multiple claims that arise out of different forum contacts must establish specific jurisdiction for each claim. *McFadin, 587 F.3d at 759*. Specific jurisdiction applies when a nonresident defendant "has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Walk Haydel, 517 F.3d at 243*. The touchstone of specific-jurisdiction analysis is "whether the defendant's conduct shows that it reasonably anticipates being haled into court." *McFadin, 587 F.3d at 759* (cleaned up). Even a single contact can support specific jurisdiction if it creates a "substantial connection" with the forum. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 n.18, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*.

Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Sangha, 882 F.3d at 103*. Due process requires that specific jurisdiction be based on more than the "random, fortuitous, or attenuated" contacts a defendant makes by interacting with people affiliated with the forum state. *Walden v. Fiore, 571 U.S. 277, 285, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*. The plaintiff thus "cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id. at 285*.

BidPrime asserts nine claims against [*5] Rubenstein; eight of them are intentional torts, and the ninth is a claim for breach of contract. (Am. Compl., Dkt. 34, at 30-44).[1] Rubenstein argues that BidPrime has failed to establish a *prima facie* case that he has minimum contacts with Texas for each claim. (Mot. Dismiss, Dkt. 38, at 10). Rubenstein argues that his alleged conduct took place in Florida—"from IP addresses at his office or at his home"—rather than Texas. (*Id.*). The only alleged conduct between Rubenstein and Texas, he argues, is his "contact with BidPrime," which is insufficient to establish specific jurisdiction because the plaintiff cannot be the only link between the defendant and the forum. (*Id.* at 10-11). As for allegations that Rubenstein obtained unauthorized access to BidPrime's servers, Rubenstein offers a number of arguments—(1) BidPrime does not allege that Rubenstein accessed servers located in Texas, (*id.* at 15-16); (2) even if it had, the location of the servers is insufficient to establish minimum contacts, (*id.* at 16); and (3) Rubenstein did not know where BidPrime's servers were located in any event and therefore would not have purposefully targeted Texas by his alleged conduct, (*id.* at 17). BidPrime admits that Rubenstein scraped data from [*6] its server in Oregon. (Schwartzbeck Decl., Dkt. 44-1, ¶ 9).

Server location notwithstanding, Rubenstein knew that BidPrime was a Texas company. BidPrime alleges that Rubenstein operates one of BidPrime's "largest competitors," that he contacted BidPrime to propose working together, and that he proposed to buy unlimited access to BidPrime's website. (Am. Compl., Dkt. 34, at 12-13). Rubenstein has not disputed that he knew BidPrime was a Texas company. (*See* Rubenstein Decl., Dkt. 38, at 27-30). Rubenstein allegedly tried to

---

[1] The same due process analysis applies when intentional torts are involved. *Walden, 571 U.S. at 286*.

register for free trial access to BidPrime's website ("BidPrime.com") using a fake name after his account was shut down. (Am. Compl., Dkt. 34, at 16). He allegedly used his computer to access BidPrime.com without authorization through another user's account. (*Id.* at 20). He allegedly hired a software developer to write a data-scraping program and directed that developer to scrape thousands of bid requests from BidPrime.com. (*Id.* at 17-20). He allegedly attempted to create two more accounts using fake names to access BidPrime.com, once successfully. (*Id.* at 22-23).

These allegations suffice to establish a *prima facie* case for specific jurisdiction in Texas. "Specific jurisdiction applies when a nonresident **[*7]** defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Walk Haydel, 517 F.3d at 243*. Both of those conditions are met here. All of Rubenstein's alleged conduct constitutes purposeful action directed at a company that he knew to be located in Texas, and he does not dispute that the injuries alleged in this case arise out of this conduct. These allegations are not "random, fortuitous, or attenuated" contacts with Texas; they are repeated intentional actions to harvest data from a Texas company. A defendant who repeatedly and purposefully obtains unauthorized access to servers he knows belong to a Texas company can reasonably anticipate being haled into court in Texas.

That Rubenstein scraped data from a BidPrime server sited in Oregon is irrelevant. Courts have repeatedly rejected the argument that a server's physical location is relevant to specific jurisdiction. *See Future World Elecs., LLC v. Results HQ, LLC, No. CV 17-17982, 2018 U.S. Dist. LEXIS 88979, 2018 WL 2416682, at *3 (E.D. La. May 29, 2018)* ("[A] plaintiff may not 'rely on the fortuitous location' of a server to establish personal jurisdiction over a defendant who accessed that server.") (quoting *Chang v. Virgin Mobile USA, LLC, No. 07-1767, 2009 U.S. Dist. LEXIS 3051, 2009 WL 111570, at *3 (N.D. Tex. Jan. 16, 2009)*); **[*8]** *Motio, Inc. v. BSP Software LLC, No. 3:16-CV-00331-O, 2016 U.S. Dist. LEXIS 193379, 2016 WL 9559916, at *6 (N.D. Tex. May 27, 2016)* ("[T]he crucial inquiry is whether Defendants purposefully directed their alleged tortious actions at Texas residents or 'communicated' with Texas, regardless of the server's actual location. . . . Defendants knew that Motio was located in Texas, that in their capacities as BSP principals they would have known that their actions were purposefully directed toward a Texas corporation."); *BGDG Enter., LLC v.*

*Barley & Swine, No. A-13-CA-719-SS, 2014 U.S. Dist. LEXIS 199599, 2014 WL 12479650, at *4 (W.D. Tex. Jan. 23, 2014)* (noting that "courts have rejected the physical location of servers as a basis for personal jurisdiction"). The question is whether Rubenstein's conduct "connects him to the forum in a meaningful way." *Walden, 571 U.S. at 290*. Rubenstein did not direct his conduct at a server in Oregon; he had no idea where BidPrime's servers were located. (Rubenstein Decl., Dkt. 38, at 28 ¶ 9). Construing disputed facts in BidPrime's favor, Rubenstein hacked a Texas company to steal its trade secrets in order to siphon business away from that company. (*See* Am. Compl., Dkt. 34). Just as the fortuitous location of an unknown server cannot create specific jurisdiction in the server's forum state, *Chang, 2009 U.S. Dist. LEXIS 3051, 2009 WL 111570, at *3*, neither should it deny specific jurisdiction over a **[*9]** defendant who purposefully directed his allegedly tortious conduct at a forum resident and knew or should have known that its effects would be felt in the forum state. *See Christie v. Nat'l Inst. for Newman Studies, 258 F. Supp. 3d 494, 506 (D.N.J. 2017)* (rejecting, in a Computer Fraud and Abuse case, the defendant's argument that their conduct targeted California because the plaintiff's emails were stored on servers there, and concluding that "because Defendants deliberately targeted a New Jersey resident—who Defendants knew was in New Jersey when they targeted him—with tortious conduct, Defendants should have reasonably anticipated being haled to court in New Jersey.").

Because BidPrime has established minimum contacts between Rubenstein and Texas, the burden of proof shifts to Rubenstein to show that the assertion of jurisdiction is unfair and unreasonable. *Sangha, 882 F.3d at 102*. In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: "(1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, **[*10]** and (5) the shared interests of the states in furthering fundamental social policies." *Id.* (citing *Burger King, 471 U.S. at 477*). The defendant must make a "compelling case . . . . It is rare to say the assertion is unfair after minimum contacts have been shown." *Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999)* (cleaned up). Even when litigation in the forum would "place a burden on the defendant," the interests of the forum and the plaintiff "justify even large burdens on the defendant" once

minimum contacts are established. *Id.*

Rubenstein argues that defending a suit in Texas would be burdensome and inconvenient because he lives 1,300 miles away from Austin in Boca Raton, Florida, and all of his records related to this action are in Florida. (Mot. Dismiss, Dkt. 38, at 19-20). This interest is insufficient to show that jurisdiction is unfair and unreasonable. *See Wien Air Alaska, 195 F.3d at 216* ("At most [the defendant] demonstrates an inconvenience which would be equally felt by forcing the plaintiff to litigate in Germany."). "Texas has an interest in protecting its residents' property rights and providing a convenient forum for its residents to resolve their disputes." *McFadin, 587 F.3d at 763.* BidPrime has an interest in securing relief quickly, efficiently, and conveniently. *See id.* BidPrime's evidence and **[*11]** witnesses are in Texas. (Resp. Mot. Dismiss, Dkt. 44, at 17). The Court finds "no overwhelming burden to the defendant that outweighs the legitimate interests of the plaintiff and the forum state." *Wien Air Alaska, 195 F.3d at 216.*[2]

### B. Fiduciary Shield

Rubenstein also argues that the fiduciary shield doctrine insulates him from individual liability because BidPrime's complaint only alleges that he acted in his official capacity. (Mot. Dismiss, Dkt. 38, at 11-12). BidPrime responds that the fiduciary shield doctrine does not apply when the officer is sued in his personal capacity or when a corporate officer commits an intentional tort while acting on behalf of the corporation. (Resp. Mot. Dismiss, Dkt. 44, at 10-11). Rubenstein agrees that the doctrine does not shield him from being subject to specific personal jurisdiction for intentional tort claims. (Reply Mot. Dismiss, Dkt. 46, at 3 n.2). Having agreed that the fiduciary shield doctrine applies to BidPrime's intentional tort claims, the parties dispute only whether the doctrine applies to BidPrime's sole remaining claim for breach of contract. (*Id.* at 3-4).

The Court need not resolve that dispute. Assuming *arguendo* that the doctrine does apply to BidPrime's

breach of contract **[*12]** claim, it only "prohibits a court from exercising personal jurisdiction" over Rubenstein. *Fairchild v. Barot, 946 F. Supp. 2d 573, 581 (N.D. Tex. 2013)* (citing *Stuart v. Spademan, 772 F.2d 1185, 1197 (5th Cir. 1985)).* Because the Court possesses personal jurisdiction over BidPrime's intentional tort claims, it can exercise pendent personal jurisdiction over another claim that arises out of the same nucleus of operative facts, even though it lacks an independent basis for personal jurisdiction over that claim. *Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008).* BidPrime alleges that Rubenstein breached BidPrime.com's terms of service by registering for accounts under fake identities and customer accounts. (Am. Compl., Dkt. 34, at 41-43). This claim arises out of the same nucleus of operative facts as BidPrime's intentional tort claims against Rubenstein, which likewise arise out of his alleged attempts to access BidPrime.com without authorization and obtain data. The Court can therefore exercise pendent personal jurisdiction over Rubenstein for the breach of contract claim even if the fiduciary shield doctrine would otherwise deprive the Court of an independent basis for personal jurisdiction over that claim.

### III. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Defendant Jeffrey Rubenstein's ("Rubenstein") Motion to Dismiss, **[*13]** (Dkt. 38), is **DENIED.**

**SIGNED** on October 22, 2018.

/s/ Robert Pitman

ROBERT PITMAN

UNITED STATES DISTRICT JUDGE

---

*End of Document*

---

[2] Rubenstein also argues that it would be unfair to require him to defend this action in Texas because he lacks minimum contacts with Texas. (Mot. Dismiss, Dkt. 38, at 19). This argument misunderstands the burden-shifting analysis. Courts only look at whether jurisdiction would be fair to a defendant if it has already found minimum contacts, **Sangha, 882 F.3d at 102**, as this Court has here.

No *Shepard's* Signal™
As of: October 2, 2023 8:24 PM Z

## *Digitalway Servs., LLC v. Blue Ridge Healthcare*

United States District Court for the Northern District of Texas, Fort Worth Division

May 16, 2023, Decided; May 16, 2023, Filed

No. 4:22-CV-0602-P

**Reporter**
2023 U.S. Dist. LEXIS 85203 *; 2023 WL 3480904

DIGITALWAY SERVICES, LLC, Plaintiff, v. BLUE RIDGE HEALTHCARE ET AL., Defendants.

# Core Terms

personal jurisdiction, forum state, contacts, resident, minimum contact

**Counsel:  [*1]** For Digitalway Services, LLC, Plaintiff: James N Floyd, LEAD ATTORNEY, The Floyd Firm, Fort Worth, TX.

For Blue Ridge Healthcare, doing business as, Blue Ridge Healthcare, doing business as, Blue Ridge Healthcare, doing business as, Blue Ridge Healthcare, doing business as, Blue Ridge Healthcare, doing business as, Blue Ridge Healthcare Willow Trace LLC nka 1406 East LLC, Blue Ridge Healthcare, doing business as, Defendants: Daniel D. McGuire, LEAD ATTORNEY, FisherBroyles LLP, Coppell, TX.

**Judges:** Mark T. Pittman, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Mark T. Pittman

# Opinion

### OPINION & ORDER

Before the Court is Defendants' Motion to Dismiss. ECF No. 13. The Court hereby **TRANSFERS** this case to the Southern District of Alabama for the following reasons.

### FACTUAL & PROCEDURAL BACKGROUND

This case involves a contractual dispute between Plaintiff—a satellite television service provider—and Defendants Blue Ridge Healthcare—a Delaware LLC

who purchased senior living facilities in Alabama. Plaintiff alleges that Defendants breached a five-year contract made in 2019. Defendant alleges that they were not a party to the contract and only purchased assets belonging to the actual parties to the contract. Defendants only alleged **[*2]** actions involving Texas come through a Texas choice-of-law clause in the contract and its communications, negotiations, and payments to Plaintiff.

Defendants moved to dismiss under *Rule 12(b)(6)* for failure to state a claim and under *Rule 12(b)(2)* for lack of personal jurisdiction. The facts and contentions argued under *rule 12(b)(6)* are immaterial to this motion as—even construing all disputed facts favorably to Plaintiff—this Court does not have personal jurisdiction over Defendants. The Court thus addresses personal jurisdiction alone.

### LEGAL STANDARD

The plaintiff bears the burden of establishing jurisdiction but must present "only prima facie evidence." *Luv N' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006)*. In determining whether a plaintiff has met its burden, district courts must "accept the plaintiff's uncontroverted allegations as true and resolve all conflicts of jurisdictional facts contained in the parties' affidavits and other documentation in the plaintiff's favor." *Jones v. Artists Rts. Enf't Corp., 789 F. App'x 423, 425 (5th Cir. 2019)*.

### ANALYSIS

#### A. Personal Jurisdiction

District courts may exercise personal jurisdiction over nonresident defendants if two conditions are met: (1) if the forum state's long-arm statute confers personal

jurisdiction over that defendant; and (2) if the exercise of personal jurisdiction satisfies the *Due Process Clause of the Fourteenth Amendment*. *See [\*3] Freudensprung v. Offshore Tech. Servs., Inc., 379 F.3d 327, 343 (5th Cir. 2004)*. And because the Texas long-arm statute extends to the limits of federal due process, the two-step process "collapses into one federal due process analysis." *Sangha v. Navig8 Ship Mgmt. Priv. Ltd., 882 F.3d 96, 101 (5th Cir. 2018)*.

A court may assert specific jurisdiction[1] over a nonresident defendant "whose contacts with the forum state are singular or sporadic only *if the cause of action asserted arises out of or is related to those contacts.*" *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd., 818 F.3d 193, 212 (5th Cir. 2016)* (citing *Daimler AG v. Bauman, 571 U.S. 117, 126, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)*). When a plaintiff asserts specific jurisdiction, a court must determine: (1) whether "the defendant purposefully directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there"; and (2) whether "the controversy arises out of or is related to the defendant's conduct with the forum state." *Freudensprung, 379 F.3d at 343*. When a plaintiff successfully satisfies these two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*.

As to the first prong, contacts that are "random, fortuitous, or attenuated" do not satisfy the minimum contacts requirement. *Moncrief Oil Int'l. Inc. v. OAO Gazprom, 481 F.3d 309, 312 (5th Cir. 2007)*. But a single act by the defendant directed at the forum state can confer personal jurisdiction if the single act gives rise to the claim being asserted. [\*4] *See Ruston Gas Turbines, Inc. v. Donaldson Co., 9 F.3d 415, 418 (5th Cir. 1993)*. The required analysis must "look to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore, 571 U.S. 277, 285, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*. Put simply, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is a defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.*

---

[1] Neither party asserts that Digitalway is subject to general jurisdiction. Thus, the Court only addresses whether specific jurisdiction exists.

A mere contract with a resident of the forum state is not enough on its own, and thus courts must also look to the context and activity surrounding a contract. *See Stuart v. Spademan, 772 F.2d 1185, 1193 (5th Cir. 1985)*. The context and activity surrounding the contract must be substantial enough to avail a defendant of the privilege of doing business in Texas. *See id.* This generally requires more than the mere remittance of payments or interstate communications with a forum plaintiff. *See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1986)* (finding no jurisdiction where the defendant entered a contract with a Texas resident, sent an agreement and multiple checks to Texas, and engaged in extensive telephonic and written communication with the plaintiff).

In *Stuart v. Spademan*, the Fifth Circuit held that a non-forum defendant's contractual contacts with a Texas plaintiff could not meet minimum contacts. *772 F.2d 1185, 1192-94 (5th Cir. 1985)*. The court [\*5] stated that "[t]he random use of interstate commerce to negotiate and close a particular contract, the isolated shipment of goods to the forum at the instigation of the resident plaintiffs, and the mailing of payments to the forum do not constitute the minimum contacts necessary to constitutionally exercise jurisdiction." *Id.*

Like the plaintiff in *Stuart*, Plaintiff's assertion rests almost entirely on the random use of interstate commerce to execute a contract, various payments, and sporadic communications. The context and activity surrounding this contractual relationship hardly avails itself of any of the privileges of Texas outside of its airwaves and electronic banking infrastructure. The only distinguishing factor between these two cases is the Texas choice of law clause, which has little impact by itself. *See Hydrokinetics, Inc. v. Alaska Mech., Inc., 700 F.2d 1026, 1029 (5th Cir. 1983)*; *see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (discussing the minor relevance of the choice of law provisions to minimum contacts analysis). Even with the choice of law clause, minimum contacts are not present. *See Stuart, 772 F.2d at 1192-94* (finding no indication that the nonresident defendant intended to avail himself of the privilege of doing business in Texas and hence no specific jurisdiction where nonresident defendant contracted [\*6] with Texas residents, directed letters and phone calls to Texas, shipped prototypes and products to Texas, negotiated a contract with plaintiffs that was to be governed by Texas law, and marketed his product in Texas).

2023 U.S. Dist. LEXIS 85203, *6

Because Plaintiff fails on the first prong, an analysis of the other elements and fairness is unnecessary. The Court thus lacks personal jurisdiction over Defendants.

### B. *28 U.S.C § 1631* - Transfer

Because personal jurisdiction is not present, the Court must determine whether the case should be dismissed or transferred to a district where jurisdiction is proper. *See 28 U.S.C § 1631.* In 1982, Congress passed a statute explicitly authorizing district courts to transfer a case when it "finds that there is a want of [personal] jurisdiction . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed." *Id.*; *Franco v. Mabe Trucking Co., Inc., 3 F.4th 788, 795 (5th Cir. 2021)* ("[W]e join the weight of circuit authority and conclude that the use of the term "jurisdiction" in *§ 1631* encompasses . . . personal jurisdiction.").

"A case is 'transferable' [under *§ 1631*] when three conditions are met: (1) the transferee court would have been able to exercise its jurisdiction on the date the action was misfiled; (2) the transferor **[*7]** court lacks jurisdiction; and (3) the transfer serves the interest of justice." *Harutyunyan v. Love, No. CV 19-41, 2019 U.S. Dist. LEXIS 186104, 2019 WL 5551901, at *4 (E.D. La. Oct. 28, 2019)*

*First*, venue is proper in any judicial district in which any "defendant resides" or where "a substantial part of the events or omissions giving rise to the claim occurred." *28 U.S.C. § 1391(a)(1-2).* Based on the complaint and facts before the Court, the Southern District of Alabama is the appropriate venue for this case. Personal jurisdiction is also appropriate here as most of the business contacts and property is in the state of Alabama. *Second*, as discussed above, this Court lacks personal jurisdiction over Defendants. *Third*, a transfer is necessary here as it would cut the time and expense expended by the parties in continuing this case. Rather than refiling and reserving Defendants—which was a difficulty to begin with—this case can continue in its current posture. These factors, among others—that serve judicial economy and the cost of the suit to both parties—are in the interest of justice.

Transfer is thus necessary.

### CONCLUSION

For the above reasons, the Court **TRANSFERS** this case to the Southern District of Alabama.

**SO ORDERED** on this **16th day of May 2023**.

/s/ Mark T. Pittman

Mark T. Pittman

UNITED STATES DISTRICT JUDGE

---

*End of Document*

 Neutral
As of: October 2, 2023 8:24 PM Z

# *Elevacity U.S., LLC v. Schweda*

United States District Court for the Eastern District of Texas, Sherman Division

August 26, 2022, Decided; August 26, 2022, Filed

Civil Action No. 4:22-CV-00042

**Reporter**
2022 U.S. Dist. LEXIS 154111 *; 2022 WL 3704537

ELEVACITY U.S., LLC d/b/a THE HAPPY CO. f/k/a ELEPENEURS U.S., LLC d/b/a ELEPRENEURS, LLC, Plaintiff, v. BRIAN CHRISTOPHER SCHWEDA, JR., Defendant

**Prior History:** *Elevacity U.S., LLC v. Schweda, 2022 U.S. Dist. LEXIS 115187, 2022 WL 2345741 (E.D. Tex., June 29, 2022)*

## Core Terms

personal jurisdiction, distributors, residents, posts, purposefully, minimum contact, Freight, pendent, forum state, tortious interference, breach of contract claim, targeted, contracts, contacts, availed, asserts, entity, Lines, intentional torts, tortious, website, operative fact, products, nucleus, parties, courts, Brand, solicit, cause of action, connections

**Counsel:** **[*1]** For Elevacity U.S., LLC, doing business as The Happy Co., formerly known as Elepreneurs U.S., LLC, doing business as Elepreneurs, LLC, Plaintiff: Janet Douvas Chafin, LEAD ATTORNEY, Jackson Walker LLP - Houston, Houston, TX; Blake Thomas Dietrich, Jackson Walker LLP - Dallas, Dallas, TX; Michael Curtis Roberts, Jackson Walker LLP - Austin, Austin, TX.

For Brian Christopher Schweda, Jr., Defendant: Chris Wellman, Scott W Wellman, Wellman and Warren, LLP, Laguna Hills, CA; Kristin Anne Regel, Regel PLLC, Dallas, TX.

**Judges:** AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** AMOS L. MAZZANT

## Opinion

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's *12(b)(2)* Motion to Dismiss (Dkt. #6). Having considered the motion and the relevant pleadings, the Court finds that the motion should be **DENIED**.

### BACKGROUND

This case arises out of the business relationship between Plaintiff Elevacity U.S., LLC d/b/a The Happy Co., f/k/a Elepreneurs U.S., LLC d/b/a Elepreneurs, LLC ("Elevacity") and Defendant Brian Christopher Schweda, Jr. ("Schweda"). Elevacity is a Texas limited liability company with its principal office in Plano, Collin County, Texas (Dkt. #1 ¶ 2). Elevacity sells and markets "various health, wellness and **[*2]** happiness products and services through a direct sales community of independent contractors[,]" also known as distributors or brand partners (Dkt. #1 ¶ 8). Elevacity's distributors market and sell the company's products and "recruit additional individuals into the Elevacity Distributor system to further promote and sell products and services to" potential customers (Dkt. #1 ¶ 9). Schweda is a Louisiana resident who is a former Elevacity distributor.

### I. Schweda Joins Elevacity and Agrees to Elevacity's Agreements

In 2017, Schweda joined Elevacity's business as a distributor (Dkt. #1 at p. 4). On October 4, 2018, Schweda agreed to and accepted three essential documents (pursuant to an electronic verification system process) governing his work with Elevacity: (i) the Elepreneur Agreement; (ii) the Policies and Procedures of Eleprenuers LLC, and (iii) the Eleprenuers Social Media and Online Policy Guide (collectively the "Prior

Agreements") (Dkt. #1 ¶ 13). To accept and agree to the Prior Agreements, distributors, including Schweda, underwent the following standard process: (i) logging in to the Elevacity computer system to access the distributor's "Back-Office"[1]; (ii) reading the Prior Agreements; **[*3]** and (iii) manually agreeing to the Prior Agreements by clicking the mouse to place a check-mark in a box accepting all of the terms and conditions of the Prior Agreements (Dkt. #1 ¶ 14). If a distributor did not complete this process, that distributor would not be able to proceed to access their Back-Office (Dkt. #1 ¶ 14).

### A. The Prior Agreements Are Amended

The Policies and Procedures of Elepreneurs, LLC stated that "Amendments and changes will be communicated to Elepreneurs through official Company publications, including posting on the website or by electronic mail. Amendments are effective and binding on all Elepreneurs five days after publication" (Dkt. #1, Exhibit 2 at p. 36). According to Elevacity, it "considered 'posting on 'the website or by electronic mail'' to include posting to a distributor's Back-Office" (Dkt. #1 ¶ 15). In 2021, Elevacity posted its Independent Brand Partner Agreement and Policies and Procedures (collectively, the "Amended Agreements") to its distributors' Back-Offices (Dkt. #1 ¶ 17). However, according to Schweda, the Amended Agreements were placed in a remote section of Back-Office and nothing in Back-Office informed distributors that the agreements **[*4]** were amended (Dkt. #6, Exhibit 1 ¶¶ 18-19). Further, according to Schweda, Elevacity never "communicated" to him that the Prior Agreements were revised (Dkt. #6, Exhibit 1 ¶ 8). For instance, Elevacity never sent him an email, alert, or any other type of notification that informed him that the documents had been amended (Dkt. #6, Exhibit 1 ¶ 8).

The Amended Agreements contain various provisions stating that Elevacity's distributors (i) cannot solicit other distributors to leave Elevacity or otherwise terminate their relationship with Elevacity, (ii) use a social media site to draw inquiries from other distributors about a new network marketing company, or (iii) disparage Elevacity by making negative comments (Dkt. #1 ¶ 19). For example, under Section 12 of the Independent Brand Partner Agreement, distributors are prohibited,

---

[1] At Elevacity, Back-Office is the primary portal for distributors to order more product and keep track of sales figures (Dkt. #1 ¶ 14).

they are distributors for Elevacity and for twelve months afterward, from recruiting any other Elevacity distributor for any other direct selling or network marketing business (Dkt. #1, Exhibit 5 ¶ 12). Under the Agreement, "recruiting" includes: (i) "communicating information or offering to provide information about another direct selling, network marketing, **[*5]** or social selling business" to another Elevacity distributor; (ii) "posting or messaging information" about such a company on a social media site the distributor has also used to promote their Elevacity business; (iii) or "tagging" other Elevacity distributors in such posts (Dkt. #1, Exhibit 5 ¶ 12). Additionally, during this same term, distributors may not use such social media accounts in any way that may "reasonably be foreseen" to draw inquiries from other Elevacity distributors to other direct selling or network marketing businesses or products (Dkt. #1, Exhibit 5 ¶ 12).

Further, the Independent Brand Partner Agreement, like the Prior Agreements, references Texas in several provisions. For example, Section 16 of the Independent Brand Partner Agreement provides:

> This Agreement shall be governed by the laws of the State of Texas without reference to its conflict of laws rules. Except as set forth in the P&P, all claims and disputes relating to this Agreement, the rights and obligations of the parties, or any other claims or causes of actions relating to the performance of either party under this Agreement and/or Brand Partner's purchase of products shall be settled totally and finally **[*6]** by arbitration in Collin County, Texas, in accordance with the *Federal Arbitration Act* and the Commercial Rules of the American Arbitration Provision

(Dkt. #1, Exhibit 5 ¶ 16). Further, the notice provision in Section 18 ties the definition of "business day" to a legal holiday in the State of Texas (Dkt. #1, Exhibit 5 ¶ 16).

### B. Schweda's Work with Elevacity and Subsequent Resignation from the Company

After enrolling as a distributor for Elevacity, Schweda operated his distributorship in Louisiana (Dkt. #6, Exhibit 1 at p. 2). Schweda allegedly used his Facebook page to conduct his business—both marketing Elevacity products and recruiting additional distributors through the platform (Dkt. #1 ¶ 18). Further, as part of his work, Schweda recruited a significant number of individuals into the Elevacity distributor system to work in his "down-line" and grew that "down-line" (Dkt. #13 at p. 5).

The two biggest distributors in Schweda's "down-line" are Texas residents, Ricky Durant ("Durant") and Ian Prather ("Prather") (Dkt. #13 at p. 5). However, according to Schweda, he did not direct his marketing efforts to Texas residents or solicit Texas residents to join Elevacity (Dkt. #6, Exhibit 1 at p. 2).[2]

Schweda operated **[*7]** his distributorship with Elevacity until December 17, 2021, the date on which he resigned (Dkt. #1 ¶ 20). Following Schweda's resignation, Schweda allegedly began marketing and promoting different products, including an "energizing" coffee product, on social media (Dkt. #1 ¶ 21). More specifically, Elevacity alleges that Schweda made a variety of Facebook posts, which were aimed at promoting his new marketing venture (Dkt. #1 ¶ 27). Further, according to Elevacity, former Elevacity distributors—some of which are Texas residents—commented on the posts and joined Schweda's new venture (Dkt. #1 ¶¶ 22-27). However, according to Schweda, his Facebook page is accessible to all persons who have Facebook, and the posts were not directly sent to any Texas residents (Dkt. #6, Exhibit 1 ¶¶ 12-13).

On January 20, 2022, Elevacity filed suit against Schweda, asserting claims for breach of contract and tortious interference with existing contracts (Dkt. #1). On February 23, 2022, Schweda filed a *Rule 12(b)(2)* motion to dismiss for lack of personal jurisdiction (Dkt. #6). On March 29, 2022, Elevacity filed a response to the motion to dismiss, requesting jurisdictional discovery in the event there is any doubt as **[*8]** to jurisdiction over Schweda (Dkt. #13). On April 5, 2022, Schweda filed a reply (Dkt. #15). On April 13, 2022, Elevacity filed a sur-reply (Dkt. #19). On June 29, 2022, the Court granted Elevacity's request for jurisdictional discovery

_____

[2] According to Elevacity, however, Schweda personally recruited Durant as a distributor (Dkt. #13 at p. 5). To support this proposition, Elevacity provides a declaration from David Litt ("Litt"), the Vice President of Digital Strategy for Elevacity (Dkt. #13, Exhibit B). According to Litt, "Mr. Schweda recruited Ricky Durant to become one of Mr. Schweda's down-line Distributors from whom Mr. Schweda would receive compensation from sales made by Ricky Durant" (Dkt. #13, Exhibit B ¶ 6). In response, Schweda argues that Litt's declaration is "[f]alse" and "relies on inadmissible hearsay which lacks any foundation whatsoever" (Dkt. #15 at p. 7). More specifically, Schweda contends that "Litt provides absolutely no foundation explaining how he knows Mr. Schweda 'recruited' Mr. Durant, " and, thus, "the evidence regarding Mr. Durant is inadmissible, inaccurate, and should be ignored" (Dkt. #15 at pp. 7-8).

(Dkt. #23). On August 12, 2022, after conducting jurisdictional discovery, Elevacity filed a supplemental jurisdictional brief (Dkt. #24). On August 16, 2022, Schweda responded to Elevacity's jurisdictional brief (Dkt. #25).

## LEGAL STANDARD

*Federal Rule of Civil Procedure 12(b)(2)* requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant. *FED. R. CIV. P. 12(b)(2)*. After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990)* (citing *WNS, Inc. v. Farrow, 884 F.2d 200, 202 (5th Cir. 1989)*).

To satisfy that burden, the party seeking to invoke the court's jurisdiction must "present sufficient facts as to make out only a *prima facie* case supporting jurisdiction," if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 215 (5th Cir. 2000)*. When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003)* (citing *Wyatt v. Kaplan, 686 F.2d 276, 282-83 n.13 (5th Cir. 1982)*); *accord Black v. Acme Mkts., Inc., 564 F.2d 681, 683 n.3 (5th Cir. 1977)* **[*9]** . Further, "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1067 (5th Cir. 1992)*). However, if a court holds an evidentiary hearing, a plaintiff "must establish jurisdiction by a preponderance of the admissible evidence." *In re Chinese Manufactured Drywall Prods. Liab. Lit., 742 F.3d 576, 585 (5th Cir. 2014)* (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 241-42 (5th Cir. 2008)*).

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cienega Music Co., 4 F.3d 413, 415 (5th Cir. 1993)*. First, absent a controlling federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* And second, the court

establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution.

The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc., 963 F.2d 90, 93 (5th Cir. 1992)*. Therefore, the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion, 895 F.2d at 216*. The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. Minimum contacts with a forum state can be satisfied by contacts **[*10]** that give rise to either general jurisdiction or specific jurisdiction. *Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994)*.

## ANALYSIS

Schweda asserts that the Court should dismiss Elevacity's claims under *Federal Rule of Civil Procedure 12(b)(2)* because he is not subject to personal jurisdiction in Texas (Dkt. #6). In response, Elevacity concedes that the Court lacks general jurisdiction as to Schweda (Dkt. #13 at p. 7 n.2). The Court agrees. Therefore, the Court will only address whether it has specific jurisdiction over Schweda.

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros Nacionales de Colum., S.A. v. Hall, 466 U.S. 408, 414 n.8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. For the court to exercise specific jurisdiction, the court must determine "(1) whether the defendant has . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310 F.3d 374, 378 (5th Cir. 2002)* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*). "Because 'specific personal jurisdiction is a claim-specific inquiry,' '[a] plaintiff bringing multiple claims that arise out of different

forum **[*11]** contacts of the defendant must establish specific jurisdiction for each claim.'" *Inmar Rx Sols., Inc. v. Devos, Ltd., 786 Fed. Appx. 445, 2019 WL 4440400, at *3 (5th Cir. 2019)* (quoting *McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009)*).

Defendants who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King, 471 U.S. at 475* (citing *Travelers Health Assoc. v. Va., 339 U.S. 643, 647, 70 S. Ct. 927, 94 L. Ed. 1154 (1950)*). Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.*

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 271 (5th Cir. 2006)*. In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King, 471 U.S. at 477*. "It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *McFadin, 587 F.3d at 760 (5th Cir. 2009)* (quoting *Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999)*).

 **[*12]** Here, Elevacity has asserted both a breach of contract and tortious interference claim against Schweda (Dkt. #1). Both causes of action arise from the same or similar alleged facts: Schweda became an Elevacity distributor while knowing the company was a Texas entity, allegedly entered into to the Amended Agreements, and then allegedly violated them by posting impermissible content on Facebook. Nevertheless, the Court analyzes the breach of contract and tort claims separately because the minimum-contacts test differs[3] for the claims, and both parties

---

[3] For example, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden v. Fiore, 571 U.S. 277, 286, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*. Thus,

considered each separately. *See Trois v. Apple Tree Auction Center, Inc., 882 F.3d 485, 490 (5th Cir. 2018)* ("Importantly, the minimum-contacts test for personal jurisdiction in fraud differs from that in contract."); *see also Danziger, 24 F. 4th at 495-500 (5th Cir. 2022)* (analyzing personal jurisdiction for intentional tort claims and breach of contract claims separately).

## I. Tortious Interference with Existing Contracts

Elevacity asserts a tortious interference claim against Schweda, alleging that Schweda willfully and intentionally interfered with Elevacity's contracts with its distributors by soliciting them to work for his competing company (Dkt. #1). In support of its tortious interference claim, Elevacity alleges that Schweda posted about a competing business on his Facebook page and then some of Elevacity's distributors responded to the posts (Dkt. #1). More specifically, according to Elevacity, Schweda "tortiously interfered **[*13]** with contracts that [he] knew or should have known involved substantial Texas connections and that would cause injury in Texas" (Dkt. #13 at p. 12).

Thus, Elevacity argues that the Court has personal jurisdiction over Schweda for its tortious interference claim "[b]ecause [Schweda]'s tortious conduct was directed toward Texas and caused significant harm in Texas" (Dkt. #13 at p. 11). Further, Elevacity points out that Schweda's two biggest down-line distributors live in Texas and that Schweda earned almost $500,000 based on their sales efforts in 2020 and 2021, which indicate both that Schweda "should have know[n] the effect his actions would have in Texas" and "the extent to which [Schweda]'s actions can have an effect on [Elevacity]'s business in Texas" (Dkt. #13 at p. 13). Additionally, according to Elevacity, even "[m]ore telling

---

"[t]he proper focus of the 'minimum contacts' inquiry in intentional-tort cases is the relationship among the defendant, the forum, and the litigation." *Id. at 291* (citing *Calder v. Jones, 465 U.S. 783, 788, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*). By contrast, "[w]hen determining whether a court has personal jurisdiction over a breach of contract claim, 'only those acts which relate to the formation of the contract and the subsequent breach are relevant,' including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C., 24 F. 4th 491, 500 (5th Cir. 2022)* (citing *Trois, 882 F.3d at 489*). Thus, because the minimum contacts test for tort cases and breach of contract cases has different considerations, the contacts examined in each will invariably be different.

is that Schweda's "Facebook postings . . . were seen by Texas distributors" (Dkt. #13 at p. 13). In response, Schweda contends that his Facebook posts are insufficient to establish the required contacts for Elevacity's tort claim because (i) the posts were made on a public webpage accessible to anyone who has a Facebook page, not just Texas residents; **[*14]** (ii) Schweda did not place limitations on the posts so they could only be viewed by Texas residents; (iii) there is no evidence of targeted advertising on Schweda's Facebook page to Texas residents; (iv) the posts mention nothing about Texas residents; and (v) the posts were not sent through private messaging to Texas residents (Dkt. #6 at pp. 6-7).

The Fifth Circuit has repeatedly held that "mere allegations of tortious interference with a forum resident's contractual rights are not sufficient to establish specific personal jurisdiction." *Cent. Freight Lines v. APA Transp. Corp., 322 F.3d 376, 383 (5th Cir. 2003)*. Further, in intentional tort cases, "it is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff." *Danziger, 24 F. 4th at 495* (internal quotations omitted). Instead, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden, 571 U.S. at 286* (citation omitted). Thus, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Danziger, 24 F. 4th at 497*.

To support their respective arguments, Elevacity **[*15]** and Schweda rely on factually different Fifth Circuit cases. On the one hand, Elevacity contends this case is similar to *Central Freight Lines*, a case that involved a New Jersey-based freight carrier's alleged interference with a contract between the plaintiff, a Texas-based freight carrier, and Dell Computers, a Texas-based computer manufacturer. *See 322 F.3d at 384*. In holding the New Jersey-based freight carrier was subject to personal jurisdiction in Texas, the Fifth Circuit emphasized that the New Jersey-based carrier knew about the plaintiff's relationship with Dell, another Texas entity, and that the defendant "intentionally attempted to interfere with that relationship by holding Dell freight hostage . . . and manipulating the price of freight delivery in the northeast." *Id.* Thus, the Fifth Circuit found that the plaintiff had pleaded facts that were sufficient to show that the defendant committed intentional torts that were purposefully directed at

plaintiff's contractual relationship with another Texas entity. _Id. at 383-84_. Further, according to the Fifth Circuit, because Texas was both the plaintiff's "home state" and the "primary location" of the business dealings of the two Texas-based companies, **[*16]** it was not a "mere fortuity" that the plaintiff suffered injury in Texas. _Id. at 384_. Consequently, Elevacity asserts this case is like _Central Freight Lines_ because it "alleges that [Schweda] tortiously interfered with contracts that it knew or should have known involved substantial Texas connections and that would cause injury in Texas" (Dkt. #13 at p. 12).

By contrast, Schweda argues that _Admar International Inc. v. Eastock, L.L.C., 18 F.4th 783 (5th Cir. 2021)_, applies here. In _Admar_, the Fifth Circuit held that the mere fact that Louisiana residents could access a defendant's website in Louisiana was insufficient to create minimum contacts necessary for personal jurisdiction. _18 F.4th at 787_. More specifically, in the case, plaintiffs, companies in the baby products business, brought an action in Louisiana against a Wisconsin-based competitor, alleging that the defendant committed copyright and trade dress infringement by displaying copies of plaintiffs' products on its website. _Id. at 785_. Though the accused products were available on defendant's website, the Fifth Circuit found it significant that there was no "evidence that [defendant]'s website specifically target[ed] Louisiana"—defendant "ha[d] not sold a single accused product to a Louisiana resident, and it [had] solicite[d] no business **[*17]** there through targeted advertising." _Id. at 787_. Thus, relying on _Admar_, Schweda asserts that "[a]lthough [his] public Facebook website was accessible to the world, including persons [that] lived in Texas, that is not enough to establish jurisdiction" (Dkt. #15 at p. 6). Instead, according to Schweda, Elevacity "must show Schweda actually 'targeted' persons residing in Texas through his Facebook website" (Dkt. #15 at p. 6).

Because Elevacity's tortious interference claim is based on Schweda's Facebook posts, it is arguable that _Admar_—which dealt with Internet-based contacts—is closer to the facts at hand. That said, _Central Freight Lines_ involved a tortious interference claim—the specific claim at issue here. While on the one hand, _Central Freight Lines_ involves traditional contacts and arguably supports a finding of personal jurisdiction here, on the other hand, _Admar_ involves Internet contacts and supports a lack of personal jurisdiction. Nevertheless, the cases can be harmonized.

In both _Central Freight Lines_ and _Admar_, the Fifth

Circuit, as with other intentional tort cases, focused its inquiry on whether the plaintiff had pleaded facts that showed the defendant had purposefully directed its intentionally tortious **[*18]** conduct toward the forum state. _Cf. Central Freight Lines, 322 F.3d at 383-84_ ("[W]e find that [plaintiff] has pled facts that are sufficient to show [defendant] committed intentional torts that were purposefully directed at [plaintiff's] contractual business relationship with another Texas entity."), _with Admar, 18 F.4th at 787_ ("Missing here is any evidence that [defendant]'s website specifically targets Louisiana."). For example, in _Central Freight Lines_, plaintiff alleged the defendant knew of Texas-based plaintiff's contractual relationship with Dell, another Texas-based entity, and that defendant took specific action to interfere with it by holding Dell's freight hostage. _322 F.3d at 383_. Thus, defendant's tortious conduct—though entailing the holding of freight hostage located in New Jersey—was purposefully directed toward Texas because it was specifically aimed at interfering with the contractual relationship of two Texas-based companies whose business dealings were based in Texas. _Id. at 384_. Similarly, in _Admar_, the Fifth Circuit found that the defendant did not have minimum contacts with Louisiana because there was no evidence that the defendant targeted the forum state by purposefully availing itself of the opportunity to do business in that state. _18 F.4th at 787_. Thus, the **[*19]** key is whether Schweda targeted Texas.

Accordingly, equipped with the proper focus, it becomes clearer that Schweda's comparison of the case at hand to _Admar_ is more fitting than Elevacity's comparison to _Central Freight Lines_. Indeed, though Elevacity contends this case is like _Central Freight Lines_ because it "alleges that [Schweda] tortiously interfered with contracts that it knew or should have known involved substantial Texas connections and that would cause injury in Texas," (Dkt. #13 at p. 12), missing from Elevacity's argument is how or in what way Schweda purposefully directed his allegedly intentionally tortious conduct toward Texas. To be sure, while the Fifth Circuit in _Central Freight Lines_ held that the defendant's awareness of a Texas-based plaintiff's contractual relationship with another Texas-based entity, combined with the defendant's later tortious actions directed at that other Texas-based entity, indicated that the defendant's intentional torts were purposefully directed at Texas, the same cannot be said here. Here, Elevacity has failed to show how Schweda's tortious actions were purposefully directed at Texas.

Indeed, though Schweda's Facebook posts are the

basis for **[*20]** Elevacity's tortious interference claim against Schweda, the posts are not connected to Texas in any way. Schweda made the posts on a public webpage that is accessible to all persons who have Facebook—not just Texas residents. Likewise, the posts were never sent directly to any Texas residents through private messaging. Further, the posts mention nothing about Texas residents or even anything Texas-related. And Schweda does no targeted advertising on his Facebook page to Texas residents. Thus, like *Admar*, "missing here is any evidence that [Schweda]'s [Facebook] web[page] specifically target[ed] [Texas]." *18 F. 4th at 787*. Further, unlike *Central Freight Lines*, where the facts showed that the defendant had allegedly committed intentional torts that were purposefully directed at plaintiff's business relationship with another Texas entity, here, Schweda's posts—the basis of the alleged torts—were not purposefully directed at any Texas residents. Indeed, the posts were accessible to all people who have Facebook—they were not sent directly to any Texas residents through private messaging. Thus, because Schweda's allegedly tortious conduct did not target Texas, the Court lacks personal jurisdiction.

Nevertheless, **[*21]** Elevacity attempts to distinguish *Admar*, arguing that the facts here are dissimilar. In doing so, Elevacity relies on a quoted passage from *Admar*, which states:

> [A] defendant does not have sufficient minimum contacts with a forum state just because its website is accessible there. The defendant must also target the forum state by purposefully availing itself of the opportunity to do business in that state. And here, there is no evidence that [defendant] targets Louisiana: [Defendant] has not sold a single accused product to a Louisiana resident, and it solicits no business there through targeted advertising.

*18 F. 4th at 787*. Thus, according to Elevacity, this case is different from *Admar* because, unlike the defendant in *Admar*, "given the magnitude of Texas business in [Schweda]'s down-line, [Schweda] cannot credibly claim he has not purposefully availed himself of the opportunity to do business in Texas" (Dkt. #19 at p. 5). However, Schweda disagrees. He states that he has "not solicit[ed] Texas residents to join [Elevacity]," and, therefore, "it cannot be said that [he] purposefully directed his activities to Texas residents" (Dkt. #6, Exhibit 1 ¶ 6; Dkt. #15 at p. 8).

Here, the Court finds Elevacity's argument

unavailing. **[*22]** Importantly, for specific jurisdiction, courts "look only to the contact out of which the cause of action arises . . . ." *Revell v. Lidov, 317 F.3d 467, 472 (5th Cir. 2002)*; *see also Bristol-Myers Squibb Company v. Superior Court of California, 137 S. Ct. 1773, 1781, 198 L. Ed. 2d 395 (2017)* ("[F]or a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy . . . When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.") (cleaned up). And, here, Elevacity's tortious interference claim does not arise from Schweda's contact with Durant or Prather. Indeed, these individuals do not provide a connection between Schweda, Texas, and the underlying controversy, and Elevacity has otherwise failed to allege or show that Schweda's alleged tortious conduct meaningfully connects him to Texas. *Cf. Danziger, 24 F. 4th at 498* ("And because none of [defendant]'s allegedly tortious conduct meaningfully connects it to Texas, Texas courts do not have jurisdiction over [plaintiff]'s intentional tort claims."). Accordingly, the Court finds that personal jurisdiction is lacking over Elevacity's intentional tort claim.

Nevertheless, because Elevacity also asserts a breach of contract claim against Schweda, the Court turns to examine **[*23]** whether it has personal jurisdiction over this claim. *See Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274 (5th Cir. 2006)*.

## II. Breach of Contract

Elevacity also brings a breach of contract claim against Schweda, asserting that it has made a *prima facie* showing that Schweda purposefully availed himself of Texas in connection with its breach of contract claim (Dkt. #13). More specifically, Elevacity contends Schweda purposefully availed himself of the benefits of conducting business in Texas because he "knowingly associated with a Texas entity, initiated the relationship,[4] entered into another agreement with that Texas entity, and visited Texas at least quarterly to attend events in Texas related to his work with Plaintiff"

---

[4] Schweda disputes this fact, asserting that "the evidence shows the opposite" (Dkt. #25 at p. 3). Nonetheless, when evaluating a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, all conflicts of fact between the parties' affidavits and other evidence must be resolved in the plaintiff's favor. *Cent. Freight Lines., 322 F.3d at 380*.

(Dkt. #24 at p. 1). Further, Elevacity points specifically to the Amended Agreements' Texas choice of law and arbitration provisions, which "mak[e] clear that any dispute would be governed by Texas law and decided in Texas" (Dkt. #19 at p. 3). In response, Schweda asserts that he does not have does not have the required minimum contacts in Texas because (i) the Amended Agreements were unilaterally imposed on him; (ii) the Amended Agreements do not mention anywhere that services will be rendered in Texas and, in fact, Schweda performed [*24] his services in Louisiana; and (iii) all the commissions that Schweda received under the Amended Agreements were sent to Louisiana where he resides (Dkt. #6 at pp. 5-6).[5]

In the context of business relationships, it is "well settled that 'an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum.'" *Pervasive Software, Inc. v. Lexware GmbH & Co. KG, 688 F.3d 214, 222-23 (5th Cir. 2012)* (alteration in original) (quoting *Burger King, 471 U.S. at 478*). Rather, "[a] 'highly realistic' approach is called for, recognizing that a contract is ordinarily but an intermediate step serving to tie up prior negotiations and future consequences which themselves are the real object of the business transaction." *Electrosource, Inc. v. Horizon Battery Techs., Ltd. 176 F.3d 867, 872 (5th Cir. 1999)*. Thus, when determining whether exercising personal jurisdiction over a breach of contract claim is proper, courts consider the "acts which relate to the formation of the contract and the subsequent breach," including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Trois, 882 F.3d at*

---

[5] Schweda also asserts that the Amended Agreements are invalid because Elevacity did not comply with the amendment procedure in the Prior Agreements—namely, Elevacity did not "communicate[]" the Amended Agreements to him "through an 'official Company publication' that would have given Schweda notice of the contracts' '[a]mendments and changes . . . .'" (Dkt. #15 at pp. 1-2). In response, Elevacity asserts that it "complied with the Prior Agreements' amendment procedures by posting the Amended Agreements in [Schweda]'s Back-Office for more than 30 days" (Dkt. #19 at p. 2). Accepting Elevacity's uncontroverted allegations as true and resolving all conflicts in its favor, the Court finds that the Amended Agreements are enforceable for purposes of considering personal jurisdiction. *See Alpine, 205 F.3d at 215* ("[The Court] must accept as true th[e] [plaintiff's] uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation.").

*489* (citations omitted). "The ultimate question is whether the allegedly breached contract had a *substantial* relationship to the forum state, considering the totality [*25] of the circumstances." *Ecigrusa LLC v. Silver State Trading LLC, No. 3:21-CV-1846, 2022 U.S. Dist. LEXIS 79793, 2022 WL 1321573, at *4 (N.D. Tex. May 3, 2022)* (emphasis in original).

On the one hand, Schweda asserts he performed his distribution services in Louisiana, and the commissions he received from his work with Elevacity were sent there (*see* Dkt. #6, Exhibit 1 ¶ 6). And "where the contract is to be performed . . . is a weighty consideration." *Command-Aire Corp. v. Ontario Mech. Sales and Serv. Inc., 963 F.2d 90, 94 (5th Cir. 1992)*. Further, though Schweda admits to contracting with Elevacity and entering into the Prior Agreements, he contends that the Amended Agreements were unilaterally imposed on him without negotiations (Dkt. #6 at p. 5). And "merely contracting with a resident of Texas is not enough to establish minimum contacts." *Moncrief Oil Int'l Inc. v. OAO Gazprom, 481 F.3d 309, 312 (5th Cir. 2007)*. Thus, viewed from this lens, Schweda's contacts with Texas appear to be sparse. However, viewed from a different lens, the opposite appears to be true.

According to Elevacity, Schweda "initiated the relationship with [Elevacity], knowing it was based in Texas, and continued that relationship over a period of approximately over four years" (Dkt. #24 at p. 4). Thus, according to Elevacity, "Schweda could have reasonably expected to be haled into a Texas court because he contracted with, and continuously did business with, a Texas company, even agreeing to resolve all [*26] disputes in this Court's geographical territory" (Dkt. #19 at p. 1). So what explains these two very different pictures? The parties' differing views on the effect of the Amended Agreements.

Indeed, Elevacity relies heavily on the Amended Agreements' existence to support its argument that personal jurisdiction is proper. Conversely, Schweda significantly downplays their significance. For example, Elevacity argues the Court has personal jurisdiction over its breach of contract claim "[b]ecause the provisions of the Amended Agreements create continuous obligations with a Texas resident, call for dispute resolution in Texas, and apply Texas law" (Dkt. #19 at p. 4). Yet, Schweda asserts that the "provisions . . . do not overcome th[e] jurisdictional dispute" because that "Schweda may have known [Elevacity] was a Texas resident, which arguably could be implied through these

Case 4:23-cv-00860-P   Document 22   Filed 10/02/23   Page 24 of 59   PageID 199

Page 9 of 13
2022 U.S. Dist. LEXIS 154111, *26

provisions, [] is insufficient"[6] (Dkt. #15 at pp. 4-5). The Court turns to resolve the crux of the parties' dispute—namely, whether the Amended Agreements provide the necessary minimum contacts between Schweda and Texas or whether, as Schweda contends, more is necessary for this Court to exercise jurisdiction.

Here, [*27] the Court finds that the terms and contemplated future consequences of the Amended Agreements, as well as the parties' actual course of dealing, indicate that Schweda purposefully availed himself of the benefits and protections of doing business in Texas and could reasonably anticipate being haled into court here. First, it is undisputed that Schweda knew Elevacity was a Texas-based company when he began his relationship with it. Nonetheless, "[i]t is well established that merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Freudensprung v. Offshore Tech. Servs., Inc., 379 F.3d 327, 344 (5th Cir. 2004)*. However, Schweda also "had [] more than a fortuitous connection to Texas related to a single transaction"—rather, he "entered into an ongoing business relationship with a Texas resident" and continued that relationship over approximately four years. *Latshaw v. Johnston, 167 F.3d 208, 213 (5th Cir. 1999)*.

Moreover, the terms of the Amended Agreements support a finding of personal jurisdiction over Schweda—they contemplate significant involvement with Texas. *See Burger King, 471 U.S. at 479* (finding it significant that the parties' dispute "grew directly out of a contract which had a *substantial* connection with that State.") (emphasis in original). For example, Section [*28] 16 of the Independent Brand Partner Agreement provides:

This Agreement shall be governed by the laws of the State of Texas without reference to its conflict of laws rules. Except as set forth in the P&P, all claims and disputes relating to this Agreement, the rights and obligations of the parties, or any other claims or causes of actions relating to the performance of either party under this Agreement and/or Brand Partner's purchase of products shall be settled totally and finally by arbitration in Collin County, Texas, in accordance with the *Federal Arbitration Act* and the Commercial Rules of the American Arbitration Provision

(Dkt. #1, Exhibit 5 ¶ 16). Further, the notice provision in Section 18 of the Independent Brand Partner Agreement ties the definition of "[b]usiness [d]ay" to a legal holiday in the State of Texas (Dkt. #1, Exhibit 5 ¶ 18). Thus, notably, the Amended Agreements contain numerous provisions related to Texas that, at the very least, "indicate[] what future consequences [Schweda] [] should have contemplated when [he] contracted with [Elevacity]." *Gundle Lining Constr. Corp. v. Adams County Asphalt, 85 F.3d 201, 206 (5th Cir. 1996)*.

Moreover, the Amended Agreements "include[] clauses addressing disclosure of confidential information and a non-solicitation agreement," showing [*29] the parties "contemplated continuing obligations and wide-reaching contacts with Texas." *Transplace Texas, L.P. v. Higgins, No. 4:10-CV-428, 2011 U.S. Dist. LEXIS 13719, 2011 WL 623172, at *5 (E.D. Tex. Jan. 19, 2011)*. Even more so, the Texas choice of law and arbitration provisions show Schweda "deliberate[ly] affiliat[ed] with the forum State and [had] reasonable foreseeability of possible litigation there." *Burger King Corp., 471 U.S. at 482*. Indeed, as another sister court has noted, "[t]he combination of choosing Texas law and designating Texas as the arbitration forum . . . [strongly] support a finding that [defendant] anticipated and foresaw further contacts with Texas." *Gateway Logistics Grp., Inc. v. Dangerous Goods Mgmt. Australia Party, Ltd., No. H-05-2742, 2006 U.S. DIST. LEXIS 34931, at *20 (S.D. Tex. May 31, 2006)*; *see also Moncrief, 481 F.3d at 313* (noting that Russian arbitration and choice of law clauses suggest intent was to keep undertaking within Russian jurisdiction).

To be sure, while a choice-of-law clause alone is not enough to establish personal jurisdiction, courts appear to weigh the clause as strong evidence of intent to either purposefully avail or not avail oneself of a forum. *See id., 471 U.S. at 482*; *Freudensprung, 379 F.3d at 345* ("The significance of these alleged minimum contacts is

---

[6] Schweda also contends, without citing any law, that the Independent Brand Partner Agreement, the Agreement that contains the Texas-related provisions, is not enforceable because though the Agreement states that Schweda's "obligation to be bound by this Agreement shall be effective by means of an electronic acceptance portal . . . ," he was never offered an "electronic acceptance portal" to click on (Dkt. #15 at p. 4). Elevacity does not respond to this argument. However, as stated previously, the Court finds that the Amended Agreements are enforceable for purposes of considering personal jurisdiction. *See Alpine, 205 F.3d at 215* ("[The Court] must accept as true th[e] [plaintiff's] uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation.").

severely diminished by the fact that the contract at issue specified that it was to be governed by English law. . . ."); *Jones v. Petty-Ray Geophysical, Geosource, Inc., 954 F.2d 1061, 1069 (5th Cir. 1992)* (suggesting that forum-selection and choice-of-law clauses "indicate rather forcefully **[\*30]** that defendant "did not purposefully direct its activities towards Texas"); *Pervasive, 688 F.3d at 223* ("When combined with other factors, a choice-of-law clause may reinforce a conclusion that a defendant 'deliberate[ly] affiliat[ed] with the forum State and [had] reasonable foreseeability of possible litigation there.'"). Thus, the fact that Schweda entered into Agreements specifically invoking Texas law as the governing law powerfully indicates that Schweda has purposefully availed himself of the benefits and protections of Texas' laws.

Similarly, the Amended Agreements' arbitration provision pointing to dispute resolution in Texas "bolsters a finding for specific jurisdiction." *Timber Source, LLC v. Cahaba Valley Timber Co, No. 06-9239, 2007 U.S. Dist. LEXIS 19972, 2007 WL 891883, at *4 (E.D. La. Mar. 21, 2007)*; *see also Electrosource, 176 F.3d at 873* (finding that the parties' stipulation that Texas law was to apply to disputes settled by arbitration showed that that defendant purposefully invoked the benefits of Texas laws in one respect). To be sure, the personal jurisdiction analysis focuses on whether the defendant could reasonably foresee being hailed into a Texas court. And "[b]y agreeing to arbitrate in [Collin] [County], Texas, [Schweda] purposefully availed himself of the protections of Texas law and, accordingly, he could reasonably foresee being sued here." **[\*31]** *Am. Gen. Life Ins. Co. v. Rasche, 273 F.R.D. 391, 398 (S.D. Tex. 2011)*.

In sum, Elevacity has established the minimum contacts necessary between Schweda and Texas so that Schweda is subject to personal jurisdiction in this forum for Elevacity's breach of contract claim. Indeed, the Court finds that Schweda has purposefully availed himself of the privilege of conducting activities within Texas by entering into an ongoing business relationship with a Texas-based entity and agreeing to Texas choice-of-law and arbitration provisions in furtherance of that relationship.

### III. Fair Play and Substantial Justice

Since Elevacity has established that Schweda has the required minimum contacts with Texas in this litigation on its breach of contract claim, Schweda must now

demonstrate that "asserting jurisdiction would offend traditional notions of fair play and substantial justice." *Hess v. Bumbo Int'l Tr., 954 F. Supp. 2d 590, 593 (S.D. Tex. 2013)* (Costa, J). Schweda "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp., 471 U.S. at 477*; *see Wien, 195 F.3d at 215* ("[O]nce minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant."). Furthermore, because it is highly uncommon for an assertion of jurisdiction to be unfair once minimum contacts **[\*32]** have been established, the "fair play and substantial justice" factor should rarely be outcome determinative. *Blunt Wrap USA, Inc. v. Grabba-Leaf, L.L.C., No. CV 15-2764, 2016 U.S. Dist. LEXIS 118080, 2016 WL 4547992, at *3 n.3 (E.D. La. Sept. 1, 2016)*.

Importantly, the Fifth Circuit has outlined a number of factors for courts to balance in determining whether the exercise of personal jurisdiction over a particular defendant is fair and reasonable, including: "(1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies." *Cent. Freight Lines Inc., 322 F.3d at 384*.

Here, though Schweda does not address the last three factors in his motion, he argues it would be unreasonable to litigate this action here because (i) it would be a "huge 'burden" on Schweda, and (ii) Texas does not have interest in the matter (Dkt. #6 at p. 8). More specifically, Schweda asserts it would be a "huge 'burden'" to defend this case in Texas because he and most of the material witnesses are residents of Louisiana and "pay[ing] for these witnesses to travel over state **[\*33]** lines and appear before a jury would be [] costly" (Dkt. #6 at p. 8). Along the same lines, Schweda contends that Texas does not have an interest in resolving the matter because "most of the people who are alleged to have been wrongfully solicited reside outside of this State" (Dkt. #6 at p. 8).

The Court is unpersuaded by Schweda's arguments. First, Schweda has failed to identify any burdens outside of the basic inconvenience imposed on any party to litigation, such as having to travel to Texas for trial. *Conrad Shipyard, L.L.C. v. Franco Marine 1 LLC, 431 F. Supp. 3d 839, 853 (E.D. Tex. Jan. 3, 2020)*.

2022 U.S. Dist. LEXIS 154111, *33

Further, by contracting with Elevacity, a Texas company, and agreeing to Agreements that provided for Texas law with dispute resolution to take place in Texas, Schweda should have reasonably foreseen that that he could be haled into Texas for his alleged tortious actions. *See McAfee, LLC v. Kinney, No. 4:19-CV-463, 2019 U.S. Dist. LEXIS 146929, 2019 WL 4077647, at *7 (E.D. Tex. Aug. 29, 2019)*. And given the extent of Schweda's business dealings with Elevacity, litigation in Texas does not seem particularly burdensome. Indeed, since beginning his work with Elevacity, Schweda has visited Texas at least quarterly to attend events in Texas related to his work.

Second, contrary to Schweda's argument otherwise, the interests of the forum state also favor personal jurisdiction over Schweda. Though Schweda **[*34]** bases his argument on this factor on the fact that most of the people who are alleged to have been wrongfully solicited reside outside of the state, this case also concerns a Texas plaintiff and involves a contract governed by Texas law. *Higgins, 2011 U.S. Dist. LEXIS 13719, 2011 WL 623172, at *7*; *see also Seisa Med., Inc. v. Asia Cap. Advisor, Ltd., No. EP-18-CV-79, 2018 U.S. Dist. LEXIS 179432, 2018 WL 5020226, at *11 (W.D. Tex. Sept. 20, 2018)* ("Plaintiff's interest in securing relief in this case, where it has established Defendants' minimum contacts with Texas, also clearly favors personal jurisdiction, especially given that it filed this case in Texas and its principal place of business is in Texas."). Accordingly, at the very least, Texas has a general, "manifest interest in providing effective means of redress for its residents." *McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957)*.

In sum, considering the relevant factors in light of the steep burden Schweda faces here, the Court finds that Schweda has not made out a compelling case that the Court's assertion of jurisdiction over it is unreasonable. As such, it does not go against the interests of fair play and substantial justice to allow Texas, a state with which Schweda has sufficient minimum contacts, to exercise personal jurisdiction over Schweda for Elevacity's breach of contract claim.

## IV. Pendent Personal Jurisdiction

Finally, even though the Court does not possess **[*35]** specific jurisdiction over Elevacity's tortious interference claim, pendent personal jurisdiction permits the Court to exercise jurisdiction over Schweda as to this claim. *See,*

*e.g., In re Toyota Hybrid Brake Litig., No. 4:20-CV-127, 2021 U.S. Dist. LEXIS 124918, 2021 WL 2805455, at *17 (E.D. Tex. July 6, 2021)* (exercising pendent personal jurisdiction); *Nat'l Oil Well Varco, L.P. v. Sadagopan, No. H-16-2261, 2017 U.S. Dist. LEXIS 107115, 2017 WL 2957908, at *5-*6 (S.D. Tex. July 11, 2017)* (asserting pendent jurisdiction over breach of contract claim after plaintiff had established personal jurisdiction on intentional tort claim); *Sedillo as Tr. of Filo and Fran Sedillo Revocable Tr. v. Team Techs., Inc., No. 3:20-CV-1628, 2020 U.S. Dist. LEXIS 218708, 2020 WL 6870711, at *5 (N.D. Tex. Nov. 23, 2020)* (same); *Pension Advisory Grp., Ltd. v. Country Life Ins. Co., 771 F. Supp. 2d 680, 696 (S.D. Tex. 2011)* (same).

The concept of pendent personal jurisdiction "enables a court with in personam jurisdiction over a defendant to exercise that jurisdiction over all transactionally related claims against the same defendant, even where the court lacks an independent basis for personal jurisdiction over one or more related claims." *In re Toyota, 2021 U.S. Dist. LEXIS 124918, 2021 WL 2805455, at *17*; *see also United States v. Botefuhr, 309 F.3d 1263, 1272 (10th Cir. 2002)* ("[O]nce a district court has personal jurisdiction over a defendant for one claim, it may piggyback onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction.") (internal quotations omitted). While the Fifth Circuit has not addressed pendent personal **[*36]** jurisdiction, district courts in the Fifth Circuit have embraced the concept.[7]

---

[7] At its inception, pendent personal jurisdiction was typically employed in cases where the court had personal jurisdiction over a federal claim but lacked personal jurisdiction over related state law claims. *See, e.g., Soto v. Vanderbilt Mortg. & Fin., Inc., No. C-10-66, 2010 U.S. Dist. LEXIS 42946, 2010 WL 1790177, at *5-7 (S.D. Tex. May 3, 2010)* (Jack, J.) (finding personal jurisdiction over plaintiffs' RICO claims and exercising pendent personal jurisdiction over plaintiffs' related state law claims); *Team Healthcare/Diagnostic Corp. v. Aetna Life Ins. Co., No. A:3:07-CV-0214-O, 2008 U.S. Dist. LEXIS 13428, 2008 WL 483366, at *7 (N.D. Tex. Feb. 22, 2008)* (finding personal jurisdiction over plaintiff's ERISA claims and exercising pendent personal jurisdiction over plaintiff's related state law claims). In those circumstances, the justification for the use of pendent personal jurisdiction was that a "defendant who already [was] before the court to defend a federal claim [was] unlikely to be severely inconvenienced by being forced to defend a state claim whose issues are nearly identical or substantially overlap the federal claim." *Rolls-Royce Corp. v. Heros, Inc., 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008)*.

*See, e.g., Sedillo as Tr. of Filo & Fran Sedillo Revocable Tr. v. Team Techs., Inc., No. 3:20-CV-1628-D, 2020 U.S. Dist. LEXIS 218708, 2020 WL 6870711, at *5 (N.D. Tex. Nov. 23, 2020); ESPOT, Inc. v. MyVue Media, LLC, 492 F. Supp. 3d 672, 700 (E.D. Tex. 2020); Halcyon Biomedical, Inc. v. Glatt Air Techniques, Inc., No. CV H-19-690, 2019 U.S. Dist. LEXIS 97020, 2019 WL 2420232, at *7 (S.D. Tex. June 10, 2019); BidPrime, LLC v. SmartProcure, Inc., No. 1:18-CV-478-RP, 2018 U.S. Dist. LEXIS 180546, 2018 WL 5260050, at *4 (W.D. Tex. Oct. 22, 2018).* Moreover, other circuits to consider the issue have uniformly adopted and applied pendent personal jurisdiction. *See Pension Advisory, 771 F. Supp. 3d at 696* (collecting out-of-circuit caselaw, which "uniformly approve[s] pendent personal jurisdiction").

Courts conduct a three-part analysis to ensure the propriety of pendent personal jurisdiction. *In re Toyota, 2021 U.S. Dist. LEXIS 124918, 2021 WL 2805455, at *17.* First, the Court must identify an "anchor" claim, *i.e.*, a claim that allows a court to exercise personal jurisdiction over the defendant. *Mackzilla, LLC, 2016 U.S. Dist. LEXIS 34752, 2016 WL 1059529, at *5.* Next, the Court examines whether the anchor claim and the claim over which the court lacks an independent basis for personal jurisdiction "aris[e] out of the same nucleus of operative fact." *ESPOT, 492 F. Supp. 3d at 700.* If yes, then the Court must determine whether entertaining the pendent claims against the defendant promotes "judicial economy, avoidance of piecemeal litigation[,] and the overall convenience of the parties." *Canyon Furniture Co. v. Rueda Sanchez, No. SA-18-CV-00753-OLG, 2018 U.S. Dist. LEXIS 224455, 2018 WL 6265041, at *13 (W.D. Tex. Nov. 8, 2018); see In re Commonwealth Oil/Tesoro Petrol. Corp. Sec. Litig., 467 F. Supp. 227, 247 (W.D. Tex. 1979)* (Higginbotham, J.). This final step—and, accordingly, the overall decision to invoke pendent personal jurisdiction—is "within the court's discretion." *Rolls-Royce Corp., 576 F. Supp. 2d at 784; see also Martin v. La. & Ark. Ry. Co., 535 F.2d 892, 894 (5th Cir. 1976)* ("[T]he mere existence of power to adjudicate pendent claims does not **[*37]** mean that the exercise of that power is wise in every instance.").

As stated above, the Court has determined that

---

However, over time, courts have employed the doctrine in diversity cases involving purely state law claims as well, concluding that the reasoning supporting pendent personal jurisdiction applies with "equal, or perhaps even greater, force" in these cases. *Gen. Elec. Cap. Corp. v. Mackzilla, LLC, No. CV H-15-2425, 2016 U.S. Dist. LEXIS 34752, 2016 WL 1059529, at *6 (S.D. Tex. Mar. 17, 2016).*

Elevacity's breach of contract claim permits the Court to exercise personal jurisdiction over Schweda. Thus, having identified an anchor claim, the Court turns to the second analytical step and examines whether this anchor claim and the claim which the Court lacks an independent basis for personal jurisdiction—the tortious interference with an existing contract claim—arise out of the same nucleus of operative fact. While this Court has recognized that the "common nucleus of operative fact" concept is "somewhat protean," it has also found that claims generally derive from a common nucleus of operative fact when they are "so interrelated that plaintiffs would ordinarily be expected to try them all in one judicial proceeding." *In re Toyota, 2021 U.S. Dist. LEXIS 124918, 2021 WL 2805455, at *18* (internal quotations omitted); *see also Mendoza v. Murphy, 532 F.3d 342, 346 (5th Cir. 2008)* (determining claims derive from a common nucleus of operative fact when they "concern the same core factual issue"). More concretely, courts have characterized claims derived from a common nucleus of operative fact as those "arising out of the same occurrence." *FDIC v. C.D. Henderson Inc., No. A-07-CA-982-SS, 2008 U.S. Dist. LEXIS 128663, 2008 WL 11334958, at *3 (W.D. Tex. Oct. 31, 2008); Mortell v. Mortell Co., 887 F.2d 1322, 1325 (7th Cir. 1989)* (Easterbrook, J.) ("One series of related transactions **[*38]** is a single 'nucleus of operative facts.' All theories of liability concerning the same transaction or series of acts should be litigated in the same suit. . . .").

Here, an examination of the relevant facts quickly shows that Elevacity's tortious interference with an existing contract claim derives from the same nucleus of operative fact as the anchor claim, the breach of contract claim. Indeed, "[b]oth causes of action arise from the same alleged fact: [Schweda] allegedly posted impermissible content on Facebook." *Elevacity U.S., LLC v. McLean, No. 4:22-CV-047, 2022 U.S. Dist. LEXIS 138071, 2022 WL 3107891, at *1 (E.D. Tex. Aug. 3, 2022).* Thus, undoubtedly, the claims "arise out of the same occurrence." *FDIC, 2008 U.S. Dist. LEXIS 128663, 2008 WL 11334958, at *3.* Consequently, the Court turns to the final analytical step and looks to whether judicial economy, the avoidance of piecemeal litigation, and the overall convenience of the parties would be served by the exercise of pendent personal jurisdiction against Schweda. *In re Toyota, 2021 U.S. Dist. LEXIS 124918, 2021 WL 2805455, at *18.*

Here, the Court finds that keeping the pendent claim together with the anchor claim will promote these interests for two key reasons. First, Schweda is already

present in this action and must remain before the Court as a defendant to Elevacity's breach of contract claim. Therefore, the burden on Schweda **[*39]** to defend against the pendent claims is minimal. *Id.* Second, were the Court to decline to exercise pendent personal jurisdiction in this case, the parties would likely be forced to litigate the claims—which share a common nucleus of operative fact—in a cross-jurisdictional, piecemeal fashion. *Id.* Accordingly, this would necessarily require consideration by two courts of the same operative facts and would impose unnecessary expenses on the court system and the parties. Moreover, "allowing such an outcome would run contrary to the justifications elemental to the doctrine of pendent personal jurisdiction." *Id.* Therefore, taken together, considerations of judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties counsel the Court to wield its discretion and exercise pendent personal jurisdiction in this case.

## CONCLUSION

It is therefore **ORDERED** that Defendant's *12(b)(2)* Motion to Dismiss (Dkt. #6) should be **DENIED**.

**IT IS SO ORDERED**.

**SIGNED this 26th day of August, 2022**.

/s/ Amos L. Mazzant

AMOS L. MAZZANT

UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Neutral
As of: October 2, 2023 8:27 PM Z

## *Heavy Duty Prods., LLC v. Band Wdth, LLC*

United States District Court for the Western District of Texas, Austin Division

July 21, 2015, Decided; July 21, 2015, Filed

CAUSE NO. 1:14-CV-974-LY

**Reporter**
2015 U.S. Dist. LEXIS 183124 *

HEAVY DUTY PRODUCTIONS, LLC, PLAINTIFF, v. BAND WDTH, LLC, COHERENTRX, INC., AND THOMAS R. HARTLE, DEFENDANTS.

**Prior History:** *Heavy Duty Prods., LLC v. Bandwdth, LLC, 2015 U.S. Dist. LEXIS 62252 (W.D. Tex., May 12, 2015)*

## Core Terms

report and recommendation, magistrate judge, recommendation, motion to dismiss, lack of personal jurisdiction, receive evidence, objection to the report, dismissal without prejudice, proposed findings, written objection, de novo review, day of july, timely file, above-styled

**Counsel:** **[*1]** For Heavy Duty Productions, LLC, Plaintiff: Andrew Preston Vickers, Mark Curtis Taylor, LEAD ATTORNEYS, Waller Lansden Dortch & Davis, LLP, Austin, TX.

For Bandwth, LLC, CoherentRx, Inc., Thomas R. Hartle, Defendants: Michael McMillin, LEAD ATTORNEY, Thompson & knight LLP, Austin, TX; David Philip Whittlesey, Andrews Kurth LLP, Austin, TX.

**Judges:** LEE YEAKEL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LEE YEAKEL

## Opinion

### ORDER ON REPORT AND RECOMMENDATION

Before the court in the above-styled and numbered cause are Defendants' Motion to Dismiss for Lack of Personal Jurisdiction filed October 31, 2014 (Clerk's

Doc. No. 3) and Plaintiffs Response to Defendants' Motion to Dismiss filed November 14, 2014 (Clerk's Doc. No. 4). The above-listed motion was referred to the United States Magistrate Judge for Report and Recommendation pursuant to *28 U.S.C. § 636(b)*, *Federal Rule of Civil Procedure 72*, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, as amended. The magistrate judge filed his Report and Recommendation on May 12, 2015 (Clerk's Doc. No. 8) wherein he recommends granting Defendants' motion to dismiss.

On May 26, 2015, Plaintiff filed, along with objections to the report and recommendation, a "Motion to Receive **[*2]** Evidence" (Clerk's Doc. No. 10) asking the court to consider "additional support that the Defendants maintained systematic and specific contacts" within the Western District of Texas. This court referred that motion to the United States Magistrate Judge for resolution and reconsideration, if appropriate, of his report and recommendation. On June 26, 2015, the magistrate judge rendered an order (Clerk's Doc. No. 17) denying Plaintiffs motion to receive evidence and reaffirming his recommendation to grant Defendants' motion to dismiss.

Under *Title 28 of the United States Code, Section 636(b)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, a party may serve and file specific, written objections to the proposed findings and recommendations of the Magistrate Judge within 14 days after being served with a copy of the Report and Recommendation, and thereby secure a *de novo* review by the District Court. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation in a Report and Recommendation bars that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See Douglass v. United Services Auto Ass 'n, 79 F.3d 1415 (5th Cir. 1996) (en banc)*.

Plaintiff timely filed objections to the report **[*3]** and recommendation (Clerk's Doc. No. 9), to which Defendants responded (Clerk's Doc. No. 11). Plaintiff also objected to the magistrate judge's Order on the motion to receive evidence and "supplement to the report and recommendation" (Clerk's Doc. No. 18). In light of Plaintiffs multiple objections, the court has undertaken a *de novo* review of the entire case file in this cause. The court, having carefully reviewed the objections, motions, responses, available evidence, and entire record in the cause, and finding no error, accepts and adopts the report and recommendation for substantially the reasons stated therein.

IT IS THEREFORE ORDERED that the objections contained in Plaintiff Heavy Duty Productions LLC's Objections to the Report and Recommendation of the United States Magistrate Judge (Clerk's Doc. No. 9) and Objection to the Order on Motion to Receive Evidence and Supplement to Report and Recommendation of the United States Magistrate Judge are OVERRULED.

IT IS FURTHER ORDERED that the Report and Recommendation of the United States Magistrate Judge (Clerk's Doc. No. 8) is hereby ACCEPTED and ADOPTED by the court.

IT IS FURTHER ORDERED that Defendants Bandwdth, LLC, Coherentrx, **[*4]** Inc., and Thomas R. Hartle's Motion to Dismiss for Lack of Personal Jurisdiction (Clerk's Doc. No. 3) is GRANTED.

IT IS FINALLY ORDERED that this cause is DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction.

SIGNED this 21st day of July, 2015.

/s/ Lee Yeakel

LEE YEAKEL

UNITED STATES DISTRICT JUDGE

FINAL JUDGMENT

Before the court is the above-styled and numbered cause. By separate order signed this day, the court granted Defendants Bandwdth, LLC, Coherentrx, Inc., and Thomas R. Hartle's Motion to Dismiss for Lack of Personal Jurisdiction. All claims asserted by Plaintiff were thereby dismissed without prejudice. Accordingly, the court renders the following Final Judgment pursuant to *Federal Rule of Civil Procedure 58*.

IT IS HEREBY ORDERED that Defendants are awarded costs of court.

IT IS FINALLY ORDERED that this case is CLOSED.

SIGNED this 21st day of July, 2015.

/s/ Lee Yeakel

LEE YEAKEL

UNITED STATES DISTRICT JUDGE

---

**End of Document**

➕ Positive
As of: October 2, 2023 8:23 PM Z

# *Heavy Duty Prods., LLC v. Bandwdth, LLC*

United States District Court for the Western District of Texas, Austin Division

May 12, 2015, Decided; May 12, 2015, Filed

A-14-CV-974-LY

**Reporter**
2015 U.S. Dist. LEXIS 62252 *; 2015 WL 2374461

HEAVY DUTY PRODUCTIONS, LLC v. BANDWDTH, LLC, COHERENTRX, INC., and THOMAS R. HARTLE

**Subsequent History:** Motion denied by *Heavy Duty Prods.,LLC v. Bandwdth, Inc., 2015 U.S. Dist. LEXIS 83111 (W.D. Tex., June 26, 2015)*

Adopted by, Dismissed without prejudice by, Objection overruled by, Judgment entered by *Heavy Duty Prods., LLC v. Band Wdth, LLC, 2015 U.S. Dist. LEXIS 183124 (W.D. Tex., July 21, 2015)*

## Core Terms

personal jurisdiction, forum state, contacts, fraudulent transfer, minimum contact, Recommendation, communications, purposefully, non-resident, resident, district court, e-mail, Defendants', transferred, dissolved, effects, aimed, cases

**Counsel:** **[*1]** For Heavy Duty Productions, LLC, Plaintiff: Andrew Preston Vickers, LEAD ATTORNEY, Taube Summers Taylor Meinzer, LLP, Austin, TX; Mark Curtis Taylor, LEAD ATTORNEY, Hohmann, Taube & Summers, L.L.P., Austin, TX.

For Bandwdth, LLC, CoherentRx, Inc., Thomas R. Hartle, Defendants: Michael McMillin, LEAD ATTORNEY, David Philip Whittlesey, Andrews Kurth LLP, Austin, TX.

**Judges:** ANDREW W. AUSTIN, UNITED STATES MAGISTRATE JUDGE. HONORABLE LEE YEAKEL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ANDREW W. AUSTIN

## Opinion

### REPORT AND RECOMMENDATION OF THE UNITED

STATES MAGISTRATE JUDGE

TO: THE HONORABLE LEE YEAKEL

UNITED STATES DISTRICT JUDGE

Before the Court are: Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 3); and Plaintiff's Response (Dkt. No. 4). The District Court referred the above-motion to the undersigned Magistrate Judge for a report and recommendation pursuant to *28 U.S.C. §636(b)* and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

### I. GENERAL BACKGROUND

Plaintiff Heavy Duty Productions, LLC ("Heavy Duty") is a Massachusetts limited liability company with its principal place of business **[*2]** in Travis County, Texas. Dkt. No. 1-1. Before moving to Texas, Heavy Duty was based out of California. Dkt. No. 3, Ex. A at ¶12-13. Defendant Bandwdth[1] is a dissolved Delaware limited liability company that was headquartered in California. *Id.* at ¶ 2. It developed mobile applications primarily for use in the music industry. *Id.* at ¶ 11. Defendant CoherentRX is a Delaware corporation with its principal place of business in Michigan. *Id.* at ¶ 16. It develops mobile applications for use in the healthcare industry. *Id.* at ¶ 17. Defendant Thomas Hartle is an individual residing in Michigan. *Id.* at ¶ 27-28. He is a founder and president of both Bandwdth and Coherent. *Id.* at ¶ 2.

Heavy Duty claims that it performed services for Bandwdth in 2010-11, and was not paid for those services. It now brings a claim for payment on a sworn

---

[1] This is, in fact, the correct spelling of the defendant's name. The record does not reflect why they chose to misspell "bandwidth," but there is no doubt a good reason for it.

account. Dkt. No. 1-1. Heavy Duty further alleges that Hartle and Coherent are liable as successors to Bandwdth, and also that they engaged in fraudulent transfers of assets from Bandwdth when **[*3]** it closed its doors. *Id.* at 4-5. Suit was originally filed in state court on September 11, 2014, styled *Heavy Duty Productions, LLC v. Bandwdth, LLC, CoherentRX, Inc., and Thomas R. Hartle*, No. D-1-GN-14-003616, in the 353rd Judicial Court, Travis County, Texas. On October 27, 2014, the defendants removed the case to this Court on the basis of diversity. They now move to dismiss the case for lack of personal jurisdiction.

## II. ANALYSIS

Defendants assert that Heavy Duty's sole jurisdictional allegation is that "Bandwdth has entered into agreements and accepted services from [Heavy Duty] in the State of Texas." Dkt. No. 1-1 at 1. Defendants contend that to the extent that there was a business relationship between Bandwdth and Heavy Duty, that entire relationship took place in California and terminated before Heavy Duty moved to Texas. Dkt. No. 3-1 at ¶¶ 12-14. According to Defendants, the mere fact that Heavy Duty is now located in Texas is not enough to subject Defendants to suit in Texas. Additionally, Defendants argue, because the only basis for jurisdiction over Coherent and Hartle is successor liability, and neither Coherent nor Hartle has contacts with Texas or relationships with Heavy Duty **[*4]** separate from whatever Bandwdth had, there is no basis for personal jurisdiction over them either. Heavy Duty responds that the Court has specific jurisdiction over all Defendants because Bandwdth's contacts with Texas give rise to the claims Heavy Duty asserts against them.

### A. Legal Standard

Under *Federal Rule of Civil Procedure 12(b)(2)*, the "plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident." *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008)*. A plaintiff must make a prima facie showing that the defendant is subject to personal jurisdiction; "[p]roof by a preponderance of the evidence is not required." *Bullion v. Gillespie, 895 F.2d 213, 217 (5th Cir. 1990)* (citing *D.J. Invs. Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc., 754 F.2d 542, 545-46 (5th Cir. 1985))*. At the motion stage, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts

between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Id.*

"A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the *Due Process Clause of the Fourteenth Amendment*." *Mullins v. TestAmerica, Inc., 564 F.3d 386, 398 (5th Cir. 2009)*. The Texas long-arm statute extends to the limits of due process. *Id.* To satisfy due process, the plaintiff must demonstrate "(1) that the non-resident purposefully availed himself of the benefits and protections of **[*5]** the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Johnston, 523 F.3d at 609*.

"A defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [he] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V, 310 F.3d 374, 379 (5th Cir. 2002)* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985))*. "There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." *Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001)*. A court has general jurisdiction over a nonresident defendant "to hear any and all claims" against him when his contacts with the state are so "'continuous and systematic' as to render [him] essentially at home in the forum." *Goodyear Dunlop Tires Operations v. Brown, 131 S.Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011)*. As noted, Heavy Duty does not contend that there is general jurisdiction over the Defendants, so the only issue here is whether the Court has specific jurisdiction over the Defendants.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id. at 2851* (citation omitted). The Fifth **[*6]** Circuit frames the specific jurisdiction issue with a three-step analysis:

(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the

defendant's forum related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Monkton Ins. Servs. v. Ritter, 768 F.3d 429, 433 (5th Cir. 2014)* (citing *Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 271 (5th Cir. 2006))*. The plaintiff bears the burden of satisfying the first two prongs; if the plaintiff is successful, the burden shifts to the defendant to show that exercising jurisdiction would be unfair or unreasonable. *Seiferth, 472 F.3d at 271*. The main question is "whether there was 'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Goodyear, 131 S.Ct. at 2854* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958))*. The Supreme Court recently stated that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore, 134 S.Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014)*.

In another case involving the reach of personal jurisdiction, **[*7]** two years ago the undersigned wrote the following:

> The law of personal jurisdiction, which stems from constitutional principles, is judge-made, and although it has evolved greatly over the past 100 years, it remains obtuse and burdened by conclusory concepts. The fundamental principles are handed down by the Supreme Court, interpreted and refined by the courts of appeal, and then applied to real cases by the district courts. The result is that tens of thousands of cases addressing personal jurisdiction are cluttered with the same phrases, derived from seminal Supreme Court decisions, and repeated like mantras. Courts routinely recite the facts of a case, and then, using the doctrinal phrases, simply pronounce that a defendant "purposefully availed itself of the privilege of conducting activities" in the forum or "purposefully directed its activities" toward the forum. This problem of unenlightening conclusory phrases in jurisdictional case law is not new, as it was noted more than 80 years ago by Learned Hand, as he discussed the notion of a corporation's "presence" for purposes of jurisdiction: "It scarcely advances the argument to say that a corporation must be 'present' in the foreign **[*8]** state, if we define that word as demanding such dealings as

will subject it to jurisdiction, for then it does no more than put the question to be answered." *Hutchinson v. Chase & Gilbert, Inc., 45 F.2d 139, 141 (2d Cir.1930)*. Judge Hand remarked that "it has become quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass." *Id. at 142*.

Although the Supreme Court has tried in numerous cases to bring some order to this area of the law, the morass remains. In the seminal case of *International Shoe*, the Court defended its inability to state bright line rules by invoking the fact that the inquiry was a constitutional one:

> It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose **[*9]** of the *due process clause* to insure.

*326 U.S. at 319* (citations omitted). Even after thirty years to sort out what *International Shoe*'s "minimum contacts" test means, the Court made little progress:

> Like any standard that requires a determination of "reasonableness," the "minimum contacts" test of *International Shoe* is not susceptible of mechanical application; rather the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present. . . . We recognize that this determination is one in which few answers will be written in black and white. The greys are dominant, and even among them the shades are innumerable. *Kulko v. Superior Court, 436 U.S., 84, 92, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978)*.

*Transverse, LLC v. Info Directions, Inc., 2013 U.S. Dist. LEXIS 84928, 2013 WL 3146838 at *3-4 (W.D. Tex. June 17, 2013)*.

Unfortunately, not much has changed in the past two years, and the law of personal jurisdiction remains as clear as mud. Indeed, if anything, technology, the internet and global electronic commerce have stretched the concept of "jurisdiction" close to a breaking point. A few helpful principles have emerged, however. First, for contacts with a state to subject a party to suit there, the contacts must be "contacts that the '*defendant himself*' creates with the forum State." *Walden, 134 S.Ct. at 1122* (quoting *Burger King, 471 U.S. at 475*) (emphasis added). Second, the principles and limits of jurisdiction "principally **[*10]** protect the liberty of the nonresident defendant—not the convenience of the plaintiff[ ] or third parties." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980))*. The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" *Id.* (quoting *Rush v. Savchuk, 444 U.S. 320, 332, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980))*. Stated another way, "plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.*

## B. Jurisdictional Facts

It is undisputed that Bandwdth initially engaged in business with Heavy Duty while Heavy Duty was located in San Francisco, California. At that time, there were absolutely no connections between Texas and the parties' relationship. Heavy Duty notified Bandwdth via e-mail on August 18, 2010, that it had relocated and its new address was in Austin, Texas. Heavy Duty owner/operator Jim Lewin identified **[*11]** this address as his home address in the same e-mail in which he stated to Bandwdth "[p]lease accept my sincere thanks for offering to send payments to my home instead of handing them to me in twenties at a midnight blackjack table in Reno." Dkt. No. 4-2 at 3. Heavy Duty argues that it performed services for Bandwdth after Heavy Duty relocated to Austin, and that Bandwdth failed to pay for those services. Heavy Duty offers as evidence a bill submitted to Bandwidth dated December 23, 2011, for services rendered from May 20, 2010, to March 31, 2011. Dkt. No. 4-3. Heavy Duty also submits a number of e-mails between Hartle and Lewin relating to ongoing

business between Heavy Duty and Bandwdth. Dkt. No. 4-1. It notes that Hartle visited Austin from March 14-20, 2011, and stayed at Lewin's home. Dkt. No. 4-1 at ¶ 5. Lewin states that while Hartle was there, the two met regarding the ongoing business between Heavy Duty and Bandwdth. *Id.* Finally, in a marketing brochure, Bandwdth lists its "OFFICES (VIRTUAL)" as "NYC, Austin, TX, and LA." Dkt. No. 4-4.[2]

## C. Application

Heavy Duty has **[*12]** failed to proffer sufficient evidence that Bandwdth or the other Defendants aimed their activities at Texas, or availed themselves of the privileges of conducting business in Texas, such that they are subject to suit here. The only connection Defendants have with the state of Texas is that one of them—Bandwdth—entered into a contract with Heavy Duty while its principal place of business was located in California, and then continued the relationship after Heavy Duty relocated to Texas. Continuing the relationship amounted to communicating with Heavy Duty (mainly via email) regarding the terms and performance of their relationship. The Fifth Circuit has explicitly held that "merely contracting with a resident of the forum state does not establish minimum contacts." *Moncrief Oil Int'l v. OAO Gazprom, 481 F.3d 309, 311 (5th Cir.2007). See also, Burger King Corp., 471 U.S. at 478*. Furthermore, "communications relating to the performance of a contract themselves are insufficient to establish minimum contacts." *Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 344 (5th Cir. 2004)*.

In support of its motion Heavy Duty also points to the marketing document in which Bandwth states it has a "virtual office" in Austin, Texas. Dkt. No. 4-4. But this same document also states that Bandwdth has no employees and that "the Company currently operates virtually, using **[*13]** freelancers for all design, editorial, production, development, and marketing functions." Immediately preceding the list of "virtual" locations is a list of "corporate locations"—which sounds much less "virtual" and much more "real"—and these include only Sonoma and Buenos Aires. It is not at all clear that identifying a "virtual office" in a state has any significance from the jurisdictional standpoint,

---

[2] Immediately above this statement is the following: "CORPORATE LOCATIONS: Sonoma, CA; Buenos Aires, AR (Development)." *Id.*

particularly when the company listing this "office" also states that it has no employees and operates "virtually."

The number and extent of the communications between Defendants outside of Texas, to Heavy Duty in the state, is also insufficient to show that Defendants were "aiming" their conduct at Texas. Where the exchange of communications rests on nothing except "the mere fortuity that [plaintiff] happens to be a resident of the forum," it is insufficient to establish specific jurisdiction. *MH Outdoor Media, LLC v. Am. Outdoor Adver., LLC, No. Civ. H-14-898, 2014 U.S. Dist. LEXIS 127020, 2014 WL 4537959, at \*3 (S.D. Tex. Sept. 10, 2014)*. *See also, McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009)* (no personal jurisdiction in Texas even though Colorado saleswoman's contact information appeared on website, she had contract with Texas manufacturer, and her representative sold goods in Texas, because contract **[\*14]** centered around saleswoman's operations outside Texas); *Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1986)* (no specific jurisdiction where defendant communicated extensively with, sent payments to, and contracted with Texas party for drilling contract to be performed in Oklahoma). There simply is not enough evidence that Defendants aimed any of their actions at Texas, so as to establish personal jurisdiction over them here.

Heavy Duty also contends that its claims arise from activity that is specifically regulated by Texas consumer protection statutes, and under Texas law, an act governed by these statutes that impacts a Texas resident will bestow jurisdiction over the offending party. *See Siskind v. Villa Found. for Educ., Inc., 642 S.W.2d 434, 436-37 (Tex. 1982)*. The holding in *Siskind*, however, is not premised on the notion that a violation of a Texas consumer protection statute automatically confers specific jurisdiction over the alleged out-of-state party; rather *Siskind* is a precursor to the "effects" test spelled out in *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*. As noted in the undersigned's 2013 decision referenced earlier,

The Fifth Circuit has stated that a finding of jurisdiction under *Calder* based on "effects" in the forum state "is rare." *Stroman Realty, Inc. v. Wercinski, 513 F.3d 476, 486 (5th Cir.2008)*, cert. denied, 555 U.S. 816, 129 S. Ct. 63, 172 L. Ed. 2d 25 (2008). The circuit has further clarified that the effects test "is not a substitute for **[\*15]** a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state," and "the key to *Calder* is that the effects of

an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." *Allred v. Moore & Peterson, 117 F.3d 278, 286 (5th Cir.1997)*, cert. denied, 522 U.S. 1048, 118 S. Ct. 691, 139 L. Ed. 2d 637, (1998).

*Transverse, 2013 U.S. Dist. LEXIS 84928, 2013 WL 3146838 at \*6*.

As noted at the outset, this case involves a suit for breach of contract, suit on an account, and claims that Defendants violated the Texas Uniform Fraudulent Transfer Act, *Tex. Bus. C. Code § 24.002 et seq* ("TUFTA"). The argument now being considered is focused on the TUFTA claims, which assert that each of the Defendants intentionally participated in the fraudulent transfer of Bandwdth's assets to Coherent in an effort to avoid payment of Heavy Duty's invoices. To establish a claim under TUFTA, a plaintiff must prove that (1) she is a "creditor" with a claim against a "debtor"; (2) the debtor transferred assets after, or a short time before, the plaintiff's claim arose; and (3) the debtor made the transfer with the intent to hinder, delay, or defraud the plaintiff. *Nwokedi v. Unlimited Restoration Specialists, Inc., 428 S.W.3d 191, 203-05* (Tex. App. — Houston 1st Dist.2013, pet. denied). Heavy Duty maintains that the following facts support its fraudulent transfer claim:

• From **[\*16]** and after August 6, 2010, Heavy Duty Productions provided services for Bandwdth from Austin, Texas, and performed those throughout 2010 and 2011.

• Throughout 2010 and even through 2014, Jim Lewin, on behalf of Plaintiff, communicated regularly with Hartle, on behalf of the Defendants, concerning the work that was being performed, ongoing work, and request for payment. These communications include substantial email communications between the two.

• Mr. Hartle continued to represent that payment would be made. Plaintiff did not discover until April of 2014 that no payment would be made and, instead, that Bandwdth was being "dissolved" and that Mr. Hartle was engaged in a new business, CoherentRX, Inc., which would utilize the business model, contacts and knowledge of Bandwdth. Some of the business contacts that lead to work performed by Coherent originated from Bandwdth's business activities.

• Mr. Hartle and Coherent issued stock, notes or other debt or equity interests in Coherent to former

Case 4:23-cv-00860-P   Document 22   Filed 10/02/23   Page 36 of 59   PageID 211

Page 6 of 7
2015 U.S. Dist. LEXIS 62252, *16

Bandwdth investors for no new consideration, but made no such offer to Heavy Duty Productions nor any payment to Heavy Duty Productions.

Dkt. No. 4 at 2 (citations omitted). Heavy Duty contends that [*17] specific jurisdiction exists because Defendants' conduct amounts to an intentional tort intended, or highly likely, to harm Heavy Duty in Texas.

Even when the issue is focused on a tort, and not a pre-existing contractual relationship, "the [jurisdictional] inquiry still 'focuses on whether the conduct underlying the claims was purposefully directed at the forum state.' '[T]he plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction under *Calder*." *Transverse, 2013 U.S. Dist. LEXIS 84928, 2013 WL 3146838 at *8* (citations omitted). Thus, the ultimate issue is: did Defendants "'purposefully direct' or 'expressly aim' its activities at Texas?" *Id.* With regard to Coherent, which allegedly received assets from Bandwdth, Heavy Duty has failed to point out any contacts between Coherent and Texas related to the tort in issue. As stated in *Mullins v. TestAmerica*, "we are skeptical of [the plaintiff's] suggestion that a non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor *ipso facto* establishes personal jurisdiction in the state where a complaining creditor resides." *Mullins, 564 F.3d at 400*. As noted, the "effects" test in *Calder* does not supplant the need for Bandwdth to demonstrate [*18] minimum contacts that show Coherent aimed actions at Texas. As the Fifth Circuit noted in *Mullins*,

> the premise of the fraudulent transfer claim asserted by [Plaintiff] . . . requires only a finding of fraudulent intent on the part of the "debtor," not the transferee. Knowingly accepting a fraudulent transfer may subject a transferee to liability, but such conduct is not necessarily tantamount to committing a wrongful act purposefully aimed at a creditor of the transferor in his state of residence. . . .We are thus doubtful that personal jurisdiction exists over the recipient of a fraudulent transfer anywhere a complaining creditor files suit simply by virtue of the creditor's residence in that forum.

*Mullins, 564 F.3d at 401* (citations omitted). Heavy Duty has failed to overcome this problem with regard to Coherent.

With regard to Bandwdth and Hartle, their alleged act of dissolving a company without paying its debts is insufficient to establish that they were specifically directing the resultant harm at its Texas debtor. As the Fifth Circuit has stated,

> recognizing that such collateral consequences may be far-reaching (particularly in a commercial tort situation such as the one before us), our precedent holds [*19] that consequences stemming from the actual tort injury do not confer personal jurisdiction at the site or sites where such consequences happen to occur.

*Jobe v. ATR Mktg., 87 F.3d 751, 753 (5th Cir. 1996)*. *See also Hoffman v. L & M Arts, 774 F.Supp.2d 826, 844 (N.D. Tex.2011)* (allegedly tortious acts occurring outside of Texas do not establish personal jurisdiction over the defendant on tortious interference claim). In this case, Bandwdth, a Delaware corporation headquartered in California, transferred its assets to Coherent, a Delaware corporation with its principal place of business in Michigan. As a result, Heavy Duty claims it suffered a financial injury in Texas. These facts do rise to the level of being purposeful tortious acts directed at Texas. In fact, the portion of the parties' relationship that arguably had something to do with the Texas—the e-mails and communications by Defendants with Heavy Duty in Texas—do not relate in any way to the fraudulent transfer claim. Assuming that a fraudulent transfer did occur, it occurred outside of Texas and did not involve any Texas property or property formerly owned by a Texas entity.

The cases Heavy Duty relies upon in support of its argument under TUFTA are not on point. For example, *Mullins, supra*, involved a multitude of contacts with the forum [*20] state. The Court in *Mullins* found that the actions that thwarted the party's right to payment under its contracts "were executed by [defendant] Faraway in Texas, where Faraway resides," and that the debtor-creditor relationship at issue was "centered in Texas." *Mullins, 564 F.3d at 401*. Additionally, *Mullins* involved a claim that one major creditor—located in Texas—was singled out as the only creditor not payed as a result of the allegedly fraudulent transfer. Here, there is no evidence that this is the case (as discussed below).

In *Dontos v. Vendomation NZ, Ltd., 582 Fed. Appx. 338 (5th Cir. 2014)*, the court based its jurisdictional finding on the fact that the defendants allegedly fraudulently transferred assets specifically to prevent Texas plaintiffs from collecting a pre-existing Texas judgment, thus demonstrating that the Texas residents were the express targets of the defendants' acts. This is not the case here, where Heavy Duty's complaint is that Bandwdth fraudulently transferred its assets in order to

2015 U.S. Dist. LEXIS 62252, *20

avoid payment of its bill. Heavy Duty fails to plead that Bandwdth acted to single it out as a debtor. While Lewin's Affidavit states "Heavy Duty Productions was one of the few vendors, if not the only vendor, that was not paid by Bandwdth" he also states that "after **[*21]** [Hartle] told me in April 2014, that Bandwdth needed to be dissolved, I learned that Bandwdth had been administratively dissolved by the State of Delaware in 2012 for Bandwdth's failure to pay Delaware LLC tax for 2012 and prior years." Dkt. No. 4-1. Thus, the evidence here shows that Bandwdth was failing to pay other creditors as well. The TUFTA claims here do not establish the sort of targeted activity described in *Mullins* and *Dontos*. *See, e.g., Allen & Vellone, P.C. v. Pino, 2014 U.S. Dist. LEXIS 35290, 2014 WL 1040634 (D. Colo. Mar. 18, 2014)* ("Fairly construed, Plaintiffs' allegation is that they—like all other creditors—were negatively affected by Defendant Pino's actions. That is a far cry from the purposeful, targeted actions that were established in *Mullins*."); *AAA Cooper Transp. v. Wes-Pak, Inc., 2012 U.S. Dist. LEXIS 33171, 2012 WL 847470 (M.D. Ala. Mar. 13, 2012)* ("[T]here is no evidence that AAA Cooper was paid less than other creditors or treated differently than any of Wes—Pak's other creditors.").

Because the first two factors of the specific jurisdiction test are not met, the Court need not address whether exercising jurisdiction is fair and reasonable—the third factor—which is only considered "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State. . . ." *Burger King, 471 U.S. at 476*. Even acknowledging that the third factor can **[*22]** "sometimes serve to establish reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required," *id. at 477*, the first two factors are too weak here to be saved by the third.

## III. RECOMMENDATION

Based upon the foregoing, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 3) and **DISMISS** this case **WITHOUT PREJUDICE** for lack of jurisdiction.

## IV. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must

specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987)*.

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions **[*23]** accepted by the District Court. *See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140, 150-53, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996)* (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 12th day of May, 2015.

/s/ Andrew W. Austin

ANDREW W. AUSTIN

UNITED STATES MAGISTRATE JUDGE

**End of Document**

 Positive
As of: October 2, 2023 8:20 PM Z

## *Honus Wagner Co. v. Luminary Grp. LLC*

United States District Court for the Southern District of Florida

December 21, 2017, Decided; December 21, 2017, Entered on Docket

Case No. 17-cv-61317-BLOOM/Valle

**Reporter**
2017 U.S. Dist. LEXIS 210097 *; 2017 WL 6547899

HONUS WAGNER COMPANY, Plaintiff, v. LUMINARY GROUP LLC and LESLIE BLAIR ROBERTS, Defendants.

**Subsequent History:** Reconsideration denied by
*Honus Wagner Co. v. Luminary Grp. LLC, 2018 U.S. Dist. LEXIS 227417 (S.D. Fla., Jan. 30, 2018)*

**Prior History:** *Honus Wagner Co. v. Luminary Grp. LLC, 2017 U.S. Dist. LEXIS 224191 (S.D. Fla., Oct. 12, 2017)*

## Core Terms

motion to dismiss, allegations, website, contacts, resides, personal jurisdiction, infringing, motion to strike, trademark, license, Notice, trademark infringement, due process, Defendants', forum state, purposefully, marks, Lanham Act, long-arm, effects, rights, lack of personal jurisdiction, cause injury, motions, Venue, moot, substantial justice, district court, tortious act, fair play

**Counsel:** **[*1]** For Honus Wagner Company, Plaintiff: Elliot Michael Zimmerman, Elliot Zimmerman, Plantation, FL.

For Luminary Group LLC, Leslie Blair Roberts, Defendants: Jordan Scott Cohen, LEAD ATTORNEY, Wicker Smith Tutan O'Hara McCoy Graham & Ford, Fort Lauderdale, FL; Michael Gene Polatsek, Wicker, Smith, O'Hara, McCoy, Ford, P.A., Fort Lauderdale, FL.

**Judges:** BETH BLOOM, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BETH BLOOM

## Opinion

ORDER ON MOTIONS TO DISMISS, OR IN ALTERNATIVE CHANGE VENUE; MOTION TO STRIKE; MOTION TO TAKE JUDICIAL NOTICE; MOTION FOR EXTENSION OF TIME; AND MOTION TO AMEND

**THIS CAUSE** is before the Court upon six motions: Motion to Dismiss or in the Alternative Transfer Venue of Plaintiff's First Amended Complaint, ECF No. [34], filed by Defendant Luminary Group LLC ("Luminary"); Motion to Dismiss or, in the Alternative, to Transfer Venue, ECF No. [47], filed by Defendant Leslie Blair Roberts ("L. Roberts," together with Luminary, "Defendants"); Defendant Leslie Blair Roberts' Motion Requesting the Court to Take Judicial Notice of Public Records, ECF No. [48]; and Defendants Luminary Group, LLC and Leslie Blair Roberts' Motion to Strike the Affidavit of Raymond M. Roberts (DE 50), the Supplemental Affidavit of **[*2]** Raymond M. Roberts (DE 55), and Plaintiff's Notice of Filing (DE 56), ECF No. [58] (collectively, the "Motions"). On December 12, 2017 Plaintiff filed an opposed Motion for Extension of Time to Amend Pleadings and or [sic] Add Parties and Incorporated Memorandum of Law with Request for Expedited Briefing Schedule or Immediate Ruling, ECF No. [67]. Finally, on December 19, 2017, Plaintiff filed a motion styled as "Plaintiff's Motion for Leave to File Second Amended Complaint to Add an Additional Count, Count XI for Declaratory Judgment, and to Clarify the First Amended Complaint to Reflect the Background History of Honus Wagner Company as per the Affidavits of Raymond M. Roberts ECF Nos. [50 and 55] Filed After the First Amended Complaint." ECF No. [68]. The Court has carefully reviewed the Motions, all opposing and supporting materials, the record in this case and the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion to Strike is granted in part and denied in part, the Motions to Dismiss are granted based on lack of personal jurisdiction, and the remaining motions are denied as moot.

## I. PROCEDURAL BACKGROUND

Plaintiff Honus Wagner Company ("Plaintiff") **[*3]** filed its Amended Complaint, ECF No. [20], on September 17, 2017. On October 4, 2017, Luminary filed its Motion to Dismiss or in the Alternative Transfer Venue of Plaintiff's First Amended Complaint, ECF No. [34]. On October 18, 2017, L. Roberts filed her Motion to Dismiss or, in the Alternative, to Transfer Venue, ECF No. [47] (together, with ECF No. [34], the "Motions to Dismiss"). Plaintiff filed Oppositions to both Motions to Dismiss, ECF Nos. [42] and [51] ("Oppositions"), and Luminary and L. Roberts replied, ECF Nos. [49] and [62]. On October 24, 2017, the day after Luminary filed its reply brief, Plaintiff filed an affidavit which purported to relate to Luminary's Motion to Dismiss styled "Affidavit of Raymond M. Roberts, Attorney at Law, Opining That Plaintiff Honus Wagner Company, Domesticated in Florida in 2013, Is a Successor in Interest Under the Decree, ECF No. 20-1," to which Plaintiff attached twelve exhibits. *See* ECF No. [50] ("October 24, 2017 R. Roberts Affidavit").[1] In addition, on October 26, 2017, two days after Plaintiff filed its Opposition to Roberts' Motion to Dismiss and prior to L. Roberts' Reply, Plaintiff filed an additional affidavit in support of its Opposition **[*4]** to L. Roberts' Motion to Dismiss styled "Supplemental Affidavit of Raymond M. Roberts, Attorney at Law, Opining That Plaintiff Honus Wagner Company, Domesticated in Florida in 2013, Is a Successor in Interest Under the Decree, ECF No. 20-1," in which Plaintiff referenced the exhibits attached to ECF No. [50] and attached an additional exhibit. *See* ECF Nos. [55] and [55-1] ("October 26, 2017 R. Roberts Affidavit").

Concurrent with the filing of her motion to dismiss, L. Roberts also filed a Motion Requesting the Court to Take Judicial Notice of Public Records. ECF No. [48] ("Motion to Take Judicial Notice"). In addition, on October 30, 2017, Defendants filed a Motion to Strike the October 24, 2017 R. Roberts Affidavit, the October 26, 2017 R. Roberts Affidavit, and Plaintiff's Notice of Filing (ECF No. [56]). ECF No. [58] ("Motion to Strike"). The day prior, however, Plaintiff filed a Notice of Striking as to ECF No. [56]. ECF No. [57]. Additionally, on October 30, 2017, after Defendants' Motion to Strike was filed, Plaintiff filed a second notice of striking styled "Notice of Striking ECF Nos. [50 and 55] Only With Respect to ECF Nos. [34 and 35]," which ostensibly attempted to clarify **[*5]** that ECF Nos. [50] and [55] are related only to the Motion to Dismiss filed by L. Roberts and not Luminary as Plaintiff originally filed them. ECF No. [61]. Plaintiff subsequently filed an opposition styled "Plaintiff's Response in Opposition to Luminary Group, LLC's and Leslue [sic] Blair Roberts' Motion to Strike the Affidavit of Raymond M. Roberts (DE 50), the Supplemental Affidavit of Raymond M. Roberts (DE 55), and Plaintiff's Notice of Filing (DE 56)," ECF No. [63], which appears to respond to both the Motion to Strike and the Motion to Take Judicial Notice. Defendants replied on November 14, 2017. ECF No [64]. Each of these motions is now ripe for review.

## II. FACTUAL BACKGROUND

According to the Amended Complaint, Johannes Peter Wagner, also known as Honus Wagner or John H. Wagner ("Wagner"), was a well-known shortstop for the Pittsburgh Pirates who was inducted into the Baseball Hall of Fame in 1936. ECF No. [20] ¶ 2. In 1922, after Wagner had retired from baseball, he formed a sporting goods store called the Honus Wagner Company and opened a store front in Pittsburgh, Pennsylvania. *Id.* ¶ 3. On December 28, 1928, a bankruptcy order was issued in the bankruptcy of the Honus Wagner **[*6]** Sporting Goods Company, a Delaware Corporation. *Id.* ¶ 8. Plaintiff alleges that Wagner subsequently sold the Honus Wagner Company,[2] "along with the rights to the Honus Wagner name, mark, likeness, and identity" to E.L. Braunstein in 1929. *Id.* ¶ 4. 6. While not clear from the Amended Complaint, the sale may have been memorialized in a written agreement (also not before the Court) between John H. Wagner and E.L. Braunstein dated January 21, 1939. *See id.* ¶ 8. By 1933, Wagner sued the Honus Wagner Company for an accounting and damages related to monies Wagner claimed he was owed by the Honus Wagner Company. *Id.* ¶ 5-6. According to the Amended Complaint, Wagner also sought injunctive relief "to stop the use of the Honus Wagner name, likeness, mark, and identity all together" and equitable relief to "give him back the

---

[1] To avoid confusion between Defendant Leslie Blair Roberts and Plaintiff's Affiant Raymond M. Roberts, the Court will refer to each as "L. Roberts" and "R. Roberts," respectively.

[2] Plaintiff refers to the original Honus Wagner Company, incorporated in Pennsylvania in 1922 (*id.* ¶ 3), and the Honus Wagner Sporting Goods Company, incorporated in Delaware, interchangeably (*id.* ¶ 8). For purposes of this motion, the Court need not decide whether these entities are the same, successors in interest, or otherwise related, and will refer to the entities with the terminology used by Plaintiff in the Amended Complaint.

Honus Wagner name, mark, likeness identity, and reputation for his sole use." *Id.* ¶ 6-7.

The lawsuit resulted in a decree "entered ... by consent of all the parties," and signed by the attorney for John H. Wagner; the attorney for E.L. Braunstein, E.L. Braunstein & Co., Inc., and E.L. Braunstein & Co, Inc. trading as United Sporting Goods Company; the attorney for Honus **[*7]** Wagner Company; and the attorney for National Stores Company. ECF No. [21-1] ("Consent Decree"). The Consent Decree states that "all commissions due, or alleged to be due" to Wagner "have been fully paid." *Id.* at 1. The Consent Decree further states:

> That the right to the exclusive use of the name "Honus Wagner" for all commercial and advertising purposes is vested in E.L. Braunstein & Co, Inc., a corporation, E.L. Braunstein and Honus Wagner Company, a corporation, their heirs, executors, administrators, successors and assigns, as appears by Order of Court dated December 28th, 1928, of Watson B. Adair, Esq., Referee in Bankruptcy of the District Court of the Unites States for the Western District of Pennsylvania, made in the Matter of the Honus Wagner Sporting Goods Company, a Delaware Corporation, Bankrupt, at No. 14400 In Bankruptcy, and further acknowledged in the written agreement between Johan H. Wagner and E.L. Braunstein, to the said and same effect, dated January 21st, 1929.

ECF No. [20-1] at 1-2. According to the Amended Complaint, E.L. Braunstein, and later his son-in-law, Murray Shapiro, continued to run the store until March 21, 2011. ECF No. [20] ¶¶ 11-12. The Amended Complaint **[*8]** alleges that after Murray Shapiro died in 2012 "ownership of Honus Wagner Company" passed first to Murray's daughter and then her brother, Allen Shapiro in 2013. *Id.* ¶ 16. By 2014, Allen Shapiro "move[d] the Honus Wagner Company's principal place of business to Florida and has been transitioning the physical store to the World Wide Web." *Id.* The Amended Complaint states that the Honus Wagner Company maintains an online store at www.HonusWagner.biz . *Id.* Plaintiff asserts that based on the foregoing facts, it "owns common law rights in the Honus Wagner name and mark." Plaintiff also alleges that it has registered the mark Honus Wagner with the United States Patent and Trademark Office for use for an "on-line retail store featuring sporting goods" and "for tee shirts, baseballs, and baseball bats." *Id.* ¶ 17. *See also* ECF No. [35] at 3 (Defendant Luminary noting that Plaintiff obtained two trademarks for the words "Honus

Wagner" in April 2016 and June 2016 for an online retail store featuring sporting goods and for tee shirts, baseballs and baseball bats).[3]

Luminary is a licensing agency which serves as "business representative for the estate of Honus Wagner" with its principal place of **[*9]** business in Indiana. ECF No. [20] ¶ 18; ECF No. [35] at 3; *see also* Affidavit of Pete Enfield, ECF No. [35-1] ("Enfield Aff."), ¶ 4. Luminary has registered the URL www.HonusWagner.com . ECF No. [20] ¶ 18; *see also* Enfield Aff. ¶ 12. The website is available to internet users "everywhere in the world." ECF No. [20]¶ 20. Through this website, Luminary offers to "work with companies who wish to use the name or likeness of Honus Wagner in any commercial fashion." *Id.* ¶ 18. The website states "[i]f you are interested in using Honus Wagner in a promotion or product campaign, please contact the Luminary Group" and provides a telephone and fax number. *Id.* The website also includes a fill-in form which allows potential customers to inquire by providing their name, email, subject and message. *Id.* Luminary further states on the same website that "[Honus Wagner's] name, image, words, signature, and voice are the protectable property rights owned by the estate. Any use of the above, without express written consent of the estate is strictly prohibited." *Id.*

Defendant L. Roberts is a resident of South Carolina and the sole heir of the Honus Wagner estate. *Id.* ¶ 26. Plaintiff alleges that Roberts "claimed **[*10]** ownership of the rights to the Honus Wagner name and mark and either granted [Luminary] a license, or assigned, her alleged rights to [Luminary]." *Id.* ¶ 21; *see also* Affidavit of Leslie Blair Roberts, ECF No. [47-3] ("L. Roberts Aff."), ¶ 3. The rights that Luminary offers to license through its website purportedly derive from Defendant L. Roberts, who claims to be the sole heir of the Honus Wagner estate. *Id.* ¶ 19; *see also* L. Roberts Aff. ¶ 5-7.

Plaintiff alleges that Luminary has entered into an agreement with at least one company, The Topps Company, Inc. ("Topps")[4], to license "Plaintiff's

---

[3] While Plaintiff does not allege when the trademarks were registered, the Court may take judicial notice of the USPTO's public records which indicate that U.S. Registration Number 4934815 was registered on April 12, 2016 and U.S. Registration Number 4971323 was registered on June 7, 2016. *See also* ECF No. [47] at 3.

[4] While not alleged by Plaintiff, according to Defendants,

intellectual property rights ... to advertise, make and sell products in this jurisdiction, as well as throughout the U.S. and the world." *Id.* ¶ 22. This includes sales in at least one store, All Star Sports & Collectibles located in Davie, Florida. *Id.* Plaintiff contends that "Luminary Group owns and controls several other websites directed at this jurisdiction and venue, the U.S. and the world, including but not limited to its company website located at *http://luminarygroup.com* . . . ." *Id.* ¶ 20. Plaintiff further alleges, without additional detail, that Luminary has licensed others and/or advertised to license others, **[*11]** and/or sold, advertised, and/or in some way shape, form or fashion infringed Plaintiff's Intellectual Property in this jurisdiction, venue, throughout the U.S. and/or the world." *Id.* ¶ 22.

Based on these allegations, Plaintiff alleges that Defendants have infringed on its intellectual property rights and asserts claims under the Lanham Act, as well as state law claims of trademark infringement, unfair competition, and right of publicity under Florida common law, the Florida Deceptive and Unfair Trade Practices Act, and the Indiana State Statutory Right of Publicity. *Id.* ¶ 24.

## III. MOTION TO STRIKE

Before reaching Defendants' Motions to Dismiss, the Court first addresses Defendants' Motion to Strike, ECF No. [58]. Defendants move to strike the October 24, 2017 R. Roberts Affidavit ECF No. [50]; the October 26, 2017 R. Roberts Affidavit, ECF No [55]; and Plaintiff's Notice of Filing, ECF No. [56]. *Rule 12(f) of the Federal Rules of Civil Procedure* permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," granting courts broad discretion in making this determination. *Fed. R. Civ. P. 12(f)*; *see also Morrison v. Executive Aircraft Refinishing, Inc., 434 F. Supp. 2d 1314, 1318-19 (S.D. Fla. 2005)*; *Williams v. Eckerd Family Youth Alternative, 908 F. Supp. 908, 910 (M.D. Fla. 1995)*. Under *Rule 12(f)*, "[a] motion to strike will usually be denied unless the allegations have no **[*12]** possible relation to the controversy and may cause prejudice to one of the parties." *Harty v. SRA/Palm Trails Plaza, LLC, 755 F. Supp. 2d 1215, 1218 (S.D. Fla. 2010)* (internal quotation and citation omitted); *see also Tarasewicz v. Royal Caribbean Cruises Ltd., No. 14-CIV-60885, 2015 U.S. Dist. LEXIS 45923, 2015 WL*

*1566398, at *1 (S.D. Fla. Apr. 8, 2015)* (same). Courts have broad discretion in considering a motion to strike under *Federal Rule of Civil Procedure 12(f)*. *Sakolsky v. Rubin Mem'l Chapel, LLC, No. 07-80354-CIV, 2007 U.S. Dist. LEXIS 79713, 2007 WL 3197530, at *1 (S.D. Fla. Oct. 26, 2007)*. However, *Rule 12(f)* motions to strike are considered drastic, granted sparingly and often disfavored. *Pujals ex rel. El Rey De Los Habanos, Inc. v. Garcia, 777 F. Supp. 2d 1322, 1327 (S.D. Fla. 2011)*.

First, Plaintiff has already stricken ECF No. [56] and its attachment, ECF No. [56-1] based on its own Notice of Striking, ECF No. [57]. *See* ECF No. [63] at 2 (representing that "Plaintiff has completely stricken its Notice of Filing, [DE 56], so Defendants' argument regarding same is moot"). The Court therefore denies as moot that portion of Defendants' Motion to Strike related to ECF No. [56].

Second, as to the October 24, 2017 R. Roberts Affidavit and October 26, 2017 R. Roberts Affidavit (together, the "R. Roberts Affidavits"), Defendants argue that both were improperly filed in contravention of the Local Rules, contain additional arguments not asserted in Plaintiff's Oppositions to the Motions to Dismiss, and effectively seek to amend the operative complaint. **[*13]** *See* ECF No. [58] at 2-3. In a combined response to both the Motion to Strike and Motion to Take Judicial Notice, ECF No. [63], Plaintiff appears to concede that the affidavits contain additional arguments not found in Plaintiff's Opposition to L. Roberts' Motion to Dismiss. Plaintiff urges the Court to deny the Motion to Strike because "to understand the true significance" of documents authored by Defendant L. Roberts to its motions, "the Court must examine the history" of Plaintiff and any related entities and proceedings as contained in the R. Roberts Affidavits. ECF No. [63] ¶ 1. Plaintiff further states in a footnote that "Plaintiff contends, regardless of striking some of its own pleadings, that Plaintiff's Response and the [R. Roberts Affidavits] apply to any and all pleadings affected by these new allegations." *Id.* ¶ 3 n.1. Conflating the standards for admission of expert testimony, a motion to dismiss, and a motion to strike, Plaintiff argues that R. Roberts is qualified as an expert and thus the R. Roberts Affidavits "satisfy the *Twombly/Iqbal* plausibility test, and as a result, the Court should not strike . . . ." *Id.* at 5.[5] On

---

Topps is a Delaware corporation with its principal place of business in New York. ECF No. [47] at 12-13 n.7.

---

[5] Plaintiff seems to further admit that the R. Roberts Affidavits seek to amend or supplement the pleadings based on its motion to amend filed December 19, 2017, styled as "Plaintiff's Motion for Leave to File Second Amended Complaint to Add an Additional Count, Count XI for Declaratory Judgment, and

reply, Defendants reiterate that they "take issue with [*14] Plaintiff's attempt to amend or improve upon its allegations . . ." through purported expert testimony and/or procedurally improper affidavits. ECF No. [64] at 2, 5.

The content and timing of filing of the R. Roberts Affidavits lend credence to Defendants' arguments in favor of striking the R. Roberts Affidavits. Defendant Luminary's Motion to Dismiss was fully briefed on October 23, 2017. *See* ECF No. [49]. Defendant L. Roberts filed her Motion to Dismiss on October 18, 2017, ECF No. [47], triggering Plaintiff's response date of November 1, 2017. Plaintiff filed an Opposition to L. Roberts' Motion to Dismiss on October 24, 2017. ECF No. [51], and that same day filed the October 24, 2017 R. Roberts Affidavit. For purposes of the Motion to Strike, the Court assumes, without deciding, that the October 24, 2017 R. Roberts Affidavit was erroneously filed as related to Defendant Luminary's fully-briefed Motion to Dismiss and should have been filed as related to Defendant L. Roberts' Motion to Dismiss, per counsel's representation to the Court. ECF No. [61].

The October 24, 2017 R. Roberts Affidavit was filed contemporaneously with Plaintiff's Opposition to L. Roberts' Motion to Dismiss, ECF [*15] No. [51], and thus is not improperly filed *as to Defendant L. Roberts*. Similarly, the October 26, 2017 R. Roberts Affidavit was filed within the allowed time to respond to L. Roberts' Motion to Dismiss and prior to the filing of L. Roberts' reply, and thus is not improperly filed *as to Defendant L. Roberts*.

However, the R. Roberts Affidavits contain additional factual matter not plead in the Amended Complaint and appear to be an attempt by Plaintiff's counsel to amend the operative complaint—apparently as to Defendant L. Roberts only—without seeking leave of Court. This is plainly improper. *Flintlock Constr. Servs. v. Well-Come Holdings, LLC, 710 F.3d 1221, 1228 (11th Cir. 2013)* (finding Eleventh Circuit precedent foreclosed defendant's attempt to amend its complaint without seeking leave of court pursuant to *Rule 15(a)(2)*); *SecurityPoint Media, LLC v. The Adason Grp., LLC, No. 8:07CV444T24TGW, 2007 U.S. Dist. LEXIS 57349, 2007 WL 2298024, at *3 (M.D. Fla. Aug. 7, 2007)* ("It is axiomatic that a plaintiff cannot amend the complaint by

_____

to Clarify the First Amended Complaint to Reflect the Background History of Honus Wagner Company as per the Affidavits of Raymond M. Roberts ECF Nos. [50 and 55] Filed After the First Amended Complaint."

arguments made by counsel in opposition to a motion to dismiss." (citation omitted)).

Accordingly, the Court grants Defendants' Motion to Strike the R. Roberts Affidavits as to Defendant L. Roberts, to the extent the allegations contained therein purport to amend the operative complaint. Further, to the extent that facts contained [*16] in the R. Roberts Affidavits may be construed as facts propounded to satisfy Plaintiff's burden under the due process prong of personal jurisdiction analysis, the Court will apply those facts as to Defendant Roberts only. Accordingly, Defendants' Motion to Strike ECF No. [50] and [55] is granted in part and denied in part.

## IV. MOTION TO DISMISS

### I. Legal Standard

A complaint in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. A motion to dismiss under *Rule 12(b)(6)* challenges the legal sufficiency of the complaint. *See Fed. R. Civ. P. 12(b)(6)*. To survive such a motion, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). Although this pleading standard "does not require 'detailed factual allegations,' ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," meaning that a plaintiff is required to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 556-56*). Thus, while a court must accept well-pleaded factual allegations as true, "conclusory [*17] allegations ... are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010)*. When considering a motion to dismiss, the Court construes the pleadings broadly and views the allegations in the complaint in the light most favorable to the plaintiff *Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016)*; *Levine v. World Fin. Network Nat'l Bank, 437 F.3d 1118, 1120 (11th Cir. 2006)*.

Under *Federal Rule of Civil Procedure 12(b)(2)*, a party may also move for dismissal based on lack of personal

jurisdiction. When a district court does not conduct a discretionary evidentiary hearing on a motion to dismiss for lack of jurisdiction, "[a] plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1350 (11th Cir. 2013)* (quoting *United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009)*); *Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990)* (citation omitted). If "a defendant challenges personal jurisdiction 'by submitting affidavit evidence in support of its position,'" the plaintiff then bears the burden of producing evidence supporting jurisdiction. *Id.* (quoting *United Techs., 556 F.3d at 1274*). When the plaintiff's complaint and the defendant's evidence conflict, the court "construe[s] all reasonable inferences in favor of the plaintiff." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006)*

## A. DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendant Luminary and Roberts both move to **[*18]** dismiss the Amended Complaint based on, *inter alia,* lack of personal jurisdiction. *See* ECF No. [35] at 9; ECF No [47] at 9. Luminary argues that it lacks any connection to Florida and that Luminary's passive websites that may be viewed in Florida are insufficient to establish personal jurisdiction. ECF No. [35] at 9. In particular, Defendant argues that these websites only "allow[] for the potential of someone to access them in Florida or to submit an email from Florida (which has never happened to Luminary Group's knowledge)." *Id.* at 10 (citing ECF No. [35-1] ¶ 16).

In support of its Motion to Dismiss based on lack of personal jurisdiction, Luminary filed an affidavit of Pete Enfield, the co-owner and president of Luminary Group. ECF No. [35-1], The Enfield Affidavit avers that Luminary (1) does not make or sell any products; (2) is a limited liability company created and organized in Indiana; (2) has two full time employees who work in Indiana; (3) does not maintain a Florida phone number or address; (4) has no agents in Florida; (5) has no Florida licenses, liens, real property or bank accounts; (6) has no contracts requiring performance in Florida; (7) does not insure any person, property **[*19]** or risk in Florida. *Id.* ¶¶ 3-7.

Luminary Group entered into one contract with NGC,

Florida company, on behalf of L. Roberts from 2014 to 2015 which licensed the phrase "J. Honus Wagner" on labels as part of a display holder for baseball-themed coin set. The contract resulted in gross revenue of $362 to Luminary and was no longer active as of 2015. *Id.* ¶¶ 17-19; *see also* Roberts Aff. ¶ 10-11.

L. Roberts, a South Carolina resident, similarly contends that this Court lacks personal jurisdiction over her because she has no minimum contacts with the state of Florida, and that, to the extent Luminary has any contacts with the state of Florida, those contacts may not be attributed to L. Roberts. ECF Nos. [47] at 12; [20] ¶ 26. In her affidavit in support of her motion to dismiss for lack of personal jurisdiction, L. Roberts avers that she is a resident of South Carolina since 2003. L. Roberts Aff. ¶ 3. Prior to 2003, L. Roberts lived in Pennsylvania and has never lived in Florida. *Id.* She is party to an agreement with Luminary Group as the exclusive worldwide licensing representative for Honus Wagner. *Id.* ¶ 8. She has "never entered into an agreement with Honus Wagner Company or any other Florida-based **[*20]** entity to act as a licensing representative in relation to Honus Wagner." *Id.* (footnote omitted).

In her Motion to Dismiss, L. Roberts contends that Plaintiff only alleges one specific allegation against her: "Upon information and belief, Defendant Leslie Blair Roberts claimed ownership of the rights to the Honus Wagner name and mark and either granted Defendant Luminary Group a license, or assigned, her alleged rights to Defendant Luminary Group." ECF No. [47] at 4 (citing ECF No. [20] ¶ 21). L. Roberts argues that this allegation is not only insufficient to state a claim against her, but also insufficient for the Court to exercise personal jurisdiction over her because it does not satisfy the Florida long arm statute or due process. *Id.* ¶ 10-18.

## B. THE COURT LACKS PERSONAL JURISDICTION OVER PLAINTIFF'S LANHAM ACT CLAIMS

"[S]pecific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within Florida and concerns a nonresident defendant's contacts with Florida only as those contacts related to the plaintiff's cause of action. *Louis Vuitton, 736 F.3d at 1352-53* (finding defendant's "tortious acts on behalf of JEM Marketing caused injury in Florida and thus occurred **[*21]** there because [defendant]'s trademark infringing goods were not only accessible on the website, but were sold to Florida

customers through that website. This satisfies *§ 48.193(1)(a)(2)*'s requirements for specific personal jurisdiction over [defendant]"). "A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008)*. Thus, to determine whether the Court may exercise personal jurisdiction over a defendant, the Court engages in a two part inquiry. First, the Court must determine whether Florida's long-arm statute is satisfied because the defendant committed one of its enumerated acts that subject a party to jurisdiction within Florida. *Carmouche v. Tamborlee Mgmt., Inc., 789 F.3d 1201, 1204 (11th Cir. 2015)* (quoting *Fla. Stat. § 48.193(1)(a)*). Second, the Court must determine whether such exercise comports with due process. *Louis Vuitton, 736 F.3d at 1350*. Because the federal statute that forms the basis of jurisdiction here, the Lanham Act, is silent on service of process, under *Federal Rule of Civil Procedure 4(e)* the Court relies on the long-arm statute to determine jurisdiction. *Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626-27(11th Cir. 1996)*.

Here, Plaintiff alleges personal jurisdiction based on three provisions of the Florida long arm statute:

(l)(a) A person, **[*22]** whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
2. Committing a tortious act within this state.
. . .
6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
a. The defendant was engaged in solicitation or service activities within this state; or

b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

*Fla. Stat. § 48.193(1)(a)(1)*, *(2)*, & *(6)*. "The reach of Florida's long-arm statute 'is a question of Florida law,' and this Court is required to apply the statute as would the Florida Supreme Court.'" *Louis Vuitton, 736 F.3d at 1352* (quoting *United Techs., 556 F.3d at 1274*).

Under *§ 48.193(1)(a)(2)*, a defendant **[*23]** commits a tortious act within Florida when that act causes injury in Florida. *See Posner v. Essex Ins. Co., 178 F.3d 1209, 1217 (11th Cir. 1999)* (holding that the Eleventh Circuit's "firmly established precedent . . . interprets subsection [*48.193(1)(a)(2)* ] to apply to defendants committing tortious acts outside the state that cause injury in Florida"). In the Eleventh Circuit, trademark claims under the Lanham Act as alleged by Plaintiff here are "tortious acts" for the purposes of Florida's long-arm statute. *Louis Vuitton, 736 F.3d at 1353*. Such a tortious act—that is, trademark infringement—occurs when a foreign defendant creates an infringing website out of state which is accessible to residents in Florida and causes harm to a plaintiff in Florida. *Licciardello, 544 F.3d at 1283-84* (finding "although the website was created in Tennessee, the Florida long-arm statute is satisfied if the alleged trademark infringement on the website caused injury in Florida"). In *Licciardello*, defendant, the singer-plaintiff's former manager, created a website in Tennessee which utilized the plaintiff's protected mark. In reversing the District Court's finding that it lacked personal jurisdiction, the Eleventh Circuit reasoned that the allegedly infringing website caused injury within Florida "by virtue of the website's **[*24]** accessibility in Florida" and Plaintiff's residence in Florida as the owner of the mark. *Licciardello, 544 F.3d at 1282-83*. *See also Louis Vuitton, 736 F.3d at 1353-54* (applying *Licciardello* and finding that the creation of websites which offered to sell infringing products accessible to and purchased by Florida residents was one of several tortious acts alleged which caused injury in Florida under *§ 48.193(1)(a)(2)*).

While the Eleventh Circuit has so far declined to weigh in on whether trademark injury necessarily occurs where the owner of the mark resides (*Licciardello, 544 F.3d at 1284*), district courts in this state have consistently held that allegations of trademark infringement occurring outside Florida are sufficient for long-arm jurisdiction if the plaintiff suffered harm in Florida. *Nida Corp. v. Nida, 118 F. Supp. 2d 1223, 1228 (M.D. Fla. 2000)* ("Injury from trademark infringement occurs in the state where the trademark owner resides."); *see also USA Mgmt. Grp., LLC v. Fitness Publications, Inc., No. 14-22477-CIV, 2015 U.S. Dist. LEXIS 191207, 2015 WL 11233075, at *2 (S.D. Fla. Mar. 4, 2015)* ("The act is

considered to take place within the state for purposes of the long-arm statute if the injured party resides in Florida, regardless of where the acts were actually committed."); *Mighty Men of God, Inc. v. World Outreach Church of Murfreesboro Tennessee, Inc., 102 F. Supp. 3d 1264, 1271 (M.D. Fla. 2015)* (finding trademark infringement satisfied *§48.193(I1(a)(2))*; *Carmel & Co v. Silverfish, LLC, No. 1:12-CV-21328-KMM, 2013 U.S. Dist. LEXIS 39824, 2013 WL 1177857, at \*4 (S.D. Fla. Mar. 21, 2013)*(" [T]he injury from trademark infringement occurs in the state **[\*25]** where the trademark owner resides." (internal citations and quotation marks omitted)); *Roca Labs, Inc. v. Boogie Media, LLC, No. 8:12-CV-2231-T-33EAJ, 2013 U.S. Dist. LEXIS 69169, 2013 WL 2025806, at \*6 (M.D. Fla. May 14, 2013)* (finding specific jurisdiction under *section 48.193(1)(b)* because alleged trademark infringement occurred where the holder resides; *Jackson-Bear Grp., Inc. v. Amirjazil, No. 2:10-CV-332-FTM-29, 2011 U.S. Dist. LEXIS 38621, 2011 WL 1232985, at \*6 (M.D. Fla. Mar. 30, 2011)* (noting *Licciardello*'s holding and assuming, without deciding, that the trademark infringement occurred in Florida, but finding assertion of personal jurisdiction violated due process); *KVAR Energy Sav., Inc. v. Tri-State Energy Solutions, No. 6:08-cv-85, 2009 U.S. Dist. LEXIS 3007, 2009 WL 103645, at \*11 (M.D. Fla. Jan. 15, 2009)* (holding long arm statute satisfied where website displays alleged trademark infringement and is accessible in Florida); *DiMaggio, LLC. v. City, Cty. of San Francisco, 187 F. Supp. 2d 1359, 1365 (S.D. Fla. 2000)* (finding long arm statute satisfied when Defendant City of San Francisco named a park after Joe DiMaggio, allegedly causing injury within the state of Florida where his estate, DiMaggio, LLC, resides, but finding exercise of personal jurisdiction did not comport with due process); *JB Oxford Holdings, Inc. v. Net Trade, Inc., 76 F. Supp. 2d 1363, 1366 (S.D. Fla. 1999)* (finding specific jurisdiction under *section 48.193(1)(b)* because alleged trademark infringement occurred where the holder resides). *But see Smith v. Trans-Siberian Orchestra, 728 F. Supp. 2d 1315, 1321-22 (M.D. Fla. 2010)* (noting that courts in the Eleventh Circuit have recognized three different tests for under **[\*26]** what circumstances a website may constitute an electronic communication into Florida to fulfill the Florida's long arm statute: specific targeting (*Whitney Info. Network, Inc. v. Xcentric Ventures, LLC, 347 F. Supp. 2d 1242, 1243 (M.D. Fla. 2004))*, accessibility (*Licciardello, 544 F.3d at 1280*), and accessible and actually accessed (*Internet Sols. Corp. v. Marshall, 557 F.3d 1293, 1295-96 (11th Cir. 2009)*, *certified question answered*, *39 So. 3d 1201 (Fla. 2010)))*.

Here, Plaintiff has alleged that it is a Florida corporation—albeit somewhat recently domesticated in the state of Florida—and that it is the holder of the marks on which Defendants have allegedly infringed. ECF No. 20 ¶ 27. The Amended Complaint alleges that in 2014, three years after the last store closed in Pittsburgh, Allen Shapiro "moved Honus Wagner Company's principal place of business to Florida and has been transitioning the physical store to the World Wide Web," which can be found online at *www.HonusWagner.biz* . *Id.* ¶ 16. Plaintiff alleges that the Honus Wagner Company is "now a Florida Corporation." *See* ECF No. [20] ¶ 3. Honus Wagner Company now maintains its principal place of business in Fort Lauderdale, Florida. *Id.* ¶ 27

The Amended Complaint alleges that Defendants infringed on Plaintiff's trademark, by either unlawfully contracting with a licensing agency to license the marks (in the case of Roberts) or unlawfully licensing, advertising **[\*27]** the licensing, and using the Plaintiff's marks (in the case of Luminary). Reading the Eleventh Circuit's direction in *Licciardello* and *Louis Vuitton* with the district court decisions in this state which have found that the trademark injury occurs where the owner of the mark resides, and taking Plaintiff's allegations as true that both Defendant Luminary and Defendant L. Roberts infringed on the marks, the Court finds that Plaintiff has adequately alleged conduct which satisfies the Florida's long-arm statute under *§48.193(1)(a)2)*.

Plaintiff also argues that it satisfies Florida's long-arm statute under *§ 48.193(1)(a)(1)* and *(6)*. *See* ECF No. [51] at 13-18. However, to the extent that Plaintiff's allegations regarding Topps' connection to Florida attempt to establish personal jurisdiction over Luminary and L. Roberts based on *§ 48.193(1)(a)(1)* and *(6)*, the Court finds that argument unpersuasive. The Amended Complaint does not contain sufficient allegations that Defendants were "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state," or "[c]ausing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or **[\*28]** about the time of the injury, . .. [t]he defendant was engaged in solicitation or service activities within this state." *Id.* An alleged licensing agreement between an Indiana company and a Delaware company with its principal place of business in New York in which the licensee contracts to license the use of the mark on products that are sold online or sold to third party stores, including one in Florida, cannot confer jurisdiction in this state over Luminary,

more less L. Roberts. *See* ECF Nos. [20] ¶ 22, 26; [42] at 4; [47] at 12-13 n.7; [51] at 4, 13.

Moreover, to the extent Plaintiff has argued in its Oppositions to the Motions to Dismiss that the licensing agreement mentioned in the affidavit of Pete Enfield, president of Luminary, with Florida company NGC active between 2014-2015 (Enfield Aff. ¶¶ 17-20) qualifies as "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state" arising out of the claim sufficient to confer personal jurisdiction over Defendants on Plaintiff's Lanham Act claims under *§ 48.193(1)(a)(1)*, that contract pre-dates any registered trademark allegedly owned by the Plaintiff and therefore cannot satisfy the long [*29] arm statute for the purposes of Plaintiff's Lanham Act claims. *Nat. Answers, Inc. v. SmithKline Beecham Corp., 529 F.3d 1325, 1329 (11th Cir. 2008)* ("To bring a trademark infringement claim under the *Lanham Act*, a plaintiff must hold a valid trademark.").

## C. DUE PROCESS

The Court has found that Plaintiff's allegations sounding in violations of the *Lanham Act* satisfy the Florida long arm statute because they allege that Defendants committed tortious acts outside the state that caused injury in Florida. However, the inquiry does not end there. Now the Court must examine whether the exercise of personal jurisdiction comports with constitutional due process. The Court finds that it does not.

The Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless its contacts with the state are such that it has "fair warning" or could have "reasonably anticipated" that it may be subject to suit there. *Licciardello, 544 F.3d at 1284* (quoting *Shaffer v. Heitner, 433 U.S. 186, 218, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)* (Stevens, J., concurring in judgment)); *Burger King, 471 U.S. at 472* (quoting *International Shoe, 326 U.S. at 316*). "This 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' [its] activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Licciardello, 544 F.3d at 1284*. (citing *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)* and *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. In addition, the Court must also [*30]

examine whether the exercise of jurisdiction comports with "fair play and substantial justice." *Licciardello, 544 F.3d at 1284 (11th Cir. 2008)* (quoting *International Shoe, 326 U.S. at 320*).

The Eleventh Circuit has distilled the due process analysis into a three-part test: "(1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "'traditional notions of fair play and substantial justice.'" *Louis Vuitton, 736 F.3d at 1355* (citation omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1267 (11th Cir. 2010)*).

## 1. Relatedness

"[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum.'" *Fraser v. Smith, 594 F.3d 842, 850 (11th Cir. 2010)* (quoting *Oldfield, 558 F.3d at 1222* (some internal quotation marks omitted)). The "inquiry must focus on the direct causal [*31] relationship between the defendant, the forum, and the litigation." *Fraser, 594 F.3d at 850* (internal quotation marks omitted) (quoting *Helicopteros, 466 U.S. at 414, 104 S.Ct. at 1872*).

Plaintiff alleges five federal claims that sound under the Lanham Act against both Defendants: Count I, Federal Trademark Infringement Under the Lanham Act *15 U.S.C. § 1114*; Count II, Unfair Competition Under the Lanham Act, *15 U.S.C.§ 1125(a)*; Count III, False Advertising Under the Lanham Act, *15 U.S.C. § 1125(a)*; Count IV, Dilution by Blurring Under the *Lanham Act, 15 U.S.C. § 1125(c)*; and Count V, Cyberpiracy Prevention Under the Lanham Act, *15 U.S.C. § 1125(d)(1)*. Each is premised on two registrations for the mark "Honus Wagner" in the United States Patent and Trademark Office ("USPTO"). One is an "International Class 35 as an on-line retail store featuring sporting goods (U.S. Registration Number 4934815)" and the second is an "International Classes 25 & 28 for tee shirts, baseballs and baseball bats (U.S. Registration Number 4971323)."

ECF No. [20] ¶ 17. Counts I-V each alleges that Defendants infringed on these registered marks which were registered in April and June 2016. Accordingly, only those contacts which Defendants made with the forum after the registering of the trademarks are relevant to the Court's jurisdictional inquiry.[6] *See Omega Psi Phi Fraternity, Inc. v. Edden, No. 11-CV-80479, 2012 U.S. Dist. LEXIS 199404, 2012 WL 13018589, at *3 (S.D. Fla. Oct. 30, 2012)*.

Plaintiff has alleged that Luminary's infringing website is available to anyone with [*32] internet access in the world, including Florida residents and offers to enter into infringing licensing agreements with anyone in the world with internet access, including Florida residents. ECF No. [20] ¶¶ 18-20. Plaintiff argues that Defendant Luminary entered into two licensing agreements, one (included in the Amended Complaint) with Topps that allegedly infringes on Plaintiff's marks by selling goods in the forum (*id.* ¶20) and one with NGC (argued in Plaintiff's Oppositions to the Motions to Dismiss), that allegedly infringes on Plaintiff's marks by entering into a licensing agreement with a Florida company, ECF Nos. [42] at 4 & [51] at 4-5. As to Defendant L. Roberts, Plaintiff alleges that L. Roberts entered into its agreement with Luminary to license for the allegedly infringing advertising and marketing of Plaintiff's marks. ECF No. [20] ¶ 21. Under the broad standard applied for relatedness in this Circuit, these allegations are sufficient to find the Defendants' contacts with Florida are related for purposes of the first prong because the contacts are sufficiently related to the forum state. *Louis Vuitton, 736 F.3d at 1355-56 (11th Cir. 2013); Mighty Men, 102 F. Supp. 3d at 1272; Commodores Entm't Corp. v. McClary, No. 6:14-cv-1335-Orl-37GJK, 2015 U.S. Dist. LEXIS 33540, 2015 WL 1242818, at *3 (M.D. Fla. Mar. 18, 2015)*.

## 2. Purposeful [*33]  Availment

As this Circuit has observed, in intentional tort cases including trademark infringement, there are two

---

[6] Accordingly, the Court will not analyze contacts with the forum state prior to registration for the purposes of personal jurisdiction over Plaintiff's Lanham Act claims. However, even if the Court were to include the single contract specified by Defendant Luminary in the Enfield Affidavit with a Florida company active from 2014 to 2015 which grossed Luminary $362, the Court is doubtful that the addition of this contact into the due process analysis would change the outcome here for Luminary Group, much less for L. Roberts.

applicable tests to determine whether a defendant has "purposefully availed" himself to the forum state: the "effects test" and the traditional "minimum contacts" test. Under the effects test articulated by the Supreme Court in *Calder v. Jones*, a nonresident defendant's single tortious act can establish purposeful availment even if a defendant does not have any additional contacts with the forum state. *See Licciardello, 544 F.3d at 1285* (citing *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*. This occurs when the tort was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (citations omitted). This Circuit has "applied the traditional minimum contacts test for purposeful availment analysis in lieu of, or in addition to, the "effects test" in cases involving trademark-related intentional torts." *Louis Vuitton, 736 F.3d at 1357*. Under that test, a court asks whether the defendant's contacts (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are [*34] such that the defendant should reasonably anticipate being haled into court in the forum. *U.S. S.E.C. v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997)*.

The two leading Eleventh Circuit cases analyzing purposeful availment in trademark infringement cases where the claims are based on a website are *Licciardello* and *Louis Vuitton*. In both, the Eleventh Circuit found that the district court could exercise jurisdiction over a foreign defendant, but the facts analyzed in each are distinguishable from those before the Court here. In *Licciardello*, the Eleventh Circuit applied the *Calder* effects test and found that defendant had committed the intentional tort of "using [plaintiff's] trademarked name and his picture on a website accessible in Florida in a manner to imply [plaintiff's] endorsement of [defendant] and his products" sufficient to satisfy purposeful availment. The *Licciardello* Court further observed: "The use was not negligent, but intentional. The purpose was to make money from [plaintiff's] implied endorsement. The unauthorized use of [plaintiff's] mark, therefore, individually targeted [plaintiff] in order to misappropriate his name and reputation for commercial gain. These allegations satisfy the *Calder* effects test for personal jurisdiction—the [*35] commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum." *Licciardello, 544 F.3d at 1287-88 (11th Cir. 2008)*.

Similarly, in *Louis Vuitton*, the Eleventh Circuit found

personal jurisdiction was appropriate. There, the Eleventh Circuit found that "[defendant] purposefully availed himself of the Florida forum in such a way that he could reasonably foresee being haled into a Florida court. [Defendant] purposefully solicited business from Florida residents through the use of at least one fully interactive, commercial website, "pendoza.com ." As a result of this Internet advertising, [defendant] received orders from multiple Florida residents to ship goods into Florida. At least one of those orders was from [plaintiff's investigator] for a billfold and [defendant] shipped those goods, including the billfold, into Florida. These collective contacts establish that [defendant] purposefully availed himself of the privileges of doing business in south Florida." *Louis Vuitton, 736 F.3d at 1357*. The Eleventh Circuit, however, cautioned, that its holding in *Louis Vuitton* did not mean that "the mere operation of an interactive website alone gives rise to purposeful availment *anywhere* the website can be accessed," **[*36]** but rather that on the facts before the Court there personal jurisdiction was proper where "in addition to his fully interactive "pendoza.com " website accessible in Florida, [defendant] had other contacts with Florida—through selling and distributing infringing goods through his website to Florida consumers—*and the cause of action here derives directly from those contacts*." *Id. at 1358* (emphasis in original).

After both *Licciardello* and *Louis Vuitton*, the Supreme Court in *Walden v. Fiore* clarified the constrains that constitutional due process places on the exercise of personal jurisdiction. *134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*. In *Walden*, the Supreme Court held that the state of Nevada could not exercise jurisdiction over a defendant from Georgia based merely on the defendant's knowledge that his false affidavit would cause harm to two plaintiffs in Nevada. The *Walden* Court observed that the inquiry regarding "minimum contacts" required to exercise specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation.' . . . For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with **[*37]** the forum State." *Walden, 134 S. Ct. at 1121-22*.

Importantly, "the relationship must arise out of contacts that the "defendant himself creates with the forum State . . . [since d]ue process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id. at 1122* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L.*

*Ed. 2d 528 (1985)* and citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980))*. The analysis must focus on the "defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* Accordingly, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* (citing *Burger King, 471 U.S. at 478*). "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King, 471 U.S. at 475*).

With regard to the *Calder* effects test, *Walden* held that "[t]hese same principles apply when intentional torts are involved." *Id. at 1123*. The *Walden* Court, in reviewing *Calder*, noted that jurisdiction was appropriate **[*38]** in *Calder* under the effects test because defendants' intentional conduct connected them directly with California, based on not only the defamatory effects of the news article in the state, but also the California-focused subject matter of the news article which involved California sources and descriptions of activities in California. *Id.*

Reading *Licciardello* and *Louis Vuitton* in conjunction with *Walden*, the Court finds Plaintiffs have failed to allege that Defendants purposefully availed themselves to the state of Florida under both the traditional minimum contacts test and the *Calder* effects test. Plaintiff argues that Defendants' website which provides Luminary's contact information to anyone with internet access, including those in Florida, and allows users to submit their contact information to Luminary is sufficient to show purposeful availment in the state of Florida. However, Plaintiff has specifically pled itself out of this contention repeatedly stating that Defendants never specifically targeted Florida, but rather the U.S. and the world. ECF No. [20] ¶¶ 18-20; *Louis Vuitton, 736 F.3d at 1357* (noting mere availably of a website in the district does not confer personal jurisdiction). Defendants aver **[*39]** that they have no knowledge of any Florida resident contacting Luminary based on the information viewable on the website nor filling in the contact information form. ECF No. [35-1] ¶¶ 16-17. Moreover, the Court rejects Plaintiff's argument that Defendants' allegedly infringing contract with Delaware corporation Topps, which is domiciled in New York, does not evince purposeful availment *in Florida*. ECF No. [47] at 12-13

2017 U.S. Dist. LEXIS 210097, *39

n.7. Finally, any connections non-party Tops may have to the state of Florida are irrelevant for purposes of analyzing personal jurisdiction over Defendants. *See Walden, 134 S. Ct. at 1122*; *U.S. S.E.C. v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997)*.

Plaintiff's second argument in favor of personal jurisdiction urges the Court to find that Defendants have purposefully availed themselves to the state of Florida because their infringing conduct caused harm to Plaintiff, which is located the state. ECF No. [20] ¶¶ 24, 59. While these allegations may be sufficient to satisfy Florida's long-arm statute, they fall short of satisfying the requirements of due process. Exercise of due process based on this theory would controvert the Supreme Court's guidance in *Walden* because it would arise out out of Defendants' purposeful contacts with the state but rather would **[\*40]** be based on their connection to Plaintiff and Plaintiff's contacts with Florida. *See Blue Water Int'l, Inc. v. Hattrick's Irish Sports Pub, LLC, No. 8:17-CV-1584-T-23AEP, 2017 U.S. Dist. LEXIS 154121, 2017 WL 4182405, at \*3 (M.D. Fla. Sept. 21, 2017)* ("Under *Hanson v. Denckla, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)*, *Colder*, and *Walden*, the fact that the plaintiff allegedly suffered an injury in Florida as a consequence of a purportedly "intentional" tort is insufficient to subject the Missouri bar to suit in Florida."). This is even more true for Defendant L. Roberts, whose only alleged connection to Florida is *through* the same contacts of Luminary the Court finds to be insufficient to satisfy due process. *See TracFone Wireless, Inc. v. Clear Choice Connections, Inc., No. 13-CV-23066, 2014 U.S. Dist. LEXIS 193047, 2014 WL 11899285, at \*3-4 (S.D. Fla. July 15, 2014)* (finding no purposeful availment as to individual defendant when allegations of contact with the forum state only alleged corporate conduct). Accordingly, the Court finds Defendants have not purposefully availed themselves to Florida, and, thus, there exists no personal jurisdiction over the Defendants.

## 3. Fair Play and Substantial Justice

Under the third prong, once Plaintiff has satisfied its burden under the first two prongs, Defendants bear the burden of establishing that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice. *See Louis Vuitton, 736 F.3d at 1355*. This inquiry requires consideration **[\*41]** of the following factors: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective

relief; and (4) "the [interstate] judicial system's interest in resolving the dispute." *Mighty Men, 102 F. Supp. 3d at 1275* (quoting *Licciardello, 544 F.3d at 1288*). "[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Burger King, 471 U.S. at 477-78*.

While the Court need not analyze these factors since Plaintiff has failed to fulfill its due process burden, even if it had, the exercise of jurisdiction in this case would violate fair play and substantial justice. On the first factor, Luminary is an Indiana company with two employees with its principal place of business also in Indiana. L. Robert is an individual residing in South Carolina. ECF No. [20] ¶ 25, 26. Both would be heavily burdened by litigating in this form. *See* Enfield Aff. ¶ 21; L Roberts Aff. ¶ 44. On factors two and four, the unique facts before the Court weigh against exercise of jurisdiction. This dispute is between an Indiana company, a South Carolina individual, and a recently domesticated **[\*42]** Florida corporation which for over 90 years was located in Pennsylvania. With the exception of Allen Shapiro, is it is not clear than any relevant witnesses or documents are located in the state of Florida. *See* L. Roberts Aff. ¶ 45. Taking the allegations in the Amended Complaint as true, Plaintiff and this dispute have significant contacts with Pennsylvania. Amended Complaint alleges that the Honus Wagner Company was prosperous and "world renowned famous sporting goods company" in Pittsburgh, which at its peak in the 1930s and 1940s maintained ten stores. *See* ECF No. [20] ¶ 11. In 2011, the Allegheny County Council presented the Honus Wagner Company with a proclamation recognizing the company as an "icon of Pittsburgh retail business." *Id.* ¶ 15. While Plaintiff is a domesticated Florida corporation, Florida's interest in adjudicating this dispute is minimal, and it may be more appropriately heard in other jurisdictions more connected with the facts of this case. The third factor weighs in favor of exercise of jurisdiction in this district, but on balance, the facts here demonstrate that exercise of jurisdiction by a Florida court offends traditional notions of fair play and substantial **[\*43]** justice.

## D. SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS

Having determined that the Court lacks personal jurisdiction over Plaintiff's federal claims, only Plaintiff's

state law claims remain. *See* ECF No. [20]. Plaintiff has alleged federal question subject matter jurisdiction because the Amended Complaint "alleges violations of federal law under the Lanham Act," and supplemental jurisdiction over Plaintiff's state law claims under *28 U.S.C. § 1338 (b)* and *§ 1367*. While a district court may exercise jurisdiction over remaining state law claims when it "has dismissed all claims over which it has original jurisdiction," it need not do so. *28 U.S.C. § 1367*. In fact, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004)*.

Because the Court has dismissed any "substantial and related claim under the copyright, patent, plant variety protection or trademark laws" (*28 U.S.C. § 1338(b)*) and "all claims over which it has original jurisdiction" (*28 U.S.C. § 1367(c)(3)*) for lack of personal jurisdiction, the Court declines to exercise personal jurisdiction over Plaintiff's remaining state law claims. *28 U.S.C. § 1367*. Accordingly, Counts VI, Trademark Infringement Under Florida [*44] Common Law; Count VII, Unfair Competition Under Florida Common Law; Count VIII, Violation of the *Florida Deceptive and Unfair Trade Practices Act Fla. Stat. § 501.201 et seq.*; Count IX, Indiana State Statutory Right of Publicity; and Count X, Common Law Right of Publicity are dismissed.

**V. REMAINING MOTIONS BEFORE THE COURT**

The Court lacks personal jurisdiction over Defendants. Accordingly, the remaining motions before the Court, (1) Defendants Motions to Transfer Venue to the Southern District of Indiana as contained in ECF Nos. [34] and [47]; (2) Defendant L. Roberts' Motion to Take Judicial Notice, ECF No. [48], (3) Plaintiff's Motion for Extension of Time to Amend Pleadings and or [sic] Add Parties and Incorporated Memorandum of Law with Request for Expedited Briefing Schedule or Immediate Ruling, ECF No. [67]; and (4) Plaintiff's Motion for Leave to File Second Amended Complaint to Add an Additional Count, Count XI for Declaratory Judgment, and to Clarify the First Amended Complaint to Reflect the Background History of Honus Wagner Company as per the Affidavits of Raymond M. Roberts ECF Nos. [50 and 55] Filed After the First Amended Complaint, ECF No. [68], are denied as moot.

**VI. CONCLUSION**

Accordingly, for **[*45]** the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Luminary's Motion to Dismiss, **ECF No. [34]**, is **GRANTED** based on lack of personal jurisdiction;

2. Defendant L. Roberts' Motion to Dismiss, **ECF No. [47]**, is **GRANTED** based on lack of personal jurisdiction;

3. Defendants Motions to Transfer Venue to the Southern District of Indiana as contained in **ECF Nos. [34] and [47]**, are **DENIED AS MOOT**.

4. Plaintiff's Amended Complaint, **ECF No. [20]**, is **DISMISSED WITHOUT PREJUDICE**;

5. Defendant L. Roberts' Motion to Take Judicial Notice, **ECF No. [48]**, is **DENIED AS MOOT**;

6. Defendant L. Roberts' Motion to Dismiss, **ECF No. [47]**, is **GRANTED**;

7. Plaintiff's Motion for Extension of Time to Amend Pleadings and or [sic] Add Parties and Incorporated Memorandum of Law with Request for Expedited Briefing Schedule or Immediate Ruling, **ECF No. [67]**, is **DENIED AS MOOT**;

8. Plaintiff's Motion for Leave to File Second Amended Complaint to Add an Additional Count, Count XI for Declaratory Judgment, and to Clarify the First Amended Complaint to Reflect the Background History of Honus Wagner Company as per the Affidavits of Raymond M. Roberts ECF Nos. [50 and 55] Filed After the First Amended Complaint, **[*46] ECF No. [68]**, is **DENIED AS MOOT**.

9. All deadlines are terminated and all pending motions are denied as moot.

10. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 21st day of December, 2017.

/s/ Beth Bloom

**BETH BLOOM**

**UNITED STATES DISTRICT JUDGE**

*End of Document*

 Neutral
As of: October 2, 2023 8:22 PM Z

## *Southwest Airlines Co. v. Kiwi*

United States District Court for the Northern District of Texas, Dallas Division

August 10, 2021, Decided; August 10, 2021, Filed

CIVIL ACTION NO. 3:21-cv-00098-E

**Reporter**
2021 U.S. Dist. LEXIS 207508 *; 2021 WL 4552146

SOUTHWEST AIRLINES CO., Plaintiff, v. KIWI.COM, INC. AND KIWI.COM S.R.O., Defendants.

## Core Terms

personal jurisdiction, alleges, website, flights, argues, scraping, motion to dismiss, minimum contact, forum state, unauthorized, nonresident, contacts, servers, unfair

**Counsel:** **[*1]** For Southwest Airlines Co, Plaintiff: Michael C Wilson, LEAD ATTORNEY, Julie M Christensen, S Wallace Dunwoody, IV, Zachary Brian Tobolowsky, Munck Wilson Mandala LLP, Dallas, TX; Amanda Kate Greenspon, Munck Wilson Mandala, Dallas, TX.

For Kiwi.com Inc, Kiwi.com SRO, Defendants: Alex More, LEAD ATTORNEY, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX; Ryan P Bates, LEAD ATTORNEY, Bates PLLC, Austin, TX; Asa Cash Garber, PRO HAC VICE, McCarthy Garber Law LLC, Denver, CO; Kieran McCarthy, PRO HAC VICE, McCarthy Garber Law LLC, Denver, CO; Monica Gaudioso, Carrington Coleman Sloman & Blumenthal, Dallas, TX.

For Mark Lemley, Amicus: Kevin James Terrazas, Cleveland Terrazas PLLC, Austin, TX.

For ADR Provider, Mediator: John Sabine DeGroote, LEAD ATTORNEY, Dallas, TX.

**Judges:** Ada Brown, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Ada Brown

## Opinion

## ORDER

Before the Court is Defendant Kiwi.com s.r.o.'s Motion to Dismiss First Amended Complaint (Doc. 60). Kiwi contends the Court lacks personal jurisdiction over it. Alternatively, Kiwi asks the Court to dismiss several of Plaintiff Southwest Airlines Company's claims under Rule 12(b)(6). Southwest responds that Kiwi is subject to specific personal jurisdiction, that Kiwi waived personal **[*2]** jurisdiction by an enforceable forum selection clause, and that it has stated claims upon which relief can be granted. For reasons that follow, the Court denies Kiwi's motion.

Defendant Kiwi is a limited liability company with headquarters in the Czech Republic. In its First Amended Complaint, Southwest alleges that Kiwi, and another defendant who does not challenge personal jurisdiction, operates an online travel agency.[1] Southwest does not allow online travel agencies to sell Southwest flights without express written approval. The Terms & Conditions for use of its website ("the Terms") expressly prohibit attempts to "page scrape" flight data and use of the website for any commercial purpose without authorization from Southwest. Southwest alleges Kiwi has engaged in repeated, unlawful activity on the Southwest website, including unauthorized scraping of flight and pricing data and unauthorized sale of Southwest tickets. Southwest asserts the following causes of action: (1) breach of contract/the Terms; (2) trademark infringement under *15 U.S.C. § 1114*; (3) false designation of origin and unfair competition under *15 U.S.C. § 1125(a)*; (4) dilution under *15 U.S.C. § 1125(c)*; (5) computer fraud and abuse under *18 U.S.C. § 1030*; (6) violation of the Texas **[*3]** Harmful Access by Computer Act; and (7) unjust enrichment.

Southwest's live pleading includes the following

---

[1] The other defendant is Kiwi.com Inc., a Delaware corporation. For purposes of this Order, "Kiwi" refers only to Kiwi.com s.r.o.

2021 U.S. Dist. LEXIS 207508, *3

jurisdictional allegations. Southwest alleges Kiwi is accessing Southwest's computer systems located in Texas and in this District without authorization, bypassing Southwest's security systems intended to block automated traffic and bots from using its website, and hacking the Southwest application program interface that is accessible only through Southwest's website. Southwest alleges Kiwi purchased tickets from Southwest's website and resold those flights to over 170,000 customers. In purchasing the flights, Kiwi interacted with Southwest's computer systems located in this District.

Southwest further alleges the Court has jurisdiction over Kiwi pursuant to the Terms of its website, which include the following forum selection clause:

**Forum Selection**

**These Terms and the relationship between you and Southwest shall be governed by the laws of the State of Texas without regard to any conflict of law provisions. You agree to the personal and exclusive jurisdiction of the courts located within Dallas, TX. You hereby consent to the exclusive jurisdiction and venue of the State and Federal [*4] courts in Dallas, Texas in all disputes. You agree and understand that you will not bring against the Southwest Parties any class action lawsuit related to your access to, dealings with, or use of the Service**.

In addition, Southwest asserts Kiwi has committed torts in this District, breached a contract in this District, violated Texas statutes in this District, and systematically conducts business in this District.

In its motion to dismiss, Kiwi argues that it is not subject to general or specific personal jurisdiction in Texas. Kiwi denies that it has consented to personal jurisdiction in this district. It maintains the forum selection clause on Southwest's website is invalid and unenforceable. Kiwi also argues that even if there are minimum contacts to support specific jurisdiction, exercise of that jurisdiction would be unfair and unreasonable.

On a motion to dismiss for lack of personal jurisdiction, the plaintiff rather than the movant has the burden of proof. *Wyatt v. Kaplan, 686 F.2d 276, 280 (5th Cir. 1982)*. The plaintiff need not establish personal jurisdiction by a preponderance of the evidence; prima facie evidence of personal jurisdiction is sufficient. *Id.* The Court accepts the plaintiff's uncontroverted,

nonconclusory factual **[*5]** allegations as true and resolves all controverted allegations in the plaintiff's favor. *Carmona v. Leo Ship Mgmt., Inc., 924 F.3d 190, 193 (5th Cir. 2019)*. The Court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, and other recognized methods of discovery. *Stuart v. Spademan, 772 F.2d 1185, 1192 (5th Cir. 1985)*.

A federal court sitting in diversity in Texas may exercise personal jurisdiction over a foreign defendant if permitted by (1) the Texas long-arm statute, and (2) the due process clause of the Fourteenth Amendment. *Diece-Lisa Indus., Inc. v. Disney Enters., Inc., 943 F.3d 239, 249 (5th Cir. 2019)*. Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis. *Id.* Federal due process is satisfied if two requirements are met: (1) the nonresident purposely availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the state; and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Id. at 249-50*. The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id. at 250* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*). A defendant's "minimum contacts" may give rise to either general **[*6]** or specific jurisdiction. *Id.*

Southwest does not argue that Kiwi is subject to general jurisdiction here. General jurisdiction is difficult to establish and requires extensive contacts between a defendant and forum. *Sangha v. Navig8 ShipManagement Private, Ltd., 882 F.3d 96, 101-02 (5th Cir. 2018)*. Specific jurisdiction is very different. *Bristol-Myers Squibb Co. v. Superior Court of Ca., 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017)*. For a court to exercise specific jurisdiction, the lawsuit must arise out of or relate to the defendant's contacts with the forum. *Id.* In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)*). For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

Southwest contends Kiwi's Texas contacts support specific jurisdiction. Southwest argues that its complaint alleges, and Kiwi has not refuted, that Kiwi had the following contacts with Texas: (1) accessing and hacking Southwest's computer systems in Texas; (2) scraping and republishing data from Southwest's website hosted in Texas without permission; (3) purchasing over 170,000 flights from **[*7]** Southwest in Texas; (4) reselling thousands of Southwest flights departing or arriving at airports in Texas; (5) reselling Southwest's services to thousands of customers in Texas; (6) engaging in unfair and deceptive practices with respect to the sale of Southwest's services in Texas; (7) targeting and soliciting customers in Texas; and (8) soliciting Southwest leadership in Texas to form a cooperative business relationship.

The Court is not persuaded that the location of Southwest's servers here in Dallas alone can be a basis for personal jurisdiction, as the location of Southwest's servers could be merely fortuitous. *See, e.g., Chang v. Virgin Mobile USA, LLC, No. 3:07-CV-1767-D, 2009 U.S. Dist. LEXIS 3051, 2009 WL 111570, at *4 (N.D. Tex. Jan 16, 2009)* (noting courts have rejected argument that physical location of computer servers can be basis for personal jurisdiction); *see also BidPrime, LLC v. SmartProcure, Inc., No. 1:18-CV-478-RP, 2018 U.S. Dist. LEXIS 180546, 2018 WL 5260050, at *2-3 (W.D. Tex. Oct. 22, 2018)*. But coupled with Southwest's other allegations, the Court finds that Southwest has established a prima facie case for specific jurisdiction in Texas. Southwest alleges that Kiwi has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those **[*8]** activities. *See BidPrime, 2018 U.S. Dist. LEXIS 180546, 2018 WL 5260050, at *2-3*. The Court finds the *BidPrime* opinion instructive. In that case, the plaintiff sued a rival business and its nonresident CEO, alleging that they hacked the plaintiff's website and scraped information. The nonresident defendant argued, as Kiwi does, that his alleged conduct took place from his home, not in Texas. *2018 U.S. Dist. LEXIS 180546, [WL] at *2*. Among other things, the plaintiff alleged the nonresident defendant, knowing the plaintiff was a Texas company, used his computer to access the plaintiff's website without authorization and hired a software developer to write a data-scraping program and scrape bid requests from the plaintiff's website. The court concluded the allegations sufficed to establish a prima facie case for specific jurisdiction in Texas, stating, "[a] defendant who repeatedly and purposefully obtains unauthorized access to servers he knows belong to a Texas company can reasonably anticipate

being haled into court in Texas." *2018 U.S. Dist. LEXIS 180546, [WL] at *2*.

The Court reaches this same result here based on Southwest's allegations. Southwest contends Kiwi has knowingly violated the Terms of Southwest's website through the unauthorized scraping of flight and pricing data and by selling Southwest tickets without approval. Kiwi **[*9]** allegedly continues to resell Southwest flights despite Southwest's demands that Kiwi stop. As alleged by Southwest, Kiwi has repeatedly and purposefully obtained unauthorized access to servers it knows belong to a Texas company to resell Southwest's services. Kiwi thus purposefully directed its conduct at a Texas resident. It knew or should have known the effects of its conduct would be felt in this forum and could reasonably anticipate being haled into court in Texas. Based on the Court's conclusion that Southwest has established a prima facie case for specific jurisdiction in Texas, the Court need not reach Kiwi's arguments regarding the validity, enforceability, and scope of the forum selection clause in the Terms.

The burden of proof shifts to Kiwi to show that the assertion of jurisdiction is unfair and unreasonable based on the following factors: (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states or nations in furthering fundamental social policies. **[*10]** *See Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 276 (5th Cir. 2006)*; *see also Asahi Metal Indus. Co. v. Superior Court of Ca., 480 U.S. 102, 115, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)*. To show that an exercise of jurisdiction is unreasonable once minimum contacts are established, the defendant must make a "compelling case" against it. *Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999)*. It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown. *Id.*

Kiwi argues that the burden of traversing the distance between its headquarters in the Czech Republic and Texas would be a heavy one, as would being forced to submit its dispute to a foreign nation's judicial system. Kiwi also argues that many of the documents that might become evidence in this suit are "either in Czech, in the Czech Republic, or both." It further argues that only a few of its employees speak English well enough to be subjected to examination in English. And Kiwi contends these burdens are exacerbated by the Covid-19 pandemic; Kiwi asserts travel restrictions preclude Kiwi

representatives from traveling to Dallas.

At most Kiwi demonstrates an inconvenience which would be equally felt by forcing Southwest to litigate in the Czech Republic, especially given the availability and use of technology for remote court proceedings during the Covid-19 pandemic. The Court concludes the assertion of jurisdiction **[*11]** over Kiwi is fair and reasonable. Texas has an interest in providing a convenient forum for its residents to resolve their disputes. The Court finds no overwhelming burden to Kiwi that outweighs the legitimate interests of Southwest and the forum state. *See BidPrime, 2018 U.S. Dist. LEXIS 180546, 2018 WL 5260050, at \*4*.

Kiwi further argues that even if the Court finds personal jurisdiction, Southwest has failed to state a claim under Rule 12(b)(6) on some of its claims, specifically Southwest's claims for violation of the Texas Harmful Access by Computer Act, unjust enrichment, and attorney's fees. To survive such a motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*; *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Upon review of the amended complaint, motion to dismiss, Southwest's response, and Kiwi's reply, the Court concludes Southwest has pleaded specific facts which establish a plausibility of entitlement to relief on these claims. Accordingly, Kiwi's motion to dismiss is **DENIED** in its entirety.

**SO ORDERED**.

Signed August 10, 2021.

/s/ Ada Brown

Ada Brown

UNITED STATES DISTRICT JUDGE

---

**End of Document**

⚠️ Caution
As of: October 2, 2023 8:19 PM Z

## *Wilson v. Wilson*

United States District Court for the Western District of Texas, San Antonio Division

May 17, 2016, Decided; May 17, 2016, Filed

Civil Action No. 5:15-cv-01024-XR

**Reporter**
2016 U.S. Dist. LEXIS 64564 *

RONNIE JAMES WILSON, d/b/a THE GAP BAND, Plaintiff, v. CHARLES KENT WILSON, a/k/a CHARIE WILSON, MICHAEL PARAN, P MUSIC GROUP, INC., a California Corporation; INTERNATIONAL CREATIVE MANAGEMENT PARTNERS, LLC, a Delaware limited Liability company; and DOES 1 through 5, inclusive, Defendants.

**Subsequent History:** Transferred to, Motion granted by *Wilson v. Wilson, 2016 U.S. Dist. LEXIS 199482 (C.D. Cal., July 19, 2016)*

## Core Terms

contacts, personal jurisdiction, Music, alleges, motion to dismiss, concert, forum state, venue, trademark, general jurisdiction, purposefully, residents, emails, minimum contact, Defendants', advertising, lack of personal jurisdiction, amended complaint, improper venue, availed

**Counsel:  [*1]** For Ronnie James Wilson, d/b/a The Gap Band, Plaintiff: Bill Zuhdi, LEAD ATTORNEY, Zuhdi Law Firm, Oklahoma City, OK.

For Charles Kent Wilson, a/k/a Charlie Wilson, Michael Paran, P Music Group, Inc., a California Corporation, Defendants: Peter D. Kennedy, LEAD ATTORNEY, Graves, Dougherty, Hearon & Moody, PC, Austin, TX; Edwin Francis McPherson, McPherson Rane LLP, Los Angeles, CA.

For International Creative Management Partners, LLC, a Delaware Limited Liability Company, Defendant: J. K. Leonard, LEAD ATTORNEY, Naman Howell Smith & Lee, PLLC, San Antonio, TX; Cem Ozer, Bushell, Sovak, Ozer & Gulmi LLP, New York, NY; Victor C. Bushell, Bushell, Sovak, Ozer & Gulmi LLP, New York, NY.

**Judges:** XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** XAVIER RODRIGUEZ

## Opinion

**ORDER**

On this date, the Court considered Defendant ICM's motion to dismiss for lack of personal jurisdiction and improper venue, their alternative motion to transfer venue, and motion to dismiss for failure to state a claim (docket no. 21); Charles Kent Wilson, Michael Paran and P Music Group Inc.'s motion to dismiss for lack of personal jurisdiction and improper venue (docket no. 23); Ronnie Wilson's motion to take judicial notice (docket no. 31) **[*2]** [1]; and Ronnie Wilson's motion for leave to file surreply (docket no. 37).[2]

For the following reasons, the Court grants Defendants' motion to dismiss for lack of personal jurisdiction as related to Counts Two, Three, Four, and Five of Plaintiff's Second Amended Complaint; and does not reach Defendant International Creative Management Partner's, LLC's motion to dismiss for failure to state a claim. Further, because venue is improper in this District, this case is transferred to the Central District of California.

**I. Background**

On November 20, 2015, Plaintiff Ronnie James Wilson filed a complaint against Defendants. (Docket No. 1). Subsequently, Plaintiff filed two amended complaints.

_____

[1] This motion is granted in part and denied in part. The Court takes judicial notice of all exhibits that are from United States governmental web sites. Otherwise, the motion is denied.

[2] The motion for leave to file a surreply is granted.

(Docket Nos. 17 & 20). Plaintiff, by way of his Second Amended Complaint, seeks to enforce his common law rights in the trademark, "The Gap Band," and seeks both injunctive relief and monetary damages from the Defendants—damages he claims resulted from the unlawful use of that mark **[\*3]** by Defendants. Plaintiff also brings a claim for tortious interference with business contracts, and alleges that Defendants redirected two URLs pertaining to The Gap Band to web pages pertaining to Defendant, Charles Wilson's personal, solo music ventures. *Id.*[3]

## II. Motion to Dismiss for Lack of Personal Jurisdiction

District courts may exert personal jurisdiction over a defendant "if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 131 S. Ct. 2846, 2853, 180 L. Ed. 2d 796 (2011)* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945))*. The Supreme Court has determined that, "[t]here are two types of 'minimum **[\*4]** contacts:' those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." *Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001)*; *see Goodyear, 131 S. Ct. at 2853-54*.

## A. General jurisdiction lacking against all Defendants

General jurisdiction may be found when the defendant's contacts with the forum state are substantial, continuous, and systematic. *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-19, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a

forum." *Johnston v. Multidata Sys. Int'l Corp., 523 F.3d 602, 609 (5th Cir. 2008)*. To confer general jurisdiction, a defendant must have a business presence in the forum state. *Access Telecom, Inc. v. MCI Telecomm. Corp., 197 F.3d 694, 717 (5th Cir. 1999)*. Injecting a product, even in substantial volume, into a forum's "stream of commerce," without more, does not support general jurisdiction. *Bearry v. Beech Aircraft Corp., 818 F.2d 370, 375 (5th Cir. 1987)*; *accord Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 216 (5th Cir. 2000)*. Advertising and marketing through national media is insufficient, as are isolated visits to a forum. *See Johnston, 523 F.3d at 612*; *Alpine View Co., 205 F.3d at 218*; *Bearry, 818 F.2d at 376*.

Plaintiff has failed to allege facts sufficient to demonstrate that any of these Defendants engaged in such "continuous and systematic" contact with the State of Texas to invest this court with jurisdiction over the defendants. *See Johnston, 523 F.3d at 609*. Charles Wilson is a citizen and resident of California who has never resided in Texas; he owns no property, business, or assets in Texas; and he, as a performer, **[\*5]** has not performed in or interacted with the State of Texas with the frequency to establish the requisite continuous and systematic contact needed for this Court to exercise general jurisdiction. Similarly, Michael Paran is a citizen and resident of California who has never resided in the State of Texas. He owns no property, businesses, or assets in the State of Texas and maintains no business presence in the State, preventing this Court from exercising general jurisdiction over Michael Paran. P Music Group owns no property, business, or other assets in the State of Texas; has no offices, employees, or agents in the State of Texas; and maintains no business presence in the state, preventing this court from exercising general jurisdiction over P Music Group.

ICM is a Delaware corporation whose principal place of business is in Los Angeles, California. ICM neither owns any property in nor maintains any offices or employees in the State of Texas, it pays no taxes in the State of Texas, and maintains no business presence in the State.

## B. Specific jurisdiction only exists as to Count One

Specific jurisdiction exists when "the defendant has 'purposefully directed' his activities at residents **[\*6]** of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *See Burger King v. Rudzewicz, 471 U.S. 462, 472, 105 S.*

---

[3] Count One alleges common law trademark infringement against Charlie Wilson, Michael Paran, P Music Group and ICM. Count Two alleges tortious interference with existing contracts against all defendants. Count Three alleges violation of the Texas Free Enterprise and Antitrust Act against all defendants. Count Four alleges that all the defendants tortiously interfered with a contract between Pastor Gregg Patrick and Plaintiff for a concert scheduled to be held in Houston, Texas. Count Five alleges that Wilson, Paran and P Music Group engaged in "anticybersquatting."

2016 U.S. Dist. LEXIS 64564, *6

Ct. 2174, 85 L. Ed. 2d 528 (1985) (citations omitted); Jones v. Petty—Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1068 n. 9 (5th Cir. 1992). The Fifth Circuit has articulated a three-step analysis for determining whether a court has specific jurisdiction over a defendant: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." McFadin v. Gerber, 587 F.3d 753, 759 (5th Cir. 2009). The non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state. Burger King, 471 U.S. at 474. Specific jurisdiction also requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action.

Plaintiff alleges that specific jurisdiction exists over defendants Charles Wilson, Michael Paran, and P Music Group because: (1) Charles Wilson performed a concert in Beaumont, Texas on October 13, [*7] 2012; (2) emails, letters and phone calls (each originating from outside of the State of Texas) were sent by Michael Paran in his capacity as CEO of P. Music Group, which Plaintiff alleges tortiously interfered with Plaintiff's Texas based business; and (3) Defendants redirected two URLs pertaining to The Gap Band to web pages pertaining to Defendant, Charles Wilson's personal, solo music ventures.

Plaintiff alleges Defendant Charlie Wilson, with the assistance of Defendants Michael Paran, P Music Group, and ICM, advertised and performed a concert in the State of Texas, satisfying the minimum contacts standard required to allow this Court's exercise of specific jurisdiction over defendant's trademark infringement claim.[4] For minimum contacts to be established, "it is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp., 471 U.S. at 475. "The minimum contacts inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it reasonably anticipates being hauled into court." Vanderbilt Mortgage & Fin.,

Inc. v. Flores, 692 F.3d 358, 375 (5th Cir. 2012). "The defendant [*8] must not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." Id.

Charles Wilson purposefully directed his musical performance to residents of Texas and availed himself of the privileges of conducting activities here. Charles Wilson performed a concert in the State of Texas invoking the benefits and protections of its laws. Having performed in the State of Texas, it is reasonable for Charles Wilson to have anticipated being haled into a court in the State of Texas for conduct arising out of that performance. Plaintiff claims Defendant violated his trademark rights by advertising and misleading buyers and consumers into believing that The Gap Band, a trademark Plaintiff claims to own, was performing in the State.

Plaintiff alleges Defendants Michael Paran and P Music Group served as Charles Wilson's managers when he performed in Beaumont and that ICM served as his agent, booking the concert in Beaumont, Texas and negotiating the contract that gave rise to that concert. As Charles Wilson's manager and agent, Plaintiff alleges Defendants [*9] Michael Paran, P Music Group, and ICM "misled buyers and consumers within the State of Texas when they approved and/or allowed multiple forms and platforms of advertising directed in Beaumont, Texas area and by booking and advertising the concert as "Charlie Wilson featuring The Gap Band," "Charlie Wilson and The Gap Band." Plaintiff successfully pled sufficient facts to indicate that Defendants Michael Paran, P Music Group, and ICM[5] purposefully directed their activities towards the State of Texas, availing themselves to the forum, and those alleged activities serve as the basis of Count One, providing this Court with personal jurisdiction.

Though personal jurisdiction exists over all three defendants as related to Count One, personal jurisdiction is a "claim-specific inquiry." Seifert v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274-75 (5th Cir. 2006). "A plaintiff [*10] bringing multiple claims that

---

[4] Count One of Plaintiff's Second Amended Complaint.

[5] Plaintiff alleges ICM served as Charlie Wilson's agent and "booked the concert in Beaumont, Texas." Plaintiff also alleges ICM negotiated the contract facilitating Charles Wilson's Beaumont concert. These facts, taken as true, though contested by Defendant, are sufficient to warrant this Court's assertion of personal jurisdiction over ICM, as related to Count One of Plaintiff's Second Amended Petition.

arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." *Id.* If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the *Due Process Clause* prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts. *Id.* Necessarily, permitting the legitimate exercise of specific jurisdiction over one claim to justify the exercise of specific jurisdiction over a different claim that does not arise out of or relate to the defendant's forum contacts would violate the *Due Process Clause*. *Id.* Thus, a plaintiff must independently demonstrate a basis for this Court's assertion of personal jurisdiction for all claims arising out of different forum contacts.

Plaintiff alleges Defendants engaged in out-of-state conduct which was intended to and actually did prevent Plaintiff from performing concerts and fulfilling his contractual obligations with contracted buyers. (Docket No. 20). Plaintiff alleges he entered into seven contracts to perform concerts using the trademark, "The Gap Band;" however, he was precluded from performing any of these contractual obligations **[*11]** due to the conduct of Defendants. *Id.* The exclusive source of the Defendants' involvement with the cancellation of Plaintiff's shows is alleged to derive from the Defendants' participation in telephone calls, emails, and the mailing of letters from outside of the State of Texas. (Docket No. 20). Specifically, Plaintiff alleges:

1. On October 20, 2015, Defendants Paran and ICM emailed a gentleman who had contracted with Plaintiff to perform a concert, which was later canceled as a result of Defendants' conduct;

2. On October 21, 2015, Defendant Paran sent an email to two other gentleman accusing Plaintiff of "fraudulently representation" that he owned The Gap Band trademark—Defendant ICM was copied in these emails;

3. These emails were purposefully sent with the purpose of causing Plaintiff's concerts to be cancelled, causing harm to Plaintiff and his Texas-based company;

4. ICM emailed several demand letters to agents representing Plaintiff instructing those agents that Plaintiff had no right to use The Gap Band trademark and that Plaintiff's use of the Gap Band trademark was "currently subject to litigation in Federal Court;"

5. Paran, P Music Group, and ICM collaborated together to make **[*12]** decisions to purposefully harm Plaintiff; and

6. Defendants sent various emails, letters, and other communications from other States to persons in the State of Texas for the purpose of bringing about harm to Plaintiff in the State of Texas. *Id.*

"For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case." *Walden v. Fiore, 134 S. Ct. 1115, 1121-22, 188 L. Ed. 2d 12 (2014)*. First, the relationship must arise out of contacts that the "defendant himself" created with the forum State and, second, the Court's "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there. *Walden v. Fiore, 134 S. Ct. 1115, 1122, 188 L. Ed. 2d 12 (2014)* (quoting *Burger King, 471 U.S. at 475*); *see, e.g., International Shoe, 326 U.S. at 319* (Due process "does not contemplate that a state may make binding a judgment *in personam* against an individual . . . with which the State has no contacts, ties, or relations"); *Hanson v. Denckla, 357 U.S. 235, 251, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)* ("however minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him") **[*13]** Plaintiff has failed to allege facts sufficient to demonstrate that Defendants "availed themselves", precluding this Court from exercising personal jurisdiction over Counts Two, Three, and Four of Plaintiff's Second Amended Complaint.

The exercise of personal jurisdiction over an individual for his Internet activities, including allegations of trademark infringement and cybersquatting, is proper when a defendant both specifically and intentionally directs his activities toward the forum State. *See Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc., et al., 2001 U.S. Dist. LEXIS 3724, 2001 WL 290569, *2 (N.D. Tex. 2001)* (analyzing *Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1322 (9th Cir. 1998)*). When an individual defendant has expressly and intentionally aimed his conduct at Texas, with the effect of injuring a plaintiff in this state, the defendant is subject to jurisdiction here. *See 2001 U.S. Dist. LEXIS 3724, [WL] at *2*. This Court does not have specific jurisdiction over Defendants, because Plaintiff has failed to allege facts sufficient to demonstrate that Defendants, in diverting the URLs of thegapband.com and gapband.com to charliewilsonmusic.com , expressly and intentionally aimed their conduct toward the State of Texas with the intent of harming Plaintiff. Accordingly, this Court has no

personal jurisdiction over Court Five of Plaintiff's Second Amended Complaint.

### III. Motion to Dismiss for Improper [*14] Venue or Transfer to the Central District of California

Defendants argue that this Court should dismiss Plaintiff's Complaint under *Fed. R. Civ. P. 12(b)(3)* because venue is not proper in the Western District. Alternatively, Defendants argue that the Court should transfer venue to the Central District of California for the parties' and witnesses' convenience.

Under *Rule 12(b)(3) of the Federal Rules of Civil Procedure*, a party may move to dismiss an action on the basis of improper venue. *Fed. R. Civ. P. 12(b)(3)*. Once challenged, the burden of sustaining venue lies with the plaintiff. *See Langton v. Cbeyond Commc'n, LLC, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003)*. If, as here, there is no evidentiary hearing, a plaintiff may carry its burden by presenting facts that, taken as true, would establish venue. *Id*. The court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff. *Braspetro Oil Servs. Co. v. Modec (USA), Inc., 240 F. App'x. 612, 615 (5th Cir. 2007)* (citing *Murphy v. Schneider National, Inc., 362 F.3d 1133, 1138 (9th Cir. 2004))*. Further, in deciding whether venue is proper, "the court is permitted to look at evidence beyond simply those facts alleged in the complaint and its proper attachments." *Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 238 (5th Cir. 2009)*.

Venue is appropriate in:
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim [*15] occurred, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

*28 U.S.C. § 1391(b)*. Plaintiff alleges a substantial part of his claims occurred in this district; however, as related to the only claim over which this Court has personal jurisdiction, Count One, Plaintiff has failed to plead sufficient facts to demonstrate the Western District of Texas is the proper venue. The concert and advertisement giving rise to Count One occurred in Beaumont, Texas (Eastern District of Texas) and Plaintiff has pled no facts to even hint at San Antonio having been the locus of any events associated with that allegation, rendering the Western District of Texas an improper venue. *Id*.

Inasmuch as all of the Defendants reside or do business in the Central District of California, this case should be transferred to the Central District of California pursuant to *28 U.S.C. § 1406(a)*. This case could have been brought in that district, venue is improper in this district, and weighing the *Volkswagen [*16] II* factors, the Court concludes that a transfer is appropriate.

### IV. Conclusion

For the foregoing reasons, the Court:
> 1. GRANTS in part and DENIES in part Defendants' Motion to Dismiss for Lack of Personal Jurisdiction; the Court DENIES the motion as to Count One and GRANTS the motion as to Counts Two, Three, and Four of Plaintiff's Second Amended Petition (docket no. 23);
> 2. GRANTS Defendant ICM's motion to dismiss (docket no. 21);
> 3. DISMISSES as moot Defendant ICM's motion to dismiss for failure to state a claim; and
> 4. DIRECTS the Clerk to transfer this case to the Central District of California.

It is so ORDERED.

SIGNED this 17th day of May, 2016.

/s/ Xavier Rodriguez

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE

---

**End of Document**