# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

## DECLARATION OF JULIA G. WISENBERG

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

      1.     My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

      2.     I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Brief in Support of its Response to Defendant Skiplagged, Inc.'s ("Skiplagged") Motion for Summary Judgment.

      3.     Attached as Exhibit A-1 is a true and correct copy of an excerpt of the transcript of the deposition of Marcial Lapp, taken on May 30, 2024.

      4.     Attached as Exhibit A-2 is a true and correct copy of the transcript of the deposition of Raymond Scott Chandler, taken on June 7, 2024.

1

5.      Attached as Exhibit A-3 is a true and correct copy of the transcript of the deposition of Marcial Lapp as the Rule 30(b)(6) Corporate Representative of Plaintiff American Airlines, Inc., taken on July 1, 2024.

6.      Attached as Exhibit A-4 is a true and correct copy of American internal email exchanges, produced by American as AA-SKP-00005532–34, AA-SKP-00005774–75, AA-SKP-00005795–98, AA-SKP-00010324–25, AA-SKP-00010763–65, and AA-SKP-00010776–78.

7.      Attached as Exhibit A-5 is a true and correct copy of Skiplagged's Third Amended Objections and Responses to Plaintiff's First Set of Interrogatories.

8.      Attached as Exhibit A-6 is a true and correct copy of the transcript of the deposition of Aktarer Zaman, taken on May 29, 2024.

9.      Attached as Exhibit A-7 is a true and correct copy of the transcript of the deposition of Aktarer Zaman as the Rule 30(b)(6) Corporate Representative of Defendant Skiplagged, Inc., taken on June 12, 2024.

10.     Attached as Exhibit A-8 is a true and correct copy of the transcript of the deposition of Daniel Gellert, taken on November 30, 2023.

11.     Attached as Exhibit A-9 is a true and correct copy of test buys of flights on Skiplagged.com, produced by American as AA-SKP-00058891–922, AA-SKP-00059519–536, and AA-SKP-00059659–76.

12.     Attached as Exhibit A-10 is a true and correct copy of American's Use Agreement, produced by American as AA-SKP-00053437–44.

13.     Attached as Exhibit A-11 is a true and correct copy of Defendant Skiplagged, Inc.'s Fourth Amended Objections and Responses to Plaintiff's Interrogatory No. 8.

14.     Attached as Exhibit A-12 is a true and correct copy of the Expert Report of Professor Yoram (Jerry) Wind, served by American on April 23, 2024.

15.     Attached as Exhibit A-13 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00001001, SKP00003664–67, SKP00003831, SKP00004346–47, SKP00012618–20, SKP00015754, SKP00017437–43, SKP00020235–36, SKP00034672–77, and SKP00060686–87.

16.     Attached as Exhibit A-14 is a true and correct copy of a Skiplagged customer support reference spreadsheet, produced by Skiplagged as SKP00103763_Page 1–10.

17.     Attached as Exhibit A-15 is a true and correct copy of an American internal email exchange, produced by American as AA-SKP-00005479–81, AA-SKP-00059850–60, AA-SKP-00059930–32, AA-SKP-00084825–28, and AA-SKP-00085908–11.

18.     Attached as Exhibit A-16 is a true and correct copy of customer complaints related to Skiplagged and discussed internally by American, produced by American as AA-SKP-00005562–63,   AA-SKP-00052654,   AA-SKP-00052881–83,   and   AA-SKP-00053218–22.

19.     Attached as Exhibit A-17 is a true and correct copy of the Expert Report of David N. Fuller, CFA, ASA, CFE dated May 31, 2024.

20.     Attached as Exhibit A-18 is a true and correct copy of the Settlement Agreement entered into between Fareportal, Inc. and Aktarer Zaman, Skiplagged.com and

Affiliates on February 27, 2015, produced by Fareportal, Inc. as Fareportal Subpoena 0001–9.

21.    Attached as Exhibit A-19 is a true and correct copy of Plaintiff Southwest Airlines Co.'s First Amended Complaint Against Skiplagged, Inc. and Skybooker.com Ltd. in Cause No. 3:21-cv-01722 (N.D. Tex.), produced by Skiplagged as SKIP0000335–403.

22.    Attached as Exhibit A-20 is a true and correct copy of the Complaint filed by Plaintiffs United Airlines, Inc., Orbitz Worldwide, LLC, and Orbitz, LLC against Defendant Aktarer Zaman, individually and d/b/a Skiplagged.com in Cause No. 1:14-cv-09214 (N.D. Ill.), produced by Skiplagged as SKIP0000078–112.

23.    Attached as Exhibit A-21 is a true and correct copy of Skiplagged's internal Slack messages and investigations and materials, produced by Skiplagged as SKP00105924–25,    SKP00092041–43,    SKP00081152.xlsx_Page    1–26,    and SKP00105999–6005.

24.    Attached as Exhibit A-22 is a true and correct copy of Skiplagged's Terms and Conditions, produced by Skiplagged as SKIP0000010–11.

25.    Attached as Exhibit A-23 is a true and correct copy of Skiplagged customer complaints,    produced    by    Skiplagged    as    SKP00022172,    SKP00031337–39, SKP00057359–62, SKP00082380–81, and SKP00083690.

26.    Attached as Exhibit A-24 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00006938–41, SKP00079187–90, and SKP00080891–94.

27.    Attached as Exhibit A-25 is a true and correct copy of screenshots of Skiplagged's website, produced by Skiplagged as SKIP0000072–77.

4

28.     Attached as Exhibit A-26 is a true and correct copy of the Conditions of Carriage, produced by American as AA-SKP-00054065–85.

29.     Attached as Exhibit A-27 is a true and correct copy of Skiplagged's profit and loss statements, produced by Skiplagged as SKIP0000634–38 and SKP00111227.

30.     Attached as Exhibit A-28 is a true and correct copy of Skiplagged's internal Slack messages, produced by Skiplagged as SKP00095889–93.

31.     Attached as Exhibit A-29 is a true and correct copy of a report entitled, "Future Brand—American Airlines Brand Recognition," produced by American as AA-SKP-00059957–60066.

32.     Attached as Exhibit A-30 is a true and correct copy of Trademark File Wrappers for American's Trademark Reg. Nos. 4449061, 4939082, 5279167, and 5559145, produced by American as AA-SKP-00054086–90, AA-SKP-00054095–105, AA-SKP-00054143,     AA-SKP-00054149–61,     AA-SKP-00054178–79,     AA-SKP-00054202–06, AA-SKP-00054236–38, AA-SKP-00054240–43, AA-SKP-00054279, AA-SKP-00054286–309,     AA-SKP-00054343–44,     AA-SKP-00054412–29,     AA-SKP-00054580–83,  AA-SKP-00054588–607,  AA-SKP-00054663,  AA-SKP-00054695–96, AA-SKP-00054719–31, AA-SKP-00054768–69, and AA-SKP-00054833–56.

33.     Attached as Exhibit A-31 is a true and correct copy of a Certificate of Registration for the American Airlines Flight Symbol, produced by American as AA-SKP-00058803–05.

34.     Attached as Exhibit A-32 is a true and correct copy of American's Form 10-K for Year Ending December 31, 2023, produced by American as AA-SKP-00058499, AA-SKP-00058506, and AA-SKP-00058580.

35.    Attached as Exhibit A-33 is a true and correct copy of a Skiplagged Onboarding Survey and New to Affiliate Questionnaire, produced by Skiplagged as SKP00081041–44 and SKP00095589–92.

36.    Attached as Exhibit A-34 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00004300–01, SKP00013049–53, SKP00071936–39, and SKP00079338–42.

37.    Attached as Exhibit A-35 is a true and correct copy of customer complaints related to Skiplagged, produced by American as AA-SKP-00052724–25, AA-SKP-00052764–66, and AA-SKP-00052798–801.

38.    Attached as Exhibit A-36 is a true and correct copy of customer complaints related to Skiplagged, produced by American as AA-SKP-00063900–902 and AA-SKP-00064792.

39.    Attached as Exhibit A-37 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00001090, SKP00011574, and SKP00042790–91.

40.    Attached as Exhibit A-38 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00001031–32, SKP00006753–54, SKP00039745–49, SKP00040775–76, and SKP00080906–10.

41.    Attached as Exhibit A-39 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00002212, SKP00004212, SKP00010474–76, SKP00093654–55, and SKP00102530–32.

42.    Attached as Exhibit A-40 is a true and correct copy of Skiplagged customer complaints, produced by Skiplagged as SKP00004827–29, SKP00006578–81, and SKP00024561–64.

43.    Attached as Exhibit A-41 is a true and correct copy of a Consulting Services Agreement, entered into between American Airlines, Inc. and Hypermedia Solutions, LLC d/b/a FutureBrand on January 1, 2013, produced by American as AA-SKP-00065419–74.

44.    Attached as Exhibit A-42 is a true and correct copy of a Fare, Schedule and Inventory Access and Use Agreement between American Airlines, Inc. and Skyscanner Limited, produced by American as AA-SKP-00065397–418.

45.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 22, 2024.

Julia G. Wisenberg

7

# Exhibit A-1

MARCIAL LAPP May 30, 2024

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,   *
                   *
  Plaintiff,    *
                   *
v.           *  Civil Action No.
             *  4:23-cv-00860-P
SKIPLAGGED, INC.,   *
                   *
  Defendant.    *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO DEPOSITION OF
MARCIAL LAPP
MAY 30, 2024
VOLUME 1 OF 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL AND VIDEO DEPOSITION OF MARCIAL LAPP, produced as
a witness at the instance of the Defendant, and duly sworn,
was taken in the above-styled and -numbered cause on the
30th day of May, 2024, from 10:01 a.m. to 2:17 p.m., before
Amy Massey, CSR in and for the State of Texas, reported by
machine shorthand, at the offices of Kelly Hart & Hallman,
LLP, 201 Main Street, Suite 2500, in the City of
Fort Worth, County of Tarrant, State of Texas, pursuant
to the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

```
 1            A P P E A R A N C E S
 2    FOR THE PLAINTIFF, AMERICAN AIRLINES, INC.:
 3      MR. NATHAN J. MUYSKENS
        Greenberg Traurig, LLP
 4      2101 L Street, N.W.
        Suite 1000
 5      Washington, D.C.  20037
        202-331-3100
 6      nathan.muyskens@gtlaw.com
 7      MS. ALYSSA ORTIZ JOHNSTON
        Greenberg Traurig, LLP
 8      2200 Ross Avenue
        Suite 5200
 9      Dallas, Texas  75201
        214-665-3600
10      johnston@gtlaw.com
11    FOR THE DEFENDANT, SKIPLAGGED, INC.:
12      MR. WILLIAM L. KIRKMAN
        Kirkman Law Firm, PLLC
13      201 Main Street
        Suite 1160
14      Fort Worth, Texas  76102
        817-336-2800
15      billk@kirkmanlawfirm.com
16      MS. ABIGAIL R.S. CAMPBELL
        Condon Tobin Sladek Thornton Nerenberg, PLLC
17      8080 Park Lane
        Suite 700
18      Dallas, Texas  75231
        214-265-3800
19      acampbell@condotobin.com
20    Also Present:
21      Mr. Jeremy Ballew
        American Airlines
22
        Ms. Leana Dippie
23      American Airlines Intern
24      Mr. Joseph McDermott, Videographer
        Elite Video Productions
25      214-747-1952
26
```

## Page 3

```
 1                    INDEX
 2                                      PAGE
 3
 4    Appearances . . . . . . . . . . . . . . . . . . . . . 2
 5    Stipulations  . . . . . . . . . . . . . . . . . . . . 1
 6    MARCIAL LAPP
 7        Direct Examination by Mr. Kirkman. . . . . . 8
 8    Signature and Changes . . . . . . . . . . . . . . .146
 9    Reporter's Certificate  . . . . . . . . . . . . . .148
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1            EXHIBIT INDEX
 2    DEPOSITION  DESCRIPTION            PAGE
      EXHIBIT              MARKED/IDENTIFIED
 3
 4    NUMBER 1  Email Thread Regarding     15
                Scary:  United Seriously
 5              Threatening Passengers
                Who Skip Flights - Live
 6              and Let's Fly
 7    NUMBER 2  Email Thread Regarding     19
                Scary:  United Seriously
 8              Threatening Passengers
                Who Skip Flights - Live
 9              and Let's Fly
10    NUMBER 3  Email Thread Regarding     21
                Scary:  United Seriously
11              Threatening Passengers
                Who Skip Flights - Live
12              and Let's Fly
13    NUMBER 4  Email Thread Regarding     22
                Spain Courts Allowing
14              Hidden City of IB
15    NUMBER 5  Email Thread Regarding     24
                3 Links I love:  Hidden
16              City Ticketing, Mokulele
                Cuts, California Pacific
17              Tries a Comeback
18    NUMBER 6  Email Thread Regarding     25
                Cranky on the Web: Hidden
19              City Ticketing Can Get you
                in Trouble
20    NUMBER 7  Email Thread Regarding     26
                Customer:
21
22    NUMBER 8  Email Thread Regarding     34
                Customer:
23    NUMBER 9  Email Thread Regarding     37
                Customer:
24
25
```

Amy Massey & Associates

App'x 0010

## Page 5

EXHIBIT INDEX CONTINUED

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT | MARKED/IDENTIFIED | |
| NUMBER 10 | Email Thread Regarding Customer: ███ | 41 |
| NUMBER 11 | Email Thread Regarding Customer: ███ | 44 |
| NUMBER 12 | Email Thread Regarding Customer: ███ | 44 |
| NUMBER 13 | Email Thread Regarding Kayak Source | 50 |
| NUMBER 14 | Email Thread Regarding Kayak Source | 52 |
| NUMBER 15 | Email Thread Regarding Kayak Source | 54 |
| NUMBER 16 | Email Thread Regarding Kayak Source | 57 |
| NUMBER 17 | Email Thread Regarding Kayak Source | 59 |
| NUMBER 18 | Email Thread Regarding RIPA Roadmap with Azure_1.pptx | 65 |
| NUMBER 19 | Email Thread Regarding RE PNR MRCROV | 69 |
| NUMBER 20 | Email Thread Regarding Skiplagged | 73 |
| NUMBER 21 | Email Thread Regarding Skiplagged | 75 |
| NUMBER 22 | Email Thread Regarding | 78 |
| NUMBER 23 | Message Exchange on Chat Platform | 80 |
| NUMBER 24 | Email Thread Regarding RE PNR MCRCROV | 81 |

## Page 6

EXHIBIT INDEX CONTINUED

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT | MARKED/IDENTIFIED | |
| NUMBER 25 | Email Thread Regarding Same GDS Rule | 85 |
| NUMBER 26 | Email Thread Regarding Skiplagged pertaining to "buy a ticket" | 89 |
| NUMBER 27 | Email Thread Regarding Skiplagged | 93 |
| NUMBER 28 | Email Thread Regarding Weekend Review: Southwest Airlines in a Legal Tussle | 95 |
| NUMBER 29 | Email Tread Regarding Hidden City Party ID with Hidden Cities Party ID and FXTX.xisx Attachment | 97 |
| NUMBER 30 | Email Thread Regarding Hidden City Party ID | 98 |
| NUMBER 31 | Email Thread Regarding WN is Suing Skiplagged | 100 |
| NUMBER 32 | Email Thread Regarding Hidden City Party ID | 102 |
| NUMBER 33 | Email Thread Regarding Landline (L4) Update | 109 |
| NUMBER 34 | Email Thread Regarding Delta Air Lines/Booking Policy Update | 113 |
| NUMBER 35 | Email Thread Regarding Revenue Engineering - January 2023 - Priorities | 118 |
| NUMBER 36 | Email Thread Regarding Revenue Engineering - January 2023 - Priorities | 122 |
| NUMBER 37 | Email Thread Regarding This is Interesting | 126 |

## Page 7

EXHIBIT INDEX CONTINUED

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT | MARKED/IDENTIFIED | |
| NUMBER 38 | Email Thread Regarding Banning a Customer for Skiplagging? | 134 |
| NUMBER 39 | MI:33 LitPak #230066 | 136 |

## Page 8

THE VIDEOGRAPHER:  All right.  We are now on the record.  Today's date is May the 30th, 2024, and the time on the video monitor is 10:01 a.m.  This is the videotaped deposition of Marcial Lapp.

Counsel may identify themselves at this time; afterwards, the court reporter will swear in the witness.

MR. KIRKMAN:  I am Bill Kirkman.  I'm here with Abigail Campbell on behalf of Skiplagged, Inc.

MR. MUYSKENS:  I'm Nathan Muyskens on behalf of American Airlines.

MS. JOHNSTON:  Alyssa Ortiz Johnston on behalf of American Airlines.

MR. BALLEW:  Jeremy Ballew with American Airlines.

MS. DIPPIE:  Leana Dippie with American Airlines.

MARCIAL LAPP,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KIRKMAN:

Q.  All right.  Would you please identify yourself for the record.

A.  My name is Marcial Lapp.  I work for American Airlines.

Q.  And how do you spell your first name?

Amy Massey & Associates

App'x 0011

Electronically signed by Amy Massey (401-010-081-3772)

cfc28345-03b2-4b29-8502-5d67f1ce0f55

Page 9

1     A.  M-a-r-c-i-a-l.
2     Q.  All right.  And how old of a man are you,
3  Mr. Lapp?
4     A.  41, unfortunately.
5     Q.  Unfortunately?
6     A.  Yeah.
7     Q.  Well, you -- you're talking to a guy a lot older
8  than that, let me tell you.
9         How long have you worked for American?
10    A.  Going on 13 years.
11    Q.  And what is it that you do?  What is your title?
12    A.  My title is the Vice President of Revenue
13  Engineering at American Airlines.
14    Q.  And how long have you been the Vice President --
15  or excuse me, the Director of Revenue Engineering?
16    A.  Just to be clear, so my title changed as of last
17  week.  So before that, I was the Managing Director of the
18  Revenue Engineering team.
19    Q.  Okay.  Until last week, your title was Managing
20  Director of Revenue Engineering?
21    A.  Correct.
22    Q.  How do you engineer revenue?
23    A.  We are the technical team that supports all of the
24  revenue generation functions of American Airlines.  So
25  think of us as teams that design algorithms/math to

Page 10

1  optimize our prices.
2     Q.  Okay.  And you indicated you received a different
3  permission -- or position last week?
4     A.  Correct.
5     Q.  Okay.
6     A.  It's increased scope but still the same team.
7     Q.  So what is your position now or your title?
8     A.  I'm Vice President of Revenue Engineering.
9     Q.  And what kind of increase in scope did you obtain?
10    A.  We have -- or prior to last week, we had a
11  different kind of organizational structure in terms of the
12  commercial group that was led by our Chief Commercial
13  Officer.  He has since left, and so we are now taking that
14  responsibility, making sure that it's covered, let's say,
15  that way.
16    Q.  Okay.  When you -- do you remember the year you
17  started with American?
18    A.  2012.
19    Q.  And what did you do at that time?  In other words,
20  what was your titled position of employment?
21    A.  I was an analyst in the Revenue Management team.
22    Q.  And how long were you an analyst?
23    A.  I would say probably until 2015 maybe, somewhere
24  around there.
25    Q.  All right.  And what happened in 2015?

Page 11

1     A.  I was promoted to a management role, which meant
2  that I was a leader of a team.  And so at that point, my
3  title became Manager of, I believe, Revenue Management.
4     Q.  Different than Director of Revenue Management?
5     A.  Correct.
6     Q.  So 2015, you became a manager -- into a management
7  role as Manager of Revenue Engineering?
8     A.  No.  We called it Operations Research back then.
9     Q.  Okay.  And that was in 2015?
10    A.  I -- I'm fairly certain.  Right around the merger,
11  so 2014, 2015, sometime like that.
12    Q.  Merger of what?
13    A.  American Airlines and US Airways.
14    Q.  And that was when?
15    A.  2014.  2013, 2014.  Took a while.
16    Q.  And so how long did you stay in that position?
17    A.  Within that specific position, I would like to say
18  it was probably a year and a half maybe -- a year, year and
19  a half; after which I switched into a senior manager role
20  of our Mexico/Caribbean/Latin America entity.
21    Q.  And when was that?
22    A.  I believe it was around 2016, 2017.
23    Q.  How long did you stay in that position?
24    A.  About six months.
25    Q.  And then what?

Page 12

1     A.  Then I was promoted to the role of Director of
2  Operations Research.
3     Q.  And do you remember when that was?
4     A.  I -- I believe it was about 2018.
5     Q.  You can just ballpark as best as you can.
6     A.  Yeah.
7     Q.  That's just fine for now.
8         So you became Director of Operations Research
9  in 2018?
10    A.  I think that's right, yes.
11    Q.  And how long did you hold that position?
12    A.  Probably a year and a half, I think.  Yes.
13    Q.  And then what did you do?
14    A.  And then I was promoted to Managing Director of
15  the Revenue Management development group when my previous
16  boss at the time retired.
17    Q.  And that was mid-2019, do you think?
18    A.  I think, yes.  Early 2019, I believe.
19    Q.  How long did you stay in that position?
20    A.  That was the position that I had as of last week.
21  We've just rebranded the title a little bit.
22    Q.  Okay.  So you essentially stayed in the same
23  position, irrespective of titles, from 2019 until your
24  recent change last week?
25    A.  That is correct in the sense of I was in that --

3 (Pages 9 to 12)

Electronically signed by Amy Massey (401-010-081-3772)                                                    cfc28345-03b2-4b29-8502-5d67f1ce0f55

Page 13

1  in that role. But I'm sure you're familiar, you know, we
2  change organizational structures, meaning that sometimes
3  I -- you know, a team moves into my team; sometimes we
4  change organizational structures and somebody moves out of
5  my team.
6      So -- but within that role, yes, that was my
7  title for probably the three years, two years.
8      Q.  What did you do before you went to work for
9  American Airlines?
10     A.  I was a student.
11     Q.  Where?
12     A.  University of Michigan.
13     Q.  Huh.  What years did you attend University of
14  Michigan?
15     A.  2001 until 2012.
16     Q.  That's longer than I stayed in school, so tell me
17  what you did.
18     A.  I was a professional student.  So, yeah, I was
19  there for my undergraduate degree, my -- and -- and let's
20  just say a few graduate degrees.
21     Q.  So you -- did you graduate in 2012 from the
22  University of Michigan?
23     A.  Correct.
24     Q.  And then what did you do after that?  Go right to
25  work for American Airlines?

Page 14

1      A.  Correct.
2      Q.  All right.  Let me ask you, from 2019 through
3  today, can you generally describe what it is that you do --
4  or that you did during that period for American Airlines?
5  You don't need to be specific.  I'm trying to just get some
6  sense of what you did.
7      A.  Yes.  So the -- the -- what I will explain is kind
8  of the role of our team.  So we are, like I said,
9  responsible for all of the systems that power American
10  Airlines revenue generation.  So we have, you know, various
11  systems that have to come together to create, what we call,
12  our prices in the marketplace.  So what you see on AA.com,
13  and those systems are designed, maintained, and built
14  within my team.
15     Q.  And that's essentially what you've done since
16  2019?
17     A.  That's correct.
18     Q.  Let me hand you -- I'm going to show you a bunch
19  of exhibits.  I guess really before I do that, let me ask
20  you, have you ever had your deposition taken before?
21     A.  No.
22     Q.  Do you kind of understand what goes on?
23     A.  I think so, yes.
24     Q.  Did you meet with some lawyers ahead of time to
25  get an idea of what's going to happen here?

Page 15

1      A.  I did, yes.
2      Q.  And so you understand that, above all, you're
3  obligated to tell the truth?
4      A.  Uh-huh.
5      Q.  You need to say "yes" or "no."
6      A.  Correct.  Yes.
7      Q.  And do you understand that if you don't tell the
8  truth, that I can point that out at trial and show that
9  American is being less than candid?
10     A.  I understand that, yes.
11     Q.  Okay.  And is it your intent to tell the truth
12  today?
13     A.  It is.
14     Q.  All right.  Let me hand you what I will mark as
15  Lapp 1.
16         (Exhibit 1 marked.)
17     Q.  (BY MR. KIRKMAN)  If you'd take a second to read
18  that over, and then I want to ask you a few questions about
19  it.
20     A.  Uh-huh, I have read it.
21     Q.  And does that appear to be an email that you sent
22  on October 15th of 2018 to Darrin Goodreau -- at least to
23  Darrin Goodreau?
24     A.  That's what it appears to be, yes.
25     Q.  Okay.  Let me kind of walk through this email.  We

Page 16

1  won't do this with every one, but I just kind of want to
2  get an understanding.
3         You are the sender of this email, right?
4      A.  That's correct.
5      Q.  And then the information that's in all caps to the
6  right of your name, what is that information?
7      A.  I do not know what that represents.
8      Q.  Okay.  When you send an email, does that always
9  appear?
10     A.  Not when I'm -- no, I don't think so.
11     Q.  Okay.  Then who is Darrin Goodreau?
12     A.  Darrin, at the time of this email, was the Senior
13  Manager of the Revenue Integrity group within my -- within
14  my team.
15     Q.  Revenue Integrity?
16     A.  That's correct.
17     Q.  And what is Revenue Integrity at American
18  Airlines?
19     A.  Revenue Integrity is a team that makes sure that
20  all of our -- all of our sales, i.e., ticket sales, all of
21  our products that we sell are done within kind of the --
22  the policies and procedures that we've set out to govern
23  those sales.
24     Q.  Revenue obviously including the sales of tickets
25  on American Airlines?

4 (Pages 13 to 16)

MARCIAL LAPP May 30, 2024



Page 29

1  team at American?
2      A.  It's a team that manages all of our internal and
3  external communication to team members as well as external
4  audiences.
5      Q.  Would that be another department that's sort of
6  joined at the hip with the Revenue department?
7      A.  Not quite as close with distribution, but pretty
8  close, yes.
9      Q.  Okay.  But for some reason, Ross Feinstein sent a
10  copy of his email and the lower emails to you, right?
11      A.  That's correct.
12      Q.  Do you know why he did that?
13      A.  I do not know.
14      Q.  Who is Tom Jiede?
15      A.  Tom Jiede (different pronunciation) was, at the
16  time of this email, in the Revenue Management group.
17      Q.  Worked in your department?
18      A.  He -- not in my group but within the Revenue
19  Management group.  I, for the life of me, can't recall what
20  team he was managing at the time of this email.
21      Q.  So he was associated with the Revenue department?
22      A.  Yes, that's correct.
23      Q.  And who is Kimberly Cisek?
24      A.  Kimber Cisek (different pronunciation)?  She was
25  the -- again, at the time of this email it's a little hard

Page 30

1  for me to recall.  I would say she was responsible for all
2  of our customer relations.  I don't know in what -- in
3  terms of title or capacity.
4      Q.  She was not in the Revenue department?
5      A.  She was not, no.
6      Q.  And then how about Melissa Leach?  What was her
7  position at the time?
8      A.  I believe she was responsible at the time for our
9  Policies and Procedures team.
10      Q.  Not in the Revenue department?
11      A.  Not part of Revenue Management, correct.
12      Q.  Okay.  Well, at any rate, with all these people at
13  American Airlines that are looking at this customer's
14  email, you responded to -- strike that.
15          You actually sent this to Neil Geurin, who is
16  not a party to any of the other emails, right?
17      A.  That's what it appears to be, correct.
18      Q.  And you said, ████████████████████████████
██████████████████████████████████████████████
20  ███████████
21          Did I read that correctly?
22      A.  Yes, you did.
23      Q.  Okay.  Why did you send this email to Neil Geurin
24  on December 26th of 2019?
25      A.  If you -- if you read the entire email, the

Page 31

████
████████████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████████████████
██████████████████████████████
████████████████████████████████████████
████████████████████████████████████
██████████
████████████████████████████████
██████████████████████████████
████████████████
██████████████████████████████████
████████████████████████████████████
20      Q.  Well --
21      A.  --██████████.
22      Q.  -- why was it sent to -- I mean, why did you
23  choose to send it to Neil Geurin?
24          What was special about him or his position?
25      A.  As a mentioned, he was the Director of

Page 32

1  Distribution, which is managing all of our third parties.
2  And so I reached out to him because if anybody would be
3  able to accomplish something like this, it would be him and
4  his team.
5      Q.  Okay.  So Skiplagged, the reference you make in
6  that email, that is -- what did you understand Skiplagged
7  to be?
8      A.  ████████████████████████████████████████
████████████████████████████████████████
████████████████████
12      Q.  Were you familiar with Skiplagged at the time?
13      A.  I believe, yes.
14      Q.  All right.  And you understood them to be what?
15      A.  A -- a third-party website that sells American
16  Airlines content and specifically provides opportunities
17  for customers to provide lower-priced itineraries which
18  then sometimes results in hidden city itineraries that
19  customers purchase.
20      Q.  Okay.  ██████████████████████████████████
████████████████████████ right?
23      A.  That is what I wrote.  That is correct.
24      Q.  That's right.
25          Well, that would connotate that you knew that

Amy Massey & Associates

App'x 0014

Electronically signed by Amy Massey (401-010-081-3772)                    cfc28345-03b2-4b29-8502-5d67f1ce0f55



Page 41

1  understand what that has to do with revenue.
2      A.  ████████████████████████
3  ████████████████████████████
4  ████████████████████████████
5  ████████████████████
6      Q.  ████████████████████████
7  ████████████████████████████
8  ████████████████████████████
9  ████████████████████████
10 ████████████████████████
11 ████████████████████████████
12 ████████████████████████████
13 ████████████████████████████
14 ████████████████████████████
15 ████████████████████████████
16 ████████████████████████████
17 ████████████████████████████
18     Q.  And I understand that the email says whatever it
19 says.  What I'm asking you is, ████████████████
20 ████████████████████████████
21 ████████████
23     Q.  Okay.  Then let me hand you Exhibit Number 10.
24         (Exhibit 10 marked.)
25         THE WITNESS:  Thank you.

Page 42

1      A.  All right.  I've read the email.
2      Q.  (BY MR. KIRKMAN)  Is this -- this an email from
3  the same Neil Geurin to you on the same date, December 26th
4  of 2019?
5      A.  Yes, it appears to be.  Correct.
6      Q.  All right.  And then if I'm reading this
7  correctly, Mr. Geurin tells you that, ████████████████
8  ████████████████████████████████
9  ████████  right?
10     A.  That's what he says, correct.
11     Q.  And what is -- what is an MSE.
12     A.  MSE is -- is an acronym for metasearch engine.
13     Q.  Okay.  What is a metasearch engine?
14     A.  It is a third party that serves up American
15 Airlines content but books directly through
16 AmericanAirlines.com through what we call a redirect.
17        So imagine you go to a website called
18 googleflights, you search for your flight, you select your
19 flight; when you go to book, you don't actually book with
20 Google; it redirects you to AA.com and you create your
21 booking.
22     Q.  Okay.  Then the sentence -- a sentence later in
23 the email says, ████████████████████████
24 ████████████████████
25     A.  I believe, yes.

Page 43

1      Q.  Okay. -- ████████████████████████
2  ████████████████████████████
3  ████████████████████████████
4  ████████████████████████████
5  ████████████
6        Did I read that correctly?
7      A.  I think you did, yes.
8      Q.  So I guess what Mr. Geurin was doing was
9  responding to ████████████████████████
10 ████████████  right?
11     A.  That's what it appears to be, yes.
12     Q.  Okay.  What did you understand Mr. Geurin to be
13 telling you by this email?
14     A.  It's -- ████████████████████████
15 ████████████████████████████
16 ████████████████████████████
17 ████████████████████████
18 ████████████████████████
19     Q.  But he does go on and says, ████████████████
20 ████████████  Is that what he says?
21     A.  That is what he says.
22     Q.  What did you understand him to mean by a
23 ████████████
24     A.  I think you would have to ask him.
25     Q.  I guess we will.

Page 44

1        Let me hand you Number 11.
2        (Exhibit 11 marked.)
3        THE WITNESS:  Thank you.
4      Q.  (BY MR. KIRKMAN)  And this is just an email where
5  you responded to Mr. Geurin, telling him that you got the
6  email and thanking him, right?
7      A.  Yes, that's what this appears to be.  Correct.
8      Q.  All right.  I hand you Number 12.
9        (Exhibit 12 marked.)
10       THE WITNESS:  Thank you.
11     Q.  (BY MR. KIRKMAN)  This is a multi-page document,
12 some of which includes emails we've been over, but what I
13 would like to do is get you to focus on the two emails that
14 are on the top page, which for the record as you see in the
15 bottom right-hand corner is 5700 by a Bates number in the
16 right-hand corner.  Do you see that?
17     A.  Yes, I do.
18     Q.  Okay.  The top email is an email that you sent
19 to --
20     A.  Sorry, can I, kind of, just look through the whole
21 thing --
22     Q.  Oh, sure.
23     A.  -- real quick?
24     Q.  Sure.
25     A.  Thank you.



MARCIAL LAPP May 30, 2024

## Page 45

1    Q.   Absolutely.
2    A.   All right.
3    Q.   The top email is written to Richard Grantvedt.
4    And I am just doing terrible with the names probably, so
5    I'm going to stop.  I'm going to say, Who did you send this
6    to?
7    A.   No, you got it right.  Richard Grantvedt.
8    Q.   Wow.  All right.  Who is -- what position did he
9    have at the time?
10   A.   I believe Richard was and still is the manager of
11   our digital assets, i.e., AA.com, mobile.
12   Q.   Okay.  Tell me what that department is.
13   A.   It's -- it's there to kind of drive the -- the
14   technology development that we do on our website, our
15   mobile app.  And so kind of think of project management for
16   any initiative that has to go through our website.
17   Q.   Okay.  And apparently on January 2nd of 2020,
18   Emma Mao had written you and Becky Gross; and then you were
19   sending the -- the email to Richard, right?
20   A.   That's what it appears to be.
21   Q.   So tell me -- tell me what's happening here.  What
22   is the purpose of you sending this email to Richard?
23   A.   All right.

## Page 46

14   Q.   Okay.  So on January 3rd of 2020, when you wrote
15   Richard, you told him in your third paragraph that -- you
16   said,
                                    right?
19   A.   I mean -- no.
                 "
21   Q.   I didn't mean to say that.
22   A.   Okay.
23   Q.   I'm just trying to understand, who's "we"?
24   A.   The -- the -- the general public.
25   Q.   This could have said,

## Page 47

1    A.   That's correct.
2    Q.   -- right?
3    A.   English is not my first language.
4    Q.   That's all right.  Better than me.
5
9    A.   It's the --
14   Q.   So you are continuing to do, I guess, what I would
15   say, a investigation into Skiplagged as of January of 2020,
16   right?
17   A.   That's correct.
18   Q.   And why was it that you were doing this?
19   A.   This is the responsibility of my team, is the, as
20   I mentioned, Revenue Integrity.  And so I was just trying
21   to connect various folks across the organization together
22   to see if we can jointly together solve this problem.
23   Q.   Did someone assign you this task, or did you just
24   do it on your own?
25   A.   My job is to fix problems.  So this is maybe

## Page 48

1    self-driven.
2    Q.   Well, that really wasn't my question.  But my
3    question is, did someone assign you this task?
4    A.   No.
5    Q.   To whom did you report at the time in January of
6    2020?
7    A.   I believe I reported to Jim Fox, who was the
8    Vice President of Revenue Management at the time.
9    Q.   Okay.  And who did he report to?
10   A.   I believe he reported to Don Casey, who was the
11   Senior Vice President of Revenue Management and Commercial.
12   Q.   Both in the Revenue departments of some sort?
13   A.   Both having oversight of Revenue Management, yes.
14   Q.   Okay.  Then you go on and say,
17            What did you mean by that?
18   A.   So, again,
24   Q.   Okay.  At the time, you knew --

12 (Pages 45 to 48)

Amy Massey & Associates

App'x 0016

Electronically signed by Amy Massey (401-010-081-3772)                    cfc28345-03b2-4b29-8502-5d67f1ce0f55



Page 69

1    A.  That the -- I can only make a guess.
2    Q.  Well, as long as it's reasoned based on your
3    position at American Airlines and not because you're a
4    softball player or something.
5    A.  Correct.
6        The -- so when -- ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████
████████████████████████
21   Q.  Okay.  I got it.  Thank you.
22       Let me hand you 19.
23       (Exhibit 19 marked.)
24       THE WITNESS:  Thank you.
25   A.  All right.

Page 70

1    Q.  (BY MR. KIRKMAN)  Okay.  So it looks to me like
2    one Alfred Lloyd with Executive Platinum/Concierge Desk
3    has sent an email to Vasu Raja on October 26th of '20
4    asking if he's ever heard about an app called Skiplagged,
5    right?
6    A.  That's what it appears to be, yes.
7    Q.  Then it looks to me like, on the same day,
8    Mr. Raja responded and copied you.
9    A.  That's correct.
10   Q.  What was Raj- -- Vasu Raja's position at the time;
11   that is, October 26th of 2020?
12   A.  In October 2020, I -- I believe he was already our
13   Chief Commercial Officer.
14   Q.  And what is that?
15   A.  That is the person that oversees all of the
16   commercial functions, such as revenue management, network
17   planning, customer experience.
18   Q.  All of those departments that you've described
19   earlier report to him?
20   A.  That's correct.
21   Q.  And his position was what?
22   A.  Chief Commercial Officer.
23   Q.  Chief Commercial Officer.  Okay.
24       So then Alfred Lloyd Campbell, looked like he
25   is somebody employed by American in the Executive Platinum

Page 71

1    or Concierge Desk department of some sort?
2    A.  Yes.  This sounds like a team member that works in
3    our, yes, reservations office.
4    Q.  Southeast reservation office?
5    A.  Correct.
6    Q.  So he was reporting on his experience or knowledge
7    with Skiplagged?
8    A.  I believe he's responding -- he's providing
9    information about a customer that has called his
10   reservations desk.
11   Q.  Right.  And he's apparently decided to write this
12   to --
13   A.  To Vasu.
14   Q.  -- Vasu Raja?
15   A.  That's right.
16   Q.  So Mr. Raja says, ████████████████████
████████    ███
████████████████████████████████████
████████████████████████████████████
████████
21       Is that correct?
22   A.  That's correct.
23   Q.  Okay.  When he says, ████████████  what did
24   you understand that to mean?
25   A.  ████████████████████████

Page 72

1    Q.  Okay.  Well, obviously you had been looking into
2    Skiplagged for some time now as of December 2- -- or excuse
3    me, October 26th of 2020 --
4    A.  Yes.
5    Q.  -- right?
6        Okay.  Had you ever had any discussions with
7    Vasu Raja up to that point?
8    A.  I've had many discussions with Vasu, yes.
9    Q.  I should -- that was a bad question.  I mean
10   discussions with him about Skiplagged.
11   A.  That, I cannot recall.
12   Q.  So understanding that this was sent in October of
13   '20 -- I believe that we talked about an email in October
14   of '18 to start this process about hidden city ticketing.
15   So would it be fair to say that you'd be looking into this
16   hidden city ticketing problem at least two years before you
17   got this memo?
18   A.  Yes, that's prob- -- that's a correct statement,
19   and --
20   Q.  Do you --
21   A.  -- therefore, we've not been able to solve the
22   problem.
23   Q.  Right.
24       But if you would, turn back to Exhibit 1 for
25   just a minute.

18 (Pages 69 to 72)

Electronically signed by Amy Massey (401-010-081-3772)                                    cfc28345-03b2-4b29-8502-5d67f1ce0f55



Page 125

3    A.  That's how I read it as well, yes.
4    Q.  All right.  So then I'm curious as to why you
5  responded to that by saying,
     What did you mean by that?
7    A.  So if you -- if you skip the middle section and
8  you go to the email that I wrote at the very bottom,
9  right --
10    Q.  Yes, sir.
11    A.  -- this is a summary.
12        So what I --
20    A.  That's right.
21    Q.  Okay.
22    A.  Chief Commercial Officer.
23    Q.  All right.
25    A.  Good job.

Page 126

1    Q.  --
         , and --
3    A.  Correct.
4    Q.  -- good job?
5    A.  That's right.
6    Q.  All right.  Let me go to the next one, 37.
7        (Exhibit 37 marked.)
8        MR. MUYSKENS:  Thank you.
9        THE WITNESS:  Thank you.
10    A.  All right.
11    Q.  (BY MR. KIRKMAN)  And do you know David Bell?
12    A.  Yes.
13    Q.  And who is he?
14    A.  He was our Managing Director of, I believe,
15  Corporate Security.
16    Q.  Same department where we went over that
18    A.  Yes.  Jayson, through various other folks, would
19  report to David Bell.
20    Q.  Okay.  That puts it in context.
21        So he's sending an article to Steven Leist,
22  L-e-i-s-t, right?
23    A.  Uh-huh.
24    Q.  And who -- who was Steven at the time?  What was
25  his position?

Page 127

1    A.  He was the Vice President of the Information
2  Technology team -- or one of the vice presidents of
3  information technology, specifically focused on channels
4  like AA.com, our mobile app, any customer-facing
5  technology.
6    Q.  Okay.  So Steven Leist then sends to Scott
7  Chandler, Neil Geurin, and you an email that says,
                                right?
9    A.  Yes, that appears to be correct.
10    Q.  Obviously all three of you were aware of
11  Skiplagged.  You'd been working on it since 2018, right?
12    A.  Correct.
13    Q.  Okay.  So then you responded by saying, I guess
14  the same day,
                      right?
19    A.  (Witness nods head.)
20    Q.  Okay.  When you say that
23    A.  It's --

Page 128

4    Q.  Okay.
7    Q.  How is that?
8    A.
25    A.  That's right.

32 (Pages 125 to 128)

Electronically signed by Amy Massey (401-010-081-3772)                    cfc28345-03b2-4b29-8502-5d67f1ce0f55

MARCIAL LAPP May 30, 2024



Page 129

1    Q.  All right. ▮▮▮▮▮▮▮▮
▮
▮
5    A.  Yes. ▮▮▮▮▮▮▮
▮
8    Q.  Okay.  Well, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
12   A.  No, no. ▮▮▮▮▮▮▮▮▮▮

▮

25   Q.  Right.

Page 130

1          But the situation we're talking about here is
2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮
8    Q.  Okay.  Well, I'm just trying to understand what
9    you said, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
15   A.  That is not what I believe; that is what we do.
16   That's our policy.
17   Q.  But you understood that's the process --
18   A.  That's our process --
19   Q.  -- at American --
20   A.  -- correct.
21   Q.  -- right?
22          Okay.  What I'm trying to understand is, ▮▮
▮▮▮▮▮▮▮
25   A.

Page 131

▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
9    A.  True statement.  That is correct.
10   Q.  Okay.  Then you say, ▮▮▮▮▮
▮▮▮▮▮▮
14   A.  This is a, let's call it, ▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ isn't it?

Page 132

1    A.  I -- I think that's -- that's maybe your opinion.
2    Q.  Well, isn't it true? ▮▮▮▮▮▮
▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
11   Q.  ▮▮▮▮▮▮
▮▮▮▮▮▮
14   Q.  Okay.  Then ▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

33 (Pages 129 to 132)

Amy Massey & Associates

App'x 0019

Electronically signed by Amy Massey (401-010-081-3772)

cfc28345-03b2-4b29-8502-5d67f1ce0f55

MARCIAL LAPP May 30, 2024



**Page 133**

1  Q.  Well,

8  I mean, that's the point you were trying to

10  A.  That's right.

11  Q.  Then you say,

16  Q.  Okay.

**Page 134**

8  I mean, that's the point you were trying to
9  make, right?
10  A.  Correct.
11  Q.  In other words,

18  Q.  Right.
19
That was the point you were trying to make
22  here, right?
23  A.  Yes.
24  Q.  Okay.  Then let me get 38.
25  (Exhibit 38 marked.)

**Page 135**

1  A.  All right.
2  Q.  (BY MR. KIRKMAN)  Okay.  So Andrea Koos, who is a
3  Senior Manager with Corporate Communications at American,
4  is sending to you and Neil Geurin and Thomas Rajan and
5  Meghan Grove and Curtis Blessing, it looks like,

8  A.  Yes, that's what this appears to be.
9  Q.  Okay.  And then there's a reaction from you in
10  your email thanking her for sending the article.
11  And then it says,

13  "RM" is Revenue Management?
14  A.  Correct.
15  Q.  And that would be the department that you work
16  for?
17  A.  That's correct.
18  Q.

21  A.  So if you -- if you read the -- the comment from
22  Andrea, the very last line here it says,

25

**Page 136**

3  Q.  Okay.

6  Q.  Well, why did you use RM?  Just because that's the
7  department you worked on?
8  A.  Correct.
9  Q.  And you -- did -- does anybody --
11  A.  Not to my knowledge.
12  Q.  Okay.

14  A.

17  Q.  Okay.  Let me give you 39.
18  (Exhibit 39 marked.)
19  THE WITNESS:  Thank you.
20  Q.  (BY MR. KIRKMAN)  Let me ask you first in terms of
21  the packet itself, which was produced to us like this:  Do
22  you know what this is, this packet?
23  A.  Can you give me just a --
24  Q.  Sure.
25  A.  -- minute to take a look here?

34 (Pages 133 to 136)

Amy Massey & Associates

App'x 0020

MARCIAL LAPP May 30, 2024



Page 137

1   Q.  Absolutely.
2   A.  All right.
3   Q.  Go ahead.  Do you know what this packet is?
4   A.  I do not.
5   Q.  Do you know what "MI:33" means?
6   A.  I do not.
7   Q.  "LitPak 230066"?
8   A.  No.
9   Q.  Okay.  Any of the other wording there on the front
10  page?  It says --
11  A.  I mean, I --
12  Q.  -- "Case Name:  Skiplagged; Our Case:  22428;
13  Incident ID."
14  A.  No.
15  Q.  Did you have anything to do with putting this
16  packet together?
17  A.  I have not.
18  Q.  Do you know who did?
19  A.  No.
20  Q.  Have you ever seen this before?
21  A.  No.
22  Q.  Okay.  Have you seen an analysis at American of
23  what allegedly American has lost in revenue by virtue of
24  Skiplagged's business with American?
25  A.  No.

Page 138

1   Q.  Have you had any discussion with anyone at
2   American about that concept?
3   A.  The concept of --
4   Q.

Page 139

21  Q.  Okay.  Let me make -- let's kind of -- if you
22  don't mind, let me kind of ask some questions about that --
23  A.  Sure.
24  Q.  -- specific -- in the instance which you've
25  described,

Page 140

1   A.  Correct.
2   Q.
3       , right?
4   A.  That's right.
5   Q.  Okay.
10  A.  That's right.
11  Q.  -- right?
12  A.  Correct.
13  Q.  Okay.

35 (Pages 137 to 140)

Amy Massey & Associates

App'x 0021

MARCIAL LAPP May 30, 2024



Page 141

1    A.  I did, yes.
2    Q.  Okay.

15    A.

25    A.  I don't know.

Page 142

1    Q.  Well,
2    A.  Somebody could probably do a study.
3    Q.  You haven't?
4    A.  I have not.
5    Q.  Who is that somebody?
6    A.

15    Q.  You don't know, right?  You don't --
16    A.  No, I --
17    Q.  -- have that information?
18    A.  I do not, no.
19    Q.  And it's certainly beyond your capability of doing
20  it?
21    A.  Correct.
22    Q.
24    A.  Yes.
25    Q.  Anybody else you can think of at American that

Page 143

1   could do that?
2    A.  I would start there.
3    Q.  Okay.

17    A.

Page 144

5         MR. KIRKMAN:  Okay.  All right.  Let's take a
6   short break, and I'm about ready to wrap up.  That okay?
7         MR. MUYSKENS:  Okay.
8         THE VIDEOGRAPHER:  Off the record at
9   2:10 p.m.
10         (Brief recess.)
11         THE VIDEOGRAPHER:  Back on the record at
12  2:16 p.m.
13    Q.  (BY MR. KIRKMAN)  Mr. Lapp, have you met with
14  anyone who identified himself as an investigator for
15  American associated with this lawsuit?
16    A.  No.
17    Q.  Have you met with a man who introduced himself as
18  a Mr. Holmes, Mr. Robert Holmes?
19    A.  No.
20    Q.  Have you met with the lawyers for American
21  Airlines in connection with this lawsuit?
22    A.  Yes, these folks.  (Indicating.)
23    Q.  Okay.  Anybody else?
24    A.  No.
25    Q.  When did you meet with them?

36  (Pages 141 to 144)

Amy Massey & Associates

App'x 0022

## Page 145

1    A. Over the past month, probably four times.
2    Q. Okay. These specific lawyers, nobody else; is
3 that right?
4    A. I -- yes. I know I'm looking at you guys, but,
5 yes, that's --
6    Q. Have you been involved in gathering documents for
7 discovery production?
8    A. Me -- no. No.
9    Q. Has anyone asked you to gather documents for
10 discovery production in this case?
11    A. No.
12        MR. KIRKMAN: Okay. Okay. No further
13 questions.
14        MR. MUYSKENS: Thank you.
15        THE VIDEOGRAPHER: Before we go off the
16 record, besides Mr. Kirkman, does anybody need a copy of
17 the video?
18        MR. MUYSKENS: At some point.
19        THE VIDEOGRAPHER: Okay. All right. We are
20 off the record at 2:17 p.m.
21        (End of proceedings.)
22
23
24
25

## Page 146

1  WITNESS: MARCIAL LAPP
2  DATE TAKEN: MAY 30, 2024
3
4        CORRECTIONS AND SIGNATURE
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## Page 147

1    I, MARCIAL LAPP, have read the foregoing deposition and
2 hereby affix my signature that same is true and correct,
3 except as noted above.
4
5 _____
         MARCIAL LAPP
6
7 THE STATE OF _____)
8 COUNTY OF _____)
9 Before me,_____, on this day personally
10 appeared MARCIAL LAPP, known to me (or proved to me under
   oath or through_____) (description of identify
11 card or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged to
12 me that they executed the same for the purposes and
   consideration therein expressed.
13 Given under my hand and seal of office this ____day of
   _____A.D., _____.
14
15 _____
   NOTARY PUBLIC IN AND FOR
16 THE STATE OF _____
   My Commission Expires:
17
18
19
20
21
22
23
24
25

## Page 148

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2            FORT WORTH DIVISION
   AMERICAN AIRLINES, INC., *
3                          *
      Plaintiff,            *
4                          *
                           *
5  v.              * Civil Action No.
                   * 4:23-cv-00860-P
6  SKIPLAGGED, INC.,        *
                           *
7      Defendant.      *
8       REPORTER'S CERTIFICATION
   ORAL AND VIDEO DEPOSITION OF MARCIAL LAPP
9            MAY 30, 2024
             VOLUME 1 of 1
10
11    I, Amy Massey, CSR, and Notary Public in and for
12 the State of Texas, hereby certify to the following:
13    That the witness, MARCIAL LAPP, was duly
14 sworn by the officer and that the transcript of the oral
15 and video deposition is a true record of the testimony
16 given by the witness;
17    That the deposition transcript was submitted on
18 June 17, 2024, to Ms. Alyssa Ortiz Johnston, Attorney for
19 the Plaintiff, for the review and signature by the
20 witness, to be returned to the reporter within 30 days;
21    That the amount of time used by each party at the
22 deposition is as follows:
23    Mr. Nathan J. Muyskens:  00:00
      Ms. Alyssa Ortiz Johnston:  00:00
24    Mr. William L. Kirkman:  03:16
      Ms. Abigail R.S. Campbell:  00:00
25

37 (Pages 145 to 148)

Electronically signed by Amy Massey (401-010-081-3772)
cfc28345-03b2-4b29-8502-5d67f1ce0f55

Page 146

1   WITNESS:  MARCIAL LAPP

2   DATE TAKEN:  MAY 30, 2024

3

4               CORRECTIONS AND SIGNATURE

5   Page 54 ln 22 and page 55 ln 8 - replace ▮▮▮ with ▮▮▮ _____

6   Page 55 ln 25 and page 108 ln 8 - replace ▮▮▮ with ▮▮▮ _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Electronically signed by Amy Massey (401-010-081-3772)                    cfc28345-03b2-4b29-8502-5d67f1ce0f55

Page 147

1      I, MARCIAL LAPP, have read the foregoing deposition and

2   hereby affix my signature that same is true and correct,

3   except as noted above.

4

5                                          MARCIAL LAPP

6

7   THE STATE OF _Texas_____)

8   COUNTY OF _Tarrant_____)

9   Before me, _Marcial Lapp_____, on this day personally
    appeared MARCIAL LAPP, known to me (or proved to me under
10  oath or through _ID_____) (description of identify
    card or other document) to be the person whose name is
11  subscribed to the foregoing instrument and acknowledged to
    me that they executed the same for the purposes and
12  consideration therein expressed.

13  Given under my hand and seal of office this _9th_ day of
    _July_____ A.D., _2024_.
14

15  NOTARY PUBLIC IN AND FOR
    THE STATE OF _Texas_____
16

17  My Commission Expires: 11-08-2027

18       CHRISTINA JANE GOURLEY
         Notary Public, State of Texas
19       Comm. Expires 11-08-2027
         Notary ID 134638944
20

21

22

23

24

25

Amy Massey & Associates

App'x 0025

MARCIAL LAPP May 30, 2024

Page 149

```
1        That pursuant to information given to the
2   deposition officer at the time said testimony was taken,
3   the following includes counsel for all parties of record:
4
    FOR THE PLAINTIFF, AMERICAN AIRLINES, INC.:
5
        MR. NATHAN J. MUYSKENS
6       Greenberg Traurig, LLP
        nathan.muyskens@gtlaw.com
7
        MS. ALYSSA ORTIZ JOHNSTON
8       Greenberg Traurig, LLP
        johnston@gtlaw.com
9
10  FOR THE DEFENDANT, SKIPLAGGED, INC.:
11      MR. WILLIAM L. KIRKMAN
        Kirkman Law Firm, PLLC
12      billk@kirkmanlawfirm.com
13      MS. ABIGAIL R.S. CAMPBELL
        Condon Tobin Sladek Thornton Nerenberg, PLLC
14      acampbell@condotobin.com
15          That $_____ is the deposition officer's charges
16  to the Defendant for preparing the original deposition
17  transcript and any copies of exhibits;
18
19          I further certify that I am neither counsel for,
20  related to, nor employed by any of the parties or attorneys
21  in the action in which this proceeding was taken, and
22  further that I am not financially or otherwise interested
23  in the outcome of the action.
24
25
```

Page 150

```
1   Certified to by me this 17th day of June, 2024.
2
3   Amy Massey, Texas CSR 6254
    Expiration Date: 1/31/25
4   Amy Massey & Assoc., Inc.
    Firm Registration Number 404
5   6724 Kirk Lane
    Burleson, Texas  76028
6   Phone:  817-447-6721
    amymasseyassociates@gmail.com
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

38 (Pages 149 to 150)

Electronically signed by Amy Massey (401-010-081-3772)                    cfc28345-03b2-4b29-8502-5d67f1ce0f55

# Exhibit A-2

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,  *
                          *
     Plaintiff,           *
                          *
v.                        * Civil Action No.
                          * 4:23-cv-00860-P
SKIPLAGGED, INC.,         *
                          *
     Defendant.           *

*******************************************
ORAL DEPOSITION OF
RAYMOND SCOTT CHANDLER
JUNE 7, 2024
VOLUME 1 OF 1
*******************************************

     ORAL DEPOSITION OF RAYMOND SCOTT CHANDLER, produced as
a witness at the instance of the Defendant, and duly sworn,
was taken in the above-styled and -numbered cause on the
7th day of June, 2024, from 10:05 a.m. to 12:56 p.m.,
before Amy Massey, CSR in and for the State of Texas,
reported by machine shorthand, at the offices of Kelly Hart
& Hallman, LLP, 201 Main Street, Suite 2500, in the City of
Fort Worth, County of Tarrant, State of Texas, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

## Page 2

```
 1            A P P E A R A N C E S
 2   FOR THE PLAINTIFF, AMERICAN AIRLINES, INC.:
 3      MR. NATHAN J. MUYSKENS
        Greenberg Traurig, LLP
 4      2101 L Street, N.W.
        Suite 1000
 5      Washington, D.C.  20037
        202-331-3100
 6      nathan.muyskens@gtlaw.com
 7      MS. ALYSSA ORTIZ JOHNSTON
        Greenberg Traurig, LLP
 8      2200 Ross Avenue
        Suite 5200
 9      Dallas, Texas  75201
        214-665-3600
10      johnston@gtlaw.com
11   FOR THE DEFENDANT, SKIPLAGGED, INC.:
12      MR. WILLIAM L. KIRKMAN
        Kirkman Law Firm, PLLC
13      201 Main Street
        Suite 1160
14      Fort Worth, Texas  76102
        817-336-2800
15      billk@kirkmanlawfirm.com
16      MS. ABIGAIL R.S. CAMPBELL
        Condon Tobin Sladek Thornton Nerenberg, PLLC
17      8080 Park Lane
        Suite 700
18      Dallas, Texas  75231
        214-265-3800
19      acampbell@condotobin.com
20   Also Present:
21      Mr. Jeremy Ballew
        American Airlines
22
        Ms. Leana Dippie
23      American Airlines Intern
24      Mr. Joseph McDermott, Videographer
        Elite Video Productions
25      214-747-1952
```

## Page 3

```
 1               INDEX
 2                              PAGE
 3
 4   Appearances . . . . . . . . . . . . . . . . . . . . 2
 5   Stipulations  . . . . . . . . . . . . . . . . . . 1
 6   RAYMOND SCOTT CHANDLER
 7      Direct Examination by Mr. Kirkman. . . . . . 6
 8   Signature and Changes . . . . . . . . . . . . . . .130
 9   Reporter's Certificate  . . . . . . . . . . . . . .132
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                   EXHIBIT INDEX
 2   DEPOSITION   DESCRIPTION           PAGE
     EXHIBIT                       MARKED/IDENTIFIED
 3
 4   NUMBER 1  Email Correspondence Regarding    19
                Skiplagged.com
 5   NUMBER 2  Email Correspondence Regarding    24
                Skiplagged
 6
 7   NUMBER 3  Email Correspondence Regarding    31
                YUL and YTO Agents
                Short-Checking Bags
 8
 9   NUMBER 4  Email Correspondence Regarding    40
                YUL and YTO Agents
                Short-Checking Bags
10
11   NUMBER 5  Email Correspondence Regarding    51
                Baggage
12   NUMBER 6  Email Correspondence Regarding    57
                Hidden City with Bag
13              Delivery
14   NUMBER 7  American Airlines AWG           60
                Policy Review
15              October 2018
16   NUMBER 8  American Airlines Fraud,       62
                Security, and Integrity
17              Teams Printout
18   NUMBER 9  Email Correspondence Regarding    62
                American Airlines Travel
19              News and Information - An
                Update on Booking and
20              Ticketing Practices
21   NUMBER 10   Email Correspondence Regarding  64
                American Airlines Travel
22              News and Information - An
                Update on Booking and
23              Ticketing Practices
24   NUMBER 11   Email Correspondence Regarding  65
                Hidden City FYI & Question
25
```

1 (Pages 1 to 4)

Amy Massey & Associates

App'x 0028

Electronically signed by Amy Massey (401-010-081-3772)                                5bdb4925-ac27-4d63-b7e6-abcc5c71c238

## Page 5

EXHIBIT INDEX CONTINUED

DEPOSITION   DESCRIPTION              PAGE
EXHIBIT                          MARKED/IDENTIFIED

NUMBER 12   Email Correspondence Regarding      78
            Media Inquiries About
            Hidden City Ticketing

NUMBER 13   Email Correspondence Regarding      80
            Dallas Morning News Inquiry
            Re: Skiplagging

NUMBER 14   Email Correspondence Regarding      83
            Dallas Morning News Inquiry
            Re: Skiplagging

NUMBER 15   Email Correspondence Regarding      87
            Dallas Morning News Inquiry
            Re: Skiplagging

NUMBER 16   Email Correspondence Regarding      90
            DMN Unsigned Editorial
            About Skiplagging

NUMBER 17   Email Correspondence Regarding     109
            DMN Unsigned Editorial
            About Skiplagging with
            Attached Article

## Page 6

1        P R O C E E D I N G S
2        (Federal read-on waived by agreement of all
3    parties.)
4        (On the record at 10:05 a.m.)
5        RAYMOND SCOTT CHANDLER,
6    having been first duly sworn, testified as follows:
7        DIRECT EXAMINATION
8    BY MR. KIRKMAN:
9    Q.  Please state your full name for the record, sir.
10   A.  Raymond Scott Chandler.
11   Q.  And, Mr. Chandler, how old of a man are you?
12   A.  59.
13   Q.  And where do you work?
14   A.  At American Airlines.
15   Q.  And what is your current official position with
16   American?
17   A.  Senior Vice President of Revenue and Loyalty.
18   Q.  And how long have you been a Senior Vice President
19   of Revenue and Loyalty?
20   A.  About a year and a half.  Before that, I was the
21   Vice President of Revenue and Loyalty, since January '21.
22   Q.  All right.  I think I understand "revenue" in the
23   context of American Airlines, but what does "loyalty" mean?
24   A.  The AAdvantage program.
25   Q.  So you became the Vice President of Revenue and

## Page 7

1    Loyalty at American in January of '21?
2    A.  Yes.
3    Q.  And so when did you become the Senior Vice
4    President?
5    A.  Middle of '22.
6    Q.  All right.  And prior to you becoming Vice
7    President of Revenue and Loyalty, what did you do?  What
8    was your position?
9    A.  I was a Managing Director of Revenue Analysis as
10   of January of 2020.
11   Q.  Okay.  The title is Managing Director of Revenue
12   Analysis?
13   A.  Correct.
14   Q.  And what did you do in that function?
15   A.  We helped the commercial teams make decisions, so
16   how can they make better decisions using data, analytics,
17   math, smart people on the team, things like that.
18   Q.  And when you say "the commercial teams," what do
19   you mean by that?
20   A.  The Revenue Management team in particular.  We
21   also help Network team, the Loyalty team, anybody that's
22   involved with revenue production.
23   Q.  All right.  And prior to January of '20 when you
24   became the Managing Director of Revenue Analysis, what did
25   you do?

## Page 8

1    A.  I was the Managing Director of Pacific Revenue
2    Management.
3        THE REPORTER:  Of revenue --
4        THE WITNESS:  Revenue Management.
5        THE REPORTER:  The word before that?
6        THE WITNESS:  Pacific.  Sorry.
7    Q.  (BY MR. KIRKMAN)  Like, the Pacific Coast?
8    A.  Like, all of our flights to Asia and Australia.
9    Q.  Okay.  Managing Director of Revenue Management for
10   the Pacific area?
11   A.  Correct, yes.
12   Q.  And when did you obtain that position?
13   A.  December of 2019.
14   Q.  And prior to becoming the Revenue Director of the
15   Pacific -- management of the Pacific region, what did you
16   do?
17   A.  I was the Managing Director of Systems and
18   Development.
19   Q.  And when did you obtain that position?
20   A.  In various forms, since 2011.  So through the
21   merger, different functions were traded around but that was
22   essentially what I was doing.
23   Q.  Okay.  But from 2011, at some point, to December
24   of '19, you were in Systems and Development?
25   A.  Correct.

2 (Pages 5 to 8)

Electronically signed by Amy Massey (401-010-081-3772)                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238

Page 9

1    Q.  And what did you do in Systems and Development
2  generally?
3    A.  So all of the systems, so -- that support the
4  revenue production, they're -- there's a lot of them, and
5  so I would be responsible for them.
6    Q.  A lot of what?
7    A.  Systems.  The machine -- machines that run the
8  algorithms.  There are things around how we manage
9  inventory, how we work with vendors and partners, all of
10  the supporting infrastructure.
11    Q.  When you obtained your position in December of
12  2019, did that involve revenue?
13    A.  Yes.
14    Q.  Okay.  You did not -- you were not associated with
15  the Revenue Department prior to that time?
16    A.  I was.  I was in Revenue Management.  So when I
17  was in Systems and Development, it was part of the Revenue
18  Management department.
19    Q.  Okay.  How long were you in the Revenue Management
20  department in the Systems department?
21    A.  I officially moved in 2010.
22    Q.  Okay.
23    A.  I was a manager at the time.
24    Q.  So from 2010 up until you took the Pacific region
25  in December 2019, you were within the Revenue Management

Page 10

1  department within the Systems and Development department --
2    A.  Correct.
3    Q.  -- is that fair?
4    A.  That is fair.
5    Q.  Okay.  Since apparently you have had some
6  experience with revenue, I guess one way American earns
7  revenue is to sell airline tickets, right?
8    A.  Yes.
9    Q.  What other forms of revenue does American have
10  that you would be managing when you were in the Revenue
11  Department?
12    A.  It was primarily selling tickets.  We also have
13  ancillary revenue like seats.
14    Q.  Tell me what the ancillary revenue is.
15    A.  So you can buy a seat -- an actual seat on the
16  plane for an added charge for -- if you want a better seat.
17  Bags.  When you pay for a bag, that is ancillary revenue.
18  You can upgrade.  You can pay to upgrade into a higher
19  cabin.  That is ancillary revenue.
20    Q.  So baggage fees and upgrades and specific buying
21  of seats would be considered ancillary revenue at American?
22    A.  Correct.
23    Q.  Let me make sure I understand what you mean, "buy
24  a seat."  What do you mean by that?
25    A.  So you -- when you purchase a ticket to go from

Page 11

1  "A" to "B," you can be assigned a seat, you can assign --
2  have a seat on the plane; but if you want a specific seat,
3  we have access rules and options to purchase those seats.
4    Q.  That would be a specific seat as opposed to an
5  upgrade?
6    A.  Correct.
7    Q.  All right.  Any other forms of ancillary revenue
8  other than what you've described?
9    A.  In-cabin fees.
10    Q.  What's that?
11    A.  When you bring a pet on board, there is a fee
12  associated with carrying a pet.
13    Q.  I noticed you raised those, like, a month ago.
14  Why did you do that?
15    A.  It was longer than a month ago.  It was a while
16  back.
17    Q.  Okay.  Other than pet fees, what else?
18    A.  Those are the primary ones.
19    Q.  Okay.
20    A.  They generate the majority of our ancillary
21  revenue.
22    Q.  All right.  All, I am gathering from your
23  testimony, is centering around the sale of tickets to fly?
24    A.  The majority of the revenue.
25    Q.  Have you ever had your deposition taken before?

Page 12

1    A.  Yes.
2    Q.  How long -- how many times?
3    A.  I don't recall.
4    Q.  More than ten?
5    A.  No.
6    Q.  More than five?
7    A.  No.  Less than five.
8    Q.  Were they when you were with American?
9    A.  Yes.
10    Q.  Tell me the circumstances generally of what case
11  they were.  What was the subject matter about?
12    A.  We've had disagreements with say, SABRE, that I
13  was involved in.
14    Q.  Okay.
15    A.  And we've had a disagreement with the patent
16  office at one point on, you know, what was considered
17  patentable or, you know, what is our research and
18  development leading to.  And then we had a suit against
19  people who were scraping our data.
20    Q.  So you gave depositions in those three litigation
21  instances?
22    A.  Yes.
23    Q.  Okay.  Tell me just generally what the SABRE case
24  was about.
25    A.  The SABRE case was in how they were displaying our

Amy Massey & Associates

App'x 0030

Electronically signed by Amy Massey (401-010-081-3772)                5bdb4925-ac27-4d63-b7e6-abcc5c71c238

RAYMOND SCOTT CHANDLER June 7, 2024

| Page 13 | Page 14 |
|---|---|

**Page 13**

1  content and what the agreements were between them.
2  Q. Where was that suit pending?
3  A. Fort Worth.
4  Q. Was it state or federal court?
5  A. I believe it was state.
6  Q. And Kelly Hart representing?
7  A. Yes.
8  Q. Who was the lawyer?
9  A. I don't remember.
10  Q. And the patent litigation, where was that pending?
11  A. I believe it was here as well.
12  Q. Federal court?
13  A. I don't recall.
14  Q. And who was the principal lawyer representing?
15  A. Don't remember.
16  Q. Don't remember?
17  A. No.
18  Q. Was Kelly Hart involved in that?
19  A. I don't -- that one, I don't remember.  That was a
20  long time ago.
21  Q. I understand you say it had to do with research
22  and development related to a patent?
23  A. It was -- it was a tax-related thing with the
24  government.
25  Q. A tax-related?

**Page 14**

1  A. Yes.
2  Q. Who were the parties to the patent suit?
3  A. I don't remember.
4  Q. Was the government a party?
5  A. I don't remember.
6  Q. How long ago was that case?
7  A. At least a decade ago or more.
8  Q. And then you finally indicated you gave a
9  deposition in a case where there was the scraping of data
10  involved?
11  A. Yes.
12  Q. And who were the parties in that case?
13  A. There's a company called QL2.
14  Q. QL2?
15  A. Correct.
16  Q. Okay.  Is that who American sued?
17  A. Yes.
18  Q. And where was that suit?
19  A. Here in Fort Worth.
20  Q. In state or federal court?
21  A. I believe that was state as well.
22  Q. State?
23  A. I believe.
24  Q. Okay.  And who were the lawyers that represented
25  American in the QL2 case?

| Page 15 | Page 16 |
|---|---|

**Page 15**

1  A. Do not remember.
2  Q. You gave a deposition in that case?
3  A. I did.
4  Q. Do you remember giving a deposition any other
5  times other than those three cases?
6  A. No.
7  Q. What was the subject matter of your testimony in
8  the data scraping case, if you will?
9  A. I was a -- an expert witness on ▌▌▌▌▌▌▌▌
10  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
11  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
12  ▌▌▌▌▌▌▌▌▌▌
13  Q. And that is what American accused QL2 of doing?
14  A. Correct.
15  Q. And was that matter tried?  Was it settled?  How
16  did it resolve?
17  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
18  Q. And the name of the company was QL2?
19  A. Correct.
20  Q. Did they go by any other name?
21  A. They -- I believe they went -- they've gone
22  through some different incarnations.  I don't know if they
23  had other names at the time.
24  Q. Do you --
25  A. I just knew them as "QL2."

**Page 16**

1  Q. And your expert testimony, if I understand, ▌▌▌
2  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
3  ▌▌▌▌▌▌
4  A. Correct.
5  Q. Okay.  Well, then, you know that you're obligated
6  today to tell the truth?
7  A. Yes.
8  Q. And you understand that if you do not tell the
9  truth, that, as the lawyers, we have the opportunity to
10  point that out to the court and challenge your credibility?
11  A. Okay.
12  Q. Can you define for me what ▌▌▌▌▌ is in the
13  context of the QL2 suit?
14  A. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
15  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.
16  Q. When you say ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
17  what do you mean?
18  A. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
19  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
20  Q. What business was QL2 in?
21  A. Reselling that data.
22  Q. The data that you say that they scraped?
23  A. Correct.
24  Q. Were they a travel agency?  Were they --
25  A. No.

4 (Pages 13 to 16)

Amy Massey & Associates

App'x 0031

Page 17

Q. -- travel-related?
What were they?
A. They were a data company that would sell pricing information to other companies.
Q. It would sell American's pricing information?
A. Amongst other airlines, yes.
Q. Were they related only to airline travel?
A. That's a good question. I -- I believe so.
Q. Now, I'm going to hand you some exhibits that I have brought with me, and the court reporter will mark them and I'm going to ask you about them. So let's start with what I will ask the court reporter to mark as Chandler 1.
(Exhibit 1 marked.)
Q. (BY MR. KIRKMAN) And in Chandler 1, we have a series of email strings that took place on March 21st of 2018; am I correct?
A. Yes.
Q. Now, let's get a sense of what your position was in '18. I think it was shortly before you became the Director of Revenue for the Pacific region; would that be right?
A. It was nine months before that, yes.
Q. Okay. So what was your position at the time in March of 2018?
A. Managing Director of Systems and Development.

Page 18

Q. Okay. But you worked in the Revenue Department?
A. Revenue Management.
Q. Okay. Then what I'd like for you to do is let's start with the email on the second page, which is 836, from Gladys Moromisato to Ops Site. Do you see that?
A. Uh-huh.
Q. And apparently these Ops Site emails were then forwarded to you about 1:00 on March 21st. Do you see that there at the top?
A. I do not see that.
Q. All right. Let's start from the top and go down.
A. Okay. 10:27 a.m.
Q. Okay. And then on March 21st, you sent an email commenting upon these various emails that you received, right?
A. Yes.
Q. Okay. What is "Ops Site"?
A. It's actually "Site Ops."
Q. Okay.
A. And at the time, they were the technical team that supported the website, the health of the website. When I say "website," AA.com in particular.
Q. Okay. So if I'm understanding how this worked, Gladys sent to Ops Site on March 21st an email where she indicated

Page 19

Do you see that?
A. I do.
Q. Okay. Those emails eventually ended up to you at 10:27 on March 21st, correct?
A. Correct.
Q. Okay. Then as I understand it, you reviewed these emails and then sent a response at, it looks like, almost 1:00 that day, right?
A. Yes.
Q. Okay. Then you said,
Was that read properly?
A. Yes.
Q. What is an
A.
Q.

Page 20


Electronically signed by Amy Massey (401-010-081-3772) 5bdb4925-ac27-4d63-b7e6-abcc5c71c238



Page 21

American,

Page 22

Page 23

```
 6    Q.  And do you have a memory of it?
 7    A.  I do not.
 8    Q.  And then to whom did you report in March of 2018.
 9    A.  Don Casey.  He was the VP of Revenue Management.
10    Q.  Spell the last name.
11    A.  C-a-s-e-y.
12    Q.  Okay.  And how long had you reported to him?
13    A.  Directly or in his organization?
14    Q.  Both.
15    A.  When I joined in 2010, he was the VP of Revenue
16  Management.
17    Q.  Uh-huh.
18    A.  But I had a -- I was reporting to a Managing
19  Director at the time.  And when I became a Managing
20  Director, I reported straight to Don Casey.
21    Q.  And who is the Managing Director you reported to
22  at the time?
23    A.  Would have been Tom Jiede.
24    Q.  Spell that.
25    A.  J-i-e-d-e.
```

Page 24

```
 1    Q.  Then this email that you sent
 2                        I'd like to know who these people are.  Who is
 3  Shaibaz?  I don't want to try and pronounce the last name.
 4  And what was that position at the time?
 5    A.  Don't remember her or him.
 6    Q.  Okay.  And how about Jay Creech?
 7    A.  Jay Creech is currently at American.  He's a
 8  director in retailing.
 9    Q.  And do you know what he was doing at the time?
10    A.  I believe he was involved with our agreements with
11  companies like Expedia or companies like Google that have
12  legitimate access to our inventory.
13    Q.  Okay.  And Megan Goodmansen, what position did she
14  occupy at time?
15    A.  I don't know what she had at the time.  She's in
16  Corporate Security now.
17    Q.  How about Darrin Goodreau?
18    A.  Darren worked for me.  He was the manager for
19  Revenue Integrity and PNR automation.
20    Q.  Okay.  Then let me hand you what will be Number 2.
21        (Exhibit 2 marked.)
22        THE WITNESS:  Do I pass this back or --
23        MR. KIRKMAN:  No.  You just keep it in front
24  of you.
25
```

6 (Pages 21 to 24)

Amy Massey & Associates

App'x 0033



Page 25

1    THE WITNESS:  Okay.
2    Q.  (BY MR. KIRKMAN)  And at the very bottom on
3  Exhibit 2, we've got an email from Jay Creech, who I think
4  you just identified, to one Neil Geurin.  Do you see that?
5    A.  Yes.
6    Q.  And then there is a screenshot of something.  I
7  think it's called a PNR; is that right?
8    A.  That is a PNR.
9    Q.  Okay.  And who is Neil Geurin currently?
10    A.  Neil Geurin is our Managing Director of Modern
11  Retailing.
12    Q.  Modern Retailing?
13    A.  Correct.
14    Q.  And what is Modern Retailing?
15    A.  It is a combination of sales and any agreements
16  that we have with anybody who is selling American Airlines.
17    Q.  Okay.  And it looks later on on March 9th of
18  2018, Mr. Geurin sent an email to a number of people,
19  including yourself --
20    A.  Yes.
21    Q.  -- right?
22    A.  Uh-huh.
23    Q.  And it has to do with Skiplagged?
24    A.  Yes.
25    Q.  It says, ████████████████████████

Page 26

1  ████████████████████████████
2    First of all, I'm assuming that Skiplagged is
3  the company, Skiplagged, Inc. --
4    A.  That's --
5    Q.  -- right?
6    A.  I believe so.
7    Q.  Okay.  And who's Kevin MacFarland?  What was his
8  position at the time?
9    A.  I don't know his exact position, but he would have
10  been part of a team that runs the AA.com site.
11    Q.  And then Melody Andersen, have I already asked you
12  about her?
13    A.  I don't believe so.
14    Q.  What was she doing at the time?
15    A.  I don't recall.
16    Q.  How about Laura Banse?
17    A.  Don't recall.
18    Q.  Or Julie Rath?
19    A.  At the time -- Julie is now our Senior Vice
20  President over all of our airports.
21    Q.  Okay.
22    A.  At the time -- we've all gone through multiple
23  jobs.  I don't recall exactly what she was doing at the
24  time.
25    Q.  Okay.  And then who -- Jennifer Proctor?

Page 27

1    A.  I don't recall what her position was at the time.
2    Q.  And then Mr. -- Mr. Geurin indicates ██████████
3  ████████████████████████████████████
4  ████████████   Do you see that?
5    A.  I do see that.
6    Q.  ████████████████████████████
7  ■ ████████████████████████████
8  ■ ██████████████████████
9  ■ ██████████████████████████████
10 ■ ███████████████████████
11 ■ █████████████████████████████████████
12 ■ ████████████████████████████████████
13 ■ █████████████
14    Q.  Okay.  And he was the head of, is it, Modern
15  Retailing, did you say?
16    A.  Not at that time.
17    Q.  Okay.  What was his position at the time?
18    A.  I don't recall.
19    Q.  Okay.  Well, then, do you know -- when he says
20  "we," do you know what department he's referring to?
21    A.  He would have been likely in sales at the time.
22 ■ █████████████████████████████████
23 ■ ██████████████
24 ■ ███████████████████████████████
25 ■ ████████████████████████████

Page 28

1  ████████████████████████████████████████
2  ██████████████████████████
3    A.  Yes.
4    Q.  Okay.  Then if you drill down a little deeper into
5  these bullet points, he says in the -- it's, like, the
6  second-to-the-last sentence, ████████████████████████████
7  ■ █████████████████████████████████████
8  ■ ████████████████████████████████████
9  ■ ████████████████████
10   Did I read that correct?
11    A.  Yes.
12    Q.  And do you know who Jay is?
13    A.  That would have referred to Jay Creech.
14    Q.  Okay.  ████████████████████████████
15 ■ ████████████████████████████
16    A.  Yes.
17    Q.  And then the second bullet point indicates, ██████
18 ■ ████████████████████████████████████
19 ■ ███████████████████████████████
20 ■ ████████████████████████████████
21 ■ ████████████████████████
22 ■ ██████████████████████████
23   Did I read that correctly?
24    A.  Yes.
25    Q.  And then he says, ████████████████████████

7 (Pages 25 to 28)

Amy Massey & Associates

App'x 0034



Page 29

10     Q.  Okay.  Then in the second-to-the-last sentence of
11  that paragraph it says,

Page 30

6     Q.  Excuse -- I didn't mean to interrupt, but doing
7  that to you, American Airlines --
8     A.  To us --
9     Q.  -- is that what you're --
10    A.  -- American Airlines.
11    Q.  -- referring to?
12    A.  Yes.
13    Q.  Okay.
14    A.  Yes.
15    Q.  All right.  Go ahead.

Page 31

5     Q.  Okay.  Then I'm going to hand you Number 3.
6         (Exhibit 3 marked.)
7     Q.  (BY MR. KIRKMAN)  Then at the bottom, it looks
8  like someone at American named Tony Y-a-v-a-s-i-l-e sent
9  you and others an email on the 22nd of May of 2018
10                                  right?
11    A.  Yes.
12    Q.  And what did you understand Tony meant by the --
13  using the term                ?
14    A.
21    Q.  So if I was flying from Phoenix to Miami through
22  Dallas, for instance, I could go to the agent and tell them
23  to check my bag in Dallas?
24    A.  To have it come off the carousel in Dallas.
25    Q.  That's what I meant.

Page 32

1     A.  Yes.
2     Q.  And that's what you meant by                ?
3     A.  Yes.
4     Q.  Okay.  So what did you understand Tony was
5  advising in the email at about 2:00 on the 22nd of May,
6  '18?
7     A.  Do you mind if I read it?
8     Q.  No.  Absolutely.  I want you to.
9         MR. MUYSKENS:  You guys are kind of talking
10  over each other once in a while.
11        MR. KIRKMAN:  Huh?
12        MR. MUYSKENS:  You guys are kind of talking
13  over each other a little bit sometimes too.  I'm just
14  trying to make her job easier.
15    A.  So what I can understand from reading this,
18    Q.  (BY MR. KIRKMAN)  And who is Tony?
19    A.  Tony worked in Revenue Management at the time.
20    Q.  Okay.  And she indicates that she
25    A.  Correct.

8 (Pages 29 to 32)



Page 33

4     Q.  So you then got an email -- or a copy of an email
5     written by one Brandon Norman who said,

8     A.  Yes.
9     Q.  Who is Brandon Norman?
10    A.  Brandon Norman currently is the Managing Director
11    for International Revenue Management.
12    Q.  And what was he at the time, if you know?
13    A.  He would have been the Director of Ancillary.
14    Q.  In the Revenue department?
15    A.  In the Revenue Management department, yes.
16    Q.  And the person to whom he makes reference,
17    Anshuman --
18    A.  Anshuman (different pronunciation).
19    Q.  -- Anshuman, what was --
20    A.  Yes.
21    Q.  -- his position or her position at the time?
22    A.  He -- at the time, I don't recall.  I believe he
23    was also a Director at the time in Merchandising.  He is
24    currently the Managing Director over our Digital Assets.
25    Q.  Okay.  So then you respond at 3:30 or so that

Page 34

1     afternoon by saying

6     A.  Yes.
7     Q.  Okay.  Who is Jenn Proctor, and what was her
8     position at the time?
9     A.  That's Jennifer Proctor.  So she had previously
10    been in Revenue Management.  At the time, I assumed she was
11    with the airports, so supporting the airport teams, their
12    operations.
13    Q.  Still with American?
14    A.  Still with American.
15    Q.  Just in a different department?
16    A.  Correct.
17    Q.  Okay.  Why were you saying that

Page 35

Page 36

9     MR. MUYSKENS:  Asked --
10    A.  Is that a question?
11    Q.  (BY MR. KIRKMAN)  Yes, it is.
12    MR. MUYSKENS:  Asked and answered.
13    Q.  (BY MR. KIRKMAN)  Were you?
14    A.  That's what I wrote.
15    Q.  I understand that's what you wrote, but is that
16    true?
17    A.  That's what I wrote.
18    Q.  Okay.  Well, I can see that.
19    A.  Okay.
20    Q.  You meant it when you said it, did you not?
21    A.  Is that a question?
22    Q.  It is.
23    A.

Amy Massey & Associates

App'x 0036

Electronically signed by Amy Massey (401-010-081-3772)                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238



Page 37

4    MR. MUYSKENS:  Asked and answered.
5    Q.  (BY MR. KIRKMAN)  Go ahead.

16   Q.  And how is it, Mr. Chandler, as of March 22nd,
17   2018, based on your investigation,

19        MR. MUYSKENS:  Objection, foundation.
20   Q.  (BY MR. KIRKMAN)  Go ahead.
21

25   Q.  Okay.

Page 38

2    A.  Yes, they were.
3    Q.  Is that your opinion?
4    A.  That is a fact.
5    Q.  Okay.  Well, what is the basis of your saying that
6
8    A.
12   Q.  And this was based on what, an investigation that
13   you'd been doing?
14   A.
19   Q.  Okay.  Well, all of this was done in part by you
20   prior to May 22nd of 2018?
21   A.  The teams.
22   Q.  Did you participate in that?
23   A.  How so?
24   Q.  Did you check it?  Did you form the conclusions?
25   Apparently you formed some conclusion --

Page 39

1    A.  Yes.
5    Q.  And when you say "the team," who is the team?
6    A.  The Revenue Integrity team under Darrin Goodreau,
7    the Sales and Distribution team under Neil Geurin.
8    Q.  Okay.  Those two teams?
9    A.  (Witness nods head.)
12   Q.  And you were working with them?
13   A.  I was the Managing Director at the time.
14   Q.
17   Q.  Okay.
21   Q.  Do you have an ability to remember?
22   A.  No.
23   Q.  Okay.
24   A.  Actually, you can ask Skiplagged.  They have all
25   the data.

Page 40

1    Q.  Well, I've asked Skiplagged, but I'm asking you
2    now.
3    A.  I don't know.
4    Q.
7    A.  I don't know.
8    Q.  --
9    A.  I don't know.
13   A.  I don't know.
14   Q.  Let me hand you Exhibit 4.
15        (Exhibit 4 marked.)
16   Q.  (BY MR. KIRKMAN)  That's another series of emails
17   strings, is it not?
18   A.  Yes.
19   Q.  And I think you can see there by the fourth page,
20   which has a 9919 in the bottom right-hand corner, it's an
21   actual copy of the email we went over earlier from
22   Toni.
23        MR. MUYSKENS:  I'm sorry, where are you?
24        MR. KIRKMAN:  00059919.
25        MR. MUYSKENS:  Sorry, Bill.

10  (Pages 37 to 40)

Amy Massey & Associates

App'x 0037



Page 41

1    A.  Yes.
2    Q.  (BY MR. KIRKMAN)  Okay.  So let's go forward to
3  Page 59917 and get you to focus on an email from Thomas
4  A-i-c-h-e-l-e to Chris DeGroot and others at 3:09 on
5  May 23rd, 2018, right?  Got it?
6    A.  Yes.
7    Q.  Okay.  Who is Thomas?
8    A.  He was a Managing Director in Sales at the time.
9    Q.  And how about Chris DeGroot?
10   A.  He was also in sales at the time.
11   Q.  Okay.  Then Thomas is telling Chris DeGroot,
12  ██████████████████████████████████
██████████
██████████
██████████████████
████  correct?
17   A.  I see that.
18   Q.  And then writ--- then there's a line, and written
19  below it is, ██████████████████████████████
███
██████████████████████████████████
████████████████████████
24       And this is signed Tom, right?
25   A.  Yes.

Page 42

1    Q.  Okay.  Who is Tom, if you know?
2    A.  Tom, Thomas Aichele.
3    Q.  Thomas who?
4    A.  Thomas Aichele.  He goes by "Tom," so the -- the
5  email that you just --
6    Q.  Okay.
7    A.  -- told me.
8    Q.  Okay.  Good.
9        So this is his signature on the email that he
10  sent to Chris DeGroot?
11   A.  Yes.
12   Q.  Very good.
13       And where physically was Thomas Aichele
14  located in his job, if you --
15   A.  I don't recall.
16   Q.  Then it looks like there was a response from
17  Chris DeGroot the same day where he said, █████████
███
████████████████████████████
21       I read that correctly?
22   A.  Yes.
23   Q.  When he said "Cory," did you know who he was
24  talking about?
25   A.  I assume it's Cory Garner.  He's copied on the

Page 43

1  email.
2    Q.  And who is -- who was Cory Garner at the time?
3    A.  He was in Sales as well and Distribution, so -- he
4  was actually the head of Distribution.
5    Q.  And do you know what Cory's team was that is
6  referenced to there in the response by Mr. DeGroot?
7    A.  It would be referring to Neil Geurin and
8  Jay Creech, amongst others.
9    Q.  Were they on Cory's team?
10   A.  Yes.
11   Q.  Okay.  Well, then, what team was that?
12   A.  Sales and Distribution.  Distribution.
13   Q.  Okay.  And did you understand what he meant when
14  he said ████████████████████████████████
████  ?  What did you understand that to mean?
████  ████████████████████████
████  ██████████████████████████████████
████  ██████████████
████  ██████████████████████████
████  █████████
22   Q.  Then above that is an email from one Tom -- I
23  forget how to pronounce it -- Jiede?
24   A.  Jiede (different pronunciation).
25   Q.  Jiede?

Page 44

1    A.  Jiede, uh-huh.
2    Q.  -- to Chris DeGroot.
3        Do you see that?
4    A.  I do.
5    Q.  And then above that is an email that flows from
6  the first page from Cory Garner, who you identified, back
7  to Jiede and Chris DeGroot, right?
8    A.  Uh-huh.
9    Q.  You need to say "yes" or "no."
10   A.  Yes.
11   Q.  Okay.  And, again, if I'm understanding your
12  testimony, Mr. Geurin, among others, had been working
13  with -- excuse me, working in Cory Garner's department
14  ████████████████████████████████
15   A.  Yes.
16   Q.  So Cory Garner in his May 23rd, 2018, email
17  indicates that, ███████████████████████████████
████  █████████████████████████████████████
20       Do you see that?
21   A.  I do.
22   Q.  "Skiplagged" would be skiplagged.com or
23  Skiplagged, Inc., right?
24   A.  Yes.
25   Q.  And then ████████████  did you understand



Page 45

1   that to mean his department in which Mr. Geurin was
2   working?
3       A.  Yes.
4       Q.  Okay.  Then it says

23      Q.  Who did Cory Garner report to at the time, if you
24  know?
25      A.  I don't remember.

Page 46

Page 47

1       Q.  Would his department have a reporting
2   responsibility to another department?
3       A.  They would have reported to the head of sales,
4   which was Alison Taylor.
5       Q.  Who?
6       A.  Alison Taylor.
7       Q.  And "sales" being all sales of American?
8       A.  Yes, the Sales and Distribution.
9       Q.
11              MR. MUYSKENS:  Objection, foundation.
12      A.  I do not.
13      Q.  (BY MR. KIRKMAN)
21              MR. MUYSKENS:  Objection, foundation.
22      A.  I assume so.  I don't know for sure.
23      Q.  (BY MR. KIRKMAN)  Would that have been the normal
24  course?
25      A.  That would have been the normal course.

Page 48

1       Q.  Okay.  Then if I might go down a little bit
2   further into Cory Garner's email, the information that he
3   places in the bottom paragraph -- strike that -- in his
4   first paragraph of his email, were you familiar with that
5   information at the time?
6       A.  This first paragraph?
7       Q.  Yeah, beginning --
8       A.
11              I'm just trying to understand, were you aware
12  of that information at the time?
13      A.  I -- I don't believe so.
14      Q.  So this was --
15      A.  I don't know for sure.  I don't believe so.
16      Q.  So this was -- some of this was new information to
17  you?
18      A.  Yes.
19      Q.  Then on the second page it says,
                                    Do you see that?
22      A.  Yes.
23      Q.  "UA" being United Airlines?
24      A.  Yes.
25      Q.  And did you know that prior to receiving this,

12 (Pages 45 to 48)

Amy Massey & Associates

App'x 0039



Page 49

1    that it -- that United Airlines had discovered something
2    Skiplagged was doing?
3        A.  Prior to receiving this email?
4        Q.  Yes, sir.
5        A.  I don't know for sure.  It is likely I would have
6    known.
7        Q.  Okay.  Then it goes on and talks about a joint
8    suit in Illinois.  Do you see that?
9        A.  I do.
10       Q.  Were you aware of that suit before you got this
11   email?
12       A.  I would have read it in the news, yes.
13       Q.  Okay.  Do you know what was redacted here and why
14   it was redacted?
15       A.  I do not.
16       Q.  And it says, ████████████████████

Page 50

1        Q.  ████████████████████
2    ████████████████████████
3    ████████████████████████████
6        Q.  Okay.  Now, Skiplagged does not screenscrape, do
7    they?
8        A.  I do not know.
9        Q.  You have no -- no idea, one way or another?
10       A.  I have no idea.
11       Q.  Have you looked into that?
12       A.  That is very difficult to follow.  I -- that was
13   not my responsibility.
14       Q.  Well, you were ████████████████
15   ████████████████
16   ████████████████████████
17   ████████
18   ████████████████████████
21       Q.  Has anyone at American asked you to look into
22   whether there was screenscraping going on by -- by --
23       A.  As in the techniques of how they do the
24   screenscraping?  No.
25       Q.  No, no, no.  I'm talking about screenscraping, the

Page 51

1    process.  Has anyone asked you to look into that in terms
2    of Skiplagged?
3        A.  Like, how they do it?  Is that the question?
4        Q.  Are they doing it?  How are they doing it?  Any
5    way.
6        A.  No.
7        Q.  Okay.  Do you know if there is such an
8    investigation going on in American?
9        A.  I do not know.
10       Q.  Have you talked to anyone at American about
11   whether Skiplagged screenscrapes?
12       A.  I have not.
13       Q.  Let me go back just a bit on Number 4.
14           You see where Mr. Garner talks about this
15   ████████████████████████
16   ████████
17   ████████████
19       Q.  Okay.  Let me give you Number 5.
20           (Exhibit 5 marked.)
21       Q.  (BY MR. KIRKMAN)  Do you -- before I get into 5,
22   do you remember who reported to Mr. Garner at the time in
23   March of '18?
24       A.  I do not.
25       Q.  Okay.  Then let me hand you Number 5.  This is an

Page 52

1    email you wrote on March -- excuse me, May 31 of 2018?
2        A.  Yes.
3        Q.  It refers to ████████████
4    ████████████████████ right?  That's the
5    attachments?
6        A.  Excuse me?
7        Q.  Well, have you got Number 5 in front of you?
8        A.  I've got Number 5 in front of me.
9        Q.  Is it a May 31, 2018, email?
10       A.  Yes.
11       Q.  And is the attachment ████████████████
12   ████████████████████████?  Does that
13   say an attachment?
14       A.  I don't see an attachment.
15       Q.  That's where it --
16       A.  Where is --
17       Q.  I just said where it says that.  See at the very
18   top --
19       A.  Oh.
20       Q.  -- it says, "Attachments"?
21       A.  Oh, the -- okay.  Got it.  Yes.
22       Q.  Okay.
23       Q.  Okay.
24       Q.  The subject is baggage?
25       A.  Thank you.

13 (Pages 49 to 52)

RAYMOND SCOTT CHANDLER June 7, 2024



Page 53

```
1    Q.  The subject is baggage, right?
2    A.  Yes.
3    Q.  And it says,
4        Did I read that correctly?
5
6    A.  Yes.
19   Q.  Then you say,
22       Did I read that correctly?
23   A.  Not quite.
24   Q.  Okay.  Did I -- what did I misread?
25   A.  It's
```

Page 54

Page 55

```
12   Q.  Where do you find that Skiplagged is lying to
13   customers about being associated with AA?
14   A.  When they use our logo and our brand, they are
15   representing that they are legitimate resellers of American
16   Airlines.
17   Q.  Is that it?  Anything else that supports that
18   position other than that?
19   A.  They tell the customers -- they -- there's a lot
20   of things they don't tell the customers, but they -- they
21   don't explain to them that the airline doesn't know what
22   they're doing, and the airline will -- may not be able to
23   help them because of the way they bought their tickets.
24   Q.  Anything else other than what you've just said?
25   A.  I'm sure there are other things, but I --
```

Page 56

```
1    Q.  But you don't know?  Right now you're not able to
2    tell me?
3    A.  Correct.
4    Q.  Then you say,
7        Did I read that correctly?
8    A.  You did.
23   Q.  Well, other than that -- I mean, you knew
25   A.  I did not know that.
```

14 (Pages 53 to 56)

Amy Massey & Associates

App'x 0041



**Page 57**

1  Q.
2
4       MR. MUYSKENS:  Objection, form; foundation.
5  Q.  (BY MR. KIRKMAN)  Sir?
6  A.  I did not.
7       (Exhibit 6 marked.)
8  Q.  (BY MR. KIRKMAN)  Let me hand you 6.
9       MR. MUYSKENS:  Is there any chance I could
10 get a five-minute restroom break?  Or you can do another
11 document or --
12      MR. KIRKMAN:  I'm not the judge, but sure.
13 Absolutely.  Any time.
14      (Recess taken from 11:06 a.m. to 11:17 a.m.)
15 Q.  (BY MR. KIRKMAN)  Let me hand you Exhibit 6 which
16 is an email string, the top one of which was sent by Darrin
17 Goodreau, if you'll take a look at that a minute.  And
18 remind me who Darrin Goodreau was at the time and what his
19 position was.
20 A.  He was the Manager of Revenue Integrity and
21 PNR Automation.
22 Q.  And he is writing a memo that, as I read it,
25 A.  I'm going to just read it for a second, if that's

**Page 58**

1  okay.
2  Q.  Oh, sure.
3  A.  Okay.  Thank you.
4  Q.  Okay.  And am I correct in understanding that this
7  A.  Yes.
8  Q.  And so if I'm reading this correctly,
12 A.  I'm going to make sure I'm reading that correctly.
13 Yes.
14 Q.  Okay.  Then let me ask in email below from Felicia
15 Jones, of which you were not -- well, you were copied.  I'm
16 sorry.
17 A.  I am.
18 Q.  She says,

**Page 59**

4  Q.  Do you know whether this was implemented?
5  A.  I do not.
6  Q.  And I assume, as of August of '18, you had been
7  working on Skiplagged for a while, looking into it, right?
8  A.  Yes.
9  Q.
12 A.  That would be this team, yes.
13 Q.  All right.  So assuming that someone flies hidden
14 city ticketing and does not check a bag, right, there would
15 not be a short bag-checking problem, correct?
16 A.  If they do not have to check a bag --
17 Q.  Or do not check a bag, period.
18 A.  If they do not have to check a bag, then there is
19 no checking of bags.
20 Q.  Right.
21      And if I understand the
25 A.  That is correct.

**Page 60**

1  Q.
2  A.  Yes.
3  Q.  But just so that I'm clear, if someone gets on the
4  airplane and flies a hidden city ticketing route but
5  doesn't check a bag,
7  A.  There is no checking of a bag.
8  Q.  Right.
9       So on that instance, in that scenario, there
10 really wouldn't be a reason to apply a
12 A.  On those circumstances where the customer does not
13 have to check a bag, yes.
14 Q.  All right.  And I -- that's what I needed to know.
15 Okay.
16      Let me hand you 7.
17      (Exhibit 7 marked.)
18 Q.  (BY MR. KIRKMAN)  This is an
20 for?
21 A.  I do not know what that stands for.
22 Q.  Are you familiar with this document, Exhibit 7?
23 A.  I do not recall seeing it.  I'm going to go
24 through it, if that's okay.
25 Q.  Oh, sure.

15 (Pages 57 to 60)



Page 61

1    MR. MUYSKENS:  Is this one of these, like,
2  presentations that has, like, one Bates number for the
3  whole thing; or is it just --
4    MR. KIRKMAN:  I guess.
5    MR. MUYSKENS:  You have no idea, do you?
6  Cool.
7    MS. CAMPBELL:  He probably printed the native
8  rather than the imaged version.
9    THE REPORTER:  Rather than the what version?
10   MS. CAMPBELL:  Imaged.
11   THE REPORTER:  Thank you.
12  A.  Okay.
13  Q.  (BY MR. KIRKMAN)  Are you familiar with this?
14  A.  I don't recall it.
15  Q.  You had not seen it before?
16  A.  I don't believe so.
17  Q.  Okay.  Do you know who -- understanding that, do
18  you know which department would have put this out?
19   A.  This is policy for at the airport, so it would
20  have been the Policy team for airports.
21  Q.  And is that a department at American?
22  A.  Policies and Procedures under Airports.
23  Q.  And what -- who's the head of that department now,
24  if there is a department now?
25   A.  It would be somebody under Julie Rath.

Page 62

1  Q.  And do you know who would have been the head of
2  the department at the time, in October of '18?
3  A.  I don't remember.
4  Q.  Okay.  Okay.  Let me hand you 8.
5   (Exhibit 8 marked.)
6  A.  Okay.
7  Q.  (BY MR. KIRKMAN)  Can you identify this?
8  A.  I don't recall seeing this.
9  Q.  Have not seen it before?
10  A.  I don't believe so.
11  Q.  Do you have any ability to tell me which
12  department would have produced this?
13  A.  I don't know.
14  Q.  Okay.  Let me hand you Number 9 --
15   (Exhibit 9 marked.)
16  Q.  (BY MR. KIRKMAN)  -- which is a series of email
17  strings again, and I'm going to want to focus on what is on
18  the second page going onto the third page that says, ▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                    issued
20  January 26th of 2021.
21  A.  Okay.  I'm going to read through it.
22   Okay.
23  Q.  Have you seen and are you familiar with what is
24  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 63

1  A.  Yes.
2  Q.  -- which -- which is on the second and third page?
3  A.  Yes.
4  Q.  And what is that?
5  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9   A.  Correct.
10  Q.  And this was issued to them on January 26th of
11  '21?
12  A.  Let's see.  I'm going to assume so based on the
13  headers from this email that it would have gone out to all
14  of them from this, but I'm not -- I didn't send out the
15  email.  I don't do the notifications.
16  Q.  Did you receive a copy of it when it went out?
17  A.  No.
18  Q.  Who is American Airlines Global Sales?  Is that a
19  department?
20  A.  Yes.
21  Q.  And who was the head of that department in '21,
22  January?
23  A.  That would have been Alison Taylor.
24  Q.  And so that would have been the department that
25  had the responsibility of sending this memo, so to speak,

Page 64

1  to all of the agencies --
2  A.  Yes.
3  Q.  -- referring to practices?
4  A.  Yes.
5  Q.  Okay.  Then giving you 10 --
6   (Exhibit 10 marked.)
7  A.  Okay.
8  Q.  (BY MR. KIRKMAN)  It looks like you sent an email
9  on January 27th of 2021 saying, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  right?
13  A.  Correct.
14  Q.  So when you said, ▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24  Q.  ▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓

16 (Pages 61 to 64)



**Page 65**

1    A.  Correct.
2    Q.  And then you say, █████████████
█    █████  What did you mean by that?
4    A.  ████████████████████████
█    ████████████████████████████
█    ████████████████████
█    ████████
█    █████████████████████
█    ██████████████████████████████
█    ████████████████████████
█    ████████████████████████████████
█    ███████████████████████████
█    █████████████████████████████████
█    ████████████████████████████
17       Q.  If they would have been keeping stats, who would
18  have been responsible for doing that?
19       A.  Justin Dunn.
20       Q.  Let me hand you Number 11.
21          (Exhibit 11 marked.)
22       Q.  (BY MR. KIRKMAN)  It's an email from Jayson
23  Hardeman to you, and if you'd take a minute to read through
24  it.
25       A.  Okay.  Thanks.

**Page 66**

1       Okay.
2       Q.  If I remember testimony previously, Jayson
3  Hardeman was in the Security department?
4       A.  Yes.
5       Q.  And what position did he occupy, if you remember?
6       A.  I don't recall.  He -- part of Corporate Security.
7       Q.  Had you worked with him previously?
8       A.  Yes.
9       Q.  And then he sent this to you on March 18th of
10  2021; am I correct?
11       A.  Yes.
12       Q.  Starting off with, ██████████████████
█    ██████████████████████████
14       A.  Yes.
15       Q.  Okay.  Then Mr. Hardeman in this second paragraph
16  says, ███████████████████████████████████
█    █████████████████████████████████████
19       Did I read that correctly?
20       A.  Yes.
21       Q.  Is that true, that as of March 18th of '21 you
22  were █████████████████████████████████████
23       A.  I was the head of Revenue Management.
24       Q.  That department's function being managing revenue?
25       A.  Very good.

**Page 67**

1       Q.  So he says ██████████████████████
█    ██████████████████████████  right?
3       A.  Yes.
4       Q.  Okay.  He then says, ████████████████
█    █████████████████████████████████████
█    █████████████████████████████████████
█    ████████████████████████████
9       Are you familiar with that previous practice
10  prior to March 18 of 2021?
11       A.  I was aware that, █████████████████████
█    ████████████████████████████████
█    █████████████████████████
█    ████████████████████████
█    ██████████████████████████
█    ████████████████████████████████
█    █████████████████
█    ████████████████████████████
█    ██████████████████████████████
█    ███████████████
█    ████████████

**Page 68**

█    ████████████████████████
█    ████████████████████████████████
█    █████████████████████████████████
█    ██████████████████████████████████
█    ████████████
█    ███████████████
█    ██████████████████████████████
█    ████████████████████████████████████
14       Q.  Okay.  And so I'm trying to understand when he
15  says ████████████████████████████████████
█    ██████████████████████████████████████
█    ████████████████████████████
█    ██████████████████████████████████████
█    ████████████████████████████████
█    ████████████████████████████████████
█    ████████████
█    ███████████████████████████████████

Amy Massey & Associates

App'x 0044

Electronically signed by Amy Massey (401-010-081-3772)                                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238

RAYMOND SCOTT CHANDLER June 7, 2024



Page 69

4    Q.  And was Hardeman the head of Corporate Security?
5    A.  No.
6    Q.  Who was?
7    A.  I don't remember who was.
8    Q.  What position did he occupy in Corporate Security?
9    A.  He was an analyst.
10   Q.  And what department did Corporate Security report
11   to?
12   A.  They are a department.
13   Q.  The what?
14   A.  They are a department.  Corporate Security --
15   Q.  Okay.
16   A.  -- is a department.
17   Q.  And a better question is, who did the head of that
18   department report to?
19   A.  I don't -- I don't know.
20   Q.  Okay.  But when he said

Page 70

5    Q.  And we'll get to that.  Thank you.
6    A.  Okay.
7    Q.  Then let's go back to the second sentence in the
8    second paragraph where Jayson Hardeman, whom you've known
9    for many years, said,
11       What did you understand him to mean by that?
16   A.  Please restate that.
17   Q.  Sure.
18       If I'm getting the point of this, he said

Page 71

17   Q.  He says,
19       Did you understand what he meant by that?
20   A.  Not entirely.
21   Q.  Do you know what he meant by
22   A.

Page 72

10   Q.  Okay.  So then he says,
15       Did you understand what he meant by that?
16   A.  I -- the further definition of it, yes.
17   Q.  Okay.  Explain what you mean.
18   A.  That -- well,
21   Q.  And it says,
24       What -- what does that mean?
25   A.

18 (Pages 69 to 72)

Amy Massey & Associates

App'x 0045



Page 73

7   Q.  Okay.  He then says, ▮▮▮▮▮▮

11         Did I read that accurately?
12   A.  You did.
13   Q.  What does airport/RES agents mean?
14   A.  These are agents at the airport.  "RES" stands for
15   reservations.  So they have the ability to issue tickets,
16   check in customers, take care of them.
17   Q.  Okay.  Well, apparently, according to Mr. Hardeman
18   ▮▮▮▮▮▮▮▮▮▮▮▮

21         Now, what did you understand that to mean?
22   A.  ▮▮▮▮▮▮▮▮▮▮

Page 74

22   Q.  I got you.
23         Okay.  Then he says that ▮▮▮▮▮▮

Page 75

1   A.  That's what it says, yes.
2   Q.  Okay.  And I guess that would impact you because
3   you're part of the Revenue Management department?
4   A.  This is not part of my department.
5   Q.  Right.  ▮▮▮▮▮▮▮▮ right?
6   A.  That's --
7   Q.  I mean --
8   A.  Again, this is from Corporate Security and from
9   the agents at the airport and the processes that they have.
10         I manage all of the initial sales of tickets.
11   Q.  Okay.  Well, I'm just trying to understand. ▮
▮▮▮▮▮▮▮▮▮▮

15   Q.  Okay.  Then it says -- or he says, ▮▮▮▮

18         Do you know what he means by that?
▮▮▮▮▮▮

21   A.  That's what I assume.
22   Q.  Okay.  Then do you know what he means by ▮▮▮

Page 76

12   Q.  Then he says, ▮▮▮▮▮▮

15         Did I read that right?
16   A.  Yes.

19 (Pages 73 to 76)

Amy Massey & Associates

App'x 0046



**Page 77**

5    Q.  Did you have an understanding of what it meant
6  when you got the email?
7    A.  I don't remember.
8    Q.  Then the last paragraph I think you mentioned
9  earlier is,
13               What did he mean by that?
16    Q.  It says,
20               Do you know what that means?
21    A.  I do not.
22    Q.  Then he says,                          right?
24    A.  Yes.
25    Q.  Revenue Management was you?

**Page 78**

1    A.  That was my department.
2    Q.  Okay.  Then he says,
5               Do you remember looking into that?
6    A.  I do not.
13    Q.  All right.  Let me give you 12 --
14         (Exhibit 12 marked.)
15    Q.  (BY MR. KIRKMAN)  -- which is an email from July
16  of '23 from Andrea Koos to you and others.  Do you see
17  that?
18    A.  Yes.
19    Q.  And who is Andrea Koos?
20    A.  She's in corporate communications.
21    Q.  Okay.  And she is writing you and telling you
               right?
24    A.  Yes.
25         I'm going to read it.

**Page 79**

1    Q.  Sure.
2    A.  Okay.
3    Q.  And apparently, if I'm reading this correctly,
7    A.  Where do you see
8    Q.  In --
9    A.  Over here (indicating).  Got it.  Yes.
10    Q.  Do you recall her
                              I don't recall this
13  specific one.
14    Q.  You don't recall this specific one?
15    A.  No.
16
20    Q.  And "RM friends" being Revenue Management friends,
21  that would be you?
22    A.  Yes, amongst the other folks on the email.
23    Q.  Okay.  And those other folks, if you take a quick
24  look at them, were those other department heads, or were
25  they all part of the revenue department?

**Page 80**

1    A.  They're part of Revenue Management, Brandon,
2  Randeep, Marcial.  Yes.
3    Q.  When she says,                        do you
4  remember whether you had any thoughts or responded to her?
5    A.  I do not remember.
6    Q.  I hand you 13.
7         (Exhibit 13 marked.)
8    Q.  (BY MR. KIRKMAN)  If you'd take a look at --
9    A.  Yeah.
10    Q.  -- those three pages.
11    A.  Okay.
12    Q.  All right.  Do you -- does this series of emails
13  refresh your memory as to some communications you had
14
19    A.  Yes.
20    Q.  Okay.  So if you take a look at the very last
21  page, which is 773 --
22    A.  Uh-huh.
23    Q.  -- it appears that on November 16th of '23

20 (Pages 77 to 80)

Amy Massey & Associates

App'x 0047

Electronically signed by Amy Massey (401-010-081-3772)          5bdb4925-ac27-4d63-b7e6-abcc5c71c238



Page 81

1    A.  Correct.
2    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7        Right?
8    A.  Yes.
9    Q.  So if I'm understanding this series of emails, one
10   Caroline Barksdale wrote ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ right?
13   A.  Yes.
14   Q.  And do you know Caroline Barksdale?
15   A.  I don't know her.
16   Q.  And if you would, take just a second to read ▮▮
▮▮▮▮▮▮
18   A.  Yeah.
19   Q.  And did you have any role ▮▮▮▮▮▮▮
▮▮▮
21   A.  No.
22   Q.  Then as you go up a little bit further, ▮▮▮▮▮
23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮   Do you see that?
25   A.  Yes.

Page 82

1    Q.  And then he says, ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
11       Did I read that correctly?
12   A.  Yes.
13   Q.  So, then, if I understand correctly this email
14   string, Andrea Koos, who we went over before with the
15   Communications department, wrote you an email and said, ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
18   A.  Yes.
19   Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ right?
22   A.  Correct.
23   Q.  Then based on the rest of this email, what was
24   your response to that request of Ms. Koos?
25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 83

1    Q.  Okay.  At Ms. Koos' request?
2    A.  Yes.
3    Q.  And so that I'm clear, on -- and I know you've
4    told me this, and I apologize, but as of November of '23,
5    what was your position with the company?
6    A.  The Senior Vice President of Revenue and Loyalty.
7    Q.  Okay.  I hand you Number 14.
8        (Exhibit 14 marked.)
9    Q.  (BY MR. KIRKMAN)  And I know I've asked you this
10   before and I'm sorry, to whom did you report in November of
11   '23?
12   A.  Vasu Raja, Chief Commercial Officer.
13   Q.  I don't think I did ask you that.
14   A.  I don't think you did.  Yes.
15   Q.  And he -- you said he was the Chief Commercial
16   Officer?
17   A.  Correct.
18   Q.  And what department was he the head of?
19   A.  All of Commercial.
20   Q.  And Commercial is what?  What is the Commercial
21   department?
22   A.  Network Planning, Revenue Management,
23   Reservations, Sales and Retailing.  I'm sure there's more,
24   but -- yes.
25   Q.  Okay.  Then handing you Number 14, if you'd go to

Page 84

1    the second page it kind of catches up where we were in the
2    previous email.
3    A.  Yes.  I'm going to read the rest of it.
4    Q.  Sure.
5    A.  Okay.
6    Q.  Okay.  Let me make sure that I kind of understand
7    what's going on here.  And if we can, maybe start at the
8    top of the second page where you write the email on
9    November 16th that says, ▮▮▮▮▮▮▮
10   A.  Uh-huh.
11   Q.  And is that ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮
13   A.  I guess.
14   Q.  So then back on the first page, the email from
15   November 17th from Andrea Koos to you, she says, ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25       Did I write that -- did I read that

21 (Pages 81 to 84)

Amy Massey & Associates

App'x 0048



**Page 85**

1  correctly?
2  A. Yes.
3  Q. I guess what Andrea Koos is asking ▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
6  A. That's what she wrote.
7  Q. Do you know ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇
10  A. The only Don I know is Don Broadfield.
11  Q. Last --
12  A. Broadfield, B-r-o-a-d-f-i-e-l-d.
13  Q. That's --
14  A. But I don't know for 100 percent sure.
15  Q. Is he the lawyer?
16  A. Yes.
17  Q. Do you know any other Dons at American?
18  A. Not off the top of my head.
19  Q. Okay. Then as I understand it, you responded to
20  her shortly thereafter saying, ▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇
22  What did you mean by that?
23  A. Exactly what it reads. So the --
24  Q. Let me ask. I don't mean to interrupt, but --
25  A. Go ahead.

**Page 86**

1  Q. -- you're talking about ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
3  A. Correct.
4  Q. Okay. When you say ▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
6  what did you mean?
7  A. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
8  Q. Explain that. I'm not following you.
9  A. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
14  A. Correct.
15  Q. And then you said, ▇▇▇▇▇▇▇▇▇▇▇ You
16  said, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
21  Did I read that correct?
22  A. You did.
23  Q. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25  A. Yes.

**Page 87**

1  Q. And at the time, November of '23, ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇
5  A. (Witness nods head.)
6  Q. Okay. She then responded, ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇
12  I read that correctly?
13  A. Yes.
14  Q. So I'm assuming by this email that American had
15  already sued Skiplag when this conversation took place. Is
16  that your understanding?
17  A. I don't know exactly when we entered into a
18  lawsuit.
19  Q. Okay. Number 15.
20  (Exhibit 15 marked.)
21  Q. (BY MR. KIRKMAN) And, again, this is a series of
22  emails, and I think we'll catch up with the ones we've been
23  going over. And at the top on Page 1 are the new emails.
24  A. Yeah.
25  Q. So following, then, the conversation -- or excuse

**Page 88**

1  me, the communication you were having with Ms. Koos and her
2  response, you responded and say, ▇▇▇▇▇▇▇▇▇▇▇▇▇
3  Do you see that?
4  A. That's from the previous one, yes
5  Q. And -- right. And I'm assuming what you meant by
6  that was ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇
9  A. Yes.
10  Q. Okay. Then she responded, ▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13  So let me ask this: ▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25  Q. Okay. Then you say, ▇▇▇▇▇▇▇▇▇▇▇▇▇

Amy Massey & Associates

App'x 0049

Electronically signed by Amy Massey (401-010-081-3772)                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238



Page 89

Do you see that?
4    A. Yes.
5    Q. ████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████
████████████
12   Q. But does that refresh your memory that you were
13   aware of the lawsuit?
14   A. I was not aware of the lawsuit. I don't know
15   exactly when it was filed or --
16   Q. And you don't know whether --
17   A. -- in -- I'm not aware.
18   Q. I'm sorry.
19       You don't know whether it was ████████████
████████████████
21   A. Correct.
22   Q. And when Andrea Koos says, ██████████████
████████████████████
████████████████████████
████████████████████████

Page 90

████████████████████████
████████████████████████████
████████████████
████████████████████████████████
████████████████████████████████████
████████████████████
████████████████████████████████
10   Q. All right. Let me hand you Number 16.
11       (Exhibit 16 marked.)
12   Q. (BY MR. KIRKMAN) And 16, for the record, appears
13   to be a couple of separate emails from March -- excuse me,
14   November 17th of 2023, correct?
15   A. Yes.
16   Q. And let's look at the top one and identify it
17   first. It's from, again, Ms. Koos with the Communications
18   department to a number of people ████████████████████
████████████████   right?
20   A. Yes.
21   Q. Okay. Let me see if I can get an identification
22   of some of these people.
23       Who is Ronald DeFeo, D-e-F-e-o?
24   A. He is the head of Corporate Communications.
25   Q. So that's somebody to whom Ms. Koos reported?

Page 91

1    A. Yes.
2    Q. And then if I'm reading this correct,
3    Caroline Clayton?
4    A. Yes.
5    Q. Do you know who that is --
6    A. Yes.
7    Q. -- or was at the time?
8    A. She reports to Ron DeFeo. Andrea reports to
9    Caroline.
10   Q. Okay. And then, of course, you're having received
11   a copy ████████████████████████████,
12   right?
13   A. Yes.
14   Q. And who is Matt Miller?
15   A. He is in the Corporate Communications group.
16   Q. Okay. And Gianna Urgo, U-r-g-o?
17   A. I don't know her.
18   Q. And I think we've been over Caroline --
19   A. Yeah.
20   Q. -- Barksdale, right?
21   A. Uh-huh.
22   Q. Okay. "DMN unsigned editorial about skiplagging."
23   Do you know what is meant by using the phrase "unsigned
24   editorial"?
25   A. I'm going to read the --

Page 92

1    Q. Sure.
2    A. -- email first.
3       Okay.
4    Q. Do you have an understanding of what is meant by
5    using the term "unsigned editorial"?
6    A. I'm going by what it says; he did not put his
7    signature on it.
8    Q. Okay. And, again, it says "about Skiplagging."
9    And if I understand your testimony, this was about
10   principally Skiplagging, Inc., or skiplagging.com?
11   A. The practice of skiplagging.
12   Q. Which is a practice that you believe Skiplagging,
13   Inc., my client, is participating in, right?
14   A. Yes.
████████████████████████████
████████████████████████████
████████████████
████████████████
████████████████
████████████████████████████
████████████████████████████
████████████
████████████████████████

23 (Pages 89 to 92)

Amy Massey & Associates

App'x 0050



Page 93

6  Q.  Okay.  Then Ms. Koos says,

10        Did I read that correct?
11  A.  You did.
12  Q.  And do you -- do you believe

20  Q.  Okay.  Then it says,

Page 94

10  Q.  Okay.  When it says

13        Well, let me back up.
14  A.  Yeah.
15  Q.  Is that a subject you discussed
16  A.  Yes.
17  Q.  And what did you understand that to mean?
18  A.

20  Q.  Okay.  Let me first of all understand

25  A.  Yes.

Page 95

1   Q.  And you're saying that -- that

4   A.  Yes.

13  Q.  Right.  But I didn't ask you that.  I'm just
14  trying to make sure I get an understanding.
15

17  A.  Are you asking about what our discussion was, or
18  are you --
19  Q.  No, no, no, no.
20  A.  -- are you separating those now?
21  Q.  I'm separating.
22  A.  Okay.
23  Q.  I'm trying to get --
24  A.  Okay.  So I don't --
25  Q.  -- an understanding --

Page 96

1   A.  -- need to look at this?
2   Q.  -- of the practice first.
3   A.  Okay.  So what's your question?
4   Q.  Okay.  We're back to my hypothetical between --
5   I'm just picking Phoenix, Miami, and Dallas -- I don't --
6   or Dallas/Fort Worth --
7   A.  Okay.
8   Q.  -- since we're in Fort Worth.
9        The empty seat, I think we've established if
10  you're going from east to west, would be from Dallas/Fort
11  Worth to Phoenix, right?
12  A.  An unused seat, yes.
13  Q.  Right.
14  A.  Uh-huh.
15  Q.  But that's what you mean by an empty seat?
16  A.  Yes.
17  Q.  Somebody who had bought a ticket all the way
18  through to Phoenix, got off in Dallas, they occupied that
19  seat from Miami to Dallas but didn't occupy it from Dallas
20  to Phoenix?
21  A.  Correct.
22  Q.  And so the empty seat refers to the seat between
23  Dallas to Phoenix?
24  A.  Yes.
25  Q.  Okay.  Now, the question I'm asking is, the seat

24 (Pages 93 to 96)

Electronically signed by Amy Massey (401-010-081-3772)                                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238



Page 97

1  was originally paid for by the customer?
2      A.  The trip was paid for.  The seat was not paid for.
3      Q.  The trip that the customer's taking between Miami,
4  Dallas, and Phoenix was paid for?
5      A.  To Miami to Phoenix was paid for.
6      Q.  Right.
7          And he sat in -- the customer, man or woman,
8  sat in the seat, right?
9      A.  They sat in the first trip, the first flight to
10  Dallas.
11      Q.  Right.  They sat in a seat in an airplane, right?
12      A.  I assume so.
13      Q.  And they paid for that seat?
14      A.  They paid for the trip from Miami to Phoenix.
15      Q.  Right.  But they paid for it?
16      A.  They paid for the trip from Miami to Phoenix.
17      Q.  Yes.  But they actually paid for it?
18          MR. MUYSKENS:  Asked and answered.
19      Q.  (BY MR. KIRKMAN)  Not free?
20      A.  They paid for Miami to Phoenix.
21      Q.  Okay.  That's the fourth time you've said that.  I
22  get that.
23      A.  Okay.
24      Q.  But they actually paid money to American for that
25  trip?

Page 98

1      A.  For what trip?
2          MR. MUYSKENS:  Asked and answered.
3      Q.  (BY MR. KIRKMAN)  The trip from Miami to Phoenix.
4          MR. MUYSKENS:  Asked and answered.
5      A.  That's correct.
6      Q.  (BY MR. KIRKMAN)  Right.  And American got revenue
7  from that trip?
8      A.  For what trip?
9      Q.  From Miami to Phoenix.  That's the ticket they
10  sold --
11      A.  Correct.
12      Q.  -- right?
13      A.  Uh-huh.
14      Q.  No question about that?
15      A.  The trip from Miami to Phoenix, paid for and
16  expected to be delivered.
17      Q.  Right.
18          That customer, whoever it was, paid for that
19  ticket?
20          MR. MUYSKENS:  Asked and answered.
21      A.  They paid for a trip from Miami to Phoenix.
22          MR. MUYSKENS:  Just hold on.
23          Just because you don't understand the answer,
24  Bill, doesn't mean it's not answering the question.
25          MR. KIRKMAN:  Well, maybe it does and maybe

Page 99

1  it doesn't.
2          MR. MUYSKENS:  No, I'm pretty sure it does.
3  You're just badgering now.  Now is getting annoying.
4      Q.  (BY MR. KIRKMAN)  Okay.  A hypothetical person
5  buys a hidden city ticket from Miami to Phoenix that goes
6  through Dallas, right?
7      A.  How do I know it's hidden city?
8      Q.  Well, because he's -- he's fixing to get off in
9  Dallas.
10      A.  So the intention is to get off in Dallas?
11      Q.  Yes, sir.
12      A.  But they bought a ticket from Miami to Phoenix.
13      Q.  Yes.  Yes, sir.  No question.
14      A.  Okay.
15      Q.  I'm just trying to establish that there was a
16  payment by that customer for that trip that was booked from
17  Miami through Dallas to Phoenix --
18          MR. MUYSKENS:  Asked and answered.
19      Q.  (BY MR. KIRKMAN)  -- right?
20      A.  From Miami to Phoenix?
21      Q.  Right.  It just happened to stop in Dallas.
22      A.  On -- for this itinerary, yes.
23      Q.  Okay.  I don't know why that took so long.
24          MR. MUYSKENS:  I have no idea why that took
25  so long, if you're asking me.

Page 100

1      Q.  (BY MR. KIRKMAN)  Okay.  Then we say ▓▓▓▓
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7
8          Did I read that correctly?
9      A.  You did.
10      Q.  So is it true that ▓▓▓▓▓▓▓▓▓▓▓▓▓
11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  ▓▓▓▓▓▓▓▓▓▓▓
13      A.  Yes.
14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15
16      A.  What year is this?
17      A.  This is November of '23.
18      A.  And then when was that previous --
19      Q.  We just went over it.
20      A.  And --
21  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24      A.  When -- when that --
25          MR. MUYSKENS:  Objection, mischaracterizes

25 (Pages 97 to 100)

Electronically signed by Amy Massey (401-010-081-3772)                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238



**Page 101**

1  the previous testimony; lack of foundation.
2  Q. (BY MR. KIRKMAN) Well, it was back in '21.
3  A. Okay. So two years later.
4  Q. So what? Previously they'd done that.
5  MR. MUYSKENS: Objection --
6  Q. (BY MR. KIRKMAN) Why were you telling
7  ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
8  ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬
9  MR. MUYSKENS: Objection, mischaracterizes --
10 A. I am telling you --
11 MR. MUYSKENS: -- the previous testimony.
12 A. -- exactly what our and my belief is in 2023
13 ▮ ▬▬▬▬▬▬▬▬▬
14 Q. (BY MR. KIRKMAN) Okay.
15 That's what you're
16 telling me?
17 MR. MUYSKENS: Objection, mischaracterizes --
18 A. I'm telling you --
19 MR. MUYSKENS: -- his prior testimony.
20 A. -- exactly what I said to them.
21 ▮ ▬▬▬▬▬▬▬▬▬▬▬▬
22 ▮ ▬▬▬▬▬▬▬▬
23 Q. (BY MR. KIRKMAN) Okay. Well, there -- there's
24 no -- ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
25 ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**Page 102**

1  ▮
2  ▮
3  ▮
4  ▮
5  ▮
6  ▮
7  ▮
8  ▮
9  ▮
10 ▮
11 ▮
12 ▮
13 MR. MUYSKENS: Objection, form.
14 Q. (BY MR. KIRKMAN) Then you go on and say,
15 ▮
16 ▮
17 ▮
18 ▮
19 ▮
20 MR. MUYSKENS: Objection --
21 Q. (BY MR. KIRKMAN) Did I read that right?
22 MR. MUYSKENS: -- you did misread that.
23 Q. (BY MR. KIRKMAN) Sir, did I read that right?
24 A. I might have missed something there. Can you --
25 Q. Well, that --

**Page 103**

1  A. -- read it again?
2  Q. -- sentence that begins
3  ▬▬▬▬▬▬▬▬▬▬▬▬
4  A. Yes.
5  ▮
6  ▮
7  ▮
8  ▮
9  ▮
10 ▮
11 ▮
12 ▮
13 Q. Well, it says,
14 ▮
15 ▮
16 ▮
17 ▮
18 ▮
19 Did I read that correctly?
20 A. Not quite.
21 ▮
22 ▮
23 ▮
24 A. No. But if you read that properly it says
25 ▮

**Page 104**

1  ▮
2  Q. Okay.
3  A. That happens.
4  Q. I'm sorry, I didn't mean to interrupt.
5  My question is very simple: If somebody
6  flies a hidden city ticket and does not check a bag, you
7  don't have a short bag checking problem, correct?
8  ▮
9  ▮
10 ▮
11 Q. I'm just talking about generally, Mr. Chandler.
12 Listen to my question.
13 In the simple situation where a guy is flying
14 a hidden city ticket and doesn't check a bag, you don't
15 have a short bag checking problem, do you?
16 A. So they -- they're not required to check a bag at
17 the gate because there's no more room on the plane, then
18 they would not have a problem.
19 Q. No. He never brought a bag, doesn't have a bag,
20 never intended to take a bag, and he flies hidden city.
21 You don't have a short bag checking problem with that
22 customer, do you?
23 MR. MUYSKENS: Objection, asked --
24 A. So they brought --
25 MR. MUYSKENS: -- and answered.

26 (Pages 101 to 104)

Electronically signed by Amy Massey (401-010-081-3772)                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238

## Page 105

1    A. -- a backpack?
2    Q. (BY MR. KIRKMAN) I don't care whether he had a
3 backpack or a purse. He doesn't check a bag. If he
4 doesn't check a bag on a hidden city ticket, you don't have
5 a problem, do you?
6    A. So in those --
7        MR. MUYSKENS: Objection, asked and
8 answered --
9    A. -- narrow cases --
10        MR. MUYSKENS: -- form.
11    A. -- there is no problem.
12        THE REPORTER: Sir, when the attorney is
13 objecting, if you can pause, please --
14        THE WITNESS: Okay. Sorry.
15        THE REPORTER: -- so I can get both.
16        THE WITNESS: Okay. Great.
17        THE REPORTER: Thank you.
18        THE WITNESS: Uh-huh.
19    Q. (BY MR. KIRKMAN) Okay. Then it says, ▮▮▮
▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮ ▮▮▮▮▮▮▮▮
23        Did I read that correctly?
24    A. You did.
25    Q. Do you -- can you tell me ▮▮▮▮▮▮▮▮▮

## Page 106

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3    A. Let's go back to your example, Miami to Phoenix.
4    Q. Sure.
5    A. And it's a minor child. Our obligation with all
6 of these customers is to get them from Miami to Phoenix,
7 Miami to Phoenix. If that minor child gets off in Dallas,
8 now we are -- our whole operation is scrambling to find
9 where they are.
10        Do you realize it's pretty bad if we lose a
11 minor child somewhere in our system? So if they get off
12 there, then it is very, very difficult on the operation.
13    Q. How many instances did that happen?
14    A. I don't know.
15    Q. Have you looked into that?
16    A. I have not.
17    Q. Has anybody?
18    A. I'm sure they have.
19    Q. How do you know?
20    A. I don't know for sure, but, of course, I'm sure we
21 have.
22    Q. Have you seen any written suggestion that that
23 happened?
24    A. Yes.
25    Q. Where?

## Page 107

1    A. It was in a news article in some instance that had
2 been reported in the news.
3    Q. Okay. Other than that, are you aware of any time
4 that it happened?
5    A. I am not aware personally of this.
6    Q. Well, I don't care if you're impersonally aware.
7 Are you aware at all? Did somebody tell you?
8        MR. MUYSKENS: Asked and answered.
9    Q. (BY MR. KIRKMAN) I don't -- it doesn't matter the
10 source; I just want to know, are you aware of that in any
11 way.
12        MR. MUYSKENS: Asked and answered.
13    A. Personally from the information I have, I am not
14 aware of that.
15    Q. (BY MR. KIRKMAN) Okay. When you made this
16 statement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## Page 108

▮ ▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6    Q. Then the email goes on, ▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8        Did I read that accurately?
9    A. You did.
10    Q. And when she says, ▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮ what did you understand that to mean?
12    A. Exactly what it says.
13    Q. Well, did you believe, ▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮
17    Q. Well, I'm -- do you know what she was talking
18 about? ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮



27 (Pages 105 to 108)

Electronically signed by Amy Massey (401-010-081-3772)                                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238

RAYMOND SCOTT CHANDLER June 7, 2024

Page 109



16    MR. KIRKMAN: Okay. Let's take a short
17 break.
18    (Recess taken from 12:22 p.m. to 12:34 p.m.)
19    (Exhibit 17 marked.)
20    Q.  (BY MR. KIRKMAN)  All right.  I've handed you
21 Exhibit 17.  This appears to be an email from Ms. Koos
22 again with the Communications department to a number of
23 people and copied to a number of people regarding the
24 Dallas Morning News unsigned editorial about skiplagging,
25 right?

Page 110

1    A.  Yes.
2    Q.  And apparently from reading this, the article
3 actually did appear in the Dallas Morning News?
4    A.  Yes.
5    Q.  And you are aware that it did appear?
6    A.  Yes.
7    Q.  And I assume you read it when it came out?
8    A.  I read this.
9    Q.  Okay.  It looks like what Ms. Koos has done is
10 reproduce the article there in the second part of the
11 memo --
12    A.  I'm going to read it, if that's okay.
13    Q.  Sure.  Let me just finish my question, then I'll
14 let you read.
15    It looks like what she's done is reproduced
16 that article in the actual email that she sent.  Is that
17 what it appears to be?
18    A.  Yes.
19    Q.  Okay.  Then go ahead and take a look at the
20 article, if you would.
21    A.  Okay.
22    Q.  All right.  So the people that received this email
23 were provided a reproduced copy of the article in the
24 Dallas Morning News; am I understanding that correctly?
25    A.  Yes.

Page 111

1    Q.  And when you read it just now, does that refresh
2 your memory of --
3    A.  Yes.
4    Q.  -- what the article said?
5    Does it appear to be a fair copy of it?
6    A.  Yes.
7    Q.  Then it looks like at the very beginning in bold
8 letters the article started out by saying, "Don't persecute
9 skiplaggers."
10    Did I read that right?
11    A.  You did.
12    Q.  And then underneath there it says, "Airfare tactic
13 exists because people are incentivized to take it."
14    Did I read that accurately?
15    A.  Yes.
16    Q.  Do you agree with that?
17    A.  I do not.
18    Q.  Why do you not agree that this airfare tactic of
19 skiplagging exists because people are incentivized to take
20 it?
21    A.  Because there are companies that induce people to
22 do it.
23    Q.  Well, do you agree that people are incentivized to
24 fly skiplagging taking hidden city ticket?
25    A.  I don't -- you know, I think each -- each and

Page 112

1 every one would be its own, kind of, assessment on it.
2    Q.  Generally it's cheaper to fly hidden city ticket
3 than direct, isn't it?
4    A.  I don't think so, not -- it would have to be each
5 and every one of the examples to determine if there was
6 an -- incentivized or not.
7    Q.  Well, saving money is certainly a reason to take a
8 hidden city ticket rather than a direct ticket, isn't it?
9    A.  If you could save money, that would be an
10 incentive, yeah.
11    Q.  Okay.  Then going on in the article, after the
12 example of the coffee, there's a paragraph in the article
13 that starts with the word "Skiplagging."
14    A.  Yes.
15    Q.  It says, "Skiplagging is a money-saving tactic in
16 which a traveler books a flight with a layover in the city
17 which is their true destination, then just skips the
18 connecting flight."
19    Is that -- do you believe that that is an
20 accurate general description of skiplagging?
21    A.  Well, the definition of a "layover" is in
22 question.  There's a connection; it doesn't mean that
23 there's a layover.  There's a difference.
24    Q.  Okay.  Whether it's a layover or a connection, you
25 don't disagree with that statement, do you?

28 (Pages 109 to 112)

Amy Massey & Associates

App'x 0055

RAYMOND SCOTT CHANDLER June 7, 2024

## Page 113

1   A.  I don't disagree with that, no.
2   Q.  Then it goes on to say, "It works because the
3   wacky pricing of airline flights sometimes means shorter
4   flights are more expensive."
5        Do you -- did I read that correctly?
6   A.  You read it correctly.
7   Q.  Is it true that sometimes shorter flights are more
8   expensive than longer flights associated with hidden city
9   ticketing?
10  A.  It's -- it's not the distance of the flight that
11  matters.
12  Q.  Well, what does matter?
13  A.  It's the -- we're selling from an "A" to a "B."
14  So the market is what matters.  Where you're starting and
15  where you're saying you're going to go, that's how the
16  pricing is done.
17  Q.  Okay.  You say "the market."  Is that -- what do
18  you mean by "the market"?
19  A.  Miami to Phoenix is the market.  That's what we're
20  pricing, is the market on buying -- I'm in Miami; I am
21  buying a ticket to go to Phoenix.  Whether you go nonstop
22  or connect or you connect over Chicago, that's the --
23  that's not what we're pricing; we're pricing from Miami to
24  Phoenix.
25  Q.  Okay.  Well, let's take one of the examples we're

## Page 114

1   using.  I forget sometimes whether I'm going --
2   A.  You were using --
3   Q.  -- west to east, but let's go from Miami to
4   Phoenix through Dallas.
5        Is that fair?
6   A.  That's an example.
7   Q.  Okay.  Isn't it true that oftentimes it is cheaper
8   to fly from Miami through Dallas to Phoenix than it is just
9   to fly from Miami to Dallas?
10  A.  Define "often."
11  Q.  Often.  Simple term.
12  A.  More than 50 percent of the time?  More than
13  10 percent of the time?  More than 1 percent of the time?
14  More than 90 percent of the time?  What does "often" mean
15  there?
16  Q.  Let's use -- let's use each one of your examples.
17  More than 10 percent of the time?
18  A.  I don't know.
19  Q.  More than 20 percent of the time?
20  A.  I don't know.
21  Q.  More than 30 percent of the time?
22  A.  I don't know.
23  Q.  More than 50 percent of the time?
24  A.  I don't know.
25  Q.  Then why did you ask me to separate those

## Page 115

1   percentages if you don't know either one of them?
2   A.  Because you're trying to -- it matters on the
3   exact example at the exact time that somebody's shopping
4   for the ticket.
5   Q.  But --
6   A.  Because what's important is the ticket from Miami
7   to Phoenix.  That's what we're selling, Miami to Phoenix.
8   Q.  Uh-huh.
9   A.  Over Dallas, over Chicago, direct, that's not
10  what's important.  It's the Miami to Phoenix ticket that
11  we're selling.
12  Q.  But the reason people fly hidden city ticketing
13  through/connecting with/layover is because it's cheaper,
14  isn't it?  That's why people do this.
15       MR. MUYSKENS:  Objection, foundation.
16  A.  Oh, yeah, I'm -- I can't speculate on why they do
17  it.
18  Q.  (BY MR. KIRKMAN)  But you've been looking at this
19  for years, Mr. Chandler.  Haven't you determined that
20  that's the reason these people make these flights with
21  layovers and connections and then get off; because it's
22  cheaper?
23       MR. MUYSKENS:  Objection, form; foundation.
24  A.  Seems logical that they would do that.
25  Q.  (BY MR. KIRKMAN)  Then he uses a "for instance"

## Page 116

1   there, "A direct flight from Denver to Dallas might cost
2   200; but a journey from Denver to New Orleans with a stop
3   in Dallas might cost 160.  You pay less to get more, even
4   though you don't intend to use it all.  Skiplag turns a
5   liability (a layover) into an asset (cheaper fares)."
6        Did you understand what he meant by that?
7   A.  I can read that.  Yes.
8   Q.  Did you understand what he meant by it?
9   A.  Yes.
10  Q.  And isn't that an advantage to a consumer in that
11  instance where he saves 40 bucks?
12  A.  Why is that?
13  Q.  200 less 160 is 40 bucks, right?
14  A.  So they are buying a ticket -- let me just get
15  this right -- from Denver to New Orleans.  So they're
16  saying that they're going to go from Denver to New Orleans.
17  That's what they're buying, they're buying a trip from
18  Denver to New Orleans; but they're actually doing something
19  different; is that correct?
20  Q.  I'm not changing what he said at all, sir.
21  A.  Okay.
22  Q.  He's buying a ticket from Denver to New Orleans
23  and gets off in Dallas and it can cost him 160 bucks if
24  he -- through the short trip, while it would be 200 if it
25  was the other way.  Isn't that a savings of 40 bucks?

29 (Pages 113 to 116)

Electronically signed by Amy Massey (401-010-081-3772)                    5bdb4925-ac27-4d63-b7e6-abcc5c71c238



## Page 117

1    A.  So they bought a ticket from Denver to New Orleans
2   but got off early.  Yes.
3    Q.  Right.
4    A.  Uh-huh.
5    Q.  And he saved 40 bucks, right?
6    A.  From this made-up example, yes.
7    Q.  That's the reason people buy these tickets, so
8   they can save the 40 bucks --
9        MR. MUYSKENS:  Objection, form.
10    Q.  (BY MR. KIRKMAN)  -- right?
11    A.  In this made-up example, yes.
12    Q.  Well, that's generally what's true?  All of this
13   investigation that you've done, you've determined that's
14   the reason people buy these Skiplag trips, is they can save
15   some money?
16        MR. MUYSKENS:  Objection, form; foundation;
17   mischaracterizes earlier testimony.
18    Q.  (BY MR. KIRKMAN)  Go ahead and answer.
19    A.  In this example, yes.
20    Q.  Well, I'm not asking about this example.  I'm
21   asking you generally, based on all your investigation that
22   you've been doing into Skiplagged since 2016, you've
23   learned that the reason people do this is because they save
24   money?
25        MR. MUYSKENS:  Objection, form; foundation;

## Page 118

1   mischaracterizes previous testimony.
2    A.  That would make sense, yes.
3    Q.  (BY MR. KIRKMAN)  Now, I want to talk to you about
4   the paragraph beginning "Luggage" towards the bottom.
5   "Luggage hiccups aside, skiplagging costs airlines nothing
6   except the higher price they might have collected if they
7   hadn't offered layover fares."
8        Did I read that correctly?
9    A.  You did.
10   ▪ ████████████████████
11   ▪ ███████████████████████
12   ▪ ██████████████
13   ▪ ████████████████████████
14   ▪ ███████████████
15   ▪ ███████████████████████
16   ▪ ████████████████████████
17   ▪ █████████████
18   ▪ ███████████████
19    Q.  Okay.  Well, he says, "skiplagging costs airlines
20   nothing except the higher price they might have collected
21   if they hadn't offered layover fares."
22        Do you agree with that?
23    A.  I do not.
24    Q.  And why do you not agree with that?
25    A.  Have you got a minute?

## Page 119

1    Q.  Yep.
2    A.  Okay.
3   ▪ ██████████████████████████
4   ▪ ████████████████████
5   ▪ ██████████████████████████
6   ▪ ██████████████████████████
7   ▪ █████████████████████
8   ▪ ████████████████
9   ▪ ██████████████████████
10   ▪ █████████████████████████
11   ▪ ████████████████████████
12   ▪ ████████████████
13   ▪ █████████
14   ▪ ███████████████████████
15   ▪ ███████████████████████████
16   ▪ ████████████████████████████
17   ▪ ████████████████████████████
18   ▪ █████████████████████████

## Page 120

1   ▪ █████████████████████████████
2   ▪ ███████████████████████████
3   ▪ ████████████████
4   ▪ ██████████████████████████████
5   ▪ ██████████████████████████████
6   ▪ ████████████████████████████
7   ▪ ██████████████████████
8   ▪ █████████████
9   ▪ █████████████████████████
10   ▪ █████████████████
11    Q.  ███████████████████
12   ▪ ████████████
13   ▪ ████████
14    Q.  Okay.  What is the study that supports that?
15    A.  The study?
16    Q.  Yes.
17    A.  It's my 28 years of understanding how our
18   optimization, all of our systems, our forecasting, all of
19   the science behind it, how it works.
20    Q.  Has there been any written study to that effect at
21   American Airlines ever?
22    A.  And do you know where there isn't?
23    Q.  Oh, no, no, no.  You need to say yes or no first
24   before you tell me that.  Has there been such a study?
25    A.  No.

30 (Pages 117 to 120)

Page 121

1    Q.  Okay.  Have you ever seen such a study anywhere?
2    A.  No.
3    Q.  Have you seen such a study at Delta?
4    A.  I don't work with Delta.
5    Q.  Well, I didn't ask you if you worked with; I asked
6  you if you'd ever seen a study at Delta over that?
7    A.  Why would I see a study at Delta?
8    Q.  I don't know.  I just asked you.
9    A.  No.
10   Q.  Okay.
11   A.  I do not look at Delta studies.
12   Q.  Have you seen any such study at United Airlines?
13   A.  Same reason.
14   Q.  Okay.  You haven't seen any such study at
15  American?
16   A.  No.
17   Q.  Have you asked that such a study be run?
18   A.  No.
19   Q.  Has anyone at American asked that such a study be
20  run?
21   A.  I don't know.
22   Q.  Has anyone at American done an analysis of what
23  alleged revenue they're losing because of what Skiplagged
24  does?
25   A.  That is possible, but I don't know.

Page 122

1    Q.  You have no idea?
2    A.  I don't know.
3    Q.  Have you seen such a study?
4    A.  No.
5    Q.  Have you talked to anyone who's done such a study?
6    A.  No.
7    Q.  Do you know what alleged revenue American says
8  they're losing because of any operations of Skiplagged?
9    A.  We don't know what Skiplagged puts on us, so no.
10   Q.  No.
11        My question is, do you know what alleged
12  revenue American is losing because of what Skiplagged is
13  doing?
14   A.  If Skiplagged would give us all of the tickets
15  that they've sold, then we could do that.
16   Q.  Is that a no or a yes?
17   A.  That's a no.
18   Q.  Okay.  And why have they not done that?
19   A.  Because we don't know what Skiplagged is selling.
20  We do not know because they're doing it under the radar.
21  They don't have an agreement with us.  They are accessing
22  our inventory without -- you know, by hiding it.  So we
23  don't know the extent of what is being done.  We do not
24  know.
25   Q.  Have you talked to anybody at American who says

Page 123

1  they're familiar with such a study about the revenue
2  allegedly lost because of any activities of Skiplagged?
3    A.  No.
4    Q.  And you are the head of Revenue?
5    A.  I'm the head of Revenue Management currently.
6    Q.  Do you know of anybody in your department that's
7  conducted such a study?
8    A.  From Skiplagged specifically?  No.
9    Q.  Yeah, I'm talking about Skiplagged's effects on
10  revenue.
11   A.  No, because we do not know what the extent is that
12  Skiplagged sells tickets on behalf of American Airlines.
13   Q.  Have you asked that such a study be done?
14   A.  It's not possible to do it because we don't have
15  the data.
16   Q.  Okay.  What data are you talking about?
17   A.  Skiplagged selling of hidden city tickets.
18   Q.  Have you done any kind of analyses about how
19  Skiplagged is assessing -- or accessing any of the
20  inventory of American?
21   A.  We have tried for years and years and years to
22  figure that out, and we have not been able to do it.
23   Q.  As of this date, you don't know the answer to that
24  question?
25   A.  I do not know.

Page 124

1    Q.  And what do you -- what activities have they done
2  to try to access that inventory?
3    A.  Skiplagged?
4    Q.  What have you done to investigate that?
5    A.  ████████████████████████
██   ████████████████████████████
██   ████████████████████████████████
██   ███████████████
10   Q.  Okay.  You said -- what was the other department
11  that you said was --
12   A.  Distribution.
13   Q.  And who's the head of that?
14   A.  Neil Geurin.
15   Q.  And do you know whether they've actually tried to
16  look at that?
17   A.  For years, yes.
18   Q.  And how do you know that, from conversations with
19  Mr. Geurin?
20   A.  Well, if you go back through all of these emails,
21  there are multiple instances of it, starting in 2017, 2018.
22   Q.  Okay.  So they would be reflected in these emails?
23   A.  Yes.
24   Q.  Okay.
25   A.  And other emails that I wasn't a part of.

31 (Pages 121 to 124)

Page 125

1    Q.  Okay.  Have you had any discussions with anyone at
2    American about how you could determine what revenue has
3    been lost by virtue of any activities with Skiplagged?
4    A.  We have talked about how to do it, but we have no
5    idea how to do it because we don't have the data.
6    Q.  Okay.  Who's "we"?  Who is talking?
7    A.  That would be Revenue Management.  That would be
8    the Revenue Integrity team.
9    Q.  Okay.  And who within the Revenue Integrity team
10   has discussed that?
11   A.  I don't know.  I mean, I -- some of it would have
12   been in 2018, Darrin Goodreau.  Some would be currently
13   with the current heads of Revenue Integrity.
14   Q.  And you were part of those discussions?
15   A.  Yes.
16   Q.  So to date, there's been no analysis that was
17   done, that you're aware of?
18   A.  We can't do the analysis.  We don't have the data.
19   Your company hides it from us.
20   Q.  It's just easy to say yes or no, sir.  I didn't
21   ask you about whether anybody hid it; I simply asked you
22   did you do it.
23   A.  Do what again?
24   Q.  Have you done such an analysis to determine what
25   revenue, if any, American has lost by virtue of any

Page 126

1    activity of Skiplagged?
2    A.  And what I'm saying is, we can't do the study
3    because we don't have the data.
4    Q.  Okay.  So is that a no, that you haven't done such
5    a study?
6    A.  We can't do the study because we don't have the
7    data.
8    Q.  Okay.  Yes or no?  Did you or didn't you?
9        MR. MUYSKENS:  Asked and answered.
10   A.  We can't do the study because we don't have the
11   data.
12   Q.  (BY MR. KIRKMAN)  Okay.  Well, I don't know
13   whether you have the data or not.  Maybe you do, maybe you
14   don't.
15   A.  We do not.
16   Q.  I don't know.  But my question is, have you done
17   it?
18   A.  We can't do the study because we don't have the
19   data.  Your company has the data.  They could give it to me
20   and I could do the study.
21   Q.  Have you tried?
22   A.  How can we do it if we don't have the data?
23   Q.  Have you tried?
24   A.  How can we do it if we don't have the data?
25       MR. MUYSKENS:  Asked and answered.

Page 127

1    Q.  (BY MR. KIRKMAN)  Look, answer my question whether
2    you've tried or not --
3        MR. MUYSKENS:  Just because he's not --
4    Q.  (BY MR. KIRKMAN)  -- and tell me how you've
5    done --
6        MR. MUYSKENS:  -- telling you what you want
7    to hear --
8    Q.  (BY MR. KIRKMAN)  -- how you've tried.
9        MR. MUYSKENS:  -- does not mean your question
10   is valid.
11       I'm objecting again.
12   Q.  (BY MR. KIRKMAN)  Okay.  Go ahead.
13   A.  I -- what's the question?
14   Q.  How have you tried?
15       MR. MUYSKENS:  Asked and answered.
16   A.  If we had the data, we could go do it.
17   Q.  (BY MR. KIRKMAN)  Okay.  I don't know whether you
18   have the data or not.  That's not what I'm asking you.  I'm
19   asking you have you tried?
20       MR. MUYSKENS:  Asked and answered.
21   A.  Me personally?  No.
22   Q.  (BY MR. KIRKMAN)  All right.
23   A.  Somebody in the company could have tried.
24   Q.  Somebody at the company what?
25   A.  Somebody could have tried.

Page 128

1    Q.  Do you know who that was?
2    A.  No.
3    Q.  Okay.  But we know you haven't?
4    A.  That's correct.
5    Q.  All right.  Anybody in your department tried?
6    A.  Possibly.
7    Q.  But you don't know?
8    A.  No.
9    Q.  Okay.  Have you had any discussions with anybody
10   at American about how you would go about doing that?
11       MR. MUYSKENS:  Asked and answered.
12   A.  I would tell you exactly how we would go about
13   doing it --
14   Q.  (BY MR. KIRKMAN)  No.
15   A.  -- if we had the data.
16   Q.  My first question is, have you had discussions
17   with anybody at American about how you would go about doing
18   that?
19       MR. MUYSKENS:  Asked and answered.
20   A.  I don't recall any specific discussions.
21   Q.  (BY MR. KIRKMAN)  Are you aware of the data that
22   was provided to you on March 31 of 2024?
23   A.  What data?
24       MR. MUYSKENS:  Objection, foundation.
25   Q.  (BY MR. KIRKMAN)  Are you aware of -- I'm sorry,

32 (Pages 125 to 128)

Electronically signed by Amy Massey (401-010-081-3772)                5bdb4925-ac27-4d63-b7e6-abcc5c71c238

Page 129

1  are you aware of data provided by Skiplagged to American
2  Airlines on March 31 of 2024?
3     A.  I am not.
4     Q.  Are you aware of any other follow-up articles that
5  were written after the Dallas Morning News article that
6  we're referencing here from November of '23?
7     A.  I am not.
8     Q.  Are you aware of any other articles in any other
9  newspaper that discussed that -- this issue of skiplagging
10  after November of '23?
11     A.  I am not.
12         MR. KIRKMAN:  Okay.  I pass the witness
13         MR. MUYSKENS:  I'm done.
14         (End of proceedings at 12:56 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 130

1  WITNESS:  RAYMOND SCOTT CHANDLER
2  DATE TAKEN:  JUNE 7, 2024
3         CORRECTIONS AND SIGNATURE
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25     I, RAYMOND SCOTT CHANDLER, have read the foregoing

Page 131

1  deposition and hereby affix my signature that same is true
2  and correct, except as noted above.
3
4         _____
4         RAYMOND SCOTT CHANDLER
5
6  THE STATE OF _____)
7  COUNTY OF _____)
8  Before me,_____, on this day personally
   appeared RAYMOND SCOTT CHANDLER, known to me (or proved to
9  me under oath or through_____) (description of
   identify card or other document) to be the person whose
10  name is subscribed to the foregoing instrument and
   acknowledged to me that they executed the same for the
11  purposes and consideration therein expressed.
12  Given under my hand and seal of office this ____day of
   _____A.D., _____.
13
         _____
14  NOTARY PUBLIC IN AND FOR
   THE STATE OF _____
15
   My Commission Expires:
16
17
18
19
20
21
22
23
24
25

Page 132

1         IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2              FORT WORTH DIVISION
   AMERICAN AIRLINES, INC.,   *
3                              *
     Plaintiff,                *
4                              *
   v.                          *  Civil Action No.
5                              *  4:23-cv-00860-P
   SKIPLAGGED, INC.,           *
6                              *
     Defendant.                *
7         REPORTER'S CERTIFICATION
8      ORAL DEPOSITION OF RAYMOND SCOTT CHANDLER
9              JUNE 7, 2024
10            VOLUME 1 of 1
11
12     I, Amy Massey, CSR, and Notary Public in and for
13  the State of Texas, hereby certify to the following:
14
15     That the witness, RAYMOND SCOTT CHANDLER, was duly
16  sworn by the officer and that the transcript of the oral
17  and video deposition is a true record of the testimony
18  given by the witness;
19     That the deposition transcript was submitted on
20  June 28, 2024, to Ms. Alyssa Ortiz Johnston, Attorney for
21  the Plaintiff, for the review and signature by the
22  witness, to be returned to the reporter within 30 days;
23     That the amount of time used by each party at the
24  deposition is as follows:
25

33 (Pages 129 to 132)

Amy Massey & Associates

App'x 0060

Page 133

```
 1        Mr. Nathan J. Muyskens:  00:00
          Ms. Alyssa Ortiz Johnston:  00:00
 2        Mr. William L. Kirkman:  02:28
          Ms. Abigail R.S. Campbell:  00:00
 3
 4        That pursuant to information given to the
 5   deposition officer at the time said testimony was taken,
 6   the following includes counsel for all parties of record:
 7   FOR THE PLAINTIFF, AMERICAN AIRLINES, INC.:
 8        MR. NATHAN J. MUYSKENS
          Greenberg Traurig, LLP
 9        nathan.muyskens@gtlaw.com
10        MS. ALYSSA ORTIZ JOHNSTON
          Greenberg Traurig, LLP
11        johnston@gtlaw.com
12   FOR THE DEFENDANT, SKIPLAGGED, INC.:
13        MR. WILLIAM L. KIRKMAN
          Kirkman Law Firm, PLLC
14        billk@kirkmanlawfirm.com
15        MS. ABIGAIL R.S. CAMPBELL
          Condon Tobin Sladek Thornton Nerenberg, PLLC
16        acampbell@condotobin.com
17        That $_____ is the deposition officer's charges
18   to the Defendant for preparing the original deposition
19   transcript and any copies of exhibits;
20        I further certify that I am neither counsel for,
21   related to, nor employed by any of the parties or attorneys
22   in the action in which this proceeding was taken, and
23   further that I am not financially or otherwise interested
24   in the outcome of the action.
25
```

Page 134

```
 1   Certified to by me this 27th day of June, 2024.
 2
 3   Amy Massey, Texas CSR 6254
     Expiration Date: 1/31/25
 4   Amy Massey & Assoc., Inc.
     Firm Registration Number 404
 5   6724 Kirk Lane
     Burleson, Texas  76028
 6   Phone:  817-447-6721
     amymasseyassociates@gmail.com
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

34  (Pages 133 to 134)

Electronically signed by Amy Massey (401-010-081-3772)                              5bdb4925-ac27-4d63-b7e6-abcc5c71c238

# Exhibit A-3

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-4

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

### DEFENDANT SKIPLAGGED, INC.'S THIRD AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Judge Ray's December 19, 2023 Order [Dkt. 53], and the parties' Confidentiality Agreement, Defendant Skiplagged, Inc. ("Skiplagged") hereby serves this, its Third Amended Objections and Responses to Plaintiff American Airlines, Inc.'s First Set of Interrogatories.

Dated: January 12, 2024

Respectfully submitted,

/s/*William L. Kirkman*_____
William L. Kirkman
State Bar No. 11518700
billk@kirkmanlawfirm.com
Preston B. Sawyer
State Bar No. 24102465
prestons@kirkmanlawfirm.com
**KIRKMAN LAW FIRM, PLLC**
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone: (817) 336-2800
Facsimile:  (817) 877-1863

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0142

*/s/ Abigail R.S. Campbell*
Aaron Z. Tobin,
Texas Bar No. 24028045
atobin@condontobin.com
Kendal B. Reed
Texas Bar No. 24048755
kreed@condontobin.com
Abigail R.S. Campbell
acampbell@condontobin.com
**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311

***ATTORNEYS FOR DEFENDANT SKIPLAGGED, INC.***

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on January 12, 2024, a copy of the foregoing was served via e-mail as to all parties who have entered an appearance in this proceeding.

*/s/ Abigail R.S. Campbell*
Abigail R.S. Campbell

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

2

28191315v2 99460.002.00

App'x 0143

## THIRD AMENDED OBJECTIONS AND RESPONSES
## TO FIRST SET OF INTERROGATORIES

To comply with Judge Ray's December 19, 2023 Order, Skiplagged makes the following amended objections and responses to Plaintiff's First Set of Interrogatories but does not waive its previously asserted objections.

**INTERROGATORY NO. 1:** Identify Skiplagged's annual, monthly, and quarterly number of American Bookings, and the resulting revenue generated from such bookings, from January 1, 2020 to the present.

**RESPONSE:**



**INTERROGATORY NO. 2:** Identify and describe in detail each way that Skiplagged has accessed, obtained, collected, received, scraped, cached or harvested American's Content, including but not limited to when and how Skiplagged collected or otherwise obtained the content/information, and including information obtained by Skiplagged from any third party or other source other than American or AA.com.

**RESPONSE:**

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0144



**INTERROGATORY NO. 3:**   Identify and describe all types of data, information, and content relating to American flights, fares, products, or services that Skiplagged has collected or used (whether from or through AA.com, an API of AA.com, or some other source), and the process used by Skiplagged to obtain and use such data, information, or content.

**RESPONSE:**



**INTERROGATORY NO. 4:**   Identify and describe in detail each way that Skiplagged has purchased, booked, ticketed, sold, resold, brokered, facilitated, acted as a conduit, or made a reservation for customers on American flights, whether purchased or booked on AA.com, through another third party, or by some other means. Your ANSWER should include, without limitation, the names/identities of each and every third party whose data, services, or platform Skiplagged has used or relied on to facilitate the sale of American flights.

**RESPONSE:**

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0145



**INTERROGATORY NO. 5:**   Describe in detail, from the time a user submits her information and payment on Skiplagged.com to the time Skiplagged completes the booking on AA.com on behalf of the passenger, the process by which Skiplagged purchases and completes a customer's reservation on AA.com, including but not limited to each step of the process, how the passenger's personal, contact, and payment information is submitted on AA.com (i.e., manually or by an automated technological means), and the specific location (both physical and IP address) of the computers or servers from which Skiplagged inputs the passenger's information on AA.com.

**RESPONSE:**



**INTERROGATORY NO. 6:**   Identify and describe all agreements and/or business relationships that Skiplagged has with other Travel Agencies, travel metasearch engines, airfare consolidators, global distribution systems, or any other third party that provides, enables, facilitates, or otherwise participates in the distribution, display, marketing, brokering, booking, ticketing or sale of flights. Your answer should include the nature of the relationship, any agreements relating to such relationships, and the details, dates, and amounts of any payments or monetary compensation that Skiplagged has paid to or received from such third parties.

**RESPONSE:**



Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0146



**INTERROGATORY NO. 7:**   Identify all other websites to which Skiplagged.com has provided customers a link or otherwise re-directed customers to complete a booking or purchase of American flights.

**RESPONSE:**



**INTERROGATORY NO. 8:**   Identify all instances in which a person has booked, ticketed or purchased a ticket on an American-marketed flight through or facilitated by Skiplagged.com, including by providing, without limitation, the purchasers' name/identity, location, all PNR Data, any other personal identifying information, flight/itinerary information, reservation numbers, amounts paid by the customer, dates of purchase, and dates of travel.

**RESPONSE:** In response to this interrogatory and pursuant to Judge Ray's Order, Skiplagged states that while it has information regarding the number of bookings facilitated through its "Book Now" feature, the number of bookings facilitated by redirecting users to online travel agencies is unknown. Thus, the number of instances in which Skiplagged facilitated the booking of an American flight from August 1, 2018, to August 17, 2023 and according to Google Analytics is 1,376,927. Because of the magnitude of the information requested, pursuant to Fed. R. Civ. P. 33(d), Skiplagged refers Plaintiff to documents being produced by Skiplagged that reflect responsive information.

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0147

**INTERROGATORY NO. 9:**   Identify all IP addresses, names, email addresses, accounts, computers, and any other identifying information that Skiplagged, or anyone acting under Skiplagged's instruction or direction, has used in connection with booking, ticketing, purchasing and/or selling of tickets on American-marketed flights.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not book, ticket, purchase, or sell tickets for American-marketed flights. Skiplagged is unable to identify the requested IP addresses, as Skiplagged uses Google Cloud to host Skiplagged.com, which uses dynamic addresses.

**INTERROGATORY NO. 10:**   Identify each and every instance where an American-Skiplagged Customer requested a refund, partial or full, for a ticket on an American-marketed flight or where Skiplagged received a refund from American for a flight booked for an American-Skiplagged Customer, and for each instance, identify the reservation number, date of the request, date of the refund, the amount refunded by American, if any, and whether Skiplagged issued a refund back to the customer (and if so, how much of the amount refunded by American was paid back to the customer).

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not provide or receive refunds from American for any flights because Skiplagged does not charge users for flight tickets nor does Skiplagged purchase flight tickets. Users pay American for their flight tickets. In response to Skiplagged users who request flight refunds, Skiplagged informs them that that refunds must be requested from and issued by American.  In certain instances, Skiplagged  has refunded service fees. Pursuant to Fed. R. Civ. P. 33(d), Skiplagged refers Plaintiff to documents being produced that reflect customer requests for refunds of American flights.

**INTERROGATORY NO. 11:**   From the time Skiplagged began its operations, identify and describe any/all other lawsuits, claims, charges, allegations, arbitration, threatened litigation, administrative complaints, or other proceedings against Skiplagged, whether in the United States or any other country, relating to Skiplagged's marketing or sale of flights or other travel services, including the status of any such proceedings.

**RESPONSE:** In response to this interrogatory, Skiplagged identifies the following lawsuits filed against it, the allegations of which are publicly available:

1. United Airlines, Inc., Orbitz Worldwide, LLC, and Orbitz, LLC v. Zaman, Case No. 1:14-cv-09214 (N.D. Ill.); and
2. Southwest Airlines, Inc. v. Skiplagged, Inc., Skybooker.com LTD, Case No. 3:21-cv-01722-E (N.D. Tex.).

Both cases have been resolved and are terminated. The following "claims, charges, and allegations" have also been made:

1. A demand letter from counsel for Delta Air Lines, Inc. dated July 19, 2018, to which Skiplagged responded through counsel on July 26, 2018; and

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0148

2. A demand letter from Fareportal on behalf of Cheapoair dated February 11, 2015, which was resolved on February 27, 2015.

**INTERROGATORY NO. 12**: Identify the number of bookings Skiplagged has made for or on behalf of consumers with a Texas address through Skiplagged.com's "Book Now" feature, as described in paragraph 12 of Zaman's Declaration.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target, or keep separate in its records, persons with a Texas address. The reference made by Mr. Zaman in his Declaration is to Skiplagged's general operations, which are used by all persons everywhere and not just Texans. Skiplagged provides information to persons who come to its website to find information about airfares, air travel, and online travel offerings so they may book fares or tickets through other travel resources and Skiplagged does not "book" tickets or airfares, but rather facilitates persons booking flights. With this understanding, from August 1, 2018, through August 17, 2023, and according to Google Analytics, 59,426,399 persons accessed Skiplagged's site through 209,618,689 sessions, which resulted in 434,534 bookings reflecting Texas addresses through Skiplagged's "Book Now" feature. Accordingly, bookings with Texas addresses made through Skiplagged's Book Now feature represents approximately 00.207 percent of all sessions on Skiplagged.com during the identified period.

**INTERROGATORY NO. 13**: Identify the number of bookings Skiplagged has made for or on behalf of consumers for flights to, from, or within Texas through Skiplagged.com's "Book Now" feature, as described in paragraph 12 of Zaman's Declaration.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target, or keep separate in its records, persons with a Texas address. The reference made by Mr. Zaman in his Declaration is to Skiplagged's general operations, which are used by all persons everywhere and not just Texans. Skiplagged provides information to persons who come to its website to find information about airfares, air travel, and online travel offerings so they may book fares or tickets through other travel resources and Skiplagged does not "book" tickets or airfares, but rather facilitates persons booking flights. With this understanding, from August 1, 2018, through August 17, 2023, and according to Google Analytics, 59,426,399 persons accessed Skiplagged's site through 209,618,689 sessions, which resulted in 854,317 bookings for flights that originated and/or terminated in Texas through Skiplagged's "Book Now" feature. Accordingly, such bookings made through Skiplagged's Book Now feature represent approximately 00.408 percent of all sessions on Skiplagged.com during the identified period.

**INTERROGATORY NO. 14**: Identify all "online travel agencies, global distribution systems, and other travel metasearch engines" and any of the other "variety of sources" from whom "Skiplagged obtains American flight and fare information" (as described in paragraphs 10 and 11 of Zaman's Declaration) and describe the technical means and process by which Skiplagged obtains such information.

**RESPONSE:** ████████████████████████████████████████████████████████████████████████████████

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.



**INTERROGATORY NO. 15**: Identify the total number of bookings for which Skiplagged has received commission payments or other financial compensation from other Travel Agencies, and the total amount of such payments, for purchases made by consumers with a Texas address that Skiplagged.com redirected to such other Travel Agency.

**RESPONSE:** In response to this interrogatory, Skiplagged states it does not direct, target, or keep separate in its records, persons with a Texas address.  Skiplagged is not a Travel Agency, so use of the term "other Travel Agencies" is incorrect. With that understanding, from August 1, 2018, through August 17, 2023, Skiplagged is unaware of the total number of bookings through Travel Agencies made by persons referred by Skiplagged. Skiplagged commissions on redirected bookings to Travel Agencies are paid on two models (1) cost per click or "CPC" (*i.e.*, intent to book), the standard advertising revenue model, or (2) cost per action or "CPA" (*i.e.*, successful booking). However, Skiplagged does not collect the requested information with respect to Texas addresses or anywhere else.

**INTERROGATORY NO. 16**: Identify the total number of bookings for which Skiplagged has received commission payments or other financial compensation from other Travel Agencies, and the total amount of such payments, for purchases of flights to, from, or within Texas made by users that Skiplagged.com redirected to such other Travel Agency.

**RESPONSE:** In response to this interrogatory, Skiplagged states it does not direct, target, or keep separate in its records, persons with a Texas address. Skiplagged is not a Travel Agency, so use of the term "other Travel Agencies" is incorrect. With that understanding, from August 1, 2018, through August 17, 2023, Skiplagged is unaware of the total number of bookings through Travel Agencies made by persons referred by Skiplagged. Skiplagged commissions on redirected bookings to Travel Agencies are paid on two models (1) cost per click or "CPC" (*i.e.*, intent to book), the standard advertising revenue model, or (2) cost per action or "CPA" (*i.e.*, successful booking). However, Skiplagged does not collect the requested information with respect to routing for bookings made by Travel Agencies.

**INTERROGATORY NO. 17**:  Identify the number of persons who have signed up for the Skiplagged.com "newsletter" or email subscriber service by entering a "home airport" located in Texas, as prompted on https://skiplagged.com/signup.\

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0150

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target or keeps separate in its records, persons with a Texas address or a "home airport" located in Texas as such. Despite that, zero persons "signed up" for such newsletter or e-mail subscriber service from August 1, 2018, to August 17, 2023, by entering a "home airport" located in Texas. This is because Skiplagged launched the newsletter sign-up page on August 28, 2023, which was after American Airlines filed the Complaint in this action.

**INTERROGATORY NO. 18**: Identify the number of times Skiplagged.com has redirected a user to another Travel Agency to complete a booking for a flight to, from, or within Texas.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target, or keeps separate in its records, persons who fly to, from, or within Texas. Skiplagged is not a Travel Agency, so the use of the term "another Travel Agency" is incorrect. With that understanding, Skiplagged has redirected persons 966,655 times to a Travel Agency (not "another" Travel Agency, as Skiplagged is not a "Travel Agency") to potentially "complete" a booking for a flight to from or within Texas from August 1, 2018, to August 17, 2023, understanding that Skiplagged interprets this Interrogatory to ask for the number of times that Skiplagged.com has redirected persons to an online Travel Agency to complete a booking for a flight involving Texas. Skiplagged does not have information as to how many such referrals resulted in the purchase of airline tickets for flights involving Texas. Each identified booking involves two cities, not necessarily in the same state or country, and "involving Texas" refers to bookings where the trip starts and/or ends in Texas.

**INTERROGATORY NO. 19**: Describe in detail how and from what sources Skiplagged "obtained … the alleged 'American Marks' from [sources other than] American's website" as alleged in paragraph 10 of Zaman's Declaration and at page 13 of Skiplagged's Motion to Dismiss.

**RESPONSE:** In response to this interrogatory, Skiplagged states that paragraph 10 of the Zaman Declaration does not reference American Marks and page 13 of Skiplagged's Motion to Dismiss erroneously cites Zaman Declaration paragraph 10 instead of paragraph 11 for this proposition. Subject to this correction, Skiplagged states that on May 23, 2017, a former employee obtained the American icon from the API response of a Skiplagged advertiser, which Skiplagged understood to be allowed to use and distribute the American icon. Skiplagged's former employee then edited the image to make the background transparent and slightly enlarge the logo. The result is what Skiplagged has been using: https://skiplagged.com/img/airlines-favicon/AA.png.

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0151

**28 U.S.C. § 1746 DECLARATION VERIFYING INTERROGATORY ANSWERS**

"I declare and verify under penalty of perjury that the foregoing responses to Interrogatories are true and correct. Executed on the 12th day of January 2024, in New York City, New York."

Aktarer Zaman
Chief Executive Officer
Skiplagged, Inc.

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 0152

# Exhibit A-6

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-7

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-8

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-9

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-10



Home    Log in »     English ▾    Search AA.com®   ⌕

**American Airlines**

Plan Travel    Travel Information   AAdvantage   

⌂   Home   ›   Legal information

# Legal information

American Airlines offers legal information to assist you with the best possible experience throughout your travels and on our website:

Conditions of carriage »

# aa.com site usage

Thank you for visiting the American Airlines Website titled "aa.com" and if you have done so, downloading the American Airlines Mobile Application (collectively, the "Site"). In return for gaining access to the Site and using it, you agree to be bound by the following Agreement without limitation or qualification, so please carefully review this Agreement before proceeding. If you do not intend to be legally bound by these terms and conditions, do not access and use the Site. American Airlines reserves the right to change this Agreement and to make changes to any of the products or programs described in the Site at any time without notice or liability. Any such revisions are prospectively binding on you and therefore you should periodically visit this page when you use the Site to review the then current Agreement that binds you. American Airlines also reserves the right in its sole and unfettered discretion to deny you access to the Site at any time. American Airlines enters into agreements with third parties from time to time to provide our customers with the opportunity to obtain special services, products or prices offered by the third party. You will not be deemed to be violating this agreement when acting in accordance with the terms and conditions of any such program. Likewise, the terms and conditions in this agreement will be considered broadened to the extent needed to permit such third parties to operate within the terms of a written agreement they have entered into with us. The titles in this Agreement are provided only for your convenience and are not to be used in interpreting the Agreement.

## Intellectual property notifications

Unless otherwise noted, all information, AAdvantage® account information, articles, data, images, passwords, Personal Identification Numbers ("PINs"), screens, text, user names, Web pages, or other materials (collectively "Content") appearing on the Site are the exclusive property of American Airlines Group, Inc., or American Airlines, Inc., or their subsidiaries and affiliates:

- All information, products, services and software contained on or used in the Site ("Content") is Copyright 2019 by American Airlines, Inc. All rights reserved. Please assume that everything you see or read on the Site is copyrighted to, or used with permission by, American Airlines unless otherwise noted.

- The trademarks, logos, service marks, and trade dress (collectively the "Trademarks") displayed on the Site are registered and unregistered Trademarks of American Airlines, Inc. or others.

- Images of people, objects, or places displayed on the Site are either the property of, or used with permission by, American Airlines Group, Inc., or American Airlines, Inc., or their subsidiaries and affiliates.

App'x 0427
10/26/2020, 1:20 PM
AA-SKP-00053437

- American Airlines owns or uses by permission all software contained on the Site, including without limitation all HTML code and Active X controls. Copyright and other laws and international treaty provisions protect this software. The law expressly prohibits any modification, redistribution, or reproduction of the software, and such actions could result in severe civil and criminal penalties. American Airlines will seek and support prosecuting violators to the maximum extent possible.

- You may not copy, display, distribute, download, license, modify, publish, re-post, reproduce, reuse, sell, transmit, use to create a derivative work, or otherwise use the content of the Site for public or commercial purposes. Nothing on the Site shall be construed to confer any grant or license of any intellectual property rights, whether by estoppel, by implication, or otherwise.

- For additional information regarding American's intellectual property, please click on the "Copyright" link at the bottom of any page.

## Your representations and warranties

By using the Site, you represent and warrant that you are 18 years of age or older and possess the legal right and ability to enter into this Agreement and to use the Site in accordance with all of the terms and conditions of this Agreement. You accept financial responsibility for all use of the Site under your name or account, including without limitation all uses of your account by others, including minors living with you. You may allow other members of your household to use the Site under your name or account only if you agree to pay all charges that they incur and to be responsible for all other aspects of their usage. You further agree to supervise all minors who use the Site under your name or account. You agree not to assign, transfer, or sublicense your rights pursuant to this Agreement.

## Your indemnity obligation

You agree to indemnify, defend, and hold harmless American Airlines and its affiliates from and against any and all claims, demands, proceedings, suits and actions, including any related liabilities, obligations, losses, damages, deficiencies, penalties, taxes, levies, fines, judgments, settlements, expenses (including legal and accountants' fees and disbursements) and costs (collectively, "Claims"), based on, arising out of or resulting from your use of the Site, including without limitation any Claims alleging facts that if true would constitute your breach of this Agreement.

## Limitations on your use

American Airlines provides the Site solely to permit you to determine the availability of goods and services offered on the Site and to make legitimate reservations or otherwise transact business with American Airlines, and for no other purposes. The Site is for your personal, non-commercial use. You agree that you will use the Site's services only to make legitimate reservations or purchases for you or for another person for whom you are authorized to act both legally and under the terms of this Agreement.

You agree that without limitation you shall not make any fictitious, fraudulent, or abusive reservation or any reservation in anticipation of demand. In addition, you agree that you shall not make any duplicate or impossible/illogical reservation. (See Conditions of carriage for definitions of Fictitious, Fraudulent or Abusive and Duplicate or Impossible/Illogical reservations.) If American Airlines determines that you have confirmed multiple reservations to one or more destination on or about the same date, American Airlines may without notice cancel all confirmed space associated with the multiple reservations. You agree to abide by the terms and conditions of purchase American Airlines imposes including, but not limited to, payment of all amounts when due and compliance with all rules regarding availability of fares, products, or services. You are completely responsible for all assessments, charges, duties, fees, and taxes arising out of your use of the Site.

App'x 0428
10/26/2020, 1:20 PM
AA-SKP-00053438

Conditions of carriage »

Your account information is owned by and proprietary to American Airlines. While you may access your account information through the Site, you may not give access to your account to any person or entity other than a member of your household or a person that you directly supervise as part of your career or employment. You may not give access to your account to any third party on-line service, including, but not limited to any mileage management service, mileage tracking service, or mileage aggregation service.

You must access your account information directly through the Site and not through a third party Website, including but not limited to any mileage management service, mileage tracking service, or mileage aggregation service. You also violate this Agreement if you enable an AAdvantage member to access account information without visiting the Site.

You agree that you will not misuse the Site. "Misuse" includes, but is not limited to, using the Site to do any of the following:

- Distribute, disseminate, post, or publish any information or material that degrades, embarrasses, harasses, humiliates, intimidates, or threatens any individual or group of individuals on the basis of their age, ancestry, color, ethnicity, marital status, medical condition, mental or physical disability, national origin, race, sex, sexual orientation, union or nonunion affiliation, or any other basis protected by federal, state, or local law or ordinance.

- Abuse, defame, harass, stalk, threaten, or otherwise violate others' legal rights, including but not limited to rights of privacy and publicity.

- Download or upload files that may damage the operation of another's computer, such as computer viruses, corrupt files, or similar software.

- Download or upload files that contain materials, including but not limited to software that violate the intellectual property, privacy, or publicity rights of others unless you own, control, or have been authorized to exercise such rights.

- Misrepresent or omit the origin or source of any file you download or upload.

- Download or upload files that do not contain the posted proprietary language, author attributions, and/or copyright, patent, or trademark notices.

- Distribute, disseminate, post, or publish any indecent, infringing, obscene, or unlawful information or material.

- Engage in any commercial purpose including but not limited to: Advertising or offering to sell any goods or services; conducting contests or surveys; distributing chain letters, or advertising with respect to any Ponzi scheme or pyramid scheme; advertising or offering to sell any business opportunities, direct sales opportunities, employment, independent contractor positions, multi-level marketing opportunities, or securities.

- Post, send, or otherwise disclose confidential information, trade secrets, or other confidential and/or protected proprietary data of any entity or person, including but not limited to American Airlines Group, Inc., American Airlines Inc., or their subsidiaries and affiliates.

- Download or upload files that you know, or reasonably should know, cannot be legally distributed through the Site.

- Upload, download, or otherwise export or re-export software from the Site: (1) to a national or resident of or into any country the U.S. has embargoed, including without limitation, Cuba, Iran, Iraq, Libya, North Korea or Syria; (2) to anyone on the U.S. Treasury Department's Specially Designated Nationals list, or (3) to anyone on the U.S. Commerce Department's Table of Denial Orders.

- Copy or create derivative works from, display, distribute, license, perform, publish, recreate, reproduce, sell, transfer, or transmit any information, products, services, or software obtained by, from, or through the Site.

App'x 0429
10/26/2020, 1:20 PM
AA-SKP-00053439

- Monitor or copy any Content by using any manual process, or any robot, spider, or other automatic device, without first obtaining American Airlines' prior written consent.

- Act as an agent or attorney in fact for any person who is not a member of your immediate household; or your direct supervisor at your place of employment.

- Take any action that will or could impose an unreasonable or disproportionately large load on our site infrastructure.

- Act as a mileage management service, mileage tracking service or mileage aggregation service for any AAdvantage member.

- Access information about any AAdvantage member protected by site log-in and post it on any other Website, with or without that AAdvantage member's consent.

- Utilize an AAdvantage member's password or personal identification number during log-in, unless you are: the AAdvantage member to whom that password or personal identification number is assigned (the "Authorized AAdvantage member"); a family member of the Authorized AAdvantage Member, acting with the Authorized AAdvantage Member's permission; or an employee of the Authorized AAdvantage Member's employer, acting with the Authorized AAdvantage Member's permission.

- Engage in any other conduct that is, or that American Airlines deems to be, in conflict with this Agreement. American Airlines forbids such Misuses, and access of the Site for any such Misuses or other similar purposes is an unauthorized use of the Site.

## No warranty by American Airlines

The Content may contain inaccuracies and/or typographical errors. American Airlines may alter, change or improve the Content at any time and without notice. American Airlines makes no representations or warranties as to the Content's completeness or accuracy, and makes no commitment to update the Content. American Airlines makes no representations about the Content's suitability for any purpose.

YOU USE THE SITE AT YOUR OWN RISK. THE CONTENT IS PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF EXPECTATION OF PRIVACY, FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT OR TITLE. IN NO EVENT SHALL AMERICAN AIRLINES OR ITS AFFILIATES BE LIABLE FOR ANY DAMAGES (WHETHER CONSEQUENTIAL, DIRECT, INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR OTHERWISE) ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THE USE OF OR INABILITY TO USE THE SITE OR FOR ANY OF THE CONTENT OBTAINED THROUGH OR OTHERWISE IN CONNECTION WITH THE SITE, IN EACH CASE REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON CONTRACT, STRICT LIABILITY, TORT OR OTHER THEORIES OF LIABILITY, AND ALSO REGARDLESS OF WHETHER AMERICAN AIRLINES WAS GIVEN ACTUAL OR CONSTRUCTIVE NOTICE THAT DAMAGES WERE POSSIBLE.

American Airlines neither warrants nor represents that your use of information and material on the Site will not infringe upon the intellectual property rights of third parties. American Airlines shall not be liable for any virus or other damage to your computer equipment or other property due to your accessing, browsing, or using the Site or due to your downloading any audio, data, images, materials, pictures, text or video from the Site. Because American Airlines provides services and products in many parts of the world, the Site may refer to certain goods, products, and/or services that are not available in your area. A reference to goods, products, and/or services without limiting their geographic scope does not imply that American Airlines offers or intends to offer those goods, products, and/or services in all locations.

## Use of information you provide American Airlines

Consistent with the American Airlines privacy policy, we ask you to provide us with certain information when you purchase travel or when you take advantage of certain personalized services. You agree that when you provide such information, the information will be accurate. Under no circumstances will you provide false or misleading information. We agree to use this information in a manner consistent with our privacy policy. To review our privacy policy, please click on the "Privacy Policy" link at the bottom of any page.

For use of certain services, we may provide you with a pass code. This pass code is proprietary to and the property of American Airlines. However, you must take precautions to insure the security of your pass code. American Airlines assumes no responsibility for and will not be liable in the event that another person learns your pass code or uses your pass code to cause damage to you.

While American Airlines takes reasonable steps to safeguard and to prevent unauthorized access to your private information, we cannot be responsible for the acts of those who gain unauthorized access, and we make no warranty, express, implied, or otherwise, that we will prevent unauthorized access to your private information. IN NO EVENT SHALL AMERICAN AIRLINES OR ITS AFFILIATES BE LIABLE FOR ANY DAMAGES (WHETHER CONSEQUENTIAL, DIRECT, INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR OTHERWISE) ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, A THIRD PARTY'S UNAUTHORIZED ACCESS TO YOUR INFORMATION, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON CONTRACT, STRICT LIABILITY, TORT OR OTHER THEORIES OF LIABILITY, AND ALSO REGARDLESS OF WHETHER AMERICAN AIRLINES WAS GIVEN ACTUAL OR CONSTRUCTIVE NOTICE THAT DAMAGES WERE POSSIBLE.

## No offer to sell or buy securities

The information on the Site does not constitute an offer to sell, or the solicitation of an offer to buy any securities and must not be relied upon in connection with any investment decision.

## Links to other sites and to the Site

The Site may provide hyperlinks or references to other sites. While American Airlines endeavors to provide links only to sites that are reputable and safe, we take no responsibility for the information, products, or services obtained on such other sites and will not be liable for any damages arising from your access to such sites. American Airlines provides any such links to other sites merely for your convenience and our inclusion of such links and frames in the Site does not imply an endorsement of the linked or framed sites, their content, or the persons or entities operating those sites. Therefore, you assume sole responsibility for using links or pointers to third parties.

American Airlines specifically denies you permission to hyperlink or provide references to the Site, unless you are allowed to do so under a separate written agreement with American Airlines. You are also denied permission to use any trademarked or copyrighted material to provide such hyperlinks or references, unless you are allowed to do so under a separate written agreement with American Airlines. American Airlines bears no responsibility for sites that provide hyperlinks or references to the Site unless those sites are operated by American Airlines.

## Your communication with us

American Airlines will not treat as confidential any communications you send to us by electronic mail or otherwise. American Airlines has no obligation to refrain from publishing, reproducing, or otherwise using your communications in any way and for any purpose.

American Airlines does not accept or consider unsolicited proposals related to its business, including but not limited to proposals for advertising campaigns, logos, names, processes, products, promotions, services, slogans, and

App'x 0431
10/26/2020, 1:20 PM
AA-SKP-00053441

technologies. American Airlines therefore requests that you not send such proposals. Please also refrain from sending original creative artwork, blueprints, demonstratives, designs, layouts, photographs, or samples. American Airlines has adopted this policy to prevent claims that we have copied such unsolicited ideas without authorization, when, in fact, we developed the idea independent of or even long before receiving the unsolicited proposal. If you do send us unsolicited proposals, then do so with the understanding that American Airlines may use any concepts, ideas, inventions, know-how, or techniques that you disclose in those communications for any purpose, including the developing, manufacturing, and/or marketing of goods, products, or services. American Airlines may do so free of any obligation to compensate you for that use.

## Comparison monitoring of on-line chats or telephone conversations with American Airlines

The Site may provide you the ability to have an on-line chat session with American Airlines or with information as to how you can contact American Airlines by telephone. You may use these functions only for business purposes related to the Site. For quality assurance purposes, American Airlines may monitor, record, and/or transcribe the contents of these communications. By contacting American Airlines, you agree that the communication may be monitored, recorded, and/or transcribed and you consent to the monitoring, recording, and/or transcribing. Such records may be kept indefinitely or disposed of at our discretion.

## Your use of Forums

You agree to use any bulletin boards, chat rooms, conferences, or other communication or message facilities ("Forums") contained on the Site only to send and receive material and messages that are proper and related to the particular Forum. You further agree that you will use the Forums in conformity with all applicable laws and this Agreement. You agree that you will not Misuse a Forum.

American Airlines reserves the right to remove at will and without notice any Content on the Site, including anything you post in a Forum. You understand that any use by you of a Forum constitutes a public communication. You understand that American Airlines owns any and all information or material that you post on a Forum. You agree that you waive all of the rights you have to any information or material that you post on a Forum. American Airlines has the right to do whatever it wishes with that information or material, including but not limited to deleting or editing for any reason any posting by you. You further acknowledge that American Airlines does not endorse or sponsor any information or material posted by Forum users, and that American Airlines has no responsibility to approve, review, or screen such information or material.

## Forum for actions, governing law, and procedural restrictions

You agree that this Agreement is made and entered into in Tarrant County, Texas. You agree that Texas law governs this Agreement's interpretation and/or any dispute arising from your access to, dealings with, or use of the Site, without regard to conflicts of law principles. Any lawsuit brought by you related to your access to, dealings with, or use of the Site must be brought in the state or federal courts of Tarrant County, Texas. You agree and understand that you will not bring against American Airlines Group, Inc., American Airlines, Inc., or any of its affiliated entities, agents, directors, employees, and/or officers any class action lawsuit related to your access to, dealings with, or use of the Site.

## Other terms

This Agreement constitutes the entire agreement governing your access to, dealings with, and use of the Site. Of course, separate agreements may attach to any goods, products, or services you obtain, purchase, or use from the Site. In the case of a conflict between this Agreement and any agreement specific to any goods, products, or

App'x 0432
10/26/2020, 1:20 PM
AA-SKP-00053442

services that you obtain, purchase, or use from the Site, the terms of the specific agreement shall govern.

Any failure of American Airlines to assert any rights it may have under this Agreement does not constitute a waiver of our right to assert the same or any other right at any other time or against any other person or entity. If any provision of this Agreement is found to be invalid or unenforceable, then the invalid or unenforceable provision will be stricken from this Agreement without affecting the validity or enforceability of any other provision.

## Acknowledgements

The following information about third-party software used in the American Airlines Mobile Application is provided to you for informational purposes only.

**card.io**

All files are released under the MIT License: The MIT License (MIT) Copyright (c) 2013-2016 PayPal Holdings, Inc.

Permission is hereby granted; free of charge, to any person obtaining a copy of this software and associated documentation files (the "Software"), to deal in the Software without restriction, including without limitation the rights to use, copy, modify, merge, publish, distribute, sublicense, and/or sell copies of the Software, and to permit persons to whom the Software is furnished to do so, subject to the following conditions:

The above copyright notice and this permission notice shall be included in all copies or substantial portions of the Software.

THE SOFTWARE IS PROVIDED "AS IS", WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. IN NO EVENT SHALL THE AUTHORS OR COPYRIGHT HOLDERS BE LIABLE FOR ANY CLAIM, DAMAGES OR OTHER LIABILITY, WHETHER IN AN ACTION OF CONTRACT, TORT OR OTHERWISE, ARISING FROM, OUT OF OR IN CONNECTION WITH THE SOFTWARE OR THE USE OR OTHER DEALINGS IN THE SOFTWARE.

⊙ Back to top

## Help

Contact American

Receipts and refunds

FAQs

Agency reference

Cargo 🗗

Bag and optional fees

Customer service and contingency plans

Conditions of carriage

## About American

About us

Careers 🗗

Investor relations 🗗

Newsroom 🗗

Legal, privacy, copyright

Environmental, social and governance

Combating human trafficking

Browser compatibility

## Extras

Business programs

Gift cards 🗗

American Airlines credit card

Trip insurance

CoBrowse

Earn 50,000 bonus miles after qualifying purchases 🗗

BuyMiles
Start a new adventure with your miles🗗

AVIS 🗗Budget
Up to 35% savings plus AAdvantage® miles 🗗

App'x 0433
10/26/2020, 1:20 PM
AA-SKP-00053443

Web accessibility

 Link opens in new window. Site may not meet accessibility guidelines. AA.com®

App'x 0434
10/26/2020, 1:20 PM
AA-SKP-00053444

# Exhibit A-11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

<u>**DEFENDANT SKIPLAGGED, INC.'S FOURTH AMENDED ANSWER**</u>
<u>**TO PLAINTIFF AMERICAN AIRLINES, INC.'S INTERROGATORY NO. 8**</u>

TO:    Plaintiff, American Airlines, Inc., by and through its attorneys of record, Messrs. Dee J. Kelly, Jr., Lars L. Berg,  J. Austin Franklin, and Ms. Julia G. Wisenberg, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, Texas 76102; Ms. Bina Palnitkar, Greenberg Traurig LLP, 2200 Ross Avenue, Suite 5200, Dallas, Texas 75201; and Mr. Nathan J. Muyskens, Greenberg Traurig, LLP, 2101 L Street, N.W., Suite 1000, Washington, D.C. 20037.

Pursuant to the FEDERAL RULES OF CIVIL PROCEDURE and the Honorable Magistrate Hal Ray's *Order* of May 1, 2024, Defendant, Skiplagged, Inc. ("Skiplagged"), hereby serves this, its *Fourth Amended Answer to Plaintiff American Airlines, Inc.'s Interrogatory No. 8.*

**INTERROGATORY NO. 8:**

Identify all instances in which a person has booked, ticketed or purchased a ticket on an American-marked flight through or facilitated by Skiplagged.com, including by providing, without limitation, the purchasers' name/identity, location, all PNR Data, any other personal identifying information, flight/itinerary information, reservation numbers, amounts paid by the customer, dates of purchase, and dates of travel.

**FOURTH AMENDED ANSWER:**

Skiplagged does not "book" airfares as such and Skiplagged does not purchase or sell American tickets. Skiplagged facilitates booking of flights by providing information to users of Skiplagged.com to find information about airfares, air travel, and online offerings so that they may book fares or tickets with travel resources. Given this:

---

App'x 0436

(1)     Skiplagged states that while it has certain information in its database regarding the number of bookings "facilitated" through its "Book Now" feature, the number of bookings facilitated by Skiplagged redirecting users to online travel agencies is unknown;

(2)     The number of instances in which Skiplagged "facilitated" the booking of an American flight for customers from August 1, 2018, to August 17, 2023, pursuant to the "Book Now" feature, is 1,376,927;

(3)     Skiplagged previously produced over 2,000 documents containing information responsive to this Interrogatory, including internal and customer emails that contain a customer's name, record locator number, fees paid etc. For example, these documents include,

SKP00042966-42968, 00029050-51, 00042959-42972, 43027-43031, 84916, 84918, 82655-56, 5284, 97507, 84678-84680, 84681-84683, 80522, 5285-5286, 9664, 81603-81605, 54848-850, 1863-64, 87332-87335, 9666-67, 5277-78, 86009, 3942-3945, 3946-3948, 83955-56, 2418-20, 28403-04, 9704-9706, 14207, 100887-88, 14220-14221, 83953-54, 2669-2671, 53979, 94842-94859, 100675-78, 100665-74, 50524-41, 9367-72, 54880-54883, 100351-100357, 100340-350, 100138, 54886-889, 90020-25, 85481-85484, 85188-85191, 82650-51, 90494-98, 100116-20, 99852-870, 100875-77, 100868-874, 99315-320, 99294-99314, 94226-94231, 48253-58, 25672-75, 84893-96, 84031-36, 99909-99915, 99899-99908, 100039-10045, 100029-38, 99423-27, 99407-422, 99269-74, 99248-68, 98810-98817, 98801-98809, 98411-12, 98413-17, 10572-75, 9399-9402, 84020-25, 90393-95, 87075-87077.

(4)     Skiplagged will extract from its database and provide the following information as to American customers who have used the "Book Now" feature, except pursuant to Magistrate Judge Ray's December 19, 2023 Order, customers' Social Security numbers or credit card numbers:

    a.     PNR Data, as defined in AA's Requests except as limited below;

    b.     Amount expected to be charged to the customer for the American Ticket; and

    c.     Amount of the expected service fee and accompanying information such as refund of such fees or chargeback amounts.

    Skiplagged does not have the ability to provide the following: (1) frequent flier and benefit information, (2) travel agency/travel agent information, (3) code share information, (4) split/divide information, (5) travel status of

DEFENDANT SKIPLAGGED, INC.'S FOURTH AMENDED ANSWER TO
PLAINTIFF AMERICAN AIRLINES, INC.'S INTERROGATORY NO. 8                Page 2
G:\Shared drives\FILES\SKIPLAGGED adv. AA\DISCOVERY\FOURTH AMENDED ANSWER TO INT. NO. 8.wpd

App'x 0437

passenger information, (6) ticketing information, (7) baggage information, (8) seat numbers, (9) OSI and SSR information, (15) APIS information, (10) historical changes to PNR, and (11) baggage fees.

Respectfully submitted,

By:     /s/ *William L. Kirkman*
        William L. Kirkman
        State Bar No. 11518700
        billk@kirkmanlawfirm.com
        Preston B. Sawyer
        State Bar No. 24102465
        prestons@kirkmanlawfirm.com
        KIRKMAN LAW FIRM, PLLC
        201 Main Street, Suite 1160
        Fort Worth, Texas 76102
        Telephone:    (817) 336-2800
        Facsimile:    (817) 877-1863

        Aaron Z. Tobin
        State Bar No. 24028045
        atobin@condontobin.com
        Kendal B. Reed
        State Bar No. 24048755
        kreed@condontobin.com
        Abigail R.S. Campbell
        State Bar No. 24098959
        acampbell@condontobin.com
        CONDON TOBIN SLADEK THORNTON
          NERENBERG PLLC
        8080 Park Lane, Suite 700
        Dallas, Texas 75231
        Telephone:    (214) 265-3800
        Facsimile:    (214) 691-6311

**DEFENDANT SKIPLAGGED, INC.'S FOURTH AMENDED ANSWER TO PLAINTIFF AMERICAN AIRLINES, INC.'S INTERROGATORY NO. 8**                Page 3
G:\Shared drives\FILES\SKIPLAGGED adv. AA\DISCOVERY\FOURTH AMENDED ANSWER TO INT. NO. 8.wpd

App'x 0438

Darin M. Klemchuk
State Bar No. 24002418
darin.klemchuk@klemchuk.com
KLEMCHUK PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone:      (214) 367-6000
Facsimile:      (214) 367-6001

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

**DEFENDANT SKIPLAGGED, INC.'S FOURTH AMENDED ANSWER TO**
**PLAINTIFF AMERICAN AIRLINES, INC.'S INTERROGATORY NO. 8**          Page 4
G:\Shared drives\FILES\SKIPLAGGED adv. AA\DISCOVERY\FOURTH AMENDED ANSWER TO INT. NO. 8.wpd

App'x 0439

**28 U.S.C. § 1746 DECLARATION VERIFYING INTERROGATORY ANSWER**

"I declare and verify under penalty of perjury that the foregoing Amended Answers to Interrogatory No. 8: (1)–(2) and (4) are true and correct

Executed on the 28 day of May, 2024, in Fort Worth, Texas."

Aktarer Zaman
Chief Executive Officer
Skiplagged, Inc.

**DEFENDANT SKIPLAGGED, INC.'S FOURTH AMENDED ANSWER TO PLAINTIFF AMERICAN AIRLINES, INC.'S INTERROGATORY NO. 8**
G:\Shared drives\FILES\SKIPLAGGED adv. AA\DISCOVERY\FOURTH AMENDED ANSWER TO INT. NO. 8.wpd

Page 5

App'x 0440

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 28, 2024, a true and correct copy of the foregoing was served by e-mail upon all counsel of record as indicated:

Messrs. Dee J. Kelly, Jr., Lars L. Berg, J. Austin Franklin,
  and Ms. Julia G. Wisenberg
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Ms. Bina Palnitkar
Greenberg Traurig LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

Mr. Nathan J. Muyskens
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037

Messrs. Aaron Z. Tobin and Kendal B. Reed
  and Ms. Abigail R.S. Campbell
Condon Tobin Sladek Thornton Nerenberg PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231

Mr. Darin M. Klemchuk
Klemchuk PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206

*/s/William L. Kirkman*
William L. Kirkman

**DEFENDANT SKIPLAGGED, INC.'S FOURTH AMENDED ANSWER TO**
**PLAINTIFF AMERICAN AIRLINES, INC.'S INTERROGATORY NO. 8**                    Page 6
G:\Shared drives\FILES\SKIPLAGGED adv. AA\DISCOVERY\FOURTH AMENDED ANSWER TO INT. NO. 8.wpd

App'x 0441

# Exhibit A-12

*Dr. Yoram (Jerry) Wind*
*President, Wind Associates*
*1834 Delancey Place*
*Philadelphia, PA 19103*
*Tel: (610) 642-2120*
*E-Mail: windj@wharton.upenn.edu*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## EXPERT REPORT OF PROFESSOR YORAM (JERRY) WIND

### TABLE OF CONTENTS

I.    BACKGROUND AND OBJECTIVES ...................................................................................... 3

II.   QUALIFICATIONS ................................................................................................................ 5

III.  SUMMARY OF OPINION .................................................................................................... 7

IV.   METHODOLOGY ................................................................................................................ 8

    A.    The Voice of the Consumer – The Consumer Experiments ............................................ 8

        1.   The Research Design ................................................................................................ 8

        2.   Universe and Sample ............................................................................................... 9

        3.   The Stimuli ............................................................................................................ 10

        4.   The Questionnaire ................................................................................................. 11

        5.   Data Collection and Quality Control .................................................................... 27

        6.   Analysis ................................................................................................................. 28

    B.    Validating the consumer experiments with other data and relevant marketing and consumer
        behavior theories and findings ..................................................................................... 28

        Consumer complaints to AA about Skiplagged re confusion and perceived deception. .............. 28

        Consumer complaints to Skiplagged re confusion and perceived deception. ................................ 29

        The sampled data, when projected to the universe of complaints to the nearest thousand, suggests
        approximately 11,000 of the complaints reflect deception and/or confusion. ................................ 30

        Consumer posts on social networks illustrating confusion and deception. ..................................... 30

        Consumer behavior and advertising theories and findings that support the validity of our empirical
        findings. ........................................................................................................................................ 30

V.    FINDINGS ............................................................................................................................ 31

    A.    The results of the consumer experiments are presented in the five sections corresponding to the
        five key areas of interest addressed by the experiments. ............................................. 31

        1.   Consumers' awareness and usage of Skiplagged (vs. Expedia) .................................... 31

        2.   Consumers' perceptions of Skiplagged (vs. Expedia) ............................................ 31

        3.   Consumers' beliefs re Skiplagged's (Expedia) association with AA ........................... 37

        4.   Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia) ...................... 42

        5.   Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden
        city offer. ................................................................................................................ 52

    B.    Other Data supporting the Experimental Findings ...................................................... 58

        1.   Illustrative actual confusion and perceived deception in consumer complaints to AA .............. 58

        2.   Illustrative actual confusion and perceived deception in consumer complaints to Skiplagged ... 61

        3.   Illustrative actual confusion and perceived deception in consumer posts on social media .......... 67

        4.   Consumer behavior and advertising and marketing theories and findings that support the validity
        of our empirical findings. ....................................................................................... 85

VI.   CONCLUSION ..................................................................................................................... 87

App'x 0444

## <u>APPENDICES</u>

**Appendix A:** Biography, Resume, Publications List, and Cases in Which Dr. Wind has Testified in Previous 4 Years

**Appendix B:** Materials Relied Upon

**Appendix C:** The Consumer Experiments

> **C-1.** The Panel
>
> **C-2.** The Stimuli
>
> **C-3.** Formatted Questionnaire
>
> **C-4.** Screenshots of the programmed questionnaire
>
> **C-5.** Screening Results
>
> **C-6.** Computer Tabulations
>
> **C-7.** Verbatim Responses
>
> **C-8.** The Data
>
> **C-9.** Data Listing

I.    **BACKGROUND AND OBJECTIVES**

A.    **Background**

For decades, American Airlines, Inc. ("American" or "AA") has been using its federally registered trade name and trademark "American Airlines" and its registered flight symbol design (collectively, the "American Marks") to promote its products and services throughout the world. American carefully protects its flight, fare, schedule, and inventory data and content by providing this information only to its authorized agents, and by taking measures to ensure that only authorized agents of American are permitted to act on its behalf, to use and display its protected Marks, data, and content, and to issue tickets to passengers on American flights.

Skiplagged, Inc. ("Skiplagged") owns and operates the website Skiplagged.com. Skiplagged is not an authorized agent of American. Instead, Skiplagged obtains data on American flights by obtaining data from other agents of American (in apparent violation of their contracts with American), and/or by developing computer programs to obtain this information from American's website. Skiplagged.com allows users to search for, identify, and purchase and book American flights directly on Skiplagged.com. In doing so, Skiplagged uses and displays on its website American's Marks and American's fare, schedule, inventory, ticketing, and flight data. Skiplagged does not inform users that it is not authorized to issue tickets to passengers on American's behalf. Because it is not an agent, Skiplagged is not authorized to use American's marks, data or content to market, display or sell American tickets or services.

On August 17, 2023, American filed a lawsuit against Skiplagged, asserting, among other claims, trademark infringement and false designation of origin/unfair competition. American seeks an injunction to enjoin Skiplagged from, among other things, continuing its infringing use of American's Marks; publishing American's flight/fare content on Skiplagged's website; selling or

3

re-selling American flights, fares, or other products; holding itself out as an authorized agent of American or continuing to act in an agency capacity for American; or displaying or otherwise using the American Marks for commercial gain.

Having reviewed the complaint and various screenshots of American's and Skiplagged's websites, I designed multiple consumer survey experiments to evaluate (1) the likelihood and degree of confusion among consumers as to Skiplagged's affiliation, connection, or association with American and/or as to American's sponsorship, approval, or authorization of Skiplagged's services in offering and facilitating the sale of American flights; and (2) the degree of consumer deception associated with Skiplagged's offerings. As explained below and based on my analysis of the results of these consumer surveys, I have concluded with a reasonable degree of expert certainty that Skiplagged's activities (1) have generated confusion in the marketplace regarding Skiplagged's affiliation, connection, or association with American and American's sponsorship, approval, or authorization of Skiplagged's services, and (2) deceive consumers about the risks associated with its products/services.

### B.   Objectives

I was retained by Greenberg Traurig, LLP, and Kelly Hart & Hallman, LLP, counsel for American, to assess whether, and to what extent, Skiplagged's published content and offerings on Skiplagged.com relating to American flights has generated confusion and deception in the marketplace, including as it relates to Skiplagged's perceived association with and/or authorization or sponsorship from American. To accomplish this objective, I considered whether Skiplagged's uses of the American Marks and data were likely to cause, or have caused, confusion amongst consumers who have booked airline tickets using a third party website in the past year, or who plan to do so in the coming year.

The purpose of these experiments was to determine, respectively, whether participants: (A) exhibited confusion about whether Skiplagged is an authorized agent of American; (B) exhibited other confusion about the relationship between Skiplagged and American; (C) exhibited confusion or deception about the fees and total cost charged by Skiplagged; and (D) exhibited confusion about the risks involved in buying "hidden city" tickets from Skiplagged.

## II.  QUALIFICATIONS

I am the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania. I joined the Wharton staff in 1967, upon receipt of my doctorate from Stanford University. I took Emeritus status in July 2017. I am also the President of Wind Associates Inc, A marketing and business consulting firm.

Publications: I have been a regular contributor to the marketing field, including 30 books and more than 300 papers, articles, and monographs. My books and articles, which are frequently cited by other authors, encompass marketing strategy, marketing research, new product and market development, consumer behavior, organizational buying behavior, advertising, and global marketing strategy.

Editorships: I have served as Editor-In-Chief of the Journal of Marketing, as a guest editor of the major marketing journals, and on the policy boards of the Journal of Consumer Research and Marketing Science. I have been on the editorial boards of the major marketing journals. I founded Wharton School Publishing and served as its first editor from 2003 to 2008. Currently, I server as guest editor of a special issue of Management Business Review (MBR) on AI for Customer Engagement.

Teaching, Research, and Consulting: Since 1967, I have taught MBA, Ph.D., and executive development courses on a wide range of marketing topics. I am currently developing a Coursera course on Creativity (for all ages and professions). I was the founding Director of the Wharton

5

think tank – The SEI Center for Advanced Studies in Management and directed it from 1988 to 2018. I have consulted extensively for Fortune 500 firms on marketing issues and marketing-driven business strategy. I am a trustee of Philadelphia Museum of Art, Curtis Institute of Music and Grounds for Sculpture. I am also an advisor for startups and non-profit organizations. In my teaching, research, consulting, editorial, and university positions, I have designed, conducted, and evaluated thousands of marketing and consumer research studies, including for use by businesses.

Awards: I have received numerous awards for my work, including the four major marketing awards—The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007)—and received the first Faculty Impact Award by Wharton Alumni (1993). I was elected to the Attitude Research Hall of Fame in 1984 and have also been honored with research awards, including two Alpha Kappa Psi Foundation awards. In 2001, I was selected as one of the ten grand Auteurs in Marketing, and in 2003 I received the Elsevier Science Distinguished Scholar Award of the Society for Marketing Advances. In 2010, I was selected as one of the Ten Legends of Marketing and Sage Publication published eight volumes of my writings. In 2017, I was one of four people inducted into the Marketing Hall of Fame, an honor awarded annually to individuals who have made an outstanding contribution to the marketing profession. In 2021, I received an Honorary Doctorate from Reichman University (Israel), a university I co-founded in 1994. More recently (2023) I received the International Marketing Trend Conference Award.

Expert Witness Experience: I have conducted and evaluated marketing and consumer research for use in litigation, have been qualified as a marketing and survey research expert in court proceedings, and have testified at deposition and trial in federal courts.

<u>Relevant Qualifications for this Case</u>: Academic and Industry expert Re marketing, marketing strategy, consumer behavior, marketing research, and advertising.

Attached as **Appendix A** to this Report is a copy of my brief biography, my full resume, a list of my publications, and a list of cases in which I testified since 2018.

<u>Compensation</u>: My compensation is at my regular consulting rate of $1200 per hour and is not contingent on my opinions or the outcome of this litigation.

## III.   **SUMMARY OF OPINION**

My expert opinion is that Skiplagged' s hidden city and non-hidden city ticket offerings have the following negative impact on consumers:

a.   Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American (either as an authorized travel agent for American or as having some other direct relationship with American);

b.   Skiplagged deceives consumers into believing that purchasing a regular, non-hidden city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly; and

c.   Skiplagged deceives consumers of hidden city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden city tickets.

My conclusions are based on the following:

1.   Two consumer experiments in which test groups saw a Skiplagged.com web site offering for either a hidden city flight or non-hidden city ticket. Two control groups saw a corresponding ticket offered on Expedia.com.

   •   The findings of these experiments showed significant levels of confusion and deception among consumers.

2.   Four independent sets of data, all of which validate the findings of the consumer experiments. These included:

   a.   Actual complaints to AA;
   b.   Actual complaints to Skiplagged;
   c.   Analysis of consumer conversations on social networks; and
   d.   Insights from consumer behavior and advertising and marketing theories and findings.

7

## IV.    METHODOLOGY

To determine if Skiplagged's practices lead consumers to (a) perceive that they are an authorized agent of (or have other association with) American Airlines and (b) be deceived, I designed and implemented two consumer experiments and validated them against marketing and consumer behavior theories and findings.

### A.    The Voice of the Consumer – The Consumer Experiments

Because Skiplagged has two different airfare offerings—regular flight tickets and "hidden city" tickets—I designed two related experiments, one for each type of offering. The experiments also were designed to test the validity of the two major questions – namely, whether consumers (a) perceive Skiplagged as an authorized agent of American or having some other association with American, and (b) are deceived by Skiplagged's advertising messages and offerings.

Regarding question (b), this included two conditions:

(i)    For the regular (non-hidden city) tickets: Skiplagged's claim of providing the "cheapest regular flights;" and

(ii)    For the hidden city tickets: the adequacy of Skiplagged's disclosures to consumers regarding the risks associated with booking a hidden city ticket.

To assure the validity of the findings, the research design relied heavily on responses to open-ended questions.

### 1.  The Research Design

After qualifying the respondents (see universe and sample sections), the main questionnaire was based on 5 major and intercalated parts:

1. Showing the respondents in the test group the Skiplagged flight offering and showing the respondents in the control group the Expedia flight offering (see the Stimuli section) and assuring that they could see it clearly (Q0).

2. Asking an open-ended question with a follow up probing on how the respondent would

App'x 0451

describe the offering to a friend (Q1).

3. Asking the typical confusion questions regarding connection or association (Q3) and permission or authorization (Q4-6), with follow up probes of the reasons for their response.

4. Asking a series of questions about the respondent's beliefs regarding the Skiplagged (or Expedia) offerings and the reasons for such beliefs (Q7-12), their awareness and usage of Skiplagged (or Expedia) (Q13), and feelings about Skiplagged's (or Expedia's) offerings and the reasons for such beliefs (Q14).

5. Showing the offering on AA.com for the same/corresponding flight ticket and asking the respondent about their reactions after having this information to compare to the Skiplagged (or Expedia) offering (Q15), their intentions to buy their next airline ticket from Skiplagged, and the reasons for their response (Q16).

The design was based on two experiments:

a. Using the Skiplagged regular ticket as the stimulus for the test group vs. the ticket offering on Expedia for the same/corresponding flight, as a control group; and

b. Using the Skiplagged hidden city ticket as the stimulus for the test group vs. the ticket offering on Expedia for a corresponding flight to the intended destination, as a control group.

Expedia was chosen as a control to show what the responses would be as to an *authorized agent* of American. The interpretation of the difference between the test and control groups is that the closer the results for Skiplagged are to those of Expedia the greater the perceived confusion and deception.

### 2. Universe and Sample

**The Universe**

The universe for each study included U.S. consumers who (a) booked a commercial flight in the past 12 months and/or intended to do so in the next 12 months, and (b) booked or intend to book their tickets through an online ticket website.

**The Sample**

The sample was drawn from the panel of Prodege. See Appendix C-1. An initial sample

9

matching the census gender, age, race, and geography assured the representativeness of the sample.

It was further screened for the relevant study criteria:

- Passed the CAPTCHA test (to ensure all participants were humans).

- They or members of their families do not work for
  (ii)   An advertising agency or public relations firm,
  (iii)  A market research firm or the market research department of a company,
  (iv)   A marketing firm or the marketing department of a company law or legal firm
  (v)    An airline, travel agency, or a company that sells airline and travel tickets

- If they wore glasses or contact lenses when using a mobile device, laptop, or desktop computer, they had them on.

The total sample included 600 respondents across all studies, as shown below.

**Exhibit A**

**Sample Size**

|  | Test | Control | Test | Control |
|---|---|---|---|---|
|  | Skiplagged Ticket | Expedia Ticket | Skiplagged Hidden City Ticket | Expedia Ticket |
| Sample Size | 146 | 155 | 144 | 155 |

### 3.   The Stimuli

The stimuli are included in Appendix C-2 and were embedded in the 4 programmed questionnaires. Appendix C-3 includes the screen shots of one of these.

To ensure that a fair and representative sample booking was used as the stimuli for the consumer survey, we (a) generated 200 different pairings of randomized "tier 1" airports across the country to use for the respective origin/destination, (b) generated and assigned randomized flight dates for each pairing, (c) ran searches on Skiplagged.com (for one-way flights) using each set of randomized flight criteria, (d) simulated 200 "test buys" on Skiplagged.com by selecting the least expensive American flight option shown in the search results and proceeding through the booking process up to the final checkout page, and (e) recorded the final total cost charged by Skiplagged for each booking. Contemporaneous with each test booking on Skiplagged.com, we

searched for the same corresponding flights/itineraries on AA.com and recorded the total cost charged by American for each. Of those 200 samples, 41 of the test bookings were for a "hidden city" flight ticket. Then, to determine the particular booking that would provide the most realistic and representative stimuli for the survey, we (1) separated the hidden city bookings from the non-hidden city bookings, (2) calculated the average price differential (between Skiplagged.com vs. AA.com) across all hidden city bookings, and across all non-hidden city bookings, respectively, and (3) selected the hidden city test booking that was closest to the average price difference across the hidden city bookings, and selected the non-hidden city test booking that was closest to the average price difference across the non-hidden city bookings. Additionally, upon identifying and selecting the most representative hidden city booking and non-hidden city booking to use for the survey, we also collected and used as control stimuli the corresponding offerings on Expedia.com for the same flights shown on the respective Skiplagged.com and AA.com stimuli.

For the non-hidden city bookings, the average price differential was $12.62 more expensive on Skiplagged.com than AA.com (the median difference was $10.00 more on Skiplagged.com than AA.com). Thus, the stimuli selected for the survey was a booking that was $10.00 more expensive on Skiplagged.com than AA.com. For the hidden city bookings, the average price differential was $62.46 cheaper on Skiplagged.com than AA.com (and the median was $28.80 cheaper on Skiplagged.com than AA.com). Thus, based on the specific test buys simulated, the stimuli selected for the survey was a booking that was $55.00 cheaper on Skiplagged.com than AA.com. The selected stimuli are included in appendix C2 and in the programmed questionnaire.

### 4.  The Questionnaire

#### - SCREENER -

**INTRO**
Thank you for your interest in today's survey.

We value your opinions, and all of your answers will be held in the strictest confidence, so do not be afraid to answer

App'x 0454

each question honestly. Remember, there are no right or wrong answers.

While you are completing the survey, we ask that you do not look at windows, tabs, or applications on any device. Please do not search the Internet or ask others for help regarding any questions. We are only interested in your own opinions. If you don't know the answer, that is okay, please select "Don't know" and move forward to the next question. Do not guess your answer.

**[PN: ADD IN "CAPTCHA" AND INSTRUCTIONS.]**

**SA1.**
First, please select the type of device you are using right now to access this page.
*Select one.*

| A laptop or desktop computer | 1 | |
|---|---|---|
| A tablet (e.g., Samsung Galaxy Note or Apple iPad) | 2 | |
| A smartphone (e.g., Samsung Galaxy or Apple iPhone) | 3 | |
| Other device | 4 | **[PN: TERMINATE HERE]** |

**[PN: TERMINATE IF SA1=4.]**

**S0.**
Before you continue, please read the following confidentiality and non-disclosure statement, and answer the question that follows.

I recognize and fully understand that the survey content is of confidential nature. Therefore, I agree that both during and after the study, I will not disclose any of the information referenced in the interview and will not discuss this survey with anyone else. Also, I will not identify the nature of the product or service described in this survey.

Do you agree or disagree?
*Select one.*

| I agree | 1 | |
|---|---|---|
| I disagree | 2 | **[PN: TERMINATE HERE]** |

**[PN: MUST AGREE AT S0 – PUNCH 1, OTHERWISE TERMINATE.]**

**S01.**
Do you wear glasses or contact lenses when you're using a computer, tablet, or smartphone?
*Select one.*

| Yes | 1 |
|---|---|
| No | 2 |

**[PN: ASK IF WEAR GLASSES OR CONTACT LENSES (S01=1)]**
**S02.**
Are you currently wearing your glasses or contact lenses?
*Select one.*

| Yes | 1 | |
|---|---|---|
| No | 2 | **[PN: STOP/HOLD HERE]** |

12

App'x 0455

**[PN: IF NO STOP/HOLD ABOVE (S02=2), DISPLAY BELOW AND ALLOW RESPONDENT TO START AGAIN WHEN RETURNING.]**
Please put on your glasses/contact lenses before you proceed with the survey.

**INTRO.**
Now, we'd like to ask you a few questions to make sure the survey is relevant to you.

**S1.**
Do you or does anyone in your household work for any of the following industries or companies?
*Select all that apply.*

| | | |
|---|---|---|
| An advertising agency or public relations firm | 1 | **[PN: TERMINATE AFTER S7c]** |
| A market research firm or the market research department of a company | 2 | **[PN: TERMINATE AFTER S7c]** |
| A marketing firm or the marketing department of a company | 3 | **[PN: TERMINATE AFTER S7c]** |
| An airline, travel agency, or a company that sells airline and travel tickets | 4 | **[PN: TERMINATE AFTER S7c]** |
| Any financial services company such as a bank, mutual fund company, brokerage firm, or investment firm | 5 | |
| A company that manufactures technology or electronics products | 6 | |
| A company that manufactures, distributes, or sells food or beverage products | 7 | |
| None of the above | 99 | **[PN:ANCHOR,EXCLUSIVE]** |

**[PN: IF WORK IN A RELATED INDUSTRY (PUNCHES 1-4), TERMINATE AFTER S7c. OTHERWISE, CONTINUE.]**

**S2a.**
What is your age?
*Enter a whole number.*

| | | |
|---|---|---|
| _____ | 1 | |
| Prefer not to answer | 98 | **[PN: TERMINATE]** |

**[PN: Allow 0-99. MUST BE 18+. TERMINATE HERE IF UNDER 18.]**

**[PN: HIDDEN QUESTION]**
**hS2b.**
**AGE**

| | | | |
|---|---|---|---|
| Under 18 | 1 | **S2a < 18** | **[PN: TERMINATE HERE]** |
| 18-24 | 2 | **S2a = 18-24** | |
| 24-34 | 3 | **S2a = 25-34** | |
| 35-44 | 4 | **S2a = 35-44** | |
| 45-54 | 5 | **S2a = 45-54** | |
| 55-64 | 6 | **S2a = 55-64** | |
| 65+ | 7 | **S2a = 65+** | |
| Prefer not to answer | 98 | **S2a = 98** | **[PN: TERMINATE HERE]** |

**[PN: MUST BE 18+ TO QUALIFY. TERMINATE HERE IF UNDER 18 OR PREFER NOT TO ANSWER.]**

**S3.**
Please record your gender identity.
*Select one.*

| | |
|---|---|
| Male | 1 |
| Female | 2 |

| Non-binary | 97 |
|---|---|
| Other (Specify _____) | 98 |
| Prefer not to answer | 99 |

**S4.**

Are you of Spanish, Hispanic or Latino/a origin?

*Select one.*

| Yes | 1 |
|---|---|
| No | 2 |

**S5.**

Which of the following ethnic groups do you identify most closely with?

*Select one.*

| Asian/Pacific Islander | 1 |
|---|---|
| Black/African American | 2 |
| Native American or Alaska Native | 3 |
| White/Caucasian | 4 |
| Other (Specify)_____ | 97 |
| Prefer not to answer | 98 |

**S6.**

In which state do you reside?

*Select one.*

**[PN: USE DROP DOWN LIST]**

**[PN: HIDDEN QUESTION]**
**S6a.**
**REGION**

| Northeast | 1 |
|---|---|
| South | 2 |
| Midwest | 3 |
| West | 4 |

**[PN: THE FOLLOWING QUESTIONS SHOULD BE SET UP AS A GRID WITH COLUMNS; YES, NO, DON'T KNOW. PLEASE ROTATE SO HALF THE RESPONDENTS WILL SEE YES/NO AND THE OTHER HALF WILL SEE NO/YES. KEEP ORDER OF YES/NO CONSISTENT THROUGHOUT ENTIRE SURVEY AND RECORD ORDER.]**

**S7a.**

Which, if any, of the following activities **did you do in the past 12 months**? For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER: Yes, No,]** or you "Don't know."

*Select all that apply.*

**[PN: RANDOMIZE]**

| | | Yes | No | Don't know |
|---|---|---|---|---|
| 1 | Booked a hotel room | (1) | (2) | (3) |
| 2 | Booked an airline ticket (on a commercial airline) | (1) | (2) | (3) |

| 3 | Booked a car rental | (1) | (2) | (3) |
| 4 | Made a restaurant reservation | (1) | (2) | (3) |
| 5 | Made an appointment for eye care | (1) | (2) | (3) |
| 6 | Made an appointment for auto service | (1) | (2) | (3) |

**S7b.**

Which, if any, of the following activities are you **likely to do in the next 12 months**? For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No,**]** or you "Don't know."

*Select all that apply.*

**[PN: HOLD IN THE SAME ORDER AS S7a]**

| | | Yes | No | Don't know |
|---|---|---|---|---|
| 1 | Book a hotel room | (1) | (2) | (3) |
| 2 | Book an airline ticket (on a commercial airline) | (1) | (2) | (3) |
| 3 | Book a car rental | (1) | (2) | (3) |
| 4 | Make a restaurant reservation | (1) | (2) | (3) |
| 5 | Make an appointment for eye care | (1) | (2) | (3) |
| 6 | Make an appointment for auto service | (1) | (2) | (3) |

**[PN: HIDDEN QUESTION]**
**S7c.**

Commercial airline reservation status

| Made a commercial airline reservation in the last 12 months only | 1 | **S7a_2=1 AND S7b_2=2 OR 3** | |
| Will make a commercial airline reservation in the next 12 months only | 2 | **S7a_2=2 OR 3 AND S7b_2=1** | |
| Both – reservation made in last 12 months AND will make in next 12 months | 3 | **S7a_2=1 AND S7b_2=1** | |
| Neither | 4 | **S7a_2=2 OR 3 AND S7b_2=2 OR 3** | **[PN: TERMINATE]** |

**[PN: CONTINUE IF MADE OR INTEND TO MAKE A COMMERCIAL AIRLINE RESERVATION (S7c=1-3). OTHERWISE, TERMINATE.]**

**S8a.**
**[ASK IF MADE AN AIRLINE RESERVATION IN THE PAST 12 MONTHS (S7c=1 OR 3)]**

In the **past 12 months**, when you made a reservation for an airline, which of the following methods did you use to make your reservation? For each option, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No**]** or you "Don't know."

*Select one response for each option.*

In the past 12 months…
**[PN: RANDOMIZE]**

| | | Yes, I made a reservation for an airline through this method | No, I did not make a reservation for an airline through this method | Don't know |
|---|---|---|---|---|
| 1 | Through an online ticket website | 1 | 2 | 3 |
| 2 | Directly through an airline | 1 | 2 | 3 |
| 3 | Through a travel agency | 1 | 2 | 3 |
| 4 | Through a credit card company | 1 | 2 | 3 |

| | | | | |
|---|---|---|---|---|
| 5 | Other (Specify_____) | 1<br>[PN: ANCHOR ROW] | 2 | 3 |

**S8b.**
**[ASK IF PLANNING ON MAKING AN AIRLINE RESERVATION IN THE NEXT 12 MONTHS (S7c=2 OR 3)]**

In the **next 12 months**, when you make a reservation for an airline, which of the following methods will you use to make your reservation? For each option, please answer **[MATCH ASSIGNED YES/NO ORDER: Yes, No]** or you "Don't know."
*Select one response for each option.*

In the next 12 months…
**[PN: HOLD IN THE SAME ORDER AS S8a]**

| | | Yes, I will make a reservation for an airline through this method | No, I will not make a reservation for an airline through this method | Don't know |
|---|---|---|---|---|
| 1 | Through an online ticket website | 1 | 2 | 3 |
| 2 | Directly through an airline | 1 | 2 | 3 |
| 3 | Through a travel agency | 1 | 2 | 3 |
| 4 | Through a credit card company | 1 | 2 | 3 |
| 5 | Other (Specify) | 1<br>[PN: ANCHOR ROW] | 2 | 3 |

**[PN: HIDDEN QUESTION]**
**S8c.**
**Online Ticket Website Usage Status**

| | | | |
|---|---|---|---|
| Used online ticket website in the last 12 months only | 1 | **S8a_1=1 AND S8b_1=2 OR 3 OR BLANK** | |
| Will use an online ticket website in the next 12 months only | 2 | **S8a_1=2 OR 3 OR BLANK AND S8b_1=1** | |
| Both – Used online ticket website in the last 12 months AND will use an online ticket website in the next 12 months | 3 | **S8a_1=1 AND S8b_1=1** | |
| Neither | 4 | **S8a_1=2 OR 3 OR BLANK AND S8b_1=2 OR 3 OR BLANK** | **[PN: TERMINATE]** |

**[PN: CONTINUE IF PURCHASED OR INTEND TO PURCHASE TICKET THROUGH AN ONLINE TICKET WEBSITE (S8c=1-3). OTHERWISE, TERMINATE.]**

**S9.**
Which of the following sets of stripes appears in this order: RED, YELLOW, GREEN, BLUE?
*Select one.*
**[RANDOMIZE]**
**[PN: PLEASE SHOW 4 SETS OF STRIPES OF 4 DIFFERENT COLORS, INCLUDING ONE THAT IS ORDERED RED, YELLOW, GREEN, BLUE]**
**[PN: TERMINATE IF RED, YELLOW, GREEN, BLUE ORDER NOT SELECTED]**

App'x 0459

**[PN: TO QUALIFY FOR SURVEY, MUST MEET THE FOLLOWING CRITERIA:]**

- **Meets device qualifications SA1=1,2,3**
- **Agree to terms S0=1**
- **If typically wears glasses or contact lenses while working on a computer, must be wearing them (if S01=1, then must be S02=1)**
- **Does not work in a sensitive industry (S1=5,6,7,99)**
- **Age 18+ (S2b=2-6)**
- **Made or planning on making airline reservation (S7c=1-3)**
- **Made or plannning on using online ticket website (S8c=1-3)**

**S10 – HIDDEN.**
**ASSIGN TO A CELL ON A LEAST FILL BASIS BASED ON AGE, GENDER AND REGION**

| Non-Hidden Cell 1 | **1** |
|-------------------|-------|
| Non-Hidden Cell 2 | **2** |

| - MAIN QUESTIONNAIRE - |
|:---:|

**INTRODUCTION**
**[PN: SHOW TO ALL]**
Remember, please do not search the Internet, or ask others for help regarding any questions. We are only interested in your own opinions. If you don't know the answer, that is okay, please enter or select "Don't know" and move forward to the next question. Do not guess your answer.

After you click "Next" you will see a series of images screen.

***Please take your time to review the images. Do not use the back button of your browser at any time or your information will be lost.***

**[PN: NEW SCREEN]**

Imagine that you wanted to book a roundtrip airline flight from Santa Ana to Miami, and you decided to use the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** website to book flights. Below is the output you received when checking for available flights. Please assume that you selected the flight boxed in red.

Please review this information the way that you normally do when reviewing and selecting airline flights online.

**PN: IF CELL 1(S10=1) THEN SHOW:**

17

**HC – Cell 1 – Stimuli 1 – Page 1**

**HC – Cell 1 – Stimuli 1 – Page 2**

**HC – Cell 1 – Stimuli 1 – Page 3**

**HC – Cell 1 – Stimuli 1 – Page 4**

**PN: IF CELL 2 (S10=2) THEN SHOW:**
**HC – Cell 2 – Stimuli 1 – Page 1**

**HC – Cell 2 – Stimuli 1 – Page 2**

**Q0.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Were you able to see the images **clearly**?
*Select one.*

| | | |
|---|---|---|
| **Yes**, I was able to clearly see the images and read the words on the screen | 1 | **[PN: CONTINUE TO Q1]** |
| **No**, I was not able to clearly see the images and read the words on the screen | 2 | **[PN: RE-SHOW STIMULUS AND ASK THIS QUESTION AGAIN]** |

**[PN: MUST CONFIRM SAW IMAGES CLEARLY. DO NOT CONTINUE TO Q1a UNLESS Q0=1. IF SELECTED Q0=2 A SECOND TIME TERMINATE]**
**[PN: IF Q0=2, DISPLAY THIS MESSAGE AND RE-SHOW THE IMAGE PAGE, THEN SHOW Q0 AGAIN:** We are going to show you the images again. Please look at the images carefully and click "Next" when you are ready to continue.**]**
**Q1a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

How would you describe the offering on this website to a friend?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q1a. ASK IF PROVIDED AN ANSWER IN Q1a. – NE 99]**
**Q1b.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| There is no other way I would describe it to a friend | **99** | **EXCLUSIVE** |

**Q2.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Does the company that operates this website have a business connection or association with another company, or do you not know?
*Select one.*

**[PN: ROTATE ORDER OF YES AND NO].**

| | |
|---|---|
| Yes, it has a business connection or association with another company | 1 |
| No, it does not have a business connection or association with another company | 2 |
| Don't know | 3 |

**[PN: IF YES AT Q2, ASK Q3a AND Q3b, ELSE SKIP TO Q4]**
**Q3a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Which other company does the company operating this website have a business connection or association with?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q3A. ASK IF PROVIDED AN ANSWER IN Q3a. – NE 99]**
**Q3b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q4.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Does the company that operates this website require permission or authorization from any other company, or do you not know?
*Select one.*

**[PN: ROTATE ORDER OF YES AND NO].**

| | |
|---|---|
| Yes, it requires permission or authorization from another company | 1 |
| No, it does not require permission or authorization from another company | 2 |
| Don't know | 3 |

**[PN: IF YES AT Q4, ASK Q5a, Q5b, Q6a, AND Q6b, ELSE SKIP TO Q7]**

**Q5a.**

19

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

From which company is permission or authorization required?

*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|------------|-----|-----------|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q5a. ASK IF PROVIDED AN ANSWER IN Q5a. – NE 99]**
**Q5b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|------------|-----|-----------|

**[PN: IF YES AT Q4 ASK Q6a]**

**Q6a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

For what do they need to get permission or authorization?

*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|------------|-----|-----------|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q6a. ASK IF PROVIDED AN ANSWER IN Q6a. – NE 99]**
**Q6b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|------------|-----|-----------|

**Q7a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

What do you believe is the relationship between **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** and the airline?
*Select one.*
**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is an authorized agent of the airline | 1 | |
|---|---|---|

20

| | | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is not an authorized agent of the airline | **2** | |
| There is some other relationship between **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** and the airline | **3** | |
| Don't know | **99** | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q7A. ASK IF PROVIDED AN ANSWER IN Q7a/NE 99]**
**Q7b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q8a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| Buying tickets through **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is cheaper than buying directly from the airline | **1** | |
| Buying tickets through **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is not cheaper than buying directly from the airline | **2** | |
| Don't know | **99** | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q8a. ASK IF PROVIDED AN ANSWER IN Q8a. – NE 99]**
**Q8b.**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q9a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** charges an additional fee on top of the airline's total ticket cost. | **1** | |
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** does not charge an additional fee on top of the airline's total ticket cost. | **2** | |
| Don't know | **99** | **[ANCHOR]** |

21

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q9a. ASK IF PROVIDED AN ANSWER IN Q9a. – NE 99]**
**Q9b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK ONLY IF THEY THINK THERE'S A FEE – Q9a=1]**
**Q10a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| I believe the fee **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges for its services is reasonable | 1 | |
|---|---|---|
| I believe the fee **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges for its services is not reasonable | 2 | |
| N/A (I do not think **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges an additional fee on top of the airline's total cost) | 3 | |
| Don't know | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q10a. ASK IF PROVIDED AN ANSWER IN Q10a. – NE 99]**
**Q10b.**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**Q11a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is an authorized travel agency with access to fares I could not access via the airline | 1 | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is not an authorized travel agency and does not have access to fares I could access via the airline | 2 | |

22

| Don't know if **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** are an authorized travel agency | 98 | **[ANCHOR]** |
|---|---|---|
| Don't know if **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** have or do not have access to fares I could not access via the airline | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q11a. ASK IF PROVIDED AN ANSWER IN Q11a. – NE 99]**
**Q11b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | **EXCLUSIVE** |
|---|---|---|

**Q12a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** offerings, please select the option you believe is correct or "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| A ticket bought through **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** is a valid ticket | 1 | |
|---|---|---|
| A ticket bought through **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** is not valid ticket | 2 | |
| Don't know | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q12A. ASK IF PROVIDED AN ANSWER IN Q12A – NE 99]**
**Q12b**
What makes you say that?
*Please enter your response below and be as detailed as possible* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | **EXCLUSIVE** |
|---|---|---|

**Q12c.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** offerings, please select the option you believe is correct or "Don't know."

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

*Select one.*

| The option offered by **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** carries no risk | 1 | |
|---|---|---|
| The option offered by **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** carries risks | 2 | |
| Don't know | 99 | **[ANCHOR]** |

23

App'x 0466

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q12C. ASK IF PROVIDED AN ANSWER IN Q12C – NE 99]**
**Q12d**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK IF CARRIES A RISK – Q12C/2]**
**Q12e.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

What are the risks associated with this ticket?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q12e. ASK IF PROVIDED AN ANSWER IN Q12e. – NE 99]**
**Q12f.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Are there any other risks?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is no other risks | 99 | EXCLUSIVE |
|---|---|---|

**Q13a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Before today were you aware of **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]**?

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

**[PN: ASK IF AWARE OF SKIPLAGGED/EXEDIA Q13a. = 1]**
**Q13b.**
Have you ever used **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]**?

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

24

App'x 0467

**Q14a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Reflecting on the **[PN: IF Cell 1 (S10=1):** "Skiplagged"**, IF Cell 2 (S10=2):** "Expedia"**]** offering and everything you know about them how do you feel about buying your next airline ticket from them?
*Please enter your response below and be as detailed as possible or select "Don't know."*
**[OPEN END TEXT BOX]**

| Don't know | 99 | **EXCLUSIVE** |
|---|---|---|

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q14a. ASK IF PROVIDED AN ANSWER IN Q14a – NE 99]**
**Q14b.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[PN: OPEN END TEXT BOX]**

| There are no other reasons why I said that | 99 | **EXCLUSIVE** |
|---|---|---|

**INTRO**

Let's imagine that you decide to compare the **[PN: IF Cell 1 (S10=1):** "Skiplagged"**, IF Cell 2 (S10=2):** "Expedia"**]** offer with the same flights available on the American Airlines website and you got the following results.

Please review this information the way that you normally do when reviewing and selecting airline flights online.

**PN: SHOW ALL:**

**HC – Stimuli 2 – Page 1**

**HC – Stimuli 2 – Page 2**

**AFTER SHOWING STIMULI 2:**

**IF CELL 1(S10=1) THEN SHOW:**

**HC – Cell 1 – Stimuli 1 – Page 4**

**IF CELL 2 (S10=2) THEN SHOW:**

**HC – Cell 2 – Stimuli 1 – Page 2**

25

**PN: NEW SCREEN only show for Cell 1 (S10=1)**
Now, please review the conditions associated with the Skiplagged offering versus American Airlines' policies. Please review this information the way that you normally do when reviewing and selecting airline flights online.

**Q15a.**

Flight Information Link: **[PN: INSERT STIMULI 1 FOLLOWED BY STIMULI 2]**

Comparing the results you got from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** and from the American Airlines website, how do you feel about the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offering?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q15a. ASK IF PROVIDED AN ANSWER IN Q15a. – NE 99]**
**Q15b.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is nothing else that describes how I feel about the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings | 99 | EXCLUSIVE |
|---|---|---|

**Q16a.**

Flight Information Link: **[PN: INSERT STIMULI 1 FOLLOWED BY STIMULI 2]**

How likely would you be to consider buying your next airline ticket from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]**?
*Select one.*
**[PN: ROTATE WHETHER PUNCHES ARE SHOWN FROM 1 – 5 OR 5 – 1. RECORD WHAT WAS SEEN]**

| **Definitely would not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 1 | |
|---|---|---|
| **Probably would not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 2 | |
| **May or may not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 3 | |
| **Probably would** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 4 | |
| **Definitely would** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 5 | |
| **Do not know** | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q16a AFTER THEY PROVIDED AN ANSWER – 1-5 AND 99]**
**Q16b.**
What made you say that you **[INSERT ANSWER FROM Q16A IN LOWER CASE]**?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q16b. ASK IF PROVIDED AN ANSWER IN Q16b – NE 99]
**Q16c.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
[PN: OPEN END TEXT BOX]

| There are no other reasons why I said that | 99 | EXCLUSIVE |
|---|---|---|

[PN: ASK ALL]
**D1.**
For quality control purposes, please enter the year you were born.
[PN: ALLOW NUMBERS RANGING FROM 1922-2023]

| _____ | 1 |
|---|---|

[PN: Must come within 1 year of actual age (S2a) or flag]

[PN: SHOW FOR ALL AT THE END OF THE SURVEY - NEW SCREEN]
Thank you very much for completing this survey. We truly value your response and appreciate you taking time to share your opinions with us.

## 5.   Data Collection and Quality Control

The data collection was conducted by Radius Global.[1] They worked under my direction, formatted, and programmed the questionnaires, coordinated the data collection process, analyzed the data, and prepared the Appendices for this report. The data collection was done between April 10 – 15, 2024 and resulted in 600 respondents. The data collection was stopped after the first day of interviewing (as a pretest). Since none of the respondents had any difficulties with the questionnaire, we continued with the data collection.

In addition to the quality assurance questions included as part of the screening questions, Radius employed the following quality control procedures:

- Surveys hosted on secure encrypted servers.

---

[1] Radius Global is a leading provider of research, data, analytics, insights, and marketing intelligence. *See* https://radiusinsights.com/

App'x 0470

- Data checks implemented:

    o Check for duplicate IP addresses to keep respondents from taking the survey more than once;

    o CAPTCHA;

    o Speeders removed from data;

    o Open-ended responses reviewed to ensure respondent is paying attention/providing meaningful answers.

### 6. Analysis

The analysis included:

- Analysis of the verbatim responses regarding the reasons for the confusion and perceived deception. This analysis followed the scientific approach for content analysis, including coding the data by (a) involving two independent coders who were not familiar with the objective of the study or its sponsors, and (b) a procedure for resolving conflicts between the two coders; and

- Computer tabulations of the results.

- Testing for the statistical significance of the difference between the test and control groups of each of the two stimuli. The Hidden City and Non-Hidden City offerings

## B. Validating the consumer experiments with other data and relevant marketing and consumer behavior theories and findings

To validate the findings of our customer experiments we looked at other relevant data sets

that included.

### 1. Consumer complaints to AA about Skiplagged re confusion and perceived deception.

During the period 1/1/2018 – 3/6/2024, the AA customer complaint database identified 88

complaints with the terms "Skiplagged" or "Skiplag". Eighty (80) of the complaints dealt with

Hidden City. The analysis was done by a litigation support company using the following

definitions:

*Deception* - any complaint where the customer misunderstood what they were buying. This included where the customer is confused because their itinerary has an extra leg beyond where they plan to get off; where the customer did not get the necessary visa or bring a passport for a ticket with where final destination is

international; where the customer does not understand why they couldn't check a bag; where the customer complains that they paid more booking through Skiplagged versus booking directly. This category also included complaints about consumer consequences, such as: did the customer get denied boarding; was the customer prevented from checking-in; did the customer have to rebook and pay a higher price; did the customer lose baggage when it was checked through to the destination; and any other instance where the customer had harm/loss/consequences as a result of their hidden city ticket.

*Confusion* – any complaint about role, authority, or relationship of Skiplagged vis a vis the airline. This included any complaint suggesting the customer misunderstood what Skiplagged could and could not do to support a customer after purchase, or the customer assumed Skiplagged could provide travel agency services; any complaint where the customer expected Skiplagged to reaccommodate, cancel, refund flight price, make meal selections or seat reservations; and any complaint where the customer thought Skiplagged is an approved booking partner or agent.

*Other* - all documents that do not fall under the above categories.

Analysis of the complaints revealed the following distribution.

- Confusion and Deception (n=22)

- Deception (n=57)

- Neither (n=7)

**2. Consumer complaints to Skiplagged re confusion and perceived deception.**

Skiplagged produced a total of 46,621 documents. Of those, 30,658 were emails with one of the following email addresses as a last-in-time sender or recipient:

- agent@skiplagged.com

- booking@skiplagged.com

- privacy@skiplagged.com

- support@skiplagged.com

These are Skiplagged's customer support emails. The vast majority of these emails relate to AA bookings.

The documents are in a Relativity database. Using Relativity's Sampling tool (https://help.relativity.com/RelativityOne/Content/Relativity/Sampling.htm), we created a randomized 95/2.5 statistical sample. The sample was 1,464 emails. We categorized these documents as Deception, Consumer Confusion or Other, defined as set forth above.

Analysis of the complaints revealed the following distribution.

- Confusion (n=263)
- Deception (n=204)
- Confusion and Deception (n=47)
- Other (n=951)

The sampled data, when projected to the universe of complaints to the nearest thousand, suggests approximately 12,000 of the complaints reflect deception and/or confusion.

### 3.  Consumer posts on social networks illustrating confusion and deception.

I directed Voluble[2] to identify and collect consumer comments posted online about Skiplagged. To identify consumer comments about Skiplagged, a search for social media posts that contain the term "skiplagged" or "skip lagged" was performed using Brandwatch, an industry-leading database that provides access to social media data. The search was limited to posts on X (formerly, Twitter) and Reddit, as these platforms returned the highest volume of consumer posts that mentioned Skiplagged. I then reviewed the posts returned by the search to identify those that were potentially relevant to my analysis.

### 4.  Consumer behavior and advertising theories and findings that support the validity of our empirical findings.

The purpose of this additional analysis is to test to what extent consumer behavior and advertising theories and findings are consistent with or support the findings of our experiments

---

[2] Voluble is a consulting firm experienced in analyzing social media and other online posts to provide insights for litigation. Voluble is division of Global Business Experts Group (GBX), a litigation consulting firm, that has worked with dozens of clients on a variety of matters involving intellectual property and other issues.

App'x 0473

and the other independent data.

## V.   <u>FINDINGS</u>

**A. The results of the consumer experiments are presented in the five sections corresponding to the five key areas of interest addressed by the experiments.**

### 1.   Consumers' awareness and usage of Skiplagged (vs. Expedia)

As can be seen in Exhibit 1 below, as expected most respondents are familiar with Expedia. In contrast only a small % (between 14 and 18%) are familiar with Skiplagged. Yet, among the segment familiar with Skiplagged, the percent who used Skiplagged for regular tickets is similar to the % of Expedia users among those aware of them. But the % of users of Skiplagged Hidden city tickets are much lower.

<u>**Exhibit 1**</u>

<u>**Consumers' awareness and usage of Skiplagged (and Expedia)**</u>
<u>**(Q13a & 13b)**</u>

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on:** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Awareness (Q13a)** | | | | |
| Yes | 17.8% | 92.9%* | 13.9% | 96.8%* |
| No | 81.5%* | 6.5% | 86.1%* | 3.2% |
| DK | 0.7% | 0.6% | 0.0% | 0.0% |
| **Based on aware of Skiplagged (Expedia) Usage (Q13b):** | **Skiplagged Ticket (n=26)** | **Expedia Ticket (n=144)** | **Skiplagged Hidden City Ticket (n=20)** | **Expedia Ticket (n=150)** |
| Yes | 73.1% | 77.8% | 50.0% | 80.0%* |
| No | 26.9% | 21.5% | 45.0%* | 20.0% |
| DK | 0.0% | 0.7% | 5.0%* | 0.0% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Note: Awareness and Usage for Test Cells are related to Skiplagged. Awareness and Usage for Control Cells is related to Expedia.

### 2.   Consumers' perceptions of Skiplagged (vs. Expedia)

Exhibit 2 includes illustrative responses to the open ended question "how would you describe the offering on this (Skiplagged) website to a friend?" For a full listing of these responses, see the full verbatim in Appendix C-6.

**Exhibit 2**

**Illustrative Consumers' Description of the Skiplagged offering
(Q1a:b) Test Stimuli**

| Skiplagged Ticket (n=146) |
|---|
| **Illustrative responses** |
| Flight booking american airlines |
| A good offer that benefits the buyer. |
| A way to book flights cheaper |
| I think it's not a bad price it's cheaper than most [else] basically your only going to pay 150 for a few hours longer but at least you'll get there |
| Scam |
| There are good prices that you should check it out |

**Illustrative Consumers' Description of the Skiplagged Hidden City offering
(Q1a:b) Test Stimuli**

| Skiplagged Hidden City Ticket (n=144) |
|---|
| **Illustrative responses** |
| Very good website for booking flights |
| It's a offering for airline tickets |
| It's a good awful price wise but I thought the airlines did not allow this |
| The site is clear about baggage requirements and says the airlines don't like this method. |
| It's a cheaper alternative to most options. No checked bags, but it's worth it. |
| Receive a discount compared to the actual airline site. |

At the end of the questioning re Skiplagged (Expedia), we asked the respondents in Question 14a "reflecting on the Skiplagged (Expedia) offering and everything you know about them how do you feel about buying your next airline ticket from them?" The responses were coded into positive, neutral, or negative sentiment and presented in Exhibit 3. Examination of these results show that less than 12% of the respondents had negative sentiment toward Skiplagged. Yet, this is more than double the negative sentiment toward Expedia. While the positive sentiments toward Skiplagged are significantly below that of Expedia, they are still very high -- 45% among the Non-Hidden City ticket customers and 35% among the Hidden City customers.

32

**Exhibit 3**
**Reflections on Skiplagged and Expedia**
**(Q14a:b)**

| Consumer Reactions of Skiplagged (Expedia): | % of Respondents | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Negative** sentiment towards Skiplagged (Expedia) | 11.0%* | 4.5% | 11.8%* | 5.8% |
| **Neutral** sentiment towards Skiplagged (Expedia) | 17.1%* | 7.7% | 25.7%* | 9.0% |
| **Positive** sentiment towards Skiplagged (Expedia) | 45.2% | 71.6%* | 35.4% | 67.7%* |
| **Don't Know** | 26.7%* | 16.1% | 27.1%* | 17.4% |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Illustrative verbatim for all the sentiments are presented in Exhibits 3a, b and c. For the full verbatim. See Appendix C-6.

33

App'x 0476

**Exhibit 3a**
**Reflections on Skiplagged and Expedia: Illustrative Negative Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=16)** | **Expedia Ticket (n=7)** | **Skiplagged Hidden City Ticket (n=17)** | **Expedia Ticket (n=9)** |
| I am not familiar with this website and would not be comfortable ordering tickets there. | I would rather book directly from website | I would not buy my next ticket from them because of the fees and how cluttered their website looked. | Likely buy directly from airline unless they offer a great deal |
| I have never heard of this company. It doesn't state whether your ticket is valid through the airlines purchased for. | I wouldn't buy from Expedia again I have had bad experiences when my flight was cancelled | Cautious as I have never heard of them | It is probably better to go direct through the airline |
| I will not be doing this because I will not end up on the no flight list. | I will be very careful | I would not buy the ticket | I usually find better rates if I just book the flight myself through the airlines |
| i have never heard of them before - so will be a bit wary | I dont like expedia | Fairly risky and might lose your money at the end | I will likely not unless it is much cheaper |
| I probably would still go through the airline website | No. I will stick to going to the direct airline I am flying with | I'm just not sure because it's making me seem like I shouldn't trust it | I will continue to use the airline website |
| Still not sure how reliable it would be | I likely will not use Expedia unless it offers something cheaper than I can find | Another online service trying to make money | I have never used Expedia personally, but I did use another similar site and was very displeased at all the "hidden" charges. So, I probably would not purchase a ticket through Expedia. |

App'x 0477

**Exhibit 3b**
**Reflections on Skiplagged and Expedia: Illustrative Neutral Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=25)** | **Expedia Ticket (n=12)** | **Skiplagged Hidden City Ticket (n=37)** | **Expedia Ticket (n=14)** |
| I could do it but first I have to know more | I don't have any feelings if they offer a better price I'll use them | will look into it | I will definitely look into it. I have my own favorite websites that I use when I'm flying |
| Given proper reviews, maybe I'd checkmate out if it was legit or not and purchase one | Third party booking site that checks fees | May or may not | I would be on the fence. third parties are a concern to me |
| Not sure if I would purchase using this website, but I will definitely check them out for my next ticket to purchase | Would research to make I'm not paying more | It's a possibility I would need to do more research to confirm | I'm undecided. We just had to cancel some flights and it's not always clear who you're dealing with |
| Would have to do more research about validity of this site | not super comfortable, but will buy anyways | I will do more research | I would definitely look into it. |
| I would need to do some research on them before using them, I research everything before using it. | I may do it. I will compare with other websites. | Very possible, I can't plan to far ahead! Things deals discounts promos come and go! | I would certainly look and see what I can find and would use them. |
| Confident in saving, cautious about potential restrictions | I may or may not use them. | Since I've never heard of this company I don't know how I feel. But it would be something that I would be happy to look into it and see if it would save me any money. | 50/50 depends on price or competitors offers |

35

App'x 0478

**Exhibit 3c**
**Reflections on Skiplagged and Expedia: Illustrative Positive Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=66)** | **Expedia Ticket (n=111)** | **Skiplagged Hidden City Ticket (n=51)** | **Expedia Ticket (n=105)** |
| I will look into them for next time | Confidence that they will get me a good deal better then I could on my own from the airline. | Confident it will save me money | I will definitely buy tickets from them because they offer huge discounts |
| I feel as if buying an airline ticket from this platform would be a good deal. | I feel good about buying from them because I trust their service. | Most of the time, I do book with Skiplagged. it offers competitive prices | I'm excited to check them out because I would like to save money on my next flight |
| I will be very happy to book a travel trip with them because their service is affordable and customers centric | I feel like I would consider Expedia as a way to save money | Would be a site I would surely check out | I may consider it if it is a large enough discount. |
| It would be easy and cheaper | Very professional and timely responsive | I would probably buy my next ticket from them | I would buy a ticket from Expedia if it was the price I was looking for. |
| Might be a good idea. Price seemed reasonable. | I think this is a very efficient and convenient way to book travel and accommodations | I would use this site again. | I feel positive. I have found them to be a good source for travel. |
| Reflecting on the offering and what I saw in the images, I will definitely visit the skip lagged website to purchase an airline ticket | I think Expedia is doing a good job and there is lots of choice. | Safe and secure | Comparing prices through different companies and options |

The results of the analysis of the open ended responses regarding getting cheaper flights (for the Non-Hidden City tickets) or not recognizing the risks of the hidden city flights for those exposed to these stimuli, are listed in Exhibit 3d. This analysis was done both for the responses to the first open ended question (Q1) as well as across all open ended questions.

App'x 0479

**Exhibit 3d**
**Open-ended description of offering (to a friend) – (Open Ended Coded) – Deception**
**Q1a/b AND all OE Questions**

| | % of Confused Consumers | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q1a/b** | | | | |
| There is deception | 4.8% | NA | 89.6% | NA |
| There is not deception | 95.2% | NA | 0.7% | NA |
| Ambiguous | 0% | NA | 9.7% | NA |
| **All OE Questions** | | | | |
| There is deception | 29.5% | NA | 63.2% | NA |
| There is not deception | 69.2% | NA | 27.8% | NA |
| Ambiguous | 1.4% | NA | 9.0% | NA |

**There is deception:**
- For Non-Hidden City ONLY: Skiplagged (Expedia) is cheaper than American Airlines
- For Hidden City: Consumer doesn't understand that there are meaningful risks associated with the ticket (financial penalties, not being able to fly on airline, etc.)

**There is not deception:**
- **For Hidden City:** Consumers understand at least one meaningful risk (beyond needing to pack a carry on) AND think the risks are worth it

**Ambiguous**
- If unclear based on responses
- **For Hidden City:** If only mention less meaningful risks (can't check a bag)

### 3. Consumers' beliefs re Skiplagged' s (Expedia) association with AA

One of the most striking findings of our study is that 41% of respondents exposed to the Skiplagged stimuli associated Skiplagged with AA, which is about the same % as those who associated Expedia (i.e., AA's legitimate/authorized agent) with AA. Even among those exposed to the Hidden City offering, 30% associated Skiplagged with AA. The detailed results based on questions 1 ,2, 4, 5 and 6 are presented in Exhibit 4.

App'x 0480

**Exhibit 4**
**Consumer Confusion as to the relationship between Skiplagged (or Expedia) and AA**
**(Q 1-6)**

| Based on | % of Confused Consumers | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **All OE Questions** Associated or connected with airline based on open-ended responses for all questions | 2.7% | 3.2% | 4.9% | 5.8% |
| **Q1** Associated or connected with airline based on open-ended description of offering | 1.4% | 0.6% | 0.7% | 1.9% |
| **Q2-3** Associated or connected with airline | | | | |
| **Q2** | | | | |
| Yes | 33.6% | 31.6% | 25.7% | 33.5% |
| No | 21.9% | 21.9% | 29.2% | 21.3% |
| Don't Know | 44.5% | 46.5% | 45.1% | 45.2% |
| **Q4-6** Require permission or authorization from an airline | | | | |
| **Q4** | | | | |
| Yes | 24.0% | 28.4% | 13.9% | 22.6% |
| No | 34.2% | 33.5% | 42.4% | 36.1% |
| Don't Know | 41.8% | 38.1% | 43.8% | 41.3% |
| **NET (Yes for Q2 or Q4)** | | | | |
| Yes | **41.1%** | **42.6%** | **29.9%** | **42.6%*** |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

To get a better understanding of the respondent's perceptions of the relationship between Skiplagged and AA, we asked them two additional questions: (Q7a) whether "Skiplagged (Expedia) is the authorized agent of the airline" or not. The responses to this question and a follow up question regarding the reasons for their belief are presented in Exhibit 5. Examination of these results shows that over 40% of the respondents exposed to the two Skiplagged stimuli believed Skiplagged is an authorized agent of the airline. And an additional 14-17% believed there is some other relationship between the two. Many of the reasons for this are not surprising, which included the facts that you can buy the ticket for the airline and the way the information is presented.

App'x 0481

**Exhibit 5**
**The perceived relationship between Skiplagged (or Expedia) and AA**
**(Q 7a)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q7a Skiplagged (Expedia) is an Authorized agent of the airline** | **43.2%** | **56.1%*** | **42.4%** | **63.9%*** |
| Skiplagged (Expedia) is NOT an authorized agent of the airline | 13.0% | 14.2% | 22.2% | 9.0% |
| There is some other relationship between Skiplagged (Expedia) and the airline | 17.1% | 15.5% | 13.9% | 13.5% |
| Don't Know | 26.7% | 14.2% | 21.5% | 13.5% |
| **Q7b** Illustrative Reasons for believing that Skiplagged (Expedia) is an authorized agent of the airline | | | | |
| | Because they have to be to be dealing with the airline | Because they wouldn't be able to broker me a flight then | Generally many airlines require this for the services to be sold by a third party | That's the only way Expedia will be allowed to sell airline tickets from that company |
| | Because I can buy a ticket | It connects with the airline so that they know that you booked a ticket to their airline. | From the name and information | It shows real time travel rates |
| | They obviously selling tickets for them | The airline offers a certain amount of tickets to the company at a reduced rate for the company to sell | Because you buy tickets from them | The airline is allowing Expedia to sell tickets for THEIR services provided. |
| | They are helping to sell flight tickets through their platform. | Because I always booked at 39xpedia agency to book any airlines | They must be authorized to sell plane tickets | I would have to believe that they would be otherwise how could they sell the ticket |
| | They're selling airline tickets | They connect the passenger to the actual flight and receive payments | Because their selling the airlines tickets and flights. | It has been around for a long time so it would make sense that it would be |
| | By how the information was listed | You can get on the airline through Expedia but have to contact Expedia if you have any problems. | Because your able to buy a airline ticket associated with the airline | There are many flights available through the Expedia website. |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

App'x 0482

The second question regarding the relationship between Skiplagged and the airline was Q 11: whether "Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline."

The responses to this question are presented in Exhibit 6. An extremely high percent of respondents --close to 40%-- exposed to the two Skiplagged stimuli said YES. Many of the reasons for this perception is the way the material is presented.

**Exhibit 6**
**Consumers' belief re Skiplagged (or Expedia) as an authorized agent with special access to fares that could not be accessed via the airline**
**(Q11a)**

| Based on | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **Q11a Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline** | **38.4%** | **52.9%*** | **38.9%** | **53.5%*** |
| Q11a Skiplagged (Expedia) is NOT an authorized travel agency and does NOT have access to fares I could access via the airline | 9.6% | 7.7% | 7.6% | 7.7% |
| **DK** if authorized agent | 23.3% | 19.4% | 32.6% | 16.1% |
| **DK** if they have or do not have access to tickets, I could not access via the airline | 28.8% | 20.0% | 20.8% | 22.6% |
| **Q11b Illustrative Reasons for believing** Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline | | | | |
| | Because I could buy the ticket | It helps me book the ticket, luggage, and it gives me an option to pay more for luggage protection. | Can only book those fares though them | They sell fares for airlines so that should mean they have access to flights |
| | Because their service is unique to them | You can book any airlines through Expedia | Listed on a major airline website | Some deals are only listed on their site |
| | Because I believe they are cheaper | Airlines set aside a number of available seats to authorized travel agencies. | It seems like they offered exclusive discounts | This is the business they are in. They have certain parameters that make them more attractive. |
| | Those tickets were too cheap for it to be anything else. | This is what Expedia does | States it in the pictures | I know they compare prices for the best deal |
| | It seems they have very reasonable prices that I have not seen through the airlines directly | Expedia works to fulfill vacancies | I could not access via the airline | They are a travel company to book the entire trip from flights, hotels and car rentals |
| | The only way I see them being able to get that low prices | | If they weren't authorized, they would be shut down. | |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

41

Given that we had a number of questions probing the respondent's' perceived association between Skiplagged and the airlines, exhibit 6a includes a summary of these responses identifying the NET percent of respondents who believed that such association exists. The results show that an overwhelming number of respondents (73% - 76%) believe Skiplagged is affiliated with AA. This is only slightly below the belief as to Expedia (AA's actual authorized agent).

**Exhibit 6a**

**Overall and NET perceived association between Skiplagged and the Airlines
(All associated questions)**

| % of Confused Consumers | | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **All OE Questions** Associated or connected with airline based on open-ended responses for all questions | 2.7% | 3.2% | 4.9% | 5.8% |
| **Q1-Q6 NET** Associated or connected with airline based on open-ended description of offering | 41.1% | 42.6% | 29.9% | 42.6%* |
| **Q7a** Skiplagged (Expedia) is an Authorized agent of the airline | 43.2% | 56.1%* | 42.4% | 63.9%* |
| **Q11a** Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline | 38.4% | 52.9%* | 38.9% | 53.5%* |
| | | | | |
| **NET (said yes to at least one question)** | **76%** | **81.3%** | **72.9%** | **86.5%** |

### 4. Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia)

AA's Complaint in this case alleges that Skiplagged deceives consumers to believe that Skiplagged's regular tickets are cheaper than purchasing tickets directly from the airline, and that Skiplagged does not fully disclose to consumers the actual risks/consequences of purchasing a hidden city ticket from Skiplagged. To test these allegations, we asked the respondents who were

App'x 0485

exposed to the Skiplagged offerings a few questions.

The first of these questions asked if "buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the Airline" or not (Q8).

Not surprisingly, 62% of the respondents exposed to the first stimulus (the non-hidden city tickets) and 70% of those exposed to the second stimulus (the hidden city tickets) said YES. This is very similar to the % who said yes to this question with respect to Expedia.

43

**Exhibit 7**

**Consumers' belief Re the cost of buying tickets through Skiplagged (or Expedia) vs. buying directly from the Airline**
**(Q8a:b)**

| | Test | Control | Test | Control |
|---|---|---|---|---|
| **% of Respondents** | | | | |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q8a Buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the airline** | **61.6%** | **74.2%\*** | **70.1%** | **65.2%** |
| Buying tickets through Skiplagged (Expedia) is NOT cheaper than buying directly from the airline | 7.5% | 9.0% | 8.3% | 15.5% |
| Don't Know | 30.8% | 16.8% | 21.5% | 19.4% |
| **Q8b** Illustrative Reasons for believing that buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the airline | | | | |
| | Cheaper fees | Because I have used them before and if it was cheaper to book through the airline nobody would ever use Expedia. | Price decreased | Often times these third party sites offer huge discounts |
| | The tickets were discounted I believe | I guess they offer the list price available | Slight discount | They find the cheapest flights across all airlines |
| | Because they had a great price | I get to get points for every booking that I do so next time I book I get a discount. | This is indicated on the site | You can compare prices ahead of time on the website. |
| | I get a better deal. | It has more promotions | The price just seems low | From past experience. |
| | The price is very affordable and customers centric | I travel frequently and the prices shown are cheaper | They showed a discount | You can use discounts and codes for deals and promotion |
| | It offers discounts | It comes with rewards that could be use forthwith | Always cheaper thru a travel agent | In my experience, you get better deals by booking that way |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

A related question was whether "Skiplagged (Expedia), charges an additional fee on top of the airline total cost" (Q9).

App'x 0487

Exhibit 8 presents the results, which show that one out of three respondents exposed to the non-hidden city stimuli said YES and one of 4 of the respondents exposed to the hidden city stimulus said YES. And both % are very similar to those of Expedia.

**Exhibit 8a**
**Consumers' belief Re the fees charged by Skiplagged (or Expedia)**
**(Q9)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q9a** Skiplagged (Expedia) charges an additional fee on top of the airline total ticket cost. | 35.6% | 34.2% | 26.4% | 24.5% |
| **Q9a Skiplagged (Expedia) does NOT charge an additional fee on top of the airline total ticket cost.** | **34.9%** | **39.4%** | **34.0%** | **44.5%\*** |
| Don't Know | 29.5% | 26.5% | 39.6% | 31.0% |
| **Q9b Illustrative Reason for believing that** Skiplagged (Expedia) does NOT charge a fee for its services | | | | |
| | No additional charges was stated on their website | It rather comes with discounts and rewards | Much cheaper | Did not see an extra fee listed |
| | It doesn't charge | They collect a fee from the airlines | They make there money from airline | From my experience, they simply do not do this. |
| | I get a better value for my money when buying through this platform. | It said so | No additional cost if direct to the airline website | From past experience. |
| | They don't accept extra fee | I didn't see additional fee on the website | I used it before and there was no additional fee | They get a percentage of tickets sold from the airline |
| | The website doesn't charge extra it just charges your regular feats and how much ticket cost | I didn't see any extra fees | It was stated | No fees are listed |
| | It doesn't say they do | It only charged taxes on top of the ticket price so there is no additional fees. | It's what I saw within the ad itself. | Additional fees are charged by the aitline |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

45

The perception of the reasonableness of the fees are presented in Exhibit 8b and show very little difference between the perception of Skiplagged and Expedia.

**Exhibit 8b**
**Consumers' belief Re the fees charged by Skiplagged (or Expedia) are reasonable.**
**(Q10)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q10a Believe the fee Skiplagged (Expedia) charges for its services is reasonable** | **52.1%** | **51.0%** | **41.7%** | **49.0%** |
| **Q10a** Believe the fee Skiplagged (Expedia) charges for its services is NOT reasonable | 8.2% | 11.0% | 17.4% | 6.5% |
| **N/A** (I do not think Skiplagged (Expedia) charges an additional fee on top of the airline's total cost) | 17.1% | 19.4% | 16.7% | 29.0% |
| Don't Know | 22.6% | 18.7% | 24.3% | 15.5% |
| **Q10b Illustrative Reasons for believing** the fee Skiplagged (Expedia) charges for its services is reasonable | | | | |
| | It seems fair | I feel the fee is reasonable because it would help their business out and it'll improve their services. | 45.00 is a o.k. fee | There is not an uplift in the price. |
| | They are a middle plane of plane tickets | They just charged taxes | Other sites charge at least this fee or more. | Because it is still less than retail. |
| | They have to make money somehow | Not too much | they have to make some money | I don't mind paying additional if it's really worth it. |
| | So I can get a better deal overall. | The earliest bookings normally save customers money | They prices seemed reasonable given today's costs | Affordable prices. |
| | There's a detailed information about the booking process for travelers | It's a third party and there is a fee | reasonable price good for everyone | They usually have all the information you need about a trip so they offering something that is valuable |
| | The $10 feed at this website charges is quite reasonable | It is a decent fee And not too expensive | The price that's offered | I've booked with Expedia before and I think the rates are the same or very close with er way. |

The following exhibits present the respondents' perceived legitimacy and risk of the Skiplagged offerings.

App'x 0490

Exhibit 9a presents the results to the question of whether "a ticket bought through Skiplagged (Expedia) is a valid ticket." Over 70% of the respondents to Skiplagged stimuli said YES. Very close to the around 90% who said so for Expedia. The exhibit also includes some illustrative quotes; for more detailed verbatim, see Appendix C-6.

<u>**Exhibit 9a**</u>
<u>**Consumers' beliefs Re the legitimacy and risks Skiplagged Hidden City offerings**</u>
<u>**(Q12)**</u>

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q12a A ticket bought through Skiplagged (Expedia) is a valid ticket** | **74.0%** | **87.7%\*** | **70.1%** | **90.3%\*** |
| **Q12a** A ticket bought through Skiplagged (Expedia) is NOT a valid ticket | 4.1% | 4.5% | 5.6% | 1.3% |
| Don't Know | 21.9% | 7.7% | 24.3% | 8.4% |
| **12b Illustrative Reasons for believing** A ticket bought through Skiplagged (Expedia) is a valid ticket | | | | |
| | Because they would not sell fake tickets | It's a valid ticket because it's connected to the airline. | I real website | I've flown with them |
| | They're authorized | Because no one would use it otherwise | why would they be able to sell invalid tickets? | Expedia is a great company |
| | Because it said so | Because they are recognized and authorized | They are offering tickets to flights | It's from the airline Expedia is a third party company. |
| | Why else would they be in business | Once the ticket is sold and paid for the airline has to honor the ticket. | It seems like a valid ticket | people have used it for travel |
| | It has to be | I have used Expedia before | I'm just assuming that I legit website. | I've bought tickets from them |
| | I think it's a trustworthy platform. | It's a trustworthy booking site | Authorized travel agent, I think. | It has to be valid. |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Exhibit 9b presents the results to the question of whether "the option offered by Skiplagged (Expedia) carries no risk." Over a third of all respondents to both Skiplagged stimuli said YES.

48

App'x 0491

This is significantly lower than the perceived risk of Expedia, but still a very high percentage, and especially with respect to the numerous risks of the hidden city offering.

**Exhibit 9b**
**Consumers' beliefs Re the Risks of Skiplagged**
**(Q12)**

| | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **12c The option offered by Skiplagged (Expedia) carries no risk** | **37.0%** | **59.4%\*** | **36.1%** | **55.5%\*** |
| **12c** The option offered by Skiplagged (Expedia) carries risk | 14.4% | 14.8% | 28.5% | 18.1% |
| Don't Know | 48.6% | 25.8% | 35.4% | 26.5% |
| **12d Illustrative Reasons for believing** the option offered by Skiplagged (Expedia) carries no risk | | | | |
| | there is no risk | It doesn't carry risks if you pay more to keep your information secured and luggage safe. | It's a guaranteed fare | I have never had an issue with my ticket purchase or my flights |
| | Did not see any risk factors | As long as you book a ticket with a refundable one it's o k | why would they sell invalid tickets | They are a well known company |
| | It's a trustworthy platform. | It's a trustworthy brand | There is no risk | It is as good as a ticket purchased directly from the carrier. |
| | None was provided on their website | I don't see how there would be a risk involved. | One price one flight ticket | It is licensed. |
| | I believe the offerings that this website has carries little to no risk as with the other sites that offer the same service | If it is authorized I don't think it is a problem | It's a guaranteed money back. It's a failsafe service. | I do not know of any risk involved |
| | They must do what they said of not I fraud | I've done it before | Everything is clearly explained | They are guaranteed |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

The next two exhibits focus on the perceived risks of buying Skiplagged (Expedia) tickets.

Exhibit 10a categorized the open ended responses to the question "what are the risks associated with this ticket" and a follow up probe. (Q12e: f). The risks were categorized into three

App'x 0493

categories: meaningful risks, unmeaningful risks, and no risk. The definition and examples are listed underneath the below exhibit. Examination of the results show that the vast majority of the respondents perceived no risk, and only 4% of the respondents who saw the Skiplagged first stimulus and 17% of those who saw the second stimulus perceived a meaningful risk.

<u>**Exhibit 10a**</u>
<u>**Consumers' perceptions of the risks involved in buying Skiplagged (or Expedia) tickets**</u>

| Consumers perceived risks (Q12e-f): | % of Respondents | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| Meaningful Risks | 4.1% | 11% | 16.7% | 11.0% |
| Unmeaningful Risks | 8.9% | 7.7% | 12.5% | 7.1% |
| **No Risk** | **89.0%** | **87.1%** | **74.3%** | **85.2%*** |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

<u>**Meaningful Risks:**</u>
**Includes the following risks:**
- Financial penalties
- Can't fly on airline/Can get banned/Makes airline angry
- Cancellation problems/schedule changes
- Ticket isn't valid/ticket may not be honored
- Refund issues
- Fraud/scam issues
- Changes in plans
- Delays
- 'Third party' risk
- Weather risk
- No seats/plane is full
- Other Meaningful risks

Examples:
- Maybe the airline will be angry and kick you offf the plane
- Unknown extra fees at the airline, change fees, chance they are a scam website, cancellation fees.
- Not being validated or if it is canceled

<u>**Unmeaningful Riks:**</u>
**Includes the following:**
- Can't check a bag
- Unidentified Risks

Examples:
- Everything has risk
- Lost items
- Every ticket purchase carries risk. You can buy all the insurance in the world, have all the assurances in the world, and all the guarantees in the world, but stuff still happens.

Exhibit 10b presents the number of meaningful risks identified by the respondents.

App'x 0494

Examination of the results show that, despite the numerous risks associated with the Hidden City tickets, the vast majority of the respondents do not perceive any meaningful risks, 11% perceive only one meaningful risk, and hardly anyone mentioned 2 or more meaningful risks.

**Exhibit 10b**

**Number of meaningful risks identified by each respondent.**

| Consumers perceived risks (Q12e-f): | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **Mean** | 0.08 | 0.14 | 0.23 | 0.17 |
| **Median** | 0 | 0 | 0 | 0 |
| **0 (No Meaningful Risk Mentioned)** | **95.9%*** | **89.0%** | **83.3%** | **89%** |
| **1** | 1.4% | 8.4%* | 11.1%* | 5.8% |
| **2** | 2.1% | 2.6% | 4.9% | 3.9% |
| **3** | 0.7% | 0% | 0.7% | 1.3% |
| **4+** | 0% | 0% | 0% | 0% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

## 5. Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden city offer.

The last part of the questionnaire focused on the respondent's reaction to knowing the truth about how Skiplagged's offering compared to the same offering on AA.com, and, for the respondents who saw the Skiplagged hidden city stimulus, the risks associated with this offer.

Exhibit 11a presents the results of the open-ended responses to the question "Comparing the results you got from Skiplagged (Expedia) and from American Airlines websites, how do you feel about the Skiplagged (Expedia) offering?" (Q15a: b). Surprisingly, only 20% of the Skiplagged respondents who saw the first stimulus and 25% of those who saw the second stimulus had negative sentiment toward Skiplagged. And a very large segment still had positive sentiment toward Skiplagged – 50% among those who saw the first stimulus and 43% among those who saw the second stimulus.

App'x 0495

The following three Exhibits – 11b, c and d, presents illustrative quotes for the negative, neutral, and positive reactions.

**Exhibit 11a**

**Given additional information about American Airlines,
how do consumers feel about the Skiplagged (or Expedia) offer (Q15a:b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| Consumer Feelings about the Skiplagged (Expedia) offer (Q15a +b): | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **Negative Sentiment about Skiplagged (Expedia)** | **19.2%\*** | **5.8%** | **25%\*** | **5.8%** |
| **Neutral Sentiment** about Skiplagged (Expedia) | 11.6% | 25.8% | 12.5% | 23.9% |
| **Positive Sentiment** about Skiplagged (Expedia) | 50% | 47.7% | 43.1% | 52.3% |
| **Don't Know** | 18.5% | 20% | 19.4% | 18.1% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

53

**Exhibit 11b**
**Reflections on Skiplagged and Expedia: Illustrative Negative Verbatims**
**(Q15a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=28)** | **Expedia Ticket (n=9)** | **Skiplagged Hidden City Ticket (n=36)** | **Expedia Ticket (n=9)** |
| I feel like they're ripping people off | Is that the total price or is n the next screen adds fees? If it is the same price why not go through the airline instead? | not sure worth it since I normally have luggage to check and want my frequent flyer miles | Not a big enough discount. |
| They are charging more than booking directly with the airline. | I feel it might be a scam because they're the same | I think it's risky | Since it is the same, I would book directly through the airline |
| I prefer to order tickets from a site I am familiar with. | it was more expensive and less secure than just buying from the airline | It seems like there are risks | It cost too much |
| There isn't a huge difference that I would deem it creditable to use this site. Play it safe and buy from the airlines directly. | American Airlines just looks more setup then Expedia does | sounds like they are using exploitive practices. | I would just use the American airlines website |
| It is $10 more because of service charge so why book it | Not great. it's the exact same, so there's no incentive to chose them over the aurline | American airlines website is more accurate than skiplagged | American Airlines is cheaper by about $35 |
| It is expensive and has several charges | The Expedia offering did not charge significantly more at all. | Wow. I wasn't aware of the airline restrictions. Maybe that's not the best way to buy a ticket. | Is more expensiv |

App'x 0497

**Exhibit 11c**
**Reflections on Skiplagged and Expedia: Illustrative Neutral Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=17)** | **Expedia Ticket (n=13)** | **Skiplagged Hidden City Ticket (n=18)** | **Expedia Ticket (n=35)** |
| Same offering as the airline | The same flight same price | Cheaper but not clearer | They are the same prices |
| It is reasonable, but I would then book directly through the airline | Not bad. The difference is in incentives | It really just depends on the situation | It's essentially the same |
| Same as other booking sites | The offers are the same | I feel like it is cheaper, but it violates the airline policy so there is a risk. | It looked similar, so not sure why I would use it |
| I'd feel comfortable buying a ticket from this agency it looks professional and just like other websites | About the same | I feel like it's almost identical | The same flights |
| It looks like any other travel website I've used before. | It looks almost exactly the same, I would feel like Expedia is just offering the same thing I see with American | I think they offer more but I'm just not sure if I still trust it | It's literally the same exact thing |
| Is a great offer if not the same | It is basically the same price | I'm not sure now if it's okay or not | I think it was pretty much the same |

**Exhibit 11d**
**Reflections on Skiplagged and Expedia: Illustrative Positive Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=73)** | **Expedia Ticket (n=74)** | **Skiplagged Hidden City Ticket (n=62)** | **Expedia Ticket (n=81)** |
| I think it is a good value | Expedia gets you good deals. | Much better fee | I think the Expedia offering saves me and more of their customers money than the other offering |
| Seems like a decent deal | I feel Expedia offers better options than just the airline itself. | The Skiplagged is better | It sounds very reasonable |
| It is way more cheape | It seems like a better deal | Love it, seems to be a smart way to hack the system | It is favorable and credible. |
| I feel as if I am getting a better value for my money. | It's cheaper and affordable | They offer more protection plans as to your flight. | Feel as though the price is great and better. |
| It's cheaper | This is a good offering | It's a more affordable option | Expedia is less and easier to navigate. |
| I will be very happy to book a travel trip with them because their service is affordable and customers centric | They are offering a very good price for the flight with options. | It feels like they are less intimdating and more open and reliable | Good, price is about the same |

Exhibit 12 asks the respondents about their intentions to buy their next ticket from

55

Skiplagged (Expedia). And this is after being exposed to the facts about the AA offer, and, for respondents who saw the Hidden City offering, after finding out about the risks of the offer.

Surprisingly, almost half of the respondents still definitely or probably would buy the tickets from Skiplagged.

**Exhibit 12**
**Consumers' intention to buy their next airline ticket from Skiplagged (or Expedia)**
**(Q16a)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Consumer Reaction:** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Bottom Two (Definitely would not/Probably would not)** | **19.9%\*** | **7.7%** | **19.4%\*** | **2.6%** |
| **Top Two (Probably would/Definitely would)** | **53.4%** | **77.4%\*** | **47.2%** | **73.5%\*** |
| 1. **Definitely would not** consider buying my next airline ticket from Skiplagged (Expedia) | 8.9% | 3.2% | 6.9% | 0.6% |
| 2. **Probably would not** consider buying my next airline ticket from Skiplagged (Expedia) | 11.0% | 4.5% | 12.5% | 1.9% |
| 3. **May or may not** consider buying my next airline ticket from Skiplagged (Expedia) | 21.9% | 14.8% | 29.2% | 21.9% |
| 4. **Probably would** consider buying my next airline ticket from Skiplagged (Expedia) | 26.7% | 25.2% | 19.4% | 34.2% |
| 5. **Definitely would** consider buying my next airline ticket from Skiplagged (Expedia) | 26.7% | 52.3% | 27.8% | 39.4% |
| **Don't Know** | 4.8% | 0.0% | 4.2% | 1.9% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Exhibit 13 presents illustrative reasons for the various intentions to buy responses. For a more complete review of the reasons given by the respondents, see the full verbatim in Appendix C6.

App'x 0499

**Exhibit 13**
**Illustrative Reasons for consumers' intention to buy their next ticket from Skiplagged (or Expedia)**
**(Q16a+c)**

| Intend to buy (4+5) | |
|---|---|
| **Skiplagged Ticket (n=78)** | **Skiplagged Hidden City Ticket (n=54)** |
| I'll get a better value for my money. | It is a cheaper way to fly. |
| Seemed professional and prices are relatively good. | Seems like they offer good deals and offers |
| I would consider it because it seems like a reliable option. | It seems interesting and I learned something new about traveling. Almost like a hack of sorts |
| Based on what I saw no reason to doubt it | They offer really good deal. This is something that would fit in a line with my schedule on some good places that I need to go. I don't mind having to layover if it'll save me almost $200. |

| Intent not to buy (1+2) | |
|---|---|
| **Skiplagged Ticket (n=29)** | **Skiplagged Hidden City Ticket (n=28)** |
| There isn't a huge difference in price that I would risk this not being a valid offer. | Its too risky |
| If it has same ticket but more because of service charges I see no reason to use it | You could lose your right to fly |
| There are too many risks involved. | Cause I want to make sure the ticket is real |
| Because it was hard to get a refund. | They don't comply with AA rules. |

| May or may not intend to buy (3) | |
|---|---|
| **Skiplagged Ticket (n=32)** | **Skiplagged Hidden City Ticket (n=42)** |
| Depending if the offer is cheaper than airlines | Not sure if worth the risks now that I understand the offer better |
| Because it gave the same results as the airline gave me but without protection | Don't know if i want the trouble |
| It is new to me, so I want to research and see how users feel about it. | I'm not sure I would want to take the risk |
| Depending if my deal is better on skiplagged I'd chose that instead | Because I'm still interested but need more research |

57

| Don't Know | |
|---|---|
| **Skiplagged Ticket**<br>**(n=7)** | **Skiplagged Hidden City Ticket**<br>**(n=6)** |
| I need more information about them and to read their reviews. | It really depends on the total price |
| I'll have to read more reviews | |

## B. Other Data supporting the Experimental Findings

In this section, we will briefly review 4 sets of data, which individually and collectively support the findings of our experiments.

### 1. Illustrative actual confusion and perceived deception in consumer complaints to AA

The following two exhibits present illustrative cases of actual confusion as evident from an analysis of consumer complaints to AA.

Exhibit 14 presents illustrative complaints to AA evidencing confusion as to association between Skiplagged and AA.

Exhibit 15 presents illustrative complaints to AA evidencing Skiplagged deceptive practices.

App'x 0501

### 3. Illustrative actual confusion and perceived deception in consumer posts on social media

Since actual complaints are often believed to be the "tip of the iceberg" given that most consumers are reluctant to complain, we also engaged in the analysis of consumer conversations on social networks. Thie results of this analysis are included in Exhibit 18.

The exhibit is divided into the following parts:

- Believing that Skiplagged is an agent of AA or another airline.

- Luggage sent to the wrong destination.

- Dishonored tickets/had to pay extra.

- The cost was higher than expected.

- Passport issues

- General dissatisfaction

Exhibit 18 includes illustrations posted on social media.

**Exhibit 18**
**Consumer Comments on Skiplagged**

## Believing Skiplagged is an Agent of AA or Another Airline

1. "Wow accidentally booked my flight thru Skiplagged instead of American and now I can't check my bag

*Author: @laurenash_213*
*Date: 2018-04-14*
*URL: http://twitter.com/laurenash_213/statuses/984976293966917633*
*American Airlines Reference: N*

6. "@KhadiDon download the skiplagged app, all flights are cheaper an yes it's legit"

*Source: Twitter*
*Author: @Niall_JayDub*
*Date: 2015-10-14*
*URL: http://twitter.com/Niall_JayDub/statuses/654162040479686656*
*American Airlines Reference: N*

## Luggage Sent to the Wrong Destination

1. "@SteveSasman @AmericanAir @Skiplagged Lol. You had to bring me back to PHX because AA shipped my bag to and from Vegas, which was within their rights but still sucked."

   *Source: Twitter*
   *Author: @ChrisStrub*
   *Date:2020-09-01*
   *URL: http://twitter.com/ChrisStrub/statuses/1300919283086696456*
   *American Airlines Reference: Y*

2. "@Skiplagged You all give good deals but keeping up w/ luggage is not good on skiplagged behalf! Traveling partial flights & bags going to the final destination is terrible"

   *Source: Twitter*
   *Author: @jerlbrown*
   *Date: 2024-01-29*
   *URL: http://twitter.com/jerlbrown/statuses/1752017421186089335*
   *American Airlines Reference: N*

3. "@xtatiana_ @Yaardiegurl @Pharaoh_Wilder @KateDaughtry @darnyb @EagleEye1906 Skiplagged will have your luggage going to Timbuktu but oh well you got the tkt for cheap

70

*Author: @YeaImTORI*
*Date: 2020-11-02*
*URL: http://twitter.com/YeaImTORI/statuses/1323245232444551168*
*American Airlines Reference: N*

6. "Throwaway for obvious reasons. I fcked up and trusted someone to book our tickets. They used skiplagged and now 3 of us has luggages that needed to be checked in. I trusted this "friend" because they said they knew of a way to get cheaper tickets and kept us in the dark about its details. We missed the flight and now our luggage is being shipped to another damn state thats not our supposed destination. I am annoyed and is currently frantically looking for a way to get it back. Should I just take the flight or can I have the airline ship it back? And fr, should i drop this friend lol. Dont use skip lagged people, esp when youre like me. Late and manipulated into this mess."

*Source: Reddit*
*Author: Flippedmacaronisalad*
*Date: 2023-10-01*
*URL: https://www.reddit.com/r/travel/comments/16wupkp/fukd_up_by_using_skip_lag/*
*American Airlines Reference: N*

7. "Used @Skiplagged and they made me check my bag. See my luggage in a week or so.."

*Source: Twitter*
*Author: @Koridarnell*
*Date: 2016-06-05*
*URL: http://twitter.com/Koridarnell/statuses/739459507491737601*
*American Airlines Reference: N*

71

## Dishonored Ticket/Had to Pay Extra

1. "@Skiplagged used @AmericanAir to book a flight I found & AA refused to let me carryon when I mentioned ur app & made me pay for a new flight"

   *Source: Twitter*
   *Author: @nicolebrajer*
   *Date: 2017-01-20*
   *URL: http://twitter.com/nicolebrajer/statuses/822303955908628484*
   *American Airlines Reference: Y*

2. "@Skiplagged My son just purchased his first airfare using skiplagged, Tuscan to LA. American Airlines made him purchase a new ticket to board! $172 on top of what he spent on app. Can he get a refund? This is effed up!"

   *Source: Twitter*
   *Author: @itwitt2*
   *Date: 2021-08-18*
   *URL: http://twitter.com/itwitt2/statuses/1428113256477073410*
   *American Airlines Reference: Y*

3. "@Ieshialot Just stay away from Skiplagged if you're booking american, security was about to come get me in Philly if I didn't rebook

I don't have a ticket today."

*Source: Twitter*
*Author: @_____de*
*Date: 2021-01-24*
*URL: http://twitter.com/_____de/statuses/1353408328173555713*
*American Airlines Reference: Y*

6. "A word of caution on Skiplagged - use it too often and American will catch on and start pulling bullshit. I've been denied boarding to a flight, at the gate in terminal C, after checking in!"

*Source: Reddit*
*Author: ihrtbeer*
*Date: 2022-12-09*
*URL:*
*https://www.reddit.com/r/Charlotte/comments/zgwq3j/how_do_you_save_money_flying_with_clt_being_so/izj0exh/*
*American Airlines Reference: Y*

7. "@AmericanAir @Skiplagged the carryon clearly fits. I have carried it on multiple AA flights. AA forced me to pay 4 a new flight #skiplagged https://t.co/uN1sK2UgV8"

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: http://twitter.com/nicolebrajer/statuses/822347673030098944*
*American Airlines Reference: Y*

8. "@_StayFit101 So basically AA considers this to be cheating the system. Skiplagged gets you lower rates by booking your flight as connecting and you get off at the layover. That's what I did, my ticket got flagged. When I got to the airport I had to pay an additional $150 & bumped to standby."

*Source: Twitter*
*Author: @dorianjanelle*
*Date: 2022-05-08*
*URL: http://twitter.com/dorianjanelle/statuses/1523387295906566145*
*American Airlines Reference: Y*

9.  "Hi everyone, I read the FAQ but have a question regarding getting fines/banned for life from American. I bought a skiplagged flight from DTW to FLL - with a connection in CLT (my intended destination). I tried to check in, but the gate attendant told me they knew CLT was my final destination and if I did not pay the change fee & did not get on my flight to FLL, I would be banned from American for life. Has anyone had experience with this? I know not to check bags etc, and have taken 50+ flights with skiplagged & have never had an issue. Thanks"

    *Source: Reddit*
    *Author: @laith-the-arab*
    *Date: 2022-02-06*
    *URL: [https://www.reddit.com/r/Flights/comments/sm97ni/change_fees_on_skiplagged/](https://www.reddit.com/r/Flights/comments/sm97ni/change_fees_on_skiplagged/)*
    *American Airlines Reference: Y*

10. "@AmericanAir @Skiplagged as a member of @NBCUniversal, a frequent flyer, I was shocked I was forced off the line & to pay for a new flight!"

    *Source: Twitter*
    *Author: @nicolebrajer*
    *Date: 2017-01-20*
    *URL: [http://twitter.com/nicolebrajer/statuses/822344867619557376](http://twitter.com/nicolebrajer/statuses/822344867619557376)*
    *American Airlines Reference: Y*

11. "@AmericanAir @Skiplagged AA has the worst customer service in our nation! AA CLAIMS THIS BAG ISN'T A CARRYON! Forced me to buy a new flight. [https://t.co/JrTRVaQ8rj](https://t.co/JrTRVaQ8rj)"

    *Source: Twitter*
    *Author: @nicolebrajer*
    *Date: 2017-01-20*
    *URL: [http://twitter.com/nicolebrajer/statuses/822357723127762944](http://twitter.com/nicolebrajer/statuses/822357723127762944)*
    *American Airlines Reference: Y*

12. "@AmericanAir @Skiplagged u let ppl pass w me their carryons but BC I booked thru #skiplagged AA gave me no option than 2 pay 4 a new flight! [https://t.co/ySRBcY6wRD](https://t.co/ySRBcY6wRD)"

    *Source: Twitter*
    *Author: @nicolebrajer*
    *Date: 2017-01-20*
    *URL: [http://twitter.com/nicolebrajer/statuses/822349705979916289](http://twitter.com/nicolebrajer/statuses/822349705979916289)*
    *American Airlines Reference: Y*

13. "@DiskullOfficial @Skiplagged @AnthonyAttia24 Do not recommend skiplagging on the way back. Got flagged coming back from New York with @Megamarv97. American made us pay the flight in full since they knew we fly out of Charlotte and weren't getting on the connecting flight

74

*Source: Twitter*
*Author: @Hozay_Guap*
*Date: 2022-12-20*
*URL: http://twitter.com/Hozay_Guap/statuses/1605078826593443840*
*American Airlines Reference: Y*

14. "@Skiplagged @AmericanAir wouldn't refund me the change fee - made me purchase a brand new flight & miss my original cus I mentioned ur app."

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: http://twitter.com/nicolebrajer/statuses/822307917722370051*
*American Airlines Reference: Y*

15. "@united @CFPB @AmericanAir @MarkWarnerVA @timkaine @Skiplagged Current attempt is a @united employee telling me it is another $1000 I have to pay...to KEEP MY SAME FLIGHT."

*Source: Twitter*
*Author: @MsWZ*
*Date: 2017-09-18*
*URL: http://twitter.com/MsWZ/statuses/909593100372324354*
*American Airlines Reference: N*

App'x 0518

# Cost Was Higher Than Expected

1. "@Skiplagged $35 service fees yeah you guys are bugging I'll just book my flight via American. SMH! Use to love u guys"

   *Source: Twitter*
   *Author: @candydeepthr0at*
   *Date: 2023-11-14*
   *URL: http://twitter.com/candydeepthr0at/statuses/1724359090648801288*
   *American Airlines Reference: Y*

2. "BUYERS BEWARE! This company @ExploreTrip, found on @Skiplagged .com, will promise prices on internet and then inform you that you need to pay more money to secure your booking. They will even try to get you to pay more than the price on the airline's website #scammers #fraud https://t.co/3L105ps7H3"

   *Source: Twitter*
   *Author: @cati4563*
   *Date: 2019-02-03*
   *URL: http://twitter.com/cati4563/statuses/1092121343275999232*
   *American Airlines Reference: N*

3. "@Skiplagged how do I contact customer service? I booked a flight, entered CC#, it was transferred to ExploreTrips who cancelled it with no notification. Now the trip is twice as expensive. #Angry"

   *Source: Twitter*
   *Author: @Audiv8q*
   *Date: 2019-10-23*
   *URL: http://twitter.com/Audiv8q/statuses/1187109886036865025*
   *American Airlines Reference: N*

App'x 0519

# Passport Issues

1. "i used skiplagged (great site, highly recommend )to book a flight home to CA from Hawaii early because my original flight overlapped with school. I show up to the airport and they ask me for my passport because the flight is technically to Canada with a layover in SF (where I planned to get off). I frantically call the airline an hour before the flight and try and explain the situation and they offer to change my flight for a $300 change fee ONTOP of the price of the new ticket. I hang up and change my story to someone stole my passport and I need to get on this flight to San Francisco where I can get a new passport and they no questions change my flight for no fees."

   *Source: Reddit*
   *Author: j-blizzle*
   *Date: 2017-10-17*
   *URL: https://www.reddit.com/r/AskReddit/comments/76xpa3/reddit_whats_your_top_holy_shit_that_worked_moment/dohyfu3/#*
   *American Airlines Reference: N*

2. "@Skiplagged you didn't tell me I'd need my passport to get through security for a domestic flight!! Stuck and stressed."

   *Source: Twitter*
   *Author: @StormMurphy*
   *Date: 2016-01-11*
   *URL: http://twitter.com/StormMurphy/statuses/686539365661700096*
   *American Airlines Reference: N*

3. "Usually it works great if one knows what s/he is doing, but one time was hilarious (to me). Wanted to go to PHX. Flt was $300+. Flt from LAX to Vegas was $48!!! with a layover conveniently in PHX. No brainer. Worked fine going. On the way back I had a flt to Seattle w a layover in LA. Mechanical issues cancelled the flt. They tell everyone they will rebook at the counter. The over accommodating agent is like "you're in luck - there's a direct flight to Seattle & we can upgrade you"! And it leaves in 30 minutes so you'll arrive sooner!! Damn good customer service. What do I do!?! What can I say? "Oh no, I like layovers, inefficiency & downgrades"? I told her I had to go to the restroom- where I stayed until the flight left. Went online to book & there was a flight to BC w/ a layover in LA (not sure why it's cheaper to go to BC from Phoenix than to LA). They wouldn't let me board that flight b/c I didn't have my passport. WTH? Can I have someone in LA meet me w it? No, you can't board an international flt w no passport. But it's going to LA 1st, which isn't international. She said you can't do that, but you wouldn't want to take the chance of being stuck in LA. (Actually I would!) Ended up staying another night in PHX to catch the same PHX- LAX-Seattle flt I had originally. Even w the extra night hotel (and fun) I still saved almost $200! And the longer version makes for a great

story. Hope they can't trace me thru this story. Crap"

*Source: Reddit*
*Author: go4urs*
*Date: 2023-07-17*
*URL: [https://www.reddit.com/r/TravelHacks/comments/152fom9/my_hilarious_to_me_skiplagged_story/](https://www.reddit.com/r/TravelHacks/comments/152fom9/my_hilarious_to_me_skiplagged_story/)*
*American Airlines Reference: N*

4.  "I fucked myself over last week I used @Skiplagged and didn't have my passport smh I didn't land at my destination had to purchase a new one way that shit sucked"

    *Source: Twitter*
    *Author: @Itz_RicanSteph*
    *Date: 2018-10-02*
    *URL: [http://twitter.com/Itz_RicanSteph/statuses/1046939729013497856](http://twitter.com/Itz_RicanSteph/statuses/1046939729013497856)*
    *American Airlines Reference: N*

5.  "@Skiplagged ...Really messed me and my kids vacation return UP. Our return flights... Needed PASSPORTS from Hawaii. Had to buy NEW full fare tickets! https://t.co/LzF3E6auhz"

    *Source: Twitter*
    *Author: @TamekaRaymond*
    *Date: 2018-01-08*
    *URL: [http://twitter.com/TamekaRaymond/statuses/950464317270343680](http://twitter.com/TamekaRaymond/statuses/950464317270343680)*
    *American Airlines Reference: N*

6.  "If you ever use Skiplagged, please don't be like me and forget your passport by not thinking about the fact that you purchased an international flight since you just plan on getting off at a domestic layover

App'x 0521

*American Airlines Reference: N*

8.  "I was flying through SFO about a week ago at this point and I booked a flight to Seattle as a hidden city flight connecting to Calgary. I didn't have my passport, but I was effectively only taking the flight to Seattle. An attendant sent me to special services desk saying there was a way for me to get on the initial flight, knowing I had used Skiplagged. The Delta attendant at the services desk, seeing my issue, was adamant about it being impossible for me to get on the flight. He then began lecturing me about how I was a hipster and how I couldn't "cheat the system" among other things. He included that it was possible to get me booked just for the Seattle flight, but simply wouldn't. Due to the circumstances, I needed to book an emergency second flight to Seattle. Is there anything I can do about this? Can an airline decline service because of how I booked my flight?"

*Source: Reddit*
*Author: KindaCompostable*
*Date: 2017-06-10*
*URL: https://www.reddit.com/r/legaladvice/comments/6geakw/wa_i_wasnt_allowed_on_a_flight_because_i_used/#*
*American Airlines Reference: N*

App'x 0522

# General Dissatisfaction

1. "@Skiplagged you guys took my money for the ticket and service fee. Now @AmericanAir says I don't have a ticket today"

   *Source: Twitter*
   *Author: @_____de*
   *Date: 2021-01-24*
   *URL: http://twitter.com/_____de/statuses/1353408328173555713*
   *American Airlines Reference: Y*

2. "Am I being punked @AmericanAir @Skiplagged This is a deceitful way to sell tickets and take people's money! #shameful #fraud #AmericanAirlines #skiplagged"

   *Source: Twitter*
   *Author: @JessyDiva59*
   *Date: 2021-09-26*
   *URL: http://twitter.com/JessyDiva59/statuses/1441930656670523393*
   *American Airlines Reference: Y*

3. "@Skiplagged @AmericanAir absolutely horrible misleading and deceptive services. Want a direct flight to #WashingtonDC - then sell me a cheap ticket going all the way to #Richmond - where I can't have a carry on luggage & hence needed to buy a fresh ticket altogether. Outrageous!"

   *Source: Twitter*
   *Author: @Akshobh*
   *Date: 2017-12-02*
   *URL: http://twitter.com/Akshobh/statuses/937040316351250433*
   *American Airlines Reference: Y*

4. "I am so annoyed with @AmericanAir & @Skiplagged someone needs to produce my voucher, apply a credit or give me my money back TODAY INSTANTLY!!"

   *Source: Twitter*
   *Author: @kushmie*
   *Date: 2020-08-17*
   *URL: http://twitter.com/kushmie/statuses/1295374798873219072*
   *American Airlines Reference: Y*

5. "Hey, just some more info — this exact thing happened to me. Traveling for work. Boss booked a Skiplagged from CMH->CLT(home airport)->LGA. The app would not let me get my boarding pass. See ticket agent. Agent informs me that because I have an NC ID, they believe it is not my intention to actually fly to LGA. I told him he can believe whatever he wants and that I would

like my ticket. He, having no recourse, did print my ticket. Flight to LGA ended up being delayed a couple hours (oh nooo), so I ended up leaving CLT with no issues. I have never used Skiplagged for American because of this. Not worth the risk. But they really did flag me because of my ID."

*Source: Reddit*
*Author: @Castalyca*
*Date: 2023-07-11*
*URL: https://www.reddit.com/r/americanairlines/comments/14wr746/teenager_taken_to_security_room_and_interrogated/jrjv6mu/*
*American Airlines Reference: Y*

6. "Hey guys I was wondering if anyone who is familiar with Skiplagged can help me understand this. This is my first time using Skiplagged and I am not much of a traveler. I live in NYC. I am planning a week trip in Cancun followed by a couple of days in Miami. Three flights in all. JFK to Cancun (American Airlines), Cancun to Miami (JetBlue), then Miami to JFK (also JetBlue). However, I am now seeing that my credit card was charged for these random flights in Tulsa Oklahoma and Salt Lake City Utah?? I immediately suspected fraud, but interestingly enough, the charges are for the **same exact prices** as my vacation flights. I did some research on how Skiplagged works and apparently the website shows you hidden city flights. I didn't understand this before - so now I am wondering if I happened to unknowingly book a hidden city flight from Tulsa >>> NYC >>> Cancun or something, and am now being charged the full price by the airlines? I have no idea what's going on. Or is this just fraud? Was my info sow hacked and now someone is buying tickets from my card? Who would I go to to resolve this issue? The airlines or skiplagged? Or my credit card company for fraud? I've seen articles about Airlines banning or suing customers for booking through skiplagged, and I don't want to get in any trouble. Please help me understand this so I know how to explain my situation when I talk to a representative from an airline."

*Source: Reddit*
*Author: @mykashu*
*Date: 2021-05-07*
*URL: https://www.reddit.com/r/travel/comments/n759ar/i_used_skiplagged_to_book_a_trip_are_these/*
*American Airline Reference: Y*

7. "I just want to cancel my flight @Skiplagged & @AmericanAir giving me the hardest time ever then i have @Allianz insurance on this flight and it's a complete waste of money not helpful at all I'm so over all of these companies completely disgusted!!!"

*Source: Twitter*
*Author: @KassidyBankss*
*Date: 2021-06-07*
*URL: http://twitter.com/KassidyBankss/statuses/1402011904055332870*

App'x 0524

*American Airlines Reference: Y*

8. "don't ever use @Skiplagged , they had me stranded in Aruba! Been otp for 6+ hours trying to reach @AmericanAir & @priceline , yall got me alllllll the way eff'd up!!!!!!!!!!"

   *Source: Twitter*
   *Author: @notgnerahk*
   *Date: 2021-06-14*
   *URL: http://twitter.com/notgnerahk/statuses/1404292375971774464*
   *American Airlines Reference: Y*

9. "DON'T buy a connecting flight for American Airlines through Skiplagged

12. "@Skiplagged terrible, I'm so disappointed about your service"

   *Source: Twitter*
   *Author: @eliasferreirah*
   *Date: 2020-12-26*
   *URL: http://twitter.com/eliasferreirah/statuses/1342933144983511041*
   *American Airlines Reference: N*

13. "I really may never use @skiplagged again. Girlfriend and I paid for the upgraded seats on our
   @united flights over a month ago and had our seats changed with no notification or refund.
   Customer support has been terrible to deal with. Over 7 hours of waiting total... no response"

   *Source: Twitter*
   *Author: @ThatMFerr*
   *Date: 2021-06-08*
   *URL: http://twitter.com/ThatMFerr/statuses/1402222251282468866*
   *American Airlines Reference: N*

14. "@Skiplagged this flight is really important, and to be totally duped by your service/app is
   terrible"

   *Source: Twitter*
   *Author: @CaelinCX*
   *Date: 2018-09-15*
   *URL: http://twitter.com/CaelinCX/statuses/1040782338869927937*
   *American Airlines Reference: N*

15. "@Skiplagged you guys really need to stop lying to your users and saying this as false hope.
   you've been saying the price might go down for 10 days and it's just been shooting up ever since.
   terrible feature that cost me hundreds https://t.co/9UiD4GrDdV"

   *Source: Twitter*
   *Author: @SwallowMeHole*
   *Date: 2021-06-17*
   *URL: http://twitter.com/SwallowMeHole/statuses/1405458169082650631*
   *American Airlines Reference: N*

16. "@Skiplagged Urgently seeking help, reached out this morning re: a reservation, no response. I
   trusted your 24-hour cancellation guarantee +My initial purchase was based on trust in ur
   policies. Now, with my money taken and policies not upheld, it's a terrible customer journey."

   *Source: Twitter*
   *Author: @heidifamilia*
   *Date: 2023-11-18*

*URL: http://twitter.com/heidifamilia/statuses/1725669070425522550*
*American Airlines Reference: N*

17. "For me it was skyscanner until last year, it really got terrible. Skiplagged turned terrible too, secret flying? Terrible"

   *Source: Reddit*
   *Author: yerry_Sanchez*
   *Date: 2023-03-30*
   *URL: https://www.reddit.com/r/TravelHacks/comments/1268g6t/what_are_the_best_and_most_well_hidden_secrets_to/je8a3uu/*
   *American Airlines Reference: N*

18. "@Skiplagged Lina #72 was whack. Unhelpful and left me on hold for several minutes at a time. I'm disappointed you couldn't refund the difference of my flight. Regret sharing u to friends.

21. "Almost had a situation with my luggage because of this damn skip lagged app. I don't know that I can trust it now."

*Source: Twitter*
*Author: @QuoirBoy*
*Date: 2016-12-22*
*URL: http://twitter.com/QuoirBoy/statuses/811930426335956993*
*American Airlines Reference: N*

22. "@Skiplagged I wanted to share my experience with @Saudi_Airlines : My luggage arrived broken Reaching your customer service department was remarkably difficult Staff seemed unwilling to acknowledge the airline's responsibility for the damage. @Saudia_Care #be_aware @RiyadhSeason @NEOM https://t.co/QowJ9b37s2"

*Source: Twitter*
*Author: @A_Suray7i*
*Date: 2023-10-11*
*URL: http://twitter.com/A_Suray7i/statuses/1712179287778861412*
*American Airlines Reference: N*

23. "Yo skiplagged really almost made me lose all my luggage lmfaoo Im glad ik how to talk to ppl"

*Source: Twitter*
*Author: @prodilovechris*
*Date: 2019-05-04*
*URL: http://twitter.com/prodilovechris/statuses/1124663991110909952*
*American Airlines Reference: N*

24. "@Skiplagged Extremely angry with your services right now and I will be requesting a refund. I scheduled a flight through you to leave today and somehow it was changed to July 13. Come to find out, 3 more families were in line ALSO expecting to leave today. #ripoff"

*Source: Twitter*
*Author: @LaTori_Blair*
*Date: 2018-06-29*
*URL: http://twitter.com/LaTori_Blair/statuses/1012802242452295680*
*American Airlines Reference: N*

## 4. Consumer behavior and advertising and marketing theories and findings that support the validity of our empirical findings.

When searching for cheap flights or directly for Skiplagged, the Skiplagged messages are very appealing.

85

Consider for example the prominent first search results sponsored by Skiplagged. "Skiplagged: the smart way to find cheap flights." And the follow up heading "Find flights the airlines don't want you to see," "cheap flights to NY," and next to it the Nerd Wallet post: "What is Skiplagged and how to use it," with the following opening sentence: "Skiplagged is a legit way to reduce the cost of certain flights. By booking a hidden city ticket, you might be able to save hundreds of dollars."

These and similar messages are appealing and meet the RAVES criteria for effective advertising and offering.[3]

- **Relevant and respectful:**
  - The big cost savings make it very relevant for any consumer looking for cheap flights.

- **Actionable**:
  - The convenience of a click away from getting the savings is very actionable and tempting.
  - The assurance of legitimacy also makes it more actionable.

- **Valuable:**
  - The big cost savings make it valuable for sophisticated consumers who weigh the cost benefits of the offer, given that Skiplagged does not disclose all the risks. The benefit of cost savings outweighs the few identified risks.
  - The presentation of the tickets with the AA logo and their typical format (see the stimuli we used in our study) further increases the consumer confidence that they are dealing with a legitimate agent of AA.

- **Experiential:**
  - The presentation of the offering with the AA logo and format assures the consumer an experience similar to the one they experience in dealing with AA directly or with authorized agents of AA.

---

[3] Based on Wind and Hays, *Beyond Advertising: Creating Value Through all Customer Touchpoints.* Wiley, 2016

App'x 0529

- **Sharable story:**

  o Ther hidden city story is clever, doing something which is legal, but the airlines do not like is intriguing and could tempt consumers to buy it and share it with others.

  o And for some, the creative way of finding loopholes to get cheaper flights is appealing as well as a "David against Goliath" scheme.

Thus, based on what we know about how advertising works, the Skiplagged message and offering is clever and likely to work. While the FAQ includes a bit more information about the risks of Hidden city offering, the reality is that consumers rarely if ever read the small print.

## VI.    CONCLUSION

The conclusion of my analysis is:

1. The results of two consumer experiments among 600 consumers show conclusively that Skiplagged's non-hidden city and hidden city ticket offerings deceive consumers to believe that Skiplagged is an authorized agent of or otherwise associated with American.

   - These results are clearly summarized in Exhibit 6a (p 41-42), which shows that 75% of consumers exposed to the non-hidden city ticket and 73% of the consumers exposed to the hidden city ticket believe that Skiplagged is associated with American.

     o This is just slightly below the level of perceived association between Expedia (the control groups) and American.

2. The results of the experiments clearly show that Skiplagged deceives consumers of its non-hidden city tickets to believe that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American. In fact, 62% of the consumers exposed to the Skiplagged regular/non-hidden city stimulus believed that buying tickets through Skiplagged is cheaper than buying directly from the airline. See Exhibit 7.

App'x 0530

    o   Relatedly, consumers of both the non-hidden city and hidden city tickets believed that Skiplagged does not charge an additional fee on top of the airline's total ticket costs (Exhibit 8a).

3. The results of the experiments clearly show that Skiplagged deceived consumers of its hidden city tickets to believe the following:

    a.  That a hidden city ticket bought through Skiplagged is a valid ticket – 70% of the respondents. See Exhibit 9a;

    b.  That a hidden city ticket offered by Skiplagged carries no risk – 36% of the respondents. See Exhibit 9b; and

    c.  Among those who perceived some risk, less than 17% perceived any meaningful risk (Exhibit 10a), and most of them perceived only one meaningful risk (Exhibit 10b).

4. Knowing the truth about the AA prices and the real risks associated with hidden city tickets has only limited impact on consumers' intentions to buy their next airline tickets from Skiplagged. See Exhibit 12.

5. Overall, consumers perceived Skiplagged quite similarly to their perceptions of Expedia, the legitimate and *authorized* travel agent of American that served as our control.

6. The above findings are strongly validated by the actual complaint data received by American (Exhibits 14 and 15), the complaints received by Skiplagged demonstrating a very large number of confused consumers (Exhibits 16 and 17), and consumer conversations on social networks (Exhibit 18).

7. All of my findings are consistent with what one would expect from consumer behavior, advertising, and marketing theories and practices.

8. Given these findings Skiplagged's practices are harming both consumers and American Airlines.

App'x 0531

Philadelphia, Pennsylvania

_____
Yoram (Jerry) Wind, Ph.D.

# Exhibit A-13

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-14

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-15

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-16

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-17

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-18

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-19

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SOUTHWEST AIRLINES CO.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:21-cv-01722** |
| | § | |
| **SKIPLAGGED, INC., AND** | § | |
| **SKYBOOKER.COM LTD. d/b/a** | § | |
| **DESTINA HOLIDAYS** | § | |
| | § | |
| **Defendants.** | § | |

---

**PLAINTIFF SOUTHWEST AIRLINES CO.'S**
**FIRST AMENDED COMPLAINT AGAINST SKIPLAGGED, INC AND**
**SKYBOOKER.COM LTD.**

---

Southwest Airlines Co. ("Southwest" or "Plaintiff") files this First Amended Complaint against Skiplagged, Inc. ("Skiplagged") and Skybooker.com ltd. d/b/a Destina Holidays ("Destina Holidays") (collectively "Defendants") and shows as follows:

## I.     NATURE OF ACTION

1.     Just over 50 years since its first flights in 1971, Southwest Airlines has grown to become one of the most-flown airlines in the United States. Southwest prides itself on offering customer-friendly policies, including its unique "Bags Fly Free" policy (each customer can check two bags for free, subject to weight and size limits) and its "No Change Fees" policy (Southwest does not charge fees to change or cancel flights, though fare differences may apply).

2.     Southwest has built a reputation for high customer satisfaction and has recently received several awards demonstrating its success, such as the 2020 J.D. Power award for best airline in North America, the Wall Street Journal's "Best Airline" of 2020, and one of America's Most Trusted Travel & Hospitality Brands for 2021 by Morning Consult. Southwest takes pride in

SKIP00003365'x 0654

these awards and one key factor in this success comes from Southwest employees showing their legendary customer service and hospitality on a daily basis.

3.      To help with customer service, among other goals, Southwest maintains the exclusive online distribution rights to sell Southwest tickets to the general public through the Southwest Website[1] and does not allow online travel agencies ("OTAs") to sell Southwest flights without express written approval. Southwest offers its low-fare flights, ticket information, reservation details, additional booking options for Southwest flights, and ancillary services through its website at www.Southwest.com and its mobile application available via the Apple app store and Google Play app store.  Having customers book trips through the Southwest Website enables Southwest to efficiently communicate with its customers about important information prior to the trip or, if necessary, to timely update them on a flight's schedule change on the day of travel.

4.      Southwest has long controlled access to the Southwest Website to prohibit OTAs from selling reservations on its airline without authorization. Among other things, the Terms & Conditions for use of the Southwest Website (the "Terms & Conditions") expressly prohibit any attempts to "page scrape" flight data and any use of the Southwest Website "for any commercial purpose" without authorization from Southwest.[2] This is an important distinguishing feature of its business strategy, and a source of competitive advantage.

5.      In the past, Southwest has successfully prosecuted actions and obtained injunctions against website operators or OTAs attempting to scrape or display data from the Southwest

---

[1] The terms "Southwest Website" or "Southwest.com" shall refer to Southwest's public-facing front end website available at www.Southwest.com, application programming interface ("API"), and/or mobile applications, available via the Apple app store and Google Play app store. API is an interface used to programmatically access an application through a set of routines, protocols, and other tools for building software applications. The purpose of using an API is to access an application without using the standard user interface.

[2] A true and correct copy of the Southwest Terms & Conditions is attached as Ex. A.

SKIP0000237

Website for commercial purposes without authorization by Southwest. *See, e.g., Southwest Airlines Co. v. Farechase, Inc.*, 318 F.Supp.2d 435 (N.D. Tex. 2004); *Southwest Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007 WL 4823761, at *4-11 (N.D. Tex. Sept. 12, 2007); *Southwest Airlines Co. v. Infare Solutions A/S*, No. 3:10-cv-01674-M (N.D. Tex. 2010); *Southwest Airlines Co v. Checkinsooner.com, LLC*, No. 3:10-cv-01512-K (N.D. Tex. 2010); and *Southwest Airlines v. Roundpipe LLC*, et al., 375 F. Supp. 3d 687 (N.D. Tex. 2019).

6.     Southwest previously filed a lawsuit against Kiwi.com, Inc. and Kiwi.com, s.r.o., (hereinafter, "Kiwi"), a Czech OTA business that owns and operates a website at www.kiwi.com (hereinafter, "Kiwi.com"), that has engaged in repeated, unlawful activity relating to the Southwest Website and ignored a series of cease and desist demands from Southwest.[3]  On September 30, 2021, this Court granted Southwest's Motion for Preliminary Injunction against Kiwi.  *See Sw. Airlines v. Kiwi.com, et al.*, No. 3:21-cv-0098, 2021 WL 4476799 (N.D. Tex. Sept. 30, 2021) ("Kiwi Ruling").

7.     Southwest recently discovered that Defendants are displaying Southwest's trademarks and/or fare information – without authorization – and, on information and belief, Skiplagged (a) was previously collecting or scraping Southwest's fare information from Kiwi; and (b) has recently been collecting or scraping Southwest's fare information from Destina Holidays. Both Kiwi and Destina Holidays obtained Southwest's fare information without authorization and in violation of the Southwest Terms & Conditions.

8.     In sum, Skiplagged would display Southwest's fare information on its website and then direct Skiplagged's users to complete the booking or purchase on an unauthorized OTA like

---

[3] *Sw. Airlines Co. v. Kiwi.com, et al.*, No. 3:21-cv-00098 (N.D. Tex.) (the "Kiwi Litigation").

SKIP0000338 x 0656

Kiwi or Destina Holidays. Neither Skiplagged, Kiwi, nor Destina Holidays is authorized to display Southwest fares or sell Southwest flights.

9.      Despite Skiplagged claiming its website "Shows you the cheapest regular flights" and "the best available rates anywhere,"[4] and Destina Holidays claiming that "if you are looking for a budget trip, Destina Holidays is your go-to place"[5] these statements are false and misleading because Defendants display Southwest fares that are inflated above the actual price on the Southwest Website. *See infra* at ¶¶ 20-22, 107-110.

10.     Prior to the Kiwi Ruling, Kiwi was sharing Southwest's data with its partner, Skiplagged, who, together with Kiwi, had been using Southwest's data and trademarks to sell tickets (including prohibited "hidden city" tickets) on Southwest Airlines at a markup, without Southwest's authorization.

11.     Even after this lawsuit (filed in July 2021) and the Kiwi Ruling (issued in September 2021), Skiplagged continued to display Southwest's flight and fare information by directing its users to purchase Southwest flights on unauthorized OTAs, including www.DestinaHolidays.com.

12.     Upon information and belief, Skiplagged has entered into a contract or business relationship with Destina Holidays for the purpose of helping Destina Holidays to sell Southwest flights, among other things. Throughout 2022, Skiplagged directed its users to purchase Southwest flights on the Texas-based website www.DestinaHolidays.com. As a result, throughout 2022, Southwest sent two (2) separate cease and desist letters to a Texas corporation, Skybooker.com Ltd (d/b/a Destina Holidays), through its registered agent in Irving, Texas (located in this District).

---

[4] *See* https://skiplagged.com/ (last visited July 29, 2022).

[5] *See* https://www.destinaholidays.com/static/about-us (last visited July 29, 2022).

SKIP0000339x 0657



Office of the Secretary of State
Corporations Section
P.O. Box 13697
Austin, Texas 78711-3697
(Form 503)

Filed in the Office of the
Secretary of State of Texas
Filing #: 802986837 11/16/2021
Document #: 1094478230003
Image Generated Electronically
for Web Filing

**ASSUMED NAME CERTIFICATE**
**FOR FILING WITH THE SECRETARY OF STATE**

1. The assumed name under which the business or professional service is or is to be conducted or rendered is:
**DESTINA HOLIDAYS**

2. The name of the entity as stated in its certificate of formation, application for registration, or comparable document is:
**skybooker.com ltd**

3. The state, country, or other jurisdiction under the laws of which it was incorporated, organized or associated is **TEXAS**

4. The period, not to exceed 10 years, during which the assumed name will be used is :
**10/10/2031**

5. The entity is a : **Domestic For-Profit Corporation**

6. The entity's principal office address is:
**7952, SOUTHFORK BEND, irving, TX, USA 75063-75063**

13.     Thus, even after this lawsuit was filed, Skiplagged furthered its Texas contacts by conducting business with a Texas corporation (via the website www.DestinaHolidays.com) in order to display, market, and sell Southwest flights without authorization.

**A.**     **Southwest filed suit against Kiwi for illegally scraping data from Southwest's website and using it to sell tickets on Southwest's airline without its authorization.**

14.     For a period of time before 2021, Skiplagged and Kiwi worked in concert to engage in the unauthorized display of Southwest's fare information and the unauthorized sale of Southwest's flights.

15.     In the Kiwi Litigation, Southwest alleged that Kiwi was illegally harvesting flight schedules and airfare prices from the Southwest Website and servers in violation of the Southwest Terms & Conditions. Kiwi then used Southwest's data to sell airline tickets on Southwest Airlines without its authorization.

16.     As alleged in the Kiwi Litigation, Kiwi has engaged in the following unlawful conduct:

5

a. **Page Scraping:** Kiwi knowingly violated the Southwest Terms & Conditions through its unauthorized access and scraping of flight and pricing data from the Southwest Website;

b. **Unauthorized Sale:** Kiwi knowingly violated the Southwest Terms & Conditions by selling Southwest tickets without approval from Southwest and therefore has engaged in unauthorized commercial activity;

c. **Unauthorized Services:** Kiwi knowingly violated the Southwest Terms & Conditions by charging certain "service fees" that are not otherwise charged by Southwest;

d. **Trademark Infringement:** Kiwi knowingly violated Southwest's registered trademarks by displaying, among other things, Southwest's famous "Heart" logo on Kiwi.com;

e. **Unauthorized Access:** Kiwi violated federal and state law by continuing to access the Southwest Website without authorization from Southwest;

f. **Unfair and Deceptive Practices:** Kiwi violated federal law by engaging in unfair and deceptive practices in connection with the sale of airline tickets, including (i) selling Southwest flights without permission; (ii) failing to identify the carrier when advertising Southwest flights; (iii) adding its own service fees to the price of Southwest flights; (iv) misrepresenting Southwest's policies in an effort to bilk customers into purchasing ancillary services from Kiwi, such as customer service and checked bags, that are free with the purchase of Southwest flights; (v) failing to issue refunds to customers for cancellations on Southwest flights; and

6

SKIP0000341 App'x 0659

g. **Hidden City Tickets:** Kiwi promoted and offered "hidden city" tickets, meaning that the passenger's intended final destination is not the ticketed final destination, but rather an intermediate or connecting city.[6] This booking practice is a violation of Southwest's Contract of Carriage. It negatively impacts Southwest's operations and causes problems (i) with checked baggage because Southwest must check baggage to the ticketed, final destination, yet the customer intends to end their trip in the connecting city; (ii) for operational employees and flight crews trying to locate connecting customers that are listed on the connecting flight's manifest; and (iii) trying to locate connecting customers which lead to flight delays that negatively impact other passengers and disrupt Southwest flight schedule and on-time performance metrics. Southwest has recently suffered multiple reportable flight delays caused by Kiwi's unauthorized sales of "hidden city" flights.

**B.**    **Southwest discovers that Skiplagged is displaying Southwest's fare information (at inflated prices) by scraping or connecting to Kiwi's website, which is also not authorized to display Southwest's fare information**

17.    As part of its investigation, Southwest discovered that certain "hidden city" tickets for which Kiwi was the apparent seller were in fact obtained through a website owned by Skiplagged, www.Skiplagged.com.

---

[6] As an illustrative example, a passenger purchases a ticket from Los Angeles to New York with a connection in Las Vegas, but does not travel beyond Las Vegas. These are also known as "buy long/fly short" itineraries or "hidden city" tickets.

SKIP0000342 'x 0660

18. On information and belief, Kiwi distributed *to Skiplagged* the Southwest schedules and fares that Kiwi was scraping from Southwest's website.[7]

19. On information and belief, Skiplagged integrated Kiwi's database into its own travel website by becoming a Kiwi "partner." According to Kiwi's website, OTAs and metasearch engines must become a Kiwi partner to access Kiwi's flight and fare data and these partners are remunerated on a commission basis.[8]

20. On information and belief, Skiplagged and Kiwi work together, as partners, to market and sell tickets on Southwest Airlines at an inflated price—and earn profits on these sales.

21. Kiwi's website describes its "B2B2C" model as follows:

> Kiwi collects content from hundreds of different sources, including consolidators, web-modules, and direct APIs with carriers. … Kiwi.com provides a unified pricing model …. for our B2B2C customers. Our markup contains ***fees for the provision of services*** **and** a ***partner commission***. It is possible to receive pricing with no commission in order to make the price more attractive for the final customer. … The prices which are returned by our Search API are always final. These include ***partner commission***, guarantee costs, payment fees, Customer Support fees, infrastructure and content fees, ***and Kiwi.com's commission***. **Kiwi.com acts as the merchant of record.** Our markup is dynamically calculated and varies from 5 per cent to 20 per cent.[9]

22. Kiwi and Skiplagged understand that they are able to convince buyers to purchase tickets at inflated prices by (i) including flights on airlines like Southwest that are not otherwise

---

[7] Kiwi website, https://partners.kiwi.com/our-solutions/tequila/ (last verified, July 11, 2021). Kiwi website, https://www.kiwi.com/tw/pages/content/partner (then click on OTA & metasearch) (last accessed July 12, 2021).

[8] https://www.kiwi.com/tw/pages/content/partner (last accessed July 12, 2021).

[9] https://partners.kiwi.com/technology-services/b2b2c-partnership-model/ (last accessed July 20, 2021) (emphasis added).

8

SKIP0000343'x 0661

available on OTAs like Kayak or Expedia; and (ii) promoting improper ways to combine flights to reach a destination, like "hidden city" travel. [10]

**C.   Skiplagged partners with Kiwi to sell "hidden city" tickets on Southwest.**

23.    Skiplagged runs a search engine that claims to identify lower airfares to a given destination by, with its actual knowledge, inducing OTAs (like Kiwi and Destina Holidays) to breach applicable contracts of carriage with the airline. Skiplagged's CEO Aktarer Zaman signed a declaration in the New York action that confirmed "Kiwi.com is one vendor as to which Skiplagged publishes pricing for routes offered by a wide variety of airlines, including [Southwest]."[11]

24.    The name Skiplagged is a reference to the term "Skiplagging" that is the practice of booking an itinerary where the stopover (connecting city) is the true and intended destination of the traveler. Tickets purchased to travel to a stopover rather than the destination are known as "hidden city" tickets.

25.    Many airlines (including Southwest) prohibit "hidden city" tickets due to logistical, operational, and public safety concerns that arise from it. Some examples include: (1) there are challenges at the airport with checked baggage because Southwest must check baggage to the ticketed, final destination, yet the customer intends to end his or her trip in the connecting city; (2) when a customer ends his or her trip in the connecting city, this presents a series of challenges for operational employees and flight crews trying to locate connecting customers that are listed on the connecting flight's manifest; and (3) challenges arise in the amount of time trying to locate

---

[10]   *See, e.g.*, https://partners.kiwi.com/technology-services/b2b2c-partnership-model/ (last accessed June 12, 2020).

[11]   *Skiplagged, Inc. v. Southwest Airlines Co.*, No. 1:21-cv-05749-JPC (S.D.N.Y.) (Dkt. #35) Declaration of Aktarer Zama ¶ 4.

SKIP0000344 Appx 0662

connecting customers which has led to actual flight delays that negatively impact other passengers and disrupt Southwest's flight schedule and on-time performance metrics.

26.     "Hidden city" travel violates the Contract of Carriage that a passenger enters with Southwest and, more specifically, Section 2(a)(2) of Southwest's Contract of Carriage prohibits "purchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities)."[12]

27.     By identifying and promoting prohibited forms of travel (such as "hidden city" tickets), Skiplagged has induced Southwest's customers to breach both (a) the Southwest Terms & Conditions and (b) Southwest's Contract of Carriage.

28.     Skiplagged.com includes repeated reference to "hidden city" tickets that it describes as "a flight where you get off at the layover rather than the final destination"[13] and then explains "but there are **some things to be aware of**" and notes that:

- You might upset the airline, so don't do this often.

---

[12] Southwest provides notice of the Contract of Carriage throughout the purchase path, among other places on the Southwest Website, and also incorporates the Contract of Carriage as part of the Terms & Conditions that provide: "[i]n some instances both these Terms [& Conditions] and separate terms and conditions will apply, including . . . [being] subject to the terms & conditions contained in Southwest's Contract of Carriage." Kiwi's website also contains terms and conditions explaining to Kiwi's users in the "Service Agreement" (Article 2.1.2) that Kiwi's services consist of "[b]rokerage of the Contract of Carriage between You [the Kiwi user] and the Selected Carrier." Article 16 of Kiwi.com's terms and conditions are labeled "Brokerage of the Contract of Carriage" and explains: "We [Kiwi] are responsible primarily for brokering the Contract of Carriage between You [Kiwi user] and a Selected Carrier."

[13] https://support.skiplagged.com/hc/en-us/articles/115003286687-What-is-a-hidden-city-flight- (last accessed July 23, 2021).

SKIP0000345 x 0663

29.     On information and belief, when a Skiplagged.com user is ready to purchase a ticket on Southwest, Skiplagged.com directs the user to a page on Kiwi.com (or more recently DestinaHolidays.com) to complete the purchase and process payment.

30.     Because Kiwi or Destina Holidays acts as the merchant of record, Southwest cannot easily determine from the electronic record which tickets were purchased through Skiplagged.com.

**D.     Southwest demands that Skiplagged cease and desist from using its trademarks and selling "hidden city" flights on its airline without authorization.**

31.     On June 8, 2021, Southwest wrote a letter to Skiplagged from Texas, explaining that Skiplagged was violating the Southwest Terms & Conditions by scraping and/or using data scraped from Southwest.com, promoting "hidden city" tickets, and using Southwest's trademarked heart logo to advertise the sale of tickets on Southwest Airlines without its authorization.[14]

32.     Southwest explained that Southwest had "the exclusive distribution rights to sell Southwest flights to the general public through the Southwest Website" and never authorized Skiplagged to display or sell its fares, display its trademark logos, publish its flight or fare data, or to use the Southwest Website for or in connection with offering any third-party product or service—or use Southwest's trademarks in doing so.[15]

33.     Southwest further explained that Skiplagged was inducing Southwest customers to violate the Southwest Terms & Conditions and/or Contract of Carriage. Southwest included a complete copy of the Southwest Terms & Conditions, and the details of registered trademarks. It noted that the Southwest Terms & Conditions prohibit:

---

[14] Letter from James Sheppard (Southwest) to Skiplagged, Inc. c/o Aktarer Zaman (June 8, 2021), attached hereto as Ex. B.

[15] *Id.* at p. 1.

SKIP0000346'x 0664

- Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information[16] to create a derivative work;"

- Use of the Southwest Website "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

- Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading ….";

- Attempts to "harvest any information from the [Southwest Website];"

- Attempts to "infringe any intellectual property or other right of any third party;"

- Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

- ["U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire information, … search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[17]

---

[16] "Company Information" is defined in the Southwest Terms & Conditions as "Information and materials concerning Southwest and its products and services, and similar items from our licensors and other third parties, including flight schedules, routes, fares, text, graphics, button icons, layout, databases, articles, posts, text, data, files, images, scripts, designs, instructions, illustrations, photographs, sounds, pictures, advertising copy, URLs, technology, software, interactive features, the "look and feel" of the Sites, audio and video clips, digital downloads, data compilations (including customer and Rapid Rewards® information), the compilation, assembly, and arrangement of the materials of the Sites, all copyrightable materials, trademarks, logos, trade names, trade dress, service marks, and trade identities of various parties, including those of Southwest, and other forms of intellectual property, and information regarding the status of Southwest flights, etc." *See* Ex. A.

[17] *See* Ex. B, letter from James Sheppard (Southwest) to Skiplagged, Inc. c/o Aktarer Zaman (June 8, 2021) at Ex. A thereto, Southwest Terms & Conditions, p. 2.

SKIP0000347

34.    On June 18, 2021, outside counsel for Southwest in Texas wrote to Skiplagged again demanding that it cease and desist from all violative conduct and preserve all physical and electronic evidence in anticipation of litigation. In the June 18th letter, Southwest expressly noted that "**Skiplagged's failure to cease and desist the conduct described herein may result in Southwest pursuing litigation against you in a Texas federal court and seeking all available legal relief, including damages** and/or injunctive relief, and seeking to recover its attorneys' fees."[18]

35.    On June 21, 2021, Skiplagged replied to counsel for Southwest in Texas, asserting that it did not "web scrape" data from the Southwest.com website or obtain data from Southwest's application programming interface or sell "hidden-city" flights on Southwest.[19] And it no longer displayed any heart logo for Southwest flights.

36.    On July 1, 2021, outside counsel for Southwest replied to Skiplagged's June 21 letter again demanding that it cease and desist.[20] Counsel explained that Skiplagged continued to violate the Southwest Terms & Conditions through its unauthorized publication, marketing, and sale of Southwest tickets (that falsely misrepresent actual ticket prices), even if linking to another unauthorized travel website, Kiwi.com. Southwest explained that it had filed a federal lawsuit against Kiwi that included, among other things, a claim for breach of the Southwest Terms & Conditions, and provided the relevant case number.

---

[18] Letter from Michael Wilson to Skiplagged, Inc. c/o Aktarer Zaman (June 18, 2021), attached hereto as Ex. C (emphasis original).

[19] Letter from Skiplagged, Inc. c/o Aktarer Zaman to Michael Wilson (June 21, 2021), attached hereto as Ex. D.

[20] Letter from Michael Wilson to Skiplagged, Inc. c/o Aktarer Zaman (July 1, 2021), attached hereto as Ex. E.

SKIP0000348 x 0666

37.     Southwest warned Skiplagged that if it did not cease displaying Southwest flights at inflated prices and directing customers to Kiwi.com to purchase Southwest flights, cease promoting "hidden city" flights on Southwest Airlines, and cease interfering with Southwest's contractual relationships with Southwest's current and future customers, Southwest would file suit in federal district court in Texas.[21]

38.     Southwest explained that "regardless of how Skiplagged acquires the information, Skiplagged is misleading and deceiving customers by misstating the cost of Southwest's flights. By misrepresenting and inflating the cost of Southwest's fares, Skiplagged is also violating federal law, which prohibits deceptive and misleading practices in the sale of air transportation."

39.     On July 6, 2021, outside counsel for Skiplagged replied to Southwest's letter.[22] There, it denied that its conduct (in republishing Southwest fare data and selling Southwest flights to consumers on "hidden-city" flights, at a markup) was wrongful. It declared that it was not subject to jurisdiction in Texas and was therefore filing a defensive declaratory judgment action in New York:

> Accordingly, **given your Letter's litigation threat, Skiplagged has commenced a declaratory judgment action in the Southern District of New York**, which properly has jurisdiction over this dispute.[23]

40.     Skiplagged also claimed that it obtained its Southwest fare data from third parties— and not from Southwest.com. It denied representing to Skiplagged customers that the prices

---

[21] *Id.*

[22] Letter from Skiplagged, Inc. c/o Aktarer Zaman to Michael Wilson (July 6, 2021), attached hereto as Ex. F (emphasis added).

[23] *Id.*

SKIP0000340 'x 0667

25

Skiplagged charged them for Southwest flights were "the 'actual' prices that Southwest charges" for its flights.

41.     Southwest implemented self-help security measures, including technology blocks, in an effort to stop Kiwi (and therefore, also its "partners" like Skiplagged) from illegally scraping its data and using it to sell "hidden city" tickets on its airline, without authorization. Kiwi continued to hack the Southwest Website (in violation of federal law and the Southwest Terms & Conditions), republish Southwest fares and flight schedules, and share it with Skiplagged, who, together with Kiwi, used the data to sell flights on Southwest's airline without authorization.

## E.    Skiplagged files a declaratory judgment action in New York to deprive Southwest of its right as plaintiff to the forum of its choice; Southwest files this suit.

42.     On July 2, 2021, to deprive Southwest of its right to a forum of its choice, Skiplagged filed a declaratory judgment action in Federal District Court for the Southern District of New York.[24]

43.     Nearly one year later, on July 1, 2022, the New York federal court granted Southwest's Motion to Dismiss Skiplagged's Declaratory Judgment Action and, in a written opinion, ruled that Skiplagged's lawsuit was an "improper anticipatory action."[25]

44.     Among other things, Skiplagged and Kiwi (or Destina Holidays) have acted in concert and on information and belief, pursuant to a partnership or affiliate agreement, to market and sell Southwest flights, including "hidden city" tickets.

---

[24] *Skiplagged, Inc. v. Southwest Airlines Co.*, Case No. 1:21-cv-05749-JPC (S.D.N.Y.).

[25] *Id.* Dkt #46 at 5–6.

footer
15

SKIP00000350 'x 0668

**F.** **Skiplagged partners with Destina Holidays, another unauthorized OTA to continue to illegally sell flights on Southwest.**

45. As part of its investigation into unauthorized OTAs, Southwest determined that Texas-based Destina Holidays was selling unauthorized tickets for flights on Southwest and that after the Kiwi litigation, Skiplagged was sending users to Destina Holidays to complete their ticket purchases.

46. On information and belief, like other unauthorized OTAs, Destina Holidays is not legally permitted to display Southwest flight and fare data and obtains information regarding Southwest flights and fares through improper means.

47. On information and belief, Destina Holidays uses fake or false addresses and other misleading information to purchase Southwest tickets in violation of the Southwest Terms and Conditions.

48. On December 1, 2021, Southwest wrote a letter to Destina Holidays, explaining that Destina Holidays was violating the Southwest Terms & Conditions by using data unlawfully obtained from Southwest.com and advertising and selling tickets on Southwest Airlines without its authorization.[26]

49. In the December 1, 2021 notice, Southwest explained to Destina Holidays that Southwest had "the exclusive distribution rights to sell Southwest flights to the general public through the Southwest Website" and never authorized Destina Holidays to display or sell its fares, publish its flight or fare data, or to use the Southwest Website for or in connection with offering any third-party product or service—or use Southwest's trademarks in doing so.[27]

---

[26] Letter from James Sheppard (Southwest) to Skybooker.com Ltd. c/o Nadeem Qureshi (December 1, 2021), attached hereto as Ex. G.

[27] *Id.* at p. 2.

SKIP0000251 px 0669

50.     In the December 1, 2021 notice, Southwest further explained that Destina Holidays was inducing Southwest customers to violate the Southwest Terms & Conditions and/or Contract of Carriage. Southwest included a complete copy of the Southwest Terms & Conditions, and the details of registered trademarks. Southwest further explained to Destina Holidays that the Southwest Terms & Conditions prohibit:

- Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information[28] to create a derivative work;"

- Use of the Southwest Website "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

- Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading ….";

- Attempts to "harvest any information from the [Southwest Website];"

- Attempts to "infringe any intellectual property or other right of any third party;"

- Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

---

[28] "Company Information" is defined in the Southwest Terms & Conditions as "Information and materials concerning Southwest and its products and services, and similar items from our licensors and other third parties, including flight schedules, routes, fares, text, graphics, button icons, layout, databases, articles, posts, text, data, files, images, scripts, designs, instructions, illustrations, photographs, sounds, pictures, advertising copy, URLs, technology, software, interactive features, the "look and feel" of the Sites, audio and video clips, digital downloads, data compilations (including customer and Rapid Rewards® information), the compilation, assembly, and arrangement of the materials of the Sites, all copyrightable materials, trademarks, logos, trade names, trade dress, service marks, and trade identities of various parties, including those of Southwest, and other forms of intellectual property, and information regarding the status of Southwest flights, etc." *See* Ex. A.

SKIP0000352

- ["U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire information, … search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[29]

51.　　Later that day (December 1, 2021), Mohammad Nadeem (who was identified as a "Director" of Destina Holidays) responded to Southwest and indicated Destina Holidays would "remove South West [sic] content immediately.[30] That statement proved to be false.

52.　　Southwest's investigation shows that, less than two weeks after its promise to stop, Destina Holidays resumed making unauthorized Southwest reservations on December 14, 2021.

53.　　Destina Holidays would continue to engage in the unauthorized activity prohibited by the Southwest Terms & Conditions, such as (1) the unauthorized distribution of Southwest's fare information to websites like Skiplagged; and (2) the unauthorized display and marketing of Southwest's fare information including completing bookings of tickets at inflated prices.

54.　　As a result, on July 1, 2022, Southwest sent a second cease and desist letter to Destina Holidays including proof that "Destina Holidays continues its unauthorized use and display of Southwest fare data."[31]

55.　　On July 7, 2022, Destina Holidays responded to Southwest's notice and said: "Please check, we have removed now".[32] That statement also proved to be false.

---

[29] *See* Ex. G, Letter from James Sheppard (Southwest) to Skybooker.com Ltd. c/o Nadeem Qureshi (December 1, 2021) at Ex. A thereto, Southwest Terms & Conditions, p. 2.

[30] *See* Support Thread between James Sheppard (Southwest) and Mohammad Nadeem (Destina Holidays), attached hereto as Ex. H.

[31] *See id.*

[32] *See id.*

SKIP0000253

56. Southwest's investigation shows that, less than two weeks after its promise to stop, Destina Holidays resumed making unauthorized Southwest reservations on July 16, 2022.

57. Contrary to its repeated promises, Destina Holidays continued to display and sell tickets on Southwest Airlines on its website.

## II. THE PARTIES

58. Southwest is a Texas corporation with its principal place of business located at 2702 Love Field Drive, Dallas, Texas 75235.

59. Skiplagged, Inc. is a Delaware corporation with a principal place of business located at 41 E. 11th St., 9th Floor, New York, New York 10003. Skiplagged owns and/or operates Skiplagged.com.

60. Skybooker Ltd. is a Texas corporation with a principal place of business located at 7952, Southfork Bend, Irving, Texas 75063. Skybooker Ltd. does business under the assumed name Destina Holidays. On information and belief, Skybooker Ltd. previously operated under the name Destina Travel.

## III. JURISDICTION AND VENUE

61. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because Southwest asserts claims arising under 15 U.S.C. §§ 1114, 1116, 1117, and 1125 of the Lanham Act. This Court has supplemental and pendent jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

62. Defendants know, including from correspondence with Southwest, that:

    a. Southwest is based in Texas.

    b. Use of Southwest's Website—which is necessary not only to scrape Southwest's fares and schedules, but also to communicate passenger

SKIP0000354

information to Southwest on any ticket that Skiplagged, Kiwi, or Destina Holidays sells—is subject to the Southwest Terms & Conditions.

c. The Southwest Terms & Conditions prohibit the use of the Southwest Website "*for any commercial purpose*, with the exception of authorized Southwest travel agents/agencies."

d. Pursuant to the Southwest Terms & Conditions, neither Skiplagged, Kiwi, nor Destina Holidays are authorized to scrape or publish Southwest's proprietary schedule and pricing data.

e. Neither Skiplagged, Kiwi, nor Destina Holidays are authorized to market or sell Southwest tickets on their websites.

f. Southwest does not authorize the sale of "hidden city" tickets, the sale of which substantially harms Southwest, as does the misrepresentation of its prices and policies, the unauthorized sale of its products at a markup, and use of its trademarks—all of which are prohibited.

g. The Southwest Terms & Conditions contain a forum selection clause that applies to "all disputes":

## Forum Selection

These Terms and the relationship between you and Southwest shall be governed by the laws of the State of Texas without regard to any conflict of law provisions. **You agree to the personal and exclusive jurisdiction of the courts located within Dallas, TX. You hereby consent to the exclusive jurisdiction and venue of the State and Federal courts in Dallas, Texas in all disputes**.[33]

63. Although Southwest notified Defendants that Skiplagged, Kiwi, and Destina Holidays are not permitted to scrape, publish, or distribute Southwest's data, nor are they permitted

---

[33] Ex. A, Southwest Terms & Conditions at 3 (emphasis in original).

SKIP0000255 x 0673

to market or sell tickets on Southwest pursuant to the Southwest Terms & Conditions, Skiplagged has continued to use data from Kiwi and/or Destina Holidays to wrongfully publish and market Southwest flights on Skiplagged and direct customers to its partners, Kiwi and Destina Holidays, to process payment on the sale and collect its commission and Destina Holidays has continued to obtain and illegally republish Southwest fare and schedule data to advertise and sell flights on Southwest Airlines.

64.     Due to Skiplagged directing its users to purchase tickets on Kiwi.com, Southwest was forced to file the Kiwi Litigation to enforce the contract terms on the Southwest website.

65.     In connection with their unauthorized republication of Southwest fares and flight schedules and their unauthorized sales of Southwest flights and services, Kiwi was accessing Southwest's computer systems located in Texas and in this District without authorization, bypassing Southwest's security systems intended to block automated traffic and bots from using the Southwest Website, and hacking the Southwest API that is accessible only through the Southwest Website—and then distributing that data to *Skiplagged*.

66.     Skiplagged knows that Kiwi and Destina Holiday's use of Southwest's data and sale of tickets on Southwest Airlines is unauthorized, but Skiplagged still continued to republish that data *and sell tickets through Kiwi and Destina Holidays* on its website, Skiplagged.com.

67.     Destina Holidays knows that its use of Southwest's data and sale of tickets on Southwest Airlines is unauthorized, but Destina Holidays still continues to republish that data and sell tickets through its website, Destinaholidays.com.

68.     This Court has jurisdiction over Defendants and all of Southwest's claims because:

SKIP000036 'x 0674

a. Defendants knowingly used trademarks that belong to Southwest without Southwest's permission to market and sell tickets on Southwest Airlines without authorization;

b. Defendants knowingly have used Southwest's trademarks to market prohibited forms of travel, including "hidden city" tickets, to travelers in Texas—diluting Southwest's trademarks and causing foreseeable confusion as to the origin of certain services;

c. Defendants knowingly induce Texas citizens to breach their contracts of carriage with Southwest—causing foreseeable injury to Southwest in Texas;

d. Defendants market Southwest flights to travelers in Texas, and knowingly convince travelers domiciled in Texas to breach their contracts of carriage with Southwest—a Texas entity;

e. Skiplagged, in cooperation and partnership with Kiwi and Destina Holidays, induces Kiwi and Destina Holidays to breach their agreements with Southwest by sharing Southwest's data and directing customers to Kiwi.com and DestinaHolidays.com to book "hidden city" fares;

f. Skiplagged acts as Kiwi and Destina Holidays' partners, and collectively uses Southwest's Company Information to generate profits for Kiwi, Destina Holidays, and Skiplagged on Southwest bookings.

g. Even after this lawsuit was filed and the Kiwi Ruling, Skiplagged still continued to display Southwest's fare and pricing information through its partnership with Destina Holidays which is a Texas corporation.

SKIP0000357 0675

     h.   Destina Holidays maintains its principal place of business in Texas and is incorporated in Texas.

69.     Southwest's claims arise out of the "access to … or use" of Southwest's Website by Defendants, alone and, as to Skiplagged, in partnership with Kiwi and/or Destina Holidays. Under the Southwest Terms & Conditions, it is agreed that:

> [A]ny transactions carried out through the Sites will be deemed to take place in the State of Texas, United States of America, regardless of the jurisdiction where [it] may be located or reside….

70.     Defendants, both alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have committed torts in this District, breached or induced breaches of contract in this District, violated Texas statutory law in this District, and systematically conduct business in this District. Skiplagged also has purposefully availed itself of the forum by soliciting business from Texas residents and purposefully directing its actions towards Texas, including by offering and selling flights in Texas, and soliciting business from Texas residents.

71.     Defendants have offered and facilitated the sale of Southwest flights to airports in Texas cities, including in this District.

72.     On information and belief, Defendants have sold, using Southwest's proprietary fare data and trademarks (or caused the sale of, by directing customers to submit payment through Kiwi.com and DestinaHolidays.com), over 1,000 flights on Southwest.

73.     Skiplagged knows and understands that, in connection with the purchase of Southwest flights, Kiwi and Destina Holidays interact with Southwest computer systems located in Texas and in this District, and Skiplagged, Destina Holidays, and Kiwi are selling the services of Southwest, a Texas company with its base of operations in this District. On information and

SKIP0000358 'x 0676

belief, Skiplagged has derived substantial revenues and profits from such contacts with Texas and can reasonably anticipate being haled into court in Texas to answer for its actions.

74.    On information and belief, a significant number of travelers residing in the Dallas area have purchased tickets on Southwest through Defendants' websites.

75.    The injuries Defendants inflict on Southwest are felt in this District, and Defendants knew that serious harmful effects from its conduct would occur here.

76.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the claims asserted in this action arose in this District and a substantial part of the activities, conduct and damages have occurred in Texas.

77.    During all relevant times, as Skiplagged directed its users to unauthorized OTAs, Skiplagged has knowingly and intentionally induced Kiwi and/or Destina Holidays to breach the Southwest Terms & Conditions by, for example, (a) engaging in "Restricted Activity" that prohibits using Southwest's Service or Company Information for any commercial purpose; (b) using page-scraping or bots to obtain Southwest's Company Information, such as its flight and pricing data; (c) violating the prohibition on copying, displaying, publishing, or distributing Southwest's Company Information, such as its flight and pricing data; and (d) the restriction that users "will not use the Service [Southwest's website and computer servers] for or in connection with offering any third party product or service not authorized or approved by Southwest."

78.    Skiplagged was knowingly accessing Southwest's Company Information (e.g., fare data) from Kiwi and, in turn, Kiwi was accessing Southwest's servers located in this district. In the Kiwi Litigation, this Court ruled that venue is proper in this jurisdiction and summarized a declaration from a Southwest Enterprise Architect explaining that "Southwest's digital platforms

SKIP0000359

are hosted and supported at data centers located in and around Dallas." *Sw. Airlines Co. v. Kiwi.com, et al.*, No. 3:21-cv-00098 (N.D. Tex.) (Dkt. # 30).

79.    Skiplagged is also knowingly obtaining and accessing Southwest's Company Information (e.g., fare data) from Destina Holidays which (a) is a Texas corporation; and (b) on information and belief, is accessing Southwest's servers located in this district to collect Southwest's Company Information (e.g., fare data) and/or complete booking transactions.

## IV.    FACTS GIVING RISE TO THIS ACTION

### A.    Southwest's Operation and Website.

80.    Since its first flight in June 1971, Southwest has provided affordable flights to business and leisure passengers for just over 50 years. Southwest is one of the most-flown airlines in the United States. In the highly competitive airline industry, Southwest has been successful in large measure because of Southwest's commitment to customer service and consumer loyalty, including its well-known promises of fares with "no hidden fees" and "no change fees" (though fare differences may apply), and allowing its customers to directly book tickets on Southwest.com.

81.    Southwest owns and operates the Southwest Website. Southwest also maintains the exclusive online distribution rights to sell Southwest tickets to the general public through the Southwest Website and does not allow the sale of Southwest flights without express written approval.

82.    Southwest has long prevented website operators and OTAs from selling its flights and the Southwest Terms & Conditions for the Southwest Website include a list of Restricted Activities that prohibit attempts to "page scrape" or using the Southwest Website "for any commercial purpose" without permission from Southwest.[34] Such restrictions are permitted under

---

[34] *See* Ex. A, Southwest Terms & Conditions at 2.

SKIP0000360 0'x 0678

federal law.[35] Southwest's fares and flight schedules are proprietary and subject to certain use restrictions, such that they may not be republished or used for commercial purposes without Southwest's express permission.

83. To protect the security of its website and ensure normal operations, Southwest makes its website and the proprietary contents available for consumers' use subject to the Terms & Conditions. An interactive link on each page of Southwest's website, including the homepage, references the Terms & Conditions.

84. Because use of the Southwest Website constitutes acceptance of the Terms & Conditions, the Terms & Conditions constitutes a valid and enforceable contract between Southwest and those who access the website.

85. Southwest has sent multiple cease and desist letters to Defendants, informed Defendants of the Kiwi Litigation, and identified the relevant Terms & Conditions.[36]

86. The Terms & Conditions for use of the Southwest Website specifically prohibit, among other things, the following user conduct:

    a. Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information to create a derivative work;"

---

[35] *See* 14 C.F.R. § 256.6 ("Nothing in this section requires an air carrier, foreign air carrier, or ticket agent to allow a system to access its internal computer reservation system or to permit 'screen scraping' or 'content scraping' of its Web site; nor does it require an air carrier or foreign air carrier to permit the marketing or sale of the carrier's services through any ticket agent or other carrier's system. 'Screen scraping' as used in this paragraph refers to a process whereby a company uses computer software techniques to extract information from other companies' Web sites without permission from the company operating the targeted Web site."). To the extent that any common law right to scrape "publicly available" data exists, this section preempts it.

[36] Ex. E, Letter from Michael Wilson to Skiplagged c/o Aktarer Zaman (July 1, 2021); Ex. G, Letter from James Sheppard (Southwest) to Skybooker.com Ltd. c/o Nadeem Qureshi (December 1, 2021).

SKIP0000361 Skip'x 0679

b.  Use of the Southwest Website or Company Information "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

c.  Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading . . . .;"

d.  Attempts to "harvest any information from the [Southwest Website];"

e.  Attempts to "infringe any intellectual property or other right of any third party;"

f.  Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

g.  "[U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire information, . . . search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[37]

87.    The Terms & Conditions also provide that, by accessing the Southwest Website, or using the content made available through the website, Defendants accept and agree to the Southwest Terms & Conditions. As described herein, Defendants are aware that they, and as to Skiplagged, Kiwi and Destina Holidays, are using the Southwest Website and content from the Southwest Website.

---

[37] *See* Ex. A, Southwest Terms & Conditions at 2.

SKIP0000362'x 0680

## B. Southwest's Registered Trademarks.

88. Southwest is the owner of, among other things, the federal trademark registrations listed below (hereinafter collectively referred to as the "Southwest Marks"):[38]

| Trademark | Date | Services | No. |
|---|---|---|---|
| SOUTHWEST AIRLINES | Registered: Dec. 8, 1992 | (Int'l Class: 39) transportation services; namely, transportation of cargo and passengers by air | Reg. No.: 1,738,670 |
| SOUTHWEST | Registered: Aug. 15, 2006 | (Int'l Class: 39) Transportation of passengers and/or goods by air | Reg. No.: 3,129,737 |
|  | Registered September 8, 2015 Int'l Class: 35 First Use: September 8, 2014 Filed: October 1, 2014 | (Int'l Class: 35) providing electronic on-line information services, namely, the provision of advertisements and business information in respect of travel, tourism and entertainment through a computer database; advertising services and promotion services by data communications for service providers in the travel industry; on-line direct electronic marketing services and advertising services for service providers in the travel industry; providing online information to others, namely, advertisements and solicitations | Reg. No.: 4,806,962 |
|  | Registered July 7, 2015 Int'l Class: 16 First Use: September 8, 2014 Filed: December 1, 2014 | (Int'l Class: 16) printed matter, namely, publications, magazines, and books all featuring information about the airline and travel industry | Reg. No.: 4,768,717 |
| | Registered April 14, 2015 Int'l Class: 39 | (Int'l Class: 39) air transportation of passengers and freight; air transportation services | Reg. No.: 4,720,322 |

---

[38] True and correct copies of the registration certificates for the Southwest Marks are available free of charge from the USPTO's Trademark Electronic Search System (TESS) database available at https://www.uspto.gov/trademarks-application-process/search-trademark-database.

SKIP0000363

| Trademark | Date | Services | No. |
|---|---|---|---|
| | First Use: September 8, 2014 Filed: September 8, 2014 | featuring a frequent flyer bonus program; airline transportation services; delivery of goods by air; freight transportation by air; making reservations and bookings for transportation; making transportation bookings and reservations for others by means of a website; on-line transportation reservation and travel ticket reservation services; online transportation reservation services; providing a website featuring information in the field of air transportation; providing automated check-in and ticketing services for air travelers; transport by aircraft; transport by air; transport of passengers; transport of persons and goods; transportation of passengers and/or goods by air; travel agency services, namely, making reservations and bookings for transportation | |
| | Registered April 21, 2015 Int'l Class: 09 First Use: September 8, 2014 Filed: September 22, 2014 | (Int'l Class: 09) computer application software for mobile phones, namely, software for delivery of personalized travel information; computer e-commerce software to allow users to perform electronic business transactions via a global computer network; computer software for the delivery of personalized travel information that may be downloaded from a global computer network; downloadable mobile applications for providing personalized travel information namely flight check-in, flight status, and flight and car rental information and services; downloadable software in the nature of a mobile application for the delivery of personalized travel information | Reg. No.: 4,723,791 |
| | Registered April 21, 2015 Int'l Class: 43 First Use: September 8, 2014 Filed: September 22, 2014 | (Int'l Class: 43) making hotel reservations for others; providing a website featuring information in the field of hotels and temporary accommodations for travelers; providing personalized information about hotels and temporary accommodations for travel via the internet | Reg. No.: 4,723,789 |

SKIP0000364

| Trademark | Date | Services | No. |
|---|---|---|---|
|  | Registered January 26, 2016<br>Int'l Class: 41<br>First Use: September 8, 2014<br>Filed: May 22, 2015 | (Int'l Class: 41)<br>providing information on entertainment, sporting, and cultural events and venues, amusements parks, tourist attractions, and recreational activities; ticket reservation and booking services for entertainment, sporting, and cultural events and venues, amusement parks, tourist attractions, and recreational services | Reg. No.: 4,892,223 |

89.     Southwest spends substantial time, money, and effort advertising and promoting its products and services using its trademarks throughout the United States. The Southwest Marks provide Southwest with the exclusive right to use the registered marks in connection with air transportation and other travel services, as well as the right to exclude third parties from unauthorized use of the marks. Through years of nationwide and continuous use and advertisement, Southwest has established enormous goodwill with respect to these marks, and they are Southwest's valuable intellectual property. The Southwest Marks have become famous, distinctive, and well known, and the public accepts the marks as indicative that Southwest is the source of those services.

## C.     Skiplagged's Wrongful, Unauthorized, and Misleading Conduct in partnership with Kiwi and Destina Holidays.

90.     On information and belief, Skiplagged, acting in concert with Kiwi and Destina Holidays as its partner, has (i) infringed Southwest's Marks by displaying Southwest's name and Heart logo on the Skiplagged website; (ii) used those marks without Southwest's authorization to market and sell tickets on Southwest flights; (iii) enticed and encouraged Southwest customers to breach their contract of carriage with Southwest; (iv) aided and abetted Kiwi and Destina Holidays' infringement of Southwest's Marks; and (v) aided and abetted Kiwi and Destina Holidays' breach of the Southwest Terms & Conditions.

SKIP0000365

91.     Skiplagged is aware that, in connection with promoting and selling Southwest flights and services, the unauthorized OTAs (e.g. Kiwi and Destina Holidays) knowingly and intentionally target the Southwest Website and Southwest's servers in manner that violates (a) the Southwest Terms & Conditions; and/or (b) Southwest's Contract of Carriage.

92.     In addition, Skiplagged is aware that, in connection with promoting and selling Southwest flights and services, the unauthorized OTAs (e.g. Kiwi and Destina Holidays) use Southwest's information in a manner that is fraudulent, false or misleading, and that violates (a) the Southwest Terms & Conditions; and/or (b) Southwest's Contract of Carriage.

93.     According to Kiwi's website, parties like Skiplagged must sign a contract to access Kiwi's API and are then paid on a commission basis.[39]

94.     On or about February 2021, Southwest's employees reported problems and challenges with "hidden city" tickets that, according to the customer, were located through searches on Skiplagged and then purchased through Kiwi. The Southwest employee took a photo of the boarding pass and made hand-written notes, reflecting a conversation with the customer, that the Southwest fare was displayed on Skiplagged and then the trip itinerary was sent by Kiwi.

---

[39] https://www.kiwi.com/tw/pages/content/partner (last accessed July 12, 2021).

SKIP0000366 'x 0684



95.   As Southwest investigated Skiplagged's connection to Kiwi, it learned that this particular passenger's itinerary included (a) a booking email domain of @kachipytel.com; (b) that it included a false billing address; and (c) was for a prohibited "hidden city" ticket where the passenger was booked to travel from Las Vegas, Nevada to connect in Oakland, California (Flight 783) and then take another flight to Seattle, Washington (Flight 2331); however, the customer only intended to travel to Oakland, California (on Flight 783).

96.   On information and belief, a booking that is displayed on Skiplagged and booked through Kiwi, the reservation contains the email domain of @kachipytel.com and Southwest's records show over 1,500 reservations with an email domain of @kachipytel.com and where the passengers trip originated from or landed in one of Southwest's Texas cities. There are more than 500 reservations with an email domain of @kachipytel.com and where the customer's trip originated from or landed in Dallas, Texas.

97.   In addition, Southwest discovered Skiplagged's infringing use of Southwest's famous "heart" trademark, as found in the Skiplagged website screenshot below:

32



98.    Skiplagged has infringed the Southwest Marks by displaying its well-known heart

logo on the Skiplagged website, to benefit from its goodwill and generate commissions for itself

and Kiwi on sales of Southwest flights.

99.    On information and belief, Defendants act as the merchant of record to process

payment for tickets on Southwest purchased by customers from Skiplagged's website. However,

when booking at ticket on Southwest, Kiwi includes a fake address as part of the booking detail

and some examples include: (a) for a flight departing out of Austin, TX, the billing city is listed as

"Morganchester, WV;" (b) for a flight departing out of Dallas, TX, the billing city is listed as

"North Susanborough, TX"; (c) for a flight departing of Austin, TX, the billing city is listed as

"New Karen, TN"; and (d) for a flight departing out of Dallas, TX, the billing city is listed as

"Lake Allisonport, GA."   Other fake cities (with reservations showing @kachipytel.com email

domain) include "East Jesus, OK" or "East Laurabury, NC" or "East Markchester, WY."  These

are not real cities in the United States and, therefore, show that Skiplagged and/or Kiwi are

SKIP0000368'x 0686

violating the Southwest Terms & Conditions which prohibit, among other things, "any speculative, fraudulent, or false reservation."

100.    When a customer clicks on a Southwest flight displayed on Skiplagged.com, the customer is then routed to a page hosted on Kiwi.com or DestinaHolidays.com to collect payment information.

101.    On information and belief, Skiplagged has sold (or facilitated the sale of) thousands of flights on Southwest through Kiwi.com and, more recently, through the Texas-based Destina Holidays.

102.    When reselling Southwest flights, Skiplagged, alone and through its agent and partners Kiwi and/or Destina Holidays, acknowledges that purchases are subject to the Southwest Terms & Conditions, stating: "All services provided by Southwest Airlines are subject to their Terms & Conditions. More information is available on their website." Skiplagged markets and sells these flights with knowledge that it and its customers are bound by the Southwest Terms & Conditions.

SKIP0000369 'x 0687



103.     Kiwi's terms and conditions state that "a Selected Carrier's terms and conditions and conditions of carriage will apply to Your contractual relationship with the Selected Carrier and that You must make Yourself aware of such terms and conditions as well as conditions of carriage before the Service Agreement is concluded and You complete the Booking."

104.     Skiplagged's use of the Southwest Marks to identify and sell flights on Southwest in partnership with Kiwi and Destina Holidays negatively impacts Southwest's reputation. For

35

SKIP0000270

example, booking Southwest flights through Skiplagged is more expensive than booking on the Southwest website because Skiplagged, Destina Holidays, and Kiwi charge additional fees. Thus, Skiplagged, Destina Holidays, and Kiwi are not merely scraping data or republishing it; they are improperly extracting data from the Southwest Website and trading on Southwest's reputation for having no hidden fees.

105.    Southwest has received significant complaints and inquiries from customers who purchased Southwest flights from Skiplagged and/or Kiwi. These complaints include that Skiplagged and/or Kiwi are (i) selling Southwest flights without permission; (ii) failing to identify the carrier when advertising Southwest flights; (iii) adding their own service fees to the price of Southwest flights; (iv) misrepresenting Southwest's policies in an effort to deceive customers into purchasing ancillary services from Skiplagged and/or Kiwi, such as customer service and checked bags, that are free with the purchase of Southwest flights; (v) failing to issue refunds to customers for cancellations on Southwest flights even after Southwest refunded the credit card used by Kiwi to purchase the ticket; (vi) not providing customers with notices about schedule changes or delays; (vii) not allowing customers to change or cancel reservations; (viii) misrepresenting checked bag policies and baggage fees charged by Skiplagged and/or Kiwi; and/or (ix) leading customers to mistakenly believe that Skiplagged and/or Kiwi are Southwest's authorized agent and blaming Southwest for Skiplagged and/or Kiwi's conduct.

106.    Various circumstances (i.e., cancelled flights, delayed flights, or rescheduled flights) necessitate the timely communication of information to customers and the issuance of refunds in many cases. Skiplagged's and/or Kiwi's unauthorized sales of Southwest flights interfere with Southwest's ability to issue timely communications and refunds to customers because Kiwi uses its own email addresses and credit cards (not the customer's) when booking

SKIP0000371

flights purchased through Skiplagged and Kiwi, thus preventing Southwest from directly communicating with customers and directly issuing refunds to customers. In some cases, the customer blames Southwest for the issue, even though Skiplagged and Kiwi are the direct cause of the problem.

**D.** **Defendants Inflate Fares and Charges Service Fees That Are Not Collected By Southwest.**

107.    Defendants, alone and as to Skiplagged, in partnership with Kiwi, do not identify the flight prices or additional charges in a transparent or straightforward manner. By way of example and comparison, the Southwest Website shows a total price of $229.95 for a flight from Dallas, Texas (DAL) to Amarillo, Texas (AMA) with an outbound flight on July 12, 2021 and a return flight on July 17, 2021 (the "Dallas-Amarillo Flight"):



108.    But Skiplagged, alone and in partnership with Kiwi, inflates the price of the Dallas-Amarillo Flight to $267 by adding a "Service Fee" or "Other Fees" to the actual ticket price:

SKIP0000372 'x 0690



109.    Destina Holidays does the same. For example, it inflates the price of a November

19, 2021 flight from Dallas, TX (DAL) to Houston, TX (HOU) from $128.98 on Southwest.com

to $148.98 on Destinaholidays.com.



SKIP0000273's 0691



110.     Moreover, like Skiplagged, Destina Holidays misrepresents the terms of travel. At checkout, the customer at DestinaHolidays.com must choose one of two options. First, if a customer chooses not to add on a $12.50 fee for "premium" support and later needs to change or cancel the fare, DestinaHolidays.com charges a $50.00 fee that is not charged by Southwest. Or, a customer must pay $12.50 upfront at checkout and receive "free" rescheduling assistance for flight changes and cancellations, a fee that is also not charged by Southwest.

111.     Skiplagged and Kiwi also promise an "Automatic flight check-in," which violates the Terms & Conditions on the Southwest Website because "online check-in providers may not use Southwest web pages to check-in customers online or attempt to obtain for them a boarding

SKIP0000274 'x 0692

pass in any certain boarding group."[40] Moreover, on information and belief, Skiplagged, alone and in partnership with Kiwi, does not actually provide customers with an automatic flight check-in service, despite promising it.

112. Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, also misrepresent that Southwest flights purchased through Defendants and Kiwi.com are nonrefundable or subject to change fees, which is not true because Southwest's fare policies have "No Change Fees" (though fare differences may apply); and tickets are always refundable (i.e., Business Select or Anytime fares) or reusable as travel credit (i.e., Wanna Get Away fares).

113. Skiplagged, alone and in partnership with Kiwi and Destina Holidays, also misrepresents Southwest's ticket policies by indicating a customer would need to pay an additional cost for "Premium Services" to get email support or avoid fees for other services. In effect, Skiplagged, in partnership with Kiwi and Destina Holidays, is seeking to further increase the price of a Southwest flight for "services" that are not otherwise collected by Southwest because it does not charge any fees for email support or customer service.

114. Skiplagged also proposes undesirable and inefficient routes and connections without adequate disclosure to customers of potential issues with such routes, including "hidden city" tickets, which are prohibited by Southwest's Contract of Carriage.

115. These and other unlawful, deceptive, and harmful practices by Defendants and Kiwi deliver inferior service, charge hidden fees, and directly contradict Southwest's policies, all of which harm Southwest's reputation and customer goodwill.

---

[40] *See* Ex. A, Southwest Terms & Conditions at 2.

SKIP0000375 x 0693

**E.    Defendants have Refused to Stop their Wrongful Conduct.**

116.    Several Southwest departments have dedicated company time and resources to investigate the unauthorized access of the Southwest Website relating to flights sold by Defendants and Kiwi.

117.    In late 2020, Southwest leadership teams received complaints from its frontline employees (i.e., customer service and ground operations) about problems caused by Kiwi's unauthorized sales of Southwest flights. During the ensuing investigation, Southwest learned that Kiwi was cheating customers on refunds, advertising disruptive "hidden city" flights that cause operational delays, and engaging in unfair and deceptive practices. This conduct violates the Southwest Terms & Conditions and federal law,[41] and causes irreparable harm to Southwest's business, reputation, and its brand.

118.    Some of these "hidden-city" fares were being booked through Kiwi's partner's website, Skiplagged.com—a website devoted, as its name implies, to helping customers identify "hidden-city" fares. On information and belief, some of these "hidden-city" fares were purchased through Destina Holidays.

119.    Defendants' activities are causing dilution of the quality of the famous Southwest Marks and other harm to Southwest, its business reputation and goodwill, for which Southwest has no adequate remedy at law.

120.    Defendants' activities are likely to cause, and have caused, confusion. Defendants' conduct is misleading and deceiving to the public and is likely to lead (and has led) the public to

---

[41] *See* 49 U.S.C. § 41712(a) (prohibiting any such "unfair or deceptive practice or an unfair method of competition in air transportation or the sale of air transportation."); 14 C.F.R. § 256.6 (allowing carriers to restrict sales of flights).

SKIP0000376

wrongly conclude that the goods and services offered by Defendants originate with, are sponsored by, and/or are authorized by Southwest—all to the damage and harm of Southwest and the public.

**F.     Southwest demands that Skiplagged cease and desist; Skiplagged refuses to do so.**

121.    On June 8, 2021, Southwest wrote to Skiplagged from Texas, explaining that Skiplagged was violating the Terms & Conditions of Southwest.com by scraping and/or using data scraped from Southwest's Website, promoting "hidden city" tickets, and using Southwest's trademarked heart logo to advertise the sale of tickets on Southwest without its authorization.[42]

122.    Southwest explained that Southwest had "the exclusive distribution rights to sell Southwest flights to the general public through the Southwest Website" and never authorized Skiplagged to display its fares or sell its flights, display its trademark logos, publish its flight or fare data, or to use the Southwest Website for or in connection with offering any third-party product or service—or use Southwest's trademarks in doing so.[43]

123.    Southwest explained that Skiplagged was inducing Southwest customers to violate the Southwest Terms & Conditions and/or Contract of Carriage. Southwest included a complete copy of its Terms & Conditions, and details of registered trademarks. It noted that Skiplagged was violating the Terms & Conditions of Southwest's website, which prohibit:

> a.   Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information to create a derivative work;"
>
> b.   Use of the Southwest Website "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

---

[42] Ex. B, Letter from James Sheppard (Southwest) to Skiplagged, Inc. c/o Aktarer Zaman (June 8, 2021).

[43] *Id.* at p. 1.

SKIP0000377 Appx 0695

    c.   Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading . . . .";

    d.   Attempts to "harvest any information from the [Southwest Website];"

    e.   Attempts to "infringe any intellectual property or other right of any third party;"

    f.   Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

    g.   ["U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire information, . . . search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[44]

124.    On June 18, 2021, outside counsel for Southwest in Texas wrote to Skiplagged, Inc., again asking that it cease and desist from all violative conduct and preserve all physical and electronic evidence in anticipation of litigation. Reiterating its grievances, Southwest expressly noted that "**Skiplagged's failure to cease and desist the conduct described herein may result in Southwest pursuing litigation against you in a Texas federal court and seeking all available legal relief, including damages** and/or injunctive relief, and seeking to recover its attorneys' fees."[45]

125.    On June 21, 2021, Skiplagged replied to counsel for Southwest in Texas, asserting that it did not "web scrape" data from the Southwest.com website or obtain data from Southwest's

---

[44] *See* Ex. B, Letter from James Sheppard (Southwest) to Skiplagged, Inc. c/o Aktarer Zaman (June 8, 2021) at Ex. A thereto, Southwest Terms & Conditions, p. 2.

[45] Ex. C, Letter from Michael Wilson to Skiplagged, Inc. c/o Aktarer Zaman (June 18, 2021) (emphasis original).

SKIP0000378'x 0696

application programming interface or sell "hidden-city" flights on Southwest.[46] And it no longer displayed any heart logo for Southwest flights.

126.    On July 1, 2021, counsel for Southwest in Texas replied to Skiplagged's July 21 letter, again demanding that it cease and desist.[47] The letter explained that Skiplagged continued to violate the Southwest Terms & Conditions through its unauthorized publication, marketing, and sale of Southwest fares (that falsely misrepresent actual ticket prices) by linking to another unauthorized travel website, Kiwi.com. Southwest explained that it had filed a federal lawsuit against Kiwi that included, among other things, a claim for breach of the Southwest Terms & Conditions, and directed Skiplagged to the Kiwi Litigation case number.

127.    Southwest warned Skiplagged that if it did not cease displaying Southwest flights at inflated prices and directing customers to Kiwi.com to purchase Southwest flights, cease promoting "hidden city" flights on Southwest, and cease interfering with Southwest's contractual relationships with Southwest's current and future customers, Southwest would file suit in Federal District court in Texas.[48] It explained that regardless of how Skiplagged acquires the information, Skiplagged is misleading and deceiving customers by misstating the cost of Southwest's flights. By misrepresenting and inflating the cost of Southwest fares, Skiplagged is also violating federal law, which prohibits deceptive and misleading practices in the sale of air transportation.

128.    On July 6, 2021, outside counsel for Skiplagged replied to Southwest's letter.[49] There, Skiplagged denied that its conduct (in republishing Southwest fare data and selling Southwest reservations to consumers on "hidden-city" flights, at a markup) was wrongful. It

---

[46] Ex. D, Letter from Skiplagged, Inc. c/o Aktarer Zaman to Michael Wilson (June 21, 2021).

[47] Ex. E, Letter from Michael Wilson to Skiplagged, Inc. c/o Aktarer Zaman (July 1, 2021).

[48] *Id.*

[49] Ex. F, Letter from Skiplagged, Inc. c/o Aktarer Zaman to Michael Wilson (July 6, 2021).

SKIP0000379

declared that—given that Southwest was going to file suit—Skiplagged had filed a defensive declaratory judgment action in New York:

> Accordingly, **given your Letter's litigation threat, Skiplagged has commenced a declaratory judgment action in the Southern District of New York**, which properly has jurisdiction over this dispute.[50]

129.    Southwest, however, is the true plaintiff in this matter.

130.    Since filing the Kiwi Litigation, Southwest has implemented self-help security measures in an effort to stop Skiplagged and Kiwi from illegally scraping and using its data and using it to sell tickets on its airline without authorization. But Skiplagged, together with its partner, Kiwi and/or Destina Holidays, has continued to hack the Southwest Website (in violation of federal law and the Southwest Terms & Conditions), republish Southwest fares and flight schedules, and publish and promote flights on Southwest on *Skiplagged.com*, without authorization.

**G.    Southwest demands that Destina Holidays cease and desist; Destina Holidays falsely states that it will comply, but instead continues selling flights.**

131.    On December 1, 2021, Southwest wrote a letter to Destina Holidays, explaining that Destina Holidays was violating the Southwest Terms & Conditions by using data obtained from Southwest.com without authorization and advertising and selling tickets on Southwest Airlines without its authorization.[51]

132.    Southwest explained that Southwest had "the exclusive distribution rights to sell Southwest flights to the general public through the Southwest Website" and never authorized Destina Holidays to display or sell its fares, publish its flight or fare data, or to use the Southwest

---

[50] *Id.* (emphasis added).

[51] Letter from James Sheppard (Southwest) to Skybooker.com Ltd. c/o Nadeem Qureshi (December 1, 2021), attached hereto as Ex. G.

SKIP0000380

Website for or in connection with offering any third-party product or service—or use Southwest's trademarks in doing so.[52]

133.    Southwest further explained that Destina Holidays was inducing Southwest customers to violate the Southwest Terms & Conditions and/or Contract of Carriage. Southwest included a complete copy of the Southwest Terms & Conditions, and the details of registered trademarks. It noted that the Southwest Terms & Conditions prohibit:

- Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information[53] to create a derivative work;"

- Use of the Southwest Website "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

- Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading ….";

- Attempts to "harvest any information from the [Southwest Website];"

- Attempts to "infringe any intellectual property or other right of any third party;"

---

[52] *Id.* at p. 2.

[53] "Company Information" is defined in the Southwest Terms & Conditions as "Information and materials concerning Southwest and its products and services, and similar items from our licensors and other third parties, including flight schedules, routes, fares, text, graphics, button icons, layout, databases, articles, posts, text, data, files, images, scripts, designs, instructions, illustrations, photographs, sounds, pictures, advertising copy, URLs, technology, software, interactive features, the "look and feel" of the Sites, audio and video clips, digital downloads, data compilations (including customer and Rapid Rewards® information), the compilation, assembly, and arrangement of the materials of the Sites, all copyrightable materials, trademarks, logos, trade names, trade dress, service marks, and trade identities of various parties, including those of Southwest, and other forms of intellectual property, and information regarding the status of Southwest flights, etc." *See* Ex. A.

SKIP0000381 App'x 0699

- Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

- ["U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire information, … search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[54]

134.  Later that day Mohammad Nadeem, who was identified as a "Director" of Destina Holidays, responded and indicated that Destina Holidays would "remove South West [sic] content immediately.[55]

135.  That statement proved to be false, on July 1, 2022, Southwest sent a second cease and desist letter to Destina Holidays including proof that "Destina Holidays continues its unauthorized use and display of Southwest fare data."[56]

136.  Once again, Destina Holidays stated that it had removed Southwest fares from its website.[57] However, Destina Holidays continues to display and sell tickets on Southwest Airlines on its website.

### H. Skiplagged knowingly encourages Southwest customers to violate their Contracts of Carriage with Southwest.

137.  Southwest customers who book through Skiplagged.com (with Kiwi.com or DestinaHolidays.com as merchant of record) often travel on "hidden city" fares which occurs when

---

[54] *See* Ex. G, Letter from James Sheppard (Southwest) to Skybooker.com Ltd. c/o Nadeem Qureshi (December 1, 2021) at Ex. A thereto, Southwest Terms & Conditions, p. 2.

[55] *See* Support Thread between James Sheppard (Southwest) and Mohammad Nadeem (Destina Holidays).

[56] *See id.*

[57] *See id.*

SKIP0000382

a passenger's intended final destination is not the final arrival city on his or her itinerary, but rather an intermediate or connecting city. In its simplest form, a passenger purchases a ticket from City 1 to City 2 to City 3, but does not travel beyond City 2. This is sometimes referred to as "skiplagging."

138.    This booking practice is a violation of Southwest's Contract of Carriage which details "Prohibited Booking Practices" within Section 2(a)(2) as prohibiting "[p]urchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities)."[58] By promoting prohibited forms of travel on Skiplagged.com, Skiplagged induces passengers to breach the Southwest Terms & Conditions and/or Contract of Carriage.

139.    Skiplagged *knowingly* encourages customers to breach its contract of carriage with airlines, including Southwest. For example, in 2015, Skiplagged's founder Aktarer Zaman used the website Reddit to make an open solicitation for donations and acknowledged that there were "a few caveats" to using the Skiplagged website: "(1) you'd have to book a round-trip as two one-ways (which Skiplagged handles automatically), (2) you can only have carry-ons, *and* (3) *you may be breaking an agreement with the airlines known as a contract of carriage*, **where it might say you can't miss flights on purpose.**"[59]

---

[58] Southwest provides notice of the Contract of Carriage throughout the purchase path, among other places on the Southwest Website, and also incorporates the Contract of Carriage as part of the Terms & Conditions that provide: "[i]n some instances both these Terms [& Conditions] and separate terms and conditions will apply, including . . . [being] subject to the terms & conditions contained in Southwest's Contract of Carriage." Kiwi's website also contains terms and conditions explaining to Kiwi's users in the "Service Agreement" (Article 2.1.2) that Kiwi's services consist of "[b]rokerage of the Contract of Carriage between You [the Kiwi user] and the Selected Carrier." Article 16 of Kiwi.com's terms and conditions are labeled "Brokerage of the Contract of Carriage" and explains: "We [Kiwi] are responsible primarily for brokering the Contract of Carriage between You [Kiwi user] and a Selected Carrier."

[59]    United Airlines sued me last year for creating Skiplagged, https://www.reddit.com/r/IAmA/comments/3ux82r/united_airlines_sued_me_last_year_for_creating/ (posted November 30, 2015) (emphasis added).

SKIP0000383 Kiwi'x 0701

> Basically, hidden-city is where your destination is a stopover; you'd simply leave the airport when you arrive at your destination. It turns out booking this way can save you hundreds of dollars on over 25% of common routes, especially in the USA. New York to San Francisco example. There are a few caveats, of course: (1) you'd have to book a round-trip as two one-ways (which Skiplagged handles automatically), (2) you can only have carry-ons, and (3) you may be breaking an agreement with the airlines known as contract of carriage, where it might say you can't miss flights on purpose.

140.    Despite making a public post on Reddit in 2015 that its users "may be breaking an agreement with the airlines known as contract of carriage" and pointing to specific provisions that would be breached, Skiplagged's CEO Aktarer Zaman just filed a sworn declaration in this Court where he now claims to have "no knowledge" of agreements between airlines, customers, or OTAs.[60]

141.    Skiplagged even warns its users: "Do not overuse hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame. . . . **You might upset the airline, so don't do this often**."[61]

---

[60] Dkt. #25-1, Declaration of Aktarer Zaman ¶ 3.

[61] Skiplagged website, https://skiplagged.com/about (last accessed July 14, 2021) (emphasis added).

49

- **Do not overuse** hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame.
- In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline (2% chance).
- You might upset the airline, so don't do this often.



142.    Skiplagged runs a search engine specifically designed to identify opportunities where travelers can pay less for airfare to a given destination by breaching their contract of carriage with the airline.

143.    "Hidden city" travel is prohibited by Southwest and other commercial airlines because of the significant logistical, operational, and public safety concerns it causes. Hidden city travel negatively impacts Southwest's operation in numerous ways. For example, flight crews and ground operations employees in connecting cities will attempt to locate connecting passengers (or "through" passengers) for the final leg of the flight, or delay flights when passengers are missing— unaware that a passenger has ended his or her trip in the connecting city. The practice negatively affects Southwest's ability to estimate passenger headcounts, causing potential disruptions at the airport gate and maintenance adjustments, such as variations in the amount of jet fuel needed for

SKIP0000385

each flight and proper passenger distribution within the plane. Customers with "hidden city" tickets will refuse to gate-check bags when it is necessary to do so, and may become upset—wasting airline resources, delaying take-off, and causing delay to other passengers requiring assistance. Some customers—who are unaware or forget that airlines are not equipped to handle "hidden city" travel—will check bags that continue to the trip's destination, leaving the passenger unable to retrieve them at the layover, and further straining resources. Flight delays and disruptions have a significant negative impact on the other passengers' experience on the flight and, thus, with Southwest, while causing disruption to Southwest's flight schedule systemwide.

144.    Skiplagged's promotion of "hidden city" ticketing also causes irreparable harm to Southwest's ability to obtain new customers. That is because when a passenger does not travel on the final leg of the trip, that passenger removes a seat that could have been sold to a prospective Southwest customer. That prospective Southwest customer may choose to travel on a different airline and, therefore, Southwest would also likely lose the sales revenue for ancillary services, such as EarlyBird Check-in, car rental deals, or hotel packages. Other disappointed customers may switch away from Southwest to another airline if Southwest's flights are "full."

I.   **Kiwi Continues to Hack Southwest's API and Bypass Its Security to provide Southwest's data to Skiplagged; Skiplagged continues to Aid and Abet Kiwi by using Southwest's data to Generate Commissions.**

145.    In early February 2021, as Southwest's investigation continued and Southwest's technology department learned more about Kiwi's actions, Southwest implemented technical measures to identify and monitor Kiwi's automated access of Southwest.com.

146.    Over the next several weeks, and through the following months, Southwest implemented various security measures to block unauthorized scraping from Kiwi or other unauthorized OTAs.

SKIP0000386 Appx 0704

147. Southwest has invested significant resources in an effort to prevent Defendants and Kiwi from using its proprietary flight schedule and pricing data, trademarks and brand name to sell tickets on its flights without its authorization.

148. Due to Skiplagged's wrongful conduct in concert with Kiwi, Southwest was forced to file the Kiwi Litigation to enforce the Southwest Terms & Conditions (for which it incurred significant attorneys' fees and costs) which it seeks to recover as actual damages in this lawsuit.[62]

149. Due to Skiplagged's filing of the "improper anticipatory action" in New York, Southwest was forced to incur attorneys' fees and costs in filing its Motion to Dismiss (that was granted by the Court) in order to continue pursuit of this lawsuit in Texas, which it seeks to recover as actual damages in this lawsuit.[63]

## V.    CAUSES OF ACTION

**COUNT ONE: Trademark Infringement and Contributory Trademark Infringement Under 15 U.S.C. § 1114 (Against All Defendants)**

150. Southwest realleges and incorporates the allegations above, as if fully set forth herein.

151. The services for which Defendants and Kiwi used and/or use the Southwest Marks are identical and/or substantially similar to services offered by Southwest.

152. Defendants' conduct, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays—including Skiplagged and Kiwi's prominent use of Southwest's protected "Heart" mark on Skiplagged.com in conjunction with promoting and re-selling Southwest's

---

[62] *See Tex. Beef Cattle Co. v. Green*, 883 S.W.2d 415, 430 (Tex. App.—Beaumont 1994), *rev'd on other grounds*, 921 S.W.2d 203 (Tex. 1996) ("We hold that necessary and reasonable attorneys' fees and costs even though expended and incurred in previous litigation can be recovered as proper damages in a later suit based on tortious interference of contract.")

[63] *Skiplagged, Inc. v. Southwest Airlines Co.*, Case No. 1:21-cv-05749-JPC (S.D.N.Y.), Dkt. #46 at 5–6.

SKIP0000387x 0705

fares—has caused and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with Southwest, or as to the origin, sponsorship, approval or legitimacy of Defendants' goods and services by Southwest.

153. The acts of Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, constitute infringement of one or more of the Southwest Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114 as represented in U.S. Federal Registration Nos. 1,738,670; 3,129,737; 4,806,962; 4,768,717; 4,720,322; 4,723,791; 3,027,789 and 4,892,223.

154. Southwest has suffered and will continue to suffer irreparable harm as a result of Defendants' infringement of the Southwest Marks, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays.

155. Southwest is entitled to monetary damages, or disgorgement of Defendants profits, for Defendants' infringement, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays.

156. Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have acted with knowledge of Southwest's ownership of the Southwest Marks and with deliberate intention or willful blindness to unfairly benefit from the incalculable goodwill symbolized by these marks. Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have willfully infringed one or more of the Southwest Marks, and the intentional nature of Defendants' actions make this case exceptional under 15 U.S.C. § 1117(a).

157. Southwest has been, is now, and will be irreparably harmed by Defendants' infringement and, unless enjoined by the Court pursuant to 15 U.S.C. § 1116, Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, will continue to infringe the Southwest Marks.

SKIP0000388'x 0706

**COUNT TWO: False Designation of Origin and Unfair Competition Under 15 U.S.C. § 1125(a) (Against All Defendants)**

158.    Southwest repeats and realleges the allegations above as if fully set forth herein.

159.    The conduct of Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with Southwest, or as to the origin, sponsorship or approval of Defendants' goods and services by Southwest. For example, consumers associate the "Heart" logo with Southwest, known for having "no change fees" (though fare differences may apply) and "no hidden fees;" yet customers purchasing Southwest flights through Defendants (alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays) are charged both.

160.    The acts of Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, constitute false designation of origin which is likely to cause and have caused confusion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

161.    The intentional nature of Defendants' actions, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, entitle Southwest to recover profits, damages, costs, and attorney's fees under 15 U.S.C. § 1117(a).

162.    Southwest has suffered, and will continue to suffer, irreparable harm as a result of such false designation of origin by Defendants, and, unless enjoined by the Court pursuant to 15 U.S.C. § 1116, Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, will continue to misrepresent and mislead the public that its services are in some manner connected with, sponsored by, affiliated with, related to, or approved by Southwest.

**COUNT THREE: Dilution Under 15 U.S.C. § 1125(c) (Against All Defendants)**

163.    Southwest repeats and realleges the allegations above as if fully set forth herein.

SKIP0000389 x 0707

164.    Southwest is engaged in substantially exclusive use of the Southwest Marks.

165.    The Southwest Marks are widely recognized by the consuming public of the United States to indicate Southwest as the source of services provided.

166.    The Southwest Marks have achieved fame under the relevant provisions of the Lanham Act.

167.    Defendants' infringing use of the Southwest Marks occurred after the Southwest Marks achieved such fame.

168.    Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have acted with knowledge of Southwest's ownership of the Southwest Marks and with deliberate intention or willful blindness to unfairly benefit from the incalculable goodwill symbolized by these marks.

169.    Defendants' conduct, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, has and is likely to continue to dilute the value of one or more of the Southwest Marks. For example, customers associate the "Heart" logo with Southwest, known for having "no change fees" (though fare differences may apply) and "no hidden fees;" yet customers purchasing Southwest flights through Defendants' website and Kiwi are charged both.

170.    The acts of Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, constitute a dilution, including dilution by tarnishment, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

171.    Defendants' intentional use of one or more of the Southwest Marks, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, has caused the Southwest Marks to lose the distinctive quality associated with Southwest's exclusive use of the Southwest Marks.

SKIP0000390'x 0708

172. The acts of Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have caused harm to the reputation of the Southwest Marks due to the deceptive, poor quality, and nature of the services and products provided by Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays.

173. The intentional nature of Defendants' actions, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, entitle Southwest to recover profits, damages and costs, and attorney's fees under 15 U.S.C. § 1117(a).

174. Southwest has suffered, and will continue to suffer, dilution of the Southwest Marks as a result of such actions by Defendants, and, unless enjoined by the Court pursuant to 15 U.S.C. § 1116, Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, will continue to dilute the Southwest Marks.

**COUNT FOUR: Tortious Interference with Contract (Contract of Carriage Between Southwest and its Customers – Against Defendant Skiplagged)**

175. Southwest realleges and incorporates the allegations above, as if fully set forth herein.

176. Skiplagged runs a search engine specifically designed to identify opportunities where travelers can pay less for airfare to a given destination by breaching their contract of carriage with the airline.

56

177. As its name implies, Skiplagged.com identifies and promotes "hidden city" travel. Its search engine allows users to search for "hidden city" travel opportunities by identifying travel itineraries where the layover is the user's intended destination.[64]



178. This booking practice is a violation of Southwest's Contract of Carriage which details "Prohibited Booking Practices" within Section 2(a)(2) as prohibiting "[p]urchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities)."[65]

179. By promoting prohibited forms of travel, Skiplagged knowingly encourages and induces customers to breach the Southwest Terms & Conditions and/or Contract of Carriage.

180. For example, in an open call on the website, Reddit, for donations to pay for its legal team in 2015, Skiplagged's founder acknowledged that by using Skiplagged's service, "**you**

---

[64] *Id.*

[65] Southwest provides notice of the Contract of Carriage throughout the purchase path, among other places on the Southwest Website, and also incorporates the Contract of Carriage as part of the Terms & Conditions that provide: "[i]n some instances both these Terms [& Conditions] and separate terms and conditions will apply, including . . . [being] subject to the terms & conditions contained in Southwest's Contract of Carriage." Kiwi's website also contains terms and conditions explaining to Kiwi's users in the "Service Agreement" (Article 2.1.2) that Kiwi's services consist of "[b]rokerage of the Contract of Carriage between You [the Kiwi user] and the Selected Carrier." Article 16 of Kiwi.com's Terms and Conditions are labeled "Brokerage of the Contract of Carriage" and explains: "We [Kiwi] are responsible primarily for brokering the Contract of Carriage between You [Kiwi user] and a Selected Carrier."

SKIP0000392'x 0710

***may be breaking an agreement with the airlines known as a contract of carriage***, **where it might say you can't miss flights on purpose."**[66]

181.    Skiplagged also warns its users: "Do not overuse hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame. . . . **You might upset the airline, so don't do this often**."[67]

> • **Do not overuse** hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame.

182.    Skiplagged warns travelers against entering their frequent flyer information because "[i]f you do, ***the airline might invalidate any miles you've accrued with them***."[68]

> • **Don't associate a frequent flyer account** — If you do, the airline might invalidate any miles you've accrued with them.

183.    When reselling Southwest flights, Skiplagged, alone and in partnership with Kiwi and/or Destina Holidays, acknowledges that purchases are subject to the Southwest Terms & Conditions, stating: "All services provided by Southwest Airlines are subject to their Terms & Conditions. More information is available on their website."

184.    When purchasing a flight through Skiplagged, Kiwi's Terms and Conditions state that "a Selected Carrier's terms and conditions and conditions of carriage will apply to Your contractual relationship with the Selected Carrier and that You must make Yourself aware of such

---

[66]  United Airlines sued me last year for creating Skiplagged, available at https://www. reddit.com/r/IAmA/comments/3ux82r/united_airlines_sued_me_last_year_for_creating/   (posted November 30, 2015) (last accessed July 14, 2021) (emphasis added).

[67]  Skiplagged website, https://support.skiplagged.com/hc/en-us/articles/115003286687-What-is-a-hidden-city-flight- (last accessed July 14, 2021) (emphasis added).

[68]  Skiplagged website, https://support.skiplagged.com/hc/en-us/articles/115003286687-What-is-a-hidden-city-flight- (last accessed July 14, 2021) (emphasis added).

SKIP0000393x 0711

terms and conditions as well as conditions of carriage before the Service Agreement is concluded and You complete the Booking."

> **Article 9. Conditions of Carriage**
> 1. You acknowledge that a Selected Carrier's terms and conditions and conditions of carriage will apply to Your contractual relationship with the Selected Carrier and that You must make Yourself aware of such terms and conditions as well as conditions of carriage before the Service Agreement is concluded and You complete the Booking. By concluding the Service Agreement You hereby acknowledge that the Flight(s) included in Your Booking may not be part of the "frequent flyer programs" of the Selected Carrier(s). This article 9.1 also applies to the terms and conditions of the airlines, railway and other transportation companies which are offered to You based on (i) application of the Kiwi.com Guarantee or (ii) voluntary change of the Booking based on Your request.

185.     Skiplagged knew that, in connection with the publication and purchase of Southwest flights, Kiwi and/or Destina Holidays interact with Southwest computer systems located in Texas and in this District, and that it is selling the services of Southwest, a Texas company with its base of operations in this District.

186.     Skiplagged's activities impede Southwest's ability to do business and cause substantial injury. Hidden city travel is prohibited by most commercial airlines because of the significant logistical, operational, and public safety concerns it causes. Hidden city travel negatively impacts Southwest's operation, and has a significant negative impact on the other passengers' experience on the flight and, thus, with Southwest.

187.     Skiplagged's promotion of hidden city ticketing also causes irreparable harm to Southwest's ability to obtain new customers. For example, when a passenger does not travel on the final leg of the trip, that passenger removes a seat that could have been sold to a prospective Southwest customer. That prospective Southwest customer may choose to travel on a different airline and, therefore, Southwest would also likely lose the sales revenue for ancillary services, such as EarlyBird Check-in, car rental deals, or hotel packages.

SKIP0000394 x 0712

**COUNT FIVE: Tortious Interference with Contract (Contract Between Southwest and Destina Holidays – Against Defendant Skiplagged)**

188.    Southwest realleges and incorporates the allegations above as if fully set forth herein.

189.    Skiplagged is aware that the Southwest Terms & Conditions do not allow Destina Holidays or other parties to use its Company Information or sell flights on its airline without its permission. Skiplagged is aware that the Southwest Terms & Conditions prohibit:

    a.    Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information to create a derivative work;"

    b.    Use of the Southwest Website "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

    c.    Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading . . . .;"

    d.    Attempts to "harvest any information from the [Southwest Website];"

    e.    Attempts to "infringe any intellectual property or other right of any third party;"

    f.    Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

    g.    ["U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire

SKIP0000395

information, . . . search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[69]

190.    Southwest informed Skiplagged that Destina Holidays was violating the Southwest Terms & Conditions by obtaining Southwest Company Information without authorization, publishing or distributing it, and by selling tickets on Southwest's airline.

191.    Each time Skiplagged convinces a user on its website to purchase a ticket on Southwest's airline, and directs that customer to Destina Holidays to finalize their purchase, Skiplagged is knowingly inducing Destina Holidays to breach its agreement with Southwest.

**COUNT SIX: Tortious Interference with Contract (Contract Between Southwest and Kiwi – Against Defendant Skiplagged)**

192.    Southwest realleges and incorporates the allegations above as if fully set forth herein.

193.    Skiplagged is aware that the Southwest Terms & Conditions do not allow Kiwi or other parties to scrape its data or sell flights on its airline without its permission. Skiplagged is aware that the Southwest Terms & Conditions prohibit:

  a.  Use of the Southwest Website to "copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use the Service or Company Information to create a derivative work;"

  b.  Use of the Southwest Website "for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;"

  c.  Engaging in any activity in connection with the Southwest Website or Company Information that is "fraudulent, unlawful, false or misleading . . . .;"

---

[69] *See* Ex. B, letter from James Sheppard (Southwest) to Skiplagged, Inc. c/o Aktarer Zaman (June 8, 2021) at Ex. A thereto, Southwest Terms & Conditions, p. 2.

SKIP0000396 Ex 0714

d.   Attempts to "harvest any information from the [Southwest Website];"

e.   Attempts to "infringe any intellectual property or other right of any third party;"

f.   Use of the Southwest Website "to make any speculative, fraudulent, or false reservation or any reservation in anticipation of demand;" and

g.   ["U]se [of] any deep-link, page-scrape, robot, crawl, index, spider, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things to use, access, copy, acquire information, . . . search, generate searches, or monitor any portion of the [Southwest Website] or Company Information[.]"[70]

194.   Southwest informed Skiplagged that Kiwi was violating the Southwest Terms & Conditions by scraping data from the Southwest Website, publishing or distributing it, and by selling tickets on Southwest's airline.

195.   Each time Skiplagged convinces a user on its website to purchase a ticket on Southwest's airline, and directs that customer to Kiwi to finalize their purchase, Skiplagged is knowingly inducing Kiwi to breach its agreement with Southwest.

196.   Under Texas law, Southwest is entitled to recover as damages the attorney's fees and expenses expended in previous litigation (i.e. the Kiwi Litigation and the New York Action) in a later suit based on tortious interference.  *See, e.g. Tex. Beef Cattle Co. v Green*, 883 S.W.3d 415 (Tex. App. – Beaumont 1994), *rev'd on other grounds*, 921 S.W.2d 203 (Tex. 1996). Southwest has incurred a significant amount of attorney's fees and expenses in order to (a) pursue the Kiwi Litigation and ultimately obtain a Preliminary Injunction against Kiwi on the breach of

---

[70] *See* Ex. B, letter from James Sheppard (Southwest) to Skiplagged, Inc. c/o Aktarer Zaman (June 8, 2021) at Ex. A thereto, Southwest Terms & Conditions, p. 2.

SKIP00000397   Skip'x 0715

contract claim; and (b) prepare and file a successful motion to dismiss in the New York Action -- due to Skiplagged filing an improper anticipatory action – in order to pursue the tortious interference claim in this district.

**COUNT SEVEN: Breach of Contract (Against Defendant Destina Holidays)**

197.    Southwest repeats and realleges the allegations above as if fully set forth herein.

198.    Use of the Southwest Website is governed by and subject to Southwest's Terms & Conditions.

199.    At all relevant times, the main homepage for the Southwest Website and other web pages have provided a link to the Terms & Conditions and alert users that "Use of the Southwest websites and our Company Information constitutes acceptance of our Terms & Conditions." The Terms & Conditions constitutes a valid and enforceable agreement between Southwest and Destina Holidays.

200.    Through direct correspondence as early as 2021 and continuing through June 2022, Southwest further provided Destina Holidays with further actual notice of the Terms & Conditions, including that Destina Holidays' use of Southwest fare and pricing information without Southwest's authorization violated the Terms & Conditions.

201.    On information and belief, Destina Holidays has regularly accessed the Southwest Website with knowledge of the Terms & Conditions and its prohibitions. Despite Destina Holidays' knowledge of the Terms & Conditions, on information and belief, Destina Holidays continues to obtain and use Southwest Company Information without authorization and then copy, aggregate, display, distribute and/or make derivative use of the Southwest Company Information.

202.    Destina Holidays' actions breach the provisions of the Terms & Conditions by at least the following: (1) using Southwest's company information obtained from the Southwest

SKIP0000398

Website to copy, display, distribute, publish, re-post, reproduce, re-use, sell, transmit or use Southwest's company information to create a derivative work, namely the fare and pricing information on DestinaHolidays.com; (2) using Southwest's company information on fare and pricing for its own commercial gain; (3) engaging in an activity in connection with Southwest's company information (among other things, charging change fees) that is fraudulent, unlawful, false or misleading; (4) harvesting information from the southwest.com website; and (5) using one or more automatic device(s), program(s), algorithm(s) or methodology(ies) to access, extract, and use information from the Southwest Website for, or in connection with, offering services through DestinaHolidays.com.

203.   Destina Holidays' continued breaches of the Terms & Conditions have damaged, and will continue to damage, Southwest.

**COUNT EIGHT: Unfair Competition Under Texas Common Law (Against All Defendants)**

204.   Southwest realleges and incorporates the allegations above as if fully set forth herein.

205.   Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have been and continue to unfairly compete with Southwest in violation of Texas Unfair Competition common law. For example, as alleged *supra*, Defendants falsely and misleading inflate the cost of tickets on Southwest Airlines, make false and misleading statements regarding the policies of Southwest Airlines, use Southwest's proprietary information without authorization, make a profit from marketing Southwest flights through Defendants' websites without Southwest's authorization, and utilize Southwest Marks without authorization.

SKIP0000399'x 0717

206.    Defendants' unfair competition, including false and misleading conduct, use of Southwest's information, and use of Southwest Marks have caused and will continue to cause harm to Southwest.

**COUNT NINE: Unjust Enrichment Under Texas Common Law (Against All Defendants)**

207.    Southwest realleges and incorporates the allegations above as if fully set forth herein.

208.    Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have been unjustly enriched by taking undue advantage of Southwest's fare information. Defendants have benefitted from the use of Southwest's proprietary information and makes a profit from marketing Southwest flights through their websites without Southwest's authorization. Without authorization, Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have taken undue advantage of Southwest's fare information in violation of the Lanham Act and encouraged Southwest customers to breach their contracts of carriage for Defendants' own benefit (disrupting service and increasing Southwest's costs).

209.    Southwest has been and continues to be injured by the conduct and unlawful acts of Defendants (both alone and, as to Skiplagged, through its partnership with Kiwi and Destina Holidays) and is entitled to restitution and equitable damages under quasi-contract theories of recovery.

## VI.    ATTORNEY'S FEES

210.    Southwest realleges and incorporates the allegations above as if fully set forth herein.

SKIP0000400 Appx 0718

211.    Southwest was required to retain the undersigned's services in the prosecution of this claim. Pursuant to at least Texas Civil Practice & Remedies Code §§ 38.001 and 143.002, Southwest seeks reasonable and necessary attorney's fees.

## VII.    APPLICATION FOR INJUNCTIVE RELIEF

212.    As set forth above, the actions of Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, in violation of the Lanham Act and Texas law, have caused, and are continuing to cause, substantial and irreparable damage to Southwest for which there is no adequate remedy at law. Defendants, alone and, as to Skiplagged, in partnership with Kiwi and Destina Holidays, have improperly used, and will continue to improperly use, the Southwest Marks unless this Court prevents them from doing so. Southwest will continue to lose control over its own reputation and goodwill, and the public and consumers likely will continue to be confused, misled, and deceived by the fact that Defendants, alone and, as to Skiplagged, through its partnership with Kiwi and Destina Holidays, offer competing or related services under the Southwest Marks. Southwest has a substantial likelihood of success on the merits and is, therefore, entitled to an injunction preventing Defendants' continued infringement, including an injunction against Defendants' continued use of the Southwest Marks.

213.    Southwest requests that Defendants, and all companies owned or controlled by them either directly or indirectly, their employees, representatives, agents, members, and others acting in concert with them, be preliminarily and permanently enjoined from: (1) extracting Southwest's flight and fare information from the Southwest Website and its proprietary servers or websites; (2) publishing Southwest fare information on any website, including Skiplagged.com and Destinaholidays.com, through Defendants' mobile applications, or elsewhere; (3) using the Southwest Marks, including the famous "Heart" logo, in violation of U.S. trademark law;

SKIP0000401

(4) accessing or using the Southwest Website and data in violation of the Southwest Terms & Conditions, or partnering with others to do so.

## VIII.   PRAYER FOR RELIEF

Southwest respectfully requests an order and/or judgment:

A.      That Defendants, their officers, members, managers, affiliates, agents, employees, servants, representatives, any entities owned or controlled by them, and all persons acting under or in concert with them, be preliminarily enjoined throughout the pendency of this lawsuit, and permanently enjoined thereafter, from: (1) extracting Southwest's flight and fare information from the Southwest Website and its proprietary servers or websites; (2) publishing Southwest fare information on Skiplagged.com or Destinaholidays.com, through Defendants' mobile applications, or elsewhere; (3) use of the Southwest Marks, including its famous "Heart" logo, in violation of U.S. trademark law; and (4) accessing and using the Southwest Website and data in violation of the Southwest Terms & Conditions;

B.      That the Defendants be enjoined from using the Southwest Marks, or any other mark, word or name confusingly similar to or including those marks, in the ordinary course of business;

C.      That the Defendants be required to account for and pay to Southwest all profits and benefits they derived as a result of the activities complained of herein;

D.      That the Defendants be required to pay to Southwest actual, consequential, and compensatory damages sustained as a result of the activities complained of herein;

E.      That the Defendants be required to pay increased damages due to their willful infringement;

F.      That the Defendants be required to pay pre-judgment and post-judgment interest at the highest rates allowed by law;

SKIP0000402

G.    That the Defendants be required to pay costs and attorney's fees; and

H.    For such other and further relief as this Court deems just and proper.


Dated:  August 4, 2022                 Respectfully submitted,

By:  */s/ Michael C. Wilson*
Michael C. Wilson
Texas State Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar. No. 24040838
wdunwoody@munckwilson.com
Amanda K. Greenspon
Florida Bar No. 1014584
AGreenspon@munckwilson.com
Julie M. Christensen
Texas State Bar No. 24105601
jchristensen@munckwilson.com
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, Texas 75251
Telephone: (972) 628-3600

**ATTORNEYS FOR PLAINTIFF
SOUTHWEST AIRLINES CO.**

SKIP0000403

# Exhibit A-20

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED AIRLINES, INC., a Delaware corporation,<br>ORBITZ WORLDWIDE, LLC, a limited liability company,<br>ORBITZ, LLC, a limited liability company, | )<br>)<br>)<br>)<br>)<br>) | |
| Plaintiffs, | ) | Case No. |
| v. | )<br>) | Jury Trial Demanded |
| AKTARER ZAMAN, individually and d/b/a SKIPLAGGED.COM. | )<br>)<br>) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs United Airlines, Inc. ("**United**"), Orbitz Worldwide, LLC ("**Orbitz Worldwide**"), and Orbitz, LLC ("**Orbitz, LLC**")[1] (collectively, "**Plaintiffs**"), by and through their undersigned counsel, for their Complaint against Defendant Aktarer Zaman ("**Zaman**"), individually and d/b/a Skiplagged.com ("**Skiplagged**"), state as follows:

**NATURE OF THE ACTION**

1.     This is a federal-question and diversity action involving statutory claims under the Lanham Act, 15 U.S.C. § 1125, and common law claims under Illinois law.  Plaintiffs assert claims against Zaman for federal unfair competition, tortious interference with contract, breach of contract, and common law misappropriation.

2.     Defendant Zaman, operator of Skiplagged, has used his website to intentionally and maliciously interfere with Plaintiffs' contracts and business relations in the airline industry, and in doing so, has falsely associated Skiplagged with Orbitz and United.  By promoting

---

[1] Orbitz Worldwide and Orbitz, LLC will be collectively referred to as "**Orbitz**," unless otherwise indicated.

SKIP0000078 's 'x 0723

prohibited forms of travel on Skiplagged, Zaman has induced breach of Orbitz Worldwide's travel agency contracts with commercial airlines and of United's customer contractual relationships.

3.     Skiplagged promotes and makes available to consumers an airline booking ploy called "hidden city" ticketing.  "Hidden city" ticketing refers to a travel arrangement where the passenger's intended final destination is not the final arrival city on his or her itinerary, but rather an intermediate or connecting city.

4.     With intent to interfere with and cause breach of Plaintiffs' contracts and to otherwise interfere with United's ticketing processes, Skiplagged prompts consumers to book tickets from their departure city to a city to which those consumers do not intend to travel.  Upon arrival at an intermediate or connecting city on the itinerary, the passengers leave the airport and "skip" the last leg(s) of their itineraries.  In its simplest form, a passenger purchases a ticket from City A to City B to City C, but does not travel beyond City B.

5.     As explained further below, "hidden city" ticketing is strictly prohibited by most commercial airlines because of logistical and public safety concerns.  When consumers purchase a flight through United, they agree to be bound by United's prohibition against "hidden city" ticketing.  Also, as further protection against this prohibited form of travel, airlines often require online travel agencies, such as Orbitz, to prohibit "hidden city" ticketing and other abusive ticketing practices.

6.     With full knowledge of these prohibitions, Zaman has provided and continues to provide a search tool that enables consumers to locate "hidden city" flights on Skiplagged and then purchase tickets for those flights through Orbitz's website (www.orbitz.com) and United's website (www.united.com).  Neither Orbitz nor United has granted Zaman permission to engage

SKIP0000079Orbitz 0724

in this prohibited form of booking or to otherwise offer their services.  To the contrary, Zaman expressly agreed not to engage in this conduct when he entered into an affiliate agreement with Orbitz, LLC in early 2013.  Orbitz, LLC has since terminated that agreement.  More recently, Zaman agreed to stop engaging in this prohibited form of booking, only to continue the conduct unabated.  At the same time, Zaman has taken steps to try to hide from Orbitz and United his continued bad conduct and breach of his promises to stop.

7.      Moreover, the process that Zaman uses to promote "hidden city" ticketing and prompt purchases of "hidden city" tickets constitutes a deliberate attack on Plaintiffs' trademark rights.  Despite his promise to Orbitz that he would cease and desist his redirection of users to the Orbitz website, Zaman continues to assist Skiplagged users in booking "hidden city" flights through Orbitz and to otherwise continue to link Skiplagged consumers to the Orbitz website. Additionally, despite his assurances to United that he would remove all United content from Skiplagged, Zaman continues to include United content and flights on Skiplagged and continues to link Skiplagged consumers to the United website.  These deliberately false associations that Zaman has created between Skiplagged and Plaintiffs threaten to confuse consumers, deceive the public, and damage Plaintiffs' businesses.

## THE PARTIES

8.      Plaintiff United is a Delaware corporation, with its principal place of business at 233 S. Wacker Dr., in Chicago, Illinois.

9.      Plaintiff Orbitz Worldwide is a Delaware limited liability company, with its principal place of business at 500 W Madison St. in Chicago, Illinois.  Orbitz Worldwide's sole member is Orbitz Worldwide, Inc., a publicly held Delaware corporation, with its principal place of business in Chicago, Illinois.

SKIP0000080'x 0725

10.     Plaintiff Orbitz, LLC is a Delaware limited liability company, with its principal place of business at 500 W Madison St. in Chicago, Illinois.  The two members of Orbitz, LLC are Orbitz, Inc. and O Holdings, Inc.  Orbitz, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.  O Holdings, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

11.     Defendant Zaman, an individual, is the founder and CEO of Skiplagged.  Upon information and belief, Zaman is a resident of Ozone Park, New York, and Skiplagged's principal place of business is at 8312 101st Ave., Fl. 3, in Ozone Park, New York 11416.  Despite publishing its own "Terms of Use" on its website and referring to itself as a "business" in same, on neither the Skiplagged website, nor Zaman's personal correspondence with Plaintiffs, does Zaman indicate any corporate status for Skiplagged.  Furthermore, Plaintiffs are unable to identify any registered corporate status for Skiplagged.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.  The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims that arise under the laws of the United States, namely, the Lanham Act, 15 U.S.C. § 1125.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal-question claims that they form part of the same case or controversy.

13.     The Court also has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiffs and Zaman are citizens of different States and more than $75,000 is in controversy.  Zaman's acts interfere with and jeopardize Orbitz Worldwide's travel agency agreements with major airlines, from which Orbitz Worldwide earns well in excess of

4

$75,000 in revenue annually. By definition, "hidden city" ticketing interferes with United's ability to sell unused seats on the final leg(s) of connecting flights, resulting in the loss of revenue that United would have earned by selling the unused seats. In certain instances, "hidden city" ticketing could result in flights with empty seats being listed as full flights, potentially causing the diversion of hundreds, if not thousands, of prospective United customers to other airlines, in some cases permanently. Finally, Plaintiffs have invested millions of dollars to raise their brand awareness and develop goodwill with their customers and industry partners – goodwill that is unalterably harmed through any false association Zaman implies between him and Orbitz and United. Thus, any modicum of success by Zaman will have an impact on Plaintiffs far in excess of $75,000.

14. The Court has specific personal jurisdiction over Zaman because he has sufficient contacts with the State of Illinois, and has committed tortious acts directed to Illinois. Among other things, Zaman has intentionally interfered with Illinois contracts performed (or which are still in the process of being performed) in Illinois, and has intentionally interfered with the contractual duties of Illinois residents. In particular, Zaman has interfered with Orbitz Worldwide's agency agreements with commercial airlines and has induced Orbitz's and United's customers to breach the airlines' contracts of carriage. Additionally, Zaman's acts are likely to cause confusion among Illinois consumers who purchase airline tickets on Orbitz's website. Those purchases are processed on Orbitz's servers located in Illinois. The damage that Orbitz and United will suffer from these tortious acts will be predominantly felt in Illinois. Furthermore, Zaman made promises to Orbitz and United, directed to Illinois, that he would stop his improper conduct, only to break those promises almost immediately, while making efforts to conceal his deception to Orbitz and United employees in Illinois.

SKIP0000082'x 0727

15.     The Court also has specific personal jurisdiction over Zaman because he has expressly consented to the exclusive jurisdiction of the federal courts in Illinois.  On December 29, 2013, Zaman entered into an agreement with Orbitz, LLC to become a member of Orbitz, LLC's affiliate program (the "**Affiliate Agreement**").  Under the "Miscellaneous" provisions of the Affiliate Agreement, Zaman consented to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois for any dispute involving the Affiliate Agreement.  (*See* Affiliate Agreement, a copy of which is attached hereto as Ex. A ("Miscellaneous").)  Zaman also agreed that the Affiliate Agreement would be governed by Illinois law.  (*Id.*)  Orbitz, LLC terminated Zaman's affiliate status on September 3, 2014.  The Affiliate Agreement had obligations and covenants that survived termination.  Orbitz, LLC's breach of contract claim arises out of the Affiliate Agreement.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiffs' claims occurred in Chicago, Illinois, which is within this judicial district.  Moreover, as explained above, Zaman agreed to venue in this Court.  (*See id.*)

## FACTS COMMON TO ALL COUNTS

### I.     Orbitz's Business and Its Affiliate Program

17.     Orbitz is a leading global online travel company offering a broad range of travel products and services, including airline tickets, hotels, car rentals, cruises, and vacation packages.

18.     Orbitz's success in the marketplace is dependent, in part, on long-standing working relationships with commercial airline companies.  To this end, Orbitz must ensure that its bookings comply with its partnering airlines' rules and restrictions.

6

SKIP00000033x 0728

19.     By way of example, American Airlines Inc.'s rules and regulations prohibit "hidden city" ticketing, among other abusive ticketing practices.  In Section 3(c) of American Airlines' governing addendum with its travel agents – which applies to flights booked on American Airlines, US Airways, Envoy Air, and PSA Airlines, among other airlines – American Airlines requires its travel agents to acknowledge that "hidden city" ticketing and other prohibited forms of travel violate American Airlines' rules.  (*See* American Airlines, Inc. Addendum to the Governing Travel Agency Agreement (the "**American Agency Addendum**"), a copy of which is attached hereto as Ex. B.)  Likewise, according to Section 3(c) of the American Agency Addendum, travel agents must ensure that bookings done through the agent are not for "hidden city" tickets or other prohibited forms of travel.  (*Id.*)

20.     A number of other airlines have similar arrangements with their travel agents.  For instance, in Section 3(c) of their governing addenda with travel agents, British Airways and Iberia Airlines require agents to ensure that bookings made through the agents are only for customers' genuine travel requirements.  (*See* British Airways PLC Travel Agency Addendum, a copy of which is attached hereto as Ex. C; Iberia Lineas Aereas De España, S.A. Operadora, Sociedad Unipersonal Travel Agency Addendum, a copy of which is attached hereto as Ex. D.) Additionally, travel agents may not encourage customers to circumvent or violate these airlines' general conditions of carriage.  (*See* Ex. C; Ex. D.)  Delta Airlines' rules and restrictions impose similar obligations on travel agents.

21.     Within this contractual framework set by the airlines, Orbitz strives to increase traffic on Orbitz.com and enhance awareness of the Orbitz brand.  One way in which Orbitz does this is through the Orbitz affiliate program.  This program permits authorized "affiliates" to establish HTML links between third-party websites and Orbitz.com, and then earn commissions

7

SKIP0000084x 0729

on travel products ultimately purchased through Orbitz.  Orbitz also authorizes a small number

of companies to "deep link" into the Orbitz.com website.  Deep-linking refers to hyper-linking to

an interior web page on the Orbitz.com website, such as that generated by a specific flight

search.

22.     As explained above, Zaman signed an Orbitz Affiliate Agreement on December

29, 2013 (which Orbitz, LLC terminated on September 3, 2014).  (*See* Ex. A.)  In the Affiliate

Agreement, Zaman agreed that he would not, "[d]uring the term of or after the expiration or

termination of this Agreement, use any mark, name or domain name of any type which is

confusingly similar to 'Orbitz' or other 'Orbitz' trademarks."  (*See id.* ("*Do Not Use Our*

*Trademark*."))  In addition, Zaman expressly agreed to abide by all of the terms and conditions

on Orbitz's websites, including the Orbitz.com Terms and Conditions (the "**Terms and**

**Conditions**") relating to prohibited forms of travel and use of Orbitz's trademarks.  (*Id.* ("*Link to*

*the Orbitz Site*."))

23.     In pertinent part, Section 3 of the Orbitz.com Terms and Conditions prohibits

authorized affiliates – absent prior written consent from Orbitz, LLC – from implying that Orbitz

is endorsing the affiliates' products and services; from using Orbitz's website for illegitimate

reservations and bookings; from using software to interfere, or attempt to interfere, with the

normal operation of Orbitz's website; and from disguising the origin of information transmitted

through Orbitz's website.  (*See* Terms and Conditions, a copy of which is attached hereto as Ex.

E.)  Zaman's acts of promoting "hidden city" ticketing and redirecting users to Orbitz.com

violate these provisions.  Orbitz, LLC terminated Zaman's affiliate status on September 3, 2014,

shortly after learning of Skiplagged's promotion of "hidden city" ticketing.

SKIP0000035'x 0730

## II.     United's Business and Prohibition of "Hidden City" Ticketing

24.     United is one of the world's largest commercial airlines, operating (along with United Express) an average of 5,100 flights a day to more than 370 airports across six continents.

25.     As part of its global operations, United must comply with numerous air traffic and public safety regulations, such as those established by the Federal Aviation Administration and the Transportation Security Administration.  Moreover, to stay competitive in the marketplace, United must also operate its fleet with its passengers' schedules and demands in mind.  To help fulfill these twin goals, United includes specific provisions in its passengers' contracts that are designed to ensure predictable flight schedules and passenger headcounts.

26.     Specifically, in its standard contract of carriage, United prohibits its customers from engaging in "Hidden city" ticketing (also known as "Point Beyond Ticketing").  (*See* United Airlines, Inc. Contract of Carriage, a copy of which is attached hereto as Ex. F ("Section 6(J)").)

27.     Passengers who violate this provision adversely affect United's ability to estimate headcounts, which can not only cause disruptions at the airport gate, but can also require mechanical tweaks, such as variations in the amount of jet fuel needed for each flight.  Moreover, because United sometimes holds flights at gates when passengers have not yet arrived, "hidden city" ticketing could cause flight delays on connecting flights where one or more "hidden city" passengers fail to appear.  Delays on one leg of a flight can impact subsequent legs of a flight, or subsequent flights flown by the same airplane, with the potential for considerable disruption of United's flight schedule and harm to United's other customers.  As the use of "hidden city" ticketing increases, the issues could become exponentially larger.

SKIP0000086x 0731

28.     "Hidden city" ticketing also causes irreparable harm to United's relationships with prospective customers.  Any time a passenger foregoes a leg of travel, the passenger essentially takes away a seat that could have been sold to a prospective United customer.  The prospective United customer may switch to another airline as a result, especially if his or her desired flight is full.  In such case, United likely would also lose ancillary sales for other services, such as car rentals and lodging, and a number of disappointed customers may switch from United for all future travel if United's flights are consistently "full."  United has no adequate remedy at law.

29.     United also expends significant time, labor, and financial resources on developing its fare calculations and flight schedules.  Likewise, United expends significant resources every year on protecting its fare and scheduling data from its competitors so that it cannot be easily duplicated without United's prior consent.  The unauthorized use of this content by United's competitors not only disadvantages United in the marketplace, but also discourages future investments in new fare and scheduling models.

## III.    Skiplagged's Promotion of "Hidden City" Ticketing

30.     With knowledge of Plaintiffs' prohibitions of "hidden city" ticketing, Zaman has intentionally and maliciously used Skiplagged to damage Plaintiffs' businesses.  Starting in December 2013, and perhaps earlier, Zaman began offering consumers a customized search tool that locates "hidden city" flights and makes them available for booking by providing links to external booking websites.  At times, Zaman has provided links to Orbitz only, while on other occasions, Zaman has also provided links to airline websites, such as United's, and other third-party booking websites.  Based on Plaintiffs' investigation to date, Zaman's search-and-redirection scheme relies on a combination of new and old technologies.

10

31.     As the foundation for his scheme, Zaman has developed a graph database that pulls real-time flight and fare data from an external source and then processes it through a customized computer program that locates "hidden city" flights.  Zaman's customized program exploits certain data, such as flight numbers, to determine which flights present "hidden city" ticketing opportunities.

32.     When a Skiplagged user searches for a specific flight itinerary, Zaman's graph database will display an extensive list of flight results, including any "hidden city" flights. Skiplagged identifies the airline(s) that will be used for each flight, both by logo and by name, and lists the flight time.  The user then has the ability to choose a preferred flight and click "Book Now."

33.     In recent months, Skiplagged has employed a variety of redirection strategies. Under one of Skiplagged's configurations, the user is always redirected to a search result on the Orbitz website.  Under another one of Skiplagged's configurations, the user is redirected to either Orbitz's website, to an airline's website, such as United's, or to another third-party booking website.  With respect to Skiplagged's redirection to Orbitz, Zaman's redirection scheme involves several unique features.

34.     First, Zaman has developed an algorithm that can discern the precise tolerance of search parameters on Orbitz's website, such as desired departure time.  This algorithm enables Zaman to generate a specific search on Orbitz that will produce only one flight result.  With "hidden city" flights, that algorithm also utilizes a destination city to which a Skiplagged user does not intend to travel.

35.     Second, Zaman's program identifies the unique Orbitz URL needed to generate the Skiplagged user's desired search result.  In furtherance of his scheme to generate precise

SKIP0000038    App'x 0733

search results, Zaman likely wrongfully obtained information about Orbitz's application programming interface ("**API**") at some point before September 2014. Orbitz's API information is necessary to "call in" to Orbitz's website with the unique Orbitz URL.

36.    Third, with the help of a redirector service, Skiplagged redirects users to the unique Orbitz URL when they select "Book Now." This redirection process is accomplished through the use of an antiquated html technique called "meta refresh." In its most basic form, a "meta refresh" will automatically refresh the user's current web page after a specified time interval. With a few tweaks of the html code, "meta refresh" can also be used to automatically transfer users to a new page on a different website. This is done by instructing the browser to fetch a different URL and setting a low refresh time interval. Here, Skiplagged instructs the user's browser to refresh automatically to the unique Orbitz URL that Skiplagged's program has identified.

37.    When Zaman causes the redirect to Orbitz, he also causes the user's computer to initiate a pre-populated search utilizing his algorithm to cause searching on Orbitz's site that would not be replicable by the typical user or otherwise through authorized use of the site. Once on the Orbitz website, because of the Zaman search (conducted without the user's knowledge) the user is presented with the exact flight itinerary that was selected on Skiplagged. This is akin to "deep linking," which transfers a user to a specific, indexed piece of web content on another website, rather than the website homepage. Just as with "deep linking," Zaman uses the "meta refresh" and related algorithm to seamlessly transfer a user from Skiplagged to Orbitz's site, which creates the impression that Skiplagged and Orbitz are partners or one-in-the-same.

38.    To counteract Zaman's conduct, Orbitz is continuing to investigate ways in which it may detect customers originating on Skiplagged and prevent the "hidden city" bookings from

SKIP0000039 App'x 0734

being made on the Orbitz site.  Nevertheless, Zaman's repeated variation in redirection strategies and his use of technical approaches like the "meta refresh" technique have frustrated Orbitz's efforts.  Injunctive relief will be necessary to ensure that Zaman does not further alter his software in an effort to circumvent Orbitz's corrective actions.

39.     Skiplagged offers both desktop and mobile app versions of its search tool, both of which have redirected to the Orbitz.com and United.com websites.

40.     To offer a more concrete example, suppose a Skiplagged user wishes to purchase a flight from Chicago to Los Angeles as part of a "hidden city" itinerary.  The user can begin by inserting the desired cities or airports into Skiplagged's search boxes, such as ORD (O'Hare International, Chicago) to LAX (Los Angeles International).  Skiplagged automatically populates a list of results.



(*See* larger copy, which is attached hereto as Ex. G.)

SKIP0000090    'x 0735

41.     In this example, the first option is a "hidden city" flight on American Airlines that departs from Chicago, connects through Los Angeles, and then continues on to Calgary, Alberta (YYC, Calgary International).  The user is shown the American Airlines logo for each leg of the flight.

42.     After choosing a departing and returning flight, the user is shown a Chicago-to-Los Angeles itinerary, which includes an additional leg of Los Angeles to Calgary.  Skiplagged invites the user to "Book Now!" on the itinerary screen.



(For a larger copy, *see id.*)

43.     In this example, after clicking the "Book Now!" selection, the user is redirected to Orbitz's website and presented with the exact same itinerary as was shown on Skiplagged.

SKIP0000091 0736



(For a larger copy, *see id.*)

44.     To the average internet user of Skiplagged, the transition from the Skiplagged site to Orbitz's website is seamless and strongly suggests an affiliation or identity between Skiplagged and Orbitz that does not exist.  Indeed, online travel agencies such as Orbitz enter into agreements with airlines to use and publish the airlines' data, all with the prior consent and cooperation of the airlines and according to financial terms that compensate all parties involved. By creating a website that operates in much the same manner as an online travel agency, and by linking that site to Orbitz's site, Zaman is attempting to confuse and mislead the public into believing that his website, and the "hidden city" ticketing it employs, is done with the approval (if not the outright authorization and sponsorship) of Orbitz and the airlines.

45.     Under the Skiplagged configuration that redirects some users directly to airlines' websites, Zaman has caused a similarly false association between Skiplagged and United.  For example, suppose a Skiplagged user wants to book a one-way flight from Cleveland

15

(CLE/Cleveland Hopkins International Airport) to Houston (IAH/George Bush Intercontinental Airport). As shown in the attached screenshots, Skiplagged has offered an itinerary that departs from Cleveland, connects through Houston, and then continues on to Phoenix (PHX/Phoenix Sky Harbor International Airport). (*See id.*) When the user selects "Book Now," the user is redirected directly to United's website, with an itinerary from Cleveland to Phoenix. (*Id.*) The transition from the Skiplagged site to United's website strongly suggests an affiliation or identity between Skiplagged and United that does not exist.

46.     Zaman's false associations between Skiplagged and Orbitz, and between Skiplagged and United, have already caused confusion within the marketplace. For instance, at least one news outlet has reported on Skiplagged's redirection of users to Orbitz with pre-populated reservations, without any clarification that Orbitz has no business relationship with Skiplagged or that Skiplagged's actions are strictly prohibited by Orbitz and commercial airlines.

47.     Zaman has also openly acknowledged that "hidden city" ticketing violates airline rules and regulations. For instance in a blog post he wrote in February 2014 to advertise his Skiplagged app, Zaman states that "hidden city" ticketing "[v]iolates some airlines['] [Terms of Service]."

48.     Furthermore, upon information and belief, Zaman has personally profited from his practice of promoting "hidden city" ticketing by soliciting and receiving payments from commercial airlines and online travel agencies. In fact, in response to one of United's cease-and-desist letters, Zaman solicited United to become one of Skiplagged's "partners," and, in later communications with United, he represented that other airlines had agreed to partner with him. Furthermore, the Skiplagged site includes links to two meta search engines – Kayak and Hipmunk – which, upon information and belief, compensate Zaman for advertising their sites.

SKIP0000093

Likewise, at certain times, the Skiplagged website will "pop up" what appear to be paid advertisements for other services and products.

## IV.    Plaintiffs' Demands to Cease & Desist and Zaman's Refusals

49.    Plaintiffs have each demanded that Zaman cease and desist his tortious acts. Although Zaman has replied with empty promises to stop, he has simultaneously taken affirmative steps to do just the opposite (while disguising the conduct), all in an effort to denigrate Plaintiffs' brands and hinder Plaintiffs' ability to identify and combat his conduct.

50.    On September 15, 2014, Orbitz Worldwide sent a cease-and-desist letter to Zaman, explaining that it has received several complaints from major airlines that believe Orbitz Worldwide is facilitating "hidden city" ticketing.  Orbitz Worldwide demanded that Zaman immediately cease and desist all redirection from Skiplagged to the Orbitz.com website, or to any of Orbitz's affiliate sites.

51.    On the same day, Zaman responded to Orbitz Worldwide by email and promised to "stop redirecting users to Orbitz and partners by end of business week."

52.    Zaman, however, did not stop redirecting Skiplagged users to Orbitz, but instead has blocked Orbitz IP addresses from accessing the Skiplagged website.  Starting on or around October 2, 2014, when Orbitz personnel attempted to perform a search on Skiplagged, they received an error message that read "Sorry for the inconvenience, but Skiplagged is unable to process your booking request."  Zaman, in other words, was trying to hide his improper conduct from Orbitz, so that he could go on redirecting Skiplagged users to Orbitz's site, without Orbitz's permission or knowledge.  Orbitz believed and relied upon Zaman's promises and believed for a time that Zaman was complying with his promises based on several tests from Orbitz computers

SKIP0000094 's 0739

that seemed to show that Zaman had complied with his promises.   As such, Orbitz initially refrained from bringing this lawsuit.





(For a larger copy, *see id.*)

53.     Similarly, United sent a cease-and-desist letter to Skiplagged on September 5, 2014, demanding that Skiplagged refrain from offering "hidden city" ticketing of United flights. The letter explained that "hidden city" ticketing is expressly prohibited by Section 6(J) of United's Contract of Carriage.

54.     Zaman responded on September 5, 2014, with an extensive email outlining his disagreements with the cease-and-desist letter.   Nevertheless, Zaman ended the letter with an offer to remove all references to "United Airlines" and United's logo on Skiplagged.

55.     Zaman and United's counsel and business representatives spoke via telephone on September 9, 2014, during which Zaman agreed to remove all United references and all United flights and fare information from Skiplagged's search results.

18

SKIP0000095 x 0740

56. Afterward, and contrary to his promises, Zaman merely "censored" the references to United on Skiplagged and added a notification for Skiplagged users that read "Sorry for the inconvenience, but United Airlines says we can't show you this information."



(For a larger copy, *see id.*)

57. After further conversations, Zaman later emailed United on September 15, 2014, to confirm (purportedly) that "United is removed from our services.    Sorry for the inconvenience."

58. Again, however, Zaman did not remove United content as promised.  To this day, he continues to include United flights and fare information in Skiplagged's search results, with a redaction of United's name and insertion of the word "censored."  Zaman also alters slightly the departure and arrival times of the United flights to create an argument that the information is not "identical."   More games and disguised false promises.   But this "censored" data is easily attributable to United because Zaman continues to allow consumers to select "Book Now!" for

19

United flights, at which point they are redirected to a United itinerary on either Orbitz's site, on United's site, or on a third-party booking site, depending on Skiplagged's redirection configuration (although, with further intent to create the impression of compliance, Zaman for a while disabled the "Book Now" button for United flights on the desktop version of Skiplagged – but not on the mobile version of Skiplagged – only to reactivate it after not hearing from United for a week or so).  This false association between Skiplagged and United is intended to confuse consumers and give the impression that United condones or authorizes the practice of "hidden city" ticketing.

## V.     Plaintiffs' Trademark Ownership

### A.     *The Orbitz Marks*

59.     Since long before the acts of Zaman complained of herein, Orbitz has been engaged in the business, *inter alia*, of the sales and marketing of travel agency services, namely, the making of reservations and bookings for transportation and temporary lodging (the **"Orbitz Services"**).

60.     Since at least the early 2000s, Orbitz has provided its Orbitz Services to the public under the Orbitz name and one or more trademarks comprising the word "Orbitz," including, but not limited to, the marks identified in Paragraph 65 below (collectively, the "**Orbitz Marks**").

61.     Orbitz displays and uses the Orbitz Marks in advertising and promotional materials for its Orbitz Services in interstate commerce, including without limitation, on television, radio commercials, the Internet, and in print and online advertisements.  Further, Orbitz, LLC is the owner and operator of several websites, including that available at the URL http://www.orbitz.com, which are used to advertise and promote its Orbitz Services.

SKIP0000097 x 0742

62.     Long before the acts of Zaman, the Orbitz Marks became extremely well known among consumers throughout the United States.

63.     Orbitz has spent millions of dollars annually to advertise and promote the Orbitz Services under the Orbitz Marks and has generated millions of dollars in annual sales by providing the Orbitz Services under the Orbitz Marks.

64.     As a result of Orbitz's extensive use, advertising, and promotion of the Orbitz Marks, the Orbitz Marks have become famous and have acquired strong secondary meaning identifying Orbitz as the source of the Orbitz Services offered.

65.     Orbitz, LLC has obtained a number of trademark registrations for its marks in the United States Patent and Trademark Office (copies of the registration certificate for each of the marks detailed below are attached hereto as composite Ex. H).  Such registrations include, but are not limited to, the following:

| MARK | REG. NO. | REG. DATE | GOODS OR SERVICES |
|---|---|---|---|
| ORBITZ | 2,858,685 | June 29, 2004 | Providing on-line chat rooms and on-line bulletin boards for transmission of messages among computer users concerning travel; providing access to an interactive computer database in the field of travel information, transportation by air, train, bus or boat, musical events, theatrical events, live dramatic events, films, sporting events, dining, art exhibitions, ground traffic, parking, shopping and destination information; travel agency services, namely, making reservations and bookings for transportation; providing |

SKIP0000098 0743

| | | | information concerning travel, travel news and travel-related topics via electronic communications networks; travel agency services, namely, making reservations and booking for temporary lodging. |
|---|---|---|---|
| ORBITZ.COM | 2,951,983 | May 17, 2005 | Providing on-line chat rooms and on-line bulletin boards for transmission of messages among computer users concerning travel; providing access to an interactive computer database in the field of travel information, transportation by air, train, bus or boat, musical events, theatrical events, live dramatic events, films, sporting events, dining, art exhibitions, ground traffic, parking, shopping and destination information; travel agency services, namely, making reservations and bookings for transportation; providing information concerning travel, travel news and travel-related topics via electronic communications networks; travel agency services, namely, making reservations and booking for temporary lodging. |

66.     Orbitz, LLC's trademark registrations under numbers 2,858,685 (ORBITZ) and 2,951,983 (ORBITZ.COM) are now incontestable in accordance with 15 U.S.C. §§ 1065 and 1115(b).   As such, those registrations serve as conclusive evidence of the validity of the incontestable Orbitz Marks and of the registration of these Orbitz Marks, of Orbitz, LLC's

SKIP0000099   'x 0744

ownership of these Orbitz Marks, and of Orbitz's exclusive rights to use the incontestable Orbitz Marks in U.S. commerce.

67.     As a result of the extensive use and promotion by Orbitz of the Orbitz Marks, Orbitz now owns valuable goodwill, which is symbolized by said name and marks.  The use of the Orbitz Marks substantially increases the value of Orbitz's business and the salability of its Orbitz Services.

68.     Long after the Orbitz Marks became incontestable, Zaman began using the Orbitz Marks by providing a service to Skiplagged users in interstate commerce and by re-directing those users to Orbitz's website.  As explained above, the transition from the Skiplagged site to Orbitz's website strongly suggests an affiliation or identity between Skiplagged and Orbitz that does not exist.  Zaman is attempting to confuse and mislead the public into believing that his website, and the "hidden city" ticketing it employs, is done with the approval (if not the outright authorization and sponsorship) of Orbitz and the airlines.

69.     In accordance with 15 U.S.C. § 1072, Orbitz, LLC's federal trademark registrations, including the Orbitz Marks identified above, served as constructive notice to Zaman of Orbitz's rights in and to the Orbitz Marks.  Moreover, as a result of Zaman's participation in the Orbitz affiliate program, Zaman had actual notice of Orbitz's rights in and to the Orbitz Marks.

70.     Despite this notice, Zaman has deliberately and willfully associated the Skiplagged website with Orbitz, without Orbitz's consent or authority.  Zaman's actions have and are likely to continue to cause confusion, cause mistake, and deceive consumers.

B.     *The United Marks*

SKIP0000100 App'x 0745

71.     Since long before the acts of Zaman complained of herein, United has been engaged in the business, *inter alia*, of the sales and marketing of air transportation of persons and property (the **"United Services"**).

72.     Since at least the late 1920s, United has provided its United Services to the public under the United name and one or more trademarks comprising the word "United," including, but not limited to, the marks identified in Paragraph 77 below (collectively, the "**United Marks**").

73.     United displays and uses the United Marks in advertising and promotional materials for its United Services in interstate commerce, including without limitation, on television, radio commercials, the Internet, and in print and online advertisements. Further, United is the owner and operator of several websites, including that available at the URL http://www.united.com, which are used to advertise and promote its United Services.

74.     Long before the acts of Zaman, the United Marks became extremely well known among consumers throughout the United States.

75.     United has spent millions of dollars annually to advertise and promote the United Services under the United Marks and has generated millions of dollars in annual sales by providing the United Services under the United Marks.

76.     As a result of United's extensive use, advertising, and promotion of the United Marks, the United Marks have become famous and have acquired strong secondary meaning identifying United as the source of the United Services offered.

77.     United has obtained a number of trademark registrations for its marks in the United States Patent and Trademark Office (copies of the registration certificate for each of the

SKIP0000101 App'x 0746

marks detailed below are attached hereto as composite Ex. I). Such registrations include, but are not limited to, the following:

| MARK | REG. NO. | REG. DATE | GOODS OR SERVICES |
|---|---|---|---|
| UNITED | 676,462 | March 31, 1959 | Transportation of persons, mail, and property by air. |
| UNITED AIRLINES | 1,750,451 | February 2, 1993 | Transportation of persons, property and mail by air. |
|  | 2,022,051 | December 10, 1996 | Air transportation of persons and property. |

78.     United's trademark registrations under numbers 676,462 (UNITED), 1,750,451 (UNITED AIRLINES), and 2,022,051 () are now incontestable in accordance with 15 U.S.C. §§ 1065 and 1115(b). As such, those registrations serve as conclusive evidence of the validity of the incontestable United Marks and of the registration of these United Marks, of United's ownership of these United Marks, and of United's exclusive rights to use the incontestable United Marks in U.S. commerce.

79.     As a result of the extensive use and promotion by United of the United Marks, United now owns valuable goodwill, which is symbolized by said name and marks. The use of the United Marks substantially increases the value of United's business and the salability of its United Services.

80.     Long after the United Marks became incontestable, Zaman began using the United Marks by providing a service to Skiplagged users in interstate commerce, by using the United Marks in connection with that service, and by misleading Skiplagged users to believe that United condones the practice of "hidden city" ticketing. As explained above, Zaman is attempting to confuse and mislead the public into believing that his website, and the "hidden

SKIP0000102   'x 0747

city" ticketing it employs, is done with the approval (if not the outright authorization and sponsorship) of United.

81.     In accordance with 15 U.S.C. § 1072, United's federal trademark registrations, including the United Marks identified above, served as constructive notice to Zaman of United's rights in and to the United Marks.  Moreover, as a result of Zaman's correspondence with United, and likely earlier, Zaman had actual notice of United's rights in and to the United Marks.

82.     Despite this notice, Zaman has deliberately and willfully associated the Skiplagged website with United and given off the impression that United condones the practice of "hidden city" ticketing, all without United's consent or authority.  Zaman's actions have and are likely to continue to cause confusion, cause mistake, and deceive consumers.

## <u>COUNT I – LANHAM ACT – FEDERAL UNFAIR COMPETITION</u><br><u>(under 15 U.S.C. § 1125(a), by Plaintiff Orbitz, LLC)</u>

83.     Orbitz, LLC repeats and realleges each and every allegation in Paragraphs 1 through 82 as though fully set forth herein.

84.     Zaman's willful acts of associating the Skiplagged website with Orbitz has and is likely to continue to cause confusion, cause mistake, and deceive consumers.  Zaman's conduct in this regard constitutes a false designation of origin and a false representation of fact in connection with goods and services, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.     Orbitz, LLC has been damaged by Zaman's conduct and is likely to be damaged in the future.

86.     Zaman's conduct has also caused irreparable injury to Orbitz, LLC's goodwill and reputation, an injury which is and continues to be ongoing and irreparable.  Orbitz, LLC lacks an

SKIP0000103    Orbitz 0748

adequate remedy at law, and an award of monetary damages alone cannot fully compensate Orbitz, LLC for its injuries. Accordingly, Orbitz, LLC is entitled to an injunction.

87.     Furthermore, given Zaman's willful infringement and deceptive tactics, this is an exceptional case, and Orbitz, LLC is entitled to treble damages and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a)(3).

WHEREFORE, Plaintiff Orbitz, LLC prays that the Court enter judgment in its favor and against Defendant Zaman, and award Orbitz, LLC the following relief: (i) preliminarily enjoin Zaman from falsely associating Skiplagged's services with Orbitz; (ii) permanently enjoin Zaman from falsely associating Skiplagged's services with Orbitz; (iii) award treble damages in Orbitz, LLC's favor and against Zaman in excess of $75,000; (iv) order disgorgement of Zaman's profits, and award such profits to Orbitz, LLC; (v) award Orbitz, LLC its costs and reasonable attorneys' fees; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT
### (by Plaintiff Orbitz Worldwide)

88.     Orbitz Worldwide repeats and realleges each and every allegation in Paragraphs 1 through 87 as though fully set forth herein.

89.     Orbitz Worldwide's travel agency agreements with commercial airlines are valid and enforceable contracts. Orbitz Worldwide has fulfilled all of its contractual obligations under these agreements.

90.     Zaman had knowledge of Orbitz Worldwide's travel agency agreements with commercial airlines, including the restrictions that American Airlines, British Airways, Iberia Airlines, and Delta Airlines impose on their travel agents.

SKIP0000104

91.     Zaman has intentionally interfered with Orbitz Worldwide's travel agency agreements with commercial airlines.  He continues to do so, while still trying to shield his conduct by blocking Orbitz personnel.

92.     Zaman's intentional interference is without justification.

93.     Zaman's conduct has jeopardized Orbitz Worldwide's ability to perform the travel agency agreements with commercial airlines, including but not limited to, the prohibitions in Section 3(c) of the American Agency Addendum between American Airlines and its travel agents, and the prohibitions in Section 3(c) of British Airways' and Iberia Airlines' agreements with their travel agents.

94.     As a result of Zaman's conduct, Orbitz Worldwide has suffered and will continue to suffer damage, including but not limited to remedies available to commercial airlines in the agency agreements and the costs of investigating Zaman's wrongful conduct.

95.     Zaman's conduct has also caused irreparable injury to Orbitz Worldwide's goodwill and reputation, an injury which is and continues to be ongoing and irreparable.  Orbitz Worldwide lacks an adequate remedy at law, and an award of monetary damages alone cannot fully compensate Orbitz Worldwide for its injuries.  Accordingly, Orbitz Worldwide is entitled to a permanent injunction.

96.     Furthermore, because Zaman has continued to operate his website in a way that damages Orbitz Worldwide, despite his promises that he would cease and desist all such activity (and attempts to hide same from Orbitz), his conduct constitutes wanton and malicious behavior warranting punitive damages.

WHEREFORE, Plaintiff Orbitz Worldwide prays that the Court enter judgment in its favor and against Defendant Zaman, and award Orbitz Worldwide the following relief:  (i)

28

SKIP0000105 x 0750

preliminarily enjoin Zaman from tortiously interfering with Orbitz Worldwide's contracts; (ii)

permanently enjoin Zaman from tortiously interfering with Orbitz Worldwide's contracts; (iii)

award damages in Orbitz Worldwide's favor and against Zaman in excess of $75,000; (iv) award

punitive damages in Orbitz Worldwide's favor and against Zaman because of Zaman's wanton

and malicious conduct; (v) award Orbitz Worldwide its costs; and (vi) grant such other or further

relief as the Court deems just and equitable.

### COUNT III – BREACH OF CONTRACT
### (by Plaintiff Orbitz, LLC)

97.     Orbitz, LLC repeats and realleges each and every allegation in Paragraphs 1

through 96 as though fully set forth herein.

98.     Orbitz, LLC's Affiliate Agreement with Zaman, including the Terms and

Conditions that are incorporated, constitutes a valid and enforceable contract.

99.     Zaman has and continues to breach the Affiliate Agreement and its incorporated

Terms and Conditions.  Specifically, Zaman has and continues to breach the Affiliate Agreement

by using the Skiplagged website in a way that makes Skiplagged's services and marks

confusingly similar to the Orbitz Services and the Orbitz Marks.  In addition, Zaman has and

continues to breach Section 3 of the Terms and Conditions by, *inter alia*, implying that Orbitz is

endorsing Skiplagged's products and services; using Orbitz's website for illegitimate

reservations and bookings; using software to interfere, or attempt to interfere, with the normal

operation of Orbitz's website; and disguising the origin of information transmitted through

Orbitz's website – all without Orbitz, LLC's prior written consent.

100.     Orbitz, LLC has performed all of its obligations under the Affiliate Agreement.

SKIP0000106 x 0751

101.    As a result of Zaman's continuing breaches, Orbitz, LLC has suffered and will continue to suffer damage, including but not limited to irreparable harm to Orbitz, LLC's client relationships and reputation.

WHEREFORE, Plaintiff Orbitz, LLC prays that the Court enter judgment in its favor and against Defendant Zaman, and award Orbitz, LLC the following relief: (i) preliminarily enjoin Zaman from breaching the Affiliate Agreement between him and Orbitz, LLC; (ii) permanently enjoin Zaman from breaching the Affiliate Agreement between him and Orbitz, LLC; (iii) award damages in Orbitz, LLC's favor and against Zaman in excess of $75,000; (iv) award Orbitz, LLC its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT IV – LANHAM ACT – FEDERAL UNFAIR COMPETITION
### (under 15 U.S.C. § 1125(a), by Plaintiff United)

102.    United repeats and realleges each and every allegation in Paragraphs 1 through 101 as though fully set forth herein.

103.    Zaman's willful acts of associating the Skiplagged website with United has caused, and is likely to continue to cause, confusion and cause mistake and deceive consumers. Zaman's conduct in this regard constitutes a false designation of origin and a false representation of fact in connection with goods and services, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

104.    United has been damaged by Zaman's conduct and is likely to be damaged in the future.

105.    Zaman's conduct has also caused irreparable injury to United's goodwill and reputation, an injury which is and continues to be ongoing and irreparable.  United lacks an adequate remedy at law, and an award of monetary damages alone cannot fully compensate United for its injuries.  Accordingly, United is entitled to an injunction.

SKIP0000407 App'x 0752

106.    Furthermore, because Zaman's conduct has been willful and deceptive, this is an exceptional case, and United is entitled to treble damages and reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(a)(3).

WHEREFORE, Plaintiff United prays that the Court enter judgment in its favor and against Defendant Zaman, and award United the following relief:  (i) preliminarily enjoin Zaman from falsely associating Skiplagged's services with United; (ii) permanently enjoin Zaman from falsely associating Skiplagged's services with United; (iii) award treble damages in United's favor and against Zaman in excess of $75,000; (iv) order disgorgement of Zaman's profits, and award such profits to United; (v) award United its costs and reasonable attorneys' fees; and (vi) grant such other or further relief as the Court deems just and equitable.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT
### (by Plaintiff United)

107.    United repeats and realleges each and every allegation in Paragraphs 1 through 106 as though fully set forth herein.

108.    United's Contract of Carriage is a valid and enforceable contract.  United has fulfilled all of its contractual obligations in the Contracts of Carriage with its customers.

109.    Zaman had knowledge of United's Contract of Carriage, including Section 6(J)'s prohibitions relating to "hidden city" ticketing.

110.    Zaman intentionally interfered with United's Contracts of Carriage with its customers by inducing customers to engage in "hidden city" ticketing, which is expressly prohibited in Section 6(J) of the Contract of Carriage.

111.    Zaman's intentional interference was done without justification.

SKIP0000108's 0753

112.    Zaman's conduct of encouraging "hidden city" ticketing has induced United customers to breach their Contracts of Carriage upon purchase of their "hidden city" flights through Orbitz.

113.    As a result of these breaches, United has suffered and will continue to suffer damage, including but not limited to increased operating costs due to scheduling disruptions; loss of revenues from prospective United customers who would have otherwise purchased seats on the "skipped" legs of passengers' flights; and the costs of investigating Zaman's wrongful conduct.

114.    Zaman's conduct has also caused irreparable injury to United's goodwill and reputation and in increased risk of harm to public safety, injuries which are and continue to be ongoing and irreparable.  United lacks an adequate remedy at law, and an award of monetary damages alone cannot fully compensate United for its injuries.  Accordingly, United is entitled to an injunction.

115.    Furthermore, because Zaman has continued to operate his website in a way that damages United, despite his promises that he would cease and desist all such activity (and ongoing attempts to hide same), his conduct constitutes wanton and malicious behavior warranting punitive damages.

WHEREFORE, Plaintiff United prays that the Court enter judgment in its favor and against Defendant Zaman, and award United the following relief:  (i) preliminarily enjoin Zaman from tortiously interfering with United's contracts; (ii) permanently enjoin Zaman from tortiously interfering with United's contracts; (iii) award damages in United's favor and against Zaman in excess of $75,000; (iv) award punitive damages in United's favor and against Zaman

SKIP0000109   App'x 0754

because of Zaman's wanton and malicious conduct; (v) award United its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

<div align="center">

**COUNT VI – MISAPPROPRIATION**
**(by Plaintiff United)**

</div>

116.    United repeats and realleges each and every allegation in Paragraphs 1 through 115 as though fully set forth herein.

117.    United expends significant time, labor, and financial resources on developing its fare calculations and flight schedules, and in protecting this content from its competitors.  United strives to ensure that this data cannot be easily duplicated without United's prior consent.

118.    United's fare and scheduling data reflect not only the price of travel, but also the ever-changing level of availability on a particular flight.  Thus, United's fares are highly time-sensitive.

119.    United's fare and scheduling data have substantial commercial value, particularly among United's competitors.  Zaman's use of United's fare and scheduling data on the Skiplagged website constitutes free-riding on United's labor, efforts, and resources.  This wrongful act of free-riding advantages Zaman because he, upon information and belief, is personally profiting from the use of this information.  Zaman's acts also disadvantage legitimate attempts by United and its authorized agents to use the fare and scheduling data.  Because of these disadvantages, Zaman's free-riding discourages future investments in new fare and scheduling models.

120.    As a result, United has suffered and will continue to suffer damage to its fare and scheduling processes.

SKIP0000110 x 0755

121. Furthermore, because Zaman has continued to operate his website in a way that damages United, despite his promises that he would cease and desist all such activity, his conduct constitutes wanton and malicious behavior warranting punitive damages.

WHEREFORE, Plaintiff United prays that the Court enter judgment in its favor and against Defendant Zaman, and award United the following relief: (i) preliminarily enjoin Zaman from misappropriating United's fare and scheduling data; (ii) permanently enjoin Zaman from misappropriating United's fare and scheduling data; (iii) award damages in United's favor and against Zaman in excess of $75,000; (iv) award punitive damages in United's favor and against Zaman because of Zaman's wanton and malicious conduct; (v) award United its costs; and (vi) grant such other or further relief as the Court deems just and equitable.

Date: November 17, 2014

Respectfully submitted,

**UNITED AIRLINES, INC.,**
**ORBITZ WORLDWIDE, LLC &**
**ORBITZ, LLC**


/s/ *John S. Letchinger*
*One of the Attorneys for Plaintiffs*

John Letchinger (#6207361)
Matthew Caccamo (#6282605)
Frank Blechschmidt (#6308606)
BAKER & HOSTETLER LLP
191 N. Wacker Drive, Suite 3100
Chicago, Illinois 60606
(312) 416-6200
(312) 416-6201 (FAX)

34

SKIP0000App'x 0756

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned, an attorney, certifies that a copy of the foregoing **Plaintiff's Complaint** will be served upon the following, or an agent thereof, via personal delivery by an individual over the age of 18 who is not a party to this action, and that a notice certifying the same will be filed upon service.

Aktarer Zaman
8312 101st Ave. Fl. 3
Ozone Park, New York 11416-2011


/s/ *John S. Letchinger*
John S. Letchinger

SKIP0000112'x 0757

# Exhibit A-21

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-22

## Terms and Conditions

**General Terms**          Privacy Policy          Hotels          Rewards          Contest

### 1. Terms

By accessing this web site, you are agreeing to be bound by these web site Terms and Conditions of Use, all applicable laws and regulations, and agree that you are responsible for compliance with any applicable local laws. If you do not agree with any of these terms, you are prohibited from using or accessing this site. The materials contained in this web site are protected by applicable copyright and trademark law.

### 2. Use License

a. Permission is granted to temporarily download one copy of the materials (information or software) on Skiplagged's web site or apps for personal, non-commercial transitory viewing only. This is the grant of a license, not a transfer of title, and under this license you may not:
  i. modify or copy the materials;
  ii. use the materials for any commercial purpose, or for any public display (commercial or non-commercial);
  iii. attempt to decompile or reverse engineer any software contained on Skiplagged's web site or apps;
  iv. remove any copyright or other proprietary notations from the materials; or
  v. transfer the materials to another person or "mirror" the materials on any other server.
b. This license shall automatically terminate if you violate any of these restrictions and may be terminated by Skiplagged at any time. Upon terminating your viewing of these materials or upon the termination of this license, you must destroy any downloaded materials in your possession whether in electronic or printed format.

### 3. Disclaimer

a. The materials on Skiplagged's web site and apps are provided "as is". Skiplagged makes no warranties, expressed or implied, and hereby disclaims and negates all other warranties, including without limitation, implied warranties or conditions of merchantability, fitness for a particular purpose, or non-infringement of intellectual property or other violation of rights. Further, Skiplagged does not warrant or make any representations concerning the accuracy, likely results, or reliability of the use of the materials on its Internet web site or otherwise relating to such materials or on any sites linked to this site or app.

### 4. Limitations

In no event shall Skiplagged or its suppliers be liable for any damages (including, without limitation, damages for loss of data or profit, or due to business interruption,) arising out of the use or inability to use the materials on Skiplagged's Internet site or apps, even if Skiplagged or a Skiplagged authorized representative has been notified orally or in writing of the possibility of such damage. Because some jurisdictions do not allow limitations on implied warranties, or limitations of liability for consequential or incidental damages, these limitations may not apply to you.

### 5. Revisions and Errata

The materials appearing on Skiplagged's web site and apps could include technical, typographical, or photographic errors. Skiplagged does not warrant that any of the materials on its web site are accurate, complete, or current. Skiplagged may make changes to the materials contained on its web site or apps at any time without notice. Skiplagged does not, however, make any commitment to update the materials.

Feedback

SKIP0000010     Plx 0798

Skiplagged has not reviewed all of the sites linked to its Internet web site and is not responsible for the contents of any such linked site. The inclusion of any link does not imply endorsement by Skiplagged of the site. Use of any such linked web site is at the user's own risk. Skiplagged does not warrant or make any representations concerning the accuracy, likely results, or reliability of the use of the materials on any sites linked to this site or app.

## 7. Travel Documents

Users are responsible for ensuring that they have all necessary travel documents to enter their ticketed final destination. This includes, but is not limited to, Passport and Visa. Destination entry requirements vary by Country and the citizenship held by the user. Skiplagged has no special knowledge with regard to entry requirements and therefore makes no guarantees of entry with purchases made on its web site or apps.

## 8. Fees

If you are making a purchase from outside your local country, your bank may convert your payment amount to your local currency and charge you a conversion fee. Rates are determined by your bank, not Skiplagged. In such cases, the amount shown on your billing statement may be different from the amount shown on Skiplagged's web site or apps at the time of purchase. They may also charge you a foreign transaction fee depending on the type of card you use and how they choose to classify the transaction. With some cards, booking an international trip is considered an international purchase. We urge users to check with their banks prior to making an international purchase. For purchases made on Skiplagged's web site, there may be a fee charged. The full amount of this fee will be disclosed to user prior to making their payment.

## 9. Site Terms of Use Modifications

Skiplagged may revise these terms of use for its web site at any time without notice. By using this web site you are agreeing to be bound by the then current version of these Terms and Conditions of Use.

## 10. Indemnity

You agree to indemnify, hold harmless and defend Skiplagged and Skiplagged's affiliates, subsidiaries, officers, directors, employees, agents and licensors at your expense, against any and all third party claims, actions, proceedings and suits and all related liabilities, damages, settlements, penalties, fines, costs and expenses (including, without limitation, reasonable attorneys' fees and other dispute resolution expenses) incurred by Skiplagged arising out of or relating to (a) breach of any term of this Agreement or (b) violation of any law, rule or regulation or the rights of any third party or (c) your use of or access to Skiplagged's website, app or intellectual property.

## 11. Governing Law

Any claim relating to Skiplagged's web site or app shall be governed by the laws of the State of New York without regard to its conflict of law provisions.



**skiplagged**

ABOUT (/ABOUT)          FAQ (/FAQ)          PRESS (/PRESS)          TERMS (/TERMS)          CAREERS (/CAREERS)

English          USD

ttps://www.facebook.com/Skiplagged/)          (https://twitter.com/skiplagged)          (https://www.instagram.com/skiplagged

App Store (/ios)          Google Play (/android)

Feedback

SKIP0000070 App'x 0799

# Exhibit A-23

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-24

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-25

Login

## Skiplagged makes it easier to experience the world.

Skiplagged makes it easy for you to find the best rates on airfare and hotels. All of the information, none of the hassle. We even show you flights the airlines don't want you to see. Our goal is to empower consumers to use their buying power however they please. We exist to just find the best prices for you.







**Making it easier to experience the world.**

Find flight and hotel rates you won't see anywhere else. Check out our mobile app.

**We show you flights the airlines don't want you to see.**

Skiplagging or hidden-city flying is where you get off at the layover rather than the final destination to save money.

**We also show you the best rates on hotels.**

This is one of the top hotels in Las Vegas. Everyone else is charging $200/night. We only charge $100/night.

## How are we doing this?

Our unique algorithm shows the cheapest regular flights and skiplagging flights faster than any other site. Skiplagging flights refer to itineraries with multiple legs where the traveler exits prior to the final destination. As an example, a traveler who wants to go to San Francisco from New York would book a flight that is ticketed for NYC -> San Fran -> Seattle and then their travel once they arrive in San Fran and skip the leg to Seattle. This results in savings of up to 80% using Skiplagged. Be sure to check out our FAQ for full details.

## Why are we doing this?

We are improvers and frequent travelers. We believe consumers should have more power over how they spend their money. Information = power in our books. We grew tired of the inefficient and expensive process of travel planning so we sought to improve it by creating a lightning fast search portal. We also noticed there were no travel companies that truly worked for the consumers benefit so we changed that. Some tried to stop us but we persevered.

## We're hiring!

Apply now!



### skiplagged

ABOUT    FAQ    PRESS    TERMS    CAREERS

English ∨    USD ∨

SKIP00000472    App Store    Google Play    1172'x 0826

Skiplagged Support  >  Flights

🔍 Search

### Articles in this section

How to Book a Flight on Skiplagged

Can I cancel or change a flight?

Self-transfer/Virtual Interlining Flights

How do I add my TSA Known Traveler Number (KTN) to my booking?

Why are there two booking links for my round trip flight?

How do I purchase tickets for multiple travelers?

Why is the app not defaulting to my local airport?

**How do I search for a hidden-city flight?**

Can I track the price of a specific flight?

Can I search for a multi-city itinerary?

See more

# How do I search for a hidden-city flight?

Follow

Hidden-city or "Skiplagged Rate" flights are only available on certain routes.  Some cities are major transit hubs, so flights frequently have layovers in those cities.

If you are flying through such a city, you may see flight options on our site that allow you to disembark at the layover city. If these options are available, they will appear in your search results (you don't have to do anything special to get these results to appear). You'll know they're hidden-city flights because the final legs of the journey will be crossed off, and the layover location will appear as your destination.  These flights will also be denoted as "Skiplagged rate":



If hidden-city flights are options in your search results, you will have the ability to filter the results to view hidden-city flights. On the website, simply select the filter option on the left called **SKIPLAGGING** to view **Hidden-City** flight in your search results. Deselect it to exclude hidden-city flights:

**Remember:** If you choose a hidden-city itinerary, consult our page about tips for hidden-city travel: What is a "hidden-city" flight?

Have more questions? Submit a request

#### Recently viewed articles

What is Skiplagging or "hidden-city" flying?

#### Related articles

What is Skiplagging or "hidden-city" flying?

Why are there two booking links for my round trip flight?

How do I purchase tickets for multiple travelers?

Can I check a bag if I book flights found on Skiplagged?

Can I cancel or change a flight?

Skiplagged Support

SKIP00000174

Skiplagged Support  >  Flights

**Articles in this section**

How to Book a Flight on
Skiplagged

Can I cancel or change a
flight?

Self-transfer/Virtual
Interlining Flights

How do I add my TSA Known
Traveler Number (KTN) to my
booking?

Why are there two booking
links for my round trip flight?

How do I purchase tickets for
multiple travelers?

Why is the app not defaulting
to my local airport?

How do I search for a hidden-
city flight?

Can I track the price of a
specific flight?

Can I search for a multi-city
itinerary?

See more

# How to Book a Flight on Skiplagged

[ Follow ]

Welcome to Skiplagged! Here are some basic instructions on how to search for and book a flight.

Go to the https://skiplagged.com/ homepage and enter your departure and destination
locations and departure date for a one-way trip. You can also change to round trip and adjust
the number of travelers.



Flight search results will load on the next screen so you can choose your flight.



- There are two types of flights: **Standard** and **Hidden-city or Skiplagging**
- **Standard**: Leaving from the departure city and arriving at the final destination of the
  ticket. (*Example*: You want to fly from NYC area to LAX. The route is JFK-SEA-LAX. This
  means you would leave from JFK and arrive at the final destination of the ticket, LAX).
- **Hidden-city (Skiplagging)**: Leaving from the departure city and you will disembark at the
  layover airport but not continue on to the final destination of the ticket. (*Example*: You
  want to fly from NYC to LAX and you found a hidden-city flight route EWR-LAX-OAK. This
  means you would exit in LAX and not continue on to OAK.) Learn more about them here:
  What is Skiplagging or "hidden-city" flying?

There are **filters along the left side** where you can narrow down your options by filtering
standard vs. hidden-city (skiplagging), number of stops, takeoff, landing, flight duration, layover
duration, airlines, departure airport, and layover city.



**To select a flight**, you can hover over the price on the right side and click on the flight or the
blue "Select" button.

- This will create a popup for you to review the details before you get to the checkout
  page.
- If you are ready to book, click on the blue "Book Now" button to take you to the checkout
  page.

SKIP0000075



On the checkout page, you will select fare class (if available), enter the passenger information, and the payment information.

- Once you have reviewed the flight, the payment information, and agreed to the terms and conditions, you now click on the final, blue "Book Now" button to complete your flight purchase. You will see a page showing the booking was successfully completed.

Within a few minutes, a Skiplagged confirmation email will be sent to the inbox of the email address you used on the checkout page.

And that's it. You've booked your flight. Thank you for choosing us and safe travels!

Have more questions? Submit a request.

**Recently viewed articles**

Can I check a bag if I book flights found on Skiplagged?

How do I search for a hidden-city flight?

What is Skiplagging or "hidden-city" flying?

**Related articles**

What is Skiplagging or "hidden-city" flying?

Can I cancel or change a flight?

Why are there two booking links for my round trip flight?

How do I search for a hidden-city flight?

How do I add my TSA Known Traveler Number (KTN) to my booking?

Skiplagged Support

Skiplagged Support > FAQ

Q Search

**Articles in this section**

What is Skiplagging or "hidden-city" flying?

How do I contact Skiplagged's support team?

Why are flight prices sometimes more expensive than listed?

How do I receive a refund for a canceled flight?

Why don't I see any search results?

Beware of Scammers Pretending to be Skiplagged

How do I cancel Trip Protection?

Where are the price graphs for flights?

What are the benefits of creating an account with Skiplagged?

Does Skiplagged buy or sell timeshares?

See more

# What is Skiplagging or "hidden-city" flying?

Follow

Skiplagging or hidden-city flying is where you get off at the layover rather than the final destination. For example, a flight from New York to Orlando might be $250, but a similar flight from New York to Dallas with a layover in Orlando might be $130. If you're going to Orlando, we'll show you both flights. If you choose the cheaper one, you get off the plane at the layover (Orlando) rather than going to the final ticketed destination (Dallas).

This is perfectly legal and the savings can be significant, but there are **some things to be aware of**:

- **Backpack only** — We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Dallas (final ticketed destination)!

- **Bring your passport** for international flights (even if you're not going all the way to the final destination). Some carriers require a passport to board the plane.

- **You may need a visa** for international flights. This depends on the country that's the final destination. In some cases, all you need is a passport, but you may also need a visa for some countries.

- **Don't associate a frequent flyer account** — If you do, the airline might invalidate any miles you've accrued with them.

- **Some airlines may require proof of a return ticket** during check-in. If this happens to you, just buy a refundable return ticket directly from the airline and cancel it ASAP after boarding.

- **Do not overuse** hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame.

- In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline (1% chance).

- You might upset the airline, so don't do this often.



$250
ATL → MCO

Atlanta        Orlando        Dallas

Exit here!

$130
ATL → MCO → DFW

(f) (v) (in)

Have more questions? Submit a request

**Related articles**

Can I check a bag if I book flights found on Skiplagged?

Why are flight prices sometimes more expensive than listed?

Why are there two booking links for my round trip flight?

How do I receive a refund for a canceled flight?

How do I contact Skiplagged's support team?

Skiplagged Support

SKIP0000077

Plaintiff's 0830

# Exhibit A-26

 English ▼          Search AA.com®  🔍

    **Plan travel Travel informatic AAdvantage®**      **Log in**

🏠  Home  ›  Legal, privacy & copyright  ›  Conditions of carriage

# Conditions of carriage

Updated March 1, 2024

## The contract between you, the passenger, and us, American Airlines

At American Airlines, we fly over borders – across the country and the world – to connect people and communities. Providing this service and making the world a smaller, more inclusive place, is a huge part of who we are.

Flying with American »

All transportation of passengers and bags provided by American Airlines is subject to the terms of these Conditions of Carriage, in addition to any:

- Terms printed on any ticket, ticket jacket or ticket receipt
- Published fare rules; and
- Applicable tariffs filed by American Airlines in accordance with U.S. Department of Transportation regulations.

All terms, fare rules, and tariffs are incorporated herein by reference and constitute part of your agreement with American Airlines.

American Airlines General Rules of the International Tariff 🗗

### You

Passenger responsibilities »

Children traveling »

Customers with special needs »

### Your flight

Check-in and arrival »

Changes to schedules / operations »

Events beyond our control »

Oversold flights »

Delays, cancellations and diversions »

### Your ticket, bags & refunds

Baggage »

Baggage liability (domestic flights) »

Liability for international flights »

Ticket types and refunds »

Ticket validity »

App'x 0832
3/21/2024, 3:07 PM
AA-SKP-00054065

Case 4:23-cv-00860-P    Document 188-1    Filed 07/22/24    Page 313 of 509    PageID 8198

# Contact us

Good or bad, we want to hear from you. Please contact us with your comments, concerns and feedback. Our Customer Relations team is here for you and will respond promptly.

Email Customer Relations »

## ⌃ Contract details

When you buy a ticket or travel on a flight provided by American Airlines, you agree:

- To the extent not preempted by federal law, Texas law applies to this contract and any dispute from your ticket purchase or travel on American Airlines without regard to conflict of law principles.

- This contract cannot be modified or waived unless authorized in writing by an American Airlines corporate officer.

- Even if you didn't pay for your ticket, for example if you're one of multiple passengers in the same reservation, this contract is an agreement between us and you.

- We provided links to pages on our site for more information, but those pages are not part of this contract.

- Though we translated these conditions of carriage for convenience, the English language version is the official, legal version.

- This contract is the entire agreement that governs your rights and responsibilities as a passenger. If we don't enforce a right under this contract in one case, it does not waive our right to enforce the contract later. And if any part of this contract is found invalid or unenforceable, we'll strike what's invalid or unenforceable without effect to the rest of the contract.

- **Limit of liability:** You agree we are not liable for special, consequential, indirect or incidental damages that arise from this agreement, even if we knew, should've known or were advised damages were possible, including from lost, damaged or delayed bags (including lost revenue or business interruption).

- **Class Action Waiver:** You agree that any lawsuit you bring against us, or any of our affiliated entities, agents, directors, employees, and/or officers related to these Conditions of Carriage, your ticket, and/or your use of or dealings with American's website, customer service and other call centers, or American will be brought only in your individual capacity, and may not be brought in or asserted as part of a class action proceeding.

Customer service plan »

## ⌃ The words we use

Here's what we mean by things like 'domestic' and 'FAA.' If you can't find something or have questions, please get in touch.

Contact American »

## American Airlines

Under the name "American Airlines" we operate mainline flights as American Airlines and regional codeshare flights (doing business as American Eagle) operated by:

- Air Wisconsin Airlines
- Envoy Air Inc.
- Piedmont Airlines Inc.

App'x 0833
3/21/2024, 3:07 PM
AA-SKP-00054066

- PSA Airlines Inc.
- Republic Airways Inc.
- SkyWest Airlines Inc.

## We also offer codeshare flights operated by:

- Aer Lingus
- Air Tahiti Nui
- Alaska Airlines, Inc.
- British Airways
- Cathay Pacific
- China Southern Airlines
- El Al
- Fiji Airways
- Finnair

- GOL Linhas Aéreas
- Hawaiian Airlines, Inc.
- Horizon Air Industries, Inc. (doing business as Alaska Airlines)
- Hyannis Air Service, Inc. (doing business as Cape Air)
- Iberia Airlines
- Japan Airlines

- Jetstar
- Philippine Airlines
- Jetstar Japan
- Qantas
- Qatar Airways
- Royal Air Maroc
- Royal Jordanian Airlines
- Silver Airways
- Vueling

| What we say | What it means |
| --- | --- |
| American Ticket Office | A ticket sales office of American Airlines, Inc. / American Eagle or one of our appointed travel agents |
| Assistive device | Equipment used by passengers with special needs (Disabled Passenger or Qualified Individual with a Disability) to hear, see, communicate, maneuver or perform daily functions; includes medical devices and medications |
| Automated re-shopping (Auto re-shop) | The use of a robotic or automated process of re-booking a ticket for the same passenger and itinerary on American with the purpose of taking advantage of a reduced fare where there is no change fee payable to American for the administrative costs of the re-booking. |
| Baggage | Personal property that's either checked in or carried on the plane |
| Codeshare | Codeshare agreements allow us to sell seats on flights operated by other airlines, giving American customers access to more flights and destinations; partners include British Airways, Iberia, Alaska Airlines and more |
| Customs and Border Protection (CBP) | CBP is our country's primary border control organization. It regulates and facilitates international trade, collects import duties, and enforces U.S. regulations, including trade, customs and immigration |
| Disabled Passenger or Qualified Individual with a Disability | An individual who has a physical or mental impairment that, permanently or temporarily, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment as further defined in the U.S. Department of Transportation regulations in 14 C.F.R. Section 382.3 |

| What we say | What it means |
|---|---|
| Domestic | The 50 federated states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands, also see 'U.S.' |
| Federal Aviation Administration (FAA) | An agency of the U.S. Department of Transportation that regulates all aspects of civil aviation in the U.S. including operation of airports, air traffic and the certifying personnel and aircraft |
| Fare | The price you pay for your ticket; also, the rules associated with that ticket including whether it's refundable |
| Flight segment | A flight segment is a nonstop point-to-point flight that consists of one takeoff and one touchdown |
| International | Outside the 50 federated states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands; also, outside of your home country |
| Montreal Convention and Warsaw Convention | International agreements that set the rules for airlines' liability when we carry passengers, baggage and goods internationally |
| Oversold flight | When the number of checked-in passengers exceeds the number of seats |
| Stopover | A planned stop in a city/airport for over 4 hours |
| Ticket | Passenger ticket, bag check and boarding pass which incorporate these conditions of carriage, including tickets issued electronically |
| Transportation Security Administration (TSA) | An agency of the U.S. Department of Homeland Security with authority over the security of the traveling public in the U.S. |
| U.S. | The 50 federated states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands |
| U.S. Department of Transportation (DOT) | A federal Cabinet department of the U.S. government that regulates aspects of air transportation |

# You

As a passenger, you're required to act in way that's consistent with ensuring the safety of everyone on board. This includes complying with the laws and travel requirements of the countries we fly to, from or over. Traveling can be stressful, and we appreciate your patience and courtesy for other passengers and American Airlines team members.

App'x 0835
3/21/2024, 3:07 PM
AA-SKP-00054068

Case 4:23-cv-00860-P   Document 188-1   Filed 07/22/24   Page 316 of 509   PageID 8201

⊘ Passenger responsibilities

# Complying with the law and government regulations

To fly on American, you must:

- Have a valid photo ID accepted by the TSA (like a driver's license or other government issued ID).
- Have a valid passport, visa and any travel documents required if you're traveling internationally.
- Allow your baggage to be inspected by Customs, the TSA or other government officials.

Be sure your driver's license complies with REAL ID and that your passport is valid or you may not be allowed to board your flight. Some countries require your passport be valid for 3 – 6 months beyond your departure date, so be sure you know the rules before you travel.

We are not responsible for any loss, damage or expense if you do not meet the travel document requirements.

More about ID requirements »

# Complying with airline rules for safety

The safety and comfort of our customers and team members is our top priority. We will respond seriously to any language or behavior that threatens the well-being or functionality of our crew or any American Airlines team member. Violent or inappropriate actions may result in the denial of boarding, removal from the terminal or legal prosecution.

To ensure a safe environment for everyone, you must:

- Allow you and your bags to be searched for explosives, dangerous weapons or banned substances.
- Show a valid ID.
- Understand and comply with all safety instructions.
- Release us from responsibility for any loss, damage or expense if you do not meet the travel document requirements.
- Behave appropriately and respectfully with other passengers, crew or any American Airlines team member.
- Postpone your flight if you have a dangerous disease deemed transmissible by a federal public health authority.
- Be respectful that your odor isn't offensive (unless it's caused by a disability or illness).
- Dress appropriately; bare feet or offensive clothing aren't allowed.
- Not threaten the safety of the flight in any way.
- Have the right travel documents and be allowed to travel to, from or through any countries in your itinerary.
- Be able to sit with your seatbelt fastened.

If your physical or mental condition is such that in American's sole opinion, you are rendered or likely to be rendered incapable of comprehending or complying with safety instructions without the assistance of an attendant, American may refuse to transport you.

In addition, you may be asked to give up your seat if a government official needs space, for weather conditions requiring reduced aircraft load, or for other conditions beyond our control.

# Failing to comply

App'x 0836
3/21/2024, 3:07 PM
AA-SKP-00054069

Case 4:23-cv-00860-P   Document 188-1   Filed 07/22/24   Page 317 of 509   PageID 8202

We may not let you fly (temporarily or permanently) for any reason, including if you:

- Don't obey the law

- Are uncooperative, abusive, harassing, or show the potential to be while on board

- Pose a risk to safety or security

- Appear intoxicated or under the influence of drugs

- Attempt to interfere with the flight crew or refuse to obey instructions

- Fail to comply with American Airlines rules or policies

- Need to be removed for your safety or the safety of other passengers or the crew

- Have a communicable disease or virus, or if we suspect you have a communicable disease or virus

- Are traveling with an animal that causes a delay or damage to the plane or other passengers

You may also be liable for any loss, damage or expense resulting from your conduct. For example, you may be liable for the costs if we have to divert to another city because of your conduct. Also, under U.S. law you may be liable if you assault a federal, airport or airline employee with security duties. Failing to meet passenger responsibilities is a material breach of this contract.

## Children traveling

We welcome children of all ages on board. Be sure you know the rules for your child based on his or her age. We count "age" based on the child's age the day of departure.

Traveling with children and infants »

### Infants (under 2 years)

- One infant under 2 can travel in your lap. You are not required to pay for a separate seat unless you have an FAA approved car seat you plan to use on board.

- There may be a fee for infants traveling outside the U.S.

- Infants as young as 2 days old can fly, but any infant under 7 days old needs a passenger medical form filled out by your doctor before flying.

- Infants must be accompanied by a parent (any age) or someone 16 years or older in the same cabin.

### Children (2 years or older)

- Children 2 and older must have a purchased seat. If your child turns 2 during a trip, the child will need their own seat for the remainder of the trip.

- Children under 5 years cannot travel alone.

Traveling with children and infants »

## Unaccompanied minor service

Our unaccompanied minor service ensures your child is escorted on the plane, introduced to the flight attendant, chaperoned during connections and brought to the person you designate when they arrive. Keep in mind, flight attendants can't continuously monitor children during flight.

App'x 0837
3/21/2024, 3:07 PM
AA-SKP-00054070

Unaccompanied minor service »

## ⌄ Customers with special needs

We're dedicated to providing customers with special needs dignified, professional and courteous service at all times. Customers with special needs may need to board the plane early.

You can request special assistance when you book on aa.com (our site is accessible) or call us anytime at (800) 433-7300.

## Special assistance coordinators

When you request special assistance, a coordinator will contact you before your flight to make sure necessary medical paperwork is complete and requests are arranged.

They can help with:

- Wheelchair assistance
- Mobility assistance, getting in and out of the plane
- Traveling with a service animal*
- Traveling with a portable oxygen concentrator (POCs)*
- Battery-powered medical devices
- Traveling within 7 days of your due date or after your delivery
- Adjacent seating for yourself and your personal care attendant
- Disassembly and packaging for mobility assistive devices when needed

*We require at least 48 hours advance notice if you need to travel with a service animal, or a POC.

Call us anytime:

- 800-433-7300
- For hearing or speech impaired assistance dial 711 to be connected through the National Relay Service

Special assistance »

## Mobility and medical devices

If you're traveling with any medical device, a wheelchair or other mobility device, we're here to help. If we're able, we offer early boarding, help getting off the plane and airport assistance. Contact us to make sure your device is approved for travel and to make any special requests.

Mobility and medical devices »

## Special assistance issues

If you had a special-assistance issue on your trip, please go to the American Airlines customer service desk. We have local complaint resolution officials (LCRO) available during operating hours, and a corporate complaint resolution official is available to assist our LCROs 24/7. You can also call our disability team 24/7 at 800-892-3624.

App'x 0838
3/21/2024, 3:07 PM
AA-SKP-00054071

# Your flight

When it comes to checking in and arriving at the airport, earlier is better. Give yourself extra time if you're checking bags or traveling internationally.

Before you head to the airport, you can check for travel alerts that impact the cities in your trip and get flight status information like gates and times.

Travel alerts »

Get flight status information »

Download the American Airlines app to get real time updates about your travel.

American Airlines app »

## ⌄ Check-in and arrival

### Check-in times

You can check in on aa.com and in the app beginning 24 hours before departure. All airports have minimum check-in times. If you're not checked in by the minimum check-in time, we may reassign your seat to another passenger.

In most cities, you must be checked in:

- At least 45 minutes before scheduled departure, for flights within the U.S.
- At least 60 minutes before scheduled departure, for flights to or from airports outside of the U.S.

Some airports require you to check in earlier.

Check-in and arrival »

### Arriving at the gate

Be at the gate and ready to board the plane at least:

- 30 minutes before departure on domestic flights
- 45 minutes before departure for international flights

You must have a boarding pass with a valid seat assignment to board the plane.

Boarding ends 15 minutes before departure. If you're not on board, we may reassign your seat to another passenger. You will not be allowed to board once the doors close.

If you're on a codeshare flight operated by one of our partners, check with that airline.

## ⌄ Our responsibilities when there are schedule / operations changes

Sometimes we have to make adjustments to our operation, and between the time you book and the time your flight

departs, there may be changes to:

- Your flight number

- The type of plane you're flying on and the available amenities

- Your seat assignment

- The airline that operates your flight

- The number of stopovers or stopover cities

- Departure or arrival times

When there are changes or cancellations that affect your trip, we'll try to contact you in advance to rebook another flight or move you to a similar seat or cabin, though we can't make any guarantees.

We do our best to be on time but our flight schedule is not guaranteed and not part of this contract. We are not liable if:

- We're late or you don't make your connection

- We change the schedule of any flight

- We (or our partners) cancel a flight or route

- Your checked baggage is late (except as required by statute, regulation, or Convention)

- There are special, incidental or consequential damages because of these changes

If we or our airline partner fails to operate your flight or your arrival is delayed more than 4 hours, our sole obligation is to refund the remaining ticket value and any optional fees according to our involuntary refunds policy, subject to our policy for rebooking your delayed / canceled flight.

Refunds »

Rules for delays on international trips are governed by the Montreal Convention and Warsaw Convention. The full linked page provides more information and is incorporated by reference.

Montreal Convention and Warsaw Convention »

## ⌄ Events beyond our control (Force Majeure)

When there's an event we can't control like weather, a strike or other civil disorder, we may have to cancel, divert or delay flights. If your ticket still has value (if you were, for example, re-accommodated in a different class of service) we'll refund the unused portion to the original form of payment, but beyond that we are not liable.

Such "Force Majeure" events include:

- Meteorological or weather conditions

- Civil disturbances including war, embargoes or unsettled international conditions (real or threatened)

- Acts of terror

- Public health emergencies of domestic or international concern

- Labor disputes that involve or affect our service

- Government regulations or requirements

- Shortage of labor, fuel or facilities of American or others

- Any fact not reasonably foreseen or predicted by American

International air transportation liability is regulated by the Montreal Convention and Warsaw Convention.

Montreal Convention and Warsaw Conventions »

## ⌄ Oversold flights

A flight is "oversold" when there are more checked-in passengers than seats. When this happens, our team gets involved as early as possible to find volunteers to change flights.

When, despite our best efforts, we don't have enough volunteers, we'll have to choose customers to change flights involuntarily, and deny boarding. If this happens, we will follow the DOT's compensation rules. We will do our best to get those customers on the next possible flight.

We will not involuntarily remove a revenue passenger who has already boarded to give a seat to another passenger.

## Voluntary denied boarding

We will ask for passengers who are willing to voluntarily give up their seats in exchange for compensation in an amount and form to be determined solely at American's discretion.

When you volunteer to give up your confirmed seat on a flight, we will compensate you in a form and in an amount we think is fair.

## Involuntary denied boarding

If there aren't enough volunteers, we will choose customers to change flights involuntarily and deny boarding.

Boarding priority is given to certain customers, including to those who:

- Have special assistance needs
- Are traveling as an unaccompanied minor
- Have AAdvantage elite status
- Paid for First, Business or Premium Economy
- Checked in earliest

The selection of customers who are involuntarily denied seats is solely at American's discretion.

You will not receive involuntary denied boarding compensation if:

- You fail to comply with American's ticketing, check-in and reconfirmation requirements, or you're not acceptable for transportation under American's usual rules and practices.
- Your flight is canceled.
- We switch to a smaller plane for safety or operational reasons.
- Your plane has 60 or fewer seats and there are safety-related weight/balance restrictions.
- You're offered a seat in a section of the plane that's different from your original ticket. If you are seated in a section for which a lower fare is charged, you will be given an appropriate refund.

Case 4:23-cv-00860-P    Document 188-1    Filed 07/22/24    Page 322 of 509    PageID 8207

- We're able to get you to your next stopover or final destination within 1 hour of your original arrival time.

# Compensation for involuntary denied boarding

DOT rules determine how much you're compensated based on how late you'll be to your stopover or destination. Our goal is to get you to your next scheduled stopover or final destination as soon as possible, so we may offer flights on other airlines and non-air travel such as by train. If your flight is oversold and you're not allowed to board, we'll give you a check or travel credit the same day at the airport or mail it within 24 hours.

## Travel within U.S.

- Up to 1 hour arrival delay – not compensated
- 1 - 2 hour arrival delay – 200% of one-way fare (max. $775)
- 2+ hour arrival delay – 400% of one-way fare (max. $1,550)

## International

- Up to 1 hour arrival delay – not compensated
- 1 - 4 hour arrival delay – 200% of one-way fare (max. $775)
- 4+ hour arrival delay – 400% of one-way fare (max. $1,550)

## Travel from European Union countries (EU)

If you're not allowed to board an oversold, nonstop flight from the EU to the U.S., you may be eligible to receive one of these:

- A travel voucher that can be used for 1 ticket to anywhere American flies
- A check for 300 EUR (arrival delays under 4 hours) or 600 EUR (arrival delays more than 4 hours)

## Travel to or from Canada

If you're not allowed to board a flight to or from Canada, the Canada Air Passenger Protection Regulations may provide additional protections, including compensation.

Canada passengers »

## Delays, cancellations and diversions

Our goal is to provide timely, frequent and helpful updates – from the time you are ticketed, at the airport and on board – when there are delays, cancellations and diversions.

# Rebooking your delayed / canceled flight

When your flight is canceled or a delay could cause you to miss your connection, we'll rebook you on the next American Airlines flight with available seats at no additional cost. If no American flights are available until the next day, and the disruption is caused by us, we'll rebook you on one of our partner airlines with available seats at no additional cost. We'll rebook you in your originally ticketed cabin or class with your original form of payment.

If your flight was delayed or canceled and you don't accept our alternative arrangements, or none were available, we'll refund the remaining ticket value and any optional fees according to our involuntary refunds policy. Beyond that, we have no further contractual obligation.

### Delays caused by us

If the disruption is our fault or you're diverted to another city, and we don't board before 11:59 p.m. local time on your scheduled arrival day, we'll arrange an overnight stay or cover the cost of an approved hotel, if available. We don't guarantee reimbursement for hotel expenses if you book directly without written authorization from American Airlines.

### Delays beyond our control (like weather)

If the delay is beyond our control, or you book your own arrangements without written authorization from American Airlines, you're responsible to pay for your hotel, meals and other expenses. An American Airlines agent may be able to help you find a hotel.

## Taking care of delayed passengers

We'll do our best to ensure delayed passengers are as comfortable as possible. Gate agents are asked to look after customers with special needs including unaccompanied minors, customers with disabilities and the elderly.

For long delays on the plane, we'll make every reasonable effort to ensure you have food (such as crackers or biscuits), water, access to the restroom and basic medical assistance if needed.

We are not responsible for any special, incidental or consequential damages if we're unable to meet this commitment.

Customer service plan »

## Travel to or from Canada

If your flight is delayed or cancelled due to reasons within our control, the Canada Air Passenger Protection Regulations may provide additional protections, including compensation.

Canada passengers »

# Your ticket, bags and refunds

⊘ Baggage

All bags are subject to inspection. We will not accept checked or carry-on bags we think are unsuitable for transportation for reasons like size, weight or character.

Before you go to the airport, be sure to check our baggage page for information on all our checked and carry-on baggage policies.

Baggage »

App'x 0843
3/21/2024, 3:07 PM
AA-SKP-00054076

# Checking your bag

You can only check bags on the day you travel, and your bags must travel to the same ticketed final destination as you. Be sure your name is on all bags before you check them.

If you're flying from one of these airports, you can't check bags more than 4 hours before departure:

- Denver (DEN)
- Fort Lauderdale (FLL)
- Las Vegas (LAS)
- Orlando (MCO)
- Portland (PDX)
- Salt Lake City (SLC)
- Seattle (SEA)

## Baggage limits and fees

The number of bags you can check depends on your destination. Checked bag fees apply with some exceptions. All bag fees are non-refundable and apply per person, each way. Additional fees may apply for overweight / oversize bags or specialty items.

Also, you may have to pay bag fees again if:

- You are connecting on another airline
- Your connection on American is more than 16.5 hours later

Checked bag policies »

Oversize and overweight baggage »

Specialty and sports equipment »

# Claiming your bag

Hang on to your baggage claim tickets; you may have to show your ticket to claim your bags. The airport baggage office will release bags to the person with the baggage claim ticket that matches. If you lose your ticket, we may ask for ID.

When you arrive in the U.S. from an international city, you will claim your checked bags before going through Customs.

# Delayed bags

If you arrive on American at your final destination and your bags have not arrived with you, our goal is to return them within 24 hours (for flights within the U.S., Puerto Rico and the U.S. Virgin Islands).

Some of the reasons it may take us longer to get you your delayed bags include if:

- We don't have a local name, address or phone number for you
- You're on a cruise, in remote camp site or somewhere we can't reasonably reach you

- You changed your delivery address
- We have limited flights to your destination
- Weather or other operational issues get in the way

If you arrive at your final destination on another airline, please check with that airline for information.

# Carry-on bags

In general, you're allowed 1 bag and 1 personal item:

- Your bag must fit in the sizer at the airport.
- Your personal item must fit under the seat in front of you.
- All bags must be stowed before takeoff.

Diaper bags, child safety seats, strollers and medical or mobility devices don't count as your bag or personal item. You may carry on a fully collapsible stroller if it's under 20 lbs. and fits in an overhead bin. All other strollers must be checked at a ticket counter.

We always reserve the right to decide if your carry-on items are suitable to bring on board and if there is enough space in the overhead bins.

If you need to check your carry-on bags, be sure to take any fragile or valuable items like your keys, medication or computers with you on board. Also remove and carry on any e-cigarettes and spare batteries for laptops, cameras or other mobile devices.

There are additional carry-on restrictions for certain fares, aircraft and airports. We may have to check your bag at the gate if the overhead bins are full or if there are restrictions. Overhead bin size varies, and some planes and American Eagle flights have smaller bins.

Carry-on baggage policy »

# Restricted items

For everyone's safety on board, some common items are restricted by the TSA and FAA. Be sure you know what you can carry on and what you can check in your bags before you go to the airport.

## Hazardous materials

We don't transport hazardous materials, except for small amounts of dry ice, and we may remove and dispose of any hazardous material in your bags.

Restricted items »

## Firearms

You can travel with firearms in checked baggage only. Firearms must be declared to an agent at check-in. There are other rules or temporary policies that apply; be sure you understand the rules before you go to the airport.

Firearms »

# Pets and service animals

Depending on the animals' breed, size and requirements, pets can travel as a carry-on, be checked or transported with American Airlines Cargo. We only allow you to travel with your pet cats and dogs.

Service animals are welcome at no charge if they meet the requirements. The animal must fit on your lap, at your feet or under your seat, and cannot block the aisle. Dogs trained to detect explosives/drugs or trained for search and rescue (documentation required) are also welcome at no charge.

Traveling with pets »

Traveling with service animals »

## ⌄ Baggage liability (domestic flights)

### What we cover

If your checked bag is lost, damaged or delayed, we will pay the provable value of the losses up to $3,800 (or up to $5,000 if you declare excess value).

A good rule of thumb is never to check anything you can't live without. If it's irreplaceable, sentimental or you depend on it for your well-being, keep it on you or leave it at home.

### What we don't cover

We don't cover loss or damage to:*

- Antiques or artifacts
- Artwork
- Books or documents
- Business equipment or samples, or marketing material
- China or silverware
- Computers, software or other electronics
- Fragile items

- Furs
- Heirlooms
- Jewelry
- Keys
- Liquids
- Medication (over-the-counter)
- Money
- Orthotics or surgical supports

- Perishable items
- Photographic, video or optical equipment
- Precious metals or stones
- Securities or negotiable papers
- Time pieces
- Unique, irreplaceable or similar valuable items

*Wheelchairs or other assistive devices are covered

We strive to be as careful as possible during the normal transport of your belongings. As such, we also don't cover:

- Items you carry on the plane
- Minor scratches, scuffs, stains, dents, cuts or dirt from normal wear and tear
- Things not packed appropriately for transportation like musical instruments or recreational/sports items that aren't in a hard-sided case
- Damage to the inside contents of a bag if the outside isn't damaged
- Damage to or loss from normal wear and tear to parts that stick out like wheels, straps, pockets, handles, hooks or other attachments
- Damage to an item caused by another item in your bag

App'x 0846
3/21/2024, 3:07 PM
AA-SKP-00054079

- Loss, damage or delay of any bag or item considered not acceptable as checked baggage on American

Items not properly packed in a hard-sided case will be treated as fragile items.

We are not liable for any incidental, punitive or special damages that result from lost, damaged or delayed bags including damages for lost revenue or business interruption.

We are not liable if and to the extent that the damage resulted from the inherent defect or quality of the bag.

Excess valuation coverage is not available for and does not apply to items we don't cover.

# Time limits for liability

## First report

If your bags are lost or delayed, you should file a report before you leave the airport.

- Within 4 hours of arriving at your final destination if your bags were delayed
- Within 12 hours of arrival if you used Bags VIP Luggage Delivery

If your bags are damaged, you should file a report before you leave the airport.

- Within 24 hours of receiving your bags if they were delayed and then delivered or picked up
- Within 24 hours if your bags were damaged

## Next steps

For any follow-up reports or action you must:

- Ask us to repair the damage within 30 days of your first report
- Submit a Passenger Property Questionnaire within 30 days of filing your first report (if you're seeking compensation)
- Take legal action related to damage, delay, or loss within 2 years of the incident

# Rejected claims

We may reject your claim if you:

- Falsify information on your claim or submit the same claim with more than 1 airline
- Don't have proof of loss or receipts
- Don't submit your report or necessary claim documents in time
- Used a prohibited booking practice and then made a claim

Prohibited booking practices »

## ⌄ Liability for international flights

For international travel, the Warsaw Convention and the Montreal Convention govern liability for personal injury, death or damage. The terms and conditions are set by these international conventions and are not subject to change or modification by American Airlines. These conventions set compensation amounts for death, injury and

baggage loss and damage. The full linked page is incorporated herein by reference.

Montreal Convention and Warsaw Conventions »

⌄ Ticket types and refunds

Each passenger must have a valid ticket to fly. A ticket is non-transferrable – it can't be used by or refunded to any other passenger. All refunds are made to the original form of payment.

## How long a ticket is valid

In general, a ticket is valid for 1 year:

- If unused, you must start travel within 1 year of date the ticket was issued
- If partially used, you must complete travel within 1 year of the first completed flight

So for an unused ticket issued June 1, 2019, you must begin travel on the new ticket by June 1, 2020.

For a roundtrip ticket that was partially flown on March 1, 2019, you must complete all new travel by March 1, 2020.

These rules apply unless your ticket states otherwise.

## Refunds

Generally, you have up to 24 hours from when you buy your ticket to get a full refund if you booked at least 48 hours before departure. You must cancel your trip within 24 hours of purchase for a refund. If you bought your ticket through a travel agency or another booking source, contact them for a refund. Some countries have different rules about refunds, and if so, we will follow those rules.

Refunds will be made only to the person who paid. Tickets issued for official government travel will be refunded only to the government agency that issued the transportation request.

## Refundable tickets

If you bought a refundable ticket, decide not to travel and want a refund, we'll pay:

- The full amount of the ticket if travel hasn't started
- The value of the unused travel if the ticket is partially used

We'll refund the original credit card within 7 days (allow 1-2 billing cycles for credit to show). We'll process cash and check refunds within 20 days of receiving all your paperwork.

Some requests may take longer, for example, tickets bought outside the U.S. in another currency or tickets that require research or verification. We are not liable for longer processing times.

Refunds FAQs »

## Non-refundable tickets

We don't refund cash for non-refundable tickets. But if you cancel your trip before departure, we will cancel your ticket and issue a travel credit that you can use toward future travel on American.

Case 4:23-cv-00860-P    Document 188-1    Filed 07/22/24    Page 329 of 509    PageID 8214

Travel credit »

We will refund a non-refundable ticket (or the value of the unused segment of your trip) to the original form of payment if:

- You cancel within 24 hours of booking (and booked at least 2 days before departure).
- We cancel your flight
- We make a schedule change that results in a change of more than 4 hours to your departure time
- A passenger or their travel companion dies. (Supporting paperwork is required)
- Military orders require you to cancel your trip. (Supporting paperwork is required)

If you bought your ticket through a travel agency or another booking source, contact them for a refund.

## Refunds of taxes

You can request a refund of eligible taxes included in the ticket price. If eligible, we'll refund the original form of payment.

- Destination-specific taxes not imposed by us may be eligible
- Taxes we must pay whether or not you travel are not eligible.

Request a refund 🗗

## Refunds for seats, bags and extras

If you paid for seats, bags or other extras and don't use them because you didn't travel as planned, you may request a refund. Read our refunds FAQs for details.

Request a refund 🗗

Refunds FAQs »

## Involuntary refunds

If you are due a refund because we failed to operate on schedule (a delay to your departure time of over 4 hours) or we refused to let you fly for reasons other than your violation of this contract, we will refund you:

- The full amount of the ticket and any extras if travel hasn't started
- The value of the unused travel if the ticket is partially used

If you were involuntarily denied boarding, we will not charge any refund fees or penalties.

We will only refund tickets issued by American Airlines and reserve the right to only make refunds in a currency or country of the original purchase.

⌄ Ticket validity

Tickets are valid for travel only when used with all terms and conditions of sale.

Your ticket is valid only when:

App'x 0849
3/21/2024, 3:07 PM
AA-SKP-00054082

Case 4:23-cv-00860-P   Document 188-1   Filed 07/22/24   Page 330 of 509   PageID 8215

- Travel is to/from the cities on your ticket and in your trip record
- You meet all the fare requirements

Fare requirements, like dates, special purpose or status, may include:

- Dates of stay (a Saturday night, weekend, etc.)
- Military status (to qualify for a military fare)
- Official government business (to qualify for a government fare)
- Attendance at an event (to qualify for a meeting or convention fare)

Your ticket is not valid when:

- You don't meet the dates of stay, purpose or status requirements for the fare
- We find that the ticket was bought using an exploitative practice

## Prohibited booking practices

Reservations made to exploit or circumvent fare and ticket rules are prohibited.

Examples include (but are not limited to):

- Purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing)
- Buying a ticket without intending to travel, including to gain access to our airport lounges or other facilities
- Combining 2 or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing)
- Booking a ticket in someone's name without the person's consent (which is illegal)
- Holding reservations for reasons like securing upgrades, blocking seats or obtaining lower fares
- Automated re-shopping conducted by you or your agent, or through an authorized third party that is enabled or assisted by you or your agent
- Booking duplicate or impossible trips, for example multiple trips for the same passenger around the same time (trips a passenger physically could not complete)

If we find evidence that you or your agent are using a prohibited practice, we reserve the right to:

- Cancel any unused part of the ticket
- Refuse to let the passenger fly and check bags
- Not refund an otherwise refundable ticket
- Charge you for what the ticket would have cost if you hadn't booked it fraudulently
- Require you refund to us any compensation we provided like bag delivery costs, and reimbursement for clothes or toiletries because of late or lost bags

## Fare errors

If we sell a fare in error, we have the right to cancel the ticket. This includes fare errors, computer errors and third party errors (human or computer). We try to prevent, detect and correct errors as soon as possible.

When we issue a mistaken fare, we'll void the ticket, give a full refund and notify you within:

App'x 0850
3/21/2024, 3:07 PM
AA-SKP-00054083

Case 4:23-cv-00860-P   Document 188-1   Filed 07/22/24   Page 331 of 509   PageID 8216

- 72 hours after we learn of the mistaken fare
- At least 24 hours before departure if you bought the ticket less than 72 hours before departure

# You may also like...

Customer service and contingency plans »

Contact American »

Baggage »

⊕ Back to top

## Help

Contact American

Receipts and refunds

FAQs

Agency reference ⍈

American Airlines Cargo ⍈

Bag and optional fees

Customer service and contingency plans

Conditions of carriage

## About American

About us

We're hiring! Join our team ⍈

Investor relations ⍈

Newsroom ⍈

Legal, privacy, copyright

Environmental, social and governance ⍈

Combating human trafficking

Browser compatibility

Web accessibility

## Extras

Business programs

Gift cards ⍈

American Airlines credit card

Trip insurance

App'x 0851
3/21/2024, 3:07 PM
AA-SKP-00054084



Special offer: Earn 75,000 bonus miles.
Terms apply.



Up to 35% savings
plus AAdvantage® miles

---

Link opens in new window. Site
may not meet accessibility
guidelines. AA.com®

  

App'x 0852
3/21/2024, 3:07 PM
AA-SKP-00054085

# Exhibit A-27

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-28

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-29

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-30

Generated on: This page was generated by TSDR on 2024-03-21 12:50:27 EDT

Mark:



| | | | |
|---|---|---|---|
| US Serial Number: | 85825121 | Application Filing Date: | Jan. 16, 2013 |
| US Registration Number: | 4449061 | Registration Date: | Dec. 10, 2013 |
| Register: | Principal | | |
| Mark Type: | Service Mark | | |

TM5 Common Status Descriptor:



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

Status: The registration has been renewed.

Status Date: Feb. 24, 2024

**Publication Date:**Jun. 18, 2013**Notice of Allowance Date:**Aug. 13, 2013

# Mark Information

| | |
|---|---|
| Mark Literal Elements: | None |
| Standard Character Claim: | No |
| Mark Drawing Type: | 2 - AN ILLUSTRATION DRAWING WITHOUT ANY WORDS(S)/ LETTER(S) /NUMBER(S) |
| Description of Mark: | The mark consists of a stylized eagle with one blue wing and one red wing separated by a white and gray eagle head. |
| Color Drawing: | Yes |
| Color(s) Claimed: | The color(s) blue, white, red, and gray is/are claimed as a feature of the mark. |
| Design Search Code(s): | 03.15.01 - Eagles<br>03.15.19 - Birds in flight or with outspread wings<br>03.15.24 - Stylized birds |

# Related Properties Information

| | |
|---|---|
| International Registration Number: | 1180965 |
| International Application(s) /Registration(s) Based on this Property: | A0033947/1180965 |

# Goods and Services

Note:
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis (( ..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

For: Promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then

App'x 0978

AA-SKP-00054086

be redeemed for merchandise and travel; Online retail store services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership

| International Class(es): | 035 - Primary Class | U.S Class(es): | 100, 101, 102 |
|---|---|---|---|
| Class Status: | ACTIVE | | |
| Basis: | 1(a) | | |
| First Use: | Jan. 21, 2013 | Use in Commerce: | Jan. 21, 2013 |

**For:** Air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing transportation reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation transportation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network

| International Class(es): | 039 - Primary Class | U.S Class(es): | 100, 105 |
|---|---|---|---|
| Class Status: | ACTIVE | | |
| Basis: | 1(a) | | |
| First Use: | Jan. 21, 2013 | Use in Commerce: | Jan. 21, 2013 |

**For:** Providing travel agency services, namely, providing temporary lodging reservation services for others

| International Class(es): | 043 - Primary Class | U.S Class(es): | 100, 101 |
|---|---|---|---|
| Class Status: | ACTIVE | | |
| Basis: | 1(a) | | |
| First Use: | Jan. 21, 2013 | Use in Commerce: | Jan. 21, 2013 |

# Basis Information (Case Level)

| Filed Use: | No | Currently Use: | Yes |
|---|---|---|---|
| Filed ITU: | Yes | Currently ITU: | No |
| Filed 44D: | No | Currently 44D: | No |
| Filed 44E: | No | Currently 44E: | No |
| Filed 66A: | No | Currently 66A: | No |
| Filed No Basis: | No | Currently No Basis: | No |

# Current Owner(s) Information

| Owner Name: | American Airlines, Inc. | | |
|---|---|---|---|
| Owner Address: | 1 Skyview Drive<br>MD 8B503<br>Fort Worth, TEXAS UNITED STATES 76155 | | |
| Legal Entity Type: | CORPORATION | State or Country Where Organized: | DELAWARE |

# Attorney/Correspondence Information

### Attorney of Record

| Attorney Name: | Eric J. Maiers | Docket Number: | 177306.06930 |
|---|---|---|---|
| Attorney Primary Email Address: | chiipmail@gtlaw.com | Attorney Email Authorized: | Yes |

### Correspondent

| Correspondent Name/Address: | Eric J. Maiers<br>Greenberg Traurig, LLP<br>77 W. Wacker Drive<br>Suite 3100<br>Chicago, ILLINOIS UNITED STATES 60601 | | |
|---|---|---|---|
| Phone: | 312.456.8400 | Fax: | 312.456.8435 |
| Correspondent e-mail: | chiipmail@gtlaw.com matthewsk@gtlaw.com eric.maiers@gtlaw.com carrm@gtlaw.com | Correspondent e-mail Authorized: | Yes |

### Domestic Representative - Not Found

App'x 0979

AA-SKP-00054087

# Prosecution History

| Date | Description | Proceeding Number |
|------|-------------|-------------------|
| Feb. 24, 2024 | NOTICE OF ACCEPTANCE OF SEC. 8 & 9 - E-MAILED | |
| Feb. 24, 2024 | REGISTERED AND RENEWED (FIRST RENEWAL - 10 YRS) | |
| Feb. 24, 2024 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | |
| Feb. 23, 2024 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Aug. 29, 2023 | TEAS SECTION 8 & 9 RECEIVED | |
| Dec. 10, 2022 | COURTESY REMINDER - SEC. 8 (10-YR)/SEC. 9 E-MAILED | |
| Aug. 08, 2022 | NOTICE OF SUIT | |
| Jul. 28, 2022 | NOTICE OF SUIT | |
| Aug. 20, 2021 | NOTICE OF SUIT | |
| Mar. 19, 2020 | NOTICE OF SUIT | |
| Jan. 13, 2020 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| Jan. 13, 2020 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Jan. 13, 2020 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Nov. 21, 2019 | TEAS SECTION 8 & 15 RECEIVED | |
| Dec. 10, 2018 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Oct. 01, 2018 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 01, 2018 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Dec. 10, 2013 | REGISTERED-PRINCIPAL REGISTER | |
| Nov. 06, 2013 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Nov. 05, 2013 | LAW OFFICE REGISTRATION REVIEW COMPLETED | |
| Nov. 04, 2013 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Nov. 04, 2013 | ASSIGNED TO EXAMINER | |
| Oct. 31, 2013 | STATEMENT OF USE PROCESSING COMPLETE | |
| Sep. 30, 2013 | USE AMENDMENT FILED | |
| Oct. 25, 2013 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | |
| Sep. 30, 2013 | TEAS STATEMENT OF USE RECEIVED | |
| Aug. 13, 2013 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Jun. 18, 2013 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Jun. 18, 2013 | PUBLISHED FOR OPPOSITION | |
| May 29, 2013 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| May 10, 2013 | LAW OFFICE PUBLICATION REVIEW COMPLETED | |
| May 09, 2013 | ASSIGNED TO LIE | |
| May 01, 2013 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| May 01, 2013 | EXAMINER'S AMENDMENT ENTERED | |
| May 01, 2013 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | |
| May 01, 2013 | EXAMINERS AMENDMENT E-MAILED | |
| May 01, 2013 | EXAMINERS AMENDMENT -WRITTEN | |
| Apr. 29, 2013 | ASSIGNED TO EXAMINER | |
| Jan. 24, 2013 | NOTICE OF DESIGN SEARCH CODE MAILED | |
| Jan. 23, 2013 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Jan. 19, 2013 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

| | | | |
|---|---|---|---|
| Current Location: | GENERIC WEB UPDATE | Date in Location: | Feb. 24, 2024 |

# Assignment Abstract Of Title Information

**Summary**

| | | | |
|---|---|---|---|
| Total Assignments: | 1 | Registrant: | American Airlines, Inc. |

AA-SKP-00054088

## Assignment 1 of 1

| | | | |
|---|---|---|---|
| **Conveyance:** | SECURITY INTEREST | | |
| **Reel/Frame:** | 7061/0605 | **Pages:** | 47 |
| **Date Recorded:** | Sep. 25, 2020 | | |
| **Supporting Documents:** | assignment-tm-7061-0605.pdf | | |

### Assignor

| | | | |
|---|---|---|---|
| **Name:** | AMERICAN AIRLINES, INC. | **Execution Date:** | Sep. 25, 2020 |
| **Legal Entity Type:** | CORPORATION | **State or Country Where Organized:** | DELAWARE |

### Assignee

| | | | |
|---|---|---|---|
| **Name:** | WILMINGTON TRUST, NATIONAL ASSOCIATION, AS COLLATERAL AGENT | | |
| **Legal Entity Type:** | NATIONAL BANKING ASSOCIATION | **State or Country Where Organized:** | ALABAMA |
| **Address:** | 50 SOUTH SIXTH STREET, SUITE 1290 MINNEAPOLIS, MINNESOTA 55402 | | |

### Correspondent

| | |
|---|---|
| **Correspondent Name:** | MILBANK LLP |
| **Correspondent Address:** | 55 HUDSON YARDS ATTN: NATHANIEL T. BROWAND NEW YORK, NY 10001-2163 |

### Domestic Representative - Not Found

App'x 0981

| From: | TMOfficialNotices@USPTO.GOV |
|---|---|
| Sent: | Saturday, February 24, 2024 11:17 PM |
| To: | XXXX |
| Cc: | XXXX; XXXX; XXXX |
| Subject: | Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 4449061: Miscellaneous Design: Docket/Reference No. 177306.06930 |

**U.S. Serial Number:** 85825121
**U.S. Registration Number:** 4449061
**U.S. Registration Date:** Dec 10, 2013
**Mark:** Miscellaneous Design
**Owner:** American Airlines, Inc.

Feb 24, 2024

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058.  **The Section 8 declaration is accepted.**

### NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059.  **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
035, 039, 043

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=85825121&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch  or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=85825121&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch  NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

App'x 0982

AA-SKP-00054090

PTO- 1583
Approved for use through 01/31/2024. OMB 0651-0055
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

**Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9**

**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 4449061
**REGISTRATION DATE:** 12/10/2013

**MARK:** (Stylized and/or with Design, Miscellaneous Mark (see, mark))

**Current:** The owner, American Airlines, Inc., a corporation of Delaware, having an address of
   1 Skyview Drive MD 8B503
   Fort Worth, Texas 76155
   United States
   XXXX

**Proposed:** The owner, American Airlines, Inc., a corporation of Delaware, having an address of
   MD 8B503
   1 Skyview Drive
   Fort Worth, Texas 76155
   United States
   XXXX

is filing a Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9.

For International Class 035, the mark is in use in commerce on or in connection with **all** goods/services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then be redeemed for merchandise and travel; Online retail store services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership ; or, the owner is making the listed excusable nonuse claim.

The owner is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
SPN0-419086-2023072513070 5228686 . Flight_Symbol_-_35.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3

Webpage URL: None Provided
Webpage Date of Access: None Provided
For International Class 039, the mark is in use in commerce on or in connection with **all** goods/services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing transportation reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation transportation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network ; or, the owner is making the listed excusable nonuse claim.

The owner is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) photograph showing use of the mark in connection with the listed services.
Specimen File1

Webpage URL: None Provided

App'x 0983

AA-SKP-00054095

Webpage Date of Access: None Provided
For International Class 043, the mark is in use in commerce on or in connection with **all** goods/services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Providing travel agency services, namely, providing temporary lodging reservation services for others ; or, the owner is making the listed excusable nonuse claim.

The owner is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
SPN2-419086-2023072513070 5228686 . Flight Symbol - 43.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

Webpage URL: None Provided
Webpage Date of Access: None Provided
The owner's/holder's current attorney information: Eric J. Maiers. Eric J. Maiers of Greenberg Traurig, LLP, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, is located at

Suite 3100
77 W. Wacker Drive
Chicago, Illinois 60601
United States
The docket/reference number is 177306.06930.

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

The owner's/holder's proposed attorney information: Eric J. Maiers. Other appointed attorneys are Mark R. Galis, Jeffrey P. Dunning, Herbert H. Finn, Richard D. Harris, Gary R. Jarosik, Keith R. Jarosik, James J. Lukas, Jr., Cameron M. Nelson, Howard E. Silverman, Barry R. Horwitz, Matthew J. Levinstein, Marc Trachtenberg, Benjamin P. Gilford, Jonathan Giroux, Jacqueline Brousseau, Callie Sand, Samuel Chase Means, Maja Sherman, Katie Cronin, Erik Bokar, Molly Carr, Jonathan Easter. Eric J. Maiers of Greenberg Traurig, LLP, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at

Suite 3100
77 W. Wacker Drive
Chicago, Illinois 60601
United States
The docket/reference number is 177306.06930.

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

Eric J. Maiers submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**Correspondence Information (current)**
Eric J. Maiers
PRIMARY EMAIL FOR CORRESPONDENCE: chiipmail@gtlaw.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): NOT PROVIDED
The docket/reference number is 177306.06930.

**Correspondence Information (proposed)**
Eric J. Maiers
PRIMARY EMAIL FOR CORRESPONDENCE: chiipmail@gtlaw.com

App'x 0984

AA-SKP-00054096

SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): matthewsk@gtlaw.com; eric.maiers@gtlaw.com; carrm@gtlaw.com The docket/reference number is 177306.06930.

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $1575 will be submitted with the form, representing payment for 3 class(es), plus any additional grace period fee, if necessary.

<div align="center">

**Declaration**

</div>

**Original PDF file:**
hw_419086-113409014_._Dec1_4449061.pdf
**Converted PDF file(s)** (2 pages)
Signature File1
Signature File2
Signatory's Name: Donald Broadfield, Jr.
Signatory's Position: Chief Intellectual Property and Data Counsel
Signature method: Handwritten

Mailing Address **(current):**
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601

Mailing Address **(proposed):**
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601

Serial Number: 85825121
Internet Transmission Date: Tue Aug 29 11:37:22 ET 2023
TEAS Stamp: USPTO/S08N09-X.X.XX.XX-20230829113723230
323-4449061-850123aa464f658de2db531ce5a6
f2418b2826be36fd355ddfc77bd2d8a074f-DA-3
7228537-20230829113409014321

AA-SKP-00054097

 **American Airlines**

PLAN TRAVEL   TRAVEL INFORMATION   AADVANTAGE®   [LOG IN]

 

Home   >   AAdvantage® program

# AAdvantage® program

## (i) Experience more with Loyalty Point Rewards

Enjoy new ways to earn rewards and reach your travel goals with the AAdvantage® program

Read about Loyalty Point Rewards (ii)



Plan your next adventure

BuyMiles


AAdvantage®


Earn miles


Redeem miles


AAdvantage® status


Loyalty Points

## In the best travel rewards program

### Life adds up to travel

Earn rewards easier and more often with the free to join American Airlines AAdvantage® program

As a member of the AAdvantage® program, you'll earn miles when you fly on American, **oneworld®** and other participating airlines, as well as over 1,000 partners. Then, you can use your miles for:

» Flights to nearly 1,100 destinations worldwide
» Upgrades
» Vacations, car rentals and hotels
» Other retail products

Not a member? Join now »



## Earn miles and Loyalty Points

We make it easy to earn miles and track your progress toward reaching AAdvantage® status with Loyalty Points

### Fly to earn miles

Earn miles when you fly with American, **oneworld®** and other participating airlines.

Partner airlines »

Request missing flight miles »

### Engage with our partners

There are over 1,000 ways to earn miles with our partners – from car rentals, hotel stays, dining out or ordering in.

Earn miles »

Partner offers (ii)

Request missing partner miles »

### Use an AAdvantage® credit card

You'll earn 1 Loyalty Point for every 1 eligible AAdvantage® mile earned from purchases using your U.S. or internationally-issued AAdvantage® credit card.

AAdvantage® credit cards »

App'x 0986

AA-SKP-00054098

Earn miles when you fly with American, oneworld® and other participating airlines.

Partner airlines »

Request missing flight miles »

There are over 1,000 ways to earn miles with our partners – from car rentals, hotel stays, dining out or ordering in.

Earn miles »

Partner offers @

Request missing partner miles »

You'll earn 1 Loyalty Point for every 1 eligible AAdvantage® mile earned from purchases using your U.S. or internationally-issued AAdvantage® credit card.

AAdvantage® credit cards »

## Earn Loyalty Points

Which AAdvantage® miles count toward earning Loyalty Points? »

Which AAdvantage® miles don't count toward earning Loyalty Points? »

## Use your miles

### Flight awards

Use your miles for a flight award on any American flight – there are no blackout dates.

Flight awards on American »

Partner award chart »

Book award travel »

### Elevate your experience

Use your miles to enjoy a higher cabin of service on American and select partner airlines, or toward an Admirals Club® membership. You can use your miles for yourself or for anyone else!

Upgrade with miles »

Reserve seats with miles »

Admirals Club® membership »

### Hotels, cars and more

Redeem your miles for hotel stays, rental cars, vacation packages and other retail products.

Hotel awards @

Car awards @

Vacation packages @

## Earn 50,000 bonus miles with the Citi® / AAdvantage® Platinum Select® card



Plus, enjoy your first checked bag free on domestic American Airlines itineraries. You can also earn a $125 American Airlines Flight Discount after you spend $20,000 or more in purchases during your cardmembership year and renew your card. Terms apply.

Learn more @

Already a cardholder? Learn more about your card's benefits »

## Discover the perks of AAdvantage® status



The more you travel the more you earn – upgrades, bonus miles, airport privileges and more

Qualify for AAdvantage® status when you meet the required Loyalty Point thresholds. Simply earn Loyalty Points whenever you fly, use an AAdvantage® credit card for purchases, or earn eligible miles with AAdvantage® partners. It's all part of the new AAdvantage® program, and yes, it's really that easy.

AAdvantage® status benefits »

Qualify for AAdvantage® status »

## The oneworld® Alliance: More destinations around the globe

oneworld offers convenient service on the world's leading airlines across more than 1,000 destinations worldwide. And as an AAdvantage® member, when you travel on oneworld airlines, your eligible activity will count toward AAdvantage® status qualification. Plus, enjoy:

» Smooth transfers between partner airlines

» Earning and redeeming miles across the oneworld Alliance

» Recognition of AAdvantage® status across all member airlines

App'x 0987

AA-SKP-00054099

Learn more »

Already a cardholder? Learn more about your card's benefits »

## Discover the perks of AAdvantage® status

The more you travel the more you earn – upgrades, bonus miles, airport privileges and more

Qualify for AAdvantage® status when you meet the required Loyalty Point thresholds. Simply earn Loyalty Points whenever you fly, use an AAdvantage® credit card for purchases, or earn eligible miles with AAdvantage® partners. It's all part of the new AAdvantage® program, and yes, it's really that easy.



AAdvantage® status benefits »

Qualify for AAdvantage® status »

## The oneworld® Alliance: More destinations around the globe

**oneworld** offers convenient service on the world's leading airlines across more than 1,000 destinations worldwide. And as an AAdvantage® member, when you travel on **oneworld** airlines, your eligible activity will count toward AAdvantage® status qualification. Plus, enjoy:

» Smooth transfers between partner airlines

» Earning and redeeming miles across the **oneworld** Alliance

» Recognition of AAdvantage® status across all member airlines

Learn more about the benefits of the **oneworld** Alliance »

## You may also like...

AAdvantage® program updates »

AAdvantage® terms and conditions »

AAdvantage® FAQs »

Admirals Club® »

⊕ Back to top

| Help | About American | Extras |
|---|---|---|
| Contact American | About us | Business programs |
| Receipts and refunds | We're hiring! Join our team | Gift cards |
| FAQs | Investor relations | American Airlines credit card |
| Agency reference | Newsroom | Trip insurance |
| Cargo | Legal, privacy, copyright | |
| Bag and optional fees | Environmental, social and governance | |
| Customer service and contingency plans | Combating human trafficking | |
| Conditions of carriage | Browser compatibility | |
| | Web accessibility | |

Limited-time: Earn up to 100,000 bonus miles. Terms apply

**BuyMiles**
Buy or gift miles for new adventures

AVIS Budget
Up to 35% savings plus AAdvantage® miles

Link opens in new window. Site may not meet accessibility guidelines. AA.com®

App'x 0988

AA-SKP-00054100



AA-SKP-00054101

American Airlines

Home    English ▾    Search AA.com®

PLAN TRAVEL    TRAVEL INFORMATION    AADVANTAGE®    LOG IN

⌂ Home  ›  AAdvantage® program  ›  Earn miles  ›  Hotels

## Hotels



## Earn miles and Loyalty Points at hotels

Stay in your favorite hotels and earn AAdvantage® miles at the same time. Provide your AAdvantage® number in the booking path or at check-in to earn miles. Plus, when you earn AAdvantage® base miles at hotels, you'll also earn Loyalty Points that count toward qualifying for AAdvantage® status. Base offers vary by partner.

### Convert your hotel points to miles

Need more AAdvantage® miles for that trip you're planning? Convert your hotel points into bonus miles and redeem them for award travel on American Airlines and our partner airlines.

Convert hotel points to miles »

## Hotel partners

⊘ AAdvantage Hotels™

⊘ Hyatt Hotels & Resorts

⊘ Marriott International

⊘ InterContinental Hotels and Resorts

⊘ Rocketmiles

⊘ Terms and conditions

## You may also like...

Redeem miles for hotel stays

Book awards »

App'x 0990

AA-SKP-00054102

Stay in your favorite hotels and earn AAdvantage® miles at the same time. Provide your AAdvantage® number in the booking path or at check-in to earn miles. Plus, when you earn AAdvantage® base miles at hotels, you'll also earn Loyalty Points that count toward qualifying for AAdvantage® status. Base offers vary by partner.

## Convert your hotel points to miles

Need more AAdvantage® miles for that trip you're planning? Convert your hotel points into bonus miles and redeem them for award travel on American Airlines and our partner airlines.

Convert hotel points to miles »

## Hotel partners

⌄ AAdvantage Hotels™

⌄ Hyatt Hotels & Resorts

⌄ Marriott International

⌄ InterContinental Hotels and Resorts

⌄ Rocketmiles

⌄ Terms and conditions

## You may also like...

Redeem miles for hotel stays 🖉

Book awards »

More ways to earn miles »

⊕ Back to top

| Help | About American | Extras |
|---|---|---|
| Contact American | About us | Business programs |
| Receipts and refunds | We're hiring! Join our team 🖉 | Gift cards 🖉 |
| FAQs | Investor relations 🖉 | American Airlines credit card |
| Agency reference | Newsroom 🖉 | Trip insurance |
| Cargo 🖉 | Legal, privacy, copyright | |
| Bag and optional fees | Environmental, social and governance 🖉 | |
| Customer service and contingency plans | Combating human trafficking | |
| Conditions of carriage | Browser compatibility | |
| | Web accessibility | |

Limited-time: Earn up to 100,000 bonus miles. Terms apply 🖉

**Buy Miles**
Buy or gift miles for new adventures 🖉

**AVIS** **Budget®**
Up to 35% savings plus AAdvantage® miles 🖉

🖉 Link opens in new window. Site may not meet accessibility guidelines. AA.com®

App'x 0991

AA-SKP-00054103

PTO- 1963
Approved for use through 01/31/2025. OMB 0651-0055
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

You may sign this document but do not edit it. Make any necessary changes through TEAS, then generate a new signature page.

# Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9
## Handwritten Signature or Digital Signature

Review the complete filing details before signing. Preparers printing this form for handwritten signature should also print the filing details for signatory review.

A fee payment in the amount of $1575 will be submitted with the application, representing payment for 3 class(es).

**MARK:** Miscellaneous Mark (stylized and/or with design, see



**Applicant(s):** Eric J. Maiers.
**Correspondence email address:** chiipmail@gtlaw.com;matthewsk@gtlaw.com; eric.maiers@gtlaw.com; carrm@gtlaw.com

## Declaration

Read the following statements before signing. Acknowledge the statements by signing below.

- Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

- Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

- The registrant requests that the registration be renewed for the goods/services/collective organization identified above.

- To the best of the signatory's knowledge, information, and belief, formed after an inquiry

App'x 0992

AA-SKP-00054104

reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

* The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Signature Section**

Signature: _____

Date: _____16 August 2023_____

Signatory's Name: Donald Broadfield, Jr.

Signatory's Position: Chief Intellectual Property and Data Counsel

Document generated on August 15, 2023 at 04:28:16 PM ET

App'x 0993

AA-SKP-00054105

| From: | TMOfficialNotices@USPTO.GOV |
|---|---|
| Sent: | Monday, January 13, 2020 11:07 PM |
| To: | XXXX |
| Subject: | Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 4449061: Miscellaneous Design: Docket/Reference No. 177306.06930 |

**U.S. Serial Number:** 85825121
**U.S. Registration Number:** 4449061
**U.S. Registration Date:** Dec 10, 2013
**Mark:** Miscellaneous Design
**Owner:** American Airlines, Inc.

Jan 13, 2020

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058.  **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065.  **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
035, 039, 043

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date.  See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=85825121&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch  or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=85825121&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=documentSearch  NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

   \*   **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

App'x 0994

AA-SKP-00054143

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1583 (Rev 05/2006)
OMB No. 0651-0055 (Exp 10/31/2021)

## Combined Declaration of Use and Incontestability under Sections 8 & 15
## To the Commissioner for Trademarks:

**REGISTRATION NUMBER:** 4449061
**REGISTRATION DATE:** 12/10/2013

**MARK:** (Stylized and/or with Design, Miscellaneous Mark (see, <u>mark</u>))

The owner, American Airlines, Inc., a corporation of Delaware, having an address of
    MD 8B503
    1 Skyview Drive
    Fort Worth, Texas 76155
    United States
    XXXX (authorized)
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 035, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then be redeemed for merchandise and travel; Online retail store services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
<u>SPN0-66195542-20191107164755526297 . Flight_symbol_spec_35.pdf</u>
**Converted PDF file(s)** (4 pages)
<u>Specimen File1</u>
<u>Specimen File2</u>
<u>Specimen File3</u>
<u>Specimen File4</u>

For International Class 039, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing transportation reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation transportation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shot from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**

App'x 0995

AA-SKP-00054149

SPN1-66195542-20191107164755526297 _ . flight_symbol_spec_39.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3


For International Class 043, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Providing travel agency services, namely, providing temporary lodging reservation services for others; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
SPN2-66195542-20191107164755526297 _ . Flight_symbol_spec_43.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2


The applicant's current attorney information: Eric J. Maiers. Eric J. Maiers of Greenberg Traurig, LLP, is located at

    Suite 3100
    77 W. Wacker Drive
    Chicago, Illinois 60601
    United States

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

The applicants proposed attorney information: Eric J. Maiers. Other appointed attorneys are Mark R. Galis, Jeffrey P. Dunning, Herbert H. Finn, Richard D. Harris, Gary R. Jarosik, Keith R. Jarosik, James J. Lukas, Jr., Jeffrey G. Mote, Cameron M. Nelson, Howard E. Silverman, Barry R. Horwitz, Matthew J. Levinstein, Marc Trachtenberg, Benjamin P. Gilford, Jonathan Giroux, Jacqueline Brousseau, Callie Sand, Michael Friedman, Sara Skulman, Chase Means, Maja Sherman. Eric J. Maiers of Greenberg Traurig, LLP, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at

    Suite 3100
    77 W. Wacker Drive
    Chicago, Illinois 60601
    United States
The docket/reference number is 177306.06930.

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

Eric J. Maiers submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.


The applicant's current correspondence information: Eric J. Maiers. Eric J. Maiers of Greenberg Traurig, LLP, is located at

AA-SKP-00054150

Suite 3100
77 W. Wacker Drive
Chicago, Illinois 60601
United States

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

The applicants proposed correspondence information: Eric J. Maiers. Eric J. Maiers of Greenberg Traurig, LLP, is located at

Suite 3100
77 W. Wacker Drive
Chicago, Illinois 60601
United States
The docket/reference number is 177306.06930.

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

A fee payment in the amount of $975 will be submitted with the form, representing payment for 3 class(es), plus any additional grace period fee, if necessary.

## Declaration

- ☑ Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

- ☑ Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

- ☑ The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration.

- ☑ There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register.

- ☑ There is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court.

- ☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

- ☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /DB280/   Date: 11/21/2019
Signatory's Name: Donald Broadfield, Jr.
Signatory's Position: Intellectual Property and Data Counsel

Mailing Address **(current)**:
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601

Mailing Address **(proposed)**:
  Greenberg Traurig, LLP

App'x 0997

AA-SKP-00054151

77 W. Wacker Drive
Chicago, Illinois 60601

Serial Number: 85825121
Internet Transmission Date: Thu Nov 21 16:55:44 EST 2019
TEAS Stamp: USPTO/S08N15-XX.XXX.XX.X-201911211655447
37985-4449061-70041c45860372ebb2f7c6f9ea
54751494deb32c3fff0217adf13795e981bf3-DA
-55448376-20191112165631849867

AA-SKP-00054152

11/7/2019                                    AAdvantage – AAdvantage program – American Airlines

 **American Airlines**

Home    Log in »    ▨ English ▾    Search aa.com    🔍

Plan Travel    Travel Information    AAdvantage

🏠 Home  >  AAdvantage program

# AAdvantage program



Earn more miles with SimplyMiles™
Browse, click and earn miles on qualifying purchases

AAdvantage    SimplyMiles


AAdvantage


Earn miles


Redeem miles


Elite status


Log in / Join

## In the best loyalty program

### The possibilities are endless

As a member of the AAdvantage® program, you'll earn miles when you fly on American, oneworld® and other participating airlines, as well as over 1,000 partners. Then, you can use your miles for:

- Flights to nearly 1,000 destinations worldwide
- Upgrades
- Vacations, car rentals and hotels
- Other retail products

Not a member? Join now »



https://www.aa.com/i18n/aadvantage-program/aadvantage-program.jsp?anchorEvent=false&from=Nav                1/4

App'x 0999

AA-SKP-00054153

# Earn miles

We make it easy to earn miles when you fly or when you engage with any of our partners.

## Fly to earn miles

Earn miles when you fly with American, **one**world® and other participating airlines.

Partner airlines »

Earn extra miles »

Request missing flight miles »

## Earn miles with partners

There are over 1,000 ways to earn miles with our partners – from car rentals and hotel stays, to dining out and using credit cards.

Earn miles »

Partner offers »

Request missing partner miles »

## Buy, transfer or gift miles

Don't wait any longer for that trip you've been longing to take. Buy the miles you need and be on your way.

Buy, gift or transfer miles 🗗

# Use your miles

## Flight awards

With AAnytime® Awards there are no blackout dates and if a seat is available, you can book it with miles. And if your travel plans are flexible, MileSAAver awards are available for fewer miles.

Flight award chart »

Book award travel »

## Upgrades

Use your miles to upgrade to First or Business on American and select partner airlines. You can use your miles for yourself or for anyone else!

Award travel »

## Hotels, cars and more

Redeem your miles for hotel stays, rental cars, vacation packages and other retail products.

Car/hotel awards 🗗

Vacation packages 🗗

Admirals Club® membership »

# Get the most out of your AAdvantage® account with the Citi® / AAdvantage® Platinum Select® card



App'x 1000

AA-SKP-00054154

Earn 50,000 bonus miles after qualifying purchases. Plus, enjoy your first checked bag fee waived on domestic American Airlines itineraries and a $125 American Airlines Flight Discount after you spend $20,000 or more in purchases during your cardmembership year and renew your card.

Learn more 

Already a cardholder? Learn more about your card's benefits »

# Discover the perks of elite status



## The more you travel the more you earn – upgrades, bonus miles, airport privileges and more

Qualify for Executive Platinum, Platinum Pro, Platinum or Gold status with a combination of Elite Qualifying Dollars (EQDs) and Elite Qualifying Miles (EQMs) or Elite Qualifying Segments (EQSs). When you fly with us or participating partner airlines, your travel will count toward elite status qualification.

Elite status benefits »

Qualify for elite status »

# The **one**world® alliance: More destinations around the globe

oneworld® offers convenient service on the world's leading airlines across nearly 1,000 destinations worldwide. And as an AAdvantage® member, when you travel on **one**world® airlines, your eligible activity will count toward AAdvantage® elite status qualification. Plus, enjoy:

- Smooth transfers between partner airlines
- Earning and redeeming miles across the **one**world® alliance
- Recognition of AAdvantage® elite status across all member airlines

Learn more about the benefits of the oneworld® alliance »

App'x 1001

AA-SKP-00054155

# You may also like...

AAdvantage® program updates »

AAdvantage® terms and conditions »

AAdvantage® FAQs »

Admirals Club® »

⊕ Back to top

## Help

Contact American

Receipts and refunds

FAQs

Agency reference

Cargo ⧉

Bag and optional fees

Customer service and
contingency plans

Conditions of carriage

## About American

About us

Careers ⧉

Investor relations ⧉

Newsroom ⧉

Legal, privacy, copyright

Combating human trafficking

Browser compatibility

Web accessibility

## Extras

Business programs

Gift cards ⧉

American Airlines credit card

Trip insurance

CoBrowse



Earn 50,000 bonus miles
after qualifying purchases ⧉

BuyMiles
Earn up to 150,000
bonus miles by November 28 ⧉

AVIS  Budget®
Up to 35% savings
plus AAdvantage® miles ⧉

⧉ Link opens in new window. Site may not meet accessibility guidelines.

App'x 1002

AA-SKP-00054156

11/7/2019                                    Book flights - Book round trip, one way, multi city - American Airlines



# Book flights

{ • Required}

# Select booking type

☐  Redeem miles                                    Log in to your AAdvantage account »

# Cities and dates



App'x 1003

AA-SKP-00054157

11/7/2019                    Book flights - Book round trip, one way, multi city - American Airlines

# Passengers

Number of passengers          Passenger 1

| 1 |                         | Adult (16-64) |

Unaccompanied minors 🔗

Traveling with infants 🔗

For groups of 10 or more, contact Group & Meeting Travel 🔗

# Options

Search by                     Class                 Airline

| Lowest fare |               | Show all |           | American Airlines |

Search

| Help | About American | Extras | |
|------|----------------|--------|--|
| Contact American | About us | Business programs | Earn 50,000 bonus miles after qualifying purchases 🔗 |
| Receipts and refunds | Careers 🔗 | Gift cards 🔗 | BuyMiles |
| FAQs | Investor relations 🔗 | American Airlines credit card | Earn up to 100,000 bonus miles by November 29 🔗 |
| Agency reference | Newsroom 🔗 | Trip insurance | |
| Cargo 🔗 | Legal, privacy, copyright | CoBrowse | AVIS Budget |
| Bag and optional fees | Combating human trafficking | | Up to 35% savings plus AAdvantage® miles 🔗 |
| | Browser compatibility | | |

App'x 1004

AA-SKP-00054158

11/7/2019                                        Book flights - Book round trip, one way, multi city - American Airlines

Customer service and                Web accessibility
contingency plans

Conditions of carriage

🖉 Link opens in new window. Site may not meet accessibility guidelines.                              

App'x 1005

AA-SKP-00054159

11/7/2019                 American Airlines: 28,969,183 hotel and property listings worldwide. 196+ million hotel reviews.



Powered by
**Booking**.com

Find deals        Destination inspiration        Manage my booking



$ U.S. Dollar      ▦ English (US)

## Be a Booker and experience the world

From cozy bed & breakfasts to luxury hotels

Where are you going?

📅 Check-in                                    Check-out

2 adults · 0 children · 1 room

☐ I'm traveling for work

erican Airl    **Book to earn up to 10,000 miles per night at select properties**
nta           Enter your AAdvantage® number when you book and get your miles 6–8 weeks after your stay





Relaxing Centre
Amsterdam
Starting from $7...
...ent · 12 reviews







Apartments                    Resorts                    Villas                    Cabins

Charlotte                                      Washington, D.C.                                      Phila
United States of America                       United States of America                             United

7 vacation rentals, 100 apartments, 34 villas, 34 vacation homes, 18 motels    310 vacation rentals, 229 apartments, 82 villas, 82 vacation homes, 15 B&Bs    411 vac

More destinations »

App'x 1006

AA-SKP-00054160

11/7/2019                    American Airlines: 28,969,183 hotel and property listings worldwide. 196+ million hotel reviews.

FAQs    Terms & Conditions    Privacy & Cookies    Customer Service

Copyright © 2019 American Airlines, Inc. American Airlines and Flight Symbol logo are trademarks of American Airlines, Inc.

App'x 1007

AA-SKP-00054161

# United States of America

## United States Patent and Trademark Office



**Reg. No. 4,449,061**

**Registered Dec. 10, 2013**

**Int. Cls.: 35, 39, and 43**

**SERVICE MARK**

**PRINCIPAL REGISTER**

AMERICAN AIRLINES, INC. (DELAWARE CORPORATION)
4333 AMON CARTER BLVD.
FORT WORTH, TX 76155

FOR: PROMOTING THE GOODS AND SERVICES OF OTHERS BY MEANS OF A DISCOUNT REWARDS PROGRAM AND AN INCENTIVE AWARDS PROGRAM WHEREBY PURCHASE POINTS ARE AWARDED FOR PURCHASES MADE BY VENDOR SUBSCRIBERS AND TRAVEL CONDUCTED BY MEMBER SUBSCRIBERS WHICH CAN THEN BE REDEEMED FOR MERCHANDISE AND TRAVEL; ONLINE RETAIL STORE SERVICES FEATURING TOYS, JEWELRY, BOOKS, OFFICE SUPPLIES, CONSUMER ELECTRONICS, MUSIC, SPORTING EQUIPMENT, GIFTS, TRAVEL RELATED GOODS AND SERVICES, APPAREL, HOME AND GARDEN-RELATED ITEMS, GENERAL RETAIL MERCHANDISE, GIFT CARDS, AND PRIVATE CLUB MEMBERSHIP, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013.

FOR: AIR TRANSPORTATION OF PASSENGERS, CARGO, AND FREIGHT; PROVIDING TRAVEL AGENCY SERVICES, NAMELY, PROVIDING TRANSPORTATION RESERVATION SERVICES FOR OTHERS, AIR TRANSPORTATION RESERVATION SERVICES FOR OTHERS, VEHICLE RESERVATION SERVICES FOR OTHERS, CRUISE RESERVATION SERVICES FOR OTHERS AND VACATION TRANSPORTATION RESERVATION SERVICES BY MEANS OF A GLOBAL COMPUTER NETWORK; PROVIDING INFORMATION IN THE FIELD OF TRAVEL BY MEANS OF A GLOBAL COMPUTER NETWORK , IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013.

FOR: PROVIDING TRAVEL AGENCY SERVICES, NAMELY, PROVIDING TEMPORARY LODGING RESERVATION SERVICES FOR OTHERS, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013.

THE MARK CONSISTS OF A STYLIZED EAGLE WITH ONE BLUE WING AND ONE RED WING SEPARATED BY A WHITE AND GRAY EAGLE HEAD.



Commissioner for Trademarks of the
United States Patent and Trademark Office

App'x 1008

AA-SKP-00054178

**Reg. No. 4,449,061**   THE COLOR(S) BLUE, WHITE, RED, AND GRAY IS/ARE CLAIMED AS A FEATURE OF THE MARK.

SN 85-825,121, FILED 1-16-2013.

ZACHARY R. SPARER, EXAMINING ATTORNEY

App'x 1009

AA-SKP-00054179

PTO Form 1663 (Rev 9/2005)
OMB No. 0651-0054 (Exp. 10/31/2017)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

To the Commissioner for Trademarks:
**MARK:** Miscellaneous Mark (Stylized and/or with Design, see http://tess2.uspto.gov/ImageAgent/ImageAgentProxy?getImage=85825121)
**SERIAL NUMBER:** 85825121

The applicant, American Airlines, Inc., having an address of
    4333 Amon Carter Blvd.
    Fort Worth, Texas 76155
    United States
is submitting the following allegation of use information:

For International Class 035:
Current identification: Promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then be redeemed for merchandise and travel; Online retail store services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership

The mark is in use in commerce on or in connection with all of the goods/services, or to indicate membership in the collective organization listed in the application or Notice of Allowance or as subsequently modified for this specific class.

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 01/21/2013, and first used in commerce at least as early as 01/21/2013, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) webpage providing and advertising services.

**Original PDF file:**
SPN0-3898152163-152206498_._12901-4381_Flight_Symbol_Specimen_-_Class_35.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

For International Class 039:
Current identification: Air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing transportation reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation transportation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network

The mark is in use in commerce on or in connection with all of the goods/services, or to indicate membership in the collective organization listed in the application or Notice of Allowance or as subsequently modified for this specific class.

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 01/21/2013, and first used in commerce at least as early as 01/21/2013, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) webpage providing and advertising services.

**Original PDF file:**
SPN1-3898152163-152206498_._12901-4381_Flight_Symbol_Specimen_-_Class_39_and_43.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

App'x 1010

AA-SKP-00054202

For International Class 043:
Current identification: Providing travel agency services, namely, providing temporary lodging reservation services for others

The mark is in use in commerce on or in connection with all of the goods/services, or to indicate membership in the collective organization listed in the application or Notice of Allowance or as subsequently modified for this specific class.

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 01/21/2013, and first used in commerce at least as early as 01/21/2013, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) webpage providing and advertising services.

**Original PDF file:**
SPN2-3898152163-152206498_._12901-4381_Flight_Symbol_Specimen_-_Class_39_and_43.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2


The applicant is not filing a Request to Divide with this Allegation of Use form.


A fee payment in the amount of $300 will be submitted with the form, representing payment for the allegation of use for 3 classes.


**Declaration**

Applicant requests registration of the above-identified trademark/service mark in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq., as amended). Applicant is the owner of the mark sought to be registered, and is using the mark in commerce on or in connection with the goods/services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce.

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements may jeopardize the validity of the form or any resulting registration, declares that he/she is properly authorized to execute this form on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /DB280/     Date Signed: 09/30/2013
Signatory's Name: Donald E. Broadfield
Signatory's Position: Senior IP/Internet/Data Attorney

RAM Sale Number: 85825121
RAM Accounting Date: 10/01/2013

Serial Number: 85825121
Internet Transmission Date: Mon Sep 30 15:14:34 EDT 2013
TEAS Stamp: USPTO/SOU-XX.XX.XXX.XXX-2013093015143487
3779-85825121-5007e98b8762b1de07687835e3
ca18e4e94c22f7a10f1955df37730940b18d8c8-
DA-5277-20130927151910169656

App'x 1011

AA-SKP-00054203



## Program Information

America's AAdvantage program is one of the largest and most popular loyalty programs in the world.

Members can earn miles for flying on American Airlines and participant airlines as well as for transacting with over 1,000 participating companies, both travel and non-travel related.

And members can redeem miles for flights to almost 950 destinations worldwide as well as other awards including flight upgrades, vacation packages, car rentals, hotel stays and other retail products.

It's free and easy to join the AAdvantage program.

**News and Information**
View the latest AAdvantage program news and information.

**oneworld Alliance**
See how members benefit from our global alliance of 12 of the world's leading airlines.

**Fresh Tools**
Learn about how your AAdvantage membership can make your travel easier.

**Travel And Destination Information**
Find travel inspiration and learn more about worldwide destinations.

**AAdvantage FAQs**
Find answers to the most frequently asked questions about the AAdvantage program.

**AAdvantage Program Terms & Conditions**
Read the complete rules of the program.



AA-SKP-00054204





## The new American is arriving





The world is waiting



Catch 42 in flight this month



Earn 30,000 bonus miles



Flight Notifications

## Stay informed

News & Offers    Twitter

## See what's happening



Featured video: Celebrating 80 years of flight attendants

App'x 1013

AA-SKP-00054205

**More About American**

About Us
Corporate Information
Investor Relations
Corporate Responsibility
Join Us
Environmental Footprint
Diversity & Inclusion
Newsroom
AAdvantage program
Careers

**Products & Services**

Travel Information
Travel Subscriptions
Exclusive Vibe Travel
Low-Price Guarantee
Group & Meeting Travel
Business Programs
Cargo
American Airlines Credit Card
Gift Cards
DealFinder
AA.com
Five-Star Service
Promotions & Discounts
Last-Minute Packages

**Customer Service**

Contact American
FAQs
Refunds
Agency Reference
American Travel Centers
Baggage & Optional Service Charges
Customer Service Plan & Flight Irregularities
Privacy Policy - Notice Updated
Legal
Copyright
Site Map
Browser Compatibility

**AAdvantage**

For a limited time
save up to 25%

AVIS  Budget
Up to 35% savings
plus AAdvantage miles

AA-SKP-00054206

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 85825121**
**Filing Date: 01/16/2013**

## To the Commissioner for Trademarks:

**MARK:** (Stylized and/or Design, see mark)
The color(s) blue, white, red and gray is/are claimed as a feature of the mark. The mark consists of a stylized eagle with one blue wing and one red wing separated by a white and gray eagle head.
The applicant, American Airlines, Inc., a corporation of Delaware, having an address of
   4333 Amon Carter Blvd.
   Fort Worth, Texas 76155
   United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

   International Class 035: Promoting the goods and services of others by means of a discount rewards program and an incentive awards program whereby purchase points are awarded for purchases made by vendor subscribers and travel conducted by member subscribers which can then be redeemed for merchandise and travel; Online retail services featuring toys, jewelry, books, office supplies, consumer electronics, music, sporting equipment, gifts, travel related goods and services, apparel, home and garden-related items, general retail merchandise, gift cards, and private club membership
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

   International Class 039: Air transportation of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network
Intent to Use: The applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services. (15 U.S.C. Section 1051(b)).

The applicant's current Attorney Information:
   Jeffrey A. Handelman and Nicholas G. de la Torre, Scott J. Slavick, Jennifer J. Theis, Andrew J. Avsec, and Tiffany D. Shimada of BRINKS HOFER GILSON & LIONE
   P.O. Box 10395
   Chicago, Illinois 60610
   United States
The attorney docket/reference number is 12901/.

The applicant's current Correspondence Information:
   Jeffrey A. Handelman
   BRINKS HOFER GILSON & LIONE
   P.O. Box 10395
   Chicago, Illinois 60610
   officeactions@brinkshofer.com;jhandelman@brinkshofer.com; aavsec@brinkshofer.com; jtheis@brinkshofer.com;
   nicholasd@brinkshofer.com (authorized)

A fee payment in the amount of $650 has been submitted with the application, representing payment for 2 class(es).

## Declaration

App'x 1015

AA-SKP-00054236

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /DB280/   Date: 01/16/2013
Signatory's Name: Donald E. Broadfield
Signatory's Position: Senior IP/Internet/Data Attorney
RAM Sale Number: 8138
RAM Accounting Date: 01/17/2013

Serial Number: 85825121
Internet Transmission Date: Wed Jan 16 19:13:22 EST 2013
TEAS Stamp: USPTO/BAS-XX.XX.XXX.XXX-2013011619132247
4949-85825121-4908d2a9db547e017c36c43919
6e5bd943-DA-8138-20130116135150058887

App'x 1016



App'x 1017

AA-SKP-00054238

**Generated on:** This page was generated by TSDR on 2024-03-21 12:44:41 EDT
**Mark:** AMERICAN AIRLINES



| | | | |
|---|---|---|---|
| **US Serial Number:** | 86488996 | **Application Filing Date:** | Dec. 23, 2014 |
| **US Registration Number:** | 4939082 | **Registration Date:** | Apr. 19, 2016 |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Status Date:** Jul. 06, 2022

**Publication Date:** Feb. 02, 2016

# Mark Information

**Mark Literal Elements:** AMERICAN AIRLINES

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

**Disclaimer:** "AIRLINES"

**Acquired Distinctiveness Claim:** In whole

# Related Properties Information

**International Registration Number:** 1266184

**International Application(s) /Registration(s) Based on this Property:** A0047386/1266184

**Claimed Ownership of US Registrations:** 514294, 1845693, 2054132 and others

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Sales promotion; promoting the goods and services of others by means of a loyalty program, discount program, and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by

App'x 1018

AA-SKP-00054240

member subscribers which can then be redeemed for merchandise and travel; online retail store services featuring gift cards and private club membership; promoting the goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise

| | | | |
|---|---|---|---|
| **International Class(es):** | 035 - Primary Class | **U.S Class(es):** | 100, 101, 102 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Apr. 20, 1981 | **Use in Commerce:** | Apr. 20, 1981 |

**For:** Repair and maintenance of aircraft, vehicles, aircraft-related facilities, baggage-related facilities, and air travel-related facilities; refueling of aircraft and land vehicles; ground support services in the field of air transportation, namely, aircraft de-icing services, aircraft interior and exterior cleaning, and sanitation

| | | | |
|---|---|---|---|
| **International Class(es):** | 037 - Primary Class | **U.S Class(es):** | 100, 103, 106 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | 1934 | **Use in Commerce:** | 1934 |

**For:** Air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, namely, coordinating travel arrangements for individuals and for groups, providing air transportation reservation services for others, providing vehicle reservation services for others, providing cruise reservation services for others, and providing vacation reservation services by means of a global computer network, namely, coordinating travel arrangements for individuals and for groups; providing information in the field of travel by means of a global computer network; providing lounge facilities, namely, airport services featuring transit lounge facilities for passenger relaxation and also including shower facilities

| | | | |
|---|---|---|---|
| **International Class(es):** | 039 - Primary Class | **U.S Class(es):** | 100, 105 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | 1934 | **Use in Commerce:** | 1934 |

**For:** Providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of an inflight entertainment system; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of a personal computer or tablet

| | | | |
|---|---|---|---|
| **International Class(es):** | 041 - Primary Class | **U.S Class(es):** | 100, 101, 107 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Sep. 1997 | **Use in Commerce:** | Sep. 1997 |

**For:** Food and drink catering; providing food and beverage services in conjunction with providing facilities in the form of a private club for conducting business, meetings and conferences; providing conference room facilities, food and beverage lounge facilities, and amenities, namely, food, drink, catering, and restaurant; providing hotel reservation and coordination services for others by means of a global computer network; travel agency services, namely, making reservations and booking for temporary lodging; entertainment services, namely, providing a general purpose arena facility for sports, entertainment, trade shows, exhibitions and conventions

| | | | |
|---|---|---|---|
| **International Class(es):** | 043 - Primary Class | **U.S Class(es):** | 100, 101 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | 1939 | **Use in Commerce:** | 1939 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |

App'x 1019

AA-SKP-00054241

| | | | |
|---|---|---|---|
| Filed 66A: | No | Currently 66A: | No |
| Filed No Basis: | No | Currently No Basis: | No |

# Current Owner(s) Information

| | |
|---|---|
| Owner Name: | American Airlines, Inc. |
| Owner Address: | MD 8B503 |
| | 1 Skyview Drive |
| | Fort Worth, TEXAS UNITED STATES 76155 |
| Legal Entity Type: | CORPORATION |
| State or Country Where Organized: | DELAWARE |

# Attorney/Correspondence Information

### Attorney of Record

| | | | |
|---|---|---|---|
| Attorney Name: | Eric J. Maiers | Docket Number: | 177306.06910 |
| Attorney Primary Email Address: | CHIIPMAIL@GTLAW.COM | Attorney Email Authorized: | Yes |

### Correspondent

| | |
|---|---|
| Correspondent Name/Address: | Eric J. Maiers |
| | Greenberg Traurig, LLP |
| | 77 W. Wacker Drive |
| | Suite 3100 |
| | Chicago, ILLINOIS UNITED STATES 60601 |

| | | | |
|---|---|---|---|
| Phone: | 312.456.8400 | Fax: | 312.456.8435 |
| Correspondent e-mail: | CHIIPMAIL@GTLAW.COM matthewsk@gtlaw.com brousseauj@gtlaw.com m aierse@gtlaw.com | Correspondent e-mail Authorized: | Yes |

### Domestic Representative - Not Found

# Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Sep. 14, 2023 | NOTICE OF SUIT | |
| Aug. 08, 2022 | NOTICE OF SUIT | |
| Jul. 28, 2022 | NOTICE OF SUIT | |
| Jul. 06, 2022 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| Jul. 06, 2022 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Jun. 29, 2022 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Jan. 25, 2022 | TEAS SECTION 8 & 15 RECEIVED | |
| Aug. 20, 2021 | NOTICE OF SUIT | |
| Apr. 19, 2021 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Mar. 19, 2020 | NOTICE OF SUIT | |
| Oct. 01, 2018 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 01, 2018 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Jan. 08, 2018 | REVIEW OF CORRESPONDENCE COMPLETE - INFORMATION MADE OF RECORD | |
| Dec. 29, 2017 | TEAS WITHDRAWAL OF ATTORNEY RECEIVED-FIRM RETAINS | |
| Apr. 19, 2016 | REGISTERED-PRINCIPAL REGISTER | |
| Feb. 02, 2016 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Feb. 02, 2016 | PUBLISHED FOR OPPOSITION | |
| Jan. 13, 2016 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Dec. 29, 2015 | LAW OFFICE PUBLICATION REVIEW COMPLETED | |
| Dec. 17, 2015 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Dec. 17, 2015 | EXAMINER'S AMENDMENT ENTERED | |
| Dec. 17, 2015 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | |
| Dec. 17, 2015 | EXAMINERS AMENDMENT E-MAILED | |
| Dec. 17, 2015 | EXAMINERS AMENDMENT -WRITTEN | |
| Dec. 17, 2015 | PREVIOUS ALLOWANCE COUNT WITHDRAWN | |

App'x 1020

AA-SKP-00054242

| | |
|---|---|
| Dec. 01, 2015 | WITHDRAWN FROM PUB - OG REVIEW QUERY |
| Nov. 13, 2015 | LAW OFFICE PUBLICATION REVIEW COMPLETED |
| Nov. 06, 2015 | ASSIGNED TO LIE |
| Sep. 28, 2015 | APPROVED FOR PUB - PRINCIPAL REGISTER |
| Sep. 28, 2015 | EXAMINER'S AMENDMENT ENTERED |
| Sep. 28, 2015 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED |
| Sep. 28, 2015 | EXAMINERS AMENDMENT E-MAILED |
| Sep. 28, 2015 | EXAMINERS AMENDMENT -WRITTEN |
| Sep. 11, 2015 | TEAS/EMAIL CORRESPONDENCE ENTERED |
| Sep. 10, 2015 | CORRESPONDENCE RECEIVED IN LAW OFFICE |
| Sep. 10, 2015 | TEAS RESPONSE TO OFFICE ACTION RECEIVED |
| Mar. 11, 2015 | NOTIFICATION OF NON-FINAL ACTION E-MAILED |
| Mar. 11, 2015 | NON-FINAL ACTION E-MAILED |
| Mar. 11, 2015 | NON-FINAL ACTION WRITTEN |
| Mar. 09, 2015 | ASSIGNED TO EXAMINER |
| Dec. 31, 2014 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED |
| Dec. 26, 2014 | NEW APPLICATION ENTERED |

## TM Staff and Location Information

**TM Staff Information - None**

**File Location**

| | | | |
|---|---|---|---|
| Current Location: | TMEG LAW OFFICE 105 | Date in Location: | Jul. 06, 2022 |

## Assignment Abstract Of Title Information

**Summary**

| | | | |
|---|---|---|---|
| Total Assignments: | 1 | Registrant: | American Airlines, Inc. |

**Assignment 1 of 1**

| | | | |
|---|---|---|---|
| Conveyance: | SECURITY INTEREST | | |
| Reel/Frame: | 7061/0605 | Pages: | 47 |
| Date Recorded: | Sep. 25, 2020 | | |
| Supporting Documents: | assignment-tm-7061-0605.pdf | | |

**Assignor**

| | | | |
|---|---|---|---|
| Name: | AMERICAN AIRLINES, INC. | Execution Date: | Sep. 25, 2020 |
| Legal Entity Type: | CORPORATION | State or Country Where Organized: | DELAWARE |

**Assignee**

| | | | |
|---|---|---|---|
| Name: | WILMINGTON TRUST, NATIONAL ASSOCIATION, AS COLLATERAL AGENT | | |
| Legal Entity Type: | NATIONAL BANKING ASSOCIATION | State or Country Where Organized: | ALABAMA |
| Address: | 50 SOUTH SIXTH STREET, SUITE 1290 MINNEAPOLIS, MINNESOTA 55402 | | |

**Correspondent**

| | |
|---|---|
| Correspondent Name: | MILBANK LLP |
| Correspondent Address: | 55 HUDSON YARDS ATTN: NATHANIEL T. BROWAND NEW YORK, NY 10001-2163 |

**Domestic Representative - Not Found**

## Proceedings

**Summary**

| | |
|---|---|
| Number of Proceedings: | 7 |

App'x 1021

| From: | TMOfficialNotices@USPTO.GOV |
|---|---|
| Sent: | Wednesday, July 6, 2022 11:02 PM |
| To: | XXXX |
| Cc: | XXXX;  XXXX;  XXXX |
| Subject: | Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 4939082: AMERICAN AIRLINES: Docket/Reference No. 177306.06910 |

**U.S. Serial Number:**  86488996
**U.S. Registration Number:**  4939082
**U.S. Registration Date:**  Apr 19, 2016
**Mark:**   AMERICAN AIRLINES
**Owner:**  American Airlines, Inc.


Jul 6, 2022

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058.  **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065.  **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
035, 037, 039, 041, 043


TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

---

### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date.  See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=86488996&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch  or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=86488996&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=documentSearch  NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

*   **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

App'x 1022

AA-SKP-00054279

PTO- 1583
Approved for use through 01/31/2026 OMB 0651-0055
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

## Combined Declaration of Use and Incontestability under Sections 8 & 15
## To the Commissioner for Trademarks:

**REGISTRATION NUMBER:** 4939082
**REGISTRATION DATE:** 04/19/2016

**MARK:** AMERICAN AIRLINES

**Current:** The owner, American Airlines, Inc., a corporation of Delaware, having an address of
    4333 Amon Carter Boulevard
    Fort Worth, Texas 76155
    United States

**Proposed:** The owner, American Airlines, Inc., a corporation of Delaware, having an address of
    MD 8B503
    1 Skyview Drive
    Fort Worth, Texas 76155
    United States
    XXXX
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 035, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Sales promotion; promoting the goods and services of others by means of a loyalty program, discount program, and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by member subscribers which can then be redeemed for merchandise and travel; online retail store services featuring gift cards and private club membership; promoting the goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
SPN0-419086-2022011416223 4956913 . AMERICAN_AIRLIN ES_spec_IC_35.pdf
**Converted PDF file(s)** (5 pages)
Specimen File1
Specimen File2
Specimen File3
Specimen File4
Specimen File5

Webpage URL: None Provided
Webpage Date of Access: None Provided
For International Class 037, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Repair and maintenance of aircraft, vehicles, aircraft-related facilities, baggage-related facilities, and air travel-related facilities; refueling of aircraft and land vehicles; ground support services in the field of air transportation, namely, aircraft de-icing services, aircraft interior and exterior cleaning, and sanitation; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective

AA-SKP-00054286

membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) photographs of signage showing use of the mark in connection with the listed services.
Specimen File1
Specimen File2

Webpage URL: None Provided
Webpage Date of Access: None Provided
For International Class 039, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, namely, coordinating travel arrangements for individuals and for groups, providing air transportation reservation services for others, providing vehicle reservation services for others, providing cruise reservation services for others, and providing vacation reservation services by means of a global computer network, namely, coordinating travel arrangements for individuals and for groups; providing information in the field of travel by means of a global computer network; providing lounge facilities, namely, airport services featuring transit lounge facilities for passenger relaxation and also including shower facilities; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
SPN2-419086-2022011416223 4956913 . AMERICAN AIRLIN ES spec IC 39.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3

Webpage URL: None Provided
Webpage Date of Access: None Provided
For International Class 041, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of an inflight entertainment system; providing in-flight entertainment services, namely, providing passengers with entertainment services in the form of providing in-flight entertainment services, namely, providing movies, radio and radio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, tablets, video and online games, and children's programming, all by means of a personal computer or tablet; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shot from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
SPN3-419086-2022011416223 4956913 . AMERICAN AIRLIN ES spec IC 41.pdf
**Converted PDF file(s)** (6 pages)
Specimen File1

App'x 1024

AA-SKP-00054287

<u>Specimen File2</u>
<u>Specimen File3</u>
<u>Specimen File4</u>
<u>Specimen File5</u>
<u>Specimen File6</u>

Webpage URL: None Provided
Webpage Date of Access: None Provided
For International Class 043, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Food and drink catering; providing food and beverage services in conjunction with providing facilities in the form of a private club for conducting business, meetings and conferences; providing conference room facilities, food and beverage lounge facilities, and amenities, namely, food, drink, catering, and restaurant; providing hotel reservation and coordination services for others by means of a global computer network; travel agency services, namely, making reservations and booking for temporary lodging; entertainment services, namely, providing a general purpose arena facility for sports, entertainment, trade shows, exhibitions and conventions; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from Registrant's website showing use of the mark in connection with the listed services.

**Original PDF file:**
<u>SPN4-419086-2022011416223 4956913 . AMERICAN_AIRLIN ES_spec_IC_43.pdf</u>
**Converted PDF file(s)** (3 pages)
<u>Specimen File1</u>
<u>Specimen File2</u>
<u>Specimen File3</u>

Webpage URL: None Provided
Webpage Date of Access: None Provided
The owner's/holder's current attorney information: Eric J. Maiers. Eric J. Maiers of Greenberg Traurig, LLP, is located at

    Suite 3100
    77 W. Wacker Drive
    Chicago, Illinois 60601
    United States

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

The owner's/holder's proposed attorney information: Eric J. Maiers. Other appointed attorneys are Mark R. Galis, Jeffrey P. Dunning, Herbert H. Finn, Richard D. Harris, Gary R. Jarosik, Keith R. Jarosik, James J. Lukas, Jr., Jeffrey G. Mote, Cameron M. Nelson, Howard E. Silverman, Barry R. Horwitz, Matthew J. Levinstein, Marc Trachtenberg, Benjamin P. Gilford, Jonathan Giroux, Jacqueline Brousseau, Callie Sand, Sara Skulman, Chase Means, Maja Sherman, Katie Cronin, Erik Bokar, Molly Carr. Eric J. Maiers of Greenberg Traurig, LLP, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at

    Suite 3100
    77 W. Wacker Drive
    Chicago, Illinois 60601
    United States
The docket/reference number is 177306.06910.

The phone number is 312.456.8400.

The fax number is 312.456.8435.

App'x 1025

AA-SKP-00054288

The email address is CHIIPMAIL@GTLAW.COM

Eric J. Maiers submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**Correspondence Information (current):**
  Eric J. Maiers
  PRIMARY EMAIL FOR CORRESPONDENCE: chiipmail@gtlaw.com
  SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): NOT PROVIDED

**Correspondence Information (proposed):**
  Eric J. Maiers
  PRIMARY EMAIL FOR CORRESPONDENCE: CHIIPMAIL@GTLAW.COM
  SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): matthewsk@gtlaw.com; maierse@gtlaw.com; brousseauj@gtlaw.com

The docket/reference number is 177306.06910.

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $2125 will be submitted with the form, representing payment for 5 class(es), plus any additional grace period fee, if necessary.

**Declaration**

**Original PDF file:**
hw_419086-155920955_._Sig ned_Declaration_-_AMERICA N_AIRLINES.pdf
**Converted PDF file(s)** (1 page)
Signature File1
Signatory's Name: Donald Broadfield, Jr.
Signatory's Position: Chief Intellectual Property and Data Counsel
Signature method: Handwritten


Mailing Address **(current):**
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601

Mailing Address **(proposed):**
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601


Serial Number: 86488996
Internet Transmission Date: Tue Jan 25 16:00:59 ET 2022
TEAS Stamp: USPTO/S08N15-X.X.XX.XX-20220125160059697
712-4939082-800a29d2b279c6685282cb377588
ef752d1aa313c7054c1b8c30a5f26b70507c-DA-
00570517-20220125155920955823

App'x 1026

AA-SKP-00054289

🔒 **PageVault**

| | |
|---|---|
| Document title: | American Airlines AAdvantage eShopping: Shop Online & Earn Miles |
| Capture URL: | https://www.aadvantageeshopping.com/?source=cl|AA|ALL|cl||link||EarnPg|generic|2 0180420&utm_source=cl&utm_medium=link&utm_campaign=EarnPg&utm_content=g eneric&chan=cl&seg=&med=link&strm=&cam=EarnPg&cont=generic&end=1 |
| Page loaded at (UTC): | Fri, 14 Jan 2022 21:09:07 GMT |
| Capture timestamp (UTC): | Fri, 14 Jan 2022 21:09:33 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 5 |
| Capture ID: | 496fd2b6-7ba0-4de7-9575-07b59957a74d |
| User: | gt-kmatthews |

PDF REFERENCE #:    6HHvqQJUByTzW6t Qj GEz2n

App'x 1027

AA-SKP-00054290



## Sign up for free to start earning miles today

Watch how it works »





App'x 1028

AA-SKP-00054291



App'x 1029

AA-SKP-00054292



## Earn at 950+ stores








Shop and
Earn 1 miles/$    Shop and
Earn 1 miles/$    Shop and
Earn 1 miles/$    Shop and
Earn 1 miles/$    Was 1
Now 5 miles/$    Was 5
Now 12 miles/$

## Trending stores




























Bonus ends 1/20

Treat yourself and earn up to 1,000 bonus miles

Turn your shopping into more miles today

1,000 bonus miles

App'x 1030

AA-SKP-00054293



## Trending stores





Bonus ends 1/20

# Treat yourself and earn up to 1,000 bonus miles

Turn your shopping into more miles today



Earn additional miles on every purchase when you use an American Airlines AAdvantage® Mastercard® credit card

App'x 1031

AA-SKP-00054294



AA-SKP-00054295



AA-SKP-00054296

🔒 **Page Vault**

| | |
|---|---|
| Document title: | Book flights - Book round trip, one way, multi city - American Airlines |
| Capture URL: | https://www.aa.com/booking/find-flights?tripType=roundTrip |
| Page loaded at (UTC): | Fri, 14 Jan 2022 21:17:26 GMT |
| Capture timestamp (UTC): | Fri, 14 Jan 2022 21:17:40 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 3 |
| Capture ID: | 49139a5a-b847-4d33-95f3-fbe19d8fc99d |
| User: | gt-kmatthews |

PDF  REFERENCE  #:        6JR1VkbUL2osr P1eTaZJvm

AA-SKP-00054297



App'x 1035

AA-SKP-00054298

## Cities and dates

| Round trip | One way | Multi city | | Vacation packages 🔗 |

**From** *
```
One
```

**To** *
```
City or airport
```

☐ Include nearby airports

☐ Include nearby airports

**Depart** *
```
mm/dd/yyyy  📅
```

**Time of day**
```
Early Morning  ▾
```

**Return** *
```
mm/dd/yyyy  📅
```

**Time of day**
```
Early Morning  ▾
```

## Passengers

**Number of passengers**
```
1  ▾
```

**Passenger 1**
```
Adult (16-64)  ▾
```

Unaccompanied minors 🔗

Traveling with infants 🔗

For groups of 10 or more, contact Group & Meeting Travel 🔗

## Options

**Search by**
```
Lowest fare  ▾
```

**Class**
```
Show all  ▾
```

**Airline**
```
American Airlines  ▾
```

Feedback 🔗

[ Search ]



App'x 1036

AA-SKP-00054299

🔒 PageVault

| | |
|---|---|
| Document title: | American Airlines - Entertainment Online |
| Capture URL: | https://entertainment.aa.com/en/ |
| Page loaded at (UTC): | Fri, 14 Jan 2022 21:19:01 GMT |
| Capture timestamp (UTC): | Fri, 14 Jan 2022 21:19:23 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 6 |
| Capture ID: | f862a2fb-35a0-44d9-92ec-72202509f17f |
| User: | gt-kmatthews |

PDF  REFERENCE  #:          unuVPuK6U4kDCXgDGi KVpH

AA-SKP-00054300

Document title: American Airlines - Entertainment Online
Capture URL: https://entertainment.aa.com/en/
Capture timestamp (UTC): Fri, 14 Jan 2022 21:19:23 GMT

App'x 1038

AA-SKP-00054301

American Airlines  WHAT'S ON MY FLIGHT  SEARCH 





New Movies onboard (varies by aircraft)

    

Document title: American Airlines - Entertainment Online
Capture URL: https://entertainment.aa.com/en/
Capture timestamp (UTC): Fri, 14 Jan 2022 21:19:23 GMT

App'x 1039

AA-SKP-00054302

**American Airlines**  WHAT'S ON MY FLIGHT  SEARCH 







Clifford the Big Red Dog
2021 | 96 mins | PG

CODA
2021 | 111 mins

Cry Macho
2021 | 104 mins

Dear Evan Hansen
2021 | 136 mins | PG-13

Falling for Figaro
2021 | 104 mins | R

○ ∗ ∗

## New TV onboard (varies by aircraft)







Center Stage: Natalie Hemby
2021 | 4 mins

Curb Your Enthusiasm: Season 11
2021 | 48 mins

Foundation: Season 1
2021 | 58 mins

Genius: Aretha
2021 | 50 mins

Invasion: Season 1
2021 | 57 mins

○ ∗ ∗

## Lifestyle                                                                Show all







Insider Travel Guide

Insider Travel Guide

Insider Travel Guide

Language Essentials

Language Essentials

App'x 1040

AA-SKP-00054303

American Airlines  WHAT'S ON MY FLIGHT    SEARCH 







Insider Travel Guides: Italian: S...    Insider Travel Guides: Japanese    Insider Travel Guides: Spanish    Language Essentials: Chinese    Language Essentials: French
2021 | 10 mins    2021 | 9 mins    2021 | 10 mins    2021 | 1 mins    2021 | 4 mins

◇  •  •  •

All Movies (varies by aircraft)                                                                 Show all







12 Mighty Orphans    1917    200 Meters    96    A League of Their Own
2021 | 118 mins | PG-13    2019 | 119 mins | R    2020 | 96 mins    2018 | 152 mins | PG    1992 | 128 mins | PG

◇  •  •  •

All TV shows (varies by aircraft)                                                               Show all







'Planet Her': Natural Chemistry ...    100 Foot Wave    30 Rock: Season 1    A Black Lady Sketch Show: Seas...    AA Clean Commitment
2021 | 25 mins    2021 | 60 mins    2006 | 15 mins    2021 | 30 mins    2020 | 1 mins

◇  •  •  •

App'x 1041

AA-SKP-00054304

American Airlines

WHAT'S ON MY FLIGHT          SEARCH

    

'Planet Her: Natural Chemistry    100 Foot Wave    30 Rock: Season 1    A Black Lady Sketch Show: Seas    AA Clean Commitment

2021 | 29 mins    2021 | 60 mins    2006 | 22 mins    2021 | 30 mins    2020 | 1 mins

○ ● ● ●

## Music                                                                    Show all

    

Center Stage: Alessia Cara    Center Stage: Jon Batiste    Center Stage: Lukas Nelson Pro    Center Stage: NATALIE HEMBY    Center Stage: Remi Wolf

Alessia Cara    Jon Batiste    Lukas Nelson & Promise of the Real    NATALIE HEMBY    Remi Wolf

○ ● ● ●



App'x 1042

AA-SKP-00054305

🔒 **PageVault**

| | |
|---|---|
| Document title: | American Airlines: 27,996,864 hotel and property listings worldwide. 231+ million hotel reviews. |
| Capture URL: | https://www.bookaahotels.com/index.html?aid=366304&label=aa-homepage-nav&lang=en-us&selected_currency=USD |
| Page loaded at (UTC): | Fri, 14 Jan 2022 21:20:23 GMT |
| Capture timestamp (UTC): | Fri, 14 Jan 2022 21:20:39 GMT |
| Capture tool: | v7.13.2 |
| Collection server IP: | 54.157.181.49 |
| Browser engine: | Chrome/77.0.3865.120 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 3 |
| Capture ID: | efc15baa-2ad7-4b24-8674-25c13611f89c |
| User: | gt-kmatthews |

PDF REFERENCE #:      kK9XL8Zi gzmqj 91DD6Jt ur

App'x 1043

AA-SKP-00054306




Find deals    Manage my booking



### Book now, relax, and enjoy your getaway

| Where are you going? | Check-in — Check-out | 2 adults · 0 children · 1 room | Search |

☐ I'm traveling for work

ⓘ Get the advice you need. Check the latest COVID-19 restrictions before you travel. Learn more.



AAdvantage    **Book your hotel with us and earn up to 10,000 miles per night on select properties**
Enter your AAdvantage® number when booking and receive miles in 6-8 weeks.



  **Discover Early 2022 Deals**
Kick off your new-year travels with 15% off stays

  Find deals    ✕

## Browse by property type






**Hotels**    **Apartments**    **Resorts**    **Villas**    **Cabins**    **Cottages**
832,433 hotels    736,991 apartments    17,049 resorts    377,998 villas    31,264 cabins    129,752 cottages

## More than just hotels... Bookers discover pure comfort with homes, apartments, and more






Document title: American Airlines: 27,995,864 hotel and property listings worldwide. 231+ million hotel reviews.
Capture URL: https://www.bookaahotels.com/index.html?aid=366304&amp;label=aa-homepage-nav&amp;lang=en-us&amp;selected_currency=USD
Capture timestamp (UTC): Fri, 14 Jan 2022 21:26:39 GMT                                    Page 1 of 2

App'x 1044

AA-SKP-00054307

 Get the advice you need. Check the latest COVID-19 restrictions before you travel. Learn more



**Discover Early 2022 Deals**
Kick off your new-year travels with 15% off stays.

Find deals



## Browse by property type

     

**Hotels** 832,433 hotels | **Apartments** 716,191 apartments | **Resorts** 17,049 resorts | **Villas** 377,938 villas | **Cabins** 31,284 cabins | **Cottages** 129,752 cottages

## More than just hotels... Bookers discover pure comfort with homes, apartments, and more

   

Cheval Three Quays at The Tower of... London
Starting from $363
8.4 Awesome 331 reviews

Sugar Loft Apartments Rio de Janeiro
Starting from $53
8.8 Awesome 160 reviews

Apartments on Belinskogo ulitsa Saint Petersburg
Starting from $288
8.2 Exceptional 23 reviews

A casa di Edi Rome
Starting from $192
8.6 Exceptional 4 reviews

FAQs | Terms & Conditions | Customer Service | Privacy & Cookies | Don't sell my information | California residents only

Copyright © 2022 American Airlines, Inc. American Airlines and Flight Symbol logos are trademarks of American Airlines, Inc.

Document title: American Airlines: 27,996,864 hotel and property listings worldwide. 231+ million hotel reviews.
Capture URL: https://www.bookaahotels.com/index.html?aid=366304&amp;label=aa-homepage-nav&amp;lang=en-us&amp;selected_currency=USD
Capture timestamp (UTC): Fri. 14 Jan 2022 21:20:39 GMT                Page 2 of 2

App'x 1045

AA-SKP-00054308

1/21/22, 2:22 PM                 https://teas.uspto.gov/post/reg/rxlt.service?xsl=hsign&stamp=USPTO/S08N15-4.1.90.86-2022012115220876666T-eTEAS-800b66...

## Declaration

Read the following statements before signing. Acknowledge the statements by signing below.

* Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

* Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

* The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration.

* There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register.

* There is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court.

* To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

* The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Signature Section**

Signature: _____

Date: _____

Signatory's Name: Donald Broadfield, Jr.

Signatory's Position: Chief Intellectual Property and Data Counsel

**NOTE TO APPLICANT:** When filed as part of the electronic form (i.e., scanned and attached as an image file), the signature page **must** include both the signature information **and** the declaration language. Do **not** include the entire application, but do ensure that the declaration language actually appears; *a signature by itself will **not** be acceptable.* If, due to browser limitations, the declaration language appears on a previous page when printed, you must "merge" the declaration and signature block onto a single page prior to signing, so that the *one complete page* can be scanned to create an acceptable image file. It is recommended that you copy-and-paste the entire text form into another document, manipulate the spacing there to move the declaration and signature section to a separate page, and then print this new version of the text form to send to the signatory.

https://teas.uspto.gov/post/reg/rxlt.service?xsl=hsign&stamp=USPTO/S08N15-4.1.90.86-2022012115220876666T-eTEAS-800b66a7cf6a14ccce4cdf...      6/7

AA-SKP-00054309



# United States of America

## United States Patent and Trademark Office

# AMERICAN AIRLINES

**Reg. No. 4,939,082**

**Registered Apr. 19, 2016**

**Int. Cls.: 35, 37, 39, 41 and 43**

**SERVICE MARK**

**PRINCIPAL REGISTER**



*Michelle K. Lee*

Director of the United States
Patent and Trademark Office

AMERICAN AIRLINES, INC. (DELAWARE CORPORATION)
4333 AMON CARTER BOULEVARD
FORT WORTH, TX 76155

FOR: SALES PROMOTION; PROMOTING THE GOODS AND SERVICES OF OTHERS BY MEANS OF A LOYALTY PROGRAM, DISCOUNT PROGRAM, AND AN INCENTIVE AWARDS PROGRAM WHEREBY PURCHASE POINTS ARE EARNED OR AWARDED FOR PURCHASES MADE FROM VENDOR SUBSCRIBERS OR TRAVEL CONDUCTED BY MEMBER SUBSCRIBERS WHICH CAN THEN BE REDEEMED FOR MERCHANDISE AND TRAVEL; ONLINE RETAIL STORE SERVICES FEATURING GIFT CARDS AND PRIVATE CLUB MEMBERSHIP; PROMOTING THE GOODS AND SERVICES OF OTHERS BY MEANS OF PROVIDING AN ON-LINE SHOPPING MALL WITH LINKS TO THE RETAIL WEB SITES OF OTHERS IN THE FIELD OF BOOKS, COMPUTERS, SOFTWARE, OFFICE SUPPLIES, CONSUMER ELECTRONICS, MUSIC, SPORTING AND RECREATIONAL EQUIPMENT, GIFTS, TRAVEL ITEMS, APPAREL, JEWELRY, HEALTH AND BEAUTY, TOYS, TRAVEL, HOME AND GARDEN-RELATED ITEMS, AND GENERAL RETAIL MERCHANDISE, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 4-20-1981; IN COMMERCE 4-20-1981.

FOR: REPAIR AND MAINTENANCE OF AIRCRAFT, VEHICLES, AIRCRAFT-RELATED FACILITIES, BAGGAGE-RELATED FACILITIES, AND AIR TRAVEL-RELATED FACILITIES; REFUELING OF AIRCRAFT AND LAND VEHICLES; GROUND SUPPORT SERVICES IN THE FIELD OF AIR TRANSPORTATION, NAMELY, AIRCRAFT DE-ICING SERVICES, AIRCRAFT INTERIOR AND EXTERIOR CLEANING, AND SANITATION, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 0-0-1934; IN COMMERCE 0-0-1934.

FOR: AIR TRANSPORT OF PASSENGERS, CARGO, AND FREIGHT; PROVIDING TRAVEL AGENCY SERVICES, NAMELY, PROVIDING TRAVEL RESERVATION SERVICES FOR OTHERS, NAMELY, COORDINATING TRAVEL ARRANGEMENTS FOR INDIVIDUALS AND FOR GROUPS, PROVIDING AIR TRANSPORTATION RESERVATION SERVICES FOR OTHERS, PROVIDING VEHICLE RESERVATION SERVICES FOR OTHERS, PROVIDING CRUISE RESERVATION SERVICES FOR OTHERS, AND PROVIDING VACATION RESERVATION SERVICES BY MEANS OF A GLOBAL COMPUTER NETWORK, NAMELY, CO-ORDINATING TRAVEL ARRANGEMENTS FOR INDIVIDUALS AND FOR GROUPS;

App'x 1047

AA-SKP-00054343

**Reg. No. 4,939,082**   PROVIDING INFORMATION IN THE FIELD OF TRAVEL BY MEANS OF A GLOBAL COMPUTER NETWORK; PROVIDING LOUNGE FACILITIES, NAMELY, AIRPORT SERVICES FEATURING TRANSIT LOUNGE FACILITIES FOR PASSENGER RELAXATION AND ALSO INCLUDING SHOWER FACILITIES , IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 0-0-1934; IN COMMERCE 0-0-1934.

FOR: PROVIDING ONLINE ELECTRONIC PUBLICATIONS, NAMELY, ONLINE MAGAZINES AND ONLINE NEWSLETTERS IN THE FIELD OF GENERAL INTEREST; PUBLICATION OF MAGAZINES; PROVIDING IN-FLIGHT ENTERTAINMENT SERVICES, NAMELY, PROVIDING PASSENGERS WITH ENTERTAINMENT SERVICES IN THE FORM OF PROVIDING IN-FLIGHT ENTERTAINMENT SERVICES, NAMELY, PROVIDING MOVIES, RADIO AND RADIO PROGRAMS, MUSIC, DOCUMENTARIES, MUSIC VIDEOS. NEWS AND INFORMATION IN THE FIELD OF SPORTS, LIVE AND RECORDED TELEVISION PROGRAMS, E-BOOKS, TABLETS, VIDEO AND ONLINE GAMES, AND CHILDREN'S PROGRAMMING, ALL BY MEANS OF AN INFLIGHT ENTERTAINMENT SYSTEM; PROVIDING IN-FLIGHT ENTERTAINMENT SERVICES, NAMELY, PROVIDING PASSENGERS WITH ENTERTAINMENT SERVICES IN THE FORM OF PROVIDING IN-FLIGHT ENTERTAINMENT SERVICES, NAMELY, PROVIDING MOVIES, RADIO AND RADIO PROGRAMS, MUSIC, DOCUMENTARIES, MUSIC VIDEOS, NEWS AND INFORMATION IN THE FIELD OF SPORTS, LIVE AND RECORDED TELEVISION PROGRAMS, E-BOOKS, TABLETS, VIDEO AND ONLINE GAMES, AND CHILDREN'S PROGRAMMING, ALL BY MEANS OF A PERSONAL COMPUTER OR TABLET, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 9-0-1997; IN COMMERCE 9-0-1997.

FOR: FOOD AND DRINK CATERING; PROVIDING FOOD AND BEVERAGE SERVICES IN CONJUNCTION WITH PROVIDING FACILITIES IN THE FORM OF A PRIVATE CLUB FOR CONDUCTING BUSINESS, MEETINGS AND CONFERENCES; PROVIDING CONFERENCE ROOM FACILITIES, FOOD AND BEVERAGE LOUNGE FACILITIES, AND AMENITIES, NAMELY, FOOD, DRINK, CATERING, AND RESTAURANT; PROVIDING HOTEL RESERVATION AND COORDINATION SERVICES FOR OTHERS BY MEANS OF A GLOBAL COMPUTER NETWORK; TRAVEL AGENCY SERVICES, NAMELY, MAKING RESERVATIONS AND BOOKING FOR TEMPORARY LODGING; ENTERTAINMENT SERVICES, NAMELY, PROVIDING A GENERAL PURPOSE ARENA FACILITY FOR SPORTS, ENTERTAINMENT, TRADE SHOWS, EXHIBITIONS AND CONVENTIONS, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 0-0-1939; IN COMMERCE 0-0-1939.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 514,294, 2,054,132 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "AIRLINES", APART FROM THE MARK AS SHOWN.

SEC. 2(F).

SER. NO. 86-488,996, FILED 12-23-2014.

MARK SHINER, EXAMINING ATTORNEY

App'x 1048

AA-SKP-00054344

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 86488996**
**Filing Date: 12/23/2014**

## To the Commissioner for Trademarks:

**MARK:** AMERICAN AIRLINES (Standard Characters, see mark)
The literal element of the mark consists of AMERICAN AIRLINES.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, American Airlines, Inc., a corporation of Delaware, having an address of
    4333 Amon Carter Boulevard
    Fort Worth, Texas 76155
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 035:  Sales promotion; promoting the goods and services by means of loyalty program, discount program, and an incentive awards program whereby purchase points are earned or awarded for purchases made from vendor subscribers or travel conducted by member subscribers which can then be redeemed for merchandise and travel; retail services featuring gift cards and private club membership; promoting the goods and services by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise

In International Class 035, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 04/20/1981, and first used in commerce at least as early as 04/20/1981, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) website advertising services.

**Original PDF file:**
SPE00-3898152163-20141216171150848760_._12901-4356_specimen_cl_35.pdf
**Converted PDF file(s)** (1 page)
Specimen File1
**Original PDF file:**
SPE00-3898152163-20141216171150848760_._12901-4356_specimen_cl_35-b.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

    International Class 037:  Repair and maintenance of aircraft, vehicles, aircraft-related facilities, baggage-related facilities, and air travel-related facilities; refueling of aircraft and land vehicles; ground support services in the field of air transportation, namely, aircraft de-icing services, aircraft interior and exterior cleaning, and sanitation

In International Class 037, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 00/00/1934, and first used in commerce at least as early as 00/00/1934, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) website advertising services.

**Original PDF file:**
SPE0120-3898152163-20141216171150848760_._12901-4356_specimen_cl_37.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

App'x 1049

AA-SKP-00054412

International Class 039:  Air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services by means of a global computer network; providing information in the field of travel by means of a global computer network

In International Class 039, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 00/00/1934, and first used in commerce at least as early as 00/00/1934, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) website demonstrating use of mark in connection with services.

**Original PDF file:**
SPE0120-3898152163-20141216171150848760_._12901-4356_specimen_cl_39.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

International Class 041:  Providing online electronic publications, namely online magazines and online newsletters; publication of magazines; providing in-flight entertainment services; entertainment services, namely, providing an arena facility for sports, entertainment, trade shows, exhibitions and conventions

In International Class 041, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 09/00/1997, and first used in commerce at least as early as 09/00/1997, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) website advertising services.

**Original PDF file:**
SPE01230-3898152163-20141216171150848760_._12901-4356_specimen_cl_41.pdf
**Converted PDF file(s)** (5 pages)
Specimen File1
Specimen File2
Specimen File3
Specimen File4
Specimen File5

International Class 043:  Food and drink catering; providing food and beverage services in conjunction with providing facilities in the form of a private club for conducting business, meetings and conferences; providing conference room facilities, lounge facilities, and amenities; providing hotel reservation and coordination services for others by means of a global computer network; travel agency services, namely, making reservations and booking for temporary lodging

In International Class 043, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 00/00/1939, and first used in commerce at least as early as 00/00/1939, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) website demonstrating use of mark in connection with services.

**Original PDF file:**
SPE012340-3898152163-20141216171150848760_._12901-4356_specimen_cl_43.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

The applicant claims ownership of U.S. Registration Number(s) 0514294, 1845693, 2054132, and others.

The applicant's current Attorney Information:
  Andrew J. Avsec and Jeffery A. Handelman, Nicholas G. de la Torre, Scott J. Slavick, Jennifer J. Theis, Genevieve E. Adams, Michael Friedman, and Craig C. Bradley of BRINKS GILSON & LIONE
    P.O. Box 10395
    Chicago, Illinois 60610
    United States
The attorney docket/reference number is 12901/4356.

App'x 1050

AA-SKP-00054413

The applicant's current Correspondence Information:

Andrew J. Avsec

BRINKS GILSON & LIONE

P.O. Box 10395

Chicago, Illinois 60610

(312) 321-4200(phone)

(312) 321-4299(fax)

Officeactions@brinksgilson.com;aavsec@brinksgilson.com; jhandelman@brinksgilson.com; sslavick@brinksgilson.com; rrios@brinksgilson.com (authorized)

A fee payment in the amount of $1625 has been submitted with the application, representing payment for 5 class(es).

## Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. Section 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant or the applicant's related company or licensee is using the mark in commerce on or in connection with the goods/services in the application, and such use by the applicant's related company or licensee inures to the benefit of the applicant; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. Section 1051(b), Section 1126(d), and/or Section 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

## Declaration Signature

Signature: /DB280/   Date: 12/18/2014
Signatory's Name: Donald E. Broadfield
Signatory's Position: Senior IP/Internet/Data Attorney
RAM Sale Number: 86488996
RAM Accounting Date: 12/23/2014

Serial Number: 86488996
Internet Transmission Date: Tue Dec 23 12:05:15 EST 2014
TEAS Stamp: USPTO/BAS-XX.XX.XXX.XXX-2014122312051558
4969-86488996-500777a2bb6edc13df3a53af17
626e6196542b8d7c826b9de950916e96d2eb157c
-DA-11219-20141218132436726555

App'x 1051

AA-SKP-00054414

# AMERICAN AIRLINES

App'x 1052

AA-SKP-00054415





 **American Airlines**

Home    Login    English ▾    Search aa.com    ⌕

Plan Travel    Travel Information    AAdvantage    

# EARN MILES SHOPPING

Earn Miles ≫ Retail

### Earn Miles

Earn up to 10 miles per $1 spent with the AAdvantage eShopping℠ mall.

Enrollment is free and easy. Start earning miles for everyday purchases today:

- Begin by visiting the AAdvantage eShopping mall.
- Sign up with your AAdvantage number and create a new password to enroll.
- Start earning miles for all of your purchases.

Visit the AAdvantage Shopping mall today.



The AAdvantage eShopping℠ mall is an exciting way to earn AAdvantage miles with over 900 retailers when you shop online. Nordstrom, Apple, Best Buy, Macy's and Home Depot are just a few of the many featured retailers where you can earn miles for shopping through the mall.



### Request Mileage Credit

Allow six to eight weeks for miles to post to your account. For questions regarding your mileage credit, please use the contact information below. Be prepared to provide your AAdvantage number and receipt copies.

Contact AAdvantage eShopping Customer Service.

### Terms and Conditions

Qualifying AAdvantage eShopping purchases will accrue AAdvantage miles per the terms and conditions set by each particular merchant. Mileage offer is available to U.S. residents only, not including Puerto Rico and the USVI. Members should read each mileage offer carefully as certain exclusions may apply. Miles are awarded as reported by the applicable merchant ("Merchant") to American Airlines or Cartera Commerce, and certain exclusions may apply. Online purchase awards only valid when you make a qualifying purchase via a valid link on www.aadvantageeshopping.com. Please read our full terms and conditions carefully before shopping.



AA-SKP-00054417

Five Star Service
Timetables & Downloads
Last Minute Packages

Site Map
Browser Compatibility

App'x 1055

AA-SKP-00054418

# AmericanAirlines®

## American Airlines Maintenance Services

**Fact Sheet**

American Airlines Maintenance Services, the maintenance and engineering arm of the airline, offers a full line of airframe, engine and component, and line maintenance services, customizing those services to meet the specific needs of the client. American's MRO business has a growing customer base of more than 70 different entities ranging from numerous domestic and international airlines to Original Equipment Manufacturer (OEM) to the U.S. military.

American has three overhaul maintenance bases located in Tulsa, Okla., Fort Worth, Texas and Kansas City, Mo., along with line stations located throughout its domestic and international network. American Airlines Maintenance Services brings a broad range of maintenance capabilities to the MRO demands of its customers. American's highly skilled Aviation Maintenance Technicians repair and maintain American's fleet of over 600 large jets as well as aircraft for dozens of other carriers.

**Select Services Offered:**

**Aircraft Maintenance**

American has the capability to perform line maintenance and overhaul work on a variety of fleet types, including but not limited to:

- A300-600
- Fokker 100
- Super 80
- B767

- B737
- B757
- B777

American performs more than 150,000 maintenance checks of various types each year, offers complete manufacturing and machine shop capabilities and has competitive turn times.

**Aircraft Modifications**

American has the capability to conduct all levels of service bulletins and airworthiness directive support. This includes:

- Crown skin replacement
- Empennage panel replacement
- Pylon modification
- Landing gear work

- Mylar
- Interior changes
- Seat re-pitch
- Winglet work

**Back Shop Support**

American maintains 80 percent of all back shop support in-house. This allows for excellent quality control and innovative engineering opportunities. Work provided includes:

- Metal spray
- Plating
- Electron beam welding
- High speed tip grinding for engine cores
- Standards lab tool calibration
- Heat treatment
- Slides

- Seats
- Engineering support
- Floor board
- Plastics
- Wiring
- Wheel and brake

April 2008

App'x 1056

AA-SKP-00054419

**Maintenance Services Fact Sheet**
Page 2

**Components/Avionics**
American has the capability to perform a myriad of component and avionics work, including:

- Flight instrumentation
- Components for above mention fleet types
- GPS installations
- Halon recovery
- Utilize Automated Test Equipment
- Windshear installations
- Thrust reverser repair and modifications

**Composite Repairs**
American offers a state-of-the-art composite repair facility, and the airline has already developed many repairs for many A300, Super 80, 777, 767, 757 and 737 composite aircraft parts.

**Engineering and Planning**
American offers an expansive package of world-class engineering solutions for its customers, which include planning for future endeavors, developing technical publications and assisting with current challenges. These services range from developing and preparing engineering requirements for aircraft modification and cabin reconfigurations to developing maintenance programs.

**Engine Work**
American can conduct overhaul work on a variety of engine types including the CF6-80A, CF6-80C2, JT8D-217/219 and CFM56-7B. A prime example of American's ability to provide competitive maintenance work to third parties is its joint venture with Rolls Royce called TAESL (Texas Aero Engine Services Ltd). TAESL was formed in April 1998 to repair and overhaul the RB211 engine, which American has on its Boeing 757 fleet, and the Trent 800 engine, which is on American's Boeing 777 aircraft.

April 2008

App'x 1057



◯ All Carriers                          List of All Carriers ⟨+⟩

**Country of Residence**

United States ▾

**Promotion Code**

Enter a Promotion Code

[                    ]                    Promotion Code Information ⊞

Start Over   Continue

**More About American**

About Us
Corporate Information
Careers
Investor Relations
Corporate Responsibility
Join Us In Causes That Matter
Environmental Footprint
Diversity & Inclusion
Newsroom
Airline Museum

**Products & Services**

Travel Insurance
Email Subscriptions
Enhance Your Travel
Low Price Guarantee
Group & Meeting Travel
Business Programs
Cargo
American Airlines Credit Card
Gift Cards
DealFinder
RSS
Five Star Service
Timetables & Downloads
Last Minute Packages

**Customer Service**

Contact American
FAQs
Refunds
Agency Reference
American Travel Centers
Baggage & Optional Service Charges
Customer Service Plan & Contingency Plan
Privacy Policy (newly updated)
Legal
Copyright
Site Map
Browser Compatibility

Earn 50,000 bonus miles

buy Å miles®
Up to 45,000 bonus miles

AVIS  Budget®
Up to 35% savings plus earn AAdvantage® Miles

App'x 1059

AA-SKP-00054422



Home   Login   🏳 English ▾   Search aa.com 🔍

Plan Travel          Travel Information          AAdvantage          

∨ During Your Flight
  ∨ Our Planes
      Boeing 777-300ER
      Boeing 777-200
      Boeing 777-200 Retrofit
      Boeing 767
      Airbus A321 Transcon
      Airbus A319
      Boeing 757
      Boeing 737-800
      Boeing MD-80
      Bombardier CRJ-200
      Bombardier CRJ-700
      Bombardier CRJ-900
      NextGen
      Embraer ERJ-140 And ERJ-
      145
      Embraer ERJ-175
  Wi-Fi and Connectivity
  Entertainment
  Seating Options
  Inflight dining
  Flying in Comfort
  Shop

🏠 HOME  >  DURING YOUR FLIGHT  >  ENTERTAINMENT

# Stay entertained in flight
## Entertainment options on your flight

🔲 RECOMMEND    🔲 TWEET    ✉ MAIL



When it comes to inflight entertainment, you'll find more choices than ever before on your next flight. Sit back, relax, and let us entertain you. Catch up on a favorite television show, finally watch that movie your friends have been talking about, or play a video game. Or maybe you'd like to listen to music? We have up to 300 full CDs and music channels covering a wide variety of genres

### ▤ Highlights

× Choose from a library of movies and
  television shows

× Check out available entertainment options
  on board our planes

× Listen to your favorite music during the flight
  or enjoy our award-winning magazines

## Movies, television and more

### Entertainment available at every seat

On each of our new and refurbished planes, you will have access to the latest, personal in-seat entertainment. You can choose from various entertainment options on the seatback screen in front of you:

× Up to 250 movies*
× Up to 180 TV programs
× More than 350 audio selections
× 18 American Airlines Radio channels
× Up to 20 games



These entertainment options will be available gate to gate. Once you have taken your seat, you can begin enjoying your selection. We offer this entertainment complimentary on all international flights as well as in all First Class and Business Class cabins. The Main Cabin offers a choice of complimentary or special entertainment packages for purchase.

*Up to 250 movies on international flights and up to 150 movies on domestic flights.

See what's playing on your next flight ▶



App'x 1060

AA-SKP-00054423

## Overhead video screens

We also offer overhead inflight entertainment options on select flights with NBCU on American. This includes full episodes of popular NBC entertainment as well as clips from hit late night comedy shows

See what's playing on your next flight »

## Tablets

The innovative Samsung Galaxy Tab™, featuring a 10.1 inch screen, allows for a customized viewing experience. Our First and Business Class passengers will enjoy this amenity on select international and transcontinental flights where in-seat entertainment is not available. You can expect a variety of entertainment options including:



* New movie releases and top classics
* Hit TV shows and games
* Various music selections
* Best-selling book excerpts

## Bring your own device

Browse our inflight library of movies and television shows which can be purchased and streamed to your Wi-Fi-enabled device.

Current devices that will stream these entertainment options include:



* Laptops
* iPad
* Galaxy Tab
* Motorola Xoom
* Smartphone
* Or any tablet that runs iOS or Android OS 3.2 and above

Follow these easy steps to stream video:

1  Connect to the "gogoinflight" signal and launch browser.

2  Click on the entertainment banner and select a movie or TV show.

3  Download plugin or tablet app, if prompted.

4  Log in or create an account.

5  Enjoy your program!

## Entertainment options by airplane

| | In-seat entertainment | Tablets[†] | Overhead video | Streaming video | Inflight radio |
|---|---|---|---|---|---|
| Airbus A319 | ※ | | | | ※ |

App'x 1061

AA-SKP-00054424

| | | | | | |
|---|---|---|---|---|---|
| Airbus A321 | ※ | | | | ※ |
| Airbus A321T | ※ | | | | ※ |
| Boeing 737 | ※[3] | ※ | ※ | ※[2] | ※ |
| Boeing 757 domestic | | | ※ | ※ | ※ |
| Boeing 757 international | ※[4] | ※ | ※ | | ※ |
| Boeing 762 | | ※ | ※ | ※ | ※ |
| Boeing 763 | | ※ | ※ | | ※ |
| Boeing 772 | ※ | | | | ※ |
| Boeing 773 | ※ | | | | ※ |
| Boeing 787 | ※ | | | | ※ |
| MD80 | | | | ※ | |

[1] Available on select routes in First Class and Business Class
[2] New airplanes only
[3] Available on airplanes without in-seat entertainment
[4] Business Class only

## Bose headphones



Enjoy the complimentary use of Bose® QuietComfort® 15 Acoustic Noise Cancelling® headphones when traveling in First or Business Class on select international and transcontinental flights. Tune out the world or tune in to entertainment -- either way, you'll love the performance of these acclaimed headsets.

## Music

We also have up to 18 channels that span classical, jazz, pop, country, alternative rock, international pop and more.

Our station names include:

- ※ Symphony Hall
- ※ Jazz Mix
- ※ Chill
- ※ The Hit List
- ※ American Jukebox
- ※ Country Roads
- ※ Spotlight

- ※ Latin Showcase
- ※ Smooth
- ※ Pop Piano
- ※ Japanese Horizons
- ※ Rhythm of Brazil
- ※ The Vault
- ※ Mandarin Mix

### Earbuds



If you're flying in the Main Cabin, enjoy improved sound quality on our new earbuds available for inflight purchase. The new earbuds are complimentary in the Main Cabin on select international flights.

App'x 1062

AA-SKP-00054425

* Spotlight                     × Mainstream Hits
* On The Edge                   × Metro
* Totally 80's                  × London Calling

## Magazines and newspapers

Exclusive interviews with some of the world's most interesting people can be found in the pages of our award-winning inflight magazines. And when traveling on flights to Europe, Asia and select flights to South America, you'll also have a choice of daily newspapers to read including *USA Today, The Wall Street Journal, The New York Times, Financial Times* and local newspapers based on availability.

* *American Way*
* *American Airlines Nexos*
* *Celebrated Living*

## You may also be interested in…

* During your flight
* Stay connected with inflight Wi-Fi
* Set up flight status notifications



New planes.
Inside and out.

Taking delivery of one new plane a
week on average.

⊕ BACK TO TOP

| More About American | Products & Services | Customer Service | |
|---|---|---|---|
| About Us | Travel Insurance | Contact American | Earn 50,000 bonus miles |
| Corporate Information | Email Subscriptions | FAQs | |
| Careers | Enhance Your Travel | Refunds | |
| Investor Relations | Low Price Guarantee | Agency Reference | buy ✈ miles |
| Corporate Responsibility | Group & Meeting Travel | American Travel Centers | Up to 45,000 bonus miles |
| Join Us in Causes That Matter | Business Programs | Baggage & Optional Service Charges | |
| Environmental Footprint | Cargo | Customer Service Plan & Contingency Plan | AVIS ✚Budget |
| Diversity & Inclusion | American Airlines Credit Card | Privacy Policy (newly updated) | Up to 35% savings plus earn AAdvantage® Miles |
| Newsroom | Gift Cards | Legal | |
| Airline Museum | DealFinder | Copyright | |
| | RSS | Site Map | |
| | Five Star Service | Browser Compatibility | |
| | Timetables & Downloads | | |
| | Last Minute Packages | | |

App'x 1063

AA-SKP-00054426

App'x 1064

AA-SKP-00054427

 American Airlines

Home   Login   aa.com 

Hotels                                                    Plan Travel ⌄    Travel Tools ⌄



**Book Hotel** | My Hotels

City Name or Airport Code

Check-in

Check-out

Rooms
1

Room 1
Adults                Children (0-12)
2                     0

Book Now

Relax, enjoy and earn
up to 250 miles on hotels



**Rev up your savings**
Save up to 35% and earn quadruple miles.
Learn More »



**On the road again**
Get your best car rental deal and earn AAdvantage miles.
Learn More »



Book tours and activities in advance, reserve now
Learn More »

**Information**

About Us
Earn AAdvantage Miles
Low Price Guarantee
Last Minute Packages
Amtrak Club
Car Rental Help
FAQ
AA Vacations

Pay With Miles

Last Minute Packages

App'x 1065



Legal

Privacy Policy

Copyright

Lowest Price
Guaranteed

App'x 1066

AA-SKP-00054429

**Generated on:** This page was generated by TSDR on 2024-03-21 12:48:33 EDT
**Mark:** AMERICAN AIRLINES

AMERICAN AIRLINES

| | | | |
|---|---|---|---|
| **US Serial Number:** | 86898575 | **Application Filing Date:** | Feb. 05, 2016 |
| **US Registration Number:** | 5279167 | **Registration Date:** | Sep. 05, 2017 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark, Service Mark | | |



**TM5 Common Status Descriptor:**

LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Status Date:** Mar. 19, 2024

**Publication Date:** Jun. 20, 2017

## Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | AMERICAN AIRLINES |
| **Standard Character Claim:** | Yes. The mark consists of standard characters without claim to any particular font style, size, or color. |
| **Mark Drawing Type:** | 4 - STANDARD CHARACTER MARK |
| **Acquired Distinctiveness Claim:** | In whole |

## Related Properties Information

| | |
|---|---|
| **Claimed Ownership of US Registrations:** | 514294, 1845693, 2381172 |

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | |
|---|---|
| **For:** | Computer application software for mobile devices and handheld computers, namely, software for providing information in the fields of travel, transportation and loyalty award programs; Computer application software for mobile devices, namely, software for tracking and redeeming loyalty program awards; Computer application software for mobile devices and handheld computers, namely, software for ticketing passengers, checking reservations, and checking flight status |
| **International Class(es):** | 009 - Primary Class |
| **Class Status:** | ACTIVE |
| **Basis:** | 1(a) |
| **First Use:** | Jul. 2010 |

**U.S Class(es):** 021, 023, 026, 036, 038

**Use in Commerce:** Jul. 2010

App'x 1067

AA-SKP-00054580

| | | | |
|---|---|---|---|
| **For:** | Providing Internet access | | |
| **International Class(es):** | 038 - Primary Class | **U.S Class(es):** | 100, 101, 104 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Mar. 2009 | **Use in Commerce:** | Mar. 2009 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | American Airlines, Inc. |
| **Owner Address:** | 1 Skyview Drive<br>MD 8B503<br>Fort Worth, TEXAS UNITED STATES 76155 |
| **Legal Entity Type:** | CORPORATION |
| **State or Country Where Organized:** | DELAWARE |

## Attorney/Correspondence Information

### Attorney of Record

| | | | |
|---|---|---|---|
| **Attorney Name:** | Eric J. Maiers | **Docket Number:** | 177306.14630 |
| **Attorney Primary Email Address:** | chiipmail@gtlaw.com | **Attorney Email Authorized:** | Yes |

### Correspondent

| | |
|---|---|
| **Correspondent Name/Address:** | Eric J. Maiers<br>Greenberg Traurig, LLP<br>77 W. Wacker Drive<br>Suite 3100<br>Chicago, ILLINOIS UNITED STATES 60601 |
| **Phone:** | 312.456.8400 |
| **Fax:** | 312.456.8435 |
| **Correspondent e-mail:** | chiipmail@gtlaw.com matthewsk@gtlaw.com eric.maiers@gtlaw.com carrm@gtlaw.com |
| **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Mar. 19, 2024 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| Mar. 19, 2024 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Mar. 06, 2024 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Sep. 14, 2023 | TEAS SECTION 8 & 15 RECEIVED | |
| Sep. 14, 2023 | NOTICE OF SUIT | |
| Sep. 05, 2022 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Aug. 08, 2022 | NOTICE OF SUIT | |
| Jul. 28, 2022 | NOTICE OF SUIT | |
| Aug. 20, 2021 | NOTICE OF SUIT | |
| Mar. 19, 2020 | NOTICE OF SUIT | |
| Oct. 01, 2018 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 01, 2018 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |

App'x 1068

| Jan. 08, 2018 | REVIEW OF CORRESPONDENCE COMPLETE - INFORMATION MADE OF RECORD |
| Dec. 29, 2017 | TEAS WITHDRAWAL OF ATTORNEY RECEIVED-FIRM RETAINS |
| Sep. 05, 2017 | REGISTERED-PRINCIPAL REGISTER |
| Jun. 20, 2017 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED |
| Jun. 20, 2017 | PUBLISHED FOR OPPOSITION |
| May 31, 2017 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED |
| May 09, 2017 | APPROVED FOR PUB - PRINCIPAL REGISTER |
| Apr. 29, 2017 | TEAS/EMAIL CORRESPONDENCE ENTERED |
| Apr. 28, 2017 | CORRESPONDENCE RECEIVED IN LAW OFFICE |
| Apr. 28, 2017 | TEAS RESPONSE TO OFFICE ACTION RECEIVED |
| Oct. 28, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED |
| Oct. 28, 2016 | NON-FINAL ACTION E-MAILED |
| Oct. 28, 2016 | NON-FINAL ACTION WRITTEN |
| Oct. 08, 2016 | TEAS/EMAIL CORRESPONDENCE ENTERED |
| Oct. 07, 2016 | CORRESPONDENCE RECEIVED IN LAW OFFICE |
| Oct. 07, 2016 | TEAS RESPONSE TO OFFICE ACTION RECEIVED |
| Apr. 08, 2016 | NOTIFICATION OF NON-FINAL ACTION E-MAILED |
| Apr. 08, 2016 | NON-FINAL ACTION E-MAILED |
| Apr. 08, 2016 | NON-FINAL ACTION WRITTEN |
| Apr. 01, 2016 | ASSIGNED TO EXAMINER |
| Feb. 10, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED |
| Feb. 09, 2016 | NEW APPLICATION ENTERED |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

Current Location: FILE DESTROYED     Date in Location: Mar. 19, 2024

# Assignment Abstract Of Title Information

**Summary**

Total Assignments: 1     Registrant: American Airlines, Inc.

**Assignment 1 of 1**

Conveyance: SECURITY INTEREST
Reel/Frame: 7061/0605     Pages: 47
Date Recorded: Sep. 25, 2020
Supporting Documents: assignment-tm-7061-0605.pdf

**Assignor**

Name: AMERICAN AIRLINES, INC.     Execution Date: Sep. 25, 2020
Legal Entity Type: CORPORATION     State or Country Where Organized: DELAWARE

**Assignee**

Name: WILMINGTON TRUST, NATIONAL ASSOCIATION, AS COLLATERAL AGENT
Legal Entity Type: NATIONAL BANKING ASSOCIATION     State or Country Where Organized: ALABAMA
Address: 50 SOUTH SIXTH STREET, SUITE 1290
MINNEAPOLIS, MINNESOTA 55402

**Correspondent**

Correspondent Name: MILBANK LLP
Correspondent Address: 55 HUDSON YARDS
ATTN: NATHANIEL T. BROWAND
NEW YORK, NY 10001-2163

**Domestic Representative - Not Found**

App'x 1069

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Tuesday, March 19, 2024 11:16 PM |
| **To:** | XXXX |
| **Cc:** | XXXX; XXXX; XXXX |
| **Subject:** | Official USPTO Notice of Acceptance/Acknowledgement Sections 8 and 15: U.S. Trademark RN 5279167: AMERICAN AIRLINES: Docket/Reference No. 177306.14630 |

**U.S. Serial Number:**  86898575
**U.S. Registration Number:**  5279167
**U.S. Registration Date:**  Sep 5, 2017
**Mark:**  AMERICAN AIRLINES
**Owner:**  American Airlines, Inc.

Mar 19, 2024

### NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058.  **The Section 8 declaration is accepted.**

### NOTICE OF ACKNOWLEDGEMENT UNDER SECTION 15

The declaration of incontestability filed for the above-identified registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. §1065.  **The Section 15 declaration is acknowledged.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
009, 038

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**Requirements in the First Ten Years**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between the 9th and 10th years after the registration date.  See 15 U.S.C. §§1058, 1059.

**Requirements in Successive Ten-Year Periods**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=86898575&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch  or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=86898575&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=documentSearch  NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

*    For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.

App'x 1070

AA-SKP-00054583

PTO- 1583
Approved for use through 01/31/2026 OMB 0651-0055
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

## Combined Declaration of Use and Incontestability under Sections 8 & 15
## To the Commissioner for Trademarks:

**REGISTRATION NUMBER:** 5279167
**REGISTRATION DATE:** 09/05/2017

**MARK:** AMERICAN AIRLINES

**Current:** The owner, American Airlines, Inc., a corporation of Delaware, having an address of
   4333 Amon Carter Boulevard
   Fort Worth, Texas 76155
   United States

**Proposed:** The owner, American Airlines, Inc., a corporation of Delaware, having an address of
   MD 8B503
   1 Skyview Drive
   Fort Worth, Texas 76155
   United States
   XXXX
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 038, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Providing Internet access; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from mobile app showing use of the mark in connection with the listed services.
Specimen File1
Specimen File2
Specimen File3
Specimen File4
Specimen File5
Specimen File6
Specimen File7
Specimen File8
Specimen File9

Webpage URL: https://aainflight.com/#/Home_Page
Webpage Date of Access: 07/28/2023
Webpage URL: https://www.aainflight.com/com/#/wifi_service_details
Webpage Date of Access: 07/28/2023
For International Class 009, the mark is in use in commerce on or in connection with **all** of the goods/**all** of the services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Computer application software for mobile devices and handheld computers, namely, software for providing information in the fields of travel, transportation and loyalty award programs; Computer application software for mobile devices, namely, software for tracking and redeeming loyalty program awards; Computer application software for mobile devices and handheld computers, namely, software for ticketing passengers, checking reservations, and checking flight status; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods/**all** services, or to indicate membership in the collective membership organization, listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods/services, or to indicate membership in the collective membership organization, exists, or to the owner's

App'x 1071

AA-SKP-00054588

right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one(or more) specimen(s) for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) screen shots from website and mobile app showing use of the mark in connection with the listed services.
**JPG file(s):**
Specimen File1
Specimen File2
Specimen File3
**Original PDF file:**
SPN1-419086-2023072512005 5523813 _ AMERICAN  AIRLIN ES_spec.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3

Webpage URL: None Provided
Webpage Date of Access: None Provided
The owner's/holder's current attorney information: Eric J. Maiers. Eric J. Maiers of Greenberg Traurig, LLP, is located at

    Suite 3100
    77 W. Wacker Drive
    Chicago, Illinois 60601
    United States

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

The owner's/holder's proposed attorney information: Eric J. Maiers. Other appointed attorneys are Mark R. Galis, Jeffrey P. Dunning, Herbert H. Finn, Richard D. Harris, Gary R. Jarosik, Keith R. Jarosik, James J. Lukas, Jr., Cameron M. Nelson, Howard E. Silverman, Barry R. Horwitz, Matthew J. Levinstein, Marc Trachtenberg, Benjamin P. Gilford, Jonathan Giroux, Jacqueline Brousseau, Callie Sand, Samuel Chase Means, Maja Sherman, Katie Cronin, Erik Bokar, Molly Carr, Jonathan Easter, Olivia Mathews. Eric J. Maiers of Greenberg Traurig, LLP, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at

    Suite 3100
    77 W. Wacker Drive
    Chicago, Illinois 60601
    United States
The docket/reference number is 177306.14630.

The phone number is 312.456.8400.

The fax number is 312.456.8435.

The email address is chiipmail@gtlaw.com

Eric J. Maiers submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**Correspondence Information (current)**
    Eric J. Maiers
    PRIMARY EMAIL FOR CORRESPONDENCE: chiipmail@gtlaw.com
    SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): NOT PROVIDED

**Correspondence Information (proposed)**
    Eric J. Maiers
    PRIMARY EMAIL FOR CORRESPONDENCE: chiipmail@gtlaw.com
    SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): matthewsk@gtlaw.com; eric.maiers@gtlaw.com; carrm@gtlaw.com

App'x 1072

AA-SKP-00054589

The docket/reference number is 177306.14630.

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $1050 will be submitted with the form, representing payment for 2 class(es), plus any additional grace period fee, if necessary.

<div align="center">

**Declaration**

</div>

**Original PDF file:**
hw_419086-085348562_._Affidavit_of_Use_-_AMERICAN__AIRLINES.pdf
**Converted PDF file(s)** (2 pages)
Signature File1
Signature File2
Signatory's Name: Donald Broadfield, Jr.
Signatory's Position: Chief Intellectual Property and Data Counsel
Signature method: Handwritten

Mailing Address **(current):**
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601

Mailing Address **(proposed):**
  Greenberg Traurig, LLP
  77 W. Wacker Drive
  Chicago, Illinois 60601

Serial Number: 86898575
Internet Transmission Date: Thu Sep 14 08:56:07 ET 2023
TEAS Stamp: USPTO/S08N15-X.X.XX.XX-20230914085608008
766-5279167-85082f9a2b96b4186e2c2e61b599
442175c52e7463edd736b932ebabbba-DA-56078
409-20230914085348562708

AA-SKP-00054590



App'x 1074

AA-SKP-00054591



App'x 1075

AA-SKP-00054592





App'x 1077

AA-SKP-00054594



AA-SKP-00054595





App'x 1080

AA-SKP-00054597



8:55

# American Airlines

Terms of use

Privacy policy

Copyright 2020 American Airlines, Inc.

v1.0

# Viasat

Terms of service

Privacy policy

Acceptable use policy

FAQs

Contact us

Satellite coverage map

Connected by Viasat

aainflight.com — Private

AA-SKP-00054598



App'x 1082

AA-SKP-00054599



Document title: American Airlines on the App Store
Capture URL: https://apps.apple.com/us/app/american-airlines/id382698565
Capture timestamp (UTC): Tue, 25 Jul 2023 15:56:43 GMT

Page 1 of 3

App'x 1083

AA-SKP-00054600

**App Store** Preview



**★★★★★**

marley_mae, 06/28/2021

**Very helpful!**

I downloaded this app for my most recent trip
to California and I'm so glad I did it don't know
how I would have survived without it)! The app
was great at getting me checked in/boa... more



**★★★★★**

KLKA080, 07/11/2022

**Customer complaints**

I just wanted to make a note about some of
the complaints about aadvantage or American
Airlines I do not work for either aadvantage or
American airline's . This review is based ... more



**★★★★★**

Saige0.0, 06/01/2023

**DO NOT FLY WITH THESE PEOPLE.**

I have used there airlines for the past couple
years and all I can say is even spirit is better
than them. From damaging my baggage twice
and once refusing to let me file a claim ... more

## App Privacy

See Details

The developer, **American Airlines**, indicated that the app's privacy practices may include handling of data as described below. For more information, see the
developer's privacy policy.

### Data Linked to You

The following data may be collected and linked to your identity:

| | |
|---|---|
| ⦿ Health & Fitness | ⚬ Purchases |
| 🏦 Financial Info | ⓘ Contact Info |
| 🖼 User Content | ⬚ Search History |
| ⊕ Browsing History | 🆔 Identifiers |
| ▦ Usage Data | ⚙ Diagnostics |

### Data Not Linked to You

The following data may be collected but it is not linked to your identity:

🧭 Location

Privacy practices may vary, for example, based on the features you use or your age. Learn More

## Information

| Seller | Size | Category |
|---|---|---|
| American Airlines, Inc. | 444 MB | Travel |
| **Compatibility** | **Languages** | **Age Rating** |
| iPhone | English | 4+ |
| Requires iOS 15.0 or later. | | |
| **iPad** | | |
| Requires iPadOS 15.0 or later. | | |
| **iPod touch** | | |
| Requires iOS 15.0 or later. | | |
| Copyright | Price | |
| © Copyright 2023 American Airlines, Inc. All Rights Reserved. | Free | |

Developer Website ↗   App Support ↗   Privacy Policy ↗

## Supports



**Wallet**
Get all of your passes, tickets, cards, and
more in one place.

## More By This Developer

## You Might Also Like

See All

Document title: American Airlines on the App Store
Capture URL: https://apps.apple.com/us/app/american-airlines/id382698565
Capture timestamp (UTC): Tue, 25 Jul 2023 15:56:43 GMT

App'x 1084

AA-SKP-00054601

**App Store** Preview

The developer, American Airlines, indicated that the app's privacy practices may include handling of data as described below. For more information, see the developer's privacy policy.



| Data Linked to You | | Data Not Linked to You |
|---|---|---|
| The following data may be collected and linked to your identity: | | The following data may be collected but it is not linked to your identity: |

**Data Linked to You**

- Health & Fitness
- Financial Info
- User Content
- Browsing History
- Usage Data
- Purchases
- Contact Info
- Search History
- Identifiers
- Diagnostics

**Data Not Linked to You**

- Location

Privacy practices may vary, for example, based on the features you use or your age. Learn More

## Information

| Seller | Size | Category |
|---|---|---|
| American Airlines, Inc. | 444 MB | Travel |

| Compatibility | Languages | Age Rating |
|---|---|---|
| **iPhone** | English | 4+ |
| Requires iOS 15.0 or later. | | |

**iPad**
Requires iPadOS 15.0 or later.

**iPod touch**
Requires iOS 15.0 or later.

| Copyright | Price |
|---|---|
| © Copyright 2023 American Airlines, Inc. All Rights Reserved | Free |

Developer Website ↗   App Support ↗   Privacy Policy ↗

## Supports



**Wallet**
Get all of your passes, tickets, cards, and more in one place.

## More By This Developer

## You Might Also Like

See All








| JetBlue - Book & manage trips | Fly Delta | United Airlines | Spirit Airlines | Frontier Airlines | Southwest Airlines |
|---|---|---|---|---|---|
| Travel | Travel | Travel | Travel | Travel | Travel |

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

Copyright © 2023 Apple Inc. All rights reserved.   Privacy Policy   Terms of Use   Sales and Refunds   Legal   Site Map   Choose your country or region

Document title: American Airlines on the App Store
Capture URL: https://apps.apple.com/us/app/american-airlines/id382698565
Capture timestamp (UTC): Tue, 25 Jul 2023 15:56:43 GMT

Page 3 of 3

App'x 1085

AA-SKP-00054602





## American Airlines
Travel

**UPDATE**

| 374K RATINGS | AGE | CHART | DEVELOPER |
|---|---|---|---|
| **4.7** ★★★★★ | **4+** Years Old | **#5** Travel | American Airlir |

## What's New
Version 2023.13

Version History
3h ago

We're continuing to work behind the scenes to improve your app experience.

## Preview



Get flight up
and manage
with just a fe



3:18   5G 67

‹ Search   UPDATE

With the American Airlines app, you're covered with the information you need exactly when you need it. Curious about traffic to the airport? Need a mobile boarding pass? Wondering where the closest Admirals Club® lounge is? All of this info and more is available at your fingertips.

- Lock Screen widgets: See your next trip's details right from the Lock Screen with our new dynamic widgets.

- Dynamic home screen: Knows where you are in your travel journey and gives you easy access to the right tools at the right time.

- Mobile boarding pass: Check in for your trip and retrieve your mobile boarding pass. No need to print, and it's updated along the way.

- Flight updates: Get the latest flight updates by simply retrieving your trip and allowing American Airlines to send notifications to your mobile device.

- Interactive terminal maps: Navigating airports is a breeze with our interactive terminal maps. Find the closest Admirals Club® lounge or get directions to your connecting gate.

- AAdvantage® account details: Review all the details of your AAdvantage® account right from the app. Not an AAdvantage® member? Sign up today.

- Upgrade your seat: Request upgrades with ease. Want to see where you are on the list? The app displays the upgrade standby list within 4 hours of your scheduled departure.



Today   Games   Apps   Arcade   Search

App'x 1087

AA-SKP-00054604



3:18    5G 67

< Search     **UPDATE**

- Seat selection: Choose or change your seat within the app. Just pick the one you'd like and change it on the spot.

- Track your bag: Know exactly where your bag is from the time it leaves your hands to when you extend the handle at your destination.

- Save your trip: Your recently viewed trips are automatically saved in the app so you can easily grab the details for your next flight in seconds.

- Quick interactions: The American app utilizes Haptic Touch and is Apple watch compatible, giving you quick access to the most important info.

- Wi-Fi access in the air: Don't forget, on flights with Wi-Fi you can use the American app and aa.com at no cost.

There's a new group of flyers out there – The World's Greatest Flyers. They know that having the right travel tools makes for a great experience.

The sky's the limit with the American Airlines sticker pack! Let friends and family know that you're traveling, headed to the Admirals Club® lounge to take it easy before taking off, snapping photos at 30,000 feet or that you've arrived.

Contact Us: 800-222-2377

American Airlines                                    >
Developer



Today    Games    Apps    Arcade    Search

App'x 1088

AA-SKP-00054605

PTO- 1583
Approved for use through 01/31/2025 OMB 0651-0055
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

You may sign this document but do not edit it. Make any necessary changes through TEAS, then generate a new signature page.

## Combined Declaration of Use and Incontestability under Sections 8 & 15
## Handwritten Signature or Digital Signature

Review the complete filing details before signing. Preparers printing this form for handwritten signature should also print the filing details for signatory review.

A fee payment in the amount of $850 will be submitted with the application, representing payment for 2 class(es).

**MARK:** AMERICAN AIRLINES (Standard Characters, see )

# AMERICAN AIRLINES

**Correspondent:** Eric J. Maiers.
**Correspondence email address:** chiipmail@gtlaw.com;matthewsk@gtlaw.com; eric.maiers@gtlaw.com; carrm@gtlaw.com

### Declaration

Read the following statements before signing. Acknowledge the statements by signing below.

- Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods/services or to indicate membership in the collective membership organization identified above, as evidenced by the attached specimen(s).

- Unless the owner has specifically claimed excusable nonuse, the specimen(s) shows the mark as currently used in commerce on or in connection with the goods/services/collective membership organization.

- The mark has been in continuous use in commerce for five consecutive years after the date of registration, or the date of publication under 15 U.S.C. § 1062(c), and is still in use in commerce on or in connection with all goods/services, or to indicate membership in the collective membership organization, listed in the existing registration.

App'x 1089

AA-SKP-00054606

- There has been no final decision adverse to the owner's claim of ownership of such mark for such goods/services, or to indicate membership in the collective membership organization, or to the owner's right to register the same or to keep the same on the register.

- There is no proceeding involving said rights pending and not finally disposed of either in the United States Patent and Trademark Office or in a court.

- To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

- The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Signature Section**

Signature: _____

Date: _14 SEPTEMBER 2023_

Signatory's Name: Donald Broadfield, Jr.

Signatory's Position: Chief Intellectual Property and Data Counsel

Document generated on September 11, 2023 at 12:29:28 PM ET

App'x 1090

# United States of America

## United States Patent and Trademark Office

# AMERICAN AIRLINES

**Reg. No. 5,279,167**

**Registered Sep. 05, 2017**

**Int. Cl.: 9, 38**

**Service Mark**

**Trademark**

**Principal Register**

American Airlines, Inc. (DELAWARE CORPORATION)
4333 Amon Carter Boulevard
Fort Worth, TX 76155

CLASS 9: Computer application software for mobile devices and handheld computers, namely, software for providing information in the fields of travel, transportation and loyalty award programs; Computer application software for mobile devices, namely, software for tracking and redeeming loyalty program awards; Computer application software for mobile devices and handheld computers, namely, software for ticketing passengers, checking reservations, and checking flight status

FIRST USE 7-00-2010; IN COMMERCE 7-00-2010

CLASS 38: Providing Internet access

FIRST USE 3-00-2009; IN COMMERCE 3-00-2009

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

OWNER OF U.S. REG. NO. 0514294, 1845693, 2381172

SEC.2(F)

SER. NO. 86-898,575, FILED 02-05-2016
KAREN DINDAYAL, EXAMINING ATTORNEY



*Joseph Matal*

Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

App'x 1091

AA-SKP-00054663



AA-SKP-00054695



 **American Airlines**

American Airlines, Inc. 

E Everyone

| UNINSTALL | UPDATE |
|-----------|--------|

   

Downloads          13,368 ≗          Travel & Local          Similar

Get the app that knows where you're
going – view your flight, check in & more

WHAT'S NEW
• Fix for the performance issue found on some
devices at start up

App'x 1093

AA-SKP-00054696

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 86898575**
**Filing Date: 02/05/2016**

## To the Commissioner for Trademarks:

**MARK:** AMERICAN AIRLINES (Standard Characters, see mark)
The literal element of the mark consists of AMERICAN AIRLINES.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, American Airlines, Inc., a corporation of Delaware, having an address of
    4333 Amon Carter Boulevard
    Fort Worth, Texas 76155
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 009:  Computer application software for mobile devices and handheld computers, namely, software for providing information in the fields of travel, transportation and loyalty award programs; Computer application software for mobile devices, namely, software for tracking and redeeming loyalty program awards; Computer application software for mobile devices and handheld computers, namely, software for ticketing passengers, checking reservations, and checking flight status

In International Class 009, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 07/00/2010, and first used in commerce at least as early as 07/00/2010, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) screen capture of software in use.

**Original PDF file:**
SPE0-3898152163-20160204094530218613 . 12901-    AMERICAN_AIRLINES_specimen_cl_9.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

    International Class 038:  Providing Internet access

In International Class 038, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 03/00/2009, and first used in commerce at least as early as 03/00/2009, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) advertisement for services.

**Original PDF file:**
SPE0-3898152163-20160204094530218613 . 12901-    AMERICAN_AIRLINES_specimen_cl_38.pdf
**Converted PDF file(s)** (4 pages)
Specimen File1
Specimen File2
Specimen File3
Specimen File4

**Claim of Active Prior Registration(s)**
The applicant claims ownership of active prior U.S. Registration Number(s) 0514294, 1845693, 2381172, and others.

The applicant's current Attorney Information:
    Andrew J. Avsec and Jerome Gilson, Jeffery A. Handelman, David S. Fleming, Scott J. Slavick, Howard S. Michael, Jeffrey J. Catalano, Jennifer J. Theis, Joshua Frick, Genevieve E. Charlton, Michael Friedman, and Craig C. Bradley of BRINKS GILSON & LIONE     P.O. Box

App'x 1094

AA-SKP-00054719

10395
    Chicago, Illinois 60610
    United States
    (312) 321-4200(phone)
    (312) 321-4299(fax)
    officeactions@brinksgilson.com (authorized)
The attorney docket/reference number is 12901/New.

The applicant's current Correspondence Information:
    Andrew J. Avsec
    BRINKS GILSON & LIONE
    P.O. Box 10395
    Chicago, Illinois 60610
    (312) 321-4200(phone)
    (312) 321-4299(fax)
    officeactions@brinksgilson.com (authorized)
**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant or applicant's attorney at the e-mail address provided above. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in an additional processing fee of $50 per international class of goods/services.

A fee payment in the amount of $550 has been submitted with the application, representing payment for 2 class(es).

<div align="center">

**Declaration**

</div>

The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /DB280/   Date: 02/04/2016
Signatory's Name: Donald E. Broadfield
Signatory's Position: Senior IP/Internet/Data Attorney
RAM Sale Number: 86898575
RAM Accounting Date: 02/05/2016

Serial Number: 86898575
Internet Transmission Date: Fri Feb 05 10:08:56 EST 2016
TEAS Stamp: USPTO/BAS-XX.XX.XXX.XXX-2016020510085653
8453-86898575-550d0e22384d5c5f9edf9b8d91
14fcee127258de2a338e9677b809e751f6fa7fb-
DA-7999-20160204115958543130

<div align="right">

App'x 1095

</div>

AA-SKP-00054720

# AMERICAN AIRLINES

AA-SKP-00054721

 AAdvantage®

Mobile Home Login English

American Airlines

# Flight status

Search by: Cities Flight number

( • Required)

From •

CHI

To •

City or airport

Date

Thursday, February 4

Time

**American Airlines**

Home    Login    English ▾    Search aa.com

Plan Travel    Travel Information   AAdvantage 

⌂ Home  >  Wi-Fi and connectivity

# Wi-Fi and connectivity



Want to get some work done, catch up with friends or simply surf the web? Whether your trip is for business or pleasure, we'll keep you connected while onboard your flight.

## Inflight Wi-Fi

Stay connected using any Wi-Fi enabled device, including smartphones (in airplane mode). To see if your flight has Wi-Fi, look for the symbol on your boarding pass or check here before you go.

Does your flight have Wi-Fi?  »

### Domestic flights

Wi-Fi is available on nearly all flights within the U.S., including our new, two-class regional jets. Daily and monthly passes are available, and you can also enjoy complimentary access to aa.com.

All-day pass

» $16 plus tax
» Expires 12 months from date of purchase

American Airlines Plan

» $49.95 plus tax
» Monthly subscription

App'x 1098

AA-SKP-00054723

Buy the all-day pass 🖉                          Buy the American Airlines plan 🖉

## International flights

Enjoy Wi-Fi service when traveling internationally on our new 777-300ER, 787 Dreamliner and select 777-200 planes. Passes may only be purchased once you're onboard:

* 2 hour - $12
* 4 hour - $17
* Length of flight - $19

⊙ Wi-Fi customer assistance

---

# Onboard power

So you can stay productive in the air, you'll find power outlets at every First and Business Class seat, and on our new planes, power at every seat in the Main Cabin. Other aircraft have power in select rows of the Main Cabin - just look for the lightning bolt symbol on the overhead bins. You'll also find USB ports on select aircraft and all new planes include USB ports and power outlets at every seat.

## Type of power you can expect

Most of our planes feature AC power outlets and those that offer DC power are in the process of being converted. In the meantime, you can use a DC-to-AC adaptor on select flights if you're in First or Business Class. Simply ask your flight attendant for an adaptor.

⊙ Want to know where to find power?

---

# Phones and electronic devices

Enjoy increased productivity and talk time on the ground before you depart and after landing as you taxi to the gate. You may use your cell phone, laptop computer, and other electronic devices onboard until advised by the flight crew, but please note that use of cell phones is not allowed during flight.

Please keep these things in mind during taxi, takeoff and landing:

* Put small devices in airplane mode and either hold or place the device under your seat

App'x 1099

AA-SKP-00054724

» Laptops and other large items cannot be held and should be turned off and put away

## Onboard satellite phones

Satellite phone service is available on our Airbus A330 aircraft in First and Business Class. Enjoy worldwide calls and pay onboard using most major credit cards.*

*Telenor Satellite Services, Inc. (Telenor) operates under a license issued by the Federal Communications Commission (FCC). Liability of Telenor and air carrier for failure of communications is limited to call charges only. Billing starts when the call is connected. Service may be unavailable or interrupted due to factors such as gaps in satellite coverage, weather conditions, system repair and capacity limitations. Complaints may be directed to: Federal Communications Commission, Enforcement Bureau, 445 12th Street SW, Washington, DC 20554.

## You may also like...

Mobile tools »
Inflight entertainment »
Seating options »

⊕ Back to top

| Help | About American | Extras | |
|---|---|---|---|
| Contact American | About us | Business programs ⊠ | |
| Refunds and receipts | Careers ⊠ | Gift cards | Earn 50,000 bonus miles |
| FAQs | Investor relations ⊠ | American Airlines credit card | |
| Agency reference | Newsroom ⊠ | Travel insurance | |
| Cargo ⊠ | Legal, privacy, copyright | CoBrowse | **Buy**Miles |
| Baggage and optional service charges | Browser compatibility | | Offer ends March 1 Enjoy up to 42,500 bonus |
| Customer service and contingency plan | Web accessibility | | AVIS Budg |
| Conditions of carriage and tariffs | | | Up to 35% savings plus AAdvantage® mi |

App'x 1100

AA-SKP-00054725



App'x 1101

AA-SKP-00054726

Generated on: This page was generated by TSDR on 2024-03-21 12:51:21 EDT

Mark:



| | | | |
|---|---|---|---|
| **US Serial Number:** | 87601655 | **Application Filing Date:** | Sep. 08, 2017 |
| **US Registration Number:** | 5559145 | **Registration Date:** | Sep. 11, 2018 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark, Service Mark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Sep. 11, 2018

**Publication Date:** Jun. 26, 2018

## Mark Information

**Mark Literal Elements:** None

**Standard Character Claim:** No

**Mark Drawing Type:** 2 - AN ILLUSTRATION DRAWING WITHOUT ANY WORDS(S)/ LETTER(S) /NUMBER(S)

**Description of Mark:** The mark consists of a stylized eagle in black and white separated by a white and gray eagle head.

**Color(s) Claimed:** Color is not claimed as a feature of the mark.

**Design Search Code(s):**
03.15.01 - Eagles
03.15.19 - Birds in flight or with outspread wings
03.15.24 - Stylized birds
03.17.16 - Heads of birds

## Related Properties Information

**Claimed Ownership of US Registrations:** 4449061

## Goods and Services

Note:
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear

**International Class(es):** 025 - Primary Class    **U.S Class(es):** 022, 039

**Class Status:** ACTIVE

App'x 1102

AA-SKP-00054727

**Basis:** 1(a)

**First Use:** Mar. 2013      **Use in Commerce:** Mar. 2013

---

**For:** Toys, namely, model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards

**International Class(es):** 028 - Primary Class      **U.S Class(es):** 022, 023, 038, 050

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Mar. 2013      **Use in Commerce:** Mar. 2013

---

**For:** Promoting goods and services of others by means of loyalty program, discount program, promotional program and an incentive awards program whereby points are earned or awarded for purchases made by members which can then be redeemed for merchandise, services and travel; promoting goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, gift cards, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise; provision, organization, operation, and administration of a loyalty program, a discount program, a promotional program and an incentive awards program for customers whereby points are earned for purchases made via credit cards which can be redeemed for merchandise, services and travel; provision, organization, operation, and administration of loyalty, discount, promotional, and incentive programs, namely, managing and tracking the transfer and redemption of points that are earned or awarded for purchases made by members; provision of clerical and secretarial services; providing facilities, office machines and equipment for conducting business, business meetings, and conferences; providing professional support staff to assist in the conducting of office business, meetings and conferences; promotion of travel insurance services of others

**International Class(es):** 035 - Primary Class      **U.S Class(es):** 100, 101, 102

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Jan. 21, 2013      **Use in Commerce:** Jan. 21, 2013

---

**For:** Banking; real estate affairs, namely, real estate lending services; aircraft financing; credit union services; financial services for credit union members, namely, financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage, mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and real estate lending services; issuance of credit cards through a licensee

**International Class(es):** 036 - Primary Class      **U.S Class(es):** 100, 101, 102

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Jan. 21, 2013      **Use in Commerce:** Jan. 21, 2013

---

**For:** Providing internet access

**International Class(es):** 038 - Primary Class      **U.S Class(es):** 100, 101, 104

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Mar. 2013      **Use in Commerce:** Mar. 2013

---

**For:** Air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services in the nature of coordinating travel arrangements for individuals and groups; providing information in the field of travel; ground support services in the field of air transportation, namely, marking, sorting, loading, unloading, transfer, and transit of cargo and passengers' luggage; providing information concerning cargo and passengers' luggage in transit and delivery; air travel passenger ticketing and check-in services; airport ramp services; transporting aircraft at airport; providing aircraft parking and storage; aircraft towing; transportation services, namely, checking of baggage; airport services featuring transit lounge facilities for passengers; booking and providing ancillary travel services, namely, making reservations in the nature of seat selection, baggage check-in; airport ramp services, namely, transfer of checked baggage to aircraft; airport ramp services, namely, transfer of carry-on baggage to aircraft; airline services, namely, providing priority boarding for customers, and access to airport lounge facilities; air passenger wheel-chair services at airport; leasing of aircraft; leasing of components of aircraft; leasing of aircraft engines; transporting of aircraft engines for others; airport services featuring transit lounge facilities for passengers

**International Class(es):** 039 - Primary Class      **U.S Class(es):** 100, 105

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Jan. 21, 2013      **Use in Commerce:** Jan. 21, 2013

---

**For:** Providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight and airport lounge entertainment services, namely, providing movies, audio and audio programs, music,

AA-SKP-00054728

documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, audio books, tablets, video and online games, and children's programming; travel services, namely, providing headphones on aircraft for use for entertainment purposes

| | | | |
|---|---|---|---|
| **International Class(es):** | 041 - Primary Class | **U.S Class(es):** | 100, 101, 107 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Jan. 21, 2013 | **Use in Commerce:** | Jan. 21, 2013 |

**For:** Providing conference rooms; Food and drink catering; Café services; Restaurant services; Bar services; providing conference room facilities; providing lounge facilities for providing food and drink; Providing hotel reservation and coordination services for others; hotel services; restaurant services, namely, providing of food and drink in airports and on aircraft

| | | | |
|---|---|---|---|
| **International Class(es):** | 043 - Primary Class | **U.S Class(es):** | 100, 101 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Jan. 21, 2013 | **Use in Commerce:** | Jan. 21, 2013 |

**For:** Facilitating expedited passenger screening, namely, providing priority access to airline passenger and baggage security screening

| | | | |
|---|---|---|---|
| **International Class(es):** | 045 - Primary Class | **U.S Class(es):** | 100, 101 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Jan. 21, 2013 | **Use in Commerce:** | Jan. 21, 2013 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | American Airlines, Inc. |
| **Owner Address:** | 4333 Amon Carter Boulevard<br>Fort Worth, TEXAS UNITED STATES 76155 |
| **Legal Entity Type:** | CORPORATION |
| **State or Country Where Organized** | DELAWARE |

## Attorney/Correspondence Information

### Attorney of Record

| | | | |
|---|---|---|---|
| **Attorney Name:** | Eric J. Maiers | | |
| **Attorney Primary Email Address:** | chiipmail@gtlaw.com | **Attorney Email Authorized:** | Yes |

### Correspondent

| | | | |
|---|---|---|---|
| **Correspondent Name/Address:** | Eric J. Maiers<br>Greenberg Traurig, LLP<br>77 W. Wacker Drive<br>Suite 3100<br>Chicago, ILLINOIS UNITED STATES 60601 | | |
| **Phone:** | 312.456.8400 | **Fax:** | 312.456.8435 |
| **Correspondent e-mail:** | chiipmail@gtlaw.com | **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

App'x 1104

AA-SKP-00054729

| Date | Description | Proceeding Number |
|------|-------------|-------------------|
| Sep. 11, 2023 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Aug. 08, 2022 | NOTICE OF SUIT | |
| Jul. 28, 2022 | NOTICE OF SUIT | |
| Aug. 20, 2021 | NOTICE OF SUIT | |
| Mar. 19, 2020 | NOTICE OF SUIT | |
| Oct. 01, 2018 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Oct. 01, 2018 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Sep. 11, 2018 | REGISTERED-PRINCIPAL REGISTER | |
| Jun. 26, 2018 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Jun. 26, 2018 | PUBLISHED FOR OPPOSITION | |
| Jun. 06, 2018 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| May 23, 2018 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| May 22, 2018 | TEAS/EMAIL CORRESPONDENCE ENTERED | |
| May 21, 2018 | CORRESPONDENCE RECEIVED IN LAW OFFICE | |
| May 21, 2018 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Dec. 13, 2017 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Dec. 13, 2017 | NON-FINAL ACTION E-MAILED | |
| Dec. 13, 2017 | NON-FINAL ACTION WRITTEN | |
| Dec. 13, 2017 | ASSIGNED TO EXAMINER | |
| Sep. 15, 2017 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Sep. 14, 2017 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Sep. 12, 2017 | NEW APPLICATION ENTERED | |

# TM Staff and Location Information

**TM Staff Information - None**

**File Location**

| | | | |
|---|---|---|---|
| Current Location: | PUBLICATION AND ISSUE SECTION | Date in Location: | Sep. 11, 2018 |

# Assignment Abstract Of Title Information

**Summary**

| | | | |
|---|---|---|---|
| Total Assignments: | 1 | Registrant: | American Airlines, Inc. |

**Assignment 1 of 1**

| | | | |
|---|---|---|---|
| Conveyance: | SECURITY INTEREST | | |
| Reel/Frame: | 7061/0605 | Pages: | 47 |
| Date Recorded: | Sep. 25, 2020 | | |
| Supporting Documents: | assignment-tm-7061-0605.pdf | | |

**Assignor**

| | | | |
|---|---|---|---|
| Name: | AMERICAN AIRLINES, INC. | Execution Date: | Sep. 25, 2020 |
| Legal Entity Type: | CORPORATION | State or Country Where Organized: | DELAWARE |

**Assignee**

| | | | |
|---|---|---|---|
| Name: | WILMINGTON TRUST, NATIONAL ASSOCIATION, AS COLLATERAL AGENT | | |
| Legal Entity Type: | NATIONAL BANKING ASSOCIATION | State or Country Where Organized: | ALABAMA |
| Address: | 50 SOUTH SIXTH STREET, SUITE 1290 MINNEAPOLIS, MINNESOTA 55402 | | |

**Correspondent**

| | |
|---|---|
| Correspondent Name: | MILBANK LLP |
| Correspondent | 55 HUDSON YARDS |

App'x 1105

AA-SKP-00054730

**Address:** ATTN: NATHANIEL T. BROWAND
NEW YORK, NY 10001-2163

**Domestic Representative - Not Found**

App'x 1106

AA-SKP-00054731

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,559,145**

**Registered Sep. 11, 2018**

**Int. Cl.: 25, 28, 35, 36, 38, 39, 41, 43, 45**

**Service Mark**

**Trademark**

**Principal Register**

American Airlines, Inc. (DELAWARE CORPORATION)
4333 Amon Carter Boulevard
Fort Worth, TEXAS 76155

CLASS 25: Clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear

FIRST USE 3-00-2013; IN COMMERCE 3-00-2013

CLASS 28: Toys, namely, model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards

FIRST USE 3-00-2013; IN COMMERCE 3-00-2013

CLASS 35: Promoting goods and services of others by means of loyalty program, discount program, promotional program and an incentive awards program whereby points are earned or awarded for purchases made by members which can then be redeemed for merchandise, services and travel; promoting goods and services of others by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, gift cards, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise; provision, organization, operation, and administration of a loyalty program, a discount program, a promotional program and an incentive awards program for customers whereby points are earned for purchases made via credit cards which can be redeemed for merchandise, services and travel; provision, organization, operation, and administration of loyalty, discount, promotional, and incentive programs, namely, managing and tracking the transfer and redemption of points that are earned or awarded for purchases made by members; provision of clerical and secretarial services; providing facilities, office machines and equipment for conducting business, business meetings, and conferences; providing professional support staff to assist in the conducting of office business, meetings and conferences; promotion of travel insurance services of others

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013

CLASS 36: Banking; real estate affairs, namely, real estate lending services; aircraft financing; credit union services; financial services for credit union members, namely, financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage,

*Andrei Iancu*

Director of the United States
Patent and Trademark Office

App'x 1107

AA-SKP-00054768

mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and real estate lending services; issuance of credit cards through a licensee

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013

CLASS 38: Providing internet access

FIRST USE 3-00-2013; IN COMMERCE 3-00-2013

CLASS 39: Air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services in the nature of coordinating travel arrangements for individuals and groups; providing information in the field of travel; ground support services in the field of air transportation, namely, marking, sorting, loading, unloading, transfer, and transit of cargo and passengers' luggage; providing information concerning cargo and passengers' luggage in transit and delivery; air travel passenger ticketing and check-in services; airport ramp services; transporting aircraft at airport; providing aircraft parking and storage; aircraft towing; transportation services, namely, checking of baggage; airport services featuring transit lounge facilities for passengers; booking and providing ancillary travel services, namely, making reservations in the nature of seat selection, baggage check-in; airport ramp services, namely, transfer of checked baggage to aircraft; airport ramp services, namely, transfer of carry-on baggage to aircraft; airline services, namely, providing priority boarding for customers, and access to airport lounge facilities; air passenger wheel-chair services at airport; leasing of aircraft; leasing of components of aircraft; leasing of aircraft engines; transporting of aircraft engines for others; airport services featuring transit lounge facilities for passengers

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013

CLASS 41: Providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight and airport lounge entertainment services, namely, providing movies, audio and audio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, audio books, tablets, video and online games, and children's programming; travel services, namely, providing headphones on aircraft for use for entertainment purposes

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013

CLASS 43: Providing conference rooms; Food and drink catering; Café services; Restaurant services; Bar services; providing conference room facilities; providing lounge facilities for providing food and drink; Providing hotel reservation and coordination services for others; hotel services; restaurant services, namely, providing of food and drink in airports and on aircraft

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013

CLASS 45: Facilitating expedited passenger screening, namely, providing priority access to airline passenger and baggage security screening

FIRST USE 1-21-2013; IN COMMERCE 1-21-2013

The mark consists of a stylized eagle in black and white separated by a white and gray eagle head.

OWNER OF U.S. REG. NO. 4449061

SER. NO. 87-601,655, FILED 09-08-2017

App'x 1108

AA-SKP-00054769

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 87601655**
**Filing Date: 09/08/2017**

## To the Commissioner for Trademarks:

**MARK:** (Stylized and/or Design, see mark)
The applicant is not claiming color as a feature of the mark. The mark consists of a stylized eagle in black and white separated by a white and gray eagle head.
The applicant, American Airlines, Inc., a corporation of Delaware, having an address of

> 4333 Amon Carter Boulevard
> Fort Worth, Texas 76155
> United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

International Class 025:  Clothing, namely, shirts, jackets, fleece tops, t-shirts, sweatshirts, pants, shorts, skirts, sweat pants, pajamas, socks, and coats; headwear

In International Class 025, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as _____, and first used in commerce at least as early as _____, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) display of mark in connection with sales of goods.

**Original PDF file:**
SPE0-3898152171-20170908130742137682 . 12901-    AMERICAN  AIRLINES - specimen_cl_25 - cap.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

International Class 028:  Toys, namely model airplanes; scale model vehicles; plush toys; toy building blocks for model airplane sets; dolls, and dolls' clothes; playing cards

In International Class 028, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as _____, and first used in commerce at least as early as _____, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) display of mark in connection with sales of goods.

**Original PDF file:**
SPE0-3898152171-20170908130742137682 . 12901-    AMERICAN  AIRLINES - specimen_cl_28 - toy_airplanes.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2
**Original PDF file:**
SPE0-3898152171-20170908130742137682 . 12901-    AMERICAN  AIRLINES - specimen_cl_28 - playing_cards.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

International Class 035:  Promoting goods and services by means of loyalty program, discount program, promotional program and an incentive awards program whereby points are earned or awarded for purchases made by members which can then be redeemed for merchandise, services and travel; promoting goods and services by means of providing an on-line shopping mall with links to the retail web sites of others in the field of books, computers, software, office supplies, consumer electronics, music, sporting and recreational equipment, gifts, gift cards, travel items, apparel, jewelry, health and beauty, toys, travel, home and garden-related items, and general retail merchandise; a loyalty program, a

App'x 1109

AA-SKP-00054833

discount program, a promotional program and an incentive awards program whereby points are earned for purchases made via credit cards which can be redeemed for merchandise, services and travel; managing and tracking the transfer and redemption of points that are earned or awarded for purchases made by members; provision of clerical and secretarial services; providing facilities, office machines and equipment for conducting business, meetings, and conferences; providing professional support staff to assist in the conducting of office business, meetings and conferences; promotion of travel insurance services of others

In International Class 035, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 01/21/2013, and first used in commerce at least as early as 01/21/2013, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) website demonstrating use of the mark in connection with the services.

**Original PDF file:**
SPE0-3898152171-20170908130742137682_._12901-6655_b_w_Flight_Symbol_Logo_-_specimen_cl_35.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3

   International Class 036:  Banking; real estate affairs; aircraft financing; credit union services; financial services for credit union members, namely financial transactions in the nature of bank transactions, credit card transactions, debit transactions and credit transactions, consumer and mortgage lending, securities brokerage, mortgage and loan insurance services, and brokerage services, namely, real estate brokerage and real estate lending services; issuance of credit cards through a licensee

In International Class 036, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as _____, and first used in commerce at least as early as _____, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) website demonstrating use of the mark in connection with services.

**Original PDF file:**
SPE0-3898152171-20170908130742137682_._01-6655_b_w_Flight_Symbol_Logo_-_specimen_cl_36_credit_union.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

   International Class 038:  Providing internet access

In International Class 038, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as _____, and first used in commerce at least as early as _____, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) website demonstrating use of the mark in connection with the services.

**Original PDF file:**
SPE0-3898152171-20170908130742137682_._12901-6655_b_w_Flight_Symbol_Logo_-_specimen_cl_38_wi-fi.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3

   International Class 039:  Air transport of passengers, cargo, and freight; providing travel agency services, namely, providing travel reservation services for others, air transportation reservation services for others, vehicle reservation services for others, cruise reservation services for others and vacation reservation services; providing information in the field of travel; ground support services in the field of air transportation, namely, marking, sorting, loading, unloading, transfer, and transit of cargo and passengers' luggage; providing information concerning cargo and passengers' luggage in transit and delivery; air travel passenger ticketing and check-in services; airport ramp services; transporting aircraft at airport; providing aircraft parking and storage; aircraft towing; transportation services, namely, checking of baggage; airport services featuring transit lounge facilities for passengers; booking and providing ancillary travel services, namely, seat selection, checked baggage, carry-on baggage, priority security screening, priority boarding, food and beverage, in-flight headphones, upgrades, in-flight entertainment, airport lounge access; air passenger wheel-chair services at airport; leasing of aircraft; leasing of components of aircraft; leasing of aircraft engines; transporting of aircraft engines for others

In International Class 039, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 01/21/2013, and first used in commerce at least as early as 01/21/2013, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed

App'x 1110

AA-SKP-00054834

goods/services, consisting of a(n) website demonstrating use of the mark in connection with the services.

**Original PDF file:**
SPE0-3898152171-2017090813074 2137682 _. 6655_b_w_Flight_Symbol_Logo_-_specimen_cl_39_booking_flights.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

International Class 041:  Providing online electronic publications, namely, online magazines and online newsletters in the field of general interest; publication of magazines; providing in-flight and airport lounge entertainment services, namely, providing movies, audio and audio programs, music, documentaries, music videos, news and information in the field of sports, live and recorded television programs, e-books, audio books, tablets, video and online games, and children's programming

In International Class 041, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as _____, and first used in commerce at least as early as _____, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) website demonstrating use of the mark in connection with services.

**Original PDF file:**
SPE0-3898152171-2017090813074 2137682 _. w_Flight_Symbol_Logo_-_specimen_cl_41_inflight_entertainment.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

International Class 043:  Providing conference rooms; Food and drink catering; Café services; Restaurant services; Bar services; providing conference room facilities; providing lounge facilities; Providing hotel reservation and coordination services for others; hotel services

In International Class 043, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 01/21/2013, and first used in commerce at least as early as 01/21/2013, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) website demonstrating use of the mark in connection with the services.

**Original PDF file:**
SPE0-3898152171-2017090813074 2137682 _. 1-6655_b_w_Flight_Symbol_Logo_-_specimen_cl_43_club_services.pdf
**Converted PDF file(s)** (2 pages)
Specimen File1
Specimen File2

**Claim of Active Prior Registration(s)**
The applicant claims ownership of active prior U.S. Registration Number(s) 4449061.

The applicant's current Attorney Information:
   Andrew J. Avsec and Jerome Gilson, Jeffery A. Handelman, David S. Fleming, Howard S. Michael, Jeffrey J. Catalano, Jennifer J. Theis, Joshua Frick, Susan H. Frohling, Virginia Wolk Marino, Evi Katsantonis and Emily T. Kappers of BRINKS GILSON & LIONE      P.O. Box 10395
   Chicago, Illinois 60610
   United States
   312-321-4200 x3260(phone)
   (312) 321-4299(fax)
   officeactions@brinksgilson.com (authorized)
The attorney docket/reference number is 12901/6655.

The applicant's current Correspondence Information:
   Andrew J. Avsec
   BRINKS GILSON & LIONE
   P.O. Box 10395
   Chicago, Illinois 60610
   312-321-4200 x3260(phone)

App'x 1111

AA-SKP-00054835

(312) 321-4299(fax)

officeactions@brinksgilson.com;aavsec@brinksgilson.com; rrios@brinksgilson.com (authorized)

**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant, the applicant's attorney, or the applicant's domestic representative at the e-mail address provided in this application. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in the loss of TEAS Reduced Fee status and a requirement to submit an additional processing fee of $125 per international class of goods/services.

A fee payment in the amount of $2200 has been submitted with the application, representing payment for 8 class(es).

<div align="center">

**Declaration**

</div>

☐ **Basis:**

   **If the applicant is filing the application based on use in commerce under 15 U.S.C. § 1051(a):**

   - The signatory believes that the applicant is the owner of the trademark/service mark sought to be registered;
   - The mark is in use in commerce on or in connection with the goods/services in the application;
   - The specimen(s) shows the mark as used on or in connection with the goods/services in the application; and
   - To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

   **And/Or**
   **If the applicant is filing the application based on an intent to use the mark in commerce under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e):**

   - The signatory believes that the applicant is entitled to use the mark in commerce;
   - The applicant has a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application; and
   - To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

☐ To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

☐ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☐ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: Not Provided    Date: Not Provided
Signatory's Name: Not Provided
Signatory's Position: Not Provided
Payment Sale Number: 87601655
Payment Accounting Date: 09/11/2017

Serial Number: 87601655
Internet Transmission Date: Fri Sep 08 16:58:37 EDT 2017
TEAS Stamp: USPTO/BAS-XX.XX.XXX.XXX-2017090816583768
5428-87601655-51088ec2d667c5e1bd3a342b33
88d711b17e18753235e1a7edc2fe77fd6b3fa9cf
5-DA-3902-20170908164845369137

AA-SKP-00054836



App'x 1113

AA-SKP-00054837



Home    Contact Us    FAQ    About Us    Return Policy    Privacy Policy    Shipping Info          👤 Sign In or Register

C.R. SMITH MUSEUM SHOP          Search 🔍          🛒 CART 0


MODELS    TOYS & GAMES    For the Home    GIFTS    APPAREL    WORKPLACE ACCESSORIES    Accessories    Books & DVD

Home / APPAREL / Adult Headwear / Gray/Black Cap




## Gray/Black Cap

### $26.00

*14 in Stock*

| 1 ⌄ |    ADD TO CART

DESCRIPTION    REVIEWS

022629

100% Cotton heavy brushed twill cap is soft-structured with a mid profile. Pre-curved visor and Velcro closure.

SHARE:

   

    All Museum Shop proceeds directly support C. R. Smith Museum programs. The Museum is a 501 3(c) non-profit organization funded by the generous gifts of corporate partners, American Airlines Group employees and retirees, and museum friends.

Home    Contact Us    FAQ    About Us    Returns    Privacy    Shipping Schedule

4601 Highway 360 @ FAA Road
Fort Worth TX 76155

Phone: 817.967.5922

Hours of Operation: Tue - Sat, 9am - 5pm CST




Authorize.Net

VISA  MasterCard  [card]  DISCOVER

App'x 1114

AA-SKP-00054838

© 2017 CR SMITH MUSEUM SHOP   Integrated eCommerce for MS RMS SO by NitroSell

App'x 1115

Home    Contact Us    FAQ    About Us    Return Policy    Privacy Policy    Shipping Info          👤 Sign In or Register



C.R. SMITH MUSEUM SHOP          Search 🔍          🛒 CART 0

MODELS    TOYS & GAMES    For the Home    GIFTS    APPAREL    WORKPLACE ACCESSORIES    Accessories    Books & DVD

Home / TOYS & GAMES / AA Logo Toys

▦ ▤    16 ⌄                                    Description (ascending ⌄)

8 products in this category, displaying products 1 to 8.



**AA AIRPORT PLAY SET**

$17.99

🛒 ADD TO CART



**AA DIECAST 777**

$8.95

🛒 ADD TO CART



**AA DIECAST A350**

$9.49

🛒 ADD TO CART

**AA INTERLOCKING BLOCK PLANE**

$10.99

🛒 ADD TO CART



**AA PULLBACK-LIGHTS & SOUNDS**

$10.99

🛒 ADD TO CART



**BLONDE AA F/A DOLL BACK PACK**

$16.99

🛒 ADD TO CART



**BRUNETTE AA F/A DOLL BACK PACK**

$16.99

🛒 ADD TO CART



**FLYING TOY-AA PLANE**

$19.99

🛒 ADD TO CART



All Museum Shop proceeds directly support C. R. Smith Museum programs. The Museum is a 501 3(c) non-profit organization funded by the generous gifts of corporate partners, American Airlines Group employees and retirees, and museum friends.

App'x 1116

AA-SKP-00054840

Home    Contact Us    FAQ    About Us    Returns    Privacy    Shipping Schedule

4601 Highway 360 @ FAA Road
Fort Worth TX 76155

Phone: 817.967.5932

Hours of Operation: Tue - Sat, 9am - 5pm CST





© 2017 CR SMITH MUSEUM SHOP - NitroSell Shopping Cart for Microsoft RMS SO

AA-SKP-00054841

Home    Contact Us    FAQ    About Us    Return Policy    Privacy Policy    Shipping Info          👤 Sign In or Register

## C.R. SMITH MUSEUM SHOP

Search 🔍          🛒 CART 0

MODELS    TOYS & GAMES    For the Home    GIFTS    APPAREL    WORKPLACE ACCESSORIES    Accessories    Books & DVD

Home / TOYS & GAMES / Puzzles & Cards / Playing Cards



## Playing Cards

### $5.99

262 In Stock

1 ▾     ADD TO CART

DESCRIPTION    REVIEWS

045107
Full deck of playing cards, printed in the USA on the finest authentic playing card stock.

SHARE:

📘 🐦 G+ 📌 ✉️

ℹ️ All Museum Shop proceeds directly support C. R. Smith Museum programs. The Museum is a 501 3(c) non-profit organization funded by the generous gifts of corporate partners, American Airlines Group employees and retirees, and museum friends.

Home    Contact Us    FAQ    About Us    Returns    Privacy    Shipping Schedule

4601 Highway 360 @ FAA Road
Fort Worth TX 76155

Phone: 817.967.5922

Hours of Operation: Tue - Sat, 9am - 5pm CST





VISA  💳  💳  💳

© 2017 CR SMITH MUSEUM SHOP · NitroSell Shopping Cart for MS RMS SO

AA-SKP-00054843



American Airlines

Home    Log in >    English ▾    Search aa.com

Plan Travel    Travel Information    AAdvantage

⌂ Home  ›  AAdvantage program

# AAdvantage program



## Need more miles?

Buy or gift miles

| ⌂ AAdvantage | ✈ Earn miles | ✈ Redeem miles | Elite status | 🔒 Log in / Join |

## In the best loyalty program

### The possibilities are endless

As a member of the AAdvantage® program, you'll earn miles when you fly on American, **one**world® and other participating airlines, as well as over 1,000 partners. Then, you can use your miles for:



» Flights to nearly 1,000 destinations worldwide
» Upgrades
» Vacations, car rentals and hotels
» Other retail products

Not a member? Join now »

## Earn miles

We make it easy to earn miles when you fly or when you engage with any of our partners.

### Fly to earn miles

Earn miles when you fly with American, **one**world and other participating airlines.

Earn miles when you fly »

Explore bonus offers »

### Earn miles with partners

There are over 1,000 ways to earn miles with our partners – from car rentals and hotel stays, to dining out and using credit cards.

More ways to earn miles »

### Buy, share or gift miles

Don't wait any longer for that trip you've been longing to take. Buy the miles you need and be on your way.

Buy, share or gift miles »

App'x 1120

AA-SKP-00054844

Request missing flight miles »

Explore partner offers »

Request missing partner miles »

## Use your miles

### Flight awards

With AAnytime® Awards there are no blackout dates and if a seat is available, you can book it with miles. And if your travel plans are flexible, MileSAAver awards are available for fewer miles.

See our award chart »

Book award travel »

### Upgrades

Use your miles to upgrade to First or Business Class on American and select partner airlines. You can use your miles for yourself or for anyone else!

More about upgrades »

### Hotels, cars and more

Redeem your miles for hotel stays, rental cars, vacation packages and other retail products.

Car/hotel awards 🔗

Vacation packages 🔗

Admirals Club »

Feedback 🔗

## Get the most out of your AAdvantage® account with the Citi® / AAdvantage® Platinum Select card

Earn 30,000 bonus miles after qualifying purchases. Plus, a free checked bag on domestic itineraries.

Learn more 🔗

Already a cardholder? Learn more about your card's benefits »



## Discover the perks of elite status

### The more you travel the more you earn – upgrades, bonus miles, airport privileges and more

Qualify for Executive Platinum, Platinum Pro, Platinum or Gold status with a combination of Elite Qualifying Dollars (EQDs) and Elite Qualifying Miles (EQMs) or Elite Qualifying Segments (EQSs). When you fly with us or participating partner airlines, your travel will count toward elite status qualification.

Explore the benefits of elite status »

Qualify for elite status »



## The oneworld alliance: More destinations around the globe

oneworld offers convenient service on the world's leading airlines across nearly 1,000 destinations worldwide. And as an AAdvantage member, when you travel on oneworld airlines, your eligible activity will count toward AAdvantage elite status qualification. Plus, enjoy:

» Smooth transfers between partner airlines

» Earning and redeeming miles across the oneworld alliance

» Recognition of AAdvantage elite status across all member airlines

Learn more about the benefits of the oneworld® alliance »

App'x 1121

AA-SKP-00054845

You may also like...

Upcoming changes to the AAdvantage program »

Updated AAdvantage program terms and conditions »

FAQs 🗗

Admirals Club »

⊕ Back to top

| Help | About American | Extras | |
|---|---|---|---|
| Contact American | About us | Business programs | |
| Receipts and refunds | Careers 🗗 | Gift cards 🗗 | Limited-time offer. Earn 75,000 bonus miles after qualifying purchases. |
| FAQs | Investor relations 🗗 | American Airlines credit card | |
| Agency reference | Newsroom 🗗 | Trip insurance | BuyMiles |
| Cargo 🗗 | Legal, privacy, copyright | CoBrowse | Need more miles? |
| Baggage and optional service fees | Browser compatibility | | AVIS Budget |
| Customer service and contingency plans | Web accessibility | | Up to 30% savings plus AAdvantage® miles |
| Conditions of carriage and tariffs | | | |

🗗 Link opens in new window. Site may not meet accessibility guidelines.

App'x 1122

AA-SKP-00054846







AA-SKP-00054847



⌂  Home  ›  During your flight  ›  Wi-Fi and connectivity

# Wi-Fi and connectivity



## Inflight Wi-Fi

Stay connected using any Wi-Fi enabled device, including smartphones (in airplane mode). To see if your flight has Wi-Fi, look for the symbol on your boarding pass or check before you go

Does your flight have Wi-Fi? »

### Domestic flights

Wi-Fi is available on nearly all flights within the U.S., including our new, 2-class regional jets. Daily and monthly passes are available or you can access aa.com without a pass.

| All-day pass | American Airlines Plan |
| --- | --- |
| » $16 plus tax | » $49.95 plus tax |
| » Expires 12 months from date of purchase | » Monthly subscription |
| AA All-Day Pass 🔗 | Monthly American Airlines Plan 🔗 |

### International and select domestic flights

Enjoy Wi-Fi service when traveling internationally or on select domestic routes on our 777-300ER, 787 Dreamliner and select 777-200 planes. Passes may only be purchased once you're onboard:

» 2 hour - $12
» 4 hour - $17
» Length of flight - $19

⊙ Wi-Fi customer assistance

## Onboard power

App'x 1124

AA-SKP-00054848

Most of our planes have AC power outlets; those with DC power are being converted. If you need, we have DC-to-AC adaptors available on select flights in First or Business. Simply ask your flight attendant for an adaptor.*

See what power is available on our planes.

Our planes »

## Phones and electronic devices

You can use your cell phone, laptop computer and other electronic devices onboard until advised by the flight crew, but cell phone calls aren't allowed during flight.

Please keep these things in mind during taxi, takeoff and landing:

» Put small devices in airplane mode and either hold or place the device under your seat
» Laptops and other large items cannot be held and should be turned off and put away

### Onboard satellite phones

Satellite phone service is available on select Airbus A330 aircraft in First and Business. Enjoy worldwide calls and pay onboard using most major credit cards.**

*AC adaptors are available for First and Business Class customers on 777-200 planes flying to/from Europe, South America or Asia, 757-300 planes flying to/from Europe or South America, and 767-200 and 767-300 planes on transcontinental flights between JFK and LAX or between JFK and San Francisco (SFO).

**Telenor Satellite Services, Inc. (Telenor) operates under a license issued by the Federal Communications Commission (FCC). Liability of Telenor and air carrier for failure of communications is limited to call charges only. Billing starts when the call is connected. Service may be unavailable or interrupted due to factors such as gaps in satellite coverage, weather conditions, system repair and capacity limitations. Complaints may be directed to: Federal Communications Commission, Enforcement Bureau, 445 12th Street SW, Washington, DC 20554.

## You may also like...

Mobile and app »
Inflight entertainment »
During your flight »

⊕ Back to top

| Help | About American | Extras | |
| --- | --- | --- | --- |
| Contact American | About us | Business programs | Limited-time offer: Earn 75,000 bonus miles after qualifying purchases |
| Receipts and refunds | Careers | Gift cards | |
| FAQs | Investor relations | American Airlines credit card | |
| Agency reference | Newsroom | Trip insurance | BuyMiles |
| Cargo | Legal, privacy, copyright | CoBrowse | Need more miles? |
| Baggage and optional service fees | Browser compatibility | | AVIS Budget |
| Customer service and contingency plans | Web accessibility | | Up to 35% savings plus AAdvantage® miles |
| Conditions of carriage and tariffs | | | |

App'x 1125

AA-SKP-00054849



Link opens in new window. Site may not meet accessibility guidelines.

AA-SKP-00054850



AA-SKP-00054851

Search

## Help

Contact American

Receipts and refunds

FAQs

Agency reference

Cargo

Baggage and optional service fees

Customer service and contingency plans

Conditions of carriage and tariffs

## About American

About us

Careers

Investor relations

Newsroom

Legal, privacy, copyright

Browser compatibility

Web accessibility

## Extras

Business programs

Gift cards

American Airlines credit card

Trip insurance

CoBrowse

Limited-time offer. Earn 75,000 bonus miles
after qualifying purchases

BuyMiles

Need more miles?

AVIS Budget

Up to 35% savings
plus AAdvantage® miles

Link opens in new window. Site may not meet accessibility guidelines.

AA-SKP-00054852



American Airlines

Home   Log in >   English ▼   Search aa.com

Plan Travel        Travel Information        AAdvantage

🏠 Home  >  During your flight  >  Inflight entertainment

# Inflight entertainment



## Watch for free from your seat

Yes, all inflight entertainment is free. Enjoy more with us – we have the largest library of any U.S. carrier including movies, TV shows, music and games.

Available entertainment varies with route and plane type.

See what's playing on your flight ✈

Our planes »

### Wireless streaming

Download the latest version of the American Airlines app to enjoy free wireless streaming from your own phone, tablet or laptop on select U.S. domestic flights.

American Airlines app »

### Seatback screens

Enjoy our full library of entertainment plus live TV channels like CNN International, CNBC, BBC World News and Sport 24 on select aircraft.

### Overhead screens

Catch some of today's best movies, full episodes of hit NBCUniversal shows and clips of other popular segments during your flight.

### Tablets

Use the Samsung Galaxy Tab⁴, loaded with new movie releases, hit TV programs, games, music and best-selling book excerpts in First and Business on select flights.

## You may also like...

During your flight »

Wi-Fi and connectivity »

Flight status »

⊕ Back to top

App'x 1129

AA-SKP-00054853

| Help | About American | Extras | |
|---|---|---|---|
| Contact American | About us | Business programs | |
| Receipts and refunds | Careers | Gift cards | |
| FAQs | Investor relations | American Airlines credit card | |
| Agency reference | Newsroom | Trip insurance | |
| Cargo | Legal, privacy, copyright | CoBrowse | |
| Baggage and optional service fees | Browser compatibility | | |
| Customer service and contingency plans | Web accessibility | | |
| Conditions of carriage and tariffs | | | |

Limited-time offer: Earn 75,000 bonus miles after qualifying purchases

BuyMiles
Need more miles?

AVIS Budget
Up to 35% savings
plus AAdvantage® miles

Link opens in new window. Site may not meet accessibility guidelines.

AA-SKP-00054854

 American Airlines

Home   Log in ›   English ▾   Search aa.com 🔍

Plan Travel     Travel Information     AAdvantage     

🏠 Home   ›   At the airport   ›   Admirals Club

# Admirals Club

| 🍴 Amenities | 🎫 Membership | 📍 Locations | 🔒 Access |

## Inside the club

Complimentary amenities and services are available to make your travel more productive and relaxing.

Snacks


House drinks*


Made-to-order specialties**


Personal travel assistance


Shower suites**


Business center**


## Food and drink

Morning


Afternoon


New additions


» Hard-boiled eggs & spice bar

» Hearty soups

» Freshly-brewed La Colombe coffee

App'x 1131

AA-SKP-00054855

- Oatmeal, cereal & spices
- Assorted fruit & yogurt
- Bagels & breakfast breads
- Fresh & healthy grain salads
- Vegetables, hummus & cheese
- Cookies & brownies
- Barista-style espresso & lattes**

## Full meals & premium drinks

Hungry for more? Some clubs have bigger meals for sale; premium cocktails are available in all.

---

## Limited-time offer: Earn 75,000 bonus miles

After qualifying purchases. Plus, enjoy an Admirals Club® membership, including complimentary access for authorized users, a Global Entry or TSA PreCheck application fee credit, and many other travel benefits with the Citi® / AAdvantage® Executive World Elite™ Mastercard®

Learn more &

Already a cardholder? Learn about your benefits »



*Where permitted

**At select locations

---

## You may also like...

Admirals Club® conference rooms »

Admirals Club® terms and conditions »

⊕ Back to top

### Help

Contact American
Receipts and refunds
FAQs
Agency reference
Cargo &
Baggage and optional service fees
Customer service and contingency plans
Conditions of carriage and tariffs

### About American

About us
Careers &
Investor relations &
Newsroom &
Legal, privacy, copyright
Browser compatibility
Web accessibility

### Extras

Business programs
Gift cards &
American Airlines credit card
Trip insurance
CoBrowse

Limited-time offer: Earn 75,000 bonus miles after qualifying purchases

BuyMiles
Need more miles?

AVIS  Budget
Up to 35% savings
plus AAdvantage® miles

& Link opens in new window. Site may not meet accessibility guidelines.

AA-SKP-00054856

# Exhibit A-31

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn A. Temple*

Acting United States Register of Copyrights and Director

**Registration Number**

## VA 2-130-520

**Effective Date of Registration:**
June 03, 2016

---

## Title

**Title of Work:** American Airlines Flight Symbol

## Completion/Publication

**Year of Completion:** 2012
**Date of 1st Publication:** January 17, 2013
**Nation of 1st Publication:** United States

## Author

- **Author:** Hypermedia Solutions, LLC d/b/a FutureBrand
  **Author Created:** 2-D artwork
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** American Airlines, Inc.
4333 Amon Carter Boulevard, Fort Worth, TX, 76155, United States
**Transfer statement:** By written agreement

## Rights and Permissions

**Organization Name:** IP Administrator
**Email:** ip.administrator@aa.com
**Address:** MD 5675
4333 Amon Carter Boulevard
Fort Worth, TX 76155 United States

## Certification

**Name:** Andrew J. Avsec

Page 1 of 2

App'x 1134

AA-SKP-00058803

**Date:** June 03, 2016
**Applicant's Tracking Number:** 13945/71

**Correspondence:** Yes



AA-SKP-00058804

Type of Work:        Visual Material

Registration Number / Date:
                     VA0002130520 / 2016-06-03

Application Title: American Airlines Flight Symbol.

Title:               American Airlines Flight Symbol.

Description:         Electronic file (eService)

Copyright Claimant:
                     American Airlines, Inc., Transfer: By written agreement.

Date of Creation:  2012

Date of Publication:
                     2013-01-17

Nation of First Publication:
                     United States

Authorship on Application:
                     Hypermedia Solutions, LLC d/b/a FutureBrand, employer for
                     hire; Domicile: United States. Authorship: 2-D artwork.

Rights and Permissions:
                     IP Administrator, MD 5675, 4333 Amon Carter Boulevard, Fort
                     Worth, TX, 76155, United States, ip.administrator@aa.com

Copyright Note:    C.O. correspondence.

Names:               Hypermedia Solutions, LLC d/b/a FutureBrand
                     American Airlines, Inc.

******************************************************************************

App'x 1136

AA-SKP-00058805

# Exhibit A-32

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### FORM 10-K

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2023**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period From**                **to**

Commission file number 1-8400

## American Airlines Group Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **75-1825172** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **1 Skyview Drive,  Fort Worth,  Texas  76155** | **(682) 278-9000** |
| *(Address of principal executive offices, including zip code)* | *Registrant's telephone number, including area code* |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value per share | AAL | The Nasdaq Global Select Market |
| Preferred Stock Purchase Rights | — | [1] |

[1] Attached to the Common Stock

**Securities registered pursuant to Section 12(g) of the Act: None**

Commission file number 1-2691

## American Airlines, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-1502798** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **1 Skyview Drive,  Fort Worth,    Texas  76155** | **(682) 278-9000** |
| *(Address of principal executive offices, including zip code)* | *Registrant's telephone number, including area code* |

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act: None**

App'x 1138

AA-SKP-00058499

PART I

## ITEM 1. BUSINESS

### Overview

American Airlines Group Inc. (AAG), a Delaware corporation, is a holding company and its principal, wholly-owned subsidiaries are American Airlines, Inc. (American), Envoy Aviation Group Inc., PSA Airlines, Inc. (PSA) and Piedmont Airlines, Inc. (Piedmont). AAG was formed in 1982, under the name AMR Corporation (AMR), as the parent company of American, which was founded in 1934.

AAG's and American's principal executive offices are located at 1 Skyview Drive, Fort Worth, Texas 76155 and their telephone number is 682-278-9000.

### Airline Operations

Together with our wholly-owned regional airline subsidiaries and third-party regional carriers operating as American Eagle, our primary business activity is the operation of a major network air carrier, providing scheduled air transportation for passengers and cargo through our hubs in Charlotte, Chicago, Dallas/Fort Worth, Los Angeles, Miami, New York, Philadelphia, Phoenix and Washington, D.C. and partner gateways, including in London, Doha, Madrid, Seattle/Tacoma, Sydney and Tokyo (among others). In 2023, approximately 211 million passengers boarded our flights. During 2023, we launched more than 50 new routes, providing service to close to 350 destinations around the world, and we announced several new destinations for customers to explore in 2024: Copenhagen, Denmark; Naples, Italy; Nice, France; Governor's Harbour, Bahamas; Tijuana, Mexico; Tulum, Mexico; Ocho Rios, Jamaica; Pasco, Washington and Hyannis, Massachusetts. In 2024, we announced new service to Brisbane, Australia and Veracruz, Mexico, as well as additional nonstop service between New York and Tokyo, Japan.

As of December 31, 2023, we operated 965 mainline aircraft supported by our regional airline subsidiaries and third-party regional carriers, which together operated an additional 556 regional aircraft. See Part I, Item 2. Properties for further discussion of our mainline and regional aircraft and *"Regional"* below for further discussion of our regional operations.

American is a founding member of the **one**world® Alliance, which brings together a global network of 13 world-class member airlines and their affiliates, working together to provide a superior and seamless travel experience. See *"Distribution and Marketing Agreements"* below for further discussion on the **one**world Alliance and other agreements with domestic and international airlines.

See Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – *"2023 Financial Overview," "AAG's Results of Operations"* and *"American's Results of Operations"* for further discussion of AAG's and American's operating results and operating performance. Also, see Note 1(m) to each of AAG's and American's Consolidated Financial Statements in Part II, Items 8A and 8B, respectively, for passenger revenue by geographic region and Note 13 to AAG's Consolidated Financial Statements in Part II, Item 8A and Note 12 to American's Consolidated Financial Statements in Part II, Item 8B for information regarding operating segments.

### *Regional*

Our regional carriers provide scheduled air transportation under the brand name "American Eagle." The American Eagle carriers include our wholly-owned regional carriers Envoy Air Inc. (Envoy), PSA and Piedmont, as well as third-party regional carriers including Republic Airways Inc. (Republic), SkyWest Airlines, Inc. (SkyWest) and Air Wisconsin Airlines LLC (Air Wisconsin). Our regional carriers are an integral component of our operating network. We rely heavily on regional carriers to serve small markets and also to drive connecting traffic to our hubs from markets that are not economical for us to serve with larger, mainline aircraft. In addition, regional carriers offer complementary service in many of our mainline markets. All American Eagle carriers use logos, service marks, aircraft paint schemes and uniforms similar to those of our mainline operations. In 2023, 46 million passengers boarded our regional flights, approximately 45% of whom connected to or from our mainline flights.

8

App'x 1139

AA-SKP-00058506

**AMERICAN AIRLINES GROUP INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except share and per share amounts)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| **Operating revenues:** | | | |
| Passenger | $ 48,512 | $ 44,568 | $ 26,063 |
| Cargo | 812 | 1,233 | 1,314 |
| Other | 3,464 | 3,170 | 2,505 |
| Total operating revenues | 52,788 | 48,971 | 29,882 |
| **Operating expenses:** | | | |
| Aircraft fuel and related taxes | 12,257 | 13,791 | 6,792 |
| Salaries, wages and benefits | 14,580 | 12,972 | 11,817 |
| Regional expenses | 4,643 | 4,385 | 3,204 |
| Maintenance, materials and repairs | 3,265 | 2,684 | 1,979 |
| Other rent and landing fees | 2,928 | 2,730 | 2,619 |
| Aircraft rent | 1,369 | 1,395 | 1,425 |
| Selling expenses | 1,799 | 1,815 | 1,098 |
| Depreciation and amortization | 1,936 | 1,977 | 2,019 |
| Special items, net | 971 | 193 | (4,006) |
| Other | 6,006 | 5,422 | 3,994 |
| Total operating expenses | 49,754 | 47,364 | 30,941 |
| **Operating income (loss)** | 3,034 | 1,607 | (1,059) |
| **Nonoperating income (expense):** | | | |
| Interest income | 591 | 216 | 18 |
| Interest expense, net | (2,145) | (1,962) | (1,800) |
| Other income (expense), net | (359) | 325 | 293 |
| Total nonoperating expense, net | (1,913) | (1,421) | (1,489) |
| **Income (loss) before income taxes** | 1,121 | 186 | (2,548) |
| Income tax provision (benefit) | 299 | 59 | (555) |
| **Net income (loss)** | $ 822 | $ 127 | $ (1,993) |
| | | | |
| **Earnings (loss) per common share:** | | | |
| Basic | $ 1.26 | $ 0.20 | $ (3.09) |
| Diluted | $ 1.21 | $ 0.19 | $ (3.09) |
| **Weighted average shares outstanding (in thousands):** | | | |
| Basic | 653,612 | 650,345 | 644,015 |
| Diluted | 719,669 | 655,122 | 644,015 |

See accompanying notes to consolidated financial statements.

App'x 1140

AA-SKP-00058580

# Exhibit A-33

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-34

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-35

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-36

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-37

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-38

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-39

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-40

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-41

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-42

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal