IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

## APPENDIX TO PLAINTIFF AMERICAN AIRLINES, INC.'S MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF GARY L. GUTZLER, MOTION TO STRIKE LATE-PRODUCED EVIDENCE RELIED UPON BY GUTZLER, AND BRIEF IN SUPPORT

In support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of Gary L. Gutzler, Motion to Strike Late-Produced Evidence Relied Upon by Gutzler, and Brief in Support, American submits the following materials:

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A | Declaration of Julia G. Wisenberg | App'x 001–03 |
| A-1 | Expert Report of Gary L. Gutzler, served by Defendant Skiplagged, Inc. ("Skiplagged") on May 31, 2024 (Confidential) | App'x 004–22 |
| A-2 | Transcript of the deposition of Gary L. Gutzler, taken on July 12, 2024 | App'x 023–46 |
| A-3 | Rebuttal Expert Report of Gary L. Gutzler, served by Skiplagged on July 31, 2024 (Confidential) | App'x 047–82 |
| A-4 | Expert Report of David N. Fuller, CFA, ASA, CFE, served by American on May 31, 2024 (Confidential) | App'x 083–112 |
| A-5 | Supplemental Expert Report of David N. Fuller, CFA, ASA, CFE, served by American on August 2, 2024 (Confidential) | App'x 113–34 |

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A-6 | Supplemental Rebuttal Expert Report of Gary L. Gutzler, served by Skiplagged on August 22, 2024 (Confidential) | App'x 135–70 |
| A-7 | Transcript of the deposition of Aktarer Zaman as the Rule 30(b)(6) Corporate Representative of Skiplagged, taken on June 12, 2024 (Confidential) | App'x 171–263 |
| A-8 | Transcript of the deposition of Aktarer Zaman, taken on May 29, 2024 (Confidential) | App'x 264–318 |
| A-9 | Document produced by Skiplagged (SKP00111228–31) | App'x 319–23 |

Dated: August 23, 2024                    Respectfully submitted,

                                          */s/ Dee J. Kelly, Jr.*
                                          Dee J. Kelly, Jr.
                                          State Bar No. 11217250
                                          dee.kelly@kellyhart.com
                                          Julia G. Wisenberg
                                          State Bar No. 24099146
                                          julia.wisenberg@kellyhart.com
                                          KELLY HART & HALLMAN LLP
                                          201 Main Street, Suite 2500
                                          Fort Worth, Texas 76102
                                          (817) 332-2500

                                          R. Paul Yetter
                                          State Bar No. 22154200
                                          pyetter@yettercoleman.com
                                          YETTER COLEMAN LLP
                                          811 Main Street, Suite 4100
                                          Houston, Texas 77002
                                          (713) 632-8003

                                          Cameron M. Nelson
                                          nelsonc@gtlaw.com
                                          GREENBERG TRAURIG LLP
                                          77 West Wacker Drive, Suite 3100
                                          Chicago, Illinois 60601
                                          Telephone: (312) 456-6590

Nathan J. Muyskens
nathan.muyskens@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: (202) 331-3100

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on August 23, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Dee J. Kelly, Jr.*
Dee J. Kelly, Jr.

3

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

## DECLARATION OF JULIA G. WISENBERG

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

1. My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

2. I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of Gary L. Gutzler, Motion to Strike Late-Produced Evidence Relied Upon by Gutzler, and Brief in Support.

3. Attached as Exhibit A-1 is a true and correct copy of the Expert Report of Gary L. Gutzler, served by Defendant Skiplagged, Inc. ("Skiplagged") on May 31, 2024.

4. Attached as Exhibit A-2 is a true and correct copy of the transcript of the deposition of Gary L. Gutzler, taken on July 12, 2024.

1

5.       Attached as Exhibit A-3 is a true and correct copy of the Rebuttal Expert Report of Gary L. Gutzler, served by Skiplagged on July 31, 2024.

6.       Attached as Exhibit A-4 is a true and correct copy of the David N. Fuller, CFA, ASA, CFE, served by American on May 31, 2024.

7.       Attached as Exhibit A-5 is a true and correct copy of the Supplemental Expert Report of David N. Fuller, CFA, ASA, CFE, served by American on August 2, 2024.

8.       Attached as Exhibit A-6 is a true and correct copy of the Supplemental Rebuttal Expert Report of Gary L. Gutzler, served by Skiplagged on August 22, 2024.

9.       Attached as Exhibit A-7 is a true and correct copy of the transcript of the deposition of Aktarer Zaman as the Rule 30(b)(6) Corporate Representative of Defendant Skiplagged, Inc., taken on June 12, 2024.

10.       Attached as Exhibit A-8 is a true and correct copy of excerpts from the transcript of the deposition of Aktarer Zaman, taken on May 29, 2024.

11.       Attached as Exhibit A-9 is a true and correct copy of a document produced by Skiplagged, Bates-labeled SKP00111228–31.

12.       I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 23, 2024.

_____
Julia G. Wisenberg

# Exhibit A-1

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-2

```
 1                  IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF TEXAS

 2                         FORT WORTH DIVISION

 3     AMERICAN AIRLINES, INC.,          )

                                         )

 4          Plaintiff,                   )

                                         )

 5     v.                                )         CIVIL ACTION

                                         )    NO. 4:23-cv-00860-P

 6     SKIPLAGGED, INC.,                 )

                                         )

 7          Defendant.                   )

 8

 9

10

11                 -----------------------------------

12                  ORAL AND VIDEOTAPED DEPOSITION OF

13                         GARY L. GUTZLER

14                         JULY 12, 2024

15                 -----------------------------------

16

17

18          ORAL AND VIDEOTAPED DEPOSITION OF GARY L. GUTZLER,

19     produced as a witness at the instance of the PLAINTIFF, and

20     duly sworn, was taken in the above-styled and numbered cause on

21     July 12, 2024, from 10:00 a.m. to 12:30 p.m., before Amber

22     Garcia, Notary Public in and for the State of Texas, reported

23     by machine shorthand, at the law offices of Condon Tobin Sladek

24     Thornton Nerenberg, PLLC, 8080 Park Lane, Suite 700, Dallas,

25     Texas, pursuant to the Federal Rules of Civil Procedure.
```

Page 1

App'x 024

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. LARS L. BERG
Kelly Hart & Hallman LLP
201 Main Street
Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Lars.berg@kellyhart.com

FOR THE DEFENDANT:

Mr. Darin M. Klemchuk
Klemchuk PLLC
8150 North Central Expressway
10th Floor
Dallas, Texas 75206
Phone: (214) 367-6000
Darin.klemchuk@klemchuk.com

ALSO PRESENT:

Ms. Miranda Glover, Videographer
Mr. Jeremy Ballew, American Airlines General Counsel

Page 2

INDEX

PAGE

Appearances........................................   2

GARY L. GUTZLER
   Examination by Mr. Berg.......................   4

Reporter's Certificate.............................   76

EXHIBITS

NO.        DESCRIPTION                     PAGE

Exhibit 1     Expert Report of Gary L. Gutzler       6

Exhibit 2     January-December 2023 Profit and Loss   58
              Statement
Exhibit 3     12/31/2023 Balance Sheet              59

Page 3

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record for the videotaped deposition of Gary Gutzler in the matter of American Airlines, Inc. versus Skiplagged, Inc., filed in the United States District Court for the Northern District of Texas, Fort Worth Division.  Today is July 12th, 2024.  The time is 10:00 a.m.  This deposition is located at 8080 Park Lane, Suite 700 in Dallas, Texas.  My name is Miranda Glover, and the certified shorthand reporter is Amber Garcia, both representing Veritext Legal Solutions.

Will Counsel state their appearance?

MR. BERG:  Good morning.  Lars Berg for American Airlines, and I have with me Jeremy Ballew, in-house lawyer at American Airlines.

MR. KLEMCHUK:  Darin Klemchuk for the defendant.

GARY L. GUTZLER,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BERG:

Q.  Good morning, Mr. Gutzler.  Could you please state your full name and occupation?

A.  Gary Gutzler, G-A-R-Y, G-U-T-Z-L-E-R.  I'm a consultant.

Q.  And Mr. Gutzler, what kind of consultant are you?

A.  Financial and accounting-related matters.

Page 4

Q.  And when you say "consulting," who do you consult for, just generally?

A.  Various companies.

Q.  Okay.  And what types of consulting do you do for these various companies?

A.  Generally related to finance and accounting issues.  And for the most part, the word "generally" relates to disputes between various parties.

Q.  Okay.  I- -- so is it fair to say that some of your consulting work involves litigation?

A.  Yes.

Q.  And I -- I believe you've been deposed before?

A.  I have.

Q.  Okay.  And do you have any questions or concerns about the deposition process?

A.  I don't believe so.

Q.  Okay.  Did you have the opportunity prepare for your deposition today?

A.  I did.

Q.  And please tell me what you did.

A.  I read various documents, expert reports, deposition transcripts, met with Counsel.  I think that's about it.

Q.  Okay.  What expert reports did you review?

A.  I read my own.

Q.  Yes, sir.

Page 5

2 (Pages 2 - 5)

1  A. I read Mr. Fuller's. I think those are the two.
2  Q. Okay. And Mr. Fuller has done more than one report
3 in this case. Do you remember which one it -- you read?
4  A. I read both.
5  Q. Okay. And so when we say "both," just to be clear,
6 originally, a May 31st original report, and then a July 1st
7 rebuttal report?
8  A. There was a May 31st and a July 1st, yes.
9  Q. Okay. And when you said you reviewed documents, do
10 you have a recollection of the general categories of documents
11 that you reviewed in preparation for your deposition?
12  A. The documents that I considered in my report.
13  Q. Okay. What documents were those?
14  A. You can show me in my report. If not, I can --
15  Q. Absolutely. Happy to do that. Not complaining. I'm
16 going to hand you what has been marked as Deposition Exhibit
17 Number 1. I believe that's your May 31st report.
18      (Gutzler Exhibit 1 was marked.)
19      MR. BERG: There you are.
20  A. Okay.
21  Q. (BY MR. BERG) Yes, sir. And I believe you were
22 referring to Attachment B to your report; is that correct?
23  A. Attachment B lists the documents and information that
24 I considered in -- in forming my opinions in this report. Yes.
25  Q. Yes, sir. Okay. Other than the documents listed in

Page 6

1 Exhibit B, did you consider any other documents in preparing
2 your report?
3  A. No, these are the documents.
4  Q. And in preparation for your deposition today, did you
5 review any documents other than those listed in Exhibit B to
6 your report?
7  A. Probably.
8  Q. And what were those?
9  A. I don't remember them all.
10  Q. Do you remember any of them? And -- and sir, I'm
11 just asking for the ones that aren't listed already in your
12 report that you reviewed in preparation for your depo.
13  A. Probably some that were referenced by Mr. Fuller.
14  Q. Okay. And do you remember what those were?
15  A. One document is the Excel spreadsheet that he relies
16 on for his damages to American analysis, what he calls damages
17 to American analysis.
18  Q. Good save.
19      Anything else that you can recall other than
20 that?
21  A. There were probably more, I just -- I can't remember.
22  Q. Okay. And you said you read some deposition
23 transcripts. Which ones?
24  A. Mr. Fuller's.
25  Q. Yes, sir. Any others?

Page 7

1  A. I reviewed Mr. Lapp's. I -- I read Mr. Zaman's first
2 deposition and his 30(b)(6) deposition.
3  Q. Okay.
4  A. I think those are it.
5  Q. Yes, sir. And you said you spoke with Counsel in
6 preparation for your deposition, correct?
7  A. Yes.
8  Q. And who was that?
9  A. Mr. Klemchuk and Ms. Campbell.
10  Q. Okay. Anybody else present in those meetings?
11  A. No.
12  Q. Okay. And did you speak with Aktarer Zaman in
13 preparation for your deposition?
14  A. No.
15  Q. So you -- you said that you -- in preparation for
16 your deposition, you had reviewed some documents not in Exhibit
17 B, but because they're not in Exhibit B, is it fair to say that
18 the documents you reviewed in preparation for your deposition
19 are not documents that you relied on in preparing your report?
20  A. If they're not listed in Attachment B to my May 31st
21 report, Exhibit 1, then I did not rely on them for my first
22 report. Yes.
23  Q. Okay. Thank you.
24  A. My report.
25  Q. And I believe -- do you intend to offer any opinion s

Page 8

1 that are not in your written report?
2      MR. KLEMCHUK: Objection, form.
3  A. I believe that's possible.
4  Q. (BY MR. BERG) And what is that?
5  A. I'm not sure what you mean.
6  Q. Well, what opinion do you intend to potentially
7 offer?
8  A. Potentially, a -- a rebuttal opinion to Mr. Fuller.
9  Q. Okay. Other than a rebuttal opinion to Mr. Fuller,
10 do you intend to offer any opinions not contained in your
11 written report that's Exhibit 1?
12  A. Not that I know of right now.
13  Q. And as we sit here, do you know of anything that
14 could change that?
15  A. I'm not sure.
16  Q. So I understand from your report that you intend to
17 opine in this case about issues related to the determination of
18 damages; is that correct?
19  A. I think that's fair.
20  Q. Do you believe that you are qualified to opine on any
21 topic other than -- in -- in this case, other than an opinion
22 related to damages?
23  A. Not that I'm aware of right now.
24  Q. And I believe you -- ha-- you've testified in other
25 cases offering opinions about damages; is that correct?

Page 9

3 (Pages 6 - 9)

Page 10

```
 1    A.  That's correct.
 2    Q.  And other than opinions related to damages, have you
 3  ever testified or offered opinions in any other area?
 4    A.  I don't believe so.
 5    Q.  And has your testimony ever been excluded by a court?
 6    A.  It has not.
 7    Q.  Has it ever been limited by a court?
 8    A.  No.
 9    Q.  And I understand that you were hired by
10  Mr. Klemchuk's firm; is that correct?
11    A.  I believe our retention letter was with Condon Tobin.
12    Q.  Yes, sir.  And that's Mr. Klemchuk's firm.  Do you
13  understand that?
14         MR. KLEMCHUK:  No.
15    A.  I don't understand that.
16    Q.  (BY MR. BERG)  Okay.
17         MR. KLEMCHUK:  And you're wrong.  I -- I have my
18  own firm.
19         MR. BERG:  I apologize.
20         MR. KLEMCHUK:  Yeah, we're --
21         MR. BERG:  I am sorry.
22         MR. KLEMCHUK:  Yeah.
23         MR. BERG:  You know, he's right.  He is his own
24  firm.  We're all jealous.
25    Q.  (BY MR. BERG)  Yes.  So Condon Tobin?
```

Page 11

```
 1    A.  Yep.
 2    Q.  Have you ever worked for Condon Tobin before?
 3    A.  I have not.
 4    Q.  Have you ever worked for Mr. Klemchuk before?
 5    A.  No.
 6    Q.  Have you ever worked for Bill Kirkman before?
 7    A.  No.
 8    Q.  Do you know if you've ever worked for American
 9  Airlines before?
10    A.  Not as an expert.
11    Q.  How have you worked for American Airlines in the
12  past?
13    A.  My firm has been engaged by American Airlines, and
14  I've worked on matters for them.
15    Q.  And so your firm is AlixPartners?
16    A.  It is now.  I'm trying to think back when I've worked
17  on projects for American.  And it's not only AlixPartners, it's
18  with my predecessor firm also, my prior firm.
19    Q.  Which -- yes, sir.  Which firm was that?
20    A.  LECG.
21    Q.  And how long ago was that?
22    A.  Well, there's been multiple ones.  It's been probably
23  over 10 years.
24    Q.  So have you worked on anything for American Airlines
25  in the last 10 years?
```

Page 12

```
 1    A.  Subject to my recollection, I -- I don't think so,
 2  but I -- I -- I'm not sure when these engagements occurred.  I
 3  just don't know with much precision.  I know it's been a while.
 4    Q.  Yes, sir.  Thank you.
 5         Do you have any recollection of having ever
 6  worked for my firm, Kelly Hart & Hallman?
 7    A.  I don't believe so.
 8    Q.  And one of the other law firms involved in this
 9  litigation is Greenberg Traurig.  Have you ever worked for
10  Greenberg Traurig?
11    A.  Possibly, but I don't recall it.
12    Q.  So let's just say in the last 10 years, if that's a
13  fair number for your recollection, do you remember working for
14  them in the last 10 years?
15    A.  I don't.
16    Q.  I understand from looking at Exhibit B, some of the
17  documents that you reviewed are the balance sheets and the
18  profit and loss statements from Skiplagged, Inc.; is that
19  correct?
20    A.  That's correct.
21    Q.  And other than the balance sheets and the P&L
22  statements, did you review any other financial documents?
23    A.  Not for this report, I don't believe.
24    Q.  Okay.  Did you do anything to indepe- --
25  independently verify the information in the Skiplagged's
```

Page 13

```
 1  profits and loss statements?
 2    A.  I did not perform an audit of those, no.
 3    Q.  Yes, sir.  Thank you for that information.
 4         Setting aside the audit, did you do anything at
 5  all to verify the information in Skiplagged's balance sheets?
 6    A.  I did not.
 7    Q.  Did you do anything to independently verify the
 8  information in Skiplagged's profit and loss statements?
 9    A.  I did not.
10    Q.  Did you review Skiplagged's tax returns?
11    A.  No.
12    Q.  Why not?
13    A.  I wasn't aware they were produced in the matter.
14    Q.  Did you ask for them?
15    A.  I don't recall.
16    Q.  I believe you said in your report that you
17  interviewed Mr. Zaman; is that correct?
18    A.  We had two discussions, yes.
19    Q.  Okay.  And can you please tell me when those
20  discussions were, and about how long they lasted?
21    A.  The -- the first one was early in the case, my
22  involvement in the case, and it lasted 30 to 60 minutes.
23  Something like that.  And the second one was, maybe, a month
24  later, and it may have lasted the same amount of time.
25    Q.  And do you recall -- was -- were these in person or
```

4 (Pages 10 - 13)

App'x 027

1 remote communications?

2    A. They were remote.

3    Q. Was it a -- a Zoom?

4    A. It was.

5    Q. Do you recall who else was on the Zoom call with you

6 and Mr. Zaman?

7    A. Abigail Campbell for sure was. Aaron Tobin may have

8 been. That may have been it.

9    Q. Okay.

10    A. It's possible there was somebody else from Condon

11 Tobin, Nick Burns, but I -- I'm not positive.

12    Q. And other than those two discussions with Mr. Zaman,

13 did you have any discussions before preparing your report with

14 anybody else?

15    A. You mean at Skiplagged?

16    Q. Well, we can start there. Yes, sir. At Skiplagged.

17    A. No.

18    Q. Other than the lawyers that are involved in the case,

19 did you have any discussions with anybody besides Mr. Zaman and

20 the lawyers before preparing your report?

21    A. No.

22    Q. Why didn't you interview Skiplagged's accountant?

23    A. I didn't feel the need to do that.

24    Q. Why didn't you interview Skiplagged's auditor or

25 auditors?

Page 14

1    A. Same answer.

2    Q. Why didn't you interview Skiplagged's bookkeeper?

3    A. Same answer.

4    Q. And why didn't you interview Skiplagged's CFO?

5    A. Can you remind me who the CFO is?

6    Q. Dan Gellert?

7    A. To my understanding, he's the COO. Regardless, I had

8 the information I thought was sufficient.

9    Q. You may be right about that, and I'm not trying to

10 trick you. I could be just mistaken, so I apologize if that's

11 my mistake. But --

12    A. Okay.

13    Q. E- -- either way, you did not interview Skiplagged's

14 CFO, correct?

15       MR. KLEMCHUK: Objection, form.

16    A. Yeah. To the extent there is one, and it's different

17 than Mr. Zaman, I did not.

18    Q. (BY MR. BERG) Yes, sir.

19       Do you have an understanding of how the P&Ls

20 that you reviewed for Skiplagged were created?

21    A. At a high level.

22    Q. Okay. Please tell me what that --

23    A. The co- ---

24    Q. -- what that means, "at a high level"?

25    A. The company tracks revenues and costs, assets,

Page 15

1 liabilities, and the financial statements were produced through

2 QuickBooks, which is an accounting software program.

3    Q. Okay. And just so that we're clear, I believe you

4 reviewed the balance sheets from 2018 through 2023, and then

5 the profit and loss statements from 2018 through 2023, correct?

6    A. I believe that's correct.

7    Q. And did you review income statements from Skiplagged?

8    A. Yes.

9    Q. Okay. I don't believe those are listed in Exhibit B

10 to your report.

11    A. They are.

12    Q. Please identify those for me, sir.

13    A. I -- I -- I can cut to the chase.

14    Q. Yes, sir.

15    A. But an income statement, in my -- my view, is the

16 same thing as a profit and loss statement.

17    Q. Okay. How about cash flow statements; did you review

18 cash flow statements?

19    A. No.

20    Q. Why not?

21    A. I'm not sure they're prepared in the ordinary course

22 of business by Skiplagged.

23    Q. Did you review any bank statements?

24    A. No.

25    Q. Did you review the data in the QuickBooks that

Page 16

1 underlies the P&L and the balance sheet?

2    A. No.

3    Q. Did you review any other financial data from

4 Skiplagged other than the P&L and the balance sheets?

5    A. I don't recall, unless they were exhibits to

6 Mr. Gellert's deposition.

7    Q. And then do you know if Skiplagged, on a regular

8 basis, prepares the P&L statements and the balance sheets that

9 you reviewed?

10    A. Can you repeat that?

11    Q. Absolutely.

12       Just my understanding, corporations, entities,

13 oftentimes will prepare monthly, quarterly, semiannually,

14 annually, whatever it is, the -- the balance sheet and the P&L

15 statement for others to review. And I'm asking you, do you

16 know whether or not Skiplagged, on a regular basis, prepares

17 the P&L and balance sheets?

18    A. I don't know the exact timing of -- of when they

19 produce annual, quarterly, monthly financial statements for

20 internal or external purposes. I'm not -- just -- just not

21 sure of the timing.

22    Q. Okay. Did you ask Mr. Zaman when and how the P&L and

23 statements and balance sheets that you reviewed were prepared?

24    A. I didn't ask on the timing, no.

25    Q. Did you ask how they were prepared?

Page 17

5 (Pages 14 - 17)

App'x 028

1    A.   Yes.
2    Q.   And what did you learn?
3    A.   What I told you previously, that they track revenue,
4  costs, assets, liabilities, and it's -- they used QuickBooks to
5  produce the financial statements.
6    Q.   And do you know who actually produced the financial
7  statements, meaning, the P&Ls and the balance sheets that --
8  that you reviewed for your report?
9    A.   I believe Skiplagged.
10   Q.   Who at Skiplagged?
11   A.   I'm -- I'm not sure.
12   Q.   Did you ask?
13   A.   No.
14   Q.   In reviewing the P&L and balance sheets, did you
15  notice anything out of the ordinary?
16   A.   Again, I -- I didn't audit them, and I didn't do that
17  sort of forensic analysis of them.
18   Q.   So just looking at the -- for example, the P&L
19  itself, did you notice anything out of the ordinary just
20  looking at the -- the P&Ls from '18 -- from -- yeah, '18
21  through '23?
22   A.   Not that I recall right now.
23   Q.   I have a recollection that some of the -- maybe the
24  '18 and the '19 P&L have reflection of taxes paid; is that
25  correct?

Page 18

1    A.   I -- I don't know.  You can show those to me.  I'll
2  take a look.
3    Q.   We're going to get to that later.
4         Is it -- is it normal for Federal and State
5  taxes to be included on a P&L statement?
6    A.   To the extent it goes to net income, it -- I -- yes.
7    Q.   So if it's -- it -- should it always be included
8  then?
9    A.   You can do profit and loss statements for a variety
10  of reasons.
11   Q.   Right.
12        So in this case, sometimes they included State
13  and local taxes, and sometimes they didn't, and I want to know
14  if you have an understanding as to why?
15   A.   No.
16   Q.   Mr. Gutzler, if you'll look at Page 3 of your report,
17  please, sir.  The third line from the top says, "Finally, I
18  reserve the ability to use demonstrative exhibits and/or other
19  information to illustrate my opinions."
20        Do you see that, sir?
21   A.   I do.
22   Q.   And as we sit here today, have you prepared any
23  demonstrative exhibits?
24   A.   No.
25   Q.   As we sit here today, do you have any other

Page 19

1  information that you intend to use to illustrate your opinions?
2    A.   Potentially.
3    Q.   What is that?
4    A.   To the extent I'm asked to rebut Mr. Fuller's
5  opinions, there may be other information that I'll consider.
6    Q.   Yes, sir.  Thank you.
7         Setting aside the potential rebuttal report, as
8  we sit here today, is there any other information that you
9  intend to use to illustrate your opinions?
10   A.   I'm not sure how you want me to put aside my rebuttal
11  opinions.
12   Q.   Well, you just pretend like you're not going to do a
13  rebuttal report.  Fair enough?  And so in -- if we need to,
14  we can go and talk about a rebuttal report later.  I just want
15  to focus, please, sir, on this report today.
16        And so as we sit here today, is there any other
17  information that you intend to use to illustrate your opinions
18  to support your May 31st report?
19   A.   Not in support of the costs that were set forth in
20  this report, which is the purpose of the report.
21   Q.   Other than opining about costs --
22   A.   I --
23   Q.   Yes, sir?
24   A.   To the extent 2024 information is provided, I may
25  consider and use that.

Page 20

1    Q.   So you said the purpose of the report was to assess
2  costs; is that correct?
3    A.   Yes.
4    Q.   And is that all that you've done in this report is
5  assess costs?
6    A.   Generally.
7    Q.   And when you say "generally," that suggests to me
8  that perhaps you're excepting something out.  Can you think of
9  what, specifically, that might be?
10   A.   Well, I -- I've included in this report the revenues
11  that have been generated by Skiplagged on certain of its
12  business activities.
13   Q.   Okay.  So other than -- well, let's talk about that.
14  Certain revenues related to some of its business activities,
15  I'm paraphrasing what you said.  What business activities?
16   A.   The facilitated bookings related to American
17  Airlines.
18   Q.   Anything else?
19   A.   That's what I've included in this report.
20   Q.   So other than cost and the revenue associated with
21  facilitated bookings related to American Airlines, is there
22  anything else included in your opinions?
23   A.   Table 1 also includes and sets forth the number of
24  American flights facilitated by Skiplagged.
25   Q.   Is that it?

Page 21

6 (Pages 18 - 21)

1    A.  In this report, I believe that's it.

2    Q.  So relative to the American Bookings, you used that

3  phrase in your report and you used it just now, correct?

4    A.  I did.

5    Q.  And can you please tell me what you -- your

6  understanding of that phrase, "American Bookings," is?

7    A.  It's the number of bookings facilitated by Skiplagged

8  through the -- its "book now" feature that were made on

9  American Airlines, ultimately.

10    Q.  And then that's different than revenue generated when

11  Skiplagged directed the consumer to a third party, correct?

12    A.  Yes.

13    Q.  Did you do anything to assess the amount of revenue

14  Skiplagged generated for bookings facilitated by redirecting

15  users to online travel agencies?

16    A.  Not in this report.

17    Q.  Do you plan to do that?

18    A.  Potentially.

19    Q.  Why?

20    A.  It may be part of my rebuttal to Mr. Fuller.

21    Q.  In your report, Page 3, Paragraph 5, it says, "Based

22  on my analysis to date, from January 1, 2020, through

23  August 18, 2023, Skiplagged has generated $6,099,423 related to

24  identifiable bookings on American (so-called "American

25  Bookings")."  Do you see that?

Page 22

---

1    Q.  And what is your understanding, the components of the

2  $6.1 million number to be?

3    A.  It includes the service fees that Skiplagged

4  generates from its customers, it includes estimates of what

5  I'll call "ancillary revenue," which could be related to

6  baggage insurance, trip insurance.  It includes offsets or

7  discounts and allowances in -- in returns, including travel

8  credits, discounts for cancellations, chargebacks, transaction

9  fees.  So that $6.1 million, my understanding, is a net revenue

10  number.

11    Q.  So the next sentence, "Skiplagged does not track

12  operating costs related specifically to American Bookings."

13  How did you come to form that belief?

14    A.  It was either Mr. Gellert's deposition, but I suspect

15  it was based on my conversation with Mr. Zaman.

16    Q.  Okay.  Anything else?

17    A.  I'm not sure if it was in Mr. Zaman's declaration

18  also.  Potentially, in an interrogatory answer.  I'm not sure.

19    Q.  So the next sentence we talk about -- you talk about

20  Skiplagged's total operating costs from 2020 through 2023 to be

21  $13,936,004.  Do you see that?

22    A.  Yes.

23    Q.  And where did you get that number?

24    A.  From the Skiplagged income statements.

25    Q.  And when you say "income statements," we're talking

Page 24

---

1    A.  I do.

2    Q.  And where did you get the number, 6,099,423?

3    A.  I believe that's from the -- Skiplagged's Third

4  Amended Interrogatory Answers.

5    Q.  Okay.  It says, "Based on my analysis," what analysis

6  did you do of the $6,099,423 number?

7    A.  I read the interrogatories, I had discussions with

8  Mr. Zaman, and I read Mr. Gellert's deposition.  I think those

9  are the things related to that number.

10    Q.  And to me, "analysis" means something different than

11  just reviewing the interrogatories and deposition testimony.

12  So do you mean anything else by that word when you use it

13  there?

14    A.  Not in terms of deriving that number, no.

15    Q.  So then is it fair to say that you didn't do anything

16  to analyze whether or not that number is accurate?

17    A.  No, I've -- I've assumed that number's accurate.

18    Q.  And please, sir, tell me what Mr. Zaman told you

19  about that -- and can we just refer to it as the "$6.1 million

20  number" for shorthand?

21    A.  We can do that.

22    Q.  Thank you.

23        What did Mr. Zaman tell you about the

24  $6.1 million number?

25    A.  The various components of it.

Page 23

---

1  the profit and loss sta- ---

2    A.  Profit and loss statements.

3    Q.  I'm going to keep going back to that because that's

4  what they say at the top of the document.  I understand that

5  income statements and P&L are the same.  I'm not trying to give

6  you a hard time, but that's what the document says, and so...

7    A.  And if I use the wrong terminology, I mean profit and

8  loss statement the same as an income statement.

9    Q.  Thank you.

10        And then it says, "its" -- "its," meaning

11  Skiplagged's, "total operating costs related to the generation

12  of, among other things, American Bookings revenue for the same

13  period total $12,680,290."  Do you see that?

14    A.  I do.

15    Q.  And how did you arrive at that number?

16    A.  For purposes of determining the cost related to the

17  trademark and copyright claims, I excluded certain costs that I

18  felt were either discretionary or not directly related to

19  Skiplagged's operations, and its efforts to generates revenues

20  and operate the firm.  And so I excluded those types of costs,

21  and focused on those costs that were related to generating

22  revenues for the firm.

23    Q.  In assessing the cost directly related to generation

24  of revenue, did you distinguish between revenue attributable to

25  American Airlines and other revenues?

Page 25

7 (Pages 22 - 25)

App'x 030

1    A.  No.
2    Q.  Why not?
3    A.  As I say, those -- they don't track costs --
4  Skiplagged does not track the cost on a per airline basis.
5    Q.  Did you do anything to try and track costs on a per
6  airline basis?
7    A.  I don't believe so.
8    Q.  Did you -- and stepping back from just the airlines,
9  let's talk about in general.  Did you do anything to
10  distinguish between different streams of revenue -- perhaps an
11  example would be helpful.  For example, the revenue generated
12  from hotel bookings versus revenue generated from bookings on
13  all airlines, did you do anything to distinguish between those
14  types of revenue streams?
15    A.  Yes, I did.
16    Q.  And what did you do?
17    A.  I excluded cost of goods sold, which I understand
18  relates solely to the hotel's business.  So for purposes of my
19  cost determination, I did not include those costs.
20    Q.  Okay.  Did you do anything to distinguish between any
21  other stream of income?
22    A.  No.
23    Q.  And when you say you understand that the cost of
24  goods sold are related exclusively to the hotel bookings,
25  what's that based on?

Page 26

1  loss statements?
2    A.  I'm not sure what else is included in that.  There
3  could be other things, but...
4    Q.  Did Mr. Zaman specifically tell you that there was
5  anything else?
6    A.  No.  My recollection is that he told me that the cost
7  of goods sold were related solely to the hotel business.
8    Q.  But you didn't find out exactly what all those costs
9  were?
10    A.  Other than the fact that he told me why they're in
11  cost of goods sold and it's the hotel business, and what I
12  talked to you about earlier.
13    Q.  So it says, "total operating cost" -- I'm looking at
14  your report.  It's the -- your Summary of Opinions.  It's that
15  third full sentence.  It says, "costs related to the generation
16  of, among other things, American Bookings revenue."  When you
17  say "related to the generation," what do you mean by "related,"
18  exactly what you mean in this context?
19    A.  They're the costs that were incurred in order to
20  generate the revenues of the company.
21    Q.  And those are the costs that were incurred to
22  generate all the revenues of the company, correct?
23    A.  Yes.
24    Q.  And then it says, "generation of, among other things,
25  American Booking revenue."  Do you see that?

Page 28

1    A.  Mr. Zaman.
2    Q.  And explain to me what you understand about the cost
3  of goods sold here.
4    A.  It's my understanding that Skiplagged actually buys
5  blocks of hotel rooms and sells them.  So they're acquiring an
6  asset, and they're selling it as -- as a cost of goods sold.
7    Q.  And so the cost of goods sold is -- that number is
8  exactly what Skiplagged paid to a third party to acquire that
9  inventory?
10    A.  There could be more costs involved in that process.
11  But generally, that's my understanding.
12    Q.  In that number that you -- you deducted for costs of
13  goods sold, did it include anything else other than the direct
14  cost of acquiring that inventory?
15    A.  I'm not sure.  It's my understanding that it all
16  relates to the hotels business.
17    Q.  Do you have any understanding, other than the cost of
18  the inventory, that there's any other component of the number
19  reflected as cost of goods sold in the profit and loss
20  statements?
21    A.  Can you ask that again, please?  I'm sorry.
22    Q.  Of course.
23        Do you have any understanding, other than the
24  costs of the inventory, that there's any other component of the
25  number reflected as the cost of goods sold in the profit

Page 27

1    A.  I do.
2    Q.  And so when you say, "among other things," what that
3  phrase really means is, all of the revenues of the company,
4  correct?
5    A.  The other revenues of -- of the company.
6    Q.  So just to be clear, it's $12,680,290 over the 4-year
7  period '20, '21, '22 and '23, correct?
8    A.  Yes.
9    Q.  Are you opining that that full $12,680,290 is
10  attributable to the generation of the $6.1 million in American
11  Bookings?
12    A.  I don't believe I'm saying that.
13    Q.  I just want to be clear.  I think that's right.
14        If you'll turn to Page 4 of the report, we've
15  got the Background section there.
16    A.  Yeah.
17    Q.  We've got Paragraphs 8, 9, 10 and 11, correct?
18    A.  I see that.
19    Q.  And are you offering any opinions in this case on
20  anything contained in this Background section?
21    A.  I don't believe so.  Per Footnote 3, these are not an
22  expressive -- an expression of my opinions, no.  They're my
23  understanding of facts.
24    Q.  Thank you.
25        If you'll turn to Page 6, please, sir.  Down at

Page 29

8 (Pages 26 - 29)

1 the bottom, we've got two issues here, Trademark Infringement
2 and Copyright Infringement. Those are the two issues involved
3 in this case for your report, correct?
4    A. For purposes of this report, yes.
5    Q. And on the Trademark Infringement, you cite to, of
6 course, it's 1117(a), I believe; is that correct?
7    A. Yes.
8    Q. And you cite the part of the statement -- or the --
9 the statute, it says, "In assessing profits the plaintiff shall
10 be required to prove defendant's sales only; defendant must
11 prove all elements of cost or deduction claimed"; is that
12 correct?
13    A. Yes.
14    Q. And so I understand that your report discusses the
15 elements of cost, correct?
16    A. Yes.
17    Q. Do you have any opinions about, in addition to the
18 cost, deduction claimed?
19    A. To the extent what "deduction claimed" means, further
20 apportionment, I -- I have some observations on that, yes.
21    Q. Tell me what those observations are.
22    A. That Skiplagged's generation of profits is based on
23 more than just the American marks or the copyright, and that
24 there are other reasons why it generates revenues.
25    Q. Are you offering any opinion about apportionment?

Page 30

1    Q. And that is just a quote from the Copyright Act,
2 correct?
3    A. Correct.
4    Q. And so I believe your expert report of May 31st deals
5 with deductible expenses; is that accurate it?
6    A. It does.
7    Q. And does your May 31st report address at all the
8 elements of profit attributable to factors other than the
9 copyrighted work?
10    A. I don't believe so.
11    Q. And do you view that as the -- basically, the same
12 thing as apportionment?
13    A. I do.
14    Q. And as we sit here today, have you finalized any
15 opinions relative to a potential rebuttal report about
16 apportionment under the copyright context?
17    A. No.
18    Q. And so then Paragraph 15, you -- you say, after the
19 comma, "and it is the defendant's burden to prove appropriate
20 costs and offsets," correct?
21    A. Yes.
22    Q. And in this report, you're dealing with only costs,
23 correct?
24    A. Correct.
25    Q. Why didn't you do an assessment of apportionment in

Page 32

1    A. I believe I'm going to.
2    Q. When you say you "believe you're going to," does that
3 mean possibly in the rebuttal report?
4    A. Correct.
5    Q. Have you actually formed your opinions as we sit here
6 today on apportionment?
7    A. I don't believe so.
8    Q. In your report of May 31st, 2024, do you provide any
9 opinions on apportionment?
10    A. I don't believe so.
11        MR. KLEMCHUK: Objection, form.
12    Q. (BY MR. BERG) Okay. So we're going to do that over
13 because -- let him --
14        MR. KLEMCHUK: Yeah.
15        MR. BERG: -- do his objection.
16    Q. (BY MR. BERG) So in your report of May 31st, 2024,
17 do you provide any opinions about apportionment?
18        MR. KLEMCHUK: Objection, form.
19    A. I don't believe so.
20    Q. (BY MR. BERG) As for Copyright Infringement, if you
21 look under Paragraph 14, the very end, it's the last three
22 lines. "The infringer is required to prove his or her
23 deductible expenses and the elements of profit attributable to
24 factors other than the copyrighted work." Do you see that?
25    A. I do.

Page 31

1 your original report?
2    A. I -- I wasn't asked to do that.
3    Q. Paragraph 18 of your report on Page 9.
4    A. I'm there.
5    Q. When we were talking earlier, you went through, I
6 believe, these offsets in Paragraph 18, including Stripe
7 transaction fees, dispute costs, penalties, chargebacks and
8 awards travel; is that correct?
9    A. Yes, I believe I addressed all these.
10    Q. And this is saying that in Table 1, that's the
11 $6.1 million in revenue that Skiplagged says are associated
12 with the American Books- -- Bookings, correct?
13    A. Yes.
14    Q. And that $6.1 million, you said, is a net number,
15 correct?
16    A. Yes.
17    Q. And it's net of Stripe transaction fees, dispute
18 costs, penalties, chargebacks and award travel, correct?
19    A. Yes.
20    Q. And did you do any independent analysis of any of
21 those five deductions?
22    A. I -- I reviewed the deposition testimony of
23 Mr. Gellert, I had discussions with Mr. Zaman, I reviewed his
24 declarations, I've since reviewed his two depositions.
25    Q. So other than the -- the review of those things that

Page 33

9 (Pages 30 - 33)

1 you just discussed, did you do any independent analysis of the
2 specific numbers deducted in each of those five categories?
3    A.  I haven't gone back and recalculated the numbers.
4 I'm assuming that they're accurate.
5    Q.  Do you know what costs, precisely, are included in
6 Stripe transaction fees?
7    A.  The testimony that it's 2.9 percent, plus 30 cents
8 per transaction.
9    Q.  2.9 percent of what?
10    A.  The incoming revenue.
11    Q.  So what -- any other than the 2.9 percent, and I
12 believe you said 30 cents; is that correct?
13    A.  30 cents per transaction.
14    Q.  Other than those two elements, are there any other
15 costs included in Stripe transaction fees?
16    A.  I don't believe so.  I guess instead of "costs," I
17 would call them "deductions," but okay.
18    Q.  If deductions is the better word for you, that's what
19 we'll use.  That's --
20    A.  Okay.
21    Q.  I'm -- I'm happy to do that.
22        So do you know what the exact number of
23 deductions are for the Stripe transaction fees?
24    A.  In terms of dollars?
25    Q.  Yes, sir.

Page 34

1 middle category, which says dispute costs, penalties and
2 chargebacks.
3    Q.  Okay.  In that middle category -- and I'm going to
4 break it down.  Do you know a specific dollar amount for the
5 deduction of dispute costs?
6    A.  No.
7    Q.  Do you know a specific dollar amount for the
8 deduction of penalties?
9    A.  No.
10    Q.  Do you know a specific dollar amount for the
11 deduction of chargebacks?
12    A.  No.
13    Q.  Do you know a specific dollar amount for the
14 deduction of award travel?
15    A.  No.
16    Q.  Do you know what costs are included in this deduction
17 for awards travel?
18    A.  I don't know what you mean by that.
19    Q.  Well, so the $6.1 million started as a larger number,
20 and then there were these deductions, correct?
21    A.  Yes.
22    Q.  Okay.  And one of the deductions was awards travel,
23 correct?
24    A.  Yes.
25    Q.  And so what was the specific number deducted for

Page 36

1    A.  No.
2    Q.  The second category of deductions is Dispute Costs.
3 Do you see that?
4    A.  I would -- we could do it any way you want, but I
5 considered those three related, but okay.  We'll do dispute
6 costs.
7    Q.  Yes, sir.  So which three do you consider related?
8    A.  Dispute costs, penalties and chargebacks.  I, kind
9 of, lump them together in that sentence.
10    Q.  Okay.  So tell me what your understanding, for
11 purposes of this report, of each of those three is and why
12 they're different?
13    A.  This category, I basically include refunds when a
14 flight's canceled, refunds when there's a dispute about the
15 service that was provided, and chargebacks are refunding credit
16 card -- or when credit cards don't go through for whatever
17 reason.
18    Q.  Okay.  So then are you saying that Stripe transaction
19 fees, dispute costs, penalties and chargebacks, all four of
20 those are actually related?
21    A.  Not Stripe transactions.
22    Q.  Okay.  I apologize.  So you're -- you -- you --
23    A.  I -- I'm not sure how related they are.  It's just
24 that if you look at the sentence, I -- I group them into three
25 different parts.  But I've told you what I believe is in that

Page 35

1 awards travel?
2    A.  I - I think I answered that, that, No, I don't know.
3    Q.  And do you know what, regardless what the number is,
4 what the costs were specifically that made up this awards
5 travel category?
6    A.  It's the credit that is given to customers that they
7 can apply for future travel.
8    Q.  And do you know how that number was calculated to --
9 to be used in the deduction?
10    A.  The -- the testimony is that the -- for lack of a
11 better word, the system that Skiplagged employs determines that
12 number.
13    Q.  And when you say "the system that Skiplagged employs
14 determines that number," that means the amount of the award
15 that is provided to a customer?
16    A.  That's my understanding.
17    Q.  Okay.  And do you know what the redemption rate is of
18 those awards for Skiplagged?
19    A.  I -- I don't.
20    Q.  Do you know if the awards travel deduction is the
21 total awards actually given or the total awards actually
22 redeemed?
23    A.  I'm not sure.
24    Q.  Do you believe that these five categories of
25 deductions are also included in the expenses you used to create

Page 37

10 (Pages 34 - 37)

App'x 033

1 the percent to -- of -- of revenue -- well, strike that.  Let
2 me start over.
3             Do you believe that these five categories of
4 expenses are also included in the creation of your number
5 related to the total costs related to the generation of
6 American Bookings?
7     A.  No.
8     Q.  Why not?
9     A.  I understand that these are deductions for purposes
10 of determining net revenue from gross revenue, and they're not
11 considered operating costs of the company.  And so they're
12 captured above the line.
13     Q.  When you say "above the line," what does that mean?
14     A.  Above the operating expense line, operating margin.
15     Q.  Are they part of the cost of goods sold?
16     A.  No.
17     Q.  On Paragraph 19, you say, "Therefore, on Table 2
18 below, I set forth Skiplagged's total operating costs for the
19 period 2020-2023, a portion of which relates to its American's
20 [sic] Bookings revenue," correct?
21     A.  I see that.
22     Q.  Okay.  And you say, "a portion of which relates to
23 its American's [sic] Booking revenue."  What does that mean, "a
24 portion"?
25     A.  Because they relate to Delta bookings and United

Page 38

1 bookings also, and other revenue streams generated by
2 Skiplagged.
3     Q.  Did you do anything to differentiate costs between
4 those other streams of revenue and the American Airlines stream
5 of revenue?
6     A.  No.
7     Q.  Footnote 35 says, "I understand that the cost of
8 goods sold included in Skiplagged's income statements are
9 related to its stays/hotels line of business (Discussion with
10 Aktarer Zaman)."  Do you see that?
11     A.  I do.
12     Q.  Did you review any documents related to that
13 statement?
14     A.  Other than the profit and loss statements, no.
15     Q.  Okay.  And did you do any analysis of the cost of
16 goods sold?
17     A.  Not other than excluding it for purposes of this
18 analysis.
19     Q.  Sir, if you'll turn to Page 10.  There at the top is
20 Table 2, correct?
21     A.  Yes.
22     Q.  And Table 2 starts in 2020, correct?
23     A.  Yes.
24     Q.  Did you do any similar calculations for any year
25 before 2020?

Page 39

1     A.  No, not in this report.
2     Q.  Yes, sir.  I understand it's not in the report, but
3 did you do any calculations similar to those in Table 2 for any
4 year before 2020?
5     A.  I reviewed those income statements, profit and loss
6 statements, but I haven't included any sort of calculations of
7 those in the report.
8     Q.  I apologize.  I'm not trying to be difficult.  But I
9 under- -- I understand you reviewed them.  I understand that
10 you didn't include them in the report.
11             My -- my question is, did you do the similar
12 calculations for any year prior to 2020?
13     A.  I don't remember.  I'm not sure.
14     Q.  Have you done any similar calculations for any part
15 of 2024?
16     A.  No.
17     Q.  It says -- Paragraph 20, it says, "Based on my review
18 and discussions with Mr. Zaman," do you see that?
19     A.  I do.
20     Q.  It says, "Based on my review," what specifically did
21 you review to come to the conclusion that certain of those
22 expenses are related to American Bookings?
23     A.  Based on my understanding of what's included in the
24 categories.
25     Q.  And where did you gain that understanding of what's

Page 40

1 included in the categories?
2     A.  Mr. Zaman.
3     Q.  Did you review any documents to come to the
4 conclusion about what is in each of those categories?
5     A.  I don't believe so.
6     Q.  What did Mr. Zaman tell you that caused you to come
7 to the conclusion that certain of those expenses were related
8 to American Bookings?
9     A.  I -- I think I disagree with that statement.  What
10 Mr. Zaman told me is, what is included within each category of
11 costs, and then I made the determination of what to include for
12 purposes of this report.  Include as a cost for purposes of
13 this report.
14     Q.  Okay.  So other than your discussions with Mr. Zaman,
15 did you have any other basis for forming those opinions about
16 the costs?
17     A.  I don't believe so, other than what I've seen in
18 other trademark and copyright cases.
19     Q.  When you say "other than what you've seen in other
20 trademark and copyright cases," what do you mean by that, sir?
21     A.  That -- for example, generally, taxes and legal
22 expenses, generally, aren't included as a deduction for
23 purposes of calculating defendant's profits in a copyright or
24 trademark case.
25     Q.  Anything else?

Page 41

11 (Pages 38 - 41)

1   A.  I don't believe so.
2   Q.  Okay.  And I believe you've identified nine
3 categories of expenses that you believe or you're opining
4 should be included as deductions related to the American
5 Bookings, correct?
6   A.  Looks like it.  Yes.
7   Q.  Are there -- other than -- I'm just going to list
8 them so we'll be on the same page.  This is starting at
9 Page 10.  1, Advertising; 2, Bank Charges; 3, Insurance; 4,
10 Office Expenses; 5, Other Business Expenses; 6, Payroll; 7,
11 Renter Lease; 8, Repair and Maintenance; and 9, Utilities.
12 Were there any other expenses that are related to the American
13 Bookings revenue?
14   A.  Not, in my opinion, for purposes of ongoing
15 generation of revenues.  One could argue that all the costs
16 incurred by Skiplagged in some way relate to the American
17 Bookings.  But for purposes of my analysis, what I wanted to
18 focus on were the costs more closely related to its actual
19 generation of revenues.
20   Q.  Okay.  So then just to be clear, you're not going to
21 opine in this case that all of Amer- -- or Skiplagged's
22 expenses should be deducted for purposes of the trademark or
23 copyright analysis, correct?
24   A.  I don't intend to do that, no.
25   Q.  So under the advertising, I can read here in your

Page 42

1 report, it says, "Includes payments to third-party firms for
2 various advertising programs, including on Facebook and through
3 Google."  And you say, "(search engine marketing)," correct?
4   A.  Yes.
5   Q.  So other than various advertising programs, is there
6 anything else included in this advertising category?
7   A.  I believe that makes up the bulk.
8   Q.  Yes, sir.  That makes up the bulk, but is there
9 anything else that you know of that's included?
10   A.  Not that I know of.
11   Q.  And when you say "the bulk," tell me basically a
12 ballpark percentage that you believe the advertising programs
13 comprise of the total expense?
14   A.  I don't have a percentage.
15   Q.  Do you know what those advertising programs are?
16   A.  Advertising on Facebook, and implementation of a
17 search engine marketing program on Google.
18   Q.  Okay.  Do you know how each is related, if at all, to
19 American Airlines?
20   A.  It -- they relate to Skiplagged.
21   Q.  Yes, sir.
22   A.  And they're advertising to drive customers to their
23 site, and then some of those customers may eventually purchase
24 an American flight facilitated by Skiplagged.  So it's -- it's
25 driving people to the website.

Page 43

1   Q.  So the advertising programs, did you assess whether
2 those programs were directed to hotels versus airlines?
3   A.  No.
4   Q.  Do you know if there are separate advertising
5 programs for hotels versus airlines?
6   A.  I don't know.
7   Q.  Do you have any way to relate these various
8 advertising programs directly to American Airlines?
9   A.  Other than the intent is to drive customers to the
10 website, and they may, then, purchase an American ticket
11 through American or an online travel agent.  They may purchase
12 another ticket that's facilitated by Skiplagged.
13   Q.  The second deduction that you identify here is Bank
14 Charges, correct?
15   A.  Yes.
16   Q.  And it's -- includes credit card fees, correct?
17   A.  Yes.
18   Q.  And I believe the deduction that we identified
19 previously was the Stripe fees.  Do you remember that?
20   A.  Yes.
21   Q.  Isn't that the same as credit card fees here?
22   A.  No.
23   Q.  How are they different?
24   A.  This would be things, like, your annual cost of a
25 credit card.  If you have an American Express, you pay an

Page 44

1 annual fee for that.
2       MR. KLEMCHUK:  When- -- whenever we get to a
3 bathroom break --
4       MR. BERG:  Of course.
5       MR. KLEMCHUK:  -- point, that'd be great.
6       MR. BERG:  Let's do it.  Let's take a break.
7       MR. KLEMCHUK:  It could be later or right now --
8       MR. BERG:  No, now is great.
9       THE VIDEOGRAPHER:  We're off the record at
10 11:14.
11       (Recess taken from 11:14 a.m. to 11:28 a.m.)
12       THE VIDEOGRAPHER:  We are back on the record at
13 11:28.
14   Q.  (BY MR. BERG)  Mr. Gutzler, are you ready to
15 continue?
16   A.  I am.
17   Q.  Okay.  And like I said as we went off the record, if
18 you need to take a break for any reason, please let me know.
19 Otherwise, we'll -- we'll just keep going.
20   A.  Appreciate it.
21   Q.  The bank charges you said includes credit card fees,
22 that's -- we're back on Paragraph 20, Page 10 of your report.
23 Are you there?
24   A.  I am.
25   Q.  Other than credit card fees that you described as

Page 45

12 (Pages 42 - 45)

1 what you pay, for example, for your Amex card, does this
2 category include anything else?
3    A.  Related bank fees that they may incur.
4    Q.  And so "related bank fees," you're talking about
5 checking account fee that may be charged?
6    A.  Yes, things like that.
7    Q.  Okay.  If we look up at Table 2 across that category,
8 it's always right just above $2,000, correct?
9    A.  Yes.
10    Q.  Okay.  Next is Insurance.  It says, "Includes health
11 insurance for Skiplagged employees," correct?
12    A.  Yes.
13    Q.  Does it include anything else?
14    A.  Officer and -- officers and directors insurance.
15 I -- I think those are the main categories.
16    Q.  Okay.  Anything other than a main category included
17 in that?
18    A.  Potentially, but I'm not sure.
19    Q.  The next category of expenses is "Office Expenses -
20 Includes computers, laptops and other business equipment."  Do
21 you see that?
22    A.  I do.
23    Q.  Other than computers, laptops and other business
24 equipment, what is included in this category of expenses?
25    A.  I think those are the -- the main expenses in this

Page 46

1 category.
2    Q.  Can you identify anything that is not a main expense
3 in this category?
4    A.  No.
5    Q.  It says, "Other Business Expenses," is the next
6 category.  Do you see that?
7    A.  Yes.
8    Q.  It says, "Includes costs related to Skiplagged's
9 cloud computing requirements (e.g., Google, AWS)."  Did I read
10 that correctly?
11    A.  Yes.
12    Q.  And so other than costs related to Skiplagged's cloud
13 computing requirements, are there any other expenses included
14 within this Other Business Expense category?
15    A.  Not that I know of.
16    Q.  Did you do any analysis of this other business
17 expense category?
18    A.  I don't believe so.
19    Q.  The next category is "Payroll Expenses - Includes
20 salaries and costs related to employees and contractors."  Do
21 you see that?
22    A.  I do.
23    Q.  Other than salaries and costs related to employees
24 and contractors, is there anything else included in this
25 category?

Page 47

1    A.  Yes.
2    Q.  What?
3    A.  Legal expenses.  Certain legal expenses.
4    Q.  Okay.  Anything else?
5    A.  Not that I know of.
6    Q.  And why would legal expenses be included in payroll
7 expenses?
8    A.  I don't know.
9    Q.  How did you come to learn that legal expenses were
10 included in this payroll expense?
11    A.  When I talked to Mr. Zaman.
12    Q.  Okay.  So if you'll lo- -- pull up Table 2, please,
13 sir.
14    A.  Yes.
15    Q.  4, 5, 6 -- the 6th item down under "Category," do you
16 see that?
17    A.  Yes.
18    Q.  I'm looking at Legal and Professional Fees?
19    A.  Yeah.
20    Q.  So we do have a separate entry for legal and
21 professional fees; is that correct?
22    A.  That's the name of that category, yeah.
23    Q.  But nevertheless, you came to understand from talking
24 to Mr. Zaman that there were legal expenses that didn't go into
25 that category, but actually went into payroll expenses?

Page 48

1    A.  Yes.  The legal and professional fees, the 6th line
2 down that we've been talking about, my understanding, that's
3 basically the accounting fees paid to the accountant.
4    Q.  Did you ask him why Skiplagged included legal
5 expenses in the Payroll Expenses category instead of the Legal
6 and Professional Fees category?
7    A.  Not sure.
8    Q.  Wouldn't that be the way you would expect to see it
9 done, is have the legal expenses go into that Legal and
10 Professional Fees category?
11    A.  Probably.
12    Q.  And then other than the legal expenses and the
13 salaries and costs related to employees and contractors, is
14 there anything else that goes into this Payroll Expense
15 category?
16    A.  I don't believe so.
17    Q.  And you've identified employees and contractors.  Who
18 are the contractors?
19    A.  I -- I believe it's Tim Phelp when necessary, but
20 I'm -- I'm not sure.
21    Q.  Did you do any analysis of the costs associated with
22 the contractors versus the costs associated with the employees?
23    A.  No.
24    Q.  Do you know what services the contractors provided?
25    A.  No.

Page 49

13 (Pages 46 - 49)

1  Q.  Do you know how, if at all, the contractor services
2  provided related to the American Booking revenue?
3  A.  Not specific to American Booking revenue, no.
4  Q.  The next category, sir, I believe is on the next
5  page, 11.  "Rent or Lease - Cost for office space in New York."
6  Do you see that?
7  A.  I do.
8  Q.  Anything else go into this category?
9  A.  I don't believe so.
10  Q.  The next, "Repair & Maintenance - Includes costs
11  related to repairing and maintaining office equipment."  Do you
12  see that?
13  A.  I do.
14  Q.  Is there anything else that goes into this repair and
15  maintenance category?
16  A.  Not that I know of.
17  Q.  Next is "Utilities - Includes internet and
18  telecommunications services."  Anything else under this
19  category?
20  A.  Not that I know of.
21  Q.  Back to Page 10 on Number 6.  Did you do any analysis
22  of what each of the employees does for Skiplagged?
23  A.  No.
24  Q.  Do you have any opinion that any specific employee
25  has nothing or everything to do with the American Airlines

Page 50

1  example, doing the hotel booking business or -- or working on
2  the hotel booking business?
3  A.  No.
4  Q.  Table 3, Page 11.  It says, "I adjust the Payroll
5  Expenses such that they exclude legal costs"; is that correct?
6  A.  Yes.
7  Q.  And why did you exclude the legal costs?
8  A.  For the same reason before.  In my experience and
9  understanding, those generally are not deducted for purposes of
10  calculating defendant's profits in a trademark or copyright
11  case.
12  Q.  Why not?
13  A.  Because one could incur a lot of legal fees that
14  would make the defendant's profits, hypothetically, down to
15  zero.  And that doesn't seem fair and appropriate for purposes
16  of calculating the defendant's profits related to Trademark
17  Infringement or Copyright Infringement.
18  Q.  And then Paragraph 22, "In Table 4, I have summarized
19  the total costs related to, among other things, the American
20  Bookings revenue for the period 2020 through 2023."  Do you see
21  that?
22  A.  I do.
23  Q.  And when you say "among other things," what other
24  things?
25  A.  All other revenue streams.

Page 52

1  Bookings revenue?
2  A.  Not specific to American Bookings revenue.  Just that
3  they've hired and employed employees to handle the operations
4  of the company and the revenue generation of the company, which
5  includes American Bookings revenue.
6  Q.  So, for example, if an employee's exclusive role is
7  to handle the hotel bookings, correct, that would not have
8  anything to do with the American Airlines revenue, correct?
9  A.  If that were the case.
10  Q.  And did you ask if any such employees existed at
11  Skiplagged?
12  A.  Well, based on my discussion with Mr. Zaman, that
13  type of person does not exist.
14  Q.  And what did Mr. Zaman tell you that causes you to
15  form that opinion?
16  A.  That they don't have employees focus solely on
17  certain business lines, certain airlines, certain types of
18  revenue generation that they cover, the -- the spectrum of the
19  company's operations.
20  Q.  Did you conduct any analysis of how much time any
21  specific employee or the employees as a whole spend on the
22  American Airlines [sic] Bookings revenue?
23  A.  No.
24  Q.  Did you do any analysis to determine how much time
25  any specific employee or group of employees spends, for

Page 51

1  Q.  And that's the same answer as before, right?
2  A.  Hopefully, yes.
3  Q.  So then because of that statement, "all other
4  things," meaning, "all other revenue streams," the costs on
5  Table 4 are not exclusively related to the American Bookings
6  revenue, correct?
7  A.  The total sum of those costs are not.
8  Q.  Can you identify which of the costs on Table 4 are
9  related exclusively to the American Bookings revenue?
10  A.  I -- I don't believe they're exclusive to American
11  Bookings.
12  Q.  On Table 4, you've got the -- the nine categories
13  that we just went through, correct?
14  A.  Yes.
15  Q.  And just to be clear, essentially, what you've done
16  is you took Table 2 over on Page 10, and then in Table 3
17  adjusted the employee payroll expense, correct?
18      I'm sorry, sir --
19  A.  Yes.
20  Q.  Yes?
21      And then you used Table 2 and 3 to create
22  Table 4, correct?
23  A.  I -- I think that's a fair summary.  The only caveat
24  is that, obviously, I've excluded certain costs in Table 2 for
25  purposes of preparing Table 4.

Page 53

14 (Pages 50 - 53)

**Page 54**

1    Q.   Correct.  Table 4, essentially, is the subset of the
2  nine expenses that you believe are related to the American
3  Bookings revenue?
4    A.   That's fair.
5    Q.   And did you review any documents showing the specific
6  costs in each of the nine categories in Table 4?
7    A.   I -- I don't believe that was produced.
8    Q.   Yes, sir.  I agree it was not produced, but -- and
9  again, I'm not trying to give you a hard time.  Did you
10  actually review any documents that showed the specific costs in
11  each of the Categories 1 through 9 in Table 4?
12    A.   No.  And if I had, I would have, obviously, given
13  that to you.
14    Q.   Did you go through, in detail in your discussions
15  with Mr. Zaman, the specific costs in Categories 1 through 9 in
16  Table 4?
17    A.   I believe so.
18    Q.   And so what did he tell you about, for example, the
19  advertising costs?
20    A.   Well, that's what I've included in the bullet points
21  under Paragraph 20.
22    Q.   Okay.
23    A.   At a summary level.
24    Q.   And we just went through those, correct?
25    A.   Correct.

**Page 55**

1    Q.   And so do you have anything to add?
2    A.   Nothing substantial.
3    Q.   Okay.  Sorry.  Anything insubstantial?
4    A.   Not sitting here right now, no.
5    Q.   And then -- so, for example, in Advertising Expenses
6  in 2020, it's $447, correct?
7    A.   Yes.
8    Q.   Do you know what expense makes up that $447 other
9  than, in general, advertising programs?
10    A.   That's what I know.
11    Q.   But -- so, for example, you couldn't say, you know,
12  $200 went to Google for some, and the other 247 went to
13  Facebook?
14    A.   That's correct.
15    Q.   And does the same hold true for the advertising
16  expenses in 2021, 2022 and 2023?
17    A.   Yes.
18    Q.   And does the same hold true that you can't identify a
19  specific dollar for any of the categories in -- that are 2
20  through 8 in this Table 4?
21    A.   I don't have the information to apportion these
22  amongst the various components that I list in the -- in the
23  bullet points.
24    Q.   Do you recall Mr. Zaman telling you anything specific
25  in terms of a dollar amount for any of the costs that are

**Page 56**

1  reflected in Table 4?
2    A.   I don't believe so.
3    Q.   Can you tell me specifically how each of the costs in
4  Table 4 actually contributed directly to the American Bookings
5  revenue?
6    A.   Well, I think those costs are the costs incurred for
7  employees, for equipment, for operating expenses, that allow
8  Skiplagged to operate its website and generate revenues from
9  that website.
10    Q.   Anything else?
11    A.   At a high level, I think that summarizes it.
12    Q.   Well, at any level, is there anything else?
13    A.   No, I -- I think that is my explanation.
14  understanding of what and why these categories I've included.
15    Q.   In Paragraph 23 of your report, "Thus, based on the
16  above, Skiplagged had costs approximately $12.7 million that
17  were incurred in generating, among other revenue streams, the
18  American Bookings revenue."  Do you see that?
19    A.   Yes.
20    Q.   And what are the other revenue streams that you're
21  referring to here?
22    A.   It could be other facilitated bookings on other
23  airlines, United, Delta, foreign carriers.  It could be the
24  revenue is generated from online travel agency -- agencies,
25  whether it's the cost per click or cost per action revenue that

**Page 57**

1  they generation from those.  That -- those are the bulk of the
2  revenues I'm referring to.
3    Q.   Would you include the revenues associated with the
4  hotels there?
5    A.   Sure.
6    Q.   Would you include the revenue associated with booking
7  cars?
8    A.   I guess.  It's my understanding that's basically a de
9  minimis amount, but yes.
10    Q.   When you say "a de minis-- de minimis amount,"
11  what's your understanding of what the amount is?
12    A.   Less than one percent.
13    Q.   I'm sorry, sir.  I --
14    A.   Less than one percent.
15    Q.   Okay.  Any other revenue streams included when -- in
16  the phrase "other revenue streams" in Paragraph 23 of your
17  report?
18    A.   I don't believe so.
19    Q.   Did you do any analysis of the costs associated with
20  the -- the bookings on other airlines?
21    A.   Table 4.
22    Q.   A detailed analysis assigning costs to a specific
23  airline?
24    A.   No.
25    Q.   Did you do any analysis of costs associated with the

Veritext Legal Solutions
800-336-4000

App'x 038

1 revenue stream that you identified as the "OTAs," online travel
2 agents?
3    A.  No.
4    Q.  Did you do any analysis of the costs associated with
5 the revenue stream that represents hotels?
6    A.  No, other than Table 4.
7    Q.  Did you do any additional analysis of costs
8 associated with the revenue stream that's identified as "cars"?
9    A.  No, other than Table 4.
10        MR. BERG:  Do you want to take a break?
11        MR. KLEMCHUK:  Just real quick.  There's
12 somebody at the door.
13        MR. BERG:  Okay.  We'll just -- let's go off the
14 record real quick.
15        THE VIDEOGRAPHER:  We're off the record at
16 11:49.
17        (Recess taken from 11:49 a.m. to 11:52 a.m.)
18        THE VIDEOGRAPHER:  We are back on the record at
19 11:52.
20        (Gutzler Exhibit 2 was marked.)
21    Q.  (BY MR. BERG)  Sir, I've handed you what has been
22 marked as Exhibit 2.  Do you see that?
23    A.  I do.
24    Q.  And that is a copy of Skiplagged's profit and loss
25 statement for the period of January through December 2023,

Page 58

1 correct?
2    A.  Yes.
3    Q.  I'm going to hand you what we'll mark as Exhibit 3.
4        (Gutzler Exhibit 3 was marked.)
5        MR. KLEMCHUK:  Okay.
6    Q.  (BY MR. BERG)  And Exhibit 3 is a copy of
7 Skiplagged's Balance Sheet for the period in December 31st,
8 2023, correct?
9    A.  Yes.
10    Q.  And Exhibit 2 and Exhibit 3 are similar, except for
11 the specific numbers to the P&L and balance sheets that you
12 reviewed for 2018, 2019, 2020, 2021 and 2022, correct?
13    A.  As I recall, they're -- they're fairly similar, yes.
14    Q.  So you said when we were talking earlier about the
15 awards travel --
16    A.  Yes.
17    Q.  -- that you understood it was an above-the-line
18 deduction, correct?
19    A.  Yes.
20    Q.  And when you say "above-the-line deduction," you're
21 talking about the P&L statement above the gross profits number,
22 correct?
23    A.  Correct.
24    Q.  And so on the P&L statement that's Exhibit 2, the
25 income reflects Commission Income of about 4 million, correct?

Page 59

1    A.  Yes.
2    Q.  Sales of Production -- of Product Income, 15 -- or
3 16.6 million, correct?
4    A.  Yes.
5    Q.  What is included in the Sales of Production Income?
6    A.  Facilitated bookings.
7    Q.  Anything else?
8    A.  It would include hotels, I believe.
9    Q.  Okay.  Anything else?
10    A.  I think those are the main categories.
11    Q.  And then it says, "Cost of Goods Sold" as -- as a
12 deduction there.  Do you see that?
13    A.  Yes.
14    Q.  And earlier when we were talking, you said the cost
15 of goods sold was the cost of the inventory for the hotel part
16 of the business, correct?
17    A.  The inventory would be at least part of that, yes.
18    Q.  Okay.  So where are the awards liabilities reflected,
19 if at all?
20    A.  In the Sales of Product Income, the 16.6 million.
21    Q.  So sales of product has already deducted out of it
22 the awards value?
23    A.  That's a net revenue number, yes.
24    Q.  Is that -- have you ever dealt with the financial
25 statements for an entity that has a rewards program before this

Page 60

1 case?
2    A.  American Airlines.
3    Q.  And how do you --
4    A.  Other airlines.
5    Q.  Other than American Airlines, any other airlines?
6    A.  I did a project for Southwest Airlines once, and
7 maybe a couple others.
8    Q.  And in the project for American Airlines, did you
9 deal with anything to the with the AAdvantage program?
10    A.  No.
11    Q.  Did you take note or recall how American Airlines
12 treats the AAdvantage awards on its financial statements?
13    A.  Not as part of that work, no.
14    Q.  As -- as -- just in general, do you have an
15 understanding of how American Airlines, for example, treats the
16 AAdvantage miles on its financial statements?
17    A.  I don't know that I've looked at their 10(k) for --
18 for that purpose.
19    Q.  So who told you that the sales of product income is
20 net of the consumer awards given to Skiplagged's consumers?
21    A.  Mr. Zaman told me that that number is net of all the
22 deductions we've talked about, and it's inclusive of the
23 rev- -- ancillary revenues related to travel insurance and
24 baggage insurance.
25    Q.  Do you have -- do you know what the specific

Page 61

16 (Pages 58 - 61)

1 deductions were to arrive at this $16.6 million number?

2  A. Not in terms of dollars.

3  Q. The deduction to get to sales of product income for

4 travel awards, Skiplagged travel awards, is that deduction

5 awards actually redeemed or awards that were just awarded, and

6 may or may not have been redeemed?

7  A. I'm not sure. Whatever the proper GAAP accounting,

8 I'm assuming, was done.

9  Q. And what causes you to make that assumption?

10  A. I've been asked to assume these are accurate.

11  Q. I understand you assume they're accurate, and my --

12 my -- and I appreciate that, but my question is more specific.

13      The awards that were removed from the Sale of

14 Product Income to arrive at the $16.6 million, there was a

15 number deducted, let's say it was a million dollars. Okay?

16  A. Okay.

17  Q. If a million dollars is deducted, do you know if that

18 million-dollar deduction represented the actual awards redeemed

19 by customers or the awards that were granted, and may or may

20 not have been redeemed?

21  A. I'm not sure. I'm assuming whatever way it was done

22 follows proper accounting procedures.

23  Q. And that assumption is based on your interview with

24 Mr. Zaman?

25  A. I've been asked to assume that these are accurate and

Page 62

1  A. That you have to be a member to get that travel

2 credit, I believe.

3  Q. And so then the travel credit of $2.50 in this

4 instance may or may not be redeemed in -- in, say, the calendar

5 year 2023, correct?

6  A. To the extent it was actually awarded to a customer,

7 it's possible. Right.

8  Q. And then if that -- let's just say, for this example,

9 the award was earned in 2023, but not redeemed in 2023. Okay?

10  A. Yes.

11  Q. And so then that $2.50 award is a liability for

12 Skiplagged, correct?

13  A. I believe so.

14  Q. Okay. And if you can, please show me on the -- the

15 balance sheet where that liability is reflected. And that --

16 the balance sheet I'm talking about is Exhibit 3.

17  A. I'm not sure.

18  Q. So let's look at exhibit -- or Table 5. Are you

19 there?

20  A. Oh, I'm sorry. Yes.

21  Q. Okay. So on Table 5, basically what you've done is,

22 you've taken the operating expenses totaled in Table 4, and

23 then compared them to the net revenue for each year; is that

24 correct?

25  A. Yes.

Page 64

1 correct.

2  Q. So the award program that Skiplagged has, we -- we've

3 talked briefly that the awards were created by Skiplagged's

4 system, and then provided to a customer, correct?

5  A. That's my understanding.

6  Q. And -- and so let's just -- and this is an example

7 that I'm going to use for simplicity.

8  A. Okay.

9  Q. Let's say a customer buys a $100 ticket and

10 Skiplagged gives them a $2.50 award for being a Skiplagged

11 customer. Are you with me?

12  A. Yes.

13  Q. Do you know how a Skiplagged customer or what they

14 have to do to actually receive that award?

15  A. I'm not aware that they have to do anything.

16  Q. Well -- so, for example, they have to sign up for

17 Skiplagged's award program?

18  A. Point taken. I agree.

19  Q. Okay.

20  A. That's my understanding.

21  Q. And if somebody doesn't sign up for the Skiplagged

22 rewards program, they may be awarded that $2.50, but they

23 wouldn't be able to redeem it, correct?

24  A. That's not my understanding.

25  Q. Tell me what your understanding is, please.

Page 63

1  Q. And that net revenue from each year, that comes from

2 the P&L statements?

3  A. It does.

4  Q. And were there any adjustments on the net revenue?

5  A. No.

6  Q. And then you derived this operating expenses as a

7 percent of net revenue, correct?

8  A. Yes.

9  Q. And so in your opinion, the operating expenses is a

10 percent of net revenue for Skiplagged for 2020 are 10.4; for

11 '21, 11.2; for 2022, 19.6; and for 2023, 20.1; is that correct?

12  A. Yes.

13  Q. And is it also correct that in assessing Skiplagged's

14 cost to be deducted for purposes of trademark and Copyright

15 Infringement, you did not provide an exact dollar amount?

16  A. Can you repeat that? I'm sorry.

17  Q. Well, of course. So the idea is that in copyright

18 and trademark law, the plaintiff proves the total revenue,

19 correct?

20  A. Yes.

21  Q. And then the defendant deducts expenses, correct?

22  A. Their burden is to prove expenses.

23  Q. Right. And I would think that you would come up with

24 an exact number for expenses, but I don't see one anywhere in

25 your report; is that correct?

Page 65

17 (Pages 62 - 65)

1    A.   These percentages are the way the cost would be
2  applied to the revenue streams that are allegedly infringing.
3    Q.   So why didn't you come up with an exact number for
4  each year to deduct from the gross revenue?
5    A.   I -- I could have.
6    Q.   Yes, sir.  But why didn't you?
7    A.   I don't -- I don't remember.  I'm not sure.
8    Q.   So in your view, what is the jury supposed to do with
9  these percentages?
10   A.   These are the -- well, these are the cost percentages
11 to apply to the infringing revenue.
12   Q.   And so specifically, how would that work?
13   A.   If you had $100 of revenue, applicable revenue in
14 2020, you'd subtract off 10.4 percent of that, 86.6 -- 89.6
15 percent would be your profit, $89.6.
16   Q.   And so the -- the same method would hold true for
17 '21, '22 and '23?
18   A.   Yes.
19   Q.   Okay.  So going through Tables 1 through 5 based on
20 what we've talked about today, I believe that it's -- it's
21 essentially math is what you've done to get to Table 5; is that
22 correct?
23   A.   It's looking at your profit and loss statements,
24 understanding what's included in the various categories, it's
25 making a determination of which costs to include or exclude for

Page 66

1  purposes of a calculation of Defendant's profits.
2    Q.   The cost that you decided to include, those were the
3  ones that Mr. Zaman told you to include, correct?
4    A.   No.
5    Q.   Okay.
6    A.   I was not given any instructions on what costs to
7  include or exclude.  That -- that's my opinion what to include.
8    Q.   When we were previously talking about the Stripe
9  fees, do you remember that --
10   A.   Yes.
11   Q.   -- discussion?
12        Okay.  You said that that was also an
13 above-the-line deduction, do you remember that?
14   A.   It's a deduction for purposes of calculating net
15 revenue from gross revenue.
16   Q.   Right.  And so the net revenue is in Exhibit 2
17 reflected as -- well, it says, "Gross profit," not "net
18 profit," correct?
19   A.   It says that, yes.
20   Q.   Okay.  So --
21   A.   Net profit is the bottom line number.
22   Q.   Right.
23   A.   Okay.
24   Q.   And so -- but I'm trying to figure this out.  Because
25 you said the Stripe fees were deducted above-the-line, meaning,

Page 67

1  above the gross profit line?
2    A.   Yes.
3    Q.   So how can -- how is that reconcilable if it's gross
4  profit, but you've already deducted expenses to get there?
5    A.   Gross revenues doesn't imply -- gross profit is not
6  based off of gross revenues.  It's based on net revenues.
7    Q.   And the only item deducted here from the total income
8  is the cost of goods sold, correct?
9    A.   The only costs deducted, yes.
10   Q.   Right.  So --
11   A.   There -- there are deductions, offsets, included
12 within the 16.5 million.
13   Q.   And that's the Sale of Product Income is what you're
14 talking about there?
15   A.   I'm sorry.  Yes.
16   Q.   Okay.  Are there any deductions off of the commission
17 income?
18   A.   There could be -- there could be some.
19   Q.   What are they?
20   A.   If a vendor reports that their revenue due to
21 Skiplagged is $100, and they don't pay $100, it's like a bad
22 debt expense, that would be deducted here.
23   Q.   Anything else?
24   A.   I -- I think that's -- that's what I can think of
25 right now.

Page 68

1    Q.   So my understanding is that Exhibit 2, this -- this
2  P&L statement was created in QuickBooks; is that accurate?
3    A.   It's my understanding.
4    Q.   And so in QuickBooks, each one of these line items
5  would have specific line items below it that roll up into
6  what's reflected in Exhibit 2, correct?
7    A.   I don't know.  I'm not sure.
8    Q.   Isn't that usually the way QuickBooks works?
9    A.   I'm not a QuickBooks expert.
10   Q.   Did you look at Skiplagged's QuickBooks in this case?
11   A.   No.  This was what was produced, and this is what I
12 have.
13   Q.   So on the Sales of Product Income of 16,596,376, can
14 you identify how much was deducted for Stripe fees to get to
15 that number?
16   A.   I don't know the dollar amount for that, no.
17   Q.   And Stripe fees are just the credit card fees
18 associated with every time somebody runs a credit card,
19 correct?
20   A.   It's the processing fees that Stripe charges
21 Skiplagged to facilitate payments.
22   Q.   Commonly referred to as the "interchange fee"?
23   A.   It could be.
24   Q.   Okay.  In this case, you understand it's 2.9 percent?
25   A.   Yes.  Plus 30 cents per transaction.  Yes.

Page 69

18 (Pages 66 - 69)

1    Q.  Right.
2          So the -- the sales related to American Airlines
3  are identifiable, correct?
4    A.  The service fees related to American Bookings, yes, I
5  believe so.
6    Q.  So then you could actually go in and identify the
7  precise amount for the Stripe fees, correct, related to
8  American Airlines Bookings?
9          MR. KLEMCHUK:  Objection, form.
10    A.  Well, the service fee varies by customer, so you
11  couldn't do it on a per customer basis.
12    Q.  (BY MR. BERG)  Well, if, for example, Skiplagged
13  charged Jane Doe a $10 service fee, Skiplagged for Jane Doe
14  using the Book Now feature and obtaining a flight on American
15  Airlines, Skiplagged charges $10 for that, we know that there
16  would be a 30 cent fee from Stripe, plus a 2.9 percent fee,
17  correct?
18    A.  That's my understanding, yes.
19    Q.  And so you could go back in and identify all of those
20  American Airline customers and the exact amount of the Stripe
21  fee that Skiplagged paid, correct?
22    A.  To the extent that data was available, yes.
23    Q.  Do you know one way or another whether or not data is
24  available?
25    A.  I'm not sure.

Page 70

1  right to address and quantify the impact of these other factors
2  not related to the alleged infringement of American's trademark
3  and copyright"?
4    A.  Yes.
5    Q.  What does that mean?
6    A.  That's the apportionment issue that we've been
7  talking about.
8    Q.  Does it mean anything -- does it mean anything else?
9    A.  I don't believe so.
10    Q.  And then just to -- so it's all contained, on the
11  apportionment issue, as we sit here today, you have not
12  formulated a final opinion, correct?
13    A.  Correct.
14    Q.  Did you have any assistance in preparing your report?
15    A.  I did.
16    Q.  Who?
17    A.  Other colleagues at AlixPartners.
18    Q.  Yes, sir.  Who?
19    A.  Dhwani Kapadia, Gabby Sagiante [sic]  I believe
20  those are the two that assisted.
21    Q.  Okay.  And I'm just going to use the first names, if
22  that's okay.  Dhwani, what did Dhwani do?
23    A.  Assisted with the development of the exhibits,
24  quality control.
25    Q.  And what did Gabby do?

Page 72

1    Q.  Just going to backtrack real quick to Paragraph 14 of
2  your report, Exhibit 1, please, sir.
3    A.  I'm there.
4    Q.  The 7th line down.
5    A.  Yes.
6    Q.  Let's just go 6th line.  The 6th line.
7  "Additionally, it states that in establishing the infringer's
8  profits, the copyright owners were required to present proof
9  only of the infringer's gross revenue."  Did I read that?
10    A.  Yes.
11    Q.  Did you do anything to establish what Skiplagged's
12  gross revenue was related to American Airlines Bookings?
13    A.  I've assumed that the amounts set forth in the
14  interrogatory answers is the accurate net revenues for
15  Skiplagged.
16    Q.  Yes, sir.  And my question's a bit different.  That's
17  net revenue.  I'm asking if you did anything to establish
18  Skiplagged's gross revenue?
19    A.  You're saying the statute says gross revenue in the
20  accounting, using accounting terminology.  I'm not sure that's
21  what that's asking for and requiring, but maybe you're right.
22    Q.  Paragraph 25 of your report.  That last sentence
23  starts with "Subject to".
24    A.  Yes.
25    Q.  "Subject to Plaintiff's damages claim, I reserve the

Page 71

1    A.  Same, just at a different time period.
2    Q.  Okay.  So they -- they did the same job, but just
3  different time periods?
4    A.  Generally.
5    Q.  Okay.  Did anyone assist with the report that didn't
6  charge for their time?
7    A.  No.
8    Q.  Do you know how much Dhwani charges per hour?
9    A.  I believe she may be 775.
10    Q.  And Gabby?
11    A.  I -- I think she's 510.
12    Q.  Do you know how much time each spent in helping you
13  with this case?
14    A.  I'm not sure.
15    Q.  Do you know how much time you spent?
16    A.  I'm not sure.
17    Q.  Do you know the total amount your firm, AlixPartners,
18  has charged?
19    A.  I believe through June, it's approximately 40-,
20  45,000.  Something like that.
21    Q.  And that was paid directly to your firm,
22  AlixPartners, correct?
23    A.  I'm not sure it's all been paid yet, you know, the
24  June time.  We just -- but it would be paid, and has been paid
25  from Skiplagged to AlixPartners, correct.

Page 73

19 (Pages 70 - 73)

| | |
|---|---|
| 1  Q.  Okay.  And then are you compensated in some sort of | 1          IN THE UNITED STATES DISTRICT COURT |
| 2  direct correlation with what AlixPartners receives on a | 2       FOR THE NORTHERN DISTRICT OF TEXAS |
| 3  project? | 3    AMERICAN AIRLINES, INC.,    ) |
| 4  A.  No. | 4       Plaintiff,              ) |
| 5  Q.  Is your comp- -- are you just on a salary? | 5    v.                        )      CIVIL ACTION |
| 6  A.  I'm salary and bonus. | 6    SKIPLAGGED, INC.,           ) |
| 7  Q.  Is your bonus tied to how much revenue you generate | 7       Defendant.             ) |
| 8  in your work, like, for example, on this? | 8 |
| 9  A.  I'm not sure.  It's black box. | 9 |
| 10  Q.  And by "black box," I think we all know what that | 10       REPORTER'S CERTIFICATION |
| 11  means, but to be clear, it's -- you know, numbers go in, and | 11    ORAL AND VIDEOTAPED DEPOSITION OF |
| 12  then you get your compensation.  You don't really know how that | 12          GARY L. GUTZLER |
| 13  was calculated? | 13          JULY 12, 2024 |
| 14  A.  Correct. | 14 |
| 15  Q.  In your work on other trademark cases in your initial | 15    I, Amber Garcia, Notary Public in and for the State of |
| 16  report, have you ever done an apportionment of expenses related | 16  Texas, hereby certify to the following: |
| 17  to the infringing project -- or product? | 17    That the witness, GARY L. GUTZLER, was duly sworn by the |
| 18  A.  I'm not sure. | 18  officer and that the transcript of the oral deposition is a |
| 19      MR. BERG:  All right.  Can we just take a quick, | 19  true record of the testimony given by the witness; |
| 20  like, a 5-minute break? | 20    I further certify that pursuant to FRCP Rule 30 (e) (1) |
| 21      MR. KLEMCHUK:  Sure. | 21  that the signature of the deponent: |
| 22      THE VIDEOGRAPHER:  We're off the record at | 22    _____ was requested by the deponent or a party before |
| 23  12:20. | 23  the completion of the deposition and returned within 30 days |
| 24      (Recess taken from 12:20 p.m. to 12:30 p.m.) | 24  from date of receipt of the transcript.  If returned, the |
| 25      THE VIDEOGRAPHER:  We are back on the record at | 25  attached Changes and Signature Page contains any changes and |
| Page 74 | Page 76 |

| | |
|---|---|
| 1  12:30. | 1  the reasons therefor; |
| 2      MR. BERG:  Mr. Gutzler, thank you for your time | 2    ____x____ was not requested by the deponent or a party |
| 3  today.  I have no further questions at this time. | 3  before the completion of the deposition. |
| 4      MR. KLEMCHUK:  I reserve questions for trail. | 4    I further certify that I am neither attorney nor counsel |
| 5      MR. BERG:  Yeah.  And we'll reserve the right to | 5  for, related to, nor employed by any of the parties to the |
| 6  ask questions about any rebuttal report that he may or may not | 6  action in which this testimony was taken. |
| 7  do in this case. | 7    Further, I am not a relative or employee of any attorney |
| 8      THE REPORTER:  Mr. Klemchuk, would you like to | 8  of record in this cause, nor do I have a financial interest in |
| 9  purchase a copy of the transcript? | 9  the action. |
| 10      MR. KLEMCHUK:  I will get back to you. | 10    Subscribed and sworn to on this the 19th day of July, |
| 11      THE REPORTER:  Okay. | 11  2024. |
| 12      THE VIDEOGRAPHER:  We're off the record at | 12 |
| 13  12:30. | 13 |
| 14      (End of proceedings at 12:30 p.m.) | 14 |
| 15 | 15    _Amber Garcia_ |
| 16 |        Amber Garcia, Notary ID No. 13426953-9 |
| 17 |        My commission expires:  3-24-2027 |
| 18 | 16    VERITEXT LEGAL SOLUTIONS |
| 19 |        Firm Registration No. 571 |
| 20 | 17    300 Throckmorton Street, Suite 1600 |
| 21 |        Fort Worth, Texas 76102 |
| 22 | 18    (817) 336-3042 |
| 23 |        (800) 336-4000 |
| 24 | 19 |
| 25 | 20 |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

```
 1                IN THE UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF TEXAS

 2                      FORT WORTH DIVISION

 3   AMERICAN AIRLINES, INC.,        )

                                     )

 4        Plaintiff,                 )

                                     )

 5   v.                              )              CIVIL ACTION

                                     )        NO. 4:23-cv-00860-P

 6                                   )

     SKIPLAGGED, INC.,               )

 7                                   )

          Defendant.                 )

 8

 9

10                   REPORTER'S CERTIFICATION

11            ORAL AND VIDEOTAPED DEPOSITION OF

12                     GARY L. GUTZLER

13                      JULY 12, 2024

14

15        I, Amber Garcia, Notary Public in and for the State of

16   Texas, hereby certify to the following:

17        That the witness, GARY L. GUTZLER, was duly sworn by the

18   officer and that the transcript of the oral deposition is a

19   true record of the testimony given by the witness;

20        I further certify that pursuant to FRCP Rule 30 (e) (1)

21   that the signature of the deponent:

22        _____ was requested by the deponent or a party before

23   the completion of the deposition and returned within 30 days

24   from date of receipt of the transcript.  If returned, the

25   attached Changes and Signature Page contains any changes and
```

Page 76

1    the reasons therefor;

2         _____x_____ was not requested by the deponent or a party

3    before the completion of the deposition.

4         I further certify that I am neither attorney nor counsel

5    for, related to, nor employed by any of the parties to the

6    action in which this testimony was taken.

7          Further, I am not a relative or employee of any attorney

8    of record in this cause, nor do I have a financial interest in

9    the action.

10        Subscribed and sworn to on this the 19th day of July,

11   2024.

12

13

14

15        Amber Garcia, Notary ID No. 13426953-9

          My commission expires:  3-24-2027

16        VERITEXT LEGAL SOLUTIONS

          Firm Registration No. 571

17        300 Throckmorton Street, Suite 1600

          Fort Worth, Texas 76102

18        (817) 336-3042

          (800) 336-4000

19

20

21

22

23

24

25

                                              Page 77

App'x 045

```
1   American Airlines, Inc. v. Skiplagged, Inc

2   Gary L. Gutzler  Job No. 6791877

3                    E R R A T A   S H E E T

4   PAGE 24   LINE 7   CHANGE "in--in" to "and--and"

5   _____

6   REASON Transcription error

7   PAGE 49   LINE 19   CHANGE "Tim Phelp" to

8        "temp help"

9   REASON Transcription error

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____     8/21/24
                                  _____
24  Gary L. Gutzler                    Date

25
```

Page 78

App'x 046

# Exhibit A-3

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-4

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-5

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-6

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-7

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-8

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-9

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal