IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC., § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 4:23-cv-00860-P |
| § | |
| SKIPLAGGED, INC., § | |
| § | |
| Defendant. § | |

# BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE TESTIMONY AND REPORT OF PLAINTIFF'S EXPERT, DR. JERRY WIND

William L. Kirkman
Texas Bar No. 11518700
Preston B. Sawyer
Texas Bar No. 24102456
**KIRKMAN LAW FIRM, PLLC**
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone: (817) 336-2800
Facsimile: (817) 887-1863
billk@kirkmanlawfirm.com
prestons@kirkmanlawfirm.com

Aaron Z. Tobin
Texas Bar No. 24028045
Kendal B. Reed
Texas Bar No. 24048755
Abigail R.S. Campbell
Texas Bar No. 24098759
**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
atobin@condontobin.com
kreed@condontobin.com
acampbell@condontobin.com

28385761v1 99460.002.00

Darin M. Klemchuk
Texas Bar No. 24002418
**KLEMCHUK PLLC**
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone: (214) 367-6000
Facsimile: (214) 367-6001
Darin.klemchuk@klemchuk.com

***Attorneys for Defendant, Skiplagged, Inc.***

28385761v1 99460.002.00

## TABLE OF CONTENTS

OVERVIEW .................................................................................................................................. 1

ARGUMENTS AND AUTHORITIES ........................................................................................ 3

    A.   The law requires expert opinions to be relevant and reliable ............................................ 3

    B.   Dr. Wind's opinions are irrelevant because they do not specifically address AA's copyright and trademark claims ....................................................................................... 5

    C.   Dr. Wind's opinions are not reliable ................................................................................ 6

        *1. Wind lacked experience in conducting consumer surveys* .................................... 6

        *2. Wind's opinions were based on mistaken assumptions that undermined his methodology* 7

        *3. Wind's research design was unrelated to the trademarks* .................................... 8

        *4. Wind's use of Expedia rendered his report unreliable* .......................................... 9

        *5. There was too great an analytical gap between the data and Wind's opinion* ...................11

CONCLUSION ........................................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 597 (1993) ....................................................... 3, 4

*Factory Mutual Insurance Co. v. Alon USA LP*, 705 F.3d 518, 524 (5th Cir. 2013) ...................... 4

*Frakes v. Masden*, No. H-14-1753, 2015 WL 7583051 .................................................................. 3

*General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) .................................................................. 4

*Hogdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) .......................................................................................................................................... 9

*Kumho Tire Co, Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).................................................. 3, 12

*Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)) .................. 4

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. H-05-1634, 2007 WL 150606 ....................... 5

*Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (en banc) .................... 3, 4, 7

*Moore v. Int'l Paint, L.L.C.*, 547 Fed. Appx. 513, 515 (5th Cir. 2013) ........................................... 5

*Mosley-Lovings v. AT&T Corp.*, No. 3:18-CV-01145-X, 2020 WL 5753483 ............................. 3, 6

*Orthoflex, Inc. v. Thermotek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) ......................... 4, 5

*Robroy Indus.—Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, No. 2:16-CV-198-WCB, 2017 WL 1319553 ................................................................................................................ 4

*Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ............................................................. 5, 12

*Stinson Air Ctr., LLC v. XL Speciality Ins. Co.*, No. SA-03-CA-61-FB, 2005 WL 5979096 ......... 5

*Tanner v. Westbrook, M.D.,* 174 F.3d 542, 547 (5th Cir. 1999) ..................................................... 4

*Wilson v. Woods*, 163F.3d 935, 937 (5th Cir. 1999) .................................................................. 6, 7

**Rules**

Fed. R. Evid. 702 ........................................................................................................................ 3, 4, 7

Fed. R. Evid. 703 ............................................................................................................................. 4

Defendant Skiplagged, Inc. ("Skiplagged") files this Brief in Support of its Motion to Strike Plaintiff American Airlines, Inc's ("AA") Expert Witness Jerry Wind and to Exclude his testimony at trial, and shows the Court as follows:

**OVERVIEW**

AA has proffered Dr. Wind's expert report, which purports to analyze the effect on AA, of Skiplagged's "activities" associated with its website. Dr. Wind's report is based entirely on consumer survey experiments he conducted.

Because of the Court's Order on the parties' cross motions for summary judgment, this is now a copyright and trademark infringement case. *See* Dkt. 199 at 11. Therefore, the only possible relevance Dr. Wind's report could have in this case, would relate to AA's trademark infringement claim against Skiplagged. And, the only possible benefit to a jury of Wind's opinion would be to assist the jury in determining whether Skiplagged has liability for trademark infringement as to AA's marks and flight symbol. However, despite recitations to the contrary in the beginning of his report, Dr. Wind's experiments and his resulting report do not specifically address AA's trademark infringement claim. Consequently, his opinion will not assist the jury in resolving the factual issues associated with AA's claim of trademark infringement.

Wind did not study the specific effects of any trademark violations by Skiplagged. His report is devoid of any such analysis. Rather, he surveyed participants who viewed portions of Skiplagged's website and compared their experience with participants who looked at Expedia's website. This approach is not relevant to the likelihood of confusion analysis associated with the trademark claims AA asserts and immaterial to the issue of copyright damages. The word "trademark" appeared only twice in Wind's April 23, 2024 Expert Report ("Wind Report"). *See* Ex. 2, p. 3 (App. p. 022). Both instances are on page 3 and are background—unrelated to Wind's

opinions or testing. Instead, his purported conclusions contained in the first full paragraph on p. 4 addressed only "activities," not its display of the AA mark or flight symbol.

The specific issue related to AA's trademark infringement claim that the jury will be asked to determine is whether Skiplagged, by displaying the AA mark and flight symbol on Skiplagged's website in connection with facilitating consumers to purchase airline tickets on a number of different airlines, caused or is likely to cause confusion, misunderstanding, or to deceive consumers as to the affiliation, connection, or association of Skiplagged with AA. Wind's consumer experiments were not designed to determine this, nor did they provide any information to assist the jury in making such a determination. The Court should strike his opinions and exclude him from testifying.

Beyond this fundamental flaw with Dr. Wind's report described above, he lacks experience in the specific field he addresses—consumer surveys. His opinions are also unreliable and based on assertions of fact that have proven to be untrue and are fatal to his methodology. Wind's background was not well-suited for a consumer survey analysis and his lack of expertise and misunderstandings based thereon, get in the way of a reasoned judgment. For all of his credentials, his experience with consumer surveys has been confined to only *part of one chapter* he published with two other authors addressing consumer confusion.[1] Moreover, he has not published anything addressing marketing in the airline industry. The mere fact that Wind collaborated with a couple of attorneys on a chapter on consumer surveys does not make him an expert on consumer surveys. Finally, there is simply too great of an analytical gap between the accurate data and Wind's opinions.

---

[1] *See* Jerry (Yoram) Wind, Ben Mundel, Chad Hummel, "Implications of the Consumer Journey to Traditional Consumer Surveys for Litigation (Ch. 2)". In The Cambridge Handbook of Marketing and The Law, edited by, (2023).

## ARGUMENTS AND AUTHORITIES

A.  **The law requires expert opinions to be relevant and reliable**

Federal Rule of Evidence 702 requires the Court to function as a gatekeeper to screen expert testimony. *Kumho Tire Co, Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). This gatekeeping requirement ensures the reliability of expert testimony. *Id.* "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Testimony is reliable if: 1) it is based upon sufficient facts or data; 2) it is the product of reliable principles and methods; and 3) the witness applies the principles and methods reliably to the facts of the case. FED. R. EVID. 702.

"To be 'helpful' under Rule 702, an expert opinion must be relevant, or as the Supreme Court framed it, the opinion must 'fit' the issues of the case." *Mosley-Lovings v. AT&T Corp.*, No. 3:18-CV-01145-X, 2020 WL 5753483, at *3 (N.D. Tex. Apr. 13, 2020). "The proffered expert opinions must be both relevant and reliable." *Frakes v. Masden*, No. H-14-1753, 2015 WL 7583051, at *3 (S.D. Tex. Nov. 25, 2015).

The party relying on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements are met. *See Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 597 (1993). The proponent must demonstrate that the expert's findings and conclusions are based on the scientific method and must show "some objective, independent validation of the expert's methodology." *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

> The subject of an expert's testimony must be 'scientific … knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the work 'knowledge' connotes more than subjective belief of unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.' (internal cite omitted).

28385761v1 99460.002.00

* * * *

> But, in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known.

*Id.* at 275, citing *Daubert,* 509 U.S. at 589-590.

In examining expert opinion reliability, the factors in *Daubert* are a starting point, but the Court may supplement those factors with other considerations pertinent to the proposed testimony's reliability. *Tanner v. Westbrook, M.D.,* 174 F.3d 542, 547 (5th Cir. 1999). The Court may reject proposed expert testimony when "there is simply too great an analytical gap between the data and the opinion offered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Under *Daubert,* 'any step that renders the analysis unreliable…renders the expert's testimony inadmissible.'" *Moore,* 151 F.3d at 278 n.10 (internal citation omitted); FED. R. EVID. 702.

An expert witness may base her opinion on facts or data she "has been made aware of or personally observed." FED. R. EVID. 703. Numerous cases, however, support the proposition that "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Robroy Indus.—Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, No. 2:16-CV-198-WCB, 2017 WL 1319553, at *9 (E.D. Tex. Apr. 19, 2017) (quoting *Factory Mutual Insurance Co. v. Alon USA LP*, 705 F.3d 518, 524 (5th Cir. 2013) (quoting *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)); *Orthoflex, Inc. v. Thermotek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) ("Although in forming an independent opinion an expert can rely on information provided by a party's attorney, an expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him.").

28385761v1 99460.002.00

The Fifth Circuit has warned trial judges "to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). And "an expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) (citing *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. H-05-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007)); *Stinson Air Ctr., LLC v. XL Speciality Ins. Co.*, No. SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005). Nor may a party call a supposed expert who merely synthesized the party's trial arguments. *See, e.g., MGM Well Servs., Inc.*, 2007 WL 150606, at *4.

Indeed, "expert testimony that relies on completely unsubstantiated factual assertions is inadmissible." *Moore v. Int'l Paint, L.L.C.*, 547 Fed. Appx. 513, 515 (5th Cir. 2013) (internal quotations omitted). "When an expert's testimony is not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position, the trial court should exclude it." *Id.* (internal quotations omitted) (alternation in original).

**B.    Dr. Wind's opinions are irrelevant because they do not specifically address AA's copyright and trademark claims**

Despite using recitations in his introductory paragraph which recite the key aspects of an alleged trademark violation, Wind's experiments and report did not specifically address AA's trademarks or their effect on consumers. Ex. 2, pp. 4-5 (App. p. 0023-24). In fact, Wind's report mentioned trademark only twice, both in background. Ex. 2, p. 3 (App. p. 0022). That is because his objectives—"the risks" involved with buying Skiplagged tickets and "deception about the fees charged…by Skiplagged"—guided his report, not trademark confusion. Ex. 2, p. 5 (App. p. 0024). These objectives, and Wind's report, did not address AA's intellectual property or whether Skiplagged violated AA's intellectual property rights. But that is what this lawsuit is about now.

5

Wind's report must "fit the issues of the case." *Mosley-Lovings*, 2020 WL 5753483, at *3. If not, then his report and testimony will confuse the jury and prejudice Skiplagged. Because of the Court's summary judgment order, Wind's report no longer fits this case. Thus, the Court should exclude Wind's report and his testimony on this basis.

Wind purported to analyze whether consumers were confused or deceived by Skiplagged's activities. Ex. 2, p. 4 (App. p. 0023). To do this, he surveyed consumers on topics such as "the degree of consumer deception associated with Skiplagged's offerings." Ex. 2, p. 4 (App. p. 0023). He then concluded, without any real basis, that Skiplagged deceived consumers. Ex. 2, p. 39 (App. p. 0058); Ex. 1, Wind Depo. 102:4-19 (App. p. 0011). More specifically, he concluded that Skiplagged "deceive[d] consumers about the risks associated with its products/services." Ex. 2, p. 4 (App. p. 0023). Wind's consumer survey did not analyze AA's trademarks. Ex. 2, p. 4 (App. p. 0023). Instead, Wind focused on Skiplagged's "offerings," such as hidden city flights, and compared them to offerings from a known travel website, Expedia. Ex. 2, p. 4 (App. p. 0023). But AA conceded this case is not about hidden city flights even before the Court's summary judgment order. *See* American Airlines, Inc's Brief in Support of its Response to Defendant Skiplagged, Inc.'s Motion for Summary Judgment, at 1. In *Mosley-Lovings*, the Court struck an expert's testimony because, based on developments in the case, the expert's testimony "no longer fits" and an expert's "opinion must 'fit' the issues of the case." 2020 WL 5753483, at *3. Such is the case here.

**C.     Dr. Wind's opinions are not reliable**

        **1.  Wind lacked experience in conducting consumer surveys**

Before allowing Wind to testify, this Court "must be assured that [Wind] is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163

F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). In fact, this Court should "refuse to allow [Wind] to testify if it finds that [he] is not qualified to testify in a particular field or on a given subject." *Id.*

Wind is an academic experienced in teaching marketing to graduate students. He has also written about creativity, marketing, innovation, and other business topics. But one important topic was largely absent from his CV: consumer surveys. Ex. 2, Appx. A (App. p. 0109-0232). In fact, his experience with consumer surveys is confined to part of one chapter he wrote, with the help of co-authors, addressing consumer confusion.[2] Ex. 2, Appx. A (App. p. 0228). It was also unclear if this was a peer-reviewed publication. AA, in other words, cannot assure the Court that Wind's consumer survey lived up to the standards of a typical consumer survey. *See Moore*, 151 F.3d at 276 (expert report must be based on "some objective, independent validation" of the expert's methodology). Because of this, Wind is not qualified "by virtue of his 'knowledge, skill, experience, training, or education,'" to opine on consumer surveys and their results. *See Wilson*, 163 F.3d at 937. Thus, the Court should exclude Wind from testifying at trial in this lawsuit.

2. **Wind's opinions were based on mistaken assumptions that undermined his methodology**

Wind's report started off on the wrong foot because the background section contained several material mistaken assumptions. This is because his understanding of the factual disputes was based on direction from AA's counsel or the allegations in AA's Complaint. Dr. Wind admitted in deposition that "[e]verything in this section by background I was told by counsel." Ex. 1, Wind Depo. 56:15-16 (App. p. 0005). Wind has acknowledged that AA hired him to "assess whether, and to what extent, Skiplagged's published content and offerings on Skiplagged.com relating to

---

[2] *See* Jerry (Yoram) Wind, Ben Mundel, Chad Hummel, "Implications of the Consumer Journey to Traditional Consumer Surveys for Litigation (Ch. 2)". In The Cambridge Handbook of Marketing and The Law, edited by, (2023).

7

American flights has generated confusion and deception in the marketplace, including as it relates to Skiplagged's perceived association with and/or authorization or sponsorship from American." Ex. 2, p. 4 (App. p. 0023). Again, this does not concern AA's trademarks or copyrights. He also acknowledged that he did not question or confirm certain information he received from AA's counsel. Ex. 1, Wind Depo. 52:24-53:4 (App. p. 0003-4).

While Wind paid lip service to the commonly used infringement language "sponsorship, approval, or authorization," these concepts were not analyzed in the context of analyzing Skiplagged's inclusion of the trademarks and its effect on AA. Rather, Wind looked at terms in relation to the "offering and facilitating the sale of American flights." There is nothing in the record that established that the participants in Wind's surveys were even asked about any of the AA trademarks. Wind wrote, "[t]o accomplish this objective, I considered whether Skiplagged's uses of the American Marks *and data* were likely to cause, or have caused, confusion amongst consumers." Ex. 2, p. 4 (App. p. 0023) (emphasis added). While he mentioned marks, he failed to separate the marks from the "data." This error plagued the report because Wind focused on the business model rather than use of the trademarks or copyrights. As a result, there was no useful information to salvage from his efforts. Wind performed the wrong study. He asked the wrong questions in the wrong way. Now that AA's only remaining claims are Lanham Act and copyright damages, there is nothing in Wind's opinions that will assist the trier of fact.

### 3. Wind's research design was unrelated to the trademarks

Wind's report was based on two experiments:

a. Using the Skiplagged regular ticket as the stimulus for the test group vs. the ticket offering on Expedia for the same/corresponding flight, as a control group; and

b. Using the Skiplagged hidden city ticket as the stimulus for the test group vs. the ticket offering on Expedia for a corresponding flight to the intended destination, as a control group.

28385761v1 99460.002.00

Ex. 2, p. 9 (App. p. 0028).  These experiments were irrelevant to trademarks or copyrights.

Indeed, throughout his report, Wind discussed the survey participant's response to various "stimuli." He used two "stimuli": (1) "Skiplagged regular ticket," and (2) "Skiplagged hidden city ticket." Ex. 2, p. 9 (App. p. 0028). Neither of these stimuli concerned AA's trademarks. Instead, they concerned a part of Skiplagged's business model—facilitating hidden city flights.

In fact, Wind's survey showed that he did not use the stimuli to question participants on AA's trademarks. Ex. 2, p. 8 (App. p. 0027). ("Showing the respondents in the test group the Skiplagged flight offering and showing the respondents in the control group the Expedia flight offering.").

Since Wind's report relied on the wrong assumptions, his design and implementation of the consumer experiments sought the wrong information. This rendered his conclusions unreliable for this lawsuit in its current state because he asked the wrong questions, attempted to solve the wrong problems, and created irrelevant results.

### 4.  Wind's use of Expedia rendered his report unreliable

Not only did the Wind report's misaligned opinions render his report inadmissible, but also his use of Expedia also made his report unreliable. By using Expedia, Wind created a familiarity bias that made the results unreliable. *See Hogdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007) (striking an expert's survey because its respondents "were already familiar" with the company).  Expedia is a well-known travel company that Wind chose only because: (1) it had a large market share, and (2) it was an authorized agent of AA. *See* Ex. 1, Wind Depo. 96:17-22 (App. p. 0007). He did not seriously consider any other control groups. Ex. 1, Wind Depo. 96:23-97:6 (App. p. 0007-8).

Wind started with the basic assumption that people familiar with Expedia assumed it was

9

an authorized agent of AA. But there was no similar assumption about Skiplagged. Thus, it was predicable that persons surveyed assumed the unfamiliar company was not an authorized agent versus the well-known company. The way Wind interpreted the survey was even worse than that, as the survey showed that Wind ultimately measured the perceived similarity between the two companies:

> Q. All right. You said the next sentence, you say, "The interpretation of the difference between the test and control groups is that the closer the results for Skiplagged are to those of Expedia, the greater the perceived confusion and deception." Did I read that correctly?
> A. Correct.
> Q. Okay. So those people like me, without a Ph.D., does that mean that more the consumer thinks Skiplagged is like Expedia, the more confused they are?
> A. Yes.
> Q. Because Expedia is an authorized agent and Skiplagged is not?
> A. Yes.

Ex. 1, Wind Depo. at 98:3-17 (App. p. 0009).

The survey participants did not look at the use of similar trademarks. Rather, participants reported on the overall impression of each company's website and business model. From this, Wind assumed that a similar perception equated to confusion. He did not explain why this was the case or how it related to the claims and defenses of this litigation. Indeed, it did not demonstrate any confusion about AA's trademarks or copyrights, which is the only remaining focus in this lawsuit.

Wind's survey found that 43% of participants were confused about Skiplagged's association (as an authorized agent) with AA and 56% of the participants were confused Expedia's association with AA. Ex. 2, p. 39 (App. p. 0058); Ex. 1, Wind Depo. 102:4-19 (App. p. 0011). From this, Wind concluded that the 43% of participants who viewed Skiplagged's website were confused but that the 44% who did not believe Expedia was not an authorized agent (subtracted

10

from the 56% of participants who did) were just "wrong." Ex. 1, Wind Depo. 102:4-19 (App. p. 0011). ("They don't know. They don't know. They're wrong. There is no way of accounting for those.").

Wind merely parroted AA's case theories when he testified, "the truth is, we know the truth, [Skiplagged] [is] not recognized as the authorized agent. So the correct answer would have been zero." Ex. 1, Wind Depo. 101:23-102:1 (App p. 0010-11). To Wind, any finding other than zero supported AA's conclusion that there was confusion and the control group was entirely irrelevant. This ruined the reliability of Wind's methodology and opinions.

Likewise, the Wind report spent much attention on irrelevant inquiries. For example, under the "Findings" section, Wind presented results from consumer experiments corresponding to the five key areas of interest he listed as "addressed by the experiments." Ex. 2, p. 31-42 (App. p. 0050-61). Each these findings are irrelevant to the live claims in this case.

Wind purportedly evaluated "Consumers' awareness and usage of Skiplagged (vs. Expedia)." Ex. 2, p. 31 (App. p. 0050); "Consumers' perceptions of Skiplagged (vs. Expedia)." Ex. 2, p. 31 (App. p. 0050); "Consumers' beliefs re Skiplagged' s (Expedia) association with AA" Ex. 2, p. 37 (App. p. 0056); and "Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia)." Ex. 2, p. 42 (App. p. 0061). Finally, Wind looked at "Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden city offer." Ex. 2, p. 52 (App. p. 0071). None of these inquiries are relevant to this trademark and copyright lawsuit now and would only confuse the jury as to the true issues at trial.

### 5. There was too great an analytical gap between the data and Wind's opinion

One of the other fundamental flaws in Wind's report was his analysis of the price difference between flights facilitated by Skiplagged versus purchased on AA.com. Not only was this

11

irrelevant to any trademark or copyright analysis or anything for which he was engaged, but also it assumed that the consumer only looked at AA flights and not those on other airlines.

On Page 66, Wind showed Exhibit 17 which purportedly evidenced, "Complaints to Skiplagged evidencing confusion as to its association with AA." Ex. 2, p. 66 (App. p. 0085). Yet, many of these complaints did not mention Skiplagged or were requests for a refund that did not show any confusion. Thus, this data did not support Wind's conclusions.

Further, Wind's conclusions did not match the data relied on. For instance, on page 68-69, Wind included a link to a X post that purportedly said: "Wow accidentally booked my flight thru Skiplagged instead of American and now I can't check my bag." Ex. 2, pp. 68-69 (App. p. 0087-88). But following this link, it actually said: "P.S.A. Skiplagged is the best app to have if you travel. Ridiculously cheap, but legit."[3] Not only did this not say what Wind said, but the implication was the opposite. This instance, along with the opinions derived from it, should be excluded because Wind listed cherry picked complaints, which is not science. *Kumho Tire Co, Ltd.,* 526 U.S. at 152. And since Wind admitted that his background information, which formed the basis for his entire report, came from AA's counsel, it was a prime example of what the Fifth Circuit warned against in *Salas*—an expert witness must "bring to the jury more than the lawyers can offer in argument." 980 F.2d at 305; Ex. 1, Wind Depo. 56:15-16 (App p. 0005).

## CONCLUSION

The Wind report tried to prove that Skiplagged's business model "generate[s] confusion in the marketplace" and that Skiplagged "deceive[s] consumers about the risks associated with its products/services." These notions are not relevant to the trademark and copyright matters at issue.

This is now a straightforward Lanham Act and copyright infringement case. Wind's

---

[3] http://twitter.com/laurenash_213/statuses/984976293966917633 last visited on August 20, 2024.

opinions are irrelevant to these claims. Moreover, Wind was demonstrably misinformed and this skewed his experiments in the wrong direction. In the end, Wind asked the wrong questions in search of the wrong answers. Thus, Wind did not have any opinions that will help the trier of fact understand the evidence or determine a relevant fact in the case. Therefore, the Court should exclude Wind from offering any opinions in this case.

Dated: August 26, 2024

/s/ William L. Kirkman
William L. Kirkman
Texas Bar No. 11518700
Preston B. Sawyer
Texas Bar No. 24102456
**KIRKMAN LAW FIRM, PLLC**
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone: (817) 336-2800
Facsimile: (817) 887-1863
billk@kirkmanlawfirm.com
prestons@kirkmanlawfirm.com

/s/ Abigail R.S. Campbell
Aaron Z. Tobin
Texas Bar No. 24028045
Kendal B. Reed
Texas Bar No. 24048755
Abigail R.S. Campbell
Texas Bar No. 24098759
**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
atobin@condontobin.com
kreed@condontobin.com
acampbell@condontobin.com

/s/ Darin M. Klemchuk
Darin M. Klemchuk
Texas Bar No. 24002418
**KLEMCHUK PLLC**
8150 North Central Expressway, 10th Floor

13

Dallas, Texas 75206
Telephone: (214) 367-6000
Facsimile: (214) 367-6001
Darin.klemchuk@klemchuk.com

***Attorneys for Defendant, Skiplagged, Inc.***

## CERTIFICATE OF CONFERENCE

I certify that I conferred with counsel for Plaintiff regarding the relief requested herein. Counsel stated that Plaintiff is opposed.

*/s/ William L. Kirkman*
William L. Kirkman

## CERTIFICATE OF SERVICE

On August 26, 2024, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/Abigail R.S. Campbell*
Abigail R.S. Campbell

28385761v1 99460.002.00