IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

**APPENDIX TO PLAINTIFF AMERICAN AIRLINES, INC.'S
MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF
JOSEPH M. PIMBLEY, PHD AND BRIEF IN SUPPORT**

In support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert

Opinions and Testimony of Joseph M. Pimbley, PhD and Brief in Support, American submits the

following materials:

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A | Declaration of Julia G. Wisenberg | App'x 001–03 |
| A-1 | Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024 (Partially Confidential) | App'x 004–94 |
| A-2 | Appendix C-2 to Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024 | App'x 095–111 |
| A-3 | Appendix C-4 (Hidden City) to Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024 | App'x 112–38 |
| A-4 | Appendix C-4 (Non-Hidden City) to Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024 | App'x 139–65 |
| A-5 | Expert Report of Joseph M. Pimbley, PhD, served by Defendant Skiplagged, Inc. on May 20, 2024 | App'x 166–204 |

| <u>EX.</u> | <u>DESCRIPTION</u> | <u>PAGE NOS.</u> |
|---|---|---|
| A-6 | Transcript of the deposition of Joseph M. Pimbley, PhD, taken on July 10, 2024 | App'x 205–45 |
| A-7 | Transcript of the deposition of Yoram (Jerry) Wind, PhD, taken on July 8, 2024 (Partially Confidential) | App'x 246–319 |

Dated: August 26, 2024

Respectfully submitted,

*/s/ Dee J. Kelly, Jr.*

Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 332-2500

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8003

Cameron M. Nelson
nelsonc@gtlaw.com
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-6590

Nathan J. Muyskens
nathan.muyskens@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: (202) 331-3100

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 26, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

<u>*/s/ Dee J. Kelly, Jr.*                        </u>
Dee J. Kelly, Jr.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

### DECLARATION OF JULIA G. WISENBERG

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

     1.     My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

     2.     I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of Joseph M. Pimbley, PhD and Brief in Support.

     3.     Attached as Exhibit A-1 is a true and correct copy of the Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024.

4.      Attached as Exhibit A-2 is a true and correct copy of Appendix C-2 to the Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024.

5.      Attached as Exhibit A-3 is a true and correct copy of Appendix C-4 (Hidden City) to the Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024.

6.      Attached as Exhibit A-4 is a true and correct copy of Appendix C-4 (Non-Hidden City) to the Expert Report of Professor Yoram (Jerry) Wind, PhD, served by American on April 23, 2024.

7.      Attached as Exhibit A-5 is a true and correct copy of the Expert Report of Joseph M. Pimbley, PhD, served by Defendant Skiplagged, Inc. on May 20, 2024.

8.      Attached as Exhibit A-6 is a true and correct copy of the transcript of the deposition of Joseph M. Pimbley, PhD, taken on July 10, 2024.

9.      Attached as Exhibit A-7 is a true and correct copy of the transcript of the deposition of Yoram (Jerry) Wind, PhD, taken on July 8, 2024.

10.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 25, 2024.


_____
Julia G. Wisenberg


2

# Exhibit A-1

*Dr. Yoram (Jerry) Wind*
*President, Wind Associates*
*1834 Delancey Place*
*Philadelphia, PA 19103*
*Tel: (610) 642-2120*
*E-Mail: windj@wharton.upenn.edu*


# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION


| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| **Defendant.** | § | |


## EXPERT REPORT OF PROFESSOR YORAM (JERRY) WIND

## <u>TABLE OF CONTENTS</u>

I.   BACKGROUND AND OBJECTIVES ............................................................................ 3

II.  QUALIFICATIONS .................................................................................................... 5

III. SUMMARY OF OPINION ........................................................................................ 7

IV. METHODOLOGY ..................................................................................................... 8

   A.   The Voice of the Consumer – The Consumer Experiments ............................................. 8

     1.  The Research Design ................................................................................... 8

     2.  Universe and Sample .................................................................................. 9

     3.  The Stimuli ................................................................................................ 10

     4.  The Questionnaire ..................................................................................... 11

     5.  Data Collection and Quality Control........................................................ 27

     6.  Analysis ..................................................................................................... 28

   B.   Validating the consumer experiments with other data and relevant marketing and consumer behavior theories and findings .......................................................................... 28

     Consumer complaints to AA about Skiplagged re confusion and perceived deception. ............... 28

     Consumer complaints to Skiplagged re confusion and perceived deception. ............................... 29

     The sampled data, when projected to the universe of complaints to the nearest thousand, suggests approximately 11,000 of the complaints reflect deception and/or confusion. .................................. 30

     Consumer posts on social networks illustrating confusion and deception....................................... 30

     Consumer behavior and advertising theories and findings that support the validity of our empirical findings. .................................................................................................... 30

V.   FINDINGS ................................................................................................................. 31

   A.   The results of the consumer experiments are presented in the five sections corresponding to the five key areas of interest addressed by the experiments. ........................................... 31

     1.  Consumers' awareness and usage of Skiplagged (vs. Expedia) .................................... 31

     2.  Consumers' perceptions of Skiplagged (vs. Expedia) ................................................... 31

     3.  Consumers' beliefs re Skiplagged' s (Expedia) association with AA.............................. 37

     4.  Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia).................... 42

     5.  Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden city offer. ............................................................................. 52

   B.   Other Data supporting the Experimental Findings.......................................................... 58

     1.  Illustrative actual confusion and perceived deception in consumer complaints to AA ............... 58

     2.  Illustrative actual confusion and perceived deception in consumer complaints to Skiplagged ... 61

     3.  Illustrative actual confusion and perceived deception in consumer posts on social media.......... 67

     4.  Consumer behavior and advertising and marketing theories and findings that support the validity of our empirical findings............................................................................ 85

VI.  CONCLUSION............................................................................................................ 87

## <u>APPENDICES</u>

**Appendix A:** Biography, Resume, Publications List, and Cases in Which Dr. Wind has Testified in Previous 4 Years

**Appendix B:** Materials Relied Upon

**Appendix C:** The Consumer Experiments

      **C-1.**   The Panel

      **C-2.**   The Stimuli

      **C-3.**   Formatted Questionnaire

      **C-4.**   Screenshots of the programmed questionnaire

      **C-5.**   Screening Results

      **C-6.**   Computer Tabulations

      **C-7.**   Verbatim Responses

      **C-8.**   The Data

      **C-9.**   Data Listing

App'x 007

## I.   <u>BACKGROUND AND OBJECTIVES</u>

### A.   Background

For decades, American Airlines, Inc. ("American" or "AA") has been using its federally registered trade name and trademark "American Airlines" and its registered flight symbol design (collectively, the "American Marks") to promote its products and services throughout the world. American carefully protects its flight, fare, schedule, and inventory data and content by providing this information only to its authorized agents, and by taking measures to ensure that only authorized agents of American are permitted to act on its behalf, to use and display its protected Marks, data, and content, and to issue tickets to passengers on American flights.

Skiplagged, Inc. ("Skiplagged") owns and operates the website Skiplagged.com. Skiplagged is not an authorized agent of American. Instead, Skiplagged obtains data on American flights by obtaining data from other agents of American (in apparent violation of their contracts with American), and/or by developing computer programs to obtain this information from American's website. Skiplagged.com allows users to search for, identify, and purchase and book American flights directly on Skiplagged.com. In doing so, Skiplagged uses and displays on its website American's Marks and American's fare, schedule, inventory, ticketing, and flight data. Skiplagged does not inform users that it is not authorized to issue tickets to passengers on American's behalf. Because it is not an agent, Skiplagged is not authorized to use American's marks, data or content to market, display or sell American tickets or services.

On August 17, 2023, American filed a lawsuit against Skiplagged, asserting, among other claims, trademark infringement and false designation of origin/unfair competition. American seeks an injunction to enjoin Skiplagged from, among other things, continuing its infringing use of American's Marks; publishing American's flight/fare content on Skiplagged's website; selling or

3

re-selling American flights, fares, or other products; holding itself out as an authorized agent of American or continuing to act in an agency capacity for American; or displaying or otherwise using the American Marks for commercial gain.

Having reviewed the complaint and various screenshots of American's and Skiplagged's websites, I designed multiple consumer survey experiments to evaluate (1) the likelihood and degree of confusion among consumers as to Skiplagged's affiliation, connection, or association with American and/or as to American's sponsorship, approval, or authorization of Skiplagged's services in offering and facilitating the sale of American flights; and (2) the degree of consumer deception associated with Skiplagged's offerings. As explained below and based on my analysis of the results of these consumer surveys, I have concluded with a reasonable degree of expert certainty that Skiplagged's activities (1) have generated confusion in the marketplace regarding Skiplagged's affiliation, connection, or association with American and American's sponsorship, approval, or authorization of Skiplagged's services, and (2) deceive consumers about the risks associated with its products/services.

**B.      Objectives**

I was retained by Greenberg Traurig, LLP, and Kelly Hart & Hallman, LLP, counsel for American, to assess whether, and to what extent, Skiplagged's published content and offerings on Skiplagged.com relating to American flights has generated confusion and deception in the marketplace, including as it relates to Skiplagged's perceived association with and/or authorization or sponsorship from American. To accomplish this objective, I considered whether Skiplagged's uses of the American Marks and data were likely to cause, or have caused, confusion amongst consumers who have booked airline tickets using a third party website in the past year, or who plan to do so in the coming year.

The purpose of these experiments was to determine, respectively, whether participants: (A) exhibited confusion about whether Skiplagged is an authorized agent of American; (B) exhibited other confusion about the relationship between Skiplagged and American; (C) exhibited confusion or deception about the fees and total cost charged by Skiplagged; and (D) exhibited confusion about the risks involved in buying "hidden city" tickets from Skiplagged.

## II.    QUALIFICATIONS

I am the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania. I joined the Wharton staff in 1967, upon receipt of my doctorate from Stanford University. I took Emeritus status in July 2017. I am also the President of Wind Associates Inc, A marketing and business consulting firm.

Publications: I have been a regular contributor to the marketing field, including 30 books and more than 300 papers, articles, and monographs. My books and articles, which are frequently cited by other authors, encompass marketing strategy, marketing research, new product and market development, consumer behavior, organizational buying behavior, advertising, and global marketing strategy.

Editorships: I have served as Editor-In-Chief of the Journal of Marketing, as a guest editor of the major marketing journals, and on the policy boards of the Journal of Consumer Research and Marketing Science. I have been on the editorial boards of the major marketing journals. I founded Wharton School Publishing and served as its first editor from 2003 to 2008. Currently, I server as guest editor of a special issue of Management Business Review (MBR) on AI for Customer Engagement.

Teaching, Research, and Consulting: Since 1967, I have taught MBA, Ph.D., and executive development courses on a wide range of marketing topics. I am currently developing a Coursera course on Creativity (for all ages and professions). I was the founding Director of the Wharton

App'x 010

think tank – The SEI Center for Advanced Studies in Management and directed it from 1988 to 2018. I have consulted extensively for Fortune 500 firms on marketing issues and marketing-driven business strategy. I am a trustee of Philadelphia Museum of Art, Curtis Institute of Music and Grounds for Sculpture. I am also an advisor for startups and non-profit organizations. In my teaching, research, consulting, editorial, and university positions, I have designed, conducted, and evaluated thousands of marketing and consumer research studies, including for use by businesses.

Awards: I have received numerous awards for my work, including the four major marketing awards—The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007)—and received the first Faculty Impact Award by Wharton Alumni (1993). I was elected to the Attitude Research Hall of Fame in 1984 and have also been honored with research awards, including two Alpha Kappa Psi Foundation awards. In 2001, I was selected as one of the ten grand Auteurs in Marketing, and in 2003 I received the Elsevier Science Distinguished Scholar Award of the Society for Marketing Advances. In 2010, I was selected as one of the Ten Legends of Marketing and Sage Publication published eight volumes of my writings. In 2017, I was one of four people inducted into the Marketing Hall of Fame, an honor awarded annually to individuals who have made an outstanding contribution to the marketing profession. In 2021, I received an Honorary Doctorate from Reichman University (Israel), a university I co-founded in 1994. More recently (2023) I received the International Marketing Trend Conference Award.

Expert Witness Experience: I have conducted and evaluated marketing and consumer research for use in litigation, have been qualified as a marketing and survey research expert in court proceedings, and have testified at deposition and trial in federal courts.

Relevant Qualifications for this Case: Academic and Industry expert Re marketing, marketing strategy, consumer behavior, marketing research, and advertising.

Attached as **Appendix A** to this Report is a copy of my brief biography, my full resume, a list of my publications, and a list of cases in which I testified since 2018.

Compensation: My compensation is at my regular consulting rate of $1200 per hour and is not contingent on my opinions or the outcome of this litigation.

## III.   **SUMMARY OF OPINION**

My expert opinion is that Skiplagged' s hidden city and non-hidden city ticket offerings have the following negative impact on consumers:

a.  Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American (either as an authorized travel agent for American or as having some other direct relationship with American);

b.  Skiplagged deceives consumers into believing that purchasing a regular, non-hidden city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly; and

c.  Skiplagged deceives consumers of hidden city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden city tickets.

My conclusions are based on the following:

1.  Two consumer experiments in which test groups saw a Skiplagged.com web site offering for either a hidden city flight or non-hidden city ticket. Two control groups saw a corresponding ticket offered on Expedia.com.

    •  The findings of these experiments showed significant levels of confusion and deception among consumers.

2.  Four independent sets of data, all of which validate the findings of the consumer experiments. These included:

    a.  Actual complaints to AA;
    b.  Actual complaints to Skiplagged;
    c.  Analysis of consumer conversations on social networks; and
    d.  Insights from consumer behavior and advertising and marketing theories and findings.

7

App'x 012

IV.     **METHODOLOGY**

To determine if Skiplagged's practices lead consumers to (a) perceive that they are an authorized agent of (or have other association with) American Airlines and (b) be deceived, I designed and implemented two consumer experiments and validated them against marketing and consumer behavior theories and findings.

A.      **The Voice of the Consumer – The Consumer Experiments**

Because Skiplagged has two different airfare offerings—regular flight tickets and "hidden city" tickets—I designed two related experiments, one for each type of offering. The experiments also were designed to test the validity of the two major questions – namely, whether consumers (a) perceive Skiplagged as an authorized agent of American or having some other association with American, and (b) are deceived by Skiplagged's advertising messages and offerings.

Regarding question (b), this included two conditions:

(i)      For the regular (non-hidden city) tickets: Skiplagged's claim of providing the "cheapest regular flights;" and

(ii)     For the hidden city tickets: the adequacy of Skiplagged's disclosures to consumers regarding the risks associated with booking a hidden city ticket.

To assure the validity of the findings, the research design relied heavily on responses to open-ended questions.

1.  **The Research Design**

After qualifying the respondents (see universe and sample sections), the main questionnaire was based on 5 major and intercalated parts:

1. Showing the respondents in the test group the Skiplagged flight offering and showing the respondents in the control group the Expedia flight offering (see the Stimuli section) and assuring that they could see it clearly (Q0).

2. Asking an open-ended question with a follow up probing on how the respondent would

8

describe the offering to a friend (Q1).

3. Asking the typical confusion questions regarding connection or association (Q3) and permission or authorization (Q4-6), with follow up probes of the reasons for their response.

4. Asking a series of questions about the respondent's beliefs regarding the Skiplagged (or Expedia) offerings and the reasons for such beliefs (Q7-12), their awareness and usage of Skiplagged (or Expedia) (Q13), and feelings about Skiplagged's (or Expedia's) offerings and the reasons for such beliefs (Q14).

5. Showing the offering on AA.com for the same/corresponding flight ticket and asking the respondent about their reactions after having this information to compare to the Skiplagged (or Expedia) offering (Q15), their intentions to buy their next airline ticket from Skiplagged, and the reasons for their response (Q16).

The design was based on two experiments:

a. Using the Skiplagged regular ticket as the stimulus for the test group vs. the ticket offering on Expedia for the same/corresponding flight, as a control group; and

b. Using the Skiplagged hidden city ticket as the stimulus for the test group vs. the ticket offering on Expedia for a corresponding flight to the intended destination, as a control group.

Expedia was chosen as a control to show what the responses would be as to an *authorized agent* of American. The interpretation of the difference between the test and control groups is that the closer the results for Skiplagged are to those of Expedia the greater the perceived confusion and deception.

### 2. Universe and Sample

**The Universe**

The universe for each study included U.S. consumers who (a) booked a commercial flight in the past 12 months and/or intended to do so in the next 12 months, and (b) booked or intend to book their tickets through an online ticket website.

**The Sample**

The sample was drawn from the panel of Prodege. See Appendix C-1. An initial sample

9

matching the census gender, age, race, and geography assured the representativeness of the sample.

It was further screened for the relevant study criteria:

- Passed the CAPTCHA test (to ensure all participants were humans).

- They or members of their families do not work for
  - (ii)    An advertising agency or public relations firm,
  - (iii)   A market research firm or the market research department of a company,
  - (iv)   A marketing firm or the marketing department of a company law or legal firm
  - (v)    An airline, travel agency, or a company that sells airline and travel tickets

- If they wore glasses or contact lenses when using a mobile device, laptop, or desktop computer, they had them on.

The total sample included 600 respondents across all studies, as shown below.

**Exhibit A**

**Sample Size**

|  | Test | Control | Test | Control |
|---|---|---|---|---|
|  | Skiplagged Ticket | Expedia Ticket | Skiplagged Hidden City Ticket | Expedia Ticket |
| Sample Size | 146 | 155 | 144 | 155 |

### 3. The Stimuli

The stimuli are included in Appendix C-2 and were embedded in the 4 programmed questionnaires. Appendix C-3 includes the screen shots of one of these.

To ensure that a fair and representative sample booking was used as the stimuli for the consumer survey, we (a) generated 200 different pairings of randomized "tier 1" airports across the country to use for the respective origin/destination, (b) generated and assigned randomized flight dates for each pairing, (c) ran searches on Skiplagged.com (for one-way flights) using each set of randomized flight criteria, (d) simulated 200 "test buys" on Skiplagged.com by selecting the least expensive American flight option shown in the search results and proceeding through the booking process up to the final checkout page, and (e) recorded the final total cost charged by Skiplagged for each booking. Contemporaneous with each test booking on Skiplagged.com, we

10

searched for the same corresponding flights/itineraries on AA.com and recorded the total cost charged by American for each. Of those 200 samples, 41 of the test bookings were for a "hidden city" flight ticket. Then, to determine the particular booking that would provide the most realistic and representative stimuli for the survey, we (1) separated the hidden city bookings from the non-hidden city bookings, (2) calculated the average price differential (between Skiplagged.com vs. AA.com) across all hidden city bookings, and across all non-hidden city bookings, respectively, and (3) selected the hidden city test booking that was closest to the average price difference across the hidden city bookings, and selected the non-hidden city test booking that was closest to the average price difference across the non-hidden city bookings. Additionally, upon identifying and selecting the most representative hidden city booking and non-hidden city booking to use for the survey, we also collected and used as control stimuli the corresponding offerings on Expedia.com for the same flights shown on the respective Skiplagged.com and AA.com stimuli.

For the non-hidden city bookings, the average price differential was $12.62 more expensive on Skiplagged.com than AA.com (the median difference was $10.00 more on Skiplagged.com than AA.com). Thus, the stimuli selected for the survey was a booking that was $10.00 more expensive on Skiplagged.com than AA.com. For the hidden city bookings, the average price differential was $62.46 cheaper on Skiplagged.com than AA.com (and the median was $28.80 cheaper on Skiplagged.com than AA.com). Thus, based on the specific test buys simulated, the stimuli selected for the survey was a booking that was $55.00 cheaper on Skiplagged.com than AA.com. The selected stimuli are included in appendix C2 and in the programmed questionnaire.

### 4.  The Questionnaire

#### - SCREENER -

**INTRO**
Thank you for your interest in today's survey.

We value your opinions, and all of your answers will be held in the strictest confidence, so do not be afraid to answer

11

each question honestly. Remember, there are no right or wrong answers.

While you are completing the survey, we ask that you do not look at windows, tabs, or applications on any device. Please do not search the Internet or ask others for help regarding any questions. We are only interested in your own opinions. If you don't know the answer, that is okay, please select "Don't know" and move forward to the next question. Do not guess your answer.

**[PN: ADD IN "CAPTCHA" AND INSTRUCTIONS.]**

**SA1.**
First, please select the type of device you are using right now to access this page.
*Select one.*

| A laptop or desktop computer | 1 | |
|---|---|---|
| A tablet (e.g., Samsung Galaxy Note or Apple iPad) | 2 | |
| A smartphone (e.g., Samsung Galaxy or Apple iPhone) | 3 | |
| Other device | 4 | **[PN: TERMINATE HERE]** |

**[PN: TERMINATE IF SA1=4.]**

**S0.**
Before you continue, please read the following confidentiality and non-disclosure statement, and answer the question that follows.

I recognize and fully understand that the survey content is of confidential nature. Therefore, I agree that both during and after the study, I will not disclose any of the information referenced in the interview and will not discuss this survey with anyone else. Also, I will not identify the nature of the product or service described in this survey.

Do you agree or disagree?
*Select one.*

| I agree | 1 | |
|---|---|---|
| I disagree | 2 | **[PN: TERMINATE HERE]** |

**[PN: MUST AGREE AT S0 – PUNCH 1, OTHERWISE TERMINATE.]**

**S01.**
Do you wear glasses or contact lenses when you're using a computer, tablet, or smartphone?
*Select one.*

| Yes | 1 |
|---|---|
| No | 2 |

**[PN: ASK IF WEAR GLASSES OR CONTACT LENSES (S01=1)]**
**S02.**
Are you currently wearing your glasses or contact lenses?
*Select one.*

| Yes | 1 | |
|---|---|---|
| No | 2 | **[PN: STOP/HOLD HERE]** |

12

App'x 017

**[PN: IF NO STOP/HOLD ABOVE (S02=2), DISPLAY BELOW AND ALLOW RESPONDENT TO START AGAIN WHEN RETURNING.]**
Please put on your glasses/contact lenses before you proceed with the survey.


**INTRO.**
Now, we'd like to ask you a few questions to make sure the survey is relevant to you.


**S1.**
Do you or does anyone in your household work for any of the following industries or companies?
*Select all that apply.*

| | | |
|---|---|---|
| An advertising agency or public relations firm | 1 | **[PN: TERMINATE AFTER S7c]** |
| A market research firm or the market research department of a company | 2 | **[PN: TERMINATE AFTER S7c]** |
| A marketing firm or the marketing department of a company | 3 | **[PN: TERMINATE AFTER S7c]** |
| An airline, travel agency, or a company that sells airline and travel tickets | 4 | **[PN: TERMINATE AFTER S7c]** |
| Any financial services company such as a bank, mutual fund company, brokerage firm, or investment firm | 5 | |
| A company that manufactures technology or electronics products | 6 | |
| A company that manufactures, distributes, or sells food or beverage products | 7 | |
| None of the above | 99 | **[PN:ANCHOR,EXCLUSIVE]** |

**[PN: IF WORK IN A RELATED INDUSTRY (PUNCHES 1-4), TERMINATE AFTER S7c. OTHERWISE, CONTINUE.]**


**S2a.**
What is your age?
*Enter a whole number.*

| | 1 | |
|---|---|---|
| Prefer not to answer | 98 | **[PN: TERMINATE]** |

**[PN: Allow 0-99. MUST BE 18+. TERMINATE HERE IF UNDER 18.]**


**[PN: HIDDEN QUESTION]**
**hS2b.**
**AGE**

| | | | |
|---|---|---|---|
| Under 18 | 1 | **S2a < 18** | **[PN: TERMINATE HERE]** |
| 18-24 | 2 | **S2a = 18-24** | |
| 24-34 | 3 | **S2a = 25-34** | |
| 35-44 | 4 | **S2a = 35-44** | |
| 45-54 | 5 | **S2a = 45-54** | |
| 55-64 | 6 | **S2a = 55-64** | |
| 65+ | 7 | **S2a = 65+** | |
| Prefer not to answer | 98 | **S2a = 98** | **[PN: TERMINATE HERE]** |

**[PN: MUST BE 18+ TO QUALIFY. TERMINATE HERE IF UNDER 18 OR PREFER NOT TO ANSWER.]**


**S3.**
Please record your gender identity.
*Select one.*

| | |
|---|---|
| Male | 1 |
| Female | 2 |

App'x 018

| Non-binary | 97 |
|---|---|
| Other (Specify_____) | 98 |
| Prefer not to answer | 99 |

**S4.**

Are you of Spanish, Hispanic or Latino/a origin?

*Select one.*

| Yes | 1 |
|---|---|
| No | 2 |

**S5.**

Which of the following ethnic groups do you identify most closely with?

*Select one.*

| Asian/Pacific Islander | 1 |
|---|---|
| Black/African American | 2 |
| Native American or Alaska Native | 3 |
| White/Caucasian | 4 |
| Other (Specify) | 97 |
| Prefer not to answer | 98 |

**S6.**

In which state do you reside?

*Select one.*

**[PN: USE DROP DOWN LIST]**

**[PN: HIDDEN QUESTION]**
**S6a.**
**REGION**

| Northeast | 1 |
|---|---|
| South | 2 |
| Midwest | 3 |
| West | 4 |

**[PN: THE FOLLOWING QUESTIONS SHOULD BE SET UP AS A GRID WITH COLUMNS; YES, NO, DON'T KNOW. PLEASE ROTATE SO HALF THE RESPONDENTS WILL SEE YES/NO AND THE OTHER HALF WILL SEE NO/YES. KEEP ORDER OF YES/NO CONSISTENT THROUGHOUT ENTIRE SURVEY AND RECORD ORDER.]**

**S7a.**

Which, if any, of the following activities **did you do in the past 12 months**? For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No,**]** or you "Don't know."

*Select all that apply.*

**[PN: RANDOMIZE]**

| | | Yes | No | Don't know |
|---|---|---|---|---|
| 1 | Booked a hotel room | (1) | (2) | (3) |
| 2 | Booked an airline ticket (on a commercial airline) | (1) | (2) | (3) |

App'x 019

| 3 | Booked a car rental | (1) | (2) | (3) |
|---|---|---|---|---|
| 4 | Made a restaurant reservation | (1) | (2) | (3) |
| 5 | Made an appointment for eye care | (1) | (2) | (3) |
| 6 | Made an appointment for auto service | (1) | (2) | (3) |

**S7b.**

Which, if any, of the following activities are you **likely to do in the next 12 months**? For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No,**]** or you "Don't know."

*Select all that apply.*

**[PN: HOLD IN THE SAME ORDER AS S7a]**

| | | Yes | No | Don't know |
|---|---|---|---|---|
| 1 | Book a hotel room | (1) | (2) | (3) |
| 2 | Book an airline ticket (on a commercial airline) | (1) | (2) | (3) |
| 3 | Book a car rental | (1) | (2) | (3) |
| 4 | Make a restaurant reservation | (1) | (2) | (3) |
| 5 | Make an appointment for eye care | (1) | (2) | (3) |
| 6 | Make an appointment for auto service | (1) | (2) | (3) |

**[PN: HIDDEN QUESTION]**
**S7c.**

Commercial airline reservation status

| Made a commercial airline reservation in the last 12 months only | 1 | **S7a_2=1 AND S7b_2=2 OR 3** | |
|---|---|---|---|
| Will make a commercial airline reservation in the next 12 months only | 2 | **S7a_2=2 OR 3 AND S7b_2=1** | |
| Both – reservation made in last 12 months AND will make in next 12 months | 3 | **S7a_2=1 AND S7b_2=1** | |
| Neither | 4 | **S7a_2=2 OR 3 AND S7b_2=2 OR 3** | **[PN: TERMINATE]** |

**[PN: CONTINUE IF MADE OR INTEND TO MAKE A COMMERCIAL AIRLINE RESERVATION (S7c=1-3). OTHERWISE, TERMINATE.]**

**S8a.**
**[ASK IF MADE AN AIRLINE RESERVATION IN THE PAST 12 MONTHS (S7c=1 OR 3)]**

In the **past 12 months**, when you made a reservation for an airline, which of the following methods did you use to make your reservation? For each option, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No**]** or you "Don't know."

*Select one response for each option.*

In the past 12 months…
**[PN: RANDOMIZE]**

| | | Yes, I made a reservation for an airline through this method | No, I did not make a reservation for an airline through this method | Don't know |
|---|---|---|---|---|
| 1 | Through an online ticket website | 1 | 2 | 3 |
| 2 | Directly through an airline | 1 | 2 | 3 |
| 3 | Through a travel agency | 1 | 2 | 3 |
| 4 | Through a credit card company | 1 | 2 | 3 |

15

App'x 020

| | | | | |
|---|---|---|---|---|
| 5 | Other (Specify_____) | 1 [PN: ANCHOR ROW] | 2 | 3 |

**S8b.**
**[ASK IF PLANNING ON MAKING AN AIRLINE RESERVATION IN THE NEXT 12 MONTHS (S7c=2 OR 3)]**
In the **next 12 months**, when you make a reservation for an airline, which of the following methods will you use to make your reservation? For each option, please answer **[MATCH ASSIGNED YES/NO ORDER: Yes, No]** or you "Don't know."
*Select one response for each option.*

In the next 12 months…
**[PN: HOLD IN THE SAME ORDER AS S8a]**

| | | Yes, I will make a reservation for an airline through this method | No, I will not make a reservation for an airline through this method | Don't know |
|---|---|---|---|---|
| 1 | Through an online ticket website | 1 | 2 | 3 |
| 2 | Directly through an airline | 1 | 2 | 3 |
| 3 | Through a travel agency | 1 | 2 | 3 |
| 4 | Through a credit card company | 1 | 2 | 3 |
| 5 | Other (Specify) | 1 [PN: ANCHOR ROW] | 2 | 3 |

**[PN: HIDDEN QUESTION]**
**S8c.**
**Online Ticket Website Usage Status**

| | | |
|---|---|---|
| Used online ticket website in the last 12 months only | 1 | **S8a_1=1 AND S8b_1=2 OR 3 OR BLANK** |
| Will use an online ticket website in the next 12 months only | 2 | **S8a_1=2 OR 3 OR BLANK AND S8b_1=1** |
| Both – Used online ticket website in the last 12 months AND will use an online ticket website in the next 12 months | 3 | **S8a_1=1 AND S8b_1=1** |
| Neither | 4 | **S8a_1=2 OR 3 OR BLANK AND S8b_1=2 OR 3 OR BLANK** | **[PN: TERMINATE]** |

**[PN: CONTINUE IF PURCHASED OR INTEND TO PURCHASE TICKET THROUGH AN ONLINE TICKET WEBSITE (S8c=1-3). OTHERWISE, TERMINATE.]**

**S9.**
Which of the following sets of stripes appears in this order: RED, YELLOW, GREEN, BLUE?
*Select one.*
**[RANDOMIZE]**
**[PN: PLEASE SHOW 4 SETS OF STRIPES OF 4 DIFFERENT COLORS, INCLUDING ONE THAT IS ORDERED RED, YELLOW, GREEN, BLUE]**
**[PN: TERMINATE IF RED, YELLOW, GREEN, BLUE ORDER NOT SELECTED]**

App'x 021

**[PN: TO QUALIFY FOR SURVEY, MUST MEET THE FOLLOWING CRITERIA:]**

- **Meets device qualifications SA1=1,2,3**
- **Agree to terms S0=1**
- **If typically wears glasses or contact lenses while working on a computer, must be wearing them (if S01=1, then must be S02=1)**
- **Does not work in a sensitive industry (S1=5,6,7,99)**
- **Age 18+ (S2b=2-6)**
- **Made or planning on making airline reservation (S7c=1-3)**
- **Made or plannning on using online ticket website (S8c=1-3)**

**S10 – HIDDEN.**
**ASSIGN TO A CELL ON A LEAST FILL BASIS BASED ON AGE, GENDER AND REGION**

| Non-Hidden Cell 1 | **1** |
|---|---|
| Non-Hidden Cell 2 | **2** |

| - MAIN QUESTIONNAIRE - |
|---|

**INTRODUCTION**
**[PN: SHOW TO ALL]**
Remember, please do not search the Internet, or ask others for help regarding any questions. We are only interested in your own opinions. If you don't know the answer, that is okay, please enter or select "Don't know" and move forward to the next question. Do not guess your answer.

After you click "Next" you will see a series of images screen.

***Please take your time to review the images. Do not use the back button of your browser at any time or your information will be lost.***

**[PN: NEW SCREEN]**

Imagine that you wanted to book a roundtrip airline flight from Santa Ana to Miami, and you decided to use the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**]** website to book flights. Below is the output you received when checking for available flights. Please assume that you selected the flight boxed in red.

Please review this information the way that you normally do when reviewing and selecting airline flights online.

**PN: IF CELL 1(S10=1) THEN SHOW:**

17

App'x 022

**HC – Cell 1 – Stimuli 1 – Page 1**

**HC – Cell 1 – Stimuli 1 – Page 2**

**HC – Cell 1 – Stimuli 1 – Page 3**

**HC – Cell 1 – Stimuli 1 – Page 4**


**PN: IF CELL 2 (S10=2) THEN SHOW:**
**HC – Cell 2 – Stimuli 1 – Page 1**

**HC – Cell 2 – Stimuli 1 – Page 2**


**Q0.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Were you able to see the images **clearly**?
*Select one.*

| **Yes**, I was able to clearly see the images and read the words on the screen | 1 | **[PN: CONTINUE TO Q1]** |
|---|---|---|
| **No**, I was not able to clearly see the images and read the words on the screen | 2 | **[PN: RE-SHOW STIMULUS AND ASK THIS QUESTION AGAIN]** |

**[PN: MUST CONFIRM SAW IMAGES CLEARLY. DO NOT CONTINUE TO Q1a UNLESS Q0=1. IF SELECTED Q0=2 A SECOND TIME TERMINATE]**
**[PN: IF Q0=2, DISPLAY THIS MESSAGE AND RE-SHOW THE IMAGE PAGE, THEN SHOW Q0 AGAIN:** We are going to show you the images again. Please look at the images carefully and click "Next" when you are ready to continue.**]**
**Q1a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

How would you describe the offering on this website to a friend?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q1a. ASK IF PROVIDED AN ANSWER IN Q1a. – NE 99]**
**Q1b.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is no other way I would describe it to a friend | **99** | **EXCLUSIVE** |
|---|---|---|

**Q2.**

18

App'x 023

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Does the company that operates this website have a business connection or association with another company, or do you not know?
*Select one.*

**[PN: ROTATE ORDER OF YES AND NO].**

| | |
|---|---|
| Yes, it has a business connection or association with another company | 1 |
| No, it does not have a business connection or association with another company | 2 |
| Don't know | 3 |

**[PN: IF YES AT Q2, ASK Q3a AND Q3b, ELSE SKIP TO Q4]**
**Q3a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Which other company does the company operating this website have a business connection or association with?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q3A. ASK IF PROVIDED AN ANSWER IN Q3a. – NE 99]**
**Q3b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**Q4.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Does the company that operates this website require permission or authorization from any other company, or do you not know?
*Select one.*

**[PN: ROTATE ORDER OF YES AND NO].**

| | |
|---|---|
| Yes, it requires permission or authorization from another company | 1 |
| No, it does not require permission or authorization from another company | 2 |
| Don't know | 3 |

**[PN: IF YES AT Q4, ASK Q5a, Q5b, Q6a, AND Q6b, ELSE SKIP TO Q7]**

**Q5a.**

19

App'x 024

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**


From which company is permission or authorization required?

*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|


**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q5a. ASK IF PROVIDED AN ANSWER IN Q5a. – NE 99]**
**Q5b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|


**[PN: IF YES AT Q4 ASK Q6a]**


**Q6a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**


For what do they need to get permission or authorization?

*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|


**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q6a. ASK IF PROVIDED AN ANSWER IN Q6a. – NE 99]**
**Q6b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|


**Q7a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

What do you believe is the relationship between **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** and the airline?
*Select one.*
**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is an authorized agent of the airline | 1 | |
|---|---|---|

20

| | | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is not an authorized agent of the airline | **2** | |
| There is some other relationship between **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** and the airline | **3** | |
| Don't know | **99** | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q7A. ASK IF PROVIDED AN ANSWER IN Q7a/NE 99]**
**Q7b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q8a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| Buying tickets through **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is cheaper than buying directly from the airline | **1** | |
| Buying tickets through **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is not cheaper than buying directly from the airline | **2** | |
| Don't know | **99** | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q8a. ASK IF PROVIDED AN ANSWER IN Q8a. – NE 99]**
**Q8b.**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q9a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** charges an additional fee on top of the airline's total ticket cost. | **1** | |
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** does not charge an additional fee on top of the airline's total ticket cost. | **2** | |
| Don't know | **99** | **[ANCHOR]** |

21

App'x 026

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q9a. ASK IF PROVIDED AN ANSWER IN Q9a. – NE 99]**
**Q9b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK ONLY IF THEY THINK THERE'S A FEE – Q9a=1]**
**Q10a.**

                              Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| I believe the fee **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges for its services is reasonable | 1 | |
|---|---|---|
| I believe the fee **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges for its services is not reasonable | 2 | |
| N/A (I do not think **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges an additional fee on top of the airline's total cost) | 3 | |
| Don't know | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q10a. ASK IF PROVIDED AN ANSWER IN Q10a. – NE 99]**
**Q10b.**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**Q11a.**

                              Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is an authorized travel agency with access to fares I could not access via the airline | 1 | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is not an authorized travel agency and does not have access to fares I could access via the airline | 2 | |

22

App'x 027

| | | |
|---|---|---|
| Don't know if **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** are an authorized travel agency | 98 | **[ANCHOR]** |
| Don't know if **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** have or do not have access to fares I could not access via the airline | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q11a. ASK IF PROVIDED AN ANSWER IN Q11a. – NE 99]**
**Q11b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | 99 | **EXCLUSIVE** |

**Q12a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| A ticket bought through **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is a valid ticket | 1 | |
| A ticket bought through **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is not valid ticket | 2 | |
| Don't know | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q12A. ASK IF PROVIDED AN ANSWER IN Q12A – NE 99]**
**Q12b**
What makes you say that?
*Please enter your response below and be as detailed as possible* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | 99 | **EXCLUSIVE** |

**Q12c.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or "Don't know."

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

*Select one.*

| | | |
|---|---|---|
| The option offered by **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** carries no risk | 1 | |
| The option offered by **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** carries risks | 2 | |
| Don't know | 99 | **[ANCHOR]** |

App'x 028

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q12C. ASK IF PROVIDED AN ANSWER IN Q12C – NE 99]**
**Q12d**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK IF CARRIES A RISK – Q12C/2]**
**Q12e.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

What are the risks associated with this ticket?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q12e. ASK IF PROVIDED AN ANSWER IN Q12e. – NE 99]**
**Q12f.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Are there any other risks?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is no other risks | 99 | EXCLUSIVE |
|---|---|---|

**Q13a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Before today were you aware of **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia"**]**?

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

**[PN: ASK IF AWARE OF SKIPLAGGED/EXEDIA Q13a. = 1]**
**Q13b.**
Have you ever used **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia"**]**?

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

24

App'x 029

**Q14a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Reflecting on the **[PN: IF Cell 1 (S10=1):** "Skiplagged"**, IF Cell 2 (S10=2):** "Expedia"**]** offering and everything you know about them how do you feel about buying your next airline ticket from them?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q14a. ASK IF PROVIDED AN ANSWER IN Q14a – NE 99]**
**Q14b.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[PN: OPEN END TEXT BOX]**

| There are no other reasons why I said that | 99 | EXCLUSIVE |
|---|---|---|

**INTRO**

Let's imagine that you decide to compare the **[PN: IF Cell 1 (S10=1):** "Skiplagged"**, IF Cell 2 (S10=2):** "Expedia"**]** offer with the same flights available on the American Airlines website and you got the following results.

Please review this information the way that you normally do when reviewing and selecting airline flights online.

**PN: SHOW ALL:**

**HC – Stimuli 2 – Page 1**

**HC – Stimuli 2 – Page 2**

**AFTER SHOWING STIMULI 2:**

**IF CELL 1(S10=1) THEN SHOW:**

**HC – Cell 1 – Stimuli 1 – Page 4**

**IF CELL 2 (S10=2) THEN SHOW:**

**HC – Cell 2 – Stimuli 1 – Page 2**

25

App'x 030

**PN: NEW SCREEN only show for Cell 1 (S10=1)**
Now, please review the conditions associated with the Skiplagged offering versus American Airlines' policies. Please review this information the way that you normally do when reviewing and selecting airline flights online.

**Q15a.**

Flight Information Link: **[PN: INSERT STIMULI 1 FOLLOWED BY STIMULI 2]**

Comparing the results you got from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** and from the American Airlines website, how do you feel about the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offering?
*Please enter your response below and be as detailed as possible or select "Don't know."*
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q15a. ASK IF PROVIDED AN ANSWER IN Q15a. – NE 99]**
**Q15b.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is nothing else that describes how I feel about the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings | **99** | **EXCLUSIVE** |
|---|---|---|

**Q16a.**

Flight Information Link: **[PN: INSERT STIMULI 1 FOLLOWED BY STIMULI 2]**

How likely would you be to consider buying your next airline ticket from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]**?
*Select one.*
**[PN: ROTATE WHETHER PUNCHES ARE SHOWN FROM 1 – 5 OR 5 – 1. RECORD WHAT WAS SEEN]**

| | | |
|---|---|---|
| **Definitely would not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 1 | |
| **Probably would not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 2 | |
| **May or may not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 3 | |
| **Probably would** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 4 | |
| **Definitely would** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** | 5 | |
| **Do not know** | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q16a AFTER THEY PROVIDED AN ANSWER – 1-5 AND 99]**
**Q16b.**
What made you say that you **[INSERT ANSWER FROM Q16A IN LOWER CASE]**?
*Please enter your response below and be as detailed as possible or select "Don't know."*
**[OPEN END TEXT BOX]**

App'x 031

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q16b. ASK IF PROVIDED AN ANSWER IN Q16b – NE 99]**
**Q16c.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[PN: OPEN END TEXT BOX]**

| There are no other reasons why I said that | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK ALL]**
**D1.**
For quality control purposes, please enter the year you were born.
**[PN: ALLOW NUMBERS RANGING FROM 1922-2023]**

| 1 |
|---|

**[PN: Must come within 1 year of actual age (S2a) or flag]**

**[PN: SHOW FOR ALL AT THE END OF THE SURVEY - NEW SCREEN]**
Thank you very much for completing this survey. We truly value your response and appreciate you taking time to share your opinions with us.

## 5. Data Collection and Quality Control

The data collection was conducted by Radius Global.[1] They worked under my direction, formatted, and programmed the questionnaires, coordinated the data collection process, analyzed the data, and prepared the Appendices for this report. The data collection was done between April 10 – 15, 2024 and resulted in 600 respondents. The data collection was stopped after the first day of interviewing (as a pretest). Since none of the respondents had any difficulties with the questionnaire, we continued with the data collection.

In addition to the quality assurance questions included as part of the screening questions, Radius employed the following quality control procedures:

- Surveys hosted on secure encrypted servers.

---

[1] Radius Global is a leading provider of research, data, analytics, insights, and marketing intelligence. *See* https://radiusinsights.com/

App'x 032

- Data checks implemented:

    o Check for duplicate IP addresses to keep respondents from taking the survey more than once;

    o CAPTCHA;

    o Speeders removed from data;

    o Open-ended responses reviewed to ensure respondent is paying attention/providing meaningful answers.

### 6. Analysis

The analysis included:

- Analysis of the verbatim responses regarding the reasons for the confusion and perceived deception. This analysis followed the scientific approach for content analysis, including coding the data by (a) involving two independent coders who were not familiar with the objective of the study or its sponsors, and (b) a procedure for resolving conflicts between the two coders; and

- Computer tabulations of the results.

- Testing for the statistical significance of the difference between the test and control groups of each of the two stimuli. The Hidden City and Non-Hidden City offerings

### B. Validating the consumer experiments with other data and relevant marketing and consumer behavior theories and findings

To validate the findings of our customer experiments we looked at other relevant data sets that included.

### 1. Consumer complaints to AA about Skiplagged re confusion and perceived deception.

During the period 1/1/2018 – 3/6/2024, the AA customer complaint database identified 88 complaints with the terms "Skiplagged" or "Skiplag". Eighty (80) of the complaints dealt with Hidden City. The analysis was done by a litigation support company using the following definitions:

*Deception* - any complaint where the customer misunderstood what they were buying. This included where the customer is confused because their itinerary has an extra leg beyond where they plan to get off; where the customer did not get the necessary visa or bring a passport for a ticket with where final destination is

28

international; where the customer does not understand why they couldn't check a bag; where the customer complains that they paid more booking through Skiplagged versus booking directly. This category also included complaints about consumer consequences, such as: did the customer get denied boarding; was the customer prevented from checking-in; did the customer have to rebook and pay a higher price; did the customer lose baggage when it was checked through to the destination; and any other instance where the customer had harm/loss/consequences as a result of their hidden city ticket.

*Confusion* – any complaint about role, authority, or relationship of Skiplagged vis a vis the airline. This included any complaint suggesting the customer misunderstood what Skiplagged could and could not do to support a customer after purchase, or the customer assumed Skiplagged could provide travel agency services; any complaint where the customer expected Skiplagged to reaccommodate, cancel, refund flight price, make meal selections or seat reservations; and any complaint where the customer thought Skiplagged is an approved booking partner or agent.

*Other* - all documents that do not fall under the above categories.

Analysis of the complaints revealed the following distribution.

- Confusion and Deception (n=22)

- Deception (n=57)

- Neither (n=7)

### 2. Consumer complaints to Skiplagged re confusion and perceived deception.

Skiplagged produced a total of 46,621 documents. Of those, 30,658 were emails with one of the following email addresses as a last-in-time sender or recipient:

- agent@skiplagged.com

- booking@skiplagged.com

- privacy@skiplagged.com

- support@skiplagged.com

These are Skiplagged's customer support emails. The vast majority of these emails relate to AA bookings.

App'x 034

The documents are in a Relativity database. Using Relativity's Sampling tool (https://help.relativity.com/RelativityOne/Content/Relativity/Sampling.htm), we created a randomized 95/2.5 statistical sample. The sample was 1,464 emails. We categorized these documents as Deception, Consumer Confusion or Other, defined as set forth above.

Analysis of the complaints revealed the following distribution.

- Confusion (n=263)
- Deception (n=204)
- Confusion and Deception (n=47)
- Other (n=951)

The sampled data, when projected to the universe of complaints to the nearest thousand, suggests approximately 12,000 of the complaints reflect deception and/or confusion.

### 3.  Consumer posts on social networks illustrating confusion and deception.

I directed Voluble[2] to identify and collect consumer comments posted online about Skiplagged. To identify consumer comments about Skiplagged, a search for social media posts that contain the term "skiplagged" or "skip lagged" was performed using Brandwatch, an industry-leading database that provides access to social media data. The search was limited to posts on X (formerly, Twitter) and Reddit, as these platforms returned the highest volume of consumer posts that mentioned Skiplagged. I then reviewed the posts returned by the search to identify those that were potentially relevant to my analysis.

### 4.  Consumer behavior and advertising theories and findings that support the validity of our empirical findings.

The purpose of this additional analysis is to test to what extent consumer behavior and advertising theories and findings are consistent with or support the findings of our experiments

---

[2] Voluble is a consulting firm experienced in analyzing social media and other online posts to provide insights for litigation. Voluble is division of Global Business Experts Group (GBX), a litigation consulting firm, that has worked with dozens of clients on a variety of matters involving intellectual property and other issues.

and the other independent data.

## V.   FINDINGS

**A. The results of the consumer experiments are presented in the five sections corresponding to the five key areas of interest addressed by the experiments.**

**1.  Consumers' awareness and usage of Skiplagged (vs. Expedia)**

As can be seen in Exhibit 1 below, as expected most respondents are familiar with Expedia. In contrast only a small % (between 14 and 18%) are familiar with Skiplagged. Yet, among the segment familiar with Skiplagged, the percent who used Skiplagged for regular tickets is similar to the % of Expedia users among those aware of them. But the % of users of Skiplagged Hidden city tickets are much lower.

**Exhibit 1**

**Consumers' awareness and usage of Skiplagged (and Expedia)
(Q13a & 13b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on:** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Awareness (Q13a)** | | | | |
| Yes | 17.8% | 92.9%* | 13.9% | 96.8%* |
| No | 81.5%* | 6.5% | 86.1%* | 3.2% |
| DK | 0.7% | 0.6% | 0.0% | 0.0% |
| **Based on aware of Skiplagged (Expedia) Usage (Q13b):** | **Skiplagged Ticket (n=26)** | **Expedia Ticket (n=144)** | **Skiplagged Hidden City Ticket (n=20)** | **Expedia Ticket (n=150)** |
| Yes | 73.1% | 77.8% | 50.0% | 80.0%* |
| No | 26.9% | 21.5% | 45.0%* | 20.0% |
| DK | 0.0% | 0.7% | 5.0%* | 0.0% |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Note: Awareness and Usage for Test Cells are related to Skiplagged. Awareness and Usage for Control Cells is related to Expedia.

**2.  Consumers' perceptions of Skiplagged (vs. Expedia)**

Exhibit 2 includes illustrative responses to the open ended question "how would you describe the offering on this (Skiplagged) website to a friend?" For a full listing of these responses, see the full verbatim in Appendix C-6.

App'x 036

**Exhibit 2**

**Illustrative Consumers' Description of the Skiplagged offering
(Q1a:b) Test Stimuli**

| Skiplagged Ticket (n=146) |
|---|
| **Illustrative responses** |
| Flight booking american airlines |
| A good offer that benefits the buyer. |
| A way to book flights cheaper |
| I think it's not a bad price it's cheaper than most [else] basically your only going to pay 150 for a few hours longer but at least you'll get there |
| Scam |
| There are good prices that you should check it out |

**Illustrative Consumers' Description of the Skiplagged Hidden City offering
(Q1a:b) Test Stimuli**

| Skiplagged Hidden City Ticket (n=144) |
|---|
| **Illustrative responses** |
| Very good website for booking flights |
| It's a offering for airline tickets |
| It's a good awful price wise but I thought the airlines did not allow this |
| The site is clear about baggage requirements and says the airlines don't like this method. |
| It's a cheaper alternative to most options. No checked bags, but it's worth it. |
| Receive a discount compared to the actual airline site. |

At the end of the questioning re Skiplagged (Expedia), we asked the respondents in Question 14a "reflecting on the Skiplagged (Expedia) offering and everything you know about them how do you feel about buying your next airline ticket from them?" The responses were coded into positive, neutral, or negative sentiment and presented in Exhibit 3. Examination of these results show that less than 12% of the respondents had negative sentiment toward Skiplagged. Yet, this is more than double the negative sentiment toward Expedia. While the positive sentiments toward Skiplagged are significantly below that of Expedia, they are still very high -- 45% among the Non-Hidden City ticket customers and 35% among the Hidden City customers.

32

App'x 037

**Exhibit 3**
**Reflections on Skiplagged and Expedia**
**(Q14a:b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| **Consumer Reactions of Skiplagged (Expedia):** | **Test** | **Control** | **Test** | **Control** |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Negative** sentiment towards Skiplagged (Expedia) | 11.0%* | 4.5% | 11.8%* | 5.8% |
| **Neutral** sentiment towards Skiplagged (Expedia) | 17.1%* | 7.7% | 25.7%* | 9.0% |
| **Positive** sentiment towards Skiplagged (Expedia) | 45.2% | 71.6%* | 35.4% | 67.7%* |
| **Don't Know** | 26.7%* | 16.1% | 27.1%* | 17.4% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Illustrative verbatim for all the sentiments are presented in Exhibits 3a, b and c. For the full

verbatim. See Appendix C-6.

33

App'x 038

**Exhibit 3a**
**Reflections on Skiplagged and Expedia: Illustrative Negative Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=16)** | **Expedia Ticket (n=7)** | **Skiplagged Hidden City Ticket (n=17)** | **Expedia Ticket (n=9)** |
| I am not familiar with this website and would not be comfortable ordering tickets there. | I would rather book directly from website | I would not buy my next ticket from them because of the fees and how cluttered their website looked. | Likely buy directly from airline unless they offer a great deal |
| I have never heard of this company. It doesn't state whether your ticket is valid through the airlines purchased for. | I wouldn't buy from Expedia again I have had bad experiences when my flight was cancelled | Cautious as I have never heard of them | It is probably better to go direct through the airline |
| I will not be doing this because I will not end up on the no flight list. | I will be very careful | I would not buy the ticket | I usually find better rates if I just book the flight myself through the airlines |
| i have never heard of them before - so will be a bit wary | I dont like expedia | Fairly risky and might lose your money at the end | I will likely not unless it is much cheaper |
| I probably would still go through the airline website | No. I will stick to going to the direct airline I am flying with | I'm just not sure because it's making me seem like I shouldn't trust it | I will continue to use the airline website |
| Still not sure how reliable it would be | I likely will not use Expedia unless it offers something cheaper than I can find | Another online service trying to make money | I have never used Expedia personally, but I did use another similar site and was very displeased at all the "hidden" charges. So, I probably would not purchase a ticket through Expedia. |

34

**Exhibit 3b**
**Reflections on Skiplagged and Expedia: Illustrative Neutral Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=25)** | **Expedia Ticket (n=12)** | **Skiplagged Hidden City Ticket (n=37)** | **Expedia Ticket (n=14)** |
| I could do it but first I have to know more | I don't have any feelings if they offer a better price I'll use them | will look into it | I will definitely look into it. I have my own favorite websites that I use when I'm flying |
| Given proper reviews, maybe I'd checkmate out if it was legit or not and purchase one | Third party booking site that checks fees | May or may not | I would be on the fence. third parties are a concern to me |
| Not sure if I would purchase using this website, but I will definitely check them out for my next ticket to purchase | Would research to make I'm not paying more | It's a possibility I would need to do more research to confirm | I'm undecided. We just had to cancel some flights and it's not always clear who you're dealing with |
| Would have to do more research about validity of this site | not super comfortable, but will buy anyways | I will do more research | I would definitely look into it. |
| I would need to do some research on them before using them, I research everything before using it. | I may do it. I will compare with other websites. | Very possible, I can't plan to far ahead! Things deals discounts promos come and go! | I would certainly look and see what I can find and would use them. |
| Confident in saving, cautious about potential restrictions | I may or may not use them. | Since I've never heard of this company I don't know how I feel. But it would be something that I would be happy to look into it and see if it would save me any money. | 50/50 depends on price or competitors offers |

App'x 040

**Exhibit 3c**
**Reflections on Skiplagged and Expedia: Illustrative Positive Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=66)** | **Expedia Ticket (n=111)** | **Skiplagged Hidden City Ticket (n=51)** | **Expedia Ticket (n=105)** |
| I will look into them for next time | Confidence that they will get me a good deal better then I could on my own from the airline. | Confident it will save me money | I will definitely buy tickets from them because they offer huge discounts |
| I feel as if buying an airline ticket from this platform would be a good deal. | I feel good about buying from them because I trust their service. | Most of the time, I do book with Skiplagged. it offers competitive prices | I'm excited to check them out because I would like to save money on my next flight |
| I will be very happy to book a travel trip with them because their service is affordable and customers centric | I feel like I would consider Expedia as a way to save money | Would be a site I would surely check out | I may consider it if it is a large enough discount. |
| It would be easy and cheaper | Very professional and timely responsive | I would probably buy my next ticket from them | I would buy a ticket from Expedia if it was the price I was looking for. |
| Might be a good idea. Price seemed reasonable. | I think this is a very efficient and convenient way to book travel and accommodations | I would use this site again. | I feel positive. I have found them to be a good source for travel. |
| Reflecting on the offering and what I saw in the images, I will definitely visit the skip lagged website to purchase an airline ticket | I think Expedia is doing a good job and there is lots of choice. | Safe and secure | Comparing prices through different companies and options |

The results of the analysis of the open ended responses regarding getting cheaper flights (for the Non-Hidden City tickets) or not recognizing the risks of the hidden city flights for those exposed to these stimuli, are listed in Exhibit 3d. This analysis was done both for the responses to the first open ended question (Q1) as well as across all open ended questions.

App'x 041

**Exhibit 3d**
**Open-ended description of offering (to a friend) – (Open Ended Coded) – Deception**
**Q1a/b AND all OE Questions**

| Based on | % of Confused Consumers | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q1a/b** | | | | |
| There is deception | 4.8% | NA | 89.6% | NA |
| There is not deception | 95.2% | NA | 0.7% | NA |
| Ambiguous | 0% | NA | 9.7% | NA |
| **All OE Questions** | | | | |
| There is deception | 29.5% | NA | 63.2% | NA |
| There is not deception | 69.2% | NA | 27.8% | NA |
| Ambiguous | 1.4% | NA | 9.0% | NA |

**There is deception:**
- For Non-Hidden City ONLY: Skiplagged (Expedia) is cheaper than American Airlines
- For Hidden City: Consumer doesn't understand that there are meaningful risks associated with the ticket (financial penalties, not being able to fly on airline, etc.)

**There is not deception:**
- **For Hidden City:** Consumers understand at least one meaningful risk (beyond needing to pack a carry on) AND think the risks are worth it

**Ambiguous**
- If unclear based on responses
- **For Hidden City:** If only mention less meaningful risks (can't check a bag)

### 3. Consumers' beliefs re Skiplagged's (Expedia) association with AA

One of the most striking findings of our study is that 41% of respondents exposed to the Skiplagged stimuli associated Skiplagged with AA, which is about the same % as those who associated Expedia (i.e., AA's legitimate/authorized agent) with AA. Even among those exposed to the Hidden City offering, 30% associated Skiplagged with AA. The detailed results based on questions 1 ,2, 4, 5 and 6 are presented in Exhibit 4.

App'x 042

**Exhibit 4**
**Consumer Confusion as to the relationship between Skiplagged (or Expedia) and AA**
**(Q 1-6)**

| | Test | Control | Test | Control |
|---|---|---|---|---|
| **% of Confused Consumers** | | | | |
| **Based on** | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **All OE Questions** Associated or connected with airline based on open-ended responses for all questions | 2.7% | 3.2% | 4.9% | 5.8% |
| **Q1** Associated or connected with airline based on open-ended description of offering | 1.4% | 0.6% | 0.7% | 1.9% |
| **Q2-3** Associated or connected with airline | | | | |
| **Q2** | | | | |
| Yes | 33.6% | 31.6% | 25.7% | 33.5% |
| No | 21.9% | 21.9% | 29.2% | 21.3% |
| Don't Know | 44.5% | 46.5% | 45.1% | 45.2% |
| **Q4-6** Require permission or authorization from an airline | | | | |
| **Q4** | | | | |
| Yes | 24.0% | 28.4% | 13.9% | 22.6% |
| No | 34.2% | 33.5% | 42.4% | 36.1% |
| Don't Know | 41.8% | 38.1% | 43.8% | 41.3% |
| **NET (Yes for Q2 or Q4)** | | | | |
| Yes | **41.1%** | **42.6%** | **29.9%** | **42.6%*** |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

To get a better understanding of the respondent's perceptions of the relationship between Skiplagged and AA, we asked them two additional questions: (Q7a) whether "Skiplagged (Expedia) is the authorized agent of the airline" or not. The responses to this question and a follow up question regarding the reasons for their belief are presented in Exhibit 5. Examination of these results shows that over 40% of the respondents exposed to the two Skiplagged stimuli believed Skiplagged is an authorized agent of the airline. And an additional 14-17% believed there is some other relationship between the two. Many of the reasons for this are not surprising, which included the facts that you can buy the ticket for the airline and the way the information is presented.

App'x 043

**Exhibit 5**
**The perceived relationship between Skiplagged (or Expedia) and AA**
**(Q 7a)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q7a Skiplagged (Expedia) is an Authorized agent of the airline** | **43.2%** | **56.1%*** | **42.4%** | **63.9%*** |
| Skiplagged (Expedia) is NOT an authorized agent of the airline | 13.0% | 14.2% | 22.2% | 9.0% |
| There is some other relationship between Skiplagged (Expedia) and the airline | 17.1% | 15.5% | 13.9% | 13.5% |
| Don't Know | 26.7% | 14.2% | 21.5% | 13.5% |
| **Q7b** Illustrative Reasons for believing that Skiplagged (Expedia) is an authorized agent of the airline | | | | |
| | Because they have to be to be dealing with the airline | Because they wouldn't be able to broker me a flight then | Generally many airlines require this for the services to be sold by a third party | That's the only way Expedia will be allowed to sell airline tickets from that company |
| | Because I can buy a ticket | It connects with the airline so that they know that you booked a ticket to their airline. | From the name and information | It shows real time travel rates |
| | They obviously selling tickets for them | The airline offers a certain amount of tickets to the company at a reduced rate for the company to sell | Because you buy tickets from them | The airline is allowing Expedia to sell tickets for THEIR services provided. |
| | They are helping to sell flight tickets through their platform. | Because I always booked at 39xpedia agency to book any airlines | They must be authorized to sell plane tickets | I would have to believe that they would be otherwise how could they sell the ticket |
| | They're selling airline tickets | They connect the passenger to the actual flight and receive payments | Because their selling the airlines tickets and flights. | It has been around for a long time so it would make sense that it would be |
| | By how the information was listed | You can get on the airline through Expedia but have to contact Expedia if you have any problems. | Because your able to buy a airline ticket associated with the airline | There are many flights available through the Expedia website. |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

App'x 044

The second question regarding the relationship between Skiplagged and the airline was Q 11: whether "Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline."

The responses to this question are presented in Exhibit 6. An extremely high percent of respondents --close to 40%-- exposed to the two Skiplagged stimuli said YES. Many of the reasons for this perception is the way the material is presented.

**Exhibit 6**
**Consumers' belief re Skiplagged (or Expedia) as an authorized agent with special access to fares that could not be accessed via the airline**
**(Q11a)**

| Based on | Test<br>Skiplagged<br>Ticket<br>(n=146) | Control<br>Expedia<br>Ticket<br>(n=155) | Test<br>Skiplagged<br>Hidden City<br>Ticket<br>(n=144) | Control<br>Expedia<br>Ticket<br>(n=155) |
|---|---|---|---|---|
| | % of Respondents | | | |
| **Q11a Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline** | **38.4%** | **52.9%*** | **38.9%** | **53.5%*** |
| Q11a Skiplagged (Expedia) is NOT an authorized travel agency and does NOT have access to fares I could access via the airline | 9.6% | 7.7% | 7.6% | 7.7% |
| **DK** if authorized agent | 23.3% | 19.4% | 32.6% | 16.1% |
| **DK** if they have or do not have access to tickets, I could not access via the airline | 28.8% | 20.0% | 20.8% | 22.6% |
| **Q11b Illustrative Reasons for believing** Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline | | | | |
| | Because I could buy the ticket | It helps me book the ticket, luggage, and it gives me an option to pay more for luggage protection. | Can only book those fares though them | They sell fares for airlines so that should mean they have access to flights |
| | Because their service is unique to them | You can book any airlines through Expedia | Listed on a major airline website | Some deals are only listed on their site |
| | Because I believe they are cheaper | Airlines set aside a number of available seats to authorized travel agencies. | It seems like they offered exclusive discounts | This is the business they are in. They have certain parameters that make them more attractive. |
| | Those tickets were too cheap for it to be anything else. | This is what Expedia does | States it in the pictures | I know they compare prices for the best deal |
| | It seems they have very reasonable prices that I have not seen through the airlines directly | Expedia works to fulfill vacancies | I could not access via the airline | They are a travel company to book the entire trip from flights, hotels and car rentals |
| | The only way I see them being able to get that low prices | | If they weren't authorized, they would be shut down. | |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

App'x 046

Given that we had a number of questions probing the respondent's' perceived association between Skiplagged and the airlines, exhibit 6a includes a summary of these responses identifying the NET percent of respondents who believed that such association exists. The results show that an overwhelming number of respondents (73% - 76%) believe Skiplagged is affiliated with AA. This is only slightly below the belief as to Expedia (AA's actual authorized agent).

**Exhibit 6a**

**Overall and NET perceived association between Skiplagged and the Airlines
(All associated questions)**

| % of Confused Consumers | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **All OE Questions** Associated or connected with airline based on open-ended responses for all questions | 2.7% | 3.2% | 4.9% | 5.8% |
| **Q1-Q6 NET** Associated or connected with airline based on open-ended description of offering | 41.1% | 42.6% | 29.9% | 42.6%* |
| **Q7a** Skiplagged (Expedia) is an Authorized agent of the airline | 43.2% | 56.1%* | 42.4% | 63.9%* |
| **Q11a** Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline | 38.4% | 52.9%* | 38.9% | 53.5%* |
| | | | | |
| **NET (said yes to at least one question)** | **76%** | **81.3%** | **72.9%** | **86.5%** |

### 4. Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia)

AA's Complaint in this case alleges that Skiplagged deceives consumers to believe that Skiplagged's regular tickets are cheaper than purchasing tickets directly from the airline, and that Skiplagged does not fully disclose to consumers the actual risks/consequences of purchasing a hidden city ticket from Skiplagged. To test these allegations, we asked the respondents who were

App'x 047

exposed to the Skiplagged offerings a few questions.

The first of these questions asked if "buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the Airline" or not (Q8).

Not surprisingly, 62% of the respondents exposed to the first stimulus (the non-hidden city tickets) and 70% of those exposed to the second stimulus (the hidden city tickets) said YES. This is very similar to the % who said yes to this question with respect to Expedia.

43

**Exhibit 7**

**Consumers' belief Re the cost of buying tickets through Skiplagged (or Expedia) vs. buying directly from the Airline**
**(Q8a:b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q8a Buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the airline** | **61.6%** | **74.2%*** | **70.1%** | **65.2%** |
| Buying tickets through Skiplagged (Expedia) is NOT cheaper than buying directly from the airline | 7.5% | 9.0% | 8.3% | 15.5% |
| Don't Know | 30.8% | 16.8% | 21.5% | 19.4% |
| **Q8b** Illustrative Reasons for believing that buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the airline | | | | |
| | Cheaper fees | Because I have used them before and if it was cheaper to book through the airline nobody would ever use Expedia. | Price decreased | Often times these third party sites offer huge discounts |
| | The tickets were discounted I believe | I guess they offer the list price available | Slight discount | They find the cheapest flights across all airlines |
| | Because they had a great price | I get to get points for every booking that I do so next time I book I get a discount. | This is indicated on the site | You can compare prices ahead of time on the website. |
| | I get a better deal. | It has more promotions | The price just seems low | From past experience. |
| | The price is very affordable and customers centric | I travel frequently and the prices shown are cheaper | They showed a discount | You can use discounts and codes for deals and promotion |
| | It offers discounts | It comes with rewards that could be use forthwith | Always cheaper thru a travel agent | In my experience, you get better deals by booking that way |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

A related question was whether "Skiplagged (Expedia), charges an additional fee on top of the airline total cost" (Q9).

App'x 049

Exhibit 8 presents the results, which show that one out of three respondents exposed to the non-hidden city stimuli said YES and one of 4 of the respondents exposed to the hidden city stimulus said YES. And both % are very similar to those of Expedia.

**Exhibit 8a**
**Consumers' belief Re the fees charged by Skiplagged (or Expedia)**
**(Q9)**

| | Test | Control | Test | Control |
|---|---|---|---|---|
| **% of Respondents** | | | | |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q9a** Skiplagged (Expedia) charges an additional fee on top of the airline total ticket cost. | 35.6% | 34.2% | 26.4% | 24.5% |
| **Q9a Skiplagged (Expedia) does NOT charge an additional fee on top of the airline total ticket cost.** | **34.9%** | **39.4%** | **34.0%** | **44.5%*** |
| Don't Know | 29.5% | 26.5% | 39.6% | 31.0% |
| **Q9b Illustrative Reason for believing that** Skiplagged (Expedia) does NOT charge a fee for its services | | | | |
| | No additional charges was stated on their website | It rather comes with discounts and rewards | Much cheaper | Did not see an extra fee listed |
| | It doesn't charge | They collect a fee from the airlines | They make there money from airline | From my experience, they simply do not do this. |
| | I get a better value for my money when buying through this platform. | It said so | No additional cost if direct to the airline website | From past experience. |
| | They don't accept extra fee | I didn't see additional fee on the website | I used it before and there was no additional fee | They get a percentage of tickets sold from the airline |
| | The website doesn't charge extra it just charges your regular feats and how much ticket cost | I didn't see any extra fees | It was stated | No fees are listed |
| | It doesn't say they do | It only charged taxes on top of the ticket price so there is no additional fees. | It's what I saw within the ad itself. | Additional fees are charged by the aitline |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

App'x 050

The perception of the reasonableness of the fees are presented in Exhibit 8b and show very little difference between the perception of Skiplagged and Expedia.

**Exhibit 8b**
**Consumers' belief Re the fees charged by Skiplagged (or Expedia) are reasonable.**
**(Q10)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q10a Believe the fee Skiplagged (Expedia) charges for its services is reasonable** | **52.1%** | **51.0%** | **41.7%** | **49.0%** |
| **Q10a** Believe the fee Skiplagged (Expedia) charges for its services is NOT reasonable | 8.2% | 11.0% | 17.4% | 6.5% |
| **N/A** (I do not think Skiplagged (Expedia) charges an additional fee on top of the airline's total cost) | 17.1% | 19.4% | 16.7% | 29.0% |
| Don't Know | 22.6% | 18.7% | 24.3% | 15.5% |
| **Q10b Illustrative Reasons for believing** the fee Skiplagged (Expedia) charges for its services is reasonable | | | | |
| | It seems fair | I feel the fee is reasonable because it would help their business out and it'll improve their services. | 45.00 is a o.k. fee | There is not an uplift in the price. |
| | They are a middle plane of plane tickets | They just charged taxes | Other sites charge at least this fee or more. | Because it is still less than retail. |
| | They have to make money somehow | Not too much | they have to make some money | I don't mind paying additional if it's really worth it. |
| | So I can get a better deal overall. | The earliest bookings normally save customers money | They prices seemed reasonable given today's costs | Affordable prices. |
| | There's a detailed information about the booking process for travelers | It's a third party and there is a fee | reasonable price good for everyone | They usually have all the information you need about a trip so they offering something that is valuable |
| | The $10 feed at this website charges is quite reasonable | It is a decent fee And not too expensive | The price that's offered | I've booked with Expedia before and I think the rates are the same or very close with er way. |

The following exhibits present the respondents' perceived legitimacy and risk of the Skiplagged offerings.

App'x 052

Exhibit 9a presents the results to the question of whether "a ticket bought through Skiplagged (Expedia) is a valid ticket." Over 70% of the respondents to Skiplagged stimuli said YES. Very close to the around 90% who said so for Expedia. The exhibit also includes some illustrative quotes; for more detailed verbatim, see Appendix C-6.

**Exhibit 9a**
**Consumers' beliefs Re the legitimacy and risks Skiplagged Hidden City offerings**
**(Q12)**

| | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q12a A ticket bought through Skiplagged (Expedia) is a valid ticket** | **74.0%** | **87.7%\*** | **70.1%** | **90.3%\*** |
| **Q12a** A ticket bought through Skiplagged (Expedia) is NOT a valid ticket | 4.1% | 4.5% | 5.6% | 1.3% |
| Don't Know | 21.9% | 7.7% | 24.3% | 8.4% |
| **12b Illustrative Reasons for believing** A ticket bought through Skiplagged (Expedia) is a valid ticket | | | | |
| | Because they would not sell fake tickets | It's a valid ticket because it's connected to the airline. | I real website | I've flown with them |
| | They're authorized | Because no one would use it otherwise | why would they be able to sell invalid tickets? | Expedia is a great company |
| | Because it said so | Because they are recognized and authorized | They are offering tickets to flights | It's from the airline Expedia is a third party company. |
| | Why else would they be in business | Once the ticket is sold and paid for the airline has to honor the ticket. | It seems like a valid ticket | people have used it for travel |
| | It has to be | I have used Expedia before | I'm just assuming that I legit website. | I've bought tickets from them |
| | I think it's a trustworthy platform. | It's a trustworthy booking site | Authorized travel agent, I think. | It has to be valid. |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Exhibit 9b presents the results to the question of whether "the option offered by Skiplagged (Expedia) carries no risk." Over a third of all respondents to both Skiplagged stimuli said YES.

App'x 053

This is significantly lower than the perceived risk of Expedia, but still a very high percentage, and especially with respect to the numerous risks of the hidden city offering.

**Exhibit 9b**
**Consumers' beliefs Re the Risks of Skiplagged**
**(Q12)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **12c The option offered by Skiplagged (Expedia) carries no risk** | **37.0%** | **59.4%*** | **36.1%** | **55.5%*** |
| **12c** The option offered by Skiplagged (Expedia) carries risk | 14.4% | 14.8% | 28.5% | 18.1% |
| Don't Know | 48.6% | 25.8% | 35.4% | 26.5% |
| **12d Illustrative Reasons for believing** the option offered by Skiplagged (Expedia) carries no risk | | | | |
| | there is no risk | It doesn't carry risks if you pay more to keep your information secured and luggage safe. | It's a guaranteed fare | I have never had an issue with my ticket purchase or my flights |
| | Did not see any risk factors | As long as you book a ticket with a refundable one it's o k | why would they sell invalid tickets | They are a well known company |
| | It's a trustworthy platform. | It's a trustworthy brand | There is no risk | It is as good as a ticket purchased directly from the carrier. |
| | None was provided on their website | I don't see how there would be a risk involved. | One price one flight ticket | It is licensed. |
| | I believe the offerings that this website has carries little to no risk as with the other sites that offer the same service | If it is authorized I don't think it is a problem | It's a guaranteed money back. It's a failsafe service. | I do not know of any risk involved |
| | They must do what they said of not I fraud | I've done it before | Everything is clearly explained | They are guaranteed |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

The next two exhibits focus on the perceived risks of buying Skiplagged (Expedia) tickets.

Exhibit 10a categorized the open ended responses to the question "what are the risks associated with this ticket" and a follow up probe. (Q12e: f). The risks were categorized into three

50

categories: meaningful risks, unmeaningful risks, and no risk. The definition and examples are listed underneath the below exhibit. Examination of the results show that the vast majority of the respondents perceived no risk, and only 4% of the respondents who saw the Skiplagged first stimulus and 17% of those who saw the second stimulus perceived a meaningful risk.

**Exhibit 10a**
**Consumers' perceptions of the risks involved in buying Skiplagged (or Expedia) tickets**

| Consumers perceived risks (Q12e-f): | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| Meaningful Risks | 4.1% | 11% | 16.7% | 11.0% |
| Unmeaningful Risks | 8.9% | 7.7% | 12.5% | 7.1% |
| **No Risk** | **89.0%** | **87.1%** | **74.3%** | **85.2%*** |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

**Meaningful Risks:**
**Includes the following risks:**
- Financial penalties
- Can't fly on airline/Can get banned/Makes airline angry
- Cancellation problems/schedule changes
- Ticket isn't valid/ticket may not be honored
- Refund issues
- Fraud/scam issues
- Changes in plans
- Delays
- 'Third party' risk
- Weather risk
- No seats/plane is full
- Other Meaningful risks

Examples:
- Maybe the airline will be angry and kick you offf the plane
- Unknown extra fees at the airline, change fees, chance they are a scam website, cancellation fees.
- Not being validated or if it is canceled

**Unmeaningful Riks:**
**Includes the following:**
- Can't check a bag
- Unidentified Risks

Examples:
- Everything has risk
- Lost items
- Every ticket purchase carries risk. You can buy all the insurance in the world, have all the assurances in the world, and all the guarantees in the world, but stuff still happens.

Exhibit 10b presents the number of meaningful risks identified by the respondents.

Examination of the results show that, despite the numerous risks associated with the Hidden City tickets, the vast majority of the respondents do not perceive any meaningful risks, 11% perceive only one meaningful risk, and hardly anyone mentioned 2 or more meaningful risks.

**Exhibit 10b**

**Number of meaningful risks identified by each respondent.**

| Consumers perceived risks (Q12e-f): | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| Mean | 0.08 | 0.14 | 0.23 | 0.17 |
| Median | 0 | 0 | 0 | 0 |
| 0 (No Meaningful Risk Mentioned) | 95.9%* | 89.0% | 83.3% | 89% |
| 1 | 1.4% | 8.4%* | 11.1%* | 5.8% |
| 2 | 2.1% | 2.6% | 4.9% | 3.9% |
| 3 | 0.7% | 0% | 0.7% | 1.3% |
| 4+ | 0% | 0% | 0% | 0% |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

### 5. Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden city offer.

The last part of the questionnaire focused on the respondent's reaction to knowing the truth about how Skiplagged's offering compared to the same offering on AA.com, and, for the respondents who saw the Skiplagged hidden city stimulus, the risks associated with this offer.

Exhibit 11a presents the results of the open-ended responses to the question "Comparing the results you got from Skiplagged (Expedia) and from American Airlines websites, how do you feel about the Skiplagged (Expedia) offering?" (Q15a: b). Surprisingly, only 20% of the Skiplagged respondents who saw the first stimulus and 25% of those who saw the second stimulus had negative sentiment toward Skiplagged. And a very large segment still had positive sentiment toward Skiplagged – 50% among those who saw the first stimulus and 43% among those who saw the second stimulus.

App'x 057

The following three Exhibits – 11b, c and d, presents illustrative quotes for the negative, neutral, and positive reactions.

**Exhibit 11a**

**Given additional information about American Airlines,
how do consumers feel about the Skiplagged (or Expedia) offer (Q15a:b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| **Consumer Feelings about the Skiplagged (Expedia) offer (Q15a +b):** | **Test** | **Control** | **Test** | **Control** |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Negative Sentiment about Skiplagged (Expedia)** | **19.2%\*** | **5.8%** | **25%\*** | **5.8%** |
| **Neutral Sentiment** about Skiplagged (Expedia) | 11.6% | 25.8% | 12.5% | 23.9% |
| **Positive Sentiment** about Skiplagged (Expedia) | 50% | 47.7% | 43.1% | 52.3% |
| **Don't Know** | 18.5% | 20% | 19.4% | 18.1% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

53

**Exhibit 11b**
**Reflections on Skiplagged and Expedia: Illustrative Negative Verbatims**
**(Q15a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=28)** | **Expedia Ticket (n=9)** | **Skiplagged Hidden City Ticket (n=36)** | **Expedia Ticket (n=9)** |
| I feel like they're ripping people off | Is that the total price or is n the next screen adds fees? If it is the same price why not go through the airline instead? | not sure worth it since I normally have luggage to check and want my frequent flyer miles | Not a big enough discount. |
| They are charging more than booking directly with the airline. | I feel it might be a scam because they're the same | I think it's risky | Since it is the same, I would book directly through the airline |
| I prefer to order tickets from a site I am familiar with. | it was more expensive and less secure than just buying from the airline | It seems like there are risks | It cost too much |
| There isn't a huge difference that I would deem it creditable to use this site. Play it safe and buy from the airlines directly. | American Airlines just looks more setup then Expedia does | sounds like they are using exploitive practices. | I would just use the American airlines website |
| It is $10 more because of service charge so why book it | Not great. it's the exact same, so there's no incentive to chose them over the aurline | American airlines website is more accurate than skiplagged | American Airlines is cheaper by about $35 |
| It is expensive and has several charges | The Expedia offering did not charge significantly more at all. | Wow. I wasn't aware of the airline restrictions. Maybe that's not the best way to buy a ticket. | Is more expensiv |

54

**Exhibit 11c**
**Reflections on Skiplagged and Expedia: Illustrative Neutral Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=17)** | **Expedia Ticket (n=13)** | **Skiplagged Hidden City Ticket (n=18)** | **Expedia Ticket (n=35)** |
| Same offering as the airline | The same flight same price | Cheaper but not clearer | They are the same prices |
| It is reasonable, but I would then book directly through the airline | Not bad. The difference is in incentives | It really just depends on the situation | It's essentially the same |
| Same as other booking sites | The offers are the same | I feel like it is cheaper, but it violates the airline policy so there is a risk. | It looked similar, so not sure why I would use it |
| I'd feel comfortable buying a ticket from this agency it looks professional and just like other websites | About the same | I feel like it's almost identical | The same flights |
| It looks like any other travel website I've used before. | It looks almost exactly the same, I would feel like Expedia is just offering the same thing I see with American | I think they offer more but I'm just not sure if I still trust it | It's literally the same exact thing |
| Is a great offer if not the same | It is basically the same price | I'm not sure now if it's okay or not | I think it was pretty much the same |

**Exhibit 11d**
**Reflections on Skiplagged and Expedia: Illustrative Positive Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=73)** | **Expedia Ticket (n=74)** | **Skiplagged Hidden City Ticket (n=62)** | **Expedia Ticket (n=81)** |
| I think it is a good value | Expedia gets you good deals. | Much better fee | I think the Expedia offering saves me and more of their customers money than the other offering |
| Seems like a decent deal | I feel Expedia offers better options than just the airline itself. | The Skiplagged is better | It sounds very reasonable |
| It is way more cheape | It seems like a better deal | Love it, seems to be a smart way to hack the system | It is favorable and credible. |
| I feel as if I am getting a better value for my money. | It's cheaper and affordable | They offer more protection plans as to your flight. | Feel as though the price is great and better. |
| It's cheaper | This is a good offering | It's a more affordable option | Expedia is less and easier to navigate. |
| I will be very happy to book a travel trip with them because their service is affordable and customers centric | They are offering a very good price for the flight with options. | It feels like they are less intimdating and more open and reliable | Good, price is about the same |

Exhibit 12 asks the respondents about their intentions to buy their next ticket from

Skiplagged (Expedia). And this is after being exposed to the facts about the AA offer, and, for respondents who saw the Hidden City offering, after finding out about the risks of the offer.

Surprisingly, almost half of the respondents still definitely or probably would buy the tickets from Skiplagged.

**Exhibit 12**
**Consumers' intention to buy their next airline ticket from Skiplagged (or Expedia)**
**(Q16a)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Consumer Reaction:** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Bottom Two (Definitely would not/Probably would not)** | **19.9%\*** | **7.7%** | **19.4%\*** | **2.6%** |
| **Top Two (Probably would/Definitely would)** | **53.4%** | **77.4%\*** | **47.2%** | **73.5%\*** |
| 1. **Definitely would not** consider buying my next airline ticket from Skiplagged (Expedia) | 8.9% | 3.2% | 6.9% | 0.6% |
| 2. **Probably would not** consider buying my next airline ticket from Skiplagged (Expedia) | 11.0% | 4.5% | 12.5% | 1.9% |
| 3. **May or may not** consider buying my next airline ticket from Skiplagged (Expedia) | 21.9% | 14.8% | 29.2% | 21.9% |
| 4. **Probably would** consider buying my next airline ticket from Skiplagged (Expedia) | 26.7% | 25.2% | 19.4% | 34.2% |
| 5. **Definitely would** consider buying my next airline ticket from Skiplagged (Expedia) | 26.7% | 52.3% | 27.8% | 39.4% |
| **Don't Know** | 4.8% | 0.0% | 4.2% | 1.9% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Exhibit 13 presents illustrative reasons for the various intentions to buy responses. For a more complete review of the reasons given by the respondents, see the full verbatim in Appendix C6.

**Exhibit 13**
**Illustrative Reasons for consumers' intention to buy their next ticket from Skiplagged (or Expedia)**
**(Q16a+c)**

| Intend to buy (4+5) | |
|---|---|
| **Skiplagged Ticket (n=78)** | **Skiplagged Hidden City Ticket (n=54)** |
| I'll get a better value for my money. | It is a cheaper way to fly. |
| Seemed professional and prices are relatively good. | Seems like they offer good deals and offers |
| I would consider it because it seems like a reliable option. | It seems interesting and I learned something new about traveling. Almost like a hack of sorts |
| Based on what I saw no reason to doubt it | They offer really good deal. This is something that would fit in a line with my schedule on some good places that I need to go. I don't mind having to layover if it'll save me almost $200. |

| Intent not to buy (1+2) | |
|---|---|
| **Skiplagged Ticket (n=29)** | **Skiplagged Hidden City Ticket (n=28)** |
| There isn't a huge difference in price that I would risk this not being a valid offer. | Its too risky |
| If it has same ticket but more because of service charges I see no reason to use it | You could lose your right to fly |
| There are too many risks involved. | Cause I want to make sure the ticket is real |
| Because it was hard to get a refund. | They don't comply with AA rules. |

| May or may not intend to buy (3) | |
|---|---|
| **Skiplagged Ticket (n=32)** | **Skiplagged Hidden City Ticket (n=42)** |
| Depending if the offer is cheaper than airlines | Not sure if worth the risks now that I understand the offer better |
| Because it gave the same results as the airline gave me but without protection | Don't know if i want the trouble |
| It is new to me, so I want to research and see how users feel about it. | I'm not sure I would want to take the risk |
| Depending if my deal is better on skiplagged I'd chose that instead | Because I'm still interested but need more research |

57

App'x 062

| Don't Know | |
|---|---|
| **Skiplagged Ticket** <br> **(n=7)** | **Skiplagged Hidden City Ticket** <br> **(n=6)** |
| I need more information about them and to read their reviews. | It really depends on the total price |
| I'll have to read more reviews | |

## B.  Other Data supporting the Experimental Findings

In this section, we will briefly review 4 sets of data, which individually and collectively support the findings of our experiments.

### 1.  Illustrative actual confusion and perceived deception in consumer complaints to AA

The following two exhibits present illustrative cases of actual confusion as evident from an analysis of consumer complaints to AA.

Exhibit 14 presents illustrative complaints to AA evidencing confusion as to association between Skiplagged and AA.

Exhibit 15 presents illustrative complaints to AA evidencing Skiplagged deceptive practices.

App'x 063

### 3. Illustrative actual confusion and perceived deception in consumer posts on social media

Since actual complaints are often believed to be the "tip of the iceberg" given that most consumers are reluctant to complain, we also engaged in the analysis of consumer conversations on social networks. Thie results of this analysis are included in Exhibit 18.

The exhibit is divided into the following parts:

- Believing that Skiplagged is an agent of AA or another airline.

- Luggage sent to the wrong destination.

- Dishonored tickets/had to pay extra.

- The cost was higher than expected.

- Passport issues

- General dissatisfaction

Exhibit 18 includes illustrations posted on social media.

67

**Exhibit 18**
**Consumer Comments on Skiplagged**

## Believing Skiplagged is an Agent of AA or Another Airline

1. "Wow accidentally booked my flight thru Skiplagged instead of American and now I can't check my bag

*Author: @laurenash_213*
*Date: 2018-04-14*
*URL: http://twitter.com/laurenash_213/statuses/984976293966917633*
*American Airlines Reference: N*

6.  "@KhadiDon download the skiplagged app, all flights are cheaper an yes it's legit"

*Source: Twitter*
*Author: @Niall_JayDub*
*Date: 2015-10-14*
*URL: http://twitter.com/Niall_JayDub/statuses/654162040479686656*
*American Airlines Reference: N*

69

## Luggage Sent to the Wrong Destination

1. "@SteveSasman @AmericanAir @Skiplagged Lol. You had to bring me back to PHX because
   AA shipped my bag to and from Vegas, which was within their rights but still sucked."

   *Source: Twitter*
   *Author: @ChrisStrub*
   *Date: 2020-09-01*
   *URL: http://twitter.com/ChrisStrub/statuses/1300919283086696456*
   *American Airlines Reference: Y*

2. "@Skiplagged You all give good deals but keeping up w/ luggage is not good on skiplagged
   behalf! Traveling partial flights & bags going to the final destination is terrible"

   *Source: Twitter*
   *Author: @jerlbrown*
   *Date: 2024-01-29*
   *URL: http://twitter.com/jerlbrown/statuses/1752017421186089335*
   *American Airlines Reference: N*

3. "@xtatiana_ @Yaardiegurl @Pharaoh_Wilder @KateDaughtry @darnyb @EagleEye1906
   Skiplagged will have your luggage going to Timbuktu but oh well you got the tkt for cheap

*Author: @YeaImTORI*
*Date: 2020-11-02*
*URL: http://twitter.com/YeaImTORI/statuses/1323245232444551168*
*American Airlines Reference: N*

6.  "Throwaway for obvious reasons. I fcked up and trusted someone to book our tickets. They used skiplagged and now 3 of us has luggages that needed to be checked in. I trusted this "friend" because they said they knew of a way to get cheaper tickets and kept us in the dark about its details. We missed the flight and now our luggage is being shipped to another damn state thats not our supposed destination. I am annoyed and is currently frantically looking for a way to get it back. Should I just take the flight or can I have the airline ship it back? And fr, should i drop this friend lol. Dont use skip lagged people, esp when youre like me. Late and manipulated into this mess."

    *Source: Reddit*
    *Author: Flippedmacaronisalad*
    *Date: 2023-10-01*
    *URL: https://www.reddit.com/r/travel/comments/16wupkp/fukd_up_by_using_skip_lag/*
    *American Airlines Reference: N*

7.  "Used @Skiplagged and they made me check my bag. See my luggage in a week or so.."

    *Source: Twitter*
    *Author: @Koridarnell*
    *Date: 2016-06-05*
    *URL: http://twitter.com/Koridarnell/statuses/739459507491737601*
    *American Airlines Reference: N*

71

## Dishonored Ticket/Had to Pay Extra

1. "@Skiplagged used @AmericanAir to book a flight I found & AA refused to let me carryon when I mentioned ur app & made me pay for a new flight"

   *Source: Twitter*
   *Author: @nicolebrajer*
   *Date: 2017-01-20*
   *URL: http://twitter.com/nicolebrajer/statuses/822303955908628484*
   *American Airlines Reference: Y*

2. "@Skiplagged My son just purchased his first airfare using skiplagged, Tuscan to LA. American Airlines made him purchase a new ticket to board! $172 on top of what he spent on app. Can he get a refund? This is effed up!"

   *Source: Twitter*
   *Author: @itwitt2*
   *Date: 2021-08-18*
   *URL: http://twitter.com/itwitt2/statuses/1428113256477073410*
   *American Airlines Reference: Y*

3. "@Ieshialot Just stay away from Skiplagged if you're booking american, security was about to come get me in Philly if I didn't rebook

App'x 077

I don't have a ticket today."

*Source: Twitter*
*Author: @_____de*
*Date: 2021-01-24*
*URL: http://twitter.com/_____de/statuses/1353408328173555713*
*American Airlines Reference: Y*

6. "A word of caution on Skiplagged - use it too often and American will catch on and start pulling bullshit. I've been denied boarding to a flight, at the gate in terminal C, after checking in!"

*Source: Reddit*
*Author: ihrtbeer*
*Date: 2022-12-09*
*URL:*
*https://www.reddit.com/r/Charlotte/comments/zgwq3j/how_do_you_save_money_flying_with_clt_being_so/izj0exh/*
*American Airlines Reference: Y*

7. "@AmericanAir @Skiplagged the carryon clearly fits. I have carried it on multiple AA flights. AA forced me to pay 4 a new flight #skiplagged https://t.co/uN1sK2UgV8"

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: http://twitter.com/nicolebrajer/statuses/822347673030098944*
*American Airlines Reference: Y*

8. "@_StayFit101 So basically AA considers this to be cheating the system. Skiplagged gets you lower rates by booking your flight as connecting and you get off at the layover. That's what I did, my ticket got flagged. When I got to the airport I had to pay an additional $150 & bumped to standby."

*Source: Twitter*
*Author: @dorianjanelle*
*Date: 2022-05-08*
*URL: http://twitter.com/dorianjanelle/statuses/1523387295906566145*
*American Airlines Reference: Y*

9.  "Hi everyone, I read the FAQ but have a question regarding getting fines/banned for life from
    American. I bought a skiplagged flight from DTW to FLL - with a connection in CLT (my
    intended destination). I tried to check in, but the gate attendant told me they knew CLT was my
    final destination and if I did not pay the change fee & did not get on my flight to FLL, I would be
    banned from American for life. Has anyone had experience with this? I know not to check bags
    etc, and have taken 50+ flights with skiplagged & have never had an issue. Thanks"

    *Source: Reddit*
    *Author: @laith-the-arab*
    *Date: 2022-02-06*
    *URL: https://www.reddit.com/r/Flights/comments/sm97ni/change_fees_on_skiplagged/*
    *American Airlines Reference: Y*

10. "@AmericanAir @Skiplagged as a member of @NBCUniversal, a frequent flyer, I was shocked I
    was forced off the line & to pay for a new flight!"

    *Source: Twitter*
    *Author: @nicolebrajer*
    *Date: 2017-01-20*
    *URL: http://twitter.com/nicolebrajer/statuses/822344867619557376*
    *American Airlines Reference: Y*

11. "@AmericanAir @Skiplagged AA has the worst customer service in our nation! AA CLAIMS
    THIS BAG ISN'T A CARRYON! Forced me to buy a new flight. https://t.co/JrTRVaQ8rj"

    *Source: Twitter*
    *Author: @nicolebrajer*
    *Date: 2017-01-20*
    *URL: http://twitter.com/nicolebrajer/statuses/822357723127762944*
    *American Airlines Reference: Y*

12. "@AmericanAir @Skiplagged u let ppl pass w me their carryons but BC I booked thru
    #skiplagged AA gave me no option than 2 pay 4 a new flight! https://t.co/ySRBcY6wRD"

    *Source: Twitter*
    *Author: @nicolebrajer*
    *Date: 2017-01-20*
    *URL: http://twitter.com/nicolebrajer/statuses/822349705979916289*
    *American Airlines Reference: Y*

13. "@DiskullOfficial @Skiplagged @AnthonyAttia24 Do not recommend skiplagging on the way
    back. Got flagged coming back from New York with @Megamarv97. American made us pay the
    flight in full since they knew we fly out of Charlotte and weren't getting on the connecting flight

*Source: Twitter*
*Author: @Hozay_Guap*
*Date: 2022-12-20*
*URL: http://twitter.com/Hozay_Guap/statuses/1605078826593443840*
*American Airlines Reference: Y*

14. "@Skiplagged @AmericanAir wouldn't refund me the change fee - made me purchase a brand new flight & miss my original cus I mentioned ur app."

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: http://twitter.com/nicolebrajer/statuses/822307917722370051*
*American Airlines Reference: Y*

15. "@united @CFPB @AmericanAir @MarkWarnerVA @timkaine @Skiplagged Current attempt is a @united employee telling me it is another $1000 I have to pay...to KEEP MY SAME FLIGHT."

*Source: Twitter*
*Author: @MsWZ*
*Date: 2017-09-18*
*URL: http://twitter.com/MsWZ/statuses/909593100372324354*
*American Airlines Reference: N*

75

# Cost Was Higher Than Expected

1. "@Skiplagged $35 service fees yeah you guys are bugging I'll just book my flight via American. SMH! Use to love u guys"

   *Source: Twitter*
   *Author: @candydeepthr0at*
   *Date: 2023-11-14*
   *URL: http://twitter.com/candydeepthr0at/statuses/1724359090648801288*
   *American Airlines Reference: Y*

2. "BUYERS BEWARE! This company @ExploreTrip, found on @Skiplagged .com, will promise prices on internet and then inform you that you need to pay more money to secure your booking. They will even try to get you to pay more than the price on the airline's website #scammers #fraud https://t.co/3L105ps7H3"

   *Source: Twitter*
   *Author: @cati4563*
   *Date: 2019-02-03*
   *URL: http://twitter.com/cati4563/statuses/1092121343275999232*
   *American Airlines Reference: N*

3. "@Skiplagged how do I contact customer service? I booked a flight, entered CC#, it was transferred to ExploreTrips who cancelled it with no notification. Now the trip is twice as expensive. #Angry"

   *Source: Twitter*
   *Author: @Audiv8q*
   *Date: 2019-10-23*
   *URL: http://twitter.com/Audiv8q/statuses/1187109886036865025*
   *American Airlines Reference: N*

76

## Passport Issues

1. "i used skiplagged (great site, highly recommend )to book a flight home to CA from Hawaii early because my original flight overlapped with school. I show up to the airport and they ask me for my passport because the flight is technically to Canada with a layover in SF (where I planned to get off). I frantically call the airline an hour before the flight and try and explain the situation and they offer to change my flight for a $300 change fee ONTOP of the price of the new ticket. I hang up and change my story to someone stole my passport and I need to get on this flight to San Francisco where I can get a new passport and they no questions change my flight for no fees."

    *Source: Reddit*
    *Author: j-blizzle*
    *Date: 2017-10-17*
    *URL: https://www.reddit.com/r/AskReddit/comments/76xpa3/reddit_whats_your_top_holy_shit_that_worked_moment/dohyfu3/#*
    *American Airlines Reference: N*

2. "@Skiplagged you didn't tell me I'd need my passport to get through security for a domestic flight!! Stuck and stressed."

    *Source: Twitter*
    *Author: @StormMurphy*
    *Date: 2016-01-11*
    *URL: http://twitter.com/StormMurphy/statuses/686539365661700096*
    *American Airlines Reference: N*

3. "Usually it works great if one knows what s/he is doing, but one time was hilarious (to me). Wanted to go to PHX. Flt was $300+. Flt from LAX to Vegas was $48!!! with a layover conveniently in PHX. No brainer. Worked fine going. On the way back I had a flt to Seattle w a layover in LA. Mechanical issues cancelled the flt. They tell everyone they will rebook at the counter. The over accommodating agent is like "you're in luck - there's a direct flight to Seattle & we can upgrade you"! And it leaves in 30 minutes so you'll arrive sooner!! Damn good customer service. What do I do!?! What can I say? "Oh no, I like layovers, inefficiency & downgrades"? I told her I had to go to the restroom- where I stayed until the flight left. Went online to book & there was a flight to BC w/ a layover in LA (not sure why it's cheaper to go to BC from Phoenix than to LA). They wouldn't let me board that flight b/c I didn't have my passport. WTH? Can I have someone in LA meet me w it? No, you can't board an international flt w no passport. But it's going to LA 1st, which isn't international. She said you can't do that, but you wouldn't want to take the chance of being stuck in LA. (Actually I would!) Ended up staying another night in PHX to catch the same PHX- LAX-Seattle flt I had originally. Even w the extra night hotel (and fun) I still saved almost $200! And the longer version makes for a great

story. Hope they can't trace me thru this story. Crap"

*Source: Reddit*
*Author: go4urs*
*Date: 2023-07-17*
*URL: https://www.reddit.com/r/TravelHacks/comments/152fom9/my_hilarious_to_*
*me_skiplagged_story/*
*American Airlines Reference: N*

4.   "I fucked myself over last week I used @Skiplagged and didn't have my passport smh I didn't
     land at my destination had to purchase a new one way that shit sucked"

     *Source: Twitter*
     *Author: @Itz_RicanSteph*
     *Date: 2018-10-02*
     *URL: http://twitter.com/Itz_RicanSteph/statuses/1046939729013497856*
     *American Airlines Reference: N*

5.   "@Skiplagged ...Really messed me and my kids vacation return UP. Our return flights... Needed
     PASSPORTS from Hawaii. Had to buy NEW full fare tickets! https://t.co/LzF3E6auhz"

     *Source: Twitter*
     *Author: @TamekaRaymond*
     *Date: 2018-01-08*
     *URL: http://twitter.com/TamekaRaymond/statuses/950464317270343680*
     *American Airlines Reference: N*

6.   "If you ever use Skiplagged, please don't be like me and forget your passport by not thinking
     about the fact that you purchased an international flight since you just plan on getting off at a
     domestic layover

*American Airlines Reference: N*

8.  "I was flying through SFO about a week ago at this point and I booked a flight to Seattle as a hidden city flight connecting to Calgary. I didn't have my passport, but I was effectively only taking the flight to Seattle. An attendant sent me to special services desk saying there was a way for me to get on the initial flight, knowing I had used Skiplagged. The Delta attendant at the services desk, seeing my issue, was adamant about it being impossible for me to get on the flight. He then began lecturing me about how I was a hipster and how I couldn't "cheat the system" among other things. He included that it was possible to get me booked just for the Seattle flight, but simply wouldn't. Due to the circumstances, I needed to book an emergency second flight to Seattle. Is there anything I can do about this? Can an airline decline service because of how I booked my flight?"

*Source: Reddit*
*Author: KindaCompostable*
*Date: 2017-06-10*
*URL: [https://www.reddit.com/r/legaladvice/comments/6geakw/wa_i_wasnt_allowed_on_a_flight_because_i_used/#](https://www.reddit.com/r/legaladvice/comments/6geakw/wa_i_wasnt_allowed_on_a_flight_because_i_used/#)*
*American Airlines Reference: N*

# General Dissatisfaction

1. "@Skiplagged you guys took my money for the ticket and service fee. Now @AmericanAir says I don't have a ticket today"

   *Source: Twitter*
   *Author: @_____de*
   *Date: 2021-01-24*
   *URL: http://twitter.com/_____de/statuses/1353408328173555713*
   *American Airlines Reference: Y*

2. "Am I being punked @AmericanAir @Skiplagged This is a deceitful way to sell tickets and take people's money! #shameful #fraud #AmericanAirlines #skiplagged"

   *Source: Twitter*
   *Author: @JessyDiva59*
   *Date: 2021-09-26*
   *URL: http://twitter.com/JessyDiva59/statuses/1441930656670523393*
   *American Airlines Reference: Y*

3. "@Skiplagged @AmericanAir absolutely horrible misleading and deceptive services. Want a direct flight to #WashingtonDC - then sell me a cheap ticket going all the way to #Richmond - where I can't have a carry on luggage & hence needed to buy a fresh ticket altogether. Outrageous!"

   *Source: Twitter*
   *Author: @Akshobh*
   *Date: 2017-12-02*
   *URL: http://twitter.com/Akshobh/statuses/937040316351250433*
   *American Airlines Reference: Y*

4. "I am so annoyed with @AmericanAir & @Skiplagged someone needs to produce my voucher, apply a credit or give me my money back TODAY INSTANTLY!!"

   *Source: Twitter*
   *Author: @kushmie*
   *Date: 2020-08-17*
   *URL: http://twitter.com/kushmie/statuses/1295374798873219072*
   *American Airlines Reference: Y*

5. "Hey, just some more info — this exact thing happened to me. Traveling for work. Boss booked a Skiplagged from CMH->CLT(home airport)->LGA. The app would not let me get my boarding pass. See ticket agent. Agent informs me that because I have an NC ID, they believe it is not my intention to actually fly to LGA. I told him he can believe whatever he wants and that I would

like my ticket. He, having no recourse, did print my ticket. Flight to LGA ended up being delayed a couple hours (oh nooo), so I ended up leaving CLT with no issues. I have never used Skiplagged for American because of this. Not worth the risk. But they really did flag me because of my ID."

*Source: Reddit*
*Author: @Castalyca*
*Date: 2023-07-11*
*URL: [https://www.reddit.com/r/americanairlines/comments/14wr746/teenager_taken_to_security_room_and_interrogated/jrjv6mu/](https://www.reddit.com/r/americanairlines/comments/14wr746/teenager_taken_to_security_room_and_interrogated/jrjv6mu/)*
*American Airlines Reference: Y*

6.  "Hey guys I was wondering if anyone who is familiar with Skiplagged can help me understand this. This is my first time using Skiplagged and I am not much of a traveler. I live in NYC. I am planning a week trip in Cancun followed by a couple of days in Miami. Three flights in all. JFK to Cancun (American Airlines), Cancun to Miami (JetBlue), then Miami to JFK (also JetBlue). However, I am now seeing that my credit card was charged for these random flights in Tulsa Oklahoma and Salt Lake City Utah?? I immediately suspected fraud, but interestingly enough, the charges are for the **same exact prices** as my vacation flights. I did some research on how Skiplagged works and apparently the website shows you hidden city flights. I didn't understand this before - so now I am wondering if I happened to unknowingly book a hidden city flight from Tulsa >>> NYC >>> Cancun or something, and am now being charged the full price by the airlines? I have no idea what's going on. Or is this just fraud? Was my info sow hacked and now someone is buying tickets from my card? Who would I go to to resolve this issue? The airlines or skiplagged? Or my credit card company for fraud? I've seen articles about Airlines banning or suing customers for booking through skiplagged, and I don't want to get in any trouble. Please help me understand this so I know how to explain my situation when I talk to a representative from an airline."

*Source: Reddit*
*Author: @mykashu*
*Date: 2021-05-07*
*URL: [https://www.reddit.com/r/travel/comments/n759ar/i_used_skiplagged_to_book_a_trip_are_these/](https://www.reddit.com/r/travel/comments/n759ar/i_used_skiplagged_to_book_a_trip_are_these/)*
*American Airline Reference: Y*

7.  "I just want to cancel my flight @Skiplagged & @AmericanAir giving me the hardest time ever then i have @Allianz insurance on this flight and it's a complete waste of money not helpful at all I'm so over all of these companies completely disgusted!!!"

*Source: Twitter*
*Author: @KassidyBankss*
*Date: 2021-06-07*
*URL: [http://twitter.com/KassidyBankss/statuses/1402011904055332870](http://twitter.com/KassidyBankss/statuses/1402011904055332870)*

App'x 086

*American Airlines Reference: Y*

8.  "don't ever use @Skiplagged , they had me stranded in Aruba! Been otp for 6+ hours trying to reach @AmericanAir & @priceline , yall got me alllllll the way eff'd up!!!!!!!!!!"

    *Source: Twitter*
    *Author: @notgnerahk*
    *Date: 2021-06-14*
    *URL: http://twitter.com/notgnerahk/statuses/1404292375971774464*
    *American Airlines Reference: Y*

9.  "DON'T buy a connecting flight for American Airlines through Skiplagged

App'x 087

12. "@Skiplagged terrible, I'm so disappointed about your service"

*Source: Twitter*
*Author: @eliasferreirah*
*Date: 2020-12-26*
*URL: http://twitter.com/eliasferreirah/statuses/1342933144983511041*
*American Airlines Reference: N*

13. "I really may never use @skiplagged again. Girlfriend and I paid for the upgraded seats on our @united flights over a month ago and had our seats changed with no notification or refund. Customer support has been terrible to deal with. Over 7 hours of waiting total... no response"

*Source: Twitter*
*Author: @ThatMFerr*
*Date: 2021-06-08*
*URL: http://twitter.com/ThatMFerr/statuses/1402222251282468866*
*American Airlines Reference: N*

14. "@Skiplagged this flight is really important, and to be totally duped by your service/app is terrible"

*Source: Twitter*
*Author: @CaelinCX*
*Date: 2018-09-15*
*URL: http://twitter.com/CaelinCX/statuses/1040782338869927937*
*American Airlines Reference: N*

15. "@Skiplagged you guys really need to stop lying to your users and saying this as false hope. you've been saying the price might go down for 10 days and it's just been shooting up ever since. terrible feature that cost me hundreds https://t.co/9UiD4GrDdV"

*Source: Twitter*
*Author: @SwallowMeHole*
*Date: 2021-06-17*
*URL: http://twitter.com/SwallowMeHole/statuses/1405458169082650631*
*American Airlines Reference: N*

16. "@Skiplagged Urgently seeking help, reached out this morning re: a reservation, no response. I trusted your 24-hour cancellation guarantee +My initial purchase was based on trust in ur policies. Now, with my money taken and policies not upheld, it's a terrible customer journey."

*Source: Twitter*
*Author: @heidifamilia*
*Date: 2023-11-18*

App'x 088

*URL: http://twitter.com/heidifamilia/statuses/1725669070425522550*
*American Airlines Reference: N*

17. "For me it was skyscanner until last year, it really got terrible. Skiplagged turned terrible too, secret flying? Terrible"

*Source: Reddit*
*Author: yerry_Sanchez*
*Date: 2023-03-30*
*URL: https://www.reddit.com/r/TravelHacks/comments/1268g6t/what_are_the_best_and_most_well_hidden_secrets_to/je8a3uu/*
*American Airlines Reference: N*

18. "@Skiplagged Lina #72 was whack. Unhelpful and left me on hold for several minutes at a time. I'm disappointed you couldn't refund the difference of my flight. Regret sharing u to friends.

21. "Almost had a situation with my luggage because of this damn skip lagged app. I don't know that I can trust it now."

    *Source: Twitter*
    *Author: @QuoirBoy*
    *Date: 2016-12-22*
    *URL: http://twitter.com/QuoirBoy/statuses/811930426335956993*
    *American Airlines Reference: N*

22. "@Skiplagged I wanted to share my experience with @Saudi_Airlines : My luggage arrived broken Reaching your customer service department was remarkably difficult Staff seemed unwilling to acknowledge the airline's responsibility for the damage. @Saudia_Care #be_aware @RiyadhSeason @NEOM https://t.co/QowJ9b37s2"

    *Source: Twitter*
    *Author: @A_Suray7i*
    *Date: 2023-10-11*
    *URL: http://twitter.com/A_Suray7i/statuses/1712179287778861412*
    *American Airlines Reference: N*

23. "Yo skiplagged really almost made me lose all my luggage lmfaoo Im glad ik how to talk to ppl"

    *Source: Twitter*
    *Author: @prodilovechris*
    *Date: 2019-05-04*
    *URL: http://twitter.com/prodilovechris/statuses/1124663991110909952*
    *American Airlines Reference: N*

24. "@Skiplagged Extremely angry with your services right now and I will be requesting a refund. I scheduled a flight through you to leave today and somehow it was changed to July 13. Come to find out, 3 more families were in line ALSO expecting to leave today. #ripoff"

    *Source: Twitter*
    *Author: @LaTori_Blair*
    *Date: 2018-06-29*
    *URL: http://twitter.com/LaTori_Blair/statuses/1012802242452295680*
    *American Airlines Reference: N*

## 4. Consumer behavior and advertising and marketing theories and findings that support the validity of our empirical findings.

When searching for cheap flights or directly for Skiplagged, the Skiplagged messages are

very appealing.

85

App'x 090

Consider for example the prominent first search results sponsored by Skiplagged. "Skiplagged: the smart way to find cheap flights." And the follow up heading "Find flights the airlines don't want you to see," "cheap flights to NY," and next to it the Nerd Wallet post: "What is Skiplagged and how to use it," with the following opening sentence: "Skiplagged is a legit way to reduce the cost of certain flights. By booking a hidden city ticket, you might be able to save hundreds of dollars."

These and similar messages are appealing and meet the RAVES criteria for effective advertising and offering.[3]

- **Relevant and respectful:**
  - The big cost savings make it very relevant for any consumer looking for cheap flights.

- **Actionable**:
  - The convenience of a click away from getting the savings is very actionable and tempting.
  - The assurance of legitimacy also makes it more actionable.

- **Valuable:**
  - The big cost savings make it valuable for sophisticated consumers who weigh the cost benefits of the offer, given that Skiplagged does not disclose all the risks. The benefit of cost savings outweighs the few identified risks.
  - The presentation of the tickets with the AA logo and their typical format (see the stimuli we used in our study) further increases the consumer confidence that they are dealing with a legitimate agent of AA.

- **Experiential:**
  - The presentation of the offering with the AA logo and format assures the consumer an experience similar to the one they experience in dealing with AA directly or with authorized agents of AA.

---

[3] Based on Wind and Hays, *Beyond Advertising: Creating Value Through all Customer Touchpoints.* Wiley, 2016

App'x 091

- **Sharable story:**

  o Ther hidden city story is clever, doing something which is legal, but the airlines do not like is intriguing and could tempt consumers to buy it and share it with others.

  o And for some, the creative way of finding loopholes to get cheaper flights is appealing as well as a "David against Goliath" scheme.

Thus, based on what we know about how advertising works, the Skiplagged message and offering is clever and likely to work. While the FAQ includes a bit more information about the risks of Hidden city offering, the reality is that consumers rarely if ever read the small print.

## VI.   CONCLUSION

The conclusion of my analysis is:

1. The results of two consumer experiments among 600 consumers show conclusively that Skiplagged's non-hidden city and hidden city ticket offerings deceive consumers to believe that Skiplagged is an authorized agent of or otherwise associated with American.

   - These results are clearly summarized in Exhibit 6a (p 41-42), which shows that 75% of consumers exposed to the non-hidden city ticket and 73% of the consumers exposed to the hidden city ticket believe that Skiplagged is associated with American.

     o This is just slightly below the level of perceived association between Expedia (the control groups) and American.

2. The results of the experiments clearly show that Skiplagged deceives consumers of its non-hidden city tickets to believe that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American. In fact, 62% of the consumers exposed to the Skiplagged regular/non-hidden city stimulus believed that buying tickets through Skiplagged is cheaper than buying directly from the airline. See Exhibit 7.

App'x 092

- o  Relatedly, consumers of both the non-hidden city and hidden city tickets believed that Skiplagged does not charge an additional fee on top of the airline's total ticket costs (Exhibit 8a).

3. The results of the experiments clearly show that Skiplagged deceived consumers of its hidden city tickets to believe the following:

    a. That a hidden city ticket bought through Skiplagged is a valid ticket – 70% of the respondents. See Exhibit 9a;

    b. That a hidden city ticket offered by Skiplagged carries no risk – 36% of the respondents. See Exhibit 9b; and

    c. Among those who perceived some risk, less than 17% perceived any meaningful risk (Exhibit 10a), and most of them perceived only one meaningful risk (Exhibit 10b).

4. Knowing the truth about the AA prices and the real risks associated with hidden city tickets has only limited impact on consumers' intentions to buy their next airline tickets from Skiplagged. See Exhibit 12.

5. Overall, consumers perceived Skiplagged quite similarly to their perceptions of Expedia, the legitimate and *authorized* travel agent of American that served as our control.

6. The above findings are strongly validated by the actual complaint data received by American (Exhibits 14 and 15), the complaints received by Skiplagged demonstrating a very large number of confused consumers (Exhibits 16 and 17), and consumer conversations on social networks (Exhibit 18).

7. All of my findings are consistent with what one would expect from consumer behavior, advertising, and marketing theories and practices.

8. Given these findings Skiplagged's practices are harming both consumers and American Airlines.

Philadelphia, Pennsylvania

Yoram (Jerry) Wind, Ph.D.

# Exhibit A-2



120 Fifth Avenue, New York, NY 10011
TEL 212.633.1100 | FAX 212.633.6499
**radiusinsights.com**

## Appendix 2: The Stimuli

**Hidden City Stimuli:**

Stimuli 1 for Skiplagged (Cell 1)





### Important information about your flight!

This is a **hidden city ticket**!
That means you get out in Miami (MIA) and skip the following flight(s).



**Backpack only**
We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Nashville!

☑ I understand that I cannot check my bag(s)



**Bad weather**
In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline. If that happens, ask to be changed to a similar itinerary!



**Angry airlines**
Airlines don't like when you miss flights to save money so don't do this often.

☑ I have read and understood these notes.                    [ Proceed ]



Stimuli 1 for Expedia (Cell 2)





Stimuli 2 for Skiplagged (Cell 1) and Expedia (Cell 2)



# Choose flights

« New search

**DEPART**

## Santa Ana, CA to Miami, FL

Saturday, August 3, 2024





PLAN TRAVEL    TRAVEL INFORMATION    AADVANTAGE®    [LOG IN]

# Review and pay

« New search

**DEPART**

## Santa Ana, CA to Miami, FL

Saturday, August 3, 2024 to Sunday, August 4, 2024

| Flight | Depart | Arrive | Travel time | Class | Seats |
|---|---|---|---|---|---|
| 298 American Airlines 📶 🔄 | 8:49 PM<br>SNA | 5:08 AM<br>MIA | 5h 19m | Basic Economy | Choose seats |

## Cost summary

### Your trip total

## $263.10

Includes taxes, charges and carrier-imposed fees

Starting at $24/mo with  affirm. Learn more

**Basic Economy (Non-refundable)**

**Passenger**

| | |
|---|---|
| Trip SNA / MIA | $230.70 |
| Taxes | $32.40 |
| Carrier-imposed fees | $0.00 |
| **Total** (all passengers) | **$263.10** |

Basic Economy rules 🔗
Bag and optional fees 🔗
Reservation and tickets FAQs 🔗
Price and Tax Information 🔗
Conditions of Carriage 🔗

Stimuli 2 for Skiplagged (Cell 1)

| **SKIPLAGGED SAYS...** | **AMERICAN AIRLINES SAYS...** |
|---|---|
| **What is Skiplagging or "hidden-city" flying?**<br><br>Skiplagging or hidden-city flying is where you get off at the layover rather than the final destination. For example, a flight from New York to Orlando might be $250, but a similar flight from New York to Dallas with a layover in Orlando might be $130. If you're going to Orlando, we'll show you both flights. If you choose the cheaper one, you get off the plane at the layover (Orlando) rather than going to the final ticketed destination (Dallas).<br><br>This is perfectly legal and the savings can be significant, but there are **some things to be aware of**:<br><br>• **Backpack only** — We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Dallas (final ticketed destination)!<br>• **Bring your passport** for international flights (even if you're not going all the way to the final destination). Some carriers require a passport to board the plane.<br>• **You may need a visa** for international flights. This depends on the country that's the final destination. In some cases, all you need is a passport, but you may also need a visa for some countries.<br>• **Don't associate a frequent flyer account** — If you do, the airline might invalidate any miles you've accrued with them.<br>• **Some airlines may require proof of a return ticket** during check-in. If this happens to you, just buy a refundable | We may not let you fly (temporarily or permanently) for any reason, including if you...fail to comply with American Airlines rules or policies.<br><br>**Prohibited booking practices**<br>Reservations made to exploit or circumvent fare and ticket rules are prohibited.  Examples include (but are not limited to):<br><br>• Purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing)<br><br>If we find evidence that you or your agent are using a prohibited practice, we reserve the right to:<br><br>• Cancel any unused part of the ticket<br>• Refuse to let the passenger fly and check bags<br>• Not refund an otherwise refundable ticket<br>• Charge you for what the ticket would have cost<br><br>**Ticket Validity**<br>Your ticket is valid only when:<br>• Travel is to/from the cities on your ticket and in your trip record<br><br>Your ticket is not valid when:<br>• We find that the ticket was bought using an exploitative practice<br><br>Violation of applicable rules...is subject to...forfeiture of any and all AAdvantage® Rewards and Benefits in a member's account, as well as termination of the account and the member's future participation. |

| | |
|---|---|
| return ticket directly from the airline and cancel it ASAP after boarding.<br><br>• **Do not overuse** hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame.<br><br>• In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline (2% chance).<br><br>• You might upset the airline, so don't do this often. | |

**Non-Hidden City Stimuli:**

Stimuli 1 for Skiplagged (Cell 1)





Stimuli 1 for Expedia (Cell 2)





Stimuli 2 for Skiplagged (Cell 1) and Expedia (Cell 2)





PLAN TRAVEL    TRAVEL INFORMATION    AADVANTAGE®    LOG IN

# Review and pay

« New search

DEPART

## Philadelphia, PA to San Francisco, CA
Wednesday, May 1, 2024

| Flight | Depart | Arrive | Travel time | Class | Seats |
|---|---|---|---|---|---|
| 756 American Airlines 🛜 ♨ | 6:50 PM PHL | 10:18 PM SFO | 6h 28m | Basic Economy | Choose seats |

## Cost summary



Your trip total

## $139.10

Includes taxes, charges and carrier-imposed fees

Starting at $13/mo with **affirm**. Learn more

**Basic Economy (Non-refundable)**

**Passenger**

| | |
|---|---|
| Trip PHL / SFO | $115.35 |
| Taxes | $23.75 |
| Carrier-imposed fees | $0.00 |
| **Total** (all passengers) | **$139.10** |

Basic Economy rules 🔗

Bag and optional fees 🔗

Reservation and tickets FAQs 🔗

Price and Tax Information 🔗

Conditions of Carriage 🔗

# Exhibit A-3



Were you able to see the images **clearly**?

*Select one.*

- Yes, I was able to clearly see the images and read the words on the screen

- No, I was not able to clearly see the images and read the words on the screen

**Next**

App'x 114



We are going to show you the images again. Please look at the images carefully and click "Next" when you are ready to continue.

Next

App'x 115



How would you describe the offering on this website to a friend?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x

☐ Don't know

Is there anything else?

*Please enter your response below and be as detailed as possible.*

☐ There is no other way I would describe it to a friend

**Next**

App'x 116

Flight Information Link: <u>Click here</u>

Does the company that operates this website have a business connection or association with another company, or do you not know?

Select one

○ No, it does not have a business connection or association with another company

○ Yes, it has a business connection or association with another company

○ Don't know

Next

App'x 117

Which other company does the company operating this website have a business connection or association with?

*Please enter your response below or be as detailed as possible or select "Don't know."*

```
x
```

☐ Don't know

What makes you say that?

*Please type your answer below or select "Don't know."*

☐ Don't know

Next

App'x 118

Flight Information Link: Click here

Does the company that operates this website require permission or authorization from any other company, or do you not know?

*Select one.*



- ( ) No, it does not require permission or authorization from another company
- ( ) Yes, it requires permission or authorization from another company
- ( ) Don't know

**Next**

App'x 119

From which company is permission or authorization required?

*Please enter your response below and be as detailed as possible or select "Don't know."*

> x

☐ Don't know

What makes you say that?

*Please type your answer below or select "Don't know."*

☐ Don't know

**Next**

App'x 120

Flight Information Link: Click here

For what do they need to get permission or authorization?

Please enter your response below and be as detailed as possible or select "Don't know."

x

Don't know

What makes you say that?

Please type your answer below or select "Don't know."

Don't know

Next

App'x 121

What do you believe is the relationship between **Skiplagged** and the airline?

Select one:

- ○ **Skiplagged** is not an authorized agent of the airline
- ○ **Skiplagged** is an authorized agent of the airline
- ○ There is some other relationship between **Skiplagged** and the airline
- ○ Don't know

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

☐ Don't know

**Next**

App'x 122

Flight Information Link: <u>Click here</u>

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or select "Don't know."

Select one.

- ● Buying tickets through **Skiplagged** is not cheaper than buying directly from the airline
- ○ Buying tickets through **Skiplagged** is cheaper than buying directly from the airline
- ○ Don't know

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

Don't know

**Next**

App'x 123

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or "Don't know."

Select one:

- 🔵 **Skiplagged** does not charge an additional fee on top of the airline's total ticket cost.
- ⚪ **Skiplagged** charges an additional fee on top of the airline's total ticket cost.
- ⚪ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

**Next**

App'x 124

Based on your understanding of the **Skiplagged** offering and the option selected above, do you agree or disagree? (Don't know)

Select one.

- ● I believe the fee **Skiplagged** charges for its services is not reasonable
- ○ I believe the fee **Skiplagged** charges for its services is reasonable
- ○ N/A (I do not think **Skiplagged** charges an additional fee on top of the airline's total cost)
- ○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

---

Next

App'x 125

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or you "Don't know."

Select one:

- ● **Skiplagged** is not an authorized travel agency and does not have access to fares I could access via the airline
- ○ **Skiplagged** is an authorized travel agency with access to fares I could not access via the airline
- ○ Don't know if **Skiplagged** are an authorized travel agency
- ○ Don't know if **Skiplagged** have or do not have access to fares I could not access via the airline

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

☐ Don't know

Next

App'x 126

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or "Don't know."

Select one.

- ● A ticket bought through **Skiplagged** is not valid ticket
- ○ A ticket bought through **Skiplagged** is a valid ticket
- ○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

**Next**

App'x 127

Based on your understanding of the **Skiplagged** offering, please select the option you believe is correct or "Don't know."

Select one:

- ● The option offered by **Skiplagged** carries risks
- ○ The option offered by **Skiplagged** carries no risk
- ○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

[                    ]

---

- ☐ Don't know

[ **Next** ]

App'x 128

Flight Information Link: Click here

What are the risks associated with this ticket?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x

Don't know

Flight Information Link: Click here

Are there any other risks?

*Please enter your response below and be as detailed as possible.*

There is no other risks

**Next**

App'x 129



Flight Information Link: Click here

Before today were you aware of **Skiplagged**?

○ No

○ Yes

○ Don't know

**Next**

App'x 130



Have you ever used **Skiplagged**?

- ( ) No
- ( ) Yes
- ( ) Don't know

**Next**

Reflecting on the **skiplagged** offering and everything you know about them, how do you feel about choosing your next airline ticket from them?

*Please enter your response below and be as detailed as possible or select "Don't know."*

```
x
```

Don't know

Is there anything else?

*Please enter your response below and be as detailed as possible.*

There are no other reasons why I said that



Next

App'x 132

Let's imagine that you decide to compare the **Skiplagged** offer with the same flights available on the American Airlines website and you got the following results.

Please review this information the way that you normally do when reviewing and selecting airline flights online.



## Review and pay

« New search

**DEPART**

### Santa Ana, CA to Miami, FL
Saturday, August 3, 2024 to Sunday, August 4, 2024

| Flight | Depart | Arrive | Travel time | Class | Seats |
|---|---|---|---|---|---|
| 298 American Airlines | 8:49 PM SNA | 5:08 AM MIA | 5h 19m | Basic Economy | Choose seats |

### Cost summary

| | Basic Economy (Non-refundable) | |
|---|---|---|
| **Your trip total** | **Passenger** | |
| **$263.10** | Trip SNA / MIA | $210.70 |
| Includes taxes, charges, and carrier-imposed fees | Taxes | $52.40 |
| Starting at $26/mo with affirm Learn how | Carrier imposed fees | $0.00 |
| | **Total (all passengers)** | **$263.10** |

Basic Economy rules
Bag and optional fees
Reservation and tickets FAQs
Price and Tax Information
Conditions of Carriage

---

**American Airlines**    PLAN TRAVEL    TRAVEL INFORMATION    AADVANTAGE®    LOG IN

## Choose flights

« New search

**DEPART**

### Santa Ana, CA to Miami, FL
Saturday, August 3, 2024

| Wed, Jul 31 $214 | Thu Aug 1 $309 | Fri, Aug 2 $309 | Sat, Aug 3 $264 | Sun, Aug 4 $309 | Mon, Aug 5 $309 | Tue, Aug 6 $272 |
|---|---|---|---|---|---|---|

Filter by   Stops ▾   American Airlines                                          40 results

| Depart ↕ | Arrive ↕ | Duration ↕ | **Main** ↕ | **Premium** ↕ |
|---|---|---|---|---|
| SNA → MIA   5h 19m   Nonstop 8:49 PM → 5:08 AM AA 298 - 7M8 -Boeing 737 MAX 8 Passenger Details   Seats ⚠ Overnight flight or connection | | | One way from $264 | One way from $854 |
| SNA → MIA   6h 53m   1 stop 6:45 AM → 4:38 PM SNA - PHX - AA 886 - 7M8 -Boeing 737 MAX 8 Passenger PHX - MIA - AA 1856 - 2W8 -Boeing 737 MAX 8 Passenger Details   Seats | | | One way from $273 | One way from $1,012 1 seat left |
| SNA → MIA   8h 38m   1 stop 6:45 AM → 6:23 PM SNA - DFW - AA 1182 - 738 -Boeing 737 | | | One way from $273 | One way from $863 2 seats left |

---

**skiplagged**    Flights  Stays  Cars  Rewards  Deals                          Login

**You're saving $91 compared to other websites!**
Plus you'll save **$10.11** cash back in travel credits

Great! Just 3 simple steps away and you'll be booking this flight with Skiplagged!

| Free Cancellation There's no fee to cancel within 24 hours of booking | Baggage Policy Click here to check the baggage policy | Customer Support 800-433-7300 by American Airlines |

| ⊘ Fare Class Basic Economy | Change |
| ⊘ Traveler Information First Last Email 1212@abc.com Phone 2144082216 | Change |

**Payment Information**
Pay with Credit Card        Use Travel Credit    New

Skiplagged does not store your credit card information. Data collected in this form is passed directly to the airline.

Name on Card

**Santa Ana - Miami**
Saturday, August 3
$0lbs | Nonstop | Skiplagged | 1 Traveler

AMERICAN AIRLINES
8:49p                    5:08a
SNA                      MIA
$0/lbs | Class B | SKIPPED ONLY

8:49a                    10:50a
MIA                      2W8
$0/lbs | AA 1856/

### Summary of Charges

| 1 Adult | $172.60 |
| Service Fee | $35.00 |
| **Total Charges** | **$207.60** |
| Rewards Earned | $10.11 |

This reservation will be processed in USD currency.

**Next**

App'x 133

Now, please review the conditions associated with the Skiplagged offering versus American Airlines' policies. Please review this information the way that you normally do when reviewing and selecting airline flights online.

| SKIPLAGGED SAYS... | AMERICAN AIRLINES SAYS... |
|---|---|
| **What is Skiplagging or "hidden-city" flying?** | We may not let you fly (temporarily or permanently) for any reason, including if you…fail to comply with American Airlines rules or policies. |
| Skiplagging or hidden-city flying is where you get off at the layover rather than the final destination. For example, a flight from New York to Orlando might be $250, but a similar flight from New York to Dallas with a layover in Orlando might be $130. If you're going to Orlando, we'll show you both flights. If you choose the cheaper one, you get off the plane at the layover (Orlando) rather than going to the final ticketed destination (Dallas). | **Prohibited booking practices** Reservations made to exploit or circumvent fare and ticket rules are prohibited. Examples include (but are not limited to): |
| This is perfectly legal and the savings can be significant, but there are **some things to be aware of**: | • Purchasing a ticket without intending to fly all flights to gain lower fares If we find evidence that you or your agent are using a prohibited practice, we reserve the right to: |
| • **Backpack only** — We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Dallas (final ticketed destination)! • **Bring your passport** for international flights (even if you're not going all the way to the final destination). Some carriers require a passport to board the plane. • **You may need a visa** for international flights. This depends on the country that's the final destination. In some cases, all you need is a passport, but you may also need a visa for some countries. • **Don't associate a frequent flyer account** — If you do, the airline might invalidate any miles you've accrued with them. • **Some airlines may require proof of a return ticket** during check-in. If this happens to you, just buy a refundable return ticket directly from the airline and cancel ASAP after boarding. • **Do not overuse** hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame. • In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline (2% chance). • You might upset the airline, so don't do this often. | • Cancel any unused part of the ticket • Refuse to let the passenger fly and check bags • Not refund an otherwise refundable ticket • Charge you for what the ticket would have cost **Ticket Validity** Your ticket is valid only when: • Travel is to/from the cities on your ticket and in your trip record Your ticket is not valid when: • We find that the ticket was bought using an exploitative practice Violation of applicable rules…is subject to…forfeiture of any and all AAdvantage® Rewards and Benefits in a member's account, as well as termination of the account and the member's future participation. |

**Next**

App'x 134

Flight Information Link: Click here

Comparing the results you got from **Skiplagged** and from the American Airlines website, how do you feel about the **Skiplagged** offering?

*Please enter your response below and be as detailed as possible or select "Don't know".*

```
x
```

Don't know

Flight Information Link: Click here

Is there anything else?

*Please enter your response below and be as detailed as possible.*

There is nothing else that describes how I feel about the **Skiplagged** offerings

Next

App'x 135

How likely would you be to consider buying your next airline ticket from **Skiplagged**?

*Select one.*

- ● **Definitely would** consider buying my next airline tickets from **Skiplagged**
- ○ **Probably would** consider buying my next airline tickets from **Skiplagged**
- ○ **May or may not** consider buying my next airline tickets from **Skiplagged**
- ○ **Probably would not** consider buying my next airline tickets from **Skiplagged**
- ○ **Definitely would not** consider buying my next airline tickets from **Skiplagged**
- ○ **Do not know**

---

What made you say that you **definitely would consider buying my next airline tickets from Skiplagged**?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x|

---

☐ Don't know

---

Is there anything else?

*Please enter your response below and be as detailed as possible.*

---

☐ There are no other reasons why I said that

---

**Next**



For quality control purposes, please enter the year you were born.

Next



Thank you very much for completing this survey. We truly value your response and appreciate you taking time to share your opinions with us.

Next

App'x 138

# Exhibit A-4

Imagine that you wanted to book a roundtrip airline flight from Philadelphia to San Francisco, and you decided to use the **Skiplagged** website to book flights. Below is the output you received when checking for available flights. Please assume that you selected the flight boxed in red.



Were you able to see the images **clearly**?

*Select one.*

- Yes, I was able to clearly see the images and read the words on the screen
- No, I was not able to clearly see the images and read the words on the screen

**Next**

App'x 141



We are going to show you the images again. Please look at the images carefully and click "Next" when you are ready to continue.

Next

App'x 142



Flight Information Link: Click here

How would you describe the offering on this website to a friend?

Please enter your response below and be as detailed as possible or select "Don't know."

X

Don't know

Is there anything else?

Please enter your response below and be as detailed as possible.

There is no other way I would describe it to a friend

Next

App'x 143

Flight Information Link: Click here

Does the company that operates this website have a business connection or association with another company, or do you not know?

Select one

○ No, it does not have a business connection or association with another company

○ Yes, it has a business connection or association with another company

○ Don't know

Next

App'x 144

Flight Information Link: Click here

Which other company does the company operating this website have a business connection or association with?

*Please enter your response below or be as detailed as possible or select "Don't know."*

> x

☐ Don't know

What makes you say that?

*Please type your answer below or select "Don't know."*

☐ Don't know

Next

App'x 145

Flight Information Link: Click here

Does the company that operates this website require permission or authorization from any other company, or do you not know?

*Select one.*



- ○ No, it does not require permission or authorization from another company
- ○ Yes, it requires permission or authorization from another company
- ○ Don't know

**Next**

App'x 146

From which company is permission or authorization required?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x

Don't know

What makes you say that?

*Please type your answer below or select "Don't know."*

Don't know

**Next**

App'x 147

Flight Information Link: Click here

For what do they need to get permission or authorization?

Please enter your response below and be as detailed as possible or select "Don't know."

x

☐ Don't know

What makes you say that?

Please type your answer below or select "Don't know."

☐ Don't know

Next

App'x 148

What do you believe is the relationship between **Skiplagged** and the airline?

Select one:

- ○ **Skiplagged** is not an authorized agent of the airline
- ○ **Skiplagged** is an authorized agent of the airline
- ○ There is some other relationship between **Skiplagged** and the airline
- ○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

---

**Next**

App'x 149

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct. If not, "Don't know."

Select one.

- ● Buying tickets through **Skiplagged** is not cheaper than buying directly from the airline
- ○ Buying tickets through **Skiplagged** is cheaper than buying directly from the airline
- ○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

**Next**



App'x 150

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or "Don't know."

Select one:

- ⦿ **Skiplagged** does not charge an additional fee on top of the airline's total ticket cost.
- ◯ **Skiplagged** charges an additional fee on top of the airline's total ticket cost.
- ◯ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

☐ Don't know

**Next**

Flight Information Link: Click here

Based on your understanding of the **Skiplagged** offering, please select the option you most agree with. (or "Don't know")

Select one.

- ● I believe the fee **Skiplagged** charges for its services is not reasonable
- ○ I believe the fee **Skiplagged** charges for its services is reasonable
- ○ N/A (I do not think **Skiplagged** charges an additional fee on top of the airline's total cost)
- ○ Don't know

---

What makes you say that?

Please enter your response below and be as detailed as possible or select "Don't know."

---

☐ Don't know

**Next**

App'x 152

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or you "Don't know."

Select one:

- ○ **Skiplagged** is not an authorized travel agency and does not have access to fares I could access via the airline
- ○ **Skiplagged** is an authorized travel agency with access to fares I could not access via the airline
- ○ Don't know if **Skiplagged** are an authorized travel agency
- ○ Don't know if **Skiplagged** have or do not have access to fares I could not access via the airline

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

☐ Don't know

**Next**

App'x 153

Flight Information Link: Click here

Based on your understanding of the **Skiplagged** offerings, please select the option you believe is correct or "Don't know."

*Select one.*

- ● A ticket bought through **Skiplagged** is not valid ticket
- ○ A ticket bought through **Skiplagged** is a valid ticket
- ○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

---

**Next**

App'x 154

Flight Information Link: Click here

Based on your understanding of the **Skiplagged** offering, please select the option you believe is correct or "Don't know."

Select one:

 The option offered by **Skiplagged** carries risks

○ The option offered by **Skiplagged** carries no risk

○ Don't know

---

What makes you say that?

*Please enter your response below and be as detailed as possible or select "Don't know."*

---

☐ Don't know

**Next**

Flight Information Link: Click here

What are the risks associated with this ticket?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x

Don't know

Flight Information Link: Click here

Are there any other risks?

*Please enter your response below and be as detailed as possible.*

There is no other risks

Next

App'x 156



App'x 157



Have you ever used **Skiplagged**?

- ◯ No
- ◯ Yes
- ◯ Don't know

Next

Reviewing the **Skiplagged** offering and everything you know about them, how do you feel about purchasing your next airline ticket from them?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x

Don't know

Is there anything else?

*Please enter your response below and be as detailed as possible.*

There are no other reasons why I said that

**Next**

Let's imagine that you decide to compare the Skiplagged offer with the same flights available on the American Airlines website and you got the following results.

Please review this information the way that you normally do when reviewing and selecting airline flights online.



Now, please review the conditions associated with the Skiplagged offering versus American Airlines' policies. Please review this information the way that you normally do when reviewing and selecting airline flights online.

| SKIPLAGGED SAYS... | AMERICAN AIRLINES SAYS... |
|---|---|
| **What is Skiplagging or "hidden-city" flying?** | We may not let you fly (temporarily or permanently) for any reason, including if you...fail to comply with American Airlines rules or policies. |
| Skiplagging or hidden-city flying is where you get off at the layover rather than the final destination. For example, a flight from New York to Orlando might be $250, but a similar flight from New York to Dallas with a layover in Orlando might be $130. If you're going to Orlando, we'll show you both flights. If you choose the cheaper one, you get off the plane at the layover (Orlando) rather than going to the final ticketed destination (Dallas). | **Prohibited booking practices** |
| | Reservations made to exploit or circumvent fare and ticket rules are prohibited. Examples include (but are not limited to): |
| This is perfectly legal and the savings can be significant, but there are **some things to be aware of:** | • Purchasing a ticket without intending to fly all flights to gain lower fares (hidden city ticketing) |
| • **Backpack only** — We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Dallas (final ticketed destination)! | If we find evidence that you or your agent are using a prohibited practice, we reserve the right to: |
| • **Bring your passport** for international flights (even if you're not going all the way to the final destination). Some carriers require a passport to board the plane. | • Cancel any unused part of the ticket |
| • **You may need a visa** for international flights. This depends on the country that's the final destination. In some cases, all you need is a passport, but you may also need a visa for some countries. | • Refuse to let the passenger fly and check bags<br>• Not refund an otherwise refundable ticket<br>• Charge you for what the ticket would have cost |
| • **Don't associate a frequent flyer account** — If you do, the airline might invalidate any miles you've accrued with them. | **Ticket Validity** |
| • **Some airlines may require proof of a return ticket** during check-in. If this happens to you, just buy a refundable return ticket directly from the airline and cancel ASAP after boarding. | Your ticket is valid only when:<br>• Travel is to/from the cities on your ticket and in your trip record |
| • **Do not overuse** hidden-city itineraries. Do not fly hidden-city on the same route with the same airline dozens of times within a short time frame. | Your ticket is not valid when:<br>• We find that the ticket was bought using an exploitative practice |
| • In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline (2% chance). | Violation of applicable rules...is subject to...forfeiture of any and all AAdvantage® Rewards and Benefits in a member's account, as well as termination of the account and the member's future participation. |
| • You might upset the airline, so don't do this often. | |

**Next**

App'x 161

Comparing the results you got from **Skiplagged** and from the American Airlines website, how do you feel about the **Skiplagged** offering?

Flight Information Link: Click here

*Please enter your response below and be as detailed as possible or select "Don't know".*

x

☐ Don't know

Is there anything else?

Flight Information Link: Click here

*Please enter your response below and be as detailed as possible.*

☐ There is nothing else that describes how I feel about the **Skiplagged** offerings



Next

App'x 162

How likely would you be to consider buying your next airline ticket from **Skiplagged**?

*Select one.*

- ● **Definitely would** consider buying my next airline tickets from **Skiplagged**
- ○ **Probably would** consider buying my next airline tickets from **Skiplagged**
- ○ **May or may not** consider buying my next airline tickets from **Skiplagged**
- ○ **Probably would not** consider buying my next airline tickets from **Skiplagged**
- ○ **Definitely would not** consider buying my next airline tickets from **Skiplagged**
- ○ **Do not know**

---

What made you say that you **definitely would consider buying my next airline tickets from Skiplagged**?

*Please enter your response below and be as detailed as possible or select "Don't know."*

x|

---

☐ Don't know

---

Is there anything else?

*Please enter your response below and be as detailed as possible.*

---

☐ There are no other reasons why I said that

---

**Next**

App'x 163



For quality control purposes, please enter the year you were born.

Next



Thank you very much for completing this survey. We truly value your response and appreciate you taking time to share your opinions with us.

Next

# Exhibit A-5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

AMERICAN AIRLINES, INC.,

     Plaintiff,

                         Civil Action No. 4:23-cv-00860-P

v.


SKIPLAGGED, INC.


     Defendant.

_____


EXPERT REPORT OF JOSEPH M. PIMBLEY, PH.D.

in Response to the Expert Report of Professor Yoram (Jerry) Wind

# Table of Contents

I.  QUALIFICATIONS AND BACKGROUND ............................................................ 2

II.  SUMMARY OF MY OPINIONS ................................................................... 5

III.  PROFESSOR WIND'S CONCLUSIONS ARE FLAWED, UNRELIABLE, AND NOT
     SUPPORTED BY THE PRESENTED DATA AND PROPER DATA ANALYSIS ..... 5

    A.  Wind Report Conclusion 1 ................................................................ 6
    B.  Wind Report Conclusion 2 ................................................................ 7
    C.  Wind Report Conclusion 3 .............................................................. 10
    D.  Wind Report Conclusion 4 .............................................................. 13
    E.  Wind Report Conclusion 5 .............................................................. 15
    F.  Wind Report Conclusion 6 .............................................................. 16
    G.  Wind Report Conclusion 7 ...............................................................17
    H.  Wind Report Conclusion 8 .............................................................. 18

IV.  THE SURVEY SAMPLE OF THE WIND REPORT IS IMPROPER ..................... 19

V.  THE WIND REPORT PROVIDES NO DATA OR DATA ANALYSIS TO SUPPORT
    ALLEGATIONS OF DECEIT ON THE PART OF SKIPLAGGED......................... 21

VI.  END STATEMENT..................................................................................... 22

APPENDIX A:  Resume of Joseph M. Pimbley................................................. 23

APPENDIX B:  Publications of the Past Ten Years, J. M. Pimbley ................... 31

APPENDIX C:  Litigation Testimony of Past Four Years, J. M. Pimbley......................... 35

APPENDIX D:  Documents Reviewed .............................................................. 37

App'x 168

# I.     QUALIFICATIONS AND BACKGROUND

1.      My name is Joseph M. Pimbley. I have been active in the financial profession for more than 30 years in areas including credit ratings, structured finance, derivatives, portfolio and risk management, banking, investment advisory, consulting, and teaching. I am the Principal of Maxwell Consulting, LLC, a consulting firm I founded in 2010 that specializes, among other things, in providing expert testimony for legal disputes involving data analysis, financial database retrieval, structured financial products, credit ratings, derivatives, bond insurance and securities trading; in the review and analysis of financial risk management; in review and creation of financial and mathematical models for purposes of risk assessment or valuation of derivatives, structured products, and other investments; in credit risk and credit rating models; in economic capital calculations; in portfolio risk/return calculations; in all other cash flow or business optimization applications; and in providing advisory opinions and compliance review of investment policies and their execution for the portfolios of endowments and other entities including corporate Treasuries, colleges/universities, insurance companies, and non-profits.  Additional information on my qualifications is available in Appendix A.

2.      I have published more than seventy articles in financial and economic journals and publications, provided more than seventy presentations for financial professionals on various topics in the capital markets, co-authored three books, and contributed chapters to two others.

3.      In addition to my published work, I have extensive experience analyzing structured investments and structured credit products including collateralized debt obligations (CDOs) and residential mortgage-backed securities (RMBS) and associated

App'x 169

data analysis, validation, and retrieval, and have done consulting work as well as provided expert reports in various legal disputes and other litigation related to such instruments.

4.     As an assistant professor of applied mathematics at the Rensselaer Polytechnic Institute during the period 1987-1993, I taught numerous classes on the subjects of statistics and probability at advanced levels, ordinary differential equations (graduate and undergraduate), advanced mathematical modeling (graduate), numerical computing (undergraduate), and calculus with symbolic computing.

5.     My direct financial industry experience includes performing as both investment manager for various credit funds and Head of Risk at the executive level for an investment management firm.  In addition to oversight of risk, data, information technology, and quantitative modeling for the investment firm, this role also entailed valuation of management fee and incentive fee streams.

6.     I served as a lead Managing Director for the Lehman Brothers Bankruptcy Examiner's financial advisor from February 2009 to March 2010 conducting and supervising investigations of the valuation of Lehman assets, risk management methods and organization, accuracy of financial statements, regulatory reporting of Lehman debt funding, collateral posting, trading, derivative positions, and clearing operations.

7.     I hold a Ph.D. in Theoretical Physics (1985), an M.S. in Physics (1981), and a B.S. in Physics (1980) (*summa cum laude* and minor in Mathematics) from Rensselaer Polytechnic Institute.  I am a past member of the Editorial Board of the GARP (Global Association of Risk Professionals) *Risk Professional*, and have served on the Advisory Board of the Polytechnic University Center for Finance & Technology.  I also enlisted as a member of *Sigma Pi Sigma*, the National Physics Honor Society, and was elected a Senior Member of the Institute of Electrical and Electronic Engineers (IEEE).  I am a past

member of Sigma Xi (scientific research society), the IEEE Election Devices Society, the Society for Industrial and Applied Mathematics (SIAM), and the American Association for the Advancement of Science (AAAS).

8. I am a past Member of the Executive Advisory Board for the Master's Degree "Quantitative Finance and Risk Analytics" program of the Lally School of Management at the Rensselaer Polytechnic Institute. I am also a past member of the Strategic Advisory Board of ARMA International, LLC, an infrastructure engineering firm. I am also a past member of the Board of Directors of Solve Advisors, Inc. (now re-branded as "Solve"), a financial technology firm.

9. I am the Editor of the *Journal of Derivatives*, a widely known and respected publication for financial professionals and academics.

10. Based upon my specialized training, skill, personal experience, and knowledge of common and prevailing methods of data analysis for financial and non-financial businesses, I consider myself duly qualified as an expert to provide the opinions I express here in this response Report.

11. Counsel for Skiplagged, Inc. engaged me, through Maxwell Consulting, LLC, to review and respond to the report of Professor Yoram (Jerry) Wind with specific emphasis on the analysis, interpretation, and integrity of survey data disclosed therein. The agreement to serve as expert in this engagement specifies my fee as $800 per hour with reimbursement for reasonable expenses. My fees are not contingent upon the opinions I express herein or upon the outcome of this case.

## II.   <u>SUMMARY OF MY OPINIONS</u>

12.     The conclusions provided in Professor Wind's expert report are flawed, unreliable, and not supported by the presented data and proper data analysis.

13.     Contrary to accepted statistical data analysis standards, the survey sample in Professor Wind's survey is improper as it is not drawn from the population of Skiplagged customers.  As a consequence, Professor Wind's survey results are not relevant to hypotheses pertaining to alleged beliefs, confusion, or deception of Skiplagged customers.

14.     There is no statistically testable aspect in Professor Wind's survey data or in his data analysis that purports to measure level of alleged deceit on the part of Skiplagged as the purported cause of the survey respondents' alleged false beliefs.  Thus, Professor Wind's allegations of Skiplagged deceit are unreliable.

## III.   <u>PROFESSOR WIND'S CONCLUSIONS ARE FLAWED, UNRELIABLE, AND NOT SUPPORTED BY THE PRESENTED DATA AND PROPER DATA ANALYSIS</u>

15.     Professor Wind writes eight conclusions in the final section of his expert report.[1]  In the following sub-sections, I write each of the eight Wind Report conclusions in the first paragraph within quotation marks and then write my assessment of the associated conclusion.

---

[1] See section VI of the Expert Report of Professor Yoram (Jerry) Wind.  I refer hereafter to this report as the Wind Report.

## A.    <u>Wind Report Conclusion 1</u>

16.    *Wind Report*:  "The results of two consumer experiments among 600 consumers show conclusively that Skiplagged's non-hidden city and hidden city ticket offerings deceive consumers to believe that Skiplagged is an authorized agent of or otherwise associated with American. • These results are clearly summarized in Exhibit 6a (p 41-42), which shows that 75% [sic] of consumers exposed to the non-hidden city ticket and 73% of the consumers exposed to the hidden city ticket believe that Skiplagged is associated with American. o This is just slightly below the level of perceived association between Expedia (the control groups) and American."[2]

17.    This conclusion is flawed and unreliable for these reasons:

a.  The results summarized in Exhibit 6a do not "show conclusively" that survey respondents "believe that Skiplagged is … associated with American" because the Wind Report offers no clear data analysis standard to define what survey respondents believe.  The standard that the Wind Report appears to use is comparison to survey respondents' views of Expedia relative to Skiplagged.  But with respect to the 76% and 73% "net yes" survey results for Skiplagged relative to the corresponding 81% and 87% results for Expedia, there is no statistically significant finding that one population mean exceeds the other.  There is also no statistically significant finding that the two population means are equal within any specified tolerance.  Hence the Wind Report does not "show conclusively" its purported finding.

---

[2] *Id*. at page 87.

6

App'x 173

b.  Even if there did exist a statistically significant finding in the survey questions summarized in Exhibit 6a that the Wind Report might interpret as "[belief] that Skiplagged is … associated with American," there is no statistically testable aspect in the survey data or in the Wind Report's data analysis that measures or indicates deceit on the part of Skiplagged as the cause of the survey respondents' alleged belief.

c.  It is an error to write of Exhibit 6a survey results in terms of "[belief] that Skiplagged is … associated with American" because "American" is entirely absent from the survey questions covered in this conclusion.[3]  For questions 1-6, the language is "business connection or association with another company."  At questions 7-11, the language changes to "the airline."

## B.   Wind Report Conclusion 2

18.  *Wind Report*:  "The results of the experiments clearly show that Skiplagged deceives consumers of its non-hidden city tickets to believe that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American. In fact, 62% of the consumers exposed to the Skiplagged regular/non-hidden city stimulus believed that buying tickets through Skiplagged is cheaper than buying directly from the airline. See Exhibit 7. o Relatedly, consumers of both the non-hidden city and hidden city tickets believed that Skiplagged does not charge an additional fee on top of the airline's total ticket costs (Exhibit 8a)."[4]

19.  This conclusion is flawed and unreliable for these reasons:

---

[3] *Id*. at Appendix C-3.

[4] *Id*. at page 87.

7

a. The results summarized in Exhibit 7 do not "clearly show" that Skiplagged deceived survey respondents "to believe that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American" because the Wind Report offers no clear data analysis standard to define what survey respondents believe. The standard that the Wind Report appears to use is comparison to survey respondents' views of Expedia relative to Skiplagged. Exhibit 7 claims that 74% of Expedia survey respondents believe Expedia tickets are cheaper than those of "the airline" while 62% of Skiplagged survey respondents believe Skiplagged tickets are cheaper than those of "the airline." Further, the Wind Report (at Exhibit 7) claims that this difference is statistically significant at 90% confidence level. Hence, if comparison to Expedia is the Wind Report's standard of false belief among Skiplagged survey respondents, then the Wind Report should not conclude false belief of Skiplagged survey respondents. Hence the Wind Report does not "clearly show" its stated conclusion.

b. Even if there did exist a statistically significant finding in the survey questions summarized in Exhibit 7 that the Wind Report might interpret as "[belief] that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American," there is no statistically testable aspect in the survey data or in the Wind Report's data analysis that measures or indicates deceit on the part of Skiplagged as the cause of the survey respondents' alleged belief.

c. It is an error to write of Exhibit 7 survey results in terms of "[belief] that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket

8

directly from American" because "American" is entirely absent from the survey questions (8a and 8b) covered in this conclusion.[5]  The language of these survey questions specifies "the airline" rather than "American."

d.  For the Wind Report to claim and conclude that there is deception if Skiplagged survey respondents "believe that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American," then the Wind Report must also show it is NOT true "that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American."  Yet the Wind Report does not seriously attempt this proof.  At page 11 in a sub-section of the Wind Report titled "The Stimuli," the Wind Report writes in just two sentences a finding that non-hidden city Skiplagged tickets are, on average, $12.62 more expensive than identical American tickets.   But there is no analysis for statistical significance.  Hence, the Wind Report has not proven that non-hidden city Skiplagged tickets are not cheaper than American tickets.

e.  The results summarized in Exhibit 8a do not support the Wind Report conclusion "... consumers of both the non-hidden city and hidden city tickets believed that Skiplagged does not charge an additional fee on top of the airline's total ticket costs."  Exhibit 8a shows the fractions of Skiplagged survey respondents in these two categories who believe there is no additional charge to be 35% and 34%.  Both numbers are well below 50% (by statistically significant margins as per my own analysis).  Hence it is

---

[5] *Id*. at Appendix C-3.

false to give the impression that the majority of Skiplagged survey respondents believe there are no additional fees.

## C.   **Wind Report Conclusion 3**

20.   *Wind Report*:  "The results of the experiments clearly show that Skiplagged deceived consumers of its hidden city tickets to believe the following: a. That a hidden city ticket bought through Skiplagged is a valid ticket – 70% of the respondents. See Exhibit 9a; b. That a hidden city ticket offered by Skiplagged carries no risk – 36% of the respondents. See Exhibit 9b; and c. Among those who perceived some risk, less than 17% perceived any meaningful risk (Exhibit 10a), and most of them perceived only one meaningful risk (Exhibit 10b)."[6]

21.   This conclusion is flawed and unreliable for these reasons:

a.   The results summarized in Exhibit 9a do not "clearly show" that Skiplagged deceived survey respondents "to believe that … a hidden city ticket bought through Skiplagged is a valid ticket" because the Wind Report offers no clear data analysis standard to define what survey respondents believe.  The standard that the Wind Report appears to use is comparison to survey respondents' views of Expedia relative to Skiplagged.  Exhibit 9a claims that 90% of Expedia survey respondents believe that a ticket bought through Expedia is valid whereas 70% of Skiplagged survey respondents believe that a ticket bought through Skiplagged is valid.  Further, the Wind Report (at Exhibit 9a) claims that this difference is statistically significant at 90% confidence level.  Hence, if comparison to Expedia is the Wind Report's

---

[6] *Id.* at page 88.

standard of false belief among Skiplagged survey respondents, then the Wind Report should not conclude false belief of Skiplagged survey respondents.  Hence the Wind Report does not "clearly show" its stated conclusion.

b. In this conclusion of the Wind Report, it is conceivable that the Wind Report's desired – but not clearly stated – standard to demonstrate that survey respondents "believe that … a hidden city ticket bought through Skiplagged is a valid ticket" is that "more than zero" respondents held this belief or that "more than 50%" of respondents held this belief.  Since the Wind Report does not state that the quoted 70% value of Exhibit 9a exceeds either 0% or 50% by a statistically significant margin, then, again, the Wind Report does not "clearly show" its stated conclusion.

c. Even if there did exist a statistically significant finding in the survey questions summarized in Exhibit 9a that the Wind Report might interpret as "[belief] that … a hidden city ticket bought through Skiplagged is a valid ticket"," there is no statistically testable aspect in the survey data or in the Wind Report's data analysis that measures or indicates deceit on the part of Skiplagged as the cause of the survey respondents' alleged belief.

d. The results summarized in Exhibit 9b do not "clearly show" that Skiplagged deceived survey respondents "to believe that … a hidden city ticket offered by Skiplagged carries no risk" because the Wind Report offers no clear data analysis standard to define what survey respondents believe.  The standard that the Wind Report appears to use is comparison to survey respondents' views of Expedia relative to Skiplagged.  Exhibit 9b claims that 56% of

11

App'x 178

Expedia survey respondents believe that a "ticket offered by Expedia carries no risk" whereas 36% of Skiplagged survey respondents believe that "a hidden city ticket offered by Skiplagged carries no risk." Further, the Wind Report (at Exhibit 9b) claims that this difference is statistically significant at 90% confidence level. Hence, if comparison to Expedia is the Wind Report's standard of false belief among Skiplagged survey respondents, then the Wind Report should not conclude false belief of Skiplagged survey respondents. Hence the Wind Report does not "clearly show" its stated conclusion.

e.  In this conclusion of the Wind Report, it is conceivable that the Report's desired – but not clearly stated – standard to demonstrate that survey respondents "believe that ... a hidden city ticket offered by Skiplagged carries no risk" is that "more than zero" respondents held this belief or that "more than 50%" of respondents held this belief. Since the Wind Report does not state that the quoted 36% value of Exhibit 9b exceeds either 0% or 50% by a statistically significant margin, then, again, the Wind Report does not "clearly show" its stated conclusion.

f.  Even if there did exist a statistically significant finding in the survey questions summarized in Exhibit 9b that the Wind Report might interpret as "[belief] that ... a hidden city ticket offered by Skiplagged carries no risk," there is no statistically testable aspect in the survey data or in the Wind Report's data analysis that measures or indicates deceit on the part of Skiplagged as the cause of the survey respondents' alleged belief.

12

App'x 179

g.  The last component of the Wind Report's third conclusion is ill-posed in that it suggests Skiplagged deceived survey respondents in their open-ended (*i.e.*, volunteered narrative commentary) categorization of risks as "meaningful risks," "unmeaningful risks," and "no risk" in Exhibit 10a.  This presentation of data is patently unreliable – the entries associated with the different risk categories do not sum to 100% as they must.  Further, the high level of subjectivity inherent in the pseudo-data of Exhibits 10a and 10b does not permit a data analyst to "clearly show" the purported conclusion.

## D.  <u>Wind Report Conclusion 4</u>

22.  *Wind Report*:  "Knowing the truth about the AA prices and the real risks associated with hidden city tickets has only limited impact on consumers' intentions to buy their next airline tickets from Skiplagged. See Exhibit 12."[7]

23.  This conclusion is flawed and unreliable for these reasons:

a.  The results summarized in Exhibit 12 do not lead to a conclusion of "only limited impact" on survey respondents' intentions once they "[know] the truth … and the real risks" because the Wind Report offers no clear data analysis standard for the finding of "only limited impact."  The standard that the Wind Report appears to use is comparison to survey respondents' views of Expedia relative to Skiplagged.  Exhibit 12 claims that 74% of Expedia survey respondents would probably or definitely "consider buying my next airline tickets" from Expedia whereas 47% of Skiplagged survey respondents would probably or definitely "consider buying my next airline

---

[7] *Id.* at page 88.

13

App'x 180

tickets" from Skiplagged.  Further, the Wind Report (at Exhibit 12) claims that this difference is statistically significant at 90% confidence level. Hence, if comparison to Expedia is the Wind Report's standard of "impact" of "knowing the truth ... and the real risks" on survey respondents, then the Wind Report should not conclude "only limited impact" of Skiplagged survey respondents.

b.  I noted previously in my assessment of Wind Report Conclusion 2 that the Wind Report asserts "the truth" that American airline tickets are less expensive than those of (non-hidden city) Skiplagged tickets but does not seriously attempt to prove this assertion.  At page 11 in a sub-section of the Wind Report titled "The Stimuli," the Wind Report writes in just two sentences a finding that non-hidden city Skiplagged tickets are, on average, $12.62 more expensive than identical American tickets.  But there is no analysis for statistical significance.  Hence, the Wind Report does not show that non-hidden city Skiplagged tickets are more expensive than American tickets.  This absence of proof negates this Wind Report conclusion.

c.  This Wind Report conclusion employs the language of "[survey respondents'] intentions to buy their next airline tickets from Skiplagged." But this language does not match the language of the actual questions to survey respondents of "consider buying my next airline tickets."  Thus, it is not "[intent] to buy ... from Skiplagged" but "[intent] to consider buying ... from Skiplagged."  This failure to match language renders this Wind Report conclusion unreliable.

14

E.     **Wind Report Conclusion 5**

24.     *Wind Report*:  "Overall, consumers perceived Skiplagged quite similarly to their perceptions of Expedia, the legitimate and authorized travel agent of American that served as our control."[8]

25.     This conclusion is flawed and unreliable for these reasons:

a.  The Wind Report cites no specific data or data analysis for this conclusion. Further, there is no stated statistical meaning to the comparator "quite similarly" or any proposed method to test statistically the two survey respondent populations to determine whether "quite similarly" is satisfied or not satisfied.  Nor is there a discussion of how to quantify and draw conclusions for the descriptor "perceptions."

b.  Exhibit 1 of the Wind Report shows that fewer than 20% of survey respondents were even "aware of" Skiplagged prior to their participation in the survey.  Thus, Professor Wind's crafted survey provides the entirety of information on which more than 80% of survey respondents base their survey responses regarding Skiplagged.  Thus, the survey respondents' perceptions of Skiplagged are due predominantly to information from the crafted survey rather than from direct experience with, or even prior awareness of, Skiplagged.

c.  The Wind Report asserts that Expedia is an "authorized travel agent" of American but provides no documentation or evidence to this effect and does not define "authorized" or "travel agent."

---

[8] *Id*. at page 88.

15

d. The Wind Report asserts that Expedia is "the legitimate and authorized travel agent" of American but provides no definition of "legitimate" as a distinct qualifier of "travel agent."

### F.   <u>Wind Report Conclusion 6</u>

26.   *Wind Report*:   "The above findings are strongly validated by the actual complaint data received by American (Exhibits 14 and 15), the complaints received by Skiplagged demonstrating a very large number of confused consumers (Exhibits 16 and 17), and consumer conversations on social networks (Exhibit 18)."[9]

27.   This conclusion is flawed and unreliable for these reasons:

a. This Wind Report conclusion asserts that Exhibits 14-18, all of which are reputedly narrative consumer complaints to Skiplagged and American as well as social media posts, "strongly [validate]" the "[earlier Wind Report] findings."  But these earlier Wind Report findings focus on comparison of Expedia and Skiplagged survey responses.  Hence, for Exhibits 14-18 to "strongly [validate]" Wind Report findings, the "complaint data" must also include complaints to American about Expedia, complaints directly to Expedia, and social media posts regarding Expedia customers' experiences.

b. Anecdotal evidence in the form of customer complaints and social media posts is notoriously unreliable and biased in the absence of any quantification (*e.g.*, number of complaints as fraction of all customers, number of complaints for one product versus an alternative product, number of complaints for one time period versus a different time period, *et*

---

[9] *Id.* at page 88.

*cetera*).  The Wind Report provides no attempt at quantification.  Thus, as unreliable evidence itself, unquantified anecdotes cannot reliably validate any conclusion.

## G.   Wind Report Conclusion 7

28.   *Wind Report*:  "All of my findings are consistent with what one would expect from consumer behavior, advertising, and marketing theories and practices."[10]

29.   This conclusion is flawed and unreliable for these reasons:

a.  The dominant data and data analysis of the Wind Report concerns comparison of Skiplagged and Expedia survey results.  Thus, the phrase "[a]ll of my findings are consistent with ..." implies that marketing theories confirm the similarities and differences between Skiplagged and Expedia in the survey results.  Yet there is no discussion in the Wind Report regarding theory applied to the observed similarities and differences.

b.  The Wind Report has exceedingly little content pertaining to "consumer behavior, advertising, and marketing theories and practices."  There exists a section of only 1.5 pages, beginning on page 85, with title "Consumer behavior and advertising and marketing theories and findings that support the validity of our empirical findings."  The Wind Report states that Skiplagged advertising messages "are appealing and meet the RAVES criteria for effective advertising and offering."  This "theories and practices" discussion of the Wind Report does not claim that Skiplagged deceives its

---

[10] *Id.* at page 88.

customers and therefore is not consistent with all purported Wind Report findings.

c. To the contrary, the Wind Report discussion of "consumer behavior, advertising, and marketing theories and practices" gives evidence *opposing* allegations of Skiplagged deception.   Consider these Wind Report statements below which claim that Skiplagged discloses risks, customers are not deceived and do understand risks and potential adversarial relationship to the airline.

   i. *Wind Report* at page 87:  "The hidden city story is clever, doing something which is legal, but the airlines do not like is intriguing and could tempt consumers to buy it and share it with others."

   ii. *Wind Report* at page 87:  "And for some, the creative way of finding loopholes to get cheaper flights is appealing as well as a 'David against Goliath' scheme."

   iii. *Wind Report* at page 87:  "Thus, based on what we know about how advertising works, the Skiplagged message and offering is clever and likely to work. While the FAQ includes a bit more information about the risks of Hidden city offering, the reality is that consumers rarely if ever read the small print."

## H.   <u>Wind Report Conclusion 8</u>

30.   *Wind Report*:  "Given these findings Skiplagged's practices are harming both consumers and American Airlines."[11]

---

[11] *Id.* at page 88.

31.    This conclusion is flawed and unreliable for these reasons:

    a.    Though attributed to "these findings," the Wind Report cites no specific data or data analysis to conclude harm to survey respondents, actual consumers, or American Airlines.

    b.    To the extent the Wind Report considers anecdotal evidence such as purported complaints and social media posts to reach this flawed conclusion, my objection is that anecdotal evidence is notoriously unreliable and biased.

    c.    In order to conclude that "Skiplagged's practices are harming … American Airlines," it is incumbent on the Wind Report to specify what it defines as "harm" and to quantify this harm and its causation.  Yet the Wind Report merely states that harm has occurred without explaining what harm has occurred, quantifying this harm, or linking appropriately said harm to Skiplagged's actions.

## IV.    THE SURVEY SAMPLE OF THE WIND REPORT IS IMPROPER

32.    A well-studied problem in statistics is the estimation of data properties of a given population from a smaller sample of the population.[12]   Taking a simple and hypothetical example, imagine a school teacher wishes to determine the fraction of students in her high school class who have rudimentary knowledge of the historical relevance of Charles de Gaulle.  Perhaps it is the first day of the history class she teaches and she seeks to assess her students' historical awareness.  The task is simple.  The teacher

---

[12] See, for example, Morris H. DeGroot, *Probability and Statistics, 2nd Edition*, Addison Wesley, 1989.

might simply ask the twenty students to write down a short answer to "who was Charles de Gaulle?"  The teacher will then read these short answers and determine "yes" or "no" with her chosen "rudimentary knowledge" criteria for each of the twenty student answers.

33.      In this first hypothetical case, the population size is only twenty.  There are no statistical methods necessary to gather the data from each member of the population and determine the fraction with rudimentary knowledge of the specified topic.  Next, as a second hypothetical case, this teacher wishes to know the fraction of students in the entire United States (US) of the age of her high school class who have this rudimentary awareness of Charles de Gaulle.  Clearly, she cannot ask directly all such students.  She must resort to statistical sampling (defined as "a process or method of drawing a representative group of individuals or cases from a particular population").[13]

34.      The field of statistical sampling is broad, but I remark here on just the first and most elementary aspect.  The sample must be drawn from the target population. When the target population is US high school students, the sample must use US high school students.  It would be improper sampling to include high school students in France, for example.  If all members of the sample are not drawn from the target population, any results or analysis of the sample are unreliable if they purport to represent the target population (US high school students).

35.      Since the data of the Wind Report derives from survey questions of respondents *who are not* Skiplagged consumers (past or present),[14] then the conclusions of the Wind Report that purport to represent actual Skiplagged consumers

---

[13] See *Encyclopaedia Brittanica* at Sampling | Random selection, Population, Estimation | Britannica .
[14] Exhibit 1 of the Wind Report shows that less than 20% of survey respondents were even "aware of" Skiplagged prior to taking the survey.  Thus, more than 80% of survey respondents are not past or present Skiplagged consumers.

App'x 187

are unreliable due both to this improper statistical sampling and to the reasons I provided in §**III.A.** - §**III.H**.

### V.  THE WIND REPORT PROVIDES NO DATA OR DATA ANALYSIS TO SUPPORT ALLEGATIONS OF DECEIT ON THE PART OF SKIPLAGGED

36.      The first three conclusions of the Wind Report rely on Professor Wind's survey data to claim that survey respondents harbor false beliefs about Skiplagged and tickets purchased through Skiplagged *and that* the cause of such false beliefs is Skiplagged deception.  In §**III.A.**, §**III.B.**, and §**III.C**. of my instant report, I disputed emphatically both aspects of these conclusions.

37.      Regarding the Wind Report conclusions pertaining to survey respondent beliefs, I cited deficiencies in the data and data analysis.  For the allegation of deceit on the part of Skiplagged, the Wind Report does not state reliance on any statistically testable data or data analysis.  Hence the Wind Report does not "show conclusively" that Skiplagged deceived survey respondents.

38.      As I wrote previously in §**III.G.**, the Wind Report itself states on page 87: "Thus, based on what we know about how advertising works, the Skiplagged message and offering is clever and likely to work. While the FAQ includes a bit more information about the risks of Hidden city offering, the reality is that consumers rarely if ever read the small print."  Professor Wind acknowledges with this statement that potential false beliefs on the part of Skiplagged consumers are due partially or wholly to failure to read all information disclosed to them.

## VI.   <u>END STATEMENT</u>

39.    This report and my opinions are based on my experience and information provided to me that I reviewed listed in Appendix D.  I reserve the right to modify my assessment or opinions if I receive or review additional information.

_____                May 20, 2024

Joseph M. Pimbley                              Date

22

**APPENDIX A:  Resume of Joseph M. Pimbley**

# Joseph M. Pimbley

## Principal, *Maxwell Consulting, LLC*, March 2010 - Present
## Editor, *Journal of Derivatives*, September 2018 - Present

### Available Expertise as a Consultant

- **Review or Creation of Financial and Mathematical Models**
  - Investigate existing models as "independent review" for a wide assortment of financial purposes:  risk assessment or valuation of derivatives, structured products, and other investments; credit risk and credit rating models; economic capital calculations; portfolio risk/return calculations – OR build any of these models
  - Monte Carlo simulations; time series; statistical methods; probability distributions; cashflows; numerical solutions; robust data handling; stress tests
  - Independent review results will be reported in writing and in training of existing personnel with respect to model accuracy ranges and best practices
  - Models to be expressed in mathematical formulae, spreadsheets, appropriate language computer code, or any combination that is beneficial to the client

- **Litigation Support**
  - Review and analyze documents and facts for legal challenges relevant to derivative transactions, structured products (RMBS, CDOs, *et cetera*), municipal and corporate bonds, bond insurance, credit ratings, and securities trading
  - Collaborate with attorney legal team as a key financial expert and expert witness

- **Trading and Trading Markets and Platforms**
  - Serve as expert regarding the technology and intellectual property for electronic trading on exchanges of equities and equity options and the electronic transmission of orders and quotes for these instruments
  - Serve as expert in product development for equity volatility indices such as VIX derived from electronic trades, quotes, and orders

- **Executive Review of Existing Firm Risk Management**
  - Investigate structure, personnel, reporting, and fundamental principles
  - Document findings, explain key concepts, identify improvements and safeguards

- **Build and Establish Firm Risk Management**

23

➢ With input from Management and the Board, design architecture for new Risk Management function with respect to structure, personnel requirements, key risk measurement attributes, IT systems, and risk communication protocol

➢ Execute this plan with existing or new personnel

**Advisory Review of Investment Policies and Execution**

➢ Independent review of policies and their execution for the financial management of endowments and other portfolios of non-finanical entities (such as colleges/universities, insurance companies, corporate Treasuries, and non-profits)

➢ Ensure that the execution is consistent with stated goals and that the Board of the organization and all staff are fully aware of both the goals and execution

**Training**

➢ Conduct formal or informal training sessions for wide range of financial topics (such as risk management theory and practice, complex valuation, credit analysis for corporate, municipal, and structured securities, *et cetera*)

➢ Customized by topic and level of detail as the client desires

## Education

| | | |
|---|---|---|
| Ph.D. | (Theoretical Physics) | *Rensselaer Polytechnic Institute*, 1985 |
| M.S. | (Physics) | *Rensselaer Polytechnic Institute*, 1981 |
| B.S. | (Physics) | *Rensselaer Polytechnic Institute*, 1980 |
| | (*summa cum laude* and minor in Mathematics) | |

# Board Positions

Editorial Board of *Risk Professional*, 2003 - 2018
**Global Association of Risk Professionals**

Board of Directors, 2013 - 2021
**Solve Advisors, Inc.**

Board of Directors, 2015 - 2020
**Loud-Hailer, Inc.**

App'x 191

# Past Professional Experience

January 2021 – June 2021

**Derivatives Strategist** of *777 Partners, LLC*, a private equity firm.  Responsible for creation of asset-backed security (ABS) transactions and the associated structuring, quantitative modeling, and credit rating agency relations and negotiations.  Asset types for securitization included guaranteed and life-contingent structured settlements and commission and litigation receivables.

June 2008 – March 2010

**Managing Director** within the Financial Engineering practice of *Duff & Phelps, LLC* – a worldwide financial consulting firm.  Activities included direct contact with clients (hedge funds, private equity firms, financial institutions) and review of client activities to formulate and execute beneficial advisory projects.  Special focus was on derivative transactions and structured products (RMBS, CDOs, CMBS, *et cetera*).  Leading role in the Lehman Brothers bankruptcy court Examiner investigation that yielded important findings for funding, leverage, collateral, liquidity, and valuation challenges that led to the bankruptcy.

March 2002 – May 2008

**Executive Vice President and Head of Institutional Risk** of *ACA Capital Holdings* (ACA), a hybrid financial products and insurance company with risk positions and assets under management exceeding $90 billion.  Reported to the CEO and to the Board of Directors.  Responsible for firm-wide, enterprise risk management (ERM), quantitative modeling, information technology, and data integrity.  Senior decision maker on Credit and Investment Committees for municipal bonds, structured bonds and products, bank loans, derivative transactions.  Created proprietary cash-flow and *Monte Carlo* simulation models of credit, interest rate, and derivative pricing and risk for CDO and Structured Credit transactions in *Visual Basic* and C#.  Recruited and managed a team of quantitative finance professionals.  Managed the Information Technology function and led the technical development of proprietary database systems for trading and risk management.  Chief Risk Officer of *ACA Capital Partners I* (a "credit hedge fund") with oversight of investments, funding, risk assessment, and valuations.

July 1997 – February 2002

**Senior Vice President** and Credit Derivative Product Manager of *Sumitomo Mitsui Banking Corporation Capital Markets* (SMBC CM).  Primary task was to lead the development of a business in credit derivatives.  Duties included business development (products, distribution, *et cetera*), execution of trades, the construction of models (*Excel Visual Basic* and **C/C++** routines with market data feeds) for pricing and risk management, and creation of necessary trading and operational systems.  Primary focus was on managing economic and regulatory capital for the parent bank's US and Asian corporate loan portfolio.

October 1995 - July 1997

**Senior Risk Manager** in the Capital Markets Services group of the *Financial Guaranty Insurance Company*.  Responsible for all risks (market, credit, liquidity, operational, *et*

App'x 192

*cetera*) in the firm's ($6 billion) financial services for municipalities (primarily guaranteed investment contracts and asset management). Managed the capital markets IT function. Helped conceive, launch, and obtain triple-**A** ratings for a new special-purpose vehicle.

May 1994 - October 1995

**Senior Analyst** in the *Structured Finance* group within the Corporate division of *Moody's Investors Service*. Primarily responsible for research in the credit and market risks of structured notes and credit derivatives. The results of such research include the development of new rating businesses (*e.g.*, individual security and mutual fund market risk ratings) as well as *Moody's*, industry, and academic publications. Also active in rating guaranteed investment contracts (GICs), collateralized bond/loan obligations and other special purpose vehicles.

February 1993 - May 1994

**Assistant Vice President** in the *Risk Analytics* Unit of Citicorp North America Global Finance. Had primary responsibility for the analysis and measurement of credit risk in all "non-standard" and "emerging market" derivative transactions originating in North America, Latin America, South America and Southeast Asia. Such transactions included derivatives on equities, equity indices, debt securities, single currency interest rate swaps, cross currency swaps, foreign exchange contracts and commodities. Also responsible for validating and generating pricing models for derivative instruments. Activities required extensive computer model development (**FORTRAN**, **C** and spreadsheet programming) and daily communication with traders and financial engineers.

January 1987 - February 1993

**Assistant Professor** in the Department of Mathematical Sciences of Rensselaer Polytechnic Institute. Conducted independent research in the mathematics and physics of operation of various semiconductor devices. Discovered (with a colleague) a novel, *superresolution* spectral estimation algorithm. Taught classes on the subjects of ordinary differential equations (graduate and undergraduate), advanced mathematical modeling (graduate), numerical computing (undergraduate), probability, statistics and calculus with symbolic computing.

June 1980 - January 1987

**Staff Physicist** at the General Electric Corporate Research and Development Center, Schenectady, New York. Directed and coordinated the fabrication of Charge-Injection Device (solid-state) imagers. Suggested and studied design and fabrication innovations to improve quantum yield and signal/noise ratio of these imaging devices and won a 1982 (General Electric) Dushman Award for this advanced development work. Successfully led the development of a radiation-hard, MOS fabrication process. Studied channel hot electron reliability in short-channel NMOS FETs and made new contributions to this field. Derived and solved numerically a new set of semiconductor device equations for more accurate modeling of device physics.

# Books

Joe Pimbley and Laurel McDevitt, *Banking on Failure*, Maxwell Consulting, LLC, ISBN-10: 069227426X, 2014.

Joe Pimbley and Laurel McDevitt, *Simple Money*, 2nd Edition, Maxwell Consulting, LLC, ISBN-10: 0615864627, 2013.

J. M. Pimbley, M. Ghezzo, H. G. Parks and D. M. Brown, *Advanced CMOS Process Technology*, Academic Press, San Diego, 1989.

S. D. Silverstein and J. M. Pimbley, "The Minimum Free Energy Method of Spectral Estimation,"' chapter in *Advanced Signal Processing*, ed. S. Haykin, Prentice-Hall, 1991.

J. M. Pimbley, "Transistors"', chapter in *Magill's Survey of Science: Applied Science*, F. N. Magill, editor, Salem Press, Pasadena, **ISBN 0-89356-705-1**, 1993.

# Finance Articles

(**Seventy-plus articles** written for financial professionals on a wide range of topics in the capital markets from 1994 to the present. This list is available upon request. Five recent articles are cited below.)

J. M. Pimbley, "Testing and Mapping an Empirical Exercise Boundary for the American Put Option," *J. Derivatives*, Fall 2021.

J. M. Pimbley, "Efficient Routines for CDO Loss Calculations", *J. Structured Finance* **26**(1), 29-43, Spring 2020.

J. M. Pimbley and G. Phillips, "The *Myer* Ruling and its Limitations," *Commercial Law Quaterly*, **34**(1), March-May 2020.

J. M. Pimbley, "Simple Correlated Binomial Portfolio Loss Distribution", *J. Structured Finance* **25**(2), 75-86, Summer 2019.

J. M. Pimbley, "T-Vasicek Credit Portfolio Loss Distribution", *J. Structured Finance* **24**(3), 65-78, Fall 2018.

# Quant Perspectives

(Monthly column for the *Risk News & Resources* publication of the *Global Association of Risk Professionals*)

# Finance Public Presentations

(**Seventy-plus public presentations** for financial professionals on a wide range of topics in the capital markets from 1994 to the present. This list is available upon request. Five recent presentations are cited below.)

F. J. Fabozzi, J. M. Pimbley, S. Kackar, S. Page, and S. Karnik, "Derivatives in Asset Management," invited panel discussion for *Portfolio Management Research* by *With Intelligence*, March 2022

J. M. Pimbley and R. Chang, "Rapid Monte Carlo Simulation – Hands-On Learning," invited lecture for *GARP 18th Annual Risk Management* Convention, New York, March 2017; also Industry Webcast "Rapid Monte Carlo Simulation," May 2016.

J. M. Pimbley, "Mathematical Finance, Models, Simulation and Today's Pressing Problem", invited lecture for *INFORMS 2016*, Nashville, November 2016.

J. M. Pimbley and S. R. Lindo, "Flight Simulator for Banking," invited PRMIA Webcast, October 2015.

J. M. Pimbley, "Data, Models & Concepts for Quantitative Finance", GARP Webcast, August 2013 - includes autoregressive (AR) and other statistical time series analysis.

# Journal Articles

(Nearly one hundred refereed articles in the fields of electrical, chemical, and nuclear engineering and semiconductor physics. This list is available upon request.)

# PATENTS

J. M. Pimbley and H. R. Philipp, *Radiation Transmissive Electrode Structure*, 4,450,465, May 1984.

C.-Y. Wei and J. M. Pimbley, *Extended Drain Concept for Reduced Hot Electron Effect*, 4,613,882, September 1986.

R. D. Lillquist, J. M. Pimbley and T. L. Vogelsong, ***Vipervision*** *Composite Visible/Thermal Infrared Imaging System*, 4,679,068, July 1987.

C.-Y. Wei and J. M. Pimbley, *Graded Extended Drain Concept for Reduced Hot Electron Effect I*, 4,680,603, July 1987.

J. M. Pimbley, G. Gildenblat, C.-Y. Wei and J. Shappir, *Hybrid Extended Drain Concept for Reduced Hot Electron Effect*, 4,691,433, September 1987.

C.-Y. Wei and J. M. Pimbley, *Graded Extended Drain Concept for Reduced Hot Electron Effect II*, 4,859,620, August 1989.

28

Y. Nissan-Cohen, P. A. Frank, J. M. Pimbley, D. M. Brown, E. W. Balch, and K. J. Polasko, *Adjustable Windage Method and Mask for Correction of Proximity Effect in Submicron Photolithography*, 4,895,780, January 1990.

J. M. Pimbley and D. M. Brown, *Metallization Method for VLSIC Fabrication*, current status unknown.

S. D. Silverstein and J. M. Pimbley, *Spectral Estimation Utilizing an Autocorrelation-Based Minimum Free Energy Method*, 4,982,150, January 1991.

S. D. Silverstein and J. M. Pimbley, *Spectral Estimation Utilizing a Minimum Free Energy Method with Recursive Reflection Coefficients*, 5,068,597, November 1991.

H. M. Rougeot and J. M. Pimbley, *Light Detector Scintillator Radioactive Image Pick-up Apparatus with Improved Light Collection*, 1993-203755, August 1993.

D. M. Brown, M. Ghezzo and J. M. Pimbley, *Silicon Carbide MOSFET Integrated Circuit Devices*, current status unknown.

H. M. Rougeot and J. M. Pimbley, *Photodetector Scintillator Radiation Imager Having High Efficiency Light Collection*, 5,208,460, May 1993.

R. F. Kwasnick and J. M. Pimbley, *Method of Locating Common Electrode Shorts in an Imager Assembly*, 5,463,322, October 1995.

D. A. McDevitt-Pimbley and J. M. Pimbley, *Systems and Methods for Traffic Guidance Nodes and Traffic Navigating Entities*, 9,142,127, September 2015.

D. A. McDevitt-Pimbley and J. M. Pimbley, *Systems and Methods for Traffic Guidance Nodes and Traffic Navigating Entities*, 9,478,130, October 2016.


## Society Memberships (Past and Present)

Editorial Board member of the *GARP Risk Professional*

Advisory Board of the Polytechnic Univ *Center for Finance & Technology*

*Sigma Pi Sigma* - National Physics Honor Society

(Senior Member) *Institute of Electrical and Electronic Engineers* (IEEE)

*Sigma Xi* (scientific research society)

IEEE *Election Devices Society*

*Society for Industrial and Applied Mathematics* (SIAM)

*American Association for the Advancement of Science* (AAAS)

## Professional Activities and Honors

| | |
|---|---|
| 2014 | Financial Risk Manager – Certified by the *Global Association of Risk Professionals* |
| 1997 | Passed the Series 7 and Series 63 General Securities Representative Examinations |
| 1996 | Member of the Polytechnic University Advisory Council of the Center for Technology & Financial Services |
| 1991 | Elected to *Senior Member* of the IEEE |
| 1989 - 1992 | Chairman of the *Annual Workshop on Mathematical Problems in Industry* at *Rensselaer Polytechnic Institute* |
| 1988 - 1990 | Chairman of the *Center for Integrated Electronics VLSI Seminar Series* at *Rensselaer Polytechnic Institute* |
| 1986 | (General Electric Research and Development Center) Dushman Award for "outstanding technical contributions" to the VLSI Program |
| 1985 | (*Rensselaer Polytechnic Institute*) Karen and Lester Gerhardt Prize awarded annually for the best Ph.D. thesis from the Schools of Science and Engineering |
| 1985 | (*Rensselaer Polytechnic Institute*) H. B. Huntington Prize awarded annually for the best research by a student in the Physics Department |
| 1982 | (General Electric Research and Development Center) Dushman Award for "outstanding technical contributions" to the CID Imager Program |
| 1976 | National Merit IBM Thomas J. Watson Scholarship |
| 1976 | New York State Regents Scholarship |

# APPENDIX B:  Publications of the Past Ten Years, J. M. Pimbley

"Simple and Interesting Question for Derivative Valuation" Editor's Letter, *J. Derivatives*, Spring 2024.

"Simple Questions at the Foundation of Quantitative Finance" Editor's Letter, *J. Derivatives*, Winter 2023.

"Artificial Intelligence in the World of Derivatives?" Editor's Letter, *J. Derivatives*, Fall 2023.

"Banking Crises Past and Present" Editor's Letter, *J. Derivatives*, Summer 2023.

D. Lucas and J. M. Pimbley, "Autopsy Finds Why Lehman Failed When it Did," *Stories.Finance*, 2023.

"Provocative Black-Scholes" Editor's Letter, *J. Derivatives*, Spring 2023.

"Wrong-Way Ruble Forward" Editor's Letter, *J. Derivatives*, Fall 2022.

D. Lucas and J. M. Pimbley, "Peasant Logic and the Russian GKO Trade," *Stories.Finance*, 2022.

"LIBOR Replacement" Editor's Letter, *J. Derivatives*, Summer 2022.

"Negative Oil Futures ... a Great Derivatives Error" Editor's Letter, *J. Derivatives*, Spring 2022.

"Reconsidering Black-Scholes and Risk-Neutrality" Editor's Letter, *J. Derivatives*, Winter 2021.

J. M. Pimbley, "Testing and Mapping an Empirical Exercise Boundary for the American Put Option," *J. Derivatives*, Fall 2021.

"Wrong Ideas and ... Economists," Editor's Letter, *J. Derivatives*, Fall 2021.

"An Analogy for Derivatives' Deeper Meaning" Editor's Letter, *J. Derivatives*, Spring 2021.

"Two Classic Problems" Editor's Letter, *J. Derivatives*, Winter 2020.

J. M. Pimbley and D. A. McDevitt-Pimbley, "Optimal Testing in Semiconductor Manufacturing," *IEEE Engineering Management Review* **48**(4), 174-80, https://doi.org/10.1109/EMR.2020.3022620, December 2020.

J. M. Pimbley, "Efficient Routines for CDO Loss Calculations", *J. Structured Finance* **26**(1), 29-43, Spring 2020.

"What's New and Exciting in Derivatives?" Editor's Letter, *J. Derivatives*, Spring 2020.

J. M. Pimbley and G. Phillips, "The Myer Ruling and its Limitations," *Commercial Law Quaterly*, **34**(1), March-May 2020.

"When Risk-Free Repo Goes Rogue," Editor's Letter, *J. Derivatives*, Winter 2019.

"The Ideal is Often Wrong – LIBOR Manipulation," Editor's Letter, *J. Derivatives*, Fall 2019.

J. M. Pimbley, "Simple Correlated Binomial Portfolio Loss Distribution", *J. Structured Finance* **25**(2), 75-86, Summer 2019.

"The Great Train Robbery," Editor's Letter, *J. Derivatives*, Summer 2019.

"Risk-Free Rate," Editor's Letter, *J. Derivatives*, Spring 2019.

J. M. Pimbley, "T-Vasicek Credit Portfolio Loss Distribution", *J. Structured Finance* **24**(3), 65-78, Fall 2018.

J. M. Pimbley and G. Phillips, "Fix the VIX: Reducing Manipulation in the Volatility Index", *Risk Intelligence*, April 2018.

J. M. Pimbley, "Bernoulli & Behavioral Finance: Both Wrong", *GARP Quant Perspectives*, August 2017.

J. M. Pimbley, "Quantitative Finance on a Smartphone – II", *GARP Quant Perspectives*, June 2017.

J. M. Pimbley, "Six Great Reasons YOU Should Learn to Code", *GARP Quant Perspectives*, April 2017.

J. M. Pimbley, "Ratings Reform: Blasting the Business Model", *GARP Quant Perspectives*, February 2017.

J. M. Pimbley, "Demonetization and the Real Value of Money", *GARP Quant Perspectives*, January 2017.

J. M. Pimbley, "Today's Pressing Problem in Quantitative Finance", *GARP Quant Perspectives*, December 2016.

J. M. Pimbley, "Risk Culture: What Matters Most?", *GARP Quant Perspectives*, October 2016.

J. M. Pimbley, "Mathematical Finance, Models, Simulation and Today's Pressing Problem", chapter in *TutORials in Operations Research*, ISBN 978-0-9843378-9-7, 2016.

J. M. Pimbley, "How to Become a Better Risk Manager: Uniting Experience with Imagination", *GARP Quant Perspectives*, September 2016.

J. M. Pimbley, "SmartFinance: Quantitative Finance on a SmartPhone", *GARP Quant Perspectives*, August 2016.

J. M. Pimbley, "Better Measurements for CLO Equity Performance", *J. Structured Finance* **22**(2), 24-30, Summer 2016.

J. M. Pimbley, "Think in Code, Young Risk Analyst!", *GARP Quant Perspectives*, June 2016.

J. M. Pimbley, "Rapid Monte Carlo Simulation", *GARP Quant Perspectives*, May 2016.

J. M. Pimbley, "Quant's View of Negative Interest Rates, Part: II", *GARP Quant Perspectives*, April 2016.

J. M. Pimbley, "Banking Basics:  China and Its Alarming NPLs", *GARP Quant Perspectives*, March 2016.

J. M. Pimbley, "Liquidity Liberation for Mutual Funds", *GARP Quant Perspectives*, February 2016.

J. M. Pimbley, "How to Assess and Manage Credit Risk", *GARP Quant Perspectives*, January 2016.

J. M. Pimbley, "Mutuals should not over-promise on loan liquidity", *Creditflux*, January 2016.

J. M. Pimbley, "Before #BigData, Let's Confront #BadData", *GARP Quant Perspectives*, November 2015.

J. M. Pimbley, "Mortgage Madness", *GARP Quant Perspectives*, October 2015.

J. M. Pimbley, "A Flight Simulator for Financial Risk", *GARP Quant Perspectives*, August 2015.

J. M. Pimbley, "Greece, Black Holes and Banks' Ankles", *GARP Quant Perspectives*, July 2015.

J. M. Pimbley, "The Greatest Global Financial Risk", *GARP Quant Perspectives*, June 2015.

J. M. Pimbley, "Decisions:  Life & Death on Wall Street", *GARP Quant Perspectives*, May 2015.

J. M. Pimbley, "A Quant's View of Negative Interest Rates", *GARP Quant Perspectives*, April 2015.

J. M. Pimbley, "Fixing Banking – Volcker Rule on Steroids", *GARP Quant Perspectives*, February 2015.

J. M. Pimbley, "Fixing Banking – Part II", *GARP Quant Perspectives*, January 2015.

J. M. Pimbley, "Fixing Banking – Part I", *GARP Quant Perspectives*, December 2014.

J. M. Pimbley, "A Bailout Plan to Increase Systemic Risk?", *GARP Quant Perspectives*, November 2014.

J. M. Pimbley, "Book Excerpt:  Banking on Failure", *GARP Quant Perspectives*, October 2014.

J. M. Pimbley, "How to Build Disastrous Financial Models", *GARP Quant Perspectives*, September 2014.

J. M. Pimbley, "Banks and Political Bargains", *GARP Quant Perspectives*, August 2014.

J. M. Pimbley, "Are Systemically Important Banks Junk Credits?", *GARP Quant Perspectives*, July 2014.

J. M. Pimbley, "Monetary Policy Risk?   Deflation!", *GARP Quant Perspectives*, June 2014.

J. M. Pimbley, "Benford's Law and the Risk of Financial Fraud", *Risk Professional*, 1-7, May 2014.

App'x 201

**APPENDIX C:  Litigation Testimony of Past Four Years, J. M. Pimbley**

- **Alleged Breaches of Contract and Fiduciary Duty of Financial Start-up** – January 2024 to Present
  Working with consulting colleagues (PF2 Securities) and a law firm, I serve as an expert to value an early-stage equity interest and opine on investment structure.  I prepared an expert report and **gave expert deposition testimony** in this active case that will proceed to trial.

  **656856/2022** *Hemingway Group LLC v. i80 Group LLC et. al., and Marc Helwani*; Supreme Court of the State of New York, County of New York

- **Alleged Fraudulent Activity at a Cryptocurrency Exchange** – August - October 2023
  Working with consulting colleagues (PF2 Securities) and a law firm, I served as an expert to retrieve financial data from the database of the failed exchange operation.  I prepared an expert witness disclosure for this case and testified at trial.

  Case 1:22-cr-00673-LAK *United States of America v. Samuel Bankman-Fried.*; United States District Court, Southern District of New York

- **Alleged Fraudulent Ratings of RMBS CDOs** – March 2017 to July 2023
  Working with a law firm, I served as both subject matter and testifying expert to review documents and analyze credit rating practices for 2007-vintage CDOs of RMBS.  I prepared expert analyses to support and defend discovery requests and review expert reports.  I submitted an affidavit, submitted an expert report, and gave expert deposition testimony for this case that then settled prior to trial.

  **CA 19-02372** *M&T Bank Corporation v. Moody's Investors Service, Inc.*; Supreme Court of the State of New York, County of Erie

- **Alleged Fraudulent Inducement of Bond Insurer** – June 2018 to May 2022
  Working with consulting colleagues and a law firm, I serve as an expert to analyze claims that a bank sponsor of RMBS transactions breached

35

warranties and induced fraudulently the participation of an insurer.  I prepared an expert report and gave expert deposition testimony for this case that then settled prior to trial.

**652914/2014** *Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. et. al.*; Supreme Court of the State of New York, County of New York

App'x 203

# APPENDIX D:  Documents Reviewed

Joseph M. Pimbley

## Publicly Available Documents

Morris H. DeGroot, *Probability and Statistics, 2nd Edition*, Addison Wesley, 1989

*Encyclopaedia Brittanica* at [Sampling | Random selection, Population, Estimation | Britannica](#) .

## Case-Specific Documents

Expert Report of Professor Yoram (Jerry) Wind

App'x 204

# Exhibit A-6

```
 1                                 Volume I
                                   Pages 1 to 155
 2                                 Exhibits 1 to 3
 3              IN THE UNITED STATES DISTRICT COURT
                  NORTHEASTERN DISTRICT OF TEXAS
 4                      FORT WORTH DIVISION
 5      - - - - - - - - - - - - - - - - -x
                                         :
 6      AMERICAN AIRLINES, INC.,          :
                      Plaintiff,          :
 7                                        :
                vs.                       :   Civil Action No.
 8                                        :   4:23-cv-00860-P
        SKIPLAGGED, INC.,                 :
 9                   Defendant.           :
                                          :
10      - - - - - - - - - - - - - - - - -x
11              VIDEOTAPED DEPOSITION OF JOSEPH M. PIMBLEY,
        Ph.D., a witness called by the Plaintiff, taken
12      pursuant to the Federal Rules of Civil Procedure,
        before Alexander K. Loos, Registered Diplomate
13      Reporter and Notary Public in and for the
        Commonwealth of Massachusetts, at the Offices of
14      Greenberg Traurig, LLP, One International Place,
        Suite 2000, Boston, Massachusetts, on Wednesday,
15      July 10, 2024, commencing at 9:36 a.m.
16      PRESENT:
17          Greenberg Traurig, LLP
                    (By Cameron Nelson, Esq.)
18                  E-mail:  Nelsonc@gtlaw.com
                    77 West Wacker Drive
19                  Suite 3100
                    Chicago, IL 60601
20                  312.456.8400
                    for the Plaintiff.
21
        (Continued on the following page)
22
23
24
                                                   Page  1
```

1 PRESENT (Continued):
2   Condon, Tobin, Sladek, Thornton, Nerenberg, PLLC
        (By Aaron Tobin, Esq.; and Nicholas Burns,
3      Esq. (Via videoconference))
        E-mail:  Atobin@condontobin.com
4          Nburns@condontobin.com
        8080 Park Lane
5      Suite 700
        Dallas, TX 75231
6      for the Defendant.
7 ALSO PRESENT:
8   Gayle Ashton, Videographer
    Jeremy Ballew
9
            * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 2

---

1              P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Good morning.  We are
3  now on the record.
4        This is the videographer speaking, Gayle
5  Ashton, with Veritext Legal Solutions.  Today's date
6  is July 10th, 2024, and the time is 9:36 a.m.
7        We are here at Greenberg Traurig, One
8  International Place, Boston, Massachusetts, to take
9  the video deposition of Joseph M. Pimbley, Ph.D., in
10 the matter of American Airlines, Inc., vs.
11 Skiplagged, Inc.
12       Would counsel please introduce themselves
13 for the record.
14       MR. NELSON:  Cameron Nelson for American
15 Airlines, and with me is Jeremy Ballew from American
16 Airlines.
17       MR. TOBIN:  Aaron Tobin for Skiplagged.
18       THE VIDEOGRAPHER:  Will the court reporter,
19 Alex Loos, please swear in the witness.
20       JOSEPH M. PIMBLEY, Ph.D.
21 a witness called for examination by the Plaintiff,
22 having been satisfactorily identified by the
23 production of his driver's license and being first
24 duly sworn by the Notary Public, was examined and

Page 4

---

1              I N D E X
2
    WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
3
4  JOSEPH M. PIMBLEY,
    Ph.D.
5
    BY MR. NELSON         5
6
7
8            * * * *
9      E X H I B I T S
10 NO.         DESCRIPTION         PAGE
11 Exhibit 1  Expert Report of Joseph M.     6
              Pimbley, Ph.D.
12
    Exhibit 2  Expert Report of Professor     6
13            Yoram (Jerry) Wind
14 Exhibit 3  A portion of the responses from  99
              Appendix C-7 to Dr. Wind's
15            report
16
17           * * * *
18
19
20
21
22
23
24

Page 3

---

1  testified as follows:
2          DIRECT EXAMINATION
3  BY MR. NELSON:
4    Q.  All right.
5        Would you please state your full name.
6    A.  Joseph Maxwell Pimbley.
7    Q.  And is it Dr. Pimbley?
8    A.  Yes.
9    Q.  Okay.  And you are retained as an expert in
10 this case, correct?
11   A.  Yes, I am, sir.
12   Q.  When were you retained?
13   A.  I believe it was in May of this year.
14   Q.  Okay.  And what is your hourly rate for
15 this case?
16   A.  $800.
17   Q.  Do you know roughly how many hours you've
18 invested in the case?
19   A.  I'm sorry.  Is the question how many hours?
20   Q.  Yeah.
21   A.  Okay.
22   Q.  Just ballpark.
23   A.  It's -- I'm going to estimate 40 hours thus
24 far.

Page 5

2 (Pages 2 - 5)

1    Q.   Okay.  And you provided a report in this
2  case; is that correct?
3    A.   Yes, sir.
4        MR. NELSON:  And we've gone ahead and
5  premarked the exhibits.
6        Can you confirm that Exhibit 1 is your
7  report.
8        (Document marked as Pimbley
9        Exhibit 1 for identification)
10     THE WITNESS:  Yes, sir, this is my report.
11     MR. NELSON:  Okay.  And I've also given you
12  a copy of Dr. Wind's report should you need to refer
13  to it marked as Exhibit 2.
14        (Document marked as Pimbley
15        Exhibit 2 for identification)
16     THE WITNESS:  Yes, sir, I see that.
17  BY MR. NELSON:
18    Q.   And have you -- how many times have you
19  been deposed?
20    A.   Roughly ten times.
21    Q.   Okay.  So I don't need to go over the rules
22  with you, right?
23    A.   I know the rules well, sir, but you're
24  welcome to conduct this however you think is

Page 6

1  proper -- appropriate.
2    Q.   So you understand that the court reporter
3  is taking down everything that you and I say?
4    A.   Yes, sir.
5    Q.   All right.
6        And you understand you've sworn an oath to
7  tell the truth?
8    A.   Yes, sir.
9    Q.   And you will tell the truth today?
10    A.   I will do so.
11    Q.   Do you have any medical conditions or any
12  medication that would affect your ability to testify
13  today?
14    A.   No.  I'm good.
15        I will mention just that I do use hearing
16  aids, and so if I am staring intently at your face,
17  that means I'm doing my best to understand.  But my
18  hearing is good with -- with the assistance.
19    Q.   Okay.  If you don't understand a question
20  today, please ask me to clarify the question.
21    A.   Yes, sir.
22    Q.   The one thing you get to control today is
23  breaks and lunch.
24        So subject to -- the court reporter also

Page 7

1  gets a say on breaks and lunch --
2    A.   Sure.
3    Q.   -- if we're going long.
4        But if you need a break at any point in
5  time, will you please just let me know?
6    A.   I will do that.
7    Q.   All right.
8        And then, as we get to lunch, you know,
9  we'll see where we're at, but that's also up to you
10  as well.  You can eat lunch at 10:00.  You get to
11  decide.  We may not be here by 10:00.
12    A.   Understood, sir.
13    Q.   So I wanted to start a little bit just on
14  your background.
15    A.   Yeah.
16    Q.   What would be your sort of elevator pitch
17  of what your expertise is?
18    A.   Well, I have several areas of expertise,
19  and assuming we want to keep that focused to the
20  matters at hand here, that would be on the analysis
21  of data, understanding what data is relevant, how
22  you can, I'll say, prove, disprove or at least make
23  conclusions or -- and observations from data.
24        I have much experience and expertise in

Page 8

1  that area.
2    Q.   Okay.  And can you -- what experience do
3  you have that's relevant to the expertise you just
4  described?
5    A.   Well, I -- my -- I worked for 45 years now
6  in fields beginning in physics, applied physics,
7  mathematics, various forms of engineering:
8  Electrical engineering, mechanical engineering,
9  nuclear engineering.  I also, more than 30 years
10  ago, started a career in finance.
11        And in all of these fields, and in
12  particular quantitative finance, but also in
13  analyzing investment, I'll say worthiness,
14  investment quality of corporations, of governments,
15  of what are called structured products -- which are
16  more exotic kind of financings -- in all of these,
17  data is a dominant issue to understand, a dominant
18  issue to manage.
19        I wrote -- I'm an expert in writing
20  computer code that analyzes data, uses data, does
21  calculations that then reports data as output.
22        And I can be -- specific examples, but the
23  bigger picture is all the work I've done in finance,
24  engineering -- less so mathematics -- involves data.

Page 9

3 (Pages 6 - 9)

1  But in my mathematics portion of my career, I also
2  taught courses in probability and statistics, and so
3  in statistics, it's what you can learn from data you
4  have is essentially what statistics is.
5     Q.  Okay.  Let's talk a little bit about your
6  legal consulting work.
7        You've given us in your report, in Appendix
8  C at the end of your report, which lists I think
9  four cases in the last five years.
10    A.  Yes.  Let me -- I'm looking at Exhibit 1,
11  just to be sure -- oh, there it is.  Appendix C.
12       Yes, sir.  Four cases in the past four
13  years.
14    Q.  And --
15    A.  Yes, sir.
16    Q.  -- how many cases -- and again, ballpark --
17  total have you submitted expert reports in?
18    A.  Expert reports, I've done 12 cases, I
19  believe -- might be 12 or 13.  Those are expert
20  reports.
21       This, of course, in Appendix C is the
22  testimony, which is a little bit different than the
23  expert report.
24    Q.  Okay.  In that 12 cases, is that just in
Page 10

1  remembering right now, I believe all of those would
2  be financially based disputes, also.  Certainly the
3  majority, but -- yes.
4     Q.  Okay.  Best of your recollection?
5     A.  Thank you.
6        Best of my recollection, yes.
7     Q.  Okay.  So I usually say that when you're
8  uncertain about something -- you have an engineering
9  background, so you understand this -- if you just
10 tell me what your margin of error is, then I'll
11 understand your zone of uncertainty.  So if I ask
12 you for a date and you say it could have been five
13 years ago, give or take a year, that way I'm getting
14 an answer and you've accounted for, you know, any
15 uncertainty you have.
16       Is that a workable paradigm for you?
17    A.  Yes, sir.
18    Q.  Okay.  So were any of the cases that you've
19 consulted on in the legal realm trademark cases?
20    A.  There was one case -- and I'm trying to
21 remember the word "trademark."
22       It was an intellectual property case, and
23 I'm giving the detail only because it may approach
24 the trademark.  It was one financial exchange
Page 12

1  the last five years?  Or that's total?
2     A.  No, sir.  That goes back to about 2010.
3     Q.  Okay.
4     A.  So about 14 years.
5     Q.  Is -- as we do this today, we both need to
6  be careful about not talking over each other.
7        I know you know where my question is
8  going, but it makes the court reporter's life a lot
9  easier if you just wait a beat and let me finish the
10 question.  There's also a possibility that I might
11 change the end of the question and it might not be
12 what you assumed.  So you might -- let's work on
13 that today.
14       Okay?
15    A.  Yes, sir.
16    Q.  Okay.  So the cases that are listed here
17 for testimony all seem to sort of have a financial
18 theme to them.
19       Would you agree with that?
20    A.  Yes, sir.  I would agree these are
21 financial disputes.
22    Q.  In the 12 cases total that you mentioned,
23 were those also financial disputes?
24    A.  As I sit -- yes, as I -- as I -- as I'm
Page 11

1  that -- where you can buy and sell options was
2  alleging that a different financial exchange was
3  infringing on its methods and on its -- was there a
4  trademark involved?  There might have been, but
5  that's -- that's my only past case I recall at the
6  moment that involved what might be trademark.
7        But let me add there was also a second case
8  I now remember that was also at least intellectual
9  property that might have had a trademark component,
10 but it's not clear in my memory.
11    Q.  Can you just describe for me what you can
12 remember about that second case?
13    A.  Yes.
14       That second case I mentioned was an
15 individual who created a startup in something called
16 bond insurance, and this would have been in the
17 timeframe of 2008.  The litigation itself I think
18 was involved in in 2018 or 2019.  So roughly six
19 years ago.
20       But this gentleman had created a startup in
21 this financial area.  It failed, and he blamed an --
22 an insurance -- were they a partner?  He blamed
23 another entity that claimed they couldn't -- now,
24 I'm sorry, I'm recalling better.
Page 13

4 (Pages 10 - 13)

Page 14

1       His suit was years after he failed in 2008.
2  This other company started launching a business that
3  looked just like his -- that was his allegation --
4  and so they were infringing on a concept that he
5  created, and he claims that he had known them or
6  worked with them or shared some information with
7  them during his attempt to start his own business
8  and that they appropriated his intellectual
9  property.
10      So yes, I worked on -- that's the case I
11  worked on.
12      Q.  Okay.  So that second case sounds to me
13  like it might have been a trade secret case where --
14  was he alleging that the company that came later
15  copied the name of his prior business?  Or more
16  the -- the intellectual work product of his prior
17  business?
18      A.  I think it was the business concept, the
19  second.
20      Q.  Okay.  And did you represent the individual
21  who was pursuing the suit or the -- the later
22  company?
23      A.  I was retained by the defendant.
24      Q.  In that first case -- I'm sorry, that

Page 15

1  second case you've mentioned, since you said it was
2  2018, that would be one of the ones listed here in
3  Appendix C, or is it --
4      A.  Well, if I understand, sir, Appendix C just
5  says past four years, but I have had litigation
6  engagements starting in 2010.
7      But that wouldn't be listed here under
8  litigation testimony, if I'm understanding.
9      Q.  Yeah.  Let me reask that question a little
10  bit better.
11      At one point in your answer, you mentioned
12  insurance; and I maybe jumped to a conclusion
13  because the last thing -- the -- listed in your
14  Appendix C starts in 2018, and you have "insurer" in
15  the title.
16      Is that the case you were just describing?
17      A.  No, sir.
18      Q.  Okay.  Do you remember any of the parties
19  to that second case we were discussing?
20      A.  Yes, I do.
21      I mean, I remember the defendant who
22  retained me.  As I sit here, I don't remember the
23  name of the plaintiff.  I mean, it would -- it's in
24  my records, but I just don't happen to know it off

Page 16

1  the top of my head.
2      Q.  What was the name of the defendant?
3      A.  Marsh McClellan.
4      Q.  Can you spell that for us all?
5      A.  Marsh is M-a-r-s-h.  McClellan is
6  M-c-capital-C-l-e-l-l-a-n.
7      Q.  McClellan?
8      A.  Yes, Marsh McClellan.
9      Q.  All right.
10      The first case you mentioned -- so when you
11  used the phrase "infringing on methods," now I
12  normally would interpret that to mean a patent case.
13      A.  Yes.
14      Q.  Okay.  Do you know if -- if any of the work
15  you did in that case involved a trademark?
16      A.  Trademark would be a name, a logo, something like
17  that.
18      A.  I don't specifically recall a trademark.
19  My -- but you raised trademark, and this seemed
20  close enough to me that I'm wondering if they were
21  part of it.  But I can't specifically recall that.
22      My -- one of my roles in that case was to
23  actually read the patents that my client had
24  achieved, owned, created, and then go, you know,

Page 17

1  line by line in the claims versus what this other
2  entity -- you know, the entity being sued, the other
3  financial exchange -- and to see if they were
4  infringing on those.  And it was a lot of -- my
5  expertise both in patents and in the financial
6  system and how it works to give advice on -- on how
7  I could prove how -- how I could demonstrate how we
8  could demonstrate that the certain claims were
9  infringed.
10      Q.  Did you ever see the movie "Coming to
11  America" with Eddie Murphy?
12      A.  I'm sorry.  Repeat the question.
13      Q.  Did you ever see the movie "Coming to
14  America" with Eddie Murphy?
15      A.  Yes, I did.
16      Q.  And the guy he's working for has McDowell's
17  instead of McDonald's?
18      A.  Yes, sir.  I remember that.
19      Q.  All right.
20      So that would be a trademark case --
21      A.  Okay.
22      Q.  -- where the name is similar or the signage
23  is similar.
24      A.  Yes.

1    Q.   Okay.
2         MR. TOBIN:  Those states abut.
3    BY MR. NELSON:
4    Q.   Was there anything like that in this first
5  case you described?
6    A.   I do not recall anything like that --
7    Q.   Okay.
8    A.   -- in those cases.
9    Q.   Now, do you remember the parties to that
10  case?
11    A.   I remember -- the opposite to my last, I
12  remember the defendant financial exchange, and I'm
13  actually blanking on the plaintiff.  Again, I looked
14  it up.  It's -- what's in my head to say NASDAQ, but
15  I don't think it's NASDAQ.  I think it was -- it
16  could have been NASDAQ, but I believe it was the
17  next largest -- I mean even larger financial
18  exchange other than -- we think of Dow Jones; we
19  think of -- but the competitor to the Dow Jones.
20        So for some reason, I'm blanking on that at
21  the moment.
22    Q.   Okay.  The two cases that you've just
23  described --
24    A.   Yes, sir.

Page 18

1    Q.   -- is it fair to say, to the best of your
2  recollection, those are the only engagements you've
3  had in the legal realm that related to intellectual
4  property?
5    A.   To my best recollection, yes.
6         I will add to that, in case it's responsive
7  to your question, that, you know, I have had patent
8  issues myself and have been involved with questions
9  about, you know, both retaining a lawyer, working
10  with a lawyer, you know, arguing back and forth with
11  the PTO; but also defending against, you know, or
12  advising somebody who was trying to help me
13  prosecute a claim on a patent.  But this was -- this
14  was in my personal capacity.
15        And I will also say -- and this may be
16  outside your purview, but I want to answer the
17  question -- many years ago, 20 years ago now, I was
18  deposed as a witness for a patent that I was a
19  coauthor on where there was patent litigation, and I
20  was a witness to say, "Here's what we did when we
21  created this patent."  But I was not the driving
22  force of that litigation.
23    Q.   Okay.  But in terms of your legal
24  consulting work, it's just the two cases you

Page 19

1  described?
2    A.   To the best of my knowledge, that's
3  correct.
4    Q.   Okay.
5    A.   Yes.
6    Q.   And did you review the complaint in this
7  case?
8    A.   I did not.
9    Q.   Okay.  You don't know what the claims in
10  this case are?
11    A.   May I -- one of the rules I like to have if
12  I realize a better answer after I've given one, I
13  would like to give you a better answer --
14    Q.   Yeah.
15    A.   -- than what I just said.  Okay?
16        I did not carefully read the complaint in
17  this case.  I do have, in my records, a copy of the
18  complaint.  I did look at the complaint -- I
19  wouldn't call it skimming.  I'll say I specifically
20  wanted to know what are the -- ultimately, at the
21  end of the complaint, what are the claims of
22  plaintiff against defendant.
23    Q.   Uh-huh.
24    A.   So I did look at those, and I think the

Page 20

1  first one was a violation of the use agreement; the
2  second one was tortious interference.
3         So I know enough about the complaint to
4  know that -- the third one I'm now forgetting, but I
5  just was curious what are the actual claims of the
6  plaintiff against defendant.
7         But beyond that, I didn't read the
8  arguments or, you know, the remainder of the
9  complaint.
10    Q.   Okay.  So as you sit here today, you recall
11  that there's a claim about a use agreement and
12  there's claim about tortious interference.
13        To the best of your recollection, do you
14  recall anything else about the claims at the end of
15  the complaint?
16    A.   No.
17        And may I add, again, the extra idea that
18  this was something I did in the last few days.  I
19  was just for my -- I often keep just -- like there's
20  an Appendix C in this report saying, "Here are my
21  past cases."  I keep a record of my past cases.
22  This is now a current case.  I just wanted to write
23  down plaintiff, defendant, who was alleging what.
24  That was really the purpose just to -- so I could

Page 21

6 (Pages 18 - 21)

1  have a summary of information to put in my personal
2  records for -- for the case that I'm working on
3  here.
4      Q.  So did you review -- you didn't review
5  those claims before submitting your expert report?
6      A.  No, sir.  The report came first.
7      Q.  Okay.  And you mentioned that the -- you
8  have the complaint in your records.
9          Are there any other documents in your
10  records that you have besides Dr. Wind's report?
11      A.  Yes.
12          I -- I have Dr. Wind's report.  I have the
13  appendices to his report as a file in my folder, but
14  I also have the expert report of a Professor John
15  that I skimmed yesterday.  I was given it long -- I
16  mean, I was -- it was given to me two days ago.  I
17  saw it.  I skimmed it yesterday.  And this was after
18  I had written my expert report.
19          I'm trying to think if there are any other
20  documents other than my total bill.
21          I don't think I have any other documents on
22  this case.
23      Q.  Okay.  And did you create any other
24  documents or work product as part of preparing your

Page 22

1  expert report in this case?
2          And to be clear, I don't mean drafts of
3  your report; I just mean other documents.
4      A.  I did create drafts of my report.  As it
5  happens, I happened to delete the unused drafts two
6  days ago, too.  There were four of them.
7          I'm sorry.  I'm thinking here.
8          Because I did -- no, I don't believe I have
9  any other retained documents.
10      Q.  Okay.  Did anyone else -- aside from
11  correspondence you may have had with the law firm --
12      A.  Okay.
13      Q.  -- did anyone else assist you in preparing
14  your report?
15      A.  I -- I did all of the work of preparing my
16  report on my own.
17          There is a contact person with a legal
18  support firm that I know, and he might have -- I
19  believe he was the one that probably put me in touch
20  with -- with Skiplagged's counsel.  But I -- he did
21  not provide assistance in the form of drafting,
22  sending documents, other than the complaint.
23          So that's it.
24      Q.  Okay.  We were discussing -- so the -- I

Page 23

1  went down a few paths, side paths here, but we were
2  discussing sort of your expertise to the extent it's
3  relevant to this case.  And I believe you said that
4  you have some expertise in analyzing data and
5  determining what is relevant.
6          Is that fair?
7      A.  That's fair.
8      Q.  Okay.  And -- and proving or disproving
9  things with data?
10      A.  Yes.  I did use those words.
11          With data, it's often hard to prove
12  something to 100 percent certainty, so I don't
13  necessarily mean it that way.  But -- but reaching
14  conclusions and -- about -- about the data that one
15  has, so...
16      Q.  Okay.  What would you say -- you know, on
17  the first part of the determining what is relevant,
18  what methodologies do you employ when making that
19  determination?
20      MR. TOBIN:  Objection, form.
21      THE WITNESS:  The word "methodology," I
22  don't know what -- how to answer and say "I use this
23  methodology."
24          What I would say, when you're understanding

Page 24

1  what data is showing, you almost always -- I'll say
2  I would like to say always -- we call it
3  interrogating data, okay?
4          When you interrogate data, you have an
5  objective in mind, whatever it is.  You might want
6  to maximize the profitability of a transaction.  You
7  might want to minimize the number of complaints you
8  receive or -- or things of that sort.  I mean, it
9  can be anything.
10          But you have an idea of what you want to
11  understand about your business, or about the
12  experiment you're running, or about the model that
13  you just created, what it's showing you.
14          And so you essentially go with the idea in
15  mind of what your objective is.  Then you go look at
16  your data and you say, "Is this data" -- and I'll
17  use your word -- "relevant?  How do I know if this
18  data is relevant to the question of interest to me?"
19          And really that, either somebody else has
20  given you the problem and is telling you, "Here's
21  what I care about; here's the data I have."  Or
22  you're using your own expertise and experience in a
23  particular question, field -- call it field, or call
24  it matter -- to -- to determine if it's relevant.

Page 25

7 (Pages 22 - 25)

1       And two kind of supporting points of that.
2   One would be I know when I do -- conduct projects,
3   ultimately I need to explain my findings to someone.
4   It might be to the client who hired me. It might be
5   to an audience because I'm writing a journal article
6   or I'm writing a book or I'm giving a lecture.
7   Ultimately, I need to explain.
8       And the point being is you want to use the
9   logic -- you want the logic to be something that
10  your colleagues and other trained professionals will
11  understand; and, if you're correct, that they will
12  agree with you.
13      And so therefore, relevance is how do I
14  explain to an audience of professionals that the
15  data I've collected is relevant to the conclusion
16  I'm trying to reach? I explain the logical
17  connection.
18      And -- and though it doesn't need a lot of
19  fleshing out at this point, the best strategy there
20  is that -- is that the logic should be very clear
21  and unimpeachable. In other words, the simpler the
22  better. That's an engineering principle, the
23  simpler the better for everything.
24      And the second point I'll say, one of my

Page 26

1   experiences is I'm an expert in just reviewing,
2   reviewing intellectual content. I do that in my job
3   as a journal editor where I review hundreds of
4   papers, and, ultimately, I accept a certain fraction
5   of these. And between receiving and accepting a
6   small fraction of those, there's a lot of
7   back-and-forth in terms of asking authors why
8   they're doing things a certain way, why that makes
9   sense if I don't -- if it's not evident at first
10  blush, and how it can be improved.
11      So it is -- it really is a put your own
12  brain in the flow of does -- does this -- does data
13  A with analysis B logically lead to conclusion C?
14  And it's a process that I engage in for many decades
15  and in different roles.
16  Q.  Okay. So you mentioned one way of
17  assessing relevance is, you know, someone else, a
18  customer, will tell you what they care about.
19      This isn't one of those situations, is it?
20  Or do I have that wrong?
21  A.  No.
22  Q.  So would you agree that this is more the
23  second scenario you described where you're using
24  your general expertise in critical thinking and

Page 27

1   logic to analyze.
2       Is that fair?
3   A.  It's fair.
4       But let me add that in this situation,
5   since you used that phrase, I'm retained to read a
6   report of Professor Wind -- so I'm, in essence, a
7   reviewer of this report that's been given to me --
8   and that's where I'm bringing to bear expertise that
9   I have. I'm reviewing a document. I have much
10  experience in that area.
11  Q.  Okay. Would you say that that statement
12  that you were retained to review Dr. Wind's report,
13  is that a fair description of what your role in the
14  case is? Or is there more to it?
15  A.  That's a fair description.
16      And I would only add -- I'm retained to
17  review Dr. Wind's report with emphasis on the data
18  and whether the data support conclusions reached.
19  Q.  And that particular emphasis, is that
20  direction that was given to you? Or is that really
21  you're saying that because that's what your
22  expertise is in?
23  A.  I -- I believe I would say that was the
24  agreement, and so it encompasses part of what you

Page 28

1   just said.
2       But, as you know, with any -- when a legal
3   team retains an expert, both the expert and the
4   legal team need to believe that this is within the
5   expertise of the expert.
6       So if -- I certainly agreed, and I might
7   have, you know, been -- well, I can't remember the
8   conversation, but the point being I am very
9   comfortable as expert in saying, "Show me the data
10  that's being proposed in a particular field, in this
11  particular case right here. I can understand the
12  data and the conclusions that are being reached
13  based on that and the logical path between that, and
14  I will use my experience of understanding data and
15  how to review projects of this type to" -- "to --
16  "to fulfill my tasks here."
17  Q.  Okay. You mentioned that you're an expert
18  at writing code for data analysis?
19  A.  Yes, sir.
20  Q.  Can you tell me a little bit more about
21  that.
22  A.  Well, when I say "code," code of course I
23  mean computer programming. They also call it
24  developer, also a coder. But I've just -- and some

Page 29

8 (Pages 26 - 29)

1  people consider this a form of mathematics.  It's
2  kind of different than -- mathematics is very broad,
3  but it is kind of a mathematical exercise.
4      And so over the -- again, over my 45 years,
5  I've -- I've been confronted with data many times,
6  and the easiest way -- not easiest, but the -- it
7  might be easy; it might be efficient -- the most
8  efficient method is to write a program that says,
9  "Okay.  I've got a matrix of data."  It might be --
10  and this is typical of the financial world -- a few
11  thousand borrowers who are small companies.  They're
12  not big companies, so the financial data they have
13  is pretty rudimentary, but you have a large field
14  of -- of financial measurements of these thousands
15  of companies, and if you want to, you know, analyze
16  all of this -- you know, I'll call it
17  simultaneously -- it's better to write a program
18  that reads in all of it, stores it in its internal
19  memory, and then does the sorting and other
20  calculations that are needed to understand the -- in
21  this case, the creditworthiness of investing in
22  these companies.
23      So the point is, yes, I do write code to do
24  that kind of project.

Page 30

1  Q.  Okay.  And are there particular programming
2  languages or analysis packages you prefer to use or
3  you're particularly proficient in?
4  A.  Yes.
5      MR. TOBIN:  Objection, form.
6      You can answer, although I know where this
7  is going.
8      THE WITNESS:  So I'll say yes.
9  BY MR. NELSON:
10  Q.  And what are those?
11  A.  My preferred languages right now are Visual
12  Basic.  There's a .Net platform of languages that
13  I've used several, including C sharp and Visual --
14  and VB, which is Visual Basic.
15      The early days I learned in FORTRAN, but --
16  I used to program in C, but that is less the common
17  now.
18      And then there are -- as you said, there
19  are statistical analysis packages.  I've used a few
20  of those.  Typically, I'm able to formulate the math
21  myself and write my own short programs to evaluate
22  most statistical concepts.
23  Q.  You don't use a statistical analysis
24  package like R or anything like that?

Page 31

1  A.  Yeah.  I mean, R is a good package.  It's
2  also kind of a language, not just a statistics
3  language.
4      But SAS is something I've used.  Something
5  called STATA I used in an engagement a few years
6  ago.
7      I often use what -- when I'm working with a
8  client -- and this might be outside of litigation; I
9  do consulting outside of litigation as well -- I'll
10  often have a client who's already using something in
11  particular.  They want me to help build something
12  for them in that package.
13      So those are occasions when I might see a
14  STATA or a SAS.
15  Q.  Okay.  And in this case, you didn't do
16  any -- did you do any coding in this case?
17  A.  No.  The extent in this case was pretty
18  limited to deriving one of the statistical
19  significance criteria.
20      So I did do a small amount of that, but
21  there was no coding.
22  Q.  And you didn't -- you didn't use any stats
23  packages in this case?
24  A.  No, sir.

Page 32

1  Q.  Did you request any data from Skiplagged
2  that you didn't receive?
3  A.  No, sir.
4  Q.  Did you request any data from the lawyers
5  that you wanted to see and didn't get to see?
6  A.  No, sir.
7  Q.  Okay.  Have you done any work for
8  Skiplagged before?
9  A.  No, sir.
10  Q.  Have done any work in the airline industry
11  before?
12  A.  Have I done any work in the airline
13  industry?
14      Essentially, no.
15      But the only reason I hesitate is one of
16  these cases I mentioned with intellectual property
17  involving -- this was the Marsh McClellan -- dealt
18  with aircraft leasing, and so I -- no.
19      So I'm going to say no.
20      Boeing was part of this dispute that I was
21  involved with, so I was kind of retained -- I don't
22  want to say on their side.  I was retained by Marsh
23  McClellan through their lawyers, but Boeing was kind
24  of floating around as also being accused by the

Page 33

9 (Pages 30 - 33)

1  plaintiff in that case.
2      So I think my answer properly formulated
3  is, no, I have not worked -- done work for airlines.
4      I know Boeing's a manufacturer, but just
5  thought I'd mentioned that.
6    Q.  Would it be fair to say that some facts
7  relating to Boeing were floating around in that
8  case, but maybe your work wasn't focused on the
9  airline industry specifically?
10   A.  That's fair.
11   Q.  Okay.  Have you ever done any likelihood of
12 confusion study?
13   A.  I have not done confusion studies, if
14 that's a separate term.  Likelihood is a term of art
15 in statistics, and so -- so I have -- a mathematical
16 term, so I have -- have done projects involving that
17 concept in statistics, but I don't think that's what
18 you're asking about.
19   Q.  It's not.  So "likelihood of confusion" is
20 a legal term of art for trademarks --
21   A.  So my answer is no.
22      And I'm sorry to cut you off.  I shouldn't
23 do that.
24   Q.  No.  That's fine.

Page 34

1    Q.  Okay.  Since you're not aware of that, you
2  couldn't have compared the methodology that Dr. Wind
3  used to those -- "approved" is a strong word, but to
4  those cases where a court allowed a consumer
5  confusion survey into evidence?
6    A.  I'm not aware of that.
7    Q.  Okay.  Have you ever been rejected as an
8  expert by a court?
9    A.  Yes.  I mean, I think the answer is yes.
10      And again, I hesitate.  I want to make sure
11 I understand your definition of that phrase.
12   Q.  Oh, I'm always going to say I mean it in
13 the broadest way possible --
14   A.  Okay.
15   Q.  -- because I want to get as much -- you
16 know, even if something maybe as we talk about it
17 isn't -- turns out not to be it, I am looking for
18 the broadest answer possible, but I will ask
19 follow-up questions to try to --
20   A.  Okay.
21   Q.  -- understand your answer.
22   A.  Well, so --
23      MR. TOBIN:  He hasn't -- make him ask a
24 question.  There's not a question on the table right

Page 36

1      So have you ever done work specifically on
2  consumer surveys?
3    A.  No, sir.
4    Q.  Have you reviewed any of the legal
5  decisions about what the appropriate standards are
6  for a likelihood of confusion survey?
7    A.  No, sir.
8    Q.  So you -- I'm going to go through some
9  cases here.  And I know you've already answered, but
10 you've never read the "Eveready" case, for example?
11   A.  No, sir.
12   Q.  You've never read the "Squirt" case?
13   A.  No, sir.
14   Q.  Never read the "NFL Properties" case?
15   A.  No, sir.
16   Q.  Okay.  You've never read any court cases
17 either approving or rejecting expert testimony on
18 consumer confusion surveys?
19   A.  No, sir.
20   Q.  Are you aware that there are -- I guess
21 were you aware that there are court cases that
22 approve of certain methodologies in conducting a
23 consumer confusion survey?
24   A.  I'm not aware of that.

Page 35

1  now.
2      BY MR. NELSON:
3    Q.  The question is, have you -- have you ever
4  had your testimony or expert report rejected by a
5  court?
6    A.  I'm thinking of a case last year, yes.
7    Q.  Can you describe --
8    A.  If --
9    Q.  Is that the Bankman-Fried case?
10   A.  Yes, it is.
11   Q.  Just to shorten this, my understanding is
12 that in that case, the court tossed -- or at one
13 point entered an order saying that you can't
14 testify.  But my reading of that order was the court
15 was unhappy with the way that -- the way the
16 attorneys noticed, or gave notice of your report.
17      Is that fair?
18   A.  That's my understanding, yes.
19   Q.  It wasn't really about you; it was about
20 the lawyers or procedure, things --
21   A.  That's my understanding.
22   Q.  Okay.
23   A.  Yes.
24   Q.  You did ultimately testify in the

Page 37

10 (Pages 34 - 37)

1   Bankman-Fried trial?
2      A.   Yes, sir, I did.
3      Q.   And that was the criminal trial?
4      A.   Yes, sir.
5      Q.   All right.
6          He was convicted?
7      A.   Yes, sir.
8      Q.   Do you think your testimony helped?
9      A.   We'll never know.
10         I don't mean -- and I apologize for that
11  answer.  I don't mean to be flippant.
12     Q.   It was a little flippant question, so it's
13  okay.
14     A.   Okay.  All right.
15     Q.   The -- the testimony you offered in that
16  case related to just -- can you tell me what -- in
17  general, what the subject of your testimony was in
18  that case.
19     A.   Yes.
20         In that case, I was asked to testify on two
21  points, and both of them involved my being qualified
22  as an expert in financial databases so that I --
23  given a, as they call it, a snapshot -- that was
24  what they call it -- but essentially a one-day

1   A.   No, sir.  Not -- I mean, if you mean at
2   trial, the judge didn't -- I mean the prosecutor --
3   I mean I was on the defendant's side.  The
4   prosecutor did not move that anything be excluded
5   from what I said.  The judge did not make any kind
6   of ruling that anything that I said should be
7   excluded, if that's the question.
8      Q.   Was there some other subject that you
9   wanted to testify about that was excluded because of
10  that prior order?
11     A.   In the prior order, the points that I, in
12  my filing, said I would testify on, those points did
13  not come back.
14     Q.   Okay.
15     A.   So when I did testify at trial, and with a
16  different -- was it Rule 26?  I don't know what the
17  filing is called, but the filing for the actual
18  testimony I gave was on entirely different topics.
19     Q.   Okay.  Aside from the Sam Bankman-Fried
20  case, is there any other situation where your
21  testimony has been narrowed, or limited, by a court?
22     A.   I -- I do remember a situation where
23  testimony was narrowed.
24     Q.   Okay.  Can you describe that for me.

1   snapshot of FTX, all of its positions, all of its
2   inner workings, you know, cryptocurrencies, all
3   these things in there, extract from that database
4   the answers to two questions.
5          And one question was, you know, tell us how
6   much Alameda, a related company to that litigation,
7   you know, how much had they borrowed from FTX, okay?
8          And the second question pertained to, of
9   all the accounts in FTX, what -- you know, give
10  us -- look at that data, and sort it, categorize it
11  by the right of the company to borrow the assets.
12         And I know that's kind of getting into a
13  detail, but it was relevant to a defense theory.
14     Q.   Uh-huh.
15     A.   And so my testimony was simply I conducted
16  these two database queries -- I mean searches.  It's
17  a set of queries to get the two sets of information,
18  presented them in charts.  They were pretty
19  self-explanatory.  And, of course, then I was
20  cross-examined on that.
21     Q.   All right.
22         At -- when it came to the actual testimony
23  at trial, was your testimony narrowed and limited in
24  any way?

1   A.   That was a trial testimony in 2014, and I
2   was asked to testify on two points:
3          One was default events of a promissory
4   note, kind of like a loan agreement.  So I'm expert
5   in corporate lending and all that.
6          The second one was breach of fiduciary duty
7   of an LLC.  I had been an executive, a chief risk
8   officer for an LLC entity, so that's why I was
9   qualified to give that testimony for an LLC.
10         At trial, I testified on the first point.
11  My testimony on the second point -- and I was on the
12  plaintiff's side --
13     Q.   Uh-huh.
14     A.   -- in this case -- the defendant counsel
15  asked me numerous questions about my experience as a
16  trustee.
17     Q.   Uh-huh.
18     A.   I have no experience as a trustee, and I
19  never claimed to have any experience as a trustee.
20         And the reason that was of interest to the
21  defense counsel was there had been a breach of
22  fiduciary duty claim in this case on behalf of an
23  LLC, but that claim was dropped prior to trial.  So
24  by the time I came to trial, there was still a

1 breach of fiduciary duty claim, but it involved a
2 trustee.
3          And the attorney representing plaintiff,
4 who was the one who retained me, as he told me after
5 the trial, he said, "I forgot.  I didn't know,"
6 claimed it was his mistake.  "You should not have
7 been a witness up there trying to talk about breach
8 of fiduciary duty," since that claim was gone.  And
9 so -- so that's what happened after.
10         What happened during the trial is the judge
11 listened to this and asked me, "Well, any other
12 trustee experience?  Did you ever teach a class in
13 trustee?  Did you ever" -- you know, managing your
14 own investments doesn't count.
15         And so he did exclude -- and I'll just say,
16 the extent of my testimony on that issue, to stop
17 there, it wasn't like I testified for ten minutes
18 and then was excluded.  It was the lawyers asked me,
19 "What's your" -- "what's your experiences as a
20 trustee?"
21         So that may count as a case where I was
22 narrowed.
23    Q.  Did you -- did they ask those questions
24 about your trustee experience before you provided
Page 42

1         This was a private -- I mean, there were
2 two -- they were private parties to this litigation.
3 The -- I believe the plaintiff's name -- and, again,
4 I was retained by plaintiff's counsel -- was Alysse
5 Minkoff, M-i-n-k-o-f-f.
6    Q.  Can you spell the first name?
7    A.  Alysse, A -- I don't know why I remember
8 some things, not others.  But A-l-y-s-s-e I believe
9 is the spelling of that first name.
10        The defendant's name was another woman,
11 Hillari Kopplema.  Hillari is spelled with an I,
12 H-i-l-l-a-r-i.  Kopplema is K-o-p-p-e-l-m-a-n.
13        This was in California.  I think it was
14 Superior Court in California.
15    Q.  Okay.  So aside from what we've discussed
16 in the Sam Bankman-Fried case, and aside from what
17 we just discussed in the Minkoff/Kopplema case, any
18 the other instances where your testimony was
19 rejected or narrowed by the court?
20    A.  Not -- no, sir.  Not that I recall.
21    Q.  Okay.  Looking at the last page of your
22 report, which lists documents reviewed --
23    A.  Yes, sir.
24    Q.  -- so, you list an article, I think in
Page 44

1 your substantive opinion on fiduciary duty?  In
2 other words, did they stop your direct and start --
3 the other side started asking you questions?
4    A.  I honestly don't remember.
5    Q.  Okay.
6    A.  It could have gone either way.  I can't
7 remember how that happened.
8    Q.  Okay.  Do you recall if the court, in
9 making its decision --
10        I assume this was an oral decision from the
11 bench.
12    A.  Yes, sir.
13    Q.  And do you recall if the court said
14 anything about you testifying on ultimate issues in
15 the case?
16    A.  I'm sorry.  I missed the last part of...
17    Q.  Ultimate issues.
18    A.  Ultimately?
19    Q.  Okay.  Your legal conclusions.
20    A.  I don't remember that at all.
21    Q.  Okay.
22    A.  No.
23    Q.  Do you recall the parties to that case?
24    A.  Yes.
Page 43

1 "Encyclopedia Britannica"; is that correct?
2    A.  Yes, sir.
3    Q.  Is that an online article?
4    A.  Yes, sir.
5    Q.  Okay.  And then you list Dr. Wind's report,
6 correct?
7    A.  Yes, sir.
8    Q.  And that would include the exhibits and
9 appendices to the report?
10    A.  Yes, sir.
11    Q.  That is the complete summary of all the
12 documents you relied on in forming your opinion?
13    A.  Yes.
14        You probably mentioned the first publicly
15 available document, too.  That's just a book.
16    Q.  Which first?  When you say -- is that the
17 "Encyclopedia Britannica" article?
18    A.  Well, no.  There's book that's written just
19 above the "Encyclopedia Britannica" article.
20    Q.  Those are two separate ones?
21    A.  Yes, two separate ones.
22    Q.  That's the book by Mr. DeGroot on
23 probability and statistics?
24    A.  That's right, sir.
Page 45

12 (Pages 42 - 45)

1    Q.   Okay.  So did you review, in preparing your
2  report, Skiplagged's website?
3    A.   Other than the screenshots provided in
4  Professor Wind's report, no, sir, I did not.
5    Q.   Did you review any customer complaints?
6    A.   Only what I saw in Professor Wind's report,
7  which I did see customer complaints in that.
8    Q.   Did you review American Airlines' website?
9    A.   No, sir.
10   Q.   Did you review any publicly available
11  commentary on Skiplagged, whether that be news
12  articles, or Reddit posts, or Twitter tweets, I
13  guess?
14   A.   No, sir.
15   Q.   Okay.  Have you written any papers on
16  consumer confusion?
17   A.   No, sir.
18   Q.   And you -- you have also given some
19  presentations and written some books.
20       Do any of those address consumer confusion?
21   A.   No.
22   Q.   Have you done any -- any work, whether it's
23  consulting or in the legal context, on consumer
24  confusion?

Page 46

1    A.   No, sir.
2    Q.   Okay.  So I would like to kind of start
3  going through the substance of your report.  If
4  you'd like to take a break, about now would be a
5  good time.
6    A.   It's up to --
7        MR. NELSON:  Up to you.
8        MR. TOBIN:  A quick one.
9        THE WITNESS:  Okay.
10       THE VIDEOGRAPHER:  The time is 10:30.  We
11  are going off the record.
12       (Recess taken)
13       THE VIDEOGRAPHER:  We are back on the
14  record.  The time is 10:48.
15  BY MR. NELSON:
16   Q.   Okay.  So let's take a look at Page 6 of
17  your report, which is Exhibit 1.
18       So you've organized the report by
19  Dr. Wind's conclusions that you were offering some
20  criticism of; is that fair?
21   A.   Yes, sir.
22   Q.   Okay.  So your heading here on Page 6 is
23  "Wind Report Conclusion 1," and you start by quoting
24  a section of Dr. Wind's report; is that correct?

Page 47

1    A.   Yes, sir.
2    Q.   Okay.  And in that portion that you quote,
3  he's referring to Exhibit 6a in his report showing:
4        "... that 75 percent of consumers
5        exposed to the non-hidden city ticket and
6        73 percent of the consumers exposed to the
7        hidden city ticket believe that Skiplagged
8        is associated with American."
9        Is that correct?
10   A.   Yes.  That's his statement.  Sure.
11   Q.   Now, then you start laying out your
12  criticisms of that conclusion.  You start by saying
13  under 17a:
14        "The results summarized in Exhibit 6a
15        do not" -- in quotes -- "'show
16        conclusively' that survey respondents
17        'believe that Skiplagged is ... associated
18        with American.'"
19        Is that correct?
20   A.   Yes, sir.
21   Q.   Now, so we've already discussed, I guess
22  you've never looked at any cases on surveys in the
23  consumer confusion context, correct?
24   A.   I've never looked -- I'm repeating your

Page 48

1  question.
2        I've never looked at surveys regarding
3  consumer histories?
4    Q.   Cases, legal cases.
5    A.   Okay.
6    Q.   On surveys in the consumer confusion
7  context?
8    A.   That's correct.  I haven't read those legal
9  cases.  That's correct.
10   Q.   And so are you under the impression that
11  American or Dr. Wind have to prove consumer
12  confusion conclusively?
13   A.   I don't have an opinion on that question
14  either way.
15   Q.   Okay.  If I told you that American merely
16  needs to show a likelihood of confusion, would that
17  alter your opinions expressed in this report in any
18  way?
19   A.   No, sir, it would not.
20   Q.   Okay.  What if I told you that American, in
21  order to prove a likelihood of confusion, doesn't
22  need to present survey evidence at all?
23        Would that alter your conclusions in this
24  report?

Page 49

13 (Pages 46 - 49)

1    A.  No, sir.
2    Q.  Okay.  So do you have an opinion as to
3  whether there is a likelihood of confusion between
4  Skiplagged and American?
5        MR. TOBIN:  Objection to form.
6        THE WITNESS:  I don't have an opinion to
7  offer on whether there's confusion there or not, no.
8    BY MR. NELSON:
9    Q.  Okay.  In -- in the same 17a, a little
10  further down, you say:
11        "... there is no statistically
12        significant finding that one population
13        mean exceeds the other."
14        Do you see that?
15    A.  Yes, sir.
16    Q.  All right.
17        You're aware that in Dr. Wind's report, he
18  indicated when there was a statistically significant
19  difference by putting an asterisk next to the
20  number?
21    A.  Yes, sir, I'm aware of that.  Yeah.
22    Q.  Okay.  So I guess I'm just -- I want to --
23  help me understand what you've written here.
24        Is your -- is it -- are you saying that the

Page 50

1  reason or the problem with Dr. Wind's analysis is
2  that it has to be statistically -- I'm sorry, that
3  the population, one population mean has to exceed
4  the other in order for his analysis to be valid?
5    A.  No, that's not what I'm saying in that one
6  sentence.
7    Q.  I know you've already written the sentence,
8  right, but help me understand what you mean by that.
9    A.  Well, as is evident, I'm writing a
10  narrative description -- discussion of why I object
11  to, or I'll say I disagree with, this particular
12  conclusion of Professor Wind.
13        So one -- this part of that sentence just
14  says, with respect to those -- I don't have to read
15  it all out for you, but with respect to the 'net
16  yes' questions of Skiplagged versus Expedia, there's
17  no finding which means -- I'm really saying there's
18  no finding in Professor Wind's report that one
19  population mean exceeds the other.
20        What I'm essentially -- if I could say it a
21  little bit differently, what I would say, I don't
22  find the argument he's making -- he's not showing
23  that 76 is -- 81 is greater than 76, or vice versa,
24  and to a statistically significant sense.  He's not

Page 51

1  making that argument.
2        So what argument is he making?
3        He's not making the opposite argument,
4  which is the next sentence, that there is no
5  statistically significant finding that the two
6  population means are the same.
7        So what I'm really saying is he states a
8  conclusion, but the data and the discussion he gives
9  don't support that conclusion.  That's really
10  what --
11    Q.  Okay.
12    A.  -- those statements of mine are saying.
13    Q.  I understand that much.  And -- but I would
14  like to dig in a little bit just to make sure I
15  understand where you're coming from.
16    A.  Sure.
17    Q.  So I've given you a copy of Dr. Wind's
18  report.  If you wouldn't mind turning to Page 42,
19  and that's where Exhibit 6a is.
20    A.  Yeah.
21    Q.  So the -- just going sort of down the first
22  column of Exhibit 6a?
23    A.  Yes.  I'm at Exhibit 6a.
24    Q.  So the first -- in the first column, first

Page 52

1  row, he's got, "All OE questions."
2        That's open-ended questions, right?
3    A.  That's my understanding.
4    Q.  Okay.  And the first one says:
5        "Associated or connected with airline
6        based on open-ended responses for all
7        questions."
8        And there's a 2.7 percent in that first
9  cell, right?
10    A.  I see that, yes.
11    Q.  Okay.  Do you have any issue with that
12  number?
13    A.  I have no issue -- if you mean do I have
14  any reason to believe that was not the tabulated
15  answer that represented the survey respondents, I do
16  have reservations that may not be related to your
17  question about the process of going from an
18  open-ended question and translating that to, you
19  know, a specific result in these tables.  But
20  that -- I don't think that's the question you're
21  asking me right now.
22    Q.  Okay.  You don't have a problem with using
23  open-ended questions in a survey, right?
24    A.  I'm sorry.  Could you repeat the question?

Page 53

14 (Pages 50 - 53)

1    Q.  Do you have a problem with using open-ended
2  questions in a survey?
3    A.  I would -- that's -- forgive me for -- I
4  need to rephrase my answer to answer a question I
5  think is what you're asking, but it's --
6    Q.  Okay.
7    A.  -- it's a little bit vague to say "do you
8  have a problem with."
9       Let me just -- I'll say, when it comes to
10  using data, you know, designing an experiment, when
11  you actually get to choose what you do to create
12  data that you then want to interpret, it's very
13  important to have a very simple, logical connection
14  between what it is you're trying to understand --
15  either demonstrate yes, demonstrate no, whatever
16  you're -- whatever the point of interest is --
17  versus how the data can or cannot help get to that
18  observation.
19       So the simpler, the better; the clearer the
20  logic, the better.
21       And I will say open-ended questions add
22  uncertainty.  They add the uncertainty of -- and
23  I -- I'm -- I want to answer -- I want to make --
24  tell you my opinion is based only on the data

Page 54

1  separately.
2       So yes, I did read some of those.
3    Q.  Okay.  Did you --
4       MR. TOBIN:  Again, just remind you just to
5  make sure he finishes his question before you
6  answer.
7       BY MR. NELSON:
8    Q.  Did you do any -- did you spot any answers
9  to those open-ended questions that you thought were
10  categorized incorrectly?
11    A.  To my knowledge, I don't recall seeing
12  wrong character -- categorizations.
13    Q.  Okay.  And did you do a -- did you attempt
14  to do your own categorization to test this
15  2.7 percent number?
16    A.  No, sir.
17    Q.  Okay.  So is it fair to say that your
18  concerns about open-ended questions and answers is
19  perhaps a philosophical concern, but you haven't
20  tracked to see if it really has played out in this
21  case?
22       MR. TOBIN:  Objection, form.
23       THE WITNESS:  I did not do further analysis
24  or pursuit of -- of my concern for uncertainty in

Page 56

1  aspect.  I'm just focused on what is the data, and
2  does it support a conclusion as I'm reading -- and
3  because that's my assignment is read Professor
4  Wind's report; he's drawing conclusions; he's
5  showing data.  Does the data logically lead to the
6  conclusions?
7       And it is important to understand the
8  quality of the data, in my -- if I have a problem --
9  which is your word -- and I -- which is not a bad
10  word; I would also say "concern" -- is the quality
11  or integrity of that data that gets put in a table
12  from open-ended answers.
13       So I'm not -- I'm just saying that's --
14  that's uncertainty in my mind when I review a study
15  of this kind.
16    Q.  Okay.  Did you look at the open-ended
17  answer -- the answers to the open-ended questions --
18    A.  I read --
19    Q.  -- and --
20    A.  I read both the open-ended questions in the
21  survey.  I read through the survey.
22    Q.  Uh-huh.
23    A.  And I -- I realized some of the answers
24  were reported, I mean, either in tables or

Page 55

1  open-ended answers.
2       BY MR. NELSON:
3    Q.  Okay.  Would it be fair to say that your
4  concern about open-ended questions and answers is
5  your general view of data analysis as opposed to a
6  commentary on the specific data in this case?
7    A.  One of my concerns in this case is that
8  much of the survey process is just not spelled --
9  I'll say spelled out, but the right word is defined.
10  It's not defined.  It's not clear enough.  And I
11  can -- I do see that in many places.
12       I may -- I don't believe in my report I
13  highlight that to as much of a degree, mainly
14  because I see larger issues to confront and to --
15  and to describe, which I'm doing here.
16       But one of the -- one of the issues for me
17  is just the survey description is not sufficient.
18  For example, at one point, Professor Wind talks
19  about open-ended questions using two what he calls
20  "coders."
21    Q.  Uh-huh.
22    A.  And I -- from his context, I interpreted
23  that to mean two human beings who worked for the
24  survey company under his direction, however defined,

Page 57

15 (Pages 54 - 57)

1 and they will read all the narrative answers, and
2 it's their job to sort those into a category that's
3 already been defined for them.
4      That's -- and my view of that process was
5 not -- not clearly enough defined and too prone to
6 error.
7      Now, I did not -- to answer your question
8 again, I did not pursue that, but that's my
9 impression of that aspect of the -- of the Wind
10 report.
11   Q.  But that's not part of your formal opinion
12 in this case?  When you say you did not pursue that,
13 I just want to understand what you mean.
14   A.  I will say, to the extent I described it in
15 my report or not, it is one of my opinions that
16 there are many points of all, I'll call them, lack
17 of discipline in how the data was generated.
18      This 2.7 percent number is data, okay?  I
19 like data, okay?  You want to understand what the
20 data is telling you.  And this -- this 2.7 percent
21 number comes from that type of process which, again,
22 I have concern there's too much uncertainty, which
23 means lack of clarity, lack of rigor.
24      When you're creating any data experiment,
Page 58

1   Q.  Did you review C-7?
2   A.  I would have -- I opened all of these
3 files.  I -- as I sit here, I don't recall
4 exactly -- I don't recall my impression of C-7, but
5 I would have opened them just to see what was there,
6 yes.
7   Q.  Okay.  But you didn't, I guess, check to
8 see if they were complete?
9   A.  If I can rephrase your question, it would
10 be I did not attempt to validate whether 2.7 percent
11 was correct or a good approximation of that.  I
12 probably -- as I'm sitting here now, I'm -- my
13 belief would be I wouldn't think I would have all
14 those narrative responses presented to me.  If they
15 are, I did not try to validate or invalidate the
16 2.7 percent.
17   Q.  So C-7 does contain all the narrative
18 responses.  It's hundreds and hundreds of pages
19 long.
20   A.  Okay.
21   Q.  You didn't know that?
22   A.  I -- as I just testified, I did not know
23 that.
24   Q.  Okay.  It would be fair to say that you
Page 60

1 you want to get things as precise as possible, or
2 as -- let me not use the word "precise."  I'll use
3 the word "defined" as possible.  But it is one of my
4 opinions in this case that there's not enough
5 definition of that sort.
6   Q.  Just looking at this 2.7 percent number,
7 you have all of the underlying open-ended responses,
8 correct?
9   A.  Oh, I don't know that I do, no.
10   Q.  They're not --
11   A.  I don't believe they were in the
12 appendices.
13      Or let me -- let me improve that answer.
14      To my knowledge, all of that data was not
15 in the appendices, but I don't know that that's not
16 true.  That's to my knowledge.
17   Q.  So if you look at the second page of
18 Dr. Wind's report -- keep -- yeah, keep that one
19 out, but -- yeah.  There you go.
20   A.  Okay.  Second page?
21   Q.  Second page where it says "appendices."
22   A.  Yeah.
23   Q.  Do you see how C-7 is "Verbatim Responses"?
24   A.  Yes.
Page 59

1 made no effort to test your concern that that --
2 your concerns about that 2.7 percent number?
3   A.  I did not test any concerns about that
4 2.7 percent number.
5   Q.  Okay.  And so the next row down, it says:
6      "Q1 through Q6 net associated or
7      connected with airline based on open-ended
8      description of offering."
9      Do you see that?
10   A.  Yes, sir.
11   Q.  Okay.  And there's a -- in the first cell,
12 there's 41.1 percent.
13      Do you have any concerns about that number?
14   A.  I -- the concern -- I'll say yes.  And the
15 concern is -- is more with the wording of the
16 description.
17      In other words, as a reader of this report,
18 I don't think the questions Q1 through Q6 actually
19 match that description for maybe two reasons:
20      One is the words in those questions to the
21 survey respondents deal with, I think, a business,
22 is Skiplagged or Expedia associated with another
23 business as opposed to the word "airline."
24      So, in my opinion, it would have been more
Page 61

16 (Pages 58 - 61)

1 correct of Dr. Wind to make the words that he uses
2 to describe the results match the words that were
3 actually asked of the survey respondents.
4      In fact, we could probably go to a portion
5 of -- maybe it's one of the appendices that shows
6 the survey -- actually wherever the survey questions
7 are.
8   Q.  Page 18.
9   A.  18, yes.  That would be the right one.
10      So getting to Page 18.
11      Well, so I would look in his report
12 starting at Page 18 for questions Q1 -- let's just
13 say Q1.  This is for -- it shouldn't matter whether
14 it's Skiplagged or Expedia.
15      Okay.  For example, at the top of
16 Page 19 -- let me clarify.  I'm still answering your
17 question.
18   Q.  Uh-huh.
19   A.  Okay.  I'm at the top of Page 19, and it's
20 called Q2, which is written at the bottom of
21 Page 18.  But Q2 is:
22      "Does the company that operates this
23      website have a business connection or
24      association with another company, or do you

Page 62

1 not know?"
2      Okay.  And the answers could be:
3      "Yes, it has a business connection or
4      association with another company."
5      It could be:
6      "No," and then the same phrase.
7      Or it could be, "Don't know."
8   Q.  Uh-huh.
9   A.  And my recollection, from writing my
10 report, was that Q1 through Q6 were similar in their
11 words in that sentence.  So let me just keep looking
12 at this Q2.
13      And my point being that it's represented by
14 Dr. Wind in Exhibit 6a as if it's the associated or
15 connected with airline.
16      So my point is it's -- I don't want to use
17 too strong a word.  I would say it's falsely -- it's
18 a false representation of the actual survey
19 response -- and I don't mean false in the sense of a
20 deliberate -- it's an error.  It's an error in the
21 data to report the 41.1 percent as if the
22 respondents were thinking in terms of an airline.
23      For example, it could be the business
24 connection that Expedia has with another company is

Page 63

1 a bank.  All companies need banks to process their
2 payments, money coming in, money going out.
3      So this is part of my overriding concern
4 for this report is it's not careful.  It's not, you
5 know, pain -- it needs to be excruciatingly careful
6 how you take data and represent it when you're
7 showing it -- you've processed it into this form,
8 you need to represent it accurately.
9      So my concern is not with the 41.1 percent
10 for that reason.  It's with how it's being
11 represented as an output of the experiment.
12   Q.  So there may be a misunderstanding here,
13 and I'm asking questions to try to get at that.
14      But I'm not trying to put words in your
15 mouth, but I have to phrase my questions in way that
16 may sound that way.  So if I'm -- if I get that
17 wrong, tell me I'm wrong.
18      You didn't look at -- did you read any of
19 the verbatim responses?
20   A.  As I -- my recollection is I certainly -- I
21 opened all those appendices.  I would have read some
22 number; I don't know how many.
23      But I also did read -- there are a
24 collection of responses in the body of the report

Page 64

1 itself, and I would have been -- I would have read
2 those, yes.
3   Q.  So you're aware that a number of consumers
4 in response to the question of Q2:
5      "Does the company that operates this
6      website have a business connection or
7      association with another company, or do you
8      not know?"
9      And then in response to the follow-up
10 question, Q3, which asks, "which company" --
11   A.  Yeah.
12   Q.  -- a whole bunch of respondents said "yes"
13 to Q2 and "American Airlines" to Q3.
14   A.  That --
15      MR. TOBIN:  Hang on.  He needs to ask a
16 question.
17      MR. NELSON:  That is a question.
18   Q.  You're aware that they said that, right?
19   A.  No.  And I'm not -- because, as I sit here,
20 I'm not aware they didn't say that, either.
21      If you want to point me to that in the body
22 or represent it to me, that's fine.  I'll be happy
23 to see that evidence, but I don't recall that.
24   Q.  Well, I'll have those printed.

Page 65

17 (Pages 62 - 65)

1        But in preparing your reports and your
2   opinions --
3        A.  Yeah.
4        Q.  -- you didn't look at those verbatim
5   responses, even to get a qualitative sense of "Gee,
6   did" -- you know, "Mr. Wind says 41 percent of these
7   folks connected Skiplagged with the airline.  Should
8   I skim through these?  Did it look like 40 percent?"
9   You did not do even that level of qualitative
10  checking?
11       MR. TOBIN:  Objection, form.
12       THE WITNESS:  No.  I don't -- I don't agree
13  with your characterization.
14       BY MR. NELSON:
15       Q.  Well, did you read through the verbatim
16  responses to get a sense for did about half or more
17  of the answers to Q1 and Q6 mention American
18  Airlines?
19       MR. TOBIN:  Object to form.
20       THE WITNESS:  I do not have that
21  understanding, no.
22       So that means either I -- number one, I do
23  not have that understanding that reading through the
24  narrative responses one would understand half of --

Page 66

1   half of that 40 percent specifically says American
2   Airlines.  I think that's what you're saying, half
3   or more.
4        Number two, I don't know that that's not
5   true.  If you could show me the evidence right now,
6   I would look at that and we could --
7        BY MR. NELSON:
8        Q.  I'm having it printed.  It will take a
9   little while.
10       A.  Okay.
11       Q.  But let me just test your understanding of
12  the raw data.
13       A.  Sure.
14       Q.  Would you agree that a bunch of respondents
15  mentioned American Airlines in response to questions
16  Q1 through Q6?
17       MR. TOBIN:  Objection, form.
18       THE WITNESS:  Would I agree?
19       No, I would -- I would need to be shown the
20  data that I could assess for that.
21       BY MR. NELSON:
22       Q.  You don't have any qualitative sense for
23  how many respondents mentioned American Airlines in
24  response to Q1 through Q6?

Page 67

1        MR. TOBIN:  Objection, form.
2        THE WITNESS:  No, sir.
3        BY MR. NELSON:
4        Q.  Okay.  Would you agree -- well -- well, I
5   guess, first of all, you know these questions say,
6   "Does the company have a business connection or
7   association?"
8        Are you aware that that is a common, very
9   well-used, very well-established way of doing a
10  consumer confusion survey?
11       MR. TOBIN:  Objection, form.
12       THE WITNESS:  No, sir, I'm not aware of
13  that.
14       BY MR. NELSON:
15       Q.  I mentioned the "Eveready" and "Squirt"
16  cases earlier.
17       Are you aware that these questions come
18  from one of those cases?
19       MR. TOBIN:  Objection, form.
20       THE WITNESS:  I'm not aware of that.  I'm
21  not aware of that case or if these questions come
22  from that case.
23       BY MR. NELSON:
24       Q.  Okay.  Are you aware of those cases used --

Page 68

1   specifically endorse open-ended questions like this?
2        MR. TOBIN:  Objection, form.
3        THE WITNESS:  No, sir.
4        BY MR. NELSON:
5        Q.  Okay.  So is it possible that some of your
6   perception that things in here aren't explained in
7   the level of detail that you like maybe because
8   you're totally unfamiliar with all the cases and
9   body of work that defines what a consumer confusion
10  survey should look like?
11       MR. TOBIN:  Objection, form.
12       THE WITNESS:  Is it possible?
13       Could you repeat that question, please.
14       BY MR. NELSON:
15       Q.  Yeah.
16       You've expressed that you think there's not
17  enough detail in this report.
18       Is that a fair characterization?  Just at a
19  high level.
20       A.  That's -- at a high level, yes.
21       Q.  And I'm wondering if the reason you feel
22  that way -- let me try to ask this this way.
23       I wonder if you would feel differently if
24  you had read these cases.

Page 69

18 (Pages 66 - 69)

1     That's not a question you can answer
2  because of the double negative.
3     So I'm wondering -- I'm asking you that's
4  the context of my question.
5     Is it possible that the reason that you
6  feel that way is because you don't know that there
7  are -- is a whole body of work that says, "You
8  should ask open-ended questions"; that has, you
9  know, rejected consumer surveys when the questions
10  were too leading?  You're not familiar with that
11  body of work, and, therefore, it may have looked to
12  you like information is missing, but really it's
13  well known in the consumer survey space?
14     MR. TOBIN:  Objection, form.
15     THE WITNESS:  My objection, my -- I'll say
16  my opinion that the amount of detail is insufficient
17  for me at a high level, broad level, like we just
18  agreed.
19     I do have that opinion.  It is not based or
20  informed by prior legal cases or what's been
21  accepted as legal testimony in deception or
22  confusion cases, and I think what you called them.
23  And I was retained as an expert in data to
24  understand is this data logically leading to the
                                                    Page 70

1  conclusions that Professor Wind asserts.
2     And to the extent that my opinion is based
3  on data are not informed by legal issues, legal
4  precedents, then that's -- I agree with that.
5     BY MR. NELSON:
6     Q.  So going back to Exhibit 6a, you didn't do
7  any analysis -- let me try that a different way.
8  Sorry.
9     The -- you could have easily determined if
10  the data logically leads to that 41.1 percent number
11  by simply reviewing the verbatim responses and
12  counting the number of people that mentioned
13  American Airlines in response to those questions,
14  right?
15     A.  Well, Counselor, you know, I continue to
16  maintain what I testified earlier, which is, look,
17  Q1 to Q6, did those -- again, did they -- is
18  41.1 percent the correct tabulation of the actual
19  verbatim responses?  That's what you're asking.
20     I'm saying that it may be, that may be
21  true.  What I focus on is that the wording is
22  incorrect.
23     It's presented here in this table
24  incorrectly.  The words to the survey respondents
                                                    Page 71

1  did not have "airline."
2     Q.  If that 41.1 percent --
3     A.  Yes.
4     Q.  -- reflects respondents who specifically
5  mentioned American Airlines --
6     A.  If the 41 --
7        Okay.  I'm cutting you off.  I apologize.
8     Q.  That's okay.
9        But if -- and this is where I think there
10  may be a misunderstanding, talking past each other.
11     A.  Yep.
12     Q.  If that 41.1 percent specifically -- is
13  talking about the people who, in response to those
14  broader questions, specifically mentioned American
15  Airlines, then your concern goes away, right?
16     A.  Let me just consult --
17     Q.  Uh-huh.
18     A.  -- the Wind report for a second here.
19  We've got Q -- Q2.
20        No.  I -- I have a disagreement on the
21  premise of your question, sir.
22     Q.  Okay.
23     A.  And that is the 41.1 percent is listed as
24  Q1 to Q6 net --
                                                    Page 72

1     Q.  Uh-huh.
2     A.  -- in Exhibit 6a of Professor Wind's
3  report.  But these are primarily not open-ended
4  questions.
5        Let me look at -- okay.  Q3a, okay.  Q2a --
6  Q3a.
7        Well, let me -- let me -- let me strike
8  that.  Let me say this differently.
9        As you asked your question, if you're
10  representing to me, or if it's true -- let's just
11  put it either way -- that 41.1 percent is the actual
12  tabulation of all respondents in their open-ended
13  responses who actually said Skiplagged or Expedia is
14  associated with American Airlines -- okay -- then my
15  statement about how the label here would be
16  more of a disconnect between the meaning of the
17  number and the label, I would still say the label is
18  wrong but in a manner different than how I described
19  it before.
20     Q.  Okay.  I'm not sure how the label would be
21  wrong there if, in fact, that 41.1 percent are
22  people who specifically mentioned American Airlines
23  and the label is that these are people who are --
24  associated or connected Skiplagged with the airline.
                                                    Page 73

Veritext Legal Solutions
800-336-4000

1    A.  Uh-huh.
2    Q.  What's missing?  What's wrong about that
3  description?
4    A.  What's missing there is the "airline"
5  versus "American."
6        And what I mean by that is, again, this is
7  another uncertainty of the survey, that -- and I say
8  "I believe," but this is not my area of knowledge --
9  that survey respondents would understand that
10  Expedia or Skiplagged, either one, would be a
11  conduit for many airlines, not just American
12  Airlines.  So if you asked them a question about
13  "are you associated with airline," they perceive
14  that as different than of just American.
15        All right?
16        So I do see a distinction between saying
17  the 41 percent all mentioned American Airlines, then
18  it would be accurate to put in the label, you know,
19  that the Q1 to Q6 net represents American Airlines.
20    Q.  Okay.  But you keep saying --
21    A.  And I'm sorry.  Let me just finish, because
22  I know I paused, but I --
23    Q.  I'm sorry.
24    A.  I want to finish my answer.

Page 74

1  mischaracterizing my saying -- or the concept that I
2  haven't read any narrative answers.  Okay?  I -- I
3  did not testify to that.  I said otherwise.
4        But the second, the very issue of the
5  confusion we're discussing is -- is part of -- part
6  of the opinion I'm giving here today is that there's
7  a good deal of uncertainty in the data in terms of
8  how it was collected, then how it was presented, how
9  it was analyzed, and then drawing conclusion of what
10  the data is really telling us.
11  BY MR. NELSON:
12    Q.  You say "how it was collected."
13        Where in your report do you say that the
14  data wasn't collected properly?
15    A.  Well, let me refer to my report.
16    Q.  I just want to make sure I'm connecting up
17  what you said to what you've given me here.
18    A.  Yes.
19    Q.  It's not about your question.  I'm just not
20  sure what section that really corresponds to.
21        I don't think you've said that it wasn't
22  collected properly in your report.
23        Am I wrong?
24    A.  I believe -- I might -- I mentioned this

Page 76

1        By saying -- by repeating my point that in
2  the survey question language needs to be replicated
3  here in how you present -- or how Professor Wind
4  presents results.  Otherwise, there's -- there's
5  this kind of confusion in the interpretation.
6        Why would the wording be different?  And if
7  the answer is -- again, possibly -- well, in the
8  narrative answers, which we don't see in the
9  question that was asked of the survey respondents,
10  even though it said only "business," but 41 percent
11  in the narrative answers specifically said "American
12  Airlines," then it would be fair to write down
13  41 percent.
14        But good data presentation would mean you
15  have to explain that.
16    Q.  Well, as you sit here today, since you
17  haven't read the open-ended responses, you can't
18  offer an opinion one way or the other whether that
19  41.1 percent is accurate or whether the label is
20  accurate, right?
21        MR. TOBIN:  Objection, form.
22        THE WITNESS:  No, sir.  I can offer that
23  opinion.
24        First, let me say you're -- I think you're

Page 75

1  idea of the coders and of converting open-ended
2  questions to num -- quantitative form, I might have
3  called it.
4    Q.  But that's analysis of the data, though,
5  not collection of the data, though, right?  That's
6  just putting the data into buckets, right?
7    A.  Yes.  That is -- that's -- that's
8  reasonable that that's -- the collection of data is
9  not the same of the translation from narrative form
10  to quantitative form, which is the coders.
11        On the collection of data -- I mean
12  collection of data, my concern -- a dominant concern
13  is who are the survey respondents.
14        In other words, a dominant feature of my
15  report is that the survey respondents are not the
16  right -- as chosen to be the survey respondents are
17  not the proper population of what are called the
18  sample population.
19    Q.  Okay.  So when you say -- you're referring
20  to that section of your report about the universe --
21  the universe of respondents?
22    A.  Sir, I'm going to apologize for saying
23  that, but you interrupted me.
24    Q.  I did?  I'm sorry.

Page 77

20 (Pages 74 - 77)

1    By all means, call me out on it if I do.
2    A.  Okay.  Okay.
3       So let me continue.
4       And then please repeat the question
5    that's -- that's coming up, because I wasn't focused
6    on the question.
7       So I do have clear concerns about the
8    collection, the survey respondents are not the
9    appropriate people to be targeting.
10      I don't know if I wrote it as clearly, but
11   a secondary concern about the survey respondents is
12   I don't think they're vetted.  And what I mean by
13   that is this idea of -- finding people who are
14   willing to spend their time answering surveys on --
15   for products for marketing purposes.
16      I assume these survey respondents are being
17   paid.  I assume they have their agenda in answering
18   the survey is to be paid.  It's not -- it's not the
19   most -- it's an error-prone process where the
20   opinions or statements they're making may or may not
21   reflect their actual -- what they would actually do
22   if they were booking airline tickets or looking for
23   airline tickets.  They may not be actually customers
24   of future airline tickets, even though the questions
Page 78

1    to generate a population to use in this report, even
2    though the questions might say, "Have you traveled
3    in the last 12 months?  Have you booked tickets in
4    the last 12 months?  Or do you plan to?  Or did you
5    think about it?  Or might you do it in the next
6    12 months?"
7       My concern is there's not enough vetting of
8    these people on the online survey.
9       Now, let me be clear, that is my -- this is
10   a concern for me only insofar as how reliable is the
11   data.  My focus is on the data.  My focus is not on
12   knowing what level of vetting is normal in this
13   industry.  Okay?  That's not my focus.
14      My focus is if I'm relying on this input
15   data to reach a conclusion, I would have needed more
16   information in the Wind report to give me that
17   background.  And the better way to have done that --
18      Well, let me just stop there.
19   Q.  Thank you.
20   A.  Yeah.
21   Q.  So my question -- you asked me to reask my
22   question.
23   A.  Yes, please.
24   Q.  And so I was just trying to understand what
Page 79

1    you meant when you said you had issues with the
2    collection of the data.  In my mind, that didn't
3    translate to the portion of your report about the
4    survey universe.  In my mind, I call that the
5    universe collection.  To me, it's --
6    A.  Okay.
7    Q.  -- the kind of the physical nuts and bolts
8    process of --
9    A.  Okay.
10   Q.  -- getting it.
11      But that was really my question.
12      What did you mean by "collected"?  Did you
13   mean anything else by "collected"?
14   A.  And to summarize, "collection" to me means,
15   number one, the population.  Like you just
16   mentioned, that's how I view collection as who are
17   the people responding to me, which ones did I agree
18   to?  And the second, are they vetted?  Are they
19   really legitimate representations of online ticket
20   airline ticket consumers, period.
21   Q.  Okay.  All of that is contained in
22   Section IV of your report, correct?
23   A.  Section IV?
24   Q.  Starting on Page 19, if that's easier,
Page 80

1    Roman Numeral IV.
2    A.  I would say Section IV focuses on that,
3    yes.
4    Q.  Okay.  Well, let's just head there.
5    A.  And, of course, in the summary of my
6    opinions, yes.
7    Q.  You haven't done any survey work in any of
8    your extensive history?
9    A.  No, sir.
10   Q.  Okay.  If Dr. Wind testifies that
11   conducting online surveys in the manner he's
12   conducted is the way that it's done all the time, is
13   routinely accepted in both academic and legal
14   contexts, you have no basis to disagree with him on
15   that, right?
16   A.  If Dr. Wind testifies that marketing
17   professionals use this kind of survey method, I
18   would not dispute that's what marketing
19   professionals do.  That's correct.
20   Q.  Okay.  Dr. Wind is a marketing
21   professional, right?
22   A.  I did review Dr. Wind's background and see
23   that, as an academic, he is certainly a marketing --
24   a marketing person, yes.
Page 81

21 (Pages 78 - 81)

1    Q.  All right.
2    A.  An expert in marketing, yes.
3    Q.  And he, like you, has an extensive
4  background in his field?
5    A.  He does seem to have an extensive
6  background in his field, yes.
7    Q.  I'm trying to find phrases that don't make
8  it sound like I'm calling either of you old.
9        But you're both well-seasoned experts?
10   A.  Yeah.
11   Q.  Okay.
12   A.  Sure.
13   Q.  Dr. Wind's research and papers have been
14  cited thousands and thousands of times; is that
15  correct?
16   A.  That's what was indicated in the -- in his
17  background that I read, yes.
18   Q.  Just like yours?
19   A.  Okay.
20   Q.  Okay.  And do you have any knowledge or
21  reason to believe Dr. Wind is anything less than the
22  expert he says he is?
23   A.  I have no reason to believe that, no.
24   Q.  Okay.  Have you ever met Dr. Wind?

*Page 82*

1    Q.  Okay.  And, obviously, I have your report
2  here, but can you give me a thumbnail sketch,
3  layman's version of what do you think the correct
4  universe should be?
5    A.  Dr. Wind's conclusions, of which I wrote
6  out explicitly, focus on consumers of hidden city,
7  non-hidden city Skiplagged tickets in terms of what
8  he's concluding.
9        Therefore -- and as you know, claiming to
10  have observation -- conclusions on their beliefs and
11  on the allegation that Skiplagged deceived these
12  consumers into those beliefs.
13        So since he's so focused on the Skiplagged
14  consumers, then the sample that he should have used
15  for his survey would have been actual Skiplagged
16  customers.
17        So that's my answer, and that's not what he
18  used in his survey.
19   Q.  Okay.  So in your opinion, Dr. Wind should
20  have gotten a list of Skiplagged customers from
21  Skiplagged, people who have already bought from
22  Skiplagged, and surveyed only those people?
23   A.  That's what his sample should have been,
24  yes.

*Page 84*

1    A.  I have not.
2    Q.  So in your section of the report, you have
3  a heading that says:
4        "The Survey Sample of the Wind Report
5        is Improper."
6        I just want to make sure we don't stumble
7  over terminology.  I tend to refer to this as the
8  "universe" of respondents.  And the reason why I do
9  that is because that's how courts do it in cases,
10  not with 100 percent fidelity to the word
11  "universe," but as in general.  Whereas, in my mind,
12  "sample" can mean something smaller than the
13  universe.
14        So I'm just giving you that information so,
15  as I ask my questions, you understand where I'm
16  coming from.
17        When I read your heading:
18        "The Survey Sample of the Wind Report
19        is Improper,"
20        what I understand you to be saying is that
21  the survey respondents should have been drawn from a
22  different universe.
23        Is that fair?
24   A.  Yes.

*Page 83*

1    Q.  Okay.  So the legal standard we're
2  addressing in the case is called the "likelihood of
3  confusion," not -- as opposed to "actual confusion."
4        And I think we've established you don't
5  really have the inherent understanding of what those
6  two terms mean in the field of trademark law?
7    A.  I do not have the legal understanding of
8  those terms.
9    Q.  Okay.  Can you at least appreciate that
10  there's a difference between "actual confusion" and
11  the "likelihood of confusion"?
12        MR. TOBIN:  Objection, form.
13  BY MR. NELSON:
14   Q.  Just based on --
15   A.  As a non-legal opinion, I can see a
16  distinction between those two terms.
17   Q.  Okay.  If I told you that one type of
18  evidence of actual confusion would be things like
19  customer complaints that demonstrated in the text of
20  the complaint, "Oh, I thought I was dealing with
21  American," just hypothetically, is that consistent
22  with what you're thinking when I say "actual
23  confusion"?
24   A.  No.

*Page 85*

1  Q.  No?
2      What are you thinking when I say "actual
3  confusion"?
4      A.  I mean actual confusion is -- I honestly
5  don't know what -- I would say in this case,
6  Professor Wind is -- let me take it apart.  I'm
7  genuinely confused about something.
8      Okay.  I'm generally -- I --
9      Q.  Okay.
10      A.  -- I walked the wrong way to try to get to
11  this building yesterday type of thing.
12      Q.  I --
13      A.  But what you just mentioned, for example,
14  is if a customer complains, look, that's just what
15  they're writing.  A person who says or writes
16  something, all you can really say is that's what you
17  said or that's what you wrote.
18      What you're representing to me about your
19  mental state may be correct or it may not be.  You
20  may be telling me you're confused a because you want
21  to get a refund when, in fact, you knew what you
22  were doing.
23      So I -- so I don't know how else...
24      Q.  No.  I agree with you.  Right now, I'm just
Page 86

1  trying to get some common language, since you
2  don't -- I don't want -- I don't want to, you know,
3  lecture on "this is what the law is."  I just want
4  to understand what your understanding is and work
5  with that.  Okay.
6      So I agree with you, and so I want to parse
7  out some of the words that I have said.
8      A customer complaint would be evidence of
9  actual confusion.  When I say it would be
10  "evidence," I mean to encompass the whole last part
11  of your answer there where you said, "Well, I mean,
12  assuming that it's true, and the customer is right,
13  it's evidence."  It doesn't mean it's conclusive
14  evidence; just evidence.
15      Is that a fair concept?  Are we on the same
16  page on that -- on that part?
17      A.  A customer complaint is evidence of some
18  kind.
19      Q.  Okay.  Evidence of actual confusion.
20      So when I say "actual confusion," I don't
21  mean general confusion as in, you know, I lost my
22  keys or -- this is a trademark case.  I'm talking
23  about confusing the source of goods or services.
24      So if a customer complained to Skiplagged,
Page 87

1  "Oh, I thought I was just dealing directly with
2  American," that would be evidence of actual
3  confusion.
4      Can we agree on that?
5      A.  No.
6      MR. TOBIN:  Objection, form.
7      THE WITNESS:  I don't agree on that.
8  BY MR. NELSON:
9      Q.  Okay.  So do you have any opinion as to
10  what would be evidence of actual confusion?
11      MR. TOBIN:  Objection, form.
12      THE WITNESS:  No, sir.  As I sit here, I
13  don't have any evidence to offer.
14      BY MR. NELSON:
15      Q.  Okay.  Fair enough.
16      When you say to me that you think Dr. Wind
17  should have surveyed only Skiplagged's actual
18  customers, what I hear when you say that is you're
19  saying he should have only tested for actual
20  confusion.
21      You don't have to accept -- you don't have to
22  agree with me.  It doesn't mean I'm right.  I'm just
23  saying that's the way I hear that.
24      Because when I look at -- if I understand
Page 88

1  your position correctly, we would just be talking
2  about people who have already purchased a ticket
3  from Skiplagged and then asking if they thought
4  Skiplagged was affiliated with American.  That, to
5  me, would be evidence of actual confusion, because
6  we're talking about people who actually were
7  involved in a transaction.
8      Would you agree that limiting the universe
9  to just people who have already done business with
10  Skiplagged could only produce evidence about actual
11  confusion as opposed to likelihood of confusion?
12      A.  Do I agree with that statement?
13      I don't have an agreement or disagreement
14  with that statement.
15      Q.  Okay.  You just don't have enough knowledge
16  of actual confusion versus likelihood of confusion
17  to assess that statement; is that fair?
18      (Person enters)
19      MR. NELSON:  Thank you very much.
20      (Person exits)
21      THE WITNESS:  No.  I think I would stay
22  with my earlier answer, my previous preceding.  I
23  don't agree or disagree with that.  But I'm not
24  going to add to that that it's because of that
Page 89

23 (Pages 86 - 89)

1    absence of my -- you know, my not wanting to
2    distinguish between actual confusion and likelihood
3    of confusion, if that's -- if that was your
4    question, as I understand.
5        BY MR. NELSON:
6        Q.  I'll give you another hypothetical.
7            So you own Bob's Burgers, and you've been
8    in business for ten years, and you're the best
9    burger place in Boston, okay?  And Aaron over here
10   quits the law business and opens right across the
11   street Bobbie's Burgers.  And you don't like that,
12   because you think consumers will confuse the two of
13   you.
14           But he just opened today.  How would you
15   prove likelihood of confusion because you cannot, at
16   this point, survey his actual customers?
17       MR. TOBIN:  Object to form.
18       THE WITNESS:  Counselor, that -- your
19   hypothetical is outside of my range of experience
20   and expertise.
21       BY MR. NELSON:
22       Q.  I get that.
23           But you do seem like a pretty smart guy and
24   pretty good at working with data.

1        I think the point I'm trying to make here
2    is you would have to survey a population of
3    consumers who weren't necessarily his customers, but
4    his likely or target customers, in order to prove
5    your point, right?
6        A.  A concern I have, Counselor, on this is
7    that I like hypotheticals, but it -- it seems to
8    take me away from the opinion I'm expressing in this
9    case.
10           And I don't want to fault the Wind report
11   in this other way, but if the purpose of the Wind
12   report was to conclude -- you know, show
13   conclusively -- that's a type of phrase he uses
14   frequently --
15       Q.  Uh-huh.
16       A.  -- show conclusively that consumers who had
17   not been -- just broad consumers who have never been
18   customers of Skiplagged may have confusion, okay, or
19   there's likelihood of confusion, okay, and
20   distinguish that clearly from whether it's actual
21   confusion or actual conclusions about what people
22   believed, and even to the next level of who deceived
23   them into believing that these points that are
24   supposedly not accurate, if the Wind report had been

1    couched in that manner, closer to your hypothetical,
2    then I would have been able to evaluate that kind of
3    question.
4            But what -- the Wind report statements are
5    very -- I mean, they're clear in what they're
6    claiming.  And what they're claiming is not within
7    reach of the data as -- and conclusions one can draw
8    from the data as I have said in my report.
9        Q.  Okay.  You are aware, based on the survey
10   responses and the verbatim answers that a
11   substantial portion of survey respondents were aware
12   of Skiplagged at the time they took the survey?
13       MR. TOBIN:  Objection, form.
14       THE WITNESS:  No, sir.
15           I mean my understanding is that it's more
16   like 20 percent, I'll say -- I'll say it simply.
17   I'll say 80 percent that had never heard of
18   Skiplagged.
19       BY MR. NELSON:
20       Q.  I thought it was 70/30.  But that was
21   "substantial" to me.
22       A.  Okay.  Let's -- so let's -- it's a number
23   that's in that area.
24       Q.  Okay.

1        A.  Okay.
2            So to me, that indicates these survey
3    respondents, for the most part, have very little
4    knowledge of Skiplagged.
5        Q.  So -- but the 30 or 20 percent who did,
6    wouldn't their verbatim responses and other
7    responses be evidence of actual confusion?
8        A.  Counselor, it may be.  I'll use that
9    phrase.  But my role here is to give opinions on
10   whether Professor Wind's report provides accurate
11   conclusions based on the data, and he did not carve
12   out his 20 or 30 percent and say, "I'm only going to
13   survey these people because at least they have some
14   knowledge of Skiplagged."
15           But -- so what you're asking, again, is
16   kind of another hypothetical of, "Well, couldn't he
17   have done it this way?"  And my answer is, "Well, he
18   didn't do it that way," and my report is based on
19   what he did do.
20       Q.  If courts have said that the proper
21   universe for a sample -- for a survey is the
22   defendant's target customers or the target customer
23   base as opposed to actual customers, if -- would you
24   change your opinion?

1    A.  No, sir.
2    Q.  So even if a court says, as a matter of
3  law, this is how the survey is supposed to be done,
4  they're wrong?
5        MR. TOBIN:  Objection, form.
6        THE WITNESS:  I -- my answer is no, sir.
7        And my explanation for that answer is
8  simply that that's the legal, I'll call it
9  statement.  I wouldn't call it legal opinion, legal
10  conclusion.  If a court says, "We ratify this
11  approach for our purpose here," you know, my view
12  is, "Well, that may be true, but in terms of data
13  analysis, that doesn't mean it's right."
14  BY MR. NELSON:
15    Q.  Okay.  I want to make sure I've given you
16  every opportunity to think through this, so I'm
17  going to ask a couple of questions; we'll take a
18  break, and then we'll move on.
19        It seems to me -- I don't want to give you
20  the impression that I'm -- you know, if the court
21  says that it's absolutely wrong, it's written in
22  stone, it's, you know, immutable.
23        It seems to me there may be room for an
24  expert in your position to say, "Well, if you

Page 94

1  surveyed actual customers of Skiplagged, as opposed
2  to likely customers, then the survey results would
3  be stronger.  That seems to me a statement I could
4  agree with."
5        Do you agree with that statement?
6    A.  It -- it is true that had the survey used
7  the customers that -- you know, the actual
8  Skiplagged customers, it would be a stronger result.
9  It would be a better report.
10    Q.  Okay.  And so I think, then, the
11  fundamental disagreement here:
12        Are you of the opinion that a consumer
13  survey for purposes of demonstrating a likelihood of
14  confusion can never include likely customers as
15  opposed to actual customers?
16    A.  Mr. -- well, Counselor --
17    Q.  Uh-huh.
18    A.  -- that is not the opinion I'm offering.
19    Q.  Okay.
20    A.  And I'll repeat it just to be sure I have
21  the words correct.
22        I'm not offering the opinion that a report
23  that attempts to demonstrate, or prove -- let's say
24  demonstrate, attempts to demonstrate likelihood of

Page 95

1  confusion if the context of a litigated dispute
2  involving consumer products must be done in a
3  certain way -- and whether it's the way we just
4  mentioned or any other way -- because I am not the
5  expert in that field --
6    Q.  All right.
7    A.  -- what I am expert in is reviewing studies
8  that use data to reach conclusions.
9    Q.  Uh-huh.
10    A.  I have studied Professor Wind's report.  I
11  understand his report.  I understand the data, how
12  he generated it, to the extent of -- to the extent
13  he described how he did things, and I find that the
14  analysis of data does not lead to the conclusions he
15  reaches, period.
16        And then -- so then I'll go back and say,
17  again, that is not the same thing as me telling the
18  entire marketing and legal industry how to do a
19  survey of likelihood of confusion, because that's
20  not what I read and opined on here.
21    Q.  Would it be more accurate to say you simply
22  think Mr. Wind's report should be given less weight
23  because he didn't limit the survey to actual
24  Skiplagged customers as opposed to Mr. Wind's report

Page 96

1  is totally invalidated because he didn't limit the
2  survey to actual Skiplagged customers?
3        Which of those is the more fair statement?
4    A.  And I apologize.  Can I ask you to repeat
5  option number one.
6    Q.  Yeah.  Option A is, it's still a valid
7  study but it's entitled to less weight; and option B
8  is it's totally worthless.
9    A.  I can't take option A because it is just
10  too vague to ask me somehow a valid report should be
11  given less weight.  It's a very judgmental point.
12        The litigation world is filled with
13  judgments.  I'm not against judgments, but I'm not
14  the person to give that.  My view is that the report
15  is not valid.  So I'm --
16    Q.  It's totally worthless?
17    A.  That's a -- that's an emotional way to say
18  the point that it's not -- I'll say it's not valid.
19    Q.  I didn't intend that to come across as
20  emotional.  I mean that from a critical thinking,
21  logic standpoint.  I mean, it's in or out, right?
22        So if I understand you correctly, you're
23  saying is that a fatal flaw in the methodology,
24  end of story?

Page 97

25 (Pages 94 - 97)

1   A.  Yes.
2   Q.  Is that a --
3   A.  I -- I will -- I agree with the
4   characterization of fatal flaw to prove the point as
5   is written here.
6       MR. NELSON:  Okay.  Good time for a break.
7       THE WITNESS:  Okay.
8       THE VIDEOGRAPHER:  The time is 11:56.
9   We're going off the record.
10      (Luncheon recess taken
11      at 11:56 p.m. to 12:26 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 98

1       AFTERNOON SESSION
2       THE VIDEOGRAPHER:  We are back on the
3   record.  The time is 12:26.
4       MR. NELSON:  Dr. Pimbley, I've handed you
5   what we've marked as Exhibit 3.
6       (Document marked as Pimbley
7       Exhibit 3 for identification)
8   BY MR. NELSON:
9   Q.  Exhibit 3 is a printed copy of Appendix
10  C-7 -- or I should say it a printed copy of a
11  portion of Appendix C-7 because that appendix is
12  massive.
13      In electronic form, there were four PDFs in
14  C-7, and they correspond to sort of the four subsets
15  of the study.  The one that we have marked is the
16  hidden city Skiplagged subgroup, okay?
17      MR. NELSON:  So -- do you want copy of
18  this?  I'm sorry, Aaron.
19      Wait.  That's not the right --
20      MR. TOBIN:  I think I know where you're
21  going.
22      That's all right.
23  BY MR. NELSON:
24  Q.  Now, this -- I understand your testimony

Page 99

1   from earlier today, you have not read this in
2   substantial detail, but you did look through this?
3   A.  Well, now that I see this, I would say yes,
4   I did not read this in substantial detail.
5       As I also testified, I would have opened --
6   I opened every document just to be familiar with
7   what's there.  I don't -- so I'll say that much, if
8   that answers your question.
9   Q.  Okay.  And let's turn to Page -- these
10  aren't labeled -- well, they are labeled.
11      In lower right-hand corner, you'll see some
12  numbers.  So I want to turn to Number 790.
13  A.  Okay.
14  Q.  It's about four or five sheets in.
15  A.  Okay.  I'm on 790.
16  Q.  Okay.  So these show the verbatim responses
17  that the survey respondent provided.
18      I would like to direct your attention to
19  the question at the bottom of that first page:
20      "What do you believe is the
21      relationship between Skiplagged and the
22      airline?"
23  A.  Yes, and I see that response there.
24  Q.  And the consumer wrote:

Page 100

1       "Skiplagged is an authorized agent of
2       the airline," right?
3   A.  Yes, it says that.
4       And then following that says:
5       "I believe it is."
6   Q.  So that is a consumer exhibiting confusion,
7   correct?
8       MR. TOBIN:  Objection, form.
9       THE WITNESS:  Yeah.  May I ask -- I'm
10  sorry.  If you could repeat that last question.
11  BY MR. NELSON:
12  Q.  That is a consumer exhibiting confusion,
13  correct?
14      MR. TOBIN:  Same objection.
15      THE WITNESS:  Well, this is a -- it's a --
16  well, I -- as represented to me, this is a survey
17  respondent writing that he or she claims -- well
18  believes, because he or she writes "I believe it
19  is" -- believes Skiplagged is an authorized agent of
20  the airline.  It doesn't specify American.  It
21  doesn't specify all airlines, just one -- just one
22  subset of airlines.
23      In context, I would assume this respondent
24  probably means authorized agent of all airlines, but

Page 101

26 (Pages 98 - 101)

1  I'm just guessing and interpreting.
2         And you then -- if you then -- your
3  question was, he or she is showing confusion, and
4  I'm not trying to split hairs, but I would say he or
5  she is writing a statement that you will represent
6  to me is being incorrect.
7         I think a premise of this case, or this
8  question, or the Wind report is that Skiplagged is
9  not an authorized agent at least of American
10  Airlines.
11     BY MR. NELSON:
12     Q.  Right.  It isn't.
13     A.  Oh.  So if you want to use the word
14  "confusion," I'll verify the evidence says the
15  consumer -- or the survey respondent, which is
16  different than airline consumer -- the survey
17  respondent believes Skiplagged is an authorized
18  agent of one or several airlines, yes.
19     Q.  You know the context of that question is
20  the consumer -- by the time consumer has seen that
21  question, the consumer has seen several stimuli
22  which walk through the process of purchasing an
23  American ticket on Skiplagged?
24     A.  Yes.
                                            Page 102

1  one.
2         You said the stimuli kind of set the stage
3  for what this survey respondent might write, and, of
4  course, this is just one survey respondent out of
5  many.
6         But I would also say the questions that
7  come before kind of set the stage for what they
8  might write.
9     Q.  Uh-huh.
10     A.  Okay.  If you -- since the survey asks in
11  previous questions, you know, "Gee, is there a
12  business connection?"  Okay?
13         And then the next one, "Gee, does this
14  website need permission from anybody, authorization
15  from anybody, any other company?"
16         And so you're getting the survey
17  respondent -- you're kind of staging them to think
18  in terms of, "Do you need permission from some other
19  company?"  Because you're suggesting those ideas to
20  the survey respondent.
21     Q.  I'm sorry.  Which question suggested which
22  idea to which survey respondent?
23     A.  Well, I'm just looking at this one page
24  that you directed me to, which has the number 790 in
                                            Page 104

1     Q.  And so in that context, it is -- you still
2  believe the consumer might be referring to some
3  other airline?
4     A.  Well, again, just to make two points:
5         In the context -- and I think you just said
6  this.  In the context of the stimuli, the airline
7  that's shown is American Airlines.
8     Q.  Right.
9     A.  Okay.  So it certainly would be normal for
10  American Airlines to be on the mind of a survey
11  respondent.  I agree with that.
12         As I testified earlier today, also, I would
13  imagine any survey respondent would understand that
14  American is not a special airline among other
15  airlines other than, "Hey, the survey people just
16  happened to show me their website, not United, not
17  Delta," all that kind of stuff.
18         So I'm not trying to split hairs.  I'm just
19  trying to say, if I were that survey respondent, I
20  would assume any airline is interchangeable with
21  American in terms of what they want me to answer on
22  the survey.  Okay?
23         I will also add the comment to your last
24  question, as I had two thoughts.  That was the first
                                            Page 103

1  the lower right-hand corner.
2         The second question -- the first question
3  is:
4             "How would you describe the offering
5         on this website to a friend?"
6         The second is:
7             "Does the company that operates this
8         website" -- so that would be the
9         Skiplagged -- "have a business connection
10         or association with another company?"
11         So, in essence, the question gets that
12  respondent to start thinking about, "Well, okay.
13  Maybe they have a business connection with a bank
14  they do business with," as I said this morning.
15  Okay.
16         The next question which -- is:
17             "Which other company..."
18         Okay, in other words, trying to get them to
19  think of more than just a company.
20         And then the next question after that:
21             "Does the company that operates this
22         website require permission or
23         authorization..."
24         So that's not -- that idea is not coming
                                            Page 105

1 organically from the survey respondent; it's being
2 in the question.
3      And so when a later narrative response
4 comes down the line that says, "Oh, yeah, I think
5 this company" -- Skiplagged, in this case -- "is an
6 authorized agent of the airline," they wouldn't
7 naturally volunteer that unless they had had those
8 earlier questions.
9      And I'm not -- I'm just giving my layman's
10 review of this set of questions.
11 Q.   So anyways, with respect to --
12      You're still on 790?
13 A.   Yes, sir.
14 Q.   Okay.  Let's take a look at 900.
15      The response to the final question on the
16 first page for Respondent 900 also says:
17      "Skiplagged is an authorized agent of
18      the airline."
19      And then says:
20      "Generally many airlines require this
21      for the services to be sold by a third
22      party."
23      Do you see that?
24 A.   Actually, I apologize.  What's the next

Page 106

1 page?
2 Q.   900.
3 A.   So 900.
4      Okay.  I'm on 900.
5      And, I'm sorry, which response are you
6 reading, sir?
7 Q.   The one on the bottom of the page.
8 A.   Okay.
9      I do see this, yes.  Yes.
10 Q.   So contrary to your speculation a minute
11 ago, the consumer is explaining to you here where he
12 or she got the idea that Skiplagged was an
13 authorized agent, correct?
14 A.   I -- I will -- I mean, I will agree with
15 the part of your question that says this is what the
16 survey respondent wrote, yes.
17 Q.   All right.
18      The survey respondent didn't say "because
19 your other questions made me think of it," right?
20 A.   The survey respondent does not say -- does
21 not write that, correct.
22 Q.   And as you sit here today, you can't
23 identify any actual objective evidence that supports
24 the hypothesis you've just proposed, correct?

Page 107

1 A.   That's correct.  I did not do a study to
2 try to prove that point.  That's correct.
3 Q.   Okay.  Can we turn to 1006.
4 A.   Okay.  I'm on 1006.
5 Q.   You're looking at the back of it, though.
6 Flip it over.
7 A.   Okay.
8 Q.   Two sides to each one.
9 A.   Okay.
10 Q.   Okay.  So Respondent 1006 in response to
11 the question:
12      "Does the company that operates this
13      website have a business connection or
14      association with another company, or do you
15      not know,"
16      this respondent said:
17      "Yes, it has a business connection."
18      Right?
19 A.   Yes.
20 Q.   But then said he or she didn't know what
21 that connection was, right?
22 A.   Excuse me.  Let me read this.
23      Okay.  Yes, I agree with that.
24 Q.   Okay.  And this respondent also said that

Page 108

1 he or she believed that the website required
2 permission from another company to do what it's
3 doing.
4 A.   That's what this respondent writes, yes.
5 Q.   Okay.  And this respondent also indicated
6 that they -- he or she believed Skiplagged was an
7 authorized agent of the airline, correct?
8 A.   That's -- okay.  I believe my answer to
9 your question -- well, my answer to your question is
10 yes, that's what's written down in the answer to the
11 last question.
12      I was just pausing because I'm confused by
13 the answers surrounding that that seem to be in
14 conflict with that answer.
15 Q.   Which answer do you say is in conflict?
16 A.   Well, let me start with the last one --
17 and, again, if I'm answering the wrong question,
18 please tell me -- but the last answer is Skiplagged
19 is an authorized agent of the airline, so the survey
20 respondent wrote that, but then wrote "don't know."
21      Am I -- is that "don't know" that follows
22 it, is that what the person actually wrote?  Or is
23 that somehow generated by the -- whatever software
24 created this?

Page 109

28 (Pages 106 - 109)

1    Q.  So this is -- like many of the questions in
2  the survey, there's checkboxes.
3    A.  Yep.
4    Q.  Right?  But then it's followed up with an
5  open-ended, "Why did you say that?"
6    A.  Yeah.
7    Q.  So the "don't know" is in response to, "Why
8  did you say that?  Why do you think that?"
9        We can look at Wind's report to see the
10 specific question, but that's the follow-up answer.
11       So he checked the "authorized agent" box.
12 And when asked the follow-up question of "why did
13 you check that box," he said "don't know."
14   A.  And the point of my asking -- again, you're
15 the one that gets to ask the questions, not me,
16 but -- so I'll say it directly, not as a question,
17 which is I'm just -- I'm confused by the "don't
18 know" that's there as well as the don't -- the two
19 "don't knows" that are immediately above that,
20 because it makes it sound like the survey respondent
21 is contradicting herself.
22   Q.  Would you agree that you are not able to
23 read the mind of this survey respondent who you've
24 never met?

Page 110

1    A.  I cannot read the mind of the survey
2  respondent.  I agree with that.
3    Q.  Would you agree as a matter of principal in
4  scientific research it's probably not appropriate to
5  speculate about what the person did or did not think
6  but rather just to take the data and analyze it as
7  it is in front of you?
8    A.  No.  I disagree with that statement because
9  understanding the validity of data is of great
10 importance in analyzing the data.  If there were
11 indications in survey responses, or any source of
12 data, there's indication that the data is not
13 reliable, then you flag it.  You don't use that
14 data, or you resolve what the -- if I'm simply not
15 understanding.
16       When I say there's conflicting statements
17 in this survey response, and it's explained to me,
18 "No, these are just auto generated about the
19 software; don't worry about that."
20       But it seems to be the case to me that this
21 is invalid data.  I wouldn't use this data.
22   Q.  So in your -- and that's based on your
23 opinion of expertise of having never actually done a
24 consumer survey, correct?

Page 111

1    A.  No, that's not correct.  It's not based on
2  my expertise in consumer surveys.  It's based on my
3  expertise in data integrity.
4        I do have much experience in that, and I've
5  created courses, I've created lectures for other
6  professionals to talk about data integrity and not
7  in the consumer airline industry, but in a different
8  industry.
9        And I'm making a simple point that if you
10 have a data point and it doesn't make sense -- in
11 the world of data analysis, they sometimes call
12 those outliers.  An outlier can mean just a value
13 that's far out of the range that makes sense, or it
14 could be just wrong on its face for some other
15 reason.
16       And all I'm saying is, as I look at this
17 piece of paper in front of me, this looks like
18 unreliable data.
19   Q.  So you are determining that an individual
20 respondent's responses here are unreliable based on
21 your opinion that Respondent Number 10 --
22       Was it 1006?
23   A.  1006.
24   Q.  -- that the responses are inconsistent?

Page 112

1    A.  Yes.  And I believe I used the phrase
2  "looks like."
3        It looks like, just looking at this one
4  piece of paper that I've seen just now, it looks
5  like unreliable data.  If there is a different
6  explanation, which there may be, then I would -- I
7  would change that view.
8    Q.  Is unreliable, not in the sense -- so it's
9  not unreliable in the sense this is what the
10 respondent said, right?  There's no dispute that
11 this is what the respondent said?
12   A.  I'm not -- I don't -- I don't dispute for
13 the purpose of this testimony that that's what -- a
14 survey -- a valid survey respondent wrote down
15 there.
16   Q.  You're just calling the respondent, him or
17 herself, unreliable?
18   A.  I'm calling the answers on the printed page
19 are not consistent with each other.
20   Q.  Why -- why is that a requirement of survey?
21   A.  Oh, to validate data is extremely
22 important.  In any --
23   Q.  That's not what I asked.
24   A.  In any context of using data, validating

Page 113

29 (Pages 110 - 113)

1  your data -- take a simple example like a contact
2  relationship database, okay?  All companies have
3  these.
4       Q.   Respectfully, I know I'm interrupting you,
5  but you're going on a tangent that has nothing to do
6  with my question.
7            You can finish your answer if you want, but
8  I mean, you're just going to be here longer.
9       A.   I'm happy to truncate, but that's a new
10 rule for our conversation that one can interrupt the
11 other.
12           But go ahead.
13      Q.   Thank you.
14      A.   Yeah.
15      Q.   Human beings take these surveys, correct?
16      A.   My apologies.  Human beings do what?
17      Q.   Take these surveys, correct?
18      A.   That's what's been represented to me, and I
19 do understand Professor Wind had a reCAPTCHA kind of
20 thing to say "I'm not a robot," so I believe that
21 was his intent to have human beings do these
22 surveys, yes.
23      Q.   And human beings are rarely consistent,
24 correct?

Page 114

1       A.   Yes, they are.
2       Q.   Okay.  And -- but you're proposing a
3  standard for conducting a consumer survey that all
4  of the answers must be entirely consistent or you
5  throw it out?
6            Is that the standard you're proposing for
7  consumer surveys?
8       A.   No.  I -- I'm going to say no.
9            And I'm also -- but I'm going to reiterate
10 because you've exaggerated my point.
11           It's extremely important to question data,
12 to question the integrity of data.  This is, again,
13 something I have good experience with.
14           In the financial industry, you make
15 mistakes in your data, you lose tens of millions of
16 dollars.  Okay?  In a customer relationship
17 database, you lose clients if you lose track of
18 them.  If something's in your data that looks wrong,
19 then you question it and you try to fix it.
20           All I'm doing sitting here as a witness is
21 saying you've shown me some evidence and I see a
22 problem.
23      Q.   Uh-huh.
24           And so -- and you should throw that -- you

Page 115

1  called it invalid data, so it should be thrown out,
2  right?
3       A.   Sir, this is not my project.  I don't have
4  the authority to throw out data, but I would -- if I
5  were working with a team to do a project of this
6  sort, then I would call my team member in, or team
7  members and say, "Hey, what's going on here?  Let's
8  understand it."
9            That's what I would do.
10      Q.   How do you know Mr. Wind didn't do that?
11      A.   Well, I see this right here.
12      Q.   So you should have just -- I don't
13 understand what you mean by that.
14           Should he have thrown out this particular
15 respondent or not?
16      A.   A very important aspect of data integrity
17 in -- in any organization that has lots of data --
18 and that includes American Airlines; it includes
19 Skiplagged, but in any organization -- is to have --
20 we talked about writing code earlier.  It's you
21 write code to go through your data and look for
22 errors of a certain type so that it's not a human
23 being who has to go through hundreds of sheets of
24 paper to do that.  Okay?  And if you find -- this is

Page 116

1  how artificial intelligence works.  You define
2  flags.  You define mnemonics -- you define
3  heuristics is a better word.  You define heuristics
4  that say that if a customer -- if a survey
5  respondent answers "yes" to this and "no" to this.
6            For example, in Professor Wind's
7  methodology, they do an automated way to look for
8  answers that says, you know, is one of your
9  relatives working for an airline?  I think there was
10 a question something like that.  Okay?  And so they
11 had a way of throwing out possible respondents based
12 on the jobs they might have, or who they might be,
13 or whatever other demographic issues there might be.
14           So my point is it would be natural to have
15 an error-checking algorithm go through the data of
16 survey responses.
17           I do not represent here in this testimony
18 that this issue rises to that level.  All I'm saying
19 is, as an expert in data, I take a quick look at a
20 piece of paper, and I don't make an allegation; I
21 ask a question.  "Gee, this doesn't look right."  If
22 I were working with a team, I would say, as I just
23 said, "Let's figure this out."
24      Q.   And how would you figure it out in a

Page 117

30 (Pages 114 - 117)

1 scientifically valid way?
2    A.   You -- in my experience --
3    Q.   I'm talking about in the context of this
4 Respondent Number 1006.
5    A.   Okay.
6    Q.   I'm not asking about, you know, business
7 data analytics in other fields that have nothing to
8 do with consumer surveys.  I'm asking --
9    A.   Yeah.  No.  I would take this, if I were
10 the -- one of the team members, I would take this to
11 the colleague who generated the survey and I would
12 say, "Is it me, or does this not make sense?"
13    Q.   What if that colleague says, "That makes
14 sense.  People are inconsistent.  What's your
15 point?"
16    A.   Well, then I would say, well, if that's --
17 maybe that's the right answer, maybe it's not.
18 Let's say it is.
19       If that's the right answer, then I would
20 say, "Well, then their answer is unreliable."  Their
21 answer of, "Yes, Skiplagged is an authorized agent
22 of the airline," they don't know that.  They might
23 be wrong.  Okay?  Or they could just have as easily
24 have written the opposite, given how they wrote

1 page of this.
2    A.   That he -- you can represent to me that
3 Dr. Wind would be comfortable with this?
4    Q.   This is his report.
5    A.   He has not read this.
6    Q.   Yes, he has.
7    A.   Okay.  Look.  I'm not going -- I will
8 express surprise that any person would read every
9 word on every page of this -- and this is only
10 one-fourth of the content of Appendix C-7.  I don't
11 think he read this.  Okay?
12       I think -- but if you're going to represent
13 to me that he has read it, and if you're going to
14 represent to me that he is comfortable with this,
15 then I'm going to say it's my opinion this is not
16 acceptable data, okay?  It's not acceptable to -- to
17 understand there are errors of this sort in the
18 data, if I'm even right.
19    Q.   You don't know that it's --
20    A.   I looked at this page for 60 seconds, and I
21 would go ask my colleague, my hypothetical team
22 colleague, and he or she might have really good
23 answer for me, in which case I would say, "Good.
24 Thank you."  That's the way I do business.  Okay?

1 "don't know," "don't know" to the other questions.
2       So it's ambiguous.  I would -- I would not
3 use this as a data point in my study.
4       So to answer your question, if that's what
5 my colleague told me, I would say, "Well, we really
6 should retain" -- if that means, instead of having
7 600 survey respondents for four different buckets,
8 that we're going to have to toss half of the data
9 points, then that means we better start with 1200
10 because we've got to toss the responses that are not
11 consistent.
12    Q.   Even if doubling to 1200 costs an extra
13 $75,000?
14    A.   Absolutely.
15    Q.   Okay.  So your position is that Mr. Wind,
16 who has decades of experience doing this, should
17 have tossed out answers that you personally deem
18 inconsistent and then doubled or tripled the cost of
19 the survey to only find consumers who give
20 100 percent consistent answers?
21    A.   Of course I do not know Dr. Wind.  What I
22 do know of him, I'll say I respect who he is.  If
23 you showed him this piece of paper and say --
24    Q.   I can represent to you he reviewed every

1       But my point is this is not acceptable.
2    Q.   So just not acceptable in the context of
3 Respondent Number 1006 --
4    A.   Yes.
5    Q.   -- is that he clicked a checkbox that says
6 that he believes Skiplagged is an agent of the
7 airline, but he's not -- and when asked why he
8 thinks that, he says he doesn't know?
9       Why are -- isn't it a reasonable
10 interpretation of that data that this is a survey
11 asking for consumers' mental impressions, which is
12 what a consumer survey does, and consumers -- he
13 provided his mental impression, but simply couldn't
14 put into words exactly why he feels that way?
15       Isn't that a reasonable interpretation of
16 those two answers there?
17    A.   Okay.  It would be if that were my reading
18 of this piece of paper.
19       This piece of paper does not say -- here's
20 how I understand this piece of paper:
21       The respondent does write, as we both
22 agree:
23          "Skiplagged is an authorized agent of
24       the airline."

1    That's pretty emphatic; that's pretty
2  clear.
3    Q.  He didn't write.  He clicked a checkbox.
4    A.  Okay.  So that's a good thing for you to
5  say.  I've been assuming that these are actually
6  written things.  So yes, he or she clicks a
7  checkbox.  I mean, it would be more powerful if they
8  actually wrote it out because then at least that
9  survey respondent is actually paying attention.
10  Checking a box doesn't mean anything.
11    But my point here is now compare that to
12  what we see above:
13      "From which company is permission or
14      authorization required?"
15      Answer, "Don't know."
16    So I guess he or she clicked the box that
17  says "don't know."
18    But my point is that's not consistent.  If
19  you believe Skiplagged is an authorized agent of the
20  airline, then that means you know from which company
21  the authorization was acquired.  "Authorized."  It's
22  the same word.
23    It may be a criticism of the reliability of
24  the survey respondent, okay?  It may be that survey
Page 122

1  impression," that's invalid data?
2    A.  Sir, I think you're mischaracterize --
3  first, if I were to answer the question you just
4  asked --
5    Q.  Uh-huh.
6    A.  -- I would say -- whether it's yes or no,
7  but agreeing with your sentiment, that if they give
8  an answer and then they can't give a supporting
9  reason for the answer, "I think this; I can't really
10  say why," that's fair.  That counts as an answer.
11    Q.  Okay.
12    A.  Okay.  But that's not what I see on this
13  piece of paper, but I'm not going to -- unless you
14  want to keep going --
15    Q.  No, no.  I'm trying to understand what you
16  think is fair.  So I appreciate the answer that a
17  consumer saying, "This is impression, but I can't
18  say why," is fair.
19    With respect to your report, your
20  conclusion -- start with Conclusion 2, which is
21  Page 7.
22    Are you there?
23    A.  I'm sorry, which page?
24    Q.  Conclusion 2, which starts on Page 7.
Page 124

1  respondents, many of them, are inconsistent in this
2  manner.  I will just leave it as it strikes me as
3  unreliable data.
4    Q.  Just to be clear on the checkbox, right?
5    A.  Yes.
6    Q.  These -- some of these are open-ended
7  responses, and some of them are not.  I've kind of
8  assumed that you had a level of familiarity with the
9  survey as we've laid it out in Mr. Wind's report as
10  to which ones are which.
11    A.  Sir.
12    Q.  Hold on.  I'm just explaining.  I made an
13  assumption, and so I just want to clarify so that
14  you don't feel like I've misled you.
15      "What do you believe is the
16      relationship between Skiplagged and the
17      airline?"
18      You find that question in the report; you
19  can see whether it's a checkbox or not.  The
20  follow-up "don't know" is a written response, I
21  believe.  That's what I believe myself.
22    So you believe that -- fundamentally, you
23  just believe that because someone states their
24  impression but says, "I don't know why I have that
Page 123

1    A.  Page 7.
2      Okay.  Here I am.
3    Q.  Okay.  Have you done any personal
4  investigation as to whether buying tickets on
5  Skiplagged is cheaper than buying directly from the
6  airline?
7    A.  I have not.
8    Q.  Are you disputing as a question of fact
9  that when you buy a ticket on Skiplagged, you're
10  paying more than you pay if you just go on the
11  airline's website?
12    A.  I am not disputing that statement.
13    Q.  Okay.  And in Mr. Wind's report, 62 percent
14  of the consumers that were surveyed stated that they
15  believed buying tickets through Skiplagged was
16  cheaper than buying directly from the airline,
17  correct?
18    A.  That's what Professor Wind writes, yes.
19    Q.  Well, it's not just what he writes; that's
20  what the survey respondents said in response to the
21  survey, right?
22    A.  Well, it says "See Exhibit 7," so if I can
23  refer to Exhibit 7.
24    Q.  Yeah.  Absolutely.  That's why you have it
Page 125

32 (Pages 122 - 125)

Page 126

1  there.
2      A.  Exhibit 7.
3          Yes.  So I see Exhibit 7, and that's what
4  is -- Exhibit 7 shows the 62 percent.
5      Q.  Okay.  You don't really dispute that
6  62 percent of the respondents in that first column,
7  you know, clicked that box when doing the survey,
8  right?
9      A.  I'm sorry.  Now I'm looking at my report
10  just to quickly assess that.
11          No, I'm not -- I'm not disputing that entry
12  in the table, no.
13      Q.  Okay.  So I don't really understand what
14  you have written here in the middle of Page 8 about
15  false belief.  It's in the middle of Paragraph a.
16  That last sentence, I do not understand what you've
17  written.
18      A.  Is it last sentence of Page 8?  Or
19  Paragraph --
20      Q.  Paragraph a.
21      A.  Oh, Paragraph a.  Okay.
22          Let me read this.
23          Okay.  Well, my last sentence is:
24          "Hence, the Wind report does not,"

Page 127

1          quote, unquote, "'clearly show...'"
2          Do you mean the sentence before that?
3      Q.  I do.
4      A.  Okay.
5          "... if comparison" -- I say, "hence"
6      too often -- "if comparison to Expedia the
7      Wind Report's standard of false belief
8      among Skiplagged survey respondents, then
9      the Wind report should not conclude false
10      belief of Skiplagged survey respondents."
11          My statement there is it reflects my --
12  it's relating to other criticisms I have of
13  Professor Wind's report -- is he nominates Expedia
14  as this control group for his -- and, of course,
15  Expedia shows up in almost all the survey results,
16  if not all of them, as comparison to -- to
17  Skiplagged.
18          And I think a better description of Expedia
19  is he's really just comparing answers from
20  Skiplagged to answers from -- excuse me, regarding
21  Skiplagged regarding Expedia.
22          And -- and he doesn't -- I'm not sure why
23  he doesn't use that consistently without, because
24  the point I'm making here in the sentence you're

Page 128

1  asking about is -- it's my sentence that I wrote and
2  you're questioning -- is he should be comparing
3  Skiplagged to Expedia because that's what he said
4  his survey methodology was, or his analysis
5  methodology.
6          And as you see in his Exhibit 7, for
7  Skiplagged, we call it 62 percent believe that
8  buying tickets through Skiplagged is cheaper than
9  American; and it's 70 percent -- I'm sorry,
10  74 percent of respondents believe Expedia tickets
11  are cheaper than American.  And so, if anything,
12  survey respondents have a less positive view of
13  Skiplagged in this regard that Expedia.
14          So if you're going -- but I thought
15  Professor Wind at times was saying he's going to
16  compare Skiplagged to Expedia to help him draw
17  conclusions.  But if he did that here, he would say,
18  "Look.  Expedia is a worse answer," if I could say
19  it that way.  If he considers it -- I'll say he, or
20  American, but let me say Professor Wind.
21          If Professor Wind considers it a false
22  belief that Skiplagged ticket buyers can get a
23  cheaper price than going through American, then it
24  must also be a false belief, I would think, that

Page 129

1  buying tickets through Expedia would be cheaper.
2  And so, if anything, there's more confusion among
3  Expedia survey respondents.  They're not Expedia
4  customers, either, okay?
5          And, if anything, if you're going to make
6  an allegation of deceit against Skiplagged, you
7  should make the same allegation of deceit against
8  Expedia for the false belief among survey
9  respondents that a ticket is cheaper on Expedia than
10  American.
11          Now let me finish my answer by saying
12  that's really the genesis of that sentence that I
13  wrote.  That's what I was saying.  It's not that I
14  was saying that's the right way to analyze things;
15  it's that in the context of Dr. Wind's own
16  explanation of what he's doing, I would have thought
17  he would be comparing this first thing comparing
18  Expedia, okay?
19          And -- yeah.  Let me -- let me drop that
20  there.  I had a second point, but I don't think
21  that's what this is pointing out.
22      Q.  Yeah.  So in that bit of a straw man
23  argument, you seem to be attacking an argument or a
24  statement Dr. Wind didn't make.

1     MR. TOBIN:  Objection, form.
2     THE WITNESS:  I don't consider it a straw
3   man argument because he points us to Exhibit 7 where
4   he clearly shows Expedia right next to Skiplagged.
5   He clearly shows -- his asterisk means that, by his
6   measure, there's a statistically higher measure of
7   Expedia survey respondents claiming cheaper tickets
8   than there is of Skiplagged's survey respondents.
9     So he did that analysis.  He pointed us to
10  it.  He's -- it's in his data that he's showing
11  supports his conclusion, yet I'm saying you can look
12  at it the way I just expressed it and say, "Hey,
13  that doesn't support your conclusion that Skiplagged
14  is deceptive because only its survey respondents
15  think their tickets are cheaper."  If the Expedia
16  survey respondents think that same way to an even
17  greater extent, which he's showing us, then it would
18  only be reasonable to point out that as part of his
19  own conclusion.
20    Q.   But -- so you're essentially saying you
21  want him to write your thoughts in his report?
22    I mean I don't understand substantively
23  what your criticism here is.
24    MR. TOBIN:  Objection.

Page 130

1     THE WITNESS:  My --
2     MR. TOBIN:  Objection.
3   BY MR. NELSON:
4     Q.   What scientific methodology, or what
5   specific -- or what specific problem with data is
6   there?
7     Not -- so it's not a question of, "Gee, do
8   you read the data differently?"  The question is
9   simply is there something scientifically invalid
10  with what Dr. Wind wrote, not with what you think he
11  should have wrote?
12    A.   Yes, there is something invalid.  If you
13  want to say scientifically or rigorously invalid,
14  I'm fine with that.
15    And the answer is that when you're
16  analyzing data, you need to analyze all these other
17  questions.  Any -- when you're -- it's like in
18  science, if you want to use science.  When you're
19  creating a theory, you create a theory that you
20  believe fits all known observations, and then you
21  ask, "How can this be wrong?"  You ask yourself
22  before you present it to the outside world, "What am
23  I missing here?  Is there any other evidence that
24  contradicts my conclusion?"

Page 131

1     And if there is other evidence, then, of
2   course, you may need to revise your conclusion.  But
3   there may be other evidence.
4     But even if you think, on balance, it does
5   not override your theory or conclusion, you need to
6   present it as part of your argument to your
7   audience.
8     Q.   All right.
9     A.   In this case, the audience is whoever is
10  using this expert report in this litigated dispute.
11    Q.   So he --
12    A.   And -- I'm not finished with my answer.
13    Q.   You -- well, this is your -- it's your
14  clock at this point.  I mean, do you want to go home
15  a 6:00 p.m. and just babble for 20 minutes every
16  time I ask you a question, okay.  Up to you.
17    Go ahead.  Keep going.
18    A.   I will say, I --
19    MR. TOBIN:  Objection.
20    THE WITNESS:  I -- I've never criticized a
21  highly skilled attorney as you are for speaking too
22  long or more than was necessary for me to understand
23  a question.  I'm not going to do it here.  I'm
24  not -- I have no interest in speaking more than is

Page 132

1   necessary.  Okay?
2     But I will point out just the following, to
3   answer your question bringing up science:
4     In science, if you find any aspect of the
5   data that disagrees with your thought, your
6   conclusion or your theory, then you have to consider
7   it.  And that's what I'm doing here.  I'm bringing
8   this up, and I'm saying, "Gee, maybe Expedia is even
9   more deceptive than Skiplagged," if we accept these
10  ideas of deceit and misbelief, which I don't.
11    I'm done.
12    Q.   Okay.  Dr. Wind did present in his report
13  this chart that disclosed both the Expedia and the
14  Skiplagged numbers, right?
15    A.   Yes, he did.
16    Q.   It's right there, right?
17    A.   Yes, it is.
18    Q.   Okay.  And isn't it as simple as, according
19  to this survey, 61 percent -- 62 percent of the
20  respondents thought Skiplagged is cheaper than
21  buying directly from airline, correct?  That's what
22  it says?
23    A.   That's what it says.
24    Q.   And 74 percent of the non-hidden city

Page 133

34 (Pages 130 - 133)

1  respondents think Expedia is cheaper than the
2  airline, right?
3      A.  That's what it says.
4      Q.  And so why does anything more need to be
5  said about it?  That's what the survey says.  You're
6  not disputing that's what the respondents say.
7  Consumers -- it seems on this point consumers are
8  deceived by both, right?
9          MR. TOBIN:  Objection, form.
10         THE WITNESS:  Yes.
11     BY MR. NELSON:
12     Q.  Okay.  What -- so your sole gripe here is
13  that he didn't write the sentence, "Well, it looks
14  like they're also deceived by Expedia"?
15     A.  That's gripe number two.
16     Q.  But he's showed you the data.
17     A.  I'm not done answering.
18         Okay.  That's gripe number two is that he
19  didn't say it.  Okay?
20         Gripe number one is that it's an important
21  part of data analysis.  You say, "Look.  I have a
22  method for trying to prove that Skiplagged is
23  deceiving its survey respondents."  Okay?  "I have a
24  method for doing that with data.  I did it.  Oh,

Page 134

1  look at this.  It also turns out Expedia is
2  deceiving its customers," if I believe my analysis
3  method.  If I believe my analysis method, I have to
4  honestly conclude that both companies are guilty of
5  this.  Okay?
6      Q.  Why --
7      A.  It would make it -- it would make his
8  statement more scientific and reputable and --
9  credible is the word I'm looking for -- more
10  credible if he would say, "My Table 7 also shows
11  this.  That's interesting, but I believe that's
12  correct because..."
13         Yes, it is -- the fact that it's missing is
14  something I cited in this expert report, and I
15  believe it is correct for me to cite to that.
16     Q.  You understand that Expedia is not a party
17  to this case, right?
18     A.  It is my understanding that Expedia is not
19  part of this case, correct.
20     Q.  All right.
21         And so what Expedia may or may not be doing
22  has no relevance to this case, right?
23         MR. TOBIN:  Objection, form.
24         THE WITNESS:  Expedia has relevance to this

Page 135

1  analysis.  It may have no relevance to the case, but
2  to Dr. Wind's analysis, it is relevant.
3      BY MR. NELSON:
4      Q.  Sure.  But not every conclusion about
5  Expedia is relevant.
6      A.  To the analysis, whenever a -- a
7  scientist/statistician solves a problem, analyzes
8  data, writes a computer program, you always test to
9  see if it's valid.  Are my conclusions valid?
10         This is an excellent test of whether Dr.
11  Wind's analysis of deception on the part of any
12  company -- whether it be Skiplagged or Expedia, this
13  is an excellent test of whether his method is valid
14  is are we -- is he also alleging by his same method
15  that Expedia is deceptive also?
16         It may be well his answer would be yes, and
17  then we would have no -- we would just say, "Okay.
18  Good.  That's interesting.  That's part of the
19  conclusion, too."
20         It is a valid point for me to bring up
21  as -- is my point.  In terms of analysis of data,
22  it's valid to say, "If your method is right for
23  claiming X, and your method also claims Y, so let's
24  highlight that, because if it turns out that Y is

Page 136

1  actually not true, or you believe it's not true for
2  some other reason, then it invalidates the data
3  analysis that got you to X."
4      Q.  Okay.
5      A.  These are -- these are pretty --
6      Q.  So assuming --
7      A.  -- clear principles.
8      Q.  -- Dr. Wind agrees with you that these
9  results also show that consumers are deceived, as to
10  this question, with respect to Expedia, you have no
11  criticism then of this?
12     A.  No.  That only gives me gripe number two,
13  which is he should have said it.  But that's a
14  smaller gripe.
15     Q.  I think reasonable people could disagree
16  whether it would be relevant to this case.  He's
17  probably not in the habit of writing in his expert
18  reports irrelevant conclusions nobody cares about.
19         With respect to Conclusion 3 in your report
20  on Page 10, so you, again, claim that -- so he's
21  referring to -- let's start with the table he's
22  referring.  He's referring to Table 9a, right?
23         Let's take a look at 9a in Mr. Wind's
24  report, on Page 48.

Page 137

35 (Pages 134 - 137)

1    A.  Okay.  I'm at 9 -- 9a, yep.
2    Q.  Okay.  So you're not disputing that
3  74 percent of the non-hidden city respondents
4  believe a ticket bought there Skiplagged is valid,
5  right?
6    A.  Well, I think you mentioned 74 percent or
7  70 percent.
8    Q.  74 referring to the first cell on the
9  table.
10    A.  His conclusion here is focusing on the
11  70 percent, but I'm happy to look at the 74, if
12  you'd like.
13    Q.  Let's start with my question.
14      74 percent?
15    A.  Okay.
16    Q.  You're not disputing that 74 percent of
17  non-hidden city respondents answered that they
18  believe a ticket bought through Skiplagged is valid?
19    A.  I'm not raising a dispute over that number,
20  no.
21    Q.  And you're not disputing that 88 percent of
22  Expedia non-hidden city respondents believe a ticket
23  that they bought -- a ticket bought there is valid,
24  correct?

Page 138

1    A.  Correct.
2    Q.  All right.
3      And you're not disputing that 70 percent of
4  the consumers who were shown the hidden city stimuli
5  for Skiplagged thought that a ticket bought through
6  Skiplagged is valid?
7    A.  I'm not disputing that 70 percent number in
8  the survey result.
9    Q.  Okay.
10    A.  No.
11    Q.  You're not disputing the 90 percent number
12  on the top row of that table, either, right?
13    A.  Correct.
14    Q.  Okay.  Let's take a look at Exhibit 9b of
15  Mr. Wind's report on Page 50.
16      Are you disputing any of the numbers or
17  verbatim answers here, that the survey respondents
18  gave these reports and -- gave these answers and
19  these percentages?
20    A.  I'm sorry.  So give me just a minute here,
21  please.
22      No, I don't dispute the numbers here are
23  transcribed from the survey response, no.
24    Q.  Okay.

Page 139

1    A.  No.
2    Q.  Do you dispute anywhere in his report that
3  he inaccurately compiled what the survey respondents
4  said?
5    A.  Do I dispute anywhere?
6    Q.  Yeah.
7    A.  Yeah, I did point out Exhibit 10b, which is
8  on Page 52 --
9    Q.  Okay.
10    A.  Let me make sure I'm not getting the wrong
11  one.
12      Yeah, it's 10b.  Hold on a second.
13      With -- okay.  I'm sorry.
14      Exhibit 10a, which is Page 51, I -- just in
15  my report, I made the observation that these numbers
16  of meaningful risks, unmeaningful risks and no risk
17  don't add up to 100 percent.  So probably these
18  open-ended questions were transcribed to numbers,
19  but there -- but the numbers weren't really right.
20  I don't know what they should be, but -- but they do
21  need to add to 100 percent.
22    Q.  Okay.  Anything else in Mr. Wind's report
23  that you contest he recorded, or you contest he
24  recorded the verbatim answers or the respondents'

Page 140

1  answers inaccurately?
2    A.  I don't have any other criticism of --
3  criticisms of that type to make.
4    Q.  Okay.  You don't have any personal
5  knowledge as to whether hidden city tickets are
6  valid or invalid, correct?
7    A.  I don't have personal knowledge, no.
8    Q.  All right.
9      You don't have an opinion on that, correct?
10    A.  I don't have an opinion.
11    Q.  You don't have any personal knowledge or
12  opinion on whether the fees Skiplagged charges
13  consumers are adequately disclosed to its consumers?
14    A.  I don't have an opinion on that.
15    Q.  Okay.  You don't have an opinion on whether
16  consumers, Skiplagged's -- whether you define that
17  as Skiplagged's customers, or likely customers,
18  believe that Skiplagged is affiliated with American
19  Airlines?
20    A.  I don't have an opinion on that.
21    Q.  Okay.  With respect to -- did you ask
22  Skiplagged if it ever produced a dataset of all of
23  its passengers, customers?
24    A.  I -- my answer is going to be no, but I did

Page 141

36 (Pages 138 - 141)

1  miss a word I would rather ask.
2      But did I ask Skiplagged for?
3  Q.  A dataset.
4  A.  A dataset?
5      No, I did not.
6  Q.  Okay.  And you -- having some expertise in
7  data analysis, let's say I gave you a PDF file --
8  well, actually, let's say that I took data out of a
9  database; I exported it to a tab-delimited file
10  using a Python script, and then rather than turn
11  that data over to someone in some sort of electronic
12  text format, I converted all 1.4 million records to
13  images and produced them in a form of a PDF.
14      Do you think that's a useable data format?
15      MR. TOBIN:  Objection, form, way outside --
16  it's way outside the opinions that this expert was
17  designated to give.  You know that.
18      THE WITNESS:  Yeah.  I -- I would -- I
19  would say that's pretty hypothetical, and that's not
20  my role here to analyze -- to extract that kind of
21  data and work with it.  So I don't have a view on
22  that.
23  BY MR. NELSON:
24  Q.  Have you ever converted a large dataset of

Page 142

1  what you're doing here.
2      MR. NELSON:  Well, I may have another
3  purpose, but, I mean, that's what he said, actual
4  customers.
5      MR. TOBIN:  Your question is way out of
6  bounds, outside of his scope of expertise, and you
7  know it.  It's an improper question.
8      MR. NELSON:  I don't think it's outside the
9  scope of his expertise.  I think it's squarely
10  within it, given it's his.
11      MR. TOBIN:  It's outside of the scope of
12  the opinions he's offering that here.
13      MR. NELSON:  I'm exploring is his opinion
14  that we should have surveyed actual.
15      MR. TOBIN:  It's actually misleading
16  because you're not giving any full problem set, nor
17  should you, because that's not what he's here to do
18  today.
19      MR. NELSON:  I'm working up to it.  You
20  keep interrupting me, though.  So you've got to let
21  me ask any questions, so...
22      THE WITNESS:  If it's helpful, and I -- I
23  would like to make sure I understand -- that we
24  understand the same way.

Page 144

1  text to PDF images?
2      MR. TOBIN:  Same objections.
3      THE WITNESS:  I have done that in the past.
4      Yeah, but it's -- again, it would -- it's
5  probably outside of whatever hypothetical you're
6  thinking of.
7      But just you often do calculations on
8  spreadsheets; you might PDF the spreadsheet because
9  some people, especially in years past, couldn't read
10  spreadsheets.
11      But -- but no, I don't have an opinion to
12  offer on that.
13  Q.  So when I asked you to take a spreadsheet
14  of 1.4 million lines and turn it into PDFs, would
15  you think that was a reasonable request?
16      MR. TOBIN:  Objection to form.
17      Don't even answer that question.  He's way
18  out of bounds here.
19      MR. NELSON:  I don't think he is, because
20  he's offered an opinion that our expert should have
21  surveyed actual customers -- actual customers -- and
22  this relates to whether it's even possible to come
23  up with a list of actual customers.
24      MR. TOBIN:  Mr. Nelson, you know that's not

Page 143

1  BY MR. NELSON:
2  Q.  Uh-huh.
3  A.  That answer this morning that I gave about
4  Professor Wind's sample population should have been
5  actual Skiplagged customers, I still maintain that
6  position.  But it's not my -- it's not the second
7  part of my position that it was incumbent on
8  Professor Wind to go request from Skiplagged the
9  data that would let him do this effectively.  I
10  just -- that's outside of my scope.
11  Q.  How else could he have done it?
12  A.  I'm sorry?
13  Q.  How else could someone do a survey of
14  Skiplagged's customers unless they got a list of
15  Skiplagged's customers from Skiplagged?
16  A.  Well, again -- and I mean this in a serious
17  way -- which is it's not my role to advise Professor
18  Wind how he should have done his report because
19  maybe it wasn't possible.  Maybe the right analysis
20  needed a certain data, and maybe that certain data
21  just doesn't exist or is not possible to gather.
22  Okay?
23      You could have -- I mean, that's answer
24  number one.  It's really not -- it may not be

Page 145

37 (Pages 142 - 145)

1  possible, and it's not my role to figure out what
2  would have been possible.
3      And, number two, all I can say is -- is I
4  guess -- I guess I don't have an answer. I was
5  going to say I could say, but I don't really have an
6  answer as to how he would have done -- in the real
7  world of data analysis, what you do when you
8  confront a brick wall like that is you find a
9  question you can answer; you get data that you can
10  get. Okay? And then you say now, "How can I
11  analyze the data to get the proper answer and make
12  that useful to my case," if that's even possible.
13      But I -- as I said, let me just retreat
14  from this idea that I said Professor Wind should
15  have gotten Skiplagged's records.
16  Q. Well -- but in forming your opinion that
17  the proper universe is Skiplagged's customers, in
18  the process of forming that opinion, did you make
19  any inquiry of Skiplagged -- who you're testifying
20  on behalf of -- of how anyone would go about doing
21  that?
22  A. Well, Mr. Nelson, no. It didn't -- beyond
23  my saying, as I said in my report, "This is not a
24  proper way" -- the sample population must come from
Page 146

1  question for this deposition.
2      MR. NELSON: It's not. He's taken the
3  position that our expert should have used the
4  passenger lists essentially from Skiplagged to
5  conduct his survey, and I'm trying to explore
6  whether he has explored at all whether that's even
7  possible.
8      You know, obviously -- that's obviously
9  relevant to his opinion. He's got a whole section
10  in his report on here where he says, "You didn't use
11  the proper survey" -- I mean, "the proper universe."
12  It's all Page 19, Page 20.
13      If he didn't spend any time considering how
14  to do that, and he's essentially saying, "You should
15  have done an impossible thing," I think it's highly
16  relevant to the validity of his opinion.
17      MR. TOBIN: He's already answered that
18  question. You're going further than that. Your
19  question is improper and out of bounds.
20      MR. NELSON: And as I've done a couple of
21  times now, given him a couple of times now, I'm
22  giving him every opportunity to find a way to make
23  his answer to make sense.
24      Because as the record stands now, he's
Page 148

1  the total population, it didn't occur to me to start
2  brainstorming how could we do that in this case. I
3  did not take that as my role to say how could we get
4  the Skiplagged information.
5  Q. So you weren't concerned with whether or
6  not you were taking the position that the proper
7  survey universe was an impossible dataset to obtain?
8  A. It didn't cross my mind whether that was
9  possible or not possible.
10  Q. Didn't care?
11      MR. TOBIN: Objection, form.
12      THE WITNESS: And it's -- to say I didn't
13  care is one way of saying -- a different and more
14  callous way of saying it's just not my role. I'm
15  not being paid for that. Who's going to pay me to
16  do that? If I'm not hired to do that, it's not my
17  issue.
18      BY MR. NELSON:
19  Q. Okay. So assuming you had -- well, let's
20  say you had -- let's say you had a customer list and
21  it was just on paper, 1.4 million pages.
22      How would you analyze that?
23      MR. TOBIN: Dr. Pimbley, don't answer that
24  question. It's a completely misleading and improper
Page 147

1  basically saying I have no idea if what I
2  recommended in my report is even possible.
3      MR. TOBIN: Well, I disagree with your
4  characterization. I think he's made clear what --
5  the analysis that he went through, and your question
6  is getting at a completely different issue, which is
7  not relevant to his examination, nor was he hired to
8  analyze or evaluate.
9      If you want, I'm happy to take him on voir
10  dire and ask him if he was -- if he was hired to
11  analyze American's damages in this case, which is
12  what your questions are going to.
13      MR. NELSON: No, it's not. That data has
14  many other uses, such as the survey.
15      So --
16      MR. TOBIN: There's 1.4 million pieces of
17  information that Mr. Wind evaluated, which is all
18  your questions are premised on.
19      MR. NELSON: He testified that Dr. Wind
20  should have surveyed those 1.4 million passengers.
21  That's his testimony.
22      MR. TOBIN: You know what you're doing is
23  improper, Mr. Nelson.
24      MR. NELSON: I'm asking him what -- your
Page 149

1  expert witness questions based on his report and his
2  testimony today.
3      You know, I'm sorry you're uncomfortable
4  that it bleeds into something else you guys, you
5  know, are disputing, but that doesn't mean that his
6  testimony isn't something I can't ask questions
7  about.
8      Q.  So if you had those records on paper,
9  1.4 million passengers, or names, contact
10 information, how would you go about turning that
11 into a dataset?
12     MR. TOBIN:  Objection, form.  It's
13 completely misleading this witness.
14     THE WITNESS:  Do I answer?
15     MR. TOBIN:  If you could possibly answer
16 that question.
17     THE WITNESS:  Well --
18     MR. TOBIN:  But my -- my objections stand.
19     THE WITNESS:  There is a simple answer:
20 Copy/paste the PDF to a spreadsheet.
21  BY MR. NELSON:
22     Q.  Oh, it's one record per page.
23     MR. TOBIN:  Objection, form.
24     THE WITNESS:  Well, then had it been all on

Page 150

1  one page and had the PDF been of the right type, the
2  copy/paste actually does work to a spreadsheet.
3   BY MR. NELSON:
4     Q.  Yep.
5     A.  If the problem is it's one record per page,
6  there's likely a workaround.  I have never -- I have
7  never had that problem.
8     MR. NELSON:  Me, either.
9     Let's take a five-minute break.
10    THE VIDEOGRAPHER:  The time is 1:32.  We're
11 going off the record.
12    (Recess taken)
13    THE VIDEOGRAPHER:  We are back on the
14 record.  The time is 1:40.
15    MR. NELSON:  We have no further questions.
16    MR. TOBIN:  We reserve our questions.
17    THE REPORTER:  Copy?
18    THE VIDEOGRAPHER:  The time is 1:40.  We
19 are going off the record.  This is the end of
20 today's deposition of Joseph M. Pimbley, Ph.D.
21    THE REPORTER:  Copy?
22    MR. TOBIN:  Yeah, we'll get a copy.
23    (Whereupon, the deposition was
24     concluded at 1:40 p.m.)

Page 151

1              C E R T I F I C A T E
2      I, JOSEPH M. PIMBLEY, Ph.D., do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify under the pains and
5  penalties of perjury that said transcript
6  (with/without) suggested corrections is a true and
7  accurate record of said testimony.
8      Dated at _____, this ____ day of _____,
9  2024.
10
11              _____
12
13
14
15
16
17
18
19
20
21
22
23
24 Job No. TX6783374

Page 152

1         SUGGESTED CORRECTIONS
2  RE:  AMERICAN AIRLINES, INC. vs. SKIPLAGGED, INC.
3  WITNESS:  JOSEPH M. PIMBLEY, Ph.D., Vol. I
4  The above-named witness wishes to make the following
   changes to the testimony as originally given:
5
6  PAGE LINE   SHOULD READ        REASON
7  ___ ___ _____ _____
8  ___ ___ _____ _____
9  ___ ___ _____ _____
10 ___ ___ _____ _____
11 ___ ___ _____ _____
12 ___ ___ _____ _____
13 ___ ___ _____ _____
14 ___ ___ _____ _____
15 ___ ___ _____ _____
16 ___ ___ _____ _____
17 ___ ___ _____ _____
18 ___ ___ _____ _____
19 ___ ___ _____ _____
20 ___ ___ _____ _____
21 ___ ___ _____ _____
22 ___ ___ _____ _____
23 ___ ___ _____ _____
24 Job No. TX6783374

Page 153

39 (Pages 150 - 153)

```
 1   COMMONWEALTH OF MASSACHUSETTS)
 2   SUFFOLK, SS.              )
 3       I, Alexander K. Loos, RDR and Notary Public in
 4   and for the Commonwealth of Massachusetts, do hereby
 5   certify that there came before me on the 10th day of
 6   July, 2024, at 9:36 a.m., the person hereinbefore
 7   named, who was by me duly sworn to testify to the
 8   truth and nothing but the truth of his knowledge
 9   touching and concerning the matters in controversy
10   in this cause; that he was thereupon examined upon
11   his oath, and his examination reduced to typewriting
12   under my direction; and that the deposition is a
13   true record of the testimony given by the witness.
14   I further certify that I am neither attorney or
15   counsel for, nor related to or employed by, any
16   attorney or counsel employed by the parties hereto
17   or financially interested in the action.
18
19       Under Federal Rule 30:
20           ___ Reading and Signing was requested
21           ___ Reading and Signing was waived
22           _X_ Reading and Signing was not requested
23
24       In witness whereof, I have hereunto set my hand
```

Page 154

```
 1                           al this 19th day of July,
 2
 3
 4

 5   Notary Public
 6   Commission expires 5/5/28
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 155

# Exhibit A-7

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF TEXAS

 3                    FORT WORTH DIVISION

 4                         - - -

 5    AMERICAN AIRLINES, INC.,      :

           Plaintiff,              :

 6              -vs.-              :

      SKIPLAGGED, INC.,            : CIVIL ACTION NO:

 7         Defendant.              : 4:23-cv-00860-P

 8                         - - -

 9                  Monday, July 8, 2024

10                         - - -

11              In-person oral deposition of DR. YORAM

12    (JERRY) WIND, taken pursuant to notice, was held at

13    the Law Offices of Greenberg & Traurig, LLP, 1717 Arch

14    Street, Suite 400, Philadelphia, Pennsylvana 19103, at

15    9:30 a.m., on the above date, before Lisa DePascale, a

16    Court Reporter and Notary Public of the Commonwealth

17    of Pennsylvania and Delaware.

18

19

20

21

22

23                      VERITEXT

                888.777.6690 / 215.214.1000

24              Calendar-pa@veritext.com

                                              Page 1
```

**Page 2**

```
 1  APPEARANCES:
 2    GREENBERG TRAURIG, LLP
      BY:  CAMERON NELSON, ESQUIRE
 3    77 West Wacker Drive
      Suite 3100
 4    Chicago, Illinois 60601
      312.456.8100
 5    nelsonc@gtlaw.com
      Representing Plaintiff, American Airlines
 6
 7    CONDON TOBIN SLADEK THORNTON NERENBERG
      BY:  KENDAL B. REED, ESQUIRE
 8    8080 Park Lane
      Suite 700
 9    Dallas, Texas 75231
      214.265.3853
10    kreed@condontobin.com
      Representing Defendant, Skiplagged, Inc.
11
      KELLY HART & HALLMAN, LLP
12    BY:  LARS L. BERG, ESQUIRE
      201 Main Street
13    Suite 2500
      Fort Worth, Texas 76102
14    817.818.3524
      lars.berg@kellyhart.com
15    Representing Plaintiff, American Airlines
16
17
18  ALSO PRESENT:  AKTARER ZAMAN, CEO
                   Skiplagged, Inc.
19
20         JEREMY BALLEW, ESQUIRE
           American Airlines
21
22
23
24
```

**Page 3**

```
 1              INDEX
 2  WITNESS:
 3  DR. YORAM (JERRY) WIND,
 4                    PAGE NO.
 5     MR. REED ..............................5
 6     MR. NELSON ...........................256
 7
 8            EXHIBITS
 9  NUMBER        DESCRIPTION        PAGE NO.
10  Wind-1     Notice of Intention to Take   7
             the Oral Deposition of Jerry
11           Wind, 4 pages
12  Wind-2       Appendix B,            9
             Documents/Materials Relied
13           Upon, 4 pages
14  Wind-3     Plaintiff American Airlines,  10
             Inc.'s Designation of Expert
15           Witnesses, 6 pages
16  Wind-4     Wharton University of     35
             Pennsylvania, Appendix A, 124
17           pages
18  Wind-5     Expert Report of Expert,    50
             Yoram (Jerry) Wind, 90 pages
19
     Wind-6      Radius, Appendix C-2, 16   109
20           pages
21  Wind-7     E-mail, Bates stamped      249
             AA-SKP-00052794 through
22           AA-SKP-00052797
23
24
```

**Page 4**

```
 1               - - -
 2        DEPOSITION SUPPORT INDEX
 3               - - -
 4
 5               - - -
 6      WITNESS INSTRUCTED NOT TO ANSWER
 7  PAGE LINE      PAGE LINE     PAGE LINE
 8  137   12
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 5**

```
 1        (It is hereby stipulated and agreed by
 2     and among counsel for the respective parties
 3     that sealing, certification, and filing are
 4     waived; and that all objections, except as to
 5     the form of the question, are reserved until
 6     the time of trial.)
 7
 8        DR. YORAM (JERRY) WIND, after having
 9     been first duly sworn, was examined and
10     testified as follows:
11               - - -
12        E X A M I N A T I O N
13               - - -
14  BY MR. REED:
15     Q.   Good morning, Dr. Wind.  My name is Kendall
16  Reed.  We've never met before, have we?
17     A.   No.
18     Q.   All right.  Can you state your name for the
19  record?
20     A.   Yoram Jerry Wind.
21     Q.   And where do you currently reside?
22     A.   ███████████████████████████
23     Q.   And how many times have you been deposed
24  before?
```

1  A.   I have no idea.  A lot.
2  Q.   A lot.  More than 50?
3  A.   Probably.
4  Q.   Given that you're a veteran at this, I'll kind
5  of run through a few things real quickly.  But
6  hopefully we can have a smooth day.
7       Do you understand that you're testimony
8  here today is under oath?
9  A.   Yes.
10 Q.   And that you're sworn to tell the truth?
11 A.   Yes.
12 Q.   And the Court Reporter here is taking down
13 everything that we say today, so it's important that
14 we not to talk over each other.  It will happen from
15 time to time, she'll get on to us.  But if you'll wait
16 for me to finish my question, even though you know
17 exactly where I'm going to go with it, I'll do my best
18 to wait until you finish your answer before I ask the
19 next one.
20      Okay?
21 A.   Yes.
22 Q.   And I do expect this to take the majority of
23 the day today.  If at any time you need a break, just,
24 of course, let me know, I will do that.  The only

1  thing I'll ask is you answer any outstanding question
2  before we do it.
3       Okay?
4  A.   Makes sense.
5  Q.   Are you on any medication or have any health
6  condition today that would prevent you from giving
7  truthful testimony?
8  A.   No.
9  Q.   Have you ever filed for bankruptcy?
10 A.   No.
11 Q.   Have you ever been arrested?
12 A.   No.
13           - - -
14      (Exhibit Wind-1, Notice of Intention to
15      Take the, was marked for identification.)
16           - - -
17 BY MR. REED:
18 Q.   Hand you what's been marked as Exhibit-1 for
19 your deposition.
20      Do you have that in front of you, sir?
21 A.   Yes.
22 Q.   Have you seen this before?
23 A.   I don't believe so, but it sounds straight
24 forward.

1  Q.   You'll see at the top it's entitled Notice of
2  the Intention to Take the Oral Deposition of Jerry
3  Wind?
4  A.   Yes.
5  Q.   Do you go by Jerry from time to time?
6  A.   Yes.  That's my nickname.
7  Q.   That's your nickname.  Okay.
8       What did you do to prepare for your
9  deposition today?
10 A.   I reviewed my report and met with counsel
11 yesterday for a few hours.
12 Q.   Other than your report, did you review any
13 other documents?
14 A.   Some of the -- some of the enclosures to my
15 report and I reread the four expert reports that your
16 side submitted.
17 Q.   Do you recall which experts you read?
18 A.   I don't remember their names.  They're -- one
19 was a supply chain expert.  One was a professor from
20 the marketing firm in Minnesota and two others.
21 Q.   So you said you read a total of four reports?
22 A.   Yes.
23 Q.   Other than your own, of course?
24 A.   Correct.

1  Q.   Okay.  And you also said you looked at the
2  enclosures to your report?
3  A.   Yeah, the appendices.
4  Q.   Okay.  Other than those four expert reports,
5  your report and its appendices, did you review any
6  other documents to prepare for your deposition?
7  A.   No.
8  Q.   And you said you met with counsel for a few
9  hours.  Did you speak with anyone else, other than
10 counsel, in preparation for your deposition?
11 A.   No.
12           - - -
13      (Exhibit Wind-2, Appendix B,
14      Documents/Materials Relied Upon, 4 pages
15      was marked for identification.)
16           - - -
17 BY MR. REED:
18 Q.   You should have in front of you what's marked
19 as Exhibit-2 for your deposition.
20      Are you familiar with this document,
21 sir?
22 A.   Yes.
23 Q.   And to your knowledge, what is it?
24 A.   That's appendix B to my report that lists the

3 (Pages 6 - 9)

1  documents and materials that I relied on.
2  Q.   Okay.   And is this a complete list of all of
3  the documents that you relied upon for your report?
4  A.   Yes.
5  Q.   To your knowledge are there any other documents
6  or materials that you relied upon for your report?
7  A.   Not that I'm aware of.
8                          - - -
9            (Exhibit Wind-3, Plaintiff American
10           Airlines, Inc.'s Designation of Expert
11           Witnesses, 6 pages, was marked for
12           identification.)
13                         - - -
14  BY MR. REED:
15  Q.   Hand you what's been marked as Exhibit-3 for
16  your deposition.
17           Do you have that in front you, sir?
18  A.   Yes.
19  Q.   And have you ever seen this document before?
20  A.   I assume so.
21  Q.   I'm sorry.   I didn't hear you.
22  A.   I assume so.
23  Q.   You assume so?
24  A.   I don't recall, but I assume so.

Page 10

1  Q.   Why do you assume you've seen it?
2  A.   Because of the nature of the document, which is
3  Plaintiff's, American Airlines, Designation of Expert
4  Witness.
5  Q.   And the number -- the first person listed on
6  that document is you, correct?
7  A.   Correct.
8  Q.   Okay.   And it goes on, it lists you as
9  President of Wind Associates.   Are you sill President
10  of Wind Associates?
11  A.   Yes.
12  Q.   And what is Wind Associates?
13  A.   My consulting firm.
14  Q.   And how long have you been the President of
15  Wind Associates?
16  A.   Since I started in the early '80s.
17  Q.   How many employees does Wind Associates have?
18  A.   One.
19  Q.   Yourself, or is there another one?
20  A.   My assistant.
21  Q.   Has Wind Associates always been a small
22  operation just you and your assistant or at times has
23  it had other employees?
24  A.   No.   I basically believe in virtual

Page 11

1  organization.   So any help I need, I use outside
2  contractors.
3  Q.   So it's always been small?
4  A.   Correct.
5  Q.   Okay.   And so in preparing your report in this
6  matter, did you use outside contractors?
7  A.   Yes.
8  Q.   And who did you use as outside contractors in
9  preparing your report in this matter?
10  A.   It's actually listed in the list of documents.
11  Radius.   Radius Global, which is a marketing research
12  firm that I've been working with for many years.   And
13  Voluble, which is a litigation consulting firm.
14  They're both listed on page 1 of Wind Exhibit-2.
15  Q.   So Radius and Voluble, any other outside
16  contractors that you used in preparing your report?
17  A.   No.
18  Q.   And have you used Radius and Voluble in prior
19  engagements, other than this one?
20  A.   Yes.
21  Q.   How many times would you say you've engaged
22  Radius in the past?
23  A.   It's hard to tell.   But was -- they're one of a
24  number of research firms with whom I work.   I've been

Page 12

1  working with them probably for over 50 years.   And
2  they started under their earlier name, which was Data
3  Development.
4  Q.   Did you say 50 years?
5  A.   Yes.
6  Q.   5-0.   Okay.
7           And how many times have you worked with
8  Voluble Litigation Consulting Firm before?
9  A.   Probably five, six times over the last five
10  years.
11  Q.   And working with Radius and Voluble in the
12  matter, how would you communicate with them?
13  A.   Mostly by phone.
14  Q.   Would you communicate with them by e-mail?
15  A.   Rarely.   Mostly by phone.   Material is sent by
16  e-mail but mostly by phone.
17  Q.   Now, in going back to Exhibit-3, do you still
18  have that in front of you, that designation?
19  A.   Yes.
20  Q.   Okay.   If you look with me under your name, it
21  has a paragraph that starts there and goes onto the
22  next page.   It starts off with saying, "Dr. Wind will
23  testify regarding the confusion and deception that
24  Skiplagged has caused and/or is likely to cause among

Page 13

4 (Pages 10 - 13)

App'x 250

1 consumers in the marketplace, including as it relates
2 to Skiplagged's perceived association with and/or
3 authorization or sponsorship from American."
4       Did I read that correctly?
5 A.   Yes.
6 Q.   All right.  Did you provide the information for
7 Exhibit-3?
8       MR. NELSON:  Objection; foundation;
9    assumes facts not in evidence.
10      THE WITNESS:  I assume that that's
11    based on discussions I had with counsel.
12 BY MR. REED:
13 Q.   Did you -- you said you had assumed earlier
14 that you had seen this.  Do you recall having any
15 input into the words or phrases used in Exhibit-3?
16 A.   I don't recall seeing this specific document.
17 I have had a number of discussions with counsel.  And
18 what you just read seems correct as the assignment
19 that I had in the project.
20 Q.   You said it was your assignment, right?
21 A.   Well, the assignment was to find out if there
22 is confusion, if there is deception.
23 Q.   So your assignment was to find out whether
24 there was confusion and whether there was deception;

Page 14

1 control group.
2 Q.   Okay.  You said the three measures, and those
3 were association, is that one?
4 A.   Yeah.  Association and connection is the number
5 two typically.  Permission or authorization is the
6 third.  But the first one is who makes it, who issued
7 the product or service.
8 Q.   Who makes the product or service?
9 A.   Yeah.  That typically comes as the first
10 question.
11 Q.   Okay.  And in this matter, what did you define
12 as the product or service?
13 A.   Well, the flight, the tickets for the flight.
14 Q.   Okay.  So the product or service are tickets
15 for a flight on an airline, correct?
16 A.   Correct.
17 Q.   And who did you identify in this matter is the
18 person or entity that makes the tickets for the
19 flight?
20 A.   I did not decide, in this specific case, not to
21 ask the first question and to focus on the association
22 and permission.
23 Q.   So you didn't do the first one; is that
24 correct?

Page 16

1 is that correct?
2 A.   Correct.
3 Q.   Okay.  And what's your definition of confusion?
4 A.   The typical definition of confusion in legal
5 cases, is that consumers believe that the companies
6 are either associated or connected with each other or
7 one requires permission or authorization from the
8 other, or they are the same company, you know, they
9 manufactured the same -- produce the same product.
10 Q.   You said that's the legal definition; is that
11 what you said?
12 A.   Well, in most legal cases that I've been
13 involved in concerning confusion, these are the three
14 measures which are being used.  And they're the one
15 that I used in this study.  They are primarily the one
16 who make the product or offered the service, are they
17 are associated or connected with anyone else?  If you
18 ask with whom, it was meant to say so.  Did they
19 require permission or authorization from anyone else?
20 If you ask from whom, it was meant to say so.  And
21 that's typically the basis for when you look at the
22 next responses to avoid double counting the same
23 respondent twice.  And you establish if there is
24 confusion or not and typically compare this to some

Page 15

1 A.   No.  I basically ask a different question, an
2 open-ended question, is how would you describe the
3 material, that is an open-ended question.  And I moved
4 directly to who are they, if they are associated or
5 connected with anyone else and if they require
6 permission from anyone.
7 Q.   Okay.  So just so I'm clear, the respondents to
8 the survey in your matter were not asked the first
9 question of who makes the product or service; is that
10 correct?
11 A.   Correct.
12 Q.   Okay.  So you moved on to the association or
13 the connection question; is that correct?
14 A.   After the first question, which I would
15 describe the document you just reviewed.
16 Q.   After what?
17 A.   After you -- after I asked the respondent how
18 would you describe what you just saw to a friend.
19 Q.   Okay.
20 A.   So I asked a broader, open-ended question to
21 start with.  If you look at the question there, which
22 is part of my report, you can see those questions.
23 Q.   And we'll get to those, I promise.  I'm just
24 starting off wide here and I'll narrow in here.

Page 17

1    So three measures of confusion we have,
2  who makes the product, association or connection, and
3  then is there a required permission; is that correct?
4  A.    In general, yeah.
5  Q.    Okay.  Now, what's the definition that you used
6  in this matter regarding the term deception?
7  A.    A number of dimensions that were involved in
8  the case.  And asking consumers to what extent they
9  believed this conditions existed or did not exist.
10  And looking for information about these items, also in
11  all the open-ended responses we got.
12  Q.    Okay.  But did you start with a base definition
13  of what deception is?
14  A.    No.  No.  The definition of deception here is
15  based on the offering of Skiplagged, to what extent
16  consumers believe them to be correct or not versus
17  reality, versus the truth.
18  Q.    Okay.  When we talked about confusion, you
19  reference and I believe your testimony was that the
20  legal definition of what had been used before.  And
21  you gave me that definition with its three measures.
22  Is there a legally accepted definition of deception
23  that you used?
24        MR. NELSON:  Objection, beyond the

Page 18

1    scope.
2        THE WITNESS:  No, because definition --
3    deception depends on the specific case.
4    Basically it's the difference between, you
5    know, the truth, the reality and the way
6    consumers perceive it.
7  BY MR. REED:
8  Q.    On the second page of Exhibit-3, if you'll go
9  there for me.
10  A.    (Reviewing document.)
11  Q.    That second paragraph, it's in the middle of
12  the page there, it starts off with "The Wind report
13  contains."
14        Do you see that?
15  A.    Yes.
16  Q.    Okay.  It states here, "The Wind report
17  contains a complete statement of all opinions Dr. Wind
18  will express and his basis and reasons for them."  And
19  then goes on from there.
20        Do you agree with that statement, that
21  your report contains a complete statement of all your
22  opinions in this matter?
23        MR. NELSON:  Objection.
24        THE WITNESS:  At the time, when I

Page 19

1    was -- that's correct for the time I wrote the
2    report.
3  BY MR. REED:
4  Q.    Has that changed?
5  A.    As I see more information, it may change.  And
6  I've seen a few things since the time I submitted the
7  report.  None of the things I've seen or read since
8  this submission of the report changes any of my
9  conclusions.  My conclusions in the report stand.
10  Q.    Okay.  So you said you've seen some additional
11  things since you issued your report; is that correct?
12  A.    Yes.
13  Q.    What additional things have you seen that you
14  recall since you've issued your report?
15  A.    For example, some internal communication at
16  Skiplagged.
17  Q.    Anything else?
18  A.    That's what comes to mind.  I don't recall as I
19  sit here now anything else, but that's the most
20  prominent one.
21  Q.    And when you said internal communications, do
22  you recall how many you've seen?
23  A.    There was a bunch of them.  There were -- I
24  don't remember exact number, 10 or so, cases where

Page 20

1  they discussed internal discussions of 
2  ▮▮▮▮▮▮▮▮▮
3  Q.    And so those internal communications, are they
4  listed on Exhibit-2 --
5  A.    No.
6  Q.    -- since you've seen them after your report?
7  A.    No.
8  Q.    Do you intend to update Appendix B to your
9  report?
10  A.    We can.
11  Q.    But you haven't at this time?
12  A.    Correct.
13  Q.    Do you have any plans to?
14  A.    Well, if you're asking me questions about this
15  and show the documents then, yes, I will write them.
16  Q.    But you didn't, before we sat down here today,
17  have any plans to amend or supplement your report, did
18  you?
19  A.    No.
20  Q.    Okay.  And you said these documents that you've
21  seen, the 10 or so discussions internal
22  communications, they don't change any of your
23  conclusions; is that correct?
24  A.    Correct.

Page 21

6 (Pages 18 - 21)

1  Q.    Did anything that you've seen since you've
2  issued a report cause you to have additional opinions?
3  A.    Well, there's the new document that we're
4  talking about.  And the factor, which I did not know
5  at the time, which is it strengthened my conclusion
6  that Skiplagged is really not what they claim, they
7  are not an educational organization to try to educate
8  consumers but rather intentionally to deceive the
9  consumer.
10  Q.    Deceive how?
11  A.    By not providing them the full information
12  about the risks associated with the Hidden City
13  tickets.
14  Q.    And when you refer to Hidden City tickets, what
15  are you referring to?
16  A.    I thought that's an accepted term.  These are
17  the services they offer.  They offer regular tickets
18  and they offer ticket, what they call, Hidden City
19  tickets.
20  Q.    What do you understand that to be?  I just want
21  to make sure we're all on the same page.
22  A.    I'll accept the definition of one of the four
23  experts that you submitted.  It's primarily -- you're
24  trying to -- I'll give you an example.  You're trying
                                                    Page 22

1  to fly from Philadelphia to Chicago, but you'll go
2  Hidden City ticket, it may be a ticket from
3  Philadelphia to New Orleans via Chicago.  And the idea
4  will be the tickets, the Philadelphia, Chicago, New
5  Orleans, is cheaper than the direct ticket to
6  Philadelphia Chicago.  And the Hidden City would
7  encourage the consumer not to take the second flight,
8  to leave the plane in Chicago.  So this way they
9  benefit from the low price ticket.  But there are
10  risks associated with this.  And as I mentioned, the
11  problem is that Skiplagged does not reveal the full
12  set of risks involved with the ticket.
13  Q.    What do you understand the risk to be for a
14  Hidden City ticket?
15  A.    There are a lot of them.  First of all, the
16  airlines do not like it.  They recognize on their
17  website sometimes some of the minor things like that
18  you should not check luggage.  But the big risk is
19  that the airline will not respect the ticket because
20  it violates the airline rules.
21        American may cancel all your frequent
22  flyer miles and any other account you have with them.
23  And in my report, there is the stimuli section that we
24  have, describes specifically the conditions of --
                                                    Page 23

1  comparing the conditions of the Hidden City versus the
2  terms and conditions of American Airlines, it shows
3  you the difference.
4  Q.    Okay.  I have airlines don't like it as a risk,
5  no checked luggage, airlines may not honor the ticket?
6  A.    Correct.  You may have to pay -- you may have
7  to buy another ticket.
8  Q.    American Airlines may cancel frequent flyer
9  miles?
10  A.    They may cancel via the return ticket.  They
11  may cancel your return ticket.
12  Q.    Any other risk, as you understand it, to Hidden
13  City tickets?
14  A.    Well, if you have it show me.  There is a
15  document in my report, part of the stimuli that lists
16  exactly all of them.  But these are the, you know,
17  some examples of some of the risks involved.
18  Q.    Okay.  And which risks are you saying
19  Skiplagged does not disclose and, thereby, deceives
20  consumers?
21  A.    Well, they disclose very few of them.  They
22  don't disclose for example, that American Airlines
23  will cancel their frequent flyer miles.  They may have
24  to pay for another ticket.  They will not have a
                                                    Page 24

1  return ticket, that return ticket will be canceled.
2  Q.    And you understand as part of your analysis in
3  your report here, that one of the consequences for
4  American airlines on Hidden City tickets is
5  cancellation of frequent flyer miles?
6  A.    Correct.
7  Q.    How did you come to that understanding?
8  A.    That's my understanding, discussion with
9  counsel.
10  Q.    And that American Airlines may cancel the
11  return ticket, you understood to be a consequence of
12  booking a Hidden City ticket with American?
13  A.    Yes.
14  Q.    And you understood that American may not honor
15  a ticket as one of the consequences of booking a
16  Hidden City ticket?
17  A.    Correct.  Well, it violates -- Hidden City
18  tickets violates the terms and conditions of American
19  Airlines.
20  Q.    When you refer to terms and conditions of
21  American Airlines, what exactly are you referring to?
22  A.    Well, document American Airlines has, that
23  clearly explains what are the terms and conditions of
24  flying with them.
                                                    Page 25

7 (Pages 22 - 25)

1  Q.    Okay.  And you recall -- that's a document that
2  you reviewed as part of doing your analysis in this
3  matter?
4  A.    And as I mentioned before, it's included in my
5  report.
6  Q.    Okay.
7  A.    You can refer to that.
8  Q.    Okay.  As part of your analysis, did you
9  determine whether booking a Hidden City ticket was
10  against the law?  Is it illegal?
11        MR. NELSON:  Objection; beyond the
12     scope.
13        THE WITNESS:  I'm not sure.  And I'm
14     finding conflicting information out there.  It
15     seems that some of the documents clearly say
16     that this is illegal.  Some, you know, I think
17     Skiplagged does not view this as illegal.  And
18     consumers perceptions, which I'm really
19     reporting on in my report, consumers are mixed
20     in their perception.  Some feel it is legal and
21     some feel it is illegal.  So there is a fair
22     amount of confusion concerning the perception
23     of the legality of this.  And I know is that it
24     violates the terms and conditions of American

Page 26

1     Airlines.
2  BY MR. REED:
3  Q.    And you know that based upon your discussions
4  with American Airlines, right?
5  A.    Well, and by comparison, by comparing the terms
6  and conditions against, you know, the Skiplagged
7  offer.
8  Q.    Okay.  And terms and conditions, that's the
9  name of the document that you prepared?
10  A.    I'm not sure if that's exactly the name.
11  Q.    Okay.
12  A.    I think there was a page in my -- in the
13  appendices, a part of the stimuli that shows basically
14  the full information.
15  Q.    Is that the one where it says what SKiplagged
16  says and what American says --
17  A.    Correct.
18  Q.    -- chart?  Okay.
19  A.    As opposed to relying on my memory, the chart
20  really tells you what I believe.
21  Q.    We'll get to that.  I promise.
22        What documents did you -- you said that
23  you've seen some documents that says booking a Hidden
24  City ticket is illegal.  What documents do you recall

Page 27

1  saying that?
2  A.    I don't recall specifically.
3  Q.    Not one you can sit here and tell me today?
4  A.    Yeah.
5  Q.    There is one you can tell me?
6  A.    If I recall.  I don't recall specifically.
7  Q.    Okay.  If there is, that's in the documents
8  identified on Appendix B, right?
9  A.    Well, that's all the documents I reviewed
10  before I submitted the report, so, yeah, it should be
11  there.
12  Q.    Okay.  In your analysis, did you differentiate
13  between serious risk and not so serious risk?
14  A.    Yes.
15  Q.    And how did you differentiate the two?
16  A.    If you look at my report, I define exactly the
17  item that I considered serious risk and not.  So there
18  is, in my report, in one of the tables there is
19  exactly the definition.
20  Q.    And do you recall what that is?
21  A.    No.  I basically -- that's a definition that
22  was developed with the two independent coders that I
23  had reviewing all the open-ended responses.  But
24  serious risk will include some of the items that you

Page 28

1  just mentioned.
2  Q.    Okay.  What were the nonserious risks?
3        MR. NELSON:  Objection to form.
4        THE WITNESS:  I think that some of the
5     items that Skiplagged mentions in their warning
6     are the less serious risks, such as the
7     luggage.
8  BY MR. REED:
9  Q.    Okay.  Not being able to check a bag?
10  A.    Correct.
11  Q.    Okay.  You said two independent coders that
12  were used.  Who were they?
13  A.    Two people from Radius who were trained to
14  analyze open-ended consumer responses.  And I followed
15  the regular procedure done in all scientific research
16  for analyzing open-ended responses by having two
17  coders who did not know the purpose of the study or
18  the identity of the sponsor and asked to count and
19  analyze their responses.
20  Q.    Do you recall their names?
21  A.    No.
22  Q.    Had you met them before?
23  A.    No.
24  Q.    How did you communicate with them?

Page 29

8 (Pages 26 - 29)

1  A.   I did not communicate with them directly. I
2  communicated with the project managers from Radius.
3  Q.   Did you vet those coders before using them?
4  A.   They did. And I've used Radius, as I've
5  mentioned before, many times. They train them. There
6  are people to be used all the time for this type of
7  purpose.
8  Q.   So you didn't vet them and you didn't train
9  them, Radius did, correct?
10 A.   Correct. I worked with Radius for years and I
11 know I can rely on them.
12 Q.   Did you provide any assistance in what was to
13 go into the training for these coders?
14 A.   We definitely discussed with the Project
15 Manager what has to be done.
16 Q.   Who was the Project Manager?
17 A.   There were two that I worked with. One was
18 Dayna Colbert. I'm not sure of the family name. And
19 the other one is Colin. I don't remember his family
20 name.
21 Q.   You said the first one was Dayna Colbert?
22 A.   No. Might be Colbert. I'm not sure. I can
23 check it. I don't remember the name.
24 Q.   And the second one was Colin, and you don't

Page 30

1  remember his name?
2  A.   I thought it was a P, but I don't remember his
3  name.
4  Q.   And they're both project managers with Radius?
5  A.   Correct.
6  Q.   Okay. So you talked with Dayna and Colin about
7  the training for these two unidentified coders?
8  A.   Yeah. Briefly. We talked about the required
9  analysis.
10 Q.   And was --
11 A.   It was emphasized, fundamentally just
12 emphasized the basic rules, which was to make sure
13 they don't know who the project is for. That they are
14 totally independent in their analysis. And that there
15 is a procedure for resolving conflict between the two
16 independent coders.
17 Q.   And this communication with Dayna and Colin,
18 was that in writing?
19 A.   No. As most of my communication was done by
20 phone.
21 Q.   The procedures for resolving conflict, are
22 those in writing?
23 A.   No.
24 Q.   The training that they, the independent coders

Page 31

1  received, is that in writing?
2  A.   I don't know if Radius has anything in writing.
3  It's typically involved by having -- instructing them,
4  letting them start, do a test coding, reviewed by the
5  Radius people and then correcting, providing real live
6  feedback. And part of the conflict resolution is if
7  the two come with different assessment of the same
8  item, then they're getting together with Radius person
9  and they discuss it until they agree on what is the
10 correct coding.
11 Q.   So there is a third person involved?
12 A.   In the -- only in conflict -- when there is a
13 conflict between the two and they have to resolve it.
14 Q.   Who is that?
15 A.   Would have been probably Colin or one of the
16 other people working with Colin.
17 Q.   Do you know how many times the procedure for
18 conflict resolution was invoked in this analysis?
19 A.   I don't have a specific number. But I checked
20 about this and there were very few cases of
21 disagreement in the actual coding, not part of the
22 training but there were very few cases in the overall
23 result.
24 Q.   Do you know if Radius keeps a record of the

Page 32

1  conflicts involved?
2  A.   I have no idea.
3  Q.   Did they provide you any records regarding the
4  conflict?
5  A.   No. No.
6  Q.   How did you know there were very few cases for
7  disagreement then?
8  A.   Because I discuss it with them.
9  Q.   You had a verbal conversation with Colin about
10 it?
11 A.   Yeah. I am continuously in communication with
12 then during the study.
13 Q.   But they don't provide you a report, say, from
14 Radius that indicates how many times there was a case
15 or disagreement?
16 A.   It's rarely kept. The whole idea is it's a
17 dynamic process and they check on an ongoing basis the
18 responses. If the responses are not consistent, they
19 get the two people together and discuss it and try to
20 resolve it. It's a dynamic process. There is no --
21 it's not a rigid process.
22 Q.   Are you aware of any records kept by Radius
23 regarding the coding process?
24 A.   No. And I doubt they have it, but I can ask

Page 33

9 (Pages 30 - 33)

App'x 255

1  them.
2  Q.    And they haven't been provided to you at this
3  point?
4  A.    I never asked for that.
5  Q.    So you took Colin's words that there was very
6  few cases for disagreement, right?
7  A.    No reason to doubt it.
8  Q.    You did nothing else to verify that fact,
9  correct?
10  A.    Why should I verify it?  It's a person I'm
11  working with and I've worked with this company for
12  many years and I trust them.
13  Q.    You trust them, so you didn't have to verify
14  it, right?
15  A.    Yeah.  Sounds actually -- yeah, that's exactly
16  the fact.  You know, it's a company I've worked with.
17  And I looked at their work for many years and I know
18  that they are a reliable company in the way they are
19  performing the job that has to be done.
20  Q.    Did Radius provide you any background
21  information on the coders that were used?
22  A.    No.  And I don't ask for it.
23  Q.    You didn't ask for it either?
24  A.    No.

Page 34

1  Q.    Do you have any knowledge of how Radius keeps
2  an independent -- or these coders independent during
3  their review?
4  A.    Well, the independence is primarily not knowing
5  who the sponsor of the study is or the objective of
6  the study.  And they work in separate -- and they work
7  each one by themselves.  And then if there is
8  disagreement, we would bring the two of them together.
9  Q.    Do you know if they work in the same office?
10  A.    I don't.
11  Q.    You don't know where they did the coding, do
12  you?
13  A.    Somewhere in the Radius offices.
14  Q.    Where are they?
15  A.    In New York.
16         - - -
17         (Exhibit Wind-4, Wharton University of
18         Pennsylvania, Appendix A, 124 pages, was
19         marked for identification.)
20         - - -
21  BY MR. REED:
22  Q.    Hand you what's been marked as Exhibit-4 for
23  your deposition.
24  A.    Yes.

Page 35

1  Q.    At the top you'll see it has Appendix A and
2  then starts with short biography and then it's a
3  lengthy document here.
4         Are you familiar with it?
5  A.    Yes.
6  Q.    And to your knowledge what is this?
7  A.    Well, it includes actually three or four
8  documents.  The first page is my short bio.  And the
9  second page, the one that's says actually number one
10  on it, that's part of my full resume, which is found
11  on the Wharton website and is not fully up to date.
12  So doesn't have some of my more recent publications
13  and some other stuff.  So to try to compliment it,
14  toward the end, after page 117, there is an additional
15  three pages of recent publications since 2020, which
16  not all of which are included in the lengthy resume.
17  And after these three pages, there is another document
18  that start with Appendix A, trial and deposition
19  testimony, that lists cases in which I testified in
20  the last five years.
21  Q.    Do you recognize this as being Appendix A to
22  your report?
23  A.    Yes.
24  Q.    Okay.  And so this is information that you

Page 36

1  provided as part of preparing your report, correct?
2  A.    Correct.
3  Q.    Okay.  And when you said it wasn't up to date
4  that -- you meant that the first part wasn't up to
5  date, so that's why these additional tables and
6  testimony is included; is that correct?
7  A.    Yeah.  Well, the report -- correct.  The big
8  report, the 117 page report, not report, my resume --
9  Q.    Okay.
10  A.    -- is not fully up to date.  And that's the
11  reason I included the list of recent publications.
12  And it also does not include testimony to include --
13  there is a section in the big report of testimony,
14  primarily consulting in legal cases, that is not
15  separate and identified testimony in the position or
16  in trial, which is the purpose of the last three
17  pages.
18  Q.    Okay.  And let's go to those last couple pages,
19  starting with the chart with the publications.  I
20  think it's the page after 117, it starts over with
21  one.
22  A.    Yeah.
23  Q.    Is this publication chart up to date?
24  A.    (Reviewing document.)

Page 37

10 (Pages 34 - 37)

1    Let me see.
2        (Reviewing document.)
3        One of the pages here, the second from
4  the last, it's no longer working paper.  It was
5  accepted for publication in the Journal of Interactive
6  Marketing.  The rest of this is pretty accurate.  And
7  it does not include actually a current book that I am
8  working on, which is on creativity.  So since you have
9  working papers here, so you may want to include those.
10 Q.    So you're working on a book on creativity?
11 A.    Correct.
12 Q.    Do you have an anticipation of when that might
13 be published?
14 A.    Probably next year.
15 Q.    And you said the next to last one was unlocking
16 creative potential article that was accepted in the
17 Journal for Interactive Marketing?
18 A.    Interactive marketing.  Right.
19 Q.    And has that been published yet?
20 A.    Accepted, so probably available digitally on
21 their platform but not in print yet.
22 Q.    Anything that you have published that directly
23 addresses marketing in the airline industry?
24 A.    No.

Page 38

1  Q.    And then the other one, written with the same
2  two individuals is Beyond Surveys, a Holistic
3  Marketing Approach to Assess the Validity of Legal
4  Challenges?
5  A.    Correct.
6  Q.    And that's a working paper?
7  A.    Yeah.
8  Q.    So it hasn't been published yet?
9  A.    Correct.
10 Q.    Is it out for publication right now?
11 A.    No.  I'm revising it.
12 Q.    Had it been submitted for publication and then
13 rejected?
14 A.    No.
15 Q.    Have you done any -- strike that.
16        Okay.  Following the recent
17 publications section, then there is three pages of
18 trial or deposition testimony covering the last five
19 years; is that correct?
20 A.    Correct.
21 Q.    Okay.  And is this trial and deposition
22 testimony of the last five years up to date?
23 A.    Yes.
24 Q.    When were you hired as an expert in this case?

Page 40

1  Q.    Which of your publications touch on or address
2  confusion and or deception?
3  A.    There were two.  There are two with respect to
4  confusion.  One is the third from the bottom, Beyond
5  Surveys, A Holistic Marketing Approach To Assess The
6  Validity of Legal Challenges.  And the other one is
7  The Implication of The Consumer Journey to Traditional
8  Consumer Surveys for Litigation, so these are the two.
9  Q.    Okay.  You have a Ph.D. in marketing, right?
10 A.    In marketing, behavioral sciences.  Yes.
11 Q.    And what?
12 A.    And the behavioral sciences.
13 Q.    So The Implication of Consumer Journey to
14 Traditional Consumer Surveys for Litigation, you wrote
15 chapter two of that book; is that correct?
16 A.    Right.  This was actually published as a
17 chapter two in a book that Joel Steckel published.
18 And you have the inventory.
19 Q.    The Cambridge Handbook of Marketing and the
20 Law?
21 A.    Yes.
22 Q.    Okay.  And is that written in conjunction with
23 Mr. Hummell (ph)and Mr. Mundell (ph)?
24 A.    Yes.

Page 39

1  A.    I don't recall exactly the date.
2  Q.    Do you recall --
3  A.    Earlier this year.
4  Q.    Earlier this year.
5        And did you have a written agreement
6  for your retention?
7  A.    I assume they send me a letter of retention.
8  Yeah.
9  Q.    Do you recall it specifically?
10 A.    No, I think I got it.
11 Q.    And do you recall who actually retained you?
12 A.    I think it might have been Cam, Cam Nelson.
13 Q.    And he's an attorney, right?
14 A.    Yes.  Sitting next to me.
15 Q.    With who, do you know?
16 A.    (No response.)
17 Q.    Do you know with which firm?
18 A.    GT.
19 Q.    Have you ever been retained by GT in the past?
20 A.    Yes.
21 Q.    How many times?
22 A.    I don't recall.
23 Q.    Do you recall approximately?
24 A.    A few times.

Page 41

11 (Pages 38 - 41)

1  Q.   More than five?
2  A.   I doubt it, but I don't really know.
3  Q.   Are you familiar with the Kelly Hart law firm?
4  A.   No.
5  Q.   And the client for this case is American
6  Airlines, correct?
7  A.   Yes.
8  Q.   Have you ever been retained to give expert
9  testimony on behalf of American Airlines in the past?
10 A.   Yes.
11 Q.   How many times?
12 A.   I think one other time.
13 Q.   And that's the case, I see here in Appendix A,
14 under 2020, the trial and deposition testimony, third
15 bullet down?
16 A.   Yes.
17 Q.   So American Airlines, Inc. versus Delta
18 Airlines, Inc.?
19 A.   Correct.
20 Q.   In Fort Worth, our court, right?
21 A.   Yes.
22 Q.   It says here you gave a deposition in that
23 case.  Did you give trial testimony?
24 A.   Not that I recall.

Page 42

1  Q.   Do you know if that case has been resolved?
2  A.   I don't.
3  Q.   So you don't know if you're going to give trial
4  testimony or?
5  A.   I don't know.
6  Q.   Okay.  In the past, have you been retained to
7  give expert testimony on behalf of any other airlines?
8  A.   Not that I recall.
9  Q.   What were you asked to analyze in the prior
10 American Airlines case?
11 A.   I don't recall.
12 Q.   You don't recall at all?
13 A.   No.  Unlike you lawyers, I don't remember every
14 case.  At the end of the case, I move to the next
15 project I'm working on, I don't really remember cases.
16 Q.   It's gone, huh?
17 A.   Yeah.
18 Q.   Are you being paid for your time in this case?
19 A.   Yes.
20 Q.   And what are you being paid?
21 A.   Regular consulting rates, $1,200 an hour.
22 Q.   $1,200 an hour.
23       And do you bill on a monthly basis?
24 A.   Yes.

Page 43

1  Q.   And how much have you billed so far in the
2  matter?
3  A.   I don't recall.
4  Q.   You don't recall at all?
5  A.   No.
6  Q.   Do you know how many hours you've spent?
7  A.   No idea.
8  Q.   Do you send invoices?
9  A.   Yes.  I send monthly invoices.
10 Q.   Included -- do you pass on the cost for the
11 outside consultants, like Radius?
12 A.   They bill directly.
13 Q.   They bill directly?
14 A.   The airline.  Yeah.  They bill the law firm
15 directly.
16 Q.   Do you know how much Radius has charged in this
17 matter?
18 A.   I don't recall.
19 Q.   And Voluble was the other one, right?
20 A.   Correct.
21 Q.   Do you know how much they charged?
22 A.   No idea.
23 Q.   Is there a written agreement with Radius?
24 A.   They send the proposal and then, you know, once

Page 44

1  the client approves the proposal, they bill the client
2  directly.
3  Q.   Do you know if there is a written agreement
4  with Voluble for this matter?
5  A.   I think the same thing.  They submit a
6  proposal.  Once the proposal is accepted, they bill
7  the client directly.
8  Q.   And the proposal goes to you?
9  A.   Yes.  Me and the client.
10 Q.   You and the client?
11 A.   Yes.
12 Q.   Both have to accept it?
13 A.   Yes.  I typically work with either, in this
14 case, Radius or Voluble.  I work with them on the
15 proposal to make sure it includes what we need.  And
16 then once I approve it, they submit the final proposal
17 to the client.
18 Q.   And then they bill the client directly for
19 their services?
20 A.   Correct.
21 Q.   Other than Wind Associates, are you currently
22 employed anywhere else?
23 A.   I'm a Professor Emeritus at Wharton.
24 Q.   What does it mean to be a Professor Emeritus?

Page 45

12 (Pages 42 - 45)

1   A.   That after fifth years at Wharton I retired.
2   Q.   Okay.
3   A.   And I have my office at Wharton.  I have an
4   office there.  I'm not being paid, but I have an
5   office there and I participate in faculty meetings and
6   others.
7   Q.   Do you teach any classes?
8   A.   No.  That's the beauty of Emeritus, you don't
9   have to teach in the regular program.
10  Q.   And you said you're not being paid by Wharton,
11  right?
12  A.   Correct.
13  Q.   So 100 percent of your income now is from Wind
14  Associates?
15  A.   Correct.
16  Q.   And how long has that been the case?
17  A.   Since 2017, when I took Emeritus status.
18          MR. REED:  I'm at good break.  We've
19      been going about an hour, do you want to take a
20      break?
21          THE WITNESS:  Sounds good.
22          (A short break was taken.)
23  BY MR. REED:
24  Q.   You understood you're still under oath?

Page 46

1   A.   Yes.
2   Q.   What's Level Legal?
3   A.   I have no idea.
4   Q.   On the Exhibit-2 for your deposition, the
5   documents and material relied upon, you list an Excel
6   spreadsheet that was generated from Level Legal.
7   A.   I don't recall.  You'll have to show it to me.
8   Q.   I'm sorry.
9   A.   You'll have to show it to me.  I have no
10  recollection what it is.
11  Q.   Okay.  Do you have that Exhibit-2 in front of
12  you?
13  A.   Yes.
14  Q.   The sixth bullet point down, it's before you
15  get to the big document section of the produce
16  documents, it says Excel spreadsheet data.
17          Do you see the line right there?
18  A.   Yes.
19  Q.   And then it says generated from Level Legal.
20  A.   Yeah.  This is the 200 test cases that lead to
21  the selection of the stimuli in this case.  I'm
22  describing it in my report how the stimuli was
23  selected.
24  Q.   Okay.

Page 47

1   A.   And that's the backup data for the stimuli.
2   Q.   So is Level Legal another independent
3   contractor you used?
4   A.   They were apparently hired by the law firm.
5   Q.   By which law firm?
6   A.   By Cameron's, GT.
7   Q.   Okay.  By Greenberg?
8   A.   Yes.
9   Q.   So did you have any involvement in this 200
10  test by result?
11  A.   I had discussions with one of Cam's associates
12  about the procedure for generating it.  So I was
13  involved in the process for selecting these 200 and
14  then eventually selecting the stimuli.
15  Q.   Okay.  Was that a verbal or written
16  communication?
17  A.   It was by phone.
18  Q.   By phone.
19          And do you recall who that conversation
20  was with?
21  A.   Zach.  I don't remember his family name.
22  Q.   Okay.  When you say family name, you mean last
23  name?
24  A.   Last name.

Page 48

1   Q.   All right.  Just make sure I understand the
2   terms.
3          All right.  So this Level Legal, 200
4   test by results was something you didn't do, Greenberg
5   did and then provided that to you; is that correct?
6          MR. NELSON:  Objection;
7      mischaracterizes.
8          THE WITNESS:  No, I discussed it with
9      them -- this was primarily -- the question was,
10     how do you select the stimuli, describing it in
11     my report.  This was the data underlying the
12     selection of the stimuli.
13  BY MR. REED:
14  Q.   Okay.  And you selected the 200 test by?
15  A.   No.
16  Q.   Who did?
17  A.   Zach.
18  Q.   At Greenberg?
19  A.   Yes.
20  Q.   Okay.  As part of your preparing your report,
21  doing your analysis and coming to your opinions, did
22  you consult or communicate with anyone at American?
23  A.   Not that I recall.
24  Q.   Have you attended any other depositions in this

Page 49

13 (Pages 46 - 49)

App'x 259

1 matter?
2 A.    No.
3 Q.    Have you reviewed any deposition transcripts in
4 this matter?
5 A.    I reviewed one.
6 Q.    Which one?
7 A.    The one of the CEO, the Skiplagged CEO.
8 Q.    Okay.  And have you watched any videos of
9 depositions in this matter?
10 A.    No.
11 Q.    Have you consulted with any other individual
12 who has given opinions in this matter?
13 A.    No.
14                    - - -
15         (Exhibit Wind-5, Expert Report of
16     Expert, Yoram (Jerry) Wind, 90 pages , was
17     marked for identification.)
18                    - - -
19 BY MR. REED:
20 Q.    All right.  I've handed you what we've marked
21 as Exhibit-5 for your deposition.  The first page is
22 entitled Expert Report Professor Yoram Jerry Wind,
23 correct?
24 A.    Yes.

Page 50

1 Q.    Okay.  And if you look at it, it goes through
2 page 89 where your signature is, correct?
3 A.    Yes.
4 Q.    Okay.  And what I did, just because of the size
5 and me trying to save a little bit of paper is, I went
6 through 89 containing your opinions and didn't include
7 the appendices, which was -- we've done a few already
8 in this depo, right?
9 A.    Yes.
10 Q.    Okay.  And so you recognize this document,
11 right?
12 A.    Yes.
13 Q.    Do you recall -- strike that.
14         Let's go to page 3 at the bottom of
15 your report, that starts with background and
16 objectives.
17         Are you with me?
18 A.    Yes.
19 Q.    You start off with a paragraph there speaking
20 or talking about American Airlines, and it's what you
21 call American Marks.
22         Are you with me?
23 A.    Yes.
24 Q.    Where did you get the information for the

Page 51

1 background contained in this paragraph?
2 A.    From counsel.
3 Q.    So that's what you were told by counsel?
4 A.    Yes.
5 Q.    At Greenberg?
6 A.    Yes.
7 Q.    Do you recall who told you that?
8 A.    I think Cameron.  I'm not sure.
9 Q.    Okay.  Did you do anything to verify the
10 information that you were told contained in paragraph
11 one, the background on American?
12         MR. NELSON:  Objection;
13     mischaracterizes.
14         THE WITNESS:  No.
15 BY MR. REED:
16 Q.    Okay.  So you can offer no testimony as to what
17 American has done, for instance, to protect its flag
18 fair schedule and inventory data, can you?
19 A.    No, I can't.
20 Q.    You don't have any knowledge as to what
21 American has done to trademark its name and flight
22 symbol, do you?
23 A.    Correct.
24 Q.    You don't have any knowledge, other than what

Page 52

1 you were told by counsel, as to measures American has
2 taken to ensure only its authorized agents are
3 permitted to act on its behalf?
4 A.    Correct.
5 Q.    The next paragraph you began talking about
6 Skiplagged, correct?
7 A.    Yes.
8 Q.    And this background on Skiplagged, where did
9 you obtain this information?
10 A.    Let me review the paragraph.
11         (Reviewing document.)
12         I think it says in the first paragraph,
13 having reviewed the complaint and various screenshots
14 of American and Skiplagged's websites.
15         So I'm not sure what else are you
16 asking me about.
17 Q.    Well, I'm asking what you did to investigate or
18 get this information contained in your background.  So
19 one, you looked at the Skiplagged Website?
20 A.    Correct.
21 Q.    Okay.  Do you recall when you viewed it?
22 A.    A few times.  First, I read the complaint and
23 then probably subsequent to this once or twice.
24 Q.    So you believe you've viewed the website once

Page 53

14 (Pages 50 - 53)

1 or twice; is that what you said?
2 A.    At least, yeah.  A few times.
3          MR. NELSON:  Objection;
4 mischaracterizes.
5 BY MR. REED:
6 Q.    A few times.
7          And you said you read the complaint?
8 A.    Yes.
9 Q.    And you're referring to the complaint filed by
10 American Airlines in this lawsuit, correct?
11 A.    Correct.
12 Q.    You start off by saying, "Skiplagged, Inc. owns
13 and operates the website Skiplagged.com" in that first
14 sentence?
15 A.    Yeah.
16 Q.    Did you do anything to verify that Skiplagged,
17 Inc. owns and operates the website Skiplagged.com?
18 A.    No.
19 Q.    "One to say that Skiplagged is not an
20 authorized agent of American."
21          Did I read that correctly?
22 A.    Yes.
23 Q.    What did you do to verify whether Skiplagged
24 was an authorized agent of American?

Page 54

1 A.    Nothing.  I basically trusted my counsel to
2 give me the correct information.
3 Q.    Okay.  So you say "Skiplagged obtains data on
4 American flights by obtaining data from other agents
5 of American, an apparent violation of their contracts
6 with American and/or by developing computer programs
7 to obtain this information from American's website."
8          All right.  How do you know that
9 Skiplagged obtains data on American flights by
10 obtaining data from other agents of American?
11 A.    The same source, the source for everything in
12 the background section is from my counsel.
13 Q.    Is from Greenberg?
14 A.    Correct.
15 Q.    Okay.  And you did nothing to verify whether
16 that information was correct or not, did you?
17 A.    I saw no need to do it.
18 Q.    You assumed it was correct?
19 A.    Yes.
20 Q.    Okay.  You go on to state, "An apparent
21 violation of their contracts with American."
22          Have you reviewed any contracts between
23 American and its authorized agents?
24 A.    No.  I did not see any need for doing that.

Page 55

1 Q.    You were told by counsel that that was a
2 violation of those contracts and you believed it and
3 assumed it, right?
4 A.    Right.
5 Q.    But you have no independent knowledge of
6 whether other agents of American sharing data on
7 American flights is a violation of their contract, do
8 you?
9 A.    I don't.
10 Q.    You go on to say that "Skiplagged developed
11 computer programs to obtain this information from
12 American's website."
13          That's something that you were told by
14 counsel?
15 A.    Everything in this section by background I was
16 told by counsel.
17 Q.    Okay.  And you did nothing to verify whether
18 Skiplagged has a computer program to obtain
19 information from American's website, did you?
20 A.    Correct.  Because I say no need to verify
21 anything that counsel told me.
22 Q.    You assumed it was correct?
23 A.    Correct.
24 Q.    You go on to say "Skiplagged.com allows users

Page 56

1 to search for, identify and purchase and book American
2 flights directly on Skiplagged.com."
3          Do you see that sentence?
4 A.    Yes.
5 Q.    That's again, something you were told by
6 counsel and you assumed it to be correct?
7 A.    Yeah.  But that's also -- yes, but that's also
8 something you can observe from going over their
9 website.
10 Q.    Okay.  You can observe that by purchasing a
11 ticket on Skiplagged.com?
12 A.    Well, you can go through the website and you
13 can definitely see that everything described here is
14 correct.
15 Q.    As part of your work on this case and
16 formulating your opinions, did you actually ever
17 purchase a ticket on Skiplagged.com?
18 A.    No, I did not.
19 Q.    Did anyone on your behalf do so?
20 A.    No.
21 Q.    Anyone with Wind Associates purchase a ticket
22 on Skiplagged.com?
23 A.    No.
24 Q.    Did anyone at Radius purchase a ticket on

Page 57

15 (Pages 54 - 57)

1  Skiplagged.com?
2  A.  Not to my knowledge.
3  Q.  Did anyone as part of their work for you at
4  Soluble -- or not Soluble -- Voluble purchase a ticket
5  on Skiplagged.com?
6  A.  Not to my knowledge.
7  Q.  So everything in that paragraph there is
8  something that you were told and you assumed, correct?
9        MR. NELSON:  Objection;
10       mischaracterizes.
11       THE WITNESS:  Well, with the exception
12  of the items that I could observe also by going
13  to their website.
14  BY MR. REED:
15  Q.  Okay.  But you didn't go through the whole
16  process and actually purchase a ticket, did you?
17  A.  Correct.
18  Q.  Going to page 4, starting with that first full
19  paragraph, having reviewed the complaint?
20  A.  Yeah.
21  Q.  Are you with me?
22       You state, "Having reviewed the
23  complaint and various screenshots of American's and
24  Skiplagged's websites."  And then it goes on from
                                                    Page 58

1  Q.  With Greenberg?
2  A.  Correct.
3  Q.  So having reviewed the complaint, the
4  screenshots provided by Greenberg, you then went on
5  and designed the consumer survey experiments, correct?
6        MR. NELSON:  Objection to form.
7        THE WITNESS:  Correct.
8  BY MR. REED:
9  Q.  Okay.  Did you write the report?
10  A.  Yes.
11  Q.  Did you have any assistance?
12  A.  Radius filled the exhibits, I designed the
13  exhibits and Radius actually filled the exhibits with
14  the data.
15  Q.  Okay.
16  A.  And Radius prepared the appendices that were
17  submitted.
18  Q.  All right.  Did anyone edit your report?
19  A.  No.
20  Q.  Other than yourself, I mean, anyone outside of
21  you edit the report?
22  A.  No.  I sent the report, obviously, to counsel
23  and they may have suggested a few things, I don't
24  recall.  And that was my -- I wrote it.  I edit it and
                                                    Page 60

1  there.  I want to ask you specifically about that.
2        The various screenshots of American's
3  and Skiplagged's websites, what are you referring to
4  there?
5  A.  (Reviewing document.)
6        In addition to the complaint and the
7  website, I also looked at some screenshots of American
8  and Skiplagged website, especially the screenshots
9  referring to the stimuli that I used in the study.
10  Q.  Okay.  These screenshots, are those included in
11  your Appendix B?
12  A.  They are included as part of my report, as the
13  one we selected, they're included -- they are the
14  stimuli in the study, and they're the ones that's
15  referred to in the report of the item you highlighted
16  before with the Excel spreadsheet, was then there were
17  some screenshots.
18  Q.  Okay.  The various screenshots of American's
19  and Skiplagged's websites, are those screenshots that
20  you actually went and made or were they provided to
21  you?
22  A.  They were provided to me.
23  Q.  Who provided those to you?
24  A.  Zach.
                                                    Page 59

1  I finalize it.
2  Q.  Okay.  All right.  So do you recall how many
3  drafts you prepared?
4  A.  Basically it is an ongoing process.  As the
5  data comes in I add stuff, so it's sort of -- it's a
6  dynamic process of creating a report as data comes in.
7  Q.  As part of your analysis, did you reach any
8  conclusions that did not make your report?
9  A.  No.
10  Q.  Were you asked for any opinions or topics that
11  are not addressed in the report?
12  A.  No.
13  Q.  All right.  Other than the background
14  information and the assumptions that we've talked
15  about based upon the background, were there any other
16  assumptions that you made as part of your analysis?
17  A.  No.
18  Q.  You said no?
19  A.  No.
20  Q.  You weren't asked to assume anything other than
21  that the background information you were provided was
22  true?
23        MR. NELSON:  Objection;
24       mischaracterizes.
                                                    Page 61

16 (Pages 58 - 61)

1    THE WITNESS: Yeah. That's it.
2  BY MR. REED:
3  Q.    Part of your analysis did you have to define
4  who the consumers were?
5  A.    Yes.
6  Q.    And how did you define consumers?
7  A.    It's clearly defined in my report under the
8  universe section of the methodology, which would be on
9  page 9. And it primarily used consumers who booked a
10 commercial flight in the past 12 months or intend to
11 do so in the next 12 months and/or booked or intend to
12 book their ticket through an online ticket website.
13 Q.    How did you reach this definition of consumer?
14 A.    Seemed to me that this is the market for
15 Skiplagged.
16 Q.    How did you make that determination?
17 A.    Based on looking at the website and their offer
18 of primarily focusing on cheap flights. And it seems
19 they appeal to all consumers who are using internet to
20 book their ticket.
21 Q.    And based upon your review and analysis,
22 Skiplagged is limited to U.S. consumers?
23 A.    No. They could go beyond the U.S., obviously,
24 like any other internet. But the case is a U.S. case,
Page 62

1  A.    If you look at all the consumer studies that
2  have been done, they typically tend to limit in some
3  way, depending on the product, between six months to a
4  year. For a passport it was in between three months
5  and a year for future purchases, depending on the
6  product.
7        Very rarely in the purchase of a house
8  or a car you may come up with longer time periods.
9  Q.    And I guess I asked a bad question.
10       Is there a treatise, a publication, a
11 scholarly article that states you typically limit to a
12 12 month past and 12 month future?
13 A.    I'm not sure. There might be. That the way
14 I -- that's the way I practice. That's the way I
15 taught. And I teach marketing research or early as
16 much as that's the typical way in which I have done
17 it. And most of the studies I've seen follow a very
18 similar type pattern.
19 Q.    But you can't point me to a scholarly
20 publication that states that's the typical way to do
21 it, can you?
22       MR. NELSON: Objection;
23       mischaracterizes.
24       THE WITNESS: I'd have to search for
Page 64

1  and, therefore, the focus is on U.S. consumers.
2  Q.    So because the case is filed in the United
3  States, you focused on U.S. consumers?
4  A.    Correct.
5  Q.    All right. So you didn't consider
6  international consumers, correct?
7  A.    No. Because the case is U.S. based.
8  Q.    And your -- the study respondents did not
9  include any individuals outside of the U.S.; is that
10 correct?
11 A.    Correct.
12 Q.    You limited it to the past 12 months or
13 intended to do so in the next 12 months book a flight,
14 right?
15 A.    Correct.
16 Q.    Why did you limit it to that timeframe?
17 A.    It's a typical timeframe we use in studies. To
18 make sure that we're dealing with relevant consumers.
19 Consumers who, you know, have some flying experience
20 or intend to fly.
21 Q.    You said that's a typical timeframe?
22 A.    Yes.
23 Q.    And is there an authority that you site as that
24 being a typical timeframe?
Page 63

1  it.
2  BY MR. REED:
3  Q.    You didn't do that as part of your analysis,
4  did you?
5  A.    No. I didn't see a need to do it.
6  Q.    Now, going back to page 4 here, where we're
7  talking about your design of the survey experiments.
8        When you set about to design these
9  experiments, were the two -- you have two bullet
10 points here, not two bullet points, but two points you
11 make following that to evaluate. Were those the goals
12 of your experiment?
13       MR. NELSON: I'm sorry. Where are you?
14       MR. REED: Page 4.
15       MR. NELSON: I don't see bullet points
16       on page 4.
17       MR. REED: That's what I meant, those
18       two points.
19       MR. NELSON: Okay.
20       I'm still lost. Which points are you
21       referring to?
22       MR. REED: The first full paragraph,
23       "Having reviewed."
24       MR. NELSON: Okay.
Page 65

17 (Pages 62 - 65)

1    THE WITNESS: I think I lost the
2 question. What is the question?
3 BY MR. REED:
4 Q.   Okay. Sometimes that happens when we have the
5 back and forth.
6        You state a designed multiple consumer
7 survey experiment to evaluate. And then it starts
8 one, and you go for a while, and then a two.
9 A.   Right.
10 Q.   Were those the goals of your survey
11 experiments?
12 A.   Yeah. To find out to what extent there is
13 confusion and there is deception.
14 Q.   Okay.
15 A.   And how serious it is.
16 Q.   And those were the -- that was the direction in
17 which you were hired by Greenberg to do, right?
18 A.   No. It's stated what explicitly also in the
19 section objectives.
20 Q.   Going on in the next section, right?
21 A.   Correct.
22 Q.   Okay. Where you said you were retained by
23 Greenberg Traurig and Kelly Hart and Hallman to assess
24 to what extent, that section, right?

Page 66

1 A.   The requirements are reflected in my design.
2 Q.   What are those?
3 A.   My design address all the requirement. You
4 know, to have the relevant universe, to select the
5 right sample, to design, to select the right stimuli,
6 to have the right experiment of design, which was in
7 this case would include the control to design the
8 appropriate questionnaire on bias questions, to
9 analyze it correctly. So all the phases that everyone
10 goes through in designing a study.
11 Q.   Are these requirements to your knowledge,
12 reflected in any authority, scholarly article,
13 treatise?
14 A.   They're reflected in most books and articles on
15 marketing research. It's pretty fundamental.
16 Reflected, from a legal point of view, legal word of
17 Shari Diamond, if you look at her book. So, yeah, if
18 you look at McCarthy, you will -- so, yeah, these are
19 well accepted principles that guide all research in
20 this area.
21 Q.   So Shari Diamond?
22 A.   Yes.
23 Q.   What's the name of that book?
24 A.   I don't recall the name of the book.

Page 68

1 A.   Correct.
2 Q.   Okay. And that is reflected in what you were
3 trying to evaluate in the previous paragraph, right?
4 A.   Correct.
5 Q.   Prior to or in the process of designing your
6 experiments, did you consult any treatises, scholarly
7 article, any other authorities to aid in your design?
8 A.   No. The same answer as I gave you with respect
9 to the time period for respondents. I've done
10 thousands of studies. I've taught marketing research.
11 I don't have to go and look for, you know, help from
12 books on the topic. I wrote the books on the topic.
13 Q.   Okay. What are the requirements for designing
14 a consumer experiment?
15 A.   As I said, I conducted thousands of studies,
16 evaluated tens of thousands of studies. I know how to
17 design studies. That's a straightforward study to
18 assess confusion and to determine if there is any
19 deception or not.
20 Q.   I understand you've done it for quite some
21 time. My question is a little different.
22        As part of your experience, is there
23 any requirements when you're designing a consumer
24 experiment?

Page 67

1 Q.   You said McCarthy?
2 A.   No. They're two separate books. There is a
3 McCarthy book that refers to some research studies.
4 And Shari Diamond focuses specifically on consumer
5 surveys in her book originally, in the article and in
6 the book. There is a more recent book.
7 Q.   The McCarthy book, what's it called?
8 A.   I don't recall the name.
9 Q.   You didn't consult either one when doing this
10 work, it's just these are ones that you're referring
11 to.
12 A.   Because I'm familiar with them and I've used
13 them in the past. There is no need to waste the
14 client time going through all the books and stuff that
15 I'm familiar with.
16 Q.   All right. You ran through them kind of
17 quickly, so I want to make sure that I have them
18 correct here. You said you want to select the
19 relevant universe?
20 A.   Correct.
21 Q.   What does that mean?
22 A.   What we discussed before, who are going to be
23 the respondents.
24 Q.   Okay. And then select the right stimuli?

Page 69

18 (Pages 66 - 69)

1  A.    Well, before this was the sample.

2  Q.    The size of the sample?

3  A.    The type of the sample that you select, how do

4  you select the sample and what will be the size of the

5  sample.

6  Q.    And when you say the type of sample, what are

7  you referring to?

8  A.    Well, how do you -- given that you select the

9  universe, how are you going to identify the people

10  that are going to be your respondents in the study.

11  Q.    And is there a set of guiding principles for

12  selecting the type of sample?

13  A.    No.  What we have done in this study reflects

14  this.  It's primarily we used an internet panel, which

15  is commonly used today and randomly selected

16  participants from this.  And there is a whole

17  discussion in my report on sample selections starting

18  on page 9.

19  Q.    Okay.  So the type of sample and then the size

20  of sample?

21  A.    Right.

22  Q.    Okay.  What are the guiding principles on the

23  size of sample?

24  A.    Well, there are many rules there.  In my

Page 70

1  But there is always a threat of between size and cost.

2  And I feel that you get reliable data and valid data,

3  especially in experiment when you're looking for a

4  similarity or differences between test and control

5  with the size of sample, such as the one we used in

6  this case.

7  Q.    Are you aware of any scholarly articles that

8  assess this trade off between size and cost?

9  A.    I think many of them address it.

10  Q.    Is there any that you refer to in making your

11  determination of having a group larger than 100?

12  A.    No.  I basically relied on my experience.

13  Q.    So the larger the number in the group, the more

14  the cost, right?

15  A.    Right.

16  Q.    Okay.  That gives you more data though, right?

17  A.    Right.

18  Q.    Now, when you said the type of sample, you

19  referred me to page 9 of your report, right?

20  A.    Well, the same discussion starts on page 9.

21  Q.    Okay.  And goes on, then, to page 10, right?

22  A.    Correct.

23  Q.    Okay.  You state here, "The sample is drawn

24  from the panel of Prodigy," right?

Page 72

1  general practice and generally accepted, is in studies

2  involving experiments where you have a test and

3  control to have the sample larger than 100 respondents

4  per group.

5  Q.    Larger than 100?

6  A.    Per group.

7  Q.    Per group.

8  A.    So in this specific case, it would be testing

9  control.  And since we have two studies really, one of

10  Skiplagged's regular ticket and one of Skiplagged's

11  Hidden City ticket, so we had four sales, each one of

12  them had the test and control.  Two studies, test

13  control each one of them.

14  Q.    Okay.

15  A.    So on the four sales and the total sample of

16  600 was about 150 per group.

17  Q.    So that exceeded your 100, more than 100 per

18  group?

19  A.    Correct.

20  Q.    Okay.  This 100 per group size, is that just

21  your own guideline or is that an industry guideline?

22  A.    I've used this as a guideline for many years.

23  There are others who follow the same thing, you know,

24  kind of you can go as high as 400 people per group.

Page 71

1  A.    Yes.

2  Q.    What's Prodigy?

3  A.    It's a panel provider in Appendix 1 of my

4  report -- Appendix C1, in my report, include a

5  description of the panel.

6  Q.    Okay.  But I was more asking what Prodigy was?

7  A.    The name of the company that provides consumer

8  panels.

9  Q.    Okay.  So that's another company that you used

10  in this matter?

11  A.    Well, Radius used them.  Yeah.

12  Q.    Radius used them?

13  A.    Right.  Radius basically was the researcher for

14  my use.  And they use their -- Prodigy is one of many

15  companies that recruit, maintain, develop and ran,

16  basically, consumer panels for studies.

17  Q.    Okay.  You said an initial sample matching the

18  census gender, age, race and geography assured the

19  representativeness of the sample.

20  What do you mean there?

21  A.    Well, the procedure is, you want to make sure

22  that the sample you select represents really the U.S.

23  population.  So what you're trying to do, is initially

24  when it's commonly done, you select people that match

Page 73

19 (Pages 70 - 73)

1  the census data on gender, age, race and geography.
2  And then once you have it, and from this pool, you
3  start screening them to make sure that they meet the
4  requirement of the study, the requirement of the
5  universe.  So have they flown on a plane to fly, are
6  they buying tickets on -- using the internet.  And do
7  they pass the security, which is typically security
8  questions of any questionnaire.
9  Q.    Okay.
10  A.    And they are listed on the top of page 10.
11  Q.    Okay.  When we get to those.
12        I'm more talking about when you're
13  matching the census, gender, age, race and geography,
14  you're saying matching the general census, gender,
15  age, race and geography of the U.S.?
16  A.    Correct.
17  Q.    Okay.  Because that goes back to your
18  assumption that this is limited to the U.S. consumers
19  and not international, right?
20  A.    Correct.
21  Q.    And then what did you do to confirm that the
22  panel from Prodigy matched the U.S. census?
23  A.    It's not the panel.  It's the people that we
24  approach from the panel.  We screen them.

Page 74

1  for companies that might have unique expertise or
2  interests that can bias their responses.  You want to
3  make sure that they wore glasses when they used the
4  computer to respond to questions, they have them on.
5  And did they address the critical question of, are
6  they of the universe, did they fly or plan to fly in
7  the next 12 months, and do they use the internet to
8  book the ticket.  If yes, then that's the final sample
9  that we have.
10  Q.    When you say final sample, is that referring to
11  the total sample of 600?
12  A.    Correct.
13  Q.    Okay.  What did the initial sample number start
14  with?
15  A.    I have no idea.
16  Q.    Okay.
17  A.    You can -- there is Appendix C -- C5, they give
18  you screening results.
19  Q.    Okay.
20  A.    That's an internal process, it's not a final
21  process.  The initial sample you're just preparing the
22  sample to -- it allows us to select the final
23  respondent.
24  Q.    And that's not something you were involved in,

Page 76

1        If you would look at my questionnaire,
2  the questionnaire starts on page 12, you see a whole
3  set of screening questions that include questions
4  concerning these four things, the gender, age, race
5  and geography.
6  Q.    Okay.
7  A.    So you ask people about it.  And you basically
8  assure that you match the population.  And then you
9  ask them the secondary set of questions to make sure
10  that they fit the sample -- the study requirement.
11  Q.    So on a gender basis, what were you trying to
12  match?
13  A.    Not gender by itself, it's gender, age, race
14  and geography.  We try to match the U.S.
15  characteristics as initial sample, not the final
16  sample.
17  Q.    Okay.
18  A.    As initial sample.
19        Once we created this pool of
20  respondents, then you ask them the other questions.
21  For example, first of all, to check that they are
22  humans, that human people respond, as opposed to
23  machines.  So you give them the CAPTCHA test.  Then
24  you make sure that they or their families do not work

Page 75

1  Radius did that, right?
2  A.    Right.  Radius does it.
3  Q.    Okay.
4  A.    You know, based on my general direction.  But
5  the results are in Appendix C3 -- C5.  I'm sorry.
6  Q.    But you weren't, other than giving direction,
7  you weren't involved in the actual selection of the
8  initial sample, right?
9  A.    Correct.
10  Q.    That was Radius?
11  A.    Correct.
12  Q.    Okay.  And you weren't involved in the
13  selection of total sample, that was Radius based upon
14  direction from you, of course?
15  A.    That's the way all research is being done.
16  That's role of a research firm.
17  Q.    But you weren't involved actually, right?
18  A.    Right.
19  Q.    Okay.
20  A.    I give the general direction and supervise the
21  whole process.  But typically that's why you hire a
22  research firm to do it.
23  Q.    And so from the initial sample, then we
24  eliminate nonhumans, right?

Page 77

20 (Pages 74 - 77)

1  A.   Right.
2  Q.   Okay.  And then we eliminated anyone who they
3  or their members of their families worked for an
4  advertising agency, right?
5  A.   Right.
6  Q.   And you eliminated individuals that they or
7  their families worked for a marketing research firm,
8  right?
9  A.   Correct.
10  Q.   And you eliminated members of their families
11  that work for an airline or travel agency, correct?
12  A.   Right.
13  Q.   Is that correct?
14  A.   Yeah.
15  Q.   Okay.  Now, that's all based upon the
16  respondents answering the questionings truthfully,
17  right?
18  A.   Correct.
19  Q.   Okay.  And there is no verification that you or
20  Radius or anyone else does to verify that that
21  information is correct, is there?
22       MR. NELSON:  Objection;
23    mischaracterizes.
24       THE WITNESS:  There is -- you're going

1  ensure respondents paying attention, providing
2  meaningful answers, correct?
3  A.   Yeah.  It's basically because we relied on a
4  lot of open-ended responses, which is the best way to
5  conduct studies.  They may have just wanted to speed
6  through because they are being rewarded for completing
7  the study, so they give you kind of bullshit
8  responses.  So if we find -- so we have someone go
9  through and we check to make sure there are no
10  bullshit responses.
11  Q.   Okay.  And that -- I read that as a quality
12  control?
13  A.   Correct.
14  Q.   As part of that quality control though going
15  back to my original question, there was no
16  verification that the respondents were answering
17  truthfully, whether, for instance, the members of
18  their family work for an airline, is there?
19  A.   If you find for me a way of verifying it, you
20  will get Nobel prize in marketing research.
21  Q.   But it wasn't done, right?
22  A.   It cannot be done.  How would you do it?
23  Q.   I'm sure there is some ways to do it.
24  A.   No.  There is not.  Show me the way.

1       to section, page 27.
2  BY MR. REED:
3  Q.   Okay.
4  A.   Under data collection and quality control, you
5  will see the quality control procedures that were used
6  by Radius to ensure that we get, you know, ideally
7  valued respondents.
8  Q.   So those were security encrypted servers,
9  right?
10  A.   Right.
11  Q.   Data checks for duplicate IP addresses,
12  correct?
13  A.   Correct.
14  Q.   The CAPTCHA, that's whether it's human or
15  machine, right?
16  A.   Correct.
17  Q.   Speeders removed from data.  What's that?
18  A.   If someone completes the whole questionnaire in
19  one minute, they should be out.  Because, obviously,
20  they did not take the time to read the stimuli.
21  Q.   I got you.  I got you.  They just flew through
22  it to get it done?
23  A.   Right.
24  Q.   Okay.  And open-ended responses reviewed to

1  Q.   You're saying it can't be done?
2  A.   It cannot be done.
3  Q.   Okay.
4  A.   It cannot be done in the reality of collecting
5  data for a study.  You cannot do it.
6  Q.   Okay.  You assume that they're answering
7  truthfully, right?
8  A.   Yeah.
9  Q.   And on any of whether they or their members
10  work for any of those entities, right, or types of
11  entities?
12  A.   Right.  Right.  Unless you start doing, you
13  know, going with all types, tests for truthfulness and
14  others.  There is so far to date, in market research,
15  no one was able to find the solution for this.  So we
16  have to accept that the responses respondents are
17  giving to us.  Once you control for the things that we
18  can control, which I just -- we just reviewed as part
19  of the control -- what to control here, we have to
20  assume that they are giving us correct responses.
21  Q.   Could have looked and seen if any of the
22  respondents matched, for instance, American's employee
23  database, right?
24  A.   Their name.  They can use different names.

1 Q.   Okay.  They can give false names, right?
2 A.   They can give false names.  There are so many
3 ways of cheating here.  You have to assume that these
4 people are honest and responding.  And these are
5 people who are members of the panel.  And the panel --
6 if you should actually read the Appendix C1, and
7 you'll see that panel companies are doing the best
8 they can to try to assure they are getting the right
9 respondents who are not going to cheat.
10        And we do find, you know, we do find.
11 We do find some people that we had to eliminate
12 because they failed CAPTCHA.  We had to eliminate
13 people who gave us bullshit response.  So far there
14 has not been a better way in marketing research, in
15 survey research in general, to address the issue you
16 are raising.
17 Q.   The data is only as good as the input, right?
18 Or their opinion is only as good as the data input,
19 right?
20 A.   You know, you're trying to control for this as
21 much as you can with the quality control procedures
22 that I listed on page, I think it was 23.
23 Q.   Were you the only one involved in the design of
24 these experiments?

Page 82

1 right?
2 A.   Predominantly, yes.  Because they are the best
3 way to get unbiased answers to questions.
4 Q.   What's your authority for that proposition?
5 A.   First of all, my own experience in research.
6 That's the way I've been teaching for years.  And two,
7 if you look at all the consumer research, marketing
8 research, social science research, open-ended
9 responses are among the best one.  Unfortunately, most
10 companies don't use it because it's cheaper and easier
11 to give a bunch of closed-end questions and let people
12 respond to them, as opposed to asking respondents to
13 reflect and to answer.
14        So my preference always has been, to
15 the extent possible, ask open-ended questions and then
16 augment them with a few closed-end questions.  And I
17 totally disagree with your expert who claimed that the
18 standard is closed-end questions.  That's bullshit.
19 Q.   And who said that?
20 A.   One of your experts.
21 Q.   Okay.
22 A.   The professor from the University of Minnesota.
23 Q.   From Minnesota.
24        And you say -- what was the scholarly

Page 84

1 A.   I'm sorry.  Mistake.  It was page 27, 28.  That
2 page.
3 Q.   Okay.  Sorry.  I didn't realize you were sill
4 answering.  I apologize for interrupting.
5        Was anyone else involved in the design
6 of the experiments, other than yourself?
7 A.   No.
8 Q.   Going to the research design here, that the
9 bottom of page 8 and then goes on to page 9.  You have
10 five major parts here listed, right?
11 A.   Correct.
12 Q.   And those five parts or five steps there, how
13 did you decide on including those?
14 A.   Well, given the problem that I tried to address
15 here, whether Skiplagged is leading consumers to
16 perceive association between them and American
17 Airlines, and whether they deceive the consumers
18 concerning the terms and conditions of the Hidden City
19 ticket, I felt that these are the right things to do
20 to answer these question.
21 Q.   Did anyone else have any input into these five
22 parts?
23 A.   No.
24 Q.   And you chose to use open-ended questions,

Page 83

1 authority that you referenced for it's best to use
2 open-ended questions?
3        MR. NELSON:  Asked and answered.
4        THE WITNESS:  I thought I answered
5    this.  Any study.  I didn't give you a single
6    source.
7 BY MR. REED:
8 Q.   Can you give me a single source?
9 A.   No.  Any consumer research, any good, solid
10 consumer research, human research, social science
11 research, will give you the benefit of open-ended
12 questions.  It's well known.
13 Q.   Can you name me a scholarly article, book,
14 publication that states that it's better to use
15 open-ended than close-ended?
16 A.   I can give you a lot of articles.  If you just
17 do a Google search or use Trend, EPT or any of the
18 other sources about open-ended versus closed-end,
19 you'll get all the information you want.  I wouldn't
20 my time and the client's money to try to give sources
21 for something as obvious as this.
22 Q.   Can you tell me one as we sit here today?
23 A.   Pick up any basic marketing research.
24 Q.   I'm asking you for the -- who is the leading

Page 85

22 (Pages 82 - 85)

1  scholar on this?
2  A.    Look at Green and Tull.
3  Q.    Green?
4  A.    And Tull.
5  Q.    T-U-L-L?
6  A.    T-U-L-L.  One of the classic books on marketing
7  research.  And look at -- you know, do some Google
8  search or have one of your experts, you know, do some
9  Google search on qualitative research and the value of
10  qualitative research.
11         Why do you think there is a whole
12  process for analyzing open-ended data, because this is
13  a common and very powerful way of getting insight into
14  respondents' beliefs and answers to different
15  questions.
16  Q.    Green and Tull, those are the authors?
17  A.    Yeah.  They are the authors of many many books
18  of marketing research.
19  Q.    Okay.  And is there a specific book that you're
20  referencing here that would be the authority on using
21  open-ended versus close-ended question?
22  A.    I don't think any of the books really focus
23  specifically on one versus the other.  You know,
24  because in a sense I'm using here closed-end questions

1  as well, it's complimentary.  It's much more -- the
2  question is what is the research designed to develop
3  in the balance between open-end and close-end
4  questions.  What do you want to get information on
5  different things in different ways.  And research
6  design, to a large extent, it's not only size it's
7  also art.  And the difference between good researchers
8  and poor researchers is at the creativity of their
9  design.
10  Q.    Who is the leading authority on research
11  design?
12  A.    There are many many books on the topic.  There
13  is no single leading authority on the area.
14  Q.    Who would you consider it to be?
15  A.    I don't consider anyone as a leading authority.
16  I'm familiar with the field, I'm familiar with the
17  material and I basically publish enough in this area,
18  and taught enough in this area, and worked enough in
19  this area to rely on my judgment.
20  Q.    And that's --
21  A.    And I feel this is the best research design for
22  the topic.
23  Q.    Okay.  Based on your experience?
24  A.    Yeah.  And if you really doubt that this is not

1  the right design, you hired four experts in this case,
2  why not hire one that will do a research.  Why can't
3  you do a research?  Come up with a different research
4  design.  I believe this research design is objective,
5  balanced and can be presented.  Had Skiplagged hired
6  me, I would design exactly the same research design.
7  Q.    But you didn't reference Green and Tull or any
8  other authority when you made your decision to use
9  open-ended questions, did you?
10         MR. NELSON:  Objection; argumentative.
11         THE WITNESS:  I don't have to.  I know
12      the field.  They hired me because I am an
13      expert in the field.  Because I am the one that
14      wrote the book on many of these topics.  I
15      don't have to refer to any others.
16  BY MR. REED:
17  Q.    You wrote a book using open-ended versus
18  close-ended?
19  A.    Many of my publications, I refer to the use of
20  open-ended research.
21  Q.    Which ones?
22  A.    Many.
23  Q.    Can you name me some, please.
24  A.    Let me look at my resume.

1         (Reviewing document.)
2         Okay.  If you open my resume, page 28.
3  I'll give you now the number of articles where we used
4  extensively open-ended questions as part of that
5  analysis.  So number 5, number 8, 11.  And all of
6  dangers, heavy use of open-ended questions.  12.
7  Probably in 17.
8         (Reviewing document.)
9         Let's look at another section of m,y,
10  applications.  There is one that starts -- just
11  reviewed was in the section on marketing research that
12  calls in the area of the consumer behavior, which
13  would be starting on page 23.
14         (Reviewing document.)
15         Probably number 4.
16         (Reviewing document.)
17         Probably 11.
18         (Reviewing document.)
19         16, this is actually a very explicit
20  paper on analyzing free response data in marketing
21  research that deals directly with the whole issue of
22  open-ended questions.  And many more.
23         So I've used -- in short, I've used
24  open-ended response for years.  I've taught it for

1  years.  I reviewed thousands of other research
2  projects over the years.  And in all of them my big
3  preference always has been for open-ended response as
4  a dominant way of getting consumer insight.
5          Not necessarily instead of, but in
6  addition to closed-end questions.  So I see absolutely
7  no need to start looking for references from other
8  books to justify my research design.
9  Q.    Okay.  And so you didn't?
10 A.    Correct.
11 Q.    Open-ended questions allow for more variance
12 between the answers, right, than a close-ended
13 question?
14 A.    Well, it gives it the truth.  It's not biased
15 by the options you are giving people.  Closed-end
16 questions are not very good.  The reason they are
17 there is because of the ease of administering them and
18 the ease of responding to them and it makes it cheaper
19 and faster.  It does not mean they're better.  If you
20 are really interested in insight into it and
21 understanding the true responses of the respondent,
22 you'll use some open-ended question.  But you cannot
23 amend the closed-end questions as I've done here.
24 Q.    And I understand your point.  My question was
                                                    Page 90

1  Q.    And they're going to vary all over -- they can
2  vary all over because people can put -- write down
3  whatever they want, right?
4  A.    Correct.
5  Q.    They could write down superman to every answer,
6  right?
7  A.    If they do, we throw them out.  We can do so
8  that they did not pay attention to the question and
9  that's a nonsense answer, so they will be out.  But
10 the other people who respond honestly to surveys, as I
11 believe people do, the variability in their responses
12 is meaningful, is useful information.  That's what we
13 want to find out.
14 Q.    And it's an assumption that you make that
15 people are responding honestly, right?
16 A.    It's an assumption underlying all of marketing
17 research.
18 Q.    Okay.
19 A.    All political polls.
20 Q.    Okay.
21 A.    All public opinion polls, it's the fundamental
22 assumption of all, the whole industry of billions of
23 dollars, the industry of marketing research.
24 Q.    And because of the open-ended question, then
                                                    Page 92

1  different though.  My question was open-ended
2  questions allow for more variance on the answers than
3  closed-ended, right?
4          MR. NELSON:  Objection to form.
5          THE WITNESS:  The question is, how do
6      you define variance?  You're getting larger set
7      of responses to any answer.  Variance is
8      typically interpreted as differences among
9      people.
10 BY MR. REED:
11 Q.    Okay.
12 A.    You get a lot of variance also in closed-end
13 questions.  That's the whole basis for many, not
14 neccessarily investigation, but when you're doing
15 studies for either academic studies or studies for the
16 conduct of business, you're typically trying to
17 identify different segments of respondents.  Then you
18 focus on trying to identify, how among a heterogenous
19 group of respondents, you identify more homogenous
20 segment, that's what the variance refers to.
21 Q.    Okay.
22 A.    We're talking here in open-ended responses,
23 you're getting responses that you will never get from
24 closed-end questions.
                                                    Page 91

1  you had to use the coders in order to code those
2  responses, correct?
3  A.    Correct.  But that's the correct scientific
4  approach to analyze open-ended responses.
5  Q.    And they had to make decisions based upon those
6  open-ended questions as to how to code those into
7  discrete categories that you had selected, right?
8  A.    Correct.  And that's the reason I am using two
9  independent coders and a procedure to test for the
10 consistency in their response and resolve conflict
11 between the two of them, if there are any.
12 Q.    Now, couldn't you have used a combination of
13 both close-ended and open-ended questions in order to
14 test how the coders were organizing those open-ended
15 questions into the discrete categories?
16         MR. NELSON:  Objection to form.
17         THE WITNESS:  I'm not seeing code end
18     questions used for this purpose to test the
19     coders.  But I did include closed-end
20     questions.  If you go back to the
21     questionnaire.
22     (Reviewing document.)
23         Starting on the bottom of page 20,
24     there is a series of closed-end questions that
                                                    Page 93

24 (Pages 90 - 93)

1    I used in the study.
2         So question 7A, asks what do you
3    believe is the relationship between Skiplagged
4    and the airline?  And the response options
5    were, Skiplagged or Expedia, for those
6    responded in the control group or saw the
7    control group, which is Expedia, is an
8    authorized agent of the airline, is not an
9    authorized agent of the airline, there is some
10   other relationship between Skiplagged and the
11   airline or don't know.
12        And then there is a question, what
13   makes you say so.  So we follow up with
14   open-ended questions on this.
15        Question 8A asks, 9A, 10A, 11A, 12A,
16   12C, are all close-end questions.  But I
17   basically designed the study in a way that
18   provides the right balance between open-ended
19   questions and closed-end questions.
20   BY MR. REED:
21   Q.    You chose not to include a closed-end question
22   of, for instance, does Skiplagged confuse you, were
23   you confused by Skiplagged?
24   A.    How would people answer it?  How would people

*Page 94*

1    know if they're confused or not?
2    Q.    But you didn't include that, did you?
3    A.    No.  Because how would you ask it?  There is no
4    way of asking this question in a meaningful way.
5    Q.    And you didn't include the close-end question
6    of did you feel deceived by Skiplagged, did you?
7         MR. NELSON:  Objection; argumentative.
8         THE WITNESS:  Again, a dumb question.
9    I would not ask these dumb questions.  These
10       two questions are dumb questions.
11   BY MR. REED:
12   Q.    I understand you think my question is dumb.
13   But you didn't include it, did you?
14   A.    Because I thought they were dumb and I did not
15   include them.
16   Q.    You did not include them, did you?
17   A.    Correct.  Because I --
18   Q.    Okay.  That's all I'm asking you.  I understand
19   you think my questions are dumb.  And, hey, I'm not a
20   marketing person.
21        MR. NELSON:  Can you ask a question
22       please and not argue with the witness.
23   BY MR. REED:
24   Q.    So you can call my questions dumb.  But I'll

*Page 95*

1    ask a similar question.  They may be dumb.  They may
2    be brilliant.  Probably in the dumb area, I bet.
3         All right.  Earlier you said just a
4    minute ago that you chose Expedia as the control
5    group?
6    A.    Correct.
7    Q.    Okay.  Now, you chose Expedia because why?
8    A.    Because Expedia is a legitimate authorized
9    agent of American Airlines.
10   Q.    And how did you know that?
11   A.    From counsel.
12   Q.    Okay.  So you were told Expedia was an
13   authorized agent?
14   A.    Correct.
15   Q.    Were you given a selection of authorized agents
16   to choose from?
17   A.    I asked about Expedia.  I was looking for a
18   control group that would be a legitimate authorized
19   agent that most people use.  I was familiar with
20   Expedia and I asked for verification of authorized
21   agent, and when I was told that yes, I decided to use
22   them as a control.
23   Q.    Did you consider any others for the control
24   group?

*Page 96*

1    A.    I don't recall. I'm sure I did at the time.  I
2    don't recall what they were.  I was thinking about
3    trying to look for the best example for this.  And I
4    thought Expedia would be the one.  And then I checked
5    and I found out that they are, and I used them in the
6    control.
7    Q.    What criteria did you use to find them as the
8    best example?
9    A.    Well-know, market share.
10   Q.    And why did they need to be well-known?
11   A.    Because we wanted something that people are
12   familiar with.  They are not going to select some
13   unknown control.  I wanted a clear marker which would
14   allow me to compare the Skiplagged responses to and I
15   wanted unambiguously recognized travel agent.
16   Q.    Okay.  And what kind of market share was your
17   criteria?
18   A.    I don't recall.
19   Q.    You didn't have a certain percentage or?
20   A.    I don't recall.
21   Q.    Now, on page 9, kind of before that section on
22   universe and sample.  You have that paragraph that
23   starts, "Expedia was chosen."
24   A.    Yeah.

*Page 97*

25 (Pages 94 - 97)

1  Q.   Are you with me?
2  A.   Yes.
3  Q.   All right.  You said the next sentence, you
4  say, "The interpretation of the difference between the
5  test and control groups is that the closer the results
6  for Skiplagged are to those of Expedia, the greater
7  the perceived confusion and deception."
8           Did I read that correctly?
9  A.   Correct.
10  Q.   Okay.  So those people like me, without a
11  Ph.D., does that mean that more the consumer thinks
12  Skiplagged is like Expedia, the more confused they
13  are?
14  A.   Yes.
15  Q.   Because Expedia is an authorized agent and
16  Skiplagged is not?
17  A.   Yes.
18  Q.   Okay.
19  A.   On the question -- with respect to this
20  dimension.  It all depends on the specific question.
21  So a confusion would be, let's go and be complete.
22       (Reviewing document.)
23           So in the questions I read you before,
24  question 7A, would you believe the relationship

Page 98

1  between Skiplagged and the airline?
2  Q.   What page are you on, sir?
3  A.   Page 20.
4  Q.   Okay.
5  A.   I am reading from my questionnaire, question
6  7A.
7  Q.   Okay.
8  A.   And if you go to the results, page 39.  So here
9  the data that we got.  So the way to read all of these
10  tables are, the first two tables, the first two
11  columns, the one that is test control, with respect
12  to the Skiplagged ticket, the non Hidden City tickets
13  and the control for it.
14           The next, the third and fourth column
15  are the Skiplagged Hidden City ticket and the control
16  for it.  So there are four separate groups here.
17  Q.   Okay.
18  A.   Respond to question 7A, Skiplagged is an
19  authorized agent.  We find out that 43 percent of
20  Skiplagged respondents said its authorized agent, and
21  56 percent of Expedia knew it.
22           So this is very close to each other.
23  It also shows you that Expedia, not 100 percent of the
24  people say they are authorized agent, even though this

Page 99

1  is the truth.  But it's pretty close.  And it's close
2  to half of the people believe they are authorized
3  agent, which they are not.
4           So the comparison with Expedia allows
5  us to decide that they were wrong, they are confused.
6  Q.   Okay.
7  A.   That's a measure of confusion.
8  Q.   Okay.  Just so that I am understanding what's
9  going on here.  43 percent of those who took the
10  Skiplagged non Hidden City test or survey --
11  A.   Which means they saw the stimuli.
12  Q.   -- said that Skiplagged was an authorized agent
13  of the airline, right?
14  A.   Correct.
15  Q.   Okay.  And 56 percent of those who took the
16  Expedia, when asked is Expedia an authorized agent of
17  the airline answered yes; is that correct?
18  A.   Correct.  Yep.
19  Q.   Okay.  And then in the Hidden City ticket,
20  which is the next step, 42 percent said they took the
21  Skiplagged test and said that Skiplagged is an
22  authorized agent of the airline.  And those who, in
23  the Hidden City, that took the Expedia, said that
24  63.9 percent of those said Expedia was an authorized

Page 100

1  agent?
2  A.   Correct.
3  Q.   Okay.  So the Expedia people weren't asked
4  about Skiplagged, were they?
5  A.   Correct.
6  Q.   Okay.
7  A.   They were shown -- everything goes back to the
8  stimuli.  So the Skiplagged ticket people, the first
9  column, so the stimuli, which was the Skiplagged
10  website, basically the screenshot from the Skiplagged
11  screenshot, the people in the Expedia saw the
12  screenshots of the Expedia corresponding information,
13  and so in the other one.  And all of these stimuli are
14  included in Appendix C2, and also as part of C4, which
15  are the screenshot of the program questionnaire.
16  Q.   Okay.  And so you're saying that because
17  43 percent is similar to 56 percent, then there was
18  confusion?
19       MR. NELSON:  Objection;
20  mischaracterizes.
21       THE WITNESS:  Yeah.  Fundamentally, as
22  a laymen person, yes.  That basically you would
23  expect -- the truth is, we know the truth, they
24  are not recognized as the authorized agent.  So

Page 101

26 (Pages 98 - 101)

1    the correct answer would have been zero.
2  BY MR. REED:
3    Q.   Okay.
4    A.   Instead we find that 43 percent of the people
5  are confused.  So to me the fact, what I need to
6  decide is 43 confused or not.  So the benchmark to
7  compare it to, the control, which is 56 percent, and
8  saying it's pretty similar to this, and, therefore, I
9  can conclude, quite conclusively, plus the other
10  evidence I have.  Because we're not relying on this
11  one question.  That they basically, the Skiplagged
12  website, deceives consumers to believe that they are
13  associated with American.
14    Q.   Okay.  Now, the Expedia one, we're assuming
15  that Expedia is an authorized agent of the airline.
16  How do you account for 43, 44 percent of those people
17  being wrong?
18    A.   They don't know.  They don't know.  They're
19  wrong.  There is no way of accounting for those.  We
20  know the answer.  We know that 14.2 percent of them
21  knew they are not authorized agent, which is wrong in
22  their case.  We know that 15.5 percent say there is
23  some other relationship between them and 14 percent
24  said don't stop.  These are the responses.

Page 102

1    Q.   Okay.
2    A.   I'm giving you some example of open-ended
3  responses when we asked them why.
4    Q.   So there wasn't confusion in the Expedia
5  answers, though, even though 43 percent were wrong.
6    MR. NELSON:  Objection;
7  mischaracterizes.
8    THE WITNESS:  Well, they are not wrong.
9    They basically gave you other answers.  They
10    gave you some they believe there is other
11    relationship, like 15 percent.  They may not
12    know what authorized relationship are.  But
13    that's the reason we ask many questions.  We do
14    not rely, in my analysis, I did not rely only
15    on this.
16  BY MR. REED:
17    Q.   Your survey didn't define authorized agent, did
18  it?
19    A.   No.  And that's the only place in the survey
20  that we asked this question.
21    Q.   It required the respondents to know what an
22  authorized agent was?
23    A.   Whatever their perceptions are.
24    Q.   Okay.  And you didn't ask any open-ended

Page 103

1  questions as to what their perceptions were of that
2  term?
3    MR. NELSON:  Objection;
4  mischaracterizes.
5    THE WITNESS:  The questions are exactly
6    as question 7A on page 21.  When they finished
7    this and they answer it, we asked them what
8    made you say that?  And so there is the
9    open-ended.  If anyone mentioned it -- now, you
10    have and your experts had access to all the
11    verbatim.  Exhibit C7 includes the full
12    verbatim of every response that everyone
13    mentioned in our survey.  So they could have
14    easily gone through and examined this if they
15    wanted to.  I did not.  I did not think it was
16    relevant.
17  BY MR. REED:
18    Q.   Did you consider any other reasons that may
19  contribute to similarity in results between the
20  Skiplagged and Expedia groups --
21    MR. NELSON:  Objection.
22  BY MR. REED:
23    Q.   -- other than deliberate confusion?
24    MR. NELSON:  Objection to form.

Page 104

1    THE WITNESS:  I am just reporting the
2  result of the study.  So I'm just speculating
3  here.  I'm looking at the results of the study.
4  And the confusion of similarity.  Let's look at
5  the section of the results.
6    (Reviewing document.)
7    So this starts on page 37.  This is the
8  section that talks about consumer beliefs with
9  Skiplagged or Expedia association with American
10  Airlines.  Exhibit-4 gives you the responses.
11  And based on content analysis of all open-ended
12  questions, that's the first category here.
13  You'll notice that the columns are the same in
14  all of -- all the exhibits we present the
15  results.
16    So open-ended responses, 2.7 percent of
17  the Skiplagged ticket and 4.9 percent of the
18  Skiplagged Hidden City ticket perceived
19  association.  Then we had question one, which
20  was how would you describe this to a friend?
21  We found there the 1.4 percent.  And it was
22  less than 1 percent in the Skiplagged Hidden
23  City perceived association.
24    Then we had the two confusing

Page 105

27 (Pages 102 - 105)

1  questions, are they associated or connected
2  with the airline, this was question two and
3  three. And then question four was, are they
4  required to provide permission or authorization
5  to get results.
6      So the net result of all of these is 41
7  percent of the Skiplagged tickets believed that
8  there is association. And 42.6 percent for the
9  Expedia. Obviously, notes the difference
10  between the two and suggesting that, you know,
11  there is a major misperception of association
12  here. And similarly we have 49.9 percent of
13  the Skiplagged tickets.
14      Then there is another table -- then
15  there is the result of Table 7 that we
16  discussed before. And then there is another
17  table, Exhibit-6, that looked at the response
18  to question 11, which was, Skiplagged is an
19  authorized travel agent with access to fares I
20  could not access via the airline. Which,
21  obviously, suggests again, they're authorized
22  agent.
23      And then in Exhibit-6A, I'm summarizing
24  all of these data. And looking at the response

Page 106

1  mentioned and see if there are any other reasons. As
2  I sit here today, I cannot think about any others, but
3  we can definitely focus on this and go back to the
4  open-ended responses. You have all of them in
5  Appendix C7. And see if we getting any additional
6  insight.
7  Q.   You set up the question or the surveys here to
8  look for confusion and deception, right?
9  A.   Correct.
10 Q.   Okay. And that's what you found, right?
11 A.   Correct.
12 Q.   Okay. My question, kind of going back, and
13 maybe I missed it, is whether you considered any other
14 reasons of why you would come up with some similarity
15 of results between the Skiplagged group and the
16 Expedia group, other than confusion or deception on
17 behalf of the Skiplagged?
18      MR. NELSON: Objection to form.
19      THE WITNESS: I thought I answered
20  this. I think that these -- the fact that we
21  had the multiple questions trying to address
22  the same question, both open ended and
23  close-end reflected all of them in Exhibit-6 A.
24

Page 108

1  to the open-ended questions. Then the question
2  6, which was the explicit questions about
3  association or permission. Then we looking at
4  the two closed-end questions, 7A and 11A.
5      That the net of all of this is that
6  76 percent of the people exposed to the
7  Skiplagged ticket believe there was association
8  with American. And Expedia will be 81 percent.
9  Very close to this. With respect to the
10  Skiplagged Hidden City ticket, we find 72.9
11  percent and 86 percent for Expedia.
12      So the range, so my profession here,
13  you're talking about the range of association, when
14  you look at all of these questions and you avoid
15  duplication in answer, between 72 and 76 percent of
16  the people are deceived to believe that there was
17  association between Skiplagged and American.
18 BY MR. REED:
19 Q.   Okay. I let you kind of go. But my question
20  was, did you consider any other reasons for the
21  similarity in results, other than confusion or
22  deception?
23 A.   The only thing we can look at is we look then
24  at the open-ended responses, which I thought I

Page 107

1  BY MR. REED:
2  Q.    And I know you're going through the charts.
3  But my question is, is what else did you consider that
4  could possibly lead to similar results?
5      MR. NELSON: Objection to form.
6      THE WITNESS: I don't know what else --
7  I'm not sure what else can explain it, other
8  than there is basically -- I'm reporting on the
9  fact the consumers have the perception that
10  they are associated. I don't know what else
11  can account for this, other than the stimulus
12  that they saw. They saw the stimulus --
13 BY MR. REED:
14 Q.   Okay.
15 A.   -- in response to the stimuli. And the
16  stimulus that they saw were the Skiplagged
17  information.
18 Q.   Okay. Let's go to that then, because that --
19  there is a question that I had then.
20           - - -
21      (Exhibit Wind-6, Radius, Appendix C-2,
22       16 pages, was marked for identification.)
23           - - -
24

Page 109

28 (Pages 106 - 109)

BY MR. REED:

1  Q.   All right.  You've been handed what's been
2  marked as Exhibit-6 for your deposition.  You'll see
3  at the top it has Appendix C-2 from your report.
4  A.   Correct.
5  Q.   Is this the stimuli that you're referring to?
6  A.   Yes.
7  Q.   Okay.  Is this the complete set of stimuli that
8  was provided to the respondents?
9  A.   No.
10 Q.   What other stimuli were there?
11 A.   This is only for one of the groups.  This is
12 only for the Hidden City stimuli.
13 Q.   So we've got the Hidden City still stimuli
14 then.  The other appendix would have the other
15 stimuli, right?
16 A.   The Skiplagged Hidden City and the Expedia
17 stimuli.
18 Q.   Okay.  Because the appendices are labeled C2,
19 the stimuli.  And the --
20 A.   Plural.
21 Q.   I'm sorry.
22 A.   Plural.
23 Q.   Okay.

*Page 110*

1  A.   Stimuli, so you should have all of them.
2  Q.   So we start off with Hidden City stimuli,
3  correct?
4  A.   Yes.
5  Q.   And it says "Stimuli 1 for Skiplagged, cell 1,"
6  correct?
7  A.   Yes.
8  Q.   And then we have a couple of pages and then we
9  have a, let's see, about five or six pages in, you
10 have Stimuli 1 for Expedia cell 2, correct?
11 A.   Yes.
12 Q.   Okay.  And then go two more pages and we have,
13 Stimuli 2 for Skiplagged cell 1 and Expedia cell 2,
14 correct?
15 A.   (Reviewing document.)
16       Yes.
17 Q.   All right.  And then two more pages, Stimuli 2
18 for Skiplagged cell 1?
19 A.   Correct.
20 Q.   And then two more pages, non Hidden City
21 stimuli, Stimuli 1 for Skiplagged cell 1, correct?
22 A.   Yes.
23 Q.   Okay.  Two more pages, Stimuli 1 for Expedia
24 cell 2, correct?

*Page 111*

1  A.   Right.
2  Q.   Two more pages, Stimuli 2 for Skiplagged cell 1
3  and Expedia cell 2, correct?
4  A.   Yes.
5  Q.   Is this all the stimuli?
6  A.   I think so.
7  Q.   Okay.  So I just want to make sure that there
8  wasn't some other ones that were somewhere else?
9  A.   No.  I think they're all here.
10 Q.   Okay.  And so I think what you were saying
11 earlier is that you exposed them to this stimuli as
12 part of the test, right?
13 A.   Yes.
14 Q.   Okay.  And then based upon that exposure, they
15 answered the questions?
16 A.   Correct.
17 Q.   Okay.  And your statement here is, that based
18 upon the exposure to this stimuli, there could be no
19 other explanation for the results you got, other than
20 confusion and deception?
21       MR. NELSON:  Objection to form.
22       THE WITNESS:  Well, if there is --
23 correct.  If there is any other possible
24 explanation, the place to find it would be

*Page 112*

1  going over the verbatim responses.  To answer
2  to say, why did they answer the way they did
3  for some of those open-ended questions.
4       And so -- and my answer before was,
5  that you have all the data in Appendix C7.  I
6  did not look for other explanations because to
7  me, that's straightforward, the results.  It's
8  an experiment, you're showing a stimulus,
9  they're giving you a response, you compared to
10 control group.  So to me, that's a
11 straightforward, the cause is the Skiplagged
12 actions.  If you want to look for other
13 potential explanation, you know, we have the
14 data, so someone can look at the verbatim
15 responses and see if there are any other
16 explanations.
17 Q.   Okay.
18 BY MR. REED:
19 Q.   Okay.  Now, looking at Exhibit-6, at the
20 stimuli here, this first page is for Hidden City,
21 correct?
22 A.   Correct.
23 Q.   Okay.  And if we look at -- well, let me step
24 back.

*Page 113*

29 (Pages 110 - 113)

1    Who chose the stimuli to use in this
2  study?
3  A.    Well, I did it together with Zach from Cam's
4  office.  Who did -- this is the analysis of the 200
5  flights that's referred to in Exhibit-2.  This was the
6  Excel spreadsheet of data for 200 tests by results
7  from test booking on Skiplagged.com with corresponding
8  test booking on American Airlines.
9  Q.    Okay.  And so from that spreadsheet that we
10  talked about earlier, this stimuli was chosen; is that
11  correct?
12  A.    Yeah.  And the description of how it was chosen
13  is in my report on page 10 and 11.
14  Q.    Okay.  And did you look at all 200 of those to
15  choose this specific stimuli?
16  A.    No.
17  Q.    How did you go about choosing these specific
18  ones?
19  A.    That was described on page 11 very clearly.  We
20  looked for what is the price difference between the
21  Skiplagged and American Airlines, selected the average
22  price difference between them and selected the flight
23  which was the closest to the average.  So this is
24  described on page 11, for the known Hidden City

Page 114

1  stimuli, then, from the average?
2  A.    I was on a phone call with Zach when we did it.
3  And we talked about telling me which one are close to
4  the average, he gave me, you know, whatever they were,
5  one or two or three.  And we selected one.
6  Q.    So you asked Zach for an average one, he gave
7  you a couple and you selected them?
8  A.    Correct.
9  Q.    Okay?
10  A.    The same thing for the Hidden City.
11  Q.    Okay.  And that you were looking for an average
12  of $62 cheaper?
13  A.    Correct.
14  Q.    Okay.  On a round trip?
15  A.    No.
16  Q.    One way?
17  A.    Both of them were one way.
18  Q.    So both the non hidden and the Hidden City were
19  one way?
20  A.    One way.
21  Q.    Why did you choose one way?
22  A.    Because I think that Skiplagged recommend for
23  Hidden City not to book round trip because the airline
24  may cancel the return.

Page 116

1  booking, the average price differential was 12.62 more
2  expensive on Skiplagged.com than AmericanAirlines.com.
3  Thus the stimuli selected for the survey was booking
4  that was $10 more expensive with Skiplagged than
5  American Airlines.
6  Q.    Okay.  So that was chosen from the spreadsheet?
7  A.    From the 200, right.
8  Q.    Okay.
9  A.    And the same procedure was used for the Hidden
10  City.
11  Q.    Okay.  And that 200 was generated from Level
12  Legal by Greenberg, correct, or its lawyers?
13  A.    Correct.
14  Q.    Okay.  And so from that -- and who calculated
15  the price differential?
16  A.    Zach did it, but it's a computer program.  It's
17  very simple.
18  Q.    You didn't do it?
19  A.    I didn't do it.
20  Q.    Okay.  So from whatever Greenberg or Zach at
21  Greenberg calculated on that, you tried to find one
22  that matched closely to that average?
23  A.    Tried to be close to the average.  Right.
24  Q.    And so who actually chose this specific

Page 115

1  Q.    Okay.  So your whole study was focused on one
2  way tickets?
3  A.    Correct.
4  Q.    Okay.  In fact, when we look at, going back to
5  Exhibit-6 here, when we look at the stimuli here, and
6  I know it's a little bit small, so maybe it's a little
7  hard to, hopefully you can see it there.  It says,
8  under the Skiplagged name, it has a little drop down
9  that says one way, one traveler.
10    Do you see that?
11  A.    (Reviewing document.)
12  Q.    Kind of left, under the big blue banner.
13  A.    Yes.
14  Q.    Okay.  And so that would indicate to you this
15  was for a one-way ticket for one person?
16  A.    Correct.
17  Q.    Okay.  Now, how was this stimuli presented to
18  the respondents?
19  A.    Like this (indicating), on your screen, as part
20  of the questionnaire.
21  Q.    So it's done on a computer?
22  A.    On a computer.
23  Q.    It was a screenshot?
24  A.    Yes.

Page 117

30 (Pages 114 - 117)

1 Q.   Not an interactive web page, correct?
2 A.   Correct.
3 Q.   Okay.  And so they got this exact view that is
4 provided here?
5 A.   Correct.
6 Q.   Okay.
7 A.   And you have this actually, if you'll go to
8 Appendix C4, you will see the screenshot with embedded
9 stimuli.
10 Q.   Okay.  And the search here to generate the
11 stimuli, do you know who did that?
12 A.   Zach.
13 Q.   So at the Greenberg lawyer?
14 A.   Correct.
15 Q.   He went on to American -- or onto Skiplagged's
16 website and did the search to generate this page?
17 A.   Yes.
18 Q.   And then Zach took the screenshot?
19 A.   Yes.
20 Q.   And then Zach provided that to?
21 A.   Radius.
22 Q.   To Radius?
23 A.   To me and Radius.
24 Q.   Okay.  Do you know when Zach performed his

Page 118

1 search that ended up here on Appendix 2 here, the
2 stimuli, this first page when we're looking at
3 Exhibit-6, were those the only results returned for
4 that search or were there more?
5 A.   This is the first page.  I told him to focus
6 only on the first page, because I know that consumers
7 never look beyond the first page.
8 Q.   How do you know that?
9 A.   Experience, tons of studies.
10 Q.   What studies tell you that?
11 A.   All type of studies about consumer behavior on
12 the web.  They switch all the time to look, typically
13 they look at the first page.  And especially because
14 they're doing screening that gives them the first page
15 of what they're interested in.  So I felt first page
16 is what -- all we have to show them.
17 Q.   Can you name me a publication that says
18 consumers only look at the first page of a result?
19 A.   I don't have it here.  I'll be glad to give
20 you -- Google this and find tons of studies on this.
21 Q.   Did you refer to any when deciding to only
22 provide the first page to the respondents in this
23 study?
24 A.   I did not see any need for doing that.

Page 119

1 Q.   So the answer is no?
2 A.   Correct.
3 Q.   So there was seven offerings on this first
4 page, correct?
5 A.   Yes.
6 Q.   Four were for American Airlines and three for
7 another airline?
8 A.   Yes.
9 Q.   Okay.  And the red box, was that added or was
10 that on the website?
11 A.   This was added by us.
12 Q.   Who added it?
13 A.   Physically, it was Zach, at my suggestion.  I
14 wanted to highlight the flights we were comparing
15 here.
16 Q.   Okay.  So that wouldn't have actually appeared
17 on the Skiplagged website like that?
18 A.   Correct.
19 Q.   Now, the second page here, on Exhibit-6, do you
20 know what that is?
21 A.   A continuation of the search.  If you're going
22 towards, if you selected this and you're going to book
23 eventually a flight, so this would be the next thing
24 that you will see.

Page 120

1 Q.   Okay.  So if you clicked on the flight that is
2 in the red box on the previous page, it takes you to
3 this next page; is that your testimony?
4 A.   Yes.
5 Q.   Now, did you do this or did Zach?
6 A.   Zach did it.
7 Q.   Okay.  And so this is still from Skiplagged's
8 website?
9 A.   Yes.
10 Q.   Okay.  And this was provided to -- as a image
11 to the respondents, correct?
12 A.   Correct.
13 Q.   Okay.  In the -- this is part of the Hidden
14 City stimuli, right?
15 A.   Correct.
16 Q.   Okay.  And the next page, are you familiar with
17 what it is?
18 A.   Yeah.  That's basically the import information
19 that appears on the Skiplagged website.
20 Q.   Okay.
21 A.   Alerts them to -- these are the risks that they
22 are alerting them to.
23 Q.   Do you know how you get to that page?
24 A.   You click on it.  It's either a pop up or a

Page 121

31 (Pages 118 - 121)

1  click.  I don't recall now.
2  Q.   So you don't know how you get to that page?
3  A.   You can get this one of two ways.  Sometimes it
4  will be there, sometimes you have to click on this.
5  And sometimes, depending on what you clicked before,
6  this will appear.
7  Q.   It just depends.
8  A.   Depends.  They change.  Part of the reasons we
9  are using studied screenshots, because they change the
10 website all the time.
11 Q.   Okay.
12 A.   So there are changes.  It's dynamic.  So you
13 have to make sure that everyone sees exactly the same
14 thing.
15 Q.   And to your knowledge how often has this page
16 changed on Skiplagged's website within the last 12
17 months?
18 A.   I don't know.
19 Q.   Do you have any idea?
20 A.   No.
21 Q.   You don't know if it has, do you?
22 A.   I don't.
23 Q.   Okay.  Now, there is two checkmarks on that
24 page.

Page 122

1        Do you see that?
2  A.   Which page are you looking at, page 2 or 3?
3  Q.   Page 3 --
4  A.   Yeah.
5  Q.   -- on Exhibit-6 important information about
6  your flight.
7  A.   Yeah.
8  Q.   And I think your testimony was, you get there,
9  it depends on clicking something.  And I see two check
10 boxes checked.
11 A.   Right.
12 Q.   Do you see that?
13 A.   Yes.
14 Q.   And do you know how those boxes were checked
15 prior to producing this image?
16 A.   I assume that Zach checked them.  But typically
17 the idea here is the consumer, who is going through
18 the process of buying the ticket will check these.
19 Q.   Is it your understanding, or do you have any
20 understanding of whether a consumer on Skiplagged's
21 website can proceed without checking those boxes?
22 A.   My understanding is that they will have to
23 check it.  But it's an automatic check.  Most
24 consumers check everything.

Page 123

1  Q.   And how do you know that?
2  A.   Again, I've got a general knowledge.  Consumers
3  don't read very carefully footnotes.  They don't read
4  small print.  They just check to try to get through.
5  Their objective is to get through as fast as possible.
6  Q.   So most consumers when they have a check box,
7  they check it real quick, they don't read it, they
8  just go on, correct?
9  A.   We have evidence here.  Because we know that
10 even though it was there and they were asked to read
11 it and carefully, not everyone mentioned these when we
12 talked about risk factors.
13 Q.   Okay.
14 A.   Because there is a question on what are the
15 risk factors?  We recited the risk factors, what are
16 they.  And very few mentioned these.
17 Q.   Okay.  And that's typical consumer behavior,
18 right?
19 A.   Correct.
20 Q.   Okay.  Now, the respondents to your survey
21 didn't have to check these boxes to proceed, they were
22 just showed an image like this one (indicating),
23 where it was already checked, right?
24 A.   Correct.

Page 124

1  Q.   Correct?
2  A.   Correct.
3  Q.   And so respondents who hadn't used Skiplagged's
4  website would not know that you'd have to check those
5  to proceed, correct?
6  A.   Well, they're responding to what they see in
7  front of them.  So they see in front of them this
8  information.  And then based on this, following this,
9  they're asked a set of questions.  So there was a
10 control before they are asked the questions.  And they
11 are asked to read it carefully.  They are asked
12 validating that you read carefully, did you -- were
13 you able to see it clearly.  They said yes.  And then
14 they're asked a series of questions.
15 Q.   Okay.  I get what you're saying there.
16        Then the next page, do you know how,
17 then, that one was generated?
18 A.   This is the last purchase page.
19 Q.   Okay.  So after you click proceed, after you've
20 clicked the two check boxes, you get the purchase
21 page?
22 A.   Yes.
23 Q.   Okay.  Now, the red box, was that added by you
24 all, or was that on Skiplagged's website?

Page 125

32 (Pages 122 - 125)

1   A.   I don't recall.

2   Q.   You don't know if Zach added that or Radius

3   added it?

4   A.   I don't recall.

5   Q.   Did you do it?

6   A.   I did not.

7   Q.   Okay.  And then that's the final screenshot

8   that's provided to the respondents in the survey for

9   the Skiplagged, correct?

10   A.   Correct.

11   Q.   They weren't shown the next page once you hit

12   pay, correct?

13   A.   No.  I think this was the last page they saw.

14   Q.   Okay.  Is there a reason why you chose not to

15   show the next page?

16       MR. NELSON:  Objection; assumes facts

17   not in evidence.

18       THE WITNESS:  No.  You know, obviously,

19   we want to conclude with the last page of the

20   information.  I did not want to provide

21   information overload for the people.  I wanted

22   to make sure that they can focus on what they

23   have here in terms of the actual offer.  And

24   then the people in the sale, later on, the last

Page 126

1   part of the question, showed the American

2   Airline information.

3   BY MR. REED:

4   Q.   And I'll get to that.  I promise.

5   A.   I just want to make sure that -- because I

6   thought you asked me, that's all they saw.  I want to

7   make sure that Expedia consumers saw, in addition to

8   the Expedia stimuli, they also saw American stimuli.

9   Q.   Okay.

10   A.   Later on.

11   Q.   But is it your -- do you -- let me ask this a

12   different way.

13       Do you have any understanding of what

14   the next page is when someone, where a consumer clicks

15   on it, pay with credit card button?

16   A.   I don't recall.

17   Q.   Did you ever go past that and see?

18   A.   I did not do it myself.  I think that either

19   Cam or Zach or someone, when I was on the phone, when

20   we went through the whole sequence including purchase,

21   so I saw it after this.  But I don't recall what it

22   is.  I did not do it myself.

23   Q.   And you didn't see the next page?

24   A.   Well, I saw it on the screen.

Page 127

1   Q.   Okay.

2   A.   When it was done for me, when I was, you know,

3   on the zoom call and this was part of it.

4   Q.   And you chose not to include that page?

5   A.   Yeah.

6   Q.   Okay.

7   A.   I felt basically the last page they should see

8   what we did, what was the purchase.

9   Q.   Okay.  So then the next page here is a stimuli

10   for the Expedia with the red box added, correct?

11   A.   Correct.

12   Q.   Okay.  It doesn't show all the Expedia results?

13   A.   Correct.

14   Q.   Now, on the Expedia results, it includes two

15   American flights separated by three other airline

16   flights, correct?

17   A.   Yeah.

18   Q.   Whose decision was it to check American, Delta

19   and United for this search?

20   A.   I think we discussed it with Zach as part of

21   the search.

22   Q.   And Zach was the one who did this and took the

23   screenshot?

24   A.   Yes.

Page 128

1   Q.   Okay.  Then the next page is the payment on

2   Expedia?

3   A.   Yes.

4   Q.   Shows the total with the red box added by

5   someone, Zach or Radius or somebody?

6   A.   Right.  Yes.

7   Q.   Okay.  And then the next page is the page from

8   the American website, that both the Skiplagged group

9   and the Expedia group saw, correct?

10   A.   Yes.

11   Q.   Okay.  And that red box is added on the

12   American?

13   A.   Correct.

14   Q.   Okay.  And then with the next page being the

15   total for the trip?

16   A.   Correct.

17   Q.   Okay.  Now --

18       MR. REED:  Actually, let's go off the

19   record.

20       (A short lunch break was taken.)

21   BY MR. REED:

22   Q.   We're back on the record.  You understand

23   you're still under oath?

24   A.   Yep.

Page 129

1   Q.   All right.  I want to go back to your report,
2   which we've marked as Exhibit-5, and look at page 31
3   with me.
4   A.   (Reviewing document.)
5        Yeah.
6   Q.   So you started to the section -- starting at
7   the top of page 31, the findings of these -- of the
8   surveys, right?
9   A.   Correct.
10  Q.   Okay.  Now, you break it down in five sections
11  based on your five areas we looked at before, correct?
12  A.   Correct.
13  Q.   Okay.  Awareness and usage of Skiplagged.  Now,
14  you note here that a small percentage of the
15  respondents were familiar with Skiplagged whereas a
16  large percentage were familiar with Expedia, correct?
17  A.   Correct.
18  Q.   Did it matter to your survey that so few people
19  were familiar with Skiplagged?
20  A.   No.  Because the survey itself was on the
21  respondent's perception of the stimuli.  So in a
22  sense, the key is that every one of them saw the
23  stimuli and responded to questions, which are based on
24  the stimuli.

Page 130

1   Q.   And then I think you said, based upon the
2   awareness, only 15 percent of that 14 percent had
3   actually used Skiplagged?
4   A.   Correct.
5   Q.   Okay.  And to answer that question based on
6   awareness, did those people who answered that question
7   have to answer yes to the previous question?
8   A.   Yes.
9   Q.   So the nos didn't answer the question; is that
10  correct?
11  A.   Correct.
12  Q.   So in the Hidden City ticket test for
13  Skiplagged, there was 144 respondents, correct?
14  A.   Yes.
15  Q.   And so 14 percent of them had only heard of
16  that?
17  A.   Correct.
18  Q.   Do you know how many that is?
19  A.   What is 14 percent in terms of the number of
20  people?
21  Q.   Of 144.  Yes.
22  A.   Well, I think it would be 20.  That's the end
23  for the next question.
24  Q.   All right.  So only 20 had actually heard?

Page 132

1   Q.   And you're referring to when you were waving
2   the previous exhibit we put up, the stimuli, which
3   were the static screenshots that were provided to
4   them, right?
5   A.   Correct.
6   Q.   And so the majority of people who had -- who
7   were respondents in your test here, were familiar with
8   Expedia and had used Expedia, right?
9   A.   Correct.  And that's validation of that Expedia
10  was the right control to use.
11  Q.   And they had used the actual Expedia website,
12  opposed to just being exposed to the stimuli, right?
13  A.   Well, some of them.  78 percent of them used
14  Expedia website before.
15  Q.   Okay.  So a majority of them, a large majority,
16  right?
17  A.   Correct.
18  Q.   Okay.  And a small minority had even heard of
19  Skiplagged, correct?
20  A.   Correct.
21  Q.   And, in fact, in the Hidden City ticket test,
22  right, at 14 percent, just under 14 percent had even
23  heard of Skiplagged?
24  A.   Correct.

Page 131

1   A.   Correct.
2   Q.   And so -- and only -- so 50 percent of that 20,
3   so only 10 people in respondents within the Hidden
4   City ticket tested had actually used the Skiplagged
5   website, correct?
6   A.   Correct.  But the key again, is, you know, the
7   reaction to the stimuli, that 100 percent of them.  So
8   the questions are based on the stimuli, not based on
9   the past experience.
10  Q.   So to the extent that your stimuli differ from
11  the actual experience on the website, then your data
12  would not be correct as to an actual user of that
13  website, correct?
14       MR. NELSON:  Objection to form.
15       THE WITNESS:  No.  Because first of
16       all, there is no evidence that suggests that
17       the stimuli, which is taken from the live
18       website, is not correct or a correct
19       representation.
20  BY MR. REED:
21  Q.   So your testimony, sir, here today is that the
22  visual -- the viewing of the stimuli, the static
23  images presented, has the same effect on a consumer as
24  actually using the website, putting in their own

Page 133

34 (Pages 130 - 133)

1  searches clicking on a text box and going all the way
2  through the process in the payment screen?
3  A.    It's not going to be the same experience.  The
4  experience, obviously, is different.  When you look at
5  the page versus actually interacting with them.  The
6  point is that this accurately represents the material
7  on the website.  We asked them to review it carefully,
8  to read it, to make sure they see it.  And all the
9  responses are with respect to the stimuli.
10       So you asked an endless number of times
11 this morning, you know, what is anything else?  Well,
12 the answer, the reason for all the answer, the reason
13 for all these responses we have here is the consumers'
14 interpretation of the stimuli.
15 Q.    And not the actual website.
16       Because your studies do not account for
17 any discrepancies between the stimuli provided by
18 Greenberg and the actual website experience, right?
19       MR. NELSON:  Objection to form.
20       THE WITNESS:  It was taken from the
21       actual website in a given period of time.  It's
22       the customary approach to use basically
23       screenshots from websites and studies,
24       especially when companies change their real

Page 134

1  answer.
2  BY MR. REED:
3  Q.    Are you finished with your answer?
4  A.    Now I am.
5  Q.    Okay.  We're not here to talk about anybody
6  else's studies, we're here to talk about your work and
7  your opinions.
8       Okay?
9  A.    Yes.
10 Q.    That's what I'm asking you questions on.  Is
11 based upon your work and your opinions.  That as part
12 of your study, you did not do anything to evaluate or
13 consider the differences of the experience for the
14 consumer between using the website and observing the
15 stimuli provided by Greenberg, did you?
16 A.    I see no reason to do it, because this is a
17 common way of doing studies.  We present a website, a
18 live website with screenshots of the website, the
19 relevant sections from the website.  And I saw no
20 reason to try to replicate the study on the real
21 website.
22 Q.    And you didn't, did you?
23 A.    Correct.
24 Q.    Because you didn't see a reason for it,

Page 136

1       website all the time.  So taking screenshot
2       ensures that everyone sees the same thing and
3       it's there.  And that's what's done in all
4       studies.  I have not seen any evidence to
5       suggest that there is any discrepancy in
6       consumers' response between respond to this or
7       respond to the real website.
8  BY MR. REED:
9  Q.    You didn't look for that though, did you?
10      MR. NELSON:  Objection to form;
11      mischaracterizes.
12      THE WITNESS:  I didn't because I
13      believe that the screenshot represent
14      accurately the website.  If your experts
15      believe that it's not, they could have done a
16      study.  They could have easily replicate a
17      study or designed their own study --
18 BY MR. REED:
19 Q.    We're here to talk about your work, sir.
20      MR. NELSON:  Let him finish his answer,
21      please.
22 BY MR. REED:
23 Q.    We're here to talk today about your work?
24      MR. NELSON:  He didn't finish his

Page 135

1  correct?
2  A.    Correct.
3  Q.    Okay.  And that's all I'm asking.
4  A.    Yeah.
5  Q.    Is what you did or didn't do.  Whether you had
6  a reason or didn't have a reason, that's not the
7  question I asked.  I asked you whether you did or
8  didn't.  It will go a lot quicker if you answer those
9  questions.
10      MR. NELSON:  Objection to form
11      argumentative.
12      Don't respond.
13 BY MR. REED:
14 Q.    All right.  Now where were we?
15      So of the -- all right.  So then we get
16 to the next section in your findings, it's the
17 consumers' perceptions of Skiplagged and the consumers
18 perceptions of Expedia, correct?
19 A.    Yes.
20 Q.    Okay.  And this was an open-ended question,
21 right?
22 A.    Yes.
23 Q.    And the table here, listed on 32, are examples
24 you picked from the open-ended questions?

Page 137

35 (Pages 134 - 137)

1  A.    Correct.
2  Q.    Did you pick those examples or did someone
3  else?
4  A.    No.  These were picked by Radius.
5  Q.    Radius picked the examples?
6  A.    Correct.
7  Q.    Do you know who at Radius picked them?
8  A.    Probably the project management of the team
9  that worked together on this.
10  Q.    Do you know the criteria they used to pick
11  these?
12  A.    I asked for representatives quotes.
13  Q.    Did you do anything to evaluate whether the
14  quotes that were provided by Radius were actually
15  representative or did you just accept the ones they
16  gave you?
17  A.    Well, I accepted -- I did review all the
18  verbatim.  So I went through all the verbatim in
19  Appendix C7.  And these seem to be okay, given -- I
20  tried to be as objective having the team there select
21  the items opposed to me.
22  Q.    In Exhibit-2, on page 32, Exhibit-2 to your
23  report, that table there, did you eliminate or add any
24  illustrative responses that Radius provided you, or

Page 138

1  Q.    Who would know?
2  A.    I can find out from Radius for you.
3  Q.    Okay.  And so the respondents never actually
4  answered or were never asked to rate their sentiment
5  about their reflection on Skiplagged and Expedia as
6  negative, neutral or positive, right?
7  A.    Correct.
8  Q.    You could have?
9  A.    It would not make sense.  But no, I did not.
10  Q.    You could have, right?
11  A.    I saw no reason to do it.
12        MR. NELSON:  Objection; argumentative.
13  BY MR. REED:
14  Q.    But you could have?
15        MR. NELSON:  Objection; argumentative.
16        THE WITNESS:  You could have
17  everything.
18  BY MR. REED:
19  Q.    Okay.
20  A.    But in the research, you have to decide what
21  makes sense.
22  Q.    And you decided it didn't make sense to include
23  the question, please rate your reflection of
24  Skiplagged as negative, neutral or positive?

Page 140

1  are those all the ones that Radius provided you?
2  A.    My recollection, that's all of them.
3  Q.    That Radius provided?
4  A.    Correct.
5  Q.    And you didn't add or take any away?
6  A.    Correct.
7  Q.    Okay.  So taking those open-ended responses,
8  then you had someone at Radius then decide which ones
9  were negative, neutral and positive, correct?
10  A.    That's the coding group at Radius.
11  Q.    The two individuals, correct?
12  A.    Well, there were more than two at this stage.
13  Q.    I thought you said there were two earlier?
14  A.    The two independent ones, each one of those but
15  I think over time -- for each verbatim, there was at
16  least two people reviewing, but over time more than
17  two -- more that one team of two.
18  Q.    Ah.  Okay.  I misunderstood that.  Thank you
19  for the clarification.
20        So it's not the same two people that
21  reviewed them, it could have been multiple teams?
22  A.    Correct.
23  Q.    How many multiple teams?
24  A.    I don't know.

Page 139

1  A.    Right.  The same way it doesn't make sense to
2  ask them, are you deceived or are you confused.  These
3  are dumb questions.
4  Q.    Okay.  That's one of my dumb questions.  I got
5  you.  I knew we were going there?
6  A.    The same category.
7  Q.    All right.  I'll ask some more dumb questions
8  and I'm sure you'll call me out on it.
9        All right.  So the negative, neutral
10  and positive analysis was done by individuals at
11  Radius, an unknown number of two person teams correct?
12  A.    Correct.
13  Q.    Okay.  And how -- what criteria were they given
14  to assess open-ended responses as neutral?
15  A.    Well, neutral typically is a default category.
16  That when it's started is started anything positive
17  here that we can classify as positives or anything
18  negative here.  And the neutral will typically include
19  people who are wishy washy or who will give
20  conflicting results.  So if someone is saying
21  something positive, something negative about this,
22  eventually they will code this as neutral.  So the
23  neutral is really the default item of things which are
24  not positive and not negative.

Page 141

36 (Pages 138 - 141)

1  Q.   Let me ask a better question because I asked a
2  poor one.
3         Did you provide to Radius and their
4  two-person team reviewers or coders, classifications
5  or qualifications as to what makes a statement
6  positive, negative or neutral?
7  A.   We had a telephone discussion and we discussed
8  different examples.  So I walked them through, they
9  read some quotes and I gave them my assessment and
10 explanation of why I believe this is positive or this
11 is negative.
12 Q.   And what criteria did you use?
13 A.   Well, depending on the question.  Basically is
14 there anything in the response that suggests that
15 positive attitude.  Positive would be, I love it, it's
16 great, it's the greatest thing since sliced bread.  Or
17 they can say it's dumb, they're trying to cheat me.
18 You know, kind of -- and neutral would be, the answers
19 which include both positive, negative or something
20 which is, I don't know, without saying I don't know
21 because we say I don't know, it would be categorized
22 as don't know.
23 Q.   Okay.  So don't know is kind of that didn't
24 really express an opinion one way or the other?

Page 142

1  what it reflect.  So it suggests in this case that the
2  people who said positive Expedia is close to
3  72 percent, and Skiplagged is 45 percent, and the
4  difference between the two is statistically
5  significant in the 90 percent confidence level.
6  Q.   Okay.  And that was at each of these
7  comparisons, right --
8  A.   Correct.
9  Q.   -- in this chart?
10        And what did that show you?
11 A.   Well, that significantly more people have a
12 positive attitude towards Expedia than Skiplagged.
13 Q.   Based upon the review of the provided stimuli,
14 right?
15 A.   Based on the responses to the stimuli and all
16 the various open-ended questions.  Actually, that's
17 respond to question 14A and B, not to all questions.
18 Q.   Right.  But that was after reviewing the
19 stimuli that was provided to you by Greenberg, right?
20 A.   The stimuli that's used in the study, yeah, the
21 stimuli which is Wind-6.
22 Q.   Okay.  All right.  And how did you control for
23 any biased in your respondents based upon their
24 previous knowledge and use of either Expedia or

Page 144

1  A.   They said don't know.
2  Q.   Okay.  So they had to say don't know?
3  A.   There is a check.
4  Q.   No opinion, is that neutral?
5  A.   No opinion is the same as don't know.
6  Q.   No opinion is?
7  A.   The same as don't know.
8  Q.   The same as don't know.  Okay.  I just want to
9  make sure I wasn't...
10        We've have this ask it throughout these
11 charts, and I wanted to make sure I asked about it.
12 We have it on this chart here on page 33, that says,
13 "Significantly higher than other cell at the 90
14 percent confidence level.  Stat testing was only done
15 within study."
16        What does that mean?
17 A.   In every -- throughout the studies, we did
18 there was a comparison between test and control.  So
19 there are two studies.  One study is the Skiplagged
20 regular ticket and another study is Skiplagged city,
21 kind of the Hidden City ticket.  And in each one of
22 them, we compared all the answers test versus control
23 to see whether there are significant difference
24 between the 90 percent confidence level.  And that's

Page 143

1  Skiplagged?
2  A.   I did not.
3  Q.   Okay.
4  A.   I basically looked, this is results of all of
5  them.  Because we are based primarily interested in
6  their reaction to this.  The data are there.  And if
7  you believe that there is different responses with
8  those who had experience with Expedia or Skiplagged
9  versus those who did not, you can do that analysis.  I
10 felt it's not needed.
11 Q.   And you didn't do it, right?
12 A.   Correct.
13 Q.   Okay.  All right.  We turned the page.  We've
14 got negative on 34, we got neutral on 35 and positive
15 on 36, right, all in response to question 14?
16 A.   Yeah.  And these are all illustrative.  And
17 again, if you want to look at all the responses, you
18 have to go to Appendix C7.
19 Q.   Right.
20 A.   Which represents all the verbatim responses.
21 Q.   I got you.  I got you.
22        This is what's in your report.  These
23 are just selected ones that Radius gave you to include
24 in the table, right?

Page 145

37 (Pages 142 - 145)

1  A.    Correct.
2        MR. NELSON: Objection;
3  mischaracterizes.
4  BY MR. REED:
5  Q.    I didn't hear your answer.
6  A.    Yes.
7  Q.    Okay. I'm looking at, if you look at
8  Exhibit-3B on 35, if you look at the third column,
9  that Hidden City ticket column.
10 A.    Yes.
11 Q.    And go down about row five, and it starts off
12 "Very possible, I can't plan too far ahead. Things,
13 deals, discounts, promos come and go."
14       Do you see that box?
15 A.    Yes.
16 Q.    Okay. That got classified as neutral, right?
17 A.    Correct.
18 Q.    All right. Why is that classified as neutral?
19 A.    That's the way they interpret it. I think they
20 are correct.
21 Q.    That's the way the coders interpret it?
22 A.    Yes. Keep in mind, the coders are independent.
23 They did not know the purpose of the study. They did
24 not know who was sponsoring the study. They were
Page 146

1  primarily given the data. And so they, from their
2  point of view, could have been the studies done for
3  Skiplagged or done for American Airline or for a third
4  party. That's the reason I rely on them to select as
5  opposed to me selecting them.
6  Q.    And you taught them how to select them, right?
7  You said that earlier.
8  A.    I gave examples, yes.
9  Q.    Okay. All right. I just want to -- and you
10 told me the previous about how the coders worked. I
11 got you there.
12       All right. Now, when we look at 3C,
13 this is positive verbatims, correct?
14 A.    Yes.
15 Q.    Now, if we look at the first box there, in the
16 first column, under the Skiplagged ticket, it says, "I
17 will look into them for next time."
18 A.    Yeah.
19 Q.    Did I read that correctly?
20 A.    Yeah.
21 Q.    Now, that one was coded as a positive verbatim,
22 right?
23 A.    Right.
24 Q.    Now, comparing that to the very possible, why
Page 147

1  are they coded differently?
2  A.    The interpretation of the coders was
3  apparently. I'm looking to them for next time, means
4  that they are interested in the offering, and,
5  therefore, they will look into it. And so they
6  interpret it as positive. And they, in the previous
7  exhibit, Exhibit-3B, if we look into it, they don't
8  say, you know, for what. So it's kind of pretty
9  ambiguous. They don't look into it because they want
10 them to believe it's good or bad, so they viewed this
11 as more neutral. And that's the reason they coded
12 this a neutral and this is positive.
13 Q.    So very possible and I will look into it for
14 next time, completely different answers, right, one is
15 neutral and one is positive?
16 A.    Because the next time suggests an extra and
17 something more positive. So that's, again, that's my
18 interpretation of what the coders did. And it's a
19 quote. And again, to try to understand fully whether
20 it's the positive or neutral, we probably should go to
21 the verbatim, find out this respondent and look at the
22 context of the entire set of responses.
23 Q.    And you could have, and I know you didn't, but
24 it would have been possible, would you not agree with
Page 148

1  me, that you could have followed up and asked the
2  respondents did they view Skiplagged or Expedia,
3  whichever, as positive, neutral or negative to see how
4  those lined up with their open-ended responses, right?
5        MR. NELSON: Objection to form.
6        THE WITNESS: It's not being done. I
7  did not do it. I did not see the need for
8  doing it. And when I did it, if we go back to
9  the questionnaire on page 25, you'll see that
10 after asking the question, 14A, which is
11 reflecting on the Skiplagged, for example,
12 offering everything you know about them, how do
13 you feel about buying your next airline ticket
14 from them. And then there was a follow up
15 question, is there anything else. And I think
16 this is the conventional way of doing a probe
17 following an open-ended question or following
18 any question. And I felt there is no need for
19 anything else, other than this.
20 BY MR. REED:
21 Q.    But you could have?
22 A.    Could have done anything. I felt it's not
23 necessary. And that's the reason I did not do it.
24 Q.    Okay. All right. If we move on here to
Page 149

38 (Pages 146 - 149)

1  Exhibit 3D. What's this table showing at the top of
2  37?
3  A.     As it says, open-ended description of offering
4  to a friend. This was based on question 1A and B. If
5  you recall, if you're going back to the questionnaire,
6  question 1A and B will be on page 18, how to describe
7  the offering on this website to a friend. And the
8  follow up in B was, is there anything else.
9         So based on these responses, the coders
10 were asked to code it, whether there was a deception
11 or not. And then in addition to this, so this is the
12 first three lines, so it's there is a deception, there
13 is no deception or it's ambiguous. And then based on
14 all open-ended questions, we noted there were a lot of
15 open-ended questions in the questionnaire, so based on
16 all of them would be the responses.
17 Q.    So the first part is question 1A and B, which
18 is how would you describe the offering on this website
19 to a friend?
20 A.     Correct.
21 Q.    Open-ended, they didn't answer deception or not
22 deception, correct?
23 A.     Correct.
24 Q.    And so based upon their open-ended answer to

Page 150

1  is the basis for the coders evaluating open-end
2  responses as suggesting deception or not.
3  Q.    Okay. The respondents didn't make the decision
4  as to what was a meaningful risk or un-meaningful
5  risk, you did, correct?
6  A.     Correct.
7  Q.    Okay. Was that unilateral decision or was that
8  with input from the Greenberg lawyers?
9  A.     Well, it was my decision. I obviously
10 discussed it with them to verify that that's correct.
11 Q.    Okay. And so based upon your decision, you
12 decided what was meaningful risk and what was
13 un-meaningful risk?
14 A.     Yeah.
15 Q.    And did you look to any authority, outside
16 source to help you make that decision?
17 A.     I have no idea what source can be used for
18 deciding deception or not. It's a very simple
19 comparison between the offering and reality. You
20 know, do they mention financial penalties? Do they
21 mention that they can't fly on airline, can get
22 banned, makes the airline angry? Do they mention
23 cancellation problems? Schedule changes? Do they
24 mention ticket is invalid, ticket may not be honored?

Page 152

1  that question, the coders at Radius decided whether it
2  was deception or not right?
3  A.     Based on the guideline below.
4  Q.    Okay.
5  A.     And below there is a guideline, what is
6  deception. For non Hidden City, deception is, they
7  say for Skiplagged, cheaper than American Airlines.
8  Because we have an absolute data we know from the
9  study of the 200 different website, with Expedia --
10 that I'm sorry, that Skiplagged is not cheaper than
11 American Airlines. And the average was, as we
12 discussed before, like $10 more expensive than
13 American Airline.
14        And for Hidden City, deception was
15 consumer doesn't understand that there are meaningful
16 risks associated with the ticket. And the meaningful
17 risks were identified in the stimulus package we
18 looked before, which is Wind-6. The page we did not
19 cover, this was the page, Appendix C2, that looks like
20 this (indicating), that describe basically the risk.
21        There are also discussions of the risks
22 in the bottom of page 51, the bottom of Exhibit 10A,
23 where we describe specifically what meaningful risks
24 are, as example, un-meaningful risks as well. So this

Page 151

1  And so on and so on. It's basically yes, no. You
2  know, these are things which are the real risks
3  involved in the Skiplagged offering and the consumers
4  don't mention any of this and they basically do not
5  realize that they exist.
6  Q.    Okay. And in un-meaningful risk, you decided
7  it was can't check a bag. That's the only one?
8  A.     Or unidentified risks.
9  Q.    What is that?
10 A.     They just said it's risky without explaining
11 what it is.
12 Q.    Okay. If they just said it's risky and didn't
13 say, then you deemed that as un-meaningful or not?
14 A.     Right. An example, and you look at examples
15 below, so everything has risk. Lost items. Every
16 ticket purchase carries risk. If you buy all the
17 insurance in the world, all the assurance in the world
18 and all the guarantees in the world, but stuff still
19 happens. So that's, to me, under un-meaningful risk
20 or not as significant as the meaningful risk items
21 which was very very specific.
22 Q.    Okay. What does third-party risk mean?
23 A.     Whatever they mention.
24 Q.    You have it listed here under meaningful risk?

Page 153

39 (Pages 150 - 153)

1  A.    These are all based on actual responses of
2  consumers. So these are -- I did not invent these
3  items. These are actual statements made by consumers.
4  Some of them said third-party risk.
5  Q.    Okay. So did you come up with the meaningful
6  risk versus un-meaningful risk list before or after
7  you read the responses to your survey?
8  A.    After.
9  Q.    After.
10        Now, what you -- I believe, and I just
11  want to make sure that I'm understanding your
12  testimony because I don't want to put words in your
13  mouth.
14        When you say, in deposition Exhibit-6,
15  the Stimuli 2 for Skiplagged cell 1, is this the risks
16  that were provided to the respondents?
17  A.    Yeah.
18  Q.    Okay. Who prepared this chart?
19  A.    I prepared it in consultation with the
20  attorneys.
21  Q.    At Greenberg?
22  A.    Yes.
23  Q.    Okay. Where did you get the Skiplagged section
24  from?

Page 154

1  physical chart, they printed this.
2  BY MR. REED:
3  Q.    Okay. Do you know who at Radius did?
4  A.    Based on the information I gave them.
5  Q.    No. Do you know who at Radius --
6  A.    No.
7  Q.    -- prepared the physical chart?
8  A.    No.
9  Q.    Okay. And so you gave then all the information
10  yourself for this chart, or did some come from
11  Greenberg as well?
12  A.    I gave them --
13        MR. NELSON: Objection; asked and
14     answered.
15        THE WITNESS: I gave them the
16     information. And the information I got was
17     based on my review of the website and my review
18     of other material and the discussions with
19     counsel.
20  BY MR. REED:
21  Q.    Okay. And how did you go about making the
22  decision of what to include in this chart from the
23  Skiplagged website and what not to include?
24  A.    I thought these were the -- my understanding of

Page 156

1  A.    Based on my understanding from the website and
2  based on my discussions with the lawyers.
3  Q.    Did you, actually yourself, sir, go to
4  Skiplagged's website and pull this information from
5  it?
6  A.    I reviewed the Skiplagged website a few times.
7  And that's basically a combination of my reviewing the
8  website, the other materials and discussions with the
9  lawyer, a combination of all of these.
10  Q.    And my question was different. My question
11  was, did you yourself go to the website and pull the
12  information and put it in this chart?
13  A.    The chart in this form was actually formatted
14  by Radius based on information we gave them, that I
15  asked them to put it in a chart form of Skiplagged
16  sales and American sales. And that's the input to
17  this is a combination of multiple sources, of me
18  reviewing the website, reviewing other material and
19  discussing it with counsel.
20  Q.    Okay. So Radius prepared the chart, not you,
21  then?
22        MR. NELSON: Objection;
23     mischaracterizes.
24        THE WITNESS: They prepared the

Page 155

1  what were the relevant risk factors involved that we
2  wanted the consumer to be aware of. And I checked it
3  with counsel.
4  Q.    Is it your understanding that this is in the
5  same -- the Skiplagged section, not the American,
6  we'll talk about it next. But the Skiplagged column
7  here, is it your understanding that this is the exact
8  wording used on the Skiplagged website?
9  A.    It is trying to be as close as possible to
10  words they actually used.
11  Q.    It is the exact wording?
12  A.    I'm not sure of this case.
13  Q.    Did you do anything to validate whether it was
14  the exact wording or whether editorial decisions were
15  made?
16  A.    At the time this was designed, when I prepared
17  all the item for Radius, I believe it was, as I
18  checked as close as possible to what's actually on the
19  website. At this stage I'm not sure what is exactly
20  word to word. I have to review it again.
21  Q.    Okay. And this format doesn't appear on the
22  Skiplagged website, does it?
23  A.    No. Because they don't have a comparison with
24  American Airlines.

Page 157

40 (Pages 154 - 157)

1  Q.   They don't.  Right.  Okay.
2        But that's the way it was presented to
3  the respondents as a comparison, correct?
4  A.   Correct.  For the second part of the
5  questionnaire.
6  Q.   Okay.  The American side of things, did you go
7  on American's website and pull this information and
8  give it to Radius?
9  A.   This was developed based on material from
10 American Airlines.  And again, the source is American
11 Airline website, other information I had in discussion
12 with the lawyers.
13 Q.   Okay.  So did you actually go to American's
14 website and compare the verbiage used here and whether
15 it actually appears on American's website?
16 A.   All I remember at this stage is that I looked
17 at American Airlines.  We tried to be as close to the
18 wording they used, but there was multiple sources
19 involved in creating this.  So I cannot tell you
20 exactly whether this is, this paragraph was sent in
21 from the American Airlines website or not.
22 Q.   Because on American's website, it's not all in
23 one place like this, all grouped together like this,
24 is it?
                                        Page 158

1  A.   Correct.
2  Q.   Sitting here today you can't tell me if the
3  verbiage you used here on the American side actually
4  matches what's on their website, can you?
5  A.   I believe this is --
6        MR. NELSON:  Objection.
7        THE WITNESS:  Sorry.
8        MR. NELSON:  Mischaracterizes
9     testimony.
10       THE WITNESS:  I believe this is the
11    content that reflect accurately American
12    Airline position.
13 BY MR. REED:
14 Q.   So you can say under oath it's the exact words
15 used on American's website?
16 A.   I did not say -- no, I did not say exact words
17 as used on website.  I said I believe this accurately
18 represent the position of American Airlines.
19 Q.   As told to you by the lawyers and what you
20 reviewed on the website?
21 A.   Correct.
22 Q.   Okay.
23       (A short break was taken.)
24 BY MR. REED:
                                        Page 159

1  Q.   We're back on the record here.
2        Now, looking at page 37, Section 3,
3  about consumers belief and Skiplagged's Expedia's
4  association with AA.
5        Are you there with me, sir?
6  A.   Yes.
7  Q.   Okay.  You state here that one of the most
8  striking findings of your study is that 41 percent of
9  respondents exposed to the Skiplagged stimuli
10 associated Skiplagged with American Airlines, correct?
11 A.   Yes.
12 Q.   Why was that one of the most striking findings?
13 A.   It's a very high level of confusion.  And
14 especially because it's about the same level as the
15 people who believe that Expedia is associated with
16 American Airlines.
17 Q.   Okay.  So less than half, right, had
18 associated, right?
19 A.   Yes.
20 Q.   Okay.
21 A.   But it's a huge number.
22 Q.   That's a huge number of 70-some-odd people,
23 right?
24 A.   Yeah.  But if you --
                                        Page 160

1  Q.   Okay.
2  A.   -- but you look at the percentage, it's a huge
3  number.  Typical confusion studies, court accepted
4  anything above 10 to 15 percent confusion is a
5  meaningful confusion.  Here we're talking about, you
6  know, over 40 percent of the people, which is a huge
7  number.
8  Q.   You said courts have said anything more than
9  10?
10 A.   Courts typically accept confusion about 10 to
11 15 percent either way --
12 Q.   What courts?
13 A.   Any courts.  In confusion studies.
14 Q.   In Texas?
15 A.   I don't know about Texas.
16       Many Federal courts in this country in
17 confusion studies accept confusion about 10 to 15
18 percent.
19 Q.   Any in the 5th Circuit?
20 A.   I don't know.
21 Q.   Okay.  Can you name me any as you sit here
22 today?
23       MR. NELSON:  Asked and answered.
24       THE WITNESS:  No.
                                        Page 161

                                        41 (Pages 158 - 161)

BY MR. REED:

1 Q.   Okay.  Is associated Skiplagged with American
2 Airlines defined anywhere in your report?
3 A.   No.  Because it basically it's respond to the
4 stimuli.  The stimuli is American Airlines stimuli.
5 Q.   Is the stimuli that you provided in consulting
6 in consultation with Greenberg attorneys, right?
7 A.   No.  That's the stimuli from the Skiplagged
8 website.  And on this page, the airline is focusing on
9 the American Airlines, the one that's circled in red.
10 And the question is about the flight, this specific
11 flight of American.  So there is no ambiguity here
12 that we're talking about American Airlines.
13 Q.   Right.  Right.  And that you had highlighted
14 American in your stimuli, right?
15 A.   Right.
16 Q.   And with the filters that were clicked on the
17 search, do you know which ones they were?  First
18 stimuli on the first page.
19 A.   I don't recall at this time.
20 Q.   But you didn't do that, right?
21 A.   No.  Because I did it, it was my involvement on
22 the phone.
23 Q.   So Greenberg, Attorney Zach, is the one who

1 chose what filters to click for the Skiplagged search,
2 right?
3 A.   No.  We talked about this.  We were together on
4 the phone, reviewing basically that the project that
5 he did on the 200 site.  That we discussed before.
6 That it's listed in my list of material relied on.
7 Q.   What filters were chosen then?
8 A.   I don't recall.
9 Q.   You said you spoke with him, right?
10 A.   Yeah.  I don't recall, it was some time ago.
11 Q.   Is there any record of what filters were
12 chosen?
13 A.   I don't recall.
14 Q.   The only other person who would know would be
15 you and Zach?
16 A.   Well, the filters we chose are evident.  The
17 ones that were selected here.  Every one of the
18 stimuli that we had represent whatever we decided on.
19 So this was --
20 Q.   I'm talking -- sorry.  I think we have a
21 misunderstanding.  I asked a bad question.
22      Because you can tell here from the
23 static image on the first page of Exhibit-6 that some
24 filters were chosen, correct?

1 A.   Right.
2      MR. NELSON:  Objection; assumes facts
3    not in evidence.
4 BY MR. REED:
5 Q.   Okay.  And you can see there that like
6 Skiplagging is checked as a filter, right?
7 A.   Right.
8 Q.   And you can see that stops, two stops is
9 checked as well, right?
10 A.   Correct.
11 Q.   Okay.  But we don't get the full page all the
12 way down, we only get the top part of it, so we can't
13 see what other filters were chosen, can we, if any?
14 A.   I'm not sure there were any other filters.  The
15 rest of this would be, like, the rest of the listings,
16 which, obviously, explicitly asked him to focus on the
17 first page.
18 Q.   But see it's cut off, right?
19      Is it your -- let me ask you that.
20      You said you told him to focus on the
21 first page.  Is it your understanding that when you do
22 a search on the Skiplagged website, that this is the
23 first page that came up and you had to click over to a
24 second page of results?

1 A.   That's continuation.  The first screen -- I
2 mean, the first screen.
3 Q.   So as you scroll down, more show up?
4 A.   Correct.
5 Q.   Okay.  And so that's just what you can see on
6 the screen, correct?
7 A.   Right.  The first screen you see.
8 Q.   Based upon whatever resolution and zoom that
9 you're using on that screen?
10 A.   Correct.
11 Q.   If you have it further out or had a larger
12 screen with a different orientation, you might be able
13 to see more, correct?
14 A.   Right.
15 Q.   Okay.  Do you have any other examples of
16 customers associating Skiplagged with the airline,
17 beyond considering Skiplagged an authorized agent of
18 American?
19 A.   Yes.
20 Q.   What's that?
21 A.   Well, if you look at the whole section.  Let's
22 review Exhibit-4.  You have your responses to
23 associates connected with airline based on opening
24 response to all questions.  Associated and connected

1 with American Airlines based on question 1. This is
2 how do you describe the product to your friend.
3           Then there were the explicit confusion
4 question we asked or associate connected, this would
5 be question 2 and 3. The question 4 and 6 the
6 permission and finalization. And the net confusion of
7 all of these is 41.1 percent for the Skiplagged
8 tickets and 29.9 percent for the Skiplagged Hidden
9 City ticket.
10          And then we can continue on Exhibit-5,
11 which present the result for the explicit question,
12 closed-end question of Skiplagged or Expedia is an
13 authorized agent of the airline. And we find here
14 that 43.2 percent of the regular Skiplagged ticket and
15 42.4 percent of the Skiplagged Hidden Ticket mention
16 it.
17          Then we go the Exhibit-6, we focus on
18 another question of Skiplagged or Expedia is an
19 authorized travel agent with access to fares I could
20 not access via the airline. And then 38 percent of
21 the regular Skiplagged ticket and 38.9 percent of the
22 Skiplagged Hidden City ticket.
23          And then Exhibit-6A provides a summary
24 of all of these. And it gives you the first block of

Page 166

1 all open-ended responses. It gives you then the
2 second one, based on the first open-ended question,
3 how to describe it to a friend. And then you have
4 Skiplagged is an authorized agent, which was the
5 43.2 percent. And then you have the Skiplagged is an
6 authorized travel agent with access to fares, 38.4
7 percent. The net of this was 76 percent. And for the
8 Skiplagged Hidden City was 72.9 percent.
9           And I misspoke before because when I
10 said question 1, it was actually question 6, that
11 included the explicit questions about associated or
12 connected or required permission, which was the
13 41.1 percent.
14          So overall, when you look at all these
15 many measures, you find out between 76 percent and
16 72.9 percent of the respondents the two, Skiplagged
17 stimuli perceived association with American Airlines.
18 Q.    I appreciate it.
19          MR. REED: I'll object; nonresponsive.
20 BY MR. REED:
21 Q.    My question is, could you provide some examples
22 of customers associating Skiplagged with the airline
23 beyond considering it an authorized agent?
24          MR. NELSON: Objection; foundation.

Page 167

1           THE WITNESS: I thought that's what I
2      just did. That's exactly what I just read to
3      you.
4 BY MR. REED:
5 Q.    No, you read me a lot of tables. I'm asking
6 you for an example of customers associating Skiplagged
7 with the airline beyond considering them an authorized
8 agent?
9           MR. NELSON: Objection; asked and
10      answered.
11          THE WITNESS: I don't understand your
12      question. Because I thought that's exactly
13      what I responded to. I showed you all the
14      exhibits where we summarized the data. There
15      is only one -- there is two questions that
16      talked about authorized agents, if you go to
17      Exhibit-6A, question 7A, asked explicitly,
18      Skiplagged is an authorized agent. Question
19      11A asked explicitly, Skiplagged is an
20      authorized travel agent with access to fares
21      that could not access the other airlines.
22      These are the only two places where the term
23      authorized agent appear.
24          All the other responses just like in

Page 168

1      Exhibit 6A and the other exhibits I read you,
2      do not ever mention the word authorized agent.
3      It talked about association or connected.
4 BY MR. REED:
5 Q.    And in all of those -- and the responses to all
6 of those open-end questions, to get within that
7 section, they had to say associated or connected?
8 A.    Or something similar to this.
9 Q.    That the independent coders, we don't know who
10 they are at Radius, made the determination based upon
11 your training, as to how to interpret those questions
12 as to mean associated; is that correct?
13 A.    Yes. I'll just qualify. They are not unknown
14 that we don't know who they are. They are very
15 qualified coders who know how to code open-ended
16 responses.
17 Q.    None of which you can identify for me today,
18 correct?
19 A.    I can't identify any of the people --
20          MR. NELSON: Objection to form.
21          THE WITNESS: Sorry.
22          MR. NELSON: Go ahead.
23          THE WITNESS: I cannot identify any of
24      the people that worked on the project. That's

Page 169

43 (Pages 166 - 169)

1    the way research works.  I am the designer of
2    the project, the designer of the research, I
3    write the questionnaire, I write the report, I
4    basically analyze the data.  But there are a
5    lot of people involved in producing the data to
6    be able to present it here, and I don't have to
7    know each person's name.
8    BY MR. REED:
9    Q.    And so we don't know as we sit here today, and
10   you cannot provide testimony today on those coders who
11   had a judgment in coding something being associated or
12   not associated between Skiplagged and the Airline,
13   right?
14          MR. NELSON:  Objection to form; asked
15       and answered; argumentative.
16       Go ahead.
17          THE WITNESS:  I can tell you with full
18       confidence that these are qualified coders that
19       do it as part of their professional lives,
20       analyze open-ended questions.  They've been
21       doing it for a long time.  They are working for
22       Radius under the supervision of qualified
23       people that I worked with for a long time and I
24       have full confidence in their responses.

Page 170

1          And the most important thing we have
2       all the actual verbatim included in the report
3       I submitted.  Appendix C7 include all the
4       verbatim.  Your experts could have taken the
5       verbatim and analyzed them if they weren't
6       positive the way we coded it.
7          MR. REED:  Objection; nonresponsive.
8    BY MR. REED:
9    Q.    Nowhere in your appendices or any documents
10   that you provided do you identify who these coders
11   were, do you?
12          MR. NELSON:  Asked and answered;
13       argumentative; relevance.
14          THE WITNESS:  In the data analysis
15       section.  I think it's in this section.
16          (Reviewing document.)
17          Page 28, I clearly say in their
18       analysis of the verbatim responses, regarding
19       the reasons for the confusion and perceived
20       deception.  This analysis followed scientific
21       approach for contact analysis, including
22       coding, including coding the data by, A,
23       involving two independent coders, who are not
24       familiar with the objective, the study or the

Page 171

1    sponsors.  And B, the procedure for resolving
2    conflict between the two coders.
3          That's the process we did.  That's the
4    correct scientific process for coding
5    open-ended responses.
6          MR. REED:  Objection; nonresponsive.
7    BY MR. REED:
8    Q.    My question, sir, that you have not answered,
9    is you have not identified in any place in your report
10   or in any attachments to your report or any other
11   documents produced the identity these coders, have
12   you?
13          MR. NELSON:  Objection; asked and
14       answered; argumentative; relevance.
15          THE WITNESS:  I identified them as
16       people working for Radius, under the Radius
17       supervision, without knowing who are the
18       specific Joe Blow people who did it.
19   BY MR. REED:
20   Q.    So you have not identified them by name, have
21   you?
22   A.    Correct.
23   Q.    Okay.  And the scientific approach here for
24   content analysis, what is that?

Page 172

1    A.    That's exactly what's described there.
2    Q.    It's what goes on by A and --
3    A.    It's exactly what is described.
4    Q.    What's your support for that scientific
5    approach?
6    A.    The entire literature on content analysis of
7    open-ended responses.  There is a whole literature
8    involved in communication research, in social science
9    research and others.
10   Q.    Can you name me the leading publication on
11   that?
12          MR. NELSON:  Objection; assumes facts
13       not in evidence.
14          THE WITNESS:  If you want me to search
15       or Google the different names, I'll be glad to
16       give you, you know, a hundred references.
17   BY MR. REED:
18   Q.    Did you consult any authority when following
19   the scientific approach as part of your analysis?
20   A.    No.  I view myself as an expert in this area.
21   I've done it thousands of times.  I've done thousands
22   of researchers.  And I'll be glad to take the time, if
23   you want to and Google it and give you a lot of names,
24   I'll give you a hundred references.

Page 173

44 (Pages 170 - 173)

1  Q.    Okay.  Looking at page 40, which is following
2  the chart on perceived relationship between
3  Skiplagged, Expedia and AA.
4         Do you see that?
5  A.    Yes.
6  Q.    Okay.  On page 40, you have two little
7  paragraphs that start -- I want to start with that
8  second paragraph where you have, "The response to this
9  question are presented in Exhibit-6."  The question
10 meaning whether Skiplagged is an authorized travel
11 agency with access to fares I could not access via the
12 airline, right?
13 A.    Correct.
14 Q.    Okay.  You say, "An extremely high percent of
15 respondents, close to 40 percent, exposed to the two
16 Skiplagged stimuli said yes."
17        When you say the two Skiplagged
18 stimuli, you mean both Hidden City and non Hidden
19 City?
20 A.    Correct.
21 Q.    Okay.  Maybe the reasons for this perception is
22 the way the material is presented?
23 A.    Correct.
24 Q.    Okay.  And the way the material is presented

Page 174

1  was presented to them as the stimuli that we've gone
2  over for in Exhibit-6, your presentation, right?
3  A.    Correct.
4  Q.    Okay.  Which -- never mind.
5         What factors of the way the material is
6  presented is the reason for this perception?
7  A.    Well, you can look at this in some of the
8  open-ended responses.  Some of them is fitted here or
9  not.  But primarily it relates to the way the American
10 Airline flight is presented with American Airline logo
11 and identification, the format in which it is
12 presented.  And I think this is the dominant reason.
13 But then we can look specifically at the responses.
14        So if we look at the responses to
15 Exhibit-6, you know, so there are things such as --
16 this is page 41, because I could buy the ticket.  You
17 can buy the ticket from American.  Because the service
18 is unique to them.  Because I believe they are
19 cheaper.  Those tickets are too cheap for it to be
20 anything else.  It seems they have very reasonable
21 prices that I have not seen through the airline
22 directly.  The only way I see them being able to get
23 to the low prices.  But it seems to me the way, the
24 general sense here is, because the way it's presented

Page 175

1  and that fact they can buy the American tickets on
2  this website.
3  Q.    None of those responses say because I saw the
4  American logo, do they?
5  A.    No.
6  Q.    Okay.  All right.  Looking at page 42 here.
7  This Exhibit-6A table, entitled overall and net
8  perceived association between Skiplagged and the
9  airlines, all associated questions.
10        What is this table supposed to show?
11 A.    That's the summary of the previous four tables.
12 Q.    Okay.
13 A.    And to calculate the net.  The key was the net.
14 To avoid duplication to find out.  Because it was
15 presented -- in the previous four charts, we presented
16 the individual numbers.  Here it is to take all of
17 them together and find out how many respondents are
18 here, which are unique respondent without multiple
19 answers and get to 76 percent or the 72.9 percent.
20 Q.    Now, under net, it says, "Said yes to at lease
21 one question."
22        Now, you don't mean that the
23 respondents literally said yes associated to at least
24 one of the questions, right?

Page 176

1  A.    Well it is the yes to whatever the question is.
2  So the associate, the only places where we ask
3  explicitly associate and connected would be the second
4  line, would be question 1 to 6, is the question, are
5  they socially connected with the required permission
6  from each other.  All the others are based on analysis
7  of the open-ended responses.  This is the first group.
8  And then the 7A and 11A is based on the responses to
9  those explicit questions.
10 Q.    It's based upon the coder's interpretation of
11 those responses, right?
12 A.    These are based on the actual question.  These
13 are closed-end questions.  7A and 11A are closed-end
14 questions.
15 Q.    Oh.  Okay.
16 A.    The other one is the coder's interpretation.
17 Right.
18 Q.    Okay.  Now, that includes question 2, right?
19 A.    Yes.
20 Q.    Okay.  And question 2 asks the respondents
21 which other company does the company operating this
22 website have a business connection or association
23 with, correct?
24 A.    Well, it asks, does the company that operates

Page 177

45 (Pages 174 - 177)

1  this website have a business connection or association
2  with another company or do you not know.
3  Q.    Okay.  I just -- there's a general question,
4  have association with another company, right?
5          MR. NELSON:  Object to form.
6          THE WITNESS:  Correct.
7  BY MR. REED:
8  Q.    Not with an airline?
9  A.    Correct.
10 Q.    Not with American Airlines, right?
11 A.    Correct.
12          But keep in mind that the stimulus is
13 that primarily the American flight.  That's the one
14 that they've been focusing on.
15 Q.    Because that's what you chose to focus on,
16 correct?
17 A.    Because that's the material presented on
18 Skiplagged.  Skiplagged presented the material this
19 way.
20 Q.    SKiplagged only shows American flights?
21 A.    No.  But --
22          MR. NELSON:  Objection;
23      mischaracterizes.
24          THE WITNESS:  Skiplagged select,

Page 178

1      basically this is exact copy of what -- it's a
2      screenshot from Skiplagged's website.  That's
3      the way Skiplagged present it.
4  BY MR. REED:
5  Q.    It's not, though, we already establish that,
6  right?  The red box was added, that's not an exact,
7  right?
8  A.    That's the only difference.
9  Q.    Okay.  But it's not exact, right?
10 A.    Well, everything else, other than the red box,
11 to highlight for the consumer what we are focusing on
12 so there won't be confusion that they are focusing on
13 American.  Everything else is a screenshot from
14 Skiplagged.
15 Q.    Okay.  And then you went through the stimuli
16 that included the American flights and the chart with
17 comparing Skiplagged and American, right?
18 A.    The chart comparing Skiplagged with American
19 represented only the second part of the questionnaire.
20 Q.    Okay.
21 A.    And only for the Hidden City sale, not the
22 other sale.
23 Q.    Okay.  Let's go to page 53 of your report.
24 A.    (Reviewing document.)

Page 179

1  Q.    And talking about Exhibit 11A in your report,
2  this table.
3          This refers to questions 15A and B,
4  right?
5  A.    Yes.
6  Q.    Okay.  And this is what you were just talking
7  about, given the additional information about American
8  Airlines, how did consumers feel about Skiplagged or
9  Expedia?
10 A.    Correct.
11 Q.    Okay.  Now, I thought you just said that that
12 information was only given to the Hidden City ticket,
13 but in this chart it seems to have both?
14 A.    (Reviewing document.)
15          MR. NELSON:  Objection;
16      mischaracterizes.
17          THE WITNESS:  (Reviewing document.)
18      I'll have to check it.
19          MR. NELSON:  Why don't we take a break
20      so you can check it and answer his question.
21          MR. REED:  Well, I don't think we need
22      to check that right now.  I have some more
23      questions here.
24          MR. NELSON:  Well, we'll take a break

Page 180

1      anyway.  It's afternoon.  It's after lunch.  I
2      find that this is kind of a drag anyway just
3      sitting here.
4          MR. REED:  Well, we'll see how his
5      answer is after the break then.
6          MR. NELSON:  I'll sit here while he's
7      taking a walk then.
8          MR. REED:  We can go off the record.
9      (Discussion was held off the record.)
10 BY MR. REED:
11 Q.    We're back on the record.
12          If you look at Exhibit 11B on page 54,
13 this is a -- some examples of negative verbatims in
14 response to questions 15A and B, correct?
15 A.    Correct.
16 Q.    Okay.  And these are ones that Radius pulled
17 together for you?
18 A.    Yes.
19 Q.    Okay.  And these were classified as negative by
20 their coders, right?
21 A.    Correct.
22 Q.    Okay.  If you'll look for me in that first
23 column under the Skiplagged, which would be the non
24 Hidden City ticket test, third down, it says, "I

Page 181

46 (Pages 178 - 181)

1 prefer to order tickets from a site I'm familiar
2 with."
3          Did I read that correctly?
4 A.    Yeah.
5 Q.    And that's classified as negative, correct?
6 A.    Yeah.
7 Q.    And anything specifically negative towards
8 Skiplagged there?
9 A.    Well, it suggests that they're not familiar
10 with them.
11 Q.    They're not familiar with --
12 A.    Yeah.
13 Q.    -- being --
14 A.    That's probably the interpretation of the
15 coders.
16 Q.    And so being not familiar put them into the
17 negative category for this verbatim?
18 A.    Yeah.
19 Q.    Now, next page has 11C and 11D, which has
20 neutral and positive verbatims, right?
21 A.    Right.
22 Q.    And we have a neutral being, let's see, first
23 column, about the fourth down, it says, "I feel
24 comfortable buying a ticket from this agency.  It

Page 182

1 Q.    Is it your understanding that the Skiplagged
2 website claims that Skiplagged can sell non Hidden
3 City tickets cheaper than the airline?
4 A.    Yes.
5 Q.    And based upon your review of the website, it
6 states that?
7 A.    Yeah.  My -- I -- if you look at the website at
8 the open-ended, we can look at those, it screaming
9 cheap.  Everything there is cheap.  The message is
10 cheap.  You want cheap tickets.  All the comparison
11 and following with all the comparison they have,
12 everything suggests cheap.
13 Q.    My question was different.
14          Did anywhere from your review of the
15 website does it say Skiplagged can sell non Hidden
16 City tickets cheaper than the airlines?
17          MR. NELSON:  Objection; argumentative;
18     asked and answered.
19          THE WITNESS:  I don't think they say
20     explicitly non Hidden City tickets versus the
21     airlines.  I think that my response was that my
22     interpretation of the website, the overall
23     message is very effective and says cheap,
24     cheap, cheap and get better deals here.  And

Page 184

1 looks professional and just like other websites."
2          Did I read that correctly?
3 A.    Yeah.
4 Q.    Why is that considered and classified neutral?
5 A.    (Reviewing document.)
6          I don't know.  That's again, to try to
7 maintain the objectivity in the reporting, I asked
8 them to select what they believe were representative
9 quotes.  I did not select them.  I would probably not
10 have selected this one.  But again, I wanted to report
11 here that the coders that did analysis perceived it to
12 be neutral.
13 Q.    How would you have coded that statement?
14 A.    (Reviewing document.)
15          Probably as positive.
16 Q.    Okay.
17 A.    But again, I have to look -- the advantage that
18 they have, they look to disclose as part of the
19 context of the entire set of responses, I am at the
20 disadvantage.  I'm looking only at this without
21 context.  So without context, I would have said
22 positive.  But I'm not sure that's what I would do,
23 depending on the rest of the verbatim, whatever else
24 is responded.

Page 183

1     I'm addressing it here in my report in the last
2     part, evaluating the Skiplagged website against
3     the rates criteria, when I say very explicitly.
4     It's a very effective, very cleverly designed
5     website to communicate this cheapness and to
6     get better deal here.
7 BY MR. REED:
8 Q.    Okay.  And, in fact, you can get a better deal
9 on the Hidden City tickets, right, you saw that?
10          MR. NELSON:  Objection;
11     mischaracterizes.
12          THE WITNESS:  Well, the Hidden City,
13     the analysis was done on the Hidden City
14     tickets, the 200 sample we did, suggest that
15     the vast majority of the cases you will get a
16     better price on Skiplagged.
17 BY MR. REED:
18 Q.    Okay.
19 A.    But the problem there is they don't disclose
20 the real risks.
21 Q.    The risks.  Okay.  I get that.
22          But when we're talking just price, even
23 you found that there is a better price on Skiplagged
24 for Hidden City, right?

Page 185

47 (Pages 182 - 185)

1   A.    Right.
2        MR. NELSON:  Objection to form.
3   BY MR. REED:
4   Q.    Okay.  And you can't point me to anywhere where
5   it expressly says on Skiplagged that they can get a
6   better price than the airline on the non Hidden City,
7   right?
8   A.    They don't say it explicitly but --
9   Q.    Okay.
10  A.    -- everything in their message and the entire
11  website screams cheap, cheap, cheap.
12  Q.    Okay.  Similar to Walmart, Walmart has a
13  message of being cheap, cheap, cheap, right?
14  A.    Well, yes.  I was at that website recently.
15  But definitely the website of Skiplagged suggests you
16  could have a bargain, cheap, and will get you there at
17  the best prices.
18  Q.    And is Walmart being deceptive when some of
19  their products is more expensive than their
20  competitors, because they're overall screaming cheap,
21  cheap, cheap, too, right?
22        MR. NELSON:  Objection; false
23  hypothetical; beyond the scope.
24        THE WITNESS:  Well, it depends.  It

Page 186

1   depends on the content.  Depending what the
2   consumer perceives.  I'm reporting here
3   primarily on consumers perceptions.  And
4   consumer perceptions are as we say it here.  So
5   if you look at the data, then we have one of
6   the tables, it talks specifically about the
7   perception of price.  And consumers perceive
8   them to be cheaper.
9   BY MR. REED:
10  Q.    Consumers perceive Expedia to be cheaper too,
11  right?
12  A.    Correct.
13  Q.    Even though it's not?
14  A.    Well.  It's correct with respect to the non
15  Hidden City ticket.  It's not correct with respect --
16  I'm sorry.  It's correct for the Hidden City tickets,
17  it's not correct for the non Hidden City tickets.
18  Q.    Did you do any analysis on whether Expedia was
19  actually cheaper than booking directly through
20  American's website?
21  A.    No, I did not.
22  Q.    All right.  Now, going back to page 28, I want
23  to start looking now at section B and what you
24  entitle, Validating the Consumer Experiments with

Page 187

1   Other Data and Relevant Marketing and Consumer
2   Behavior, Theories and Findings.
3        Okay?
4   A.    Yes.
5   Q.    Now, is this the section where you were trying
6   to check your work?
7   A.    Well, it's a common, I wouldn't say check the
8   work.  I feel very comfortable that the work we've
9   done is correct and valid.  But it's always strengthen
10  your conclusion when you have independent data that
11  suggests the same thing.  That's called conversion
12  positivity.  And that's what I'm trying to do here.
13  Q.    Okay.  And the independent data that you went
14  to look for were one, consumer complaints to American
15  about Skiplagged, right?
16  A.    Yes.
17  Q.    And then two, consumer complaints to
18  Skiplagged, right?
19  A.    Correct.
20  Q.    Three, social media posts saying what?
21  A.    Talking about their consumer experience with
22  Skiplagged.
23  Q.    Skiplagged.
24        Do you do social media posts about

Page 188

1   American?
2   A.    No.
3   Q.    Didn't look at those.  Okay.
4        And then four, consumer behavior and
5   advertiser theories.  That's where you were taking
6   about the ratings, right?
7   A.    Correct.
8   Q.    Okay.  Let's start with the consumer complaints
9   to American about Skiplagged.
10        And you looked at a period from January
11  of 2018 through March of 2024?
12  A.    Correct.
13  Q.    Why did you pick that period?
14  A.    Because my understanding is that's a relevant
15  period.
16  Q.    Okay.  But you didn't look at that period for
17  your definition of consumer though, right?
18  A.    No.  Consumer is basically current perceptions.
19  Q.    Okay.
20  A.    So we look at, for the selection of the
21  respondent, we look at what's commonly done, which is,
22  have you bought this product or service in the last
23  year or do you intend to buy in the next year.
24  Q.    All right.  Did you do any analysis as to who

Page 189

1 the typical Skiplagged customer is in reality?
2 A.   No.
3 Q.   As to whether they're typical consumers are
4 ones who plan a year out?
5 A.   No.  We have not received any data from
6 Skiplagged as to their customer base.
7 Q.   And you did nothing to analyze whether their
8 customer base is typically more last minute purchasers
9 or planners, did you?
10 A.   No.  But, you know, the definition we have will
11 capture that.  Because we're not talking about
12 planning, we're talking about the question was, do you
13 intend to fly in the next year?  So it's not
14 necessarily planning a particular trip.  So people who
15 don't plan and just last minute purchasers of tickets
16 will fall in this category.
17 Q.   Okay.  But planners would too.  And if they're
18 not typically a consumer of Skiplagged, that could
19 possibly have individuals that are not representative
20 of the customer base?
21        MR. NELSON:  Objection to form.
22        THE WITNESS:  Assuming you're right and
23     the Skiplagged population does not include
24     planners, I have not seen such data.
Page 190

1 BY MR. REED:
2 Q.   Okay.
3 A.   But if you have such data, then it's definitely
4 an opportunity for your side to do study among them.
5 Q.   But you didn't differentiate that, right?
6 A.   No.
7 Q.   Okay.
8 A.   But I believe that my definition of the
9 respondent is correct.  I have not seen any data to
10 contradict this.  And the universe, through our study,
11 is the right universe in term of people who flew in
12 the last year and plan to fly in the next year and buy
13 their tickets online.
14 Q.   And in the consumer complaints, you looked back
15 from March of 2024, all the way back to January
16 of 2018 correct?
17 A.   Correct.
18 Q.   And in that American customer complaint
19 database, there were 88 complaints, correct?
20 A.   Correct.
21 Q.   Okay.  Out of how many total during that time
22 period?
23        MR. NELSON:  Objection to form.
24        THE WITNESS:  I have no idea.
Page 191

1 BY MR. REED:
2 Q.   Did you do anything to analyze the total number
3 of complaints during that time period?
4 A.   No.  We were just focusing primarily on
5 understanding people complain about Skiplagged and
6 what they were saying.
7 Q.   Okay.  How many complaints about Expedia to
8 American during that time period?
9 A.   I don't know.
10 Q.   You didn't look, did you?
11 A.   I did not.  We are looking for content here.
12 Q.   Okay.  And of those 88 complaints, 80 dealt
13 with Hidden City; is that correct?
14 A.   Yes.
15 Q.   And then you said an analysis was done by a
16 litigation support company.
17        Who did the analysis?
18 A.   This was a group that was recruited by Zach in
19 the GT, that did basically that analysis.
20 Q.   So was that Greenberg lawyers who did the
21 analysis?
22 A.   People that they hired to do it.  The
23 litigation support group that they hired to do that
24 analysis.
Page 192

1 Q.   Do you know who they hired?
2 A.   I don't remember the name.
3 Q.   Is it identified, and maybe I missed it.  Is it
4 identified anywhere in your report?
5 A.   I don't recall.
6 Q.   Okay.  Did you have any communication with the
7 litigation support group who did the analysis?
8 A.   No.  I did discuss it mostly with Zach, who was
9 the link in training and the discussion was with him.
10 Q.   So it all went through Zach at Greenberg?
11 A.   Correct.
12 Q.   Okay.  So the definition, then, of the
13 deception and confusion, is that something that Zach
14 developed?  The litigation support company?  Or you?
15 A.   I did.
16 Q.   Okay.  And this definition of deception, does
17 that come from a recognized authority, or is it
18 something you came up with for this project?
19 A.   I came up with for this project, based on my
20 understanding of the material.
21 Q.   Same thing with confusion?
22 A.   Correct.
23 Q.   Okay.  Under deception, you have any complaint
24 where the customer is --
Page 193

49 (Pages 190 - 193)

1  A.   I'm sorry.  What page are you on?

2  Q.   I'm sorry.  It's the bottom of page 28.

3  A.   Yes.

4  Q.   It starts there with deception.  Do you have

5  any complaint where the customer misunderstood what

6  they were buying?

7           Okay.  And so is that where they

8  misunderstood that they were buying an airline ticket?

9  A.   (Reviewing document.)

10           No.

11  Q.   Everyone understood they were buying an airline

12  ticket?

13  A.   Right.

14  Q.   Okay.  So the confusion as to whether they were

15  buying a Hidden City ticket or not?

16  A.   That's part of it, or what is the nature of the

17  Hidden City ticket.

18  Q.   Okay.

19  A.   Mostly about the constraint, the risks involved

20  with Hidden City ticket.

21  Q.   Okay.  So misunderstood the risk with Hidden

22  City tickets?

23  A.   That's the major underlying factor of

24  deception.

Page 194

1  Q.   Okay.  This included where the customer is

2  confused because their itinerary has an extra leg

3  beyond where they plan to get off.

4           That's a Hidden City ticket, right?

5  A.   Right.

6  Q.   Okay.  "Where the customer did not get the

7  necessary Visa or bring a passport for a ticket where

8  the final destination is international."

9           Did I read that correct?

10  A.   Correct.

11  Q.   Okay.  Now, your stimuli didn't include an

12  international leg, did it?

13  A.   No.  The destination selected were domestic

14  routes.

15  Q.   Okay.  So -- all right.  So you didn't do any

16  testing on confusion within your study that included

17  an international leg, right?

18  A.   No.  But if people mentioned this, you know,

19  we're talking about complaints here.  The complaints

20  can include from people who flew international.

21  Q.   Okay.

22  A.   So this is represents -- these are some

23  possible answers that were real deception.

24  Q.   And that becomes deception instead of

Page 195

1  confusion, why?

2  A.   Because they didn't know about it.  Because

3  these are risks involved with Hidden City ticket that

4  were not revealed by Skiplagged.

5  Q.   Because it's your belief that on the Skiplagged

6  website, it doesn't indicate anywhere during the

7  process of purchasing the Hidden City ticket with an

8  International leg, the fact that you need a passport?

9           MR. NELSON:  Objection to form;

10    mischaracterizes.

11           THE WITNESS:  It's based on consumers.

12    So this is the stimulus.  According to Wind-6.

13    They saw the stimulus and these are responses

14    to my survey.

15           In this specific part of the report

16    we're talking about is the complaint, nothing

17    to do with my stimuli.  This is based on the

18    real world reaction of people who bought and

19    have experience with Skiplagged and believe

20    that American is the place to complain about

21    their Skiplagged experience, which is huge

22    problem for American.  And these are the nature

23    of the complaint.  So based on this, the

24    definitions here were defined after listening

Page 196

1    for a lot of examples of the complaint and

2    categorizing them into these two categories of

3    confusion and deception.  And that's what was

4    given basically to the coders.

5  BY MR. REED:

6  Q.   And let me ask you this, though.  If Skiplagged

7  had, in fact, disclosed that you need a passport when

8  someone is booking a Hidden City ticket that includes

9  an international leg.  And for whatever reason that

10  customer didn't get it and then they complained about

11  it.  But if it was disclosed, should that still be

12  classified as deception or confusion?

13  A.   Well, this is first of all, this is

14  hypothetical.  But let's accept this hypothetical.

15  Let's say they disclosed it.  We're dealing with real

16  complaint of real people that apparently did not see

17  it.  So the question is how did they disclose it?  It

18  might be, yeah, we can disclose it in small print and

19  no one looks at it.  So, yeah, to me that's a

20  deception because the disclosure has to be visible.

21  There is the requirement, if you talk about

22  disclosure, it has to be visible and clear and

23  consumers have to be able to see it.  So if they did

24  not see it, to me this is the fault of the website by

Page 197

50 (Pages 194 - 197)

1  not making this explicit so people will see it.
2  Q.   If it was disclosed, not in a small print
3  somewhere but in a pop up that required the consumer
4  to check the box acknowledging that they saw this, in
5  your mind, is that still deception or confusion?
6  A.   If I was Skiplagged and I saw this type of
7  complaint, I would basically go and reexamine the way
8  I am disclosing it.  Because to me this says whatever
9  way I disclose is not effective because people don't
10  see.
11       MR. REED:  Objection; nonresponsive.
12       MR. NELSON:  Well, you asked him a
13       giant vague hypothetical and his answer was
14       responsive.
15       MR. REED:  I'm objecting to the side
16       bar.  You're outside the federal rules now.
17       MR. NELSON:  Well, so is your
18       self-objection.
19       MR. REED:  I object to the commentary
20       as well.  Let's keep it to the Federal rules.
21       MR. NELSON:  All right.  Try asking a
22       clear question, you'll get a clear answer.
23  BY MR. REED:
24  Q.   All right.  My question, sir, is because you

Page 198

1  had mentioned before why you kept it deception and not
2  confusion is that in my hypothetical you said, oh, it
3  was in small print.  My clarification on that is,
4  okay, not in small print, it's in a pop up that
5  requires you to check a box that says I acknowledge I
6  need a passport before proceeding on.  Kind of like
7  the check boxes we saw in the back before.  Remember
8  those pop ups?
9  A.   Yes.
10  Q.   Okay.  Assume that is required on an
11  international leg Hidden City ticket, would you still,
12  when someone had a complaint about needing a passport
13  would you still classify that as deception or
14  confusion?
15       MR. NELSON:  Objection; complete
16       hypothetical; beyond the scope; asked and
17       answered.
18       THE WITNESS:  The reality, the fact
19       here, even in this hypothetical is, a consumer
20       complain about this.  Obviously, they did not
21       see or they're lying.  Let's assume they are
22       not lying, then, obviously, they did not see.
23       So the burden should be on the website designer
24       and owner to try to make sure that this

Page 199

1  disclaimer is clear.
2       MR. REED:  Objection; nonresponsive.
3  BY MR. REED:
4  Q.   You came up with these definitions of deception
5  and confusion, right?
6  A.   Based on examples of complaints.
7  Q.   Okay.
8  A.   I did not invent them.  I looked for, show me
9  the whole set of -- I reviewed a whole set of
10  complaints.  And then based on the review of the set
11  of complaints and what they said, I categorized them
12  into these two.  So then I discussed them with Zach
13  and communicated with the coders and that's what we
14  have.
15  Q.   Let me ask you this way, since we seem to be
16  miscommunicating.
17       What would Skiplagged need to do in
18  your mind to convey the need for a passport on a
19  Hidden City ticket, international leg flight, that if
20  the consumer then complained about it, would qualify
21  it as confusion not deception?
22  A.   I would -- first of all, I'm not sure that
23  confusion is the alternative.  The alternative would
24  be, there are no deception.  That it's kind of

Page 200

1  misinformation.  But to be the correct information the
2  deception here or to avoid deception, they have to
3  make sure the consumer sees clearly and understands
4  it.  And I would, depending on design, there are
5  thousands of different way in which you can design a
6  website and you can test it.  All the large companies,
7  Google, everyone else, have tons of thousands of test
8  everyday.  They are doing A-B testing all the way.  If
9  I were Skiplagged, I would design A, B testing
10  different approaches for communicating this and seeing
11  which one lead to the greatest understanding by
12  consumers and go with that.
13  Q.   And so if there was -- they did that and they
14  have it disclosed and a consumer still misses it and
15  doesn't complain, would you still code it as
16  deception?
17       MR. NELSON:  Objection; complete
18       hypothetical.
19       You can answer.
20       THE WITNESS:  Well, I think I'm looking
21       at this not from a legal point of view, I'm
22       looking at this from a marketing point of view.
23       From a marketing point of view, to me this is
24       the situation that's described, the situation

Page 201

51 (Pages 198 - 201)

1    where whatever they did is ineffective in
2    communicating the truth.
3  BY MR. REED:
4  Q.    So whenever it's ineffective, it's deception?
5  A.    No.  I'm saying I'm separating it here in my
6  response to you on this.  But if they really did all
7  the best they can to try to communicate it and still
8  people do not get it, then the conclusion is that they
9  were ineffective in communicating the truth to the
10 consumer and I would not define it as deception.
11 Q.    Okay.
12 A.    Deception is when basically, when I look at the
13 material and the way I looked at this and I thought
14 this is not that visible.  That's deception.  So this
15 is the distinction I would make from a marketing
16 consumer behavior point of view.  This may not be the
17 legal deception.
18 Q.    Okay.  And is it your testimony that you went
19 through the Skiplagged website and simulated buying a
20 Hidden City ticket with an international leg?
21 A.    No, I did not.
22 Q.    Okay.  Let's turn to page 62.
23 A.    (Reviewing document.)
24 Q.    Now, Exhibit 16 in your report, starting on

Page 202

1  BY MR. REED:
2  Q.    Okay.  Okay.  Sure.  Take your time.
3  A.    (Reviewing document.)
4        Okay.  So on this page F, there were
5  six quotes and three of them mention explicitly
6  American Airlines.  The second quote on the fourth
7  line, the fourth quote on the third line, and the last
8  quote on the second line.
9  Q.    So if it uses the word American Airlines, it's
10 your contention it's using the American marks?
11 A.    Yeah.  It's American Airlines registered
12 trademark.
13 Q.    Just using that name?
14 A.    Yeah.
15 Q.    Without anything else?
16 A.    What do you want people in a complaint to say?
17 Q.    Okay.
18 A.    It's a complaint.  That's the way they want to
19 refer to it.  It's a registered trademark of American
20 Airline.  They used the name.  So here it is.  It's a
21 complaint.  It's a written complaint.
22 Q.    Okay.  I just wanted to understand where we're
23 at, if we're on the same page.
24        Now, turning to -- let's go back here.

Page 204

1  page 62.  You have examples of complaints to
2  Skiplagged that you say evidence Skiplagged's
3  deceptive practices, right?
4  A.    Correct.
5  Q.    And the deceptive practices being what?
6  A.    The one that we defined in our previous
7  paragraph.
8  Q.    Under deception?
9  A.    Yeah.
10 Q.    Okay.  So those things, deceptive has the same
11 meaning?
12 A.    Correct.
13 Q.    I just wanted to make sure.  Okay.
14        And can you point to any of these
15 complaints in 16 that refer to Skiplagged's use of
16 American's marks?
17 A.    Explicitly to the marks, I don't know.  I have
18 to look -- I have to read the whole thing.
19 Q.    Are you aware of any?
20        MR. NELSON:  Hold on.  Do you want him
21 to answer the last question?  He said he has to
22 read it.
23        THE WITNESS:  I have to read it.
24

Page 203

1  Back to page 29, going to the definition of confusion.
2  This is the definition you used for your report.
3  correct?
4  A.    Based on my analysis of the actual complaints.
5  Q.    Okay.
6  A.    So this represents -- all these items reflect
7  what I took from reading the complaint.  And then this
8  was what's communicated by Zach to the coders.
9  Q.    Okay.  And confusion you have, is "Any
10 complaint about role, authority or relationship of
11 Skiplagged vis-a-vis the airline," right?
12 A.    Right.
13 Q.    "This included any complaints suggesting the
14 customer misunderstand what Skiplagged could and could
15 not do to support a customer after purchase or the
16 customer assumed Skiplagged could provide travel
17 agency services.  Any complaint where the customer
18 expected Skiplagged to reaccommodate, cancel, refund
19 flight price, make meal selections or seat
20 reservations and any complaint where the customer
21 thought Skiplagged is an approved booking partner or
22 agent," correct?
23 A.    Yes.
24 Q.    Okay.  And all of that falls under confusion

Page 205

52 (Pages 202 - 205)

App'x 298

1  for the numbers in your report, correct?
2  A.    Correct.
3  Q.    Okay.  Now, when we go to page 66, Exhibit 17,
4  these are the complaints that you picked out that are
5  complaints to Skiplagged, evidencing confusion, as
6  based upon your definition in this report, right?
7  A.    Correct.
8  Q.    All right.  Then, let's see.  Exhibit 18, what
9  is that then?
10 A.    (Reviewing document.)
11        MR. NELSON:  Objection to form.
12        THE WITNESS:  This is, if you look at
13     page 67, page 67 explains it.  This is this
14     third source of data, which is under the
15     heading of page 67, illustrative actual
16     confusion and perceived deception and consumer
17     posts on social media.  And Exhibit 18 includes
18     illustrative posts on social media which cover
19     the different categories, which are listed on
20     page 67 and are presented here.
21 BY MR. REED:
22 Q.    All right.  How did you go about getting the
23 social media comments?
24 A.    It was a project done by Voluble.  And they did

Page 206

1  comments were made by actual people?
2  A.    They did not, we did not require them -- actual
3  people?  They do -- that's a general procedure they
4  have in reviewing posts and they try to eliminate
5  votes and others.
6  Q.    Where is that identified in the documents?
7  A.    It's not.  It's part of their regular
8  procedure.
9  Q.    Okay.  But nowhere in here does it show --
10 A.    No.  I just assumed that it's -- that's part of
11 the normal way in which they do analysis.
12 Q.    You made that assumption?
13 A.    I know.  I worked with them for the last five
14 years.
15 Q.    Okay.  And but you don't know as you sit here,
16 what process they used to eliminate false comments or
17 bots or anything like that?
18 A.    I know that they have a process to eliminate
19 bots.  If someone dies, I have no idea if they can
20 identify it, check it or not.
21 Q.    Okay.  And you said the search was limited to
22 apps, formally Twitter and Reddit, correct?
23 A.    Correct.
24 Q.    No Facebook?

Page 208

1  it -- this is described in the methodology section.
2  Q.    You didn't actually go collect them, did you?
3  A.    No.  That's the reason I hired Voluble to do
4  it.
5  Q.    All right.
6  A.    They were -- that's their specialty.  And
7  that's what they primarily focused on.  And on page
8  30, there is a description of the methodology that
9  were used.
10 Q.    And so it's your directed them to identify and
11 collect consumer comments posted on line about
12 Skiplagged, correct?
13 A.    Correct.
14 Q.    Okay.  And then the consumer, did you direct
15 them as to that they had to be individuals that had
16 actually made a purchase on Skiplagged?
17 A.    No.  That any -- any posts that mention the
18 name Skiplagged in it.
19 Q.    Okay.
20 A.    To try to undo, to identify them and pull
21 examples.  And, again, then they did it, not I.  They
22 selected examples that they were able to pick up on
23 the social networks.
24 Q.    Okay.  What did they do to verify that those

Page 207

1  A.    No.
2  Q.    No Instagram?
3  A.    These are the one that they could get the data,
4  you know, relatively easily.
5  Q.    Okay.  For ease of getting the data, you were
6  limited to those two, correct?
7  A.    We had a time constraint on this.  We decided
8  pretty late in the game to edit.  And they -- that's
9  what they were able to deliver on time.  And these two
10 platforms are big, Twitter and Reddit are really big
11 platforms.  And I think they are representative,
12 again, that's not an exhaustive list, but that's
13 illustrative list.
14 Q.    How many comments?
15 A.    I think there were about 50 comments or so in
16 this area.  I did not count them.  If you look at all
17 the cat- -- under all these categories.
18 Q.    But these are all that were found?
19 A.    That illustrative that they gave.  I asked them
20 to give me illustrative comments on some of these
21 topics and that's what they selected.
22 Q.    But is there anywhere in your report where it
23 has all of the comments?
24 A.    No.

Page 209

53 (Pages 206 - 209)

1  Q.    You didn't provide that data, did you?
2  A.    No.  I did not get it.  I basically asked them
3  to do the search, find out if there are any and then
4  to give me illustrative and that's the analysis they
5  provided.
6  Q.    They gave you those and then you put them in
7  this report?
8  A.    Correct.
9  Q.    The analysis of putting them -- did you
10 identify them as being deceptive or confusion or
11 deceptive and confusion?
12 A.    Well, I think what I did, when I work with them
13 is on the topic, which are on page 67, this is
14 believing that Skiplagged is an agent of another
15 airline, that the luggage was sent to the wrong
16 destination, with a dishonest ticket, had to pay extra
17 for it, the cost was higher than expected, passport
18 issues, or general dissatisfaction.
19 Q.    And only one here was agent, right?
20 A.    That's from the search they did, they did a few
21 days of work and that's what they found.  I'm sure if
22 we will kind of expand the search to cover the
23 Facebook and others and spend more time and do it more
24 systematically we will find many more.  These are

Page 210

1  illustrative of problems you will see on the social
2  network.
3  Q.    Well, this social media individuals not a -- is
4  this the author down here on the next page?  I was a
5  little confused.
6  A.    (Reviewing document.)
7         Yes.
8  Q.    Okay.
9  A.    For some reason it was printed wrong.
10 Q.    Okay.  And now, in that comment, the poster
11 didn't actually say that Skiplagged was an agent of
12 American, right?
13 A.    I'm sorry.  What was the question?
14 Q.    Well, let me -- the comment while I
15 accidently booked my flight through Skiplagged instead
16 of American and now I can't check my bag, correct?
17 A.    Yeah.
18 Q.    Where in that does the comment say, I believe
19 Skiplagged is an agent of American, right?
20        MR. NELSON:  Objection;
21 mischaracterizes.
22        THE WITNESS:  No, this implied to me,
23 it clearly implies that this person thought
24 that because in looking at this everything is

Page 211

1  American, that he is checking in American and
2  never realized that he's going through
3  Skiplagged.  And was totally surprised
4  apparently by the fact that he got a Hidden
5  City ticket.
6  BY MR. REED:
7  Q.    That's the way you interpreted it?
8  A.    Yes.
9  Q.    Okay.  How do you know it was a Hidden City
10 ticket?
11 A.    Because I think that the restrictions on bag is
12 only on Hidden City.
13 Q.    So you made that inference based upon, I can't
14 check my bag?
15 A.    Yes.
16 Q.    Okay.  The next comment where you have under
17 believing Skiplagged, I guess it is, it has a 6.  It
18 goes 1 to 6.  Is there missing ones?
19 A.    Some, like this, might have been lost in the
20 production of the document.
21 Q.    Okay.  You have "@AKhadiDon," downloaded --
22 "download the Skiplagged app, all flights are cheaper,
23 an yes, it's legit."  And you interpreted that to
24 mean, he thought or he or she, whoever, the poster

Page 212

1  believed that Skiplagged was an agent of American?
2  A.    Yes.
3  Q.    Why?
4  A.    Because he said, yes, it's legit.  He believed
5  that this is a legit place to buy the American Airline
6  ticket, which has to be only through authorized
7  agents.
8  Q.    To your knowledge a user of the Skiplagged
9  website, is there only option after they search for a
10 flight, to buy that flight through Skiplagged?
11 A.    No.  They have other options.
12 Q.    What are they?
13 A.    They cannot buy.  If they decide not to buy.
14 Q.    Okay.  Other than not buying, what other
15 options?
16 A.    I think they can go through another third-party
17 agent.
18 Q.    Okay.  Another option might be they could go
19 directly to American and purchase it there, right?
20 A.    They can, but even though the incentive,
21 obviously, is in the Skiplagged because of the ease
22 just to continue and buy it then on Skiplagged.
23 Q.    As part of your analysis, did you see or look
24 for any studies that show numbers of consumers that

Page 213

54 (Pages 210 - 213)

1  use sites like Expedia or agents to look for prices of
2  ticket, but then go and purchase directly from the
3  airlines?
4  A.    I'm sure there is some.  I don't know the exact
5  statistics, but I'm sure there is some.
6  Q.    You didn't review that as part of your process
7  either, did you?
8  A.    I didn't see.  I didn't see any study that does
9  it.
10  Q.    Did you look for them?
11  A.    Yeah, I did look for some other studies that
12  relate to this.  I couldn't not find any.
13  Q.    Okay.  All right.  Let's talk a little bit now
14  about your conclusions here, which I'm flipping to the
15  end of your report, starting at page 87.
16  A.    Yeah.
17  Q.    Are you there with me?
18  A.    Yes.
19  Q.    All right.  And here you list eight separate
20  conclusions, correct?
21  A.    Yes.
22  Q.    All right.  The first being the results of two
23  consumer experiments.  Two experiments meaning, one
24  Hidden City, one non Hidden City?

Page 214

1  Q.    Okay.
2  A.    That the stimulus I selected, I worked with
3  Zach and the Greenberg law firm on the 200 randomly
4  selected links that lead to the selection of the
5  stimuli.  And every -- my conclusions are based on the
6  consumer, the respondent reaction to the stimuli.
7  Q.    You said randomly selected on the 200.  That's
8  not something you did.  Correct?
9  A.    No.  Zach selected randomly 200 --
10  Q.    Okay.  How do you know that was selected
11  randomly by Zach?
12  A.    Because I spoke with him and we were together
13  on the phone when we did it.  We talked about select
14  randomly or the same time or later.  Select randomly
15  200 links between domestic locations and we focused on
16  the type one airports.
17  Q.    And do you know did he use any type of computer
18  program or anything to assist in this randomness?
19  A.    He mentioned to me at the time.  I don't
20  remember what it is.
21  Q.    He mentioned that he used one?
22  A.    He used something.  I don't remember what it
23  was.
24  Q.    Okay.  And this was a verbal communication, not

Page 216

1  A.    Correct.
2  Q.    Okay.  Among 600 consumers.  That's a total of
3  600?
4  A.    Correct.
5  Q.    With roughly 140 in each group or so?
6  A.    Close to 150, yes.
7  Q.    Okay.  Show conclusively that Skiplagged's non
8  Hidden City and Hidden City ticket offering deceive
9  consumers to believe that Skiplagged is an authorized
10  agent of or otherwise associated with American?
11         Did I read that correctly?
12  A.    Yes.
13  Q.    Okay.  And based upon your analysis, how did
14  you conclude that Skiplagged deceived their consumers
15  into believing that association?
16  A.    By the fact that that's the only stimuli the
17  respondent had was the material from the Skiplagged
18  website.  That's what they're responding to.  So it's
19  clearly attributed to the stimulus.
20  Q.    Okay.  It's attributed to the stimulus that was
21  provided to the survey respondents, that was assembled
22  by you and the Greenberg lawyer, correct?
23  A.    Assembled?  Yeah.  Basically through the
24  process we discussed.

Page 215

1  in writing, correct?
2  A.    Correct.
3  Q.    And so between you -- it would be you and Zach,
4  they would know the answer to that question?
5  A.    Correct.
6  Q.    And you can't remember it as we sit here today?
7  A.    Correct.
8  Q.    And you've come to the fact that it was
9  deceptive, why?
10  A.    Go back to Exhibit-6A, that's what I'm
11  explaining.  We discussed it twice already.  But go
12  back to page 42, Exhibit-6A.  It screams, the results
13  are screaming from the exhibit.
14  Q.    Screaming.  Okay.
15         Because of this association based upon
16  the coders' interpretation of the open-ended, plus the
17  fact that it correlated to Expedia, right?
18  A.    Plus, it's not only the coder interpretation.
19  Plus the explicit responses to closed-end question.
20  Question 7A and 11A, and these are the net, across all
21  of these many many multiple measures here that define
22  that between 73 and 76 percent of the confusion
23  respondent believed association.  And that's extremely
24  close to the perceived association for a legitimate

Page 217

55 (Pages 214 - 217)

1  travel agent, Expedia, which is 81 to 86.
2        So, yes, I have extremely high
3  confidence that the consumers do perceive association
4  between Expedia and American Airlines.  And this is
5  because of the way Expedia -- because of Skiplagged,
6  not Expedia, Skiplagged presents the material on their
7  website.
8  Q.    Which the respondents didn't see.  They saw the
9  stimuli, right?
10  A.    They saw the representation of the website as
11  presented in my stimuli.
12  Q.    As chosen by you and Zach?
13  A.    Yes.
14  Q.    Okay.  And that's based upon the confusion
15  table 6A, right?
16  A.    Correct.
17  Q.    Okay.  And then you go on to say that the
18  results of your experiments based upon the stimuli
19  presented, deceives the consumers of its non Hidden
20  City tickets to believing a purchase tick- -- let me
21  start over.
22        Number two, the results of the
23  experiments clearly show that Skiplagged deceives
24  consumers of its non Hidden City tickets to believe

Page 218

1  that purchasing a ticket on Skiplagged.com is cheaper
2  than purchasing a ticket directly from American,
3  correct?
4  A.    Yes.
5  Q.    Even though we discussed, you can't point me to
6  anywhere that would expressly claim that, right?
7  A.    No.
8  Q.    Okay.
9  A.    But they say it's cheaper.  Go back to Exhibit
10  7 --
11  Q.    Cheaper.  Cheaper.  Right.  Right.
12  A.    Go back to Exhibit 7.
13  Q.    Right.  And we talked about that, right?
14  A.    Yeah.
15  Q.    It's based upon this idea that it's cheaper,
16  cheaper, cheaper, not on it's own express, deception,
17  right?
18        MR. NELSON:  Objection;
19  mischaracterizes.
20        THE WITNESS:  Look at the response on
21  Exhibit 7.  Let's go -- let's stick with the
22  data.
23  BY MR. REED:
24  Q.    Okay.

Page 219

1  A.    Exhibit 7 asks explicitly, "Buying ticket
2  through Skiplagged is cheaper than buying directly
3  from the airline."  Cannot be more explicit.  And the
4  61 percent of those who saw that Skiplagged non Hidden
5  City ticket said yes.  And 71 -- 70 percent said it
6  among those who saw the Hidden City ticket.  And
7  they're just slightly below the percentage of Expedia.
8  Q.    And this is based upon the stimuli that you
9  provided them, right?
10  A.    Right.  Which I believe is an accurate
11  representation of the real word stimuli of Skiplagged.
12  Q.    Where does it say it on the stimuli?
13  A.    I'm telling you this because my -- that's why I
14  selected it.  And I have not seen any evidence
15  whatsoever from your side to show that this does not
16  represent accurately the Skiplagged website.
17  Q.    We'll show that later.
18        But as far as, I'm asking the stimuli
19  that were showed to the respondents for Exhibit 7, the
20  data, we want to go to the data right?  Where does it
21  say on here, the stimuli, that buying through
22  Skiplagged is cheaper than buying from the airline?
23  A.    It doesn't.  But it's the perception of
24  consumers based on seeing the stimuli.

Page 220

1  Q.    Okay.
2  A.    It doesn't show the stimulus.  This is the
3  stimulus and that's their perceptions.
4  Q.    Okay.
5  A.    So the perception is reality.  So what
6  consumers perceive is that you are offering it cheaper
7  than the airline.  It's an explicit question.
8  Q.    So always perception equals reality?
9  A.    Yes.
10  Q.    Okay.  These same respondents with the control
11  believe the same thing about Expedia, right?
12  A.    Right.
13  Q.    Is that true for Expedia?
14  A.    I don't know.  I didn't check it.  I know the
15  data we checked is against Skiplagged.  And we know
16  that this is wrong based on the 200 cases we examined.
17  Q.    The data is the same for Expedia.  Is Expedia
18  deceiving its customers?
19  A.    I don't know.  I don't know the data for
20  Expedia.
21  Q.    If it's the same, would you reach the same
22  conclusion?
23  A.    If Expedia is not cheaper?
24  Q.    Yes.

Page 221

56 (Pages 218 - 221)

1 A.    Yes.
2 Q.    Okay.
3 A.    If Expedia is not cheaper. I'm going by the
4 data.
5 Q.    Okay.
6 A.    The data to me says absolutely clearly that
7 consumers perceive the Skiplagged stimulus we
8 presented them, that buying tickets through Skiplagged
9 is cheaper than buying directly from the airline.
10 Q.    Now, one of the other things you say, relatedly
11 consumers in both non Hidden City and Hidden City
12 tickets believe that Skiplagged does not charge an
13 additional fee on top of the airline's total ticket
14 cost?
15 A.    Right.
16 Q.    All right. And that's based upon their view of
17 the stimuli that you provided, right?
18 A.    Right. And that's somewhere in Exhibit 8.
19 Q.    Okay. And if -- and you didn't include within
20 the next payment information, when you get to the next
21 page and you click through, right? Or we already
22 established that?
23 A.    If that was the way we discussed it.
24 Q.    Okay. And so if -- but you didn't include

Page 222

1 pages that might have shown the respondents breakdown
2 of the fees, did you?
3 A.    (Reviewing document.)
4        I thought the breakdown is presented
5 here. It says --
6 Q.    That's your understanding?
7 A.    -- service fee -- well, if you look at the last
8 page of the stimulus, it clearly says, one adult,
9 172.60. Service fee, that's a fee, $35. Total charge
10 207.60.
11 Q.    Okay.
12 A.    And it clearly says the fees. So they know
13 exactly the amount.
14 Q.    Okay. And then how do you explain, then, the
15 consumers not getting it?
16 A.    Not getting what?
17 Q.    When you said relatedly consumers of both non
18 Hidden City and Hidden City tickets believe that
19 Skiplagged does not charge an additional fee on top of
20 their airlines total ticket cost?
21 A.    Yeah. It's their perception.
22 Q.    Okay.
23 A.    When I say perception equals reality, is it's
24 consumer perception is their reality. And that's the

Page 223

1 way consumers perceive it.
2 Q.    So you didn't look into causation about why
3 that perception is?
4 A.    The cause is the stimuli.
5 Q.    Okay.
6 A.    The cause is the stimuli. The cause for all
7 the answers we have here, for all of the data in the
8 study was the stimuli, was the Skiplagged way they
9 presented on their website.
10 Q.    But they didn't see the website, they saw the
11 static images provided, right?
12 A.    We talked about this a number of times.
13 Q.    You keep saying, sir, the website. And the
14 respondents actually didn't see the actual website,
15 did they?
16        MR. NELSON: Objection; argumentative.
17        THE WITNESS: The respondents saw the
18    stimuli.
19 BY MR. REED:
20 Q.    Okay.
21 A.    I refer to the stimuli, the stimuli represents
22 the website.
23 Q.    Based upon what you and Zach picked from the
24 website, right?

Page 224

1 A.    The first page where the specific flight was
2 presented plus other relevant information. Yeah.
3 Q.    Plus filters chosen and everything else, right?
4 A.    As it is presented in Wind-6.
5 Q.    Okay.
6        MR. NELSON: Can we take a break.
7        MR. REED: Sure.
8        (A short break was taken.)
9 BY MR. REED:
10 Q.    We're back on the record. You're still under
11 oath.
12 A.    Yeah.
13 Q.    All right. Conclusion 3, you state the results
14 of the experiment clearly show that Skiplagged
15 deceived consumers of its Hidden City tickets to
16 believe the following. And then you list A, B and C.
17        Are you with me?
18 A.    Yes.
19 Q.    Okay. The deception here is what? Based upon
20 that definition earlier in the report?
21 A.    No. I'm referring to this specific exhibit.
22 So let's look at this. A, that Hidden City ticket
23 with Skiplagged is a valid ticket. 70 percent of the
24 respondents, see Exhibit 9A. Let's look at Exhibit

Page 225

57 (Pages 222 - 225)

1  9A.
2  Q.     Right now I'm asking you about the definition
3  of deceived, what you mean there.  Is that based upon
4  the definition of deception earlier in your report?
5  A.     Well, we talked about multiple definition -- we
6  talked also definition of deception for the analysis
7  of the complaint.
8  Q.     I thought you said it was the same.  It's
9  different?
10  A.     The definition is the same in all of them.
11  Q.     Okay.
12  A.     But in the report here, we have a multiple
13  places where we refer to this.  At the bottom of one
14  of the exhibit, we refer to this.  We talk about the
15  complaint.  So the general definition here is, whether
16  the consumers perception on the stimuli is in contrast
17  to reality, to the real risks of the ticket.
18  Q.     Okay.  And those are the risks that we've
19  already talked about earlier.
20  A.     Correct.
21  Q.     I don't need to go back through that again.
22         All right.  When you say in part A, the
23  Hidden City ticket bought through Skiplagged.  When
24  you saw bought through Skiplagged, what do you mean?

*Page 226*

1  in the first part of the report are based on the
2  stimuli which I believe and have not seen any
3  contradictory evidence that is accurate representation
4  of the Skiplagged website.
5  Q.     Okay.  But we're missing the next step where we
6  hit pay with credit card, right?
7  A.     Correct.  Because we had the relevant
8  information -- what I believe is the relevant
9  information.
10  Q.     And nowhere for the respondents did you define
11  for them bought through -- what bought through
12  Skiplagged means, did you?
13  A.     No.  I think it's plain English.
14  Q.     Okay.  All right.  Are you aware that there is
15  multiple ways to buy a ticket through Skiplagged?
16  A.     Yeah.  But in this specific case we focus our
17  attention on the stimuli.  The stimuli clearly focused
18  on American Airlines.  And the idea was their
19  perception of whether a ticket bought through
20  Skiplagged, because that's the stimulus they saw, is a
21  valid ticket.
22  Q.     Would you explain for me what you understand to
23  be the ways to buy an American ticket through
24  Skiplagged?

*Page 228*

1  A.     They are buying American Airlines through
2  Skiplagged.
3  Q.     And what do you mean?  Because the respondent
4  doesn't actually buy the ticket, right?
5  A.     Right.
6  Q.     And we talked about there is different options,
7  right?
8  A.     Right.
9  Q.     When you say buy through Skiplagged, what are
10  you referring to precisely?
11  A.     Explicitly to question 12A in my questionnaire,
12  which is reflected in Exhibit 9A on page 48.  That
13  says, "A ticket bought through Skiplagged is a valid
14  ticket" versus "a ticket bought through Skiplagged is
15  not a valid ticket."
16  Q.     Okay.
17  A.     We don't know.  And 74 percent of the
18  respondent to the Skiplagged ticket, and 70 percent of
19  the Skiplagged Hidden City ticket said, yeah, it is a
20  valid ticket.
21  Q.     Based upon the static stimuli, right?
22  A.     Everything is based on that.
23  Q.     Everything?
24  A.     Everything we talked about.  All my conclusions

*Page 227*

1  A.     Well, my perception is irrelevant.  What the
2  consumer perceive it.  The consumer perceived, based
3  on the stimulus, that it's a valid ticket.
4  Q.     I understand you may believe its irrelevant,
5  but that's my question in this deposition?
6  A.     Well, my perception is, that this would be a
7  ticket, especially when we talk about Hidden City
8  stimuli, Hidden City ticket that is legitimate, that
9  is not constrained that I can basically use it with no
10  restriction, with no consequences.
11         MR. REED:  Objection; nonresponsive.
12  BY MR. REED:
13  Q.     Do you have any understanding of how the ticket
14  is bought through Skiplagged, the American ticket?
15  A.     I thought we talked about this before.  You can
16  buy it either through Skiplagged or you can buy it
17  through American or you can buy it through a
18  third-party agent.
19  Q.     Okay.  And that's all included in the statement
20  of a city ticket bought through Skiplagged?
21  A.     Whatever the consumer interpret it to mean.
22  Q.     I'm asking you what you mean in your
23  conclusion?
24         MR. NELSON:  Objection; foundation;

*Page 229*

58 (Pages 226 - 229)

1    mischaracterizes.
2          THE WITNESS:  My conclusion is based on
3    the data that I'm referring to.  So if you go
4    back to my conclusion, we're looking at 3A,
5    that a Hidden City ticket bought through
6    Skiplagged is a valid ticket based on consumer
7    response in Exhibit 9A.
8    BY MR. REED:
9    Q.    To the question you asked?
10   A.    Correct.
11   Q.    Based upon the stimuli that you and Zach
12   provided?
13   A.    Yes.
14   Q.    Okay.
15   A.    I will not repeat again that I believe the
16   stimuli is the correct stimuli.
17   Q.    All right.  And the next is that -- and is it
18   your understanding that a Hidden City ticket bought
19   through Skiplagged is not a valid ticket?
20   A.    Yes.
21   Q.    Why is that -- how do you have that
22   understanding?
23   A.    Well, because it violates the rules of American
24   Airlines.

Page 230

1    Q.    And it's up to American if they honor that
2    ticket or not, right?
3          MR. NELSON:  Objection;
4          mischaracterizes.
5          THE WITNESS:  If you look back at the
6          table that we discussed before as part of the
7          stimuli, it's clearly this violates American
8          Airlines rules, so it's not valid.
9    BY MR. REED:
10   Q.    But American Airlines could allow the
11   passenger, the consumer to fly, right?
12         MR. NELSON:  Objection; calls for
13         speculation; beyond the scope of Mr. Wind's
14         report; calls for legal conclusion.
15         THE WITNESS:  They could.  But primary
16         it's against the rules.  And it's also sold by
17         an unauthorized agent, which is against the
18         rules.
19   BY MR. REED:
20   Q.    Okay.  Based upon what you were told, because
21   you didn't look at the rules right?
22         MR. NELSON:  Objection;
23         mischaracterizes.
24         THE WITNESS:  I did not look at the

Page 231

1    rules but I have no doubt to believe that
2          counsel told me that basically American
3          Airlines sells only through authorized agents.
4    BY MR. REED:
5    Q.    Okay.
6    A.    And I did see some documents for this.
7    Q.    Okay.
8    A.    And as well as the documents that underline the
9    stimulus that I preferred and that consumers in
10   respond to the city -- to the Hidden City stimuli
11   actually saw.
12   Q.    Do you know or do you have any information of
13   whether a Hidden City ticket bought through Skiplagged
14   on another airline is a valid ticket or not?
15         MR. NELSON:  Objection; beyond the
16         scope; calls for a legal conclusion; calls for
17         speculation.
18         THE WITNESS:  I don't know.  I did not
19         examine it.
20   BY MR. REED:
21   Q.    Okay.  You say that Skiplagged deceives
22   customers, that the Hidden City ticket offered by
23   Skiplagged carries no risk, right?
24   A.    Correct.

Page 232

1    Q.    And how does Skiplagged deceive customers into
2    believing that there is no risk?
3    A.    Look at Exhibit 9B.
4    Q.    (Reviewing document.)
5    A.    9B is based on a direct question, closed-end
6    question.  The option offered by Skiplagged carries no
7    risk, as opposed to the offering that Skiplagged
8    carries risk or don't know.  In 37 percent of the
9    Expedia ticket buyers -- I'm sorry, of the Skiplagged
10   ticket buyers, in 36.1 percent of the Skiplagged
11   Hidden City ticket buyers believe that it carries no
12   risk.
13         Now, in addition to this, we asked them
14   in question 12E and F.  Let's go to question 12E and
15   F.
16         (Reviewing document.)
17         Carries risk.  We ask them what are the
18   risks associated with this ticket?  And then a follow
19   up, are there any other risks.  So Exhibit 10A,
20   answers present the response to this.  And this is the
21   exhibit we discussed before, when I basically directed
22   the coders to code it into meaningful risks or
23   un-meaningful risks.  And you can see the results
24   here.  That clearly show that despite the real risks

Page 233

59 (Pages 230 - 233)

1  associated with the Hidden City ticket, the majority,
2  the vast majority of the people received no risks,
3  74.3 percent.
4       And most of them, those who perceived
5  risk, perceived them to be minimal risk in the Hidden
6  City ticket, 16.7 percent, slightly even a meaningful
7  risk compared to Expedia, which was only 11 percent.
8  And then 12.5 percent perceive un-meaningful risk
9  compared to only 7 percent in Expedia.
10       And then in addition to this, we did an
11  analysis on Exhibit 10B, on how many meaningful risks
12  did they identify.  And you find that the mean is less
13  than one, and the median is primarily zero of
14  meaningful risk.  And the number of risk management
15  were 11 percent mentioned one, 5 percent, two, and a
16  negligible number, less than 1 percent, mention three.
17  Q.   Did your study do anything to identify what
18  Skiplagged was doing to, in your term, deceive
19  customers?
20  A.   Well, they -- what they did is they did not
21  disclose the real risks.  The lack of disclosure, the
22  lack of disclosure of the real risks is what
23  Skiplagged did, which was wrong.
24  Q.   And how does your study identify that lack of

*Page 234*

1  disclosure being the deception versus consumers being
2  confused or consumers just not getting it or consumers
3  seeing disclosures and ignoring them?
4  A.   Well, they're responding to the stimuli.
5  Everything that we discuss is respond to the stimuli.
6  And what they are giving us back in this last three
7  exhibits we saw, the result is consumers did not
8  perceive this to be risky.  And this is -- given the
9  huge amount of risk is the Hidden City ticket, this is
10  deception.
11  Q.   It's -- because they just ignored this?
12  A.   These are only three out of probably about 10
13  different risks.
14  Q.   Okay.
15  A.   You know, what about the other risks involved
16  here?  And even these, they did not pre--- they were
17  not in a position, they were not presented in a way
18  that consumers really perceived them.
19  Q.   You didn't present them?  If they're on the
20  website and not included in here, the respondents to
21  your surveys didn't seem them, right?
22       MR. NELSON:  Objection;
23  mischaracterizes testimony.
24       THE WITNESS:  Let me counter this by

*Page 235*

1  reminding you of the one example of the
2  complaint that we have.  The complaint was
3  about, I think, one or more complaint about
4  bags.  And, obviously, the people who complain
5  about this, were it was the real website.  And
6  they still did not see it.  So I stand by the
7  fact that the way it is presented is not
8  designed to encourage people to see and
9  understand the risks involved.
10  BY MR. REED:
11  Q.   Do you have any document, any communication
12  that you have seen that that ███████████████████
13  A.   I mentioned to you at the beginning of the
14  deposition today that I saw some additional material
15  about internal communication.
16  Q.   Mm-hmm.
17  A.   Yes, there was at least one communication that
18  suggests ████████████
19  Q.   And who was on that communication?
20  A.   The CEO and some other people.
21  Q.   CEO being who?
22  A.   The person that sits next to you.
23  Q.   Okay.  And who do you understand that to be?
24  A.   What do you mean?

*Page 236*

1  Q.   Do you know his name?
2  A.   I'm not sure how to pronounce it.
3  Q.   Okay.  Who was the other individual?
4  A.   There are a whole set of other names there.
5  Q.   Do you recall any of them?
6  A.   No.  But we can to -- we have the document.  We
7  can try with the document.
8  Q.   Do you have the Bates number of the document?
9  A.   Yes.  The Bates number would be SKP, a lot of
10  zeroes and then 6416.
11       MR. NELSON:  Well, read the Bates
12  number from that specific one.
13       THE WITNESS:  The specific one would be
14  the last one.
15       (Reviewing document.)
16       So the name that you asked for is
17  Aktarer Zaman.  I'm not sure if I'm pronouncing
18  it correctly.
19  BY MR. REED:
20  Q.   What was the Bates number of the one that
21  you're looking at?
22  A.   A lot of zeroes and 107954.
23  Q.   1079 --
24       MR. NELSON:  54.

*Page 237*

60 (Pages 234 - 237)



1 BY MR. REED:
2 Q.   -- 54?
3        That's not one on your appendix list,
4 right?
5 A.   No.  That's what I mentioned to you earlier
6 today, that that's an additional material that I saw.
7 Q.   When did you see it?
8 A.   Recently.  In part of the preparation for the
9 case today.
10 Q.   Okay.  Is that one that you went and found or
11 was it provided to you?
12 A.   I was talking about the issue, and I asked is
13 there any documents about this.  And Cam said yes.
14 And he showed me the series of this internal document.
15 Q.   Okay.  And it's your testimony that in this
16 e-mail, there is deliberate discussions of ████████
████████
18 A.   Well, let me try to find it and read it to you.
19        (Reviewing document.)
20        Okay.  Here it is.  This would be on
21 Bates number 107959.  And do you want me to read it to
22 you, the section?
23 Q.   Can I take a look?
24        (Reviewing document.)
                                          Page 238

1        MR. NELSON:  It's the second to last
2     page.
3        THE WITNESS:  Yeah, it's the second
4     from the last page.
5 BY MR. REED:
6 Q.   (Reviewing document.)
7        Which -- where are you looking at?
8 A.   I'm looking at the discussion that relates to,
9 for this document, it started on, it is February 17,
10 2022 at 3:38 p.m.  It was a group of people involved.
11 And after I was there, and there was a discussion.
12 And then -- the question was towards if you read from
13 the top there on this page that we talked about, ██
████████████████████████████████
████████████████████████████████
16        So Aktarer says, ███████████████
████████████████████████  So then he continued and says,
19 ████████████████████  And
20 then the question was, ███████████████
████████  And then the answer was, ████████ -- so
22 Phil asked the question, so there are a few kind of
23 agreement to the question, ███████████████
        Then Phil Walmer (ph) says, ████████
                                          Page 239

1        So Aktarer says, ██████████
████████████████████████
        And Walmer says, ████████████████"  And
4 then Aktarer says, ████████████████████
████████
6 Q.   Okay.  And that's your example of?
7 A.   Intending ████████████████████
████████
9 Q.   Oh.  Okay.  All right.
10        How do you reconcile your conclusions
11 with number 4, that what you found was knowing, you
12 said, the truth about AA prices and the real risk
13 associated with Hidden City tickets has only limited
14 impact on consumers intentions to buy their next
15 airline tickets from Skiplagged?
16 A.   No explanation.  That's a finding.
17 Q.   And you can't reconcile that?
18 A.   Well, the only explanation is that the stimulus
19 is so powerful and that the attraction of lower prices
20 is so strong and people did not really comprehend all
21 of the risks involved.  Because everyone saw the --
22 saw, at least in the -- this goes to a question we had
23 before one of the breaks today.
24        So the people in the Hidden City did
                                          Page 240

1 see this comparative page in the stimuli, plus the
2 American Airlines actual prices.  People in the second
3 group, which was only the non Hidden City did not see
4 the comparative page, but they did see the American
5 Airlines price.  So they had to compare the two.  But
6 my guess is the only explanation here is that the
7 attraction of the cheap tickets and the effectiveness
8 of the website of Skiplagged by articulate in the
9 discussion on the marketing consideration is so strong
10 that consumers basically ignored the reality.
11        MR. REED:  Objection; nonresponsive.
12 BY MR. REED:
13 Q.   So number 4 conclusion is that even when
14 consumers know "the truth about prices and real risk,"
15 it has limited impact on their intention to buy from
16 Skiplagged, correct?
17 A.   Yes.
18 Q.   Okay.  But you also concluded that consumers
19 when given your stimuli, perceive Skiplagged quite
20 similarly to their perceptions of Expedia, correct?
21 A.   Yes.
22 Q.   The -- you say in Number 6 that the findings
23 are strongly validated.  When you say "strongly
24 validated," is that a statistical term?
                                          Page 241

                                  61 (Pages 238 - 241)

1 A.     No.  It's designed more to convey the strength
2 of the results.
3 Q.     Okay.
4 A.     We have a strong convergence validity here.
5 The complaints, I have not seen complaint that will
6 negate the findings and the complaints support the
7 findings.
8 Q.     Did you ask for complaints that might negate
9 the findings?
10 A.     I asked for all complaints.
11 Q.     And you believe you received all complaints?
12 A.     Correct.
13 Q.     Okay.
14 A.     Well, part of them, the major part of them came
15 from you.
16 Q.     Well, how about --
17 A.     Because most of the complaints was for
18 Skiplagged.
19 Q.     And the social networks you also asked for,
20 right?
21 A.     Correct.
22 Q.     And you got all of those.
23        Do you know how many, as a percentage,
24 the complaints you reviewed are of total customers of
                                                    Page 242

1        What's your basis for your conclusion
2 that there is harm to the consumers?
3 A.     Well, evidence one is the complaint.  The
4 consumers are definitely harmed.  And there are all
5 these risks they are subject to and they don't know
6 about it.  They are buying tickets that may be
7 rejected and may lose their frequent flyers, they may
8 be denied a return ticket.  There are all these really
9 serious consequences of buying Hidden City ticket that
10 they are totally unaware of.  So to me, thats' a major
11 harm to the consumer.
12 Q.     All of those consequences are imposed by
13 American, right?
14 A.     And not told to the consumers.  These are the
15 reality.  Skiplagged wants to use American Airlines,
16 so they have to abide by the rules of American.  And
17 Skiplagged, the minimum they should do, especially if
18 they pretend in their statement, that they are trying
19 to educate consumers.  They are not educating
20 consumers, they are cheating consumers.  And they
21 should actually present to the consumers the reality,
22 the facts, so consumers can make an informed decision
23 whether this cost saving, the offer through the Hidden
24 City ticket, is worth the risks involved.  Skiplagged
                                                    Page 244

1 Skiplagged?
2 A.     No.  Because I have not seen the data on how
3 many customers are at Skiplagged.
4 Q.     Did you ask for that data?
5 A.     Yes.
6 Q.     Who did you ask?
7 A.     The lawyers that dealt this.
8 Q.     Was there any other information you asked for
9 and didn't receive?
10 A.     We asked for all the information that related
11 to Skiplagged that related to this.  And I thought I
12 got everything, but we did not get the information
13 about the Skiplagged customers.
14 Q.     Okay.  Your last conclusion is, given these
15 findings Skiplagged's practices.  Practices meaning
16 what?
17 A.     Those leading to confusion for consumers to
18 believe that they are associated with American
19 Airlines and deceiving them, especially the people who
20 buy Hidden City tickets.
21 Q.     By not disclosing the risk, right?
22 A.     Correct.
23 Q.     Are harming both consumers and American
24 Airlines.
                                                    Page 243

1 hides the real risks from the consumers.  So it's a
2 unfair behavior, the consumers are being hurt.
3        MR. REED:  Objection; nonresponsive.
4 BY MR. REED:
5 Q.     The risks that you identify are all imposed by
6 American on the consumers, correct?
7 A.     Skiplagged, yes.  But Skiplagged is selling
8 American ticket, which means the ticket has to be
9 subject to the rules of American.
10        MR. REED:  Objection; nonresponsive,
11 everything after yes.
12        I'll object to counsel's outburst.
13 It's unprofessional.
14        MR. NELSON:  I'm sorry.  Objecting --
15 you asked --
16        MR. REED:  This is not allowed by Judge
17 Pitman on any form or fashion.
18        MR. NELSON:  I am sorry I giggled at
19 your constant objections to your own questions.
20        MR. REED:  Well, my objections were to
21 the witness's failure to answer the question.
22 BY MR. REED:
23 Q.     You also state that these practices that you've
24 identified by Skiplagged is harming American.  In what
                                                    Page 245

1  way did your study show harm to American?
2  A.  In multiple ways.
3  Q.  Okay.
4  A.  First of all, they show that consumers confuse
5  and believe that American is associated with
6  Skiplagged, which means it's a major damage and harm
7  to American by losing control over their own brand,
8  which is the key for different branding.  You should
9  be able to control the future of your brand.  And here
10  because consumers associate American with Skiplagged,
11  anything that Skiplagged does can be attributed to
12  American and tarnish their reputation.  So there is a
13  huge harm here to American.
14  Q.  And did your study at all quantify that harm?
15  A.  No.
16  Q.  Okay.
17  A.  We don't design to quantify.  But my study
18  clearly shows huge percentage of confusion among the
19  highest levels in any study that I've done over the
20  years.
21       And the 70 percent confusion as to
22  association, which is absolutely huge.  And then in
23  other words, the important finding here, when you look
24  at this data, they're close similarity to the

1  American?
2  A.  Yes.  Because it's not the percentage, it is
3  the magnitude.  We're talking about the complaints to
4  Skiplagged with 12,000 complaints about deception or
5  confusion.  That's a huge number of actual complaints
6  that you rarely see in confusion cases in this
7  country.
8  Q.  Out of how many?
9  A.  It doesn't make a difference.  Look at the
10  number.  Look at the number of 12,000.  That's huge.
11  Q.  So just the number matters, not as to that
12  percentage of customers that are complaining or the
13  percentage of even complaints?
14  A.  The number doesn't make as much difference here
15  because there is the theory, which was clearly
16  validated over years on the tip of the iceberg that
17  I'm referring to in my report, where most people don't
18  bother to complain.  And the few that complain are
19  typically represented a very large percentage of the
20  population.  And I don't think I've seen in any other
21  study 12,000 actual complaint.  That's huge.  That's a
22  huge number.  So I believe, based on the study they
23  I've conducted and the report, that American Airlines
24  is seriously hurt by the existence of Skiplagged.

1  association was a legitimate travel agent like
2  Expedia.  There was hardly any difference between the
3  two.  So that's a huge harm to American.
4       And then based on all of my marketing
5  expertise and knowledge, you know, when we have such
6  high level of confusion, this is a major harm for the
7  company because they loose control over their brand.
8  Q.  Did your study ask any questions as to negative
9  statements or negative impact on your respondents in
10  their perception of American?
11  A.  No.  But that's the reason we have always have
12  analysis with complaints.  So number one, is that we
13  did not ask explicitly the perception of American.
14  But if you look at the verbatim, Exhibit C7, I
15  believe, that lists a lot of the -- all of the
16  respondents, all the verbatim.  You'll see that there
17  are a number of them that mention kind of negative
18  implication to American.  And we reviewed the
19  complaints.  Many of them address with negative
20  implications to American.
21  Q.  If the complaints that you've identified
22  regarding Skiplagged to American are less than 1
23  percent of the complaints received by American, is
24  your opinion still the same, that the harm is huge to

1  Q.  Do you have you any publication, authority or
2  whatnot, that tells you that 12,000 complaints is a
3  huge number?
4  A.  No.  I've not seen any publication that has a
5  specific numbers of complaint in this specific context
6  for this complaint.
7       - - -
8       (Exhibit Wind-7, E-mail, Bates stamped
9       AA-SKP-00052794 through AA-SKP-0052797, was
10       marked for identification.)
11       - - -
12  BY MR. REED:
13  Q.  I've handed you what's been marked as Exhibit 7
14  for your deposition.  You'll see that it's Bates
15  labeled AA-SKP-00052794 through 52797.
16       When you have a minute to look at it,
17  let me know when you're ready for me to ask questions.
18  A.  (Reviewing document.)
19       Yes.
20  Q.  Are you familiar with this document?
21  A.  No.
22  Q.  It's one listed on your appendix as documents
23  and materials you relied upon?
24  A.  I reviewed a lot of material.  I don't recall

**Veritext Legal Solutions**
800-336-4000

App'x 309

1 this particular one.
2 Q.    All right.  Would you agree with me, it's
3 listed on Exhibit-2 for your deposition?
4 A.    I definitely trust you saying so.
5 Q.    Okay.  You'll see there that there is a
6 complaint there, right, at the bottom of the first
7 page?
8 A.    Yes.
9 Q.    And you've had a chance to read that complaint?
10 A.    Yes.
11 Q.    Now, based upon the definitions of confusion
12 and deception in your report, which category would you
13 put this complaint into?
14 A.    (Reviewing document.)
15        Okay.  I'm sorry can you repeat the
16 question, please.
17 Q.    Sure.
18        Which category would you place this
19 complaint into?
20 A.    Well, definitely deception, because the
21 consumer was not aware of the need for a Visa or
22 passport and basically used the Hidden City ticket
23 that violated this restrictions.  And also,
24 potentially confusion because they may have thought

Page 250

1 that by approaching American and writing to American,
2 they thought that American is responsible for this
3 situation.  So definitely there is a potential
4 confusion there.  And it's a great example for the
5 damage we talked before about hurts to consumers,
6 that's a great example of how consumers being harmed.
7        MR. REED:  Objection; nonresponsive,
8        everything after great example.
9 BY MR. REED:
10 Q.    The -- are you aware of any document that we
11 could review that would show how the coders at Radius
12 coded this document?
13 A.    Well, the results are presented here.  That's
14 the way they coded it.
15 Q.    This specific one?
16 A.    No.  No.  The total coding.
17 Q.    I get you, the total.
18        I'm saying if I wanted to go and see is
19 there a database, a spreadsheet, something that we
20 could look at that would show us how the coders coded
21 this document?
22 A.    I don't know.  I have to check.
23 Q.    Nothing in your report shows that, right?
24 A.    No.

Page 251

1 Q.    All right.  We talked earlier about your
2 background, your trial and deposition testimony.  Have
3 you ever been subject to a motion to exclude?
4 A.    Yeah.  There were a number of them that tried.
5 None of them succeeded.
6 Q.    How many times?
7 A.    About three.
8 Q.    Three times?
9 A.    The one that I recall.
10 Q.    And has your testimony ever been excluded?
11 A.    Not based on Dalbert.  I think in some very
12 early cases there were situations with the Judge did
13 not accept what I did.  One of them, for example, is
14 in an old Anheuser Busch case on LA Beer.  That was
15 presented into two courtroom.  One was in Milwaukee,
16 one was in Saint Louis.  The same study was presented
17 in both cases.  Very similar testimony was accepted in
18 Saint Louis, was rejected in Milwaukee.  And I believe
19 that the Milwaukee case was turned around on appeal
20 and that we did win on appeal, but I don't really
21 recall.
22 Q.    Any other times that your opinions have been
23 excluded by a court?
24 A.    There was a case, Dent Supply, in Washington

Page 252

1 where I and a colleague, Paul Green, conducted a
2 convert analysis study as input for the Department of
3 Justice economist.  And the judge did not accept our
4 study.  I guess it was my failure in explaining the
5 methodology and what we used.
6 Q.    And you said what court was that?
7 A.    I believe it was around Washington, DC.
8 Q.    Do you recall what year?
9 A.    It's an old study, Dent Supply, a few years
10 back.  It would be in my resume.
11 Q.    You said Dent Supply?
12 A.    Dent Supply.
13 Q.    D-E-N-T?
14 A.    Yeah.
15 Q.    If it's in there, I can find it.
16 A.    I believe it should be there.
17 Q.    Any other times that your opinion has been
18 excluded?
19 A.    I think there was one or two cases where I
20 designed a dilution study.  I think it was one was
21 involving Black Label.  And I think -- I still believe
22 the design that I did is the correct design, but the
23 judge apparently did not accept the results of the
24 study.

Page 253

64 (Pages 250 - 253)

1   Q.   You said Black Label was the name of the party?
2   A.   Black Label.
3   Q.   Do you recall what year that was?
4   A.   No.
5   Q.   Is that on your list as well?
6   A.   Yes.
7   Q.   Do you recall where the court was?
8   A.   No.
9   Q.   Any other times your opinions have been
10  excluded?
11  A.   Not that I know.
12       MR. REED:  Let's go off the record.
13       (A short break was taken.)
14  BY MR. REED:
15  Q.   Back on the record.
16  A.   Yeah.
17  Q.   All right.  Going back to your report pages 87
18  and 88.
19  A.   Yeah.
20  Q.   There is 8 conclusions listed there.  Do those
21  summarize all of your opinions that you intend to give
22  in this matter?
23       MR. NELSON:  Asked and answered.
24       THE WITNESS:  Well, they summarize you

Page 254

1       know, my understanding, my conclusions at the
2       time that I completed the report.  What I will
3       say in trial depends also on what other
4       evidence I will see between now and then.
5   BY MR. REED:
6   Q.   Okay.  But as you sit here today, those are all
7   the opinions that you formed in this matter?
8   A.   Plus the one we discussed today, which is the,
9   if there is a real intention on the part of Skiplagged
10  to deceive consumers, as opposed to being truly an
11  educational company, as they claim to be.
12  Q.   Based on that e-mail or message --
13  A.   Yes.
14  Q.   -- that you identified for me earlier, right?
15  A.   Correct.
16  Q.   Okay.  Have we talked about all of your
17  opinions here today?
18  A.   Yes.
19  Q.   Okay.  I just wanted to make sure.  I know
20  we've gone through quite a bit, but if there was
21  something I missed, I want to make sure that we
22  covered it here while we still have time.
23  A.   The report is there.
24  Q.   Okay.  You said you may.  Do you have, as you

Page 255

1   currently sit here today, the intent to amend or
2   supplement your report?
3   A.   I don't see any reason for this at this stage,
4   depending what -- definitely not based on your three
5   experts or four experts, but if there is something
6   else, you know, depending what it is.
7   Q.   But right here --
8   A.   At this stage I don't see any need for it.
9        MR. REED:  All right.
10       I'll pass the witness.
11            - - -
12       E X A M I N A T I O N
13            - - -
14  BY MR. NELSON:
15  Q.   Couple quick questions.
16       On your stimuli, one of them was a side
17  by side of --
18  A.   Comparison.
19  Q.   -- Skiplagged, what Skiplagged said versus what
20  American says.  Why did you present that stimuli that
21  way, as opposed to using screenshots of the website
22  which you used for other parts of your stimuli?
23       MR. REED:  Objection to form.
24       THE WITNESS:  I wanted to make sure

Page 256

1       that it's clear.  That you can see it.  When
2       it's part of a website there are tons of other
3       information around it and I wanted to make sure
4       that it's very very clear what the two sides
5       are saying.
6   BY MR. NELSON:
7   Q.   Okay.  Apart from that, in that particular
8   instance, you thought if you had used screenshots, it
9   wouldn't be clear?
10       MR. REED:  Objection, form; objection,
11  leading.
12       THE WITNESS:  Correct.
13  BY MR. NELSON:
14  Q.   And with respect to the content shown in that
15  stimuli, did you read the content of Skiplagged's
16  website about what it says about Hidden City tickets
17  being perfectly legal?
18       MR. REED:  Objection to form.
19       THE WITNESS:  Yes.  It basically
20       represents -- this exhibit represents, my
21       understanding and ability to represent as
22       clearly as possible what's on the Skiplagged
23       and what's on American.

Page 257

65 (Pages 254 - 257)

1   BY MR. NELSON:
2   Q.   Okay.  And for the American side of that
3   stimuli, did you find that information on American's
4   website?
5   A.   Website and whatever other documents they were.
6   They were primarily focusing on their condition of
7   sales or whatever they call it.
8   Q.   Okay.  We talked a little bit about the 12,000
9   or so complaints that Skiplagged has received.  As a
10  consulting expert in your field, have you worked with
11  many companies on the subject of consumer complaints?
12  A.   Yes.
13  Q.   How many companies would you say you've worked
14  with where you were privy to the number of complaints
15  that the company received?
16  A.   A variety of areas, one or two dozen.
17  Q.   Okay.  And have you ever seen any company in
18  your professional experience that had 12,000
19  complaints?
20       MR. REED:  Objection to form.
21       THE WITNESS:  Not on a given topic.
22  But there are a lot of complaints.  There is a
23  lot of complaints, you know, I couldn't reach
24  you know, kind of, I didn't get my bill in

Page 258

1   time.  So companies get tons of complaints.
2   But I've never seen a focused large number of
3   complaints on a topic such as deception or poor
4   service or other area that people are
5   complaining to.
6        So there are two -- my experience is in
7   the two areas.  One is in cases involved
8   litigation, which I've never seen such high
9   numbers.  And in other cases, not involving
10  litigation.  And especially the ones not
11  involving litigation, it's typically trying --
12  coming from companies who are trying to improve
13  their system and improve the system of dealing
14  with complaints and how can you prevent such
15  complaints in the future by redesigning their
16  systems.
17  BY MR. NELSON:
18  Q.   What does a company that's genuinely trying to
19  prevent complaints, what are the steps that that
20  company needs to take?
21  A.   Well, first of all, the culture that says our
22  focus is to try to meet customers needs, minimize
23  complaints, try to do the right thing.  So it's really
24  a matter of the culture.  And then if you typically

Page 259

1   those companies had a department dedicated for this,
2   that continues analysis of complaints.  And the
3   analysis involves a faster response to the customer as
4   possible but equally important analyzing it and seeing
5   what amount are current practices has to be changed or
6   modified to try to prevent things like this from
7   happening in the future.
8   Q.   Okay.
9        MR. NELSON:  All right.  I don't have
10       any further questions.
11       MR. REED:  I have nothing further.
12       (Deposition concluded at 5:04 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 260

1                    CERTIFICATE
2
3        I HEREBY CERTIFY that the witness was duly
4   sworn by me and that the deposition is a true record
5   of the testimony given by the witness.
6        It was requested before completion of the
7   deposition that the witness, DR. YORAM (JERRY) WIND,
8   have the opportunity to read and sign the deposition
9   transcript.
10
11
12   LISA DEPASCALE
     Court Reporter and Notary Public for the
13   Commonwealth of Pennsylvania and Delaware
     Dated: July, 8 2024
14
15
16
17       (The foregoing certification of this
18   transcript does not apply to any reproduction of the
19   same by any means, unless under the direct control
20   and/or supervision of the certifying reporter.)
21
22
23
24

Page 261

66 (Pages 258 - 261)

INSTRUCTIONS TO WITNESS

    Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.
    After doing so, please sign the errata sheet and date it.
    You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.
    It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 262

---

ACKNOWLEDGMENT OF DEPONENT

    I, DR. YORAM (JERRY) WIND, do hereby certify that I have read the foregoing pages, 1-263, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____     _____
DR. YORAM (JERRY) WIND        DATE

Subscribed and sworn
To before me this
_____ day of _____, 2024

My commission expires:_____

_____
Notary Public

Page 264

---

E R R A T A   S H E E T
DR. YORAM (JERRY) WIND        Job No. TX6782840
DEPO DATE: 7/8/2024

PAGE  LINE    CHANGE
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____
____  ____    _____
      REASON: _____

Page 263

---

LAWYER'S NOTES
PAGE  LINE
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
Job No. TX6782840

Page 265

67 (Pages 262 - 265)

1  Cameron M. Nelson - nelsonc@gtlaw.com

2          July 15, 2024

3  RE: American Airlines, Inc. v. Skiplagged, Inc.

4  DEPOSITION OF: Dr. Yoram (Jerry) Wind (# 6782840)

5     The above-referenced witness transcript is

6  available for read and sign.

7     Within the applicable timeframe, the witness

8  should read the testimony to verify its accuracy. If

9  there are any changes, the witness should note those

10  on the attached Errata Sheet.

11     The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14     According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18          Yours,

19          Veritext Legal Solutions

20

21

22

23

24

25

                                    Page 266

**ERRATA SHEET**

**Deposition of Dr. Yoram (Jerry) Wind**
Deposition Date: 7/8/2024
Job No. TX6782840

| Page | Line | Original Text | Change | Reason |
|------|------|---------------|--------|--------|
| 56 | 20 | say | saw | Transcription error |
| 62 | 24 | internet | website | Correction |
| 64 | 15-16 | or early as much as | and | Transcription error; correction |
| 64 | 18 | type pattern | type of pattern | Grammatical error |
| 67 | 17 | That's | This was | Correction/clarification |
| 68 | 3 | address … requirement | addresses … requirements | Grammatical error |
| 71 | 13 | test control each | test and control for each | Grammatical error |
| 72 | 1 | of | [DELETE] | Transcription error |
| 73 | 4 | …, include | …, which includes | Correction/Grammatical error |
| 73 | 15 | ran | run | Grammatical error |
| 76 | 8 | the ticket | tickets | Grammatical error |
| 81 | 16 | that | [DELETE] | Transcription error |
| 81 | 20 | correct | honest | Correction/clarification |
| 82 | 4 | and responding | when responding | Transcription error |
| 82 | 13 | response | responses | Grammatical error |
| 84 | 9 | one | ones | Grammatical error |
| 85 | 19-20 | wouldn't my | wouldn't waste my | Transcription error |
| 87 | 8 | at | in | Grammatical error |
| 89 | 24 | response | questions | Correction/clarification |
| 90 | 3 | response | questions | Correction/clarification |
| 90 | 14 | gives it the | gives the | Grammatical error |
| 91 | 6 | getting larger | getting a larger | Transcription error |
| 92 | 8 | that | because | Grammatical error |
| 93 | 17 | seeing code end | using closed-end | Transcription error |
| 97 | 9 | Well-know | Well-known | Transcription error |
| 99 | 20 | its authorized | it's an authorized | Transcription error |
| 99 | 21 | knew | respondents said | Clarification |
| 100 | 2 | they are | that Skiplagged is an | Clarification |
| 101 | 9 | so | saw | Transcription error |
| 102 | 21 | knew | said | Clarification |
| 102 | 24 | stop | know | Correction |
| 105 | 24 | confusing | confusion | Transcription error |
| 106 | 4 | provide | get | Correction/clarification |
| 106 | 5 | to get results | from an airline | Correction/clarification |
| 107 | 3 | looking | look | Grammatical error |
| 108 | 5 | getting | get | Grammatical error |

App'x 315

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

| 109 | 9 | the | that | Transcription error |
|---|---|---|---|---|
| 113 | 10 | a | [DELETE] | Transcription error |
| 114 | 8 | booking | bookings | Transcription error |
| 124 | 15 | ? | . | Transcription error |
| 125 | 12 | validating | to validate | Grammatical error |
| 131 | 9 | of | [DELETE] | Grammatical error |
| 134 | 23 | and | in | Transcription error |
| 135 | 6 | respond to | responding to | Grammatical error |
| 135 | 7 | respond to | responding to | Grammatical error |
| 135 | 13 | screenshot | screenshots | Grammatical error |
| 135 | 16 | replicate | replicated | Transcription error |
| 138 | 12 | representatives | representative | Transcription error |
| 138 | 21 | items opposed | items as opposed | Transcription error |
| 140 | 16-17 | have everything | have asked everything | Clarification |
| 143 | 22 | answers test | answers to the test | Clarification |
| 143 | 23 | are | is | Grammatical error |
| 144 | 1 | reflect | reflects | Grammatical error |
| 144 | 16-17 | that's respond | those are responses | Transcription or grammatical error |
| 145 | 5 | based | [DELETE] | Transcription or grammatical error |
| 148 | 3 | apparently. | apparently, | Transcription error |
| 148 | 12 | this a neutral and this is positive | this as neutral and this as positive | Transcription or grammatical error |
| 149 | 10-12 | is reflecting on the Skiplagged, for example, offering | is: reflecting on the Skiplagged offering, for example, and | Correction/clarification |
| 159 | 11 | reflect | reflects | Grammatical error |
| 159 | 12 | Airline | Airline's | Grammatical error |
| 161 | 4 | is | as | Transcription error |
| 161 | 10 | confusion about | confusion of about | Grammatical error |
| 161 | 17 | confusion about | confusion of about | Grammatical error |
| 162 | 4 | respond | responses | Grammatical error |
| 163 | 4 | basically that the | basically the | Transcription error |
| 163 | 5 | site | test buys | Correction/clarification |
| 165 | 23-24 | associates connected with airline based on opening response to all questions. | "associated or connected with airline based on open-ended responses to all questions." | Correction/clarification |
| 165 | 24 | Associated and connected | "Associated or connected | Correction/clarification |
| 166 | 1 | with American Airlines based on question 1. | with airline based on question 1." | Correction/clarification |
| 166 | 4 | question we asked or associate connected | questions we asked on associated or connected | Correction/clarification |

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

| 166 | 5 | The question 4 and 6 the | Then questions 4 and 6, on | Correction/clarification |
|---|---|---|---|---|
| 166 | 6 | and finalization | or authorization | Transcription error |
| 167 | 16 | , | [DELETE] | Transcription error |
| 176 | 18 | respondent | respondents | Grammatical error |
| 177 | 3 | associate and connected | "associated or connected" | Correction/clarification |
| 177 | 4 | question 1 to 6, is the question | questions 1 to 6, which are the questions | Correction/clarification; grammatical error |
| 177 | 5 | socially connected with the | associated or connected, or | Transcription error |
| 184 | 8 | it screaming | it is screaming | Transcription error |
| 185 | 3 | rates | RAVES | Transcription error |
| 188 | 9 | it's always strengthen | it always strengthens | Grammatical error |
| 196 | 23 | complaint | complaints | Grammatical error |
| 196 | 24 | listening | looking | Correction/clarification |
| 197 | 1 | complaint | complaints | Grammatical error |
| 197 | 16 | complaint | complaints | Grammatical error |
| 199 | 19-20 | a consumer complain | consumers complained | Grammatical error |
| 201 | 5 | way | ways | Transcription error |
| 201 | 7 | test | tests | Transcription error |
| 207 | 20 | undo, to | [DELETE] | Transcription error |
| 208 | 5 | votes | bots | Transcription error |
| 208 | 19 | dies | lies | Transcription error |
| 209 | 8 | edit | do it | Transcription error |
| 210 | 22 | will | were to | Grammatical error |
| 217 | 19 | question | questions | Grammatical error |
| 217 | 23 | respondent | respondents | Grammatical error |
| 218 | 4 | Expedia | Skiplagged | Correction/clarification |
| 220 | 4 | those saw that | those who saw the | Transcription or grammatical error |
| 226 | 5 | definition | definitions | Grammatical error |
| 226 | 6 | also definition | also about the definition | Grammatical error |
| 226 | 7 | complaint | complaints | Grammatical error |
| 226 | 12 | a | [DELETE] | Transcription error |
| 226 | 14 | exhibit | exhibits | Grammatical error |
| 226 | 15 | complaint | complaints | Grammatical error |
| 227 | 1 | buying American Airlines through | buying an American Airlines ticket through | Correction/clarification |
| 227 | 18 | respondent | respondents | Grammatical error |
| 229 | 21 | interpret | interprets | Grammatical error |
| 212 | 9 | preferred | referred to | Transcription error |
| 234 | 2 | received | perceived | Transcription error |
| 234 | 6 | , slightly even | perceived | Transcription error |
| 234 | 14 | risk management | risks mentioned | Transcription error |

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

| 235 | 5 | respond | responses | Transcription or grammatical error |
|---|---|---|---|---|
| 242 | 5 | complaint | complaints | Grammatical error |
| 244 | 3 | complaint | complaints | Grammatical error |
| 246 | 24 | the | the perceived | Correction/clarification |
| 247 | 1 | was | with | Transcription error |
| 247 | 7 | loose | lose | Transcription error |
| 247 | 11 | have | [DELETE] | Transcription error |
| 247 | 16 | respondents | responses | Transcription error |
| 248 | 21 | complaint | complaints | Grammatical error |
| 248 | 22 | they | that | Transcription error |
| 251 | 5 | hurts | harms | Correction/clarification |
| 251 | 6 | consumers being | consumers are being | Grammatical error |
| 257 | 22-23 | Skiplagged and | Skiplagged website and | Correction/clarification |

App'x 318

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

```
 1
 2                    ACKNOWLEDGMENT OF DEPONENT
 3
 4           I, DR. YORAM (JERRY) WIND, do hereby certify
 5     that I have read the foregoing pages, 1-263, and that
 6     the same is a correct transcription of the answers
 7     given by me to the questions therein propounded,
 8     except for the corrections or changes in form or
 9     substance, if any, noted in the attached Errata Sheet.
10
11     Yoram Wind                      August 14th, 2024
       _____   _____
12
       DR. YORAM (JERRY) WIND          DATE
13
14
15
16
       Subscribed and sworn
17     To before me this
       ___14th_ day of ___August_____, 2024
18
       My commission expires:___June 27, 2027___
19
       Elizabeth Collazo
20     _____
       Notary Public
21
22
23
24
                                       Page 264
```