IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

**PLAINTIFF AMERICAN AIRLINES, INC.'S MOTION TO EXCLUDE EXPERT
OPINIONS AND TESTIMONY OF GEORGE JOHN, PHD
AND BRIEF IN SUPPORT**

---

**TABLE OF CONTENTS**

PAGE

I.     INTRODUCTION ................................................................................................ 1
II.    LEGAL STANDARD ......................................................................................... 2
III.   ARGUMENT ...................................................................................................... 4
       A.   Dr. John is not an expert on consumer surveys or consumer confusion. ............... 4
       B.   Dr. John contradicts established case law and methodology on consumer
            surveys. ............................................................................................................. 5
       C.   Dr. John's opinions are not relevant to this case ............................................... 5
            1.   Dr. John's "consumer journey" comments are irrelevant. ....................... 6
            2.   Dr. John's "educating consumers" comments are irrelevant. ................... 8
       D.   Dr. John's report is unreliable. ......................................................................... 9
            1.   Dr. John's "measurement of subjective concepts" criticism does not cite to
                 evidence or utilize any scientific methodology. ....................................... 10
            2.   Dr. John's criticism of how open-ended responses were coded is vague
                 and conclusory. ...................................................................................... 12
            3.   Dr. John's opinion on "risk perception" does not include any scientific
                 analysis or data. ..................................................................................... 12
            4.   Dr. John's opinion about deception based on "relative prices" does not
                 include any scientific analysis or data. ................................................... 13
            5.   Dr. John's remaining arguments are also completely conclusory. ............ 15
            6.   Dr. John's final comments on hidden city tickets are similarly conclusory.
                 ............................................................................................................... 16
            7.   Dr. John's attempt to rebut the consumer complaint evidence referenced in
                 Dr. Wind's report is superficial and conclusory. .................................... 17
       E.   Dr. John's report and testimony are barred by Rule 403 because it confuses the
            issues and will mislead the jury. ....................................................................... 18
III.   CONCLUSION .................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                           **PAGE(S)**

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
    550 F.3d 465 (5th Cir. 2008) ...................................................................10

*Bocanegra v. Vicmar Servs., Inc.*,
    320 F.3d 581 (5th Cir. 2003) .....................................................................6

*CliniComp Int'l, Inc. v. Athenahealth, Inc.*,
    No. 1:18-CV-00425-LY, 2020 WL 13111151 (W.D. Tex. Dec. 14, 2020) ..............................8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..................................................................2, 6, 9, 18

*DeWolff, Boberg & Assocs., Inc. v. Pethick*,
    No. 3:20-CV-3649-L, 2024 WL 1396267 (N.D. Tex. Mar. 31, 2024) ..................................2, 3

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................3

*Goodman v. Harris County*,
    571 F.3d 388 (5th Cir. 2009) ......................................................................3

*Guile v. United States*,
    422 F.3d 221 (5th Cir. 2005) .....................................................................9

*Guillory v. Domtar Indus. Inc.*,
    95 F.3d 1320 (5th Cir. 1996) ..................................................................9, 18

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007) ...................................................................10

*Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*,
    574 F. App'x 486 (5th Cir. 2014) .....................................................................6, 8

*Jacked Up, L.L.C. v. Sara Lee Corp.*,
    807 F. App'x 344 (5th Cir. 2020) ..........................................................9

*Jezek v. R.E. Garrison Trucking, Inc.*,
    No. 4:21-cv-01102-O, 2022 WL 18717712 (N.D. Tex. Nov. 1, 2022) ...................................3

*Jim S. Adler, P.C. v. McNeil Consultants, LLC*,
    No. 3:19-CV-2025-K-BN, 2023 WL 5600128 (N.D. Tex. July 27, 2023),
    *report and recommendation adopted*, No. 3:19-CV-2025-K-BN, 2023 WL
    5604169 (N.D. Tex. Aug. 28, 2023) ...................................................................11

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) ............................................................................3, 9

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir. 1998) ...................................................................................9

*Moore v. Int'l Paint, L.L.C.*,
    547 F. App'x 513 (5th Cir. 2013) ............................................................................9

*Paz v. Brush Engineered Materials, Inc.*,
    555 F.3d 383 (5th Cir. 2009) ...................................................................................9

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) ...................................................................................3

*Puga v. RCX Sols., Inc.*,
    922 F.3d 285 (5th Cir. 2019) ...................................................................................6

*Renfroe v. Parker*,
    974 F.3d 594 (5th Cir. 2020) ...................................................................................6

*Salas v. Carpenter*,
    980 F.2d 299 (5th Cir. 1992) .................................................................................10

*Scrum All., Inc. v. Scrum, Inc.*,
    No. 4:20-CV-227, 2021 WL 1691136 (E.D. Tex. Apr. 29, 2021) ..........................12

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*,
    765 F. Supp. 2d 884 (S.D. Tex. 2011) .....................................................................8

*SquirtCo. v. Seven-Up Co.*,
    628 F.2d 1086 (8th Cir. 1980) .................................................................................5

*U.S. Alliance Group, Inc. v. Cardtronics USA, Inc.*,
    645 F. Supp. 3d 554 (E.D. La. 2002) .....................................................................15

*Union Carbide Corp. v. Ever-Ready Inc.*,
    531 F.2d 366 (7th Cir. 1976) ............................................................................5, 11

*Viterbo v. Dow Chem. Co.*,
    826 F.2d 420 (5th Cir. 1987) .................................................................................10

*Watkins v. Telsmith, Inc.*,
    121 F.3d 984 (5th Cir. 1997) ...................................................................................2

*Yeti Coolers, LLC v. RTIC Coolers, LLC*,
    No. A-15-CV-597-RP, 2017 WL 429250 (W.D. Tex. Jan. 28, 2017) ................5, 11

iv

## RULES

FED. R. EVID. 402 ..................................................................................................................6

FED. R. EVID. 403 ................................................................................................................18

FED. R. EVID. 702 ........................................................................................... *passim*

FED. R. EVID. 702(a) ............................................................................................................5

FED. R. EVID. 702(c) ............................................................................................................3

## I.      INTRODUCTION

Defendant Skiplagged, Inc. ("Skiplagged") designated George John, PhD ("Dr. John") as a purported "rebuttal" expert to American's likelihood of confusion expert, Dr. Yoram "Jerry" Wind ("Dr. Wind"). Dr. Wind is a well-established survey expert who conducted a likelihood of confusion survey using screenshots from Skiplagged's own website as the stimuli and using screenshots from Expedia's website as a control. [App'x 013–16 (Wind Report, p. 8–11)]. He then asked survey respondents a series of questions, including whether respondents thought the website belonged to an authorized agent of the airline. [App'x 016–32 (Wind Report, p. 11–27)]. Based on these screenshots, over 60% of respondents thought Skiplagged was an authorized agent of American Airlines or had some other relationship with American airlines. [App'x 044, 092 (Wind Report, p. 39, 87)].

But Skiplagged's rebuttal expert, Dr. John, has no relevant experience that qualifies him to be a rebuttal expert in this field. He does not know the definition of likelihood of confusion, the primary factual question the jury will be asked to decide. He has never conducted a likelihood of confusion survey in a legal case, and the only item on his CV that *potentially* relates to likelihood of confusion is a roundtable discussion he attended in 1986. [App'x 132 (John Report, p. 37 ¶ 7); App'x 149–54 (John Depo., 24:19–25:6, 28:2–30:2, 31:1–31:6, 32:7–32:17, 33:4–33:8, 33:15–34:19, 38:22–39:16, 43:12–44:5)]. He has not designed nor conducted any likelihood of confusion surveys in his career. [*Id.*]

Because he has not made any effort to familiarize himself with the substantial body of case law relating to likelihood of confusion surveys, Dr. John offers conclusory, meandering opinions which are irrelevant and even contradict established case law on likelihood of confusion survey methodology. Dr. John argues that Dr. Wind's survey was not a "real world" experience because he used screenshots of Skiplagged's own website instead of using the live website itself, even

1

though Dr. John's proposal would result in an invalid survey because Skiplagged's website constantly changes. Dr. John further argues that Dr. Wind should have showed consumers information about other brands (airlines), but that would not generate information relevant to this case. Dr. John also criticizes Dr. Wind for using open-ended questions, claiming that closed-ended questions are "preferred," even though established case law on consumer surveys says exactly the opposite. Finally, Dr. John has not done any survey of his own; instead he recklessly applies irrelevant data and *ipse dixit* arguments without applying any actual methodology.

Dr. John's opinions have nothing to do with the actual issues in this case. Because he does not even understand what the relevant legal framework is, he cannot offer an opinion that will be helpful to the jury in determining any fact at issue. His opinions will only serve to confuse the jury. Accordingly, American seeks to exclude Dr. John entirely.

## II.     LEGAL STANDARD

Trial courts act as gatekeepers for expert testimony, determining its admissibility based on Rule 702 of the Federal Rule of Evidence as well as *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny. *DeWolff, Boberg & Assocs., Inc. v. Pethick*, No. 3:20-CV-3649-L, 2024 WL 1396267, at *3 (N.D. Tex. Mar. 31, 2024). Under Rule 702, an expert witness may provide expert opinions if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)     the testimony is based on sufficient facts or data;
(c)     the testimony is the product of reliable principles and methods; and
(d)     the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under *Daubert* and its progeny, expert testimony is admissible if the proponent of the testimony establishes: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988–89 (5th Cir. 1997).

"The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence." *DeWolff, Boberg & Assocs.*, 2024 WL 1396267, at \*3.

An expert may be qualified "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. An expert may not "go beyond the scope of his expertise in giving his opinion." *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009); *Jezek v. R.E. Garrison Trucking, Inc.*, No. 4:21-cv-01102-O, 2022 WL 18717712, at \*3 (N.D. Tex. Nov. 1, 2022) (expert testimony inadmissible under Rule 702 when expert "concede[s] that he lacks both training and experience" regarding the specific topic at issue).

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93); *see also* FED. R. EVID. 702(c) (testimony must be "the product of reliable principles and methods"). Expert testimony "must be reliable at each and every step," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Knight*, 482 F.3d at 355 (citation omitted). Where "opinion evidence . . . is connected to existing data only by the *ipse dixit* of the expert," a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" and exclude the expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 593).

### III.    ARGUMENT

**A.    Dr. John is not an expert on consumer surveys or consumer confusion.**

Dr. John is not qualified to offer *any* opinion on the Wind Survey or likelihood of confusion, generally. He conceded during his deposition that he lacks the experience regarding the very likelihood of confusion surveys he is opining on. [App'x 151–52, 166 (John Depo., 32:3–32:17; 36:21–36:22, 92:4–92:5)]. Dr. John's only *potential* experience with likelihood of confusion is a roundtable discussion he attended in 1986. [App'x 132 (John Report, p. 37 ¶ 7); App'x 158 (John Depo., 61:1–61:20)]. But American (and the Court) cannot verify whether this roundtable discussion is even relevant, or to what extent Dr. John contributed to it, because he has provided no documentation or evidence of this discussion. [App'x 158 (John Depo., 61:3–61:7)]. Dr. John does not know the definition of likelihood of confusion. [App'x 149–51 (John Depo., 24:19–24:24, 29:18–30:2, 31:1–31:6)]. He is not sure he has ever seen a likelihood of confusion survey. [App'x 151 (John Depo., 33:15–33:23)]. He has never consulted on a likelihood of confusion survey. [App'x 151–52 (John Depo., 33:24–34:7)]. He admitted that he was only vaguely familiar with factors that the jury will be asked to evaluate in connection with likelihood of confusion. [App'x 152 (John Depo., 36:11–36:18)]. He has never conducted a likelihood of confusion survey. [App'x 152 (John Depo., 36:21–36:22)]. He does not know which methodologies have been accepted by courts and which have been rejected. [App'x 154 (John Depo., 43:12–43:23)].

In an attempt to circumvent his lack of knowledge of what is relevant to this case, Dr. John claims he is qualified to opine on whether he would accept a survey as a scholar and whether the scholarly literature would accept it. [App'x 154 (John Depo., 43:24–44:5)]. But this is not a relevant inquiry for the jury. Further, Dr. John's opinion on whether Dr. Wind's survey would be accepted in scholarly literature is fatally defective because Dr. Wind's survey was created to

4

analyze whether there is a likelihood of confusion, and Dr. John does not know what the definition of that is.

Dr. John's utter lack of knowledge of likelihood of confusion is disqualifying. Unsurprisingly, his ignorance has also led him to offer opinions which are flatly contrary to established case law, principles, and methodology required to properly conduct a consumer survey. Accordingly, the Court should exclude his testimony in full.

**B.    Dr. John contradicts established case law and methodology on consumer surveys.**

Dr. John, being entirely unfamiliar with established methodologies of likelihood of confusion surveys, opines that closed-ended questions are "preferred" and that open-ended questions are "suboptimal." [App'x 114 (John Report, p. 19)]. But this opinion contradicts established methodology for likelihood of confusion surveys. *See, e.g.*, *Yeti Coolers, LLC v. RTIC Coolers, LLC,* No. A-15-CV-597-RP, 2017 WL 429250, at *1 (W.D. Tex. Jan. 28, 2017) (approving a survey with open-ended questions based on the seminal *Ever-Ready* and *Squirt*[1] survey methodologies); *see also* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32.174 (5th ed. 2019) (discussing the seminal *Ever-Ready* case and the open-ended questions the survey in that case used). Unsurprisingly, Dr. John does not offer any treatise, academic publication, or other study supporting his position; it is merely *ipse dixit*. Because Dr. John's opinion is contrary to established case law on survey methodology and is unsupported by anything other than his own conclusory statements, it must be excluded.

**C.    Dr. John's opinions are not relevant to this case.**

Under Federal Rule of Evidence 702(a), an expert's knowledge must "help" the trier of fact understand the evidence or determine a fact in issue. 2023 NOTES TO FED. R. EVID. 702 at ¶ 7,

---

[1] *See SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980); *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976).

Appendix II. An expert's proposed testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Federal Rule of Evidence 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc*., 320 F.3d 581, 584 (5th Cir. 2003). The district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e*., whether it is relevant. *Daubert*, 509 U.S. at 591.

"When performing [the required gate-keeping Rule 702 and *Daubert*] analysis, the court's main focus should be on determining whether the expert's opinion will assist the trier of fact." *Puga v. RCX Sols., Inc*., 922 F.3d 285, 293 (5th Cir. 2019). "Assisting the trier of fact means the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument," but "the helpfulness threshold is low: it is principally . . . a matter of relevance." *Id*. at 293–94 (cleaned up). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make[ ] factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P. v. Bank of Am., N.A*., 574 F. App'x 486, 491 (5th Cir. 2014); *see also Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009) ("[e]xperts cannot 'render conclusions of law' or provide opinions on legal issues").

### 1.    Dr. John's "consumer journey" comments are irrelevant.

A major focus of Dr. John's report are his conclusory statements regarding the "consumer's journey" when visiting Skiplagged's website. These statements are not relevant to likelihood of confusion, or any other issue the jury will consider, and should be excluded from the case. Further, these statements are not based on any scientific methodology. Rather, they are based solely on Dr.

John's limited, personal efforts to browse the Skiplagged website, and his personal opinions based on that limited experience.

Generally speaking, Dr. John talks about a "consumer's journey" of how one searches for a ticket, how they decide to buy a ticket, and if they ultimately select the ticket. [App'x 102–10 (John Report, p. 7–15)]. None of this is based on actual research of consumers who visit Skiplagged's website. It is entirely based on Dr. John's personal visits to the Skiplagged website. [*Id*.]. Dr. John claims Dr. Wind's report fails to replicate this "journey," but the entirety of his criticisms here are based on facts which are entirely irrelevant to the case.

For example, Dr. John complains that Dr. Wind did not show consumers *other* airlines in the screenshots he presented to the survey respondents. He argues Dr. Wind should have showed consumers screenshots which showed them *all flights* on *all* airlines. [App'x 103–06 (John Report, p. 8–11); App'x 170, 172, 174, 176–77 (John Depo., 109:19–109:21, 114:12–114:13, 122:18–123:20, 133:11–133:17, 135:7–135:9)]. But other airlines' trademarks are not at issue in this case; only *American's* trademarks are at issue. Nor is Wind opining on the general "consumer journey." He is merely presenting survey evidence which demonstrates that consumers exposed to screenshots of Skiplagged's website, which show the process of purchasing an American Airlines ticket from Skiplagged, incorrectly believe Skiplagged is an authorized agent of American Airlines. Arguing that the Wind Survey should have included all additional stimuli on *unrelated airfare* confuses the issues and will not aid the trier of fact.

Dr. John similarly complains that the screenshots Dr. Wind showed to the survey respondents should have included up to 200 items in the search results. [App'x 103–07 (John Report, p. 8–12)]. Once again, this has nothing to do with the likelihood of confusion question the jury will be asked to answer. Dr. Wind's survey is not a survey about comparison shopping in the

airline industry in general, how far consumers scroll down in search results, or how carefully consumers assess all the options presented by Skiplagged's website.

Dr. John's opinion that the Wind Survey stimuli had to incorporate additional airlines or additional search results is incorrect and entirely irrelevant. Expert testimony may be excluded if it is "not sufficiently tied to the facts of the case." *See CliniComp Int'l, Inc. v. Athenahealth, Inc*., No. 1:18-CV-00425-LY, 2020 WL 13111151, at *2 (W.D. Tex. Dec. 14, 2020) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (finding that expert's analysis was not sufficiently tied to the facts and would not assist the trier of fact)). Further, a survey need not replicate market conditions perfectly. *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.,* 765 F. Supp. 2d 884, 893 (S.D. Tex. 2011) (declining to exclude expert report on consumer survey that did not show product in question as the consumer would exactly find it in real life). Notably, Dr. John admitted he had never seen a "dynamic experiment designed to mirror online searches" that studied likelihood of confusion. [App'x 171 (John Depo., 111:3–111:5); App'x 236, 238–39 (Wind Depo., 122:8–122:14, 133:21–135:17)]. Dr. John's opinion here is simply irrelevant.

### 2.      Dr. John's "educating consumers" comments are irrelevant.

Dr. John further opines, without any support, that "Skiplagged's website is at least thematically providing customers or potential customers with more information about prices and consumer options, enabling consumer choice." [App'x 106 (John Report, p. 11)]. Dr. John does not offer any actual consumer data to support this conclusory statement, nor is this relevant to the question of likelihood of confusion. Indeed, neither Dr. John nor Skiplagged have provided *any* evidence that even a *single* consumer uses Skiplagged's website merely for information. These statements should be excluded as an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make[ ] factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P*., 574 F. App'x at 491.

8

**D.      Dr. John's report is unreliable.**

Dr. John's opinions are entirely unreliable as they are generally conclusory statements unsupported by any actual data or scientific analysis.

The party offering the report or testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid. *See Daubert*, 509 U.S. at 593. "[F]undamentally unsupported" opinions "offer[ ] no expert assistance to the [trier of fact]" and should be excluded." *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355 (internal quotation marks omitted). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 388 (5th Cir. 2009). The insufficient support offered in this report renders it completely unreliable.

Generally, the facts, data, and sources used in an expert's opinion are considered by the jury in weighing the evidence, but "in some cases 'the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion.'" *Jacked Up, L.L.C. v. Sara Lee Corp*., 807 F. App'x 344, 348 (5th Cir. 2020) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). As the gatekeeper, the court must "extract evidence tainted by farce or fiction. Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Guillory v. Domtar Indus. Inc*., 95 F.3d 1320, 1331 (5th Cir. 1996). "Generally, the fact-finder is entitled to hear an expert's testimony and decide whether the predicate facts on which the expert relied are accurate. At the same time, however, expert testimony that relies on completely unsubstantiated factual assertions is inadmissible." *Moore v. Int'l Paint,*

*L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (internal quotation marks, alterations, and citations omitted).

Courts routinely exclude expert testimony where the expert "offers little more than personal assurances based on his [professional] experience that his conclusions are so" on the grounds that such opinions have "insufficient factual support and lack [ ] reliable methodology." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory."). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo*, 826 F.2d at 424. Ultimately, the expert must "'bring to the jury more than the lawyers can offer in argument.'" *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

1.    **Dr. John's "measurement of subjective concepts" criticism does not cite to evidence or utilize any scientific methodology.**

Without citing to relevant evidence or methodology, Dr. John impermissibly dismisses Dr. Wind's findings. [App'x 111–115 (John Report, p. 16–20)]. Unfamiliar with likelihood of confusion surveys and the substantial body of case law accompanying them, Dr. John manufactures his own, entirely new test for assessing survey reliability, citing a single 1979 paper (which he makes no effort to actually connect to his analysis). [App'x 111 (John Report, p. 16 n.5)].

Unfettered by any connection to well-established likelihood of confusion concepts, Dr. John complains that there is no "definition" of deception or confusion. [App'x 113–14 (John Report, p. 18–19)]. But deception and confusion are well defined and well established. Likelihood of confusion is the "touchstone of trademark infringement." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). "Consumer surveys qualify as evidence of actual confusion, and the Fifth Circuit has found a survey showing a 15%

confusion rate to be 'strong evidence indicating a likelihood of confusion.'" *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, No. 3:19-CV-2025-K-BN, 2023 WL 5600128, at *9 (N.D. Tex. July 27, 2023), *report and recommendation adopted*, No. 3:19-CV-2025-K-BN, 2023 WL 5604169 (N.D. Tex. Aug. 28, 2023) (citing *Viacom Int'l v. IJR Cap. Inv., LLC*, 891 F.3d 178, 197 (5th Cir. 2018) and *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980)). Likelihood of confusion surveys receive extensive treatment in well-respected treatises. *See, e.g.,* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:158 – 32.196 (5th ed. 2019).

Dr. John then launches into conclusory statements that closed-ended questions are "preferred." He provides absolutely no support for this conclusory statement, and as addressed above, this statement contradicts a long-standing practice of using open-ended questions in surveys which goes all the way back to the seminal *Eveready* case. *See, e.g.*, *Yeti Coolers, LLC,* 2017 WL 429250, at *1 (approving a survey with open-ended questions based on the seminal *Ever-Ready* and *Squirt* survey methodologies); *see also*, J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32.174 (5th ed. 2019) (discussing the seminal *Eveready* case and the open-ended questions the survey in that case used).

Dr. John then presents an entirely conclusory section stating that "stability" is "extremely important," but he does not explain what it is, how he defines it, how it should apply to Dr. Wind's opinion, or provide any analytical, scientific or academic support for his statements. [App'x 115 (John Report, p. 20)]. Because these criticisms are conclusory and entirely unsupported, they should be excluded.

**2.      Dr. John's criticism of how open-ended responses were coded is vague and conclusory.**

Buried within the "subjective concepts" section of his report, Dr. John also offers some criticism of how the open-ended responses from the survey respondents were coded. While criticisms of coding open-ended responses are ordinarily a matter for cross-examination, Dr. John's report is simply wrong. *See Scrum All., Inc. v. Scrum, Inc.*, No. 4:20-CV-227, 2021 WL 1691136, at *2–3 (E.D. Tex. Apr. 29, 2021). He asserts that "[n]o such coding scheme development procedure is reported in the Wind Report," but in fact the Wind Report contains detailed information about how open-ended responses, as well as consumer complaints, were coded:

- The Wind Report explains that he followed "the scientific approach for content analysis, including coding the data by (a) involving two independent coders who were not familiar with the objective of the study or its sponsors, and (b) a procedure for resolving conflicts between the two coders." [App'x 033 (Wind Report, p. 28)];

- The Wind Report provides the definitions provided to the coders. [App'x 033–34 (Wind Report, p. 28–29)]; and

- The Wind Report explains that responses "were coded into positive, neutral, or negative sentiment and presented in Exhibit 3," and presented the results, along with the criteria the coders used. [App'x 037–38, 042 (Wind Report, p. 32–33, 37 ("There is deception," "There is not deception," "Ambiguous"))].

Dr. John simply ignores the detailed information in the Wind Report and falsely states that no coding scheme is reported in the Wind Report. This "opinion" is objectively false and should be excluded.

**3.      Dr. John's opinion on "risk perception" does not include any scientific analysis or data.**

At pages 20–21 of his report, Dr. John starts by concurring with Dr. Wind that the majority of survey respondents did not perceive any meaningful risks to doing business with Skiplagged. [App'x 115 (John Report, p. 20); App'x 047–62 (Wind Report, p. 42–57); App'x 243, 262–64 (Wind Depo., 151:14–152:2, 226:15–226:17, 232:21–234:16)]. Of course, it is undisputed that

there *are* risks to consumers; what Dr. Wind's survey demonstrates is that Skiplagged's warnings (which the survey respondents saw) are *not effective* in apprising consumers of these risks.

Dr. John doesn't actually rebut this point; instead, he makes a bare conclusory statement that Skiplagged does not "shroud" hidden city ticket details. Dr. John presents no data to support this statement. He conducted no analysis and performed no survey. The sole document he cites is his own "experiment" of looking at the Skiplagged website himself a few times. [App'x 116 (John Report, p. 21)].

Dr. John's "opinion" here suffers from two problems. First, he does nothing to connect his purported expertise with his conclusion. He is merely looking at Skiplagged's website and pointing out that there is a warning pop-up (the same pop-up that Wind's report demonstrates consumers do not read), and terms and conditions (with no evidence that consumers read that, either). He is not presenting any scientific analysis or conclusion other than an observations jurors can make (and Skiplagged's counsel can argue) on their own. Dr. John merely parrots Skiplagged's position without adding any value himself.

Second, Dr. John doesn't actually rebut Dr. Wind's opinion. Dr. Wind's report demonstrates that the survey respondents did not read or appreciate the warnings on Skiplagged's website. All Dr. John does is point out that those warnings exist.

For these reasons, Dr. John's opinions on "risk perception" should be excluded.

### 4.  Dr. John's opinion about deception based on "relative prices" does not include any scientific analysis or data.

In the next section of his report, Dr. John attempts to attack Dr. Wind's opinion that "Skiplagged deceives customers into believing that purchasing a regular non-hidden-city ticket on Skiplagged.com is cheaper." [App'x 117–19 (John Report, p. 22–24); App'x 012, 049–56 (Wind Report, p. 7, 44–51)]. It is worth noting that it is undisputed that buying a regular, non-hidden-city

is *not* cheaper than buying directly from American Airlines. Dr. Wind's survey merely confirms that, based on Skiplagged's own website, the survey respondents believed tickets bought through Skiplagged *would* be cheaper. [App'x 049 (Wind Report, p. 44)].

Dr. John's "rebuttal" opinion is both unintelligible and unsupported by any expert analysis. First, Dr. John claims that there is "no data" to support Dr. Wind's conclusion but then he cites the very data that supports Dr. Wind's conclusion. [App'x 117 (John Report, p. 22)]. Dr. John goes on to argue about "relative prices," but he doesn't seem to dispute that most of the survey respondents did, in fact, perceive Skiplagged as offering "cheaper" tickets.

Dr. John then spends the next two pages meandering through vague, unsupported puffery regarding Skiplagged's business strategy which has nothing to do with rebutting the point Dr. Wind demonstrated. He starts talking about how Skiplagged's "positioning" "makes a great deal of sense." [App'x 118 (John Report, p. 23)]. He talks about how airfares can vary "enormously," and about how Skiplagged can show "many more fares than any single airline's site." [App'x 119 (John Report, p. 24)]. Then he abruptly returns to his statement that there is "no evidence" of Dr. Wind's conclusion (despite having earlier cited that evidence), and talks about his "short testing," which was 3 to 4 personal visits to Skiplagged's website, divorced from any actual "testing" methodology. [App'x 119 (John Report, p. 24); App'x 161, 183 (John Depo., 70:6–70:15, 158:16–159:3)]. Dr. John then makes a conclusory statement that there is "no evidence" of harm to consumers; but, of course, the confusion that he does not understand *is* the harm (unless Dr. John simply does not believe causing consumers to believe things which are not true is harmful in and of itself).[2]

---

[2] Ironically, one of Dr. John's own limited searches demonstrated deceit on the part of Skiplagged: while Skiplagged claimed Dr. John would save $146.00 on his purchase, Dr. John admitted the ultimate cost savings were actually only $91.00, i.e., Skiplagged was clearly not honest with him as the consumer. [App'x 183 (John Depo., 160:4–161:21)].

All of these meandering "opinions" are *ipse dixit*. There is no analysis, no data, no "expertise" demonstrated in these opinions. Dr. John did not survey or speak to a single consumer. He is flatly ignoring the very data he cites, and simply making conclusory statements about it. "[I]t is well settled that expert reports that are 'nothing more than bare conclusions' are inadmissible because they offer no value to the trier of fact." *U.S. Alliance Group, Inc. v. Cardtronics USA, Inc.*, 645 F. Supp. 3d 554, 561 (E.D. La. 2002) (quoting *Slaugther v. Southern Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990)). Accordingly, this Court should exclude all the opinions on pages 22, 23 and 24 of Dr. John's report.

### 5.    Dr. John's remaining arguments are also completely conclusory.

Dr. John spends pages 25 and 26 of his report offering further conclusory arguments unsupported by any actual analysis or data.

First, he complains that "associated," "affiliated" and "authorized agent" are not "defined" anywhere in the report. [App'x 120–21 (John Report, p. 25–26)]. But the words "associated" and "affiliated" are commonly used in likelihood of confusion surveys. J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32.174 (5th ed. 2019) ("An Eveready survey format can be combined with additional questions probing whether there is a likelihood of confusion as to sponsorship, affiliation or approval."). Further, the survey allowed respondents to select "don't know" if they did not understand a question (and Dr. John notes that many respondents chose this option, but offers no further analysis or conclusions based on this fact). [App'x 120 (John Report, p. 25)].

Dr. John continues to wander, first speculating about the "lack of consumer knowledge of upstream business contracts," then comparing Skiplagged to a McDonalds franchise. [App'x 120 (John Report, p. 25)]. These statements are not tethered to any intelligible principle and have no place in this case, as there is no contract between Skiplagged and American, and Skiplagged

*certainly* is not a franchisee of American. Dr. John then talks about cell phone outlets and speculates some more about what purchasers of cell phones care about. [App'x 121 (John Report, p. 26)]. Dr. John wraps up this circuitous chain of thought by declaring—without a shred of data in support—that the "important issue" is that consumers "highly value" the "transparency" that Skiplagged provides. [App'x 121 (John Report, p. 26)].

All of these are conclusory, *ipse dixit* statements by Dr. John unsupported by any scientific method, principle or research. None of these conclusory statements actually rebut Dr. Wind's report, and none of them even connect up to the heading of this section which complains that "associated," "affiliate" and "authorized agent" are not defined in the report. Further, Dr. John's declaration of what the "important issue" in this case usurps the Court's role; the Court defines what the important issues are, through its instructions to the jury, not Dr. John. Accordingly, the "opinions" on pages 25 and 26 of Dr. John's report should be excluded in their entirety.

**6.      Dr. John's final comments on hidden city tickets are similarly conclusory.**

Dr. John wraps up this section of his report by declaring that "the relevant issue is whether hidden city tickets on offer at Skiplagged.com are represented by Skiplagged deceptively." [App'x 121 (John Report, p. 26)]. He then asserts, again without any supporting data or analysis, that there is "no evidence" because Skiplagged has some warnings and checkboxes. [*Id.*]. Dr. John should not be opining on what the "relevant issues" are before the jury, as that is the Court's exclusive province, and he also ignores the fact that the Wind Survey demonstrated that the vast majority of consumers do not read these warnings. Dr. John offers no actual evidence of his position other than his say-so. Accordingly, this opinion should also be excluded.

16

7.      **Dr. John's attempt to rebut the consumer complaint evidence referenced in Dr. Wind's report is superficial and conclusory.**

Finally, Dr. John opines that the consumer complaints referenced in Dr. Wind's report should be ignored because the complaints purportedly are only a small portion of tickets sold.[3]

Dr. John argues the number of complaints is not "material." [App'x 122 (John Report, p. 27)]. But this sidesteps the reason Dr. Wind included them in his report in the first place; he considered the complaints about Skiplagged (as made to American, to Skiplagged, or located on social media platforms) in order to analyze independent data to determine if it supports the survey results. [App'x 252 (Wind Depo., 187:22–188:11)]. Further, he explained that reviewing such complaints provided "conversion positivity" to support the Wind Survey findings and conclusions. [App'x 252 (Wind Depo., 188:11–188:12)]. Dr. John says nothing about whether the complaints are consistent or inconsistent with the survey.

While Dr. John contends that the number of complaints are "a vanishingly small fraction" of all flights flown by American, Dr. John's argument is simply not on point. [App'x 122 (John Report, p. 27)]. Dr. Wind explained he was not concerned with the "total number of complaints," but wanted to understand what the lodged complaints were complaining about and he "was looking for content here." [App'x 193 (Wind Depo., 192:2–192:11)]. The content of the complaints does indeed confirm that consumers incorrectly affiliated Skiplagged with American, and that consumers do not read Skiplagged's warnings—just as Dr. Wind's survey predicts. [App'x 064–90 (Wind Report, p. 59–85)].

The only analysis Dr. John offers is to divide the number of complaints by the total number of American passengers. This is not applying Dr. John's relevant expertise, and it is precisely the

---

[3] Dr. John improperly uses the total number of passengers flying on American as the denominator, where the proper denominator would be the number of customers who booked their flights on American *with Skiplagged*. But this point is subsidiary to the fact that Dr. John's opinions here are, once again, entirely conclusory.

kind of argument Skiplagged itself can (and will) present at trial through its attorneys and witnesses. Dr. John is merely serving as Skiplagged's mouthpiece here, making a conclusory argument without lending any actual expertise to the argument. For that reason, this section of Dr. John's report should also be excluded.

**E.    Dr. John's report and testimony are barred by Rule 403 because it confuses the issues and will mislead the jury.**

Dr. John's testimony is also barred by Rule 403 of the Federal Rules of Evidence. *See* FED. R. EVID. 403. Rule 403 prohibits admission of relevant testimony if its probative value is substantially outweighed by the danger that the evidence will confuse the issues or mislead the jury. Dr. John's testimony does just that: his report confuses the claims in controversy by providing prejudicial opinions on non-issues, and it is based on no evidence, such that Dr. John's ultimate findings are unreliable and will impermissibly mislead the jury. *See Daubert*, 509 U.S. at 595 ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge, in weighing possible prejudice against probative force under Rule 403 of the present rules, exercises more control over experts than over lay witnesses'"); *see also Guillory,* 95 F.3d at 1331 (noting that even if properly excluded expert testimony were admissible under Rule 702, the district court could have also excluded it under Rule 403). Because juries place great weight on expert evidence, Dr. John's confusing and prejudicial testimony is especially dangerous and should be excluded under Rule 403.

### III.    CONCLUSION

For the reasons stated above, the Court should grant American's Motion to Exclude Expert George John, Ph.D., striking Dr. John's expert report and excluding his opinions and testimony from this litigation.

Dated: August 26, 2024

Respectfully submitted,

*/s/ Dee J. Kelly, Jr.*

Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8003

Cameron M. Nelson
nelsonc@gtlaw.com
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-6590

Nathan J. Muyskens
nathan.muyskens@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: (202) 331-3100

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF CONFERENCE**

I certify that on August 26, 2024, I conferred with Bill Kirkman, counsel for Skiplagged, who stated that Skiplagged is opposed to the relief requested herein.

*/s/ Julia G. Wisenberg*_____
Julia G. Wisenberg

## **CERTIFICATE OF SERVICE**

I certify that on August 26, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Dee J. Kelly, Jr.*_____
Dee J. Kelly, Jr.