IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

**APPENDIX TO PLAINTIFF AMERICAN AIRLINES, INC.'S
MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF
GEORGE JOHN, PHD AND BRIEF IN SUPPORT**

In support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of George John, PhD and Brief in Support, American submits the following materials:

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A | Declaration of Julia G. Wisenberg | App'x 001-03 |
| A-1 | Expert Report of Professor Yoram (Jerry) Wind (excluding the appendices), served by American on April 23, 2024 (Partially Confidential) | App'x 004-94 |
| A-2 | Expert Report of Professor George John in Response to the Expert Report of Professor Yoram (Jerry) Wind, served by Defendant Skiplagged, Inc. on May 20, 2024 | App'x 095-141 |
| A-3 | Transcript of the deposition of George John, PhD, taken on July 9, 2024 | App'x 142-203 |
| A-4 | Transcript of the deposition of Yoram (Jerry) Wind, PhD, taken on July 8, 2024 (Partially Confidential) | App'x 204-77 |

Dated: August 26, 2024

Respectfully submitted,

*/s/ Dee J. Kelly, Jr.*
Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8003

Cameron M. Nelson
nelsonc@gtlaw.com
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-6590

Nathan J. Muyskens
nathan.muyskens@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: (202) 331-3100

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that on August 26, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Dee J. Kelly, Jr.*
Dee J. Kelly, Jr.

2

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

## DECLARATION OF JULIA G. WISENBERG

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

1.     My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

2.     I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of George John, PhD and Brief in Support.

3.     Attached as Exhibit A-1 is a true and correct copy of the Expert Report of Professor Yoram (Jerry) Wind (excluding the appendices), served by American on April 23, 2024.

4.      Attached as Exhibit A-2 is a true and correct copy of the Expert Report of Professor George John in Response to the Expert Report of Professor Yoram (Jerry) Wind, served by Defendant Skiplagged, Inc. on May 20, 2024.

5.      Attached as Exhibit A-3 is a true and correct copy of the transcript of the deposition of George John, PhD, taken on July 9, 2024.

6.      Attached as Exhibit A-4 is a true and correct copy of the transcript of the deposition of Yoram (Jerry) Wind, PhD, taken on July 8, 2024.

7.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 26, 2024.

Julia G. Wisenberg

2

# Exhibit A-1

*Dr. Yoram (Jerry) Wind*
*President, Wind Associates*
*1834 Delancey Place*
*Philadelphia, PA 19103*
*Tel: (610) 642-2120*
*E-Mail: windj@wharton.upenn.edu*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>EXPERT REPORT OF PROFESSOR YORAM (JERRY) WIND</u>

App'x 005

## <u>TABLE OF CONTENTS</u>

I.   BACKGROUND AND OBJECTIVES ........................................................................................ 3

II.  QUALIFICATIONS ................................................................................................................. 5

III. SUMMARY OF OPINION ...................................................................................................... 7

IV. METHODOLOGY ................................................................................................................... 8

   A.   The Voice of the Consumer – The Consumer Experiments .............................................. 8

     1.  The Research Design ................................................................................................... 8

     2.  Universe and Sample ................................................................................................... 9

     3.  The Stimuli ................................................................................................................ 10

     4.  The Questionnaire ..................................................................................................... 11

     5.  Data Collection and Quality Control ......................................................................... 27

     6.  Analysis .................................................................................................................... 28

   B.   Validating the consumer experiments with other data and relevant marketing and consumer behavior theories and findings ........................................................................ 28

     Consumer complaints to AA about Skiplagged re confusion and perceived deception. ............... 28

     Consumer complaints to Skiplagged re confusion and perceived deception. ................................ 29

     The sampled data, when projected to the universe of complaints to the nearest thousand, suggests approximately 11,000 of the complaints reflect deception and/or confusion. .................................. 30

     Consumer posts on social networks illustrating confusion and deception. ...................................... 30

     Consumer behavior and advertising theories and findings that support the validity of our empirical findings. ........................................................................................................... 30

V.  FINDINGS ............................................................................................................................. 31

   A.   The results of the consumer experiments are presented in the five sections corresponding to the five key areas of interest addressed by the experiments. ........................................................ 31

     1.  Consumers' awareness and usage of Skiplagged (vs. Expedia) .................................... 31

     2.  Consumers' perceptions of Skiplagged (vs. Expedia) .................................................. 31

     3.  Consumers' beliefs re Skiplagged' s (Expedia) association with AA ............................. 37

     4.  Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia) .......... 42

     5.  Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden city offer. .......................................................................................................... 52

   B.   Other Data supporting the Experimental Findings ......................................................... 58

     1.  Illustrative actual confusion and perceived deception in consumer complaints to AA .............. 58

     2.  Illustrative actual confusion and perceived deception in consumer complaints to Skiplagged ... 61

     3.  Illustrative actual confusion and perceived deception in consumer posts on social media .......... 67

     4.  Consumer behavior and advertising and marketing theories and findings that support the validity of our empirical findings. ........................................................................................ 85

VI. CONCLUSION ....................................................................................................................... 87

## <u>APPENDICES</u>

**Appendix A:** Biography, Resume, Publications List, and Cases in Which Dr. Wind has Testified in Previous 4 Years

**Appendix B:** Materials Relied Upon

**Appendix C:** The Consumer Experiments

      **C-1.**   The Panel

      **C-2.**   The Stimuli

      **C-3.**   Formatted Questionnaire

      **C-4.**   Screenshots of the programmed questionnaire

      **C-5.**   Screening Results

      **C-6.**   Computer Tabulations

      **C-7.**   Verbatim Responses

      **C-8.**   The Data

      **C-9.**   Data Listing

App'x 007

## I.   **BACKGROUND AND OBJECTIVES**

### A.   **Background**

For decades, American Airlines, Inc. ("American" or "AA") has been using its federally registered trade name and trademark "American Airlines" and its registered flight symbol design (collectively, the "American Marks") to promote its products and services throughout the world. American carefully protects its flight, fare, schedule, and inventory data and content by providing this information only to its authorized agents, and by taking measures to ensure that only authorized agents of American are permitted to act on its behalf, to use and display its protected Marks, data, and content, and to issue tickets to passengers on American flights.

Skiplagged, Inc. ("Skiplagged") owns and operates the website Skiplagged.com. Skiplagged is not an authorized agent of American. Instead, Skiplagged obtains data on American flights by obtaining data from other agents of American (in apparent violation of their contracts with American), and/or by developing computer programs to obtain this information from American's website. Skiplagged.com allows users to search for, identify, and purchase and book American flights directly on Skiplagged.com. In doing so, Skiplagged uses and displays on its website American's Marks and American's fare, schedule, inventory, ticketing, and flight data. Skiplagged does not inform users that it is not authorized to issue tickets to passengers on American's behalf. Because it is not an agent, Skiplagged is not authorized to use American's marks, data or content to market, display or sell American tickets or services.

On August 17, 2023, American filed a lawsuit against Skiplagged, asserting, among other claims, trademark infringement and false designation of origin/unfair competition. American seeks an injunction to enjoin Skiplagged from, among other things, continuing its infringing use of American's Marks; publishing American's flight/fare content on Skiplagged's website; selling or

re-selling American flights, fares, or other products; holding itself out as an authorized agent of American or continuing to act in an agency capacity for American; or displaying or otherwise using the American Marks for commercial gain.

Having reviewed the complaint and various screenshots of American's and Skiplagged's websites, I designed multiple consumer survey experiments to evaluate (1) the likelihood and degree of confusion among consumers as to Skiplagged's affiliation, connection, or association with American and/or as to American's sponsorship, approval, or authorization of Skiplagged's services in offering and facilitating the sale of American flights; and (2) the degree of consumer deception associated with Skiplagged's offerings. As explained below and based on my analysis of the results of these consumer surveys, I have concluded with a reasonable degree of expert certainty that Skiplagged's activities (1) have generated confusion in the marketplace regarding Skiplagged's affiliation, connection, or association with American and American's sponsorship, approval, or authorization of Skiplagged's services, and (2) deceive consumers about the risks associated with its products/services.

### B.    Objectives

I was retained by Greenberg Traurig, LLP, and Kelly Hart & Hallman, LLP, counsel for American, to assess whether, and to what extent, Skiplagged's published content and offerings on Skiplagged.com relating to American flights has generated confusion and deception in the marketplace, including as it relates to Skiplagged's perceived association with and/or authorization or sponsorship from American. To accomplish this objective, I considered whether Skiplagged's uses of the American Marks and data were likely to cause, or have caused, confusion amongst consumers who have booked airline tickets using a third party website in the past year, or who plan to do so in the coming year.

The purpose of these experiments was to determine, respectively, whether participants: (A) exhibited confusion about whether Skiplagged is an authorized agent of American; (B) exhibited other confusion about the relationship between Skiplagged and American; (C) exhibited confusion or deception about the fees and total cost charged by Skiplagged; and (D) exhibited confusion about the risks involved in buying "hidden city" tickets from Skiplagged.

## II.   <u>QUALIFICATIONS</u>

I am the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania. I joined the Wharton staff in 1967, upon receipt of my doctorate from Stanford University. I took Emeritus status in July 2017. I am also the President of Wind Associates Inc, A marketing and business consulting firm.

<u>Publications</u>: I have been a regular contributor to the marketing field, including 30 books and more than 300 papers, articles, and monographs. My books and articles, which are frequently cited by other authors, encompass marketing strategy, marketing research, new product and market development, consumer behavior, organizational buying behavior, advertising, and global marketing strategy.

<u>Editorships</u>: I have served as Editor-In-Chief of the Journal of Marketing, as a guest editor of the major marketing journals, and on the policy boards of the Journal of Consumer Research and Marketing Science. I have been on the editorial boards of the major marketing journals. I founded Wharton School Publishing and served as its first editor from 2003 to 2008. Currently, I server as guest editor of a special issue of Management Business Review (MBR) on AI for Customer Engagement.

<u>Teaching, Research, and Consulting</u>: Since 1967, I have taught MBA, Ph.D., and executive development courses on a wide range of marketing topics. I am currently developing a Coursera course on Creativity (for all ages and professions). I was the founding Director of the Wharton

5

think tank – The SEI Center for Advanced Studies in Management and directed it from 1988 to 2018. I have consulted extensively for Fortune 500 firms on marketing issues and marketing-driven business strategy. I am a trustee of Philadelphia Museum of Art, Curtis Institute of Music and Grounds for Sculpture. I am also an advisor for startups and non-profit organizations. In my teaching, research, consulting, editorial, and university positions, I have designed, conducted, and evaluated thousands of marketing and consumer research studies, including for use by businesses.

Awards: I have received numerous awards for my work, including the four major marketing awards—The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007)—and received the first Faculty Impact Award by Wharton Alumni (1993). I was elected to the Attitude Research Hall of Fame in 1984 and have also been honored with research awards, including two Alpha Kappa Psi Foundation awards. In 2001, I was selected as one of the ten grand Auteurs in Marketing, and in 2003 I received the Elsevier Science Distinguished Scholar Award of the Society for Marketing Advances. In 2010, I was selected as one of the Ten Legends of Marketing and Sage Publication published eight volumes of my writings. In 2017, I was one of four people inducted into the Marketing Hall of Fame, an honor awarded annually to individuals who have made an outstanding contribution to the marketing profession. In 2021, I received an Honorary Doctorate from Reichman University (Israel), a university I co-founded in 1994. More recently (2023) I received the International Marketing Trend Conference Award.

Expert Witness Experience: I have conducted and evaluated marketing and consumer research for use in litigation, have been qualified as a marketing and survey research expert in court proceedings, and have testified at deposition and trial in federal courts.

<u>Relevant Qualifications for this Case</u>: Academic and Industry expert Re marketing, marketing strategy, consumer behavior, marketing research, and advertising.

Attached as **Appendix A** to this Report is a copy of my brief biography, my full resume, a list of my publications, and a list of cases in which I testified since 2018.

<u>Compensation</u>: My compensation is at my regular consulting rate of $1200 per hour and is not contingent on my opinions or the outcome of this litigation.

## III.   <u>SUMMARY OF OPINION</u>

My expert opinion is that Skiplagged's hidden city and non-hidden city ticket offerings have the following negative impact on consumers:

a.   Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American (either as an authorized travel agent for American or as having some other direct relationship with American);

b.   Skiplagged deceives consumers into believing that purchasing a regular, non-hidden city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly; and

c.   Skiplagged deceives consumers of hidden city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden city tickets.

My conclusions are based on the following:

1.   Two consumer experiments in which test groups saw a Skiplagged.com web site offering for either a hidden city flight or non-hidden city ticket. Two control groups saw a corresponding ticket offered on Expedia.com.

   • The findings of these experiments showed significant levels of confusion and deception among consumers.

2.   Four independent sets of data, all of which validate the findings of the consumer experiments. These included:

   a.   Actual complaints to AA;
   b.   Actual complaints to Skiplagged;
   c.   Analysis of consumer conversations on social networks; and
   d.   Insights from consumer behavior and advertising and marketing theories and findings.

7

## IV.   **METHODOLOGY**

To determine if Skiplagged's practices lead consumers to (a) perceive that they are an authorized agent of (or have other association with) American Airlines and (b) be deceived, I designed and implemented two consumer experiments and validated them against marketing and consumer behavior theories and findings.

### A.   **The Voice of the Consumer – The Consumer Experiments**

Because Skiplagged has two different airfare offerings—regular flight tickets and "hidden city" tickets—I designed two related experiments, one for each type of offering. The experiments also were designed to test the validity of the two major questions – namely, whether consumers (a) perceive Skiplagged as an authorized agent of American or having some other association with American, and (b) are deceived by Skiplagged's advertising messages and offerings.

Regarding question (b), this included two conditions:

(i)      For the regular (non-hidden city) tickets: Skiplagged's claim of providing the "cheapest regular flights;" and

(ii)     For the hidden city tickets: the adequacy of Skiplagged's disclosures to consumers regarding the risks associated with booking a hidden city ticket.

To assure the validity of the findings, the research design relied heavily on responses to open-ended questions.

### 1.   **The Research Design**

After qualifying the respondents (see universe and sample sections), the main questionnaire was based on 5 major and intercalated parts:

1. Showing the respondents in the test group the Skiplagged flight offering and showing the respondents in the control group the Expedia flight offering (see the Stimuli section) and assuring that they could see it clearly (Q0).

2. Asking an open-ended question with a follow up probing on how the respondent would

8

describe the offering to a friend (Q1).

3. Asking the typical confusion questions regarding connection or association (Q3) and permission or authorization (Q4-6), with follow up probes of the reasons for their response.

4. Asking a series of questions about the respondent's beliefs regarding the Skiplagged (or Expedia) offerings and the reasons for such beliefs (Q7-12), their awareness and usage of Skiplagged (or Expedia) (Q13), and feelings about Skiplagged's (or Expedia's) offerings and the reasons for such beliefs (Q14).

5. Showing the offering on AA.com for the same/corresponding flight ticket and asking the respondent about their reactions after having this information to compare to the Skiplagged (or Expedia) offering (Q15), their intentions to buy their next airline ticket from Skiplagged, and the reasons for their response (Q16).

The design was based on two experiments:

a. Using the Skiplagged regular ticket as the stimulus for the test group vs. the ticket offering on Expedia for the same/corresponding flight, as a control group; and

b. Using the Skiplagged hidden city ticket as the stimulus for the test group vs. the ticket offering on Expedia for a corresponding flight to the intended destination, as a control group.

Expedia was chosen as a control to show what the responses would be as to an *authorized agent* of American. The interpretation of the difference between the test and control groups is that the closer the results for Skiplagged are to those of Expedia the greater the perceived confusion and deception.

### 2. Universe and Sample

**The Universe**

The universe for each study included U.S. consumers who (a) booked a commercial flight in the past 12 months and/or intended to do so in the next 12 months, and (b) booked or intend to book their tickets through an online ticket website.

**The Sample**

The sample was drawn from the panel of Prodege. See Appendix C-1. An initial sample

9

matching the census gender, age, race, and geography assured the representativeness of the sample.

It was further screened for the relevant study criteria:

- Passed the CAPTCHA test (to ensure all participants were humans).

- They or members of their families do not work for
  (ii)   An advertising agency or public relations firm,
  (iii)  A market research firm or the market research department of a company,
  (iv)   A marketing firm or the marketing department of a company law or legal firm
  (v)    An airline, travel agency, or a company that sells airline and travel tickets

- If they wore glasses or contact lenses when using a mobile device, laptop, or desktop computer, they had them on.

The total sample included 600 respondents across all studies, as shown below.

**Exhibit A**

**Sample Size**

|  | Test | Control | Test | Control |
|---|---|---|---|---|
|  | Skiplagged Ticket | Expedia Ticket | Skiplagged Hidden City Ticket | Expedia Ticket |
| Sample Size | 146 | 155 | 144 | 155 |

### 3.   The Stimuli

The stimuli are included in Appendix C-2 and were embedded in the 4 programmed questionnaires. Appendix C-3 includes the screen shots of one of these.

To ensure that a fair and representative sample booking was used as the stimuli for the consumer survey, we (a) generated 200 different pairings of randomized "tier 1" airports across the country to use for the respective origin/destination, (b) generated and assigned randomized flight dates for each pairing, (c) ran searches on Skiplagged.com (for one-way flights) using each set of randomized flight criteria, (d) simulated 200 "test buys" on Skiplagged.com by selecting the least expensive American flight option shown in the search results and proceeding through the booking process up to the final checkout page, and (e) recorded the final total cost charged by Skiplagged for each booking. Contemporaneous with each test booking on Skiplagged.com, we

10

searched for the same corresponding flights/itineraries on AA.com and recorded the total cost charged by American for each. Of those 200 samples, 41 of the test bookings were for a "hidden city" flight ticket. Then, to determine the particular booking that would provide the most realistic and representative stimuli for the survey, we (1) separated the hidden city bookings from the non-hidden city bookings, (2) calculated the average price differential (between Skiplagged.com vs. AA.com) across all hidden city bookings, and across all non-hidden city bookings, respectively, and (3) selected the hidden city test booking that was closest to the average price difference across the hidden city bookings, and selected the non-hidden city test booking that was closest to the average price difference across the non-hidden city bookings. Additionally, upon identifying and selecting the most representative hidden city booking and non-hidden city booking to use for the survey, we also collected and used as control stimuli the corresponding offerings on Expedia.com for the same flights shown on the respective Skiplagged.com and AA.com stimuli.

For the non-hidden city bookings, the average price differential was $12.62 more expensive on Skiplagged.com than AA.com (the median difference was $10.00 more on Skiplagged.com than AA.com). Thus, the stimuli selected for the survey was a booking that was $10.00 more expensive on Skiplagged.com than AA.com. For the hidden city bookings, the average price differential was $62.46 cheaper on Skiplagged.com than AA.com (and the median was $28.80 cheaper on Skiplagged.com than AA.com). Thus, based on the specific test buys simulated, the stimuli selected for the survey was a booking that was $55.00 cheaper on Skiplagged.com than AA.com. The selected stimuli are included in appendix C2 and in the programmed questionnaire.

### 4. The Questionnaire

#### - SCREENER -

**INTRO**
Thank you for your interest in today's survey.

We value your opinions, and all of your answers will be held in the strictest confidence, so do not be afraid to answer

each question honestly. Remember, there are no right or wrong answers.

While you are completing the survey, we ask that you do not look at windows, tabs, or applications on any device. Please do not search the Internet or ask others for help regarding any questions. We are only interested in your own opinions. If you don't know the answer, that is okay, please select "Don't know" and move forward to the next question. Do not guess your answer.

**[PN: ADD IN "CAPTCHA" AND INSTRUCTIONS.]**

**SA1.**
First, please select the type of device you are using right now to access this page.
*Select one.*

| A laptop or desktop computer | 1 | |
|---|---|---|
| A tablet (e.g., Samsung Galaxy Note or Apple iPad) | 2 | |
| A smartphone (e.g., Samsung Galaxy or Apple iPhone) | 3 | |
| Other device | 4 | **[PN: TERMINATE HERE]** |

**[PN: TERMINATE IF SA1=4.]**

**S0.**
Before you continue, please read the following confidentiality and non-disclosure statement, and answer the question that follows.

I recognize and fully understand that the survey content is of confidential nature. Therefore, I agree that both during and after the study, I will not disclose any of the information referenced in the interview and will not discuss this survey with anyone else. Also, I will not identify the nature of the product or service described in this survey.

Do you agree or disagree?
*Select one.*

| I agree | 1 | |
|---|---|---|
| I disagree | 2 | **[PN: TERMINATE HERE]** |

**[PN: MUST AGREE AT S0 – PUNCH 1, OTHERWISE TERMINATE.]**

**S01.**
Do you wear glasses or contact lenses when you're using a computer, tablet, or smartphone?
*Select one.*

| Yes | 1 |
|---|---|
| No | 2 |

**[PN: ASK IF WEAR GLASSES OR CONTACT LENSES (S01=1)]**
**S02.**
Are you currently wearing your glasses or contact lenses?
*Select one.*

| Yes | 1 | |
|---|---|---|
| No | 2 | **[PN: STOP/HOLD HERE]** |

App'x 017

**[PN: IF NO STOP/HOLD ABOVE (S02=2), DISPLAY BELOW AND ALLOW RESPONDENT TO START AGAIN WHEN RETURNING.]**
Please put on your glasses/contact lenses before you proceed with the survey.


**INTRO.**
Now, we'd like to ask you a few questions to make sure the survey is relevant to you.


**S1.**
Do you or does anyone in your household work for any of the following industries or companies?
*Select all that apply.*

| | | |
|---|---|---|
| An advertising agency or public relations firm | 1 | **[PN: TERMINATE AFTER S7c]** |
| A market research firm or the market research department of a company | 2 | **[PN: TERMINATE AFTER S7c]** |
| A marketing firm or the marketing department of a company | 3 | **[PN: TERMINATE AFTER S7c]** |
| An airline, travel agency, or a company that sells airline and travel tickets | 4 | **[PN: TERMINATE AFTER S7c]** |
| Any financial services company such as a bank, mutual fund company, brokerage firm, or investment firm | 5 | |
| A company that manufactures technology or electronics products | 6 | |
| A company that manufactures, distributes, or sells food or beverage products | 7 | |
| None of the above | 99 | **[PN:ANCHOR,EXCLUSIVE]** |

**[PN: IF WORK IN A RELATED INDUSTRY (PUNCHES 1-4), TERMINATE AFTER S7c. OTHERWISE, CONTINUE.]**


**S2a.**
What is your age?
*Enter a whole number.*

| | | |
|---|---|---|
| | 1 | |
| Prefer not to answer | 98 | **[PN: TERMINATE]** |

**[PN: Allow 0-99. MUST BE 18+. TERMINATE HERE IF UNDER 18.]**


**[PN: HIDDEN QUESTION]**
**hS2b.**
**AGE**

| | | | |
|---|---|---|---|
| Under 18 | 1 | S2a < 18 | **[PN: TERMINATE HERE]** |
| 18-24 | 2 | S2a = 18-24 | |
| 24-34 | 3 | S2a = 25-34 | |
| 35-44 | 4 | S2a = 35-44 | |
| 45-54 | 5 | S2a = 45-54 | |
| 55-64 | 6 | S2a = 55-64 | |
| 65+ | 7 | S2a = 65+ | |
| Prefer not to answer | 98 | S2a = 98 | **[PN: TERMINATE HERE]** |

**[PN: MUST BE 18+ TO QUALIFY. TERMINATE HERE IF UNDER 18 OR PREFER NOT TO ANSWER.]**


**S3.**
Please record your gender identity.
*Select one.*

| | |
|---|---|
| Male | 1 |
| Female | 2 |

13

App'x 018

| Non-binary | 97 |
|---|---|
| Other (Specify          ) | 98 |
| Prefer not to answer | 99 |

**S4.**

Are you of Spanish, Hispanic or Latino/a origin?

*Select one.*

| Yes | 1 |
|---|---|
| No | 2 |

**S5.**

Which of the following ethnic groups do you identify most closely with?

*Select one.*

| Asian/Pacific Islander | 1 |
|---|---|
| Black/African American | 2 |
| Native American or Alaska Native | 3 |
| White/Caucasian | 4 |
| Other (Specify) | 97 |
| Prefer not to answer | 98 |

**S6.**

In which state do you reside?

*Select one.*

**[PN: USE DROP DOWN LIST]**

**[PN: HIDDEN QUESTION]**
**S6a.**
**REGION**

| Northeast | 1 |
|---|---|
| South | 2 |
| Midwest | 3 |
| West | 4 |

**[PN: THE FOLLOWING QUESTIONS SHOULD BE SET UP AS A GRID WITH COLUMNS; YES, NO, DON'T KNOW. PLEASE ROTATE SO HALF THE RESPONDENTS WILL SEE YES/NO AND THE OTHER HALF WILL SEE NO/YES. KEEP ORDER OF YES/NO CONSISTENT THROUGHOUT ENTIRE SURVEY AND RECORD ORDER.]**

**S7a.**

Which, if any, of the following activities **did you do in the past 12 months**? For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER: Yes, No,]** or you "Don't know."

*Select all that apply.*

**[PN: RANDOMIZE]**

| | | Yes | No | Don't know |
|---|---|---|---|---|
| 1 | Booked a hotel room | (1) | (2) | (3) |
| 2 | Booked an airline ticket (on a commercial airline) | (1) | (2) | (3) |

App'x 019

| 3 | Booked a car rental | (1) | (2) | (3) |
| 4 | Made a restaurant reservation | (1) | (2) | (3) |
| 5 | Made an appointment for eye care | (1) | (2) | (3) |
| 6 | Made an appointment for auto service | (1) | (2) | (3) |

**S7b.**

Which, if any, of the following activities are you **likely to do in the next 12 months**? For each activity, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No,**]** or you "Don't know."

*Select all that apply.*

**[PN: HOLD IN THE SAME ORDER AS S7a]**

| | | **Yes** | **No** | **Don't know** |
| --- | --- | --- | --- | --- |
| 1 | Book a hotel room | (1) | (2) | (3) |
| 2 | Book an airline ticket (on a commercial airline) | (1) | (2) | (3) |
| 3 | Book a car rental | (1) | (2) | (3) |
| 4 | Make a restaurant reservation | (1) | (2) | (3) |
| 5 | Make an appointment for eye care | (1) | (2) | (3) |
| 6 | Make an appointment for auto service | (1) | (2) | (3) |

**[PN: HIDDEN QUESTION]**
**S7c.**

Commercial airline reservation status

| Made a commercial airline reservation in the last 12 months only | 1 | **S7a_2=1 AND S7b_2=2 OR 3** | |
| --- | --- | --- | --- |
| Will make a commercial airline reservation in the next 12 months only | 2 | **S7a_2=2 OR 3 AND S7b_2=1** | |
| Both – reservation made in last 12 months AND will make in next 12 months | 3 | **S7a_2=1 AND S7b_2=1** | |
| Neither | 4 | **S7a_2=2 OR 3 AND S7b_2=2 OR 3** | **[PN: TERMINATE]** |

**[PN: CONTINUE IF MADE OR INTEND TO MAKE A COMMERCIAL AIRLINE RESERVATION (S7c=1-3). OTHERWISE, TERMINATE.]**

**S8a.**
**[ASK IF MADE AN AIRLINE RESERVATION IN THE PAST 12 MONTHS (S7c=1 OR 3)]**

In the **past 12 months**, when you made a reservation for an airline, which of the following methods did you use to make your reservation? For each option, please answer **[MATCH ASSIGNED YES/NO ORDER:** Yes, No**]** or you "Don't know."

*Select one response for each option.*

In the past 12 months…
**[PN: RANDOMIZE]**

| | | Yes, I made a reservation for an airline through this method | No, I did not make a reservation for an airline through this method | Don't know |
| --- | --- | --- | --- | --- |
| 1 | Through an online ticket website | 1 | 2 | 3 |
| 2 | Directly through an airline | 1 | 2 | 3 |
| 3 | Through a travel agency | 1 | 2 | 3 |
| 4 | Through a credit card company | 1 | 2 | 3 |

App'x 020

| | Other (Specify_____) | 1 [PN: ANCHOR ROW] | | |
|---|---|---|---|---|
| 5 | | | 2 | 3 |

**S8b.**
**[ASK IF PLANNING ON MAKING AN AIRLINE RESERVATION IN THE NEXT 12 MONTHS (S7c=2 OR 3)]**
In the **next 12 months**, when you make a reservation for an airline, which of the following methods will you use to make your reservation? For each option, please answer **[MATCH ASSIGNED YES/NO ORDER: Yes, No]** or you "Don't know."
*Select one response for each option.*

In the next 12 months…
**[PN: HOLD IN THE SAME ORDER AS S8a]**

| | | Yes, I will make a reservation for an airline through this method | No, I will not make a reservation for an airline through this method | Don't know |
|---|---|---|---|---|
| 1 | Through an online ticket website | 1 | 2 | 3 |
| 2 | Directly through an airline | 1 | 2 | 3 |
| 3 | Through a travel agency | 1 | 2 | 3 |
| 4 | Through a credit card company | 1 | 2 | 3 |
| 5 | Other (Specify) | 1 [PN: ANCHOR ROW] | 2 | 3 |

**[PN: HIDDEN QUESTION]**
**S8c.**
**Online Ticket Website Usage Status**

| | | | |
|---|---|---|---|
| Used online ticket website in the last 12 months only | 1 | **S8a_1=1 AND S8b_1=2 OR 3 OR BLANK** | |
| Will use an online ticket website in the next 12 months only | 2 | **S8a_1=2 OR 3 OR BLANK AND S8b_1=1** | |
| Both – Used online ticket website in the last 12 months AND will use an online ticket website in the next 12 months | 3 | **S8a_1=1 AND S8b_1=1** | |
| Neither | 4 | **S8a_1=2 OR 3 OR BLANK AND S8b_1=2 OR 3 OR BLANK** | **[PN: TERMINATE]** |

**[PN: CONTINUE IF PURCHASED OR INTEND TO PURCHASE TICKET THROUGH AN ONLINE TICKET WEBSITE (S8c=1-3). OTHERWISE, TERMINATE.]**

**S9.**
Which of the following sets of stripes appears in this order: RED, YELLOW, GREEN, BLUE?
*Select one.*
**[RANDOMIZE]**
**[PN: PLEASE SHOW 4 SETS OF STRIPES OF 4 DIFFERENT COLORS, INCLUDING ONE THAT IS ORDERED RED, YELLOW, GREEN, BLUE]**
**[PN: TERMINATE IF RED, YELLOW, GREEN, BLUE ORDER NOT SELECTED]**

**[PN: TO QUALIFY FOR SURVEY, MUST MEET THE FOLLOWING CRITERIA:]**

- **Meets device qualifications SA1=1,2,3**
- **Agree to terms S0=1**
- **If typically wears glasses or contact lenses while working on a computer, must be wearing them (if S01=1, then must be S02=1)**
- **Does not work in a sensitive industry (S1=5,6,7,99)**
- **Age 18+ (S2b=2-6)**
- **Made or planning on making airline reservation (S7c=1-3)**
- **Made or plannning on using online ticket website (S8c=1-3)**

**S10 – HIDDEN.**
**ASSIGN TO A CELL ON A LEAST FILL BASIS BASED ON AGE, GENDER AND REGION**

| Non-Hidden Cell 1 | **1** |
|---|---|
| Non-Hidden Cell 2 | **2** |

| **- MAIN QUESTIONNAIRE -** |
|---|

**INTRODUCTION**
**[PN: SHOW TO ALL]**
Remember, please do not search the Internet, or ask others for help regarding any questions. We are only interested in your own opinions. If you don't know the answer, that is okay, please enter or select "Don't know" and move forward to the next question. Do not guess your answer.

After you click "Next" you will see a series of images screen.

***Please take your time to review the images. Do not use the back button of your browser at any time or your information will be lost.***

**[PN: NEW SCREEN]**

Imagine that you wanted to book a roundtrip airline flight from Santa Ana to Miami, and you decided to use the **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "**Expedia**"]** website to book flights. Below is the output you received when checking for available flights. Please assume that you selected the flight boxed in red.

Please review this information the way that you normally do when reviewing and selecting airline flights online.

**PN: IF CELL 1(S10=1) THEN SHOW:**

17

**HC – Cell 1 – Stimuli 1 – Page 1**

**HC – Cell 1 – Stimuli 1 – Page 2**

**HC – Cell 1 – Stimuli 1 – Page 3**

**HC – Cell 1 – Stimuli 1 – Page 4**

**PN: IF CELL 2 (S10=2) THEN SHOW:**
**HC – Cell 2 – Stimuli 1 – Page 1**

**HC – Cell 2 – Stimuli 1 – Page 2**

**Q0.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Were you able to see the images **clearly**?
*Select one.*

| **Yes**, I was able to clearly see the images and read the words on the screen | 1 | **[PN: CONTINUE TO Q1]** |
| **No**, I was not able to clearly see the images and read the words on the screen | 2 | **[PN: RE-SHOW STIMULUS AND ASK THIS QUESTION AGAIN]** |

**[PN: MUST CONFIRM SAW IMAGES CLEARLY. DO NOT CONTINUE TO Q1a UNLESS Q0=1. IF SELECTED Q0=2 A SECOND TIME TERMINATE]**
**[PN: IF Q0=2, DISPLAY THIS MESSAGE AND RE-SHOW THE IMAGE PAGE, THEN SHOW Q0 AGAIN:** We are going to show you the images again. Please look at the images carefully and click "Next" when you are ready to continue.**]**
**Q1a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

How would you describe the offering on this website to a friend?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q1a. ASK IF PROVIDED AN ANSWER IN Q1a. – NE 99]**
**Q1b.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is no other way I would describe it to a friend | **99** | **EXCLUSIVE** |

**Q2.**

18

App'x 023

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Does the company that operates this website have a business connection or association with another company, or do you not know?
*Select one.*

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes, it has a business connection or association with another company | 1 |
|---|---|
| No, it does not have a business connection or association with another company | 2 |
| Don't know | 3 |

**[PN: IF YES AT Q2, ASK Q3a AND Q3b, ELSE SKIP TO Q4]**
**Q3a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Which other company does the company operating this website have a business connection or association with?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q3A. ASK IF PROVIDED AN ANSWER IN Q3a. – NE 99]**
**Q3b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**Q4.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Does the company that operates this website require permission or authorization from any other company, or do you not know?
*Select one.*

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes, it requires permission or authorization from another company | 1 |
|---|---|
| No, it does not require permission or authorization from another company | 2 |
| Don't know | 3 |

**[PN: IF YES AT Q4, ASK Q5a, Q5b, Q6a, AND Q6b, ELSE SKIP TO Q7]**

**Q5a.**

19

App'x 024

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

From which company is permission or authorization required?

*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|------------|--------|---------------|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q5a. ASK IF PROVIDED AN ANSWER IN Q5a. – NE 99]**
**Q5b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|------------|--------|---------------|

**[PN: IF YES AT Q4 ASK Q6a]**

**Q6a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

For what do they need to get permission or authorization?

*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|------------|--------|---------------|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q6a. ASK IF PROVIDED AN ANSWER IN Q6a. – NE 99]**
**Q6b.**
What makes you say that?
*Please type your answer below or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|------------|--------|---------------|

**Q7a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

What do you believe is the relationship between **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** and the airline?
*Select one.*
**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is an authorized agent of the airline | **1** | |
|---|---|---|

App'x 025

| | | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is not an authorized agent of the airline | **2** | |
| There is some other relationship between **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** and the airline | **3** | |
| Don't know | **99** | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q7A. ASK IF PROVIDED AN ANSWER IN Q7a/NE 99]**
**Q7b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q8a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| Buying tickets through **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is cheaper than buying directly from the airline | **1** | |
| Buying tickets through **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** is not cheaper than buying directly from the airline | **2** | |
| Don't know | **99** | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q8a. ASK IF PROVIDED AN ANSWER IN Q8a. – NE 99]**
**Q8b.**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| | | |
|---|---|---|
| Don't know | **99** | **EXCLUSIVE** |

**Q9a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** charges an additional fee on top of the airline's total ticket cost. | **1** | |
| **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** does not charge an additional fee on top of the airline's total ticket cost. | **2** | |
| Don't know | **99** | **[ANCHOR]** |

21

App'x 026

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q9a. ASK IF PROVIDED AN ANSWER IN Q9a. – NE 99]**
**Q9b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK ONLY IF THEY THINK THERE'S A FEE – Q9a=1]**
**Q10a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| I believe the fee **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** charges for its services is reasonable | 1 | |
|---|---|---|
| I believe the fee **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** charges for its services is not reasonable | 2 | |
| N/A (I do not think **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** charges an additional fee on top of the airline's total cost) | 3 | |
| Don't know | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q10a. ASK IF PROVIDED AN ANSWER IN Q10a. – NE 99]**
**Q10b.**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**Q11a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** offerings, please select the option you believe is correct or you "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is an authorized travel agency with access to fares I could not access via the airline | 1 | |
|---|---|---|
| **[PN: IF Cell 1 (S10=1):** "Skiplagged**", IF Cell 2 (S10=2):** "Expedia**"]** is not an authorized travel agency and does not have access to fares I could access via the airline | 2 | |

App'x 027

| | | |
|---|---|---|
| Don't know if **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** are an authorized travel agency | 98 | **[ANCHOR]** |
| Don't know if **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** have or do not have access to fares I could not access via the airline | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q11a. ASK IF PROVIDED AN ANSWER IN Q11a. – NE 99]**
**Q11b**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | **EXCLUSIVE** |
|---|---|---|

**Q12a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or "Don't know."
*Select one.*

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

| | | |
|---|---|---|
| A ticket bought through **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** is a valid ticket | 1 | |
| A ticket bought through **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** is not valid ticket | 2 | |
| Don't know | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q12A. ASK IF PROVIDED AN ANSWER IN Q12A – NE 99]**
**Q12b**
What makes you say that?
*Please enter your response below and be as detailed as possible* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | **EXCLUSIVE** |
|---|---|---|

**Q12c.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Based on your understanding of the **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** offerings, please select the option you believe is correct or "Don't know."

**[PN: ROTATE THE ORDER OF PUNCHES 1 AND 2. RECORD ORDER.]**

*Select one.*

| | | |
|---|---|---|
| The option offered by **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** carries no risk | 1 | |
| The option offered by **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]** carries risks | 2 | |
| Don't know | 99 | **[ANCHOR]** |

App'x 028

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q12C. ASK IF PROVIDED AN ANSWER IN Q12C – NE 99]**
**Q12d**
What makes you say that?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK IF CARRIES A RISK – Q12C/2]**
**Q12e.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

What are the risks associated with this ticket?
*Please enter your response below and be as detailed as possible or select* "Don't know."
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q12e. ASK IF PROVIDED AN ANSWER IN Q12e. – NE 99]**
**Q12f.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Are there any other risks?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is no other risks | 99 | EXCLUSIVE |
|---|---|---|

**Q13a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Before today were you aware of **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]**?

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

**[PN: ASK IF AWARE OF SKIPLAGGED/EXEDIA Q13a. = 1]**
**Q13b.**
Have you ever used **[PN: IF Cell 1 (S10=1): "**Skiplagged**", IF Cell 2 (S10=2): "Expedia"]**?

**[PN: ROTATE ORDER OF YES AND NO].**

| Yes | 1 |
|---|---|
| No | 2 |
| Don't know | 3 |

24

**Q14a.**

Flight Information Link: **[PN: INSERT FIRST SET OF STIMULI]**

Reflecting on the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offering and everything you know about them how do you feel about buying your next airline ticket from them?
*Please enter your response below and be as detailed as possible or select "Don't know."*
**[OPEN END TEXT BOX]**

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q14a. ASK IF PROVIDED AN ANSWER IN Q14a – NE 99]**
**Q14b.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[PN: OPEN END TEXT BOX]**

| There are no other reasons why I said that | 99 | EXCLUSIVE |
|---|---|---|

**INTRO**

Let's imagine that you decide to compare the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offer with the same flights available on the American Airlines website and you got the following results.

Please review this information the way that you normally do when reviewing and selecting airline flights online.

**PN: SHOW ALL:**

**HC – Stimuli 2 – Page 1**

**HC – Stimuli 2 – Page 2**

**AFTER SHOWING STIMULI 2:**

**IF CELL 1(S10=1) THEN SHOW:**

**HC – Cell 1 – Stimuli 1 – Page 4**

**IF CELL 2 (S10=2) THEN SHOW:**

**HC – Cell 2 – Stimuli 1 – Page 2**

App'x 030

**PN: NEW SCREEN only show for Cell 1 (S10=1)**
Now, please review the conditions associated with the Skiplagged offering versus American Airlines' policies. Please review this information the way that you normally do when reviewing and selecting airline flights online.

**Q15a.**

Flight Information Link: **[PN: INSERT STIMULI 1 FOLLOWED BY STIMULI 2]**

Comparing the results you got from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** and from the American Airlines website, how do you feel about the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offering?
*Please enter your response below and be as detailed as possible or select "Don't know."*
**[OPEN END TEXT BOX]**

| Don't know | **99** | **EXCLUSIVE** |
|---|---|---|

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q15a. ASK IF PROVIDED AN ANSWER IN Q15a. – NE 99]**
**Q15b.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[OPEN END TEXT BOX]**

| There is nothing else that describes how I feel about the **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** offerings | **99** | **EXCLUSIVE** |
|---|---|---|

**Q16a.**

Flight Information Link: **[PN: INSERT STIMULI 1 FOLLOWED BY STIMULI 2]**

How likely would you be to consider buying your next airline ticket from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]**?
*Select one.*
**[PN: ROTATE WHETHER PUNCHES ARE SHOWN FROM 1 – 5 OR 5 – 1. RECORD WHAT WAS SEEN]**

| | | |
|---|---|---|
| **Definitely would not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** | 1 | |
| **Probably would not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** | 2 | |
| **May or may not** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** | 3 | |
| **Probably would** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** | 4 | |
| **Definitely would** consider buying my next airline tickets from **[PN: IF Cell 1 (S10=1): "Skiplagged", IF Cell 2 (S10=2): "Expedia"]** | 5 | |
| **Do not know** | 99 | **[ANCHOR]** |

**[PN: TRIGGER QUESTION - SHOW ON THE SAME SCREEN AS Q16a AFTER THEY PROVIDED AN ANSWER – 1-5 AND 99]**
**Q16b.**
What made you say that you **[INSERT ANSWER FROM Q16A IN LOWER CASE]**?
*Please enter your response below and be as detailed as possible or select "Don't know."*
**[OPEN END TEXT BOX]**

26

App'x 031

| Don't know | 99 | EXCLUSIVE |
|---|---|---|

**[PN: TRIGGER QUESTION – SHOW ON THE SAME SCREEN AS Q16b. ASK IF PROVIDED AN ANSWER IN Q16b – NE 99]**
**Q16c.**
Is there anything else?
*Please enter your response below and be as detailed as possible.*
**[PN: OPEN END TEXT BOX]**

| There are no other reasons why I said that | 99 | EXCLUSIVE |
|---|---|---|

**[PN: ASK ALL]**
**D1.**
For quality control purposes, please enter the year you were born.
**[PN: ALLOW NUMBERS RANGING FROM 1922-2023]**

| | 1 |
|---|---|

**[PN: Must come within 1 year of actual age (S2a) or flag]**

**[PN: SHOW FOR ALL AT THE END OF THE SURVEY - NEW SCREEN]**
Thank you very much for completing this survey. We truly value your response and appreciate you taking time to share your opinions with us.

## 5.   Data Collection and Quality Control

The data collection was conducted by Radius Global.[1] They worked under my direction, formatted, and programmed the questionnaires, coordinated the data collection process, analyzed the data, and prepared the Appendices for this report. The data collection was done between April 10 – 15, 2024 and resulted in 600 respondents. The data collection was stopped after the first day of interviewing (as a pretest). Since none of the respondents had any difficulties with the questionnaire, we continued with the data collection.

In addition to the quality assurance questions included as part of the screening questions, Radius employed the following quality control procedures:

- Surveys hosted on secure encrypted servers.

---

[1] Radius Global is a leading provider of research, data, analytics, insights, and marketing intelligence. *See* https://radiusinsights.com/

- Data checks implemented:

    o Check for duplicate IP addresses to keep respondents from taking the survey more than once;

    o CAPTCHA;

    o Speeders removed from data;

    o Open-ended responses reviewed to ensure respondent is paying attention/providing meaningful answers.

### 6. Analysis

The analysis included:

- Analysis of the verbatim responses regarding the reasons for the confusion and perceived deception. This analysis followed the scientific approach for content analysis, including coding the data by (a) involving two independent coders who were not familiar with the objective of the study or its sponsors, and (b) a procedure for resolving conflicts between the two coders; and

- Computer tabulations of the results.

- Testing for the statistical significance of the difference between the test and control groups of each of the two stimuli. The Hidden City and Non-Hidden City offerings

## B.   Validating the consumer experiments with other data and relevant marketing and consumer behavior theories and findings

To validate the findings of our customer experiments we looked at other relevant data sets that included.

### 1. Consumer complaints to AA about Skiplagged re confusion and perceived deception.

During the period 1/1/2018 – 3/6/2024, the AA customer complaint database identified 88 complaints with the terms "Skiplagged" or "Skiplag". Eighty (80) of the complaints dealt with Hidden City. The analysis was done by a litigation support company using the following definitions:

*Deception* - any complaint where the customer misunderstood what they were buying. This included where the customer is confused because their itinerary has an extra leg beyond where they plan to get off; where the customer did not get the necessary visa or bring a passport for a ticket with where final destination is

28

international; where the customer does not understand why they couldn't check a bag; where the customer complains that they paid more booking through Skiplagged versus booking directly. This category also included complaints about consumer consequences, such as: did the customer get denied boarding; was the customer prevented from checking-in; did the customer have to rebook and pay a higher price; did the customer lose baggage when it was checked through to the destination; and any other instance where the customer had harm/loss/consequences as a result of their hidden city ticket.

*Confusion* – any complaint about role, authority, or relationship of Skiplagged vis a vis the airline. This included any complaint suggesting the customer misunderstood what Skiplagged could and could not do to support a customer after purchase, or the customer assumed Skiplagged could provide travel agency services; any complaint where the customer expected Skiplagged to reaccommodate, cancel, refund flight price, make meal selections or seat reservations; and any complaint where the customer thought Skiplagged is an approved booking partner or agent.

*Other* - all documents that do not fall under the above categories.

Analysis of the complaints revealed the following distribution.

- Confusion and Deception (n=22)

- Deception (n=57)

- Neither (n=7)

### 2. Consumer complaints to Skiplagged re confusion and perceived deception.

Skiplagged produced a total of 46,621 documents. Of those, 30,658 were emails with one of the following email addresses as a last-in-time sender or recipient:

- agent@skiplagged.com

- booking@skiplagged.com

- privacy@skiplagged.com

- support@skiplagged.com

These are Skiplagged's customer support emails. The vast majority of these emails relate to AA bookings.

The documents are in a Relativity database. Using Relativity's Sampling tool ([https://help.relativity.com/RelativityOne/Content/Relativity/Sampling.htm](https://help.relativity.com/RelativityOne/Content/Relativity/Sampling.htm)), we created a randomized 95/2.5 statistical sample. The sample was 1,464 emails. We categorized these documents as Deception, Consumer Confusion or Other, defined as set forth above.

Analysis of the complaints revealed the following distribution.

- Confusion (n=263)
- Deception (n=204)
- Confusion and Deception (n=47)
- Other (n=951)

The sampled data, when projected to the universe of complaints to the nearest thousand, suggests approximately 12,000 of the complaints reflect deception and/or confusion.

### 3. Consumer posts on social networks illustrating confusion and deception.

I directed Voluble[2] to identify and collect consumer comments posted online about Skiplagged. To identify consumer comments about Skiplagged, a search for social media posts that contain the term "skiplagged" or "skip lagged" was performed using Brandwatch, an industry-leading database that provides access to social media data. The search was limited to posts on X (formerly, Twitter) and Reddit, as these platforms returned the highest volume of consumer posts that mentioned Skiplagged. I then reviewed the posts returned by the search to identify those that were potentially relevant to my analysis.

### 4. Consumer behavior and advertising theories and findings that support the validity of our empirical findings.

The purpose of this additional analysis is to test to what extent consumer behavior and advertising theories and findings are consistent with or support the findings of our experiments

---

[2] Voluble is a consulting firm experienced in analyzing social media and other online posts to provide insights for litigation. Voluble is division of Global Business Experts Group (GBX), a litigation consulting firm, that has worked with dozens of clients on a variety of matters involving intellectual property and other issues.

App'x 035

and the other independent data.

## V.    FINDINGS

**A. The results of the consumer experiments are presented in the five sections corresponding to the five key areas of interest addressed by the experiments.**

**1. Consumers' awareness and usage of Skiplagged (vs. Expedia)**

As can be seen in Exhibit 1 below, as expected most respondents are familiar with Expedia. In contrast only a small % (between 14 and 18%) are familiar with Skiplagged. Yet, among the segment familiar with Skiplagged, the percent who used Skiplagged for regular tickets is similar to the % of Expedia users among those aware of them. But the % of users of Skiplagged Hidden city tickets are much lower.

**Exhibit 1**

**Consumers' awareness and usage of Skiplagged (and Expedia)**
**(Q13a & 13b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on:** | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **Awareness (Q13a)** | | | | |
| Yes | 17.8% | 92.9%* | 13.9% | 96.8%* |
| No | 81.5%* | 6.5% | 86.1%* | 3.2% |
| DK | 0.7% | 0.6% | 0.0% | 0.0% |
| **Based on aware of Skiplagged (Expedia) Usage (Q13b):** | **Skiplagged Ticket (n=26)** | **Expedia Ticket (n=144)** | **Skiplagged Hidden City Ticket (n=20)** | **Expedia Ticket (n=150)** |
| Yes | 73.1% | 77.8% | 50.0% | 80.0%* |
| No | 26.9% | 21.5% | 45.0%* | 20.0% |
| DK | 0.0% | 0.7% | 5.0%* | 0.0% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Note: Awareness and Usage for Test Cells are related to Skiplagged. Awareness and Usage for Control Cells is related to Expedia.

**2. Consumers' perceptions of Skiplagged (vs. Expedia)**

Exhibit 2 includes illustrative responses to the open ended question "how would you describe the offering on this (Skiplagged) website to a friend?" For a full listing of these responses, see the full verbatim in Appendix C-6.

**Exhibit 2**

**Illustrative Consumers' Description of the Skiplagged offering
(Q1a:b) Test Stimuli**

| Skiplagged Ticket (n=146) |
|---|
| **Illustrative responses** |
| Flight booking american airlines |
| A good offer that benefits the buyer. |
| A way to book flights cheaper |
| I think it's not a bad price it's cheaper than most [else] basically your only going to pay 150 for a few hours longer but at least you'll get there |
| Scam |
| There are good prices that you should check it out |

**Illustrative Consumers' Description of the Skiplagged Hidden City offering
(Q1a:b) Test Stimuli**

| Skiplagged Hidden City Ticket (n=144) |
|---|
| **Illustrative responses** |
| Very good website for booking flights |
| It's a offering for airline tickets |
| It's a good awful price wise but I thought the airlines did not allow this |
| The site is clear about baggage requirements and says the airlines don't like this method. |
| It's a cheaper alternative to most options. No checked bags, but it's worth it. |
| Receive a discount compared to the actual airline site. |

At the end of the questioning re Skiplagged (Expedia), we asked the respondents in Question 14a "reflecting on the Skiplagged (Expedia) offering and everything you know about them how do you feel about buying your next airline ticket from them?" The responses were coded into positive, neutral, or negative sentiment and presented in Exhibit 3. Examination of these results show that less than 12% of the respondents had negative sentiment toward Skiplagged. Yet, this is more than double the negative sentiment toward Expedia. While the positive sentiments toward Skiplagged are significantly below that of Expedia, they are still very high -- 45% among the Non-Hidden City ticket customers and 35% among the Hidden City customers.

32

**Exhibit 3**
**Reflections on Skiplagged and Expedia**
**(Q14a:b)**

| Consumer Reactions of Skiplagged (Expedia): | % of Respondents | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Negative** sentiment towards Skiplagged (Expedia) | 11.0%* | 4.5% | 11.8%* | 5.8% |
| **Neutral** sentiment towards Skiplagged (Expedia) | 17.1%* | 7.7% | 25.7%* | 9.0% |
| **Positive** sentiment towards Skiplagged (Expedia) | 45.2% | 71.6%* | 35.4% | 67.7%* |
| **Don't Know** | 26.7%* | 16.1% | 27.1%* | 17.4% |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Illustrative verbatim for all the sentiments are presented in Exhibits 3a, b and c. For the full verbatim. See Appendix C-6.

33

**Exhibit 3a**
**Reflections on Skiplagged and Expedia: Illustrative Negative Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=16)** | **Expedia Ticket (n=7)** | **Skiplagged Hidden City Ticket (n=17)** | **Expedia Ticket (n=9)** |
| I am not familiar with this website and would not be comfortable ordering tickets there. | I would rather book directly from website | I would not buy my next ticket from them because of the fees and how cluttered their website looked. | Likely buy directly from airline unless they offer a great deal |
| I have never heard of this company. It doesn't state whether your ticket is valid through the airlines purchased for. | I wouldn't buy from Expedia again I have had bad experiences when my flight was cancelled | Cautious as I have never heard of them | It is probably better to go direct through the airline |
| I will not be doing this because I will not end up on the no flight list. | I will be very careful | I would not buy the ticket | I usually find better rates if I just book the flight myself through the airlines |
| i have never heard of them before - so will be a bit wary | I dont like expedia | Fairly risky and might lose your money at the end | I will likely not unless it is much cheaper |
| I probably would still go through the airline website | No. I will stick to going to the direct airline I am flying with | I'm just not sure because it's making me seem like I shouldn't trust it | I will continue to use the airline website |
| Still not sure how reliable it would be | I likely will not use Expedia unless it offers something cheaper than I can find | Another online service trying to make money | I have never used Expedia personally, but I did use another similar site and was very displeased at all the "hidden" charges. So, I probably would not purchase a ticket through Expedia. |

34

App'x 039

**Exhibit 3b**
**Reflections on Skiplagged and Expedia: Illustrative Neutral Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=25)** | **Expedia Ticket (n=12)** | **Skiplagged Hidden City Ticket (n=37)** | **Expedia Ticket (n=14)** |
| I could do it but first I have to know more | I don't have any feelings if they offer a better price I'll use them | will look into it | I will definitely look into it. I have my own favorite websites that I use when I'm flying |
| Given proper reviews, maybe I'd checkmate out if it was legit or not and purchase one | Third party booking site that checks fees | May or may not | I would be on the fence. third parties are a concern to me |
| Not sure if I would purchase using this website, but I will definitely check them out for my next ticket to purchase | Would research to make I'm not paying more | It's a possibility I would need to do more research to confirm | I'm undecided. We just had to cancel some flights and it's not always clear who you're dealing with |
| Would have to do more research about validity of this site | not super comfortable, but will buy anyways | I will do more research | I would definitely look into it. |
| I would need to do some research on them before using them, I research everything before using it. | I may do it. I will compare with other websites. | Very possible, I can't plan to far ahead! Things deals discounts promos come and go! | I would certainly look and see what I can find and would use them. |
| Confident in saving, cautious about potential restrictions | I may or may not use them. | Since I've never heard of this company I don't know how I feel. But it would be something that I would be happy to look into it and see if it would save me any money. | 50/50 depends on price or competitors offers |

35

**Exhibit 3c**
**Reflections on Skiplagged and Expedia: Illustrative Positive Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=66)** | **Expedia Ticket (n=111)** | **Skiplagged Hidden City Ticket (n=51)** | **Expedia Ticket (n=105)** |
| I will look into them for next time | Confidence that they will get me a good deal better then I could on my own from the airline. | Confident it will save me money | I will definitely buy tickets from them because they offer huge discounts |
| I feel as if buying an airline ticket from this platform would be a good deal. | I feel good about buying from them because I trust their service. | Most of the time, I do book with Skiplagged. it offers competitive prices | I'm excited to check them out because I would like to save money on my next flight |
| I will be very happy to book a travel trip with them because their service is affordable and customers centric | I feel like I would consider Expedia as a way to save money | Would be a site I would surely check out | I may consider it if it is a large enough discount. |
| It would be easy and cheaper | Very professional and timely responsive | I would probably buy my next ticket from them | I would buy a ticket from Expedia if it was the price I was looking for. |
| Might be a good idea. Price seemed reasonable. | I think this is a very efficient and convenient way to book travel and accommodations | I would use this site again. | I feel positive. I have found them to be a good source for travel. |
| Reflecting on the offering and what I saw in the images, I will definitely visit the skip lagged website to purchase an airline ticket | I think Expedia is doing a good job and there is lots of choice. | Safe and secure | Comparing prices through different companies and options |

The results of the analysis of the open ended responses regarding getting cheaper flights (for the Non-Hidden City tickets) or not recognizing the risks of the hidden city flights for those exposed to these stimuli, are listed in Exhibit 3d. This analysis was done both for the responses to the first open ended question (Q1) as well as across <u>all</u> open ended questions.

36

**Exhibit 3d**
**Open-ended description of offering (to a friend) – (Open Ended Coded) – Deception**
**Q1a/b AND all OE Questions**

| Based on | % of Confused Consumers | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **Q1a/b** | | | | |
| There is deception | 4.8% | NA | 89.6% | NA |
| There is not deception | 95.2% | NA | 0.7% | NA |
| Ambiguous | 0% | NA | 9.7% | NA |
| **All OE Questions** | | | | |
| There is deception | 29.5% | NA | 63.2% | NA |
| There is not deception | 69.2% | NA | 27.8% | NA |
| Ambiguous | 1.4% | NA | 9.0% | NA |

**There is deception:**
- For Non-Hidden City ONLY: Skiplagged (Expedia) is cheaper than American Airlines
- For Hidden City: Consumer doesn't understand that there are meaningful risks associated with the ticket (financial penalties, not being able to fly on airline, etc.)

**There is not deception:**
- **For Hidden City:** Consumers understand at least one meaningful risk (beyond needing to pack a carry on) AND think the risks are worth it

**Ambiguous**
- If unclear based on responses
- **For Hidden City:** If only mention less meaningful risks (can't check a bag)

### 3.   Consumers' beliefs re Skiplagged' s (Expedia) association with AA

One of the most striking findings of our study is that 41% of respondents exposed to the Skiplagged stimuli associated Skiplagged with AA, which is about the same % as those who associated Expedia (i.e., AA's legitimate/authorized agent) with AA. Even among those exposed to the Hidden City offering, 30% associated Skiplagged with AA. The detailed results based on questions 1 ,2, 4, 5 and 6 are presented in Exhibit 4.

App'x 042

**Exhibit 4**
**Consumer Confusion as to the relationship between Skiplagged (or Expedia) and AA**
**(Q 1-6)**

| | % of Confused Consumers | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **All OE Questions** Associated or connected with airline based on open-ended responses for all questions | 2.7% | 3.2% | 4.9% | 5.8% |
| **Q1** Associated or connected with airline based on open-ended description of offering | 1.4% | 0.6% | 0.7% | 1.9% |
| **Q2-3** Associated or connected with airline | | | | |
| **Q2** | | | | |
| Yes | 33.6% | 31.6% | 25.7% | 33.5% |
| No | 21.9% | 21.9% | 29.2% | 21.3% |
| Don't Know | 44.5% | 46.5% | 45.1% | 45.2% |
| **Q4-6** Require permission or authorization from an airline | | | | |
| **Q4** | | | | |
| Yes | 24.0% | 28.4% | 13.9% | 22.6% |
| No | 34.2% | 33.5% | 42.4% | 36.1% |
| Don't Know | 41.8% | 38.1% | 43.8% | 41.3% |
| **NET (Yes for Q2 or Q4)** | | | | |
| **Yes** | **41.1%** | **42.6%** | **29.9%** | **42.6%*** |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

To get a better understanding of the respondent's perceptions of the relationship between Skiplagged and AA, we asked them two additional questions: (Q7a) whether "Skiplagged (Expedia) is the authorized agent of the airline" or not. The responses to this question and a follow up question regarding the reasons for their belief are presented in Exhibit 5. Examination of these results shows that over 40% of the respondents exposed to the two Skiplagged stimuli believed Skiplagged is an authorized agent of the airline. And an additional 14-17% believed there is some other relationship between the two. Many of the reasons for this are not surprising, which included the facts that you can buy the ticket for the airline and the way the information is presented.

**Exhibit 5**
**The perceived relationship between Skiplagged (or Expedia) and AA**
**(Q 7a)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q7a Skiplagged (Expedia) is an Authorized agent of the airline** | **43.2%** | **56.1%*** | **42.4%** | **63.9%*** |
| Skiplagged (Expedia) is NOT an authorized agent of the airline | 13.0% | 14.2% | 22.2% | 9.0% |
| There is some other relationship between Skiplagged (Expedia) and the airline | 17.1% | 15.5% | 13.9% | 13.5% |
| Don't Know | 26.7% | 14.2% | 21.5% | 13.5% |
| **Q7b** Illustrative Reasons for believing that Skiplagged (Expedia) is an authorized agent of the airline | | | | |
| | Because they have to be to be dealing with the airline | Because they wouldn't be able to broker me a flight then | Generally many airlines require this for the services to be sold by a third party | That's the only way Expedia will be allowed to sell airline tickets from that company |
| | Because I can buy a ticket | It connects with the airline so that they know that you booked a ticket to their airline. | From the name and information | It shows real time travel rates |
| | They obviously selling tickets for them | The airline offers a certain amount of tickets to the company at a reduced rate for the company to sell | Because you buy tickets from them | The airline is allowing Expedia to sell tickets for THEIR services provided. |
| | They are helping to sell flight tickets through their platform. | Because I always booked at 39xpedia agency to book any airlines | They must be authorized to sell plane tickets | I would have to believe that they would be otherwise how could they sell the ticket |
| | They're selling airline tickets | They connect the passenger to the actual flight and receive payments | Because their selling the airlines tickets and flights. | It has been around for a long time so it would make sense that it would be |
| | By how the information was listed | You can get on the airline through Expedia but have to contact Expedia if you have any problems. | Because your able to buy a airline ticket associated with the airline | There are many flights available through the Expedia website. |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

39

App'x 044

The second question regarding the relationship between Skiplagged and the airline was Q 11: whether "Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline."

The responses to this question are presented in Exhibit 6. An extremely high percent of respondents --close to 40%-- exposed to the two Skiplagged stimuli said YES. Many of the reasons for this perception is the way the material is presented.

App'x 045

**Exhibit 6**
**Consumers' belief re Skiplagged (or Expedia) as an authorized agent with special access to fares that could not be accessed via the airline**
**(Q11a)**

| Based on | Test | Control | Test | Control |
|---|---|---|---|---|
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q11a Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline** | **38.4%** | **52.9%*** | **38.9%** | **53.5%*** |
| **Q11a Skiplagged (Expedia) is NOT** an authorized travel agency and does NOT have access to fares I could access via the airline | 9.6% | 7.7% | 7.6% | 7.7% |
| **DK** if authorized agent | 23.3% | 19.4% | 32.6% | 16.1% |
| **DK** if they have or do not have access to tickets, I could not access via the airline | 28.8% | 20.0% | 20.8% | 22.6% |
| **Q11b Illustrative Reasons for believing** Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline | | | | |
| | Because I could buy the ticket | It helps me book the ticket, luggage, and it gives me an option to pay more for luggage protection. | Can only book those fares though them | They sell fares for airlines so that should mean they have access to flights |
| | Because their service is unique to them | You can book any airlines through Expedia | Listed on a major airline website | Some deals are only listed on their site |
| | Because I believe they are cheaper | Airlines set aside a number of available seats to authorized travel agencies. | It seems like they offered exclusive discounts | This is the business they are in. They have certain parameters that make them more attractive. |
| | Those tickets were too cheap for it to be anything else. | This is what Expedia does | States it in the pictures | I know they compare prices for the best deal |
| | It seems they have very reasonable prices that I have not seen through the airlines directly | Expedia works to fulfill vacancies | I could not access via the airline | They are a travel company to book the entire trip from flights, hotels and car rentals |
| | The only way I see them being able to get that low prices | | If they weren't authorized, they would be shut down. | |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

41

Given that we had a number of questions probing the respondent's' perceived association between Skiplagged and the airlines, exhibit 6a includes a summary of these responses identifying the NET percent of respondents who believed that such association exists. The results show that an overwhelming number of respondents (73% - 76%) believe Skiplagged is affiliated with AA. This is only slightly below the belief as to Expedia (AA's actual authorized agent).

**Exhibit 6a**

**Overall and NET perceived association between Skiplagged and the Airlines
(All associated questions)**

| % of Confused Consumers | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **All OE Questions** Associated or connected with airline based on open-ended responses for all questions | 2.7% | 3.2% | 4.9% | 5.8% |
| **Q1-Q6 NET** Associated or connected with airline based on open-ended description of offering | 41.1% | 42.6% | 29.9% | 42.6%* |
| **Q7a** Skiplagged (Expedia) is an Authorized agent of the airline | 43.2% | 56.1%* | 42.4% | 63.9%* |
| **Q11a** Skiplagged (Expedia) is an authorized travel agency with access to fares I could not access via the airline | 38.4% | 52.9%* | 38.9% | 53.5%* |
| | | | | |
| **NET (said yes to at least one question)** | **76%** | **81.3%** | **72.9%** | **86.5%** |

### 4.   Consumers' belief re Skiplagged's deceptive messages and offers (vs. Expedia)

AA's Complaint in this case alleges that Skiplagged deceives consumers to believe that Skiplagged's regular tickets are cheaper than purchasing tickets directly from the airline, and that Skiplagged does not fully disclose to consumers the actual risks/consequences of purchasing a hidden city ticket from Skiplagged. To test these allegations, we asked the respondents who were

exposed to the Skiplagged offerings a few questions.

The first of these questions asked if "buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the Airline" or not (Q8).

Not surprisingly, 62% of the respondents exposed to the first stimulus (the non-hidden city tickets) and 70% of those exposed to the second stimulus (the hidden city tickets) said YES. This is very similar to the % who said yes to this question with respect to Expedia.

**Exhibit 7**

**Consumers' belief Re the cost of buying tickets through Skiplagged (or Expedia) vs. buying directly from the Airline**
**(Q8a:b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q8a Buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the airline** | **61.6%** | **74.2%*** | **70.1%** | **65.2%** |
| Buying tickets through Skiplagged (Expedia) is NOT cheaper than buying directly from the airline | 7.5% | 9.0% | 8.3% | 15.5% |
| Don't Know | 30.8% | 16.8% | 21.5% | 19.4% |
| **Q8b Illustrative Reasons for believing that buying tickets through Skiplagged (Expedia) is cheaper than buying directly from the airline** | | | | |
| | Cheaper fees | Because I have used them before and if it was cheaper to book through the airline nobody would ever use Expedia. | Price decreased | Often times these third party sites offer huge discounts |
| | The tickets were discounted I believe | I guess they offer the list price available | Slight discount | They find the cheapest flights across all airlines |
| | Because they had a great price | I get to get points for every booking that I do so next time I book I get a discount. | This is indicated on the site | You can compare prices ahead of time on the website. |
| | I get a better deal. | It has more promotions | The price just seems low | From past experience. |
| | The price is very affordable and customers centric | I travel frequently and the prices shown are cheaper | They showed a discount | You can use discounts and codes for deals and promotion |
| | It offers discounts | It comes with rewards that could be use forthwith | Always cheaper thru a travel agent | In my experience, you get better deals by booking that way |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

A related question was whether "Skiplagged (Expedia), charges an additional fee on top of the airline total cost" (Q9).

44

Exhibit 8 presents the results, which show that one out of three respondents exposed to the non-hidden city stimuli said YES and one of 4 of the respondents exposed to the hidden city stimulus said YES. And both % are very similar to those of Expedia.

**Exhibit 8a**
**Consumers' belief Re the fees charged by Skiplagged (or Expedia)**
**(Q9)**

| | % of Respondents | | | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q9a** Skiplagged (Expedia) charges an additional fee on top of the airline total ticket cost. | 35.6% | 34.2% | 26.4% | 24.5% |
| **Q9a Skiplagged (Expedia) does NOT charge an additional fee on top of the airline total ticket cost.** | **34.9%** | **39.4%** | **34.0%** | **44.5%\*** |
| Don't Know | 29.5% | 26.5% | 39.6% | 31.0% |
| **Q9b Illustrative Reason for believing that** Skiplagged (Expedia) does NOT charge a fee for its services | | | | |
| | No additional charges was stated on their website | It rather comes with discounts and rewards | Much cheaper | Did not see an extra fee listed |
| | It doesn't charge | They collect a fee from the airlines | They make there money from airline | From my experience, they simply do not do this. |
| | I get a better value for my money when buying through this platform. | It said so | No additional cost if direct to the airline website | From past experience. |
| | They don't accept extra fee | I didn't see additional fee on the website | I used it before and there was no additional fee | They get a percentage of tickets sold from the airline |
| | The website doesn't charge extra it just charges your regular feats and how much ticket cost | I didn't see any extra fees | It was stated | No fees are listed |
| | It doesn't say they do | It only charged taxes on top of the ticket price so there is no additional fees. | It's what I saw within the ad itself. | Additional fees are charged by the aitline |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

App'x 050

The perception of the reasonableness of the fees are presented in Exhibit 8b and show very little difference between the perception of Skiplagged and Expedia.

**Exhibit 8b**
**Consumers' belief Re the fees charged by Skiplagged (or Expedia) are reasonable.**
**(Q10)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q10a Believe the fee Skiplagged (Expedia) charges for its services is reasonable** | **52.1%** | **51.0%** | **41.7%** | **49.0%** |
| **Q10a** Believe the fee Skiplagged (Expedia) charges for its services is NOT reasonable | 8.2% | 11.0% | 17.4% | 6.5% |
| **N/A** (I do not think Skiplagged (Expedia) charges an additional fee on top of the airline's total cost) | 17.1% | 19.4% | 16.7% | 29.0% |
| Don't Know | 22.6% | 18.7% | 24.3% | 15.5% |
| **Q10b Illustrative Reasons for believing** the fee Skiplagged (Expedia) charges for its services is reasonable | | | | |
| | It seems fair | I feel the fee is reasonable because it would help their business out and it'll improve their services. | 45.00 is a o.k. fee | There is not an uplift in the price. |
| | They are a middle plane of plane tickets | They just charged taxes | Other sites charge at least this fee or more. | Because it is still less than retail. |
| | They have to make money somehow | Not too much | they have to make some money | I don't mind paying additional if it's really worth it. |
| | So I can get a better deal overall. | The earliest bookings normally save customers money | They prices seemed reasonable given today's costs | Affordable prices. |
| | There's a detailed information about the booking process for travelers | It's a third party and there is a fee | reasonable price good for everyone | They usually have all the information you need about a trip so they offering something that is valuable |
| | The $10 feed at this website charges is quite reasonable | It is a decent fee And and not too expensive | The price that's offered | I've booked with Expedia before and I think the rates are the same or very close with er way. |

The following exhibits present the respondents' perceived legitimacy and risk of the Skiplagged offerings.

App'x 052

Exhibit 9a presents the results to the question of whether "a ticket bought through Skiplagged (Expedia) is a valid ticket." Over 70% of the respondents to Skiplagged stimuli said YES. Very close to the around 90% who said so for Expedia. The exhibit also includes some illustrative quotes; for more detailed verbatim, see Appendix C-6.

**Exhibit 9a**
**Consumers' beliefs Re the legitimacy and risks Skiplagged Hidden City offerings**
**(Q12)**

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Based on** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Q12a A ticket bought through Skiplagged (Expedia) is a valid ticket** | **74.0%** | **87.7%\*** | **70.1%** | **90.3%\*** |
| **Q12a** A ticket bought through Skiplagged (Expedia) is NOT a valid ticket | 4.1% | 4.5% | 5.6% | 1.3% |
| Don't Know | 21.9% | 7.7% | 24.3% | 8.4% |
| **12b Illustrative Reasons for believing** A ticket bought through Skiplagged (Expedia) is a valid ticket | | | | |
| | Because they would not sell fake tickets | It's a valid ticket because it's connected to the airline. | I real website | I've flown with them |
| | They're authorized | Because no one would use it otherwise | why would they be able to sell invalid tickets? | Expedia is a great company |
| | Because it said so | Because they are recognized and authorized | They are offering tickets to flights | It's from the airline Expedia is a third party company. |
| | Why else would they be in business | Once the ticket is sold and paid for the airline has to honor the ticket. | It seems like a valid ticket | people have used it for travel |
| | It has to be | I have used Expedia before | I'm just assuming that I legit website. | I've bought tickets from them |
| | I think it's a trustworthy platform. | It's a trustworthy booking site | Authorized travel agent, I think. | It has to be valid. |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Exhibit 9b presents the results to the question of whether "the option offered by Skiplagged (Expedia) carries no risk." Over a third of all respondents to both Skiplagged stimuli said YES.

This is significantly lower than the perceived risk of Expedia, but still a very high percentage, and especially with respect to the numerous risks of the hidden city offering.

**Exhibit 9b**
**Consumers' beliefs Re the Risks of Skiplagged**
**(Q12)**

| | Test | Control | Test | Control |
|---|---|---|---|---|
| **% of Respondents** | | | | |
| | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Based on** | | | | |
| **12c The option offered by Skiplagged (Expedia) carries no risk** | **37.0%** | **59.4%*** | **36.1%** | **55.5%*** |
| **12c** The option offered by Skiplagged (Expedia) carries risk | 14.4% | 14.8% | 28.5% | 18.1% |
| Don't Know | 48.6% | 25.8% | 35.4% | 26.5% |
| **12d Illustrative Reasons for believing** the option offered by Skiplagged (Expedia) carries no risk | | | | |
| | there is no risk | It doesn't carry risks if you pay more to keep your information secured and luggage safe. | It's a guaranteed fare | I have never had an issue with my ticket purchase or my flights |
| | Did not see any risk factors | As long as you book a ticket with a refundable one it's o k | why would they sell invalid tickets | They are a well known company |
| | It's a trustworthy platform. | It's a trustworthy brand | There is no risk | It is as good as a ticket purchased directly from the carrier. |
| | None was provided on their website | I don't see how there would be a risk involved. | One price one flight ticket | It is licensed. |
| | I believe the offerings that this website has carries little to no risk as with the other sites that offer the same service | If it is authorized I don't think it is a problem | It's a guaranteed money back. It's a failsafe service. | I do not know of any risk involved |
| | They must do what they said of not I fraud | I've done it before | Everything is clearly explained | They are guaranteed |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

The next two exhibits focus on the perceived risks of buying Skiplagged (Expedia) tickets.

Exhibit 10a categorized the open ended responses to the question "what are the risks associated with this ticket" and a follow up probe. (Q12e: f). The risks were categorized into three

App'x 055

categories: meaningful risks, unmeaningful risks, and no risk. The definition and examples are listed underneath the below exhibit. Examination of the results show that the vast majority of the respondents perceived no risk, and only 4% of the respondents who saw the Skiplagged first stimulus and 17% of those who saw the second stimulus perceived a meaningful risk.

**Exhibit 10a**
**Consumers' perceptions of the risks involved in buying Skiplagged (or Expedia) tickets**

| Consumers perceived risks (Q12e-f): | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| Meaningful Risks | 4.1% | 11% | 16.7% | 11.0% |
| Unmeaningful Risks | 8.9% | 7.7% | 12.5% | 7.1% |
| **No Risk** | **89.0%** | **87.1%** | **74.3%** | **85.2%*** |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

**Meaningful Risks:**
**Includes the following risks:**
- Financial penalties
- Can't fly on airline/Can get banned/Makes airline angry
- Cancellation problems/schedule changes
- Ticket isn't valid/ticket may not be honored
- Refund issues
- Fraud/scam issues
- Changes in plans
- Delays
- 'Third party' risk
- Weather risk
- No seats/plane is full
- Other Meaningful risks

Examples:
- Maybe the airline will be angry and kick you offf the plane
- Unknown extra fees at the airline, change fees, chance they are a scam website, cancellation fees.
- Not being validated or if it is canceled

**Unmeaningful Riks:**
**Includes the following:**
- Can't check a bag
- Unidentified Risks

Examples:
- Everything has risk
- Lost items
- Every ticket purchase carries risk. You can buy all the insurance in the world, have all the assurances in the world, and all the guarantees in the world, but stuff still happens.

Exhibit 10b presents the number of meaningful risks identified by the respondents.

Examination of the results show that, despite the numerous risks associated with the Hidden City tickets, the vast majority of the respondents do not perceive any meaningful risks, 11% perceive only one meaningful risk, and hardly anyone mentioned 2 or more meaningful risks.

**Exhibit 10b**

**Number of meaningful risks identified by each respondent.**

| Consumers perceived risks (Q12e-f): | % of Respondents | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| Mean | 0.08 | 0.14 | 0.23 | 0.17 |
| Median | 0 | 0 | 0 | 0 |
| 0 (No Meaningful Risk Mentioned) | 95.9%* | 89.0% | 83.3% | 89% |
| 1 | 1.4% | 8.4%* | 11.1%* | 5.8% |
| 2 | 2.1% | 2.6% | 4.9% | 3.9% |
| 3 | 0.7% | 0% | 0.7% | 1.3% |
| 4+ | 0% | 0% | 0% | 0% |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

**5.  Consumers' reactions to knowing the facts about the AA offer and the actual risks of the Hidden city offer.**

The last part of the questionnaire focused on the respondent's reaction to knowing the truth about how Skiplagged's offering compared to the same offering on AA.com, and, for the respondents who saw the Skiplagged hidden city stimulus, the risks associated with this offer.

Exhibit 11a presents the results of the open-ended responses to the question "Comparing the results you got from Skiplagged (Expedia) and from American Airlines websites, how do you feel about the Skiplagged (Expedia) offering?" (Q15a: b). Surprisingly, only 20% of the Skiplagged respondents who saw the first stimulus and 25% of those who saw the second stimulus had negative sentiment toward Skiplagged. And a very large segment still had positive sentiment toward Skiplagged – 50% among those who saw the first stimulus and 43% among those who saw the second stimulus.

App'x 057

The following three Exhibits – 11b, c and d, presents illustrative quotes for the negative, neutral, and positive reactions.

**Exhibit 11a**

**Given additional information about American Airlines,**
**how do consumers feel about the Skiplagged (or Expedia) offer (Q15a:b)**

| % of Respondents | | | | |
|---|---|---|---|---|
| **Consumer Feelings about the Skiplagged (Expedia) offer (Q15a +b):** | **Test** Skiplagged Ticket (n=146) | **Control** Expedia Ticket (n=155) | **Test** Skiplagged Hidden City Ticket (n=144) | **Control** Expedia Ticket (n=155) |
| **Negative Sentiment about Skiplagged (Expedia)** | **19.2%\*** | **5.8%** | **25%\*** | **5.8%** |
| **Neutral Sentiment** about Skiplagged (Expedia) | 11.6% | 25.8% | 12.5% | 23.9% |
| **Positive Sentiment** about Skiplagged (Expedia) | 50% | 47.7% | 43.1% | 52.3% |
| **Don't Know** | 18.5% | 20% | 19.4% | 18.1% |

\* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

App'x 058

**Exhibit 11b**
**Reflections on Skiplagged and Expedia: Illustrative Negative Verbatims**
**(Q15a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=28)** | **Expedia Ticket (n=9)** | **Skiplagged Hidden City Ticket (n=36)** | **Expedia Ticket (n=9)** |
| I feel like they're ripping people off | Is that the total price or is n the next screen adds fees? If it is the same price why not go through the airline instead? | not sure worth it since I normally have luggage to check and want my frequent flyer miles | Not a big enough discount. |
| They are charging more than booking directly with the airline. | I feel it might be a scam because they're the same | I think it's risky | Since it is the same, I would book directly through the airline |
| I prefer to order tickets from a site I am familiar with. | it was more expensive and less secure than just buying from the airline | It seems like there are risks | It cost too much |
| There isn't a huge difference that I would deem it creditable to use this site. Play it safe and buy from the airlines directly. | American Airlines just looks more setup then Expedia does | sounds like they are using exploitive practices. | I would just use the American airlines website |
| It is $10 more because of service charge so why book it | Not great. it's the exact same, so there's no incentive to chose them over the aurline | American airlines website is more accurate than skiplagged | American Airlines is cheaper by about $35 |
| It is expensive and has several charges | The Expedia offering did not charge significantly more at all. | Wow. I wasn't aware of the airline restrictions. Maybe that's not the best way to buy a ticket. | Is more expensiv |

54

**Exhibit 11c**
**Reflections on Skiplagged and Expedia: Illustrative Neutral Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=17)** | **Expedia Ticket (n=13)** | **Skiplagged Hidden City Ticket (n=18)** | **Expedia Ticket (n=35)** |
| Same offering as the airline | The same flight same price | Cheaper but not clearer | They are the same prices |
| It is reasonable, but I would then book directly through the airline | Not bad. The difference is in incentives | It really just depends on the situation | It's essentially the same |
| Same as other booking sites | The offers are the same | I feel like it is cheaper, but it violates the airline policy so there is a risk. | It looked similar, so not sure why I would use it |
| I'd feel comfortable buying a ticket from this agency it looks professional and just like other websites | About the same | I feel like it's almost identical | The same flights |
| It looks like any other travel website I've used before. | It looks almost exactly the same, I would feel like Expedia is just offering the same thing I see with American | I think they offer more but I'm just not sure if I still trust it | It's literally the same exact thing |
| Is a great offer if not the same | It is basically the same price | I'm not sure now if it's okay or not | I think it was pretty much the same |

**Exhibit 11d**
**Reflections on Skiplagged and Expedia: Illustrative Positive Verbatims**
**(Q14a:b)**

| Test | Control | Test | Control |
|---|---|---|---|
| **Skiplagged Ticket (n=73)** | **Expedia Ticket (n=74)** | **Skiplagged Hidden City Ticket (n=62)** | **Expedia Ticket (n=81)** |
| I think it is a good value | Expedia gets you good deals. | Much better fee | I think the Expedia offering saves me and more of their customers money than the other offering |
| Seems like a decent deal | I feel Expedia offers better options than just the airline itself. | The Skiplagged is better | It sounds very reasonable |
| It is way more cheape | It seems like a better deal | Love it, seems to be a smart way to hack the system | It is favorable and credible. |
| I feel as if I am getting a better value for my money. | It's cheaper and affordable | They offer more protection plans as to your flight. | Feel as though the price is great and better. |
| It's cheaper | This is a good offering | It's a more affordable option | Expedia is less and easier to navigate. |
| I will be very happy to book a travel trip with them because their service is affordable and customers centric | They are offering a very good price for the flight with options. | It feels like they are less intimdating and more open and reliable | Good, price is about the same |

Exhibit 12 asks the respondents about their intentions to buy their next ticket from

55

Skiplagged (Expedia). And this is after being exposed to the facts about the AA offer, and, for respondents who saw the Hidden City offering, after finding out about the risks of the offer.

Surprisingly, almost half of the respondents still definitely or probably would buy the tickets from Skiplagged.

### Exhibit 12
### Consumers' intention to buy their next airline ticket from Skiplagged (or Expedia) (Q16a)

| % of Respondents | | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| **Consumer Reaction:** | **Skiplagged Ticket (n=146)** | **Expedia Ticket (n=155)** | **Skiplagged Hidden City Ticket (n=144)** | **Expedia Ticket (n=155)** |
| **Bottom Two (Definitely would not/Probably would not)** | **19.9%*** | **7.7%** | **19.4%*** | **2.6%** |
| **Top Two (Probably would/Definitely would)** | **53.4%** | **77.4%*** | **47.2%** | **73.5%*** |
| 1. **Definitely would not** consider buying my next airline ticket from Skiplagged (Expedia) | 8.9% | 3.2% | 6.9% | 0.6% |
| 2. **Probably would not** consider buying my next airline ticket from Skiplagged (Expedia) | 11.0% | 4.5% | 12.5% | 1.9% |
| 3. **May or may not** consider buying my next airline ticket from Skiplagged (Expedia) | 21.9% | 14.8% | 29.2% | 21.9% |
| 4. **Probably would** consider buying my next airline ticket from Skiplagged (Expedia) | 26.7% | 25.2% | 19.4% | 34.2% |
| 5. **Definitely would** consider buying my next airline ticket from Skiplagged (Expedia) | 26.7% | 52.3% | 27.8% | 39.4% |
| **Don't Know** | 4.8% | 0.0% | 4.2% | 1.9% |

* = Significantly higher than other cell at the 90% confidence level; Stat testing was only done within study

Exhibit 13 presents illustrative reasons for the various intentions to buy responses. For a more complete review of the reasons given by the respondents, see the full verbatim in Appendix C6.

**Exhibit 13**
**Illustrative Reasons for consumers' intention to buy their next ticket from Skiplagged (or Expedia)**
**(Q16a+c)**

| Intend to buy (4+5) | |
|---|---|
| **Skiplagged Ticket (n=78)** | **Skiplagged Hidden City Ticket (n=54)** |
| I'll get a better value for my money. | It is a cheaper way to fly. |
| Seemed professional and prices are relatively good. | Seems like they offer good deals and offers |
| I would consider it because it seems like a reliable option. | It seems interesting and I learned something new about traveling. Almost like a hack of sorts |
| Based on what I saw no reason to doubt it | They offer really good deal. This is something that would fit in a line with my schedule on some good places that I need to go. I don't mind having to layover if it'll save me almost $200. |

| Intent not to buy (1+2) | |
|---|---|
| **Skiplagged Ticket (n=29)** | **Skiplagged Hidden City Ticket (n=28)** |
| There isn't a huge difference in price that I would risk this not being a valid offer. | Its too risky |
| If it has same ticket but more because of service charges I see no reason to use it | You could lose your right to fly |
| There are too many risks involved. | Cause I want to make sure the ticket is real |
| Because it was hard to get a refund. | They don't comply with AA rules. |

| May or may not intend to buy (3) | |
|---|---|
| **Skiplagged Ticket (n=32)** | **Skiplagged Hidden City Ticket (n=42)** |
| Depending if the offer is cheaper than airlines | Not sure if worth the risks now that I understand the offer better |
| Because it gave the same results as the airline gave me but without protection | Don't know if i want the trouble |
| It is new to me, so I want to research and see how users feel about it. | I'm not sure I would want to take the risk |
| Depending if my deal is better on skiplagged I'd chose that instead | Because I'm still interested but need more research |

App'x 062

| Don't Know | |
|---|---|
| **Skiplagged Ticket**<br>**(n=7)** | **Skiplagged Hidden City Ticket**<br>**(n=6)** |
| I need more information about them and to read their reviews. | It really depends on the total price |
| I'll have to read more reviews | |

## B. Other Data supporting the Experimental Findings

In this section, we will briefly review 4 sets of data, which individually and collectively support the findings of our experiments.

### 1. Illustrative actual confusion and perceived deception in consumer complaints to AA

The following two exhibits present illustrative cases of actual confusion as evident from an analysis of consumer complaints to AA.

Exhibit 14 presents illustrative complaints to AA evidencing confusion as to association between Skiplagged and AA.

Exhibit 15 presents illustrative complaints to AA evidencing Skiplagged deceptive practices.

58

### 3. Illustrative actual confusion and perceived deception in consumer posts on social media

Since actual complaints are often believed to be the "tip of the iceberg" given that most consumers are reluctant to complain, we also engaged in the analysis of consumer conversations on social networks. Thie results of this analysis are included in Exhibit 18.

The exhibit is divided into the following parts:

- Believing that Skiplagged is an agent of AA or another airline.

- Luggage sent to the wrong destination.

- Dishonored tickets/had to pay extra.

- The cost was higher than expected.

- Passport issues

- General dissatisfaction

Exhibit 18 includes illustrations posted on social media.

**Exhibit 18**
**Consumer Comments on Skiplagged**

## Believing Skiplagged is an Agent of AA or Another Airline

1. "Wow accidentally booked my flight thru Skiplagged instead of American and now I can't check my bag

*Author: @laurenash_213*
*Date: 2018-04-14*
*URL: http://twitter.com/laurenash_213/statuses/984976293966917633*
*American Airlines Reference: N*

6. "@KhadiDon download the skiplagged app, all flights are cheaper an yes it's legit"

*Source: Twitter*
*Author: @Niall_JayDub*
*Date: 2015-10-14*
*URL: http://twitter.com/Niall_JayDub/statuses/654162040479686656*
*American Airlines Reference: N*

69

## Luggage Sent to the Wrong Destination

1. "@SteveSasman @AmericanAir @Skiplagged Lol. You had to bring me back to PHX because AA shipped my bag to and from Vegas, which was within their rights but still sucked."

   *Source: Twitter*
   *Author: @ChrisStrub*
   *Date:2020-09-01*
   *URL: http://twitter.com/ChrisStrub/statuses/1300919283086696456*
   *American Airlines Reference: Y*

2. "@Skiplagged You all give good deals but keeping up w/ luggage is not good on skiplagged behalf! Traveling partial flights & bags going to the final destination is terrible"

   *Source: Twitter*
   *Author: @jerlbrown*
   *Date: 2024-01-29*
   *URL: http://twitter.com/jerlbrown/statuses/1752017421186089335*
   *American Airlines Reference: N*

3. "@xtatiana_ @Yaardiegurl @Pharaoh_Wilder @KateDaughtry @darnyb @EagleEye1906 Skiplagged will have your luggage going to Timbuktu but oh well you got the tkt for cheap

70

App'x 075

*Author: @YeaImTORI*
*Date: 2020-11-02*
*URL: http://twitter.com/YeaImTORI/statuses/1323245232444551168*
*American Airlines Reference: N*

6.  "Throwaway for obvious reasons. I fcked up and trusted someone to book our tickets. They used skiplagged and now 3 of us has luggages that needed to be checked in. I trusted this "friend" because they said they knew of a way to get cheaper tickets and kept us in the dark about its details. We missed the flight and now our luggage is being shipped to another damn state thats not our supposed destination. I am annoyed and is currently frantically looking for a way to get it back. Should I just take the flight or can I have the airline ship it back? And fr, should i drop this friend lol. Dont use skip lagged people, esp when youre like me. Late and manipulated into this mess."

    *Source: Reddit*
    *Author: Flippedmacaronisalad*
    *Date: 2023-10-01*
    *URL: https://www.reddit.com/r/travel/comments/16wupkp/fukd_up_by_using_skip_lag/*
    *American Airlines Reference: N*

7.  "Used @Skiplagged and they made me check my bag. See my luggage in a week or so.."

    *Source: Twitter*
    *Author: @Koridarnell*
    *Date: 2016-06-05*
    *URL: http://twitter.com/Koridarnell/statuses/739459507491737601*
    *American Airlines Reference: N*

71

## Dishonored Ticket/Had to Pay Extra

1. "@Skiplagged used @AmericanAir to book a flight I found & AA refused to let me carryon when I mentioned ur app & made me pay for a new flight"

   *Source: Twitter*
   *Author: @nicolebrajer*
   *Date: 2017-01-20*
   *URL: http://twitter.com/nicolebrajer/statuses/822303955908628484*
   *American Airlines Reference: Y*

2. "@Skiplagged My son just purchased his first airfare using skiplagged, Tuscan to LA. American Airlines made him purchase a new ticket to board! $172 on top of what he spent on app. Can he get a refund? This is effed up!"

   *Source: Twitter*
   *Author: @itwitt2*
   *Date: 2021-08-18*
   *URL: http://twitter.com/itwitt2/statuses/1428113256477073410*
   *American Airlines Reference: Y*

3. "@Ieshialot Just stay away from Skiplagged if you're booking american, security was about to come get me in Philly if I didn't rebook

App'x 077

I don't have a ticket today."

*Source: Twitter*
*Author: @_____de*
*Date: 2021-01-24*
*URL: http://twitter.com/_____de/statuses/1353408328173555713*
*American Airlines Reference: Y*

6. "A word of caution on Skiplagged - use it too often and American will catch on and start pulling bullshit. I've been denied boarding to a flight, at the gate in terminal C, after checking in!"

*Source: Reddit*
*Author: ihrtbeer*
*Date: 2022-12-09*
*URL:*
*https://www.reddit.com/r/Charlotte/comments/zgwq3j/how_do_you_save_money_flying_with_clt_being_so/izj0exh/*
*American Airlines Reference: Y*

7. "@AmericanAir @Skiplagged the carryon clearly fits. I have carried it on multiple AA flights. AA forced me to pay 4 a new flight #skiplagged https://t.co/uN1sK2UgV8"

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: http://twitter.com/nicolebrajer/statuses/822347673030098944*
*American Airlines Reference: Y*

8. "@_StayFit101 So basically AA considers this to be cheating the system. Skiplagged gets you lower rates by booking your flight as connecting and you get off at the layover. That's what I did, my ticket got flagged. When I got to the airport I had to pay an additional $150 & bumped to standby."

*Source: Twitter*
*Author: @dorianjanelle*
*Date: 2022-05-08*
*URL: http://twitter.com/dorianjanelle/statuses/1523387295906566145*
*American Airlines Reference: Y*

9. "Hi everyone, I read the FAQ but have a question regarding getting fines/banned for life from American. I bought a skiplagged flight from DTW to FLL - with a connection in CLT (my intended destination). I tried to check in, but the gate attendant told me they knew CLT was my final destination and if I did not pay the change fee & did not get on my flight to FLL, I would be banned from American for life. Has anyone had experience with this? I know not to check bags etc, and have taken 50+ flights with skiplagged & have never had an issue. Thanks"

*Source: Reddit*
*Author: @laith-the-arab*
*Date: 2022-02-06*
*URL: [https://www.reddit.com/r/Flights/comments/sm97ni/change_fees_on_skiplagged/](https://www.reddit.com/r/Flights/comments/sm97ni/change_fees_on_skiplagged/)*
*American Airlines Reference: Y*

10. "@AmericanAir @Skiplagged as a member of @NBCUniversal, a frequent flyer, I was shocked I was forced off the line & to pay for a new flight!"

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: [http://twitter.com/nicolebrajer/statuses/82234486761955376](http://twitter.com/nicolebrajer/statuses/82234486761955376)*
*American Airlines Reference: Y*

11. "@AmericanAir @Skiplagged AA has the worst customer service in our nation! AA CLAIMS THIS BAG ISN'T A CARRYON! Forced me to buy a new flight. [https://t.co/JrTRVaQ8rj](https://t.co/JrTRVaQ8rj)"

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: [http://twitter.com/nicolebrajer/statuses/82235772312762944](http://twitter.com/nicolebrajer/statuses/82235772312762944)*
*American Airlines Reference: Y*

12. "@AmericanAir @Skiplagged u let ppl pass w me their carryons but BC I booked thru #skiplagged AA gave me no option than 2 pay 4 a new flight! [https://t.co/ySRBcY6wRD](https://t.co/ySRBcY6wRD)"

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: [http://twitter.com/nicolebrajer/statuses/82234970597991289](http://twitter.com/nicolebrajer/statuses/82234970597991289)*
*American Airlines Reference: Y*

13. "@DiskullOfficial @Skiplagged @AnthonyAttia24 Do not recommend skiplagging on the way back. Got flagged coming back from New York with @Megamarv97. American made us pay the flight in full since they knew we fly out of Charlotte and weren't getting on the connecting flight

74

App'x 079

*Source: Twitter*
*Author: @Hozay_Guap*
*Date: 2022-12-20*
*URL: http://twitter.com/Hozay_Guap/statuses/1605078826593443840*
*American Airlines Reference: Y*

14. "@Skiplagged @AmericanAir wouldn't refund me the change fee - made me purchase a brand new flight & miss my original cus I mentioned ur app."

*Source: Twitter*
*Author: @nicolebrajer*
*Date: 2017-01-20*
*URL: http://twitter.com/nicolebrajer/statuses/822307917722370051*
*American Airlines Reference: Y*

15. "@united @CFPB @AmericanAir @MarkWarnerVA @timkaine @Skiplagged Current attempt is a @united employee telling me it is another $1000 I have to pay...to KEEP MY SAME FLIGHT."

*Source: Twitter*
*Author: @MsWZ*
*Date: 2017-09-18*
*URL: http://twitter.com/MsWZ/statuses/909593100372324354*
*American Airlines Reference: N*

75

# Cost Was Higher Than Expected

1. "@Skiplagged $35 service fees yeah you guys are bugging I'll just book my flight via American. SMH! Use to love u guys"

   *Source: Twitter*
   *Author: @candydeepthr0at*
   *Date: 2023-11-14*
   *URL: http://twitter.com/candydeepthr0at/statuses/1724359090648801288*
   *American Airlines Reference: Y*

2. "BUYERS BEWARE! This company @ExploreTrip, found on @Skiplagged .com, will promise prices on internet and then inform you that you need to pay more money to secure your booking. They will even try to get you to pay more than the price on the airline's website #scammers #fraud https://t.co/3L105ps7H3"

   *Source: Twitter*
   *Author: @cati4563*
   *Date: 2019-02-03*
   *URL: http://twitter.com/cati4563/statuses/1092121343275999232*
   *American Airlines Reference: N*

3. "@Skiplagged how do I contact customer service? I booked a flight, entered CC#, it was transferred to ExploreTrips who cancelled it with no notification. Now the trip is twice as expensive. #Angry"

   *Source: Twitter*
   *Author: @Audiv8q*
   *Date: 2019-10-23*
   *URL: http://twitter.com/Audiv8q/statuses/1187109886036865025*
   *American Airlines Reference: N*

76

# Passport Issues

1. "i used skiplagged (great site, highly recommend )to book a flight home to CA from Hawaii early because my original flight overlapped with school. I show up to the airport and they ask me for my passport because the flight is technically to Canada with a layover in SF (where I planned to get off). I frantically call the airline an hour before the flight and try and explain the situation and they offer to change my flight for a $300 change fee ONTOP of the price of the new ticket. I hang up and change my story to someone stole my passport and I need to get on this flight to San Francisco where I can get a new passport and they no questions change my flight for no fees."

   *Source: Reddit*
   *Author: j-blizzle*
   *Date: 2017-10-17*
   *URL: [https://www.reddit.com/r/AskReddit/comments/76xpa3/reddit_whats_your_top_holy_shit_that_worked_moment/dohyfu3/#](https://www.reddit.com/r/AskReddit/comments/76xpa3/reddit_whats_your_top_holy_shit_that_worked_moment/dohyfu3/#)*
   *American Airlines Reference: N*

2. "@Skiplagged you didn't tell me I'd need my passport to get through security for a domestic flight!! Stuck and stressed."

   *Source: Twitter*
   *Author: @StormMurphy*
   *Date: 2016-01-11*
   *URL: [http://twitter.com/StormMurphy/statuses/686539365661700096](http://twitter.com/StormMurphy/statuses/686539365661700096)*
   *American Airlines Reference: N*

3. "Usually it works great if one knows what s/he is doing, but one time was hilarious (to me). Wanted to go to PHX. Flt was $300+. Flt from LAX to Vegas was $48!!! with a layover conveniently in PHX. No brainer. Worked fine going. On the way back I had a flt to Seattle w a layover in LA. Mechanical issues cancelled the flt. They tell everyone they will rebook at the counter. The over accommodating agent is like "you're in luck - there's a direct flight to Seattle & we can upgrade you"! And it leaves in 30 minutes so you'll arrive sooner!! Damn good customer service. What do I do!?! What can I say? "Oh no, I like layovers, inefficiency & downgrades"? I told her I had to go to the restroom- where I stayed until the flight left. Went online to book & there was a flight to BC w/ a layover in LA (not sure why it's cheaper to go to BC from Phoenix than to LA). They wouldn't let me board that flight b/c I didn't have my passport. WTH? Can I have someone in LA meet me w it? No, you can't board an international flt w no passport. But it's going to LA 1st, which isn't international. She said you can't do that, but you wouldn't want to take the chance of being stuck in LA. (Actually I would!) Ended up staying another night in PHX to catch the same PHX- LAX-Seattle flt I had originally. Even w the extra night hotel (and fun) I still saved almost $200! And the longer version makes for a great

story. Hope they can't trace me thru this story. Crap"

*Source: Reddit*
*Author: go4urs*
*Date: 2023-07-17*
*URL: https://www.reddit.com/r/TravelHacks/comments/152fom9/my_hilarious_to_*
*me_skiplagged_story/*
*American Airlines Reference: N*

4.   "I fucked myself over last week I used @Skiplagged and didn't have my passport smh I didn't
     land at my destination had to purchase a new one way that shit sucked"

     *Source: Twitter*
     *Author: @Itz_RicanSteph*
     *Date: 2018-10-02*
     *URL: http://twitter.com/Itz_RicanSteph/statuses/1046939729013497856*
     *American Airlines Reference: N*

5.   "@Skiplagged ...Really messed me and my kids vacation return UP. Our return flights... Needed
     PASSPORTS from Hawaii. Had to buy NEW full fare tickets! https://t.co/LzF3E6auhz"

     *Source: Twitter*
     *Author: @TamekaRaymond*
     *Date: 2018-01-08*
     *URL: http://twitter.com/TamekaRaymond/statuses/950464317270343680*
     *American Airlines Reference: N*

6.   "If you ever use Skiplagged, please don't be like me and forget your passport by not thinking
     about the fact that you purchased an international flight since you just plan on getting off at a
     domestic layover

*American Airlines Reference: N*

8. "I was flying through SFO about a week ago at this point and I booked a flight to Seattle as a hidden city flight connecting to Calgary. I didn't have my passport, but I was effectively only taking the flight to Seattle. An attendant sent me to special services desk saying there was a way for me to get on the initial flight, knowing I had used Skiplagged. The Delta attendant at the services desk, seeing my issue, was adamant about it being impossible for me to get on the flight. He then began lecturing me about how I was a hipster and how I couldn't "cheat the system" among other things. He included that it was possible to get me booked just for the Seattle flight, but simply wouldn't. Due to the circumstances, I needed to book an emergency second flight to Seattle. Is there anything I can do about this? Can an airline decline service because of how I booked my flight?"

*Source: Reddit*
*Author: KindaCompostable*
*Date: 2017-06-10*
*URL: https://www.reddit.com/r/legaladvice/comments/6geakw/wa_i_wasnt_allowed_*
*on_a_flight_because_i_used/#*
*American Airlines Reference: N*

# General Dissatisfaction

1. "@Skiplagged you guys took my money for the ticket and service fee. Now @AmericanAir says I don't have a ticket today"

   *Source: Twitter*
   *Author: @_____de*
   *Date: 2021-01-24*
   *URL: http://twitter.com/_____de/statuses/1353408328173555713*
   *American Airlines Reference: Y*

2. "Am I being punked @AmericanAir @Skiplagged This is a deceitful way to sell tickets and take people's money! #shameful #fraud #AmericanAirlines #skiplagged"

   *Source: Twitter*
   *Author: @JessyDiva59*
   *Date: 2021-09-26*
   *URL: http://twitter.com/JessyDiva59/statuses/1441930656670523393*
   *American Airlines Reference: Y*

3. "@Skiplagged @AmericanAir absolutely horrible misleading and deceptive services. Want a direct flight to #WashingtonDC - then sell me a cheap ticket going all the way to #Richmond - where I can't have a carry on luggage & hence needed to buy a fresh ticket altogether. Outrageous!"

   *Source: Twitter*
   *Author: @Akshobh*
   *Date: 2017-12-02*
   *URL: http://twitter.com/Akshobh/statuses/937040316351250433*
   *American Airlines Reference: Y*

4. "I am so annoyed with @AmericanAir & @Skiplagged someone needs to produce my voucher, apply a credit or give me my money back TODAY INSTANTLY!!"

   *Source: Twitter*
   *Author: @kushmie*
   *Date: 2020-08-17*
   *URL: http://twitter.com/kushmie/statuses/1295374798873219072*
   *American Airlines Reference: Y*

5. "Hey, just some more info — this exact thing happened to me. Traveling for work. Boss booked a Skiplagged from CMH->CLT(home airport)->LGA. The app would not let me get my boarding pass. See ticket agent. Agent informs me that because I have an NC ID, they believe it is not my intention to actually fly to LGA. I told him he can believe whatever he wants and that I would

App'x 085

like my ticket. He, having no recourse, did print my ticket. Flight to LGA ended up being delayed a couple hours (oh nooo), so I ended up leaving CLT with no issues. I have never used Skiplagged for American because of this. Not worth the risk. But they really did flag me because of my ID."

*Source: Reddit*
*Author: @Castalyca*
*Date: 2023-07-11*
*URL: https://www.reddit.com/r/americanairlines/comments/14wr746/teenager_taken_to_security_room_and_interrogated/jrjv6mu/*
*American Airlines Reference: Y*

6. "Hey guys I was wondering if anyone who is familiar with Skiplagged can help me understand this. This is my first time using Skiplagged and I am not much of a traveler. I live in NYC. I am planning a week trip in Cancun followed by a couple of days in Miami. Three flights in all. JFK to Cancun (American Airlines), Cancun to Miami (JetBlue), then Miami to JFK (also JetBlue). However, I am now seeing that my credit card was charged for these random flights in Tulsa Oklahoma and Salt Lake City Utah?? I immediately suspected fraud, but interestingly enough, the charges are for the **same exact prices** as my vacation flights. I did some research on how Skiplagged works and apparently the website shows you hidden city flights. I didn't understand this before - so now I am wondering if I happened to unknowingly book a hidden city flight from Tulsa >>> NYC >>> Cancun or something, and am now being charged the full price by the airlines? I have no idea what's going on. Or is this just fraud? Was my info sow hacked and now someone is buying tickets from my card? Who would I go to to resolve this issue? The airlines or skiplagged? Or my credit card company for fraud? I've seen articles about Airlines banning or suing customers for booking through skiplagged, and I don't want to get in any trouble. Please help me understand this so I know how to explain my situation when I talk to a representative from an airline."

*Source: Reddit*
*Author: @mykashu*
*Date: 2021-05-07*
*URL: https://www.reddit.com/r/travel/comments/n759ar/i_used_skiplagged_to_book_a_trip_are_these/*
*American Airline Reference: Y*

7. "I just want to cancel my flight @Skiplagged & @AmericanAir giving me the hardest time ever then i have @Allianz insurance on this flight and it's a complete waste of money not helpful at all I'm so over all of these companies completely disgusted!!!"

*Source: Twitter*
*Author: @KassidyBankss*
*Date: 2021-06-07*
*URL: http://twitter.com/KassidyBankss/statuses/1402011904055332870*

*American Airlines Reference: Y*

8. "don't ever use @Skiplagged , they had me stranded in Aruba! Been otp for 6+ hours trying to reach @AmericanAir & @priceline , yall got me alllllll the way eff'd up!!!!!!!!!!"

   *Source: Twitter*
   *Author: @notgnerahk*
   *Date: 2021-06-14*
   *URL: http://twitter.com/notgnerahk/statuses/1404292375971774464*
   *American Airlines Reference: Y*

9. "DON'T buy a connecting flight for American Airlines through Skiplagged

12. "@Skiplagged terrible, I'm so disappointed about your service"

   *Source: Twitter*
   *Author: @eliasferreirah*
   *Date: 2020-12-26*
   *URL: http://twitter.com/eliasferreirah/statuses/1342933144983511041*
   *American Airlines Reference: N*

13. "I really may never use @skiplagged again. Girlfriend and I paid for the upgraded seats on our
   @united flights over a month ago and had our seats changed with no notification or refund.
   Customer support has been terrible to deal with. Over 7 hours of waiting total... no response"

   *Source: Twitter*
   *Author: @ThatMFerr*
   *Date: 2021-06-08*
   *URL: http://twitter.com/ThatMFerr/statuses/1402222251282468866*
   *American Airlines Reference: N*

14. "@Skiplagged this flight is really important, and to be totally duped by your service/app is
   terrible"

   *Source: Twitter*
   *Author: @CaelinCX*
   *Date: 2018-09-15*
   *URL: http://twitter.com/CaelinCX/statuses/1040782338869927937*
   *American Airlines Reference: N*

15. "@Skiplagged you guys really need to stop lying to your users and saying this as false hope.
   you've been saying the price might go down for 10 days and it's just been shooting up ever since.
   terrible feature that cost me hundreds https://t.co/9UiD4GrDdV"

   *Source: Twitter*
   *Author: @SwallowMeHole*
   *Date: 2021-06-17*
   *URL: http://twitter.com/SwallowMeHole/statuses/1405458169082650631*
   *American Airlines Reference: N*

16. "@Skiplagged Urgently seeking help, reached out this morning re: a reservation, no response. I
   trusted your 24-hour cancellation guarantee +My initial purchase was based on trust in ur
   policies. Now, with my money taken and policies not upheld, it's a terrible customer journey."

   *Source: Twitter*
   *Author: @heidifamilia*
   *Date: 2023-11-18*

83

*URL: http://twitter.com/heidifamilia/statuses/1725669070425522550*
*American Airlines Reference: N*

17. "For me it was skyscanner until last year, it really got terrible. Skiplagged turned terrible too, secret flying? Terrible"

*Source: Reddit*
*Author: yerry_Sanchez*
*Date: 2023-03-30*
*URL: https://www.reddit.com/r/TravelHacks/comments/1268g6t/what_are_the_best_ and_most_well_hidden_secrets_to/je8a3uu/*
*American Airlines Reference: N*

18. "@Skiplagged Lina #72 was whack. Unhelpful and left me on hold for several minutes at a time. I'm disappointed you couldn't refund the difference of my flight. Regret sharing u to friends.

21. "Almost had a situation with my luggage because of this damn skip lagged app. I don't know that I can trust it now."

   *Source: Twitter*
   *Author: @QuoirBoy*
   *Date: 2016-12-22*
   *URL: http://twitter.com/QuoirBoy/statuses/811930426335956993*
   *American Airlines Reference: N*

22. "@Skiplagged I wanted to share my experience with @Saudi_Airlines : My luggage arrived broken Reaching your customer service department was remarkably difficult Staff seemed unwilling to acknowledge the airline's responsibility for the damage. @Saudia_Care #be_aware @RiyadhSeason @NEOM https://t.co/QowJ9b37s2"

   *Source: Twitter*
   *Author: @A_Suray7i*
   *Date: 2023-10-11*
   *URL: http://twitter.com/A_Suray7i/statuses/1712179287778861412*
   *American Airlines Reference: N*

23. "Yo skiplagged really almost made me lose all my luggage lmfaoo Im glad ik how to talk to ppl"

   *Source: Twitter*
   *Author: @prodilovechris*
   *Date: 2019-05-04*
   *URL: http://twitter.com/prodilovechris/statuses/1124663991110909952*
   *American Airlines Reference: N*

24. "@Skiplagged Extremely angry with your services right now and I will be requesting a refund. I scheduled a flight through you to leave today and somehow it was changed to July 13. Come to find out, 3 more families were in line ALSO expecting to leave today. #ripoff"

   *Source: Twitter*
   *Author: @LaTori_Blair*
   *Date: 2018-06-29*
   *URL: http://twitter.com/LaTori_Blair/statuses/1012802242452295680*
   *American Airlines Reference: N*

## 4. Consumer behavior and advertising and marketing theories and findings that support the validity of our empirical findings.

When searching for cheap flights or directly for Skiplagged, the Skiplagged messages are very appealing.

Consider for example the prominent first search results sponsored by Skiplagged. "Skiplagged: the smart way to find cheap flights." And the follow up heading "Find flights the airlines don't want you to see," "cheap flights to NY," and next to it the Nerd Wallet post: "What is Skiplagged and how to use it," with the following opening sentence: "Skiplagged is a legit way to reduce the cost of certain flights. By booking a hidden city ticket, you might be able to save hundreds of dollars."

These and similar messages are appealing and meet the RAVES criteria for effective advertising and offering.[3]

- **Relevant and respectful:**
  - The big cost savings make it very relevant for any consumer looking for cheap flights.

- **Actionable**:
  - The convenience of a click away from getting the savings is very actionable and tempting.
  - The assurance of legitimacy also makes it more actionable.

- **Valuable:**
  - The big cost savings make it valuable for sophisticated consumers who weigh the cost benefits of the offer, given that Skiplagged does not disclose all the risks. The benefit of cost savings outweighs the few identified risks.
  - The presentation of the tickets with the AA logo and their typical format (see the stimuli we used in our study) further increases the consumer confidence that they are dealing with a legitimate agent of AA.

- **Experiential:**
  - The presentation of the offering with the AA logo and format assures the consumer an experience similar to the one they experience in dealing with AA directly or with authorized agents of AA.

---

[3] Based on Wind and Hays, *Beyond Advertising: Creating Value Through all Customer Touchpoints.* Wiley, 2016

86

- **Sharable story:**

  o Ther hidden city story is clever, doing something which is legal, but the airlines do not like is intriguing and could tempt consumers to buy it and share it with others.

  o And for some, the creative way of finding loopholes to get cheaper flights is appealing as well as a "David against Goliath" scheme.

  Thus, based on what we know about how advertising works, the Skiplagged message and offering is clever and likely to work. While the FAQ includes a bit more information about the risks of Hidden city offering, the reality is that consumers rarely if ever read the small print.

## VI.   CONCLUSION

The conclusion of my analysis is:

1. The results of two consumer experiments among 600 consumers show conclusively that Skiplagged's non-hidden city and hidden city ticket offerings deceive consumers to believe that Skiplagged is an authorized agent of or otherwise associated with American.

   - These results are clearly summarized in Exhibit 6a (p 41-42), which shows that 75% of consumers exposed to the non-hidden city ticket and 73% of the consumers exposed to the hidden city ticket believe that Skiplagged is associated with American.

     o This is just slightly below the level of perceived association between Expedia (the control groups) and American.

2. The results of the experiments clearly show that Skiplagged deceives consumers of its non-hidden city tickets to believe that purchasing a ticket on Skiplagged.com is cheaper than purchasing a ticket directly from American. In fact, 62% of the consumers exposed to the Skiplagged regular/non-hidden city stimulus believed that buying tickets through Skiplagged is cheaper than buying directly from the airline. See Exhibit 7.

- o Relatedly, consumers of both the non-hidden city and hidden city tickets believed that Skiplagged does not charge an additional fee on top of the airline's total ticket costs (Exhibit 8a).

3. The results of the experiments clearly show that Skiplagged deceived consumers of its hidden city tickets to believe the following:

   a. That a hidden city ticket bought through Skiplagged is a valid ticket – 70% of the respondents. See Exhibit 9a;

   b. That a hidden city ticket offered by Skiplagged carries no risk – 36% of the respondents. See Exhibit 9b; and

   c. Among those who perceived some risk, less than 17% perceived any meaningful risk (Exhibit 10a), and most of them perceived only one meaningful risk (Exhibit 10b).

4. Knowing the truth about the AA prices and the real risks associated with hidden city tickets has only limited impact on consumers' intentions to buy their next airline tickets from Skiplagged. See Exhibit 12.

5. Overall, consumers perceived Skiplagged quite similarly to their perceptions of Expedia, the legitimate and *authorized* travel agent of American that served as our control.

6. The above findings are strongly validated by the actual complaint data received by American (Exhibits 14 and 15), the complaints received by Skiplagged demonstrating a very large number of confused consumers (Exhibits 16 and 17), and consumer conversations on social networks (Exhibit 18).

7. All of my findings are consistent with what one would expect from consumer behavior, advertising, and marketing theories and practices.

8. Given these findings Skiplagged's practices are harming both consumers and American Airlines.

Philadelphia, Pennsylvania

_____

Yoram (Jerry) Wind, Ph.D.

# Exhibit A-2

**EXPERT REPORT OF PROFESSOR GEORGE JOHN IN RESPONSE TO THE
EXPERT REPORT OF PROFESSOR YORAM (JERRY) WIND**

## I.      INTRODUCTION AND SCOPE OF ENGAGEMENT

I have been retained in this matter by counsel for Skiplagged, Inc. to provide a report (hereinafter "Report") in response to the report of Dr. Yoram (Jerry) Wind (hereinafter the "Wind Report"). In particular, in my report I examine the three core opinions Dr. Wind conveys in his "Summary of Opinions" (Wind Report, page 7):

> (1) "Skiplagged deceives consumers of hidden city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden city tickets";
> (2 "Skiplagged deceives consumers into believing that purchasing a regular, non-hidden city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly" and
> (3) "Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American (either as an authorized travel agent for American or as having some other direct relationship with American)".

To arrive at these opinions, he relies principally on his analysis of the data from the Wind Report experiment, where he showed each person in his sample screenshots of a pair of hypothetical website search results: screenshot pages of either a Skiplagged.com webpage or else an Expedia hypothetical flight search result followed by screenshot pages of an AA.com hypothetical flight search result.

My opinions and the bases for my opinions are contained in this Report. This Report and my analysis are based on my education, training, experience, and expertise in the matters at issue here. I reserve the right to amend, modify, or supplement this Report as appropriate in the future as additional facts or information become known to me.

1

The opinions expressed in this Report are entirely my own. My compensation is not dependent on my opinions or the outcome of this matter. I am being compensated at a rate of $900 per hour. My CV, which includes my testifying history for the last five years and my publications, including those from the last 5 years is attached as **Exhibit A**.

## II.    QUALIFICATIONS AND EXPERIENCE

I hold the General Mills – Paul S. Gerot Chair in Marketing at the Carlson School of Management at the University of Minnesota, and have been a member of the faculty of this University since 1987. From 1980-1987, I served on the Marketing Department faculty of the School of Business at the University of Wisconsin, Madison. I earned my Ph.D. in Marketing from Northwestern University in Evanston, Illinois, my MBA from the University of Illinois at Urbana-Champaign, and my Bachelor's degree in Aeronautical Engineering from the Indian Institute of Technology, Madras, India.

My teaching, research, and experience span the general field of marketing. Within this field, I focus on distribution systems. Of particular relevance to this case is my research on consumer internet search in digital channels. For 43 years, I have taught courses on marketing topics to students in bachelor, MBA, and Ph.D. degree programs. I have also taught courses on these topics to corporate business managers in continuing education programs.

I have published widely in academic journals on these topics and am listed in Thomson Reuters' "Highly Cited Researchers in Economics/Business," which includes fewer than the top 1 percent of all researchers globally in the economics/business field. My publications have been cited more than 20,000 times as of November 2023.[1]

---

[1] Google Scholar, *George John*, Accessed November 6, 2023, https://scholar.google.com/citations?user=ct11DhkAAAAJ&hl=en.

I served as the Associate Dean at the Carlson School from June 2011 to January 2015.  My responsibilities as the Associate Dean included overseeing the Carlson School's $100 million budget, faculty hiring, promotion and termination decisions, and managing operations, including information technology capabilities.

My training, teaching and research includes the design, development, and analysis of surveys. My dissertation was based on survey data. Many of my published research articles have used surveys and experimental stimuli. Finally, I have taught classes in Marketing Research methodology to Undergraduate, Masters and PhD students.

I have also consulted on many topics closely related to the issues in this case. Additionally, I have previously offered expert testimony and reports in state and federal court, as well as in arbitration and regulatory commission hearings. I have been deemed qualified to testify as an expert witness in each of these instances and my opinions have never been excluded.

My work on customer journeys and search in digital channels is closely related to the issues I have been asked to address in this case.

## III.   OVERVIEW OF OPINIONS

Necessarily, my opinion is limited by the facts and data available to me. A list of the materials on which I relied in forming my opinions is attached as **Exhibit B**.

As I describe in more detail below, it is my opinion that Dr. Wind is mistaken with respect to each of his three principal opinions below:

1.      Dr. Wind is mistaken when he concludes that his data from his experiment show

that "*Skiplagged deceives consumers of hidden city tickets by not effectively*

3

*disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden city tickets*".

2.      Dr. Wind is mistaken when he concludes that his data from his experiment show that "*Skiplagged deceives consumers into believing that purchasing a regular, non-hidden city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly*".

3.      Dr. Wind is mistaken when he concludes that his data from his experiment show that "*Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American ...*".

## IV.    BACKGROUND

This section sets forth a general summary of my understanding of the relevant conceptual and factual background. It is based on my review of the Wind Report and my knowledge of the scientific literature in Marketing.

### A.      Background: Airline Customer Journeys and Connection to Current Case

In common with many other settings, the customer purchase process for air travel has been dramatically transformed by the Internet and online commerce. Today, prospective travelers typically begin their journeys online as they search for tickets, compare prices and non-price attributes, and perhaps purchasing a ticket. Of course, the actual travel itself occurs offline. Marketing textbooks commonly describe these journeys as consisting of a few distinct stages

4

including (1) Need Recognition, (2) Information Search, (3) Evaluation of Alternatives, (4) Purchase, and (5) Post-purchase.[2] Below, I briefly describe its application to airline travel.

1. The Need Recognition stage focuses on those influences that make a person begin to actively consider the manner in which his/her need to travel might be fulfilled. This may be a family event, or a planned holiday or a business trip. In the current case, these are not central to the issues at hand.

2. The Information Search stage consists of the various sources of information that a prospective traveler may actively and/or passively navigate to arrive at their beliefs about the relevant attributes (price, non-price, etc.) of the alternative ways the trip might be completed. These may include offline sources such as asking friends and family, as well as online sources. This stage is the central focus of the current case, the focus is on the role and impact of AA.com, Expedia.com, and Skiplagged.com in online searches. There are several unique aspects to online Information searches that are familiar to all of us as online consumers today. First, online searches are a dynamic process where it is very easy to search further by going to other sites after visiting one site, (the proverbial on-click of the mouse takes you to another site). Second, research indicates that online searchers will search multiple sites until they believe they have sufficient information about the item(s), and are satisfied that there is little to be gained by further site visits even though it takes just one more click. Second, they are likely to click to a subsequent page within a site only when

---

[2] Pride, W. M. and O. C. Ferrell (2014), Foundations of Marketing, 7th Edition, Stamford, CT: Cengage Learning, p. 135. See also Farris, P. W., N. T. Bendle, P. E. Pfeifer, and D. J. Reibstein (2010), Marketing Metrics: The Definitive Guide to Measuring Marketing Performance, 2nd Edition, Upper Saddle River, NJ: Pearson Education, p. 199.

they believe that the information on that subsequent page is sufficiently important, or else if they are forced to do so before they can purchase an item[3].As I detail later, it is vital to examine the design of the Wind Report's experiments. Does it place respondents in an experimental setting that sufficiently closely resembles a real world online search for an airline ticket? Only then can we generalize the data from the experiments to the real world.

3. The Evaluation of Alternatives stage is concerned with the manner in which a prospective traveler might assemble the information acquired so as to make a summary evaluation of each alternative along the attributes or dimensions that are important to the traveler. These include relatively concrete attributes such as price, number of stops, and timing of the flight(s) as well as less concrete, more subjective matters such as comfort, reliability of airline, and brand image. In the current case, the experiments in Wind Report focus principally on deception and confusion which are subjective concepts as it relates AA, Expedia and Skiplagged.

On the price attribute, the Wind Report concludes the information acquired from the Skiplagged screenshots in the experiment deceived travelers into believing that Skiplagged's prices were relatively cheaper than AA.com prices for non-hidden city tickets.

On the subjective attributes of deception and confusion, the Wind Report concludes the information acquired from the Skiplagged.com screenshots in the experiment a) deceived site visitors into believing the risk of a hidden city ticket

---

[3] For more information about the dynamic process of online search behavior, see my research publication: Ruitong Wang, Yi Zhu,and George John (2022). Prominent Retailer and Intrabrand Competition. *Journal of Marketing Research*, 59(3), 517-533.

6

was lower than in reality, and b) confused site visitors about the business association between AA and Skiplagged.

4. The Purchase stage is concerned with the manner in which a prospective traveler actually purchases the chosen alternative, including such matters as payment methods, etc. The Wind Report offers no conclusion about these issues, so I shall not elaborate further.

5. The Post-purchase stage is concerned with matters including travelers' feelings, behaviors and responses after their trip. This includes such attributes as satisfaction, and/or dissatisfaction or complaints or compliments on social media. The Wind Report concludes that "… *the findings of our customer experiments*" are validated by the post-travel complaints about Skiplagged made on a) AA.com, b) at Skiplagged.com and c) postings on social media sites, Twitter and Reddit.

## V.   ANALYSIS AND OPINIONS

The Wind Report relies on two different types of information for its three core opinions noted above. First are the data from the experiments. This is supplemented by the Wind Report's reliance on complaint data from AA, Skiplagged, Twitter and Reddit. I analyze these sources of data separately in turn below.

### A.   Wind Report Experiment design does not resemble the real-world customer journeys occurring at Skiplagged.com.

Briefly, in the Wind Report experiments, each person is first asked a series of questions after which they see screenshots of the results returned by either Skiplagged or Expedia for either Santa Ana-Miami or Philadelphia-San Francisco. Then, they are asked a set of questions following which they see screenshots of the corresponding results returned by

7

AA.com for the same city-pair. Following these screenshots, they are asked a further set of questions. There as 4 such groups of people in this experimental design. This sequence of events for each group can be diagrammed as follows:

$$Q_1 Q_2 Q_3 \ldots X_1 Q_n Q_{n+1} \ldots X_2 Q_{n+m}.$$

where each $Q$ represents a question and each $X_1$ and $X_2$ represents two sets of screenshots.

Each person in the experiment is randomly selected to be in one of the 4 groups.

The key data used in the Wind Report to arrive at the deception conclusion are the responses to the set of questions (Q1a in the Wind Report) immediately following the first set of screenshots. In particular, the focus is on the responses of the group that was shown the screenshots of Skiplagged.com search results for Santa Ana-Miami flights that included the hidden city flights. Appendix C-4 of the Wind Report shows these images.  These 4 images were preceded by the following instructions.

"*Imagine that you wanted to book a roundtrip airline flight from Santa Ana to Miami, and you decided to use the Skiplagged website to book flights. Below is the output you received when checking for available flights. Please assume that you selected the flight boxed in red. Please review this information the way that you normally do when reviewing and selecting airline flights online.*"

1. **This Wind experiment design grossly under-represents the very large number of flights returned in the real world customer journey at Skiplagged.com.**

Contrast the number of flights shown in the (Wind Report, Appendix C-4) in the experiment with the flights returned in my real world search at Skiplagged.com (and AA.com)[4] in the Table below for the same city pair. The screenshot below from my search shows only 5 flights,

---

[4] https://skiplagged.com/flights/SNA/MIA/2024-08-03 for the skiplagged.com search and https://www.aa.com/booking/choose-flights/1for the AA.com search. Accessed May 19, 2024

8

but these represent only the first screen of a very large number of screen pages of flights returned by Skiplagged.com requiring me to scroll down repeatedly to see all of the flights.



The differences are substantial, between what I saw on skiplagged.com and what the survey respondents were shown as "representing" the results on the skiplagged.com site. The table below shows over 200 flights returned in my actual search, but the Wind Report respondents were only shown 7 flights (Wind Report Appendix C-4). Notice that the survey respondents were instructed: "*Below is the output you received*" which is a gross under-counting of the reality of the 200 plus flights across 6 airlines returned in my actual customer journey at Skiplagged.com.

| Airline (including codeshare) | Total N of Flights (including codeshare) | N of Hidden City flights | N of Codeshare flights | N of non-hidden city non-codeshare flights |
|---|---|---|---|---|
| Alaska | 6 | 0 | 2 | 6 |
| American | 133 | 34 | 1 | 98 |
| Delta | 10 | 0 | 5 | 5 |
| Frontier | 2 | 0 | 0 | 2 |
| Spirit | 11 | 0 | 0 | 11 |

9

App'x 104

| United | 79 | 0 | 7 | 72 |

- Over 200 flights are offered across 6 airlines, including codeshare flights.
- The 34 hidden city (skiplag) constitute about 15 percent of all flights offered.
- All 34 hidden city flights are on American Airlines.
- Prices range from $116 on Frontier (non-hidden  flight) all the way up to $1,222 on Alaska Airlines (also non-hidden city; not shown in picture)
- The cheapest hidden-city flight is on American Airlines at a $168 price.

10

The corresponding first page screenshot from AA.com is shown below.



The AA.com site returns a) fewer flights, and b) shows no hidden city flight ticketing options. When you consider matters from this lens, Skiplagged's website is at least thematically providing customers or potential customers with more information about prices and consumer options, enabling consumer choice - rather than limiting choice. The cheapest flight AA.com shows is $294, versus the AA flight at $168 shown on skiplagged.com (including hidden city).

11

In sum, the Wind experiment design does not even come close to recreating the actual customer journey at Skiplagged.com with respect to the number of flights. This seriously jeopardizes my confidence in generalizing data from the Wind experiment to the real world customer journeys occurring at Skiplagged.com.

2.     **The Wind experiment fails to include several other elements of the real-world customer journeys at Skiplagged.com**

The 4 images in the Wind experiment are shown to the respondents without requiring them to interact with the returned results. This is in stark contrast to the actual customer journey at Skiplagged.com. Below, I show the pop-up box returned by Skiplagged when I clicked on my selected flight on the first screen (i.e., the $168 American Airlines flight which is the 3rd from the top of the page of flights).

It explains that the flight has a Miami-Tampa leg which is crossed out. Clicking the "Book Now" blue button returns the pop-up box below.

## Important information about your flight!

This is a **hidden city ticket**!
That means you get out in Miami (MIA) and skip the following flight(s).

**Backpack only**
We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Tampa!

☐ I understand that I cannot check my bag(s)

☐ I have read and understood these notes.            Proceed

Checking the box "I understand I cannot check my bag(s)" returns the following pop-up.

13

## Important information about your flight!

This is a **hidden city ticket**!
That means you get out in Miami (MIA) and skip the following flight(s).



**Backpack only**
We recommend only bringing a backpack that can fit under the seat in front of you. Anything larger risks getting checked at the gate, and all checked bags will end up in Tampa!

☑ I understand that I cannot check my bag(s)



**Bad weather**
In rare times of irregular operations such as bad weather, your itinerary may change at the discretion of the airline. If that happens, ask to be changed to a similar itinerary!



**Angry airlines**
Airlines don't like when you miss flights to save money so don't do this often.

☐ I have read and understood these notes.                    Proceed

Notice this is the same pop up as previously, except that the two previously greyed out pieces of information ("Bad Weather" and "Angry Airlines") are now uncovered. Again, to proceed further, I have to click the box "I have read and understood these notes" and then click on the blue "Proceed" box, which returns the following screen.

14

App'x 109



In sum, the multiple affirmative acknowledgements required of the customer upon selecting a hidden city ticket at Skiplagged.com are completely missing from the Wind experiment which purports to resemble the customer journey for online ticket searches. In the Wind experiment, respondents view each image passively. This lack of correspondence between the dynamic interactions in the real-world customer journey at Skiplagged.com versus the passive viewing of 4 screenshots in the Wind experiment makes it improbable that data from this experiment can tell us about the real-world journeys occurring at Skiplagged.com. I also question whether survey respondents would have changed their responsive entries, which entries Wind inappropriately interpreted as evidence of deception, had the survey respondents seen these additional pages with required acknowledgements of the disclosed "Important information".

15

**B.**     **The measurement of subjective concepts like deception and confusion in the Wind experiment does not resemble accepted practice and methodology.**

The Wind Report offers opinions about relative prices, deception and confusion. Prices are observable and objective, whereas deception and confusion are subjective concepts that are not directly observable. As many matters in Marketing (as well as Psychology and elsewhere) involve such subjective concepts, over the last several decades, a generally accepted method has evolved which is commonly used in practice.[5] There are three important elements to developing methodologically acceptable measures of a subjective construct like deception or confusion: (a) the concept must be properly defined, (b) based on this definition, a scale preferably comprised of multiple closed ended questions/statements is developed, and (c) evidence of its stability is reported. I assess whether the Wind Report follows these practice elements.

---

[5] For a general introduction to this methodology, see this foundational study cited over 26,000 times according to Google scholar citiations. Gilbert A. Churchill Jr., "A paradigm for developing better measures of marketing constructs." *Journal of Marketing Research* 16.1 (1979): 64-73.
https://scholar.google.com/scholar?cluster=12768929774295200726&hl=en&as_sdt=5,44&sciodt=0,44 accessed May 19, 2024.

1.   **The measure of deception employed in the Report lacks any of the 3 elements of an acceptable measure of a subjective concept.**

Consider Exhibit 3d of the Wind Report, which presents the sole measure of deception

**Exhibit 3d**
**Open-ended description of offering (to a friend) – (Open Ended Coded) – Deception**
**Q1a/b AND all OE Questions**

| Based on | % of Confused Consumers | | | |
|---|---|---|---|---|
| | Test | Control | Test | Control |
| | Skiplagged Ticket (n=146) | Expedia Ticket (n=155) | Skiplagged Hidden City Ticket (n=144) | Expedia Ticket (n=155) |
| **Q1a/b** | | | | |
| There is deception | 4.8% | NA | 89.6% | NA |
| There is not deception | 95.2% | NA | 0.7% | NA |
| Ambiguous | 0% | NA | 9.7% | NA |
| **All OE Questions** | | | | |
| There is deception | 29.5% | NA | 63.2% | NA |
| There is not deception | 69.2% | NA | 27.8% | NA |
| Ambiguous | 1.4% | NA | 9.0% | NA |

**There is deception:**
- ☐   For Non-Hidden City ONLY: Skiplagged (Expedia) is cheaper than American Airlines
- ☐   **For Hidden City:** Consumer doesn't understand that there are meaningful risks associated with the ticket (financial penalties, not being able to fly on airline, etc.)

**There is not deception:**
- ☐   **For Hidden City:** Consumers understand at least one meaningful risk (beyond needing to pack a carry on) AND think the risks are worth it

**Ambiguous**
- ☐   If unclear based on responses
- ☐   **For Hidden City:** If only mention less meaningful risks (can't check a bag)

developed from the experiments. I have reproduced Exhibit 3d below. The measure was apparently

developed as follows.

Respondents in the experiment were asked the following question after being shown the 4

screenshots described in Wind Report Appendix C-4, which I discuss in Section V.A above:

*Q1a/b: How would you describe the offering on this website to a friend?*
*Please enter your response below and be as detailed as possible or select "Don't know."*

Notice they were asked to respond in their own words, i.e. this is an open-ended question. To

illustrate, Appendix C-7 reports the verbatim response of one person, Respondent #742.

"THAT ITS EASY TOO (sic) SEE AND USE".

17

In some unidentified fashion, each person's text response was converted into one of the three discrete categories in Exhibit 3d (i.e., there is deception/ there is not deception / ambiguous). Of the 144 people who saw the Skiplagged.com hidden city ticket screenshot of Santa Ana-Miami flights, 89.6% (i.e., about 129 people) were classified as having responded "There is Deception" category. It should be stressed that the respondents did not employ these terms themselves. Dr. Wind and/or his associates developed these terms. This is a problematic measure development approach for several reasons if we consider the 3 elements of an acceptable measure.

### a. There is no definition of deception (or confusion) provided.

The accepted practice is to first provide a definition of the two concepts (i.e., deception and confusion). The literature provides definitions of both these concepts. To illustrate, in my own research, I have developed a measure of "opportunism" in business-to-business dealings based on the definition of opportunism as "self-interest dealing with guile" [6]. Likewise, confusion has been defined in the literature as the likelihood one object is mischaracterized or perceived as another object because of their similarity in attributes.[7] Despite the availability of definitions of these concepts, no definition of either concept is offered in the Wind Report.[8] Neither are we told whether the coders of the text responses were provided with any definition of

---

[6] Mahoney, J.T. (2016). Opportunism. In: Augier, M., Teece, D. (eds) The Palgrave Encyclopedia of Strategic Management. Palgrave Macmillan, London. https://doi.org/10.1057/978-1-349-94848-2_588-1
[7] Loken, B., Barsalou, L.W., & Joiner, C. (2008), "Categorization Theory and Research in Consumer Psychology: Category Representation and Category-Based Inference." In C.P. Haugtvedt, F. Kardes, & P. Herr (Eds.). Handbook of consumer psychology (pp. 133-163). Mahwah, NJ: Lawrence Erlbaum Associates.
[8] I note that the consumer complaints section of the Wind Report offers a definition of Deception, which itself includes the notion of confusion. "Deception - any complaint where the customer misunderstood what they were buying. This included where the customer is confused because their itinerary has an extra leg beyond where they plan to get off; where the customer did not get the necessary visa or bring a passport for a ticket with where final destination is international; where the customer does not understand why they couldn't check a bag; where the customer complains that they paid more booking through Skiplagged versus booking directly. This category also included complaints about consumer consequences, such as: did the customer get denied boarding; was the customer prevented from checking-in; did the customer have to rebook and pay a higher price; did the customer lose baggage when it was checked through to the destination; and any other instance where the customer had harm/loss/consequences as a result of their hidden city ticket." Wind Report page 28-29.

18

deception. Indeed, Exhibit 3d itself conflates confusion and deception. Notice that the banner heading of the exhibit itself response reads "% of Confused Customers", not "% of Deceived Customers".

> **b.    Instead of the preferred closed-ended responses, the Wind Report employs open-ended responses, but there is no systematic procedure reported that was used to convert the open-ended textual responses into categories.**

Following the creation of a definition, the next step is to develop closed-ended responses that fit with the definition. Closed-ended responses are preferred over open-ended responses as the latter introduce more variations due to heterogeneous language usage and meaning across respondents. To illustrate, a simple, straightforward measure would have been to employ a statement such as "I find that this site misleads me" to which the surveyed individual can either agree or disagree.

Curiously, while the Wind experiment survey employed many such closed-ended questions elsewhere, in this important instance of measuring deception, it chose to employ the open-ended question in Q1a reproduced above.

In the suboptimal situation in which an open-ended question is decided upon, the standard practice to convert these into categories is for the experimenter and coders to first develop a coding scheme through an iterative process where the coder and the experimenter agree as to which types of text responses fit the definition of deception.

No such coding scheme development procedure is reported in the Wind Report. Instead, the brief description provided in the Wind Report (page 26) alludes to a procedure involving

19

"*(a) ... two independent coders who were not familiar with the objective of the study or its sponsors, and (b) a procedure for resolving conflicts between the two coders*".

### c.  No evidence of the stability of the measures of deception and confusion is presented.

The stability (or reliability) of the measure of subjective concepts is extremely important to judge the acceptability of a measure. Basically, multiple ways of measuring the concept should correlate to an acceptable degree. The Wind Report does not report any stability evidence. How much agreement was there between the two coders and how were conflicts resolved? It is hard to imagine that there were not significant issues of this variety, especially in the absence of a definition of deception.

To sum up, the method and practices in the Wind Report employed to develop the measures of deception and confusion do not resemble accepted practice. As such, these data cannot be relied upon to accurately describe the survey respondents' answers.

### C.  Wind Report Data Analysis of Hidden City Ticket Risk Deception concedes that no meaningful risk perception exists in the responses.

There are two sets of data in the Wind Report regarding customers' perceptions of the risks of a hidden city ticket. These include responses to the closed end question (Q12c) as well as the open-ended questions (Q12e-f) posed to customers after they viewed the screenshot of the hidden city tickets (i.e., $X_1$ in the diagram of the sequence of events in the experiment).

Exhibits 9a and 10a of the Wind Report apparently form the basis for the conclusion that *".... vast majority of the respondents do not perceive any meaningful risks*" with hidden city tickets. I concur. It is hard to conceive of deception about hidden city ticket risk on Skiplagged's part if no meaningful risk is reported by survey respondents *unless* the risks about hidden city tickets

20

have been explicitly misrepresented or else effectively shrouded from view altogether by Skiplagged. I examine this possibility of shrouding relevant information immediately below.

**1.      Skiplagged.com does not shroud hidden city ticket details. To the contrary, tt affirmatively requires its site visitors to acknowledge understanding important aspects of hidden city tickets prior to booking.**

The Wind Report concludes that Skiplagged "*deceives consumers of hidden city tickets by not effectively disclosing to them all of the serious risks*….". However, first, there is no meaningful risk reported by people in the experiment as conceded by the Wind Report (see above). Moreover, to the degree my basic testing can serve the purpose of displaying a shortcoming of the survey provided in the Wind Report, I have shown that that Skiplagged.com directs all site visitors who click on any of its hidden city flight results to a disclosure page. On this page, the visitor must affirmatively respond to having understood the disclosed conditions before being put through to the booking and payment page. Below I have reproduced this disclosure of conditions page from my own visit to Skiplagged.com.[9] I arrived at this page by clicking on the cheapest Santa Ana-Miami Skiplagged flight ($168) on the search results page.

---

[9] https://skiplagged.com/flights/view/ad210bb779c09f516ba70cdb285aa1dd . Accessed May 17, 2024



### D.    Wind Report presents no Experiment data for its conclusion that Skiplagged deceives customers about relative prices.

There is no data presented in the Wind Report that "*Skiplagged deceives customers into believing that …. a regular non-hidden city ticket on Skiplagged.com   is cheaper*…" than a corresponding ticket from AA.com. Apparently, this is based on Exhibit 7 which reports the responses to Q8 which is posed to respondents after showing them the screenshot of the flights from Skiplagged.com.

In Exhibit 7, the majority of respondents (70.1%) checked the option "*Buying tickets through Skiplagged is cheaper than buying directly from the airline*" as their response to Q8 regarding hidden city tickets. However, these are two problems that disallow us from employing this result to support a price deception conclusion:

1. First, notice respondents are responding to Q8 after seeing the Skiplagged.com search results screenshot, but prior to the AA.com search results screenshot. As such, they are

22

responding to Q8 by making a judgement as to the predicted or expected price at the corresponding airline site. Skiplagged.com does not make any such assertion about relative prices but merely presents its search results ordered by price or any other filter similar to virtually all online search results presentation. It makes no comparison about any relative prices on its site vis a vis any other specific site or airline.

2. Skiplagged.com's positioning is very apparent on its main landing page, which I have reproduced below. It invites you to search their site where you can:



*"Find flights the airlines don't want you to see.*
*We're exposing loopholes in airfare pricing to save you money."*



This invitation to search across more flights makes a great deal of sense as a positioning strategy as it is common knowledge that airline prices vary greatly across airlines for different city-pairs, and over time even for the same airline and city-pair. For instance, the Wind Report itself notes that its own 200 searches at Skiplagged.com yielded different hidden city prices with an average difference of $62.46 between Skiplagged.com and AA.com favoring the former, but oddly the Wind Report does not report the distribution of the various results. My own search results at Skiplagged.com reported above discovered fares for Santa Ana-Miami flights varying from

23

$116 (Frontier) to $1,222 (Alaska Airlines). The hidden city flight prices on AA.com for the same city-pair and date also varied enormously.

In such environments and marketplaces, the positioning advantage grows with a greater number of flight alternatives presented. In this respect, a 3rd party site such as Skiplagged.com has the advantage of showing many more fares than any single airline's site. For instance, my search results table above from my own query on Skiplagged.com for Santa Ana-Miami flight alternatives yielded 6 airlines offering over 200 flights.

To sum up, there is no evidence in the Wind Report that Skiplagged.com confuses customers about the relative prices on its site versus that provided on AA.com. From my short testing, I did not find that Skiplagged made any claim about expected prices differences. Instead, Skiplagged.com seems rather to invite customers to search its deeper, more varied set of ticket alternatives. There is no data in the Wind Report that customers' lack of knowledge about the AA-Skiplagged.com business relationship has any negative impact on consumers.

The Wind Report reports from its analysis of responses to questions (Q3, 4, 7) posed after showing respondents the Skiplagged.com search results screenshot that "*an overwhelming number of respondents (73% - 76%) believe Skiplagged is affiliated with AA. This is only slightly below the belief as to Expedia (AA's actual authorized agent)*". Apparently, this the basis on which the Wind Report offers the conclusion that Skiplagged.com "*confuses customers that* (it) *is associated with or authorized by American ….*".

There are several problems with this interpretation of these responses. I consider them in turn.

24

1.    **"Associated," "affiliated" and "authorized agent" are not defined anywhere in the Report and these contract details are not available to ordinary consumers.**

Terms such as "Authorized agent" are typically defined in lengthy business agreements and contracts between firms. However, customers have no access to these contracts, so it is unsurprising that Exhibit 4 shows the "Don't Know" response was the largest single category of response of the hidden city ticket group to Q2 ("*Does the company that operates this website have a business connection or association with another company, or do you not kn*ow?").[10]

In the current case, each surveyed individual purchasing a hidden city ticket sees that the actual travel is to be completed on an aircraft flown by the airline on a ticket with a confirmation number issued by the airline. Notice that customers are not relying on Skiplagged.com's assertions, but instead, the presence of cues such as this one.

The lack of consumer knowledge of upstream business contracts is pervasive in the business world, as is certainly not limited to the instant situation with Skiplagged. Consider a McDonald's outlet. The majority of outlets are franchisee-owned whereas a minority are company-owned, but few customer would know the status of any individual outlet at which they are ordering/dining. Similarly, some cell phone outlets are franchised whereas others are dealer-operated. Customers care about the price and non-price attributes of the products and services on offer at each outlet, and care less so, or not at all, about the business-to-business contracts and arrangements that lead to the offers. If one type of arrangement is more appealing, they will patronize that type of outlet. Earlier in Section V.D, I observed that the comparative advantage of third party sites like Skiplagged.com is a willingness to show flights from multiple airlines as well

---

[10] Q2 is actually phrased as reported above, but incorrectly reported in Exhibit 4 as "Associated or connected with *airline*" (emphasis added).

as flights that are not shown on airlines' sites (viz. hidden city flights) – in other words, the transparency provided by sites like skiplagged.com, and its provision of different options, or customer-choice, is a highly-valued driver of customer satisfaction. This is the important issue, not the business contract between Skiplagged.com and the airline.

### 2. Does any supposed confusion, by customers, of Skiplagged.com's possible links to American Airlines impact their risk perceptions of hidden city tickets?

Regardless of customers' depth of knowledge of the business relationship between Skiplagged.com and American Airlines, the relevant issue is whether hidden city tickets on offer at Skiplagged.com are represented by Skiplagged deceptively, leading to a fallacious perception of risk. In this respect, as I detail in Section V.A.3, Skiplagged.com requires customers to read and affirmatively check their understanding of the conditions of hidden city ticket, so there is no evidence of deception or withholding of important conditions

In sum, regardless of whether customers are aware of the exact contractual details between Skiplagged.com and American Airlines, there is no evidence that Skiplagged is deceptively creating customer confusion about the conditions of hidden city travel.

### E. Wind Report's customer complaint data do not support its deception or confusion opinions

The Wind Report provides numerical counts from two databases of customer complaints (AA.com, Skiplagged.com) that were supposedly assembled to "*validate the findings of our customer experiments*". Briefly, these numerical complaint count data are as follows:

> 1. AA.com customer complaint database from 1/1/2018 – 3/6/2024 identified *"… 88 complaints with the terms "Skiplagged" or "Skiplag". Eighty (80) of the complaints dealt with Hidden City."*.

> 2. The Skiplagged database identified a projected " *…12,000 … complaints* (that) *reflect deception and/or confusion*

26

To put the AA.com customer complaints into context, I examined the US Transportation Department's data on American Airlines passenger counts from 2018 through first 2 quarters of 2024 which shows the following counts:[11]

| Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Q1Q2 2024 |
|------|------|------|------|------|------|------|-----------|
| Passengers | 119,470,872 | 126,030,910 | 56,669,769 | 99,205,171 | 120,511,656 | 130,872,470 | 20,478,913 |

The 88 complaints to AA.com are a vanishingly small fraction (0.00000013) of the millions of passengers flown by American Airlines in that period (673,239,761). This tiny fraction indicates there is not a material issue of complaints to American Airlines emanating from Skiplagged or Skiplagged.com bookings.

Turning to the Skiplagged com database, the magnitude of the 12,000 of the 30,658 emails to Skiplagged.com's customer support emails described in the Wind Report as reflecting "…*deception and/or confusion*" cannot be interpreted without knowing the number of tickets booked on skiplagged.com. However, given the millions of customers flown by American Airlines, even this number appears very small.

In sum, the small evidence I have considered does not indicate to me that deception or confusion associated with Skiplagged.com bookings generates any material number of customer complaints to AA.com.

---

[11] https://www.transtats.bts.gov/Data_Elements.aspx?Data=1. Accessed May 18, 2024

F. **Wind Report description of the limited number of customer postings to social media are merely illustrative, and do not permit any conclusion about any material extent of deception or confusion**

The Twitter and Reddit social media posts assembled in Exhibit 18 are also few (total of around 50) in number. Given the millions of customers who fly on American, and the millions of people who use social media, this is a vanishingly small number as well and likely unrepresentative, as a sample.

VI. **CONCLUSION**

My examination of the experiments and data on customer complaints and social media postings in the Wind Report establishes that the three principal opinions of the Wind Report lack meaningful support.

Dr. Wind is mistaken when he concludes that his data from his experiment shows that "*Skiplagged deceives consumers of hidden city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden city tickets*". The major deficiencies with this conclusion are that a) deception and/or confusion is not defined in the Wind Report so the responses to his questions posed in the experiment do not provide a test of deception, b) the Wind Report itself concedes consumers report no meaningful risk with hidden city tickets, and c) Skiplagged affirmatively requires customers to view and respond to pop-ups describing the conditions of a hidden city ticket before completing a booking so I do not see any evidence of deception by withholding information. Finally, Dr. Wind's own analysis of the customer complaint database at American Airlines shows a vanishingly small fraction of post-travel complaints (88 out of 673 million passengers) on this topic.

28

Dr. Wind is mistaken when he concludes that his data from his experiment shows that "*Skiplagged deceives consumers into believing that purchasing a regular, non-hidden city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly*". The major deficiencies with this conclusion are that a) the hugely varying prices for any city-pair across airlines and across time for the same airline makes would make the making of such a claim by Skiplagged illogical, if it were indeed made, and b) Skiplagged makes no such claim; instead it claims to offer a wider set of flights from multiple airlines including hidden city tickets not visible on airline sites.

Dr. Wind is mistaken when he concludes that his data from his experiment shows that "*Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American …*". The major deficiencies with this conclusion are that a) these contractual terms are unfamiliar to customers who generally lack any visibility into the contracts between business, and b) notwithstanding consumers' lack of knowledge, the Wind Report does not show any confusion arising from Skiplagged's presentation of hidden city tickets.

_____

Professor George John, May 20, 2024

29

# EXHIBIT A

### PROFESSOR JOHN GEORGE CURRICULUM VITAE

**Name**          George John
**Office Address**    Marketing Department
                     Carlson School of Management
                     University of Minnesota, Twin Cities
                     321, 19th Avenue South
                     Minneapolis, MN 55455
                     ph. 612 624-5055 (office);
                     e-mail: johnx001@umn.edu

**Home Address**    12464, 54th Avenue N
                     Plymouth, MN 55442
                     ph. 612-210-7461 (cell)
                     email: johnx001@gmail.com

**Education**

PhD (1981)          Northwestern University (Marketing)
                     Evanston, IL

MBA (1976)         University of Illinois at Urbana-Champaign
                     Urbana, IL

B. Tech (1974)     Indian Institute of Technology (Aeronautical Engineering)
                     Madras, India

**Faculty Positions**

*University of Minnesota Twin Cities, Minneapolis, MN 55455*

1992–present      Professor of Marketing, Carlson School of Management
                     (Endowed Positions: Curtis L. Carlson Research Professor 1998-2002;
                     General Mills/Paul S. Gerot Chair in Marketing 2002-present)
1987–1992          Associate Professor of Marketing, Carlson School of Management

*University of Wisconsin, Madison, WI 53562*

1980–1987          Assistant Professor, Graduate School of Business

*Northwestern University, Evanston, IL 60201*

1979–1980          Lecturer, Kellogg Graduate School of Management

30

**Administrative Positions**

*University of Minnesota Twin Cities, Minneapolis, MN 55455*

June 2011–Jan 2015   Senior Associate Dean, Carlson School of Management
                                    (Responsible for Budget, Hiring, Promotion, and Tenure)

June 2007–June 2011 Marketing Department Chair, Carlson School of Management

**Consulting and Expert Witness Experience**

Consultant to various companies on diverse topics, including distribution channels and salesforce issues. Expert witness on deregulation, business-to-business marketing, distribution channels, sales forces, customer confusion and technology marketing. Testified in Federal, State Courts, Administrative Hearings, and Arbitration Panels.

**Academic Awards and Honors**

1.   "Highly Cited Researcher" in Business/Economics Category, ISI Web of Science (http://www.isihighlycited.com) 2002-present.

2.   Lifetime Achievement Award, Inter-Organizational Relations Special Interest Group, American Marketing Association, August 2010.

3.   Invited Faculty, American Marketing Association Doctoral Consortium, 1991, 1992, 1993, 1996, 1999, 2002, 2003, 2004, 2008, 2013, 2014, 2015, 2022, 2023.

4.   Louis W. Stern Prize, American Marketing Association for significant contribution to the literature on marketing and distribution channels, August 2013.

5.   Invited to present at the Symposium to Honor Oliver E. Williamson for the Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel, Norwegian School of Management, Oslo, December 2009.

6.   Prize-Winning Entry, Ph.D. Dissertation Competition, American Marketing Association, 1981.

**Teaching Interests**

Principles of Marketing, Marketing Strategy, Distribution Channels, Pricing, and Technology Marketing in the Undergraduate, MBA, PhD, and non-degree Executive Development programs of the Carlson School. Corporate programs for various corporations including Exxon-Mobil and 3M.

**Research Interests and Impact**

As of September, 2022, my publications have received 21,036 Google Scholar Citations. Digital Channels, Salesforce Contests, Supply Networks, and Technology Marketing issues are among my current areas of inquiry.

**Peer-reviewed Journal Publications**

1. "The Reliability and Validity of Key Informant Data from Dyadic Relationships in Marketing Channels," (with T. Reve), *Journal of Marketing Research,* (November) 1982.

   Reprinted in *Measurement Readings for Marketing Research,* J. Paul Peter and M. L. Ray (Eds.), American Marketing Association, Chicago, IL, 1984.

2. "Organizational Structure Effects on the Credibility and Utilization of Marketing Plans," (with J. Martin), *Journal of Marketing Research,* (May) 1984.

3. "An Empirical Investigation of Some Antecedents of Opportunism in a Marketing Channel," *Journal of Marketing Research,* (August) 1984.

4. "An Organizational Coordination Model of Sales Compensation: Theoretical Analysis and Empirical Test" (with A. Weiss and B. Weitz), *Journal of Law, Economics and Organization,* (Fall) 1987.

5. "The Role of Dependence Balancing in Safeguarding Transaction-Specific Assets in Conventional Channels," (with J. Heide), *Journal of Marketing,* (January) 1988.

6. "Forward Integration into Distribution: An Empirical Test of Transaction Cost Analysis," (with B. Weitz), *Journal of Law, Economics and Organization,* (Fall) 1988.

7. "Sales Compensation: An Empirical Investigation of Factors Related to the Use of Salary versus Incentive Compensation," (with B. Weitz), *Journal of Marketing Research,* (February) 1989.

   Finalist (top 5) in William O'Dell Best Paper Award balloting at the Journal of Marketing Research.

8. "Alliances in Industrial Purchasing: The Determinants of Joint Action In Buyer-Supplier Relationships," (with J. Heide), *Journal of Marketing Research,* (February) 1990.

9. "Unbundling of Industrial Systems," (with L. Wilson and A. Weiss), *Journal of Marketing Research,* (May) 1990.

10. "Performance Outcomes of Purchasing Arrangements on Industrial Buyer-Vendor Relationships," (with T. Noordeweir and J. R. Nevin), *Journal of Marketing,* (October) 1990.

11. "Do Norms Matter in Marketing Relationships?" (with J. Heide), *Journal of Marketing,* (April) 1992.

12. "Using Exclusive Territories When Dealers Can Bootleg," (with S. Dutta and M. Bergen), *Marketing Science,* (Spring) 1994.

13. "Understanding Dual Distribution: The Case of Reps and House Accounts," (with S. Dutta, M. Bergen and J. Heide), *Journal of Law, Economics, and Organization,* (April) 1995.

14. "Combining Laboratory Markets with Industry Data in Transaction Cost Analysis: The Case of Licensing," (with S. Dutta), *Journal of Law, Economics, and Organization,* (April) 1995.

15. "Variations in the Contractual Terms of Cooperative Advertising Contracts: An Empirical Investigation," (with S. Dutta, M. Bergen and A. Rao), *Marketing Letters*, 6 (1), 1995.

16. "Understanding Participation Rates in Coop Plans In Conventional Channels," (with M. Bergen), *Journal of Marketing Research, (*April) 1997.

17. "Understanding Institutional Design within Marketing Value Systems," (with S. Carson, T. Devinney and G. Dowling), *Journal of Marketing*, 63 (Special Issue) 1999.

18. "Marketing Strategy Implications of Governance Value Analysis," (with M. Ghosh), *Journal of Marketing,* 63 (Special Issue) 1999.

19. "Marketing in High-technology Markets: Towards a Conceptual Framework," (with A. Weiss and S. Dutta), *Journal of Marketing*, 63 (Special Issue) 1999.

20. Experimental Test of Agency Models of Sales Compensation (with M. Ghosh), *Marketing Science*, 19 (4) (Fall) 2000.

21. "When Does Vertical Coordination in Improve Industrial Purchasing Relationships," (with A. Buvik), *Journal of Marketing,* 64 (4) (October) 2001.

22. "Information Processing Moderators of the Effectiveness of Trust Based Governance on Performance in Interfirm R&D Collaboration," (with S. Carson, A. Madhok and R. Varman), *Organization Science*, 14 (1) (Jan/Feb) 2003.

23. "Strategic Fit in Purchasing Alliances", (with M. Ghosh), *Journal of Marketing Research,* Vol. 42, 3, (August) 2005.

> Awarded the Louis Stern Prize in 2013 for significant contribution to the literature on marketing and channels of distribution between three and eight calendar years after publication.

24. "Assessing the Effects of a Channel Switch", (with O. Narasimhan and X. Chen), *Marketing Science*, Vol. 27, No. 3, (May-June) 2008.

25. "Learning from a Service Guarantee Quasi-Experiment", (with X. Chen, A. Hill, J. Hays, S. Guers), *Journal of Marketing Research*, Vol. 46, 5 (October) 2009.

33

26.    "Understanding the Role of Trade-Ins in Durable Goods Markets: Theory and Evidence", (with O. Narasimhan and R. Rao), *Marketing Science,* Vol. 28, 5 (September) 2009.

27.    "When Should Original Equipment Manufacturers Use Branded Component Contracts with Suppliers?" (with M. Ghosh), *Journal of Marketing Research*, Vol. 46, 5 (October) 2009.

28.    "An Empirical Investigation of Private Label Supply by National Label Producers," (with X. Chen and O. Narasimhan), *Marketing Science*, Vol. 29, 4, 2010.

29.    "Transaction Cost Analysis in Marketing: Looking Back, Moving Forward," (with T. Reve), *Journal of Retailing*, Vol. 86, 3, Special Issue of Journal of Retailing in Honor of The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2009 to Oliver E. Williamson, (September) 2010.

30.    Bonuses vs. Commissions: A Field Study (with S. Kishore, R. S. Rao and O. Narasimhan), *Journal of Marketing Research* Vol. 50, No. 3, 2013.

       Awarded Best Paper Award, Sales Management Special Interest Group, American Marketing Association, 2014.

31.    A Theoretical and Empirical Investigation of Property Rights Sharing in Outsourced Research Development and Engineering Relationship (with S. Carson), *Strategic Management Journal,* Vol. 34, Issue 9 (September) 2013.

32.    Understanding Value-Added Resellers' Assortments on Multicomponent Systems, (with S. Ray and M. E. Bergen), *Journal of Marketing*, Vol. 80, No. 5, (September) 2016.

33.    Is Cash King for Sales Compensation Plans? A Large-Scale Field Experiment (with M. Viswanathan, X. Li, and O. Narasimhan), *Journal of Marketing Research,* Vol. 55 No. 3 (June) 2018.

34.    Economic Impact of Category Captaincy: An Examination of Assortments and Prices, (with M. Viswanathan, and O. Narasimhan), *Marketing Science*, 40 (2) 2021.

35.    Commentary: Governing Technology-Enabled Omnichannel Transactions.(with L. Scheer) *Journal of Marketing*, 85 (1) 2021.

36.    Do Activity-Based Incentive Plans Work? Evidence from a Large-Scale Field Intervention (with R. S. Rao, M. Viswanathan and S. Kishore) *Journal of Marketing Research*, 58 (4) 2021.

37.    Search Prominence and Intra-brand Competition, (with R. Wang and Y. Zhu) *Journal of Marketing Research*, 59 (3) 2022.

**Conference Proceedings**

1.  "Construct Validity in Marketing: A Comparison of Methods in Assessing the Validity of the Affective, Cognitive and Conative Components of Attitude," (with T. Reve), in *Advances in Consumer Research,* W. L. Wilkie, (Ed.), Vol. 6, Ann Arbor. MI: Association for Consumer Research, 1979.

2.  "Reliability Assessment: Coefficients Alpha and Beta," (with D. L Roedder), in *Educators' Conference Proceedings,* K. L. Bernhardt et al, (Eds.), Chicago, IL: American Marketing Association, 1981.

3.  "An Empirical Investigation of the Serial Structure of Scripts," (with J. C. Whitney), in *An Assessment of Marketing Thought and Practice,* B. J. Walker, (Ed.), Chicago, IL: American Marketing Association, 1982.

4.  "The Effects of Personal Selling: An Industrial Organization Economics Approach," (with B. Gaidis and M. Levas), in *An Assessment of Marketing Thought and Practice,* B. J. Walker (Ed.), Chicago, IL: American Marketing Association, 1982.

5.  "An Experimental Investigation of Intrusion Errors in Memory for Script Narratives," (with J. C. Whitney), in *Advances in Consumer Research,* R. P. Bagozzi and A. M. Tybout, (Eds.), Ann Arbor, MI: Association for Consumer Research, 1982.

6.  "The Effects of Technical Innovation on Inter-Firm Relationships," in *Winter Educators' Conference Proceedings,* M. J. Houston and R. Lutz (Eds.), Chicago, IL: American Marketing Association, 1985.

7.  "The Role of Information Uncertainty, Disconfirmation, and Disclosure Regulations as Determinants of Consumer Satisfaction," (with J. Nevin), *Educators' Conference Proceedings,* T. A. Shimp et al, (Eds.), Chicago, IL: American Marketing Association, 1984.

8.  "Leapfrogging Behavior and the Purchase of Industrial Innovations: Theoretical Analysis and Empirical Evidence," (with A. Weiss), *Marketing Science Institute Technical Working Paper,* Report No. 89-1 10, July 1989.

**Other Publications**

1.  Book Review of "A Second Generation of Multivariate Analysis," Vol. I (Methods) and Vol. 11 (Measurement), C. Fornell (Ed.), New York: Praeger, 1982, in *Journal of Marketing Research,* May, 1984.

2.  Book Review of "Multivariate Data Analysis," B. Jackson, Homewood: Richard Irwin, 1982, in *Journal of Marketing Research,* May, 1984.

3.     "The Governance of Exclusive Territories when Dealers can Bootleg," *Proceedings of Conference on Corporate Strategy and Corporate Governance,* Carlson School of Management, University of Minnesota, October, 1990.

4.     "Measurement Issues In Research On Inter-Firm Relationships," (with J. Heide), in *Business to Business Marketing: A Network Approach,* D. Wilson and K. Möller (Eds.), Amsterdam: Kluwer Publishers, 1995.

5.     "The Competitiveness of the Twin Cities Metropolitan Area and the Minneapolis-St. Paul International Airport: Building and Using a Knowledge Base," (with M. Zaidi, R. Johns, F. Beier, W. Maki, G. McCullough, L. Iacovo, S. Qi), Report No. CTS 01-03, *Center for Transportation Studies*, University of Minnesota, Minneapolis, 2001.

6.     "Designing Price Contracts for Procurement and Marketing of Industrial Equipment" in *Review of Marketing Research*, Volume 4, Naresh K. Malhotra (Ed.), Armonk, NY: M. E. Sharpe, 2007.

7.     "Progress and Prospects for Governance Value Analysis in Marketing: When Porter meets Williamson", in *Handbook of Business-to-Business Marketing*, Gary Lilien and Rajdeep Grewal (Eds.), Cheltenham, UK: Edward Elgar, 2012.

8.     "A Transaction Cost Approach to Channel Design with Application to Multi-Channel Settings", (with M. Viswanathan and M. Ghosh) in *Handbook of Research on Distribution Channels*, Charles Ingene, James Brown and Rajiv Dant (Eds.), Cheltenham, UK: Edward Elgar, 2019.

9.     "Porter Meets Williamson in 2022: Governance Value Analysis and Its Implications in a World of Digital Technologies", (with Mrinal Ghosh) in *Handbook of Business-to-Business Marketing*, 2nd Edition, Gary Lilien, J. Andrew Peterson and Stefan Wuyts (Eds.), UK: Edward Elgar, 2022.

**Presentations**

1.     "The Use of the Key Informant Approach in the Analysis of Marketing Channels," *Distinguished Lecture Series,* Graduate School of Management, University of California at Los Angeles, January, 1982.

2.     "The Political Economy of Vertical Marketing Systems: Transaction Costs Considerations," *Current Trends in Distribution Research,* European Institute for Advanced Studies in Management, Brussels, Belgium, May, 1982.

3.     "Transactions Costs Determinants of Salesforce Compensation and Control," *Empirical Applications of Transactions Costs Analysis,* The Wharton School, August, 1983.

36

4.    "Construct Validity Tradeoffs in Estimating Measurement Error," (with G. A. Churchill), *American Marketing Association Educators' Winter Conference,* Ft. Lauderdale, FL, February, 1984.

5.    "Control Mechanisms and Industrial Sales Productivity: The Effectiveness of Incentives," Surveillance, and Organizational Culture, (with B. Weitz), *Marketing Science Conference,* Chicago, March, 1984.

6.    "Measurement Model Specification Issues in Using LISREL:," *American Marketing Association Educators' Summer Conference,* Chicago, August, 1984.

7.    "Consumer Confusion in the Marketplace," Roundtable Program on Consumer Confusion in the Changing Telecommunications Environment, *Wisconsin Public Utilities Institute,* Madison, WI, March, 1986.

8.    "Forward Integration in Distribution: A Transaction Cost View," *AT&T Bell Laboratories, New* Jersey, March, 1987.

9.    "Unbundling of Industrial Systems," (with L. Wilson and A. Weiss), *Marketing Science Conference.* Seattle, March, 1988.

10.   "Alliances in Industrial Purchasing," *Stanford University Summer Marketing Camp,* August 1989.

11.   "Using Exclusive Territories when Dealers Bootleg," (with S. Dutta), *Marketing Science Conference,* Urbana, IL, March, 1990.

12.   "Explaining Coop Allowances in Channels," (with M. Bergen), *Marketing Science Conference,* Urbana, IL, March, 1990.

13.   "The Governance of Exclusive Territories when Dealers can Bootleg," *Marketing Seminar Series, University of Alabama,* Tuscaloosa, AL, March, 1991.

14.   "Crafting Manuscripts for Publication: Viewpoints of Frequent Contributors," *American Marketing Association Winter Educators' Conference,* Newport Beach, CA, February, 1993.

15.   "Restrictive Licensing Practices in International Technology Licenses: The Korean Experience," *University of Florida Winter Marketing Camp,* Gainesville, FL, December, 1993.

16.   "Experimental Evidence for an Agency Model of Sales Compensation," (with M. Ghosh, L. Qu), *Marketing Science Conference,* Tucson, AZ, March, 1994.

17.   "Experimental Evidence for an Agency Model of Sales Compensation," *University of Texas Marketing Department Seminar Speaker Series,* Austin, TX, April 1994.

37

18.   "Use and Abuse of Transaction Cost Analysis in Relationship Marketing," *Plenary Session, Relationship Marketing Conference,* Stone Mountain, GA, June, 1994.

19.   "Externally Assisted Technology Development for New Products," *Seminar Series,* Marketing Department, University of Chicago, Chicago, IL, April 1995.

20.   "Externally Assisted Technology Development for New Products," *Seminar Series,* Marketing Department, Virginia Polytechnic and State University, Blacksburg, VI, May 1995.

21.   "Developing A Market Orientation: A Multi-Level Analysis," *Seminar Series,* Rice University Graduate School of Business, Houston, TX, April 1997.

22.   "Competing in Systems vs. Components Markets", presented at *B. F. Goodrich Patent Awards Meeting*, Minneapolis, MN, May 1998.

23.   "Understanding Institutional Designs Within Marketing Value Chains,"(with Stephen Carson, Timothy Devinney and Grahame Dowling), *JM-MSI Special Issue Conference*, Boston, MA, Summer 1998.

24.   "Marketing Strategy Implications of Governance Value Analysis: Critical Future Directions," (with Mrinal Ghosh) *JM-MSI Special Issue Conference*, Boston, MA, Summer 1998.

25.   "Marketing In High-Technology Markets: Toward A Conceptual Framework," (with Allen Weiss and Shantanu Dutta), *JM-MSI Special Issue Conference*, Boston, MA, Summer 1998.

26.   "Methodological Considerations in Special Settings," *Association for Consumer Research--Asia-Pacific Conference*, Hong Kong, Summer 1998.

27.   "High Tech Marketing: An Agenda for Research", *American Marketing Association Doctoral Consortium*, University of Southern California, Los Angeles, August 1999.

28.   "Marketing Knowledge Intensive Products: The Problem of Tacitness", *3M Labs*, St. Paul, MN, November 1999.

29.   "Where, When and How Much Can We Improve Customer Satisfaction Using Service Guarantees: A Quasi-Experiment", *Midwest Marketing Camp*, University of Michigan, Ann Arbor, June, 2001.

30.   "Where, When and How Much Can We Improve Customer Satisfaction Using Service Guarantees: A Quasi-Experiment", *Marketing Department Camp*, University of Southern California, Los Angeles, January 2002.

31.   "Where, When and How Much Can We Improve Customer Satisfaction Using Service

38

Guarantees: A Quasi-Experiment", *Marketing Department Seminar*, University of Houston, Houston, Texas, April 2002.

32.   "Strategic Fit in Industrial Purchasing Alliances", *Marketing Department Seminar*, University of Houston, Houston, Texas, November 2002.

33.   "Learning from Quasi-Experiments; The Case of Service Guarantees", *Marketing Department Seminar*, Tulane University, New Orleans, Louisiana, November, 2002.

34.   "Channels Marketing", *Thought Leadership Seminar*, Colle+McVoy, Minneapolis, MN, November, 2002.

35.   "Marketing Challenges in High Technology Markets", *Seminar Presentation*, Indian Institute of Management, Bangalore, India, March 2003.

36.   "Changing to a Direct-to-Store Delivery Channel in the U.S Sports Drink Market", *Seminar Presentation*, Center for Mathematical Modeling and Computer Simulation, National Aerospace Laboratories, Bangalore, India, March 2003.

37.   "Vertical Positioning: Selling Components vs. Systems in a High-tech Marketplace", *Royal Bank Distinguished Speaker Series*, Concordia University, Montreal, Canada, September 2003.

38.   "Efficiency and Strategic Considerations in Channel Switches", *Hightower Distinguished Lecturer in Marketing*, Emory University, Atlanta, February 2004.

39.   "TCE and Marketing Problems: Progress, Uses and Limitations" *Invited Panel* (Oliver E. Williamson, Chair), International Society for New Institutional Economics, Tucson, Arizona, September 2004.

40.   "Separating Efficiency and Strategic Effects in Marketing Channels: Marrying NEIO Methods to NIE Concerns," *Invited Paper*, International Society for New Institutional Economics, Barcelona, Spain, September 2005.

41.   "An Empirical Study of Restricted Rights in Technology License Contracts", *Invited Paper*, International Society for New Institutional Economics, Barcelona, Spain, September 2005.

42.   "Mixed and Matched Multi-Component Systems in Value-Added Reseller Channels", *Distinguished Speaker Series*, Marketing Department, Georgia Institute of Technology, Atlanta, Georgia, November 2005.

43.   "Sharing Property Rights with Contractors in Outsourced New Product Relationships", *Invited Paper*, International Society for New Institutional Economics, Boulder, Colorado, September, 2006.

44.    "A Bayesian Approach to Estimating Inter-organizational Norms in Dyadic Relationships", International Society for New Institutional Economics, Boulder, Colorado, September, 2006.

45.    "Does the Vertical Organization of Brand Ownership Matter" The Case of Fluid Milk in Boston," International Society for New Institutional Economics, Boulder, Colorado, September, 2006

46.    "Understanding the Effects of the Vertical Organization of Brand Ownership in a Channel", *Research Camp*, Marketing Department, University of Texas, Austin, April 2007.

47.    "Branded Component Contracts as Governance Devices in Industrial Settings", *Marketing Research Camp*, Marketing Department, Pennsylvania State University, State College, April 2007.

48.    "Institutional Arrangements in Marketing", *Seminar Series*, Marketing Department, University of Arizona, Tucson, AZ, November 2007.

49.    "Branded Component Contracts in Industrial Purchasing", *Seminar Series*, Norwegian School of Economics and Business Administration, Bergen, Norway, March 2008.

50.    "An Empirical Exploration of Multi-Tasking in Marketing Channels", *Seminar Series*, Marketing Department, University of Missouri, Columbia, MO, March, 2009.

51.    "An Empirical Exploration of Multi-Tasking in Marketing Channels", *Seminar Series*, Strategic Management and Organization Department, Carlson School of Management, University of Minnesota, Minneapolis, MN, October, 2009.

52.    Transaction Cost Economics in Marketing: Looking Back, Moving Forward, *Symposium in Honor of Professor Oliver E. Williamson's Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel*, Norwegian School of Management, Oslo, Norway, December, 2009.

53.    Aligning Channel Structures and Incentives to Promote Profitable Growth: What Works? *Marketing Science Institute-Northwestern University Conference*, Evanston, IL, May 2010.

54.    Transactions Cost Analysis: Looking Back, Moving Forward, *American Marketing Association Winter Educators' Conference*, Austin, Texas, February 2011.

55.    Substituting for Costly Altruistic Monetary Punishment with Social Identity and Power: Governance Effects on Social Cooperation, *Marketing Department Seminar Series*, Graduate School of Business, University of Wisconsin, Madison, Wisconsin, March 2011.

40

56.   Substituting for Costly Altruistic Monetary Punishment with Social Identity and Power: Governance Effects on Social Cooperation, *Marketing Department Distinguished Speaker Series,* Iowa State University, Ames, Iowa, April 2011.

57.   Bonuses versus Commissions: A Field Experiment, *Christmas Marketing Camp*, Tilburg University, Netherlands, December 2011.

58.   Bonuses versus Commissions: A Field Study, *Marketing Department Seminar*, Stanford University, Palo Alto, November 2012.

59.   Rule of Law Effects on Marketing Channel Modes, *Institute for the Study of Business Markets Conference*, Chicago, August 2012.

60.   Paying for Intermediate Output: A Field Intervention, *Marketing Department Seminar*, Nanyang Business School, Singapore, September 2013.

61.   Procurement via Bid Pricing or Negotiated Prices: An Empirical Investigation, *Marketing Department Seminar*, University of Arizona., Tucson, AZ, February 2014.

62.   Is Cash King? A Field Intervention on Mental Accounting in a Salesforce, *Thought Leadership on The Sales Profession Conference*, Columbia University, New York, June 2014.

63.   Is Cash King for Sales Compensation Plans? A Large Scale Field Intervention, *Summer Marketing Camp*, London Business School, July 2014.

64.   Incentive Pay in Hybrid Sales Structures, *5th Biennial Sales Force Productivity Conference*, Georgia Tech, Atlanta, June 2015.

65.   Incentive Pay in Hybrid Sales Structures: A Field Experiment, *Thought Leadership in The Sales Profession Conference*, HEC Paris, Paris, France, June 2017.

66.   Field Experiments in Sales Compensation, *Summer School*, Institutional and Organizational Economics Academy, Corscia, France, July 2018.

67.   Do Activity-Based Incentive Plans Work: A Large-Scale Field Experiment, *Thought Leadership on The Sales Profession Conference,* Stanford University, Palo Alto, CA, May 2019.

68.   Governance Issues in a Digital Economy, *Institute for the Study of Business Markets Conference*, Chicago, August 2022.

69.   Transaction Costs Analysis in Marketing: The Long View, *PhD Seminar*, Marketing Department, University of Texas-Austin.

70. Transaction Costs Analysis in Marketing: The Long View, *PhD Seminar*, Marketing Department, University of Arizona.

**Dissertation Committees**

**a) Advisor/Co-Advisor**

1. Allen Weiss (1987) University of Wisconsin-Madison. *Title:* The Effect of Technological Expectations on the Industrial Purchase Decision: Theoretical Analysis and Empirical Test. *Initial Placement*: Stanford University.

2. Jan Heide (1987) University of Wisconsin-Madison. *Title*: Symmetric Exposure in Industrial Purchasing Relationships: The Impact on Coordination Patterns. *Initial Placement*: Case Western Reserve University.

3. Shantanu Dutta (1990) Carlson School of Management, University of Minnesota. *Title:* Effects of Buyer Switching Costs on Second-Sourcing: Theoretical Analysis and Experimental Evidence. *Initial Placement:* University of Chicago.

4. Chae Un Lim (1991) Carlson School of Management, University of Minnesota. *Title*: Understanding Restrictions on Licensees in International Markets: A Transaction Costs Analysis. *Initial Placement*: Sogang University, Korea.

5. Paul Bottum (1992) Carlson School of Management, University of Minnesota. *Title:* A Make Plus Buy Model for Sourcing Technology. *Initial Placement:* Scimed Inc.

6. Mrinal Ghosh (1997) Carlson School of Management, University of Minnesota. *Title:* The Effect of End-Customer Competition and Purpose of Investments on Supply-Chain Relationships. *Initial Placement:* University of Michigan, Ann Arbor.

7. Stephen Carson, (2000) Carlson School of Management, University of Minnesota. *Title*: Managing Creativity and Innovation in High-Technology Inter-firm Relationships. *Initial Placement*: University of Utah.

8. Susan Rosen (2004). Carlson School of Management, University of Minnesota. *Title*: Norms Versus Behavior in OEM-Supplier Relationships: Antecedents and Outcomes in Intendedly Relational Exchange. *Initial Placement*: Independent Consultant.

9. Xinlei (Jack) Chen (2005). Carlson School of Management, University of Minnesota. *Title*: Assessing the Effects of a Channel Switch. *Initial Placement*: University of British Columbia.

10. Raghunath Rao (2007), Carlson School of Management, University of Minnesota. *Title*: Two Essays on the Marketing of Durable Goods. *Initial Placement*: University of Texas, Austin.

11. Ranjan Banerjee (2010), Carlson School of Minnesota, University of Minnesota. *Title:* Essays on the Application of Multi-tasking in Marketing Channels. *Initial Placement*: Chief Operating Officer, Insta Worldwide, Mumbai, India,

42

12.    Sunil Kishore (2011), Carlson School of Minnesota, University of Minnesota. *Title:* Essays in Sales force Compensation and Matching Models**.** *Initial Placement:* McKinsey and Company.

13.    Madhu Viswanathan (2012)  Carlson School of Management, University of Minnesota. *Title*: Economic Impact of Category Captaincy: An Examination of Assortments and Prices. *Initial Placement*: University of Arizona.

14.    Paola Mallucci (2103) Carlson School of Management: University of Minnesota. *Title*: Two Essays on the Effect of Social Norms on Marketing Actions. *Initial Placement*: University of Wisconsin-Madison.

15.    Xiaolin Li (2015) Carlson School of Management, University of Minnesota *Title*: The Shadow of the Future in IT Procurement Auctions. *Initial Placement*: University of Texas-Dallas.

16.    Shaoqun Qin (2018) Carlson School of Management, University of Minnesota *Title:* Empirical Studies on Complementarity and Competition in Products and Business Relationships. *Initial Placement:* Temple University.

17.    Zuhui Xiao (2018) Carlson School of Management, University of Minnesota *Title*: Essays on Marketing Strategies with Endogenous Reference-Dependent Preferences. *Initial Placement*: University of Wisconsin-Milwaukee.

18.    Ruitong Wang (2020), Carlson School of Management, University of Minnesota. *Title*: Essays on Consumer Information Acquisition in Marketing Channels. *Initial Placement*: Tongji University, China.

## b) Committee Member

1.    Surendra Singh (1983) University of Wisconsin-Madison. *Title*: Recognition as a Measure of Learning from Television Commercials.

2.    John Gaski (1984) University of Wisconsin-Madison. *Title:* A Theory of Power and Conflict in the Channel of Distribution.

3.    Catherine Cole (1984) University of Wisconsin-Madison. *Title:* Elderly Consumers' Responses to Advertising: Processing Deficiencies versus Production Deficiencies.

4.    Thomas Noordeweir (1986) University-of Wisconsin-Madison. *Title*: Explaining Contract Purchase Arrangements in Industrial Purchasing: A Transactions Cost Perspective.

5.    Mark Bergen (1990) University of Minnesota (Economics). *Title:* Essays in the Economics of Marketing Practices in Channels.

6.    Carmal Nadav (1993) University of Minnesota (Agricultural Economics) *Title*: Dynamic Models of Cooperatives.

7.  Aksel 1. Rokkan (1995) Norwegian School of Economics and Business Administration, Bergen, Norway. *Title*: Governance of Voluntary Chains: The Problem of Collective Action.

8.  Arnt Buvik (1995) Norwegian School of Economics and Business Administration, Bergen, Norway. *Title*: Allocation of Specific Assets and Vertical Coordination in Industrial Purchasing Relationships.

9.  Boge Gulbrandsen (1998) Norwegian School of Economics and Business Administration, Bergen, Norway. *Title*: Competence Relatedness, Asset Specificity and Vertical Integration.

10.  Sourav Ray (2000) Carlson School of Management. *Title*: The Role of the Distributor in Systems Markets: Managing Hybrid Systems.

11.  Eric Walden (2002) Carlson School of Management. *Title:* Information technology issues for a new economy: Three Essays on Electronic Commerce and Information Technology Outsourcing.

12  Glen Jones (2004) University of Minnesota (Applied Economics) *Title:* Changes in Consumer Preferences; Theoretical and Empirical Issues.

13.  Jon Bingen Sande (2008) Norwegian School of Economics and Business Administration, Bergen, Norway. *Title:* The Role of Common Knowledge in Buyer-Supplier Relationships.

14.  Yilong Liang (2021) Carlson School of Management. *Title:* Two Essays on Product Subscriptions.

**Selected Professional Service**

1.  Area Editor, *Journal of Marketing*, 2020-2022.

2.  Editorial Review Board Member, *Journal of Marketing Research,* 1988 to 2003; 2018-2021.

3.  Editorial Review Board Member, *Journal of Marketing*, 2008 to 2014; 2018-2019.

4.  Editorial Review Board Member, *Journal of Retailing*, 2011 to 2019.

5.  Associate Editor, Journal of Supply Chain Management, 2015 to 2020.

6.  Ad-Hoc Reviewer, *Journal of Consumer Research, Marketing Science, Management Science*, *International Journal of Research in Marketing*, *Managerial and Decision Economics*, various years.

7.  Reviewer, *American Marketing Association Educators' Conference,* various years.

8.  Reviewer, *Association for Consumer Research,* various years**.**

9.  Reviewer, *American Marketing Association Dissertation Competition,* various years.

10.    Co-Editor, *American Marketing Association Summer Educators' Conference,* 1986.

11.    Judge, 3M Global Marketing Professionalism Competition, 1997, 1998.

12.    Co-Chairman, *American Marketing Association Dissertation Competition,* 1998.

**Selected University of Minnesota Service**

1.    Co-Chair, All-University Doctoral Dissertation Fellowship Program, 2014-2021.

2.    Member, All-University Honors Committee, 2014 – 2020.

3.    Senator, University Faculty Senate, 2014 – 2022.

4.    Member, All-University Interdisciplinary Doctoral Dissertation Fellowship Committee, 2021-present

**Testifying History In Last Five Years**

May 20, 2024

In the past 5 years, I have been engaged in the following cases.

1.    WWI FRANCHISE HOLDINGS LLC v. CLINTON SQUADRONI. In 2023, as an expert witness for the defendant, I filed a report whether Mr. Squadroni used proprietary marketing information from his previous employment with WWI in his new position with another firm. The matter is ongoing.

2.    JOHNSON CONTROLS, INC. In 2023, as an expert witness for JCI in connection with its ongoing matter with the Internal Revenue Service (IRS) with respect to the useful remaining life of JCI's brands, I filed a report that assessed whether JCI's brands were more appropriately considered as having a finite useful remaining life versus possessing an infinite and/or indefinite remaining useful life. The matter is ongoing.

3. FURNITUREDEALER.NE INC. v. AMAZON.COM, INC., and COA, INC., DBA COASTER COMPANY OF AMERICA. In 2021, as an expert witness for the defendant, I filed a report assessing the influences in online marketing customer journeys at Amazon. I assessed the impact of product information elements presented on web pages on consumers' propensity to purchase. I was deposed, and the matter has been settled.

4. SCOTT RILLEY v. MONEYMUTUAL LLC et al. In 2019, as an expert witness for the defendant, I filed a report about the role of "aggregators" in online customer journeys in the payday lending industry regarding their possible role as a bottleneck entity in these journeys. I was deposed, and the matter has been settled.

# EXHIBIT B

## **DOCUMENTS REVIEWED**

1.    Expert Report of Professor Yoram (Jerry) Wind

# Exhibit A-3

```
 1                  IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF TEXAS

 2                        FORT WORTH DIVISION

 3    AMERICAN AIRLINES, INC.,      )

            Plaintiff,              )

 4                                  )

                                    )

 5    V.                            ) Civil Action No. 4:23-cv-00860-P

                                    )

 6                                  )

      SKIPLAGGED, INC.,             )

 7          Defendant.              )

 8

 9

10        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11          ORAL AND VIDEOTAPED DEPOSITION OF GEORGE JOHN, Ph.D.

12        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14

15

16

17        ORAL AND VIDEOTAPED DEPOSITION OF GEORGE JOHN, PhD, being

18    produced as a witness at the instance of the Plaintiff, taken

19    in the above-styled and numbered cause on the 9th day of July,

20    2024, from 9:37 a.m. to 3:43 p.m., before Rhonda Jacks,

21    Certified Shorthand Reporter in and for the State of Texas, by

22    machine shorthand, at the offices of Kirkman Law Firm, PLLC,

23    201 Main Street, Suite 1160, Fort Worth, Texas, in accordance

24    with the Federal Rules of Civil Procedure and the agreements

25    hereinafter set forth:
```

Page 1

App'x 143

Page 2

```
 1            A P P E A R A N C E S
 2 APPEARING ON BEHALF OF THE PLAINTIFF:
     MS. BINA PALNITKAR
 3   palnitkarb@gtlaw.com
     MR. CAMERON NELSON (via Zoom)
 4   GREENBERG TRAURIG, LLP
     2200 Ross Avenue
 5   Suite 5200
     Dallas, TX 75201
 6   214-665-3600
 7   MR. JEREMY BALLEW (via Zoom)
     AMERICAN AIRLINES IN-HOUSE COUNSEL
 8   1 Skyview Drive
     Fort Worth, TX 76155
 9   817-967-1036
10
11 APPEARING ON BEHALF OF THE DEFENDANT:
     MR. WILLIAM KIRKMAN
12   billk@kirkmanlawfirm.com
     KIRKMAN LAW FIRM, PLLC
13   201 Main Street
     Suite 1160
14   Fort Worth, TX 76102
     817-336-2800
15
16
17 Also present:
18   Don Harris - Videographer
19   Maddie Gerrald - summer intern
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2 WITNESS:                        PAGE
 3 GEORGE JOHN, PhD
 4   Examination by Ms. Palnitkar ..................  5
 5   Change and Correction Sheet .................. 219
     Witness Signature Page ......................... 220
 6   Reporter's Certificate ......................... 221
 7
 8            EXHIBITS
 9 NUMBER & DESCRIPTION
10   Exhibit 1 .......................................  8
     Plaintiff's Notice of Deposition of
11   George John, PhD
12   Exhibit 2 .......................................  8
     Expert Report of Professor George John in
13   Response to the Expert Report of
     Professor Yoram (Jerry) Wind
14
     Exhibit 3 ...................................... 34
15   United States Court of Appeals, Fifth Circuit
     Viacom International v. IJR Capital
16   Investments, LLC
17   Exhibit 4 ...................................... 127
     Appendix 2: The Stimuli
18
     Exhibit 5 ...................................... 175
19   Competitive Edge, Inc. v. Staples, Inc.
20   Exhibit 6 ...................................... 177
     Healthpoint, Ltd. v. Ethex Corp.
21
22
23
24
25
```

Page 4

```
 1              (Deposition commenced at 9:37 a.m.)
 2              THE VIDEOGRAPHER:  On the record at 9:37 a.m.
 3  My name is Don Harris representing Veritext.  The date is
 4  June -- July 9th, 2024.  Please note that the microphones are
 5  sensitive and may pick up whispering and private conversations.
 6  Please mute your phones at this time.  Audio and video
 7  recording will continue to take place unless all parties agree
 8  to go off the record.  This is the video recorded deposition of
 9  George John, Ph.D. taken by counsel for the Plaintiff in the
10  matter of American Airlines, Inc. and Skiplagged, Inc. filed in
11  the United States District for the Northern District of Texas,
12  Fort Worth Division, Case Number 4:23-CV-00860-P.  The
13  location of this deposition is Kirkman Law Firm in Fort Worth,
14  Texas.  Attorneys, please state your appearances.
15              MS. PALNITKAR:  Bina Palnitkar of Greenberg
16  Traurig for the Plaintiff.
17              MS. GERRALD:  Maddie Gerrald of Greenberg
18  Traurig for the Plaintiff.
19              MS. PALNITKAR:  Maddie is a summer law clerk,
20  not an attorney.
21              MR. KIRKMAN:  I am Bill Kirkman.  I am here in
22  person on behalf of Skiplagged.
23              THE REPORTER:  Any attorneys on-line make an
24  appearance.
25              MR. NELSON:  Cameron Nelson from Greenberg
```

Page 5

```
 1  Traurig on behalf of American, and with me is Jeremy Ballew,
 2  counsel for American.
 3              THE REPORTER:  Mr. John, will you raise your
 4  right hand.  Do you swear to tell the truth, the whole truth
 5  and nothing but the truth so help you God?
 6              MR. JOHN:  I do.
 7              THE REPORTER:  Okay.  Thank you.
 8              GEORGE JOHN, PhD,
 9  having being first duly sworn, testified as follows:
10              EXAMINATION
11  BY MS. PALNITKAR:
12    Q   Hello and good morning.
13    A   Good morning.
14    Q   Will you please state your name for the record?
15    A   George John.
16    Q   May I call you Dr. George?
17    A   John is the last name.
18    Q   Oh, sorry.  Dr. John.  Thank you.  What is your
19  occupation?
20    A   I am a professor of marketing at the University of
21  Minnesota.
22    Q   And how long have you been there?
23    A   Let's see.  I started in 1987.  So that makes it -- I
24  can't calculate.  30 -- 30 -- What is that?  37 years.
25    Q   Okay.  Have you ever been deposed before?
```

Veritext Legal Solutions
800-336-4000

App'x 144

1    A  I have.

2    Q  So just for our refreshing -- refreshing your memory,

3  I will go over a few small rules that we have here usually in

4  depositions.  One is that we not talk over each other because

5  she is taking the transcript of this, and we need to make it

6  very clear for her.  The second is that you understand you are

7  under oath and that -- what comes with that.  Are you aware?

8    A  Yes.

9    Q  Okay.  The third is that if you need a break, we can

10  take a break.  All I is ask is that you let me get an answer to

11  the question that's pending if there is one pending.

12    A  Sure.

13    Q  There might be times where I am looking for documents

14  or papers.  So just allow me that break to organize my

15  materials --

16    A  Sure.

17    Q  -- if that's okay with you.  Thank you.  You're here

18  today pursuant to a dep -- deposition notice.  Is that correct?

19    A  I'm not exactly sure about the deposition notice.

20  Mr. Kirkman asked me to be here because he said I was going to

21  be deposed.  I don't know the exact terminology legally.

22    Q  Of course.  Were you shown any paper that had a

23  deposition notice information on it?

24    A  No.

25    Q  Were you hired by Skiplagged or its counsel to offer

Page 6

1  your opinion today?

2    A  I was hired by the law firm.  I don't know the exact

3  connection as to who pays what and whom and so on and so forth,

4  but I was hired by the law firm.

5    Q  The Kirkman Law Firm?

6    A  Yes.

7    Q  Do you remember when you were hired?

8    A  This is July.  So probably May sometime or maybe late

9  April or early May.

10    Q  Did you sign an engagement agreement?

11    A  I did.

12    Q  And the other party is the Kirkman Law Firm?

13    A  Yes.

14    Q  What is your hourly rate?

15    A  Excuse me.  It's $900 an hour.

16    Q  And how much time have you billed to this case so

17  far?

18    A  I actually haven't billed yet.  I was just waiting

19  for an appropriate time to go ahead and bill.

20    Q  Sure.  How much time have you spent working on this

21  case?

22    A  Probably say a couple of weeks.

23    Q  Do you know how many hours?

24    A  I haven't broken it out unless I know the starting

25  date.  I will have to go back and look at my records and see

Page 7

1  how much block of time I spent on particular days, but in

2  that -- it's about that much.

3    Q  And a couple of weeks total since you were hired?

4    A  Yes.

5    Q  How did you track your time?

6    A  I usually have a little spreadsheet and try and put

7  it down.

8    Q  Have you been paid to date?

9    A  I have not.

10    Q  I am going to enter as Exhibit 1 the deposition

11  notice, Dr. John.

12        (Exhibit 1 was marked for identification.)

13    Q  And I think you said earlier that you had not seen

14  this document.  Correct?

15    A  No.

16    Q  Well, I can represent to you this is the deposition

17  notice that has asked you to be here today.  I am going to now

18  mark Dr. John's expert report as Exhibit Number 2.  Where is

19  that?

20        (Exhibit 2 was marked for identification.)

21    A  Thank you.

22    Q  Do you recognize this document?

23    A  I do.

24    Q  And what is it?

25    A  It's my -- my report.

Page 8

1    Q  Did you write this?

2    A  Yes.

3    Q  You wrote every word in here?

4    A  Yes.

5    Q  Did anyone assist you in writing it?

6    A  I -- I may have had earlier drafts sent out, and they

7  would ask me, hey, can you clarify this or things like that,

8  but everything in here is my language, my wording.

9    Q  Okay.  Any assistants at your University help you or

10  students?

11    A  No.

12    Q  And when you sent those drafts out to your counsel, I

13  presume?

14    A  Yes.

15    Q  How did you send that?

16    A  E-mail.

17    Q  And you said they sent it back to you with edits?

18    A  Not edits.  Questions.

19    Q  Questions about it.

20    A  Comments, questions.

21    Q  Did your counsel change any of the words in here?

22    A  No.

23    Q  What kind of questions did they have?

24    A  Can you expand on this or can you cut back on this

25  or, you know, can you shorten this, more things like that.

Page 9

3 (Pages 6 - 9)

1   Q   Okay.  And what documents did you review in order to
2   prepare this report?
3   A   Basically my general knowledge and research and
4   things that I have already done, plus the Jerry Wind report
5   which is very long.  So I stuck to the -- the main body of the
6   report, not the incredible number of attachments to it.
7   Q   So you reviewed the body of Jerry Wind's report, but
8   not the appendices.  Correct?
9   A   Skimmed them.  Didn't really look at it to develop my
10  report.  I just relied on what he is reporting in the body of
11  the report.
12  Q   Okay.  So you didn't go and review the lengthy data
13  that he cites to in the report?
14  A   I -- Some of these exhibits come from those -- those
15  documents.
16  Q   Right.
17  A   So yes, I know what's in those exhibits, and I would
18  go back to make sure I understood what he is saying in an
19  exhibit, but that's what I did.  I didn't go through the set of
20  attachments page by page if that's what you're asking me.
21  Q   Could you give me an example of some of the lengthier
22  materials that you did not go through?
23  A   I don't know what I did not go through.  What I did
24  was I started with the report, and if I was unsure about
25  anything in the report, I would just go make sure that I

1   understood what was going on, and if necessary, I go back to
2   those attachments, but I didn't do that very many times.
3   Q   Okay.  Very good.  How many times do you think you --
4   you went to go verify or look at things?
5   A   Honestly I can't even remember in depth any
6   particular instance.  It was sufficient for me to look at the
7   report and see how they -- It was pretty detailed how the
8   questions are laid out and what the analysis was.  So I -- I
9   really stuck to this -- this report.
10  Q   Okay.  So other than your personal knowledge about
11  various marketing theories, I want to say, and tell me if I am
12  wrong, and this report, you didn't look at any other documents
13  to prepare this?  And by this report, excuse me, I mean Jerry
14  Wind's report.
15  A   Well, I -- You know, obviously I have to go back and
16  look at some research materials that I cite in my own report
17  just to refresh my memory as to what I said in those things.
18  So the footnotes that I have in my report tell you what I did
19  look at closely in order to develop it.
20  Q   Okay.  So if you look at the very last page of your
21  report which is Exhibit 2 -- You probably don't need that
22  deposition notice anymore.  Do you want to put it up there?
23  Yeah.
24          THE REPORTER:  I have to keep it at the end.
25          THE WITNESS:  Oh, sorry.

1           MR. KIRKMAN:  It's an important document.
2           THE WITNESS:  Yes.
3   Q   Please look at the last page.  Yes.
4   A   Yeah.
5   Q   So these are the documents that you have listed that
6   you reviewed in order to create your expert report.  Correct?
7   A   Yes.
8   Q   And that is the expert report of Jerry Wind that I
9   think we spoke that it was mainly the body of his report as
10  opposed to the exhibits.  Correct?
11  A   That's not true because the body of the report has a
12  lot of exhibits.
13  Q   Uh-huh.
14  A   So I did look at those exhibits very carefully.
15  Q   You're right.  Excuse me.  Let me re -- re-ask that
16  question.  I think we spoke that you mainly reviewed the body
17  of the report as opposed to the appendices that were attached.
18  Correct?
19  A   That's fair.
20  Q   Thank you.  I am going to start with a little bit of
21  your background.
22  A   Sure.
23  Q   You have so many accomplishments that I will go
24  through that.  So let's turn to your CV.  It's on page 30.  Did
25  you find it?

1   A   I did.
2   Q   Very good.  So let's talk a little bit about your
3   education.  Where did you get your bachelor's?
4   A   At the Indian Institute of Technology in Madras,
5   India.
6   Q   And that was in aeronautical engineering?
7   A   Yes.
8   Q   Did you -- and I am assuming that's a hard science.
9   Correct?
10  A   Yes.
11  Q   IIT is known for the hard sciences.  Correct?
12  A   Yes.
13  Q   All right.  And then you came to America.
14  A   Yes.
15  Q   Is that right?  And where did you pursue your
16  further --
17  A   I got an MBA at the University of Illinois.
18  Q   And what was the M -- the MBA?  Was it just a -- Did
19  it have a focus is my question?
20  A   There was some electives, but we didn't have tracks
21  if that's what you're asking.
22  Q   So this is general business, a master's in just
23  general business?
24  A   Correct.
25  Q   And then from there did you take some time to work?

1     A   No.  I went straight into the Ph.D. program.
2     Q   Okay.  And I forgot to ask, but between your
3   bachelor's degree and your MBA did you have any jobs?
4     A   No.  I went straight to the MBA program.
5     Q   Okay.  So is it fair to say that until 1981 when you
6   got your Ph.D. you had not had a typical job?  You were kind of
7   on the education track the whole way?
8     A   Yes.
9     Q   So when you went to get your Ph.D. you got that from
10   Northwestern University?
11    A   Yes.
12    Q   And what was your Ph.D. in?
13    A   So it's in marketing as I indicate on the CV.  Yeah.
14    Q   Thank you.  What was your dissertation about?
15    A   It was about distribution channels, particularly
16   about the -- the way oil companies distribute petroleum
17   products.
18    Q   Can you tell me what you were proving or defending in
19   that thesis?
20    A   So basically it's a question of how the oil
21   companies, particularly Amoco in that instance, dealt with its
22   franchise dealers, and there are several kinds of dealers, but
23   I will just use the word dealers, relationships between the
24   dealers and the oil company on various issues of whether Amoco
25   is fair to them, how they react, things like that.

Page 14

1     Q   And did you come up with a theory in that
2   dissertation?
3     A   So generally speaking you're looking for empirical
4   evidence to either support or disprove a theory.  And -- and at
5   that time the -- the big topic of the day was how do you -- how
6   do you address vertical relationships and antitrust.  And one
7   of those issues there was opportunistic behavior by the more
8   powerful actors.  So that's -- that's essentially what my
9   dissertation was about and whether in fact it was -- It would
10   be accurate to say that the powerful actor, in this case the
11   oil company, essentially could do whatever they wanted to to
12   dealers.
13    Q   So it was -- Is it safe to say it was a test of
14   monopolistic power?
15    A   It was -- So all of Williamson's formulation of
16   what's called transaction cost economics is a foundational
17   theory there, yes.
18    Q   Okay.  Cost economics?
19    A   Transaction cost economics.
20    Q   Thank you.  How did you ascertain your empirical
21   evidence?
22    A   Through surveys.
23    Q   Tell me about those.
24    A   So the surveys were filled out by the dealers.  And I
25   reached a sample of these dealers and did my initial field work

Page 15

1   with what are called territory sales managers of Amoco, and
2   then I pre-tested those survey questionnaires and then sent it
3   out to them and then analyzed the data.
4     Q   Okay.  So were -- there was confusion or unfair
5   competition -- Sorry.  Let me take -- strike that.  So were you
6   testing any kinds of confusion within that survey?
7     A   There's something very close to that.  I was testing
8   something about opportunism which is close to deception.  So --
9   And in this particular report deception and confusion in the
10   Wind report are conflated with each other.  So it's connected
11   in that sense.
12        MS. PALNITKAR:  I am going to object to that as
13   being nonresponsive.
14    Q   My question here was did you -- did you test for any
15   confusion within that survey that you sent?  I am not asking
16   how it relates to this report.  I'm just asking independently.
17        MR. KIRKMAN:  Dr. John, she is entitled to make
18   objections.  It's not necessarily correct, but she is entitled
19   to make them.  So you are obligated to answer a question only
20   once.  If you feel you have answered the question, then simply
21   tell the lawyer that.  Go ahead.
22    Q   Let me repeat my question.  When you collected your
23   empirical evidence for your dissertation did you test for
24   theories relating to a confusion of elements?
25    A   So I would like you to define confusion of elements

Page 16

1   for me.
2     Q   Are you testing whether the dealers are confused
3   about anything?
4     A   Yes.
5     Q   What was that?
6     A   Whether they actually give you reliable data.  So
7   if -- if I ask you a question and you're confused by the
8   meaning of that question, that's confusion methodologically.
9   So obviously my pre-test had to ascertain whether or not my
10   questionnaires were actually confusing to the dealers who were
11   supposed to answer them.
12    Q   So you tested if they were confused about the meaning
13   of the question?
14    A   Methodlogically yes.
15    Q   Thank you.  So after you got your Ph.D. where did you
16   go?
17    A   My first job was at -- Well, let me back up.  I did
18   teach for a year as lecturer at Northwestern in '79 to '80, but
19   that was before I finished my Ph.D.  My first job after my -- I
20   actually started at the University of Wisconsin before I
21   finished my Ph.D. also.  So in -- in 1981 I finished my Ph.D.,
22   but I started at Wisconsin in 1980.
23    Q   Okay.  And then you went on to the Twin Cities.
24   Correct?
25    A   In 1987, yes.

Page 17

5 (Pages 14 - 17)

| | |
|---|---|
| 1   Q.   Okay.  And you were -- It says here you were | 1   went -- Well, what are sales force contests? |
| 2   responsible for the budget, hiring, promotion of the Carlson | 2   A.   It's pretty straight forward.  Let's say we are all |
| 3   School of Management. | 3   sales people and say, hey, whoever sells the most this month is |
| 4   A.   Not at that time.  I mean I was in charge of the | 4   going to get an award.  That's simply put a sales contest. |
| 5   budget and so on and so forth when I was in the position of | 5   Q.   Okay.  And supply networks? |
| 6   senior associate dean. | 6   A.   So what's the best example?  So think about how this |
| 7   Q.   Okay.  And you were in the marketing department at | 7   bottle of water got here.  It came out of a spring somewhere, |
| 8   the Carlson School of Management between 2007 to 2015. | 8   Ozarka I think.  I don't know where that is, but somewhere in |
| 9   Correct? | 9   Texas I assume or Arkansas or someplace like that.  It -- it |
| 10   A.   From 1987 through today. | 10   gets processed to the point of extraction.  Then it gets |
| 11   Q.   Okay.  Ah, yes.  I see that.  Thank you.  All right. | 11   refined somewhere else.  And then it gets distributed by some |
| 12   What courses do you currently teach? | 12   distributor and finally winds up at HEB or something.  And |
| 13   A.   So I teach the intro marketing class to undergrads in | 13   that's the retailer.  And that entire thing would be called a |
| 14   the honors section.  I teach the intro marketing class to | 14   supply chain. |
| 15   the -- to the executive MBAs.  Just last year taught it to the | 15   Q.   Okay.  So supply network is like a supply chain? |
| 16   day MBAs as well.  I teach different non-degree classes to -- | 16   A.   It's -- it's more complicated than a supply chain. |
| 17   in the executive program.  I have taught channels of | 17   So a supply chain is part of a supply network. |
| 18   distribution as well, and I teach a Ph.D. seminar on channels | 18   Q.   Understood.  And technology marketing? |
| 19   of distribution. | 19   A.   So that's -- For example, we have laptops, but today |
| 20   Q.   What is channels of distribution? | 20   I -- I don't know if that gentleman's laptop is actually using |
| 21   A.   So a company produces a product, like American | 21   cloud servers or whether he's got all the programs loaded on |
| 22   Airlines produces air travel, and it has to somehow distribute | 22   locally.  So that separation would be an example of technology |
| 23   its product or service.  And often times it engages outsiders | 23   marketing.  How I would -- how I would market a subscription to |
| 24   or third parties.  Sometimes it does some of it by itself.  All | 24   cloud servers for let's say Windows would be different from how |
| 25   of those things are part and parcel of channels of | 25   I would sell Windows for that laptop locally. |
| Page 18 | Page 20 |

| | |
|---|---|
| 1   distribution. | 1   Q.   Understood.  What about digital channels? |
| 2   Q.   Okay.  And the marketing class, this is the main -- | 2   A.   So that's ubiquitous today.  When you buy something |
| 3   main thing you teach I think to the executive MBAs, the day | 3   from Amazon, that's an example of a digital channel. |
| 4   MBAs and your -- and your undergraduate class.  Correct? | 4   Q.   So I am engaging in digital channels everyday then. |
| 5   A.   I don't know if I would describe it as the main | 5   A.   Pretty much.  Yeah.  I think it's -- it's a little |
| 6   thing.  We -- You have a portfolio of classes.  I have to teach | 6   bit of a fallacy to think you're only engaging in digital |
| 7   ten credits here.  So that -- that menu of ten credits | 7   channels because the person who delivers the product to your |
| 8   changes -- | 8   house, that's non-digital. |
| 9   Q.   Okay. | 9   Q.   Right. |
| 10   A.   -- over time. | 10   A.   So there's a combination. |
| 11   Q.   If you had to say the general course description of | 11   Q.   So on-line purchasing perhaps? |
| 12   some of these classes as it relates to marketing, what -- what | 12   A.   The elements that are on-line would be the digital |
| 13   would that entail? | 13   part of it. |
| 14   A.   Well, obviously the introductory class covers the | 14   Q.   Okay.  When you -- When we spoke about the courses |
| 15   water front.  The Ph.D. class covers, you know, highly | 15   that you taught or that you teach -- excuse me -- in your |
| 16   technical material closely related to my expertise and | 16   various credits, do you teach distribution channels? |
| 17   research.  I can go into more details, but -- | 17   A.   Yes. |
| 18   Q.   I will go into your research in a minute. | 18   Q.   Do you teach the technology marketing? |
| 19   A.   Okay. | 19   A.   Yes. |
| 20   Q.   Thank you for that.  It says your research interests | 20   Q.   And you teach supply chain or supply networks? |
| 21   here on page 31 at the bottom is digital channels, sales force | 21   Excuse me. |
| 22   contests, supply networks and technology -- technology | 22   A.   Both.  Supply chains and supply networks is an |
| 23   marketing.  Is that correct? | 23   extension of it. |
| 24   A.   Are the current areas. | 24   Q.   Do you teach any trademark or brand protection survey |
| 25   Q.   Current areas.  And what are -- And I think we | 25   sampling? |
| Page 19 | Page 21 |

6 (Pages 18 - 21)

1    A   There's a lot in that question, so let me see if I
2  can take it piece by piece.  Certain branding is certainly part
3  of it.
4    Q   No.  It was all together.  It was trademark survey
5  sampling.  Do you teach that?
6    A   I don't teach trademark survey sampling.  There's
7  nothing unique about trademark survey sampling that would make
8  it a class.  So do we teach elements of it, yes.
9    Q   What elements do you teach?
10   A   I teach branding.  I teach sampling.  And I certainly
11 don't teach the legal aspects of trademarks.
12   Q   When you say you teach sampling, could you give me an
13 example of sampling methodologies?
14   A   Virtually everything -- I would say 90 percent of the
15 research I have done is empirical.  Every empirical study is at
16 some point how do you get the data, or if you don't get the
17 data yourself, what's the source of the data, and therefore
18 what are the properties of that data.  And one of the most
19 important properties is the sampling property.
20   Q   Okay.  Do you talk about constructing these surveys?
21   A   If you're asking me if I have ever taught
22 constructing surveys across all the different classes I have
23 taught, sure, in some classes, but in other classes not so.
24   Q   What parts of constructing surveys do you -- do you
25 teach?

1    A   For example, if you go back to what I have taught in
2  the past and what is covered in my seminar, we talk about
3  marketing research, how do you collect data.  And that includes
4  surveys.  It includes experiments.  It includes observational
5  data.  So you would start from A to Z on each of those things.
6    Q   And you are saying these are marketing surveys?  I'm
7  sorry.  You said marketing in there.  I forgot what you said.
8    A   I forgot also.
9    Q   We were talking about constructing surveys, and you
10 were saying marketing data --
11   A   Yes.
12   Q   -- I believe.  So what do you use -- What kind of --
13 sorry.  When you are using a survey with marketing data,
14 what -- what kind of evidence do you get from marketing data?
15 What are some examples of the data?
16   A   I think I collect the surveys to get the data.  I
17 don't have the data to formulate a survey.  So, for example, in
18 the sales force contest we would survey sales people about what
19 they intend to do or what they have done or how they feel about
20 the -- the -- the prices they could win, things like that.
21   Q   Uh-huh.  Okay.  Do you have -- Are there any specific
22 sampling methodologies that you -- like accepted sampling
23 methodologies that you teach?
24   A   That's a huge set of issues, and I try to cover them
25 at the level of the class I teach.  So if I am teaching an

1  undergraduate class, I will teach at a much lower level of
2  sophistication.  So there are several issues of sampling on
3  several types of samples that we would get into in detail if
4  you're teaching a higher level class.
5    Q   Do you teach the standards for likelihood of
6  confusion sampling?
7    A   I'm sorry?
8    Q   Do you teach any of the accepted methodologies for
9  likelihood of confusion sampling?
10   A   So I think I am not sure I understand the question.
11 Sampling is a methodology.  Likelihood of confusion is a
12 conceptual issue.  So I am not sure there is a -- sampling
13 methodology that is specific to likelihood of confusion as
14 opposed to sampling methodology per say.  So I teach sampling
15 methodology per say.  I don't teach -- In any class we try to
16 teach things as broadly as possible.  So you don't teach how to
17 answer a particular client's question.  When you do projects
18 you do that.  So I am not sure how to answer your question.
19   Q   Let me ask a better question then.  When you're
20 constructing a survey to test for likelihood of confusion are
21 you familiar with the factors that are involved with
22 constructing that type of survey?
23   A   It would depend on the definition of likelihood of
24 confusion.  So there is a general methodology, and I make a
25 note of that in my report as to how you would develop an

1  instrument and then implement that instrument in a sample to
2  get at a conceptual subjective concept like likelihood of
3  confusion or deception of any of these kinds of things.  So
4  yes, I do teach how to develop marketing instrument --
5  instruments to measure marketing which are mostly subjective
6  concepts like confusion and like deception, yes.
7    Q   Can you tell me about that methodology?
8    A   Sure.  You first have to define -- I actually say
9  that in my report.  I can go to that and sort of --
10   Q   We can go to that.  I'm -- I'm looking for the steps
11 in which you construct a survey for likelihood of confusion.
12   A   Certainly.  So starting on page 18.  So there are
13 three acceptable elements of developing a measure.  We haven't
14 even got to the sampling yet.  So I want to make sure that we
15 understand each other.  So the first thing is you have to
16 define it, and I go through that on page 18.
17   Q   Okay.  Show me where you are.
18   A   Middle of page 18, there's a Subsection A.  There's
19 no definition of deception or confusion.  So the --
20   Q   Okay.  Is it the first -- the first sentence that
21 says the accepted practice is to first provide a definition of
22 the two concepts?
23   A   Of any concept or any subjective concept.  I apply it
24 to these two in this case.
25   Q   Okay.  Where -- where is this -- Where is the

Veritext Legal Solutions
800-336-4000

1 accepted practice?  What are you referring to?
2     A    So I cite footnote five on page 16.
3     Q    I wouldn't know that because there's no cite here
4 that refers to that.
5     A    I have it on page 16.  I don't know --
6         MR. KIRKMAN:  I am not sure what relevance it is
7 if you wouldn't know.  So --
8         MS. PALNITKAR:  I am reading his report, and I
9 don't see the cite for the first sentence of the accepted
10 practice.  There's several citations.  I don't know which one
11 that sentence is referring to.
12        MR. KIRKMAN:  He just gave you an answer.
13        MS. PALNITKAR:  Right.  Objection to your
14 sidebar.
15    Q    Remind me -- Say it again.  Which --
16    A    On page 16 I give you the foundational citation to
17 developing a measure.  And then I apply that -- that framework
18 to the Wind report's measures of deception and confusion.
19    Q    And this is a -- a foundational study that is a
20 paradigm for developing better measures of marketing
21 constructs?
22    A    That's right.
23    Q    Okay.  And that is what you base the accepted
24 practice on.  Correct?
25    A    Yes.

Page 26

1     Q    Okay.  It says -- The literature provides a
2 definition of both these concepts.  And that literature is
3 again the footnote five?
4     A    I'm -- I'm sorry.  What's the question again?
5     Q    The second sentence here is the literature provided
6 definitions of both -- excuse me.  The literature provides
7 definitions of both these concepts.
8     A    Which page are you reading?
9     Q    The same page 18.
10    A    Okay.  Hold on a second.
11    Q    Sorry about that.  Okay.  Page 18 under Subsection A
12 it says -- We just spoke about the accepted practice is to
13 first provide a definition of the two concepts.  Correct?
14    A    Yes.
15    Q    And that -- You are saying that accepted practice is
16 what you're quoting in footnote five?
17    A    I think we are confusing matters.  Footnote five
18 talks about how to do something.  It does not include
19 definitions of deceptions or any construct.  It's a methodology
20 for developing a measure of any subjective construct, two of
21 which would be deception and confusion.
22    Q    Right.  I am asking about the word -- the phrase
23 accepted practice.  I am trying to find out where I can find
24 this accepted practice.  And I am just confirming with you that
25 that was in footnote five.

Page 27

1     A    That's right.
2     Q    Okay.  Then I go on to the second sentence that says
3 the literature provides definitions of both these concepts.
4 And I am asking if that -- by you referring to literature does
5 that also refer to footnote five?
6     A    No, it doesn't.  Just general literature.
7     Q    Where can I find that general literature?
8     A    I was not asked to provide these definitions, but you
9 can easily find them.  Deception and confusion have been
10 studied in hundreds of studies.
11        MS. PALNITKAR:  Objection; nonresponsive.
12    Q    I am not asking about the -- the definitions.  I am
13 asking about the literature.
14    A    The literature, I do not cite the definitions of
15 these concepts.  I am pointing out the Wind report does not
16 provide a definition of the concept.
17    Q    Right.  And I am just asking you what literature are
18 you talking about?
19    A    Marketing literature.
20    Q    That's my question to you.
21    A    Thank you.
22    Q    So what I am asking what literature are you talking
23 about, you are just saying general marketing literature?
24    A    That's right.
25    Q    And that's not cited in this report?

Page 28

1     A    No.  So can I add something here?
2     Q    No.  Just a minute.  I have a question.
3     A    I want to add to my answer.
4         MR. KIRKMAN:  You have the ability to correct or
5 amend your answer.
6     A    So you asked me about literature.  I provide an
7 example of confusion in footnote seven.  Okay.  That provides
8 an example of a definition of confusion.  All right.  That's
9 one definition.
10    Q    I don't see that definition anywhere.
11    A    I don't know what else I can say.  It's footnote
12 seven, Barbara Loken, Barsalou and Chris Joiner, Categorization
13 Theory and Research in Consumer Psychology.
14    Q    I understand, but there's -- that's -- You're
15 quoting -- You're quoting a large document.  I don't see a
16 definition for deception or confusion.
17    A    You will find it in it.
18    Q    Okay.  Do you understand that definitions of
19 confusion in a legal sense are different than definitions of
20 confusion in a marketing sense?
21    A    It may well be.  I wasn't asked to look into that.  I
22 have nothing to say about the legal definitions of anything.
23    Q    Right.  And when you have certain definitions that
24 you're referring to here, that may not be the acceptable legal
25 definition of what the same term is.  Correct?

Page 29

8 (Pages 26 - 29)

App'x 150

1    A    I have no opinion about the definitions that are
2 legally used in cases.
3    Q    But this is a lawsuit. Correct?
4    A    I believe so.
5    Q    And -- Well, you -- Yes or no?
6    A    Yes, it is.
7    Q    So if we are going to use a definition of something,
8 it has to be a definition that's determined by law. Correct?
9          MR. KIRKMAN:  Form.
10   A    That sounds to me like a legal question. I have
11 no --
12   Q    Correct.
13   A    I have no answer to that.
14   Q    Right. And could it be possible that a definition of
15 confusion which is a -- a very broad term can be different in a
16 marketing context as -- as opposed to a legal likelihood of
17 confusion context?
18   A    If you show me --
19          MR. KIRKMAN:  Form. Excuse me. Form. Go
20 ahead.
21   A    If you show me the two definitions, I would be happy
22 to give you my opinion.
23   Q    Well, the point of a -- No. Well, I am asking you,
24 could it be possible?
25   A    I don't know. I haven't seen those definitions.

Page 30

1    Q    You haven't seen the definition of what confusion is
2 in a likelihood of confusion survey?
3          MR. KIRKMAN:  Form.
4    A    In the legal context?
5    Q    Yes.
6    A    I have not.
7    Q    Okay. Have you reviewed any case law that deals with
8 likelihood of confusion surveys?
9    A    I have read them, but I don't have any strong
10 opinions about the -- the legal -- legal definitions of any of
11 these concepts. I am not offering any opinions about it.
12   Q    Okay. You are not offering any opinions about the
13 definition of confusion in a likelihood of confusion survey?
14          MR. KIRKMAN:  Form.
15   Q    I'm sorry. In a likelihood of confusion analysis.
16          MR. KIRKMAN:  Form.
17   A    All I am saying here is that I don't see a definition
18 provided. Are there definitions in the literature? To be
19 sure.
20   Q    Why -- What are you basing your opinion on that a
21 definition needs to be provided in a survey?
22   A    I have already said it. It's the methodology by
23 which we have -- we develop any measure of any subjective
24 construct.
25   Q    And that is a marketing methodology?

Page 31

1    A    That is a scientific methodology used in psychology
2 used in marketing in almost every empirical social science.
3    Q    Is it using any of the legal -- legally accepted
4 methodologies for likelihood of confusion surveys?
5    A    If you show me an example, I will tell you whether it
6 does.
7    Q    Are you familiar with the examples that go into
8 likelihood of confusion survey analysis?
9    A    I don't want to hazard a guess. If you show me an
10 example, I will tell you whether it fits what I'm thinking.
11   Q    Well, that was not my question. My question is are
12 you familiar with any of the factors that go into likelihood of
13 confusion analysis?
14          MR. KIRKMAN:  Excuse me. Form.
15   A    You know, I -- I have seen it. I haven't memorized
16 them, and I haven't seen them recently. So I don't want to
17 hazard a guess as to what these definitions are.
18   Q    They are not definitions. They are standards. Have
19 you seen those?
20          MR. KIRKMAN:  Hey, now wait a minute. Wait a
21 minute. You are not here to lecture him. Ask a question. He
22 will answer it.
23   Q    I asked have you seen those?
24          MR. KIRKMAN:  And he answered -- Wait a minute.
25 He answered that question.

Page 32

1    Q    What have you seen?
2    A    I have seen a lot of things. I don't know what
3 you're asking me what I have seen.
4    Q    Have you seen case law on the standards that go into
5 a likelihood of confusion analysis?
6    A    I have seen it in the past, but I don't know --
7 There's a lot of case law, and I don't know what you're
8 referring to. So I don't want to say I have seen whatever it
9 is you think I'm referring to.
10   Q    Have you ever seen the seven or eight factors that go
11 into establishing a likelihood of confusion?
12          MR. KIRKMAN:  Form.
13   A    I may have seen it. I couldn't tell you whether it's
14 the one that you have in mind.
15   Q    Have you ever seen a likelihood of confusion survey?
16   A    I have seen a lot of surveys. I may have seen one,
17 but I don't know which one you're referring to.
18   Q    No. I am just saying in general, a likelihood of
19 confusion survey.
20   A    I have seen a lot of surveys, and I am sure that some
21 of those surveys measure confusion just like some of those
22 surveys measure deception. So I've probably seen them. I
23 don't know which one -- which specific one you're referring to.
24   Q    I am not referring to a specific one. I understand
25 you have seen a lot of surveys, but my question is have you

Page 33

9 (Pages 30 - 33)

1 seen a likelihood of confusion survey specifically?

2     A   Again, I have seen likelihood of confusion measured

3 in surveys. I don't know if it's a legal one. I don't know if

4 it's a -- something else. I don't know the context. I don't

5 do that kind of research. Excuse me. I don't do that kind of

6 consulting work. So I don't know what kind of surveys you're

7 referring to.

8     Q   Okay. So if you say you haven't done that kind of

9 consulting work, is it safe to say you have not conducted a

10 likelihood of confusion survey in a legal case?

11         MR. KIRKMAN: Form.

12     A   I -- I actually have been involved in likelihood of

13 confusion a long time ago in the 80s, but nothing recently. So

14 I don't know what the current standards are as to what factors

15 you're talking about.

16     Q   Okay. Have you ever conducted -- I understand you

17 have seen -- Have you ever conducted a likelihood of confusion

18 survey in a legal case?

19     A   No.

20     Q   I am going to show you this. I am going to mark this

21 as -- as Exhibit 3.

22         (Exhibit 3 was marked for identification.)

23     Q   And if you could turn to the part that is

24 highlighted. This is on page 11.

25         MR. KIRKMAN: I have nothing highlighted on page

Page 34

---

1     A   I have no idea what research this is based on. So I

2 don't have an opinion about it.

3     Q   Okay. This is a legal standard set forth by the

4 courts in the United States on testing for likelihood of

5 confusion factors. Are you familiar with that?

6         MR. KIRKMAN: I am going to object. You are not

7 here to lecture him and tell him. You're here to ask him

8 questions.

9     Q   Go ahead.

10     A   What was the question?

11     Q   This is -- This case has a legal standard set forth

12 for likelihood of confusion factors. Are you familiar with

13 this standard that is set forth here?

14         MR. KIRKMAN: Form.

15     A   I have seen these -- these sorts of factors or

16 indicia or whatever they are called. I am not familiar with

17 the particular one called digits of confusion, but they look

18 very similar to the things I have seen before.

19     Q   Okay. Is this the -- the factors that you use when

20 you are evaluating a likelihood of confusion survey?

21     A   I think I have already said I have not conducted a

22 likelihood of confusion survey. So I wouldn't have had any

23 occasion to use or not use these factors.

24     Q   Understood. Let's go through some of your

25 publications here on your CV. I am looking at page 32.

Page 36

---

1 11.

2         MS. PALNITKAR: I'm sorry. I will give him my

3 version. Let's trade versions, and then we will trade back.

4 It's headnote 22, Bill, at the top.

5     Q   This is a -- I'm sorry. This is -- I can represent

6 to you that this is a case from the 5th Circuit -- U.S. Court

7 of Appeals 5th Circuit. Do you see that on the front page?

8     A   I will accept that.

9     Q   Have you read case law before like this?

10     A   I glanced at it. I have not looked at it as a lawyer

11 would.

12     Q   Okay. At the top of the second column there after

13 the headnote 22 and 23 it says to establish a likelihood of

14 confusion, Viacom must show a probability of confusion. Do you

15 see that?

16     A   I do.

17     Q   And then it goes down to have this little inset which

18 lists seven factors.

19     A   I do.

20     Q   And just above that, two sentences above here it says

21 to assess whether use of a mark creates a likelihood of

22 confusion as to affiliation, sponsorship or source, this Court

23 considers the so-called digits of confusion. Do you see that?

24     A   I do.

25     Q   Do you know about the digits of confusion?

Page 35

---

1 Peer-reviewed journal publications. Now this is a list of 37

2 peer-reviewed journal publications. What are peer-reviewed

3 publications?

4     A   So when you submit a paper it goes to a set of

5 reviewers who are double blinded. You don't know their

6 identity, and they don't know your identity. And that's what's

7 considered peer-reviewed in -- in my list here.

8     Q   So are you reviewing these publications or are you

9 writing these?

10     A   Let me repeat what I said. When you send out a paper

11 for publication, which I have in all these 37 cases, it is sent

12 to a set of reviewers whose identities I do not know, and they

13 don't know my identity. So that's -- that's what it means by

14 saying peer-reviewed journal publications.

15     Q   Okay. So you are the author of these?

16     A   Yes.

17     Q   Okay. That was my question. And do -- I didn't see

18 on here that any of these have to do with likelihood of

19 confusion surveys. Is that correct?

20         MR. KIRKMAN: Form.

21     A   Let me just take a closer look. I have not done -- A

22 likelihood of confusion survey is not in this list of

23 publications. It's not the kind of thing that would be done in

24 a -- in a general publication.

25     Q   Okay. And I am assuming that's the same for

Page 37

---

1 conference proceedings on page 35. Correct?

2    A   It's more likely that a conference proceeding which

3 is a lower level of -- of -- of quality would be -- could

4 include more consulting type work.

5    Q   What do you mean a lower level of quality?

6    A   It's not a stringent -- So, for example, these

7 general publications, the likelihood of getting published in my

8 discipline is probably about two or three percent. So about

9 100 papers submitted, two or three get published. Conference

10 proceedings, probably about 20 percent get in. So it's a lot

11 less competitive. So you will get a lot more different topics

12 in it.

13    Q   So are you -- I'm sorry. I'm not understanding. So

14 are you saying that you can put -- It's less likely that you

15 would put -- you would publish on likelihood of confusion

16 surveys?

17    A   So a likelihood of confusion survey is a very

18 specific thing. It would not have enough generalizable

19 scholarly content to merit publishing in a -- in a top level

20 journal. So it's more likely to be in a conference proceeding

21 or a non peer-reviewed proceeding.

22    Q   Okay. Do any of these eight conference proceedings

23 deal with any kind of surveys on likelihood of confusion?

24    A   You know, honestly I can't remember. I would have to

25 go through each one. I can tell you one that does. So if you

Page 38

1 go to page 17, you can see number seven, Consumer Confusion in

2 the Marketplace.

3    Q   I'm sorry. Page 35?

4    A   I'm sorry. Page 37.

5    Q   Oh, okay.

6    A   Point number -- I mean item number seven. You can

7 see that's a -- that's a presentation. So I didn't have a

8 paper on it, but I presented it at a round table program in

9 consumer confusion. So --

10    Q   In 1986?

11    A   Yes.

12    Q   Is that the last time you presented on consumer

13 confusion -- sorry -- likelihood of confusion?

14    A   So yes and no. I've -- I've -- I've looked at the

15 literature, but I haven't done my own research on it since

16 then.

17    Q   Okay. So that takes us all the way to page 42 where

18 it ends that section, correct, of presentations?

19    A   I believe so. Let me just double check that.

20 Presentations, the top of page 42, yes.

21    Q   Okay. And then your dissertation committees. So

22 this is a -- Is this for students who are coming up for their

23 Ph.D.?

24    A   Not coming up. These are the people -- The first

25 subsection labeled Advisor/Co-Advisor are the people whom I

Page 39

1 have advised as a chair or as a co-chair.

2    Q   Okay. Very good.

3    A   They have all graduated.

4    Q   And do any of -- I am looking through these 18, and I

5 don't see any -- And I know you are -- you are just the

6 advisor. So you are not coming up with the topic because the

7 Ph.D. candidates are coming up with the topics. Correct?

8    A   With my approval.

9    Q   Okay.

10    A   Yes.

11    Q   Understood. And I don't -- As I see this, I don't

12 think any of these relate to likelihood of confusion or

13 sampling studies. Correct?

14    A   Many of them do. Sampling is -- Again, sampling is

15 the general methodology. Most of these dissertations involve

16 primary data that's been collected, and many of them are

17 collected via surveys. So sampling is involved in the

18 methodology of many of these dissertations.

19    Q   You're right. You're right. I -- I cannot

20 generalize the two. So sampling is separate from likelihood of

21 confusion survey construction. So my better question would be

22 these -- do any of these 18 dissertation committees have -- or

23 sorry -- these dissertation subjects have to do with likelihood

24 of confusion surveys?

25         MR. KIRKMAN:  Form.

Page 40

1    A   Not the likelihood of confusion survey.

2    Q   Okay. And then moving on to the committee members,

3 what does this mean?

4    A   That means I am a member of the committee, but I am

5 not the -- the primary advisor.

6    Q   Okay. And I see these have a lot to do with channels

7 of distribution, marketing practices and channels. Do any of

8 these relate to likelihood of confusion surveys?

9         MR. KIRKMAN:  Form.

10    A   They -- they do, but not confusion -- likelihood of

11 confusion surveys. For example, just take the first

12 dissertation, Recognition and Measure of Learning. So what's

13 fundamental to developing a measure is to make sure that the --

14 the measure is actually measuring what you want to measure.

15 So it's again part of the general methodology. So confusion,

16 like any other topic, has to be measured in a proper way. So

17 the proper measurement of many of these things would involve

18 that same methodology I talked about. Do any of them have a

19 likelihood of confusion focus, no.

20    Q   Okay. So these are relating in some way perhaps to

21 confusion as a general marketing theory and how it's used in a

22 marketing construct?

23    A   Let me -- let me -- let me repeat what I said.

24 Confusion, deception are all subjective constructs. Many of

25 these dissertations, if not all actually, involve subjective

Page 41

1 constructs.  There's a particular methodology to go out and
2 measure subjective constructs including deception and including
3 confusion, including opportunism and many others including
4 personality traits, all of those things.  And -- and these
5 dissertations have always used accepted methodologies to
6 measure these subjective constructs.  Have any of them used
7 that particular methodology to measure likelihood of confusion,
8 no.
9     Q   Are you familiar with the survey methodologies that
10 the Courts have approved for demonstrating confusion?
11     A   I -- There are many many elements of these surveys.
12 So I am not sure what you're referring to.  If you show me
13 something that you are interested in, I can happily respond.
14         MS. PALNITKAR:  Well -- Objection;
15 nonresponsive.
16     Q   My question was are you familiar with the survey --
17 survey methodologies, the methods of conducting a likelihood of
18 confusion survey that -- that have been accepted within the
19 Courts?
20         MR. KIRKMAN:  Now, wait a minute.  I object;
21 form.  He's answered the question.  Just because you object to
22 the responsiveness of the answer doesn't mean he didn't
23 respond.  So, Dr. John, if you believe you have responded to
24 the question, you can simply tell this lawyer that.
25     A   I have lost track of the question.

Page 42

1     Q   As have I.
2         MS. PALNITKAR:  May I -- Can you repeat the
3 answer back please?
4         THE REPORTER:  There are many many elements of
5 these surveys, so I'm not sure what you're referring to.  If
6 you show me something that you are interested in, I can happily
7 respond.
8         MS. PALNITKAR:  So he said he's not sure what I
9 am referring to.  I am clarifying my question.
10         MR. KIRKMAN:  No, you weren't.  You were
11 repeating it.
12     Q   Well, let me ask the same question in a different way
13 to clarify.  Are you familiar with methodologies for conducting
14 likelihood of confusion surveys that the Courts have accepted?
15     A   I am only generally familiar with court standards.  I
16 don't know the specific standards that are acceptable today
17 that have evolved over time.  So I have seen these things.  I
18 have not paid close attention to them, and so I don't know
19 exactly how to answer your question.  Am I -- Do I think they
20 exist?  Yes, they exist.  Can I tell you how one would be
21 applicable today?  I could not, because I am not -- I am not --
22 I have not kept up with it in the sense of being able to do it
23 off the top of my head.
24     Q   Okay.  Would you be able to look at a likelihood of
25 confusion methodology and determine whether it would be

Page 43

1 accepted by a court?
2         MR. KIRKMAN:  Form.
3     A   I think courts make up their own minds.  I can tell
4 you whether I would accept it as a scholar and whether the
5 scholarly literature would accept it.
6     Q   And by that you mean the marketing literature?
7     A   Generally social science literature.
8     Q   Okay.  Would you be able to tell me if a likelihood
9 of confusion survey methodology would be rejected by a court?
10         MR. KIRKMAN:  Form.
11     A   Same thing.  I would hope that the courts follow the
12 science.  And -- and I can tell you whether it would be
13 acceptable or rejected by a journal, if I am reviewing it
14 whether I would accept it or reject it.  But it's very hard for
15 me to speak as to what the Court would reject.
16     Q   Thank you for getting through that with me.  Sorry it
17 was not clear.  All right.  Just to round out your CV here, I
18 see professional service.  You're a board member of several
19 journals, correct, and a reviewer as well on page 44?
20     A   Let me just check that.  Yes, but I want to make
21 clear that those dates are important.  I am not claiming that I
22 am a reviewer currently and everything, so --
23     Q   Sure.
24     A   Just make sure that --
25     Q   Oh, well, thank you for that.  And let's look at your

Page 44

1 testifying history in the last five years if we will.  How
2 many -- Forget the last five years, but just in the last -- In
3 your career do you recall how many -- approximately how many
4 times you have testified?
5     A   Maybe a dozen times.
6     Q   Is that in court?
7     A   Very few in court.  I would say, for example, none of
8 these four have reached a trial stage.  Probably two or three
9 times at trial, maybe around that number.  No more than that.
10 I don't know how to include arbitration proceedings and
11 commission hearing proceedings.  So if you throw all of that
12 in, maybe about four or five times.
13     Q   Okay.  Thank you.  And by the four you were referring
14 to, you mean the four cases that are listed on page 45.
15 Correct?
16     A   That's right.
17     Q   And two to three times at trial, do you recall what
18 those -- what you were testifying about at those trials?
19     A   Yes, very much so.  The -- the one that sticks out is
20 Axciom v. Axiom.  I'm going to get the spelling wrong.
21 A-x-c-i-o-m v. A-x-i-o-m.  That was a confusion case about
22 whether one brand name was being confused with another.  That
23 was a federal case.
24     Q   Okay.  Did you -- I think you already said you didn't
25 conduct the survey for it, but -- because you haven't

Page 45

12 (Pages 42 - 45)

1 constructed a survey, but did you opine as to the confusion in
2 that matter?
3   A  I did.
4   Q  And what were your opinions there?
5   A  That's a long time ago.  Let me see if I can
6 reconstruct it.
7   Q  When was it, do you remember?
8   A  Sometime this millennium --
9   Q  Okay.
10   A  -- is the best I can tell you.
11   Q  Okay.  So tell me about that.  I'm sorry I
12 interrupted you.
13   A  So it's -- It was quite an interesting case.
14 Normally consumer confusion cases rest on individual consumers
15 being confused between Brand A and Brand B.  They think that
16 Brand B came from Brand A.  So this case involved a business
17 setting where they are writing, you know, million dollar
18 checks.  So the question is who would ever be confused at your
19 million dollar check was going to this company versus this
20 company.  So I was opining about the fact that the way
21 businesses buy products still allows for this type of confusion
22 when somebody gets their foot in the door to tell their story
23 because the customer may have thought it came -- the person
24 came from the other company.  That's the gist of what we are
25 talking about.

Page 46

1   Q  Okay.
2       MS. PALNITKAR:  Can you read back that answer
3 please.  There was a lot in it.  I just want to make sure I got
4 it.
5       THE REPORTER:  It was quite an interesting case.
6 Normally consumer confusion cases rest on individual consumers
7 being confused between Brand A and Brand B.  And they think
8 Brand B came from Brand A.  And this case involved a business
9 setting where they are writing, you know, million dollar
10 checks.  So the question is who would ever be confused at your
11 million dollar check going to this company versus this company.
12       MS. PALNITKAR:  Thank you.
13   Q  So you -- you gave your opinion on -- and forgive me
14 if I am wrong, I'm trying to understand -- the psychology of
15 someone who would be confused about a million dollar check
16 going to the wrong company?
17   A  It's not the psychology of it.  It is the -- the
18 business practice of selling an item in a business context
19 which still nevertheless allows for this type of confusion to
20 occur --
21   Q  Ah, okay.
22   A  -- even though the sums involved are large.
23   Q  Understood.  So the business practice behind it is
24 what you are talking about?
25   A  That leads to the possibility of these kinds of

Page 47

1 confusion.
2   Q  Understood.  What -- what is another time if you can
3 remember?  Oh, I'm sorry.  Let me interrupt myself.  Where was
4 that Axciom versus Axiom pending, do you recall?
5   A  It's Axciom A-x-c-i-o-m versus A-x-i-o-m.  I'm sorry.
6 The question is where was that?
7   Q  Do you remember what jurisdiction that was in?
8   A  Yes.  The trial was in Delaware.
9   Q  Delaware.  Okay.  Sorry to interrupt.  So what is
10 another time that you testified at trial?
11   A  So there was a -- This one didn't go to trial, so I
12 shouldn't bring it unless you want to hear about it.
13   Q  No.  That's okay.  Let's just stick with the trial
14 ones.
15   A  Yeah.  That's the only time I have testified at trial
16 on that.
17   Q  Okay.  So you said two to three times at trials, but
18 there was just -- it was just this one?
19   A  Oh, they were not all on confusion if that's what
20 you're asking me.
21   Q  What -- what is another time you testified at trial?
22   A  The -- It was a price discrimination case in state
23 court.  There was a lumber wholesaler being sued by one of his
24 customers because he was giving a different price to --
25   Q  Ah, okay.

Page 48

1   A  -- somebody else.
2   Q  And what was your opinion in that?
3   A  These cases are almost funny.  The -- It turns out
4 the client was his brother-in-law.  He was giving his
5 brother-in-law a discount.  And, you know, I don't know what
6 the outcome was.  I lose track of these things.  Everybody sues
7 everybody else and --
8   Q  Right.  So nothing to do with confusion there?
9   A  Well, yes and no.  Because the question there was
10 when I put out a quote for lumber in response to a query, was
11 that supposed to have gone only to you or was it supposed to
12 have gone to somebody else.  And there's a question of if you
13 received it, were you confused about the fact -- If you didn't
14 get it, were you confused about the fact that you thought you
15 were getting the same price as somebody else.
16   Q  Okay.  I see.  All right.  All right.  And any other
17 times that you have testified?
18   A  Not testified, but written reports, yeah.
19   Q  Okay.  So let's look at these four cases, and the
20 first one, WWI Franchise Holdings, this -- this case is still
21 ongoing.  Correct?
22   A  That's right.
23   Q  And it says you filed your report whether
24 Mr. Squadroni used proprietary marketing information from his
25 previous employment with WWI in his new position with another

Page 49

13 (Pages 46 - 49)

1 firm. Is that correct?

2   A   That's right.

3   Q   And so this has to do with using information from

4 Employer A in Employer B?

5   A   Generally speaking. There are lots of issues there,

6 but I was just asked to talk about what was the nature of the

7 information and -- and so on and so forth, not -- not the other

8 issues. There are a lot of issues.

9   Q   Were there any surveys involved in this case or in

10 your opinion of this case?

11   A   Not in my opinion.

12   Q   Number two, Johnson Controls, you're an expert

13 witness in connection with an IRS issue.

14   A   That's right. Yeah.

15   Q   Okay. Are there any surveys involved in this case?

16   A   Again, not surveys that I conducted, but surveys that

17 were conducted by other people.

18   Q   Are you giving an expert opinion as to the validity

19 of those surveys?

20   A   You know, that matter is still ongoing. I don't know

21 what my ability is to speak to those things.

22      MR. KIRKMAN: Don't -- don't do that if you feel

23 uncomfortable.

24   A   Yeah. I would rather not get into the details.

25   Q   Okay. Well, it's just going on what you have said

Page 50

1 here. I filed a report that assessed whether JCI's brands were

2 more appropriately considered as having a finite useful

3 remaining life. What does that mean?

4   A   So this is a hot topic in brands. Do brands last

5 forever or do brands slowly lose their relevance over time and

6 depreciate. That's sort of the two sides of that -- that

7 argument.

8   Q   So would that -- It would be fair to say the

9 longevity of a brand --

10   A   Yes.

11   Q   -- is similar to what you're talking about?

12   A   Longevity is implicitly infinite if you take one

13 position, and it is finite if you take the other position.

14   Q   That's interesting. Number three, Furniture

15 Dealer.NE Inc. versus Amazon. It says here that you were an

16 expert witness for the defendant.

17   A   Yes.

18   Q   And filed a report about influences and on-line

19 customer marketing journeys. Is that correct?

20   A   That's right.

21   Q   You assess the impact of product information elements

22 on a consumer's propensity to purchase. Is that correct?

23   A   Yes.

24   Q   What is a consumer journey?

25   A   I actually describe it in my report for this case as

Page 51

1 well. So let's say you are going to buy an airline ticket.

2 So, you know, your first -- the first stage is, hey, I need to

3 travel. And there may be a variety of reasons why that is.

4 Then I go to the next step. And there are five or six steps

5 that I detail. I can go through each one or --

6   Q   We will go through it in your report when we get to

7 your report.

8   A   Okay. So --

9   Q   No. I am just asking in general what is a consumer

10 journey?

11   A   It's the steps we go through from initiation of I

12 need to do something to the final culmination of yes, I

13 purchased it or I didn't purchase it. It's that -- It's that

14 series of steps.

15   Q   So the -- Is it safe to say it's a -- it's some of

16 the psychology or what a -- what a customer goes through in

17 order from inception to actually making the purchase?

18   A   Or not making the purchase for one.

19   Q   Right. Okay.

20   A   A lot of us will drop out. And it's not just

21 psychology. It's just -- It applies to businesses. It applies

22 to consumers. It's just the steps that anybody goes through.

23   Q   Uh-huh. And it's all related to the consumer side.

24 Correct?

25   A   It applies to businesses as well. If a business is

Page 52

1 making a purchase, they go through a series of steps. It looks

2 different, but it's still a series of steps.

3   Q   Okay. So a consumer journey has to do with the

4 purchaser and whether or not they ultimately decide to

5 purchase. Okay. Let me strike that. A consumer journey has

6 to do with the consumer's mindset and whether they decide to

7 purchase or not to purchase any given item?

8   A   So I will just not use the word mindset. It's simply

9 what do we observe. And sometimes we don't observe a step, but

10 it's happening nevertheless. We have to make some inferences.

11 So it's simply the series of important steps that we can use to

12 characterize the start of a process and the end of a process or

13 at least a temporary end of a process.

14   Q   And all those processes relate to a consumer's

15 decision?

16   A   At each step there's a decision. Excuse me. Do I go

17 on? Do I drop out? Do I cycle back? So it's a series of

18 connected decisions which may end up in a purchase which may

19 end up in a non-purchase or buying something else.

20   Q   Okay. Very good. And we will get into that. All

21 right. Now we will start looking at your report, if we will.

22      MR. KIRKMAN: Can we have a short break?

23      MS. PALNITKAR: Okay.

24      THE VIDEOGRAPHER: Off the record at 10:43 a.m.

25      (A break ensued from 10:43 a.m. to 10:54 a.m.)

Page 53

14 (Pages 50 - 53)

1    THE VIDEOGRAPHER: On the record at 10:54 a.m.
2    Q   All right. If I could turn you to Exhibit 2, which
3  is your expert report on page one there.
4    A   Yes.
5    Q   Let me know if you are there. Okay. I am going to
6  go through some of your report and talk about some -- some
7  certain things, and we will chat about that. First I am going
8  to go to this paragraph here where it says to arrive at these
9  opinions. Do you see that?
10   A   Yes.
11   Q   Okay. To arrive at these opinions he, and you're
12  referring to Jerry Wind. Correct?
13   A   Yes.
14   Q   Relies principally on his analysis of the data from
15  the Wind report experience -- experiment where he showed each
16  person in his sample screenshots a pair of hypothetical website
17  results. Is that correct?
18   A   Yes.
19       MR. KIRKMAN: Website search results.
20       MS. PALNITKAR: Oh, thank you, Bill. Website
21  search results. So let me start over.
22   Q   Where he showed each person in his sample screenshots
23  of a pair of hypothetical website search results. Is that
24  correct as I have read it?
25   A   There's a little bit more to the statement, but

Page 54

1  that I gathered. So if I search, I get a set of results. If
2  you search, you are going to get possibly different results.
3  If I were to present you with my results, it would be
4  hypothetical. That's the meaning of the word hypothetical
5  here.
6    Q   Do you have any reason to believe that the search
7  results that are displayed on Jerry Wind's stimuli are false?
8    A   It's not so much that the stimuli are false. It's
9  the analysis of the data that results from it that don't
10  support the conclusions. That's what I am getting at.
11   Q   But my question was about the stimuli and not the
12  analysis. So do you have any reason to believe that the
13  screenshots he put up there are fake?
14   A   I wouldn't use the word fake. It's talking about the
15  generalizability and validity of the results that I conclude
16  from showing you those things, and that's what I'm getting at.
17   Q   Thank you. So you're talking about the results.
18  Okay. Now, it says in the next paragraph, the last paragraph
19  on the page, second sentence, this report and my analysis are
20  based on my education, training, experience and expertise in
21  the matters at issue. Correct?
22   A   Yes.
23   Q   What do you believe are the matters at issue here?
24   A   I think the three -- If we look above that page, for
25  me the matters at issue are these three conclusions that he --

Page 56

1  yes --
2    Q   Okay.
3    A   -- you're reading it correctly.
4    Q   Well, my question is about the hypothetical website
5  search results. Do you see where that is?
6    A   Yes.
7    Q   Why do you say hypothetical here?
8    A   Because there are no consequences to the results.
9  Somebody is not making a decision based on the results.
10   Q   Are they screenshots of actual website search
11  results?
12   A   I believe that's what Professor Wind describes in his
13  report. I use the word hypothetical to re-enforce the fact or
14  to describe the fact that a person is asked to respond to
15  something, and they -- they do not do the natural things we do.
16  Meaning if I search for something, I either search more or I
17  stop searching or I do something else. And none of those
18  things are true here.
19   Q   So you're talking about your consumer journey here.
20  This is a -- This is a hypothetical because it is not because
21  it is not accurate. That's what I am trying to ascertain. Are
22  you -- Are you using a hypothetical to say that these search
23  results are not real?
24       MR. KIRKMAN: Form.
25   A   It is not real in the sense it's not a search result

Page 55

1  that he offers. I consider those core opinions. And that's --
2  that's the matters at issue for me.
3    Q   Have you read the complaint, the first amended
4  complaint in this case?
5    A   I have seen it, but I -- I -- I didn't pay a lot of
6  attention to it. I just focused on the Jerry Wind report.
7    Q   Do you know the -- the allegations that -- Let me
8  strike that. Do you know what American is arguing in this
9  case?
10   A   Not in the way a lawyer would read it. I just saw
11  the complaint, and then I went straight to the Jerry Wind
12  report. And that was my -- that was my focus. That's what I
13  was asked to focus on.
14   Q   Okay. Do you know that trademark infringement is one
15  of the allegations that American is making against Skiplagged
16  in this case?
17   A   Maybe, but that was certainly not something I focused
18  on.
19   Q   Okay. So you are saying you focused on the three
20  numbered -- numbered items here in this number one?
21   A   That's what I consider the core opinions that he
22  has.
23   Q   Okay.
24   A   He breaks that up later into sub things. I don't go
25  through each one. I consider these as -- as -- I think I

Page 57

1 believe he calls that a section called Summary of Opinions. So
2 I just used those.
3    Q   Let's go through these three core opinions --
4    A   Sure.
5    Q   -- to start off. So can you describe the first core
6 opinion here listed at number one?
7        MR. KIRKMAN: Form.
8    A   I -- I can read.
9    Q   What -- What is the -- What is the first core opinion
10 you looked at?
11   A   So let me read on page one. Skiplagged deceives
12 consumers of hidden city tickets by not effectively disclosing
13 to them all of the serious risks and consequences imposed by
14 airlines in connection with hidden city tickets.
15   Q   So this core opinion has to do with hidden city
16 tickets. Correct?
17   A   Among other things, the risks and consequences
18 imposed by airlines and so on and so forth.
19   Q   In connection with hidden city tickets?
20   A   Yes.
21   Q   And this has to do with an allegation that Skiplagged
22 is deceiving consumers. Correct?
23       MR. KIRKMAN: Form.
24   A   Are you still at point one?
25   Q   Yes.

Page 58

1 ticket. The second one is deceiving customers into the price
2 of a non-hidden city ticket. So there's multiple elements
3 involved there.
4    Q   Okay. And let's go to the third core opinion. Could
5 you tell me what that is about?
6    A   Again --
7        MR. KIRKMAN: Form.
8    A   -- Dr. Wind's words are confusion. So Skiplagged
9 confuses consumers into believing -- and I can read the rest of
10 the sentence, but if you want me to, I can do that.
11   Q   Go ahead.
12   A   That Skiplagged is associated with or authorized by
13 American either as an authorized travel agent for American or
14 as having some other direct relationship with American.
15   Q   Okay. So these are the three core opinions that you
16 said you reviewed or you focused on when you were creating this
17 report. Correct?
18   A   That's right.
19   Q   Okay. Let's go to page two. I think we covered most
20 of that. Okay. So let's go to page three here. The second
21 paragraph say my training, teaching and research includes
22 the design, development and analysis of surveys. I think we
23 already established that you have not designed a likelihood of
24 confusion survey. Correct?
25       MR. KIRKMAN: Form.

Page 60

1    A   I think that's the big part of this. It's -- You're
2 deceiving consumers with respect to all of the stuff that
3 follows, yes.
4    Q   Hidden city tickets. Correct?
5    A   Yes.
6    Q   And the second core opinion is that Skiplagged
7 deceives consumers into believing that purchasing a regular
8 non-hidden city ticket is cheaper than purchasing the same
9 flight from American. Correct?
10   A   That's what Dr. Wind says, yeah.
11   Q   And you looked at this second core opinion?
12   A   Again, just like number one, number two is about
13 deception, a different type of deception. Number one is the
14 deception about consequences and so on and so forth. This one
15 is about price, which is still deception.
16   Q   And this is also about a non-hidden city ticket.
17 Correct?
18       MR. KIRKMAN: Form.
19   Q   So the first -- the first core -- core opinion has to
20 do with deception of hidden city tickets, and the second core
21 opinion has to do with deception about prices on a non-hidden
22 city ticket. Is that how you understood it?
23   A   Not quite. I think it's a little bit more nuanced
24 than that. The first one is about deceiving customers with
25 respect to risks and consequences of -- of buying a hidden city

Page 59

1    A   I have designed many surveys. I have not done any
2 consulting engagements on likelihood of confusion.
3    Q   I believe your testimony also said that you have not
4 designed a likelihood of confusion survey. Correct?
5    A   That is not quite true because remember, I did a
6 presentation. I don't have a written document based on that,
7 but that presentation did involve likelihood of confusion.
8    Q   A survey?
9    A   Yes.
10   Q   That you designed?
11   A   Yes.
12   Q   And you conducted?
13   A   Yeah. I mean I survey and conduct my own things, but
14 I don't have a document. I want to impress that on -- on you
15 because that was just a presentation.
16   Q   Okay. So you -- And that was in 1980.
17   A   A long time ago.
18   Q   But since then you have not conducted a likelihood of
19 confusion survey. Correct?
20   A   That's right.
21   Q   The next paragraph says I have also consulted on many
22 topics closely related to the issues in this case. Do you
23 consider the -- the issues in this case to be the three core
24 opinions we just spoke about?
25   A   I think you view them differently from me. I think

Page 61

16 (Pages 58 - 61)

1 of it as deception and confusion. And then the subject matter,
2 the deception and confusion would be hidden city tickets,
3 pricing and the relationship to American Airlines.
4    Q   Okay. And the last paragraph there just above roman
5 numeral three says my work on customer journeys and search and
6 digital channels is closely related to the issues I have been
7 asked to address on this case. Correct?
8    A   Yes.
9    Q   How are customer journeys related to determining
10 whether Skiplagged is affiliated with American Airlines?
11       MR. KIRKMAN: Form.
12    A   I am not sure I understand the question. The
13 customer journey of an American Airlines' customer, is that
14 what you're asking me?
15    Q   Well, you said the issues in this case relate to
16 those -- relate to deception, confusion and affiliation.
17 Correct?
18    A   I use different words, but yes, that's essentially
19 the same point, yeah.
20    Q   Okay. And so I am asking you just taking that third
21 prong of the three that you just enumerated, my work on
22 customer journeys is closely related to the issues I have been
23 asked to address in this case. So my question to you is how
24 does a customer journey relate to whether Skiplagged is
25 affiliated with American Airlines?

Page 62

1 the design of his experiments do not faithfully represent a
2 realistic picture of the customer journey that an American
3 Airlines' customer would take.
4    Q   My question to you though is are his -- is his survey
5 testing for a consumer journey?
6       MR. KIRKMAN: Form.
7    Q   Is it testing elements of a consumer journey?
8       MR. KIRKMAN: Excuse me. Form. Asked and
9 answered.
10    A   I am not sure how to answer the question because the
11 issues here, one cannot be deceived or confused without a
12 customer journey. So yes, the issues that he's testing are
13 part and parcel of a customer journey. You can't have one
14 without the other.
15    Q   Could you elaborate?
16    A   Okay. I cannot be deceived if I am not undertaking a
17 journey. I cannot be confused if I am not undertaking a
18 journey. So you can't -- you can't separate the issues of
19 deception and confusion from the presence of a customer
20 journey. It's -- it's an integral part of the customer
21 purchase. And to speak about being -- being confused or being
22 deceived by another actor only occurs in the context of a
23 journey.
24    Q   So a customer journey as you have put it before is to
25 decide if someone is going to -- how they come to a purchase

Page 64

1    A   In many many ways. So let's -- let's start from the
2 beginning. What are digital customer journeys? It's search.
3 Let's just start there, okay, on-line search. So when I get
4 the results of an on-line search, that's one step. It's the
5 first step of the -- the journey, as I said, is need
6 recognition which is really not relevant here. So the first
7 meaningful step would be I do a search, and I may choose the
8 site to go to. I may choose Skiplagged. I may choose American
9 Airlines. So right there we have a question of where I start
10 my search. So that's -- that's -- that's the connection to the
11 issue here because it clearly speaks to deception and
12 confusion. If I go to Skiplagged and I think I am going to
13 American Airlines, that's clearly confusion. So there are many
14 many places where the -- the way somebody searches on-line and
15 the steps they take are connected to these issues of deception
16 and -- and confusion. The information I get back is -- is an
17 opportunity to be deceived or confused. So there's another
18 connection. And the steps I take after I get the results back
19 is another place where I get confused -- could be confused and
20 take a step that I would not have taken had I known something
21 else. So there are many many connections.
22    Q   Thank you. Is Dr. Wind's survey testing for steps of
23 the consumer journey?
24       MR. KIRKMAN: Form.
25    A   Not in the way that I -- I describe in my report why

Page 63

1 and whether or not they are going to purchase something.
2 Correct?
3    A   No.
4    Q   Okay. I think that was what we had talked about
5 before. How am I wrong?
6       MR. KIRKMAN: Wait a minute. You don't tell
7 people and lecture. You ask questions.
8       MS. PALNITKAR: I said I think.
9       MR. KIRKMAN: Move to strike.
10       MS. PALNITKAR: I think that's what I -- that's
11 what I understood a customer journey to be. Objection to your
12 sidebar. These are my questions that I am asking.
13    Q   I think that's what my understanding of what the
14 customer journey was based on our previous --
15    A   I have lost the question. Could you repeat it?
16    Q   The question is Dr. Wind -- Let me ask this. A
17 customer journey is the steps that one takes and the decisions
18 that they face when deciding or not to buy or not buy the end
19 product. Correct?
20    A   It's part of it, but it's more than that in some
21 respects.
22    Q   So do you think that the relevant customers in
23 this -- in this -- in Dr. Wind's survey are American Airlines'
24 customers?
25    A   Not the way he did the survey.

Page 65

17 (Pages 62 - 65)

1  Q  I am not asking the way he did -- Is the universe of
2  customers here that we are testing for American Airlines'
3  customers?
4      A  That he --
5          MR. KIRKMAN:  Form.
6      A  Excuse me.  That he intended to test for or what he
7  actually did?  What are you asking me?
8      Q  I am asking in a survey to test deception between
9  Skiplagged consumers -- I mean between Skiplagged and -- Strike
10 that.  In a survey to test whether Skiplagged is affiliated
11 with American Airlines when buying an American Airlines ticket,
12 is the universe of consumers that -- is the universe of
13 consumers American Airlines' customers?
14         MR. KIRKMAN:  Form.
15     A  I am having trouble answering the question because
16 you say is the universe.  So are you referring to the universe
17 he's using, or are you asking the question what should the
18 universe be?
19     Q  No.  I am asking what is -- what is he using.  So in
20 Jerry Wind's survey what is the universe of relevant
21 consumers?
22     A  So by the way, he calls them experiments.  I prefer
23 to use his language.  In his experiments he starts with
24 anybody.  He's got a set of screeners, but essentially it boils
25 down to effectively any air traveler that's -- that's used
                                                    Page 66

1  on-line ticketing, I believe.  He's got a set of screeners.  I
2  can't remember exactly what it is, but it's not people -- it's
3  not confined to people who have actually bought a ticket from
4  Skiplagged.com.  I don't -- I can't remember exactly, but I
5  don't think it's even people who have bought a ticket from
6  American Airlines.  I think it's more -- it's broader than
7  that.
8      Q  He's -- You think other airlines are -- should -- I
9  mean a consumer's journey to buy other airlines should be
10 tested here?
11         MR. KIRKMAN:  Form.
12     A  Okay.  Again, I am completely confused.  Are you
13 asking me what he should have done or what he did do?
14     Q  I am asking you what is the relevant universe?
15     A  So that's a should question, not what he --
16     Q  What do you think the relevant universe -- universe
17 of customers is?
18     A  That's a big question.  I wasn't asked to look at
19 that.  I would have to think about it to find out how I would
20 do the study.  I -- I have a study in front of me, and I
21 responded to that study.  So one of the questions would be what
22 would be the relevant universe of confusion here.  There are
23 several possibilities.  I would have to think about it.  It's
24 hard to formulate a quick response to that because I wasn't
25 asked to do that study.
                                                    Page 67

1      Q  So you haven't done a study or any kind of analysis
2  on the relevant universe of consumers here?
3      A  I -- Again, that's a very broad question.  I know
4  what he did, and I have laid out what my response what he did.
5  I don't know if I want to go beyond that and say what I would
6  have done.  I don't offer an opinion on exactly how I would
7  have done the survey.  That wasn't what I was asked to do.
8      Q  Okay.  No.  I am not asking what you would have done.
9  I'm saying so you have not done any analysis.  Correct?
10         MR. KIRKMAN:  Form.
11     A  I have done my analysis of his report.  I have not
12 collected -- I have done a little bit of data collection
13 myself.  I did some -- some consumer searches myself, but
14 that's minor.  So I am depending on what he did for the first
15 part and trying to analyze his results, whether they line up
16 with the data that he's got and the design that he has.
17     Q  Okay.  Let me ask this in a easier way perhaps.  Have
18 you done any -- any experiments on any relevant uses -- any
19 relevant universes of consumers here for this case for your
20 expert report?
21         MR. KIRKMAN:  Form.
22     A  A little bit.  I personally did go on to the
23 websites, and -- and I show you in my report the results that I
24 got.
25     Q  Have you sampled any consumers other than -- well,
                                                    Page 68

1  not you because that's a hypothetical customer journey what
2  you're doing.  Right?  Because --
3      A  No.  I actually went through, and I am doing it
4  myself.  It's not hypothetical.  I am not -- I am not
5  extrapolating beyond myself.
6      Q  Did you buy a ticket at the end of your --
7      A  I did not buy a ticket, but customer journeys do not
8  have to end in a purchase.  I keep saying that.
9          THE REPORTER:  Do not have to end in what?
10         THE WITNESS:  Do not have to end in a purchase.
11     Q  So other than your customer journey, have you gotten
12 data on any other customer journeys as they relate to this --
13 this case?
14     A  Yes, I did.
15     Q  You actually had people go through and attempt to buy
16 the ticket?
17     A  No.
18     Q  Okay.  Did you have -- Did you have any -- collect
19 any data on potential purchasers?
20     A  No.
21     Q  Okay.  Have you designed any kind of survey
22 considerations into what a relevant universe of purchasers
23 would be here?
24     A  No.
25     Q  Have you conducted any data analysis on whether a
                                                    Page 69

                                        18 (Pages 66 - 69)

1 consumer would think Skiplagged is affiliated with American
2 Airlines?
3      A   I have looked at the conclusions of the data
4 collected by Dr. Wind.  I have not collected any data on -- on
5 affiliations myself.
6      Q   Have you con -- Have you collected any data -- Aside
7 from looking at what Dr. Wind has done, have you collected any
8 data on whether a consumer would display confusion?
9           MR. KIRKMAN:  Form.
10     A   Not personally, but I do show the results of my own
11 journey, and I make some conclusions about that, that I found
12 for my own sake.
13     Q   Uh-huh.  What is the sample size of your journey?
14     A   I think I am one person so that's --
15     Q   So N equals one for your single size.
16     A   Yes.
17     Q   Correct?
18     A   Yes.
19     Q   Do you think that is an acceptable sample size for
20 conducting a data analysis?
21     A   To disconfirm something, yes.
22     Q   What did you do when you were -- Well, I'll -- I'll
23 go to that later because we will go through that because you
24 talk about it later, but did you do any consumer -- sorry.  Did
25 you do any data analysis on various consumers' beliefs whether

Page 70

1 determine any kind of analysis of data, any samplings?
2      A   I have not conducted a survey questionnaire of any
3 consumers other than what I have seen in the Wind report.
4      Q   Other than what you have seen?
5      A   Other than what I have seen in the Jerry Wind
6 report.
7      Q   But that's not your data.  Right?  That's Jerry
8 Wind's data.
9      A   That's right.
10     Q   So I am asking have you come up with your own data?
11     A   I have.  Not from a survey, but from transportation
12 statistics.
13     Q   You came up with this data?
14     A   Yes.
15     Q   Okay.  Let's talk about this data on page 27.  What
16 does this data represents?
17     A   It represents the U.S. Department of Transportation's
18 data on passenger accounts from American Airlines.
19     Q   Okay.  And these are passengers who flew American
20 Airlines.  Correct?
21     A   According to the U.S. Department of Transportation,
22 yes.
23     Q   Well, you're putting this data forth, so I'm asking
24 you these questions.
25     A   I -- I believe the U.S. Department of Transportation

Page 72

1 or not -- as to whether or not they were deceived by
2 Skiplagged?
3           MR. KIRKMAN:  Form.
4      A   I analyzed the conclusions from the data that Dr.
5 Wind did.  I did not collect any data on my own.
6      Q   So you are not putting forth any of your own data as
7 it relates to a survey or an experiment that could have been
8 conducted.  Correct?
9      A   That's not true.
10     Q   How so?
11     A   Ask me a question and I will respond.
12     Q   No.  I am saying do you have any data that you're
13 presenting for an experiment the way Dr. Wind has presented his
14 data for his experiments?  Are you putting forth any data
15 related to experiments?
16     A   I do.
17     Q   Which experiments?
18     A   I don't know whether you call them experiments, but
19 if you look at page -- if you look at page 27, I show you U.S.
20 government data.  And if you look at page -- several other
21 pages, I show you the stimulus and responses that I got and
22 contrast that with the stimulus of which is only one that Dr.
23 Wind presents.
24     Q   Okay.  But my question is have you sampled other
25 consumers besides -- you know, other people besides yourself to

Page 71

1 data is, yes.
2      Q   Okay.  And what is the purpose of this data here?
3      A   I think I say that in the next sentence below the
4 table.  It is to put the -- data that Dr. Wind presents on
5 complaints to AmericanAirlines.com in context.
6      Q   Okay.  So you are saying here that -- Where is this
7 88 complaints coming from?
8      A   It's in his report.
9      Q   Well, tell me what that represents.
10     A   It represents complaints to AA.com.  That's what he
11 calls it.
12     Q   By whom?
13     A   By whatever Dr. Wind says it is.  We can go to his
14 report, and I can find it for you.
15     Q   Yeah.  I am asking you because this is you -- I am
16 trying to have you explain your report as you wrote it here.
17     A   That is not my number.  That is his number.  So let's
18 just go to see where he puts it.  So on page 26 I cite his
19 statement, 88 complaints of the term Skiplagged to Skiplagged,
20 80 of the complaints Delta hidden city.  These are accounts
21 with two data bases of customer complaints AA.com and
22 Skiplagged.com.
23     Q   Okay.  So these are complaints of passengers?
24     A   I would have to go to what Dr. Wind says there.  So
25 on page 28 of his report, of Dr. Wind's report, he describes

Page 73

19 (Pages 70 - 73)

1 where he gets that data from.

2    Q.   Okay.  Can you tell us?  Can you tell us what that

3 is?

4    A.   I will read what he says.  During the period January

5 1, 2018 to March 6, 2024 the AA customer complaint database

6 identified 88 complaints.

7    Q.   By Skiplagged consumers?

8         MR. KIRKMAN:  With the terms.

9    A.   With the terms Skiplagged or Skiplag.

10   Q.   Okay.  Have you read these 88 complaints that were in

11 the appendices?

12   A.   No.

13   Q.   Okay.

14   A.   I think I may have glanced at one or two.  I think he

15 offers some illustrative ones, but I didn't go through all 88

16 myself.

17   Q.   So if there are -- If this is referencing Skiplagged,

18 these are 88 complaints related to Skiplagged.  Correct?

19        MR. KIRKMAN:  Form.

20   A.   That's what Dr. Wind says.

21   Q.   So 88 complaints related to Skiplagged that

22 American Airlines has received.  Is that what you're writing

23 here in this -- in your paragraph on page 27?

24   A.   Which -- My -- my report, page 27?

25   Q.   Yes.  This is what you wrote, right, the 88

Page 74

1 complaints to AA.com?

2    A.   Correct.

3    Q.   Okay.  So you're -- So these are 88 complaints about

4 Skiplagged that were to AA.com.  Correct?

5    A.   I am simply referencing what Dr. Wind wrote here

6 during the period from January 1, 2018 to March 6, 2024, the AA

7 customer complaint database identified 88 complaints with the

8 terms Skiplagged or Skiplag.

9    Q.   Okay.  So --

10   A.   That's all I'm doing.

11   Q.   So do you think that relates to people who are

12 complaining with some kind of indication that Skiplagged is a

13 part of that complaint based on that -- those terms?

14   A.   It says the AA complaint -- customer complaint

15 database identified 88 complaints.  So that's what I am taking.

16   Q.   With Skiplagged in it.  Correct?

17   A.   Yes.

18   Q.   Okay.  So now -- So you're using that over the

19 denominator of 673 million which is all the passengers who have

20 ever flown on American Airlines.  Right?

21        MR. KIRKMAN:  Form.

22   A.   During the same period.

23        MR. KIRKMAN:  Form.

24   Q.   Okay.  Do you know how many of those passengers

25 booked their ticket through Skiplagged?

Page 75

1    A.   I have no clue.

2    Q.   Okay.  So do you think that is an appropriate

3 denominator to use when calculating your fraction of material

4 issues of complaints emanating from Skiplagged?

5    A.   Yes.

6    Q.   Okay.  Go ahead.  Explain.

7    A.   That's it.

8    Q.   So isn't it a more appropriate denominator only the

9 people who have flown on American Airlines that have booked

10 through Skiplagged if you're comparing the amount of complaints

11 of Skiplagged to those who have flown on American through

12 Skiplagged?  Is that not a more proper denominator than all the

13 people who have flown on American?

14   A.   Not necessarily.

15   Q.   Why not?

16   A.   Because you have to consider the people that did not

17 fly Skiplagged and would have generated a complaint.  This is

18 the problem with observational data.  It's very hard to make a

19 causal inference from observational data.  There's so many

20 reasons why people complain.  And there are many more reasons

21 why people don't complain.

22   Q.   You don't know how many of these 673 million people

23 booked through Skiplagged, do you?

24   A.   I don't.  I've already said that.

25   Q.   Why didn't you ask Skiplagged to tell you how many

Page 76

1 people have booked American Airlines tickets through this time

2 period via Skiplagged?

3    A.   My engagement was to respond to the Wind report.  And

4 that's what I did.

5    Q.   Yeah.  But your -- you responded by saying -- by

6 making a calculation here of 88 Skiplagged complaints over the

7 entirety of the universe of American Airlines' passengers

8 whether or not that corresponds to Skiplagged booked

9 passengers.  Correct?

10        MR. KIRKMAN:  Form.

11   A.   I don't make that -- I do not make that conclusion.

12   Q.   I agree.  I agree.  I think that --

13   A.   In this next statement, the next sentence says this

14 tiny fraction indicates there's not a material issue of

15 complaints to American Airlines emanating from Skiplagged or

16 Skiplagged bookings.  That's all I say.  That it's a very small

17 number in relation to the total number of people who fly

18 American Airlines.  We can conjecture from that that the number

19 of people who book through Skiplagged is either very very small

20 or that the people who book through Skiplagged don't complain,

21 either one.  I make no assertion as to which of those two might

22 be the possibilities it had.

23   Q.   Or maybe one more theory in that they booked -- they

24 complained to Skiplagged directly?

25   A.   That's your complaint.  That's your theory, not

Page 77

20 (Pages 74 - 77)

1 mine.

2 Q   There's 12,000 consumer complaints to Skiplagged that
3 are referenced in the Jerry Wind report.

4 A   If you say so.  I am not -- I am not referencing that
5 here.  We can go to that topic if you wish.

6 Q   Well, that's -- that's part of my issue is that you
7 are not referencing that.  You are saying that the total number
8 of complaints about Skiplagged are just 88, when in fact they
9 are 12,000.

10 A   I deal with the 12,000 later.  It says here on the
11 bottom of page 26 of my report I reference the 12,000 and
12 discuss that.

13 Q   So you are saying there's a -- there's either people
14 who didn't complain or people who complained to Skiplagged.
15 Correct?

16 A   I discuss that on page 27.

17 Q   I am asking you a question.

18       MR. KIRKMAN:  Don't -- don't interrupt him,
19 ma'am.  Let him finish his answer.  Go ahead.

20 A   So you asked me where -- did I just ignore the
21 12,000.  And on -- on the third full paragraph on page 27 I
22 tell you -- I write the following.  Turning to the
23 Skiplagged.com database, the magnitude of the 12,000 off the 30
24 -- 30,000 e-mails to Skiplagged's support e-mails described in
25 the Wind report is reflecting deception or confusion, in

Page 78

---

1 quotes.  That's his words.  My response is that cannot be
2 interpreted without knowing the number of tickets booked in
3 Skiplagged.com  Given the millions of customers flown by
4 American Airlines, even this number appears very small.

5 Q   So here you are saying that you cannot interpret
6 these -- this calculation without knowing the number of tickets
7 booked on Skiplagged.com.  Correct?

8 A   You cannot interpret the 12,000.

9 Q   What do you mean you cannot interpret the 12,000?

10 A   I am just reading what I wrote --

11 Q   Yeah.

12 A   -- as reflecting deception or confusion.

13 Q   Okay.  But -- Because you don't know how many tickets
14 were booked on Skiplagged.  Correct?

15 A   Without -- Cannot be interpreted without knowing the
16 number of tickets booked on Skiplagged.com.

17 Q   So if you did know the number of Skiplagged.com
18 tickets -- I'm sorry -- the number of tickets booked on
19 Skiplagged.com, what would you do with that?

20 A   I -- I don't have that number in front of me.

21 Q   But I am saying if you did have that number?

22 A   I would have to see the number, and I would see what
23 the circumstances were under which these things were collected
24 and how they were identified as deception or confusion.  I
25 would have to do all of that.  And I didn't do any of that.

Page 79

---

1 Q   If one has that number -- I am not saying what you
2 would do right now -- how -- Would you do a mathematical
3 calculation to -- to ascertain whether that's significant?

4 A   There's no statistical significance attached to these
5 numbers, first of all.

6 Q   That you have written here?

7 A   Yeah.  You can't calculate anything statistically
8 significant or not from two numbers, 12,000 and 30,658.

9 Q   Then how do you say in the first paragraph this tiny
10 fraction indicates there's not a material issue of complaints?

11 A   Right.

12 Q   Where -- where -- What is material issue based on?

13 A   Compared to the millions of people who travel
14 American Airlines, this number is tiny.  The 88 is tiny under
15 any circumstances.  It's just simply not material.  If -- if
16 this were a class, I would say this is just froth in the coffee
17 cup.

18 Q   Uh-huh.  But that -- that 88 complaints -- sorry --
19 that 673 million passengers flown on American Airlines is
20 people who book in all sorts of manners, correct, not just
21 through Skiplagged?

22 A   I have no idea how they booked it, but everybody flew
23 American Airlines.

24 Q   Right.  Well, did everyone who fly American Airlines
25 book through Skiplagged?

Page 80

---

1 A   Probably not.

2 Q   Did they book from other sources as well?

3 A   I don't know.  Some of them probably didn't even book
4 it themselves.  If it's a family traveling, somebody booked on
5 behalf of all of them.  So there's lots of things there.

6 Q   Right.

7 A   I just know the number of passengers that flew.

8 Q   Right, but you -- you're saying you don't know how
9 all these 706 -- 673 million people booked their tickets.
10 Right?

11 A   I have said that several times.  I don't know that.

12 Q   Okay.  And you don't know how many of those are
13 booked through Skiplagged?

14 A   I don't know that.

15 Q   Okay.  So how do you -- What if it was a thousand
16 people who booked through Skiplagged, then would the 88
17 complaints be a material issue?

18 A   Eight percent -- 88 out of a thousand is about --
19 what is that?  10 percent is 100.  So about eight percent is
20 not a particularly high number or a low number.  It's what I
21 have seen in the range of complaint data.  That would probably
22 put it somewhere in the acceptable range.  When you get
23 complaints running above 10, 20 percent, then people start
24 getting worried.  It's not a science.  It's simply an art.  And
25 that number 88 out of a thousand, the hypothetical you posed

Page 81

---

21 (Pages 78 - 81)

1 would not be a show-stopping number.
2   Q   Okay. But it's not a science. It's an art. And
3 does the art have a methodology that shows you what is an
4 alarming number of complaints or a percent of complaints?
5   A   Generally what we do is look at the history of -- of
6 -- of the numbers. So it's more important whether those
7 numbers are increasing, whether those numbers are static,
8 whether -- how -- how do those numbers compare with other
9 airlines, things like that. That's how we decide whether it's
10 material or not.
11   Q   Uh-huh. And what -- Where could I find this
12 methodology to determine this that you're referring to?
13   A   You would have to spend money to create the numbers.
14   Q   Create which numbers?
15   A   Complaint numbers. If you want to interpret
16 complaint numbers, you would have to have the sense of what is
17 the standard -- standard number of complaints of the airline
18 business and your competitors, all kinds of things like that.
19 So there's a -- there's a cottage industry of consultants that
20 are happy to take your money and do those surveys for you.
21   Q   But you haven't done any of that -- that analysis
22 onto what is a -- what is an alarming number of percent of
23 complaints. Right?
24   A   I was not asked to collect any data here, and I have
25 not collected any data. I have said that many many times.

Page 82

1   Q   Okay. Do you think that 12,000 complaints is a
2 significant number or is a material number?
3       MR. KIRKMAN: Form.
4   A   Again, we have to go through the same exercise. What
5 is the -- What is the -- the general frequency of complaints of
6 other sites of other things. So, for example, to give you an
7 example, if you look at returns, product returns is an example
8 of unsatisfied customers. Everybody in the on-line business
9 has a way higher number of returns than brick or mortar. So
10 you would have -- If you're in the airline -- If you're in the
11 on-line business, you can't compare yourself with a brick and
12 mortar person and use the same numbers and say, oh, you know,
13 my numbers are bad. You would have to look at people in the
14 same circumstances as you, and that takes money and time and
15 effort to develop.
16   Q   If you had a company that -- where 12,000 people
17 complained that they were being confused or deceived, would you
18 be worried?
19   A   Again, I have no idea what the context is. Show me
20 the context. Show me the norms for that industry. Show me
21 what the competitors are doing, and then we can arrive at a
22 conclusion as to whether it's high, low or middling.
23   Q   Have you read any of the complaints that are in the
24 appendices to Jerry Wind's report?
25   A   Again, I have skimmed the illustrative ones he pulls

Page 83

1 out and kind of vaguely looked through the -- the content of
2 what -- what he is describing.
3   Q   But you haven't read the complaints?
4   A   No.
5   Q   Okay. Then in your overview opinions you say your
6 opinion is limited by the facts -- I'm sorry. I'm on page
7 three. Excuse me.
8       MR. KIRKMAN: Three of his report?
9       MS. PALNITKAR: Yes.
10      MR. KIRKMAN: Okay.
11   Q   On page three under roman numeral three it says
12 necessarily my opinion is limited by the facts and data
13 available to me. Is that correct --
14   A   Yes.
15   Q   -- as I have read it? And what data was available to
16 you when you were asked to review Jerry Wind's report?
17   A   Basically the only data available to me -- made
18 available to me was the Jerry Wind report.
19   Q   Which include the appendices?
20   A   Yes.
21   Q   And all the consumer complaints that were in those?
22   A   You know, there were so many appendices I -- I can't
23 remember where the complaints were --
24   Q   Okay.
25   A   -- whether it was separate files or there were

Page 84

1 appendices to the report or what have you.
2   Q   Are you aware that complaints can be evidence of
3 actual confusion?
4   A   I have no idea what the legal standard is for
5 complaints vis-a-vis confusion.
6   Q   And you say that Dr. Wind is mistaken with respect to
7 each of these three three core opinions that you list below.
8 Correct?
9   A   That's what I write.
10   Q   Okay. So let's take a look. Oops. If you're
11 teaching your marketing class and you review consumer
12 complaints about being confused on something, as I am sure you
13 have, do you use that as empirical evidence?
14      MR. KIRKMAN: Form.
15   A   Evidence of what?
16   Q   Do you consider that -- Let me re -- Let me strike
17 that question and re -- restart it. When you are going through
18 your marketing courses and you're reviewing marketing data
19 literature, is a form of evidence as to confusion, could
20 that -- could that -- could you find evidence in a consumer
21 complaint which discusses confusion?
22      MR. KIRKMAN: Form.
23   A   I would not rely on that as the sole indicator. It
24 would be one of the many things that might enter into an
25 analysis of how satisfied our customers are and so on and so

Page 85

22 (Pages 82 - 85)

App'x 164

1 forth, whether they are confused and so on and so forth.
2 Confusion might be a cause of the complaint. It might not be.
3 So we would have to look at a variety of different facts and
4 put them together in the context of that business.
5    Q   So if a consumer said they were confused and you have
6 12,000 such complaints, would that be one piece of evidence to
7 use when factoring in your entire review?
8       MR. KIRKMAN: Form.
9    A   So let me make sure I understand the question you're
10 asking me. So the company receives a communication. I
11 consider that a -- Not every communication is a complaint. It
12 may be a question. So assuming we somehow re-categorize that
13 as a complaint and put it into the complaint database, and then
14 further we inspect it to see if the stated desire -- stated
15 language in the complaint was that I was confused and I bought
16 something that's not the right thing, would that be one piece
17 of evidence under all of those stipulations? Yes, that's one
18 piece of evidence.
19    Q   So I am going to go through your customer journey
20 section here in IV-A for a moment.
21    A   Yes.
22    Q   Let's go to -- Okay. So here you say in the last --
23 last sentence on this page four, marketing textbooks commonly
24 describe these journeys as consisting of a few distinct stages
25 including -- and then you list five things. Is that correct?

Page 86

1 sequence. Stages has a connotation of sequence. So generally
2 speaking these things have some sequence to them.
3    Q   So there's -- I'm sorry.
4    A   So -- so we usually think of it as a sequence, but it
5 doesn't -- Again, I want to say people can drop in at any
6 stage. They can cycle back, but they generally have a temporal
7 sequence.
8    Q   So this is a -- These are stages of a consumer
9 journey that have been described in marketing textbooks. Is
10 that correct?
11    A   Yes.
12    Q   Okay. So now you can -- Now we will talk about need
13 recognition. The need recognition stage is exactly what you
14 just said is when a person begins to actively consider the
15 manner in which their journey may be fulfilled. Is that
16 correct?
17    A   That's right.
18    Q   Okay. How does this apply to a survey testing for
19 likelihood of confusion?
20       MR. KIRKMAN: Form.
21    A   So it's -- it's interesting because, you know, one of
22 the elements of the likelihood of confusion list you showed me
23 earlier was the place where you buy it. So if I am standing in
24 a -- in a health center and I see a -- a little display of
25 over-the-counter medicines and one of the medicines has some

Page 88

1    A   Yes.
2    Q   Okay. So what -- Can you explain to me what these
3 five elements or stages -- what is it? I don't know. That's
4 what I am asking you to explain.
5    A   So I explained it on page five. If you wish, I can
6 go through it again.
7    Q   Yes. See, so in this -- I am going through your
8 report, but I want -- I want you to explain to me what you have
9 here. So I don't like to -- I would like you to tell me.
10    A   Okay.
11       MR. KIRKMAN: Objection; form.
12       MS. PALNITKAR: There was no question there.
13    A   So the recognition -- I am going to actually read it
14 because it's -- I don't know how else to describe it. It took
15 some time to write the report. So that's probably the best way
16 to describe it. Need recognition as the name implies is -- are
17 those things that make a person begin to actively consider the
18 manner in which his or her need to travel might be fulfilled.
19    Q   Okay. Just to back up for one moment. The five --
20 The need recognition, information search, evaluation of
21 alternatives, purchase and post purchase, what are those
22 indicating? Are they stages or are they elements? That's what
23 I am asking.
24    A   Oh. You can call them stages or elements. It
25 doesn't matter. Elements does not have a connotation of

Page 87

1 brand name I have never heard of, I may well think that, you
2 know, these guys are displaying it in a health center. So I am
3 going to think that's actually a good insurance policy to have.
4 So I am going to buy some of it or at least consider buying
5 some of it. So all these stages can have an influence on us.
6 That's -- that's the point being made here.
7    Q   Are we testing -- Is -- is Dr. Wind testing the
8 decisions that influence a customer's journey in his
9 experiments?
10    A   I believe I say in the next sentence here, the
11 current case -- these are not central to the issues at hand,
12 and I don't see that in the Wind report either. So I just
13 basically ignore it.
14    Q   Okay. So need recognition is not part of the issues
15 here. Information search stage.
16       MR. KIRKMAN: Objection. Move to strike. You
17 cannot say things, ma'am. You are here to ask questions.
18    Q   So is it correct that you said the need recognition
19 stage is not at issue here?
20    A   That's what I write. In the current case these are
21 not central to the issues at hand.
22    Q   Thank you. The information search stage, please tell
23 me about this stage.
24    A   So --
25       MR. KIRKMAN: Form.

Page 89

23 (Pages 86 - 89)

1    A   Middle of that whole second bulleted paragraph, I
2    said this stage is the central focus of the current case.  So
3    everything here revolves around the actions surrounding the
4    stages of searching for information on-line, looking at the
5    results, making inferences about the results, taking the next
6    step and so on and so forth.  So that information search stage
7    is the -- is the key phase here.
8    Q   Did Dr. Wind's report ask its survey respondents to
9    search for information?
10   A   The -- He shows them the results of what would have
11   happened had they searched.  It's different from asking someone
12   to do their own search.  In fact, that's my criticism of it.
13   Q   I -- I agree.  He did show them the -- He did not ask
14   them to do the search.
15   A   I am glad you agree with my criticism.
16   Q   I do.  I do.  Because he is -- Is Dr. Wind testing to
17   see how a consumer would select certain things in his
18   experiments?
19   A   So again, back to this question of are you asking me
20   what he did do, which I respond to in my report, or are you
21   asking me what he should have done?
22   Q   I am asking you what he did do in his -- You're --
23   You're opining as to his survey.  Correct?
24   A   Yes.
25   Q   I am not asking you what he should have done because

Page 90

1    Q   And have you ever seen a likelihood of confusion
2    survey where the survey respondents were told to search for a
3    product?
4    A   <u>I have not seen any likelihood of confusion surveys</u>
5    <u>of late one way or the other.</u>
6    Q   Okay.  So my question is how is the information stage
7    relevant to a likelihood of confusion survey?
8    A   So I described that here at the bottom of page five
9    and continuing onto six.  So what I tried to say here is that
10   on-line searches are very different from off-line searches.
11   And I try to go through in detail as to why that is.  I am
12   happy to expand on that if you wish.
13   Q   Is Dr. Wind's experiments -- are his experiments
14   on-line?
15   A   It was executed on-line, but it doesn't reflect an
16   on-line search.
17   Q   Okay.  Are they -- Is it -- Are they given static
18   stimuli to review?
19   A   Essentially.  Given a sequence of stimuli.
20   Q   So they are not completing a customer journey in
21   order to select the stimuli they will ultimately view?
22   A   So the heart of my statement here on page five and
23   six is that on-line searches are very different from off-line
24   searches.  It's very different from showing you a picture of an
25   HEB aisle with cereal products and asking you, you know, which

Page 92

1    I -- I believe that you have not done your own survey.  Is that
2    correct?
3    A   I am not sure one leads to the other, but I have not
4    done my own survey.  That's right.
5    Q   Okay.  So we are talking about what he did do --
6    Q   Okay.  --
7    Q   -- to clarify.  So in his experiments did he ask them
8    about how they arrived at their beliefs, which is what you say
9    here in the information search about --
10   A   I am not sure where I say that, so could you point me
11   to that.
12   Q   In the second sentence.  You are saying the
13   information stage has to show how they would do their
14   information searches.  Correct?  How a consumer would do its
15   information searches.
16   A   I'm confused because I thought you said Dr. Wind said
17   something about where they derive their beliefs from.  Can you
18   just point me to that?
19   Q   No.  I am going to strike that question.  Let me ask
20   a better question.  Is Dr. Wind giving his -- his survey
21   respondents the opportunity to do their own information
22   search?
23        MR. KIRKMAN:  Form.
24   A   So in the study there is no such phase we ask them to
25   do anything other than to respond to the questions he poses.

Page 91

1    brand is which or something like that as opposed to doing an
2    on-line search for cereals.  Those are fundamentally different.
3    And the Wind design is much more applicable.  It's -- it's a
4    reasonable way to do an off-line search, but it is not a
5    reasonable way to conduct a study about on-line searches.  And
6    that's the point I am getting at here.
7    Q   But it is a reasonable way to do an off-line search?
8    A   No.  Off-line search I would say yes because we stand
9    in front of a store.  I see what's on -- on display, and I can
10   ask questions like, you know, do you think this product is from
11   X or Y.  We do that commonly in marketing, but we wouldn't do
12   that for an on-line search.
13   Q   Okay.  When you go down here still in number two on
14   page five and you say second, research indicates that on-line
15   searches will search multiple sites.  Do you see that?
16   A   Until they believe they have sufficient information
17   about the items.
18   Q   What research are you talking about?
19   A   There's a pretty large literature on -- in the
20   academic world on how people search on-line.  And -- one of
21   the -- kind of the -- the interesting counter-intuitive
22   paradoxes is that people don't search a lot of sites.  And --
23   and -- and we have sort of been puzzled by that.  And -- and
24   the conclusion with most studies was that it's because people
25   only search the next step if I think I don't have enough

Page 93

24 (Pages 90 - 93)

1 information. And it's so easy to go to the next step. It then
2 motivates the -- the first person to give you as much
3 information as they think you are going to need. So that's
4 what I am writing here. They will search multiple sites until
5 they believe. And that belief comes pretty quickly. Two or
6 three sites and you're done.
7    Q   Did you cite to the research that you reference here?
8    A   Yes. I give you one site for footnote three on my
9 own paper. For more information about the dynamic process of
10 on-line search behavior, see my research publication bottom of
11 page six.
12    Q   So the research that you're referencing here is your
13 publication. Correct?
14    A   Yes. Which then cites that literature. Part of
15 the -- Part of the reason why that is published is because we
16 provide an explanation for why search patterns seem to be
17 counter-intuitive and less so than what would be expected. All
18 you need to do is mouse click once, and you're to the next
19 site.
20    Q   Okay. And then later in that paragraph on page six
21 you say as I detail later, it is vital to examine the design of
22 the Wind's report's experiments. Correct?
23    A   Yes.
24    Q   And then you go on to say it doesn't place
25 respondents in an experimental setting that sufficiently

Page 94

1 closely resembles a real line -- a real world on-line search
2 for an airline ticket.
3    A   Yes.
4    Q   Have you ever seen a likelihood of confusion search
5 that asks respondents to go and navigate through a consumer
6 journey to end up at a product?
7    A   As I have told you, I haven't seen any likelihood of
8 confusion studies that speak to any of these issues. I have
9 seen many studies in industry, unfortunately not in the
10 academic world, which put people through these dynamic search
11 processes. It's been there for a long time. You know,
12 starting back from the early 80s we have been putting people
13 through these -- these processes, not on-line, even off-line.
14    Q   Okay. You just said you haven't seen any likelihood
15 of confusion studies that put people in as they relate to these
16 issues.
17    A   That people put through the -- I haven't seen any
18 likelihood of confusion studies in the last recent years of any
19 kind. I want to be clear in that. I have not been consulting
20 on that topic. And the cases I have been involved in have not
21 involved those kinds of studies.
22    Q   Okay. So do you know if any of those studies
23 incorporate the elements of this consumer journey?
24    A   The standard way to understand on-line consumer
25 search is to put people through these kinds of processes with

Page 95

1 stages.
2    Q   The standard way in a marketing study?
3    A   In any social science study, economics, marketing,
4 what have you, studying on-line searches.
5    Q   Okay. So then I'll -- I'll quickly go through the
6 evaluation and alternatives -- evaluation of alternatives as
7 your third stage in the customer journey. Here you say the
8 evaluation of alternative stage is concerned with the manner in
9 which a prospective traveler might assemble the information
10 acquired so as to make a summary evaluation of each alternative
11 along the attributes or dimensions that are important to the
12 traveler.
13    A   Yes.
14    Q   And you say these include attributes such as price,
15 number of stops, as well as less concrete matters like comfort
16 and brand image. Is that correct?
17    A   And reliability.
18    Q   And reliability. So was Dr. Wind's study concerned
19 with the manner in which a traveler might assemble the
20 information so as to make a decision on the purchase?
21    A   It is. In the next state -- In the next sentence I
22 say that the experiments in the Wind report focus principally
23 on deception and confusion which has subjective concepts. So
24 yes, he's talking about the beliefs people have after seeing
25 the stimulus he shows them. So that's essentially this stage.

Page 96

1    Q   Okay. And where is -- where does this information such
2 as price, number of stops, timing, comfort, reliability,
3 where is -- where does all this come from?
4    A   I -- I don't have exact sites, but on the Wind report
5 if you look at what he shows them, you can see price. You can
6 see the name of the airline. And people have their own
7 inferences from the information they see. So we know what he
8 shows them. And then all the inferences that they make are
9 what goes into their responses to the questions he asks them.
10    Q   But here you write about the evaluation of
11 alternatives, and then you list attributes which are factors
12 into this stage. Correct?
13    A   Which a prospective traveler -- Yes. It varies from
14 person to person, but these are the kinds of things they're
15 going to look at, yes.
16    Q   So I am asking where -- where did you get these kinds
17 of things?
18    A   Just common sense, price, number of stops, timing of
19 flights, things like that are common sense. I see no
20 particular data, and there is no data in this whole case in the
21 Wind report about how different people look for different
22 things. So for starters there's no -- there's no notion of
23 individual differences.
24    Q   Right.
25    A   So I am just talking about the attributes that people

Page 97

25 (Pages 94 - 97)

1 generally use.

2   Q   Okay.  So is -- Are the attributes that people use to

3 come to their decisions, is that relevant to the data that's

4 displayed in the Wind report?

5   A   Absolutely.  The -- the reason why it's relevant is

6 that I care about three or four things.  And if I am confused

7 or deceived into believing that those three or four things are,

8 you know, in such a way that it prompts me to buy or to think

9 more highly about it, that's central to the -- to what we are

10 talking about here.  So yes, deception and confusion are things

11 that muddy up my evaluative inferences about a particular

12 product or service I am going to buy.

13   Q   And if you -- There are ways to control whether

14 things are muddied up in a design experiment, aren't there?

15   A   I am not sure.  I think we are mixing up the stimulus

16 and the response.  The question here is whether people are

17 responding and are deceived or a confused fashion upon seeing

18 the stimulus.  That's -- that's the whole purpose of that, the

19 Wind experiments.

20   Q   So I am asking about the stimulus.  I -- I think that

21 your evaluation of alternative stage has to do with the -- and

22 tell me if I am wrong.  My understanding here is that the

23 evaluation of alternative stage has to do with the attributes

24 that are important to the traveler.  Correct?

25   A   The inferences I make about the attributes.  So let's

Page 98

1 take a simple example.  I see a flight.  I see the search

2 results, the things that he shows them.  And it says the price

3 is know, price is a relatively concrete thing.  So I

4 can take it at face value.  There may be some marginal issues

5 like, you know, are there some add-on prices or first bag is 50

6 bucks or something.  It irritates people endlessly when they

7 think about a -- concrete attribute like pricing.  You

8 discover even that was confusing.  Okay.  But something like

9 reliability or -- or just the attitude of the cabin crew,

10 that's a much more subjective thing.  It depends on your own

11 personal experience.  It depends on other things you've heard

12 from other people.  So that's much fuzzier even if they show

13 you a delightfully charming cabin crew member, it's a yeah,

14 they picked one -- somebody to do that.  But when you get onto

15 the plane, that's not the person you deal with.  So that's what

16 I am getting at here.  And it all comes from the stimulus.  And

17 what Wind does is he shows them a screenshot and said now you

18 tell me what you think about these matters, deception and

19 confusion and all that stuff.

20   Q   He shows them the stimulus and asks -- and then asks

21 them their responses to the stimulus.  Correct?

22   A   That's what we would call the dependent variables.

23 That's -- That's what he asked them.  And those are the matters

24 that are influenced by the stimulus in an appropriate way if

25 they were confused or deceived.

Page 99

1 they concerned with the inferences that you make as a

2 they concerned with the inferences that you make as a

3 prospective traveler?

4   A   So deception and confusion is all about I believe

5 something that is inaccurate or I believe something that is --

6 should be something else, or I shouldn't believe what I see.

7 All of those are inferences about attributes that I make in an

8 incorrect manner or in a -- in a confused manner based on the

9 degree of deception and confusion.

10   Q   I am not asking about deception and confusion.  I am

11 just asking are Jerry Wind's experiments concerned with the

12 inferences that a prospective traveler would make when deciding

13 whether or not to purchase a ticket?

14   MR. KIRKMAN:  Form.

15   A   You know, I am not sure because he's presenting data

16 on responses to open-ended questions.  How would you describe

17 this offer, for example.  That's one of his primary questions.

18 And then he starts coding it.  So I don't even know why he asks

19 that open-ended question.  That's -- It's sort of a bizarre

20 question as far as I am concerned, but it certainly gets to

21 inferences.  What do you -- How would you describe this offer

22 to somebody.  I believe those are his exact words, close to his

23 exact words.  So yes, it's -- it's -- it's all about

24 inferences, what did the consumer make of the stimulus, and

25 therefore how did they answer those questions or how did they

Page 100

1 respond to that open-ended query.

2   Q   And are you of the belief that open-ended questions

3 are not acceptable in --

4   A   They are --

5   Q   -- in surveying?

6   MR. KIRKMAN:  Let -- let her finish.  Go ahead.

7   A   In an experiment of the type that Jerry is conducting

8 here, open-ended questions introduce more noise into the

9 system.  So -- And I describe why it introduces more noise.

10 You have to provide a definition to those coders.  Those coders

11 then have to agree with themselves.  And actually none of those

12 details are provided to us or to me at least.  So that's why

13 generally people prefer not to ask -- generally would prefer to

14 ask close-ended questions that have been pre-tested so you kind

15 of know what that person is making of the words you're using.

16 Here we have to guess what that person is saying and the

17 meaning of the words that they are using.

18   Q   Okay.  I am just going to go through the -- the rest

19 of these two prongs, and then we will take a break.  Is that

20 all right?  Here on the price -- Let's see.  The fourth prong,

21 the purchase stage, this is concerned with the manner in which

22 a prospective traveler actually purchases the -- the chosen

23 alternative.  Correct?

24   A   That's right.

25   Q   And here you say the Wind report offers no conclusion

Page 101

26 (Pages 98 - 101)

App'x 168

1 about these issues, so I will not elaborate further.  Does that
2 mean that this stage is not relevant to the experiments?
3    A  I think there's two separate things.  I believe that
4 is an important stage, but it's not in the data.  It's not in
5 any of the parts of the studies that -- that I was asked to
6 respond to.  So I am not elaborating on that.  I don't think
7 Dr. Wind makes any particular claims about purchases.
8    Q  Okay.  And then the post-purchase stage is concerned
9 with matters including travelers' feelings, behaviors and
10 responses about their trip.
11       MR. KIRKMAN:  After their trip.
12    Q  After their trip.  Excuse me.  Let me start that
13 over.  The post-purchase stage, number five, is concerned with
14 matters including travelers' feelings, behaviors and responses
15 after their trip.  Did the Wind experiment ask its survey
16 respondents about the post-purchase stage?
17    A  So as you can see, what I write here is that it's not
18 in the survey that he asks that, but he says, hey, my survey is
19 valid because I validated it by the post-travel complaints
20 about Skiplagged.  So that's where the connection comes in.
21 It's not -- It's not part of the survey, experiments, whatever
22 we want to call it.
23    Q  So the Wind experiment is using real customers
24 post-purchase stage behaviors via the 12,000 or via the
25 complaints that -- that he has put in his appendices.  Correct?

Page 102

1    A  So it -- it's -- it's muddier than that.  You may
2 recall in his survey screeners he actually asked them have you
3 flown and have you done it before.  So some of the responses
4 that people have are -- are a function of the prior experience.
5 So you kind of actually disentangle the two.  The only thing he
6 says that I am going to have my complaint data validate my
7 experiment data.  And that's what I bring in here as being
8 relevant.
9    Q  I think we are talking about two separate sets of
10 people.  We have one set of people who are the people that Wind
11 conducted the experiments with, the survey respondents.  Right?
12    A  That's right.
13    Q  And we have one set of people who have submitted
14 consumer complaints, whether to Skiplagged or American
15 Airlines.  Correct?
16    A  That's right.
17    Q  Okay.  So let's talk about the first group of people.
18    A  Okay.
19    Q  Did -- Was Wind testing for the post-purchase stage,
20 their behaviors for the first set of survey respondents?
21    A  So what I am trying to tell you is that the fact that
22 people have flown before are going to influence the responses
23 to that stimulus they saw.
24    Q  Uh-huh.
25    A  And that's what I am saying.  We can't make a clean

Page 103

1 break between these two groups of people.  The people he uses
2 in the experiment are responding to that stimulus.  The problem
3 is the response to the stimulus is a function of many many
4 things including somebody who's a million miler versus somebody
5 who's -- who's not that way.  Those things have an influence on
6 the data that he gets in that study number one.  So I don't
7 want to separate those two as -- as -- as cleanly as you're
8 making them out to be.  I think they are -- It's a little bit
9 more muddied up than that.
10    Q  Are you saying that Dr. Wind should have surveyed
11 people who have never flown on-line -- by buying an on-line
12 ticket?
13    A  You know, that's a really good question.  I don't
14 have an answer to that because that's one of the -- the big
15 questions that always comes up when we do surveys of deception
16 and confusion.  Should we only talk to people who actually
17 bought our stuff or should we talk to people who haven't bought
18 our stuff presumably because they don't trust us.  So it
19 becomes a big research question, and there's no easy answer to
20 that.
21    Q  Are you saying the universe of people he selected for
22 his experiment is flawed?
23    A  I am not sure because I didn't look at that universe.
24 I just looked at the responses that he got.  And I am saying
25 even if we assume the -- the universe that he selects is

Page 104

1 appropriate, my problem is with the responses and making the
2 inferences from the responses.  It's a whole different question
3 what the universe should be.  I did not actually look at that
4 question.
5    Q  Okay.  We will take a break.
6       MR. KIRKMAN:  Okay.
7       THE VIDEOGRAPHER:  Off the record at 12:02 p.m.
8       (A break ensued from 12:02 p.m. to 1:05 p.m.)
9       THE VIDEOGRAPHER:  On the record at 1:05 p.m.
10       MS. PALNITKAR:  Thank you.
11    Q  Dr. John, I am going to turn to page seven of Exhibit
12 2 which is your report, and we will start from there.
13    A  Okay.  Okay.  I am there.
14    Q  You're -- Under Section V, Analysis and Opinions, you
15 say the Wind report relies on two different types of
16 information for its three core opinions noted above.  First are
17 the data from the experiments.  Have you analyzed the data?
18    A  I've -- I've looked at the results he's posted and
19 made my own conclusions.  I don't know if that's what you mean
20 by analysis.  I do not have -- I did not look at the raw data
21 and re-analyze it if that's what you --
22    Q  Okay.  That is what I asked.  Thank you.  And -- But
23 then the sentence -- the last sentence of that paragraph you
24 say I analyze these sources of data separately in turn below.
25    A  Yes.

Page 105

27 (Pages 102 - 105)

1    Q    But you didn't look at the -- the raw data to analyze
2  it.  Correct?
3    A    Maybe that sentence is inartfully formed.  I analyzed
4  these data -- the data from the experiments and the data from
5  the complaint data separately.  That's what I am getting at
6  there.
7    Q    How did you analyze it?
8    A    I looked at -- I think we just walked over some of
9  it.  I looked at the 88 complaints in relation to the
10  conclusions made from it.  I looked at the deception
11  conclusions he offers and looked at the data that supposedly
12  leads to and make that.  That's what I mean by analysis.
13    Q    Sorry to be so technical.  I just want to make it
14  very clear.  You said you looked at the 88 complaints.  You
15  mean the number 88?
16    A    Correct.
17    Q    You didn't look at the content of the 88 complaints?
18    A    So let me step back.  I looked at the results.  I
19  looked at the entire report that he provides, the -- the base
20  report itself.  I looked at the exhibits.  And then I come back
21  to the conclusions he makes.  And they're usually made with
22  reference to certain exhibits, and I see if those exhibits
23  reflect a plausible way to come to the conclusion that he
24  offers.  That's what I mean by the word analysis.
25    Q    Thank you.  So when you say I analyze these sources

Page 106

1  of data, you don't mean the raw data.  Correct?
2    A    That's right.
3    Q    Okay.  Are you familiar with various literature which
4  are treatises on likelihood of confusion surveys?
5    A    Generally, but not specifically.  Those things change
6  over time, and I am aware of them, but I couldn't recite them
7  to you.
8    Q    Are you familiar with McCarthy's on surveys?
9    A    No.  That word doesn't -- doesn't ring a bell with
10  me.
11    Q    Or Gilson on trademarks and surveys?
12    A    Gilson I have read some of his stuff, but not -- I
13  can't -- I couldn't cite a particular source on -- on a
14  particular framework that he affords, but he's written a lot.
15    Q    Uh-huh.
16    A    I have read some of his stuff.
17    Q    Would you regard Gilson as a -- Gilson on trademarks
18  as an authority on the subject of trademarks?
19    A    Excuse me.  I think we use those words differently.
20  I think in, you know, legal tradition you may say authority.
21  Academics tend to look at what people have said about something
22  and see if it makes sense, if it's confirming cases, how well
23  known they are.  So you would put all of those in there.  I
24  don't think we just have the sense of somebody is the
25  authority.

Page 107

1    Q    That's fair.  Would you say that Gilson is a -- is
2  part of the literature that you would consider for reviewing --
3  I don't know what the word is that you use in -- in the
4  marketing framework.  So forgive me for fumbling here.  But is
5  -- When you talk about the literature that is frequently cited
6  to on a subject, would Gilson on trademarks be part of what you
7  would consider the literature?
8    A    Of the broad literature, but he's more focused on the
9  legal side of it.  There's a distinction.  Confusion is a
10  concept.  And a lot of people in social science, that's where
11  all the basic stuff is done.  I don't consider him an authority
12  on -- on the social science methodology, but he's more of a --
13  what I would call the -- the way science gets used in -- in --
14  in legal cases.
15    Q    So if we were -- If one were to do a survey to prove
16  something that would be used in trial, would that have to be
17  fashioned in such a way that it's consistent with legal
18  standards?
19        MR. KIRKMAN:  Form.  Form.
20    A    I -- It's hard for me to answer the question.  I
21  would fashion it in the best way I know.  And that's the way
22  science would inform me.  Social science would inform me how I
23  should do it.  Whether that meets the legal standards is for
24  somebody else to judge.  The judge and the jury can decide
25  that.

Page 108

1    Q    If there are certain elements as to what's
2  appropriate for a consumer survey to be admissible in court,
3  would that be something for -- would that be a legal
4  standard --
5        MR. KIRKMAN:  Form.
6    Q    -- as you're referencing it?
7        MR. KIRKMAN:  Form.
8    A    I just don't know what a legal standard is.  I think
9  what you're asking me is that how would I design a survey.  And
10  I think that would depend on -- on the objectives of the
11  survey.  I was not asked to design a survey here.  So it's hard
12  for me to answer that in the abstract.  But I would assume that
13  if somebody told me that the legal standard requires X, I try
14  my best to make sure that my design meets X.
15    Q    Okay.  And what specific information do you think
16  that -- do you think is missing in the stimuli that Dr. Wind
17  used?
18    A    That's a big question.  I can go through several
19  things, but I think one big part of it is that it doesn't
20  fairly represent or even accurately represent the actual
21  process of searching for information on-line.  And that's the
22  hallmark of a good research design, that it mirrors the
23  phenomenon and it -- it represents the phenomenon that you wish
24  to actually speak to.  So if you're -- if you're talking about
25  how people search for and -- and have feelings and evaluations

Page 109

28 (Pages 106 - 109)

App'x 170

1 for airline tickets, your research design should mirror that.

2 So that to me is the biggest weakness of this -- this report.

3     Q  Is that it didn't show the adventure that the

4 customer took when coming to its decision?

5     MR. KIRKMAN:  Form.

6     A  There are many elements, but to summarize it, I would

7 say on-line searching is a dynamic process.  And nowhere in

8 that design -- the research design of the experiments is there

9 any sense of a dynamic setting where the customer -- the

10 subject I should say -- is proceeding through stages.

11     Q  But you have never seen a likelihood of confusion

12 survey where they have an on-line search that is dynamic like

13 that, have you?

14     A  I have seen many -- I have actually taught classes

15 where my students have to do surveys.  I have seen industry

16 surveys done where they all replicate the process that we are

17 trying to simulate in the lab.  So you have the real world, and

18 you have the lab.  And your lab has to mirror what the real

19 world is doing.  And so yes, I have seen many many surveys.  I

20 wouldn't even call them surveys.  Just call them experiments

21 where you put people through the same series of steps that they

22 would have done in the real world.

23     MS. PALNITKAR:  Objection; nonresponsive.  Can

24 you read back my last question please?

25     THE REPORTER:  But you have never seen a

Page 110

---

1 likelihood of confusion survey where they have an on-line

2 search that is dynamic like that, have you?

3     A  So I have seen dynamic experiments designed to mirror

4 on-line searches.  Was the objective of that study to study

5 likelihood of confusion?  No, I haven't seen those.

6     Q  So we will go through here on page seven.  And I

7 think that is what we are discussing here is that you are

8 saying -- You talk about the selection process.  And then you

9 say on the middle of page eight the key data used in the Wind

10 report to arrive at the deception conclusion are the responses

11 to the set of questions, Q1a in the Wind report, immediately

12 following the first set of screenshots.  Correct?

13     A  Yes.

14     Q  Do you -- Do you agree with that data used or that

15 data?

16     MR. KIRKMAN:  Let her finish first.  Go ahead.

17     Q  Let me strike that last question.  Do you have any

18 issue with how that data was ascertained?

19     A  I go through that, and yes, I have issues with the

20 uses to which that -- that -- those responses are -- are used

21 in the Wind report.

22     Q  If someone wanted to control or standardize their

23 survey, would -- so that everyone looks at the same stimuli,

24 would you not have to show them screenshots of that material?

25     A  What's the -- I would like to know what the purpose

Page 111

---

1 of the study is.  What are you trying to study that -- for

2 which you are going to show me a screenshot?

3     Q  Sure.  If I wanted everyone to look at a round trip

4 flight from Santa Anna to Miami on Skiplagged and I wanted them

5 to look at the same flights, all the survey respondents, would

6 that not be an off-line survey where I show them a screenshot

7 of it?

8     A  I am not sure what you mean by off-line survey.

9     Q  Before we spoke about on-line -- on-line

10 methodologies versus off-line.  Right?

11     A  No.  We spoke -- I spoke about on-line customer

12 searches and journeys versus off-line customer searches and

13 journeys.

14     Q  So if we had 10 respondents and we wanted them to all

15 look at the same flights on Skiplagged from Santa Anna to

16 Miami, are you proposing that everyone log on and find their

17 own flights themselves?

18     A  Again, this is back to a question you've asked me

19 before.  I wasn't asked to design the study.  But if your

20 question is if -- did everybody in the Wind survey see the same

21 stimulus, everybody in the same condition saw the same

22 screenshot.  So I am confused as to what the question is.

23     Q  Because I am understanding that you had an issue with

24 them looking at a screenshot versus choosing their own journey

25 and finding it themselves.

Page 112

---

1     A  They all involve screenshots.  In fact, screenshots

2 are nothing but an end point capture of what the person is

3 seeing at that point in time.  My problem with it is that it's

4 a static screenshot, not screenshots off -- I can take

5 screenshots as a person goes along.  And we don't have that

6 kind of a dynamic process represented in the design.  That's my

7 problem with it.

8     Q  Do you have any evidence to show that that dynamic

9 process would alter the results of Dr. Wind's experiments?

10     A  Oh, certainly.

11     Q  Where is that at?

12     A  There's a ton of literature showing that any time you

13 have a static design you are not going to get the same results

14 as you faithfully represent the dynamic process of -- of what a

15 subject is doing.  This goes back as far as the mid 80s.  An

16 assessor would be a classic example of putting a person through

17 the assessor package or -- or procedure is probably the -- the

18 first well-known approach out there in the literature which

19 puts people through the sequence of steps they would take.  So

20 it's been there for a long time.

21     Q  Do you cite to any of those sources in this report?

22     A  I do not cite the assessor report, no.  It's just a

23 logical argument that I cite to how people make searches

24 on-line.  It's a dynamic process.  It's an easy way to get to

25 the next step.  So it's not well represented by the static

Page 113

---

29 (Pages 110 - 113)

App'x 171

1 response to the response -- by the response to a static
2 screenshot.
3    Q   So -- so that's just a logical way of responding.  I
4 am not sure where the -- the sources lie for that statement
5 that you just made.
6         MR. KIRKMAN:  Form.
7    A   So --
8         MR. KIRKMAN:  Excuse me.  Form.
9    A   Yeah.  I think -- I think I point out that the goal
10 of the study is -- So if you look at page seven, Section V-A,
11 the headline is V-A conclusion, and then I go into the details.
12 The design does not resemble the real world customer journeys
13 occurring at Skiplagged.com.  So if we back out, what are we
14 trying to get at here?  We're trying to make some inferences
15 about confusion and deception that occurs as people buy airline
16 tickets involving Skiplagged.com.  And in order to do that, you
17 have to recreate in the lab what is happening in the real
18 world.  And the design of the Wind experiment does not
19 sufficiently recreate or even -- even resemble what people do
20 in the real world when they buy tickets on-line on American
21 Airlines or through Skiplagged.com.  That's the point I am
22 making.
23    Q   Do you have data or analysis to support your opinions
24 that it does not resemble it?
25    A   Of course.

Page 114

1         MR. KIRKMAN:  Hold.  Hold.  Hold.  Don't talk at
2 the same time.  Wait a minute.  Is there a question pending?
3         MS. PALNITKAR:  Yes.
4         MR. KIRKMAN:  What is the question?
5         MS. PALNITKAR:  Well, I am getting to it.  I
6 haven't had a chance to ask it yet.
7         MR. KIRKMAN:  Okay.  Then it can't be pending.
8 Go ahead.
9    Q   A consumer that searches just on Amazon has a low or
10 zero search cost.  So that consumer would have to search across
11 several retailers to find the best price.  It would have a
12 higher search cost.  And so this obviously has nothing to do
13 with confusion, does it?
14    A   I don't think I say anything about searching in
15 Amazon, do I?  Can you point me to that please?
16    Q   It's in the footnote three.  It's in the text of the
17 footnote three that you --
18    A   Text of the footnote three says for more information
19 about the dynamic process of on-line search behavior, see my
20 research publication.
21    Q   Yeah.
22    A   That's it.
23    Q   No.  It's in the -- in the actual publication.
24    A   So can you read me the quote that I have in the
25 actual publication so I know what is being said?

Page 116

1    Q   Where is that data?
2    A   The documents that he shows, the static shots that he
3 provides.  I don't see any sequence of shots that he provides.
4 So he's done static screenshots and asked people their
5 opinions.  That is not a dynamic design.  And that's my basis
6 for saying that it doesn't resemble the actual journeys people
7 make.  And my source for pointing out how people make on-line
8 journeys are footnoted in the source that I cite, footnote
9 three, among other things.  If you want to look at the
10 literature, it's cited in that source.
11    Q   Well, footnote three assigns a search cost to
12 consumers.  Correct?
13    A   There's a lot more than that.
14    Q   But that's part of it.  Right?
15    A   A small part of it.
16    Q   Yeah.  And a consumer that searches just on Amazon
17 would have a lower or a zero search cost.  Right?
18    A   Among other things.  That's not the point of the
19 paper.
20    Q   Well, that's --
21    A   I don't know what you want me to --
22    Q   That's the footnote you're citing to back up what you
23 are saying right now, and I am showing how that is --
24    A   Let me read the footnote.  For more information --
25    Q   May I finish my question please?

Page 115

1    Q   It's talking about where your publication refers to
2 Amazon's search cost.  You wrote it.
3    A   I -- I wrote it.  I don't have it in front of me.
4 Can you just read it for me?  It's a long paper.  And if you
5 can read me the sentence, I will be happy to explain it.  I --
6 I have no idea what you're talking about.  If you want to show
7 me the publication --
8    Q   Well, I don't need to -- I'm talking about the -- You
9 wrote this paper.  Right?
10    A   Of course.
11    Q   So you know when you wrote about Amazon.  Right?
12    A   Yes.  But I have written a lot of papers.  I would
13 have to see what exactly you're speaking to.
14    Q   Did you read it when you referred to it here?
15    A   I know -- I know its contents, but you are saying
16 that I wrote a specific statement, and I would like to see what
17 that statement is.
18    Q   Well, I just have a note of it.  It says that -- that
19 there is a search cost assigned to consumers, and for Amazon
20 it's low to no search cost.  And they have to look over several
21 retailers.
22    A   And I am trying to tell you that that is not a
23 particularly interesting or important part of that paper.
24 There's a lot of stuff in that paper.  I am happy to discuss
25 the paper with you, but I would really like to see what exactly

Page 117

30 (Pages 114 - 117)

1 I said there.
2    Q   Well, I guess my issue here is I don't know in that
3 paper that discusses several different things what part of that
4 paper is backing up your opinion that you have put in your
5 expert report.
6    A   Fair enough.  And the answer is that it models a
7 dynamic process.  And the dynamic process is nowhere
8 implemented in the research and design used by Wind.
9    Q   But the parts of your -- Does that talk about
10 confusion?  Does your paper talk about confusion?
11   A   I -- I think we have gone over this ground before.
12 The paper is not about confusion.  The paper is about how
13 on-line searches differ from off-line searches.  And this is
14 trying -- This -- These experiments in the Wind report are
15 trying to gather inferences about on-line searches.  And my
16 point is that the on-line searches and their characteristics
17 are nowhere represented properly in the Wind experiments.
18   Q   Okay.  But do you agree that your paper is about
19 consumer searching across different websites of retailers?
20   A   It's about on-line searching and the dynamics of
21 on-line searching.  That's what it's about.
22   Q   Okay.  Is it -- So it's not about searching for a
23 single brand, a single product, is it?
24   A   Among other things it is.
25   Q   It is?  Because when I read it I understood it to be

Page 118

1 how the consumer goes and searches among -- amongst many
2 things.
3    A   I'm sorry you're confused, but is there a question
4 there?
5       MR. KIRKMAN:  And what you read and what you
6 understand is not relevant.
7       MS. PALNITKAR:  But that's why I'm asking.  He
8 wrote the paper, so I am asking if that's correct.
9       MR. KIRKMAN:  We all understand he wrote the
10 paper, but you are to ask him questions, not make statements
11 about what you did or didn't understand.
12   Q   Did the paper have to do for searching on many
13 websites for one product?
14   A   So I don't know if I am repeating myself here.  I
15 probably am.  It is about how do we model faithfully the
16 person's decisions that they make sequentially when they search
17 on-line.  Sometimes it's one website.  Sometimes it's more.  We
18 are trying to find a consistent way to understand all of these
19 decisions people make.  That's -- that's the way I would
20 describe it.
21   Q   Okay.  And here when the search is for an American
22 Airlines ticket, which is one product --
23       MR. KIRKMAN:  Form.
24   Q   -- how -- how do the factors go into searching for
25 one product?

Page 119

1       MR. KIRKMAN:  Form.
2    A   What factors?  I'm sorry.
3    Q   All the factors you're talking about, the inferences
4 that the consumer journey and the dynamic process creates.
5       MR. KIRKMAN:  Form.
6    A   Are you asking me what a person considers when they
7 want to travel on American?
8    Q   No.  I am asking how -- I am asking how your paper
9 which is your source of analysis for -- for why Wind's
10 experiments are flawed is relevant to this situation which has
11 to do for searching for an American Airlines ticket, one
12 product?
13       MR. KIRKMAN:  Form.
14   A   I believe that's exactly what I do in my critique of
15 the Wind experiments.  We can go over that if you want.
16   Q   We will.
17   A   Okay.
18   Q   But first let me ask a couple questions.  So you --
19 Do you have any analysis that you have done to show that a
20 dynamic -- that you have done to show that a dynamic search
21 would render a different result from the experiments that Jerry
22 Wind did?
23       MR. KIRKMAN:  Form.  Form.
24   A   So let me repeat myself.  You're trying to understand
25 what people do in the real world.  You're trying to say

Page 120

1 something about the real world.
2       MS. PALNITKAR:  No.  Objection; nonresponsive.
3    Q   I am not asking that.  I am asking do you have data
4 that you have gathered and analyzed that shows that a dynamic
5 search would have rendered different results than the
6 experiments that Jerry Wind carried out?
7    A   That is exactly what we prove in our paper.
8    Q   But I am not asking about the paper because the paper
9 was written before you started looking at this case.  Correct?
10   A   Yes.
11   Q   So I am not asking about the paper.  I am asking
12 about as it relates to this case do you have data that you
13 analyzed that shows that a dynamic search of these products
14 would render a different outcome than the experiments that
15 Jerry Wind conducted?
16       MR. KIRKMAN:  Form.
17   A   I do.
18   Q   Where is it?
19   A   It's in the report.  I show you that his exhibits do
20 not lead to the conclusions that he makes from those exhibits.
21 That's my analysis.  Now if you're asking me did I collect my
22 own data, no, I was -- I did not do any surveys with respect to
23 this case.
24   Q   And so you have no -- you have no data that you have
25 collected or analyzed on your own outside of the Wind report

Page 121

31 (Pages 118 - 121)

App'x 173

1  that will show that a dynamic search for any products will
2  render a different conclusion than what Dr. Wind has
3  ascertained in his experiments.  Correct?
4      A   So I want to make sure that I am answering the
5  question you asked.  If you're asking me have I collected any
6  data of any kind on my own other than looking in the U.S. DOT
7  statistics, the answer is no.
8      Q   Okay.  So let's get to -- Let's turn here to your
9  page eight where you say the Wind experiment design grossly
10  under-represents the large number of flights returned in the
11  real world customer journey at Skiplagged.com.  Do you see
12  that?
13      A   I do.
14      Q   So here am I correct that you are saying the Wind
15  report shows seven flights, but when you did your search on
16  your own you -- you looked at 200 flights or you had a return
17  of 200 flights?
18      A   I would have to look through it carefully whether
19  those numbers are right, but the gist of it is essentially
20  correct that the static screenshot that is shown to the
21  respondents in the experiment grossly understates the large
22  number of flights that I found in my search.
23      Q   And why is that relevant here?
24      A   Because my response to a static screenshot is
25  dependent on the information I see in that screenshot.  That

Page 122

1  means the quality of information.  That means the amount of
2  information and the relevance of the information.  And what is
3  key in the search is the number of alternatives.  And here
4  you're asking me to respond to -- If I were a subject, you're
5  asking me to respond to a screenshot of a limited number of
6  flights which is completely different from my response to the
7  large number of flights.  And as long as we are talking about
8  the differences, let me also point out that when you do your
9  own search you can reorder those flights any which way you
10  want.  You can reorder them by price.  You can reorder the
11  number of stops, all kinds of things.  You don't have any of
12  that there.  So not only do you have a smaller number, you
13  don't have the ability to format it the way you want to format
14  it.  So those are two big differences.
15      Q   Why are you looking at 200 flights which include
16  Alaska, Delta, Frontier and Spirit when we are searching for
17  American flights?
18          MR. KIRKMAN:  Form.
19      A   I did not search for an American flight.  I am
20  searching for a flight for the city pair.
21          THE REPORTER:  For the what?
22          THE WITNESS:  For the city pair.
23          MR. KIRKMAN:  P-a-i-r.
24          THE WITNESS:  P-a-i-r.
25      Q   Why are you not searching for an American flight?

Page 123

1          MR. KIRKMAN:  Form.
2      A   I told you what I did.  I searched for a city pair
3  which are the same city pairs that he searched for in his
4  design.
5      Q   But you understand that this is a lawsuit brought by
6  American as it relates to American flights.  Correct?
7      A   I don't know that.  I don't know what the basis and
8  scope of the lawsuit is.
9      Q   Okay.  Well, I can represent to you that this is in
10  fact a -- I represent American Airlines.  We brought this
11  lawsuit against Skiplagged as it relates to American Airlines
12  flights.
13          MR. KIRKMAN:  There are other factors involved
14  than just American flights.  So your representation is not
15  entirely accurate.
16          MS. PALNITKAR:  Objection to the sidebar.
17          MR. KIRKMAN:  Well, if you're going to make
18  representations, so am I.
19          MS. PALNITKAR:  This has to do with Delta
20  flights?
21          MR. KIRKMAN:  It has to do with all flights.
22          MS. PALNITKAR:  All right.  I will leave that
23  there.  Objection to all that sidebar as well.
24      Q   So is it -- is it reasonable to conduct a survey to
25  consumers and show a list of 200 flights?

Page 124

1      A   It all depends on what you're trying to do with the
2  study.  So if you can tell me the goal of your study that you
3  propose, I will be happy to respond.
4      Q   Sure.  The goal of Jerry Wind's study was to show
5  certain American Airlines flights to its consumers to the
6  respondents of the survey.  So that's -- Now I ask the same
7  question again.  Is it reasonable to conduct a survey to these
8  same respondents showing 200 flights?
9      A   So can I --
10          MR. KIRKMAN:  Form.  Excuse me.  Form.  Go
11  ahead.
12      A   Can I take a moment to look at the objectives of --
13      Q   Yes.
14      A   -- what I read?
15      Q   Absolutely.
16      A   Yeah.  So -- so there's a lot of legal issues here.
17  And -- and my understanding is that it's about confusion and
18  deception revolving around hidden city tickets purchased
19  through Skiplagged.com.  That's my understanding of it.
20  Whether or not other airlines come into it, depends on how the
21  data is organized and how -- what we would consider to be
22  important data.  So, for example, if you want to know how a
23  person would make a choice, you would obviously not do a study
24  where choice is only American Airlines.
25      Q   I am looking at Jerry Wind's report, page eight.  At

Page 125

32 (Pages 122 - 125)

1 the top of page eight where he talks about his methodology,
2 have you read this?
3    A   I have.
4    Q   Okay.  Can you read to me the first paragraph there?
5    A   To determine the Skiplagged practices lead consumers
6 to, A, perceive they are -- they are an authorized agent or
7 other -- or have other association with American Airlines, and
8 B, be deceived, comma, I designed and implemented two consumer
9 experiments and validated them against marketing and consumer
10 behavior theories and findings.
11   Q   Do you understand this to mean that his methodologies
12 related to American Airlines flights only or no?
13   A   I do not understand it to mean that the consumer
14 choice is restricted to a choice set of American Airlines
15 flights.
16   Q   Did you notice that all his stimuli that he offered
17 to the survey respondents only dealt with American Airlines
18 flights?
19   A   I believe this question involved the airline.  We can
20 talk about that.  So, for example, if you go through specific
21 exhibits, the language changes to the airline.  It changes
22 from -- It's not always called American.
23   Q   I am looking at the screenshots of the exhibits that
24 he sent, and I can -- or that he put up.  And they all relate
25 to American Airlines.  Have you seen the screenshots of those

Page 126

1 stimuli?
2    A   I don't know which ones you're talking about.  So if
3 you can point me to one, I can --
4    Q   Absolutely.
5    A   -- I can do that.  I don't have the appendices here,
6 so if you have the --
7    Q   I have them for you, yes.
8    A   -- screenshot, that would be great.
9        MS. PALNITKAR:  I will mark this as Exhibit 4.
10       (Exhibit 4 was marked for identification.)
11   A   Thank you.
12   Q   Let me find the actual -- Did you have a chance to
13 review?
14   A   Yes, but I am confused.  This is Appendix C-2.  On my
15 report on page eight I actually reference Appendix C-4.  So
16 perhaps I referenced the wrong number there.  So --
17   Q   Okay.  Yeah.  That's a -- That's something different.
18 So the stimuli that Dr. Wind is showing to the respondents,
19 they're highlighted in a red box.  That's American Airlines.
20 Correct?  American Airlines flight.
21   A   So let me back up.  You're asking me what the
22 respondents saw?
23   Q   I am asking -- Yes.
24   A   Okay.  So the respondents saw, assuming we can
25 resolve the C-4 versus C-2 issue, that stipulate -- I will

Page 127

1 stipulate that the C-2 is the same as C-4, which I am not sure,
2 but let's assume that.  The -- the respondent saw this page
3 that you -- you've shown me.  And I believe your question was
4 was that a search for American Airlines flights.  Is that your
5 question?
6    Q   No.  My question was in the red box what flight is
7 highlighted there?
8    A   The -- Jerry Wind boxed the American Airlines flight.
9 That is not the response from the website.
10   Q   Right.  But this is the stimuli he is showing.
11 Correct?
12   A   Correct.  So --
13   Q   So in his stimuli that he is showing what airline --
14 what flight did he highlight for the respondents to review?
15   A   So let me make sure I understand what you're asking
16 me.  If you're asking me who drew the red box, my answer is
17 Jerry Wind drew the red box.
18   Q   That's not my question.
19   A   What's your question?
20   Q   My question is in the red box can you describe that
21 flight that is -- that is selected?
22   A   Jerry Wind drew a red box around one of the American
23 Airlines flights.
24   Q   Okay.  How do you know it's American Airlines?
25   A   Because it says it's American Airlines.  I can't read

Page 128

1 the -- I can't read the small print there, but that -- that
2 is -- that is clearly an American Airlines flight based on what
3 I know of the logo and so on and so forth.
4    Q   So that red and blue and white flight tail logo tells
5 you it's American Airlines.  Correct?
6    A   I think that's what Jerry Wind assumes the respondent
7 infers, and I would agree with that.
8    Q   That's not my question.  My question is you just said
9 I think that's an American Airline flight.  And I am saying how
10 do you, Dr. John, know that's an American Airlines flight?
11   A   Because Jerry Wind tells me so.
12   Q   Where?
13   A   He boxed it.
14   Q   It doesn't say on there American Airlines, but you
15 made that -- that inference just now.
16   A   Okay.
17   Q   So I am asking how did you come to -- Did you
18 recognize the logo?
19   A   I do recognize the logo.
20   Q   That's my question.
21   A   Yes.  Okay.
22   Q   So -- Okay.  So he -- So that is a flight from John
23 Wayne to Miami.  Correct?
24   A   Actually I can't tell where it's from.
25   Q   SNA.

Page 129

33 (Pages 126 - 129)

| | |
|---|---|
| 1    A   Where is it?  SNA to Miami.  Okay. | 1    A   That's right. |
| 2    Q   Yes.  And I believe in your report here on page nine | 2    Q   For the city pair.  Is that right? |
| 3  you have also searched for flights from SNA to Miami.  Correct? | 3    A   Right.  200 plus.  I don't know the exact number. |
| 4    A   One of the two things.  I think there's another city | 4    Q   Okay.  And because you found that volume of flights, |
| 5  pair as well. | 5  you say that his stimuli is a gross under-counting.  Is that |
| 6    Q   Well, on page nine that's what I am looking at.  Is | 6  correct? |
| 7  that incorrect? | 7    A   His stimuli is not a gross under-counting. |
| 8    A   I am having a hard time reading this thing.  So this | 8    Q   His output. |
| 9  one is SNA to Miami, yes. | 9    A   The representation that that is the output -- Let me |
| 10    Q   Okay.  So the -- origin and destination of the | 10  read his words to you.  The instruction to the subjects are, |
| 11  stimuli is the same as the search that you conducted on page | 11  below is the output you received when checking for available |
| 12  nine.  Is that correct? | 12  flights.  That is simply not represented by this. |
| 13    A   I don't know the search that was conducted here.  So | 13    Q   Okay. |
| 14  I have to be careful.  I know the search I conducted.  And the | 14    A   That's my problem with it. |
| 15  search I conducted was for that city pair that you described. | 15    Q   So do you think a likelihood of confusion survey is |
| 16    Q   Okay.  And why did you conduct the search for that | 16  about how consumers would make choices amongst different |
| 17  city pair? | 17  airlines? |
| 18    A   Because that's the city pair that he describes in his | 18    A   It could be.  It doesn't have to be.  It could be |
| 19  study. | 19  confusion about many things.  The possibility you cited is one |
| 20    Q   Okay.  And now you say here on the next page, over | 20  possible likelihood of confusion survey. |
| 21  200 -- 200 flights are offered across six airlines including | 21    Q   Is that the survey that you understand Dr. Wind was |
| 22  code share flights.  So you are -- you are critiquing his -- If | 22  trying to run? |
| 23  I am not mistaken, you are critiquing his survey stimuli by | 23    A   What survey? |
| 24  saying it doesn't show the 200 plus flights across six | 24    Q   A likelihood of conversion -- confusion survey about |
| 25  airlines.  Is that correct? | 25  how consumers would make a choice amongst different airlines. |
| Page 130 | Page 132 |

| | |
|---|---|
| 1    A   No. | 1    A   I -- I take him at his word.  He is trying to show -- |
| 2    Q   Okay.  Please tell me how I am wrong. | 2  He says his objective is to show that there is deception and |
| 3    A   I am critiquing his study -- his survey because he's | 3  confusion generated from Skiplagged.com.  I'm paraphrasing what |
| 4  only showing part of the results that would come from a | 4  he says. |
| 5  consumer search.  So remember what the stimuli is supposed to | 5    Q   But you are critiquing him for not showing different |
| 6  be.  Let me read to you his instructions there.  Imagine that | 6  airlines in his output.  Correct? |
| 7  you wanted to book a round trip flight from Santa Anna to | 7    A   He -- he shows different airlines.  I am not |
| 8  Miami, and you decided to use the Skiplagged website to book | 8  critiquing him for not showing different airlines. |
| 9  flights.  Below is the output you received when checking for | 9    Q   Okay.  So -- |
| 10  available flights.  That's my critique.  This is not the | 10    A   I have answered your question. |
| 11  output.  There's a lot more to it. | 11    Q   No.  You're critiquing him for not showing 200 plus |
| 12    Q   Okay.  So it's an under-counting because it doesn't | 12  flights with six different airlines.  Correct? |
| 13  show the flights across six airlines.  Is that part of the | 13    A   No.  That's not it.  I am critiquing him for |
| 14  sentence -- this last sentence on page nine? | 14  showing -- not showing the very thing that he tells people |
| 15    A   He doesn't show the results. | 15  you're going -- you should have seen.  Below is the output you |
| 16    Q   But am I correct that you are saying this is a gross | 16  received when checking for available flights.  That is just |
| 17  under-counting of the reality of the 200 plus flights across | 17  flat-out wrong. |
| 18  six airlines returned in my actual customer journey? | 18    Q   What day did you do this search? |
| 19    A   It's -- it's an under-counting based on what I found. | 19    A   I think I mention it wherever it is.  I don't |
| 20  I don't know what he originally found. | 20  remember the date. |
| 21    Q   Okay.  I am not asking about what he found anymore. | 21    Q   No, I haven't seen it anywhere.  That's why I'm |
| 22  I am asking about what you found. | 22  asking. |
| 23    A   Okay. | 23    A   I think it's checked on -- I think it's on the -- If |
| 24    Q   So you found 200 flights across six airlines. | 24  you look at the -- the -- the URL, you will see it has a date |
| 25  Correct? | 25  on it.  I think it's somewhere around the 18th of May, |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

App'x 176

1 something like that.

2 Q   Do you know when -- I don't see that anywhere, but if

3 you can point me to it when you see it, let me know.

4 A   Sure.

5 Q   Do you know when Jerry Wind conducted his survey?

6 A   I think it's somewhere --

7 Q   I mean his -- his --

8 A   -- in the report.

9        MR. KIRKMAN:  Don't talk at the same time.  Hold

10 on.

11 Q   Do you know when Jerry Wind took the screenshot of

12 his output?

13 A   I think it's described somewhere in his lengthy

14 report.  I don't remember exactly when.

15 Q   Is it the same day that you did your search?

16 A   Of course not.

17 Q   So how can the outputs ever be the same?

18 A   How on earth would he and I have done a search on the

19 same day?

20 Q   Right.

21 A   I did my search after I got it from him.

22 Q   I agree with you.  It is not on the same day.

23 A   Thank you.

24 Q   So how would the outputs ever be the same?

25 A   Oh, my gosh.  So if I were to run a search, 15

Page 134

1 minutes after I run the first search -- I assume you have

2 traveled by air before -- you would not get the same results.

3 You are going to get a huge variation of results.  15 minutes

4 after you book the flight the prices are going to be different.

5 The schedule is going to be different.  Airline traffic is so

6 heterogeneous and so variable.  You are not going to get the

7 same results.  But what I am saying is that you're going to get

8 many more results than the limited number of flights he shows

9 on this page.  That's what I am saying.

10 Q   But you don't have data to show that more -- the

11 viewing of more results will result in a different outcome from

12 his experiments, do you?

13 A   In all likelihood -- Sorry.

14        MR. KIRKMAN:  Form.  Go ahead.

15 A   In all likelihood it would.

16 Q   Do you have data to show that?

17 A   Yes.

18 Q   Besides in all likelihood?

19 A   I have data that dynamic searches by customers are

20 dependent on the information they get.  The information they

21 get here is a truncated set of information.  Therefore, the

22 results are not generalizable to what they actually do in

23 practice.

24 Q   That's great in theory.  I understand what you are

25 saying, but that's not my question.  My question is do you have

Page 135

1 data to show that in this situation an output of -- a viewing

2 of 200 plus flights across six airlines would create a

3 different outcome from the experiments that Jerry Wind had?  Do

4 you have that data and that analysis to show them?

5        MR. KIRKMAN:  Excuse me.  Form.  Go ahead.

6 A   I don't know -- I have said many times I don't have

7 any data other than what I show you here.  For me it is -- it

8 is a no brainer that if my choice set is 200 plus airlines

9 versus my choice set being one, two, three, four, five, six,

10 seven flights and two airlines, the results are going to be

11 different.

12 Q   But that's to you it's a no brainer.

13 A   Yes.

14 Q   But there's no evidence to support that no brainer

15 theory.

16 A   There's a lot of academic evidence showing that the

17 choice set presented to a customer has a profound effect on

18 their choices.

19        MS. PALNITKAR:  Objection; nonresponsive.

20 Q   I am talking here do you have data to show that this

21 viewing of 200 plus flights across six airlines spits out a

22 different outcome than Jerry Wind's report?

23        MR. KIRKMAN:  Form.

24 Q   You don't have that data, do you?

25        MR. KIRKMAN:  Form.

Page 136

1 A   I do not have any data other than what's shown

2 here.

3 Q   Okay.  And that -- What's shown here is the one

4 search you did on the internet.  Correct?

5 A   That's the one search.  I actually did two different

6 searches, but this is one of the two I did.

7 Q   Is this the first or the second?

8 A   I don't know.  I can't remember which one I did

9 first.  There is two city pairs, and I did both.

10 Q   Did you keep a record of the -- the methods that you

11 were doing while you did the search?

12 A   I believe I have the screenshots of the results and

13 the time stamps on those results.  I -- I can't find it here,

14 but the URLs are in my report somewhere.

15 Q   But you don't know if this is the first or second

16 search you did?

17 A   It's either the first or the second.

18 Q   Why is the other search not in this report?

19 A   I thought they were both in there.  If it's not

20 there, I don't know why.

21 Q   Is it because your first search yielded the same

22 results as Jerry Wind's experiments?

23 A   Of course not.  That would be absurd.  No search on

24 the internet would ever result in seven trips on two airlines.

25        MR. KIRKMAN:  Let's take a short break if you

Page 137

35 (Pages 134 - 137)

1 don't mind.

2        THE VIDEOGRAPHER: Microphones. Off the record

3 at 1:47 p.m.

4        (A break ensued from 1:47 p.m. to 1:56 p.m.)

5        THE VIDEOGRAPHER: On the record at 1:56 p.m.

6    Q   Dr. John, would a survey about making choices amongst

7 different airlines be relevant in this case?

8        MR. KIRKMAN: Form.

9    A   Again, I have not been asked to design a survey. So

10 I would have to think about that question. My instincts tell

11 me that any consumer purchase involves making choices. So yes,

12 it would typically involve bringing to the picture all the

13 relevant choices that people would consider.

14   Q   And how does that relate to this case that is

15 concerned with American Airlines tickets?

16       MR. KIRKMAN: Form.

17   A   I am showing a number of flights. Which one will I

18 pick? And that's kind of where it starts from or at least

19 which one will I pick to find out more details about it. So he

20 boxed this one in red. And the presumption is that that's the

21 one that the customer wants to investigate further.

22   Q   That's a correct presumption, yes.

23       MR. KIRKMAN: Form.

24   Q   Assuming that presumption, would you need to show

25 other -- would you design a study with other airlines in it?

Page 138

1        MR. KIRKMAN: Form.

2    Q   I understand you haven't been asked to design one,

3 but I am asking.

4    A   So I think it's important to notice that you can't

5 pre-select the results. Okay. So these one, two, three, four,

6 five, six, seven I hope, I presume were not pre-selected. They

7 just happen to be the first seven. I assume that he took a

8 screenshot of the first screen. So I am not sure whether

9 you -- you proactively pre-select, which you shouldn't do. But

10 what he is doing here is that he's -- he's saying that you can't

11 imagine you have put that box yourself. So he could have put

12 it in a United Airlines box. He could have put anything else.

13 He just chose to pick one of the four American Airlines

14 flights.

15   Q   Do you know why he chose to pick one of the four

16 American Airlines flights?

17       MR. KIRKMAN: Let her finish her question.

18   Q   My question was do you know why he chose to pick one

19 of the --

20   A   Not offhand. I can't remember how he chose that

21 particular box.

22   Q   Okay. If you were to -- and my question earlier was

23 if you were designing a -- survey, would you include other

24 airlines flights in the survey that you showed to your

25 respondents?

Page 139

1        MR. KIRKMAN: Form.

2    A   So again, I don't choose the ones I -- I -- I am

3 going to show. I let the survey -- I let the -- the computer

4 or the site that I am searching at tell me what my options are.

5 And that's what I would do. And if the options invariably are

6 going to include multiple airlines, that's what will happen.

7    Q   Okay. So I am going to turn to page 11 of your

8 report. And if I am correct, you go to an American Airlines

9 web page at this point in your -- in your experiment. Is that

10 correct?

11   A   I wouldn't call mine as an experiment, but yes, I

12 went to the AA.com website.

13   Q   What should I term this -- this adventure you did?

14   A   My -- my little validation of what he's done.

15   Q   Okay. In your validation the next step was that you

16 went to an American Airlines website. Correct?

17   A   That's right.

18   Q   Okay. And this is what came up. Is that right?

19   A   That's right.

20   Q   When you searched for Santa Anna to Miami on the same

21 date, August 3rd, 2024?

22   A   It's not the only things that turned up. You can see

23 I say the corresponding first page is shown below. So that's

24 just the first page.

25   Q   Okay. And in the text below that you write the

Page 140

1 American Airlines site -- or sorry. Let me read it verbatim.

2 The AA.com site returned, A, fewer flights, and B, shows no

3 hidden city flight ticketing options. Is that correct?

4    A   That's right.

5    Q   Do you expect for hidden city flight ticketing

6 options to show up on AA.com?

7        MR. KIRKMAN: Form.

8    A   I didn't have any expectations. I just did it. And

9 that's what turned up. I just report what turned up.

10   Q   Do you know what -- Do you -- Have you visited

11 with -- Let me strike that. Do you know the business that

12 Skiplagged -- Strike that as well.

13       MR. KIRKMAN: Two strikes. One more, you're

14 out.

15       MS. PALNITKAR: No. I am still here for several

16 hours.

17   Q   Do you know what the goal of Skiplagged's business is

18 to offer to its customers?

19       MR. KIRKMAN: Form.

20   A   I actually represent what they say on their landing

21 page. The best way to understand what I try to communicate to

22 customers is to tell them what I think I have to offer. On the

23 first page you see, and I show you their landing page later in

24 the report.

25   Q   I am not asking what's on their landing page. Do you

Page 141

36 (Pages 138 - 141)

1 know what Skiplagged does as a business?

2     MR. KIRKMAN: Form.

3     A I know it from a consumer standpoint. I don't know

4 it from a business standpoint how they operate their business.

5     Q I will take your consumer understanding. What --

6 what does Skiplagged do?

7     A It's a site that offers me tickets, and it includes

8 these things called hidden city tickets.

9     Q Are hidden city tickets offered on airlines' websites

10 to your knowledge?

11     A To my knowledge, no.

12     Q So when you write here that AA site returns, A, fewer

13 flights, and B, shows no hidden flight ticketing options, did

14 you expect for AA.com to show you hidden flights -- hidden city

15 flight ticketing options. May I finish my question?

16     MR. KIRKMAN: Well, it's repetitive, but go

17 ahead.

18     MS. PALNITKAR: No. This question asked did you

19 expect for AA.com to show you hidden city flight ticketing

20 options. That is a brand-new de novo question. Please answer.

21     MR. KIRKMAN: He just said he had no

22 expectation, ma'am. If you listen to his answer, he's already

23 answered it.

24     MS. PALNITKAR: No. That is -- That is not

25 what -- I said do you expect airlines to show you hidden city

Page 142

1 flight ticketing options. He said he had no expectation. Now

2 I am asking do you expect AA.com to show you no hidden city

3 flight ticketing options? Do you still have something to

4 object to? Continue please.

5     A Was that posed to me? Okay.

6     Q That was to you.

7     A As I said before, I have no expectations of what the

8 results are going to be when I fashion a query or a stimulus

9 because that would be biasing the results. So generally as a

10 researcher you're going without expectations, and you try to

11 formulate a query that's fair. In this particular case I

12 didn't know what the results were going to be, and that --

13 that's how I proceed to design any little piece of

14 investigation I do.

15     Q So you didn't know either way for AA.com. Is that

16 what you are saying?

17     MR. KIRKMAN: Form.

18     A I just don't know the results I am going to get. So,

19 for example, and this is going beyond your question, I -- I

20 don't see hidden city tickets from other airlines. Would I

21 have seen it for another city? Possibly. I just don't know.

22 So I don't have any expectations of what I am going to find,

23 but I report faithfully what -- what I do find here. And --

24 and that's what I do find. There's no hidden city ticket

25 options.

Page 143

1     Q And when you say for other airlines do you mean if

2 you go to those airlines' websites or for other airlines on

3 Skiplagged.com?

4     A Either/or. I -- I -- I just don't know the frequency

5 of hidden city tickets or which airlines they are on. I just

6 did a search as close as possible to what I saw Wind do in

7 his -- in his search, and I am just reporting the results that

8 I have here.

9     Q And you haven't read the terms and conditions for

10 various airlines, specifically American Airlines, have you?

11     A What do you mean by terms and conditions?

12     Q When you buy a ticket on a website for American

13 Airlines it comes -- You click a box. It says I have read

14 terms and conditions. You haven't read those terms and

15 conditions, have you?

16     A The -- the -- the short answer is of course you see

17 those things. They flash by on the screen. And of course you

18 know that in order to buy a ticket you have to click it. So

19 asking me whether I have read it or not is -- You look at it.

20 You don't really process it. You don't really make any sense

21 out of it, so you click and go on.

22     Q Right. So you just click it to get to your end

23 purchase. Correct?

24     A Those long terms and conditions, yes.

25     Q Okay. Okay. And then the second sentence here says

Page 144

1 when you consider matters from this lens, Skiplagged's website

2 is at least thematically providing customers or potential

3 customers with more information about prices and consumer

4 options, comma, enabling consumer choice, dash, rather than

5 limiting choice. So are you saying here that because AA.com

6 doesn't show hidden city flight ticketing options, it is

7 limiting its choices?

8     A It's limiting the choices it shows you.

9     Q And could that be because American Airlines does not

10 endorse or support hidden city flight ticketing?

11     A I have no idea what American Airlines's motivations

12 are.

13     Q Do you know that it's -- the reason that this lawsuit

14 is -- is being filed because it is prohibited by American

15 Airlines to fly on a hidden city ticket?

16     MR. KIRKMAN: I object. Form.

17     A I have no idea what American Airlines's motivations

18 are and how it acts on it. So I just show the results as they

19 turn up. So I just don't know what American Airlines is up to

20 or what their motivations are.

21     Q So if -- if someone were to tell you that hidden city

22 flight ticketing is not part of American Airlines' business

23 model, would you still say that American Airlines is limiting

24 their choices on their website?

25     A Of course.

Page 145

37 (Pages 142 - 145)

1    Q    Why?
2    A    Because it's showing fewer options.
3    Q    It's -- it's not showing the options to travel that
4    are prohibited by the company?
5    A    It's not showing options that exist.
6    Q    Exist where?
7    A    Exist among the flights that American Airlines
8    operates.
9    Q    On Skiplagged.
10   A    No.
11   Q    Options that exist on Skiplagged.
12   A    Okay.  So if I want to fly from city A to city B,
13   there are a set of options, a multitude of options actually.
14   And if I go to a particular site, I see certain options.  If I
15   go to another site, I see some other options.  And in this
16   particular instance I contrast the options that American
17   Airlines shows me with the options that Skiplagged shows me.
18   That's all I am doing.
19   Q    Uh-huh.  Where do you think Skiplagged gets its
20   flight -- American Airlines flight information from?
21        MR. KIRKMAN:  Form.
22   A    I have no idea.
23   Q    Did you do any research into that?
24   A    I did not.  I was asked to, and that's not what I am
25   responding to.

Page 146

1    Q    Well, even if you weren't asked to, just as a part of
2    general information absorption as someone hired for Skiplagged,
3    did you speak with Skiplagged about where they get their data
4    from for their website?
5        MR. KIRKMAN:  Form.
6    A    I did not.  I've never met anybody from Skip --
7    Skiplagged.
8    Q    Did you ask for any other data from Skiplagged to
9    help support your -- your assertions in this report then --
10   Sorry.  Let me take out the then.
11   A    I'm sorry?
12   Q    Did you ask for any additional data from Skiplagged
13   to help support the assertions in this expert report?
14   A    I have had no communications of Skiplagged.  I've
15   only had communications with the law firm.  And I may have
16   asked them do you have X or do you have Y.  I don't remember
17   any particular sequence of things where they shipped me
18   something.  I think I got the report, and I got the appendices,
19   and I think that was it.  That's my best -- best memory.  I
20   certainly had no communications with Skiplagged.
21   Q    Okay.  Now in this -- in this flight that you
22   selected here, John Wayne to Miami, this is a flight going
23   through Phoenix to Miami.  Correct?
24   A    I'm sorry.  Which page are you on?
25   Q    I am on page 11.

Page 147

1    A    Page 11 on the American Airlines site.  Yes.
2    Q    This is your -- This is what you found when you did
3    your --
4    A    The first page of what I found.
5    Q    Yes.
6    A    There's many more pages.
7    Q    But yes, but this is the screen that popped up and
8    what you put in your expert report.  Right?
9    A    Right.
10   Q    So this is a flight from John Wayne to Miami that
11   goes through Phoenix.  Is that correct?
12   A    One of them, yes.  The two flights shown on this page
13   both go through Phoenix.
14   Q    Okay.  So the flight that we saw with Dr. Wind's
15   report was a flight from John Wayne to Miami that ends up in
16   Tampa.  Is that right?
17   A    I'm sorry.  Which page now are you on?  You lost me.
18   Q    Let's go back to that.  Yeah.  It's -- Where is the
19   stimuli one?  Okay.  If you go to page 15.
20   A    Of my report?
21   Q    Yes.
22   A    Okay.
23   Q    And we are talking on two different planes.  One is
24   you looking at American Airlines by yourself, and one is you
25   looking at Skiplagged.  Correct?

Page 148

1    A    That's right.  I don't think I reproduced the Wind
2    report things.  I think I only show you the -- the
3    screenshots on my --
4    Q    Right.  Let's go through your two -- two reviews
5    here.  So one you're looking at the Skiplagged site.  And you
6    chose a flight from John Wayne to Miami.  And it has a second
7    leg that goes on then to Tampa which is crossed out here.  Is
8    that correct?
9    A    Hold on a second.
10   Q    Page 15.
11        MR. KIRKMAN:  What page?  15.
12   A    15.  Skiplagged.  Okay.  SNA to Miami.
13        MS. PALNITKAR:  Maybe you should give him his
14   colored report.
15        MR. KIRKMAN:  I am just showing him a colored
16   page.
17        MS. PALNITKAR:  Yeah.  Maybe you should give him
18   your report.  Switch reports.
19   A    I don't see the --
20        MR. KIRKMAN:  I have all kinds of notes written
21   on it.
22        MS. PALNITKAR:  Okay.
23   A    I don't see the Phoenix thing crossed out.
24   Q    No.  Phoenix isn't on this one.  This is your
25   Skiplagged.

Page 149

38 (Pages 146 - 149)

App'x 180

```
 1   A   Correct.
 2   Q   It's not the same flight.  This one goes from John
 3   Wayne to Miami and then a cancelled leg from Miami to Tampa.
 4   A   Yes.  Yes.
 5   Q   And the flight that you saw on American here is John
 6   Wayne to Phoenix and Phoenix on to Miami.
 7   A   Could you tell me which one that is because the first
 8   one goes directly from --
 9   Q   No.  You're looking at stimuli.
10   A   Yep.
11   Q   And that's not what -- We are looking at your -- your
12   search.
13        MR. KIRKMAN:  Back on page 11.
14   A   On page 11, my report.  Yeah.  I see.  Okay.  Yes.
15   And the question is?
16   Q   Are those -- Is that the same flight that you chose
17   on American and Skiplagged?
18   A   I searched for flights from Santa Anna to Miami,
19   origination destination.  I picked -- On page 12 you can see I
20   picked the flight that actually goes on to Tampa and terminates
21   in the Skiplagged version that starts out in Santa Anna and
22   goes to Miami.  And then it goes from Miami to Tampa.  That's
23   on page 12.
24   Q   Uh-huh.
25   A   And then on page 13 I show you what happens when you
                                                    Page 150
```

```
 1   click that again.
 2   Q   Okay.  But my question to you is the flight that you
 3   looked at, the two flights that are priced at 294 on page 11,
 4   are those the same flights, the same exact flights as the one
 5   that you chose on Skiplagged?
 6   A   I don't think so.  I don't -- Give me a minute.  I
 7   don't believe it is because these are the screenshot pages from
 8   American Airlines which does not have hidden city ticket --
 9   hidden city tickets.  So the one on page 12 and the one on page
10   15 are hidden city tickets.  So they are not the same price.
11   Q   Okay.  And what is the price of the one you chose on
12   Skiplagged?
13   A   The one I investigated is -- The one on page 15 is --
14   I don't know how to account for the rewards earned, but the --
15   Q   No, no.  I'm just saying that --
16   A   The dollars are 202.97.
17   Q   Okay.  And -- But before you get to that page I am
18   looking at page 11 --
19   A   Right.
20   Q   -- where you -- The last line on page 11 says the
21   cheapest flight AA.com shows is 294 --
22   A   Yes.
23   Q   -- versus the AA flight at 168 shown on
24   Skiplagged.com.  Is that correct?
25   A   Yes.
                                                    Page 151
```

```
 1   Q   Okay.  So the price at this point in your journey
 2   you're seeing that the price is $168 for the Skiplagged ticket.
 3   Is that correct?
 4   A   For a hidden city ticket, yes.
 5   Q   Yes.  Okay.  And then you go on to click -- Now I am
 6   on page 12.  You go to this screenshot.  And you said you
 7   clicked it.  You clicked on this book now.  Is that correct?
 8   A   Excuse me.  Yes.
 9   Q   Okay.
10   A   So I got to this page when I first selected the
11   flight.
12   Q   Okay.
13   A   And then you go to the next page if you click that
14   book now ticket.
15   Q   Okay.  Now we are going to page 13.  And it looks
16   like you got this pop-up box on your --
17   A   Correct.
18   Q   -- on your screen.  Correct?
19   A   Yes.
20   Q   Did you get this pop-up box the first time you went
21   through this journey when you were trying to book a ticket on
22   Skiplagged?
23   A   So my recollection is that every time you click on a
24   hidden city ticket you get taken to this page.  So to the -- So
25   once you -- once you click the book now box on a hidden city
                                                    Page 152
```

```
 1   ticket, you get to this page about important information of
 2   your flight --
 3   Q   Okay.
 4   A   -- every single time.
 5   Q   Do you recall if this is the first or second time
 6   you -- you -- you tried to go down this path?
 7   A   I tried different city pairs just out of curiosity,
 8   and it always comes up with this -- this box.
 9   Q   Even the first time you clicked book now this pop-up
10   box came up?
11   A   I don't remember the sequence, but in every city
12   pair, if you click a hidden city ticket, you get this -- this.
13   And it's more than a pop-up box.  It's almost the entire
14   screen.
15   Q   If I told you that when I did it myself, the first
16   time I went through I did not get a pop-up screen, would that
17   surprise you or do you have something to --
18   A   I don't know.  I just don't know what -- how often
19   they present it.  My experience is that they seem to present it
20   very visibly and make you click through a couple of pages.
21   Q   Okay.  So again, I don't know when -- what date you
22   took these screenshots.  I haven't seen any dates listed here.
23   A   So, as I said, they were taken in May.  I believe it
24   would be May.  I thought URL had the -- the -- the date at the
25   top, but evidently it does not.  I can go back and look at
                                                    Page 153
```

39 (Pages 150 - 153)

1 the -- my originals on the computer and see if I can find
2 that.
3    Q   Okay.  So I have no way of knowing when this was
4 taken, but here you found a pop-up box that shows important
5 information about your flight.  This is a hidden city ticket.
6       MR. KIRKMAN:  He said -- He said it's more
7 than --
8    Q   Is that correct?
9       MR. KIRKMAN:  He said it's more than a pop-up
10 box, ma'am.
11       THE WITNESS:  Yeah.
12       MR. KIRKMAN:  That's what he said.
13       MS. PALNITKAR:  Okay.  Well, I am reading his --
14 relying here on page 13 that says this returns the pop-up box
15 below.
16       MR. KIRKMAN:  I understand, but he said it was
17 more than a pop-up box.
18       MS. PALNITKAR:  But I am reading from the report
19 which is what he has offered into evidence as his rebuttal.
20    Q   So do I -- Should I call it something other than what
21 you have written here?
22    A   You know, I just pointed out that the size of that
23 thing is bigger than your typical pop-up box.  That's my point.
24 A typical pop-up box, you know, would be some small part of the
25 screen.  This is pretty big.  I still call it a pop-up box

Page 154

1 because it pops up without you doing anything.
2    Q   Then that's what I will call it.  So in this pop-up
3 box here, important information about your flight -- this is a
4 hidden -- hidden city ticket.  It asks you to click here.  I
5 understand I cannot check my bags.  Is that correct?
6    A   Yes.
7    Q   And did you click that?
8    A   Yes.
9    Q   And then after you clicked that did some more
10 information come up about bad weather and angry airlines?
11    A   On page 14, yes.
12    Q   Okay.  Are you -- Do you know that when Jerry Wind
13 did his experiment this pop-up box did not come up in two
14 sections, but all together as one.  Were you aware of that --
15       MR. KIRKMAN:  Form.
16    Q   -- from the stimuli?
17       MR. KIRKMAN:  Form.
18    A   I think we are -- we are saying the same things in
19 different ways.  He does not show you the sequence of things
20 the way it shows up a person doing a dynamic search, which is
21 what I am doing.  So I cannot remember exactly how he presents
22 the stimuli, but whatever he presents a static stimuli.
23    Q   Okay.  But you don't know when -- what date this was
24 taken.  You just say sometime in May.
25    A   It's sometime in May, yes.

Page 155

1    Q   Do you know when that was changed from the former
2 pop-up box that appeared?
3       MR. KIRKMAN:  Form.
4    A   I only know what I see here.  I don't know of any
5 previous pop-up boxes and stuff.
6    Q   So if this pop-up box, two steps that you encountered
7 here was different than the one that was in place during the
8 time that Wind was conducting his experiments, would that
9 surprise you?
10       MR. KIRKMAN:  Form.
11    A   Nothing surprises me about airlines and airline
12 ticketing.  It's like trying to buy fish in a Persian fish
13 market.  But I would be surprised if there were no pop-ups
14 whatsoever.
15    Q   Okay.
16    A   So --
17    Q   That's good to know.  Okay.  So then you -- you
18 clicked it, and then this bad weather and angry airlines.  So
19 what -- what does this pop-up box -- What did you understand
20 this to mean?
21    A   Exactly what they write here.  They don't like you to
22 do this.
23    Q   Who doesn't like you to do this?
24    A   The airline.
25    Q   Do you know why?

Page 156

1    A   As I said, I have no idea of their motivations, but I
2 would imagine they make less money.
3    Q   Uh-huh.  Is it perhaps because it's against airline
4 policy, do you know?
5    A   I imagine every airline's policies is to make as much
6 money as they can.  And this is one of the ways they try to
7 make more money.
8    Q   Do you think airlines have policies to ensure the
9 safety of others?
10    A   Of course they do.
11    Q   So all airlines' policies are not just to make money.
12 Right?
13    A   I think they all have a policy of making money, yes,
14 not to the exclusion of anything else, but they definitely are
15 trying to maximize their -- their profits.
16    Q   So you're biased in that airline -- you believe
17 airline policies are all to make money?
18    A   I just told you airlines -- not just airlines, all
19 companies try to maximize their profits.  Do they do it to the
20 exclusion of everything else?  No, of course not.  But what I
21 am asserting is that every airline and every other company I
22 know of will take actions and derive policies to maximize their
23 profits.
24    Q   So you are saying that policies set forth by the
25 airline are in order to make more profits for the airline?

Page 157

40 (Pages 154 - 157)

App'x 182

1    A   Among other things, yes.

2    Q   Okay.  In -- Are you aware that there are more

3 warnings that can pop up than just these three listed here when

4 you're going through a buy on Skiplagged?

5    A   What -- What are the pop-ups you're referring to?

6    Q   I am referring to pop-ups that would say here you're

7 going to -- you're going from Miami or John Wayne to Miami.  If

8 a flight attendant asks you where they're going, say you are

9 going to Tampa and it's a customized pop-up box, have you seen

10 those when you're checking out?

11        MR. KIRKMAN:  Hold on.  Hold on.  Form.

12    A   I have not seen anything other than what I report

13 here.

14    Q   Okay.

15    A   And in the Wind report.

16    Q   How many times did you say you attempted to check out

17 on Skiplagged?

18    A   I didn't completely check out.  I stopped at the

19 point of offering my credit cards probably a couple of times.

20    Q   Okay.

21    A   On each of those city pairs or two city pairs.

22    Q   So --

23    A   It was a --

24    Q   -- two city pairs times two times.  So four times you

25 attempted?

Page 158

---

1    A   I may have done twice in the first city pair and

2 maybe just once in the second city pair to -- to make sure that

3 it looked the same.  And they all looked the same.

4    Q   But the first city pair is different from the second

5 city pair.

6    A   Correct.

7    Q   Right?

8    A   But the boxes and the sequences all look the same.

9    Q   What about the prices?

10    A   Oh, the prices of course are different.  They're

11 going to different cities.

12    Q   Okay.  Did you put any of that in this report?

13    A   I describe what I did.  I don't know if I put down

14 all those details.  I probably did not.  I would have to look

15 through my report.

16    Q   Okay.  Okay.  So now let's go to page 15.

17    A   Okay.

18    Q   So I believe the price quoted for you was 193 on

19 the -- oh, sorry -- 168 on the initial screen.  Correct?

20    A   I will have to check.

21    Q   Yeah.  The one on page --

22    A   Let me just make sure.

23    Q   -- 12.

24    A   It was -- Where is it?  Actually can you direct me to

25 the page?

Page 159

---

1    A   Page 12.

2    A   Page 12.  Yes.  168, which is a third from the top of

3 the page of flights.  Yes.

4    Q   And now you are going to this screen on page 15 where

5 you're about to check out and offer your credit card, I assume.

6 And what does it say here at the top of you're saving how much

7 compared to other websites?

8    A   146 compared to -- $146 compared to other websites.

9    Q   Okay.  So here Skiplagged is making a claim that

10 you're saving money.  Correct?

11    A   Yes.

12    Q   Okay.  And then when you go to check out what is the

13 final price?

14    A   The final cash price is 202.97.

15    Q   Okay.  And so do you recall what the American

16 Airlines' price was for the ticket that you chose?

17    A   I don't remember if I actually went through with an

18 American Airlines thing, but the one I chose was 294.

19    Q   Okay.

20    A   I think it says the lowest was -- sorry -- one way

21 for 294, one way from -- main premium.  So I would have to look

22 at this more carefully, page 11.

23    Q   I think they're both for 294.

24    A   294.  Yes.  294.  But that's to Phoenix from Miami.

25 Yes.  294.  Yes.

Page 160

---

1    Q   Okay.  So what's the difference in the -- the $294

2 flight and the $203 flight?  It's $91.  I can tell you that.

3    A   Okay.

4    Q   If you trust me.

5    A   I trust you.

6    Q   Okay.  It means we are good at math.  Right?  Okay.

7 So $91 is the difference.  So now here Skiplagged is saying the

8 savings amount.  Is that correct?

9        MR. KIRKMAN:  It says you're saving 146 compared

10 to other websites.

11        MS. PALNITKAR:  Uh-huh.

12        MR. KIRKMAN:  Yeah.

13        MS. PALNITKAR:  Yeah.

14    Q   And the --

15    A   What's your question to me?

16    Q   My question is are we saving $146 here?

17    A   That's what they're saying to me.

18    Q   But I am asking with you looking at those two

19 flights, is that price differential $146?

20    A   The differential calculation you made is not the same

21 as $146.  That's true.

22    Q   And just in a customer journey, now I am separating

23 from in a general customer journey.  If someone is telling you

24 you are saving $146, but that person actually goes to check out

25 and they are realizing they're only saving $91, how do you

Page 161

1 think that customer would feel about the claim that they are
2 saving $146?
3        MR. KIRKMAN:  Form.
4    A    The modern customer in the U.S. is completely
5 bombarded by all kinds of claims.  Most people just kind of
6 ignore all of this as just noise.  Of course you're irritated
7 when you find that there is a cheaper flight out there that you
8 didn't see or that the -- the calculation they show is
9 different from your own choices.  So, you know, it's all over
10 the place.  It's hard to make any generalizations about how
11 people feel about it.  They -- In general, people will act on
12 the information they have.  So in this particular instance if I
13 think that $202.97 is a price that I can accept, given the
14 alternatives I have in mind, I will buy it.  If it's not, I
15 don't buy it.  So that's as far as we can go.  It's very hard
16 to infer anything beyond that.
17   Q    Okay.  Let me simplify it then.  If you went to go
18 buy a -- laptop, Dr. John, and they tell you at Best Buy
19 you're going to save $146 on your laptop as compared to other
20 electronic stores.
21   A    Okay.
22   Q    Then you go into Best Buy and you buy a laptop.
23   A    Okay.
24   Q    And you find out that you only in fact saved $91.
25   A    Okay.

Page 162

1    Q    How would you feel as a purchaser?
2    A    Well, I would go back to Best Buy, and Best Buy has a
3 price matching policy.
4    Q    Well --
5    A    You just asked me how I would feel.
6    Q    No.  Forget about the price -- Well, then I will have
7 to shift my paradigm into another -- I mean something that
8 doesn't -- I am not asking about --
9        MR. KIRKMAN:  Hold on.  Stop.
10       MS. PALNITKAR:  Objection; nonresponsive to
11 that.
12   Q    I am not asking what you would do.  I am asking how
13 would you feel at that moment?
14   A    I would feel great.
15   Q    You would feel great?
16   A    Yes.
17   Q    Why?
18   A    Because I would get my money back from Best Buy.
19       MS. PALNITKAR:  Objection; nonresponsive.
20   Q    Do I need to change the paradigm?  What if Best Buy
21 -- What if -- Fine.  Then don't do it.  Go to somewhere else.
22 Go to a --
23       MR. KIRKMAN:  Now, wait a minute.  You're the
24 questioner.  He's giving you the answers.  He just gave you the
25 answer.

Page 163

1        MS. PALNITKAR:  Right.  But he's -- But that's
2 not my answer [sic].  My answer [sic] was how would you feel.
3    Q    I'm not asking for extra inputs to be put in.  I
4 think you as all people know in a survey you don't ask for
5 extra inputs that are interjected by the survey respondent.
6 This is -- I can change it if you would like.
7    A    I don't know what the question is.
8    Q    The question is if you go somewhere and buy something
9 where the salesman tells you you are going to save $146, and
10 you realize that in fact you only saved $91, how would you
11 feel?  Without any price matching, without any extra stuff,
12 just how would you feel?
13   A    It depends on what I know about the environment.  So
14 I cannot give you a universal answer without knowing what the
15 knowledge base of the customer is, what the policies are.
16   Q    I'm not asking for a universal answer.  I'm asking
17 for your answer.
18       MR. KIRKMAN:  Stop.
19   Q    How would you feel?
20       MR. KIRKMAN:  Stop.  You cannot talk over each
21 other.  Do not interrupt his answer.  Finish your answer, then
22 go to your next question.
23   A    I can tell you how I would personally feel.  I
24 wouldn't feel bad if that's what you're asking me.  I would
25 feel, okay, I have to go get my money back from retailer A.

Page 164

1    Q    Okay.  So you would want to make it right?
2        MR. KIRKMAN:  Form.
3    A    I don't know if that's the expression making it
4 right.  That's what I would personally do.  That's all I can
5 say.
6    Q    You would want to get what was promised to you?
7        MR. KIRKMAN:  Form.
8    A    If somebody promised me a price of $202.97, and they
9 charged me $202.97, they actually have come through with their
10 promise.
11       MS. PALNITKAR:  Objection; nonresponsive.
12 That's not my question.
13   Q    My question again is if someone told you you were
14 going to save $146, and you in fact only saved $91, how would
15 you feel about that discrepancy and what you told -- what
16 you're told you were going to save?
17       MR. KIRKMAN:  Form.
18   A    I wouldn't feel bad about it.
19   Q    You wouldn't?
20   A    No.
21   Q    You wouldn't -- You wouldn't be upset that you didn't
22 save as much as they told you you were going to save?
23       MR. KIRKMAN:  Form.
24   A    I never expected those $146 and $91 to mean anything.
25   Q    Why not?

Page 165

42 (Pages 162 - 165)

1    A    Because I know what I am paying, and that's all
2  that's credible, and that's all that's on the paper, and that's
3  all that my checkbook or credit card is going to get charged.
4    Q    So then why are you shopping on a website that
5  advertises it can get you lower fares?
6    A    Because I want to.
7    Q    But you don't care what you're paying.
8    A    I do care what I pay, and I just told you that if I
9  don't find the $202 price acceptable given all the information
10 I have from my dynamic search process, I won't buy it.
11   Q    So you're telling me you do care what you pay, but if
12 you didn't realize the savings that were promised to you, you
13 still don't care?
14   A    I don't accept these $146 calculations as some kind
15 of promise. It's -- This is puffery. Every company tells you
16 you're going to save money. I have never had an experience in
17 my long so far life that a company said you paid 100 bucks more
18 than you should have paid. Good luck to you. I love you as a
19 customer. Nobody says that. They all tell you you saved so
20 much money. It's just nonsense. It's what marketers get a bad
21 name for.
22   Q    Okay. So now we are going to turn to B on page 16.
23 The measurement of subjective concepts like deception and
24 confusion in the Wind experiment does not resemble accepted
25 practice and methodology. What accepted practice and

Page 166

1  methodology are you referring to?
2    A    I have said this many times before. It's laid out in
3  footnote five.
4    Q    So this is the first time we are talking about this
5  page, so I haven't asked you this question before.
6    A    I meant --
7        MR. KIRKMAN: That is not accurate. You have
8  talked about this page before. Don't make statements, ma'am.
9  Just ask questions.
10       MS. PALNITKAR: Objection to the sidebar.
11 Bill --
12       MR. KIRKMAN: I am telling you if you don't stop
13 making statements, we are going to quit. Ask questions. You
14 just made a statement that's not true.
15       MS. PALNITKAR: I am asking from -- from
16 sub-heading B what accepted practice and methodologies are you
17 referring to. Do you have an objection?
18       MR. KIRKMAN: It wasn't what I objected to. He
19 answered that question. Then you made a statement that was
20 incorrect. Now if you have questions, ask them.
21   Q    My question is what accepted practice and methodology
22 are you referring to on page 16 where you say the measurement
23 of subjective concepts like deception and confusion in the Wind
24 experiment does not resemble accepted practice and methodology?
25       MR. KIRKMAN: Objection; form. Asked and

Page 167

1  answered.
2    A    I think I have answered it before. I will repeat it.
3  It's described in footnote five.
4    Q    Okay. And does -- Footnote five is a paradigm for
5  developing better measures of marketing constructs. Correct?
6    A    That's what the title of the paper is, yes.
7    Q    What does the paper discuss?
8    A    I tell you what the -- the relevance of the paper is
9  to this case in the next sentence, the three important
10 elements. And then I describe what they are.
11   Q    My question is what does this paper discuss, not the
12 relevance.
13   A    It discusses exactly how to develop a decent measure.
14   Q    Of what?
15   A    Of a subjective concept.
16   Q    In a likelihood of confusion survey?
17   A    In any subjective concept.
18   Q    Does it cover likelihood of confusion surveys in the
19 paper? I didn't see it.
20       MR. KIRKMAN: Form. Excuse me. Form.
21   A    Confusion is the construct here. So confusion is a
22 subjective concept. Subjective concepts include personality
23 traits, attitudes, any of those things, deception, confusion,
24 opportunism, all of those things. And they're all under this
25 headline of this foundational study. The -- the applicability

Page 168

1  of the study is broad and would certainly include confusion.
2    Q    But does it include likelihood of confusion surveys
3  as they are conducted to offer --
4        MR. KIRKMAN: Sorry. Go ahead. Let her
5  finish.
6    Q    -- as they are conducted to offer into evidence into
7  court?
8        MR. KIRKMAN: Form.
9    A    If you show me a likelihood of confusion survey, I
10 can show you how it follows this procedure. And if it doesn't
11 follow the procedure, I would think it's a bad survey.
12   Q    I did show you one. It's the Wind survey.
13   A    Oh, that's not doing it properly, as I said many
14 times in this study.
15   Q    Why not? Why is that lacking accepted practice and
16 methodology?
17   A    Sure. Let's start with the first item. It never
18 defines the concept.
19   Q    Okay. You understand that -- Oh, is there a legal
20 definition that you have reviewed that is the definition of
21 confusion or deception?
22   A    No.
23   Q    Okay. So you're relying on marketing definitions of
24 deception and confusion?
25   A    No.

Page 169

43 (Pages 166 - 169)

1    Q    What -- Where are you getting your definition of
2  deception and --
3    A    I don't offer a definition.
4    Q    But you want Wind to offer a definition?
5    A    Yes.
6    Q    Do you have the appropriate definition he should have
7  offered?
8    A    No.  I -- I would like to see the definition he is
9  using.  The point is anybody who sets out and measures
10  something should start with a definition.  So that's what I am
11  looking for, and it's not present here.
12    Q    Why is a definition important to offer to your survey
13  respondents?
14    A    Because the foundational practice as described in
15  that paper and done tens of thousands of times since that paper
16  was published always starts with a definition of a concept.
17  Without defining a concept we would be going on in circles as
18  to the meaning of what we are trying to measure.
19    Q    If you ask a consumer if they think that Skiplagged
20  is affiliated with American Airlines and they answer yes, have
21  you not just witnessed confusion?
22    A    No.
23    Q    Why not?
24    A    Because that's not an acceptable way to measure
25  confusion.

Page 170

1  sentence of page 16 says I assess whether the Wind report
2  follows these practice elements.  What are you using to assess
3  whether he is following the elements?
4    A    Just my eyes.  I can read the report and see there's
5  a definition.  I can see there are multiple questions developed
6  to create a scale.  And I can see if there's any evidence of a
7  stability.  There's none of those three.
8    Q    And do you have any data to show that if done another
9  way stability would result?
10    A    I know how you get stability.  I know the right way
11  to do it.  I was not asked to do any survey, and I have said
12  many many times I have not collected any data on my own.
13    Q    So you don't know if doing it on your own would have
14  created a different result, do you?
15    A    I do know that.
16    Q    Oh, and that's because of the footnote three
17  literature?
18    A    It's because of the generalized notions of how you go
19  about developing a decent measure of a subjective construct.
20  And this does not match any of those things on those three
21  elements.
22    Q    And the -- I am going to go back to footnote three.
23  That's the data that you state generally governs this.
24  Correct?
25         MR. KIRKMAN:  Form.

Page 172

1    Q    It's not acceptable to ask a consumer if they think
2  Skiplagged is affiliated with American Airlines and then
3  understand their response as to indicate whether or not that
4  respondent was confused?
5    A    I just said that.
6    Q    Sorry?
7    A    I just said that.  That would not be a right --
8  proper way following accepted practice to measure confusion.
9  That's right.
10    Q    You understand that these questions have been asked
11  in countless amounts of surveys that have been accepted by the
12  Court and are deemed acceptable uses?
13         MR. KIRKMAN:  Now, wait a minute.
14    Q    Do you understand that?  Do you know that for sure?
15         MR. KIRKMAN:  I am going to object.  You're
16  stating again.  Form.
17    A    If you want to show me a survey, I will be happy to
18  give you my opinion on it.  I don't have any generalized
19  opinions about the quality of surveys done in the litigation in
20  cases.
21    Q    Okay.  Okay.  Let's continue.  There are three
22  important elements to developing method -- methodologically
23  acceptable measures of a subjective construct like deception or
24  confusion.  The concept must be properly defined.  Actually let
25  me strike that question.  I am just going to move on.  The last

Page 171

1    A    No.
2    Q    On page six?
3    A    No.
4    Q    Okay.  How is that different from your understanding
5  of how to conduct the subjective construct study?
6    A    So the --
7         MR. KIRKMAN:  Form.
8    A    So footnote three speaks about how people behave
9  on-line.  It's about the dynamic process that you now have to
10  simulate in your experiment or that you now have to create in
11  your lab.  Footnote five talks about how you go about measuring
12  a subjective construct.
13    Q    Okay.
14    A    Let me just double check and make sure it is indeed
15  footnote five.
16         MR. KIRKMAN:  Footnote five is on page 16.
17    A    Yes.  Thank you.  So footnote five is about the
18  methodology.  And footnote three is about dynamic process.
19  While we are at it, so footnote four actually tells you when I
20  accessed those flights.  It's May 19th, 2024.
21    Q    What page is footnote four on?
22    A    Page --
23         MR. KIRKMAN:  Eight.
24    A    Eight.  Yeah.
25    Q    May 19th, 2024?

Page 173

44 (Pages 170 - 173)

1  A  Correct.

2  Q  Okay. Thank you. Okay. So footnote three relates
3  to the on-line dynamic journey. Is that correct?

4  A  That's right.

5  Q  And footnote five relates to a methodology for
6  measuring subjective marketing constructs. Is that correct?

7  A  Subjective concepts regardless of the field.

8  Q  Okay. Subjective concepts. And here in the last
9  sentence, part B --

10     MR. KIRKMAN: What page are you on?

11     MS. PALNITKAR: 16.

12  Q  You say there are three important elements to
13  developing -- and I have said this already. I'm sorry. Three
14  important elements to developing methodologically acceptable
15  measures of a subjective construct like deception or confusion.
16  A, the concept must be properly defined. We discussed that.

17  A  Yes.

18  Q  B, based on this definition a scale preferably
19  comprised of multiple close-ended question statements is
20  developed. And C, evidence of its stability is reported. So
21  let's look at B for a moment. Why are -- Why is it a
22  preference to have closed-ended questions in a likelihood of
23  confusion survey?

24     MR. KIRKMAN: Form.

25  A  It's not confined to likelihood of confusion surveys,

Page 174

1  first of all. When you're measuring any subjective concept,
2  open-ended questions as opposed to close-ended questions give
3  you a lot more instability in originating responses. It is
4  much less stability with close-ended questions.

5  Q  I understand. But my question is tailored to
6  likelihood of confusion surveys, and that's what I am asking
7  about. So it is defined when I am asking my question. I am
8  asking why is a close-ended question preferable in a likelihood
9  of confusion survey?

10     MR. KIRKMAN: Form. Asked and answered.

11  A  For the same reasons as I just stated before, because
12  it will give you more stable answers and less noise in the
13  system.

14  Q  Have you reviewed any case law when it comes to the
15  admissibility of open-ended questions in a likelihood of
16  confusion survey?

17  A  I have not.

18  Q  Let's go through one. I am going to mark number 5.

19     (Exhibit 5 was marked for identification.)

20  Q  Are you familiar with courts preferring open-ended
21  questions to likelihood of confusion surveys?

22     MR. KIRKMAN: Form.

23  A  I have no idea what they prefer.

24  Q  So you don't know in a likelihood of confusion survey
25  if it is preferable to have close-ended or open-ended

Page 175

1  questions, do you?

2     MR. KIRKMAN: Form.

3  A  I do not know that.

4  Q  In a likelihood of confusion survey?

5  A  Yes.

6  Q  Do you know that -- Okay. Let's look here on page 10
7  of this case law that I presented to you which is Competitive
8  Edge, Inc. versus Staples, Inc. And there's a highlighted
9  portion there. Could you read that highlighted portion?

10  A  The questions used in the survey allowed for only yes
11  and no responses. The survey's reliability is significantly
12  compromised by its failure to use open-ended questions or to
13  allow for don't know responses.

14  Q  This is a -- I can represent to you this is a
15  sentence written by the Court, the judge, reviewing a
16  likelihood of confusion survey. Does this change your mind at
17  all as to whether open-ended questions are helpful to a
18  likelihood of confusion survey?

19     MR. KIRKMAN: Form.

20  A  I read the sentence different. It says the survey's
21  reliability is significantly compromised which means it's lower
22  or worse by its failure to use open-ended questions.

23  Q  Right.

24  A  That means that open-ended questions are preferable
25  to close-ended questions is --

Page 176

1  Q  Yeah.

2  A  -- is the point. I have no opinion in this matter.
3  This is apparently what this judge thinks. That's the judge's
4  opinion. That's fine.

5  Q  Okay. Okay. Let's look at another judge, this one
6  from Texas. I'm marking this as Exhibit 6. This is
7  Healthpoint Limited verse Ethex Corp.

8     (Exhibit 6 was marked for identification.)

9  Q  And let's turn to page four. Can you read the
10  highlighted sentence?

11  A  Although it is true that open-ended questions
12  generally are considered to be less likely to undermine the
13  reliability of a survey, a survey's use of close-ended
14  questions in of -- in and of itself is not determinative of
15  reliability or admissibility.

16  Q  And I can represent to you this is the Court
17  rendering this is part of their decision. Does it say here
18  that open-ended questions --

19     MR. KIRKMAN: This is -- This is -- You can
20  represent to him what now?

21     MS. PALNITKAR: That this is the Court -- the
22  judge writing this in their -- in their opinion. Do you
23  disagree?

24     MR. KIRKMAN: I don't know what this is. It's
25  just some opinion in some case that has nothing to do with

Page 177

45 (Pages 174 - 177)

1  this. I don't care what you purport to represent to him. I
2  mean --
3        MS. PALNITKAR:  Are you making an objection
4  right now?
5        MR. KIRKMAN:  Yes.
6        MS. PALNITKAR:  State it for the record.
7        MR. KIRKMAN:  Form. It -- it involves a matter
8  that has nothing to do with this case. You're asking him to
9  comment on some judge's statement as to the law --
10       MS. PALNITKAR:  Okay.  You're --
11       MR. KIRKMAN:  -- and admissibility.
12       MS. PALNITKAR:  Objection to the sidebar.  You
13 are just now directing your client in how to answer without
14 making proper objections under the Federal Rules of Evidence.
15 That's not a proper objection, and you know it.
16       MR. KIRKMAN:  If you started by asking a
17 question that was proper under the Federal Rules of Evidence, I
18 wouldn't have to make that objection.
19       MS. PALNITKAR:  I am about to ask the question.
20   Q   Does this -- Does this change your mind on whether
21 open-ended questions are considered acceptable in a legal
22 likelihood of confusion survey?
23       MR. KIRKMAN:  Form.
24   A   So my objection -- My -- my critique of the Wind
25 report is on several points. If I read what is written here,

Page 178

1  it looks like the Court is open to close-ended questions, open
2  to open-ended questions, and that's what I read. It doesn't
3  change my opinion as to which one offers more reliable evidence
4  of any subjective concept.
5    Q   Right. Not just related -- Your opinion is not just
6  related to likelihood of confusion surveys. Correct?
7    A   That's right.
8    Q   Okay. Let's go on. I am going to page 19.
9    A   Okay.
10   Q   In B you say instead of the preferred close-ended
11 responses, comma, the Wind report employs open-ended responses,
12 comma, but there is no systematic procedure reported that was
13 used to convert the open-ended textual responses into
14 categories. Just taking the first part of that phrase, the
15 Wind report employs open-ended responses, do you have -- do you
16 take issue with the Wind report using open-ended responses?
17   A   Exactly as I say, it's preferable to use close-ended
18 responses, yes.
19   Q   And is using open-ended responses something that
20 makes the survey invalid?
21       MR. KIRKMAN:  Form.
22   A   Nothing makes a survey invalid or valid in -- in --
23 by picking out one element. It's the totality of everything we
24 talked about here. So what I write here is that I would prefer
25 to use close-ended responses based on the literature. But if

Page 179

1  you're going to use open-ended responses, what I -- what is
2  distressing to me is that there's no systematic procedure
3  reported that converts the open-ended responses into numerical
4  categories, countable categories.
5    Q   And where is the data cited that says it is better to
6  convert open-ended responses into categories?
7    A   He reports counts.
8    Q   What data do you have to make that assertion?
9    A   I am looking at his counts. How does he come up with
10 those counts? You can't have counts without having converted
11 text into numbers, categories. So that's what my point is.
12 That the procedure by which he comes up with those results is
13 not reported.
14   Q   And that is your observation. Correct?
15   A   That is my observation, yes.
16   Q   And so you are saying that there's no systematic
17 procedure reported that was used to convert responses into
18 categories. And that's because you say so?
19       MR. KIRKMAN:  Convert open-ended textual
20 responses into categories.
21       MS. PALNITKAR:  Agreed. Let me strike that last
22 question.
23   Q   So you are saying there is no systematic procedure
24 reported that was used to convert the open-ended textual
25 responses into categories. And that is a flaw in his --

Page 180

1    A   One of the many flaws, but I expand on that. On the
2  bottom of page 19 I tell you what my particular problem with it
3  is. It says no such coding scheme development procedure is
4  reported in the Wind report. Instead the brief description
5  provided in the report on page 26 alludes to the procedure
6  involving two independent coders, and that's quoting from the
7  report, who are not familiar with the objective study or
8  responses and a procedure for resolving conflicts of two
9  coders. We are not told what the procedure looks like. We are
10 not told what the degree of agreement is. We are not told how
11 they resolve the conflicts.
12   Q   Do you have any literature or data that supports that
13 you must be told the coding scheme for an open-ended question?
14   A   Of course.
15   Q   Where is that?
16   A   In any academic journal you would never get passed
17 the desk reject setting if you don't tell people what you do.
18   Q   But have you put that citation into this report?
19   A   I don't need to put a citation. That would be true
20 of any academic. It would also tell you that if you did
21 something, you took text and you converted it to numbers, you
22 would have to show me how you did it. And that is not done
23 here.
24   Q   So there's no cite to --
25   A   It's not a citation. It's a procedure. It's just

Page 181

1 simply telling you what did you do.

2   Q  So that's because -- This is because you say so then.

3 You -- you are saying that someone needs to write a coding

4 procedure?

5         MR. KIRKMAN: Form.

6   A  I hope my entire report is what I am saying. So yes,

7 I'm the one saying it.

8   Q  Right. Well, I am looking for some kind of outside,

9 not you literature, that shows that a coding scheme has to be

10 developed.

11   A  And I am telling you that there is no academic person

12 of any respectability who would tell you that I can go and

13 convert textual responses into categories without telling you

14 how he did it.

15   Q  Okay. But you don't have any of that external data

16 here in this report?

17   A  That's like asking me if I have two eyes. Do I?

18   Q  I don't know. Only you know. One might not work.

19   A  That's called inter-subjectivity, but anyway.

20   Q  Okay. So you are saying that this is a flaw because

21 there's no coding scheme reported. Correct?

22   A  One of the many flaws.

23   Q  And that a coding scheme must be present because in

24 your expertise it should be present. Correct?

25   A  I tell you why in point C.

Page 182

---

1   Q  But my question is is it because it's in your

2 expertise that it should be present? Is that correct?

3   A  No. It's because you cannot judge the reliability of

4 a measure without seeing how it was developed. It's as simple

5 as that.

6   Q  I understand, but there's no -- there are citations

7 in here that refer to where other literature says that. Right

8 now it's just you saying that. Correct?

9         MR. KIRKMAN: Form. Asked and answered three

10 times.

11   A  I will repeat myself. I am saying it because that --

12 that would be the position of any academic who develops

13 measures of subjective concepts.

14   Q  But no other academics are listed here. So again, I

15 am asking is this right now as it is on this paper because you

16 say so?

17   A  You know, this is the equivalent if you ask me if the

18 earth is flat. Okay. So that's what's going on here. What I

19 am saying is that this is such a commonly known thing that if

20 you want to go back into stability of measures, you can go back

21 to footnote five and see how the procedure works, and that

22 would tell you why you would want to have evidence of

23 reliability and how you develop evidence of reliability. So

24 the details are there, and that's a foundational paper. And I

25 don't cite to anything else besides that foundational paper.

Page 183

---

1         MS. PALNITKAR: Objection; nonresponsive.

2   Q  I am asking if the only back-up to your assertion

3 that a coding scheme must be proffered by Jerry Wind, is the

4 only back-up to that your opinion as we sit here today?

5         MR. KIRKMAN: That's the fifth time you've asked

6 that. Don't answer that question.

7         MS. PALNITKAR: He hasn't answered.

8         MR. KIRKMAN: I have had it. You have asked

9 that five times, ma'am. And he's given you five times answers.

10         MS. PALNITKAR: I have objected that that last

11 answer was nonresponsive. I am entitled to ask the question.

12         MR. KIRKMAN: You are entitled to get an answer,

13 and he's answered it five times.

14   Q  Do you cite any literature in here that states that a

15 coding scheme must be stated in a survey?

16   A  The way you develop a survey is established in

17 footnote five. The details are there. I do not cite every --

18 I don't cite papers for every single element of every step of a

19 procedure. It's common sense that if you have a bunch of text,

20 to make it into numerical categories you have to tell me how

21 you went from the words to numbers, and it's not done here.

22 That's all I am saying.

23   Q  If you have a Ph.D. who's writing a thesis and they

24 make numerous assertions which are not supported by citations,

25 would you consider that to be reliable?

Page 184

---

1         MR. KIRKMAN: Form.

2   A  Give me an example, and I will be happy to answer the

3 question.

4   Q  I just did.

5         MR. KIRKMAN: No. No. No. Stop. You're

6 entitled to get an example.

7   Q  If I write a paper tomorrow on the history of India

8 and I cite many facts about people and -- and I don't

9 provide -- That's not a perfect example. I'm sorry. I am not

10 prepared. I have never done a dissertation. If I am making

11 theories about how -- how a society developed in ancient

12 Samaria, okay, and I am making assertions about how that

13 society developed and I am not providing citations to back up

14 each of my assertions, would that be reliable?

15   A  So it would depend on what your assertion is. So

16 give me that assertion and I'll -- I'll tell you.

17   Q  If it's a -- If it's an assertion that could be

18 argued by two or more people.

19   A  Give me an example of an assertion, and I'll be happy

20 to give you a response.

21   Q  That people in Samaria had two heads --

22   A  Okay.

23   Q  -- back in the day. And I don't give a citation for

24 it.

25   A  If you can show me that you have skeletons with two

Page 185

47 (Pages 182 - 185)

App'x 189

1 heads, that's perfectly acceptable. You would be establishing
2 something that nobody had expected, and you would get not only
3 a Ph.D., probably a Nobel Prize to boot.
4    Q   Sure. But if I don't show you that?
5    A   If you don't show me what?
6    Q   That skeleton with two heads.
7    A   That's data. And if you don't show me the data and
8 the procedure by which you told me you came to the conclusion
9 they all have two heads, then I wouldn't accept it.
10    Q   Okay. So going on to page 20, no evidence of the
11 stability of the measures of deception.
12    A   I'm sorry. Where is that?
13    Q   Page 20.
14        MS. PALNITKAR: Bill, could you please refrain
15 from your sighs?
16        MR. KIRKMAN: From sighing?
17        MS. PALNITKAR: Yes. Because you --
18        MR. KIRKMAN: It's really hard to refrain from
19 sighing after that exchange, ma'am. It is really hard.
20        MS. PALNITKAR: You need to --
21        MR. KIRKMAN: I don't believe I have ever seen
22 an exchange like that.
23        MS. PALNITKAR: I know you've been part of that.
24 I would just -- I would just ask you to politely refrain from
25 your comments and your sighing and your unprofessional behavior
Page 186

1 that Dr. Wind got from his coding scheme?
2    A   Well, it takes a story to beat a story. I don't see
3 a coding scheme. So if you're asking me how my coding scheme
4 would be better or worse than something else, I would like to
5 see the other coding scheme. I don't see that, so I don't know
6 how to answer your question.
7    Q   That's not exactly my question. My question is you
8 haven't undertaken the analysis to determine whether the
9 open-ended questions that you review and analyze would be --
10 result in a different output than the one that Dr. Wind -- Let
11 me start that again. You haven't taken the analysis to review
12 the open-ended question answers. Correct?
13        MR. KIRKMAN: Form.
14    A   If you're asking me if I read through the open-ended
15 questions, I have seen the illustrative ones he's talked about.
16 I have not gone through every individual one.
17    Q   Uh-huh. So do you know if your coding scheme,
18 whatever it is, would yield a different ambiguity or confusion
19 deception result than Dr. Wind's?
20        MR. KIRKMAN: Form.
21    A   You know, I just don't know how I can answer that. I
22 have got an imaginary coding scheme that you have asserted I
23 own, which I am going to put on the table. There is another
24 coding scheme which I don't know what it is. So we're
25 comparing one unknown against another unknown. I have no idea
Page 188

1 as we sit here today.
2    Q   I am on page 20 looking at subsection C.
3    A   Okay.
4    Q   No evidence of the stability of the measures of
5 deception and confusion is presented. Do you see where it says
6 that?
7    A   Hang on. I am having trouble finding that. Oh,
8 okay. Oh, the headline, yes.
9    Q   Okay.
10    A   Yes. I was reading the text. I'm sorry.
11    Q   The one, two, three, fourth sentence starts with how
12 much agreement was there between the two coders and how were
13 conflicts resolved. Do you see that?
14    A   I do.
15    Q   Okay. Did you go through the open-ended questions
16 and code them yourself?
17    A   I did not.
18    Q   Why not?
19    A   There would be no purpose in doing that.
20    Q   Why?
21    A   Because without my coding scheme and somebody else's
22 coding scheme and showing convergence, it would be pointless
23 for me to just go and code on my own.
24    Q   So you have no way of proving whether your coding
25 scheme would have yielded a different result from the result
Page 187

1 what the result will be.
2    Q   I am not asking you to compare your coding scheme
3 versus his coding scheme. I am asking you to compare whether
4 you know if your analysis of the open-ended questions would
5 yield a different result from his analysis of the open-ended
6 questions?
7    A   Of course it would if the coding schemes are
8 different.
9    Q   But you don't know which way. You don't know either
10 way?
11    A   I don't know the scheme. How can I tell if it's
12 going to be different because I haven't seen the scheme. I
13 haven't developed a scheme. So there's no way to do the
14 comparison.
15    Q   And you haven't seen the open-ended question
16 answers?
17    A   I have seen the answers. I have not developed a
18 coding scheme. I have skimmed through the -- set of
19 open-ended responses and looked at the illustrative ones he
20 provided.
21    Q   Okay. Okay. Looking at big C here --
22    A   Okay.
23    Q   -- halfway down the page. Wind report data analysis
24 of hidden city ticket risk deception concedes that no
25 meaningful risk perception exists in the responses. Is that
Page 189

48 (Pages 186 - 189)

App'x 190

1 correct as I have read it?

2   A   Right.

3   Q   And then in your second paragraph here under this

4 subsection, Exhibits 9a and 10a of the Wind report apparently

5 form the basis for the conclusion that, quote, vast majority of

6 the respondents do not perceive any meaningful risks, end

7 quote, with hidden city tickets, period.

8   A   Yes.

9   Q   Is that correct?

10   A   Yes.

11   Q   Let's look at Exhibits 9a and 10a of the Wind report.

12   A   If you can direct me to the page number.

13   Q   Yes. 15. Hold on. This is not what I wanted. Let

14 me pull up the stimuli. This is not what I am looking for. I

15 am looking for a certain thing. Give me a minute. Okay.

16   A   So I am --

17   Q   Just one second. Let me just tell you. Okay. Page

18. I am sorry it took me so long.

19       MR. KIRKNITKAR: 48 of the Wind report?

20       MS. PALNITKAR: Yes.

21   A   So if I can ask for a little bit of help here. I

22 cite the -- the quoted sentence is vast majority of respondents

23 do not perceive any meaningful risks. That's quoted from the

24 report, but I am lost as to where it is. I know that it's

25 somewhere in here.

Page 190

1   Q   Okay. Well, I just want us to look at Exhibit 9a

2 here.

3   A   Okay.

4   Q   And this is consumers' belief regarding the

5 legitimacy and risks Skiplagged hidden city offerings, question

6 12.

7   A   Yes.

8   Q   Do you see that? Is that correct?

9   A   Yes.

10   Q   All right. So are you familiar with this exhibit?

11   A   Yes.

12   Q   Okay. Could you -- Could you describe what you

13 understand it to be?

14   A   That's why I am struggling a little bit, because I am

15 trying to link it back to that quoted sentence the vast

16 majority of respondents do not perceive any meaningful risks.

17 So I am trying to find where that is. So I was going from the

18 data in 9a. What I write is Exhibits 9a and 10a of the report

19 apparently form the basis and conclusion of quote the vast

20 majority of respondents do not perceive any meaningful risks.

21 I am unable to find that particular quoted sentence. So that's

22 where those two connect up.

23   Q   I'm sorry. I'm waiting.

24   A   So I am just struggling to find where that -- that

25 quoted sentence is. So my -- my critique is based on the --

Page 191

1 the data exhibited in Exhibits 9a and 10a and the conclusion

2 that the vast majority of respondents do not perceive any

3 meaningful risks.

4   Q   Okay.

5   A   So that's -- that's why I got lost.

6   Q   Okay. Well, I am just going off of what you have

7 quoted here. So you are saying that Wind's conclusion that the

8 vast majority of the respondents do not perceive any meaningful

9 risks with hidden city tickets. And you are saying you

10 agree?

11   A   I agree with that.

12   Q   Right?

13   A   If he makes that conclusion, I do agree with that. I

14 thought he did make that conclusion. I count that loss as a

15 way.

16   Q   But just because they don't perceive any meaningful

17 risk doesn't mean they are not aware of the risks. Correct?

18       MR. KIRKMAN: Form.

19   A   I think aware and perceive mean the same thing. So I

20 would -- I would not characterize it that way. If you don't --

21 If you're not aware of the risks, you don't perceive the

22 risks.

23   Q   Can you not perceive a risk but maybe don't

24 understand the risk? Is that a possibility?

25       MR. KIRKMAN: Form.

Page 192

1   A   Let's see. I don't understand the risk, but I am

2 aware of it.

3   Q   No. I don't perceive the risk, but I don't

4 understand the risk. Can the -- Can both be true? While I

5 don't perceive a risk --

6   A   In fact, yes, the very next sentence I write is

7 exactly that. The -- the only way those two sentences can be

8 true is the risks about hidden city tickets have been

9 explicitly misrepresented or otherwise kept away, shrouded from

10 view by Skiplagged. So if I have a perception of risk and it's

11 objectively wrong, it must -- or at least in this particular

12 instance since the only stimulus I see is that -- is that

13 screenshot, it must be the case that somehow the information

14 presented in the screenshot either misrepresents or otherwise

15 hides that information in such a way that I think I saw A, but

16 it's really B.

17   Q   And could that be true?

18   A   In order for those two to be true, you would have to

19 have some explicit misrepresentation or hiding of information

20 or shrouding as we call it that we can see in the stimuli.

21   Q   Uh-huh. And could another way to determine if that's

22 true is by looking at the answers to the open-ended questions

23 on Exhibit 9a?

24   A   No, because we are making a connection between the

25 cause and the effect. The cause is the stimulus. In any

Page 193

49 (Pages 190 - 193)

1 experiment you have an independent variable and a dependent
2 variable. So you want to make a connection between the
3 stimulus, which is the independent variable. I show you
4 something, and then I ask you a question. To make that
5 connection, what I am saying is that unless that stimulus which
6 is shown can be shown independent of the responses to be
7 deceptive or shrouding, then you can't make that conclusion.
8          MS. PALNITKAR: I am going to object as
9 nonresponsive.
10    Q    My question is can someone say that a -- looking at
11 Exhibit 9a. Can someone say that a ticket bought through
12 Skiplagged is a valid ticket but not understand the reason that
13 they think it's a valid ticket?
14          MR. KIRKMAN: Form.
15    A    You know, I don't know how people come to the
16 conclusions they make. What we do know here is that these
17 percentages of people gave you these responses.
18    Q    So let's look at this then.
19    A    Okay.
20    Q    Here it says a ticket bought through -- I am looking
21 at question 12-A. A ticket bought through Skiplagged is a
22 valid ticket. Okay. You look in that first column.
23    A    Yes.
24    Q    74 percent said it's a valid ticket.
25    A    Yes.

Page 194

1    Q    Now if you look down, just go down a little bit here
2 to look at -- look at my page to these.
3    A    Yes.
4    Q    Can you read the first three in that column?
5    A    I think 12-B is --
6    Q    No, not that one. The -- the first -- Oh, yeah.
7    A    12-B asks them, you know, why do you think --
8    Q    Right.
9    A    I don't know the actual question, but he is
10 paraphrasing it as illustrative reasons for believing that a ticket
11 bought through Skiplagged or Expedia is a valid ticket. So --
12 so presumably the question was, hey, you just told me it's a
13 valid ticket. Can you tell me some more about it.
14    Q    Uh-huh.
15    A    And these are some of the responses that they got.
16    Q    Can you read some of these responses?
17    A    Because they would not sell fake tickets. They are
18 authorized. Because it said so. Why else would they be in
19 business. It has to be. I think it's a trustworthy platform.
20    Q    So even though perhaps they are not authorized, does
21 this show that people lack an understanding of what the risks
22 are?
23          MR. KIRKMAN: Form.
24    A    I -- I cannot reach that conclusion that they don't
25 understand or that they do understand, either way. You cannot

Page 195

1 tell from this.
2    Q    So you don't think that people who say that
3 Skiplagged is a valid ticket and they give the reason because
4 Skiplagged would not sell fake tickets is not an indication
5 that they don't understand the risks from buying from
6 Skiplagged?
7    A    There's a -- There's a lot of stuff that's conflated
8 in here. So let's take that first response because they would
9 not sell fake tickets. Maybe they do sell fake tickets. I
10 don't know that. So we would have to objectively figure out
11 whether in fact it is a valid ticket, whether in fact they are
12 fake or not. Without knowledge of that, we can't go -- we
13 can't say anything about their response. All we are getting is
14 their state of mind.
15    Q    Uh-huh.
16    A    And they're willing to tell you that in their state
17 of mind they think Skiplagged is a legitimate site, however
18 they define legitimate in their own mind, and that they would
19 not sell fake tickets. That much we can tell. I cannot tell
20 anything beyond that.
21    Q    Okay. All right. Now let's get to page 21 on your
22 report please.
23    A    Okay.
24    Q    I am starting with the sentence here in the third
25 sentence under number one that says --

Page 196

1    A    Okay.
2    Q    -- moreover, to the degree my basic testing can serve
3 the purpose of displaying a shortcoming of the survey provided
4 in the Wind report, I have shown that Skiplagged directs --
5 Skiplagged.com directs all site visitors who click on any of
6 its hidden city flights to a disclosure page. And you did this
7 on your own visit. Correct?
8    A    That's right.
9    Q    So this basic testing is based on your two or three
10 visits through the Skiplagged website?
11    A    That's right.
12    Q    Have you ever bought a ticket from Skiplagged just on
13 your own?
14    A    I have not.
15    Q    Have you ever flown a hidden city ticket?
16    A    I have not personally, but I have asked around. And
17 my sense is that younger people tend to do it.
18    Q    You're a lucky young man. All right. Okay. Let's
19 go through them. All right. Now let's go to page 23 please.
20    A    Okay.
21    Q    At the top, the very last sentence of the first
22 paragraph or the top paragraph.
23    A    What's the first word?
24    Q    It. So I will start at the second sentence to get
25 background.

Page 197

50 (Pages 194 - 197)

1    A   Okay.

2    Q   Skiplagged.com does not make any search -- such

3    assertion about relative prices, but merely presents its search

4    results ordered by price or any other filter similar to

5    virtually all on-line search results presentation. The next

6    sentence says it makes no comparison about any relative prices

7    on its site vis-a-vis any other specific site or airline. Do

8    you still believe that sentence to be true?

9    A   Yes.

10   Q   Do you remember when we went through your tests on

11   Skiplagged, and it said you're saving 160 something dollars?

12   A   Yes.

13   Q   Is that not a comparison about Skiplagged prices

14   versus any other airline?

15           MR. KIRKMAN:  Form.

16   A   So the -- So the reference there is so vague that

17   it's meaningless.

18   Q   So you are saying that claim about a comparison of

19   its price versus another airline's price is meaningless?

20           MR. KIRKMAN:  Form.

21   A   Let's go to -- that page. If you could direct

22   me to that page, it will be faster.

23   Q   Page 15, where it says at the top you're saving $146

24   compared to other websites, and that's from the Skiplagged.com

25   website, is that not a comparison about a price on its site

1    versus a price on another website?

2           MR. KIRKMAN:  Form.

3    A   It is a -- It doesn't tell me which website, which

4    airline, which terms. It doesn't tell me anything. It just

5    says you're saving $146. It is about as credible or about as

6    meaningful as the line below that. Plus you earn $11 --

7    $10.11. I have no idea what that means either. I know that I

8    am not going to see $10.11 in my checking account. Okay. So

9    these things are just marketing puffery. They -- they say

10   this. They say all kinds of things. I couldn't make heads or

11   tails out of this statement. What websites? What airlines? I

12   don't know.

13   Q   I am not asking about what websites or what airlines.

14   I am just talking about other third party non Skiplagged

15   websites. Right?

16   A   We don't --

17   Q   So here in your -- in your sentence here on page 23

18   you said Skiplagged makes no comparison about any relative

19   prices on its site vis-a-vis any other specific site.

20           MR. KIRKMAN:  Form.

21   Q   And here I am representing -- I am asking you where

22   it says Skiplagged on page 15 says you're saving $146 compared

23   to other websites.

24   A   And I --

25           MR. KIRKMAN:  Wait a minute. Let -- Are you

1    finished?

2           MS. PALNITKAR:  No.

3           MR. KIRKMAN:  Okay. Let her finish.

4    Q   I am still asking do you still think after reading

5    that your own customer journey you went through and your own

6    test that you did where you encountered it saying you're saving

7    $146 compared to other websites, do you still make this

8    representation that Skiplagged makes no comparison about any

9    relative prices on its site versus any other specific site?

10   A   They make --

11           MR. KIRKMAN:  Hang on. Form. Go ahead.

12   A   They make -- They make generalized statements about

13   you saved $146, and oh, we will give you $10. I -- I don't put

14   any stock to either of those statements. So I will stand by my

15   conclusion that they're not making any credible price

16   comparison.

17   Q   Okay. What would it mean to make a credible price

18   comparison? What would they have to say?

19   A   Very straight-forward.

20           MS. PALNITKAR:  Form. Go ahead.

21   A   Show me the prices that turn up on your site. Show

22   me the prices that turn up for that same flight on another

23   site. Nobody does that. I don't know of a single site that

24   shows you what another website's prices will be.

25   Q   Okay. Then at the bottom of page 23, the last

1    sentence, you say my own search results at Skiplagged.com.

2    You're talking about the two searches you did for the Santa

3    Anna to Miami flights. Correct?

4    A   Hold on. Yes. Okay.

5    Q   Okay. And going just up on that page where it says

6    on top of this banner here --

7    A   Uh-huh.

8    Q   -- on the Skiplagged website, find flights the

9    airlines don't want you to see. We are exposing loopholes in

10   airfare pricing to save you money.

11   A   Yes.

12   Q   Is that not a comparison about the prices on

13   Skiplagged's website versus an airline's website?

14           MR. KIRKMAN:  Form.

15   A   I don't read it that way. It simply says, hey, we

16   are going to show you more flights and particularly flights

17   that you are not going to see on the airline sites. And we

18   found those by -- by finding loopholes in the pricing. That's

19   -- I just read it at face value.

20   Q   So they're saying they're going to show you more

21   flights. Correct?

22   A   Yes.

23   Q   And those flights are going to be cheaper priced.

24   Correct?

25   A   Than if you didn't have those flights.

1   Q   Right.
2   A   So essentially they're saying that those flights
3   which exploit loopholes are going to be cheaper than the
4   flights that don't.
5   Q   So the flights on a Skiplagged's website will be
6   cheaper than the flights on another website?
7        MR. KIRKMAN: Form. Asked and answered.
8   Q   Is that what that is saying?
9        MR. KIRKMAN: Form.
10  A   No. What it's saying as I read it is that it's
11  saying, hey, our website shows you these hidden city tickets,
12  if you want to think of it that way. Those prices are going --
13  are not available in other websites. And those are going to be
14  cheaper. It's going to save you money.
15  Q   On Skiplagged?
16       MR. KIRKMAN: Form.
17  A   On -- Yeah. They're talking about their site, yes.
18  Q   Okay. And on the last -- Well, I think we have done
19  that. Going on to page 24, the third paragraph down that
20  starts with to sum up.
21  A   Okay.
22  Q   On the second sentence it says from my short testing
23  I did not find that Skiplagged made any claim about expected
24  price differences.
25  A   Yes.

Page 202

1   Q   Do you still believe that to be true?
2   A   Yes.
3   Q   Did you not find that Skiplagged made a claim on your
4   check-out site at page 15 about expected price differences?
5        MR. KIRKMAN: Form.
6   A   No. I don't see anything about expected price
7   differences.
8   Q   The one that says you're saving $146 compared to
9   other websites is not a price -- is not a claim about a price
10  difference?
11       MR. KIRKMAN: Form.
12  A   It's a claim against an unknown comparison point. I
13  don't know what that website is. So unless you tell me
14  specifically what the claim is, I can't -- I can't judge that
15  claim. So who's saying it's $146 more? What's that flight?
16  How many stops it has? I am supposed to assume it's got the
17  same number of stops. It's also a Skiplagged flight, all of
18  the above. I don't know what the comparison is. That's the
19  difficulty here.
20  Q   Well, Skiplagged is saying it because you pulled this
21  screenshot from a Skiplagged website.
22  A   Yes.
23  Q   That answers one of your questions. The -- But you
24  are saying this is -- You did not find Skiplagged made any
25  claim about a price difference. And I am asking you do you

Page 203

1   think that this claim on your screenshot that you're saving
2   $146 compared to other websites is -- is not a claim about a
3   price difference?
4        MR. KIRKMAN: Hold on. Form. Make sure she
5   finishes her question before you answer.
6   A   I lost the question. Could you repeat it?
7        MS. PALNITKAR: Why don't you -- Why don't you
8   repeat the question.
9        MR. KIRKMAN: It's repetitive of many others.
10       MS. PALNITKAR: Please stop with the sidebar.
11  He lost the question. He's asking for the question again. I'm
12  asking --
13       MR. KIRKMAN: It's repetitive of many others,
14  ma'am.
15       MS. PALNITKAR: Objection to the sidebar.
16       MR. KIRKMAN: You have asked this six times,
17  maybe seven.
18       MS. PALNITKAR: He asked me for the question.
19  Please when you get a moment.
20       THE REPORTER: Well, Skiplagged is saying
21  because you pulled this screenshot that you are saying that you
22  did not find Skiplagged made any claim about a price
23  difference, and I'm asking you do you think this claim on your
24  screenshot that you're saving $146 compared to other websites
25  is not a claim about a price difference?

Page 204

1        MR. KIRKMAN: Form.
2   A   So my -- my response is that I don't believe this is
3   a price comparison of apples to apples. It is not comparing a
4   hidden city ticket at Skiplagged with a hidden city ticket for
5   the same city pair going through the same -- going to the same
6   final destination on some other website. I just don't know
7   what they're comparing it to.
8   Q   Okay.
9   A   I don't know if they are comparing it to regular
10  flights. I don't know if they are comparing to some other
11  airline. So that's my reason for saying I don't think this is
12  a price comparison.
13  Q   Okay. Let's take a little break, and then I will
14  come back and ask some final questions.
15       MR. KIRKMAN: Yay.
16       THE VIDEOGRAPHER: Off the record at 3:19 p.m.
17       (A break ensued from 3:19 p.m. to 3:26 p.m.)
18       THE VIDEOGRAPHER: On the record at 3:26 p.m.
19  Q   I am going to go to this page 25 of your report, if
20  you will follow me.
21  A   Give me a second. Yes.
22  Q   All right. Now I am going to go to the core opinion,
23  one of the three core opinions where we talk about affiliation
24  and authorized agents when it comes to Dr. Wind's experiments.
25  Are you familiar with this section?

Page 205

52 (Pages 202 - 205)

1    A   Hang on for a second.  Let me just -- I have got
2  Exhibit 2.  Yes.  Go ahead.
3    Q   So Dr. Wind -- Does Dr. Wind ask if -- in his
4  experiments if the consumers believe American is affiliated
5  with Skiplagged?
6    A   So on page 25 I reproduced the question number two
7  that he asks after people see the -- the screenshots.  And it
8  says does the company that operates this website have a
9  business connection or association with another company or do
10  you not know.
11    Q   So yes, he does ask that?
12        MR. KIRKMAN:  Form.
13    A   That's the question he asks, yes.
14    Q   Okay.  And you say there is a flaw in this.  Correct?
15    A   Well, that's overly broad.  What I basically say --
16  My problem with the interpretation of the response is that I
17  don't know what these words mean and what they -- how he,
18  Professor Wind, proposes to define them.  And I don't know how
19  consumers define them.  I -- I think it's pretty telling that
20  the largest response is I don't know because they probably have
21  no idea what these words mean.
22    Q   But the words business -- They don't know what the
23  words business connection or association means?
24    A   So again, the problem is that it goes from that
25  statement to these terms called as -- either as an authorized
                                                        Page 206

1  travel agent or having some other direct relationship with
2  American and -- or authorized buy.  That's -- that's what he
3  says in a summary.  And it's a long way to go from the response
4  to that question, open-ended I might add.  I think -- I believe
5  it was open-ended where the largest single response was don't
6  know.  Let me just back up for a second.  I am not sure if
7  that's open-ended or close-ended, but do we know that don't
8  know is one of the responses.  So that -- that's my response
9  that these terms are not commonly known to consumers.  So
10  asking a question like this is -- is asking a very, you know,
11  difficult question.  And the answers that come back are going
12  to reflect their lack of knowledge.  Nothing more.  Nothing
13  less.
14    Q   You -- Is the purpose of the survey to test
15  consumers' perceptions on a given question?
16        MR. KIRKMAN:  Form.
17    A   All I know is the conclusion of the survey and the
18  experiments is that it can -- and let me read.  Skiplagged
19  confuses consumers into believing that Skiplagged is associated
20  with or authorized by American.  And I leave off the stuff in
21  parentheses.  So confusion is part of it.  A belief that is
22  apparently inaccurate is part of it.  And -- and the element
23  that it's involved with, the belief and the confusion is about
24  the nature of the relationship between between Amazon -- Amazon
25  -- American and Skiplagged.
                                                        Page 207

1        MS. PALNITKAR:  Objection; nonresponsive.
2    Q   I am asking you if you understand that the surveys --
3  these questions are posed to test consumers' perceptions?
4        MR. KIRKMAN:  Form.
5    A   I don't know what the survey's purpose is.  I do know
6  what the conclusions are and what the stimulus is.
7    Q   But when you're asking a question to a survey
8  respondent does this -- does the company that operates this
9  website have a business connection or association with another
10  company or do you not know, this is testing what they believe.
11  Correct?  What the consumer believes, the respondent believes.
12    A   It is trying to do that, but I don't think it does
13  that.
14    Q   But I am not asking if it's trying.  I am saying is
15  that what it's asking?  It's asking for their perceptions.
16        MR. KIRKMAN:  Form.
17    A   I don't know what it's asking because I don't know
18  what the responses mean.  I don't know how they interpret this
19  question.  The question is so ambiguous about the association
20  and business connection.  I have no idea what those responses
21  are.  It's a poorly-worded question, and the responses tell me
22  nothing about their beliefs other than they don't know.
23    Q   So you're telling me you don't understand what this
24  question means?
25    A   Yes.
                                                        Page 208

1    Q   Several consumers understood it because they made a
2  response.
3    A   Please show me how they understood it.
4    Q   It's all in Jerry Wind's report.  You --
5    A   If you can point one to me.  I told you a minute ago
6  I accept the don't know responses.  That tells me something.
7  And I point out it's unsurprising that the don't know response
8  is the largest single category of response.  The other
9  responses are just a confused mess.  They don't know what --
10  what these responses -- They meaning Wind doesn't know what
11  these responses mean because people don't know what business
12  connection or association means.
13    Q   So normal people don't know what association means?
14    A   That's right.  A business association, not an
15  association between two people.  These are business
16  associations.  They have no idea what their contract and
17  obligation or agreements between any airline -- any of these
18  websites is.
19    Q   But you understand we are not asking them to evaluate
20  a legal relationship.  We are asking them if they believe there
21  is an association between two businesses.
22        MR. KIRKMAN:  Form.
23    A   I can see what you're asking them, and I am telling
24  you that you cannot interpret the responses because this is a
25  very ambiguous question.
                                                        Page 209

53 (Pages 206 - 209)

Veritext Legal Solutions
800-336-4000

App'x 195

1    Q    It's ambiguous because the word association is not
2  defined?
3    A    Because business connection and association are not
4  terms that are available to an ordinary consumer, especially
5  when it talks about the connection between two companies. They
6  never see it. They don't see these documents. They don't know
7  how it works. I couldn't tell you how Expedia makes its money.
8  I would have to go find out from Expedia. And that's part of
9  its business relationship with whoever they deal with.
10    Q    But this question isn't asking about how people --
11  how businesses make their money. They are asking if there is a
12  connection between two businesses. And you are saying
13  that's -- that's something that's over the heads of a normal
14  consumer?
15    A    No. It's not over the heads. You are going to get a
16  variety of interpretations. That's what I am saying. It's an
17  ambiguous question.
18    Q    And is that what -- Okay. And is that what the
19  survey was trying to find out is what their interpretations
20  were?
21        MR. KIRKMAN:  Form.
22    A    I don't think so. I don't think we would interpret a
23  business connection as what a customer thinks. I think
24  business connection is an objective thing that can be
25  ascertained by looking in the documents.

                                                    Page 210

1  know how these people are interpreting those words. And they
2  are very likely to be interpreting it in different ways in
3  different unknown ways, uninformed ways. So all you're getting
4  is noise upon noise.
5    Q    What is the purpose of an open-ended question in a
6  survey?
7    A    Ask the person who asked them. I couldn't tell you.
8    Q    No. I am asking you.
9    A    The open-ended questions -- Point me to one, and I
10  will tell you what they're trying to do with that.
11    Q    I am not pointing you to one. You have all this
12  expertise and your survey and methodologies. And I am asking
13  you what is the purpose of an open-ended question when it comes
14  to a survey?
15        MR. KIRKMAN:  Form.
16    A    So normally an open-ended question is where you can't
17  formulate a close-ended question or you've not done enough
18  groundwork to formulate a close-ended question or it's
19  impossible to formulate a close-ended question. That's when
20  you go to an open-ended question.
21    Q    You say there's no data -- Let me see what page this
22  is. Page 20. Let's see. Yeah. I am going back to page 24.
23    A    Okay.
24    Q    Just a second. The third paragraph.
25    A    All right.

                                                    Page 212

1    Q    So you are saying that a -- whether someone thinks
2  there is an association between two businesses is an objective
3  measure?
4    A    I am saying that a business connection or association
5  between two companies is an objective matter, yes. We can go
6  look at the contract documents, look at the conditions under
7  which they share profits or there's a price result thing.
8  There are lots of elements there. Customers certainly don't
9  know that.
10    Q    But we are not asking if it is actually a legal
11  connection. We are not asking customers to tell us the actual
12  objective truth. We are -- We are asking them what they think
13  about what their perceptions are about what they're finding.
14  And is that not a valid question?
15    A    It's not valid exactly because of the way you just
16  asked the question. Notice I am not asking them what do you
17  think the business connection is. I am asking them do you
18  think the company that operates this website has a business
19  connection or association with another company or do you not
20  know. If I don't know what the meaning of the business
21  connection association is, my response is going to be different
22  from anybody else's response. In fact, a few minutes ago I
23  told you that for me I don't know what the relationship between
24  Expedia and -- and American Airlines is, focusing on how they
25  make their money, who -- who pays whom how much. So I don't

                                                    Page 211

1    Q    The last line. There is no data in the Wind report
2  that customers' lack of knowledge about the AA Skiplagged.com
3  business relationship has any negative impact on customers. Do
4  you still believe that sentence to be true?
5    A    Absolutely.
6    Q    Why?
7    A    I mean there's -- there's the lack of data. That's
8  number one. There's no data in the report that any negative
9  impact is arising from their lack of knowledge. So you have
10  two consents there, lack of knowledge and negative impact. I
11  see no data actually on either one. So there's no way you can
12  make a conclusion about a negative impact. I write that
13  statement because normally generally if I don't know about
14  something, I usually have a modest expectation or maybe even a
15  negative expectation about a company I have never heard about,
16  about a product I have never seen, those kinds of things. So
17  it's useful and very important to show that in fact that --
18  that the negative view I have of a company can be traced to my
19  lack of knowledge of it. That's -- that's a very common
20  business problem. I don't see any of that, any data speaking
21  to that here.
22    Q    Do you think that if a consumer thought -- or let me
23  scratch that. If you thought that American Airlines and
24  Skiplagged had a business relationship, would you believe that
25  a ticket you bought on Skiplagged would be valid?

                                                    Page 213

                                                    54 (Pages 210 - 213)

1      MR. KIRKMAN:  Form.
2      A   I think that's an overreach.  I don't think you
3  can -- you can go to it's valid from a connection.  I think
4  it's a lot more complicated than that.  It's the question of my
5  expectation that the ticket is valid because it's, you know,
6  the credit card is charged by American Airlines.  There are
7  many many elements that go into it.  So I would be hard-pressed
8  to say that I can conclude that something is valid or not
9  valid, a binary outcome based on whether somebody has a
10  business relationship or not a business relationship.
11      Q   Is it possible that someone would think the ticket
12  they are buying on Skiplagged is valid?
13      A   Of course.
14      Q   Is it possible to think that someone would think a
15  ticket they're buying on Skiplagged is valid because Skiplagged
16  and American have a business relationship together?
17      MR. KIRKMAN:  Form.
18      A   Anything is possible.  I just don't see any evidence
19  that the lack of knowledge which I -- which I infer from the
20  don't know being the most common response has anything to do
21  with their undisclosed negative effects on their -- on their
22  customers.  I don't see any evidence of any of this stuff.  So
23  all I am saying here is that there's no evidence of a negative
24  impact on consumers.  There's no evidence of lack of knowledge
25  leading to the negative impact.  And that's -- that's all I am

1  saying.
2      Q   Okay.  Let's go to page 26.  Under number two, the
3  second paragraph that starts with in sum, do you see that?
4      A   Yes.
5      Q   I will read it to you.  In sum, comma, regardless of
6  whether customers are aware of the exact contractual details
7  between Skiplagged.com and American Airlines, comma, there is
8  no evidence that Skiplagged is deceptively creating consumer
9  confusion about the conditions of hidden city travel, period.
10  Do you still believe that sentence to be true?
11      A   Yes.
12      Q   Did you read the complaints, any of the content of
13  the various complaints that have been sent to Skiplagged.com?
14      A   I have glanced at some of those things, the
15  illustrative examples he provides.  I have not gone through
16  the -- the 88 complaints or however many there were in any --
17  any detail.
18      Q   The 12,000 complaints produced by Skiplagged?
19      A   If there are 12,000.
20      MR. KIRKMAN:  Wait.  Let her finish.  Form.
21      Q   There were 12,000 complaints produced by Skiplagged
22  in this case that Skiplagged received from customers.  Did you
23  have access to any of those?
24      A   I believe there were 12,000 e-mails coded as
25  complaints.  I have no idea how they were coded.  Those are --

1  So I would have -- I don't -- I don't know the details of how
2  those data were produced or calculated to be 12,000.  What the
3  coding scheme -- Again, we come back to coding scheme.  So I
4  don't have any opinion on that.
5      Q   That data was produced by Skiplagged.com as -- when
6  we asked them for their customer complaints.
7      A   And I have had no contact with Skiplagged.com.  So I
8  can't vouch for what they have produced to you.
9      Q   Okay.  So you -- you can't say that there's no
10  evidence that Skiplagged is deceptively creating customer
11  confusion because you haven't seen the customer complaints,
12  have you?
13      A   I've --
14      MR. KIRKMAN:  Form.
15      THE WITNESS:  Sorry.
16      A   I have seen the illustrative examples cited in the
17  Wind report, and I have seen the data produced saying that
18  there's 12,000 complaints.  And I see no evidence that those
19  are connected to consumer confusion that -- created by
20  deception on Skiplagged's part.  That's what I'm saying.
21      Q   Because you haven't read those 12,000 complaints, you
22  don't know that there's evidence or not.  Right?
23      A   Reading those complaints would not improve or change
24  my opinion in this matter.  You have to do an analysis of who
25  was complaining about deception and whether in fact they

1  were -- they were confused and what the source of deception
2  was.  There's a lot of -- There's a lot of links there in that
3  causal chain.  And without investigating each link in the
4  causal chain, I am not going to change my opinion that there is
5  no evidence.
6      Q   So you are saying there's no evidence because you
7  haven't done the analysis?
8      MR. KIRKMAN:  Form.
9      A   No.  There's no evidence because none has been
10  presented to me, and I was -- I have told you several times I
11  have done -- produced no data or looked at any data and done
12  any data analysis on my own.
13      Q   Because it wasn't presented to you?
14      A   Correct.
15      Q   And that's why there's no evidence.  Correct?
16      MR. KIRKMAN:  Form.  Form.
17      A   There is no evidence in the Wind report to start
18  with, which is the bulk of what I am relying on.  And there's
19  no evidence in the complaint data that is also contained in the
20  Wind report that such a conclusion that there is evidence
21  connecting consumer confusion about hidden city travel to
22  deception on the part of Skiplagged.  That's what I am saying.
23      MS. PALNITKAR:  I will pass the witness.
24      MR. KIRKMAN:  We shall reserve our questions
25  until the time of trial.

**Page 218**

1    THE VIDEOGRAPHER:  Off the record at 3:43 p.m.

2    (Deposition concluded at 3:43 p.m.)

**Page 220**

1    I, GEORGE JOHN, PhD, have read the foregoing deposition

2    and hereby affix my signature that same is true and correct,

3    except as noted above.

4

5    _____

     GEORGE JOHN, PhD

6

7    THE STATE OF _____   *

                                 *

8    THE COUNTY OF _____  *

9        BEFORE ME _____, on this day

10   personally appeared GEORGE JOHN, PhD, known to be (or proved

11   to me under oath or through _____)

12   (description of identity card or other document) to be the

13   person whose name is subscribed to the foregoing instrument and

14   acknowledged to me that they executed the same for the purposes

15   and consideration therein expressed.

16       GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____

17   day of _____, _____.

18

19   _____

     NOTARY PUBLIC IN AND FOR

20   THE STATE OF TEXAS

21

22

23

24

25

**Page 219**

1        CHANGES AND SIGNATURE

2  PAGE    LINE    CHANGE              REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 Job No. TX6791874

**Page 221**

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS

2            FORT WORTH DIVISION

3  AMERICAN AIRLINES, INC.,   )
       Plaintiff,            )

4                            )
                             )

5  V.                  ) Civil Action No. 4:23-cv-00860-P
                             )

6                            )
   SKIPLAGGED, INC.,         )

7      Defendant.            )

8

9

10

11      REPORTER'S CERTIFICATION
        DEPOSITION OF GEORGE JOHN, PhD

12         TAKEN ON JULY 9, 2024

13

14

15

16

17   I, RHONDA JACKS, Certified Shorthand Reporter in and for

18 the State of Texas, certify to the following:

19      That the witness, GEORGE JOHN, PhD, was duly sworn by the

20 officer and that the transcript of the oral deposition is a

21 true record of the testimony given by the witness;

22      That the amount of time used by each party at the

23 deposition is as follows:

24   MS. BINA PALNITKAR, 4 hours, 35 minutes.

25   MR. WILLIAM KIRKMAN, 0 hours, 0 minutes.

56 (Pages 218 - 221)

1     That pursuant to the information made available to me at
2  the time said deposition was taken, the following includes all
3  parties of record:
4     MS. BINA PALNITKAR, Attorney for the Plaintiff
5     MR. WILLIAM KIRKMAN, Attorney for the Defendant
6     That before the conclusion of the deposition, the witness,
7  GEORGE JOHN, PhD, did request a review of this transcript
8  pursuant to Rule 30(e)(1).
9     I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties or attorneys in
11 the action in which this proceeding was taken, and further that
12 I am not financially or otherwise interested in the outcome of
13 the action.
14
15    Certified to by me, this 15th day of July, 2024.
16
17
18
19
20
21    RHONDA JACKS, CSR #3665
   Expiration Date:  10-31-2025
22    VERITEXT LEGAL SOLUTIONS
   Firm Registration No. 571
23    300 Throckmorton Street
   Suite 1600
24    Fort Worth, TX 76102
   817-336-3042
25

1  William L. Kirkman - billk@kirkmanlawfirm.com
2       July 15, 2024
3  RE: American Airlines, Inc. v. Skiplagged, Inc
4  DEPOSITION OF: George John , PhD (# 6791874)
5     The above-referenced witness transcript is
6  available for read and sign.
7     Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11    The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18       Yours,
19       Veritext Legal Solutions
20
21
22
23
24
25

57 (Pages 222 - 223)

```
 1                  IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF TEXAS

 2                         FORT WORTH DIVISION

 3   AMERICAN AIRLINES, INC.,      )

          Plaintiff,               )

 4                                 )

                                   )

 5   V.                            )  Civil Action No. 4:23-cv-00860-P

                                   )

 6                                 )

     SKIPLAGGED, INC.,             )

 7        Defendant.               )

 8

 9

10

11                     REPORTER'S CERTIFICATION

                   DEPOSITION OF GEORGE JOHN, PhD

12                     TAKEN ON JULY 9, 2024

13

14

15

16

17        I, RHONDA JACKS, Certified Shorthand Reporter in and for

18   the State of Texas, certify to the following:

19        That the witness, GEORGE JOHN, PhD, was duly sworn by the

20   officer and that the transcript of the oral deposition is a

21   true record of the testimony given by the witness;

22        That the amount of time used by each party at the

23   deposition is as follows:

24        MS. BINA PALNITKAR, 4 hours, 35 minutes.

25        MR. WILLIAM KIRKMAN, 0 hours, 0 minutes.
```

                                                    Page 221

1   That pursuant to the information made available to me at

2 the time said deposition was taken, the following includes all

3 parties of record:

4   MS. BINA PALNITKAR, Attorney for the Plaintiff

5   MR. WILLIAM KIRKMAN, Attorney for the Defendant

6   That before the conclusion of the deposition, the witness,

7 GEORGE JOHN, PhD, did request a review of this transcript

8 pursuant to Rule 30(e)(1).

9   I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties or attorneys in

11 the action in which this proceeding was taken, and further that

12 I am not financially or otherwise interested in the outcome of

13 the action.

14

15   Certified to by me, this 15th day of July, 2024.

16

17

18

19

20

21   RHONDA JACKS, CSR #3665

   Expiration Date:  10-31-2025

22   VERITEXT LEGAL SOLUTIONS

   Firm Registration No. 571

23   300 Throckmorton Street

   Suite 1600

24   Fort Worth, TX 76102

   817-336-3042

25

                Page 222

```
1                    CHANGES AND SIGNATURE

2    PAGE      LINE      CHANGE                    REASON _

3    ___97_____4___"sites" to "cites"_____sounds alike

4    __113_____16___"assessor" to "ASSESSOR"_____proper noun

5    __113_____22___"assessor" to "ASSESSOR"_____proper noun

6    __146_____24___"was asked" to "was not asked"__responded incorrectly

7    __175_____4___"less"_to "more" _____responded incorrectly

8    __206_____2___"buy" to"by"_____sounds alike

9    __213___10__"consents" to "concepts" _____sounds alike

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25   Job No. TX6791874

                                                    Page 219
```

1    I, GEORGE JOHN, PhD, have read the foregoing deposition

2    and hereby affix my signature that same is true and correct,

3    except as noted above.

4
5    _____

     GEORGE JOHN, PhD

6

7    THE STATE OF  MN        *

                             *

8    THE COUNTY OF Hennepin *

9      BEFORE ME   George John   ,  on this day

10   personally appeared GEORGE JOHN, PhD, known to be (or proved

11   to me under oath or through  MN Drivers Lic  )

12   (description of identity card or other document) to be the

13   person whose name is subscribed to the foregoing instrument and

14   acknowledged to me that they executed the same for the purposes

15   and consideration therein expressed.

16     GIVEN UNDER MY HAND AND SEAL OF OFFICE this  10th

17   day of  August       ,  2024    .

18
19   _____

     NOTARY PUBLIC IN AND FOR

20   THE STATE OF MINNESOTA

21

22

23

24

25

                                        Page  220

SEEMA BHARGAVA
Notary Public
Minnesota
My Commission Expires
Jan 31, 2029

App'x 203

# Exhibit A-4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF TEXAS

 3                     FORT WORTH DIVISION

 4                          - - -

 5    AMERICAN AIRLINES, INC.,      :

           Plaintiff,              :

 6             -vs.-                :

      SKIPLAGGED, INC.,             : CIVIL ACTION NO:

 7         Defendant.               : 4:23-cv-00860-P

 8                          - - -

 9                   Monday, July 8, 2024

10                          - - -

11              In-person oral deposition of DR. YORAM

12    (JERRY) WIND, taken pursuant to notice, was held at

13    the Law Offices of Greenberg & Traurig, LLP, 1717 Arch

14    Street, Suite 400, Philadelphia, Pennsylvana 19103, at

15    9:30 a.m., on the above date, before Lisa DePascale, a

16    Court Reporter and Notary Public of the Commonwealth

17    of Pennsylvania and Delaware.

18

19

20

21

22

23                       VERITEXT

              888.777.6690 / 215.214.1000

24            Calendar-pa@veritext.com

                                            Page 1
```

```
 1  APPEARANCES:
 2    GREENBERG TRAURIG, LLP
      BY:  CAMERON NELSON, ESQUIRE
 3    77 West Wacker Drive
      Suite 3100
 4    Chicago, Illinois 60601
      312.456.8100
 5    nelsonc@gtlaw.com
      Representing Plaintiff, American Airlines
 6
 7    CONDON TOBIN SLADEK THORNTON NERENBERG
      BY:  KENDAL B. REED, ESQUIRE
 8    8080 Park Lane
      Suite 700
 9    Dallas, Texas 75231
      214.265.3853
10    kreed@condontobin.com
      Representing Defendant, Skiplagged, Inc.
11
      KELLY HART & HALLMAN, LLP
12    BY:  LARS L. BERG, ESQUIRE
      201 Main Street
13    Suite 2500
      Fort Worth, Texas 76102
14    817.818.3524
      lars.berg@kellyhart.com
15    Representing Plaintiff, American Airlines
16
17
18  ALSO PRESENT:  AKTARER ZAMAN, CEO
         Skiplagged, Inc.
19
20      JEREMY BALLEW, ESQUIRE
         American Airlines
21
22
23
24
                                        Page 2
```

```
 1              INDEX
 2  WITNESS:
 3  DR. YORAM (JERRY) WIND,
 4                        PAGE NO.
 5    MR. REED ...............................5
 6    MR. NELSON ...........................256
 7
 8            EXHIBITS
 9  NUMBER        DESCRIPTION        PAGE NO.
10  Wind-1      Notice of Intention to Take    7
            the Oral Deposition of Jerry
11          Wind, 4 pages
12  Wind-2        Appendix B,            9
            Documents/Materials Relied
13          Upon, 4 pages
14  Wind-3      Plaintiff American Airlines,   10
            Inc.'s Designation of Expert
15          Witnesses, 6 pages
16  Wind-4       Wharton University of      35
            Pennsylvania, Appendix A, 124
17          pages
18  Wind-5      Expert Report of Expert,     50
            Yoram (Jerry) Wind, 90 pages
19
    Wind-6        Radius, Appendix C-2, 16    109
20          pages
21  Wind-7        E-mail, Bates stamped      249
            AA-SKP-00052794 through
22          AA-SKP-00052797
23
24
                                        Page 3
```

```
 1              - - -
 2        DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5              - - -
 6        WITNESS INSTRUCTED NOT TO ANSWER
 7  PAGE  LINE        PAGE  LINE        PAGE  LINE
 8   137   12
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                        Page 4
```

```
 1        (It is hereby stipulated and agreed by
 2    and among counsel for the respective parties
 3    that sealing, certification, and filing are
 4    waived; and that all objections, except as to
 5    the form of the question, are reserved until
 6    the time of trial.)
 7              - - -
 8        DR. YORAM (JERRY) WIND, after having
 9    been first duly sworn, was examined and
10    testified as follows:
11              - - -
12        E X A M I N A T I O N
13              - - -
14  BY MR. REED:
15  Q.    Good morning, Dr. Wind.  My name is Kendall
16  Reed.  We've never met before, have we?
17  A.    No.
18  Q.    All right.  Can you state your name for the
19  record?
20  A.    Yoram Jerry Wind.
21  Q.    And where do you currently reside?
22  A.    ███████████████████████
23  Q.    And how many times have you been deposed
24  before?
                                        Page 5
```

                                    2 (Pages 2 - 5)

1  A.    I have no idea.  A lot.
2  Q.    A lot.  More than 50?
3  A.    Probably.
4  Q.    Given that you're a veteran at this, I'll kind
5  of run through a few things real quickly.  But
6  hopefully we can have a smooth day.
7         Do you understand that you're testimony
8  here today is under oath?
9  A.    Yes.
10  Q.   And that you're sworn to tell the truth?
11  A.   Yes.
12  Q.   And the Court Reporter here is taking down
13  everything that we say today, so it's important that
14  we not to talk over each other.  It will happen from
15  time to time, she'll get on to us.  But if you'll wait
16  for me to finish my question, even though you know
17  exactly where I'm going to go with it, I'll do my best
18  to wait until you finish your answer before I ask the
19  next one.
20        Okay?
21  A.   Yes.
22  Q.   And I do expect this to take the majority of
23  the day today.  If at any time you need a break, just,
24  of course, let me know, I will do that.  The only

Page 6

1  thing I'll ask is you answer any outstanding question
2  before we do it.
3        Okay?
4  A.    Makes sense.
5  Q.    Are you on any medication or have any health
6  condition today that would prevent you from giving
7  truthful testimony?
8  A.    No.
9  Q.    Have you ever filed for bankruptcy?
10  A.   No.
11  Q.   Have you ever been arrested?
12  A.   No.
13             - - -
14        (Exhibit Wind-1, Notice of Intention to
15     Take the, was marked for identification.)
16             - - -
17  BY MR. REED:
18  Q.    Hand you what's been marked as Exhibit-1 for
19  your deposition.
20        Do you have that in front of you, sir?
21  A.   Yes.
22  Q.   Have you seen this before?
23  A.   I don't believe so, but it sounds straight
24  forward.

Page 7

1  Q.    You'll see at the top it's entitled Notice of
2  the Intention to Take the Oral Deposition of Jerry
3  Wind?
4  A.    Yes.
5  Q.    Do you go by Jerry from time to time?
6  A.    Yes.  That's my nickname.
7  Q.    That's your nickname.  Okay.
8         What did you do to prepare for your
9  deposition today?
10  A.   I reviewed my report and met with counsel
11  yesterday for a few hours.
12  Q.   Other than your report, did you review any
13  other documents?
14  A.   Some of the -- some of the enclosures to my
15  report and I reread the four expert reports that your
16  side submitted.
17  Q.   Do you recall which experts you read?
18  A.   I don't remember their names.  They're -- one
19  was a supply chain expert.  One was a professor from
20  the marketing firm in Minnesota and two others.
21  Q.   So you said you read a total of four reports?
22  A.   Yes.
23  Q.   Other than your own, of course?
24  A.   Correct.

Page 8

1  Q.    Okay.  And you also said you looked at the
2  enclosures to your report?
3  A.    Yeah, the appendices.
4  Q.    Okay.  Other than those four expert reports,
5  your report and its appendices, did you review any
6  other documents to prepare for your deposition?
7  A.    No.
8  Q.    And you said you met with counsel for a few
9  hours.  Did you speak with anyone else, other than
10  counsel, in preparation for your deposition?
11  A.   No.
12             - - -
13        (Exhibit Wind-2, Appendix B,
14     Documents/Materials Relied Upon, 4 pages
15     was marked for identification.)
16             - - -
17  BY MR. REED:
18  Q.    You should have in front of you what's marked
19  as Exhibit-2 for your deposition.
20        Are you familiar with this document,
21  sir?
22  A.   Yes.
23  Q.   And to your knowledge, what is it?
24  A.   That's appendix B to my report that lists the

Page 9

3 (Pages 6 - 9)

1  documents and materials that I relied on.
2  Q.   Okay.  And is this a complete list of all of
3  the documents that you relied upon for your report?
4  A.   Yes.
5  Q.   To your knowledge are there any other documents
6  or materials that you relied upon for your report?
7  A.   Not that I'm aware of.
8           - - -
9           (Exhibit Wind-3, Plaintiff American
10          Airlines, Inc.'s Designation of Expert
11          Witnesses, 6 pages, was marked for
12          identification.)
13          - - -
14  BY MR. REED:
15  Q.   Hand you what's been marked as Exhibit-3 for
16  your deposition.
17          Do you have that in front you, sir?
18  A.   Yes.
19  Q.   And have you ever seen this document before?
20  A.   I assume so.
21  Q.   I'm sorry.  I didn't hear you.
22  A.   I assume so.
23  Q.   You assume so?
24  A.   I don't recall, but I assume so.

Page 10

1  Q.   Why do you assume you've seen it?
2  A.   Because of the nature of the document, which is
3  Plaintiff's, American Airlines, Designation of Expert
4  Witness.
5  Q.   And the number -- the first person listed on
6  that document is you, correct?
7  A.   Correct.
8  Q.   Okay.  And it goes on, it lists you as
9  President of Wind Associates.  Are you sill President
10  of Wind Associates?
11  A.   Yes.
12  Q.   And what is Wind Associates?
13  A.   My consulting firm.
14  Q.   And how long have you been the President of
15  Wind Associates?
16  A.   Since I started in the early '80s.
17  Q.   How many employees does Wind Associates have?
18  A.   One.
19  Q.   Yourself, or is there another one?
20  A.   My assistant.
21  Q.   Has Wind Associates always been a small
22  operation just you and your assistant or at times has
23  it had other employees?
24  A.   No.  I basically believe in virtual

Page 11

1  organization.  So any help I need, I use outside
2  contractors.
3  Q.   So it's always been small?
4  A.   Correct.
5  Q.   Okay.  And so in preparing your report in this
6  matter, did you use outside contractors?
7  A.   Yes.
8  Q.   And who did you use as outside contractors in
9  preparing your report in this matter?
10  A.   It's actually listed in the list of documents.
11  Radius.  Radius Global, which is a marketing research
12  firm that I've been working with for many years.  And
13  Voluble, which is a litigation consulting firm.
14  They're both listed on page 1 of Wind Exhibit-2.
15  Q.   So Radius and Voluble, any other outside
16  contractors that you used in preparing your report?
17  A.   No.
18  Q.   And have you used Radius and Voluble in prior
19  engagements, other than this one?
20  A.   Yes.
21  Q.   How many times would you say you've engaged
22  Radius in the past?
23  A.   It's hard to tell.  But was -- they're one of a
24  number of research firms with whom I work.  I've been

Page 12

1  working with them probably for over 50 years.  And
2  they started under their earlier name, which was Data
3  Development.
4  Q.   Did you say 50 years?
5  A.   Yes.
6  Q.   5-0.  Okay.
7           And how many times have you worked with
8  Voluble Litigation Consulting Firm before?
9  A.   Probably five, six times over the last five
10  years.
11  Q.   And working with Radius and Voluble in the
12  matter, how would you communicate with them?
13  A.   Mostly by phone.
14  Q.   Would you communicate with them by e-mail?
15  A.   Rarely.  Mostly by phone.  Material is sent by
16  e-mail but mostly by phone.
17  Q.   Now, in going back to Exhibit-3, do you still
18  have that in front of you, that designation?
19  A.   Yes.
20  Q.   Okay.  If you look with me under your name, it
21  has a paragraph that starts there and goes onto the
22  next page.  It starts off with saying, "Dr. Wind will
23  testify regarding the confusion and deception that
24  Skiplagged has caused and/or is likely to cause among

Page 13

4 (Pages 10 - 13)

1 consumers in the marketplace, including as it relates
2 to Skiplagged's perceived association with and/or
3 authorization or sponsorship from American."
4      Did I read that correctly?
5 A.   Yes.
6 Q.   All right.  Did you provide the information for
7 Exhibit-3?
8      MR. NELSON:  Objection; foundation;
9      assumes facts not in evidence.
10      THE WITNESS:  I assume that that's
11      based on discussions I had with counsel.
12 BY MR. REED:
13 Q.   Did you -- you said you had assumed earlier
14 that you had seen this.  Do you recall having any
15 input into the words or phrases used in Exhibit-3?
16 A.   I don't recall seeing this specific document.
17 I have had a number of discussions with counsel.  And
18 what you just read seems correct as the assignment
19 that I had in the project.
20 Q.   You said it was your assignment, right?
21 A.   Well, the assignment was to find out if there
22 is confusion, if there is deception.
23 Q.   So your assignment was to find out whether
24 there was confusion and whether there was deception;

Page 14

1 control group.
2 Q.   Okay.  You said the three measures, and those
3 were association, is that one?
4 A.   Yeah.  Association and connection is the number
5 two typically.  Permission or authorization is the
6 third.  But the first one is who makes it, who issued
7 the product or service.
8 Q.   Who makes the product or service?
9 A.   Yeah.  That typically comes as the first
10 question.
11 Q.   Okay.  And in this matter, what did you define
12 as the product or service?
13 A.   Well, the flight, the tickets for the flight.
14 Q.   Okay.  So the product or service are tickets
15 for a flight on an airline, correct?
16 A.   Correct.
17 Q.   And who did you identify in this matter is the
18 person or entity that makes the tickets for the
19 flight?
20 A.   I did not decide, in this specific case, not to
21 ask the first question and to focus on the association
22 and permission.
23 Q.   So you didn't do the first one; is that
24 correct?

Page 16

1 is that correct?
2 A.   Correct.
3 Q.   Okay.  And what's your definition of confusion?
4 A.   The typical definition of confusion in legal
5 cases, is that consumers believe that the companies
6 are either associated or connected with each other or
7 one requires permission or authorization from the
8 other, or they are the same company, you know, they
9 manufactured the same -- produce the same product.
10 Q.   You said that's the legal definition; is that
11 what you said?
12 A.   Well, in most legal cases that I've been
13 involved in concerning confusion, these are the three
14 measures which are being used.  And they're the one
15 that I used in this study.  They are primarily the one
16 who make the product or offered the service, are they
17 are associated or connected with anyone else?  If you
18 ask with whom, it was meant to say so.  Did they
19 require permission or authorization from anyone else?
20 If you ask from whom, it was meant to say so.  And
21 that's typically the basis for when you look at the
22 next responses to avoid double counting the same
23 respondent twice.  And you establish if there is
24 confusion or not and typically compare this to some

Page 15

1 A.   No.  I basically ask a different question, an
2 open-ended question, is how would you describe the
3 material, that is an open-ended question.  And I moved
4 directly to who are they, if they are associated or
5 connected with anyone else and if they require
6 permission from anyone.
7 Q.   Okay.  So just so I'm clear, the respondents to
8 the survey in your matter were not asked the first
9 question of who makes the product or service; is that
10 correct?
11 A.   Correct.
12 Q.   Okay.  So you moved on to the association or
13 the connection question; is that correct?
14 A.   After the first question, which I would
15 describe the document you just reviewed.
16 Q.   After what?
17 A.   After you -- after I asked the respondent how
18 would you describe what you just saw to a friend.
19 Q.   Okay.
20 A.   So I asked a broader, open-ended question to
21 start with.  If you look at the question there, which
22 is part of my report, you can see those questions.
23 Q.   And we'll get to those, I promise.  I'm just
24 starting off wide here and I'll narrow in here.

Page 17

1     So three measures of confusion we have,
2  who makes the product, association or connection, and
3  then is there a required permission; is that correct?
4  A.    In general, yeah.
5  Q.    Okay.  Now, what's the definition that you used
6  in this matter regarding the term deception?
7  A.    A number of dimensions that were involved in
8  the case.  And asking consumers to what extent they
9  believed this conditions existed or did not exist.
10  And looking for information about these items, also in
11  all the open-ended responses we got.
12  Q.    Okay.  But did you start with a base definition
13  of what deception is?
14  A.    No.  No.  The definition of deception here is
15  based on the offering of Skiplagged, to what extent
16  consumers believe them to be correct or not versus
17  reality, versus the truth.
18  Q.    Okay.  When we talked about confusion, you
19  reference and I believe your testimony was that the
20  legal definition of what had been used before.  And
21  you gave me that definition with its three measures.
22  Is there a legally accepted definition of deception
23  that you used?
24          MR. NELSON:  Objection, beyond the

Page 18

1     scope.
2          THE WITNESS:  No, because definition --
3     deception depends on the specific case.
4     Basically it's the difference between, you
5     know, the truth, the reality and the way
6     consumers perceive it.
7  BY MR. REED:
8  Q.    On the second page of Exhibit-3, if you'll go
9  there for me.
10  A.    (Reviewing document.)
11  Q.    That second paragraph, it's in the middle of
12  the page there, it starts off with "The Wind report
13  contains."
14          Do you see that?
15  A.    Yes.
16  Q.    Okay.  It states here, "The Wind report
17  contains a complete statement of all opinions Dr. Wind
18  will express and his basis and reasons for them."  And
19  then goes on from there.
20          Do you agree with that statement, that
21  your report contains a complete statement of all your
22  opinions in this matter?
23          MR. NELSON:  Objection.
24          THE WITNESS:  At the time, when I

Page 19

1     was -- that's correct for the time I wrote the
2     report.
3  BY MR. REED:
4  Q.    Has that changed?
5  A.    As I see more information, it may change.  And
6  I've seen a few things since the time I submitted the
7  report.  None of the things I've seen or read since
8  this submission of the report changes any of my
9  conclusions.  My conclusions in the report stand.
10  Q.    Okay.  So you said you've seen some additional
11  things since you issued your report; is that correct?
12  A.    Yes.
13  Q.    What additional things have you seen that you
14  recall since you've issued your report?
15  A.    For example, some internal communication at
16  Skiplagged.
17  Q.    Anything else?
18  A.    That's what comes to mind.  I don't recall as I
19  sit here now anything else, but that's the most
20  prominent one.
21  Q.    And when you said internal communications, do
22  you recall how many you've seen?
23  A.    There was a bunch of them.  There were -- I
24  don't remember exact number, 10 or so, cases where

Page 20

1  they discussed internal discussions of ████
2  █████████
3  Q.    And so those internal communications, are they
4  listed on Exhibit-2 --
5  A.    No.
6  Q.    -- since you've seen them after your report?
7  A.    No.
8  Q.    Do you intend to update Appendix B to your
9  report?
10  A.    We can.
11  Q.    But you haven't at this time?
12  A.    Correct.
13  Q.    Do you have any plans to?
14  A.    Well, if you're asking me questions about this
15  and show the documents then, yes, I will write them.
16  Q.    But you didn't, before we sat down here today,
17  have any plans to amend or supplement your report, did
18  you?
19  A.    No.
20  Q.    Okay.  And you said these documents that you've
21  seen, the 10 or so discussions internal
22  communications, they don't change any of your
23  conclusions; is that correct?
24  A.    Correct.

Page 21

6 (Pages 18 - 21)

1  Q.   Did anything that you've seen since you've
2  issued a report cause you to have additional opinions?
3  A.   Well, there's the new document that we're
4  talking about.  And the factor, which I did not know
5  at the time, which is it strengthened my conclusion
6  that Skiplagged is really not what they claim, they
7  are not an educational organization to try to educate
8  consumers but rather intentionally to deceive the
9  consumer.
10  Q.   Deceive how?
11  A.   By not providing them the full information
12  about the risks associated with the Hidden City
13  tickets.
14  Q.   And when you refer to Hidden City tickets, what
15  are you referring to?
16  A.   I thought that's an accepted term.  These are
17  the services they offer.  They offer regular tickets
18  and they offer ticket, what they call, Hidden City
19  tickets.
20  Q.   What do you understand that to be?  I just want
21  to make sure we're all on the same page.
22  A.   I'll accept the definition of one of the four
23  experts that you submitted.  It's primarily -- you're
24  trying to -- I'll give you an example.  You're trying

Page 22

1  comparing the conditions of the Hidden City versus the
2  terms and conditions of American Airlines, it shows
3  you the difference.
4  Q.   Okay.  I have airlines don't like it as a risk,
5  no checked luggage, airlines may not honor the ticket?
6  A.   Correct.  You may have to pay -- you may have
7  to buy another ticket.
8  Q.   American Airlines may cancel frequent flyer
9  miles?
10  A.   They may cancel via the return ticket.  They
11  may cancel your return ticket.
12  Q.   Any other risk, as you understand it, to Hidden
13  City tickets?
14  A.   Well, if you have it show me.  There is a
15  document in my report, part of the stimuli that lists
16  exactly all of them.  But these are the, you know,
17  some examples of some of the risks involved.
18  Q.   Okay.  And which risks are you saying
19  Skiplagged does not disclose and, thereby, deceives
20  consumers?
21  A.   Well, they disclose very few of them.  They
22  don't disclose for example, that American Airlines
23  will cancel their frequent flyer miles.  They may have
24  to pay for another ticket.  They will not have a

Page 24

1  to fly from Philadelphia to Chicago, but you'll go
2  Hidden City ticket, it may be a ticket from
3  Philadelphia to New Orleans via Chicago.  And the idea
4  will be the tickets, the Philadelphia, Chicago, New
5  Orleans, is cheaper than the direct ticket to
6  Philadelphia Chicago.  And the Hidden City would
7  encourage the consumer not to take the second flight,
8  to leave the plane in Chicago.  So this way they
9  benefit from the low price ticket.  But there are
10  risks associated with this.  And as I mentioned, the
11  problem is that Skiplagged does not reveal the full
12  set of risks involved with the ticket.
13  Q.   What do you understand the risk to be for a
14  Hidden City ticket?
15  A.   There are a lot of them.  First of all, the
16  airlines do not like it.  They recognize on their
17  website sometimes some of the minor things like that
18  you should not check luggage.  But the big risk is
19  that the airline will not respect the ticket because
20  it violates the airline rules.
21        American may cancel all your frequent
22  flyer miles and any other account you have with them.
23  And in my report, there is the stimuli section that we
24  have, describes specifically the conditions of --

Page 23

1  return ticket, that return ticket will be canceled.
2  Q.   And you understand as part of your analysis in
3  your report here, that one of the consequences for
4  American airlines on Hidden City tickets is
5  cancellation of frequent flyer miles?
6  A.   Correct.
7  Q.   How did you come to that understanding?
8  A.   That's my understanding, discussion with
9  counsel.
10  Q.   And that American Airlines may cancel the
11  return ticket, you understood to be a consequence of
12  booking a Hidden City ticket with American?
13  A.   Yes.
14  Q.   And you understood that American may not honor
15  a ticket as one of the consequences of booking a
16  Hidden City ticket?
17  A.   Correct.  Well, it violates -- Hidden City
18  tickets violates the terms and conditions of American
19  Airlines.
20  Q.   When you refer to terms and conditions of
21  American Airlines, what exactly are you referring to?
22  A.   Well, document American Airlines has, that
23  clearly explains what are the terms and conditions of
24  flying with them.

Page 25

7 (Pages 22 - 25)

1 Q.    Okay.  And you recall -- that's a document that
2 you reviewed as part of doing your analysis in this
3 matter?
4 A.    And as I mentioned before, it's included in my
5 report.
6 Q.    Okay.
7 A.    You can refer to that.
8 Q.    Okay.  As part of your analysis, did you
9 determine whether booking a Hidden City ticket was
10 against the law?  Is it illegal?
11         MR. NELSON:  Objection; beyond the
12      scope.
13         THE WITNESS:  I'm not sure.  And I'm
14      finding conflicting information out there.  It
15      seems that some of the documents clearly say
16      that this is illegal.  Some, you know, I think
17      Skiplagged does not view this as illegal.  And
18      consumers perceptions, which I'm really
19      reporting on in my report, consumers are mixed
20      in their perception.  Some feel it is legal and
21      some feel it is illegal.  So there is a fair
22      amount of confusion concerning the perception
23      of the legality of this.  And I know is that it
24      violates the terms and conditions of American
                                                    Page 26

1 saying that?
2 A.    I don't recall specifically.
3 Q.    Not one you can sit here and tell me today?
4 A.    Yeah.
5 Q.    There is one you can tell me?
6 A.    If I recall.  I don't recall specifically.
7 Q.    Okay.  If there is, that's in the documents
8 identified on Appendix B, right?
9 A.    Well, that's all the documents I reviewed
10 before I submitted the report, so, yeah, it should be
11 there.
12 Q.    Okay.  In your analysis, did you differentiate
13 between serious risk and not so serious risk?
14 A.    Yes.
15 Q.    And how did you differentiate the two?
16 A.    If you look at my report, I define exactly the
17 item that I considered serious risk and not.  So there
18 is, in my report, in one of the tables there is
19 exactly the definition.
20 Q.    And do you recall what that is?
21 A.    No.  I basically -- that's a definition that
22 was developed with the two independent coders that I
23 had reviewing all the open-ended responses.  But
24 serious risk will include some of the items that you
                                                    Page 28

1      Airlines.
2 BY MR. REED:
3 Q.    And you know that based upon your discussions
4 with American Airlines, right?
5 A.    Well, and by comparison, by comparing the terms
6 and conditions against, you know, the Skiplagged
7 offer.
8 Q.    Okay.  And terms and conditions, that's the
9 name of the document that you prepared?
10 A.    I'm not sure if that's exactly the name.
11 Q.    Okay.
12 A.    I think there was a page in my -- in the
13 appendices, a part of the stimuli that shows basically
14 the full information.
15 Q.    Is that the one where it says what SKiplagged
16 says and what American says --
17 A.    Correct.
18 Q.    -- chart?  Okay.
19 A.    As opposed to relying on my memory, the chart
20 really tells you what I believe.
21 Q.    We'll get to that.  I promise.
22         What documents did you -- you said that
23 you've seen some documents that says booking a Hidden
24 City ticket is illegal.  What documents do you recall
                                                    Page 27

1 just mentioned.
2 Q.    Okay.  What were the nonserious risks?
3         MR. NELSON:  Objection to form.
4         THE WITNESS:  I think that some of the
5      items that Skiplagged mentions in their warning
6      are the less serious risks, such as the
7      luggage.
8 BY MR. REED:
9 Q.    Okay.  Not being able to check a bag?
10 A.    Correct.
11 Q.    Okay.  You said two independent coders that
12 were used.  Who were they?
13 A.    Two people from Radius who were trained to
14 analyze open-ended consumer responses.  And I followed
15 the regular procedure done in all scientific research
16 for analyzing open-ended responses by having two
17 coders who did not know the purpose of the study or
18 the identity of the sponsor and asked to count and
19 analyze their responses.
20 Q.    Do you recall their names?
21 A.    No.
22 Q.    Had you met them before?
23 A.    No.
24 Q.    How did you communicate with them?
                                                    Page 29

8 (Pages 26 - 29)

1   A.   I did not communicate with them directly.  I
2   communicated with the project managers from Radius.
3   Q.   Did you vet those coders before using them?
4   A.   They did.  And I've used Radius, as I've
5   mentioned before, many times.  They train them.  There
6   are people to be used all the time for this type of
7   purpose.
8   Q.   So you didn't vet them and you didn't train
9   them, Radius did, correct?
10   A.   Correct. I worked with Radius for years and I
11   know I can rely on them.
12   Q.   Did you provide any assistance in what was to
13   go into the training for these coders?
14   A.   We definitely discussed with the Project
15   Manager what has to be done.
16   Q.   Who was the Project Manager?
17   A.   There were two that I worked with.  One was
18   Dayna Colbert.  I'm not sure of the family name.  And
19   the other one is Colin.  I don't remember his family
20   name.
21   Q.   You said the first one was Dayna Colbert?
22   A.   No.  Might be Colbert.  I'm not sure.  I can
23   check it.  I don't remember the name.
24   Q.   And the second one was Colin, and you don't

1   remember his name?
2   A.    I thought it was a P, but I don't remember his
3   name.
4   Q.   And they're both project managers with Radius?
5   A.   Correct.
6   Q.   Okay.  So you talked with Dayna and Colin about
7   the training for these two unidentified coders?
8   A.   Yeah.  Briefly.  We talked about the required
9   analysis.
10   Q.   And was --
11   A.   It was emphasized, fundamentally just
12   emphasized the basic rules, which was to make sure
13   they don't know who the project is for.  That they are
14   totally independent in their analysis.  And that there
15   is a procedure for resolving conflict between the two
16   independent coders.
17   Q.   And this communication with Dayna and Colin,
18   was that in writing?
19   A.   No.  As most of my communication was done by
20   phone.
21   Q.   The procedures for resolving conflict, are
22   those in writing?
23   A.   No.
24   Q.   The training that they, the independent coders

1   received, is that in writing?
2   A.   I don't know if Radius has anything in writing.
3   It's typically involved by having -- instructing them,
4   letting them start, do a test coding, reviewed by the
5   Radius people and then correcting, providing real live
6   feedback.  And part of the conflict resolution is if
7   the two come with different assessment of the same
8   item, then they're getting together with Radius person
9   and they discuss it until they agree on what is the
10   correct coding.
11   Q.   So there is a third person involved?
12   A.   In the -- only in conflict -- when there is a
13   conflict between the two and they have to resolve it.
14   Q.   Who is that?
15   A.   Would have been probably Colin or one of the
16   other people working with Colin.
17   Q.   Do you know how many times the procedure for
18   conflict resolution was invoked in this analysis?
19   A.   I don't have a specific number.  But I checked
20   about this and there were very few cases of
21   disagreement in the actual coding, not part of the
22   training but there were very few cases in the overall
23   result.
24   Q.   Do you know if Radius keeps a record of the

1   conflicts involved?
2   A.   I have no idea.
3   Q.   Did they provide you any records regarding the
4   conflict?
5   A.   No.  No.
6   Q.   How did you know there were very few cases for
7   disagreement then?
8   A.   Because I discuss it with them.
9   Q.   You had a verbal conversation with Colin about
10   it?
11   A.   Yeah.  I am continuously in communication with
12   then during the study.
13   Q.   But they don't provide you a report, say, from
14   Radius that indicates how many times there was a case
15   or disagreement?
16   A.   It's rarely kept.  The whole idea is it's a
17   dynamic process and they check on an ongoing basis the
18   responses.  If the responses are not consistent, they
19   get the two people together and discuss it and try to
20   resolve it.  It's a dynamic process.  There is no --
21   it's not a rigid process.
22   Q.   Are you aware of any records kept by Radius
23   regarding the coding process?
24   A.   No.  And I doubt they have it, but I can ask

9 (Pages 30 - 33)

App'x 213

1  them.
2  Q.    And they haven't been provided to you at this
3  point?
4  A.    I never asked for that.
5  Q.    So you took Colin's words that there was very
6  few cases for disagreement, right?
7  A.    No reason to doubt it.
8  Q.    You did nothing else to verify that fact,
9  correct?
10  A.    Why should I verify it?  It's a person I'm
11  working with and I've worked with this company for
12  many years and I trust them.
13  Q.    You trust them, so you didn't have to verify
14  it, right?
15  A.    Yeah.  Sounds actually -- yeah, that's exactly
16  the fact.  You know, it's a company I've worked with.
17  And I looked at their work for many years and I know
18  that they are a reliable company in the way they are
19  performing the job that has to be done.
20  Q.    Did Radius provide you any background
21  information on the coders that were used?
22  A.    No.  And I don't ask for it.
23  Q.    You didn't ask for it either?
24  A.    No.

Page 34

1  Q.    Do you have any knowledge of how Radius keeps
2  an independent -- or these coders independent during
3  their review?
4  A.    Well, the independence is primarily not knowing
5  who the sponsor of the study is or the objective of
6  the study.  And they work in separate -- and they work
7  each one by themselves.  And then if there is
8  disagreement, we would bring the two of them together.
9  Q.    Do you know if they work in the same office?
10  A.    I don't.
11  Q.    You don't know where they did the coding, do
12  you?
13  A.    Somewhere in the Radius offices.
14  Q.    Where are they?
15  A.    In New York.
16                     - - -
17         (Exhibit Wind-4, Wharton University of
18         Pennsylvania, Appendix A, 124 pages, was
19         marked for identification.)
20                     - - -
21  BY MR. REED:
22  Q.    Hand you what's been marked as Exhibit-4 for
23  your deposition.
24  A.    Yes.

Page 35

1  Q.    At the top you'll see it has Appendix A and
2  then starts with short biography and then it's a
3  lengthy document here.
4              Are you familiar with it?
5  A.    Yes.
6  Q.    And to your knowledge what is this?
7  A.    Well, it includes actually three or four
8  documents.  The first page is my short bio.  And the
9  second page, the one that's says actually number one
10  on it, that's part of my full resume, which is found
11  on the Wharton website and is not fully up to date.
12  So doesn't have some of my more recent publications
13  and some other stuff.  So to try to compliment it,
14  toward the end, after page 117, there is an additional
15  three pages of recent publications since 2020, which
16  not all of which are included in the lengthy resume.
17  And after these three pages, there is another document
18  that start with Appendix A, trial and deposition
19  testimony, that lists cases in which I testified in
20  the last five years.
21  Q.    Do you recognize this as being Appendix A to
22  your report?
23  A.    Yes.
24  Q.    Okay.  And so this is information that you

Page 36

1  provided as part of preparing your report, correct?
2  A.    Correct.
3  Q.    Okay.  And when you said it wasn't up to date
4  that -- you meant that the first part wasn't up to
5  date, so that's why these additional tables and
6  testimony is included; is that correct?
7  A.    Yeah.  Well, the report -- correct.  The big
8  report, the 117 page report, not report, my resume --
9  Q.    Okay.
10  A.    -- is not fully up to date.  And that's the
11  reason I included the list of recent publications.
12  And it also does not include testimony to include --
13  there is a section in the big report of testimony,
14  primarily consulting in legal cases, that is not
15  separate and identified testimony in the position or
16  in trial, which is the purpose of the last three
17  pages.
18  Q.    Okay.  And let's go to those last couple pages,
19  starting with the chart with the publications.  I
20  think it's the page after 117, it starts over with
21  one.
22  A.    Yeah.
23  Q.    Is this publication chart up to date?
24  A.    (Reviewing document.)

Page 37

1     Let me see.
2         (Reviewing document.)
3         One of the pages here, the second from
4   the last, it's no longer working paper.  It was
5   accepted for publication in the Journal of Interactive
6   Marketing.  The rest of this is pretty accurate.  And
7   it does not include actually a current book that I am
8   working on, which is on creativity.  So since you have
9   working papers here, so you may want to include those.
10  Q.    So you're working on a book on creativity?
11  A.    Correct.
12  Q.    Do you have an anticipation of when that might
13  be published?
14  A.    Probably next year.
15  Q.    And you said the next to last one was unlocking
16  creative potential article that was accepted in the
17  Journal for Interactive Marketing?
18  A.    Interactive marketing.  Right.
19  Q.    And has that been published yet?
20  A.    Accepted, so probably available digitally on
21  their platform but not in print yet.
22  Q.    Anything that you have published that directly
23  addresses marketing in the airline industry?
24  A.    No.

Page 38

1   Q.    Which of your publications touch on or address
2   confusion and or deception?
3   A.    There were two.  There are two with respect to
4   confusion.  One is the third from the bottom, Beyond
5   Surveys, A Holistic Marketing Approach To Assess The
6   Validity of Legal Challenges.  And the other one is
7   The Implication of The Consumer Journey to Traditional
8   Consumer Surveys for Litigation, so these are the two.
9   Q.    Okay.  You have a Ph.D. in marketing, right?
10  A.    In marketing, behavioral sciences.  Yes.
11  Q.    And what?
12  A.    And the behavioral sciences.
13  Q.    So The Implication of Consumer Journey to
14  Traditional Consumer Surveys for Litigation, you wrote
15  chapter two of that book; is that correct?
16  A.    Right.  This was actually published as a
17  chapter two in a book that Joel Steckel published.
18  And you have the inventory.
19  Q.    The Cambridge Handbook of Marketing and the
20  Law?
21  A.    Yes.
22  Q.    Okay.  And is that written in conjunction with
23  Mr. Hummell (ph)and Mr. Mundell (ph)?
24  A.    Yes.

Page 39

1   Q.    And then the other one, written with the same
2   two individuals is Beyond Surveys, a Holistic
3   Marketing Approach to Assess the Validity of Legal
4   Challenges?
5   A.    Correct.
6   Q.    And that's a working paper?
7   A.    Yeah.
8   Q.    So it hasn't been published yet?
9   A.    Correct.
10  Q.    Is it out for publication right now?
11  A.    No.  I'm revising it.
12  Q.    Had it been submitted for publication and then
13  rejected?
14  A.    No.
15  Q.    Have you done any -- strike that.
16        Okay.  Following the recent
17  publications section, then there is three pages of
18  trial or deposition testimony covering the last five
19  years; is that correct?
20  A.    Correct.
21  Q.    Okay.  And is this trial and deposition
22  testimony of the last five years up to date?
23  A.    Yes.
24  Q.    When were you hired as an expert in this case?

Page 40

1   A.    I don't recall exactly the date.
2   Q.    Do you recall --
3   A.    Earlier this year.
4   Q.    Earlier this year.
5         And did you have a written agreement
6   for your retention?
7   A.    I assume they send me a letter of retention.
8   Yeah.
9   Q.    Do you recall it specifically?
10  A.    No, I think I got it.
11  Q.    And do you recall who actually retained you?
12  A.    I think it might have been Cam, Cam Nelson.
13  Q.    And he's an attorney, right?
14  A.    Yes.  Sitting next to me.
15  Q.    With who, do you know?
16  A.    (No response.)
17  Q.    Do you know with which firm?
18  A.    GT.
19  Q.    Have you ever been retained by GT in the past?
20  A.    Yes.
21  Q.    How many times?
22  A.    I don't recall.
23  Q.    Do you recall approximately?
24  A.    A few times.

Page 41

11 (Pages 38 - 41)

1  Q.  More than five?
2  A.  I doubt it, but I don't really know.
3  Q.  Are you familiar with the Kelly Hart law firm?
4  A.  No.
5  Q.  And the client for this case is American
6  Airlines, correct?
7  A.  Yes.
8  Q.  Have you ever been retained to give expert
9  testimony on behalf of American Airlines in the past?
10  A.  Yes.
11  Q.  How many times?
12  A.  I think one other time.
13  Q.  And that's the case, I see here in Appendix A,
14  under 2020, the trial and deposition testimony, third
15  bullet down?
16  A.  Yes.
17  Q.  So American Airlines, Inc. versus Delta
18  Airlines, Inc.?
19  A.  Correct.
20  Q.  In Fort Worth, our court, right?
21  A.  Yes.
22  Q.  It says here you gave a deposition in that
23  case.  Did you give trial testimony?
24  A.  Not that I recall.

Page 42

1  Q.  Do you know if that case has been resolved?
2  A.  I don't.
3  Q.  So you don't know if you're going to give trial
4  testimony or?
5  A.  I don't know.
6  Q.  Okay.  In the past, have you been retained to
7  give expert testimony on behalf of any other airlines?
8  A.  Not that I recall.
9  Q.  What were you asked to analyze in the prior
10  American Airlines case?
11  A.  I don't recall.
12  Q.  You don't recall at all?
13  A.  No.  Unlike you lawyers, I don't remember every
14  case.  At the end of the case, I move to the next
15  project I'm working on, I don't really remember cases.
16  Q.  It's gone, huh?
17  A.  Yeah.
18  Q.  Are you being paid for your time in this case?
19  A.  Yes.
20  Q.  And what are you being paid?
21  A.  Regular consulting rates, $1,200 an hour.
22  Q.  $1,200 an hour.
23       And do you bill on a monthly basis?
24  A.  Yes.

Page 43

1  Q.  And how much have you billed so far in the
2  matter?
3  A.  I don't recall.
4  Q.  You don't recall at all?
5  A.  No.
6  Q.  Do you know how many hours you've spent?
7  A.  No idea.
8  Q.  Do you send invoices?
9  A.  Yes.  I send monthly invoices.
10  Q.  Included -- do you pass on the cost for the
11  outside consultants, like Radius?
12  A.  They bill directly.
13  A.  They bill directly.
14  A.  The airline.  Yeah.  They bill the law firm
15  directly.
16  Q.  Do you know how much Radius has charged in this
17  matter?
18  A.  I don't recall.
19  Q.  And Voluble was the other one, right?
20  A.  Correct.
21  Q.  Do you know how much they charged?
22  A.  No idea.
23  Q.  Is there a written agreement with Radius?
24  A.  They send the proposal and then, you know, once

Page 44

1  the client approves the proposal, they bill the client
2  directly.
3  Q.  Do you know if there is a written agreement
4  with Voluble for this matter?
5  A.  I think the same thing.  They submit a
6  proposal.  Once the proposal is accepted, they bill
7  the client directly.
8  Q.  And the proposal goes to you?
9  A.  Yes.  Me and the client.
10  Q.  You and the client?
11  A.  Yes.
12  Q.  Both have to accept it?
13  A.  Yes.  I typically work with either, in this
14  case, Radius or Voluble.  I work with them on the
15  proposal to make sure it includes what we need.  And
16  then once I approve it, they submit the final proposal
17  to the client.
18  Q.  And then they bill the client directly for
19  their services?
20  A.  Correct.
21  Q.  Other than Wind Associates, are you currently
22  employed anywhere else?
23  A.  I'm a Professor Emeritus at Wharton.
24  Q.  What does it mean to be a Professor Emeritus?

Page 45

12 (Pages 42 - 45)

App'x 216

1  A.    That after fifth years at Wharton I retired.
2  Q.    Okay.
3  A.    And I have my office at Wharton.  I have an
4  office there.  I'm not being paid, but I have an
5  office there and I participate in faculty meetings and
6  others.
7  Q.    Do you teach any classes?
8  A.    No.  That's the beauty of Emeritus, you don't
9  have to teach in the regular program.
10  Q.    And you said you're not being paid by Wharton,
11  right?
12  A.    Correct.
13  Q.    So 100 percent of your income now is from Wind
14  Associates?
15  A.    Correct.
16  Q.    And how long has that been the case?
17  A.    Since 2017, when I took Emeritus status.
18        MR. REED:  I'm at good break.  We've
19  been going about an hour, do you want to take a
20  break?
21        THE WITNESS:  Sounds good.
22        (A short break was taken.)
23  BY MR. REED:
24  Q.    You understood you're still under oath?

Page 46

1  A.    Yes.
2  Q.    What's Level Legal?
3  A.    I have no idea.
4  Q.    On the Exhibit-2 for your deposition, the
5  documents and material relied upon, you list an Excel
6  spreadsheet that was generated from Level Legal.
7  A.    I don't recall.  You'll have to show it to me.
8  Q.    I'm sorry.
9  A.    You'll have to show it to me.  I have no
10  recollection what it is.
11  Q.    Okay.  Do you have that Exhibit-2 in front of
12  you?
13  A.    Yes.
14  Q.    The sixth bullet point down, it's before you
15  get to the big document section of the produce
16  documents, it says Excel spreadsheet data.
17        Do you see the line right there?
18  A.    Yes.
19  Q.    And then it says generated from Level Legal.
20  A.    Yeah.  This is the 200 test cases that lead to
21  the selection of the stimuli in this case.  I'm
22  describing it in my report how the stimuli was
23  selected.
24  Q.    Okay.

Page 47

1  A.    And that's the backup data for the stimuli.
2  Q.    So is Level Legal another independent
3  contractor you used?
4  A.    They were apparently hired by the law firm.
5  Q.    By which law firm?
6  A.    By Cameron's, GT.
7  Q.    Okay.  By Greenberg?
8  A.    Yes.
9  Q.    So did you have any involvement in this 200
10  test by result?
11  A.    I had discussions with one of Cam's associates
12  about the procedure for generating it.  So I was
13  involved in the process for selecting these 200 and
14  then eventually selecting the stimuli.
15  Q.    Okay.  Was that a verbal or written
16  communication?
17  A.    It was by phone.
18  Q.    By phone.
19        And do you recall who that conversation
20  was with?
21  A.    Zach.  I don't remember his family name.
22  Q.    Okay.  When you say family name, you mean last
23  name?
24  A.    Last name.

Page 48

1  Q.    All right.  Just make sure I understand the
2  terms.
3        All right.  So this Level Legal, 200
4  test by results was something you didn't do, Greenberg
5  did and then provided that to you; is that correct?
6        MR. NELSON:  Objection;
7  mischaracterizes.
8        THE WITNESS:  No, I discussed it with
9  them -- this was primarily -- the question was,
10  how do you select the stimuli, describing it in
11  my report.  This was the data underlying the
12  selection of the stimuli.
13  BY MR. REED:
14  Q.    Okay.  And you selected the 200 test by?
15  A.    No.
16  Q.    Who did?
17  A.    Zach.
18  Q.    At Greenberg?
19  A.    Yes.
20  Q.    Okay.  As part of your preparing your report,
21  doing your analysis and coming to your opinions, did
22  you consult or communicate with anyone at American?
23  A.    Not that I recall.
24  Q.    Have you attended any other depositions in this

Page 49

13 (Pages 46 - 49)

1 matter?
2 A.    No.
3 Q.    Have you reviewed any deposition transcripts in
4 this matter?
5 A.    I reviewed one.
6 Q.    Which one?
7 A.    The one of the CEO, the Skiplagged CEO.
8 Q.    Okay.  And have you watched any videos of
9 depositions in this matter?
10 A.    No.
11 Q.    Have you consulted with any other individual
12 who has given opinions in this matter?
13 A.    No.
14                       - - -
15            (Exhibit Wind-5, Expert Report of
16       Expert, Yoram (Jerry) Wind, 90 pages , was
17       marked for identification.)
18                       - - -
19 BY MR. REED:
20 Q.    All right.  I've handed you what we've marked
21 as Exhibit-5 for your deposition.  The first page is
22 entitled Expert Report Professor Yoram Jerry Wind,
23 correct?
24 A.    Yes.

1 Q.    Okay.  And if you look at it, it goes through
2 page 89 where your signature is, correct?
3 A.    Yes.
4 Q.    Okay.  And what I did, just because of the size
5 and me trying to save a little bit of paper is, I went
6 through 89 containing your opinions and didn't include
7 the appendices, which was -- we've done a few already
8 in this depo, right?
9 A.    Yes.
10 Q.    Okay.  And so you recognize this document,
11 right?
12 A.    Yes.
13 Q.    Do you recall -- strike that.
14            Let's go to page 3 at the bottom of
15 your report, that starts with background and
16 objectives.
17            Are you with me?
18 A.    Yes.
19 Q.    You start off with a paragraph there speaking
20 or talking about American Airlines, and it's what you
21 call American Marks.
22            Are you with me?
23 A.    Yes.
24 Q.    Where did you get the information for the

1 background contained in this paragraph?
2 A.    From counsel.
3 Q.    So that's what you were told by counsel?
4 A.    Yes.
5 Q.    At Greenberg?
6 A.    Yes.
7 Q.    Do you recall who told you that?
8 A.    I think Cameron.  I'm not sure.
9 Q.    Okay.  Did you do anything to verify the
10 information that you were told contained in paragraph
11 one, the background on American?
12            MR. NELSON:  Objection;
13       mischaracterizes.
14            THE WITNESS:  No.
15 BY MR. REED:
16 Q.    Okay.  So you can offer no testimony as to what
17 American has done, for instance, to protect its flag
18 fair schedule and inventory data, can you?
19 A.    No, I can't.
20 Q.    You don't have any knowledge as to what
21 American has done to trademark its name and flight
22 symbol, do you?
23 A.    Correct.
24 Q.    You don't have any knowledge, other than what

1 you were told by counsel, as to measures American has
2 taken to ensure only its authorized agents are
3 permitted to act on its behalf?
4 A.    Correct.
5 Q.    The next paragraph you began talking about
6 Skiplagged, correct?
7 A.    Yes.
8 Q.    And this background on Skiplagged, where did
9 you obtain this information?
10 A.    Let me review the paragraph.
11            (Reviewing document.)
12            I think it says in the first paragraph,
13 having reviewed the complaint and various screenshots
14 of American and Skiplagged's websites.
15            So I'm not sure what else are you
16 asking me about.
17 Q.    Well, I'm asking what you did to investigate or
18 get this information contained in your background.  So
19 one, you looked at the Skiplagged Website?
20 A.    Correct.
21 Q.    Okay.  Do you recall when you viewed it?
22 A.    A few times.  First, I read the complaint and
23 then probably subsequent to this once or twice.
24 Q.    So you believe you've viewed the website once

1  or twice; is that what you said?
2  A.    At least, yeah.  A few times.
3         MR. NELSON:  Objection;
4  mischaracterizes.
5  BY MR. REED:
6  Q.    A few times.
7         And you said you read the complaint?
8  A.    Yes.
9  Q.    And you're referring to the complaint filed by
10 American Airlines in this lawsuit, correct?
11 A.    Correct.
12 Q.    You start off by saying, "Skiplagged, Inc. owns
13 and operates the website Skiplagged.com" in that first
14 sentence?
15 A.    Yeah.
16 Q.    Did you do anything to verify that Skiplagged,
17 Inc. owns and operates the website Skiplagged.com?
18 A.    No.
19 Q.    "One to say that Skiplagged is not an
20 authorized agent of American."
21        Did I read that correctly?
22 A.    Yes.
23 Q.    What did you do to verify whether Skiplagged
24 was an authorized agent of American?

Page 54

1  A.    Nothing.  I basically trusted my counsel to
2  give me the correct information.
3  Q.    Okay.  So you say "Skiplagged obtains data on
4  American flights by obtaining data from other agents
5  of American, an apparent violation of their contracts
6  with American and/or by developing computer programs
7  to obtain this information from American's website."
8         All right.  How do you know that
9  Skiplagged obtains data on American flights by
10 obtaining data from other agents of American?
11 A.    The same source, the source for everything in
12 the background section is from my counsel.
13 Q.    Is from Greenberg?
14 A.    Correct.
15 Q.    Okay.  And you did nothing to verify whether
16 that information was correct or not, did you?
17 A.    I saw no need to do it.
18 Q.    You assumed it was correct?
19 A.    Yes.
20 Q.    Okay.  You go on to state, "An apparent
21 violation of their contracts with American."
22        Have you reviewed any contracts between
23 American and its authorized agents?
24 A.    No.  I did not see any need for doing that.

Page 55

1  Q.    You were told by counsel that that was a
2  violation of those contracts and you believed it and
3  assumed it, right?
4  A.    Right.
5  Q.    But you have no independent knowledge of
6  whether other agents of American sharing data on
7  American flights is a violation of their contract, do
8  you?
9  A.    I don't.
10 Q.    You go on to say that "Skiplagged developed
11 computer programs to obtain this information from
12 American's website."
13        That's something that you were told by
14 counsel?
15 A.    Everything in this section by background I was
16 told by counsel.
17 Q.    Okay.  And you did nothing to verify whether
18 Skiplagged has a computer program to obtain
19 information from American's website, did you?
20 A.    Correct.  Because I say no need to verify
21 anything that counsel told me.
22 Q.    You assumed it was correct?
23 A.    Correct.
24 Q.    You go on to say "Skiplagged.com allows users

Page 56

1  to search for, identify and purchase and book American
2  flights directly on Skiplagged.com."
3         Do you see that sentence?
4  A.    Yes.
5  Q.    That's again, something you were told by
6  counsel and you assumed it to be correct?
7  A.    Yeah.  But that's also -- yes, but that's also
8  something you can observe from going over their
9  website.
10 Q.    Okay.  You can observe that by purchasing a
11 ticket on Skiplagged.com?
12 A.    Well, you can go through the website and you
13 can definitely see that everything described here is
14 correct.
15 Q.    As part of your work on this case and
16 formulating your opinions, did you actually ever
17 purchase a ticket on Skiplagged.com?
18 A.    No, I did not.
19 Q.    Did anyone on your behalf do so?
20 A.    No.
21 Q.    Anyone with Wind Associates purchase a ticket
22 on Skiplagged.com?
23 A.    No.
24 Q.    Did anyone at Radius purchase a ticket on

Page 57

15 (Pages 54 - 57)

1  Skiplagged.com?
2  A.    Not to my knowledge.
3  Q.    Did anyone as part of their work for you at
4  Soluble -- or not Soluble -- Voluble purchase a ticket
5  on Skiplagged.com?
6  A.    Not to my knowledge.
7  Q.    So everything in that paragraph there is
8  something that you were told and you assumed, correct?
9        MR. NELSON:  Objection;
10       mischaracterizes.
11       THE WITNESS:  Well, with the exception
12  of the items that I could observe also by going
13  to their website.
14  BY MR. REED:
15  Q.    Okay.  But you didn't go through the whole
16  process and actually purchase a ticket, did you?
17  A.    Correct.
18  Q.    Going to page 4, starting with that first full
19  paragraph, having reviewed the complaint?
20  A.    Yeah.
21  Q.    Are you with me?
22       You state, "Having reviewed the
23  complaint and various screenshots of American's and
24  Skiplagged's websites."  And then it goes on from
                                              Page 58

1  Q.    With Greenberg?
2  A.    Correct.
3  Q.    So having reviewed the complaint, the
4  screenshots provided by Greenberg, you then went on
5  and designed the consumer survey experiments, correct?
6        MR. NELSON:  Objection to form.
7        THE WITNESS:  Correct.
8  BY MR. REED:
9  Q.    Okay.  Did you write the report?
10  A.    Yes.
11  Q.    Did you have any assistance?
12  A.    Radius filled the exhibits, I designed the
13  exhibits and Radius actually filled the exhibits with
14  the data.
15  Q.    Okay.
16  A.    And Radius prepared the appendices that were
17  submitted.
18  Q.    All right.  Did anyone edit your report?
19  A.    No.
20  Q.    Other than yourself, I mean, anyone outside of
21  you edit the report?
22  A.    No.  I sent the report, obviously, to counsel
23  and they may have suggested a few things, I don't
24  recall.  And that was my -- I wrote it.  I edit it and
                                              Page 60

1  there.  I want to ask you specifically about that.
2        The various screenshots of American's
3  and Skiplagged's websites, what are you referring to
4  there?
5  A.    (Reviewing document.)
6        In addition to the complaint and the
7  website, I also looked at some screenshots of American
8  and Skiplagged website, especially the screenshots
9  referring to the stimuli that I used in the study.
10  Q.    Okay.  These screenshots, are those included in
11  your Appendix B?
12  A.    They are included as part of my report, as the
13  one we selected, they're included -- they are the
14  stimuli in the study, and they're the ones that's
15  referred to in the report of the item you highlighted
16  before with the Excel spreadsheet, was then there were
17  some screenshots.
18  Q.    Okay.  The various screenshots of American's
19  and Skiplagged's websites, are those screenshots that
20  you actually went and made or were they provided to
21  you?
22  A.    They were provided to me.
23  Q.    Who provided those to you?
24  A.    Zach.
                                              Page 59

1  I finalize it.
2  Q.    Okay.  All right.  So do you recall how many
3  drafts you prepared?
4  A.    Basically it is an ongoing process.  As the
5  data comes in I add stuff, so it's sort of -- it's a
6  dynamic process of creating a report as data comes in.
7  Q.    As part of your analysis, did you reach any
8  conclusions that did not make your report?
9  A.    No.
10  Q.    Were you asked for any opinions or topics that
11  are not addressed in the report?
12  A.    No.
13  Q.    All right.  Other than the background
14  information and the assumptions that we've talked
15  about based upon the background, were there any other
16  assumptions that you made as part of your analysis?
17  A.    No.
18  Q.    You said no?
19  A.    No.
20  Q.    You weren't asked to assume anything other than
21  that the background information you were provided was
22  true?
23       MR. NELSON:  Objection;
24       mischaracterizes.
                                              Page 61

16 (Pages 58 - 61)

1    THE WITNESS: Yeah. That's it.
2  BY MR. REED:
3    Q.   Part of your analysis did you have to define
4  who the consumers were?
5    A.   Yes.
6    Q.   And how did you define consumers?
7    A.   It's clearly defined in my report under the
8  universe section of the methodology, which would be on
9  page 9. And it primarily used consumers who booked a
10  commercial flight in the past 12 months or intend to
11  do so in the next 12 months and/or booked or intend to
12  book their ticket through an online ticket website.
13    Q.   How did you reach this definition of consumer?
14    A.   Seemed to me that this is the market for
15  Skiplagged.
16    Q.   How did you make that determination?
17    A.   Based on looking at the website and their offer
18  of primarily focusing on cheap flights. And it seems
19  they appeal to all consumers who are using internet to
20  book their ticket.
21    Q.   And based upon your review and analysis,
22  Skiplagged is limited to U.S. consumers?
23    A.   No. They could go beyond the U.S., obviously,
24  like any other internet. But the case is a U.S. case,

Page 62

1    A.   If you look at all the consumer studies that
2  have been done, they typically tend to limit in some
3  way, depending on the product, between six months to a
4  year. For a passport it was in between three months
5  and a year for future purchases, depending on the
6  product.
7    Very rarely in the purchase of a house
8  or a car you may come up with longer time periods.
9    Q.   And I guess I asked a bad question.
10    Is there a treatise, a publication, a
11  scholarly article that states you typically limit to a
12  12 month past and 12 month future?
13    A.   I'm not sure. There might be. That the way
14  I -- that's the way I practice. That's the way I
15  taught. And I teach marketing research or early as
16  much as that's the typical way in which I have done
17  it. And most of the studies I've seen follow a very
18  similar type pattern.
19    Q.   But you can't point me to a scholarly
20  publication that states that's the typical way to do
21  it, can you?
22    MR. NELSON: Objection;
23    mischaracterizes.
24    THE WITNESS: I'd have to search for

Page 64

1  and, therefore, the focus is on U.S. consumers.
2    Q.   So because the case is filed in the United
3  States, you focused on U.S. consumers?
4    A.   Correct.
5    Q.   All right. So you didn't consider
6  international consumers, correct?
7    A.   No. Because the case is U.S. based.
8    Q.   And your -- the study respondents did not
9  include any individuals outside of the U.S.; is that
10  correct?
11    A.   Correct.
12    Q.   You limited it to the past 12 months or
13  intended to do so in the next 12 months book a flight,
14  right?
15    A.   Correct.
16    Q.   Why did you limit it to that timeframe?
17    A.   It's a typical timeframe we use in studies. To
18  make sure that we're dealing with relevant consumers.
19  Consumers who, you know, have some flying experience
20  or intend to fly.
21    Q.   You said that's a typical timeframe?
22    A.   Yes.
23    Q.   And is there an authority that you site as that
24  being a typical timeframe?

Page 63

1    it.
2  BY MR. REED:
3    Q.   You didn't do that as part of your analysis,
4  did you?
5    A.   No. I didn't see a need to do it.
6    Q.   Now, going back to page 4 here, where we're
7  talking about your design of the survey experiments.
8    When you set about to design these
9  experiments, were the two -- you have two bullet
10  points here, not two bullet points, but two points you
11  make following that to evaluate. Were those the goals
12  of your experiment?
13    MR. NELSON: I'm sorry. Where are you?
14    MR. REED: Page 4.
15    MR. NELSON: I don't see bullet points
16    on page 4.
17    MR. REED: That's what I meant, those
18    two points.
19    MR. NELSON: Okay.
20    I'm still lost. Which points are you
21    referring to?
22    MR. REED: The first full paragraph,
23    "Having reviewed."
24    MR. NELSON: Okay.

Page 65

17 (Pages 62 - 65)

App'x 221

1      THE WITNESS: I think I lost the
2  question. What is the question?
3  BY MR. REED:
4  Q.    Okay. Sometimes that happens when we have the
5  back and forth.
6         You state a designed multiple consumer
7  survey experiment to evaluate. And then it starts
8  one, and you go for a while, and then a two.
9  A.    Right.
10  Q.    Were those the goals of your survey
11  experiments?
12  A.    Yeah. To find out to what extent there is
13  confusion and there is deception.
14  Q.    Okay.
15  A.    And how serious it is.
16  Q.    And those were the -- that was the direction in
17  which you were hired by Greenberg to do, right?
18  A.    No. It's stated what explicitly also in the
19  section objectives.
20  Q.    Going on in the next section, right?
21  A.    Correct.
22  Q.    Okay. Where you said you were retained by
23  Greenberg Traurig and Kelly Hart and Hallman to assess
24  to what extent, that section, right?

Page 66

1  A.    Correct.
2  Q.    Okay. And that is reflected in what you were
3  trying to evaluate in the previous paragraph, right?
4  A.    Correct.
5  Q.    Prior to or in the process of designing your
6  experiments, did you consult any treatises, scholarly
7  article, any other authorities to aid in your design?
8  A.    No. The same answer as I gave you with respect
9  to the time period for respondents. I've done
10  thousands of studies. I've taught marketing research.
11  I don't have to go and look for, you know, help from
12  books on the topic. I wrote the books on the topic.
13  Q.    Okay. What are the requirements for designing
14  a consumer experiment?
15  A.    As I said, I conducted thousands of studies,
16  evaluated tens of thousands of studies. I know how to
17  design studies. That's a straightforward study to
18  assess confusion and to determine if there is any
19  deception or not.
20  Q.    I understand you've done it for quite some
21  time. My question is a little different.
22         As part of your experience, is there
23  any requirements when you're designing a consumer
24  experiment?

Page 67

1  A.    The requirements are reflected in my design.
2  Q.    What are those?
3  A.    My design address all the requirement. You
4  know, to have the relevant universe, to select the
5  right sample, to design, to select the right stimuli,
6  to have the right experiment of design, which was in
7  this case would include the control to design the
8  appropriate questionnaire on bias questions, to
9  analyze it correctly. So all the phases that everyone
10  goes through in designing a study.
11  Q.    Are these requirements to your knowledge,
12  reflected in any authority, scholarly article,
13  treatise?
14  A.    They're reflected in most books and articles on
15  marketing research. It's pretty fundamental.
16  Reflected, from a legal point of view, legal word of
17  Shari Diamond, if you look at her book. So, yeah, if
18  you look at McCarthy, you will -- so, yeah, these are
19  well accepted principles that guide all research in
20  this area.
21  Q.    So Shari Diamond?
22  A.    Yes.
23  Q.    What's the name of that book?
24  A.    I don't recall the name of the book.

Page 68

1  Q.    You said McCarthy?
2  A.    No. They're two separate books. There is a
3  McCarthy book that refers to some research studies.
4  And Shari Diamond focuses specifically on consumer
5  surveys in her book originally, in the article and in
6  the book. There is a more recent book.
7  Q.    The McCarthy book, what's it called?
8  A.    I don't recall the name.
9  Q.    You didn't consult either one when doing this
10  work, it's just these are ones that you're referring
11  to.
12  A.    Because I'm familiar with them and I've used
13  them in the past. There is no need to waste the
14  client time going through all the books and stuff that
15  I'm familiar with.
16  Q.    All right. You ran through them kind of
17  quickly, so I want to make sure that I have them
18  correct here. You said you want to select the
19  relevant universe?
20  A.    Correct.
21  Q.    What does that mean?
22  A.    What we discussed before, who are going to be
23  the respondents.
24  Q.    Okay. And then select the right stimuli?

Page 69

18 (Pages 66 - 69)

1  A.    Well, before this was the sample.

2  Q.    The size of the sample?

3  A.    The type of the sample that you select, how do

4  you select the sample and what will be the size of the

5  sample.

6  Q.    And when you say the type of sample, what are

7  you referring to?

8  A.    Well, how do you -- given that you select the

9  universe, how are you going to identify the people

10  that are going to be your respondents in the study.

11  Q.    And is there a set of guiding principles for

12  selecting the type of sample?

13  A.    No.  What we have done in this study reflects

14  this.  It's primarily we used an internet panel, which

15  is commonly used today and randomly selected

16  participants from this.  And there is a whole

17  discussion in my report on sample selections starting

18  on page 9.

19  Q.    Okay.  So the type of sample and then the size

20  of sample?

21  A.    Right.

22  Q.    Okay.  What are the guiding principles on the

23  size of sample?

24  A.    Well, there are many rules there.  In my

Page 70

1  But there is always a threat of between size and cost.

2  And I feel that you get reliable data and valid data,

3  especially in experiment when you're looking for a

4  similarity or differences between test and control

5  with the size of sample, such as the one we used in

6  this case.

7  Q.    Are you aware of any scholarly articles that

8  assess this trade off between size and cost?

9  A.    I think many of them address it.

10  Q.    Is there any that you refer to in making your

11  determination of having a group larger than 100?

12  A.    No.  I basically relied on my experience.

13  Q.    So the larger the number in the group, the more

14  the cost, right?

15  A.    Right.

16  Q.    Okay.  That gives you more data though, right?

17  A.    Right.

18  Q.    Now, when you said the type of sample, you

19  referred me to page 9 of your report, right?

20  A.    Well, the sample discussion starts on page 9.

21  Q.    Okay.  And goes on, then, to page 10, right?

22  A.    Correct.

23  Q.    Okay.  You state here, "The sample is drawn

24  from the panel of Prodigy," right?

Page 72

1  general practice and generally accepted, is in studies

2  involving experiments where you have a test and

3  control to have the sample larger than 100 respondents

4  per group.

5  Q.    Larger than 100?

6  A.    Per group.

7  Q.    Per group.

8  A.    So in this specific case, it would be testing

9  control.  And since we have two studies really, one of

10  Skiplagged's regular ticket and one of Skiplagged's

11  Hidden City ticket, so we had four sales, each one of

12  them had the test and control.  Two studies, test

13  control each one of them.

14  Q.    Okay.

15  A.    So on the four sales and the total sample of

16  600 was about 150 per group.

17  Q.    So that exceeded your 100, more than 100 per

18  group?

19  A.    Correct.

20  Q.    Okay.  This 100 per group size, is that just

21  your own guideline or is that an industry guideline?

22  A.    I've used this as a guideline for many years.

23  There are others who follow the same thing, you know,

24  kind of you can go as high as 400 people per group.

Page 71

1  A.    Yes.

2  Q.    What's Prodigy?

3  A.    It's a panel provider in Appendix 1 of my

4  report -- Appendix C1, in my report, include a

5  description of the panel.

6  Q.    Okay.  But I was more asking what Prodigy was?

7  A.    The name of the company that provides consumer

8  panels.

9  Q.    Okay.  So that's another company that you used

10  in this matter?

11  A.    Well, Radius used them.  Yeah.

12  Q.    Radius used them?

13  A.    Right.  Radius basically was the researcher for

14  my use.  And they use their -- Prodigy is one of many

15  companies that recruit, maintain, develop and ran,

16  basically, consumer panels for studies.

17  Q.    Okay.  You said an initial sample matching the

18  census gender, age, race and geography assured the

19  representativeness of the sample.

20       What do you mean there?

21  A.    Well, the procedure is, you want to make sure

22  that the sample you select represents really the U.S.

23  population.  So what you're trying to do, is initially

24  when it's commonly done, you select people that match

Page 73

19 (Pages 70 - 73)

App'x 223

1 the census data on gender, age, race and geography.
2 And then once you have it, and from this pool, you
3 start screening them to make sure that they meet the
4 requirement of the study, the requirement of the
5 universe. So have they flown on a plane to fly, are
6 they buying tickets on -- using the internet. And do
7 they pass the security, which is typically security
8 questions of any questionnaire.
9 Q.   Okay.
10 A.   And they are listed on the top of page 10.
11 Q.   Okay. When we get to those.
12      I'm more talking about when you're
13 matching the census, gender, age, race and geography,
14 you're saying matching the general census, gender,
15 age, race and geography of the U.S.?
16 A.   Correct.
17 Q.   Okay. Because that goes back to your
18 assumption that this is limited to the U.S. consumers
19 and not international, right?
20 A.   Correct.
21 Q.   And then what did you do to confirm that the
22 panel from Prodigy matched the U.S. census?
23 A.   It's not the panel. It's the people that we
24 approach from the panel. We screen them.

Page 74

1 for companies that might have unique expertise or
2 interests that can bias their responses. You want to
3 make sure that they wore glasses when they used the
4 computer to respond to questions, they have them on.
5 And did they address the critical question of, are
6 they of the universe, did they fly or plan to fly in
7 the next 12 months, and do they use the internet to
8 book the ticket. If yes, then that's the final sample
9 that we have.
10 Q.   When you say final sample, is that referring to
11 the total sample of 600?
12 A.   Correct.
13 Q.   Okay. What did the initial sample number start
14 with?
15 A.   I have no idea.
16 Q.   Okay.
17 A.   You can -- there is Appendix C -- C5, they give
18 you screening results.
19 Q.   Okay.
20 A.   That's an internal process, it's not a final
21 process. The initial sample you're just preparing the
22 sample to -- it allows us to select the final
23 respondent.
24 Q.   And that's not something you were involved in,

Page 76

1      If you would look at my questionnaire,
2 the questionnaire starts on page 12, you see a whole
3 set of screening questions that include questions
4 concerning these four things, the gender, age, race
5 and geography.
6 Q.   Okay.
7 A.   So you ask people about it. And you basically
8 assure that you match the population. And then you
9 ask them the secondary set of questions to make sure
10 that they fit the sample -- the study requirement.
11 Q.   So on a gender basis, what were you trying to
12 match?
13 A.   Not gender by itself, it's gender, age, race
14 and geography. We try to match the U.S.
15 characteristics as initial sample, not the final
16 sample.
17 Q.   Okay.
18 A.   As initial sample.
19      Once we created this pool of
20 respondents, then you ask them the other questions.
21 For example, first of all, to check that they are
22 humans, that human people respond, as opposed to
23 machines. So you give them the CAPTCHA test. Then
24 you make sure that they or their families do not work

Page 75

1 Radius did that, right?
2 A.   Right. Radius does it.
3 Q.   Okay.
4 A.   You know, based on my general direction. But
5 the results are in Appendix C3 -- C5. I'm sorry.
6 Q.   But you weren't, other than giving direction,
7 you weren't involved in the actual selection of the
8 initial sample, right?
9 A.   Correct.
10 Q.   That was Radius?
11 A.   Correct.
12 Q.   Okay. And you weren't involved in the
13 selection of total sample, that was Radius based upon
14 direction from you, of course?
15 A.   That's the way all research is being done.
16 That's role of a research firm.
17 Q.   But you weren't involved actually, right?
18 A.   Right.
19 Q.   Okay.
20 A.   I give the general direction and supervise the
21 whole process. But typically that's why you hire a
22 research firm to do it.
23 Q.   And so from the initial sample, then we
24 eliminate nonhumans, right?

Page 77

20 (Pages 74 - 77)

1    A.    Right.

2    Q.    Okay.  And then we eliminated anyone who they
3    or their members of their families worked for an
4    advertising agency, right?

5    A.    Right.

6    Q.    And you eliminated individuals that they or
7    their families worked for a marketing research firm,
8    right?

9    A.    Correct.

10   Q.    And you eliminated members of their families
11   that work for an airline or travel agency, correct?

12   A.    Right.

13   Q.    Is that correct?

14   A.    Yeah.

15   Q.    Okay.  Now, that's all based upon the
16   respondents answering the questionings truthfully,
17   right?

18   A.    Correct.

19   Q.    Okay.  And there is no verification that you or
20   Radius or anyone else does to verify that that
21   information is correct, is there?

22        MR. NELSON:  Objection;
23        mischaracterizes.

24        THE WITNESS:  There is -- you're going

Page 78

1    to section, page 27.

2    BY MR. REED:

3    Q.    Okay.

4    A.    Under data collection and quality control, you
5    will see the quality control procedures that were used
6    by Radius to ensure that we get, you know, ideally
7    valued respondents.

8    Q.    So those were security encrypted servers,
9    right?

10   A.    Right.

11   Q.    Data checks for duplicate IP addresses,
12   correct?

13   A.    Correct.

14   Q.    The CAPTCHA, that's whether it's human or
15   machine, right?

16   A.    Correct.

17   Q.    Speeders removed from data.  What's that?

18   A.    If someone completes the whole questionnaire in
19   one minute, they should be out.  Because, obviously,
20   they did not take the time to read the stimuli.

21   Q.    I got you.  I got you.  They just flew through
22   it to get it done?

23   A.    Right.

24   Q.    Okay.  And open-ended responses reviewed to

Page 79

1    ensure respondents paying attention, providing
2    meaningful answers, correct?

3    A.    Yeah.  It's basically because we relied on a
4    lot of open-ended responses, which is the best way to
5    conduct studies.  They may have just wanted to speed
6    through because they are being rewarded for completing
7    the study, so they give you kind of bullshit
8    responses.  So if we find -- so we have someone go
9    through and we check to make sure there are no
10   bullshit responses.

11   Q.    Okay.  And that -- I read that as a quality
12   control?

13   A.    Correct.

14   Q.    As part of that quality control though going
15   back to my original question, there was no
16   verification that the respondents were answering
17   truthfully, whether, for instance, the members of
18   their family work for an airline, is there?

19   A.    If you find for me a way of verifying it, you
20   will get Nobel prize in marketing research.

21   Q.    But it wasn't done, right?

22   A.    It cannot be done.  How would you do it?

23   Q.    I'm sure there is some ways to do it.

24   A.    No.  There is not.  Show me the way.

Page 80

1    Q.    You're saying it can't be done?

2    A.    It cannot be done.

3    Q.    Okay.

4    A.    It cannot be done in the reality of collecting
5    data for a study.  You cannot do it.

6    Q.    Okay.  You assume that they're answering
7    truthfully, right?

8    A.    Yeah.

9    Q.    And on any of whether they or their members
10   work for any of those entities, right, or types of
11   entities?

12   A.    Right.  Right.  Unless you start doing, you
13   know, going with all types, tests for truthfulness and
14   others.  There is so far to date, in market research,
15   no one was able to find the solution for this.  So we
16   have to accept that the responses respondents are
17   giving to us.  Once you control for the things that we
18   can control, which I just -- we just reviewed as part
19   of the control -- what to control here, we have to
20   assume that they are giving us correct responses.

21   Q.    Could have looked and seen if any of the
22   respondents matched, for instance, American's employee
23   database, right?

24   A.    Their name.  They can use different names.

Page 81

21 (Pages 78 - 81)

1 Q.    Okay.  They can give false names, right?
2 A.    They can give false names.  There are so many
3 ways of cheating here.  You have to assume that these
4 people are honest and responding.  And these are
5 people who are members of the panel.  And the panel --
6 if you should actually read the Appendix C1, and
7 you'll see that panel companies are doing the best
8 they can to try to assure they are getting the right
9 respondents who are not going to cheat.
10        And we do find, you know, we do find.
11 We do find some people that we had to eliminate
12 because they failed CAPTCHA.  We had to eliminate
13 people who gave us bullshit response.  So far there
14 has not been a better way in marketing research, in
15 survey research in general, to address the issue you
16 are raising.
17 Q.    The data is only as good as the input, right?
18 Or their opinion is only as good as the data input,
19 right?
20 A.    You know, you're trying to control for this as
21 much as you can with the quality control procedures
22 that I listed on page, I think it was 23.
23 Q.    Were you the only one involved in the design of
24 these experiments?

Page 82

1 A.    I'm sorry.  Mistake.  It was page 27, 28.  That
2 page.
3 Q.    Okay.  Sorry.  I didn't realize you were sill
4 answering.  I apologize for interrupting.
5        Was anyone else involved in the design
6 of the experiments, other than yourself?
7 A.    No.
8 Q.    Going to the research design here, that the
9 bottom of page 8 and then goes on to page 9.  You have
10 five major parts here listed, right?
11 A.    Correct.
12 Q.    And those five parts or five steps there, how
13 did you decide on including those?
14 A.    Well, given the problem that I tried to address
15 here, whether Skiplagged is leading consumers to
16 perceive association between them and American
17 Airlines, and whether they deceive the consumers
18 concerning the terms and conditions of the Hidden City
19 ticket, I felt that these are the right things to do
20 to answer these question.
21 Q.    Did anyone else have any input into these five
22 parts?
23 A.    No.
24 Q.    And you chose to use open-ended questions,

Page 83

1 right?
2 A.    Predominantly, yes.  Because they are the best
3 way to get unbiased answers to questions.
4 Q.    What's your authority for that proposition?
5 A.    First of all, my own experience in research.
6 That's the way I've been teaching for years.  And two,
7 if you look at all the consumer research, marketing
8 research, social science research, open-ended
9 responses are among the best one.  Unfortunately, most
10 companies don't use it because it's cheaper and easier
11 to give a bunch of closed-end questions and let people
12 respond to them, as opposed to asking respondents to
13 reflect and to answer.
14        So my preference always has been, to
15 the extent possible, ask open-ended questions and then
16 augment them with a few closed-end questions.  And I
17 totally disagree with your expert who claimed that the
18 standard is closed-end questions.  That's bullshit.
19 Q.    And who said that?
20 A.    One of your experts.
21 Q.    Okay.
22 A.    The professor from the University of Minnesota.
23 Q.    From Minnesota.
24        And you say -- what was the scholarly

Page 84

1 authority that you referenced for it's best to use
2 open-ended questions?
3        MR. NELSON:  Asked and answered.
4        THE WITNESS:  I thought I answered
5    this.  Any study.  I didn't give you a single
6    source.
7 BY MR. REED:
8 Q.    Can you give me a single source?
9 A.    No.  Any consumer research, any good, solid
10 consumer research, human research, social science
11 research, will give you the benefit of open-ended
12 questions.  It's well known.
13 Q.    Can you name me a scholarly article, book,
14 publication that states that it's better to use
15 open-ended than close-ended?
16 A.    I can give you a lot of articles.  If you just
17 do a Google search or use Trend, EPT or any of the
18 other sources about open-ended versus closed-end,
19 you'll get all the information you want.  I wouldn't
20 my time and the client's money to try to give sources
21 for something as obvious as this.
22 Q.    Can you tell me one as we sit here today?
23 A.    Pick up any basic marketing research.
24 Q.    I'm asking you for the -- who is the leading

Page 85

22 (Pages 82 - 85)

1  scholar on this?
2  A.   Look at Green and Tull.
3  Q.   Green?
4  A.   And Tull.
5  Q.   T-U-L-L?
6  A.   T-U-L-L.  One of the classic books on marketing
7  research.  And look at -- you know, do some Google
8  search or have one of your experts, you know, do some
9  Google search on qualitative research and the value of
10  qualitative research.
11        Why do you think there is a whole
12  process for analyzing open-ended data, because this is
13  a common and very powerful way of getting insight into
14  respondents' beliefs and answers to different
15  questions.
16  Q.   Green and Tull, those are the authors?
17  A.   Yeah.  They are the authors of many many books
18  of marketing research.
19  Q.   Okay.  And is there a specific book that you're
20  referencing here that would be the authority on using
21  open-ended versus close-ended question?
22  A.   I don't think any of the books really focus
23  specifically on one versus the other.  You know,
24  because in a sense I'm using here closed-end questions
Page 86

1  as well, it's complimentary.  It's much more -- the
2  question is what is the research designed to develop
3  in the balance between open-end and close-end
4  questions.  What do you want to get information on
5  different things in different ways.  And research
6  design, to a large extent, it's not only size it's
7  also art.  And the difference between good researchers
8  and poor researchers is at the creativity of their
9  design.
10  Q.   Who is the leading authority on research
11  design?
12  A.   There are many many books on the topic.  There
13  is no single leading authority on the area.
14  Q.   Who would you consider it to be?
15  A.   I don't consider anyone as a leading authority.
16  I'm familiar with the field, I'm familiar with the
17  material and I basically publish enough in this area,
18  and taught enough in this area, and worked enough in
19  this area to rely on my judgment.
20  Q.   And that's --
21  A.   And I feel this is the best research design for
22  the topic.
23  Q.   Okay.  Based on your experience?
24  A.   Yeah.  And if you really doubt that this is not
Page 87

1  the right design, you hired four experts in this case,
2  why not hire one that will do a research.  Why can't
3  you do a research?  Come up with a different research
4  design.  I believe this research design is objective,
5  balanced and can be presented.  Had Skiplagged hired
6  me, I would design exactly the same research design.
7  Q.   But you didn't reference Green and Tull or any
8  other authority when you made your decision to use
9  open-ended questions, did you?
10        MR. NELSON:  Objection; argumentative.
11        THE WITNESS:  I don't have to.  I know
12     the field.  They hired me because I am an
13     expert in the field.  Because I am the one that
14     wrote the book on many of these topics.  I
15     don't have to refer to any others.
16  BY MR. REED:
17  Q.   You wrote a book using open-ended versus
18  close-ended?
19  A.   Many of my publications, I refer to the use of
20  open-ended research.
21  Q.   Which ones?
22  A.   Many.
23  Q.   Can you name me some, please.
24  A.   Let me look at my resume.
Page 88

1        (Reviewing document.)
2        Okay.  If you open my resume, page 28.
3  I'll give you now the number of articles where we used
4  extensively open-ended questions as part of that
5  analysis.  So number 5, number 8, 11.  And all of
6  dangers, heavy use of open-ended questions.  12.
7  Probably in 17.
8        (Reviewing document.)
9        Let's look at another section of m,y,
10  applications.  There is one that starts -- just
11  reviewed was in the section on marketing research that
12  calls in the area of the consumer behavior, which
13  would be starting on page 23.
14        (Reviewing document.)
15        Probably number 4.
16        (Reviewing document.)
17        Probably 11.
18        (Reviewing document.)
19        16, this is actually a very explicit
20  paper on analyzing free response data in marketing
21  research that deals directly with the whole issue of
22  open-ended questions.  And many more.
23        So I've used -- in short, I've used
24  open-ended response for years.  I've taught it for
Page 89

23 (Pages 86 - 89)

1  years.  I reviewed thousands of other research
2  projects over the years.  And in all of them my big
3  preference always has been for open-ended response as
4  a dominant way of getting consumer insight.
5            Not necessarily instead of, but in
6  addition to closed-end questions.  So I see absolutely
7  no need to start looking for references from other
8  books to justify my research design.
9  Q.    Okay.  And so you didn't?
10 A.    Correct.
11 Q.    Open-ended questions allow for more variance
12 between the answers, right, than a close-ended
13 question?
14 A.    Well, it gives it the truth.  It's not biased
15 by the options you are giving people.  Closed-end
16 questions are not very good.  The reason they are
17 there is because of the ease of administering them and
18 the ease of responding to them and it makes it cheaper
19 and faster.  It does not mean they're better.  If you
20 are really interested in insight into it and
21 understanding the true responses of the respondent,
22 you'll use some open-ended question.  But you cannot
23 amend the closed-end questions as I've done here.
24 Q.    And I understand your point.  My question was
Page 90

1  Q.    And they're going to vary all over -- they can
2  vary all over because people can put -- write down
3  whatever they want, right?
4  A.    Correct.
5  Q.    They could write down superman to every answer,
6  right?
7  A.    If they do, we throw them out.  We can do so
8  that they did not pay attention to the question and
9  that's a nonsense answer, so they will be out.  But
10 the other people who respond honestly to surveys, as I
11 believe people do, the variability in their responses
12 is meaningful, is useful information.  That's what we
13 want to find out.
14 Q.    And it's an assumption that you make that
15 people are responding honestly, right?
16 A.    It's an assumption underlying all of marketing
17 research.
18 Q.    Okay.
19 A.    All political polls.
20 Q.    Okay.
21 A.    All public opinion polls, it's the fundamental
22 assumption of all, the whole industry of billions of
23 dollars, the industry of marketing research.
24 Q.    And because of the open-ended question, then
Page 92

1  different though.  My question was open-ended
2  questions allow for more variance on the answers than
3  closed-ended, right?
4            MR. NELSON:  Objection to form.
5            THE WITNESS:  The question is, how do
6      you define variance?  You're getting larger set
7      of responses to any answer.  Variance is
8      typically interpreted as differences among
9      people.
10 BY MR. REED:
11 Q.    Okay.
12 A.    You get a lot of variance also in closed-end
13 questions.  That's the whole basis for many, not
14 neccessarily investigation, but when you're doing
15 studies for either academic studies or studies for the
16 conduct of business, you're typically trying to
17 identify different segments of respondents.  Then you
18 focus on trying to identify, how among a heterogenous
19 group of respondents, you identify more homogenous
20 segment, that's what the variance refers to.
21 Q.    Okay.
22 A.    We're talking here in open-ended responses,
23 you're getting responses that you will never get from
24 closed-end questions.
Page 91

1  you had to use the coders in order to code those
2  responses, correct?
3  A.    Correct.  But that's the correct scientific
4  approach to analyze open-ended responses.
5  Q.    And they had to make decisions based upon those
6  open-ended questions as to how to code those into
7  discrete categories that you had selected, right?
8  A.    Correct.  And that's the reason I am using two
9  independent coders and a procedure to test for the
10 consistency in their response and resolve conflict
11 between the two of them, if there are any.
12 Q.    Now, couldn't you have used a combination of
13 both close-ended and open-ended questions in order to
14 test how the coders were organizing those open-ended
15 questions into the discrete categories?
16            MR. NELSON:  Objection to form.
17            THE WITNESS:  I'm not seeing code end
18      questions used for this purpose to test the
19      coders.  But I did include closed-end
20      questions.  If you go back to the
21      questionnaire.
22          (Reviewing document.)
23          Starting on the bottom of page 20,
24      there is a series of closed-end questions that
Page 93

1    I used in the study.
2        So question 7A, asks what do you
3    believe is the relationship between Skiplagged
4    and the airline?  And the response options
5    were, Skiplagged or Expedia, for those
6    responded in the control group or saw the
7    control group, which is Expedia, is an
8    authorized agent of the airline, is not an
9    authorized agent of the airline, there is some
10   other relationship between Skiplagged and the
11   airline or don't know.
12       And then there is a question, what
13   makes you say so.  So we follow up with
14   open-ended questions on this.
15       Question 8A asks, 9A, 10A, 11A, 12A,
16   12C, are all close-end questions.  But I
17   basically designed the study in a way that
18   provides the right balance between open-ended
19   questions and closed-end questions.
20 BY MR. REED:
21 Q.    You chose not to include a closed-end question
22 of, for instance, does Skiplagged confuse you, were
23 you confused by Skiplagged?
24 A.    How would people answer it?  How would people

Page 94

1 know if they're confused or not?
2 Q.    But you didn't include that, did you?
3 A.    No.  Because how would you ask it?  There is no
4 way of asking this question in a meaningful way.
5 Q.    And you didn't include the close-end question
6 of did you feel deceived by Skiplagged, did you?
7        MR. NELSON:  Objection; argumentative.
8        THE WITNESS:  Again, a dumb question.
9    I would not ask these dumb questions.  These
10   two questions are dumb questions.
11 BY MR. REED:
12 Q.    I understand you think my question is dumb.
13 But you didn't include it, did you?
14 A.    Because I thought they were dumb and I did not
15 include them.
16 Q.    You did not include them, did you?
17 A.    Correct.  Because I --
18 Q.    Okay.  That's all I'm asking you.  I understand
19 you think my questions are dumb.  And, hey, I'm not a
20 marketing person.
21       MR. NELSON:  Can you ask a question
22   please and not argue with the witness.
23 BY MR. REED:
24 Q.    So you can call my questions dumb.  But I'll

Page 95

1 ask a similar question.  They may be dumb.  They may
2 be brilliant.  Probably in the dumb area, I bet.
3        All right.  Earlier you said just a
4 minute ago that you chose Expedia as the control
5 group?
6 A.    Correct.
7 Q.    Okay.  Now, you chose Expedia because why?
8 A.    Because Expedia is a legitimate authorized
9 agent of American Airlines.
10 Q.    And how did you know that?
11 A.    From counsel.
12 Q.    Okay.  So you were told Expedia was an
13 authorized agent?
14 A.    Correct.
15 Q.    Were you given a selection of authorized agents
16 to choose from?
17 A.    I asked about Expedia.  I was looking for a
18 control group that would be a legitimate authorized
19 agent that most people use.  I was familiar with
20 Expedia and I asked for verification of authorized
21 agent, and when I was told that yes, I decided to use
22 them as a control.
23 Q.    Did you consider any others for the control
24 group?

Page 96

1 A.    I don't recall.  I'm sure I did at the time.  I
2 don't recall what they were.  I was thinking about
3 trying to look for the best example for this.  And I
4 thought Expedia would be the one.  And then I checked
5 and I found out that they are, and I used them in the
6 control.
7 Q.    What criteria did you use to find them as the
8 best example?
9 A.    Well-know, market share.
10 Q.    And why did they need to be well-known?
11 A.    Because we wanted something that people are
12 familiar with.  They are not going to select some
13 unknown control.  I wanted a clear marker which would
14 allow me to compare the Skiplagged responses to and I
15 wanted unambiguously recognized travel agent.
16 Q.    Okay.  And what kind of market share was your
17 criteria?
18 A.    I don't recall.
19 Q.    You didn't have a certain percentage or?
20 A.    I don't recall.
21 Q.    Now, on page 9, kind of before that section on
22 universe and sample.  You have that paragraph that
23 starts, "Expedia was chosen."
24 A.    Yeah.

Page 97

25 (Pages 94 - 97)

1 Q.     Are you with me?
2 A.     Yes.
3 Q.     All right.  You said the next sentence, you
4 say, "The interpretation of the difference between the
5 test and control groups is that the closer the results
6 for Skiplagged are to those of Expedia, the greater
7 the perceived confusion and deception."
8         Did I read that correctly?
9 A.     Correct.
10 Q.    Okay.  So those people like me, without a
11 Ph.D., does that mean that more the consumer thinks
12 Skiplagged is like Expedia, the more confused they
13 are?
14 A.    Yes.
15 Q.    Because Expedia is an authorized agent and
16 Skiplagged is not?
17 A.    Yes.
18 Q.    Okay.
19 A.    On the question -- with respect to this
20 dimension.  It all depends on the specific question.
21 So a confusion would be, let's go and be complete.
22        (Reviewing document.)
23        So in the questions I read you before,
24 question 7A, would you believe the relationship

Page 98

1 is the truth.  But it's pretty close.  And it's close
2 to half of the people believe they are authorized
3 agent, which they are not.
4         So the comparison with Expedia allows
5 us to decide that they were wrong, they are confused.
6 Q.     Okay.
7 A.     That's a measure of confusion.
8 Q.     Okay.  Just so that I am understanding what's
9 going on here.  43 percent of those who took the
10 Skiplagged non Hidden City test or survey --
11 A.     Which means they saw the stimuli.
12 Q.     -- said that Skiplagged was an authorized agent
13 of the airline, right?
14 A.     Correct.
15 Q.     Okay.  And 56 percent of those who took the
16 Expedia, when asked is Expedia an authorized agent of
17 the airline answered yes; is that correct?
18 A.     Correct.  Yep.
19 Q.     Okay.  And then in the Hidden City ticket,
20 which is the next step, 42 percent said they took the
21 Skiplagged test and said that Skiplagged is an
22 authorized agent of the airline.  And those who, in
23 the Hidden City, that took the Expedia, said that
24 63.9 percent of those said Expedia was an authorized

Page 100

1 between Skiplagged and the airline?
2 Q.     What page are you on, sir?
3 A.     Page 20.
4 Q.     Okay.
5 A.     I am reading from my questionnaire, question
6 7A.
7 Q.     Okay.
8 A.     And if you go to the results, page 39.  So here
9 the data that we got.  So the way to read all of these
10 tables are, the first two tables, the first two
11 columns, the one that is test control, with respect
12 to the Skiplagged ticket, the non Hidden City tickets
13 and the control for it.
14        The next, the third and fourth column
15 are the Skiplagged Hidden City ticket and the control
16 for it.  So there are four separate groups here.
17 Q.     Okay.
18 A.     Respond to question 7A, Skiplagged is an
19 authorized agent.  We find out that 43 percent of
20 Skiplagged respondents said its authorized agent, and
21 56 percent of Expedia knew it.
22        So this is very close to each other.
23 It also shows you that Expedia, not 100 percent of the
24 people say they are authorized agent, even though this

Page 99

1 agent?
2 A.     Correct.
3 Q.     Okay.  So the Expedia people weren't asked
4 about Skiplagged, were they?
5 A.     Correct.
6 Q.     Okay.
7 A.     They were shown -- everything goes back to the
8 stimuli.  So the Skiplagged ticket people, the first
9 column, so the stimuli, which was the Skiplagged
10 website, basically the screenshot from the Skiplagged
11 screenshot, the people in the Expedia saw the
12 screenshots of the Expedia corresponding information,
13 and so in the other one.  And all of these stimuli are
14 included in Appendix C2, and also as part of C4, which
15 are the screenshot of the program questionnaire.
16 Q.     Okay.  And so you're saying that because
17 43 percent is similar to 56 percent, then there was
18 confusion?
19        MR. NELSON:  Objection;
20 mischaracterizes.
21        THE WITNESS:  Yeah.  Fundamentally, as
22 a laymen person, yes.  That basically you would
23 expect -- the truth is, we know the truth, they
24 are not recognized as the authorized agent.  So

Page 101

26 (Pages 98 - 101)

1      the correct answer would have been zero.
2    BY MR. REED:
3    Q.    Okay.
4    A.    Instead we find that 43 percent of the people
5    are confused.  So to me the fact, what I need to
6    decide is 43 confused or not.  So the benchmark to
7    compare it to, the control, which is 56 percent, and
8    saying it's pretty similar to this, and, therefore, I
9    can conclude, quite conclusively, plus the other
10   evidence I have.  Because we're not relying on this
11   one question.  That they basically, the Skiplagged
12   website, deceives consumers to believe that they are
13   associated with American.
14   Q.    Okay.  Now, the Expedia one, we're assuming
15   that Expedia is an authorized agent of the airline.
16   How do you account for 43, 44 percent of those people
17   being wrong?
18   A.    They don't know.  They don't know.  They're
19   wrong.  There is no way of accounting for those.  We
20   know the answer.  We know that 14.2 percent of them
21   knew they are not authorized agent, which is wrong in
22   their case.  We know that 15.5 percent say there is
23   some other relationship between them and 14 percent
24   said don't stop.  These are the responses.

Page 102

1    Q.    Okay.
2    A.    I'm giving you some example of open-ended
3    responses when we asked them why.
4    Q.    So there wasn't confusion in the Expedia
5    answers, though, even though 43 percent were wrong.
6          MR. NELSON:  Objection;
7    mischaracterizes.
8          THE WITNESS:  Well, they are not wrong.
9          They basically gave you other answers.  They
10         gave you some they believe there is other
11         relationship, like 15 percent.  They may not
12         know what authorized relationship are.  But
13         that's the reason we ask many questions.  We do
14         not rely, in my analysis, I did not rely only
15         on this.
16   BY MR. REED:
17   Q.    Your survey didn't define authorized agent, did
18   it?
19   A.    No.  And that's the only place in the survey
20   that we asked this question.
21   Q.    It required the respondents to know what an
22   authorized agent was?
23   A.    Whatever their perceptions are.
24   Q.    Okay.  And you didn't ask any open-ended

Page 103

1    questions as to what their perceptions were of that
2    term?
3          MR. NELSON:  Objection;
4    mischaracterizes.
5          THE WITNESS:  The questions are exactly
6          as question 7A on page 21.  When they finished
7          this and they answer it, we asked them what
8          made you say that?  And so there is the
9          open-ended.  If anyone mentioned it -- now, you
10         have and your experts had access to all the
11         verbatim.  Exhibit C7 includes the full
12         verbatim of every response that everyone
13         mentioned in our survey.  So they could have
14         easily gone through and examined this if they
15         wanted to.  I did not.  I did not think it was
16         relevant.
17   BY MR. REED:
18   Q.    Did you consider any other reasons that may
19   contribute to similarity in results between the
20   Skiplagged and Expedia groups --
21         MR. NELSON:  Objection.
22   BY MR. REED:
23   Q.    -- other than deliberate confusion?
24         MR. NELSON:  Objection to form.

Page 104

1          THE WITNESS:  I am just reporting the
2    result of the study.  So I'm just speculating
3    here.  I'm looking at the results of the study.
4    And the confusion of similarity.  Let's look at
5    the section of the results.
6          (Reviewing document.)
7          So this starts on page 37.  This is the
8    section that talks about consumer beliefs with
9    Skiplagged or Expedia association with American
10   Airlines.  Exhibit-4 gives you the responses.
11   And based on content analysis of all open-ended
12   questions, that's the first category here.
13   You'll notice that the columns are the same in
14   all of -- all the exhibits we present the
15   results.
16          So open-ended responses, 2.7 percent of
17   the Skiplagged ticket and 4.9 percent of the
18   Skiplagged Hidden City ticket perceived
19   association.  Then we had question one, which
20   was how would you describe this to a friend?
21   We found there the 1.4 percent.  And it was
22   less than 1 percent in the Skiplagged Hidden
23   City perceived association.
24          Then we had the two confusing

Page 105

27 (Pages 102 - 105)

1  questions, are they associated or connected
2  with the airline, this was question two and
3  three. And then question four was, are they
4  required to provide permission or authorization
5  to get results.
6      So the net result of all of these is 41
7  percent of the Skiplagged tickets believed that
8  there is association. And 42.6 percent for the
9  Expedia. Obviously, notes the difference
10  between the two and suggesting that, you know,
11  there is a major misperception of association
12  here. And similarly we have 49.9 percent of
13  the Skiplagged tickets.
14      Then there is another table -- then
15  there is the result of Table 7 that we
16  discussed before. And then there is another
17  table, Exhibit-6, that looked at the response
18  to question 11, which was, Skiplagged is an
19  authorized travel agent with access to fares I
20  could not access via the airline. Which,
21  obviously, suggests again, they're authorized
22  agent.
23      And then in Exhibit-6A, I'm summarizing
24  all of these data. And looking at the response

1  mentioned and see if there are any other reasons. As
2  I sit here today, I cannot think about any others, but
3  we can definitely focus on this and go back to the
4  open-ended responses. You have all of them in
5  Appendix C7. And see if we getting any additional
6  insight.
7  Q.    You set up the question or the surveys here to
8  look for confusion and deception, right?
9  A.    Correct.
10  Q.    Okay. And that's what you found, right?
11  A.    Correct.
12  Q.    Okay. My question, kind of going back, and
13  maybe I missed it, is whether you considered any other
14  reasons of why you would come up with some similarity
15  of results between the Skiplagged group and the
16  Expedia group, other than confusion or deception on
17  behalf of the Skiplagged?
18      MR. NELSON: Objection to form.
19      THE WITNESS: I thought I answered
20  this. I think that these -- the fact that we
21  had the multiple questions trying to address
22  the same question, both open ended and
23  close-end reflected all of them in Exhibit-6 A.
24

1  to the open-ended questions. Then the question
2  6, which was the explicit questions about
3  association or permission. Then we looking at
4  the two closed-end questions, 7A and 11A.
5      That the net of all of this is that
6  76 percent of the people exposed to the
7  Skiplagged ticket believe there was association
8  with American. And Expedia will be 81 percent.
9  Very close to this. With respect to the
10  Skiplagged Hidden City ticket, we find 72.9
11  percent and 86 percent for Expedia.
12      So the range, so my profession here,
13  you're talking about the range of association, when
14  you look at all of these questions and you avoid
15  duplication in answer, between 72 and 76 percent of
16  the people are deceived to believe that there was
17  association between Skiplagged and American.
18  BY MR. REED:
19  Q.    Okay. I let you kind of go. But my question
20  was, did you consider any other reasons for the
21  similarity in results, other than confusion or
22  deception?
23  A.    The only thing we can look at is we look then
24  at the open-ended responses, which I thought I

1  BY MR. REED:
2  Q.    And I know you're going through the charts.
3  But my question is, is what else did you consider that
4  could possibly lead to similar results?
5      MR. NELSON: Objection to form.
6      THE WITNESS: I don't know what else --
7  I'm not sure what else can explain it, other
8  than there is basically -- I'm reporting on the
9  fact the consumers have the perception that
10  they are associated. I don't know what else
11  can account for this, other than the stimulus
12  that they saw. They saw the stimulus --
13  BY MR. REED:
14  Q.    Okay.
15  A.    -- in response to the stimuli. And the
16  stimulus that they saw were the Skiplagged
17  information.
18  Q.    Okay. Let's go to that then, because that --
19  there is a question that I had then.
20          - - -
21      (Exhibit Wind-6, Radius, Appendix C-2,
22      16 pages, was marked for identification.)
23          - - -
24

BY MR. REED:

Q. All right. You've been handed what's been marked as Exhibit-6 for your deposition. You'll see at the top it has Appendix C-2 from your report.

A. Correct.

Q. Is this the stimuli that you're referring to?

A. Yes.

Q. Okay. Is this the complete set of stimuli that was provided to the respondents?

A. No.

Q. What other stimuli were there?

A. This is only for one of the groups. This is only for the Hidden City stimuli.

Q. So we've got the Hidden City still stimuli then. The other appendix would have the other stimuli, right?

A. The Skiplagged Hidden City and the Expedia stimuli.

Q. Okay. Because the appendices are labeled C2, the stimuli. And the --

A. Plural.

Q. I'm sorry.

A. Plural.

Q. Okay.

Page 110

A. Stimuli, so you should have all of them.

Q. So we start off with Hidden City stimuli, correct?

A. Yes.

Q. And it says "Stimuli 1 for Skiplagged, cell 1," correct?

A. Yes.

Q. And then we have a couple of pages and then we have a, let's see, about five or six pages in, you have Stimuli 1 for Expedia cell 2, correct?

A. Yes.

Q. Okay. And then go two more pages and we have, Stimuli 2 for Skiplagged cell 1 and Expedia cell 2, correct?

A. (Reviewing document.)
    Yes.

Q. All right. And then two more pages, Stimuli 2 for Skiplagged cell 1?

A. Correct.

Q. And then two more pages, non Hidden City stimuli, Stimuli 1 for Skiplagged cell 1, correct?

A. Yes.

Q. Okay. Two more pages, Stimuli 1 for Expedia cell 2, correct?

Page 111

A. Right.

Q. Two more pages, Stimuli 2 for Skiplagged cell 1 and Expedia cell 2, correct?

A. Yes.

Q. Is this all the stimuli?

A. I think so.

Q. Okay. So I just want to make sure that there wasn't some other ones that were somewhere else?

A. No. I think they're all here.

Q. Okay. And so I think what you were saying earlier is that you exposed them to this stimuli as part of the test, right?

A. Yes.

Q. Okay. And then based upon that exposure, they answered the questions?

A. Correct.

Q. Okay. And your statement here is, that based upon the exposure to this stimuli, there could be no other explanation for the results you got, other than confusion and deception?

        MR. NELSON: Objection to form.

        THE WITNESS: Well, if there is -- correct. If there is any other possible explanation, the place to find it would be

Page 112

going over the verbatim responses. To answer to say, why did they answer the way they did for some of those open-ended questions.

        And so -- and my answer before was, that you have all the data in Appendix C7. I did not look for other explanations because to me, that's straightforward, the results. It's an experiment, you're showing a stimulus, they're giving you a response, you compared to control group. So to me, that's a straightforward, the cause is the Skiplagged actions. If you want to look for other potential explanation, you know, we have the data, so someone can look at the verbatim responses and see if there are any other explanations.

Q. Okay.

BY MR. REED:

Q. Okay. Now, looking at Exhibit-6, at the stimuli here, this first page is for Hidden City, correct?

A. Correct.

Q. Okay. And if we look at -- well, let me step back.

Page 113

29 (Pages 110 - 113)

1     Who chose the stimuli to use in this
2  study?
3  A.   Well, I did it together with Zach from Cam's
4  office.  Who did -- this is the analysis of the 200
5  flights that's referred to in Exhibit-2.  This was the
6  Excel spreadsheet of data for 200 tests by results
7  from test booking on Skiplagged.com with corresponding
8  test booking on American Airlines.
9  Q.   Okay.  And so from that spreadsheet that we
10  talked about earlier, this stimuli was chosen; is that
11  correct?
12  A.   Yeah.  And the description of how it was chosen
13  is in my report on page 10 and 11.
14  Q.   Okay.  And did you look at all 200 of those to
15  choose this specific stimuli?
16  A.   No.
17  Q.   How did you go about choosing these specific
18  ones?
19  A.   That was described on page 11 very clearly.  We
20  looked for what is the price difference between the
21  Skiplagged and American Airlines, selected the average
22  price difference between them and selected the flight
23  which was the closest to the average.  So this is
24  described on page 11, for the known Hidden City

Page 114

1  stimuli, then, from the average?
2  A.   I was on a phone call with Zach when we did it.
3  And we talked about telling me which one are close to
4  the average, he gave me, you know, whatever they were,
5  one or two or three.  And we selected one.
6  Q.   So you asked Zach for an average one, he gave
7  you a couple and you selected them?
8  A.   Correct.
9  Q.   Okay?
10  A.   The same thing for the Hidden City.
11  Q.   Okay.  And that you were looking for an average
12  of $62 cheaper?
13  A.   Correct.
14  Q.   Okay.  On a round trip?
15  A.   No.
16  Q.   One way?
17  A.   Both of them were one way.
18  Q.   So both the non hidden and the Hidden City were
19  one way?
20  A.   One way.
21  Q.   Why did you choose one way?
22  A.   Because I think that Skiplagged recommend for
23  Hidden City not to book round trip because the airline
24  may cancel the return.

Page 116

1  booking, the average price differential was 12.62 more
2  expensive on Skiplagged.com than AmericanAirlines.com.
3  Thus the stimuli selected for the survey was booking
4  that was $10 more expensive with Skiplagged than
5  American Airlines.
6  Q.   Okay.  So that was chosen from the spreadsheet?
7  A.   From the 200, right.
8  Q.   Okay.
9  A.   And the same procedure was used for the Hidden
10  City.
11  Q.   Okay.  And that 200 was generated from Level
12  Legal by Greenberg, correct, or its lawyers?
13  A.   Correct.
14  Q.   Okay.  And so from that -- and who calculated
15  the price differential?
16  A.   Zach did it, but it's a computer program.  It's
17  very simple.
18  Q.   You didn't do it?
19  A.   I didn't do it.
20  Q.   Okay.  So from whatever Greenberg or Zach at
21  Greenberg calculated on that, you tried to find one
22  that matched closely to that average?
23  A.   Tried to be close to the average.  Right.
24  Q.   And so who actually chose this specific

Page 115

1  Q.   Okay.  So your whole study was focused on one
2  way tickets?
3  A.   Correct.
4  Q.   Okay.  In fact, when we look at, going back to
5  Exhibit-6 here, when we look at the stimuli here, and
6  I know it's a little bit small, so maybe it's a little
7  hard to, hopefully you can see it there.  It says,
8  under the Skiplagged name, it has a little drop down
9  that says one way, one traveler.
10     Do you see that?
11  A.   (Reviewing document.)
12  Q.   Kind of left, under the big blue banner.
13  A.   Yes.
14  Q.   Okay.  And so that would indicate to you this
15  was for a one-way ticket for one person?
16  A.   Correct.
17  Q.   Okay.  Now, how was this stimuli presented to
18  the respondents?
19  A.   Like this (indicating), on your screen, as part
20  of the questionnaire.
21  Q.   So it's done on a computer?
22  A.   On a computer.
23  Q.   It was a screenshot?
24  A.   Yes.

Page 117

30 (Pages 114 - 117)

1  Q.   Not an interactive web page, correct?
2  A.   Correct.
3  Q.   Okay.  And so they got this exact view that is
4  provided here?
5  A.   Correct.
6  Q.   Okay.
7  A.   And you have this actually, if you'll go to
8  Appendix C4, you will see the screenshot with embedded
9  stimuli.
10 Q.   Okay.  And the search here to generate the
11 stimuli, do you know who did that?
12 A.   Zach.
13 Q.   So at the Greenberg lawyer?
14 A.   Correct.
15 Q.   He went on to American -- or onto Skiplagged's
16 website and did the search to generate this page?
17 A.   Yes.
18 Q.   And then Zach took the screenshot?
19 A.   Yes.
20 Q.   And then Zach provided that to?
21 A.   Radius.
22 Q.   To Radius?
23 A.   To me and Radius.
24 Q.   Okay.  Do you know when Zach performed his

Page 118

1  search that ended up here on Appendix 2 here, the
2  stimuli, this first page when we're looking at
3  Exhibit-6, were those the only results returned for
4  that search or were there more?
5  A.   This is the first page.  I told him to focus
6  only on the first page, because I know that consumers
7  never look beyond the first page.
8  Q.   How do you know that?
9  A.   Experience, tons of studies.
10 Q.   What studies tell you that?
11 A.   All type of studies about consumer behavior on
12 the web.  They switch all the time to look, typically
13 they look at the first page.  And especially because
14 they're doing screening that gives them the first page
15 of what they're interested in.  So I felt first page
16 is what -- all we have to show them.
17 Q.   Can you name me a publication that says
18 consumers only look at the first page of a result?
19 A.   I don't have it here.  I'll be glad to give
20 you -- Google this and find tons of studies on this.
21 Q.   Did you refer to any when deciding to only
22 provide the first page to the respondents in this
23 study?
24 A.   I did not see any need for doing that.

Page 119

1  Q.   So the answer is no?
2  A.   Correct.
3  Q.   So there was seven offerings on this first
4  page, correct?
5  A.   Yes.
6  Q.   Four were for American Airlines and three for
7  another airline?
8  A.   Yes.
9  Q.   Okay.  And the red box, was that added or was
10 that on the website?
11 A.   This was added by us.
12 Q.   Who added it?
13 A.   Physically, it was Zach, at my suggestion.  I
14 wanted to highlight the flights we were comparing
15 here.
16 Q.   Okay.  So that wouldn't have actually appeared
17 on the Skiplagged website like that?
18 A.   Correct.
19 Q.   Now, the second page here, on Exhibit-6, do you
20 know what it is?
21 A.   A continuation of the search.  If you're going
22 towards, if you selected this and you're going to book
23 eventually a flight, so this would be the next thing
24 that you will see.

Page 120

1  Q.    Okay.  So if you clicked on the flight that is
2  in the red box on the previous page, it takes you to
3  this next page; is that your testimony?
4  A.   Yes.
5  Q.    Now, did you do this or did Zach?
6  A.   Zach did it.
7  Q.    Okay.  And so this is still from Skiplagged's
8  website?
9  A.   Yes.
10 Q.    Okay.  And this was provided to -- as a image
11 to the respondents, correct?
12 A.   Correct.
13 Q.    Okay.  In the -- this is part of the Hidden
14 City stimuli, right?
15 A.   Correct.
16 Q.    Okay.  And the next page, are you familiar with
17 what it is?
18 A.   Yeah.  That's basically the import information
19 that appears on the Skiplagged website.
20 Q.   Okay.
21 A.   Alerts them to -- these are the risks that they
22 are alerting them to.
23 Q.   Do you know how you get to that page?
24 A.   You click on it.  It's either a pop up or a

Page 121

31 (Pages 118 - 121)

1 click. I don't recall now.
2 Q. So you don't know how you get to that page?
3 A. You can get this one of two ways. Sometimes it
4 will be there, sometimes you have to click on this.
5 And sometimes, depending on what you clicked before,
6 this will appear.
7 Q. It just depends.
8 A. Depends. They change. Part of the reasons we
9 are using studied screenshots, because they change the
10 website all the time.
11 Q. Okay.
12 A. So there are changes. It's dynamic. So you
13 have to make sure that everyone sees exactly the same
14 thing.
15 Q. And to your knowledge how often has this page
16 changed on Skiplagged's website within the last 12
17 months?
18 A. I don't know.
19 Q. Do you have any idea?
20 A. No.
21 Q. You don't know if it has, do you?
22 A. I don't.
23 Q. Okay. Now, there is two checkmarks on that
24 page.

Page 122

1        Do you see that?
2 A. Which page are you looking at, page 2 or 3?
3 Q. Page 3 --
4 A. Yeah.
5 Q. -- on Exhibit-6 important information about
6 your flight.
7 A. Yeah.
8 Q. And I think your testimony was, you get there,
9 it depends on clicking something. And I see two check
10 boxes checked.
11 A. Right.
12 Q. Do you see that?
13 A. Yes.
14 Q. And do you know how those boxes were checked
15 prior to producing this image?
16 A. I assume that Zach checked them. But typically
17 the idea here is the consumer, who is going through
18 the process of buying the ticket will check these.
19 Q. Is it your understanding, or do you have any
20 understanding of whether a consumer on Skiplagged's
21 website can proceed without checking those boxes?
22 A. My understanding is that they will have to
23 check it. But it's an automatic check. Most
24 consumers check everything.

Page 123

1 Q. And how do you know that?
2 A. Again, I've got a general knowledge. Consumers
3 don't read very carefully footnotes. They don't read
4 small print. They just check to try to get through.
5 Their objective is to get through as fast as possible.
6 Q. So most consumers when they have a check box,
7 they check it real quick, they don't read it, they
8 just go on, correct?
9 A. We have evidence here. Because we know that
10 even though it was there and they were asked to read
11 it and carefully, not everyone mentioned these when we
12 talked about risk factors.
13 Q. Okay.
14 A. Because there is a question on what are the
15 risk factors? We recited the risk factors, what are
16 they. And very few mentioned these.
17 Q. Okay. And that's typical consumer behavior,
18 right?
19 A. Correct.
20 Q. Okay. Now, the respondents to your survey
21 didn't have to check these boxes to proceed, they were
22 just showed an image like this one (indicating),
23 where it was already checked, right?
24 A. Correct.

Page 124

1 Q. Correct?
2 A. Correct.
3 Q. And so respondents who hadn't used Skiplagged's
4 website would not know that you'd have to check those
5 to proceed, correct?
6 A. Well, they're responding to what they see in
7 front of them. So they see in front of them this
8 information. And then based on this, following this,
9 they're asked a set of questions. So there was a
10 control before they are asked the questions. And they
11 are asked to read it carefully. They are asked
12 validating that you read carefully, did you -- were
13 you able to see it clearly. They said yes. And then
14 they're asked a series of questions.
15 Q. Okay. I get what you're saying there.
16        Then the next page, do you know how,
17 then, that one was generated?
18 A. This is the last purchase page.
19 Q. Okay. So after you click proceed, after you've
20 clicked the two check boxes, you get the purchase
21 page?
22 A. Yes.
23 Q. Okay. Now, the red box, was that added by you
24 all, or was that on Skiplagged's website?

Page 125

32 (Pages 122 - 125)

1  A.   I don't recall.

2  Q.   You don't know if Zach added that or Radius

3  added it?

4  A.   I don't recall.

5  Q.   Did you do it?

6  A.   I did not.

7  Q.   Okay.  And then that's the final screenshot

8  that's provided to the respondents in the survey for

9  the Skiplagged, correct?

10  A.   Correct.

11  Q.   They weren't shown the next page once you hit

12  pay, correct?

13  A.   No.  I think this was the last page they saw.

14  Q.   Okay.  Is there a reason why you chose not to

15  show the next page?

16       MR. NELSON:  Objection; assumes facts

17  not in evidence.

18       THE WITNESS:  No.  You know, obviously,

19  we want to conclude with the last page of the

20  information.  I did not want to provide

21  information overload for the people.  I wanted

22  to make sure that they can focus on what they

23  have here in terms of the actual offer.  And

24  then the people in the sale, later on, the last

Page 126

1  Q.   Okay.

2  A.   When it was done for me, when I was, you know,

3  on the zoom call and this was part of it.

4  Q.   And you chose not to include that page?

5  A.   Yeah.

6  Q.   Okay.

7  A.   I felt basically the last page they should see

8  what we did, what was the purchase.

9  Q.   Okay.  So then the next page here is a stimuli

10  for the Expedia with the red box added, correct?

11  A.   Correct.

12  Q.   Okay.  It doesn't show all the Expedia results?

13  A.   Correct.

14  Q.   Now, on the Expedia results, it includes two

15  American flights separated by three other airline

16  flights, correct?

17  A.   Yeah.

18  Q.   Whose decision was it to check American, Delta

19  and United for this search?

20  A.   I think we discussed it with Zach as part of

21  the search.

22  Q.   And Zach was the one who did this and took the

23  screenshot?

24  A.   Yes.

Page 128

1  part of the question, showed the American

2  Airline information.

3  BY MR. REED:

4  Q.   And I'll get to that.  I promise.

5  A.   I just want to make sure that -- because I

6  thought you asked me, that's all they saw.  I want to

7  make sure that Expedia consumers saw, in addition to

8  the Expedia stimuli, they also saw American stimuli.

9  Q.   Okay.

10  A.   Later on.

11  Q.   But is it your -- do you -- let me ask this a

12  different way.

13       Do you have any understanding of what

14  the next page is when someone, where a consumer clicks

15  on it, pay with credit card button?

16  A.   I don't recall.

17  Q.   Did you ever go past that and see?

18  A.   I did not do it myself.  I think that either

19  Cam or Zach or someone, when I was on the phone, when

20  we went through the whole sequence including purchase,

21  so I saw it after this.  But I don't recall what it

22  is.  I did not do it myself.

23  Q.   And you didn't see the next page?

24  A.   Well, I saw it on the screen.

Page 127

1  Q.   Okay.  Then the next page is the payment on

2  Expedia?

3  A.   Yes.

4  Q.   Shows the total with the red box added by

5  someone, Zach or Radius or somebody?

6  A.   Right.  Yes.

7  Q.   Okay.  And then the next page is the page from

8  the American website, that both the Skiplagged group

9  and the Expedia group saw, correct?

10  A.   Yes.

11  Q.   Okay.  And that red box is added on the

12  American?

13  A.   Correct.

14  Q.   Okay.  And then with the next page being the

15  total for the trip?

16  A.   Correct.

17  Q.   Okay.  Now --

18       MR. REED:  Actually, let's go off the

19  record.

20       (A short lunch break was taken.)

21  BY MR. REED:

22  Q.   We're back on the record.  You understand

23  you're still under oath?

24  A.   Yep.

Page 129

33 (Pages 126 - 129)

App'x 237

1 Q.   All right.  I want to go back to your report,
2 which we've marked as Exhibit-5, and look at page 31
3 with me.
4 A.   (Reviewing document.)
5        Yeah.
6 Q.   So you started to the section -- starting at
7 the top of page 31, the findings of these -- of the
8 surveys, right?
9 A.   Correct.
10 Q.   Okay.  Now, you break it down in five sections
11 based on your five areas we looked at before, correct?
12 A.   Correct.
13 Q.   Okay.  Awareness and usage of Skiplagged.  Now,
14 you note here that a small percentage of the
15 respondents were familiar with Skiplagged whereas a
16 large percentage were familiar with Expedia, correct?
17 A.   Correct.
18 Q.   Did it matter to your survey that so few people
19 were familiar with Skiplagged?
20 A.   No.  Because the survey itself was on the
21 respondent's perception of the stimuli.  So in a
22 sense, the key is that every one of them saw the
23 stimuli and responded to questions, which are based on
24 the stimuli.

Page 130

1 Q.   And then I think you said, based upon the
2 awareness, only 15 percent of that 14 percent had
3 actually used Skiplagged?
4 A.   Correct.
5 Q.   Okay.  And to answer that question based on
6 awareness, did those people who answered that question
7 have to answer yes to the previous question?
8 A.   Yes.
9 Q.   So the nos didn't answer the question; is that
10 correct?
11 A.   Correct.
12 Q.   So in the Hidden City ticket test for
13 Skiplagged, there was 144 respondents, correct?
14 A.   Yes.
15 Q.   And so 14 percent of them had only heard of
16 that?
17 A.   Correct.
18 Q.   Do you know how many that is?
19 A.   What is 14 percent in terms of the number of
20 people?
21 Q.   Of 144.  Yes.
22 A.   Well, I think it would be 20.  That's the end
23 for the next question.
24 Q.   All right.  So only 20 had actually heard?

Page 132

1 Q.   And you're referring to when you were waving
2 the previous exhibit we put up, the stimuli, which
3 were the static screenshots that were provided to
4 them, right?
5 A.   Correct.
6 Q.   And so the majority of people who had -- who
7 were respondents in your test here, were familiar with
8 Expedia and had used Expedia, right?
9 A.   Correct.  And that's validation of that Expedia
10 was the right control to use.
11 Q.   And they had used the actual Expedia website,
12 opposed to just being exposed to the stimuli, right?
13 A.   Well, some of them.  78 percent of them used
14 Expedia website before.
15 Q.   Okay.  So a majority of them, a large majority,
16 right?
17 A.   Correct.
18 Q.   Okay.  And a small minority had even heard of
19 Skiplagged, correct?
20 A.   Correct.
21 Q.   And, in fact, in the Hidden City ticket test,
22 right, at 14 percent, just under 14 percent had even
23 heard of Skiplagged?
24 A.   Correct.

Page 131

1 A.   Correct.
2 Q.   And so -- and only -- so 50 percent of that 20,
3 so only 10 people in respondents within the Hidden
4 City ticket tested had actually used the Skiplagged
5 website, correct?
6 A.   Correct.  But the key again, is, you know, the
7 reaction to the stimuli, that 100 percent of them.  So
8 the questions are based on the stimuli, not based on
9 the past experience.
10 Q.   So to the extent that your stimuli differ from
11 the actual experience on the website, then your data
12 would not be correct as to an actual user of that
13 website, correct?
14        MR. NELSON:  Objection to form.
15        THE WITNESS:  No.  Because first of
16      all, there is no evidence that suggests that
17      the stimuli, which is taken from the live
18      website, is not correct or a correct
19      representation.
20 BY MR. REED:
21 Q.   So your testimony, sir, here today is that the
22 visual -- the viewing of the stimuli, the static
23 images presented, has the same effect on a consumer as
24 actually using the website, putting in their own

Page 133

34 (Pages 130 - 133)

1 searches clicking on a text box and going all the way
2 through the process in the payment screen?
3 A.    It's not going to be the same experience. The
4 experience, obviously, is different. When you look at
5 the page versus actually interacting with them. The
6 point is that this accurately represents the material
7 on the website. We asked them to review it carefully,
8 to read it, to make sure they see it. And all the
9 responses are with respect to the stimuli.
10       So you asked an endless number of times
11 this morning, you know, what is anything else? Well,
12 the answer, the reason for all the answer, the reason
13 for all these responses we have here is the consumers'
14 interpretation of the stimuli.
15 Q.    And not the actual website.
16       Because your studies do not account for
17 any discrepancies between the stimuli provided by
18 Greenberg and the actual website experience, right?
19       MR. NELSON: Objection to form.
20       THE WITNESS: It was taken from the
21 actual website in a given period of time. It's
22 the customary approach to use basically
23 screenshots from websites and studies,
24 especially when companies change their real

Page 134

1       website all the time. So taking screenshot
2 ensures that everyone sees the same thing and
3 it's there. And that's what's done in all
4 studies. I have not seen any evidence to
5 suggest that there is any discrepancy in
6 consumers' response between respond to this or
7 respond to the real website.
8 BY MR. REED:
9 Q.    You didn't look for that though, did you?
10       MR. NELSON: Objection to form;
11 mischaracterizes.
12       THE WITNESS: I didn't because I
13 believe that the screenshot represent
14 accurately the website. If your experts
15 believe that it's not, they could have done a
16 study. They could have easily replicate a
17 study or designed their own study --
18 BY MR. REED:
19 Q.    We're here to talk about your work, sir.
20       MR. NELSON: Let him finish his answer,
21 please.
22 BY MR. REED:
23 Q.    We're here to talk today about your work?
24       MR. NELSON: He didn't finish his

Page 135

1       answer.
2 BY MR. REED:
3 Q.    Are you finished with your answer?
4 A.    Now I am.
5 Q.    Okay. We're not here to talk about anybody
6 else's studies, we're here to talk about your work and
7 your opinions.
8       Okay?
9 A.    Yes.
10 Q.    That's what I'm asking you questions on. Is
11 based upon your work and your opinions. That as part
12 of your study, you did not do anything to evaluate or
13 consider the differences of the experience for the
14 consumer between using the website and observing the
15 stimuli provided by Greenberg, did you?
16 A.    I see no reason to do it, because this is a
17 common way of doing studies. We present a website, a
18 live website with screenshots of the website, the
19 relevant sections from the website. And I saw no
20 reason to try to replicate the study on the real
21 website.
22 Q.    And you didn't, did you?
23 A.    Correct.
24 Q.    Because you didn't see a reason for it,

Page 136

1 correct?
2 A.    Correct.
3 Q.    Okay. And that's all I'm asking.
4 A.    Yeah.
5 Q.    Is what you did or didn't do. Whether you had
6 a reason or didn't have a reason, that's not the
7 question I asked. I asked you whether you did or
8 didn't. It will go a lot quicker if you answer those
9 questions.
10       MR. NELSON: Objection to form
11 argumentative.
12       Don't respond.
13 BY MR. REED:
14 Q.    All right. Now where were we?
15       So of the -- all right. So then we get
16 to the next section in your findings, it's the
17 consumers' perceptions of Skiplagged and the consumers
18 perceptions of Expedia, correct?
19 A.    Yes.
20 Q.    Okay. And this was an open-ended question,
21 right?
22 A.    Yes.
23 Q.    And the table here, listed on 32, are examples
24 you picked from the open-ended questions?

Page 137

35 (Pages 134 - 137)

1   A.    Correct.
2   Q.    Did you pick those examples or did someone
3   else?
4   A.    No.  These were picked by Radius.
5   Q.    Radius picked the examples?
6   A.    Correct.
7   Q.    Do you know who at Radius picked them?
8   A.    Probably the project management of the team
9   that worked together on this.
10  Q.    Do you know the criteria they used to pick
11  these?
12  A.    I asked for representatives quotes.
13  Q.    Did you do anything to evaluate whether the
14  quotes that were provided by Radius were actually
15  representative or did you just accept the ones they
16  gave you?
17  A.    Well, I accepted -- I did review all the
18  verbatim.  So I went through all the verbatim in
19  Appendix C7.  And these seem to be okay, given -- I
20  tried to be as objective having the team there select
21  the items opposed to me.
22  Q.    In Exhibit-2, on page 32, Exhibit-2 to your
23  report, that table there, did you eliminate or add any
24  illustrative responses that Radius provided you, or

Page 138

1   Q.    Who would know?
2   A.    I can find out from Radius for you.
3   Q.    Okay.  And so the respondents never actually
4   answered or were never asked to rate their sentiment
5   about their reflection on Skiplagged and Expedia as
6   negative, neutral or positive, right?
7   A.    Correct.
8   Q.    You could have?
9   A.    It would not make sense.  But no, I did not.
10  Q.    You could have, right?
11  A.    I saw no reason to do it.
12        MR. NELSON:  Objection; argumentative.
13  BY MR. REED:
14  Q.    But you could have?
15        MR. NELSON:  Objection; argumentative.
16        THE WITNESS:  You could have
17  everything.
18  BY MR. REED:
19  Q.    Okay.
20  A.    But in the research, you have to decide what
21  makes sense.
22  Q.    And you decided it didn't make sense to include
23  the question, please rate your reflection of
24  Skiplagged as negative, neutral or positive?

Page 140

1   are those all the ones that Radius provided you?
2   A.    My recollection, that's all of them.
3   Q.    That Radius provided?
4   A.    Correct.
5   Q.    And you didn't add or take any away?
6   A.    Correct.
7   Q.    Okay.  So taking those open-ended responses,
8   then you had someone at Radius then decide which ones
9   were negative, neutral and positive, correct?
10  A.    That's the coding group at Radius.
11  Q.    The two individuals, correct?
12  A.    Well, there were more than two at this stage.
13  Q.    I thought you said there were two earlier?
14  A.    The two independent ones, each one of those but
15  I think over time -- for each verbatim, there was at
16  least two people reviewing, but over time more than
17  two -- more that one team of two.
18  Q.    Ah.  Okay.  I misunderstood that.  Thank you
19  for the clarification.
20        So it's not the same two people that
21  reviewed them, it could have been multiple teams?
22  A.    Correct.
23  Q.    How many multiple teams?
24  A.    I don't know.

Page 139

1   A.    Right.  The same way it doesn't make sense to
2   ask them, are you deceived or are you confused.  These
3   are dumb questions.
4   Q.    Okay.  That's one of my dumb questions.  I got
5   you.  I knew we were going there?
6   A.    The same category.
7   Q.    All right.  I'll ask some more dumb questions
8   and I'm sure you'll call me out on it.
9         All right.  So the negative, neutral
10  and positive analysis was done by individuals at
11  Radius, an unknown number of two person teams correct?
12  A.    Correct.
13  Q.    Okay.  And how -- what criteria were they given
14  to assess open-ended responses as neutral?
15  A.    Well, neutral typically is a default category.
16  That when it's started is started anything positive
17  here that we can classify as positives or anything
18  negative here.  And the neutral will typically include
19  people who are wishy washy or who will give
20  conflicting results.  So if someone is saying
21  something positive, something negative about this,
22  eventually they will code this as neutral.  So the
23  neutral is really the default item of things which are
24  not positive and not negative.

Page 141

36 (Pages 138 - 141)

1  Q.    Let me ask a better question because I asked a
2  poor one.
3          Did you provide to Radius and their
4  two-person team reviewers or coders, classifications
5  or qualifications as to what makes a statement
6  positive, negative or neutral?
7  A.    We had a telephone discussion and we discussed
8  different examples.  So I walked them through, they
9  read some quotes and I gave them my assessment and
10 explanation of why I believe this is positive or this
11 is negative.
12 Q.    And what criteria did you use?
13 A.    Well, depending on the question.  Basically is
14 there anything in the response that suggests that
15 positive attitude.  Positive would be, I love it, it's
16 great, it's the greatest thing since sliced bread.  Or
17 they can say it's dumb, they're trying to cheat me.
18 You know, kind of -- and neutral would be, the answers
19 which include both positive, negative or something
20 which is, I don't know, without saying I don't know
21 because we say I don't know, it would be categorized
22 as don't know.
23 Q.    Okay.  So don't know is kind of that didn't
24 really express an opinion one way or the other?

Page 142

1  what it reflect.  So it suggests in this case that the
2  people who said positive Expedia is close to
3  72 percent, and Skiplagged is 45 percent, and the
4  difference between the two is statistically
5  significant in the 90 percent confidence level.
6  Q.    Okay.  And that was at each of these
7  comparisons, right --
8  A.    Correct.
9  Q.    -- in this chart?
10         And what did that show you?
11 A.    Well, that significantly more people have a
12 positive attitude towards Expedia than Skiplagged.
13 Q.    Based upon the review of the provided stimuli,
14 right?
15 A.    Based on the responses to the stimuli and all
16 the various open-ended questions.  Actually, that's
17 respond to question 14A and B, not to all questions.
18 Q.    Right.  But that was after reviewing the
19 stimuli that was provided to you by Greenberg, right?
20 A.    The stimuli that's used in the study, yeah, the
21 stimuli which is Wind-6.
22 Q.    Okay.  All right.  And how did you control for
23 any biased in your respondents based upon their
24 previous knowledge and use of either Expedia or

Page 144

1  A.    They said don't know.
2  Q.    Okay.  So they had to say don't know?
3  A.    There is a check.
4  Q.    No opinion, is that neutral?
5  A.    No opinion is the same as don't know.
6  Q.    No opinion is?
7  A.    The same as don't know.
8  Q.    The same as don't know.  Okay.  I just want to
9  make sure I wasn't...
10         We've have this ask it throughout these
11 charts, and I wanted to make sure I asked about it.
12 We have it on this chart here on page 33, that says,
13 "Significantly higher than other cell at the 90
14 percent confidence level.  Stat testing was only done
15 within study."
16         What does that mean?
17 A.    In every -- throughout the studies, we did
18 there was a comparison between test and control.  So
19 there are two studies.  One study is the Skiplagged
20 regular ticket and another study is Skiplagged city,
21 kind of the Hidden City ticket.  And in each one of
22 them, we compared all the answers test versus control
23 to see whether there are significant difference
24 between the 90 percent confidence level.  And that's

Page 143

1  Skiplagged?
2  A.    I did not.
3  Q.    Okay.
4  A.    I basically looked, this is results of all of
5  them.  Because we are based primarily interested in
6  their reaction to this.  The data are there.  And if
7  you believe that there is different responses with
8  those who had experience with Expedia or Skiplagged
9  versus those who did not, you can do that analysis.  I
10 felt it's not needed.
11 Q.    And you didn't do it, right?
12 A.    Correct.
13 Q.    Okay.  All right.  We turned the page.  We've
14 got negative on 34, we got neutral on 35 and positive
15 on 36, right, all in response to question 14?
16 A.    Yeah.  And these are all illustrative.  And
17 again, if you want to look at all the responses, you
18 have to go to Appendix C7.
19 Q.    Right.
20 A.    Which represents all the verbatim responses.
21 Q.    I got you.  I got you.
22         This is what's in your report.  These
23 are just selected ones that Radius gave you to include
24 in the table, right?

Page 145

37 (Pages 142 - 145)

1  A.   Correct.
2          MR. NELSON: Objection;
3     mischaracterizes.
4  BY MR. REED:
5  Q.   I didn't hear your answer.
6  A.   Yes.
7  Q.   Okay. I'm looking at, if you look at
8  Exhibit-3B on 35, if you look at the third column,
9  that Hidden City ticket column.
10 A.   Yes.
11 Q.   And go down about row five, and it starts off
12 "Very possible, I can't plan too far ahead. Things,
13 deals, discounts, promos come and go."
14         Do you see that box?
15 A.   Yes.
16 Q.   Okay. That got classified as neutral, right?
17 A.   Correct.
18 Q.   All right. Why is that classified as neutral?
19 A.   That's the way they interpret it. I think they
20 are correct.
21 Q.   That's the way the coders interpret it?
22 A.   Yes. Keep in mind, the coders are independent.
23 They did not know the purpose of the study. They did
24 not know who was sponsoring the study. They were
Page 146

1  primarily given the data. And so they, from their
2  point of view, could have been the studies done for
3  Skiplagged or done for American Airline or for a third
4  party. That's the reason I rely on them to select as
5  opposed to me selecting them.
6  Q.   And you taught them how to select them, right?
7  You said that earlier.
8  A.   I gave examples, yes.
9  Q.   Okay. All right. I just want to -- and you
10 told me the previous about how the coders worked. I
11 got you there.
12         All right. Now, when we look at 3C,
13 this is positive verbatims, correct?
14 A.   Yes.
15 Q.   Now, if we look at the first box there, in the
16 first column, under the Skiplagged ticket, it says, "I
17 will look into them for next time."
18 A.   Yeah.
19 Q.   Did I read that correctly?
20 A.   Yeah.
21 Q.   Now, that one was coded as a positive verbatim,
22 right?
23 A.   Right.
24 Q.   Now, comparing that to the very possible, why
Page 147

1  are they coded differently?
2  A.   The interpretation of the coders was
3  apparently. I'm looking to them for next time, means
4  that they are interested in the offering, and,
5  therefore, they will look into it. And so they
6  interpret it as positive. And they, in the previous
7  exhibit, Exhibit-3B, if we look into it, they don't
8  say, you know, for what. So it's kind of pretty
9  ambiguous. They don't look into it because they want
10 them to believe it's good or bad, so they viewed this
11 as more neutral. And that's the reason they coded
12 this a neutral and this is positive.
13 Q.   So very possible and I will look into it for
14 next time, completely different answers, right, one is
15 neutral and one is positive?
16 A.   Because the next time suggests an extra and
17 something more positive. So that's, again, that's my
18 interpretation of what the coders did. And it's a
19 quote. And again, to try to understand fully whether
20 it's the positive or neutral, we probably should go to
21 the verbatim, find out this respondent and look at the
22 context of the entire set of responses.
23 Q.   And you could have, and I know you didn't, but
24 it would have been possible, would you not agree with
Page 148

1  me, that you could have followed up and asked the
2  respondents did they view Skiplagged or Expedia,
3  whichever, as positive, neutral or negative to see how
4  those lined up with their open-ended responses, right?
5          MR. NELSON: Objection to form.
6          THE WITNESS: It's not being done. I
7     did not do it. I did not see the need for
8     doing it. And when I did it, if we go back to
9     the questionnaire on page 25, you'll see that
10    after asking the question, 14A, which is
11    reflecting on the Skiplagged, for example,
12    offering everything you know about them, how do
13    you feel about buying your next airline ticket
14    from them. And then there was a follow up
15    question, is there anything else. And I think
16    this is the conventional way of doing a probe
17    following an open-ended question or following
18    any question. And I felt there is no need for
19    anything else, other than this.
20 BY MR. REED:
21 Q.   But you could have?
22 A.   Could have done anything. I felt it's not
23 necessary. And that's the reason I did not do it.
24 Q.   Okay. All right. If we move on here to
Page 149

38 (Pages 146 - 149)

App'x 242

1 Exhibit 3D. What's this table showing at the top of
2 37?
3 A.    As it says, open-ended description of offering
4 to a friend. This was based on question 1A and B. If
5 you recall, if you're going back to the questionnaire,
6 question 1A and B will be on page 18, how to describe
7 the offering on this website to a friend. And the
8 follow up in B was, is there anything else.
9        So based on these responses, the coders
10 were asked to code it, whether there was a deception
11 or not. And then in addition to this, so this is the
12 first three lines, so it's there is a deception, there
13 is no deception or it's ambiguous. And then based on
14 all open-ended questions, we noted there were a lot of
15 open-ended questions in the questionnaire, so based on
16 all of them would be the responses.
17 Q.    So the first part is question 1A and B, which
18 is how would you describe the offering on this website
19 to a friend?
20 A.    Correct.
21 Q.    Open-ended, they didn't answer deception or not
22 deception, correct?
23 A.    Correct.
24 Q.    And so based upon their open-ended answer to

Page 150

1 is the basis for the coders evaluating open-end
2 responses as suggesting deception or not.
3 Q.    Okay. The respondents didn't make the decision
4 as to what was a meaningful risk or un-meaningful
5 risk, you did, correct?
6 A.    Correct.
7 Q.    Okay. Was that unilateral decision or was that
8 with input from the Greenberg lawyers?
9 A.    Well, it was my decision. I obviously
10 discussed it with them to verify that that's correct.
11 Q.    Okay. And so based upon your decision, you
12 decided what was meaningful risk and what was
13 un-meaningful risk?
14 A.    Yeah.
15 Q.    And did you look to any authority, outside
16 source to help you make that decision?
17 A.    I have no idea what source can be used for
18 deciding deception or not. It's a very simple
19 comparison between the offering and reality. You
20 know, do they mention financial penalties? Do they
21 mention that they can't fly on airline, can get
22 banned, makes the airline angry? Do they mention
23 cancellation problems? Schedule changes? Do they
24 mention ticket is invalid, ticket may not be honored?

Page 152

1 that question, the coders at Radius decided whether it
2 was deception or not right?
3 A.    Based on the guideline below.
4 Q.    Okay.
5 A.    And below there is a guideline, what is
6 deception. For non Hidden City, deception is, they
7 say for Skiplagged, cheaper than American Airlines.
8 Because we have an absolute data we know from the
9 study of the 200 different website, with Expedia --
10 that I'm sorry, that Skiplagged is not cheaper than
11 American Airlines. And the average was, as we
12 discussed before, like $10 more expensive than
13 American Airline.
14        And for Hidden City, deception was
15 consumer doesn't understand that there are meaningful
16 risks associated with the ticket. And the meaningful
17 risks were identified in the stimulus package we
18 looked before, which is Wind-6. The page we did not
19 cover, this was the page, Appendix C2, that looks like
20 this (indicating), that describe basically the risk.
21        There are also discussions of the risks
22 in the bottom of page 51, the bottom of Exhibit 10A,
23 where we describe specifically what meaningful risks
24 are, as example, un-meaningful risks as well. So this

Page 151

1 And so on and so on. It's basically yes, no. You
2 know, these are things which are the real risks
3 involved in the Skiplagged offering and the consumers
4 don't mention any of this and they basically do not
5 realize that they exist.
6 Q.    Okay. And in un-meaningful risk, you decided
7 it was can't check a bag. That's the only one?
8 A.    Or unidentified risks.
9 Q.    What is that?
10 A.    They just said it's risky without explaining
11 what it is.
12 Q.    Okay. If they just said it's risky and didn't
13 say, then you deemed that as un-meaningful or not?
14 A.    Right. An example, and you look at examples
15 below, so everything has risk. Lost items. Every
16 ticket purchase carries risk. If you buy all the
17 insurance in the world, all the assurance in the world
18 and all the guarantees in the world, but stuff still
19 happens. So that's, to me, under un-meaningful risk
20 or not as significant as the meaningful risk items
21 which was very very specific.
22 Q.    Okay. What does third-party risk mean?
23 A.    Whatever they mention.
24 Q.    You have it listed here under meaningful risk?

Page 153

39 (Pages 150 - 153)

1  A.   These are all based on actual responses of
2  consumers.  So these are -- I did not invent these
3  items.  These are actual statements made by consumers.
4  Some of them said third-party risk.
5  Q.   Okay.  So did you come up with the meaningful
6  risk versus un-meaningful risk list before or after
7  you read the responses to your survey?
8  A.   After.
9  Q.   After.
10        Now, what you -- I believe, and I just
11 want to make sure that I'm understanding your
12 testimony because I don't want to put words in your
13 mouth.
14        When you say, in deposition Exhibit-6,
15 the Stimuli 2 for Skiplagged cell 1, is this the risks
16 that were provided to the respondents?
17 A.   Yeah.
18 Q.   Okay.  Who prepared this chart?
19 A.   I prepared it in consultation with the
20 attorneys.
21 Q.   At Greenberg?
22 A.   Yes.
23 Q.   Okay.  Where did you get the Skiplagged section
24 from?

Page 154

1  physical chart, they printed this.
2  BY MR. REED:
3  Q.   Okay.  Do you know who at Radius did?
4  A.   Based on the information I gave them.
5  Q.   No.  Do you know who at Radius --
6  A.   No.
7  Q.   -- prepared the physical chart?
8  A.   No.
9  Q.   Okay.  And so you gave then all the information
10 yourself for this chart, or did some come from
11 Greenberg as well?
12 A.   I gave them --
13        MR. NELSON:  Objection; asked and
14    answered.
15        THE WITNESS:  I gave them the
16    information.  And the information I got was
17    based on my review of the website and my review
18    of other material and the discussions with
19    counsel.
20 BY MR. REED:
21 Q.   Okay.  And how did you go about making the
22 decision of what to include in this chart from the
23 Skiplagged website and what not to include?
24 A.   I thought these were the -- my understanding of

Page 156

1  A.   Based on my understanding from the website and
2  based on my discussions with the lawyers.
3  Q.   Did you, actually yourself, sir, go to
4  Skiplagged's website and pull this information from
5  it?
6  A.   I reviewed the Skiplagged website a few times.
7  And that's basically a combination of my reviewing the
8  website, the other materials and discussions with the
9  lawyer, a combination of all of these.
10 Q.   And my question was different.  My question
11 was, did you yourself go to the website and pull the
12 information and put it in this chart?
13 A.   The chart in this form was actually formatted
14 by Radius based on information we gave them, that I
15 asked them to put it in a chart form of Skiplagged
16 sales and American sales.  And that's the input to
17 this is a combination of multiple sources, of me
18 reviewing the website, reviewing other material and
19 discussing it with counsel.
20 Q.   Okay.  So Radius prepared the chart, not you,
21 then?
22        MR. NELSON:  Objection;
23    mischaracterizes.
24        THE WITNESS:  They prepared the

Page 155

1  what were the relevant risk factors involved that we
2  wanted the consumer to be aware of.  And I checked it
3  with counsel.
4  Q.   Is it your understanding that this is in the
5  same -- the Skiplagged section, not the American,
6  we'll talk about it next.  But the Skiplagged column
7  here, is it your understanding that this is the exact
8  wording used on the Skiplagged website?
9  A.   It is trying to be as close as possible to
10 words they actually used.
11 Q.   It is the exact wording?
12 A.   I'm not sure of this case.
13 Q.   Did you do anything to validate whether it was
14 the exact wording or whether editorial decisions were
15 made?
16 A.   At the time this was designed, when I prepared
17 all the item for Radius, I believe it was, as I
18 checked as close as possible to what's actually on the
19 website.  At this stage I'm not sure what is exactly
20 word to word.  I have to review it again.
21 Q.   Okay.  And this format doesn't appear on the
22 Skiplagged website, does it?
23 A.   No.  Because they don't have a comparison with
24 American Airlines.

Page 157

40 (Pages 154 - 157)

1 Q.   They don't.  Right.  Okay.
2       But that's the way it was presented to
3 the respondents as a comparison, correct?
4 A.   Correct.  For the second part of the
5 questionnaire.
6 Q.   Okay.  The American side of things, did you go
7 on American's website and pull this information and
8 give it to Radius?
9 A.   This was developed based on material from
10 American Airlines.  And again, the source is American
11 Airline website, other information I had in discussion
12 with the lawyers.
13 Q.   Okay.  So did you actually go to American's
14 website and compare the verbiage used here and whether
15 it actually appears on American's website?
16 A.   All I remember at this stage is that I looked
17 at American Airlines.  We tried to be as close to the
18 wording they used, but there was multiple sources
19 involved in creating this.  So I cannot tell you
20 exactly whether this is, this paragraph was sent in
21 from the American Airlines website or not.
22 Q.   Because on American's website, it's not all in
23 one place like this, all grouped together like this,
24 is it?
                                          Page 158

1 Q.   We're back on the record here.
2       Now, looking at page 37, Section 3,
3 about consumers belief and Skiplagged's Expedia's
4 association with AA.
5       Are you there with me, sir?
6 A.   Yes.
7 Q.   Okay.  You state here that one of the most
8 striking findings of your study is that 41 percent of
9 respondents exposed to the Skiplagged stimuli
10 associated Skiplagged with American Airlines, correct?
11 A.   Yes.
12 Q.   Why was that one of the most striking findings?
13 A.   It's a very high level of confusion.  And
14 especially because it's about the same level as the
15 people who believe that Expedia is associated with
16 American Airlines.
17 Q.   Okay.  So less than half, right, had
18 associated, right?
19 A.   Yes.
20 Q.   Okay.
21 A.   But it's a huge number.
22 Q.   That's a huge number of 70-some-odd people,
23 right?
24 A.   Yeah.  But if you --
                                          Page 160

1 A.   Correct.
2 Q.   Sitting here today you can't tell me if the
3 verbiage you used here on the American side actually
4 matches what's on their website, can you?
5 A.   I believe this is --
6       MR. NELSON:  Objection.
7       THE WITNESS:  Sorry.
8       MR. NELSON:  Mischaracterizes
9   testimony.
10       THE WITNESS:  I believe this is the
11   content that reflect accurately American
12   Airline position.
13 BY MR. REED:
14 Q.   So you can say under oath it's the exact words
15 used on American's website?
16 A.   I did not say -- no, I did not say exact words
17 as used on website.  I said I believe this accurately
18 represent the position of American Airlines.
19 Q.   As told to you by the lawyers and what you
20 reviewed on the website?
21 A.   Correct.
22 Q.   Okay.
23       (A short break was taken.)
24 BY MR. REED:
                                          Page 159

1 Q.   Okay.
2 A.   -- but you look at the percentage, it's a huge
3 number.  Typical confusion studies, court accepted
4 anything above 10 to 15 percent confusion is a
5 meaningful confusion.  Here we're talking about, you
6 know, over 40 percent of the people, which is a huge
7 number.
8 Q.   You said courts have said anything more than
9 10?
10 A.   Courts typically accept confusion about 10 to
11 15 percent either way --
12 Q.   What courts?
13 A.   Any courts.  In confusion studies.
14 Q.   In Texas?
15 A.   I don't know about Texas.
16       Many Federal courts in this country in
17 confusion studies accept confusion about 10 to 15
18 percent.
19 Q.   Any in the 5th Circuit?
20 A.   I don't know.
21 Q.   Okay.  Can you name me any as you sit here
22 today?
23       MR. NELSON:  Asked and answered.
24       THE WITNESS:  No.
                                          Page 161

41 (Pages 158 - 161)

BY MR. REED:

1  Q.   Okay.  Is associated Skiplagged with American
2  Airlines defined anywhere in your report?
3  A.   No.  Because it basically it's respond to the
4  stimuli.  The stimuli is American Airlines stimuli.
5  Q.   Is the stimuli that you provided in consulting
6  in consultation with Greenberg attorneys, right?
7  A.   No.  That's the stimuli from the Skiplagged
8  website.  And on this page, the airline is focusing on
9  the American Airlines, the one that's circled in red.
10  And the question is about the flight, this specific
11  flight of American.  So there is no ambiguity here
12  that we're talking about American Airlines.
13  Q.   Right.  Right.  And that you had highlighted
14  American in your stimuli, right?
15  A.   Right.
16  Q.   And with the filters that were clicked on the
17  search, do you know which ones they were?  First
18  stimuli on the first page.
19  A.   I don't recall at this time.
20  Q.   But you didn't do that, right?
21  A.   No.  Because I did it, it was my involvement on
22  the phone.
23  Q.   So Greenberg, Attorney Zach, is the one who

1  chose what filters to click for the Skiplagged search,
2  right?
3  A.   No.  We talked about this.  We were together on
4  the phone, reviewing basically that the project that
5  he did on the 200 site.  That we discussed before.
6  That it's listed in my list of material relied on.
7  Q.   What filters were chosen then?
8  A.   I don't recall.
9  Q.   You said you spoke with him, right?
10  A.   Yeah.  I don't recall, it was some time ago.
11  Q.   Is there any record of what filters were
12  chosen?
13  A.   I don't recall.
14  Q.   The only other person who would know would be
15  you and Zach?
16  A.   Well, the filters we chose are evident.  The
17  ones that were selected here.  Every one of the
18  stimuli that we had represent whatever we decided on.
19  So this was --
20  Q.   I'm talking -- sorry.  I think we have a
21  misunderstanding.  I asked a bad question.
22          Because you can tell here from the
23  static image on the first page of Exhibit-6 that some
24  filters were chosen, correct?

1  A.   Right.
2          MR. NELSON:  Objection; assumes facts
3      not in evidence.
4  BY MR. REED:
5  Q.   Okay.  And you can see there that like
6  Skiplagging is checked as a filter, right?
7  A.   Right.
8  Q.   And you can see that stops, two stops is
9  checked as well, right?
10  A.   Correct.
11  Q.   Okay.  But we don't get the full page all the
12  way down, we only get the top part of it, so we can't
13  see what other filters were chosen, can we, if any?
14  A.   I'm not sure there were any other filters.  The
15  rest of this would be, like, the rest of the listings,
16  which, obviously, explicitly asked him to focus on the
17  first page.
18  Q.   But see it's cut off, right?
19          Is it your -- let me ask you that.
20          You said you told him to focus on the
21  first page.  Is it your understanding that when you do
22  a search on the Skiplagged website, that this is the
23  first page that came up and you had to click over to a
24  second page of results?

1  A.   That's continuation.  The first screen -- I
2  mean, the first screen.
3  Q.   So as you scroll down, more show up?
4  A.   Correct.
5  Q.   Okay.  And so that's just what you can see on
6  the screen, correct?
7  A.   Right.  The first screen you see.
8  Q.   Based upon whatever resolution and zoom that
9  you're using on that screen?
10  A.   Correct.
11  Q.   If you have it further out or had a larger
12  screen with a different orientation, you might be able
13  to see more, correct?
14  A.   Right.
15  Q.   Okay.  Do you have any other examples of
16  customers associating Skiplagged with the airline,
17  beyond considering Skiplagged an authorized agent of
18  American?
19  A.   Yes.
20  Q.   What's that?
21  A.   Well, if you look at the whole section.  Let's
22  review Exhibit-4.  You have your responses to
23  associates connected with airline based on opening
24  response to all questions.  Associated and connected

1 with American Airlines based on question 1. This is
2 how do you describe the product to your friend.
3       Then there were the explicit confusion
4 question we asked or associate connected, this would
5 be question 2 and 3. The question 4 and 6 the
6 permission and finalization. And the net confusion of
7 all of these is 41.1 percent for the Skiplagged
8 tickets and 29.9 percent for the Skiplagged Hidden
9 City ticket.
10       And then we can continue on Exhibit-5,
11 which present the result for the explicit question,
12 closed-end question of Skiplagged or Expedia is an
13 authorized agent of the airline. And we find here
14 that 43.2 percent of the regular Skiplagged ticket and
15 42.4 percent of the Skiplagged Hidden Ticket mention
16 it.
17       Then we go the Exhibit-6, we focus on
18 another question of Skiplagged or Expedia is an
19 authorized travel agent with access to fares I could
20 not access via the airline. And then 38 percent of
21 the regular Skiplagged ticket and 38.9 percent of the
22 Skiplagged Hidden City ticket.
23       And then Exhibit-6A provides a summary
24 of all of these. And it gives you the first block of

Page 166

1 all open-ended responses. It gives you then the
2 second one, based on the first open-ended question,
3 how to describe it to a friend. And then you have
4 Skiplagged is an authorized agent, which was the
5 43.2 percent. And then you have the Skiplagged is an
6 authorized travel agent with access to fares, 38.4
7 percent. The net of this was 76 percent. And for the
8 Skiplagged Hidden City was 72.9 percent.
9       And I misspoke before because when I
10 said question 1, it was actually question 6, that
11 included the explicit questions about associated or
12 connected or required permission, which was the
13 41.1 percent.
14       So overall, when you look at all these
15 many measures, you find out between 76 percent and
16 72.9 percent of the respondents the two, Skiplagged
17 stimuli perceived association with American Airlines.
18 Q. I appreciate it.
19       MR. REED: I'll object; nonresponsive.
20 BY MR. REED:
21 Q. My question is, could you provide some examples
22 of customers associating Skiplagged with the airline
23 beyond considering it an authorized agent?
24       MR. NELSON: Objection; foundation.

Page 167

1       THE WITNESS: I thought that's what I
2 just did. That's exactly what I just read to
3 you.
4 BY MR. REED:
5 Q. No, you read me a lot of tables. I'm asking
6 you for an example of customers associating Skiplagged
7 with the airline beyond considering them an authorized
8 agent?
9       MR. NELSON: Objection; asked and
10 answered.
11       THE WITNESS: I don't understand your
12 question. Because I thought that's exactly
13 what I responded to. I showed you all the
14 exhibits where we summarized the data. There
15 is only one -- there is two questions that
16 talked about authorized agents, if you go to
17 Exhibit-6A, question 7A, asked explicitly,
18 Skiplagged is an authorized agent. Question
19 11A asked explicitly, Skiplagged is an
20 authorized travel agent with access to fares
21 that could not access the other airlines.
22 These are the only two places where the term
23 authorized agent appear.
24       All the other responses just like in

Page 168

1 Exhibit 6A and the other exhibits I read you,
2 do not ever mention the word authorized agent.
3 It talked about association or connected.
4 BY MR. REED:
5 Q. And in all of those -- and the responses to all
6 of those open-end questions, to get within that
7 section, they had to say associated or connected?
8 A. Or something similar to this.
9 Q. That the independent coders, we don't know who
10 they are at Radius, made the determination based upon
11 your training, as to how to interpret those questions
12 as to mean associated; is that correct?
13 A. Yes. I'll just qualify. They are not unknown
14 that we don't know who they are. They are very
15 qualified coders who know how to code open-ended
16 responses.
17 Q. None of which you can identify for me today,
18 correct?
19 A. I can't identify any of the people --
20       MR. NELSON: Objection to form.
21       THE WITNESS: Sorry.
22       MR. NELSON: Go ahead.
23       THE WITNESS: I cannot identify any of
24 the people that worked on the project. That's

Page 169

43 (Pages 166 - 169)

1     the way research works.  I am the designer of
2     the project, the designer of the research, I
3     write the questionnaire, I write the report, I
4     basically analyze the data.  But there are a
5     lot of people involved in producing the data to
6     be able to present it here, and I don't have to
7     know each person's name.
8  BY MR. REED:
9  Q.     And so we don't know as we sit here today, and
10 you cannot provide testimony today on those coders who
11 had a judgment in coding something being associated or
12 not associated between Skiplagged and the Airline,
13 right?
14              MR. NELSON:  Objection to form; asked
15         and answered; argumentative.
16         Go ahead.
17              THE WITNESS:  I can tell you with full
18         confidence that these are qualified coders that
19         do it as part of their professional lives,
20         analyze open-ended questions.  They've been
21         doing it for a long time.  They are working for
22         Radius under the supervision of qualified
23         people that I worked with for a long time and I
24         have full confidence in their responses.

Page 170

1     sponsors.  And B, the procedure for resolving
2     conflict between the two coders.
3              That's the process we did.  That's the
4         correct scientific process for coding
5         open-ended responses.
6              MR. REED:  Objection; nonresponsive.
7  BY MR. REED:
8  Q.     My question, sir, that you have not answered,
9  is you have not identified in any place in your report
10 or in any attachments to your report or any other
11 documents produced the identity these coders, have
12 you?
13              MR. NELSON:  Objection; asked and
14         answered; argumentative; relevance.
15              THE WITNESS:  I identified them as
16         people working for Radius, under the Radius
17         supervision, without knowing who are the
18         specific Joe Blow people who did it.
19 BY MR. REED:
20 Q.     So you have not identified them by name, have
21 you?
22 A.     Correct.
23 Q.     Okay.  And the scientific approach here for
24 content analysis, what is that?

Page 172

1              And the most important thing we have
2         all the actual verbatim included in the report
3         I submitted.  Appendix C7 include all the
4         verbatim.  Your experts could have taken the
5         verbatim and analyzed them if they weren't
6         positive the way we coded it.
7              MR. REED:  Objection; nonresponsive.
8  BY MR. REED:
9  Q.     Nowhere in your appendices or any documents
10 that you provided do you identify who these coders
11 were, do you?
12              MR. NELSON:  Asked and answered;
13         argumentative; relevance.
14              THE WITNESS:  In the data analysis
15         section.  I think it's in this section.
16              (Reviewing document.)
17              Page 28, I clearly say in their
18         analysis of the verbatim responses, regarding
19         the reasons for the confusion and perceived
20         deception.  This analysis followed scientific
21         approach for contact analysis, including
22         coding, including coding the data by, A,
23         involving two independent coders, who are not
24         familiar with the objective, the study or the

Page 171

1  A.     That's exactly what's described there.
2  Q.     It's what goes on by A and --
3  A.     It's exactly what is described.
4  Q.     What's your support for that scientific
5  approach?
6  A.     The entire literature on content analysis of
7  open-ended responses.  There is a whole literature
8  involved in communication research, in social science
9  research and others.
10 Q.     Can you name me the leading publication on
11 that?
12              MR. NELSON:  Objection; assumes facts
13         not in evidence.
14              THE WITNESS:  If you want me to search
15         or Google the different names, I'll be glad to
16         give you, you know, a hundred references.
17 BY MR. REED:
18 Q.     Did you consult any authority when following
19 the scientific approach as part of your analysis?
20 A.     No.  I view myself as an expert in this area.
21 I've done it thousands of times.  I've done thousands
22 of researchers.  And I'll be glad to take the time, if
23 you want to and Google it and give you a lot of names,
24 I'll give you a hundred references.

Page 173

44 (Pages 170 - 173)

1 Q.   Okay.  Looking at page 40, which is following
2 the chart on perceived relationship between
3 Skiplagged, Expedia and AA.
4      Do you see that?
5 A.   Yes.
6 Q.   Okay.  On page 40, you have two little
7 paragraphs that start -- I want to start with that
8 second paragraph where you have, "The response to this
9 question are presented in Exhibit-6."  The question
10 meaning whether Skiplagged is an authorized travel
11 agency with access to fares I could not access via the
12 airline, right?
13 A.   Correct.
14 Q.   Okay.  You say, "An extremely high percent of
15 respondents, close to 40 percent, exposed to the two
16 Skiplagged stimuli said yes."
17      When you say the two Skiplagged
18 stimuli, you mean both Hidden City and non Hidden
19 City?
20 A.   Correct.
21 Q.   Okay.  Maybe the reasons for this perception is
22 the way the material is presented?
23 A.   Correct.
24 Q.   Okay.  And the way the material is presented
Page 174

1 was presented to them as the stimuli that we've gone
2 over for in Exhibit-6, your presentation, right?
3 A.   Correct.
4 Q.   Okay.  Which -- never mind.
5      What factors of the way the material is
6 presented is the reason for this perception?
7 A.   Well, you can look at this in some of the
8 open-ended responses.  Some of them is fitted here or
9 not.  But primarily it relates to the way the American
10 Airline flight is presented with American Airline logo
11 and identification, the format in which it is
12 presented.  And I think this is the dominant reason.
13 But then we can look specifically at the responses.
14      So if we look at the responses to
15 Exhibit-6, you know, so there are things such as --
16 this is page 41, because I could buy the ticket.  You
17 can buy the ticket from American.  Because the service
18 is unique to them.  Because I believe they are
19 cheaper.  Those tickets are too cheap for it to be
20 anything else.  It seems they have very reasonable
21 prices that I have not seen through the airline
22 directly.  The only way I see them being able to get
23 to the low prices.  But it seems to me the way, the
24 general sense here is, because the way it's presented
Page 175

1 and that fact they can buy the American tickets on
2 this website.
3 Q.   None of those responses say because I saw the
4 American logo, do they?
5 A.   No.
6 Q.   Okay.  All right.  Looking at page 42 here.
7 This Exhibit-6A table, entitled overall and net
8 perceived association between Skiplagged and the
9 airlines, all associated questions.
10      What is this table supposed to show?
11 A.   That's the summary of the previous four tables.
12 Q.   Okay.
13 A.   And to calculate the net.  The key was the net.
14 To avoid duplication to find out.  Because it was
15 presented -- in the previous four charts, we presented
16 the individual numbers.  Here it is to take all of
17 them together and find out how many respondents are
18 here, which are unique respondent without multiple
19 answers and get to 76 percent or the 72.9 percent.
20 Q.   Now, under net, it says, "Said yes to at lease
21 one question."
22      Now, you don't mean that the
23 respondents literally said yes associated to at least
24 one of the questions, right?
Page 176

1 A.   Well it is the yes to whatever the question is.
2 So the associate, the only places where we ask
3 explicitly associate and connected would be the second
4 line, would be question 1 to 6, is the question, are
5 they socially connected with the required permission
6 from each other.  All the others are based on analysis
7 of the open-ended responses.  This is the first group.
8 And then the 7A and 11A is based on the responses to
9 those explicit questions.
10 Q.   It's based upon the coder's interpretation of
11 those responses, right?
12 A.   These are based on the actual question.  These
13 are closed-end questions.  7A and 11A are closed-end
14 questions.
15 Q.   Oh.  Okay.
16 A.   The other one is the coder's interpretation.
17 Right.
18 Q.   Okay.  Now, that includes question 2, right?
19 A.   Yes.
20 Q.   Okay.  And question 2 asks the respondents
21 which other company does the company operating this
22 website have a business connection or association
23 with, correct?
24 A.   Well, it asks, does the company that operates
Page 177

1 this website have a business connection or association
2 with another company or do you not know.
3 Q.   Okay.  I just -- there's a general question,
4 have association with another company, right?
5       MR. NELSON:  Object to form.
6       THE WITNESS:  Correct.
7 BY MR. REED:
8 Q.   Not with an airline?
9 A.   Correct.
10 Q.   Not with American Airlines, right?
11 A.   Correct.
12       But keep in mind that the stimulus is
13 that primarily the American flight.  That's the one
14 that they've been focusing on.
15 Q.   Because that's what you chose to focus on,
16 correct?
17 A.   Because that's the material presented on
18 Skiplagged.  Skiplagged presented the material this
19 way.
20 Q.   SKiplagged only shows American flights?
21 A.   No.  But --
22       MR. NELSON:  Objection;
23       mischaracterizes.
24       THE WITNESS:  Skiplagged select,

Page 178

1 Q.   And talking about Exhibit 11A in your report,
2 this table.
3       This refers to questions 15A and B,
4 right?
5 A.   Yes.
6 Q.   Okay.  And this is what you were just talking
7 about, given the additional information about American
8 Airlines, how did consumers feel about Skiplagged or
9 Expedia?
10 A.   Correct.
11 Q.   Okay.  Now, I thought you just said that that
12 information was only given to the Hidden City ticket,
13 but in this chart it seems to have both?
14 A.   (Reviewing document.)
15       MR. NELSON:  Objection;
16 mischaracterizes.
17       THE WITNESS:  (Reviewing document.)
18 I'll have to check it.
19       MR. NELSON:  Why don't we take a break
20 so you can check it and answer his question.
21       MR. REED:  Well, I don't think we need
22 to check that right now.  I have some more
23 questions here.
24       MR. NELSON:  Well, we'll take a break

Page 180

1       basically this is exact copy of what -- it's a
2       screenshot from Skiplagged's website.  That's
3       the way Skiplagged present it.
4 BY MR. REED:
5 Q.   It's not, though, we already establish that,
6 right?  The red box was added, that's not an exact,
7 right?
8 A.   That's the only difference.
9 Q.   Okay.  But it's not exact, right?
10 A.   Well, everything else, other than the red box,
11 to highlight for the consumer what we are focusing on
12 so there won't be confusion that they are focusing on
13 American.  Everything else is a screenshot from
14 Skiplagged.
15 Q.   Okay.  And then you went through the stimuli
16 that included the American flights and the chart with
17 comparing Skiplagged and American, right?
18 A.   The chart comparing Skiplagged with American
19 represented only the second part of the questionnaire.
20 Q.   Okay.
21 A.   And only for the Hidden City sale, not the
22 other sale.
23 Q.   Okay.  Let's go to page 53 of your report.
24 A.   (Reviewing document.)

Page 179

1 anyway.  It's afternoon.  It's after lunch.  I
2 find that this is kind of a drag anyway just
3 sitting here.
4       MR. REED:  Well, we'll see how his
5 answer is after the break then.
6       MR. NELSON:  I'll sit here while he's
7 taking a walk then.
8       MR. REED:  We can go off the record.
9     (Discussion was held off the record.)
10 BY MR. REED:
11 Q.   We're back on the record.
12       If you look at Exhibit 11B on page 54,
13 this is a -- some examples of negative verbatims in
14 response to questions 15A and B, correct?
15 A.   Correct.
16 Q.   Okay.  And these are ones that Radius pulled
17 together for you?
18 A.   Yes.
19 Q.   Okay.  And these were classified as negative by
20 their coders, right?
21 A.   Correct.
22 Q.   Okay.  If you'll look for me in that first
23 column under the Skiplagged, which would be the non
24 Hidden City ticket test, third down, it says, "I

Page 181

1 prefer to order tickets from a site I'm familiar
2 with."
3          Did I read that correctly?
4 A.    Yeah.
5 Q.    And that's classified as negative, correct?
6 A.    Yeah.
7 Q.    And anything specifically negative towards
8 Skiplagged there?
9 A.    Well, it suggests that they're not familiar
10 with them.
11 Q.    They're not familiar with --
12 A.    Yeah.
13 Q.    -- being --
14 A.    That's probably the interpretation of the
15 coders.
16 Q.    And so being not familiar put them into the
17 negative category for this verbatim?
18 A.    Yeah.
19 Q.    Now, next page has 11C and 11D, which has
20 neutral and positive verbatims, right?
21 A.    Right.
22 Q.    And we have a neutral being, let's see, first
23 column, about the fourth down, it says, "I feel
24 comfortable buying a ticket from this agency.  It

Page 182

1 Q.    Is it your understanding that the Skiplagged
2 website claims that Skiplagged can sell non Hidden
3 City tickets cheaper than the airline?
4 A.    Yes.
5 Q.    And based upon your review of the website, it
6 states that?
7 A.    Yeah.  My -- I -- if you look at the website at
8 the open-ended, we can look at those, it screaming
9 cheap.  Everything there is cheap.  The message is
10 cheap.  You want cheap tickets.  All the comparison
11 and following with all the comparison they have,
12 everything suggests cheap.
13 Q.    My question was different.
14          Did anywhere from your review of the
15 website does it say Skiplagged can sell non Hidden
16 City tickets cheaper than the airlines?
17          MR. NELSON:  Objection; argumentative;
18 asked and answered.
19          THE WITNESS:  I don't think they say
20 explicitly non Hidden City tickets against the
21 airlines.  I think that my response was that my
22 interpretation of the website, the overall
23 message is very effective and says cheap,
24 cheap, cheap and get better deals here.  And

Page 184

1 looks professional and just like other websites."
2          Did I read that correctly?
3 A.    Yeah.
4 Q.    Why is that considered and classified neutral?
5 A.    (Reviewing document.)
6          I don't know.  That's again, to try to
7 maintain the objectivity in the reporting, I asked
8 them to select what they believe were representative
9 quotes.  I did not select them.  I would probably not
10 have selected this one.  But again, I wanted to report
11 here that the coders that did analysis perceived it to
12 be neutral.
13 Q.    How would you have coded that statement?
14 A.    (Reviewing document.)
15          Probably as positive.
16 Q.    Okay.
17 A.    But again, I have to look -- the advantage that
18 they have, they look to disclose as part of the
19 context of the entire set of responses, I am at the
20 disadvantage.  I'm looking only at this without
21 context.  So without context, I would have said
22 positive.  But I'm not sure that's what I would do,
23 depending on the rest of the verbatim, whatever else
24 is responded.

Page 183

1 I'm addressing it here in my report in the last
2 part, evaluating the Skiplagged website against
3 the rates criteria, when I say very explicitly.
4 It's a very effective, very cleverly designed
5 website to communicate this cheapness and to
6 get better deal here.
7 BY MR. REED:
8 Q.    Okay.  And, in fact, you can get a better deal
9 on the Hidden City tickets, right, you saw that?
10          MR. NELSON:  Objection;
11 mischaracterizes.
12          THE WITNESS:  Well, the Hidden City,
13 the analysis was done on the Hidden City
14 tickets, the 200 sample we did, suggest that
15 the vast majority of the cases you will get a
16 better price on Skiplagged.
17 BY MR. REED:
18 Q.    Okay.
19 A.    But the problem there is they don't disclose
20 the real risks.
21 Q.    The risks.  Okay.  I get that.
22          But when we're talking just price, even
23 you found that there is a better price on Skiplagged
24 for Hidden City, right?

Page 185

47 (Pages 182 - 185)

1   A.    Right.
2           MR. NELSON:  Objection to form.
3   BY MR. REED:
4   Q.    Okay.  And you can't point me to anywhere where
5   it expressly says on Skiplagged that they can get a
6   better price than the airline on the non Hidden City,
7   right?
8   A.    They don't say it explicitly but --
9   Q.    Okay.
10  A.    -- everything in their message and the entire
11  website screams cheap, cheap, cheap.
12  Q.    Okay.  Similar to Walmart, Walmart has a
13  message of being cheap, cheap, cheap, right?
14  A.    Well, yes.  I was at that website recently.
15  But definitely the website of Skiplagged suggests you
16  could have a bargain, cheap, and will get you there at
17  the best prices.
18  Q.    And is Walmart being deceptive when some of
19  their products is more expensive than their
20  competitors, because they're overall screaming cheap,
21  cheap, cheap, too, right?
22          MR. NELSON:  Objection; false
23      hypothetical; beyond the scope.
24          THE WITNESS:  Well, it depends.  It
                                        Page 186

1       depends on the content.  Depending what the
2       consumer perceives.  I'm reporting here
3       primarily on consumers perceptions.  And
4       consumer perceptions are as we say it here.  So
5       if you look at the data, then we have one of
6       the tables, it talks specifically about the
7       perception of price.  And consumers perceive
8       them to be cheaper.
9   BY MR. REED:
10  Q.    Consumers perceive Expedia to be cheaper too,
11  right?
12  A.    Correct.
13  Q.    Even though it's not?
14  A.    Well.  It's correct with respect to the non
15  Hidden City ticket.  It's not correct with respect --
16  I'm sorry.  It's correct for the Hidden City tickets,
17  it's not correct for the non Hidden City tickets.
18  Q.    Did you do any analysis on whether Expedia was
19  actually cheaper than booking directly through
20  American's website?
21  A.    No, I did not.
22  Q.    All right.  Now, going back to page 28, I want
23  to start looking now at section B and what you
24  entitle, Validating the Consumer Experiments with
                                        Page 187

1   Other Data and Relevant Marketing and Consumer
2   Behavior, Theories and Findings.
3           Okay?
4   A.    Yes.
5   Q.    Now, is this the section where you were trying
6   to check your work?
7   A.    Well, it's a common, I wouldn't say check the
8   work.  I feel very comfortable that the work we've
9   done is correct and valid.  But it's always strengthen
10  your conclusion when you have independent data that
11  suggests the same thing.  That's called conversion
12  positivity.  And that's what I'm trying to do here.
13  Q.    Okay.  And the independent data that you went
14  to look for were one, consumer complaints to American
15  about Skiplagged, right?
16  A.    Yes.
17  Q.    And then two, consumer complaints to
18  Skiplagged, right?
19  A.    Correct.
20  Q.    Three, social media posts saying what?
21  A.    Talking about their consumer experience with
22  Skiplagged.
23  Q.    Skiplagged.
24          Do you do social media posts about
                                        Page 188

1   American?
2   A.    No.
3   Q.    Didn't look at those.  Okay.
4           And then four, consumer behavior and
5   advertiser theories.  That's where you were taking
6   about the ratings, right?
7   A.    Correct.
8   Q.    Okay.  Let's start with the consumer complaints
9   to American about Skiplagged.
10          And you looked at a period from January
11  of 2018 through March of 2024?
12  A.    Correct.
13  Q.    Why did you pick that period?
14  A.    Because my understanding is that's a relevant
15  period.
16  Q.    Okay.  But you didn't look at that period for
17  your definition of consumer though, right?
18  A.    No.  Consumer is basically current perceptions.
19  Q.    Okay.
20  A.    So we look at, for the selection of the
21  respondent, we look at what's commonly done, which is,
22  have you bought this product or service in the last
23  year or do you intend to buy in the next year.
24  Q.    All right.  Did you do any analysis as to who
                                        Page 189

1 the typical Skiplagged customer is in reality?

2 A.   No.

3 Q.   As to whether they're typical consumers are

4 ones who plan a year out?

5 A.   No.  We have not received any data from

6 Skiplagged as to their customer base.

7 Q.   And you did nothing to analyze whether their

8 customer base is typically more last minute purchasers

9 or planners, did you?

10 A.   No.  But, you know, the definition we have will

11 capture that.  Because we're not talking about

12 planning, we're talking about the question was, do you

13 intend to fly in the next year?  So it's not

14 necessarily planning a particular trip.  So people who

15 don't plan and just last minute purchasers of tickets

16 will fall in this category.

17 Q.   Okay.  But planners would too.  And if they're

18 not typically a consumer of Skiplagged, that could

19 possibly have individuals that are not representative

20 of the customer base?

21        MR. NELSON:  Objection to form.

22        THE WITNESS:  Assuming you're right and

23     the Skiplagged population does not include

24     planners, I have not seen such data.

Page 190

1 BY MR. REED:

2 Q.   Okay.

3 A.   But if you have such data, then it's definitely

4 an opportunity for your side to do study among them.

5 Q.   But you didn't differentiate that, right?

6 A.   No.

7 Q.   Okay.

8 A.   But I believe that my definition of the

9 respondent is correct.  I have not seen any data to

10 contradict this.  And the universe, through our study,

11 is the right universe in term of people who flew in

12 the last year and plan to fly in the next year and buy

13 their tickets online.

14 Q.   And in the consumer complaints, you looked back

15 from March of 2024, all the way back to January

16 of 2018 correct?

17 A.   Correct.

18 Q.   And in that American customer complaint

19 database, there were 88 complaints, correct?

20 A.   Correct.

21 Q.   Okay.  Out of how many total during that time

22 period?

23        MR. NELSON:  Objection to form.

24        THE WITNESS:  I have no idea.

Page 191

1 BY MR. REED:

2 Q.   Did you do anything to analyze the total number

3 of complaints during that time period?

4 A.   No.  We were just focusing primarily on

5 understanding people complain about Skiplagged and

6 what they were saying.

7 Q.   Okay.  How many complaints about Expedia to

8 American during that time period?

9 A.   I don't know.

10 Q.   You didn't look, did you?

11 A.   I did not.  We are looking for content here.

12 Q.   Okay.  And of those 88 complaints, 80 dealt

13 with Hidden City; is that correct?

14 A.   Yes.

15 Q.   And then you said an analysis was done by a

16 litigation support company.

17        Who did the analysis?

18 A.   This was a group that was recruited by Zach in

19 the GT, that did basically that analysis.

20 Q.   So was that Greenberg lawyers who did the

21 analysis?

22 A.   People that they hired to do it.  The

23 litigation support group that they hired to do that

24 analysis.

Page 192

1 Q.   Do you know who they hired?

2 A.   I don't remember the name.

3 Q.   Is it identified, and maybe I missed it.  Is it

4 identified anywhere in your report?

5 A.   I don't recall.

6 Q.   Okay.  Did you have any communication with the

7 litigation support group who did the analysis?

8 A.   No.  I did discuss it mostly with Zach, who was

9 the link in training and the discussion was with him.

10 Q.   So it all went through Zach at Greenberg?

11 A.   Correct.

12 Q.   Okay.  So the definition, then, of the

13 deception and confusion, is that something that Zach

14 developed?  The litigation support company?  Or you?

15 A.   I did.

16 Q.   Okay.  And this definition of deception, does

17 that come from a recognized authority, or is it

18 something you came up with for this project?

19 A.   I came up with for this project, based on my

20 understanding of the material.

21 Q.   Same thing with confusion?

22 A.   Correct.

23 Q.   Okay.  Under deception, you have any complaint

24 where the customer is --

Page 193

49 (Pages 190 - 193)

1  A.   I'm sorry.  What page are you on?
2  Q.   I'm sorry.  It's the bottom of page 28.
3  A.   Yes.
4  Q.   It starts there with deception.  Do you have
5  any complaint where the customer misunderstood what
6  they were buying?
7         Okay.  And so is that where they
8  misunderstood that they were buying an airline ticket?
9  A.   (Reviewing document.)
10        No.
11  Q.   Everyone understood they were buying an airline
12  ticket?
13  A.   Right.
14  Q.   Okay.  So the confusion as to whether they were
15  buying a Hidden City ticket or not?
16  A.   That's part of it, or what is the nature of the
17  Hidden City ticket.
18  Q.   Okay.
19  A.   Mostly about the constraint, the risks involved
20  with Hidden City ticket.
21  Q.   Okay.  So misunderstood the risk with Hidden
22  City tickets?
23  A.   That's the major underlying factor of
24  deception.

Page 194

1  Q.   Okay.  This included where the customer is
2  confused because their itinerary has an extra leg
3  beyond where they plan to get off.
4         That's a Hidden City ticket, right?
5  A.   Right.
6  Q.   Okay.  "Where the customer did not get the
7  necessary Visa or bring a passport for a ticket where
8  the final destination is international."
9         Did I read that correct?
10  A.   Correct.
11  Q.   Okay.  Now, your stimuli didn't include an
12  international leg, did it?
13  A.   No.  The destination selected were domestic
14  routes.
15  Q.   Okay.  So -- all right.  So you didn't do any
16  testing on confusion within your study that included
17  an international leg, right?
18  A.   No.  But if people mentioned this, you know,
19  we're talking about complaints here.  The complaints
20  can include from people who flew international.
21  Q.   Okay.
22  A.   So this is represents -- these are some
23  possible answers that were real deception.
24  Q.   And that becomes deception instead of

Page 195

1  confusion, why?
2  A.   Because they didn't know about it.  Because
3  these are risks involved with Hidden City ticket that
4  were not revealed by Skiplagged.
5  Q.   Because it's your belief that on the Skiplagged
6  website, it doesn't indicate anywhere during the
7  process of purchasing the Hidden City ticket with an
8  International leg, the fact that you need a passport?
9         MR. NELSON:  Objection to form;
10      mischaracterizes.
11         THE WITNESS:  It's based on consumers.
12      So this is the stimulus.  According to Wind-6.
13      They saw the stimulus and these are responses
14      to my survey.
15         In this specific part of the report
16      we're talking about is the complaint, nothing
17      to do with my stimuli.  This is based on the
18      real world reaction of people who bought and
19      have experience with Skiplagged and believe
20      that American is the place to complain about
21      their Skiplagged experience, which is huge
22      problem for American.  And these are the nature
23      of the complaint.  So based on this, the
24      definitions here were defined after listening

Page 196

1      for a lot of examples of the complaint and
2      categorizing them into these two categories of
3      confusion and deception.  And that's what was
4      given basically to the coders.
5  BY MR. REED:
6  Q.   And let me ask you this, though.  If Skiplagged
7  had, in fact, disclosed that you need a passport when
8  someone is booking a Hidden City ticket that includes
9  an international leg.  And for whatever reason that
10  customer didn't get it and then they complained about
11  it.  But if it was disclosed, should that still be
12  classified as deception or confusion?
13  A.   Well, this is first of all, this is
14  hypothetical.  But let's accept this hypothetical.
15  Let's say they disclosed it.  We're dealing with real
16  complaint of real people that apparently did not see
17  it.  So the question is how did they disclose it?  It
18  might be, yeah, we can disclose it in small print and
19  no one looks at it.  So, yeah, to me that's a
20  deception because the disclosure has to be visible.
21  There is the requirement, if you talk about
22  disclosure, it has to be visible and clear and
23  consumers have to be able to see it.  So if they did
24  not see it, to me this is the fault of the website by

Page 197

50 (Pages 194 - 197)

1  not making this explicit so people will see it.
2  Q.    If it was disclosed, not in a small print
3  somewhere but in a pop up that required the consumer
4  to check the box acknowledging that they saw this, in
5  your mind, is that still deception or confusion?
6  A.    If I was Skiplagged and I saw this type of
7  complaint, I would basically go and reexamine the way
8  I am disclosing it. Because to me this says whatever
9  way I disclose is not effective because people don't
10 see.
11        MR. REED: Objection; nonresponsive.
12        MR. NELSON: Well, you asked him a
13        giant vague hypothetical and his answer was
14        responsive.
15        MR. REED: I'm objecting to the side
16        bar. You're outside the federal rules now.
17        MR. NELSON: Well, so is your
18        self-objection.
19        MR. REED: I object to the commentary
20        as well. Let's keep it to the Federal rules.
21        MR. NELSON: All right. Try asking a
22        clear question, you'll get a clear answer.
23 BY MR. REED:
24 Q.    All right. My question, sir, is because you

Page 198

1  had mentioned before why you kept it deception and not
2  confusion is that in my hypothetical you said, oh, it
3  was in small print. My clarification on that is,
4  okay, not in small print, it's in a pop up that
5  requires you to check a box that says I acknowledge I
6  need a passport before proceeding on. Kind of like
7  the check boxes we saw in the back before. Remember
8  those pop ups?
9  A.    Yes.
10 Q.    Okay. Assume that is required on an
11 international leg Hidden City ticket, would you still,
12 when someone had a complaint about needing a passport
13 would you still classify that as deception or
14 confusion?
15        MR. NELSON: Objection; complete
16        hypothetical; beyond the scope; asked and
17        answered.
18        THE WITNESS: The reality, the fact
19        here, even in this hypothetical is, a consumer
20        complain about this. Obviously, they did not
21        see or they're lying. Let's assume they are
22        not lying, then, obviously, they did not see.
23        So the burden should be on the website designer
24        and owner to try to make sure that this

Page 199

1  disclaimer is clear.
2        MR. REED: Objection; nonresponsive.
3  BY MR. REED:
4  Q.    You came up with these definitions of deception
5  and confusion, right?
6  A.    Based on examples of complaints.
7  Q.    Okay.
8  A.    I did not invent them. I looked for, show me
9  the whole set of -- I reviewed a whole set of
10 complaints. And then based on the review of the set
11 of complaints and what they said, I categorized them
12 into these two. So then I discussed them with Zach
13 and communicated with the coders and that's what we
14 have.
15 Q.    Let me ask you this way, since we seem to be
16 miscommunicating.
17        What would Skiplagged need to do in
18 your mind to convey the need for a passport on a
19 Hidden City ticket, international leg flight, that if
20 the consumer then complained about it, would qualify
21 it as confusion not deception?
22 A.    I would -- first of all, I'm not sure that
23 confusion is the alternative. The alternative would
24 be, there are no deception. That it's kind of

Page 200

1  misinformation. But to be the correct information the
2  deception here or to avoid deception, they have to
3  make sure the consumer sees clearly and understands
4  it. And I would, depending on design, there are
5  thousands of different way in which you can design a
6  website and you can test it. All the large companies,
7  Google, everyone else, have tons of thousands of test
8  everyday. They are doing A-B testing all the way. If
9  I were Skiplagged, I would design A, B testing
10 different approaches for communicating this and seeing
11 which one lead to the greatest understanding by
12 consumers and go with that.
13 Q.    And so if there was -- they did that and they
14 have it disclosed and a consumer still misses it and
15 doesn't complain, would you still code it as
16 deception?
17        MR. NELSON: Objection; complete
18        hypothetical.
19        You can answer.
20        THE WITNESS: Well, I think I'm looking
21        at this not from a legal point of view, I'm
22        looking at this from a marketing point of view.
23        From a marketing point of view, to me this is
24        the situation that's described, the situation

Page 201

51 (Pages 198 - 201)

1    where whatever they did is ineffective in
2    communicating the truth.
3  BY MR. REED:
4  Q.    So whenever it's ineffective, it's deception?
5  A.    No. I'm saying I'm separating it here in my
6  response to you on this. But if they really did all
7  the best they can to try to communicate it and still
8  people do not get it, then the conclusion is that they
9  were ineffective in communicating the truth to the
10  consumer and I would not define it as deception.
11  Q.    Okay.
12  A.    Deception is when basically, when I look at the
13  material and the way I looked at this and I thought
14  this is not that visible. That's deception. So this
15  is the distinction I would make from a marketing
16  consumer behavior point of view. This may not be the
17  legal deception.
18  Q.    Okay. And is it your testimony that you went
19  through the Skiplagged website and simulated buying a
20  Hidden City ticket with an international leg?
21  A.    No, I did not.
22  Q.    Okay. Let's turn to page 62.
23  A.    (Reviewing document.)
24  Q.    Now, Exhibit 16 in your report, starting on

Page 202

1  page 62. You have examples of complaints to
2  Skiplagged that you say evidence Skiplagged's
3  deceptive practices, right?
4  A.    Correct.
5  Q.    And the deceptive practices being what?
6  A.    The one that we defined in our previous
7  paragraph.
8  Q.    Under deception?
9  A.    Yeah.
10  Q.    Okay. So those things, deceptive has the same
11  meaning?
12  A.    Correct.
13  Q.    I just wanted to make sure. Okay.
14        And can you point to any of these
15  complaints in 16 that refer to Skiplagged's use of
16  American's marks?
17  A.    Explicitly to the marks, I don't know. I have
18  to look -- I have to read the whole thing.
19  Q.    Are you aware of any?
20        MR. NELSON: Hold on. Do you want him
21  to answer the last question? He said he has to
22  read it.
23        THE WITNESS: I have to read it.
24

Page 203

1  BY MR. REED:
2  Q.    Okay. Okay. Sure. Take your time.
3  A.    (Reviewing document.)
4        Okay. So on this page F, there were
5  six quotes and three of them mention explicitly
6  American Airlines. The second quote on the fourth
7  line, the fourth quote on the third line, and the last
8  quote on the second line.
9  Q.    So if it uses the word American Airlines, it's
10  your contention it's using the American marks?
11  A.    Yeah. It's American Airlines registered
12  trademark.
13  Q.    Just using that name?
14  A.    Yeah.
15  Q.    Without anything else?
16  A.    What do you want people in a complaint to say?
17  Q.    Okay.
18  A.    It's a complaint. That's the way they want to
19  refer to it. It's a registered trademark of American
20  Airline. They used the name. So here it is. It's a
21  complaint. It's a written complaint.
22  Q.    Okay. I just wanted to understand where we're
23  at, if we're on the same page.
24        Now, turning to -- let's go back here.

Page 204

1  Back to page 29, going to the definition of confusion.
2  This is the definition you used for your report.
3  correct?
4  A.    Based on my analysis of the actual complaints.
5  Q.    Okay.
6  A.    So this represents -- all these items reflect
7  what I took from reading the complaint. And then this
8  was what's communicated by Zach to the coders.
9  Q.    Okay. And confusion you have, is "Any
10  complaint about role, authority or relationship of
11  Skiplagged vis-a-vis the airline," right?
12  A.    Right.
13  Q.    "This included any complaints suggesting the
14  customer misunderstand what Skiplagged could and could
15  not do to support a customer after purchase or the
16  customer assumed Skiplagged could provide travel
17  agency services. Any complaint where the customer
18  expected Skiplagged to reaccommodate, cancel, refund
19  flight price, make meal selections or seat
20  reservations and any complaint where the customer
21  thought Skiplagged is an approved booking partner or
22  agent," correct?
23  A.    Yes.
24  Q.    Okay. And all of that falls under confusion

Page 205

52 (Pages 202 - 205)

1  for the numbers in your report, correct?
2  A.    Correct.
3  Q.    Okay.  Now, when we go to page 66, Exhibit 17,
4  these are the complaints that you picked out that are
5  complaints to Skiplagged, evidencing confusion, as
6  based upon your definition in this report, right?
7  A.    Correct.
8  Q.    All right.  Then, let's see.  Exhibit 18, what
9  is that then?
10  A.    (Reviewing document.)
11        MR. NELSON:  Objection to form.
12        THE WITNESS:  This is, if you look at
13  page 67, page 67 explains it.  This is this
14  third source of data, which is under the
15  heading of page 67, illustrative actual
16  confusion and perceived deception and consumer
17  posts on social media.  And Exhibit 18 includes
18  illustrative posts on social media which cover
19  the different categories, which are listed on
20  page 67 and are presented here.
21  BY MR. REED:
22  Q.    All right.  How did you go about getting the
23  social media comments?
24  A.    It was a project done by Voluble.  And they did

Page 206

1  comments were made by actual people?
2  A.    They did not, we did not require them -- actual
3  people?  They do -- that's a general procedure they
4  have in reviewing posts and they try to eliminate
5  votes and others.
6  Q.    Where is that identified in the documents?
7  A.    It's not.  It's part of their regular
8  procedure.
9  Q.    Okay.  But nowhere in here does it show --
10  A.    No.  I just assumed that it's -- that's part of
11  the normal way in which they do analysis.
12  Q.    You made that assumption?
13  A.    I know.  I worked with them for the last five
14  years.
15  Q.    Okay.  And but you don't know as you sit here,
16  what process they used to eliminate false comments or
17  bots or anything like that?
18  A.    I know that they have a process to eliminate
19  bots.  If someone dies, I have no idea if they can
20  identify it, check it or not.
21  Q.    Okay.  And you said the search was limited to
22  apps, formally Twitter and Reddit, correct?
23  A.    Correct.
24  Q.    No Facebook?

Page 208

1  it -- this is described in the methodology section.
2  Q.    You didn't actually go collect them, did you?
3  A.    No.  That's the reason I hired Voluble to do
4  it.
5  Q.    All right.
6  A.    They were -- that's their specialty.  And
7  that's what they primarily focused on.  And on page
8  30, there is a description of the methodology that
9  were used.
10  Q.    And so it's your directed them to identify and
11  collect consumer comments posted on line about
12  Skiplagged, correct?
13  A.    Correct.
14  Q.    Okay.  And then the consumer, did you direct
15  them as to that they had to be individuals that had
16  actually made a purchase on Skiplagged?
17  A.    No.  That any -- any posts that mention the
18  name Skiplagged in it.
19  Q.    Okay.
20  A.    To try to undo, to identify them and pull
21  examples.  And, again, then they did it, not I.  They
22  selected examples that they were able to pick up on
23  the social networks.
24  Q.    Okay.  What did they do to verify that those

Page 207

1  A.    No.
2  Q.    No Instagram?
3  A.    These are the one that they could get the data,
4  you know, relatively easily.
5  Q.    Okay.  For ease of getting the data, you were
6  limited to those two, correct?
7  A.    We had a time constraint on this.  We decided
8  pretty late in the game to edit.  And they -- that's
9  what they were able to deliver on time.  And these two
10  platforms are big, Twitter and Reddit are really big
11  platforms.  And I think they are representative,
12  again, that's not an exhaustive list, but that's
13  illustrative list.
14  Q.    How many comments?
15  A.    I think there were about 50 comments or so in
16  this area.  I did not count them.  If you look at all
17  the cat- -- under all these categories.
18  Q.    But these are all that were found?
19  A.    That illustrative that they gave.  I asked them
20  to give me illustrative comments on some of these
21  topics and that's what they selected.
22  Q.    But is there anywhere in your report where it
23  has all of the comments?
24  A.    No.

Page 209

53 (Pages 206 - 209)

1  Q.    You didn't provide that data, did you?
2  A.    No.  I did not get it.  I basically asked them
3  to do the search, find out if there are any and then
4  to give me illustrative and that's the analysis they
5  provided.
6  Q.    They gave you those and then you put them in
7  this report?
8  A.    Correct.
9  Q.    The analysis of putting them -- did you
10  identify them as being deceptive or confusion or
11  deceptive and confusion?
12  A.    Well, I think what I did, when I work with them
13  is on the topic, which are on page 67, this is
14  believing that Skiplagged is an agent of another
15  airline, that the luggage was sent to the wrong
16  destination, with a dishonest ticket, had to pay extra
17  for it, the cost was higher than expected, passport
18  issues, or general dissatisfaction.
19  Q.    And only one here was agent, right?
20  A.    That's from the search they did, they did a few
21  days of work and that's what they found.  I'm sure if
22  we will kind of expand the search to cover the
23  Facebook and others and spend more time and do it more
24  systematically we will find many more.  These are
Page 210

1  illustrative of problems you will see on the social
2  network.
3  Q.    Well, this social media individuals not a -- is
4  this the author down here on the next page?  I was a
5  little confused.
6  A.    (Reviewing document.)
7         Yes.
8  Q.    Okay.
9  A.    For some reason it was printed wrong.
10  Q.    Okay.  And now, in that comment, the poster
11  didn't actually say that Skiplagged was an agent of
12  American, right?
13  A.    I'm sorry.  What was the question?
14  Q.    Well, let me -- the comment while I
15  accidently booked my flight through Skiplagged instead
16  of American and now I can't check my bag, correct?
17  A.    Yeah.
18  Q.    Where in that does the comment say, I believe
19  Skiplagged is an agent of American, right?
20         MR. NELSON:  Objection;
21  mischaracterizes.
22         THE WITNESS:  No, this implied to me,
23  it clearly implies that this person thought
24  that because in looking at this everything is
Page 211

1  American, that he is checking in American and
2  never realized that he's going through
3  Skiplagged.  And was totally surprised
4  apparently by the fact that he got a Hidden
5  City ticket.
6  BY MR. REED:
7  Q.    That's the way you interpreted it?
8  A.    Yes.
9  Q.    Okay.  How do you know it was a Hidden City
10  ticket?
11  A.    Because I think that the restrictions on bag is
12  only on Hidden City.
13  Q.    So you made that inference based upon, I can't
14  check my bag?
15  A.    Yes.
16  Q.    Okay.  The next comment where you have under
17  believing Skiplagged, I guess it is, it has a 6.  It
18  goes 1 to 6.  Is there missing ones?
19  A.    Some, like this, might have been lost in the
20  production of the document.
21  Q.    Okay.  You have "@AKhadiDon," downloaded --
22  "download the Skiplagged app, all flights are cheaper,
23  an yes, it's legit."  And you interpreted that to
24  mean, he thought or he or she, whoever, the poster
Page 212

1  believed that Skiplagged was an agent of American?
2  A.    Yes.
3  Q.    Why?
4  A.    Because he said, yes, it's legit.  He believed
5  that this is a legit place to buy the American Airline
6  ticket, which has to be only through authorized
7  agents.
8  Q.    To your knowledge a user of the Skiplagged
9  website, is there only option after they search for a
10  flight, to buy that flight through Skiplagged?
11  A.    No.  They have other options.
12  Q.    What are they?
13  A.    They cannot buy.  If they decide not to buy.
14  Q.    Okay.  Other than not buying, what other
15  options?
16  A.    I think they can go through another third-party
17  agent.
18  Q.    Okay.  Another option might be they could go
19  directly to American and purchase it there, right?
20  A.    They can, but even though the incentive,
21  obviously, is in the Skiplagged because of the ease
22  just to continue and buy it then on Skiplagged.
23  Q.    As part of your analysis, did you see or look
24  for any studies that show numbers of consumers that
Page 213

54 (Pages 210 - 213)

1  use sites like Expedia or agents to look for prices of
2  ticket, but then go and purchase directly from the
3  airlines?
4  A.    I'm sure there is some.  I don't know the exact
5  statistics, but I'm sure there is some.
6  Q.    You didn't review that as part of your process
7  either, did you?
8  A.    I didn't see.  I didn't see any study that does
9  it.
10  Q.    Did you look for them?
11  A.    Yeah, I did look for some other studies that
12  relate to this.  I couldn't not find any.
13  Q.    Okay.  All right.  Let's talk a little bit now
14  about your conclusions here, which I'm flipping to the
15  end of your report, starting at page 87.
16  A.    Yeah.
17  Q.    Are you there with me?
18  A.    Yes.
19  Q.    All right.  And here you list eight separate
20  conclusions, correct?
21  A.    Yes.
22  Q.    All right.  The first being the results of two
23  consumer experiments.  Two experiments meaning, one
24  Hidden City, one non Hidden City?

Page 214

1  Q.    Okay.
2  A.    That the stimulus I selected, I worked with
3  Zach and the Greenberg law firm on the 200 randomly
4  selected links that lead to the selection of the
5  stimuli.  And every -- my conclusions are based on the
6  consumer, the respondent reaction to the stimuli.
7  Q.    You said randomly selected on the 200.  That's
8  not something you did.  Correct?
9  A.    No.  Zach selected randomly 200 --
10  Q.    Okay.  How do you know that was selected
11  randomly by Zach?
12  A.    Because I spoke with him and we were together
13  on the phone when we did it.  We talked about select
14  randomly or the same time or later.  Select randomly
15  200 links between domestic locations and we focused on
16  the type one airports.
17  Q.    And do you know did he use any type of computer
18  program or anything to assist in this randomness?
19  A.    He mentioned to me at the time.  I don't
20  remember what it is.
21  Q.    He mentioned that he used one?
22  A.    He used something.  I don't remember what it
23  was.
24  Q.    Okay.  And this was a verbal communication, not

Page 216

1  A.    Correct.
2  Q.    Okay.  Among 600 consumers.  That's a total of
3  600?
4  A.    Correct.
5  Q.    With roughly 140 in each group or so?
6  A.    Close to 150, yes.
7  Q.    Okay.  Show conclusively that Skiplagged's non
8  Hidden City and Hidden City ticket offering deceive
9  consumers to believe that Skiplagged is an authorized
10  agent of or otherwise associated with American?
11        Did I read that correctly?
12  A.    Yes.
13  Q.    Okay.  And based upon your analysis, how did
14  you conclude that Skiplagged deceived their consumers
15  into believing that association?
16  A.    By the fact that that's the only stimuli the
17  respondent had was the material from the Skiplagged
18  website.  That's what they're responding to.  So it's
19  clearly attributed to the stimulus.
20  Q.    Okay.  It's attributed to the stimulus that was
21  provided to the survey respondents, that was assembled
22  by you and the Greenberg lawyer, correct?
23  A.    Assembled?  Yeah.  Basically through the
24  process we discussed.

Page 215

1  in writing, correct?
2  A.    Correct.
3  Q.    And so between you -- it would be you and Zach,
4  they would know the answer to that question?
5  A.    Correct.
6  Q.    And you can't remember it as we sit here today?
7  A.    Correct.
8  Q.    And you've come to the fact that it was
9  deceptive, why?
10  A.    Go back to Exhibit-6A, that's what I'm
11  explaining.  We discussed it twice already.  But go
12  back to page 42, Exhibit-6A.  It screams, the results
13  are screaming from the exhibit.
14  Q.    Screaming.  Okay.
15        Because of this association based upon
16  the coders' interpretation of the open-ended, plus the
17  fact that it correlated to Expedia, right?
18  A.    Plus, it's not only the coder interpretation.
19  Plus the explicit responses to closed-end question.
20  Question 7A and 11A, and these are the net, across all
21  of these many many multiple measures here that define
22  that between 73 and 76 percent of the confusion
23  respondent believed association.  And that's extremely
24  close to the perceived association for a legitimate

Page 217

1  travel agent, Expedia, which is 81 to 86.
2      So, yes, I have extremely high
3  confidence that the consumers do perceive association
4  between Expedia and American Airlines. And this is
5  because of the way Expedia -- because of Skiplagged,
6  not Expedia, Skiplagged presents the material on their
7  website.
8  Q.   Which the respondents didn't see. They saw the
9  stimuli, right?
10  A.   They saw the representation of the website as
11  presented in my stimuli.
12  Q.   As chosen by you and Zach?
13  A.   Yes.
14  Q.   Okay. And that's based upon the confusion
15  table 6A, right?
16  A.   Correct.
17  Q.   Okay. And then you go on to say that the
18  results of your experiments based upon the stimuli
19  presented, deceives the consumers of its non Hidden
20  City tickets to believing a purchase tick- -- let me
21  start over.
22      Number two, the results of the
23  experiments clearly show that Skiplagged deceives
24  consumers of its non Hidden City tickets to believe

Page 218

1  that purchasing a ticket on Skiplagged.com is cheaper
2  than purchasing a ticket directly from American,
3  correct?
4  A.   Yes.
5  Q.   Even though we discussed, you can't point me to
6  anywhere that would expressly claim that, right?
7  A.   No.
8  Q.   Okay.
9  A.   But they say it's cheaper. Go back to Exhibit
10  7 --
11  Q.   Cheaper. Cheaper. Right. Right.
12  A.   Go back to Exhibit 7.
13  Q.   Right. And we talked about that, right?
14  A.   Yeah.
15  Q.   It's based upon this idea that it's cheaper,
16  cheaper, cheaper, not on it's own express, deception,
17  right?
18      MR. NELSON:  Objection;
19  mischaracterizes.
20      THE WITNESS:  Look at the response on
21  Exhibit 7. Let's go -- let's stick with the
22  data.
23  BY MR. REED:
24  Q.   Okay.

Page 219

1  A.   Exhibit 7 asks explicitly, "Buying ticket
2  through Skiplagged is cheaper than buying directly
3  from the airline." Cannot be more explicit. And the
4  61 percent of those saw that Skiplagged non Hidden
5  City ticket said yes. And 71 -- 70 percent said it
6  among those who saw the Hidden City ticket. And
7  they're just slightly below the percentage of Expedia.
8  Q.   And this is based upon the stimuli that you
9  provided them, right?
10  A.   Right. Which I believe is an accurate
11  representation of the real word stimuli of Skiplagged.
12  Q.   Where does it say it on the stimuli?
13  A.   I'm telling you this because my -- that's why I
14  selected it. And I have not seen any evidence
15  whatsoever from your side to show that this does not
16  represent accurately the Skiplagged website.
17  Q.   We'll show that later.
18      But as far as, I'm asking the stimuli
19  that were showed to the respondents for Exhibit 7, the
20  data, we want to go to the data right? Where does it
21  say on here, the stimuli, that buying through
22  Skiplagged is cheaper than buying from the airline?
23  A.   It doesn't. But it's the perception of
24  consumers based on seeing the stimuli.

Page 220

1  Q.   Okay.
2  A.   It doesn't show the stimulus. This is the
3  stimulus and that's their perceptions.
4  Q.   Okay.
5  A.   So the perception is reality. So what
6  consumers perceive is that you are offering it cheaper
7  than the airline. It's an explicit question.
8  Q.   So always perception equals reality?
9  A.   Yes.
10  Q.   Okay. These same respondents with the control
11  believe the same thing about Expedia, right?
12  A.   Right.
13  Q.   Is that true for Expedia?
14  A.   I don't know. I didn't check it. I know the
15  data we checked is against Skiplagged. And we know
16  that this is wrong based on the 200 cases we examined.
17  Q.   The data is the same for Expedia. Is Expedia
18  deceiving its customers?
19  A.   I don't know. I don't know the data for
20  Expedia.
21  Q.   If it's the same, would you reach the same
22  conclusion?
23  A.   If Expedia is not cheaper?
24  Q.   Yes.

Page 221

56 (Pages 218 - 221)

1  A.    Yes.
2  Q.    Okay.
3  A.    If Expedia is not cheaper. I'm going by the
4  data.
5  Q.    Okay.
6  A.    The data to me says absolutely clearly that
7  consumers perceive the Skiplagged stimulus we
8  presented them, that buying tickets through Skiplagged
9  is cheaper than buying directly from the airline.
10 Q.    Now, one of the other things you say, relatedly
11 consumers in both non Hidden City and Hidden City
12 tickets believe that Skiplagged does not charge an
13 additional fee on top of the airline's total ticket
14 cost?
15 A.    Right.
16 Q.    All right. And that's based upon their view of
17 the stimuli that you provided, right?
18 A.    Right. And that's somewhere in Exhibit 8.
19 Q.    Okay. And if -- and you didn't include within
20 the next payment information, when you get to the next
21 page and you click through, right? Or we already
22 established that?
23 A.    If that was the way we discussed it.
24 Q.    Okay. And so if -- but you didn't include

Page 222

1  pages that might have shown the respondents breakdown
2  of the fees, did you?
3  A.    (Reviewing document.)
4        I thought the breakdown is presented
5  here. It says --
6  Q.    That's your understanding?
7  A.    -- service fee -- well, if you look at the last
8  page of the stimulus, it clearly says, one adult,
9  172.60. Service fee, that's a fee, $35. Total charge
10 207.60.
11 Q.    Okay.
12 A.    And it clearly says the fees. So they know
13 exactly the amount.
14 Q.    Okay. And then how do you explain, then, the
15 consumers not getting it?
16 A.    Not getting what?
17 Q.    When you said relatedly consumers of both non
18 Hidden City and Hidden City tickets believe that
19 Skiplagged does not charge an additional fee on top of
20 their airlines total ticket cost?
21 A.    Yeah. It's their perception.
22 Q.    Okay.
23 A.    When I say perception equals reality, is it's
24 consumer perception is their reality. And that's the

Page 223

1  way consumers perceive it.
2  Q.    So you didn't look into causation about why
3  that perception is?
4  A.    The cause is the stimuli.
5  Q.    Okay.
6  A.    The cause is the stimuli. The cause for all
7  the answers we have here, for all of the data in the
8  study was the stimuli, was the Skiplagged way they
9  presented on their website.
10 Q.    But they didn't see the website, they saw the
11 static images provided, right?
12 A.    We talked about this a number of times.
13 Q.    You keep saying, sir, the website. And the
14 respondents actually didn't see the actual website,
15 did they?
16       MR. NELSON: Objection; argumentative.
17       THE WITNESS: The respondents saw the
18 stimuli.
19 BY MR. REED:
20 Q.    Okay.
21 A.    I refer to the stimuli, the stimuli represents
22 the website.
23 Q.    Based upon what you and Zach picked from the
24 website, right?

Page 224

1  A.    The first page where the specific flight was
2  presented plus other relevant information. Yeah.
3  Q.    Plus filters chosen and everything else, right?
4  A.    As it is presented in Wind-6.
5  Q.    Okay.
6        MR. NELSON: Can we take a break.
7        MR. REED: Sure.
8        (A short break was taken.)
9  BY MR. REED:
10 Q.    We're back on the record. You're still under
11 oath.
12 A.    Yeah.
13 Q.    All right. Conclusion 3, you state the results
14 of the experiment clearly show that Skiplagged
15 deceived consumers of its Hidden City tickets to
16 believe the following. And then you list A, B and C.
17       Are you with me?
18 A.    Yes.
19 Q.    Okay. The deception here is what? Based upon
20 that definition earlier in the report?
21 A.    No. I'm referring to this specific exhibit.
22 So let's look at this. A, that Hidden City ticket
23 with Skiplagged is a valid ticket. 70 percent of the
24 respondents, see Exhibit 9A. Let's look at Exhibit

Page 225

57 (Pages 222 - 225)

1  9A.
2  Q.   Right now I'm asking you about the definition
3  of deceived, what you mean there.  Is that based upon
4  the definition of deception earlier in your report?
5  A.   Well, we talked about multiple definition -- we
6  talked also definition of deception for the analysis
7  of the complaint.
8  Q.   I thought you said it was the same.  It's
9  different?
10  A.   The definition is the same in all of them.
11  Q.   Okay.
12  A.   But in the report here, we have a multiple
13  places where we refer to this.  At the bottom of one
14  of the exhibit, we refer to this.  We talk about the
15  complaint.  So the general definition here is, whether
16  the consumers perception on the stimuli is in contrast
17  to reality, to the real risks of the ticket.
18  Q.   Okay.  And those are the risks that we've
19  already talked about earlier.
20  A.   Correct.
21  Q.   I don't need to go back through that again.
22       All right.  When you say in part A, the
23  Hidden City ticket bought through Skiplagged.  When
24  you saw bought through Skiplagged, what do you mean?

Page 226

1  in the first part of the report are based on the
2  stimuli which I believe and have not seen any
3  contradictory evidence that is accurate representation
4  of the Skiplagged website.
5  Q.   Okay.  But we're missing the next step where we
6  hit pay with credit card, right?
7  A.   Correct.  Because we had the relevant
8  information -- what I believe is the relevant
9  information.
10  Q.   And nowhere for the respondents did you define
11  for them bought through -- what bought through
12  Skiplagged means, did you?
13  A.   No.  I think it's plain English.
14  Q.   Okay.  All right.  Are you aware that there is
15  multiple ways to buy a ticket through Skiplagged?
16  A.   Yeah.  But in this specific case we focus our
17  attention on the stimuli.  The stimuli clearly focused
18  on American Airlines.  And the idea was their
19  perception of whether a ticket bought through
20  Skiplagged, because that's the stimulus they saw, is a
21  valid ticket.
22  Q.   Would you explain for me what you understand to
23  be the ways to buy an American ticket through
24  Skiplagged?

Page 228

1  A.   They are buying American Airlines through
2  Skiplagged.
3  Q.   And what do you mean?  Because the respondent
4  doesn't actually buy the ticket, right?
5  A.   Right.
6  Q.   And we talked about there is different options,
7  right?
8  A.   Right.
9  Q.   When you say buy through Skiplagged, what are
10  you referring to precisely?
11  A.   Explicitly to question 12A in my questionnaire,
12  which is reflected in Exhibit 9A on page 48.  That
13  says, "A ticket bought through Skiplagged is a valid
14  ticket" versus "a ticket bought through Skiplagged is
15  not a valid ticket."
16  Q.   Okay.
17  A.   We don't know.  And 74 percent of the
18  respondent to the Skiplagged ticket, and 70 percent of
19  the Skiplagged Hidden City ticket said, yeah, it is a
20  valid ticket.
21  Q.   Based upon the static stimuli, right?
22  A.   Everything is based on that.
23  Q.   Everything?
24  A.   Everything we talked about.  All my conclusions

Page 227

1  A.   Well, my perception is irrelevant.  What the
2  consumer perceive it.  The consumer perceived, based
3  on the stimulus, that it's a valid ticket.
4  Q.   I understand you may believe its irrelevant,
5  but that's my question in this deposition?
6  A.   Well, my perception is, that this would be a
7  ticket, especially when we talk about Hidden City
8  stimuli, Hidden City ticket that is legitimate, that
9  is not constrained that I can basically use it with no
10  restriction, with no consequences.
11       MR. REED:  Objection; nonresponsive.
12  BY MR. REED:
13  Q.   Do you have any understanding of how the ticket
14  is bought through Skiplagged, the American ticket?
15  A.   I thought we talked about this before.  You can
16  buy it either through Skiplagged or you can buy it
17  through American or you can buy it through a
18  third-party agent.
19  Q.   Okay.  And that's all included in the statement
20  of a city ticket bought through Skiplagged?
21  A.   Whatever the consumer interpret it to mean.
22  Q.   I'm asking you what you mean in your
23  conclusion?
24       MR. NELSON:  Objection; foundation;

Page 229

58 (Pages 226 - 229)

1    mischaracterizes.
2         THE WITNESS:  My conclusion is based on
3    the data that I'm referring to.  So if you go
4    back to my conclusion, we're looking at 3A,
5    that a Hidden City ticket bought through
6    Skiplagged is a valid ticket based on consumer
7    response in Exhibit 9A.
8    BY MR. REED:
9    Q.    To the question you asked?
10   A.    Correct.
11   Q.    Based upon the stimuli that you and Zach
12   provided?
13   A.    Yes.
14   Q.    Okay.
15   A.    I will not repeat again that I believe the
16   stimuli is the correct stimuli.
17   Q.    All right.  And the next is that -- and is it
18   your understanding that a Hidden City ticket bought
19   through Skiplagged is not a valid ticket?
20   A.    Yes.
21   Q.    Why is that -- how do you have that
22   understanding?
23   A.    Well, because it violates the rules of American
24   Airlines.

1    Q.    And it's up to American if they honor that
2    ticket or not, right?
3         MR. NELSON:  Objection;
4         mischaracterizes.
5         THE WITNESS:  If you look back at the
6         table that we discussed before as part of the
7         stimuli, it's clearly this violates American
8         Airlines rules, so it's not valid.
9    BY MR. REED:
10   Q.    But American Airlines could allow the
11   passenger, the consumer to fly, right?
12        MR. NELSON:  Objection; calls for
13        speculation; beyond the scope of Mr. Wind's
14        report; calls for legal conclusion.
15        THE WITNESS:  They could.  But primary
16        it's against the rules.  And it's also sold by
17        an unauthorized agent, which is against the
18        rules.
19   BY MR. REED:
20   Q.    Okay.  Based upon what you were told, because
21   you didn't look at the rules right?
22        MR. NELSON:  Objection;
23        mischaracterizes.
24        THE WITNESS:  I did not look at the

1    rules but I have no doubt to believe that
2    counsel told me that basically American
3    Airlines sells only through authorized agents.
4    BY MR. REED:
5    Q.    Okay.
6    A.    And I did see some documents for this.
7    Q.    Okay.
8    A.    And as well as the documents that underline the
9    stimulus that I preferred and that consumers in
10   respond to the city -- to the Hidden City stimuli
11   actually saw.
12   Q.    Do you know or do you have any information of
13   whether a Hidden City ticket bought through Skiplagged
14   on another airline is a valid ticket or not?
15        MR. NELSON:  Objection; beyond the
16        scope; calls for a legal conclusion; calls for
17        speculation.
18        THE WITNESS:  I don't know.  I did not
19        examine it.
20   BY MR. REED:
21   Q.    Okay.  You say that Skiplagged deceives
22   customers, that the Hidden City ticket offered by
23   Skiplagged carries no risk, right?
24   A.    Correct.

1    Q.    And how does Skiplagged deceive customers into
2    believing that there is no risk?
3    A.    Look at Exhibit 9B.
4    Q.    (Reviewing document.)
5    A.    9B is based on a direct question, closed-end
6    question.  The option offered by Skiplagged carries no
7    risk, as opposed to the offering that Skiplagged
8    carries risk or don't know.  In 37 percent of the
9    Expedia ticket buyers -- I'm sorry, of the Skiplagged
10   ticket buyers, in 36.1 percent of the Skiplagged
11   Hidden City ticket buyers believe that it carries no
12   risk.
13        Now, in addition to this, we asked them
14   in question 12E and F. Let's go to question 12E and
15   F.
16        (Reviewing document.)
17        Carries risk.  We ask them what are the
18   risks associated with this ticket?  And then a follow
19   up, are there any other risks.  So Exhibit 10A,
20   answers present the response to this.  And this is the
21   exhibit we discussed before, when I basically directed
22   the coders to code it into meaningful risks or
23   un-meaningful risks.  And you can see the results
24   here.  That clearly show that despite the real risks

1 associated with the Hidden City ticket, the majority,
2 the vast majority of the people received no risks,
3 74.3 percent.
4         And most of them, those who perceived
5 risk, perceived them to be minimal risk in the Hidden
6 City ticket, 16.7 percent, slightly even a meaningful
7 risk compared to Expedia, which was only 11 percent.
8 And then 12.5 percent perceive un-meaningful risk
9 compared to only 7 percent in Expedia.
10         And then in addition to this, we did an
11 analysis on Exhibit 10B, on how many meaningful risks
12 did they identify.  And you find that the mean is less
13 than one, and the median is primarily zero of
14 meaningful risk.  And the number of risk management
15 were 11 percent mentioned one, 5 percent, two, and a
16 negligible number, less than 1 percent, mention three.
17 Q.    Did your study do anything to identify what
18 Skiplagged was doing to, in your term, deceive
19 customers?
20 A.    Well, they -- what they did is they did not
21 disclose the real risks.  The lack of disclosure, the
22 lack of disclosure of the real risks is what
23 Skiplagged did, which was wrong.
24 Q.    And how does your study identify that lack of

*Page 234*

1 disclosure being the deception versus consumers being
2 confused or consumers just not getting it or consumers
3 seeing disclosures and ignoring them?
4 A.    Well, they're responding to the stimuli.
5 Everything that we discuss is respond to the stimuli.
6 And what they are giving us back in this last three
7 exhibits we saw, the result is consumers did not
8 perceive this to be risky.  And this is -- given the
9 huge amount of risk is the Hidden City ticket, this is
10 deception.
11 Q.    It's -- because they just ignored this?
12 A.    These are only three out of probably about 10
13 different risks.
14 Q.    Okay.
15 A.    You know, what about the other risks involved
16 here?  And even these, they did not pre-- they were
17 not in a position, they were not presented in a way
18 that consumers really perceived them.
19 Q.    You didn't present them?  If they're on the
20 website and not included in here, the respondents to
21 your surveys didn't seem them, right?
22         MR. NELSON:  Objection;
23 mischaracterizes testimony.
24         THE WITNESS:  Let me counter this by

*Page 235*

1 reminding you of the one example of the
2 complaint that we have.  The complaint was
3 about, I think, one or more complaint about
4 bags.  And, obviously, the people who complain
5 about this, were it was the real website.  And
6 they still did not see it.  So I stand by the
7 fact that the way it is presented is not
8 designed to encourage people to see and
9 understand the risks involved.
10 BY MR. REED:
11 Q.    Do you have any document, any communication
12 that you've seen that that ██████████████████
13 A.    I mentioned to you at the beginning of the
14 deposition today that I saw some additional material
15 about internal communication.
16 Q.    Mm-hmm.
17 A.    Yes, there was at least one communication that
18 suggests ██████████████████
19 Q.    And who was on that communication?
20 A.    The CEO and some other people.
21 Q.    CEO being who?
22 A.    The person that sits next to you.
23 Q.    Okay.  And who do you understand that to be?
24 A.    What do you mean?

*Page 236*

1 Q.    Do you know his name?
2 A.    I'm not sure how to pronounce it.
3 Q.    Okay.  Who was the other individual?
4 A.    There are a whole set of other names there.
5 Q.    Do you recall any of them?
6 A.    No.  But we can to -- we have the document.  We
7 can try with the document.
8 Q.    Do you have the Bates number of the document?
9 A.    Yes.  The Bates number would be SKP, a lot of
10 zeroes and then 6416.
11         MR. NELSON:  Well, read the Bates
12 number from that specific one.
13         THE WITNESS:  The specific one would be
14 the last one.
15         (Reviewing document.)
16         So the name that you asked for is
17 Aktarer Zaman.  I'm not sure if I'm pronouncing
18 it correctly.
19 BY MR. REED:
20 Q.    What was the Bates number of the one that
21 you're looking at?
22 A.    A lot of zeroes and 107954.
23 Q.    1079 --
24         MR. NELSON:  54.

*Page 237*

60 (Pages 234 - 237)

App'x 264



BY MR. REED:

1. Q. -- 54?

3 That's not one on your appendix list,
4 right?

5. A. No. That's what I mentioned to you earlier
6 today, that that's an additional material that I saw.

7. Q. When did you see it?

8. A. Recently. In part of the preparation for the
9 case today.

10. Q. Okay. Is that one that you went and found or
11 was it provided to you?

12. A. I was talking about the issue, and I asked is
13 there any documents about this. And Cam said yes.
14 And he showed me the series of this internal document.

15. Q. Okay. And it's your testimony that in this
16 e-mail, there is deliberate discussions of ██████

18. A. Well, let me try to find it and read it to you.

19 (Reviewing document.)

20 Okay. Here it is. This would be on
21 Bates number 107959. And do you want me to read it to
22 you, the section?

23. Q. Can I take a look?

24 (Reviewing document.)

Page 238

---

1 MR. NELSON: It's the second to last
2 page.

3 THE WITNESS: Yeah, it's the second
4 from the last page.

5 BY MR. REED:

6. Q. (Reviewing document.)

7 Which -- where are you looking at?

8. A. I'm looking at the discussion that relates to,
9 for this document, it started on, it is February 17,
10 2022 at 3:38 p.m. It was a group of people involved.
11 And after I was there, and there was a discussion.
12 And then -- the question was towards if you read from
13 the top there on this page that we talked about, ████
████████████████████████████████████████

16 So Aktarer says, ████████████████
████████████████████████████████ So then he continued and says,
19 ████████████████████ And
20 then the question was, ████████████
██████ And then the answer was, ████████ -- so
22 Phil asked the question, so there are a few kind of
23 agreement to the question, ████████████████
██████ Then Phil Walmer (ph) says, ████████

Page 239

---

1 So Aktarer says, ████████
████████████████████████████ And Walmer says, ████████████ " And
4 then Aktarer says, ████████████████████
████████████

6. Q. Okay. And that's your example of?

7. A. Intending ████████████████████
████████████

9. Q. Oh. Okay. All right.

10 How do you reconcile your conclusions
11 with number 4, that what you found was knowing, you
12 said, the truth about AA prices and the real risk
13 associated with Hidden City tickets has only limited
14 impact on consumers intentions to buy their next
15 airline tickets from Skiplagged?

16. A. No explanation. That's a finding.

17. Q. And you can't reconcile that?

18. A. Well, the only explanation is that the stimulus
19 is so powerful and that the attraction of lower prices
20 is so strong and people did not really comprehend all
21 of the risks involved. Because everyone saw the --
22 saw, at least in the -- this goes to a question we had
23 before one of the breaks today.

24 So the people in the Hidden City did

Page 240

---

1 see this comparative page in the stimuli, plus the
2 American Airlines actual prices. People in the second
3 group, which was only the non Hidden City did not see
4 the comparative page, but they did see the American
5 Airlines price. So they had to compare the two. But
6 my guess is the only explanation here is that the
7 attraction of the cheap tickets and the effectiveness
8 of the website of Skiplagged by articulate in the
9 discussion on the marketing consideration is so strong
10 that consumers basically ignored the reality.

11 MR. REED: Objection; nonresponsive.

12 BY MR. REED:

13. Q. So number 4 conclusion is that even when
14 consumers know "the truth about prices and real risk,"
15 it has limited impact on their intention to buy from
16 Skiplagged, correct?

17. A. Yes.

18. Q. Okay. But you also concluded that consumers
19 when given your stimuli, perceive Skiplagged quite
20 similarly to their perceptions of Expedia, correct?

21. A. Yes.

22. Q. The -- you say in Number 6 that the findings
23 are strongly validated. When you say "strongly
24 validated," is that a statistical term?

Page 241

61 (Pages 238 - 241)

1 A. No. It's designed more to convey the strength
2 of the results.
3 Q. Okay.
4 A. We have a strong convergence validity here.
5 The complaints, I have not seen complaint that will
6 negate the findings and the complaints support the
7 findings.
8 Q. Did you ask for complaints that might negate
9 the findings?
10 A. I asked for all complaints.
11 Q. And you believe you received all complaints?
12 A. Correct.
13 Q. Okay.
14 A. Well, part of them, the major part of them came
15 from you.
16 Q. Well, how about --
17 A. Because most of the complaints was for
18 Skiplagged.
19 Q. And the social networks you also asked for,
20 right?
21 A. Correct.
22 Q. And you got all of those.
23 Do you know how many, as a percentage,
24 the complaints you reviewed are of total customers of
Page 242

1 What's your basis for your conclusion
2 that there is harm to the consumers?
3 A. Well, evidence one is the complaint. The
4 consumers are definitely harmed. And there are all
5 these risks they are subject to and they don't know
6 about it. They are buying tickets that may be
7 rejected and may lose their frequent flyers, they may
8 be denied a return ticket. There are all these really
9 serious consequences of buying Hidden City ticket that
10 they are totally unaware of. So to me, thats' a major
11 harm to the consumer.
12 Q. All of those consequences are imposed by
13 American, right?
14 A. And not told to the consumers. These are the
15 reality. Skiplagged wants to use American Airlines,
16 so they have to abide by the rules of American. And
17 Skiplagged, the minimum they should do, especially if
18 they pretend in their statement, that they are trying
19 to educate consumers. They are not educating
20 consumers, they are cheating consumers. And they
21 should actually present to the consumers the reality,
22 the facts, so consumers can make an informed decision
23 whether this cost saving, the offer through the Hidden
24 City ticket, is worth the risks involved. Skiplagged
Page 244

1 Skiplagged?
2 A. No. Because I have not seen the data on how
3 many customers are at Skiplagged.
4 Q. Did you ask for that data?
5 A. Yes.
6 Q. Who did you ask?
7 A. The lawyers that dealt this.
8 Q. Was there any other information you asked for
9 and didn't receive?
10 A. We asked for all the information that related
11 to Skiplagged that related to this. And I thought I
12 got everything, but we did not get the information
13 about the Skiplagged customers.
14 Q. Okay. Your last conclusion is, given these
15 findings Skiplagged's practices. Practices meaning
16 what?
17 A. Those leading to confusion for consumers to
18 believe that they are associated with American
19 Airlines and deceiving them, especially the people who
20 buy Hidden City tickets.
21 Q. By not disclosing the risk, right?
22 A. Correct.
23 Q. Are harming both consumers and American
24 Airlines.
Page 243

1 hides the real risks from the consumers. So it's a
2 unfair behavior, the consumers are being hurt.
3 MR. REED: Objection; nonresponsive.
4 BY MR. REED:
5 Q. The risks that you identify are all imposed by
6 American on the consumers, correct?
7 A. Skiplagged, yes. But Skiplagged is selling
8 American ticket, which means the ticket has to be
9 subject to the rules of American.
10 MR. REED: Objection; nonresponsive,
11 everything after yes.
12 I'll object to counsel's outburst.
13 It's unprofessional.
14 MR. NELSON: I'm sorry. Objecting --
15 you asked --
16 MR. REED: This is not allowed by Judge
17 Pitman on any form or fashion.
18 MR. NELSON: I am sorry I giggled at
19 your constant objections to your own questions.
20 MR. REED: Well, my objections were to
21 the witness's failure to answer the question.
22 BY MR. REED:
23 Q. You also state that these practices that you've
24 identified by Skiplagged is harming American. In what
Page 245

62 (Pages 242 - 245)

1 way did your study show harm to American?
2 A.   In multiple ways.
3 Q.   Okay.
4 A.   First of all, they show that consumers confuse
5 and believe that American is associated with
6 Skiplagged, which means it's a major damage and harm
7 to American by losing control over their own brand,
8 which is the key for different branding.  You should
9 be able to control the future of your brand.  And here
10 because consumers associate American with Skiplagged,
11 anything that Skiplagged does can be attributed to
12 American and tarnish their reputation.  So there is a
13 huge harm here to American.
14 Q.   And did your study at all quantify that harm?
15 A.   No.
16 Q.   Okay.
17 A.   We don't design to quantify.  But my study
18 clearly shows huge percentage of confusion among the
19 highest levels in any study that I've done over the
20 years.
21       And the 70 percent confusion as to
22 association, which is absolutely huge.  And then in
23 other words, the important finding here, when you look
24 at this data, they're close similarity to the
Page 246

1 American?
2 A.   Yes.  Because it's not the percentage, it is
3 the magnitude.  We're talking about the complaints to
4 Skiplagged with 12,000 complaints about deception or
5 confusion.  That's a huge number of actual complaints
6 that you rarely see in confusion cases in this
7 country.
8 Q.   Out of how many?
9 A.   It doesn't make a difference.  Look at the
10 number.  Look at the number of 12,000.  That's huge.
11 Q.   So just the number matters, not as to that
12 percentage of customers that are complaining or the
13 percentage of even complaints?
14 A.   The number doesn't make as much difference here
15 because there is the theory, which was clearly
16 validated over years on the tip of the iceberg that
17 I'm referring to in my report, where most people don't
18 bother to complain.  And the few that complain are
19 typically represented a very large percentage of the
20 population.  And I don't think I've seen in any other
21 study 12,000 actual complaint.  That's huge.  That's a
22 huge number.  So I believe, based on the study they
23 I've conducted and the report, that American Airlines
24 is seriously hurt by the existence of Skiplagged.
Page 248

1 association was a legitimate travel agent like
2 Expedia.  There was hardly any difference between the
3 two.  So that's a huge harm to American.
4       And then based on all of my marketing
5 expertise and knowledge, you know, when we have such
6 high level of confusion, this is a major harm for the
7 company because they loose control over their brand.
8 Q.   Did your study ask any questions as to negative
9 statements or negative impact on your respondents in
10 their perception of American?
11 A.   No.  But that's the reason we have always have
12 analysis with complaints.  So number one, is that we
13 did not ask explicitly the perception of American.
14 But if you look at the verbatim, Exhibit C7, I
15 believe, that lists a lot of the -- all the
16 respondents, all the verbatim.  You'll see that there
17 are a number of them that mention kind of negative
18 implication to American.  And we reviewed the
19 complaints.  Many of them address with negative
20 implications to American.
21 Q.   If the complaints that you've identified
22 regarding Skiplagged to American are less than 1
23 percent of the complaints received by American, is
24 your opinion still the same, that the harm is huge to
Page 247

1 Q.   Do you have you any publication, authority or
2 whatnot, that tells you that 12,000 complaints is a
3 huge number?
4 A.   No.  I've not seen any publication that has a
5 specific numbers of complaint in this specific context
6 for this complaint.
7                    - - -
8       (Exhibit Wind-7, E-mail, Bates stamped
9       AA-SKP-00052794 through AA-SKP-0052797, was
10      marked for identification.)
11                   - - -
12 BY MR. REED:
13 Q.   I've handed you what's been marked as Exhibit 7
14 for your deposition.  You'll see that it's Bates
15 labeled AA-SKP-00052794 through 52797.
16       When you have a minute to look at it,
17 let me know when you're ready for me to ask questions.
18 A.   (Reviewing document.)
19       Yes.
20 Q.   Are you familiar with this document?
21 A.   No.
22 Q.   It's one listed on your appendix as documents
23 and materials you relied upon?
24 A.   I reviewed a lot of material.  I don't recall
Page 249

63 (Pages 246 - 249)

1 this particular one.
2 Q.    All right.  Would you agree with me, it's
3 listed on Exhibit-2 for your deposition?
4 A.    I definitely trust you saying so.
5 Q.    Okay.  You'll see there that there is a
6 complaint there, right, at the bottom of the first
7 page?
8 A.    Yes.
9 Q.    And you've had a chance to read that complaint?
10 A.    Yes.
11 Q.    Now, based upon the definitions of confusion
12 and deception in your report, which category would you
13 put this complaint into?
14 A.    (Reviewing document.)
15         Okay.  I'm sorry can you repeat the
16 question, please.
17 Q.    Sure.
18         Which category would you place this
19 complaint into?
20 A.    Well, definitely deception, because the
21 consumer was not aware of the need for a Visa or
22 passport and basically used the Hidden City ticket
23 that violated this restrictions.  And also,
24 potentially confusion because they may have thought

Page 250

1 that by approaching American and writing to American,
2 they thought that American is responsible for this
3 situation.  So definitely there is a potential
4 confusion there.  And it's a great example for the
5 damage we talked before about hurts to consumers,
6 that's a great example of how consumers being harmed.
7         MR. REED:  Objection; nonresponsive,
8         everything after great example.
9 BY MR. REED:
10 Q.    The -- are you aware of any document that we
11 could review that would show how the coders at Radius
12 coded this document?
13 A.    Well, the results are presented here.  That's
14 the way they coded it.
15 Q.    This specific one?
16 A.    No.  No.  The total coding.
17 Q.    I get you, the total.
18         I'm saying if I wanted to go and see is
19 there a database, a spreadsheet, something that we
20 could look at that would show us how the coders coded
21 this document?
22 A.    I don't know.  I have to check.
23 Q.    Nothing in your report shows that, right?
24 A.    No.

Page 251

1 Q.    All right.  We talked earlier about your
2 background, your trial and deposition testimony.  Have
3 you ever been subject to a motion to exclude?
4 A.    Yeah.  There were a number of them that tried.
5 None of them succeeded.
6 Q.    How many times?
7 A.    About three.
8 Q.    Three times?
9 A.    The one that I recall.
10 Q.    And has your testimony ever been excluded?
11 A.    Not based on Dalbert.  I think in some very
12 early cases there were situations with the Judge did
13 not accept what I did.  One of them, for example, is
14 in an old Anheuser Busch case on LA Beer.  That was
15 presented into two courtroom.  One was in Milwaukee,
16 one was in Saint Louis.  The same study was presented
17 in both cases.  Very similar testimony was accepted in
18 Saint Louis, was rejected in Milwaukee.  And I believe
19 that the Milwaukee case was turned around on appeal
20 and that we did win on appeal, but I don't really
21 recall.
22 Q.    Any other times that your opinions have been
23 excluded by a court?
24 A.    There was a case, Dent Supply, in Washington

Page 252

1 where I and a colleague, Paul Green, conducted a
2 convert analysis study as input for the Department of
3 Justice economist.  And the judge did not accept our
4 study.  I guess it was my failure in explaining the
5 methodology and what we used.
6 Q.    And you said what court was that?
7 A.    I believe it was around Washington, DC.
8 Q.    Do you recall what year?
9 A.    It's an old study, Dent Supply, a few years
10 back.  It would be in my resume.
11 Q.    You said Dent Supply?
12 A.    Dent Supply.
13 Q.    D-E-N-T?
14 A.    Yeah.
15 Q.    If it's in there, I can find it.
16 A.    I believe it should be there.
17 Q.    Any other times that your opinion has been
18 excluded?
19 A.    I think there was one or two cases where I
20 designed a dilution study.  I think it was one was
21 involving Black Label.  And I think -- I still believe
22 the design that I did is the correct design, but the
23 judge apparently did not accept the results of the
24 study.

Page 253

1 Q.   You said Black Label was the name of the party?
2 A.   Black Label.
3 Q.   Do you recall what year that was?
4 A.   No.
5 Q.   Is that on your list as well?
6 A.   Yes.
7 Q.   Do you recall where the court was?
8 A.   No.
9 Q.   Any other times your opinions have been
10 excluded?
11 A.   Not that I know.
12       MR. REED:  Let's go off the record.
13       (A short break was taken.)
14 BY MR. REED:
15 Q.   Back on the record.
16 A.   Yeah.
17 Q.   All right.  Going back to your report pages 87
18 and 88.
19 A.   Yeah.
20 Q.   There is 8 conclusions listed there.  Do those
21 summarize all of your opinions that you intend to give
22 in this matter?
23       MR. NELSON:  Asked and answered.
24       THE WITNESS:  Well, they summarize you

Page 254

1       know, my understanding, my conclusions at the
2       time that I completed the report.  What I will
3       say in trial depends also on what other
4       evidence I will see between now and then.
5 BY MR. REED:
6 Q.   Okay.  But as you sit here today, those are all
7 the opinions that you formed in this matter?
8 A.   Plus the one we discussed today, which is the,
9 if there is a real intention on the part of Skiplagged
10 to deceive consumers, as opposed to being truly an
11 educational company, as they claim to be.
12 Q.   Based on that e-mail or message --
13 A.   Yes.
14 Q.   -- that you identified for me earlier, right?
15 A.   Correct.
16 Q.   Okay.  Have we talked about all of your
17 opinions here today?
18 A.   Yes.
19 Q.   Okay.  I just wanted to make sure.  I know
20 we've gone through quite a bit, but if there was
21 something I missed, I want to make sure that we
22 covered it here while we still have time.
23 A.   The report is there.
24 Q.   Okay.  You said you may.  Do you have, as you

Page 255

1 currently sit here today, the intent to amend or
2 supplement your report?
3 A.   I don't see any reason for this at this stage,
4 depending what -- definitely not based on your three
5 experts or four experts, but if there is something
6 else, you know, depending what it is.
7 Q.   But right here --
8 A.   At this stage I don't see any need for it.
9       MR. REED:  All right.
10       I'll pass the witness.
11       - - -
12       E X A M I N A T I O N
13       - - -
14 BY MR. NELSON:
15 Q.   Couple quick questions.
16       On your stimuli, one of them was a side
17 by side of --
18 A.   Comparison.
19 Q.   -- Skiplagged, what Skiplagged said versus what
20 American says.  Why did you present that stimuli that
21 way, as opposed to using screenshots of the website
22 which you used for other parts of your stimuli?
23       MR. REED:  Objection to form.
24       THE WITNESS:  I wanted to make sure

Page 256

1       that it's clear.  That you can see it.  When
2       it's part of a website there are tons of other
3       information around it and I wanted to make sure
4       that it's very very clear what the two sides
5       are saying.
6 BY MR. NELSON:
7 Q.   Okay.  Apart from that, in that particular
8 instance, you thought if you had used screenshots, it
9 wouldn't be clear?
10       MR. REED:  Objection, form; objection,
11       leading.
12       THE WITNESS:  Correct.
13 BY MR. NELSON:
14 Q.   And with respect to the content shown in that
15 stimuli, did you read the content of Skiplagged's
16 website about what it says about Hidden City tickets
17 being perfectly legal?
18       MR. REED:  Objection to form.
19       THE WITNESS:  Yes.  It basically
20       represents -- this exhibit represents, my
21       understanding and ability to represent as
22       clearly as possible what's on the Skiplagged
23       and what's on American.

Page 257

65 (Pages 254 - 257)

1 BY MR. NELSON:
2 Q.   Okay.  And for the American side of that
3 stimuli, did you find that information on American's
4 website?
5 A.   Website and whatever other documents they were.
6 They were primarily focusing on their condition of
7 sales or whatever they call it.
8 Q.   Okay.  We talked a little bit about the 12,000
9 or so complaints that Skiplagged has received.  As a
10 consulting expert in your field, have you worked with
11 many companies on the subject of consumer complaints?
12 A.   Yes.
13 Q.   How many companies would you say you've worked
14 with where you were privy to the number of complaints
15 that the company received?
16 A.   A variety of areas, one or two dozen.
17 Q.   Okay.  And have you ever seen any company in
18 your professional experience that had 12,000
19 complaints?
20      MR. REED:  Objection to form.
21      THE WITNESS:  Not on a given topic.
22 But there are a lot of complaints.  There is a
23 lot of complaints, you know, I couldn't reach
24 you know, kind of, I didn't get my bill in

Page 258

1 those companies had a department dedicated for this,
2 that continues analysis of complaints.  And the
3 analysis involves a faster response to the customer as
4 possible but equally important analyzing it and seeing
5 what amount are current practices has to be changed or
6 modified to try to prevent things like this from
7 happening in the future.
8 Q.   Okay.
9      MR. NELSON:  All right.  I don't have
10 any further questions.
11      MR. REED:  I have nothing further.
12      (Deposition concluded at 5:04 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 260

1 time.  So companies get tons of complaints.
2 But I've never seen a focused large number of
3 complaints on a topic such as deception or poor
4 service or other area that people are
5 complaining to.
6      So there are two -- my experience is in
7 the two areas.  One is in cases involved
8 litigation, which I've never seen such high
9 numbers.  And in other cases, not involving
10 litigation.  And especially the ones not
11 involving litigation, it's typically trying --
12 coming from companies who are trying to improve
13 their system and improve the system of dealing
14 with complaints and how can you prevent such
15 complaints in the future by redesigning their
16 systems.
17 BY MR. NELSON:
18 Q.   What does a company that's genuinely trying to
19 prevent complaints, what are the steps that the
20 company needs to take?
21 A.   Well, first of all, the culture that says our
22 focus is to try to meet customers needs, minimize
23 complaints, try to do the right thing.  So it's really
24 a matter of the culture.  And then if you typically

Page 259

CERTIFICATE

     I HEREBY CERTIFY that the witness was duly
sworn by me and that the deposition is a true record
of the testimony given by the witness.
     It was requested before completion of the
deposition that the witness, DR. YORAM (JERRY) WIND,
have the opportunity to read and sign the deposition
transcript.


_Lisa A. DePascale_
LISA DEPASCALE
Court Reporter and Notary Public for the
Commonwealth of Pennsylvania and Delaware
Dated: July, 8 2024




     (The foregoing certification of this
transcript does not apply to any reproduction of the
same by any means, unless under the direct control
and/or supervision of the certifying reporter.)

Page 261

66 (Pages 258 - 261)

| | |
|---|---|
| 1      INSTRUCTIONS TO WITNESS | 1 |
| 2 | 2     ACKNOWLEDGMENT OF DEPONENT |
| 3    Please read your deposition over carefully and | 3 |
| 4 make any necessary corrections. You should state the | 4    I, DR. YORAM (JERRY) WIND, do hereby certify |
| 5 reason in the appropriate space on the errata sheet | 5 that I have read the foregoing pages, 1-263, and that |
| 6 for any corrections that are made. | 6 the same is a correct transcription of the answers |
| 7    After doing so, please sign the errata sheet and | 7 given by me to the questions therein propounded, |
| 8 date it. | 8 except for the corrections or changes in form or |
| 9    You are signing same subject to the changes you | 9 substance, if any, noted in the attached Errata Sheet. |
| 10 have noted on the errata sheet, which will be attached | 10 |
| 11 to your deposition. | 11 |
| 12    It is imperative that you return the original | 12 _____  _____ |
| 13 errata sheet to the deposing attorney within thirty | DR. YORAM (JERRY) WIND    DATE |
| 14 (30) days of receipt of the deposition transcript by | 13 |
| 15 you. If you fail to do so, the deposition transcript | 14 |
| 16 may be deemed to be accurate and may be used in court. | 15 |
| 17 | 16 |
| 18 | Subscribed and sworn |
| 19 | 17 To before me this |
| 20 | _____ day of _____, 2024 |
| 21 | 18 |
| 22 | My commission expires:_____ |
| 23 | 19 |
| 24 | 20 _____ |
| Page 262 | Notary Public |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | Page 264 |

| | |
|---|---|
| 1    E R R A T A   S H E E T | 1     LAWYER'S NOTES |
| 2 DR. YORAM (JERRY) WIND   Job No. TX6782840 | 2 PAGE LINE |
| DEPO DATE: 7/8/2024 | 3 ____ ____ _____ |
| 3 | 4 ____ ____ _____ |
| 4 PAGE LINE   CHANGE | 5 ____ ____ _____ |
| 5 ____ ____ _____ | 6 ____ ____ _____ |
| 6    REASON: _____ | 7 ____ ____ _____ |
| 7 ____ ____ _____ | 8 ____ ____ _____ |
| 8    REASON: _____ | 9 ____ ____ _____ |
| 9 ____ ____ _____ | 10 ____ ____ _____ |
| 10    REASON: _____ | 11 ____ ____ _____ |
| 11 ____ ____ _____ | 12 ____ ____ _____ |
| 12    REASON: _____ | 13 ____ ____ _____ |
| 13 ____ ____ _____ | 14 ____ ____ _____ |
| 14    REASON: _____ | 15 ____ ____ _____ |
| 15 ____ ____ _____ | 16 ____ ____ _____ |
| 16    REASON: _____ | 17 ____ ____ _____ |
| 17 ____ ____ _____ | 18 ____ ____ _____ |
| 18    REASON: _____ | 19 ____ ____ _____ |
| 19 ____ ____ _____ | 20 ____ ____ _____ |
| 20    REASON: _____ | 21 ____ ____ _____ |
| 21 ____ ____ _____ | 22 ____ ____ _____ |
| 22    REASON: _____ | 23 ____ ____ _____ |
| 23 ____ ____ _____ | 24 Job No. TX6782840 |
| 24    REASON: _____ | Page 265 |
| Page 263 | |

Veritext Legal Solutions
800-336-4000

1  Cameron M. Nelson - nelsonc@gtlaw.com

2           July 15, 2024

3  RE: American Airlines, Inc. v. Skiplagged, Inc.

4  DEPOSITION OF: Dr. Yoram (Jerry) Wind (# 6782840)

5     The above-referenced witness transcript is

6  available for read and sign.

7     Within the applicable timeframe, the witness

8  should read the testimony to verify its accuracy. If

9  there are any changes, the witness should note those

10  on the attached Errata Sheet.

11     The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14     According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18           Yours,

19           Veritext Legal Solutions

20

21

22

23

24

25

                                          Page 266

Veritext Legal Solutions
800-336-4000

**ERRATA SHEET**

**Deposition of Dr. Yoram (Jerry) Wind**
Deposition Date: 7/8/2024
Job No. TX6782840

| Page | Line | Original Text | Change | Reason |
|------|------|---------------|--------|--------|
| 56 | 20 | say | saw | Transcription error |
| 62 | 24 | internet | website | Correction |
| 64 | 15-16 | or early as much as | and | Transcription error; correction |
| 64 | 18 | type pattern | type of pattern | Grammatical error |
| 67 | 17 | That's | This was | Correction/clarification |
| 68 | 3 | address … requirement | addresses … requirements | Grammatical error |
| 71 | 13 | test control each | test and control for each | Grammatical error |
| 72 | 1 | of | [DELETE] | Transcription error |
| 73 | 4 | …, include | …, which includes | Correction/Grammatical error |
| 73 | 15 | ran | run | Grammatical error |
| 76 | 8 | the ticket | tickets | Grammatical error |
| 81 | 16 | that | [DELETE] | Transcription error |
| 81 | 20 | correct | honest | Correction/clarification |
| 82 | 4 | and responding | when responding | Transcription error |
| 82 | 13 | response | responses | Grammatical error |
| 84 | 9 | one | ones | Grammatical error |
| 85 | 19-20 | wouldn't my | wouldn't waste my | Transcription error |
| 87 | 8 | at | in | Grammatical error |
| 89 | 24 | response | questions | Correction/clarification |
| 90 | 3 | response | questions | Correction/clarification |
| 90 | 14 | gives it the | gives the | Grammatical error |
| 91 | 6 | getting larger | getting a larger | Transcription error |
| 92 | 8 | that | because | Grammatical error |
| 93 | 17 | seeing code end | using closed-end | Transcription error |
| 97 | 9 | Well-know | Well-known | Transcription error |
| 99 | 20 | its authorized | it's an authorized | Transcription error |
| 99 | 21 | knew | respondents said | Clarification |
| 100 | 2 | they are | that Skiplagged is an | Clarification |
| 101 | 9 | so | saw | Transcription error |
| 102 | 21 | knew | said | Clarification |
| 102 | 24 | stop | know | Correction |
| 105 | 24 | confusing | confusion | Transcription error |
| 106 | 4 | provide | get | Correction/clarification |
| 106 | 5 | to get results | from an airline | Correction/clarification |
| 107 | 3 | looking | look | Grammatical error |
| 108 | 5 | getting | get | Grammatical error |

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

| 109 | 9 | the | that | Transcription error |
|---|---|---|---|---|
| 113 | 10 | a | [DELETE] | Transcription error |
| 114 | 8 | booking | bookings | Transcription error |
| 124 | 15 | ? | . | Transcription error |
| 125 | 12 | validating | to validate | Grammatical error |
| 131 | 9 | of | [DELETE] | Grammatical error |
| 134 | 23 | and | in | Transcription error |
| 135 | 6 | respond to | responding to | Grammatical error |
| 135 | 7 | respond to | responding to | Grammatical error |
| 135 | 13 | screenshot | screenshots | Grammatical error |
| 135 | 16 | replicate | replicated | Transcription error |
| 138 | 12 | representatives | representative | Transcription error |
| 138 | 21 | items opposed | items as opposed | Transcription error |
| 140 | 16-17 | have everything | have asked everything | Clarification |
| 143 | 22 | answers test | answers to the test | Clarification |
| 143 | 23 | are | is | Grammatical error |
| 144 | 1 | reflect | reflects | Grammatical error |
| 144 | 16-17 | that's respond | those are responses | Transcription or grammatical error |
| 145 | 5 | based | [DELETE] | Transcription or grammatical error |
| 148 | 3 | apparently. | apparently, | Transcription error |
| 148 | 12 | this a neutral and this is positive | this as neutral and this as positive | Transcription or grammatical error |
| 149 | 10-12 | is reflecting on the Skiplagged, for example, offering | is: reflecting on the Skiplagged offering, for example, and | Correction/clarification |
| 159 | 11 | reflect | reflects | Grammatical error |
| 159 | 12 | Airline | Airline's | Grammatical error |
| 161 | 4 | is | as | Transcription error |
| 161 | 10 | confusion about | confusion of about | Grammatical error |
| 161 | 17 | confusion about | confusion of about | Grammatical error |
| 162 | 4 | respond | responses | Grammatical error |
| 163 | 4 | basically that the | basically the | Transcription error |
| 163 | 5 | site | test buys | Correction/clarification |
| 165 | 23-24 | associates connected with airline based on opening response to all questions. | "associated or connected with airline based on open-ended responses to all questions." | Correction/clarification |
| 165 | 24 | Associated and connected | "Associated or connected | Correction/clarification |
| 166 | 1 | with American Airlines based on question 1. | with airline based on question 1." | Correction/clarification |
| 166 | 4 | question we asked or associate connected | questions we asked on associated or connected | Correction/clarification |

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

| 166 | 5 | The question 4 and 6 the | Then questions 4 and 6, on | Correction/clarification |
|---|---|---|---|---|
| 166 | 6 | and finalization | or authorization | Transcription error |
| 167 | 16 | , | [DELETE] | Transcription error |
| 176 | 18 | respondent | respondents | Grammatical error |
| 177 | 3 | associate and connected | "associated or connected" | Correction/clarification |
| 177 | 4 | question 1 to 6, is the question | questions 1 to 6, which are the questions | Correction/clarification; grammatical error |
| 177 | 5 | socially connected with the | associated or connected, or | Transcription error |
| 184 | 8 | it screaming | it is screaming | Transcription error |
| 185 | 3 | rates | RAVES | Transcription error |
| 188 | 9 | it's always strengthen | it always strengthens | Grammatical error |
| 196 | 23 | complaint | complaints | Grammatical error |
| 196 | 24 | listening | looking | Correction/clarification |
| 197 | 1 | complaint | complaints | Grammatical error |
| 197 | 16 | complaint | complaints | Grammatical error |
| 199 | 19-20 | a consumer complain | consumers complained | Grammatical error |
| 201 | 5 | way | ways | Transcription error |
| 201 | 7 | test | tests | Transcription error |
| 207 | 20 | undo, to | [DELETE] | Transcription error |
| 208 | 5 | votes | bots | Transcription error |
| 208 | 19 | dies | lies | Transcription error |
| 209 | 8 | edit | do it | Transcription error |
| 210 | 22 | will | were to | Grammatical error |
| 217 | 19 | question | questions | Grammatical error |
| 217 | 23 | respondent | respondents | Grammatical error |
| 218 | 4 | Expedia | Skiplagged | Correction/clarification |
| 220 | 4 | those saw that | those who saw the | Transcription or grammatical error |
| 226 | 5 | definition | definitions | Grammatical error |
| 226 | 6 | also definition | also about the definition | Grammatical error |
| 226 | 7 | complaint | complaints | Grammatical error |
| 226 | 12 | a | [DELETE] | Transcription error |
| 226 | 14 | exhibit | exhibits | Grammatical error |
| 226 | 15 | complaint | complaints | Grammatical error |
| 227 | 1 | buying American Airlines through | buying an American Airlines ticket through | Correction/clarification |
| 227 | 18 | respondent | respondents | Grammatical error |
| 229 | 21 | interpret | interprets | Grammatical error |
| 212 | 9 | preferred | referred to | Transcription error |
| 234 | 2 | received | perceived | Transcription error |
| 234 | 6 | , slightly even | perceived | Transcription error |
| 234 | 14 | risk management | risks mentioned | Transcription error |

App'x 275

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

| 235 | 5 | respond | responses | Transcription or grammatical error |
|-----|-----|---------|-----------|------------------------------------|
| 242 | 5 | complaint | complaints | Grammatical error |
| 244 | 3 | complaint | complaints | Grammatical error |
| 246 | 24 | the | the perceived | Correction/clarification |
| 247 | 1 | was | with | Transcription error |
| 247 | 7 | loose | lose | Transcription error |
| 247 | 11 | have | [DELETE] | Transcription error |
| 247 | 16 | respondents | responses | Transcription error |
| 248 | 21 | complaint | complaints | Grammatical error |
| 248 | 22 | they | that | Transcription error |
| 251 | 5 | hurts | harms | Correction/clarification |
| 251 | 6 | consumers being | consumers are being | Grammatical error |
| 257 | 22-23 | Skiplagged and | Skiplagged website and | Correction/clarification |

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

```
 1
 2                    ACKNOWLEDGMENT OF DEPONENT
 3
 4          I, DR. YORAM (JERRY) WIND, do hereby certify
 5     that I have read the foregoing pages, 1-263, and that
 6     the same is a correct transcription of the answers
 7     given by me to the questions therein propounded,
 8     except for the corrections or changes in form or
 9     substance, if any, noted in the attached Errata Sheet.
10
11         Yoram Wind                    August 14th, 2024
       _____     _____
12
       DR. YORAM (JERRY) WIND          DATE
13
14
15
16
       Subscribed and sworn
17     To before me this
       __14th__ day of _____August_____, 2024
18
       My commission expires:__June 27, 2027__
19
          Elizabeth Collazo
20     _____
       Notary Public
21
22
23
24
                                        Page 264
```

Veritext Legal Solutions
800-336-4000

NotaryCam Doc ID: a58d1ab7-8923-464d-b7e8-b742ad2eef4b

App'x 277