IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

**APPENDIX TO PLAINTIFF AMERICAN AIRLINES, INC.'S MOTION TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY OF ZAL PHIROZ, PHD
AND BRIEF IN SUPPORT**

---

In support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert

Opinions and Testimony of Zal Phiroz, PhD and Brief in Support, American submits the following

materials:

| **EX.** | **DESCRIPTION** | **PAGE NOS.** |
|---|---|---|
| A | Declaration of Julia G. Wisenberg | App'x 001–03 |
| A-1 | Expert Report of Zal Phiroz, PhD, served by Defendant Skiplagged, Inc. ("Skiplagged") on April 23, 2024 | App'x 004–20 |
| A-2 | Declaration of Aktarer Zaman Submitted in Support of Skiplagged's Motion to Dismiss American's First Amended Complaint for Lack of Personal Jurisdiction and Alternative Request to Transfer Venue [Dkt. No. 22 at. 4–8], executed on October 2, 2023 | App'x 021–26 |
| A-3 | Expert Rebuttal Report of Darin N. Lee, Ph.D., served by American on May 31, 2024 (Confidential) | App'x 027–91 |
| A-4 | Transcript of the deposition of Darin N. Lee, Ph.D., taken on July 11, 2024 (Partially Confidential) | App'x 092–140 |
| A-5 | Skiplagged's Third Amended Objections and Responses to Plaintiff's First Set of Interrogatories, served on January 12, 2024 (Partially Confidential) | App'x 141–52 |

Dated: August 26, 2024                    Respectfully submitted,

                                          /s/ Dee J. Kelly, Jr.
                                          Dee J. Kelly, Jr.
                                          State Bar No. 11217250
                                          dee.kelly@kellyhart.com
                                          Julia G. Wisenberg
                                          State Bar No. 24099146
                                          julia.wisenberg@kellyhart.com
                                          KELLY HART & HALLMAN LLP
                                          201 Main Street, Suite 2500
                                          Fort Worth, Texas 76102
                                          (817) 332-2500

                                          R. Paul Yetter
                                          State Bar No. 22154200
                                          pyetter@yettercoleman.com
                                          YETTER COLEMAN LLP
                                          811 Main Street, Suite 4100
                                          Houston, Texas 77002
                                          (713) 632-8003

                                          Cameron M. Nelson
                                          nelsonc@gtlaw.com
                                          GREENBERG TRAURIG LLP
                                          77 West Wacker Drive, Suite 3100
                                          Chicago, Illinois 60601
                                          Telephone: (312) 456-6590

                                          Nathan J. Muyskens
                                          nathan.muyskens@gtlaw.com
                                          GREENBERG TRAURIG LLP
                                          2101 L Street, N.W., Suite 1000
                                          Washington, DC 20037
                                          Telephone: (202) 331-3100

                                          **ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

I certify that on August 26, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

                                          /s/ Dee J. Kelly, Jr.
                                          Dee J. Kelly, Jr.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

## DECLARATION OF JULIA G. WISENBERG

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

    1.    My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

    2.    I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of Zal Phiroz, PhD and Brief in Support.

    3.    Attached as Exhibit A-1 is a true and correct copy of the Expert Report of Zal Phiroz, PhD, served by Defendant Skiplagged, Inc. ("Skiplagged") on April 23, 2024.

    4.    Attached as Exhibit A-2 is a true and correct copy of the Declaration of Aktarer Zaman Submitted in Support of Skiplagged's Motion to Dismiss American's First

1

Amended Complaint for Lack of Personal Jurisdiction and Alternative Request to Transfer Venue [Dkt. No. 22 at 4–8], executed on October 2, 2023.

5.      Attached as Exhibit A-3 is a true and correct copy of the Expert Rebuttal Report of Darin N. Lee, Ph.D., served by American on May 31, 2024.

6.      Attached as Exhibit A-4 is a true and correct copy of the transcript of the deposition of Darin N. Lee, Ph.D., taken on July 11, 2024.

7.      Attached as Exhibit A-5 is a true and correct copy of Skiplagged's Third Amended Objections and Responses to Plaintiff's First Set of Interrogatories, served on January 12, 2024.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2024.

Julia G. Wisenberg

# Exhibit A-1

**Expert Report of Zal Phiroz, PhD**

**AMERICAN AIRLINES INC. v. SKIPLAGGED INC.**

### Introduction: Qualifications and Background

Dr. Zal Phiroz is an established supply chain expert. His report applies his expertise to the issues as respects American Airlines' ("AA") suit against Skiplagged, Inc. ("Skiplagged") and AA's involvement in the supply chain relative to the airline industry and what has been referred to in the litigation and herein and in the industry, as hidden-city ticketing.  In addition to having industry experience (Proctor & Gamble (NYSE:PG), and TELUS (NYSE:T), Dr. Phiroz has held a number of academic appointments (Harvard University, USC, MSU).  Dr. Phiroz currently holds an appointment as A/Professor (Clinical) at University of California, San Diego.

As a practitioner, Dr. Phiroz has managed numerous international supply chain projects, involving billion-dollar P&G brands (Iams, Tide), as well as collaboration with major retailers (Wal-Mart, Target) analyzing consumer behavior.  Various supply chain initiatives implemented by Dr. Phiroz within the area of consumer behavior, target market definition, demand simulation, shrink maintenance, and the application of retail disruptive innovation techniques, are still actively in place.

As a founding partner at Pier Consulting Group, Dr. Phiroz has consulted on projects involving simulated projection and forecasting, aggregate data analysis on competitive markets, regression techniques and clustering in determining the validity of demand projections and identification of key markets.  To these ends, opportunity quantification, consumer behavior and demand analysis have been hallmarks of Dr. Phiroz's work.

In addition to holding a PhD in Supply Chain Management (Hierarchical decision making patterns for the placement of physical supply chain entities), Dr. Phiroz has earned an MBA, and is a double Computer Science graduate of the University of Windsor (BS[Hons], BCS).  His C.V. is attached hereto as Appendix A. A list of cases in which he has been engaged to provide expert testimony is attached as Appendix B.

1

## REPORT

## Role and Appointment

I understand that my role in this case is to evaluate and opine on the impact of hidden-city fares on consumer behavior and demand using my qualifications, background, education, and experience.  From a supply chain perspective, I am specifically offering an opinion on why hidden-city fares exist, how Skiplagged's business and operations model make use of such hidden-city ticketing in the airline travel market, and that the practice of hidden-city ticketing and the business model of Skiplagged which provides information and opportunities associated with hidden-city ticketing is justified in the marketplace and provides a substantial benefit to consumers of air travel.

In forming my opinion in this case, I have been presented and reviewed a number of articles and documents noted in Appendix C.

## Observations and Opinions

1. A supply chain is an umbrella term, which aims to explain a variety of functions and processes present in the sourcing, production, distribution, purchasing and consumption phases of a product.  From a practical perspective, a supply chain describes the connectivity and collaboration between several entities (including service providers, and brokers).  Supply chain design and functionality, is often driven by consumer behavior analysis. American Airlines is involved in a supply chain as it relates to consumer air travel.

2. Each supply chain has a unique design, with respect to product/service movement, responsibilities, roles etc.  Often, a supply chain design includes multiple entities which fulfil the same role to a different consumer segment.  An example of this might be multiple retailers (e.g. Walmart and Best Buy) selling the exact same product.  While the product is the same, the targeted consumer market might differ (e.g. Walmart and Best Buy could attract different market segmentations), and as such the prices of particular products might also differ (e.g. Best Buy may sell the same product at a slightly higher price compared to Walmart).

3. Hidden-city ticketing is a term used to explain the practice of a traveler booking a flight which has one or more layovers, and simply ending their journey at a layover point instead of at their originally scheduled final destination.  Often, hidden-city fares are more inexpensive than direct flights.

   For example, a traveler might want to travel from New York to Chicago.  A direct flight from New York to Chicago might cost $500, however a flight from New York to Los Angeles with a layover in Chicago might cost $300.  If a traveler books the New York to

2

App'x 006

Los Angeles flight, and simply exits the airport in Chicago, they have used a hidden-fare strategy and would have arrived at their destination at a cost of $300 (as opposed to $500). Essentially, the traveler would not use the Chicago to Los Angeles portion of the plane ticket.

4. The concept of hidden-city ticketing is not new and existed long before Skiplagged existed. Since airlines generally do not use fixed pricing (i.e. pricing is often not based on each flight, but rather based on the point of departure and point of arrival), there are often economic advantages to passengers using hidden-fare tickets.

5. Skiplagged's business model is relatively straightforward. Skiplagged focuses on educating potential consumers on how they might be able to purchase plane tickets (and other travel-related services) through the carrier's website (or another travel sites) at a cheaper price and facilitates a consumer's purchase of a ticket.

   Skiplagged does not purchase tickets from airline carriers, nor does it directly sell tickets to customers. It essentially points consumers to websites (*e.g.*, AA.com or authorized intermediaries or travel sites). Consumers then purchase tickets from the actual seller (*e.g.*, AA.com or various third-party websites).

6. Consumer behavior and purchasing habits are a core function of a supply chain and are driven by a number of factors which impact demand. One of the more influential drivers of demand is price. American Airlines (as well as most major airlines) use dynamic pricing strategies in the context of supply chain economics. Essentially, the same seat is available for sale at different prices depending on when the ticket is bought and where it is bought (*e.g.*, kayak.com vs. priceline.com vs. aa.com directly).

   American Airlines assumedly uses this strategy to extract an advantage by marketing the same product to multiple categories of consumers (multiple segments). As the demand for leisure travel is elastic (the quantity demanded of a product, changes greatly in response to changes in its price), this strategy is an example of how consumer behavior may be influenced.

7. From an operational perspective, Skiplagged is educating consumers of the disadvantages and shortcomings to them of American Airline's pricing strategy and providing them a reasonable opportunity to counter American Airlines' strategy for their benefit.

   As American Airlines is aware of the fact that hidden-fare ticketing exists, there are a number of options American Airlines has to limit (or entirely eliminate) Skiplagged's

business advantage and hence eliminate the advantage such brings to consumers, for example:

- American Airlines could decide to overhaul its pricing strategy to use static pricing (as opposed to dynamic pricing). In doing so, there would not be an advantage for hidden-fare ticketing.
- American Airlines could publicize the fact that in its view, hidden fare ticketing is not allowed and threaten customers with fines for using hidden ticket fares. This would limit the advantage of Skiplagged's business model.
- Bring a suit such as this against Skiplagged to drive Skiplagged out of business.

8. American Airlines has been aware that the hidden-city ticket model exists for some time and assumedly chose not to intervene or act to eliminate Skiplagged's advantage until this suit was brought. This is likely due to the fact that eliminating hidden fare businesses, could potentially negatively impact American Airlines' overall business model (*e.g.*, since price is a critical demand driver, it can be assumed that fewer customers would want to purchase flights at a fixed cost).

9. In the same way that customers might try to manipulate the system by finding the cheapest price, airlines also participate in manipulating the system by constantly - and without clear explanation - changing their prices and often charging different prices to passengers on the same flight.

This occurs both for passengers on the flight who have the same itinerary and for passengers on the flight who have different itineraries (*e.g.* those who are connecting to various destinations).

10. There is ample justification for the existence and use of hidden-city ticketing and fares in the marketplace and hence for the business of Skiplagged. The information provided on Skiplagged's website is free. Passengers can find the hidden-city ticket opportunities on Skiplagged and then book those same flights on AA.com, other airlines, Orbitz, or many other travel sites.

Skiplagged is providing a very valuable service to the consuming public by educating customers and displaying public information relevant to them, including the availability of hidden-city ticketing.

4

**Basis for Opinion**

From an academic perspective, a supply chain is a network of businesses directly or indirectly involved in the development, distribution and sale of a product.  While each supply chain will have a unique design and behave differently, consumer behavioral patterns are critical to the development of supply chain strategy and overall functionality.  My industry experience, educational background, and academic involvement has led me to form the opinions shared within this report.

All opinions are given to a reasonable degree of professional certainty.  I reserve the opportunity to supplement and/or amend these opinions if/when additional information becomes available.  I also understand that I may be called to testify in rebuttal, or to respond to other opinions provided in this matter.

Zal Phiroz, PhD

App'x 009

# APPENDIX A

## INDUSTRY

**Founding Partner**                                                              April 2010 - Present
**Pier Consulting Group Inc.**                                        Los Angeles, CA | Windsor, ON

Collaboration with medium/large corporations on various areas of data analysis including sustainability, global logistics, supply chain management metrics, marketing segmentation and forecasted demand simulation.

- Direct marketing research and data analysis on competitive markets, cluster target demographics, growth opportunities and market niches.
- Predictive modeling and demand projection through various forms of regression analysis, meeting cross-functional cost optimization strategies.
- Collaboration with fortune 500 corporations including Procter & Gamble, DHL and Accenture.
- Consultation on quality control, manufacturing standards, and product liability (including topics related to consumer behavior, product differentiation and market trends).

**Sr. Manager, Market Planning (North America)**                September 2007 - March 2010
**Procter & Gamble Co.**                                            Cincinnati, OH | Toronto, ON

Managed national and international supply chain projects across the entire Procter & Gamble product portfolio. Responsible for market data analysis, demand forecasting and projection, national/international process customization, resource usage and high-level market analysis.

- Managed international supply chain processes and optimization initiatives across Procter & Gamble's $2.9B pet care sector.
- Developed and managed forecasting initiatives leading to projected cost savings of $14M.
- Led cross-functional US and Canadian analysis teams in the area of shrink. Recommended and successfully implemented strategies to reduce margin loss at partner retailers, warehouse and production plants, resulting in annual savings of $23M across all banners.
- Initiated and managed national pilot programs for joint forecasting and supply chain customization with major partner retailers including Wal-Mart, Target and Shoppers Drug Mart.

**Sr. Manager, Business Programs (Trade Marketing)**             October 2005 - May 2007
**TELUS Communications Inc.**                                                      Toronto, ON

Developed business programs within the TELUS data portfolio, interfacing with Product Development Direct Marketing, and Marketing Communications teams. Managed marketing objectives and developed specific sales programs using classification and projection regression simulation.

- Collaborated directly with sales channels (Independent Dealers, Enterprise, and Small/Medium Business) in establishing sales targets, distribution and promotional objectives.
- Managed entire data portfolio ($1.8B) including Research in Motion, Palm and Motorola accounts.

App'x 011

# Zal Phiroz MBA, PhD

zphiroz@ucsd.edu | 647.393.1014 | San Diego California

---

## HIGHLIGHTS

- Industry appointments at TELUS (NYSE: T), Procter & Gamble (NYSE: PG).

- Faculty appointments at UCSD, USC, Harvard.  Inclusive Practice Fellowship at Harvard University.

- Qualifications: PhD, MBA, BS (CIS Hons.), BCS | CIPM, CISCM, CPSCM, CISCPM

## ACADEMIA

**A/Professor and Lecturer, Innovation Technology and Operations**            August 2019 - Present
**University of California, San Diego | Rady School of Management**            **San Diego, CA**

Instructed and developed senior level undergraduate, MSBA, MBA courses in Operations Management, Supply Chain Analytics and Business Analytics.

- Hosted C-suite speakers, and collaborated with industry partners (e.g. Flex, PetCo, Apple, Intel) ensuring course content alignment with market trends and industry recruitment standards.
- Developed course content integrating industry trends with analysis of various operations / supply chain areas (e.g. forecasting, demand projection and data mining).
- Alumni engagement sub-committee leader at the Institute for Supply Chain Excellence and Innovation (ISEI).
- Served as a faculty advisor in the Academic Internship Program (AIP).

**A/Professor and Lecturer, Operations and Data Analytics**            October 2014 – August 2019
**University of Southern California | Marshall School of Business**            **Los Angeles, CA**

Developed and instructed compulsory junior and senior level undergraduate, MS, MBA and OMBA courses in Operations Management, Management Consulting and Data Analytics for Decision Making.

- Developed data analysis modules on regression through JMP/R, focusing on clustering, classification, forecasting, queueing etc.
- Developed core Operations and Data Analysis courses for the undergraduate and initial Online MBA curriculum (ranked 5th in US News 2019 and 1st in Poets & Quants, 2018).

**A/Professor and Lecturer, Supply Chain Management, Data Analysis (Term)**            April 2013 – Present
**Harvard University | DCE - Graduate School of Arts & Sciences**            **Cambridge, MA**

Developed and instructed graduate courses within the area of Supply Chain Management and Operations.  Implemented case analysis, and hosted several fortune 1000 C-suite guest speakers.

- Demonstrated case-work illustrating the practical value of decision tree modeling, logistic regression, linear programming and operations protocol.
- Initiated project collaboration through cases with Procter & Gamble, Unilever, Bombardier.

App'x 012

## EDUCATION AND PROFESSIONAL CREDENTIALS

PhD | Doctor of Philosophy (Dissertation: Hierarchical Decision Making
Patterns for the Placement of Physical Supply Chain Entities)          July 2017
**University of Cape Town | Graduate School of Business**              **Rondebosch, SA**

MBA | Master of Business Administration (International Marketing)          May 2005
**Wayne State University | Ilitch School of Business**                   **Detroit, MI**

BS (Hons) | Bachelor of Science (Honors, Computer Information Systems)    October 2003
**University of Windsor | School of Computer Science**                  **Windsor, ON**

BCS | Bachelor of Computer Science                                        June 2003
**University of Windsor | School of Computer Science**                  **Windsor, ON**

CIPM | Certified International Procurement Manager                         June 2016
CISCM | Certified International Supply Chain Manager                     December 2015
CISCPM | Certified International Supply Chain Planning Manager            March 2019
**International Purchasing and Supply Chain Management Institute**       **Los Angeles, CA**

## SELECTED FELLOWSHIPS, HONORS AND AWARDS

Inclusive Practice Fellowship                                             April 2023
**Harvard University**                                                  **Cambridge, MA**

Directors Award for Excellence Global Fleet and Products                  August 2022
**Amazon, Inc. (Global Logistics)**                                     **Nashville, TN**

Deans Award for Community Development                                      June 2017
**University of Southern California**                                   **Los Angeles, CA**

Annual Golden Apple Teaching Award for Faculty                            August 2016
**University of Southern California**                                   **Los Angeles, CA**

## SELECTED PRESENTATIONS AND PUBLICATIONS

Phiroz, Z. N. (2022). Supply Chain Influences, Impacts and Perspectives. [Presentation]. American Gear Manufacturers Association, Palm Beach.

Phiroz, Z. N. (2021). *Big Data: Application of Data in Defensive Merchandising and Shrink*. [Keynote Presentation]. Institute for Supply Management, Grand Rapids.

Phiroz, Z. N. (2020). *How COVID-19 May Rattle Companies' Supply Chains*. Legal News & Analysis on Litigation, Policy: Law360. https://www.law360.com/articles/1283697

Phiroz, Z. N. (2020). *Perspectives of Supply Chain Competitiveness— A Handbook*. Xanedu.

Phiroz, Z. N. (2018). *Shrink Within the FMCG Space*. [Keynote Presentation]. Intermodal 2018, Sao Paulo.

App'x 013

# APPENDIX B

## Prior Testimony and Deposition Experience
**Dr. Zal Phiroz**

| | Verbal Report | Written Report | Deposition |
|---|---|---|---|
| Littlefield v. Nutribullet LLC et al. 12/2017 – 9/2018 | ■ | ■ | ■ |
| Skaggs v. Amazon.com Services Inc. 5/2019 – 3/2022 | ■ | ■ | ■ |
| Pacific Wine Distributors, Inc. & Convoy Beverage Alliance v. J.F. Hillebrand USA, Inc., Sidekick Delivery, Inc. et al. 3/2020 – 4/2021 | ■ | | ■ |
| Home Depot USA Inc. v. Columbia California Venture Industrial LLC et al. 5/2021 – 7/2021 | ■ | | ■ |
| Butz v. Healthline Trading LLC 8/2021 – 9/2021 | ■ | ■ | |
| I&I Hair Corporation v. Beauty Plus Trading Co., Inc. et al. 6/2021 – present (Case is ongoing) | ■ | ■ | ■ |
| Melendez v. 3M 7/2021 – present (case is ongoing) | ■ | ■ | ■ |
| Tylt v. Wireless Advocates & Costco Wholesale Corporation 8/2021 – 8/2023 | ■ | ■ | |
| Zantac MDL- v. Pfizer, et al 9/2021 – present (case is ongoing) | ■ | ■ | ■ |

App'x 015

|  | Verbal Report | Written Report | Deposition |
|---|---|---|---|
| <u>Kroger v. Waxman, et al</u><br>2/2022 – 12/2022 | ■ | ■ | ■ |
| <u>Kearney v. Eckman et al.</u><br>5/2022 - 4/2023 | ■ | ■ | |
| <u>Martin v. Cintas et al.</u><br>3/2022 - 9/2023 | ■ | ■ | ■ |
| <u>Lloyds Underwriters v. Rainbow Gold Inc. et al.</u><br>6/2021 - 8/2023 | ■ | | ■ |
| <u>McClellan v. Home Depot</u><br>5/2023 - 7/2023 | ■ | ■ | |
| <u>Lan Global v. Alchemy</u><br>6/2023 - present (case is ongoing) | ■ | ■ | ■ |

App'x 016

# APPENDIX C

**Materials Presented to and Reviewed by Zal Phiroz, PhD**

1. *Declarations of Aktarar Zamen*, dated October 22, 2023 and December 15, 2023

2. *First Amended Complaint of American Airlines*, filed August 17, 2023

3. *Hidden City travel and its impact on airfare*, February 2022
https://www.sciencedirect.com/science/article/abs/pii/S0191261521002290

4. *American Airlines Suing Skiplagged*, September 4, 2023 (Video)
https://www.2news.com/news/american-airlines-suing-skiplagged/video_22c7ac7b-f3a9-5cbf-9efb-b4f629005c2a.html

5. *American Airlines barred a 17-year-old from flying with the airline for 3 years because he tried to use a 'skiplagging' ticket, the teen's father says*, July 17, 2023
https://www.insider.com/skiplagging-american-airlines-banned-teenager-hidden-city-ticket-canceled-2023-7

6. *Judge throws out United Airlines lawsuit against 22-year-old*, May 1, 2015
https://money.cnn.com/2015/05/01/investing/united-airlines-lawsuit-skiplagged/index.html

7. *What is skiplagging? Everything about the controversial air travel hack airlines hate*, July 23, 2023
https://www.usatoday.com/story/travel/airline-news/2023/07/23/what-is-skiplagging-hidden-city-ticketing/70438246007/

8. *What is 'skiplagging' and why do the airlines hate when you do it?* August 23, 2023
https://www.npr.org/2023/08/23/1194998452/skiplagging-airfare-flying-skiplagged-american-airlines

9. *American Airlines sues a travel site to crack down on consumers who use this trick to save money*, August 18, 2023
https://apnews.com/article/american-airlines-lawsuit-skiplagging-tickets-905acda8ac5fe302238cefd63ac864e3

10. *What is skiplagging? All about the travel hack airlines hate.* July 14, 2023

https://www.washingtonpost.com/travel/tips/skiplagging-flights-airlines-policy/

11. *American Airlines is suing Skiplagged, accusing the travel site of being a 'classic bait and switch'*, August 17, 2023
https://www.businessinsider.com/american-airlines-sues-skiplagged-deception-fares-copyright-infringement-2023-8

12. *Whether You Call It 'Skiplagging' or 'Hidden-City Travel,' It's Contentious*, September 9, 2023
https://www.nytimes.com/2023/08/08/travel/skiplagging-hidden-city-travel-layover.html

13. *American Airlines sues travel website Skiplagged over ticket price 'loophole'*, August 19, 2023
https://www.theguardian.com/business/2023/aug/19/american-airlines-sues-skiplagged-ticket-price-loophole

14. *Skiplagging Isn't Likely to Stop Anytime Soon, Even if Airlines Fight It*, September 5, 2023
https://www.phocuswire.com/american-airlines-skiplagging-airfares-united-airlines

15. *American Airlines Sues Skiplagged*, August 30, 2023
https://www.nerdwallet.com/article/travel/american-airlines-sues-skiplagged

16. *Why American Airlines Is Suing A Popular Website That Finds Cheap Airfares*, August 22, 2023
https://www.forbes.com/sites/suzannerowankelleher/2023/08/22/american-airlines-lawsuit-skiplagged/?sh=1dbde3f93a5e

17. *American Airlines Sues Airfare Site Skiplagged*, August 20, 2023
https://onemileatatime.com/news/american-airlines-sues-skiplagged/

18. *American Airlines files lawsuit against Skiplagged*, August 22, 2023
https://www.goodmorningamerica.com/travel/story/american-airlines-files-lawsuit-skiplagged-102422969

19.   *American Airlines sues skiplagging site, claiming it tricks passengers*,
      August 21, 2023
      https://www.washingtonpost.com/nation/2023/08/21/american-airlines-
      skiplagged-lawsuit/

20.   *What to know about skiplagging, the controversial tactic to save money on
      flights*, August 21, 2023
      https://www.today.com/life/travel/skiplagging-explainer-rcna100923

21.   *American Airlines Sues Skiplagged, Alleging False Savings Promises and
      Deceptive Practices*, August 24, 2023
      https://skift.com/2023/08/24/american-airlines-sues-skiplagged-alleging-
      false-savings-promises-and-deceptive-practices/

22.   *American Airlines Becomes Latest Airline To Sue Skiplagged*, August 19,
      2024
      https://simpleflying.com/american-airlines-skiplagged-lawsuit/

23.   *American Airlines Becomes Latest Airline To Sue Skiplagged*, January 11,
      2024
      https://www.nerdwallet.com/article/travel/skiplagged-flights-guide

24.   *5th Circuit Calls Out Judge's Sanction as Abuse of Discretion, Again*,
      November 7, 2023
      https://www.law.com/nationallawjournal/2023/11/07/5th-circuit-calls-out-
      judges-sanction-against-lawyer-as-abuse-of-discretion-
      again/?slreturn=20240322155412

25.   *Skiplagging: Why some flyers love it and why airlines hate it*, November 24,
      2023
      https://www.cnn.com/travel/skiplagging-hidden-city-explainer/index.html

26.   *Don't persecute skiplaggers*, November 22, 2023
      https://www.dallasnews.com/opinion/editorials/2023/11/22/airlines-stop-
      persecuting-skiplaggers/

# Exhibit A-2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**DECLARATION OF AKTARER ZAMAN SUBMITTED IN SUPPORT
OF DEFENDANT SKIPLAGGED, INC.'S MOTION TO DISMISS
PLAINTIFF AMERICAN AIRLINES, INC.'S FIRST AMENDED
COMPLAINT FOR LACK OF PERSONAL JURISDICTION
AND ALTERNATIVE REQUEST TO TRANSFER VENUE**

I, Aktarer Zaman, declare under the pains and penalties of perjury as follows:

1.      At all relevant times in this case, I have been the Chief Executive Officer and founder of Defendant, Skiplagged, Inc. ("Skiplagged"). I submit this declaration in support of Skiplagged's *Motion to Dismiss* this action for lack of personal jurisdiction over Skiplagged, and Skiplagged's *Motion to Transfer Venue*. The information contained in this declaration is true and correct based on my personal knowledge. I am above the age of eighteen years and competent to testify.

2.      I am a resident of the State of New York and have been so at all relevant times in this suit.

3.      Skiplagged was incorporated in Delaware on March 3, 2015, and has always been headquartered in New York, New York. Skiplagged has been in business since that date.

1

4.   No Skiplagged employee lives or works in Texas.

5.   All Skiplagged employees knowledgeable about Skiplagged.com's use of public information concerning Plaintiff American Airlines, Inc. ("American") are located in New York City or work remotely from locations outside of Texas.

6.   Skiplagged has no computer servers located in Texas. Skiplagged's website, Skiplagged.com, is hosted on computer servers in South Carolina and New York, and has no connection with or to Texas.

7.   All Skiplagged documents are stored electronically and located on its computers in New York City or in Internet back-up storage through Google servers., none of which are located in Texas.

8.   Skiplagged is not registered to do business in Texas, nor does Skiplagged have a bank account in Texas, nor own any other property in Texas.

9.   No Skiplagged personnel have traveled to Texas in an attempt to further the Skiplagged business or goals or for any other business-related reason.

10.   Skiplagged has not collected and does not have non-public information about airline routing and pricing, including American's routing and pricing.   Instead it aggregates publicly available flight information from a variety of sources to inform consumers who visit Skiplagged.com over the Internet of cost-effective ways to travel.

11.   Skiplagged has not and does not obtain any information about American's routes and fares or other American services from American's website or from American's computer servers.   I have no knowledge as to the location of American's servers. Skiplagged obtains American flight and fare information from publicly available sources such as online travel

App'x 023

agencies, global distribution systems, and other travel metasearch engines. Skiplagged has also not obtained any of the alleged "American Marks" from American's website.

12.     Skiplagged.com provides a wide range of travel information to users over the Internet, including for persons interested in booking commercial airline flights. Skiplagged uses a unique algorithm to enable customers to identify affordable rates for airline or hotel accommodations and then refers the user to on-line travel agents to complete the bookings.   In some instances Skiplagged.com offers a "Book Now" feature that offers users the opportunity to utilize Skiplagged.com to facilitate the user's purchase of a given flight.   When the user selects the "Book Now" option for an American flight the user is interested in booking, Skiplagged.com then prompts the user to input their passenger information and payment details through an on-line form. Skiplagged.com then automatically opens a Google Chrome browser in the Skiplagged computer servers to input user's information into the booking Uniform Resource Locator or "URL" on AA.com on the user's behalf.   Skiplagged does not purchase or sell American tickets to anyone and does not claim that it is an agent of American or any other airline.

13.     Skiplagged does not specifically direct its Internet-based travel informational services into Texas.   Skiplagged engages in no advertising or marketing focused on Texas.   Instead, Skiplagged's services are offered to anyone anywhere in the World who has access to the Internet and who may prompt Skiplagged.com to provide information about airline routing and fares.

14.     Skiplagged has never agreed to American's terms and conditions or contract of carriage on the AA.com website or anywhere else.   I have never read American's user agreement or contract of carriage or gained access thereto.

App'x 024

15.     Nothing in Skiplagged's workflow requires a visitor to Skiplagged.com to purchase the routing or fare published on Skiplagged.com. Skiplagged has no control over or even visibility into the pricing that the consumer might ultimately pay for any ticket purchased after a referral to an on-line travel agent. Skiplagged is not a party to any agreement that a customer may enter into with American or any other airline.

16.     To my knowledge, Skiplagged has not induced anyone to breach their "agreements" (whatever those "agreements" may be) with any airline.

17.     Litigating in Texas would be unduly and unfairly burdensome on Skiplagged.   For example, it would require Skiplagged to maintain local counsel in Texas, require Skiplagged's officers and employees to travel more than 100 miles from their homes and business in New York City to Texas for participation in the litigation, and require Skiplagged to litigate in a state where it has had no business contacts or presence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

SUBSCRIBED TO, SWORN TO, AND EXECUTED on this 2nd day of October, 2023, in New York, New York.

*Aktarer Zaman*
Aktarer Zaman

App'x 025

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 2, 2023, a true and correct copy of the foregoing

was served via the Court's ECF system upon all counsel of record as indicated:

> Messrs. Dee J. Kelly, Jr., Lars L. Berg, and
>  Tyson Lies and Ms. Julia G. Wisenberg
> Kelly Hart & Hallman LLP
> 201 Main Street, Suite 2500
> Fort Worth, Texas 76102
>
> Ms. Bina Palnitkar
> Greenberg Traurig LLP
> 2200 Ross Avenue, Suite 5200
> Dallas, Texas 75201
>
> Mr. Nathan J. Muyskens
> Greenberg Traurig, LLP
> 2101 L Street, N.W., Suite 1000
> Washington, D.C. 20037

> */s/William L. Kirkman*
> William L. Kirkman

# Exhibit A-3

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-4

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT NORTHERN DISTRICT OF TEXAS
 3                    FORT WORTH DIVISION
 4

 5

         --------------------------------
 6                                        )
         AMERICAN AIRLINES, INC.,         )
 7                       )
                   Plaintiff             )
 8                                        )
         vs.           ) C.A. No. 4:23-CV-00860-P
 9                                        )
         SKIPLAGGED, INC.,                )
10                                        )
                   Defendant             )
11                                        )
         --------------------------------
12
13                    CONFIDENTIAL
14          DEPOSITION OF DARIN LEE, PH.D.
15             THURSDAY, JULY 11, 2024
16              9:04 A.M. - 1:37 P.M.
17              GREENBERG TRAURIG LLP
18             ONE INTERNATIONAL PLACE
19              BOSTON, MASSACHUSETTS
20
21
22
23      REPORTED BY:  Sandra A. Deschaine, CSR, RPR,
24      CLR, RSA
25      Job No. TX6782850
```

                                        Page 1

App'x 093

CONFIDENTIAL

| | |
|---|---|
| 1  APPEARANCES: | 1                JULY 11, 2024 |
| 2 | 2 |
| 3  ON BEHALF OF THE PLAINTIFF AND THE WITNESS: | 3                9:04 a.m. |
| 4  GREENBERG TRAURIG LLP | 4 |
| 5    Nathan Muyskens, Esquire | 5          Deposition of Darin N. Lee, |
| 6    2101 L Street, N.W. | 6  Ph.D., held at Greenberg Traurig LLP, One |
| 7    Washington, DC 20037 | 7  International Place, Boston, Massachusetts, |
| 8    202.331.3164 | 8  pursuant to Notice, before Sandra A. |
| 9    nathan.muyskens@gtlaw.com | 9  Deschaine, a Shorthand Reporter, Registered |
| 10 | 10  Professional Reporter, Certified LiveNote |
| 11  ON BEHALF OF DEFENDANT: | 11  Reporter, and Notary Public in and for the |
| 12  CONDON TOBIN SLADEK THORNTON NERENBERG PLLC | 12  Commonwealth of Massachusetts. |
| 13    Aaron Z. Tobin, Esquire | 13 |
| 14    8080 Park Lane, Suite 700 | 14 |
| 15    Dallas, Texas 75231 | 15 |
| 16    214.265.3851 | 16 |
| 17    atobin@condontobin.com | 17 |
| 18 | 18 |
| 19  Also Present: Gayle Ashton, videographer | 19 |
| 20          Jeremy Ballew, Esquire | 20 |
| 21          in-house counsel for American | 21 |
| 22          Airlines | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1              INDEX | 1      P R O C E E D I N G S |
| 2  EXAMINATION                    PAGE | 2          THE VIDEOGRAPHER:  Good morning. |
| 3  Darin N. Lee, Ph.D. | 3  We are now on the record.  This is the |
| 4    By Mr. Tobin ......................... 6 | 4  videographer speaking, Gayle Ashton, |
| 5 | 5  with Veritext Legal Solutions.  Today's |
| 6          EXHIBITS | 6  date is July 11, 2024, and the time's |
| 7 | 7  9:03 a.m.  We are here at Greenberg |
| 8  EXHIBIT      DESCRIPTION      PAGE | 8  Traurig, 1 International Place, Boston, |
| Exhibit 1      Expert Rebuttal Report  6 | 9  Massachusetts, to take the video |
| 9          of Darin N. Lee, Ph.D. | 10  deposition of Darin N. Lee, Ph.D., in |
| 10  Exhibit 2      Hidden city travel and  122 | 11  the matter of American Airlines, Inc., |
| 11          its impact on | 12  versus Skiplagged, Inc. |
|           passengers, implications | 13          Would counsel please introduce |
| 12          for the traveling | 14  themselves for the record. |
|           public, Dr. Bija Vasigh | 15          MR. TOBIN:  Aaron Tobin for |
| 13 | 16  Defendant Skiplagged. |
| 14 | 17          MR. MUYSKENS:  Nathan Muyskens for |
| 15 | 18  American Airlines. |
| 16 | 19          THE VIDEOGRAPHER:  Would the court |
| 17 | 20  reporter, Sandra Deschaine, please swear |
| 18 | 21  in the witness. |
| 19 | 22          DARIN N. LEE, PH.D., deponent, |
| 20 | 23  having first been satisfactorily identified |
| 21 | 24  by the production of his Massachusetts |
| 22 | 25  driver's license and duly sworn by the Notary |
| 23 | |
| 24 | |
| 25 | |
| Page 3 | Page 5 |

1  Public, was examined and testified as
2  follows:
3  (Exhibit 1, Expert Rebuttal Report of Darin
4  N. Lee, Ph.D., marked for identification.)
5          EXAMINATION
6  BY MR. TOBIN:
7      Q.  Please state your full legal name?
8      A.  Darin, D-a-r-i-n, Norman, L-e-e.
9      Q.  Dr. Lee, my name is Aaron Tobin.
10  You understand I represent the defendant
11  Skiplagged in this lawsuit that American
12  Airlines has brought?
13     A.  I do.
14     Q.  Okay.  And I believe today was the
15  first time we had a chance to meet; is that
16  correct?
17     A.  That's correct.
18     Q.  I assume -- I've reviewed your
19  report and your resumé and your CV, and it
20  sounds like you're experienced in this.  I
21  assume you've had your deposition taken a
22  number of times?
23     A.  I have, yes.
24     Q.  And do you need me to go over any
25  of the rules or you kind of understand the
                                    Page 6

1  format of what's going to happen today?
2      A.  I understand the rules as I've
3  been deposed in the past.
4      Q.  Okay.  Great.
5          One thing I'll tell you, because
6  all lawyers are different, I am very lax
7  about breaks.  If you want to take a break
8  for any time, any reason, you just let me
9  know and we'll do it.
10         The only thing I would ask if I've
11  got a question on the table, just please
12  finish answering the question and then we're
13  good to go.  Okay?
14     A.  Sounds good.
15     Q.  Same thing about lunch.  I'm
16  really at your discretion.  If you want to
17  work through lunch -- I don't anticipate
18  we're going to be here all day, but if you
19  want to work through lunch or grab a quick
20  lunch or take a longer, more leisurely lunch,
21  your preference.  I really don't care.
22     A.  Sounds good.
23     Q.  So I placed in front of you
24  Exhibit 1.  Does that appear to be a true and
25  accurate copy of your report that you've
                                    Page 7

1  issued in this case along with the appendix
2  that's attached to the report?
3      A.  It does.  I would say that the
4  quality of the printing on some of the
5  exhibits is a little hard to read, but yeah,
6  it is.
7      Q.  Okay.  If you have trouble reading
8  anything or figuring it out today, let me
9  know and we'll stop and try to see if we can
10  fix that for you.  Okay?
11     A.  Okay.
12     Q.  Does that contain all of the
13  opinions that you intend to offer in this
14  case?
15     A.  As I sit here currently, yes.
16     Q.  Okay.  Are you planning on
17  offering any opinions that are not contained
18  in that exhibit as you sit here today?
19     A.  I don't expect to, but I haven't
20  had any discussions as to what I'm going to
21  be asked to testify at trial, if I'm asked to
22  testify.
23     Q.  Okay.  Are there any corrections
24  or omissions or mistakes in your report that
25  you need to address right now?
                                    Page 8

1      A.  Actually, I saw one typo last
2  night as I was reading the report.  It was
3  just very, very minor, but on paragraph 11, I
4  think it was --
5      Q.  Paragraph 11, you said?
6      A.  I think it was paragraph 11 where
7  it said "20 years ago."  So it's on the
8  second line of the paragraph 11, it says, "As
9  shown in Exhibit 2, 20 years ago," that
10  should say 30 years ago.  It's referring to
11  the first date of appointment, which is 1993,
12  2023 to 1993.  30 years not 20 years.
13     Q.  That's helpful.  Thank you.
14         Are there any other corrections,
15  mistakes or omissions that need to be made to
16  your report?
17     A.  Not that I'm aware of, no.
18     Q.  I want to -- and we'll get into
19  more of the details of your report.  But I
20  want to just, at a high level, kind of make
21  sure I understand where you're coming from
22  and of course my client doesn't necessarily
23  agree with everything you're saying, but I at
24  least want to understand what your opinions
25  are.  So we'll just take it at high level
                                    Page 9

3 (Pages 6 - 9)

CONFIDENTIAL

1   first.  Okay?
2       A.  Sure.
3       Q.  If I understand some of the points
4   you're making in your opinion, is that if my
5   client were to go away and not exist, you do
6   not believe that that would lead the market
7   to being any more susceptible to monopoly or
8   monopolistic behaviors by American Airlines;
9   is that fair?
10      A.  Well, I'm not sure I agree with
11  the premise of your question, in that I might
12  assume that they already have some type of
13  monopolistic power.  You know, so as I state
14  fairly clearly in my report, my report is
15  only responding to primarily the report of
16  Dr. Vasigh, and I think he makes some
17  incorrect assumptions about how the airline
18  industry operates and the competitive state
19  of it, and for the reasons I outline in my
20  report, I think those assumptions are
21  incorrect.
22      Q.  Okay.
23          MR. TOBIN:  Objection,
24      nonresponsive.
25  BY MR. TOBIN:

Page 10

1       A.  There's a whole set of what I
2   refer to as lower-cost carriers --
3       Q.  Okay.
4       A.  -- which includes low-cost
5   carriers, ultra-low-cost carriers as well as
6   lower cost and network carriers.
7       Q.  Okay.  And you believe the
8   entrance of the market of those types of
9   carriers has made the industry more
10  competitive.
11          Am I understanding that
12  correctly?
13      A.  Well, it's a combination of the
14  expansion of those carriers, of the entry of
15  those carriers, the addition of new carriers,
16  and the competitive response they've elicited
17  from network carriers.
18      Q.  And you believe all those things
19  has made the industry more competitive over
20  the years?
21      A.  Oh, that definitely is a huge part
22  of it, yes.
23      Q.  Okay.  And so, I think if I
24  understand your point, is that if the
25  hidden-city ticketing is not around, the

Page 12

1       Q.  My question, though, is just
2   generally  -- let me ask you, if Skiplagged
3   were not to exist, do you believe that that
4   could lead the market to being more
5   susceptible to monopolistic-type behavior?
6       A.  I don't think so, no.
7       Q.  Okay.  And if I understand in your
8   report kind of some of the basis for what
9   you're saying, it's because you believe the
10  industry has become more competitive over the
11  years; is that fair?
12      A.  Well, I -- the data demonstrated
13  that it has been.  So, I mean, all of the
14  indicia of competition in terms of things
15  like prices, output, the industry has become
16  incredibly competitive, that's correct.
17      Q.  You highlight part of the reason I
18  think you believe that the industry has
19  become more competitive is because you
20  believe these low-cost carriers and these --
21  I'm sorry -- what's the term? -- ultra low
22  cost, or -- there's another level of low-cost
23  carriers behind just the low-cost --
24      A.  There's a --
25      Q.  -- carriers?

Page 11

1   consumer has a number of options.
2           Is that one of the points you're
3   trying to make?
4       A.  You know, again, I would defer to
5   my report, and my report is responding to
6   some claims about the nature of competition
7   in Dr. Vasigh's report, and I don't think --
8   he didn't see -- the availability of
9   hidden-city ticketing is needed to ensure
10  that the industry is competitive.
11      Q.  Okay.  And I understand.  I've
12  read your report.  I promise I have.
13          But this is my chance to kind
14  understand and discover what you might be
15  talking about at trial.  So I'm going to ask
16  you some questions that deal with your
17  report, but, you know, not everything is
18  going to come verbatim from your report so I
19  need to understand what you're going to say
20  at trial.  Is that fair?
21      A.  I understand.
22  (Jeremy Ballew entered the deposition.)
23  BY MR. TOBIN:
24      Q.  So you say that all of these
25  things you talked about has led to the

Page 13

4 (Pages 10 - 13)

1    industry becoming more competitive, and I
2    just want to make sure I understand because
3    that -- you believe that gives the consumer
4    choices, right?
5        A.  Choices are an important part of
6    competition.
7        Q.  And you believe, as we sit here
8    right now, the consumer does have choices?
9        A.  Yes, they have choices.
10       Q.  And so if hidden-city ticketing
11   options are not around, if I understand, part
12   of your point is that the consumer could
13   choose to fly on a low-cost carrier, correct?
14       A.  Consumers have the option to fly
15   on low-cost carriers, that's correct.
16       Q.  Okay.  Or they can fly on an
17   ultra-low-cost carrier, right?
18       A.  They can fly on a ultra-low-cost
19   carrier.
20       Q.  They could shop the market and
21   possibly fly on another carrier, another
22   major carrier other than American Airlines,
23   right?
24       A.  There's many choices, yes.
25       Q.  Okay.  They could try to time the

Page 14

1    market because ticketing prices even for a
2    specific carrier vary day-to-day or
3    month-to-month, correct?
4        A.  They vary, that's correct.
5        Q.  So they can try to time the market
6    if they wanted to, right?
7        A.  I suppose they could.
8        Q.  And they don't have to fly, they
9    could take another mode of transportation or
10   just choose not to fly all together.  Is that
11   part of the choices that you believe the
12   consumer has?
13       A.  Not flying is always an option.
14       Q.  And I think, from your years of
15   experience, you at least understand that, you
16   know, that's a consumer-specific decision,
17   depending on what's going on in their life,
18   the timing of their events or the budget that
19   they're on, it's very individualistic as to
20   how each of those consumers would go through
21   that decision-making process.  Fair?
22       A.  I would generally agree that many
23   travel choices are made at the individual
24   level.
25       Q.  And so I think you would agree

Page 15

1    that it's impossible for you or impossible
2    for me to predict how each of those consumers
3    would react or what choices they would make
4    if hidden-city ticketing is not around,
5    correct?
6        A.  Well, I think that if you were
7    asking me if I could tell you what each
8    individual would do, I can't put myself in
9    the shoes of each individual.  I can tell you
10   what I would do, and I can tell you what a
11   lot of people that travel would do.  But I
12   can't sit here and tell you that I know what
13   each individual person would choose.
14       Q.  Okay.  Now, I want to make sure I
15   understand kind of the breadth of your
16   opinion and how far you are going, so to
17   speak.
18           I don't think you're opining on
19   whether there is actually a market for
20   hidden-city ticketing or not; is that
21   correct?
22       A.  Are you referring to, like, a
23   relevant market and antitrust framework, is
24   that what you're --
25       Q.  Well, I'm -- not in a legal sense,

Page 16

1    just in a lay sense.
2           Maybe I'll just ask you.
3           Do you believe -- I mean, you've
4    seen that my client actually has sales,
5    right?
6        A.  I purchased a ticket myself, so
7    they do have sales, yes.
8        Q.  All right.  And hidden-city
9    ticketing is not something that's brand new.
10   It's been around for a long time, the concept
11   at least, right?
12       A.  That is correct, it's been around
13   for a while.
14       Q.  Okay.  And if I represent to you
15   that my client didn't even start doing
16   business of any form until 2013, is at least
17   your understanding that hidden-city ticketing
18   or the practice has been around before my
19   client started doing business in 2013?
20       A.  I understand that hidden-city
21   ticketing has been around since prior to
22   2013.
23       Q.  Okay.  And you understand that my
24   client is not the only one in the market of
25   hidden-city ticketing, there are other

Page 17

5 (Pages 14 - 17)

CONFIDENTIAL

| | |
|---|---|
| 1  businesses that practice -- either similar | 1       THE WITNESS:  And I chatted with |
| 2  practices or akin practices to what my client | 2  him for a few minutes. |
| 3  does.  You understand that at least? | 3  BY MR. TOBIN: |
| 4       A.  I'm aware of at least one other | 4       Q.  Who was that? |
| 5  website that promotes hidden-city ticketing, | 5       A.  Eric Amel. |
| 6  though I don't think they do on American | 6       Q.  How do you spell the last name? |
| 7  anymore. | 7       A.  A-m-e-l. |
| 8       Q.  So at least you understand, you | 8       Q.  Is Mr. Amel in your office? |
| 9  may not agree with the practice, but you at | 9       A.  He is, yes. |
| 10  least understand there's a market out there | 10       Q.  And were you individually retained |
| 11  for hidden-city ticketing? | 11  to give a report or was a business or a firm |
| 12       A.  I just don't know what you mean | 12  that you work with retained? |
| 13  when you refer to it as a market.  I know | 13       A.  Compass Lexecon, which is my |
| 14  that there's websites out there that promote | 14  employer, was retained. |
| 15  hidden-city ticketing, so I would agree with | 15       Q.  Did you meet or discuss |
| 16  the point that there are -- you're not the | 16  preparations for your deposition with anyone |
| 17  only one out there that's doing it. | 17  else besides Mr. Amel and your counsel? |
| 18       Q.  And you'd at least agree that | 18       A.  No, I did not. |
| 19  there are consumers out there that are | 19       Q.  How long did you spend reviewing |
| 20  consuming hidden-city ticketing services | 20  documents to prepare for your deposition |
| 21  provided by my client and others? | 21  today? |
| 22       A.  Yes, there are consumers who have | 22       A.  Well, see, today is what -- today |
| 23  purchased hidden-city ticketing, yes. | 23  is Thursday.  I spent maybe 20 hours in |
| 24       Q.  What did you do to prepare for | 24  total, Monday, Tuesday, Wednesday. |
| 25  your deposition today? | 25       Q.  How long have you been with |
| Page 18 | Page 20 |

| | |
|---|---|
| 1       A.  I reviewed my report.  I read | 1  Compass Lexecon? |
| 2  Dr. Vasigh's report, Dr. Phiroz's report, and | 2       A.  I believe I joined Compass Lexecon |
| 3  I met with counsel yesterday for maybe 90 | 3  in February of 2011. |
| 4  minutes. | 4       Q.  And pardon these questions, but I |
| 5       Q.  Did you review any other documents | 5  ask of every witness I ever depose. |
| 6  or data for your preparation of your | 6           Have you ever filed for bankruptcy |
| 7  deposition today? | 7  or any type of insolvency proceeding? |
| 8       A.  I looked at the Complaint.  I, you | 8       A.  I have not. |
| 9  know, I went through my report and looked at, | 9       Q.  Have you ever been charged, |
| 10  you know, the exhibits and some of the | 10  arrested or convicted of a crime other than a |
| 11  underlying information. | 11  minor traffic offense? |
| 12       Q.  Okay.  Anything else? | 12       A.  I have not. |
| 13       A.  I think that, as I sit here right | 13       Q.  Are you on any medications or do |
| 14  now, that's pretty much -- I reviewed my | 14  you have any conditions today that would |
| 15  report and the materials I relied upon. | 15  affect your ability to give truthful |
| 16       Q.  Now, I don't want to know anything | 16  testimony? |
| 17  you talked to with your counsel.  But other | 17       A.  I'm not. |
| 18  than that, did you talk to anybody else in | 18       Q.  Are you on any medications or do |
| 19  preparing for your deposition today? | 19  you have any conditions that would affect |
| 20       A.  I have one individual that | 20  your memory at all? |
| 21  assisted me in my direct -- worked under my | 21       A.  I take a statin, but that's it. |
| 22  direction in my report and I chatted -- | 22       Q.  And it doesn't affect your recall? |
| 23       THE STENOGRAPHER:  Sir, you're | 23       A.  Not that I -- not that I know of. |
| 24  kind of dying out at the end. | 24       Q.  When were you retained? |
| 25       "And I chatted with"? | 25       A.  To the best of my recollection, as |
| Page 19 | Page 21 |

6 (Pages 18 - 21)

| | |
|---|---|
| 1 I sit here today, sometime in earlier May. | 1 correct? |
| 2   Q.  And were you retained by a law | 2   A.  That is correct. |
| 3 firm or by American Airlines?    When I say | 3   Q.  And how many times have you been |
| 4 "you," you understand I'm talking about the | 4 retained by American Airlines? |
| 5 Compass? | 5   A.  Over what period of time? |
| 6   A.  I believe our retention letter is | 6   Q.  Ever since you started doing this? |
| 7 with American Airlines, but it -- you know, | 7   A.  I couldn't tell you sitting here |
| 8 largely the reach out came from the | 8 right now. I'd defer to my CV, which lists |
| 9 attorneys. | 9 all of the engagements I provided testimony |
| 10   Q.  Okay.  Was that Greenberg Traurig | 10 in. But I've been retained by American on |
| 11 or Kelly Hart? | 11 multiple occasions, as with other airlines. |
| 12   A.  Could have been both.  I mean, it | 12   Q.  More than ten times? |
| 13 could have been -- I think the initial call | 13   A.  Over the course of my career? |
| 14 had both Kelly Hart and Greenberg. | 14   Q.  Yes. |
| 15   Q.  What is your rate? | 15   A.  Yes. |
| 16   A.  $1040 per hour. | 16   Q.  More than 25 times? |
| 17   Q.  What is Mr. Amel's rate? | 17   A.  I would need to go and count, but |
| 18       I'm sorry.  Yeah, Mr. Amel. | 18 it's possible. |
| 19   A.  I don't know it off my heart, but | 19   Q.  Your CV is attached as -- or is |
| 20 I suspect it is in the maybe 750-ish range | 20 attached to Exhibit 1, correct? |
| 21 per hour. | 21   A.  It is. |
| 22   Q.  Did anyone work on this project | 22   Q.  And your prior expert retention is |
| 23 that you're here to testify other than you | 23 part of that, correct? |
| 24 and Mr. Amel? | 24   A.  It is. |
| 25   A.  No, we were the only two. | 25   Q.  So every time you've been retained |
| Page 22 | Page 24 |

| | |
|---|---|
| 1   Q.  How much have you billed so far? | 1 by American Airlines, you or someone you're |
| 2   A.  I don't know, as I sit here right | 2 working on behalf of is reflected in |
| 3 now. | 3 Exhibit 1; is that fair? |
| 4   Q.  Do you know how much you collected | 4   A.  Well, I think Exhibit 1 lists |
| 5 so far? | 5 testimony, and so there are instances where I |
| 6   A.  I don't know as I here today right | 6 may have been retained by a client to provide |
| 7 now. | 7 nontestifying consulting, but in terms of |
| 8   Q.  Is it over $50,000? | 8 engagements where I've offered expert |
| 9   A.  Collected? | 9 testimony, my CV is quite complete, I |
| 10   Q.  I'm sorry.  Charged. | 10 believe. |
| 11   A.  Over 50,000.  I suspect it is, | 11   Q.  I'm looking at page A-6, which is |
| 12 yes. | 12 Appendix Exhibit 1. |
| 13   Q.  Is it over a hundred thousand | 13       Do you see that? |
| 14 dollars? | 14   A.  A-6? |
| 15   A.  Probably. | 15   Q.  Yes. |
| 16   Q.  Is it over $250,000? | 16   A.  Yes.  Yes, I do see that, yeah. |
| 17   A.  I don't think so. | 17   Q.  Okay.  Like, for instance, about |
| 18   Q.  Do your rates change at all | 18 two-thirds of the way down the page, you see |
| 19 depending on whether you give testimony or is | 19 where expert report in a matter between a |
| 20 the rate static? | 20 U.S. carrier, that bullet point? |
| 21   A.  My rate is the same regardless of | 21   A.  Hold on.  Page A-6, expert report. |
| 22 testimony or not. | 22 Yes, I do see that, yes. |
| 23   Q.  Okay.  Now, you've been retained | 23   Q.  Okay.  That seems to indicate to |
| 24 by American Airlines -- you or your firm have | 24 me that there may not have been any testimony |
| 25 been retained by American Airlines before, | 25 and that was just a report in that particular |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

CONFIDENTIAL

1   case.
2       A.  In that particular instance -- I'm
3   just trying to recall why I had to not
4   disclose -- the client in that matter asked
5   me not to disclose the name, their name, and
6   I filed an expert report, but I was neither
7   deposed nor was I asked to provide live
8   testimony in court.
9       Q.  Okay.  And it seems like there are
10  a couple of instances in there where -- at
11  least in this section A attached to your
12  report, where testimony is not listed.
13  That's why I thought this might have been
14  every retention as opposed to just every
15  retention that involves testimony.
16      A.  So when you refer to testimony,
17  you're referring to, like, live oral
18  testimony?
19      Q.  Yes.  Either in a deposition or a
20  court proceeding or at trial or an
21  arbitration?
22      A.  Okay.  Yeah.  So this would
23  include all of the above, all of the live
24  testimony, as you just described, as well as
25  expert reports.

Page 26

1       A.  It was not.
2       Q.  Okay.  If we look at page A-9,
3   five bullet points up where it says, "Provide
4   expert consulting services to several major
5   U.S. mainline and regional airlines."
6           Do you see that bullet point?
7       A.  I do, yes.
8       Q.  When you say "U.S. mainline and
9   regional airlines," was American Airlines or
10  any of its affiliates part of that
11  representation?
12      A.  It would be included, as would
13  most other carriers that went through Chapter
14  11 and Delta, Northwest, United, US Airways,
15  Comair, Pinnacle.  There's a whole set of
16  airlines throughout the decade after 9/11
17  that went bankrupt, and I was working --
18  providing consulting to a number of them.
19      Q.  And American was one of those?
20      A.  They were one of them, yeah.
21      Q.  And that was in connection with
22  American or its affiliates' Chapter 11
23  bankruptcy proceeding?
24      A.  That's correct.
25      Q.  And then a couple more bullet

Page 28

1       Q.  Okay.  Got it.
2           So if you'd been retained by
3   American Airlines, regardless of who you were
4   working for, if you had been retained as an
5   expert witness, regardless of whether you
6   gave testimony, if you at least gave a
7   report, it is identified in Appendix A to
8   your report; is that fair?
9       A.  To the best of my knowledge, I try
10  to keep this complete, yes.
11      Q.  Okay.  I mean, since we're there,
12  let's go ahead and talk about this section.
13  Bear with me for a minute.
14          So let's go back to A-6, that
15  bullet point we were talking about.
16      A.  A-6.  Okay.
17      Q.  The same bullet point where it
18  says, "Expert report in a matter between a
19  U.S. carrier and one of its represented
20  employee groups." (as read)
21          Do you see that bullet point?
22      A.  I do see that, yeah.
23      Q.  Okay.  Can you at least tell me if
24  that U.S. carrier that you referred to was
25  American Airlines or any of its affiliates?

Page 27

1   points down, where it says, "Analysis of
2   industry, economic and antitrust issues of
3   three major U.S. airlines," was American one
4   of those?
5       A.  No, I don't believe they were,
6   actually.
7       Q.  At the bottom it says, "Provided
8   valuation "of a major carrier's U.S. slot
9   holdings."
10          Would that major carrier have been
11  American or any of its affiliates?
12      A.  I do not believe that American was
13  that carrier, no.
14      Q.  Moving on to the next page, A-10,
15  it says, "Analysis of industry and economic
16  and antitrust issues," third bullet point
17  down, of a major U.S. airline. (as read)
18          Would that major U.S. airline have
19  been American?
20      A.  No.
21      Q.  Moving a few more bullet points
22  down to "Industry analysis for a major
23  airline in connection with post-9/11
24  workforce reductions," would that major
25  airline have been American or any of its

Page 29

8 (Pages 26 - 29)

CONFIDENTIAL

1  affiliates?
2      A.  No, it was not.
3      Q.  I've got a few bullet points I'm
4  going to ask --
5      A.  Sure.
6      Q.  -- the same question on.
7          So I would move down to the bullet
8  point that starts, "Authored whitepaper on
9  behalf of major U.S. airline."
10     A.  Sorry.  What page are you on, sir?
11     Q.  I'm still on A-10.
12     A.  A-10.  Okay.  "Authored"?
13     Q.  Whitepaper on behalf --
14     A.  Oh, I see that, yeah.
15     Q.  Was that American Airlines or any
16  of its affiliates?
17     A.  I believe that was one, yes.
18     Q.  Moving down, I believe, the fourth
19  bullet point from the bottom, as well as the
20  third bullet point from the bottom, also talk
21  about "Analysis" and -- "of industry and
22  economic issues for a major U.S. airline."
23         The major U.S. airline referred to
24  in either of those bullet points, was that
25  American or any of its affiliates?

Page 30

1  Northwest Airlines.
2      Q.  And what do you mean when you say
3  "hub dominance"?
4      A.  Allegations of hub dominance?
5      Q.  Yes.
6      A.  Well, as I discuss in my report,
7  back many years ago, the -- there were --
8  there was a pretty lively debate amongst
9  those that studied the airline industry about
10  hub pricing, you know, the pricing that
11  airlines paid -- I'm sorry -- the prices that
12  airlines would charge in hubs versus a
13  non-hub.
14     Q.  When you say "hub," what do you
15  mean?
16     A.  Well, a hub as I describe in my
17  report is a central part -- a hub-and-spoke
18  carriers' network, so there's kind of a
19  network architecture that's used by some
20  carriers known as hub-and-spoke networks.
21  And the hub is essentially the central focal
22  point where flights are funneled into the hub
23  so that people can make connections to other
24  places.
25     Q.  And when was this analysis done

Page 32

1      A.  So are you talking about the third
2  from the bottom and the second from the
3  bottom?
4      Q.  It depends -- you see there's a
5  bullet point under "impact of COVID-19," so
6  whether you count -- if you count that one,
7  I'm talking about the fourth and the third
8  from the bottom.
9      A.  On A-10?
10     Q.  On A-10?
11     A.  On A-10, third and fourth.  So the
12  one that says, "Analysis of industry and
13  economic issues for a major airline in a
14  predatory pricing suit"?
15     Q.  Correct.
16     A.  That was not American Airlines,
17  no.
18     Q.  What about the next one that is
19  related to and responsive allegations of hub
20  dominance?
21     A.  No, that was not American.
22     Q.  Who was that for?
23     A.  I think that was, if I recall,
24  part of my CV is dating back to probably the
25  late '90s or the early 2000s, I think it was

Page 31

1  that you refer to in this bullet point on
2  page A-10 on your report?
3      A.  I can't tell you precisely as I
4  sit here right now, but my suspicion,
5  especially given where this sits on my CV,
6  which is generally organized chronologically,
7  is in the, as I said, the late '90s or early
8  2000s.
9      Q.  And have you testified on hub
10  dominance before, other than this analysis
11  that you identify?
12     A.  Have I testified on hub dominance?
13  I'm just trying to think because I've
14  testified many times.  I'm just trying to
15  think if there's a time specifically where
16  that topic came up.  I don't know if I've
17  specifically testified -- I've testified
18  numerous times on the competitive state of
19  the industry; and as I describe in my report
20  and as we discussed this morning, at points
21  in time in the industry's evolution,
22  economists debated whether or not there was,
23  you know, the exercise of any type of market
24  power at hubs.  That's a debate that was
25  occurring many decades ago.  So it's possible

Page 33

1  that in some of my testimony I've recounted
2  kind of the evolution of the industry, and
3  that's a part of the evolution of the
4  industry.
5      Q.  Okay.  Same question but as to
6  expert reports.  Have you given any expert
7  reports on hub dominance or hub competitive
8  activities, other than the one that you're
9  testifying on here today?
10     A.  Define what you mean by "hub
11  competitive activities."  I'm not quite sure
12  what you mean by that.
13     Q.  I thought that's what you were
14  describing in your testimony.  Competitive
15  market forces at hubs in the airline
16  industry, is that a fair term?  Do you
17  understand what I'm saying when I say that?
18     A.  Why don't you describe what you
19  mean by that.
20     Q.  Well you're the expert.  I'm
21  trying to figure out what you believe are the
22  issues as it relates to competitive forces at
23  these hubs you've been talking about.  You
24  tell me.
25     A.  Well, as I've just told you, over

Page 34

1  the course of the industry's evolution, after
2  deregulation, when hub-and-spoke networks
3  became a more centralized part of a certain
4  carrier's airline networks --
5      Q.  What point in time are you
6  referring?
7      A.  Well, deregulation occurred in
8  1978, and after 1978, there was a period of
9  time where the hub-and-spoke networks of
10  certain carriers, the trunk carriers, as they
11  were known at the time expanded --
12     Q.  To include American?
13     A.  American was one of them, yes.
14     Q.  Go ahead.
15     A.  And over a period of years and
16  so -- I think kind of the hub -- kind of the
17  hub debate and, you know, when economists
18  were most focused on it was probably in the
19  late '80s, into the 1990s, into maybe the
20  early part of 2000s.
21         Again, so prior to essentially the
22  growth of an expansion of low-cost carriers,
23  there was a vigorous debate as to whether or
24  not hubs conferred certain types of pricing
25  advantages to hub carriers, but it was a

Page 35

1  debate amongst scholars and amongst those
2  that were following the industry.
3      Q.  Congress was interested in it as
4  well, right?
5      A.  It was a vigorous debate.  I'm not
6  sure if Congress per but certainly DOT
7  weighed in on it and others did as well.
8      Q.  So getting back to A-10, if we
9  look at the last bullet point on A-10, that's
10  these above "Impact of COVID-19," where it
11  says, "Analysis of industry, regulatory and
12  economic issues for a major U.S. airline,"
13  would that major U.S. airline have been
14  American Airlines or any of its affiliates?
15     A.  Oh, gosh, let me think.
16         And this is stretching my memory
17  because this is now probably 27 years ago or
18  26 years.  So I think American may have been
19  the carrier that was looking at some kind of
20  joint ownership agreement with a Canadian
21  holding company, but I think there could have
22  been; but, again, I don't want to say a
23  hundred percent was American, but I think it
24  could have been American.
25     Q.  If we turn the page to A-11, the

Page 36

1  last bullet point in the first section on
2  that page says, "For a major U.S. carrier,
3  analysis of the impact of COVID-19."  I
4  assume that that analysis was done somewhat
5  recently?
6      A.  Yes, it was, yes.
7      Q.  Okay.  And when was that done?
8      A.  Well, 2000, I think, generally, in
9  that time period, 2000, 2001.  I mean, it was
10  kind of post-COVID period.
11     Q.  You sure it was 2000 or 2001?
12     A.  I'm sorry.  2020.
13     Q.  2020 or 2021?
14     A.  2020, 2021.  Yeah.  Sorry.
15     Q.  And would that have been for
16  American Airlines?
17     A.  We did work for American Airlines
18  as well as other airlines on COVID-related
19  issues, but we did certainly work with
20  American Airlines.
21     Q.  If I'm looking at A-12, the second
22  bullet point under "Conferences and Other
23  Invited Presentations" it talks about
24  "Georgetown Center for Business and Public
25  Policy."

Page 37

10 (Pages 34 - 37)

CONFIDENTIAL

1    Do you see that one?
2    A.  I do, yes.
3    Q.  Airline Competition Conference,
4  what did you speak about, if anything, at
5  that conference?
6    A.  I believe I spoke -- let me think.
7    So my recollection -- and I just
8  need to -- my recollection is that I was --
9  you know, I may be confusing it with what I
10  spoke about at the -- I had a legal symposium
11  just before that.  It's one of two things or
12  it may have been an amalgamation of a couple
13  of things.
14    But I recall having completed a
15  whitepaper for Air New Zealand, where we were
16  looking at -- we, when I say "we," my
17  coauthors and I, at the joint venture that
18  they had with a variety of carriers in Asia,
19  and they had given us access to their
20  ticketing data that allowed us to do things
21  that -- and control for things that some of
22  the economic literature that relies on public
23  data wasn't able to control for, and I recall
24  that we had some nice results or interesting
25  results.

                                    Page 38

1  example, working on a matter for United in
2  which United and American were competing for
3  the same thing.
4    The one that I can think of most
5  recently would be in the most recent DOT
6  allocation for slots at Haneda, and American
7  and United were the two carriers that were
8  competing for the initial daytime slot at
9  Haneda, and I was working with United.
10    Q.  Was that a court case?
11    A.  It was -- no, it was DOT, with
12  authority preceding.
13    Q.  Any other times you can -- it
14  sounds like you're telling me that you've
15  never testified adverse -- or given an expert
16  report adverse to American Airlines in a
17  court case; is that fair?
18    A.  I don't think I've been asked to,
19  no.
20    Q.  Okay.  Have you ever been --
21  testified on behalf of a party that was an
22  adverse party to a major U.S. airline carrier
23  in any type of court case or tribunal?
24    A.  Not to the best of my recollection
25  as I sit here right now.

                                    Page 40

1    I do recall speaking about that at
2  the IATA Legal Symposium, and I suspect
3  that -- because that talk was well received
4  at the IATA conference, I may have also
5  spoken about that and other issues at the
6  Georgetown one as well.
7    Q.  You list quite a number of
8  retentions dealing with the airline industry
9  in Exhibit A, where you were retained as an
10  expert -- excuse me -- Appendix A, where you
11  were retained as a expert.  I did not see any
12  where you were adverse to American Airlines;
13  is that correct?
14    A.  So I have been -- I mean, it
15  depends on how you think of "adverse to."  I
16  have certainly worked on matters for other
17  carriers, where the -- kind of the goals of
18  that carrier were adverse to the interest of
19  American Airlines, so.
20    Q.  Was that ever in a court case?
21    A.  I need to think about that.
22    So American has never been the
23  adverse party of a case where I've testified
24  in.  But, again, as I just said, there's been
25  cases certainly where I may have been, for

                                    Page 39

1    Q.  I notice in a number of places on
2  a number of bullet points you say, "major
3  U.S. airlines."  You use that terminology.
4    When you say "major U.S.
5  airlines," which airlines are you referring
6  to?
7    A.  Can you just point me to --
8    Q.  Sure.  Like, for instance, on page
9  A-9, and it's the third bullet point down,
10  and it says -- this is one instance where you
11  use the term "major U.S. airlines"?
12    A.  For several U.S. major airlines?
13    Q.  Yeah.  And I'm trying to figure
14  out, in your head, when you're saying "major
15  carriers" or "major U.S. airlines," what is
16  the universe you're talking about?
17    A.  Well, so the DOT has a
18  classification system of airlines and majors
19  are those that, I think over the trailing
20  four quarters, have revenues over a billion
21  dollars.
22    Q.  Okay.  So this decade, in the
23  United States, which carriers would fall
24  under that category?
25    A.  This decade in the United States,

                                    Page 41

11 (Pages 38 - 41)

1  well it's grown obviously, but -- so
2  American, Delta, United, Southwest, Alaska,
3  JetBlue, Spirit would be a major airline by
4  this point. I think Frontier would be a
5  major airline by this point, and Hawaiian
6  would be a major airline at this point, and I
7  believe, I'd have to check to see whether or
8  not Allegiant is, for example. I don't
9  think, for example, Breeze or Avelo at this
10  juncture would be a major airline.
11          And, actually, I would add that
12  some of the regional carriers meet the
13  threshold -- the revenue threshold that DOT
14  would use to classify a major airline, so I
15  think SkyWest for sure.
16      Q.  So in your Appendix A, when you
17  are referring to major U.S. airlines, you
18  would be referring to carriers at the time of
19  that specific retention that at least had
20  over -- what did you say, a billion
21  dollars of --
22      A.  A billion dollars of revenue, yes.
23      Q.  Annual.  Trailing 12 months?
24      A.  I think four quarters probably.
25      Q.  Okay.  What percentage of your

Page 42

1  income is derived from -- or your billings, I
2  should say, is derived from either litigation
3  consulting or being retained as an expert as
4  it relates to the airline industry?
5      A.  Over what period of time?
6      Q.  Let's say the last five years.
7      A.  So as being retained as an expert
8  or all the other --
9      Q.   Or providing services for either
10  consulting or expert services for the airline
11  industry.
12      A.   And would you be including in that
13  all types of carriers:  passenger, cargo,
14  private?
15      Q.  Sure.
16      A.  It's fairly high.  It's -- you
17  know, there's cases where I'm retained by --
18  for example, I'm working on a matter right
19  now where the client is a maintenance service
20  provider, so that's -- I'm not sure you would
21  put that in there, that's not an airline.
22  There the adverse party is actually an
23  airline.  But I would say it's over 90
24  percent.
25      Q.  Okay.  And of the cases in the

Page 43

1  last five years where you've been retained,
2  actual court cases or arbitrations or
3  proceedings where there are adverse parties,
4  what percentage of your work has dealt with
5  the airline industry?
6      A.  It's very high.  It's north of 90
7  percent.
8      Q.  How much money has American
9  Airlines paid for your services over the last
10  five years?
11      A.  I couldn't tell you as I sit here
12  right now.
13      Q.  Do you think it's hundreds of
14  thousands of dollars or millions of dollars?
15      A.  You're saying for the billings to
16  me personally or of my billings or for all
17  the work of the entire team that's working on
18  a case?
19      Q.  The entire team that you were
20  involved with.
21      A.  Over the last five years, it's
22  probably been in millions.
23      Q.  North of $10 million?
24      A.  No.
25      Q.  North of $5 million?

Page 44

1      A.  I couldn't tell you as I sit here
2  right now.
3      Q.  Somewhere between 1 and $10
4  million is your estimate?
5      A.  It is definitely above one.  I
6  can't tell you whether or not it's -- it's
7  certainly not ten.  I don't think.  It's
8  somewhere between that, I would suspect.
9      Q.  Exhibit 1, who drafted that?
10      A.  I wrote every word of this report.
11      Q.  Were there multiple drafts?
12      A.  I'm not sure what you mean.  I've
13  worked on this report.  So at different
14  points in time it was at different states of
15  completion.
16      Q.  Was there any point in time where
17  you passed a draft of the report that was not
18  final to somebody outside of your firm?
19      A.  I think I sent one near-complete
20  version of the report to counsel for their
21  review.
22      Q.  And did you retain that version of
23  your report?
24      A.  Perhaps.  I mean, it's -- it may
25  be sitting someplace.

Page 45

12 (Pages 42 - 45)

App'x 104

CONFIDENTIAL

1    Q.  Have you produced your entire work
2  file or your team's entire work file on this
3  project to your counsel?
4    A.  Yes, I have.
5    Q.  Including any notes or work papers
6  you had?
7    A.  I didn't have any notes or work
8  papers.
9    Q.  Okay.  Did your team have any
10  notes or work papers on this project?
11    A.  Not that I know of.
12    Q.  I know, obviously, you've had
13  discussions with your counsel, which, again,
14  I don't want to know about, but have you had
15  discussions with American personnel directly
16  about this particular project that you've
17  undertaken in this case?
18    A.  On the first kickoff call, just to
19  discuss the issues that were involved in this
20  case and whether or not I could participate,
21  there was an attorney from American on the
22  call.
23    Q.  Okay.  Other than that call, have
24  you had any discussions with American
25  Airlines' personnel as it relates to this

Page 46

1  case?
2    A.  I have not.
3    Q.  Other than those calls, have you
4  had any written communications with American
5  Airlines' personnel regarding this case?
6    A.  I have not.
7    Q.  Are you aware of your team having
8  any communications, written or oral, with
9  American Airlines related to this case, other
10  than what you've already told me about?
11    A.  Not that I'm aware of.
12    Q.  Did you help American Airlines
13  personnel prepare for any other depositions?
14    A.  I had just one call prior to
15  Dr. Vasigh's deposition.  I wouldn't
16  necessarily characterize it as helping him
17  prepare, but they more or less wanted to
18  understand what was in my report, you know,
19  walk through my report with me.
20    Q.  And was that call with the lawyers
21  or was it with American Airlines personnel?
22    A.  It was with attorneys.
23  (Beeping noise.)
24    A.  It was telling me to be more
25  active.  Sorry.

Page 47

1  BY MR. TOBIN:
2    Q.  It's probably a reflection on me
3  somehow?
4      So in your report you identified
5  the materials you reviewed to help you with
6  the project in this case.
7      Are there any materials you
8  reviewed for this project in this lawsuit
9  other than what's identified in your report,
10  Exhibit 1?
11    A.  I mean, not specifically.  What I
12  would tell you is that every project I work
13  on, every report that I write, you know, I
14  also rely upon my knowledge of the industry,
15  my 25-plus years of doing both academic
16  research and other consulting work of the
17  airline industry, and so that kind of
18  accumulated knowledge of the industry and how
19  it works and -- all filters down into all of
20  my thinking, but what's listed in Appendix --
21  is it A?
22    Q.  I think it's B.
23    A.  B, are all of the documents and
24  data that I specifically relied upon in this
25  report.

Page 48

1    Q.  Okay.  Other than your general
2  accumulation of information from being in the
3  industry for many years, are there any
4  reports, data or documents that you reviewed
5  or relied on to prepare your report that are
6  not listed in Appendix B?
7    A.  Not that I know of.  If there
8  were, it would an omission by -- an
9  oversight.
10    Q.  What about specifically any types
11  of authoritative text, treatises, industry
12  papers, any type of written authority that
13  you reviewed or relied on specifically to do
14  your work in this case?
15    A.  Are they -- I mean, I think the
16  data on the documents, maybe the documents I
17  cite, but particularly the data, I'm a very
18  data-driven person, the data speaks for
19  itself, and I've cited and documented the
20  data that I used in this report.
21    Q.  Anything else?
22    A.  As I said, Appendix B contains a
23  list of all of the data and documents that I
24  specifically relied upon in forming my
25  opinions in this report, obviously

Page 49

13 (Pages 46 - 49)

1   supplemented my 25 years of experience.
2       Q.   And all those data and documents
3   you did turn over to your lawyers in this
4   case?
5       A.   Yes, we did.
6       Q.   Have you ever been retained by
7   Kelly Hart -- or a case where Kelly Hart were
8   the lawyers for the party that you were
9   working for, other than this case?
10      A.   Kelly Hart was cocounsel, I
11  believe, in a matter that I testified to --
12  testified in in 2019, I believe.
13      Q.   And who did you offer opinions on
14  behalf of in that case?
15      A.   That would have been American
16  Airlines.
17      Q.   And which case was that?
18      A.   That would have been -- pardon
19  me -- in the TWU/IAM Association slowdown
20  matter in Fort Worth.
21      Q.   Is that matter reflected in your
22  report in the appendix?
23      A.   It is.  I gave testimony before a
24  Judge McBride, the late Judge McBride.
25      Q.   Same question for Greenberg

Page 50

1   Traurig, have you ever been retained by them
2   in an airlines case before?
3       A.   Not to the best of my
4   recollection.
5       Q.   Have you ever been retained by
6   Greenberg Traurig before for any
7   representation?
8       A.   Not to the best of my
9   recollection.
10      Q.   Have any of your opinions ever
11  been criticized, disregarded or excluded by a
12  court or any type of tribunal or authority?
13      A.   Could you repeat the question?
14      Q.   Sure.  Have any of your opinions
15  ever been criticized, disregarded or excluded
16  by a court, tribunal or any type of
17  authority?
18      A.   Sure.  Yes.
19      Q.   Okay.  How many times has that
20  happened?
21      A.   So the ones that I'm thinking of,
22  Judge Sorokin, whose opinion, actually to
23  this day, I very much disagree with,
24  criticized my opinions in the
25  JetBlue/American NEA trial.

Page 51

1       Q.   And what jurisdiction was that in?
2       A.   That was across the street.
3            MR. MUYSKENS:  Right over there.
4       A.   That was the Justice Department,
5   U.S. -- United States of America versus
6   JetBlue and American.
7   BY MR. TOBIN:
8       Q.   Who were you representing in this
9   case?
10      A.   JetBlue and American.  I wasn't
11  representing.  I'll just take that back.  I
12  wasn't representing anyone.  I was offering
13  testimony on behalf of.
14      Q.   Who were you retained by?
15      A.   American and JetBlue.
16      Q.   And was that a published opinion?
17      A.   Was it a published opinion?
18      Q.   Yes.
19      A.   I believe it was a published
20  opinion, yes.
21      Q.   And I'm sorry, when again was
22  that?
23      A.   The decision came down, what, a
24  year ago maybe.  It's under appeal currently.
25      Q.   And that case is listed in your

Page 52

1   Appendix in the report?
2       A.   It is, yes.
3       Q.   Any other times this has happened,
4   where you've been criticized, disregarded --
5   your opinions have been criticized,
6   disregarded or excluded by a court, tribunal
7   or authority?
8       A.   So there's one case back in, I
9   think it's like 2008, where the judge
10  excluded multiple experts' opinions with
11  regards to one aspect of the report, and it
12  wasn't due to methodical or any liability
13  issues.  He had just decided, as a matter of
14  law, that one of the things I was asked to
15  study and opine on wasn't relevant as a
16  matter of law.
17      Q.   And which case was that?
18      A.   That was the Delta, AirTran bag
19  fee litigation.
20      Q.   And what court was that in?
21      A.   It was in Georgia, I believe.
22      Q.   Federal or state court?
23      A.   Federal court, I believe.  But,
24  again, it was not -- he excluded testimony
25  from multiple experts just as a matter of

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

1  law.
2      Q.  Do you recall who the judge was?
3      A.  I don't recall.
4      Q.  Do you remember who retained you?
5      A.  Boies Schiller.
6      Q.  What was the party you were
7  working for?
8      A.  Delta Airlines.
9      Q.  Okay.  Any other instances where
10  your opinions have been criticized,
11  disregarded or excluded by a court, tribunal
12  or authority.
13      A.  So, I mean, are you asking if I've
14  offered testimony in a matter and the judge
15  or finder of fact decided, you know, ruled --
16  ruled against the party that I was retained
17  by?  Is that what you are asking?
18      Q.  No, that's not my question.
19          My question is whether your
20  opinions have either been criticized,
21  disregarded or excluded from a
22  court proceeding by a judge?
23      A.  No.  Other than to -- and they
24  weren't struck in the NEA trial.  They were
25  just -- he didn't find it compelling, for

Page 54

1  reasons I don't quite understand, but no.
2          I can -- there's many opinions
3  that spoke quite favorably of my opinions,
4  including Judge McBride, if you wanted to
5  read that one.
6      Q.  All right.  It sounds like
7  decades, but how long have you been
8  consulting in the airline industry?
9      A.  Since 1998.
10      Q.  At a transition point, do you need
11  a break or do you want to keep going?
12      A.  I mean, I'm fine.  If you want
13  to -- stretch my legs.
14      Q.  Let's take a five-minute break?
15          THE VIDEOGRAPHER:  The time is
16      10:09.  We're going off the record.
17  (Recess taken at 10:09 a.m. to 10:18 a.m.)
18          THE VIDEOGRAPHER:  We are back on
19      the record.  The time is 10:18.
20  BY MR. TOBIN:
21      Q.  So, Dr. Lee, I think I may have
22  found the case you were talking about.  Was
23  it United States versus American Airlines
24  Group here in the District of Massachusetts
25  last year?

Page 55

1      A.  Yeah, I think -- was it -- and
2  JetBlue, I just want to make sure you're
3  looking at the right one.  I think it would
4  have been both -- against United
5  States versus JetBlue -- American and
6  JetBlue, right?
7      Q.  If you just want to identify which
8  bullet point it is on your Appendix A.
9      A.  Yeah.  It's on A-4, the third
10  bullet.
11      Q.  Thanks.
12          So in reading all these reports,
13  I've seen some acronyms and what appear to be
14  industry terms of art that I wasn't
15  necessarily familiar with until I got into
16  this case.  So I want to go over a few of
17  them just to make sure you and I are on the
18  same page while we're talking about things.
19          Have you seen the acronym GNC
20  before?
21      A.  Yes, I have.
22      Q.  What does that mean to you?
23      A.  Global network carrier.
24      Q.  And what is a global network
25  carrier?

Page 56

1      A.  Well, a global network carrier is
2  a carrier that kind of has the name -- tries
3  to explain -- has a global reach in nature
4  and operates a set of hub-and-spoke --
5  hub-and-spoke network usually with multiple
6  hubs, you know, with a global reach.
7      Q.  Is American a global network
8  carrier?
9      A.  Yes, American, Delta and United
10  are the three U.S. global network carriers.
11      Q.  And what is the acronym or term
12  O&D to you?
13      A.  It means origin and destination.
14      Q.  And if you'd explain what you
15  believe that means or what you understand it
16  to mean.
17      A.  So the term O&D -- so because of
18  passengers who travel by air often make
19  connections, not always but often make
20  connections, the term O&D refers to the
21  origin and the destination of that city
22  pairs, often looked at as a city pair with a
23  metropolitan area on both ends, kind of
24  irrespective of whether there's a connection
25  in between.

Page 57

15 (Pages 54 - 57)

1        So as I describe in my report, a
2   passenger that's traveling between Boston and
3   San Antonio is a -- and suppose I make that
4   connection via DFW, an O&D passenger between
5   Boston and San Antonio, and I'm not an O&D
6   passenger between Boston and Dallas, nor
7   between Dallas and San Antonio.
8        Q.   Okay.  So in the example you just
9   gave, is city pair synonymous with O&D?
10        A.   It's not synonymous because
11   sometimes -- and I generally don't think it's
12   the best practice, but sometimes people think
13   of O&D as airport pairs, and in the case of
14   Boston to San Antonio, because there's only
15   one airport in both the Boston and San
16   Antonio, those two would be the same.  But if
17   you were looking at, for example, Washington
18   DC to Miami, Fort Lauderdale, there are, you
19   know, airport pairs within that city pair,
20   and so they wouldn't -- I mean, I would treat
21   the two as synonymous, but some people might,
22   for certain reasons, look at the various O&D
23   airport pairs within that city pair.
24        Q.   Now, you mentioned earlier in your
25   testimony the term "hub and spoke."  Hub and
Page 58

1   refer to it.
2        Q.   What do you believe it means?
3   When it's been referred to in this case.
4        A.   Dynamic pricing, I think is
5   referring to essentially the temporal element
6   of prices or airfares and how they're kind of
7   constantly evolving over time.
8        Q.   Okay.  So -- and we talked a
9   little bit about this earlier, that, for
10   instance, your example, Boston to San Antonio
11   through DFW, you may have looked for that
12   flight on American Airlines today and that
13   price, based on American's dynamic pricing,
14   could be different tomorrow or even three
15   days from now or a week from now.  Is that
16   fair to say?
17        A.   .  As inventory is sold, pricing
18   can change.
19        Q.   And quite often it does, right?
20        A.   It can, yes.
21        Q.   Are you familiar with the term
22   "revenue management" as it relates to the
23   airline industry?
24        A.   I am, yes.
25        Q.   What does that term mean to you?
Page 60

1   spoke still exists as we sit here today,
2   right?
3        A.   Absolutely.
4        Q.   Okay.  So when you use the term
5   "hub and spoke," what do you mean?
6        A.   As I described earlier, it's a
7   network architecture that focuses around a
8   number of hub airports, for example, American
9   has hubs in Dallas Fort Worth and Charlotte,
10   Philadelphia, JFK, others as well, Chicago
11   O'Hare.  And the network is designed to bring
12   travelers from multiple spokes into the hub
13   airport and to facilitate convenient
14   connections to multiple destinations, and
15   it's just -- it's one type of network
16   structure, and the other one is known as
17   point to point.
18        Q.   Are you familiar with the term
19   "dynamic pricing" as it relates to the
20   airline industry?
21        A.   I've heard the term used.  I
22   believe it's a term that either Dr. Vasigh or
23   Mr. Phiroz uses.  I don't know if it's
24   necessarily a term of art, but I certainly --
25   I think I understand what they mean when they
Page 59

1        A.   Well, it's a pretty broad term;
2   but, essentially it means, in one of the
3   goals of all airlines, is to kind of manage
4   their inventory of seats.  They're perishable
5   products, and one of the goals of airlines is
6   to try to maximize the revenue from those
7   available seats, and they have to do it
8   taking into account a lot of different
9   things.
10        The evolution of demand,
11   competitive activities on markets and so
12   revenue management is kind of like a broad
13   part of airline pricing that is -- kind of
14   captures the entire way that airlines are
15   trying to, you know, price all of the
16   different O&Ds within their network.
17        Q.   And it's your understanding, based
18   on your experience in the industry, that the
19   United States GNCs, the three major carriers
20   you're talking about, devote a lot of time
21   and resources to management; is that fair?
22        A.   Well, I don't think that there's
23   an airline out there that doesn't devote a
24   lot of time to revenue management.  I mean,
25   that's half of the equation of whether or not
Page 61

16 (Pages 58 - 61)

1  you're hoping to generate a profit from
2  operating flights.
3        So revenue management is not
4  something that is limited to GNCs.  Every
5  carrier, as I describe in my report, uses
6  revenue management.
7     Q.  But this is, as far as this, you
8  know, emphasis on revenue management, if I
9  understand what I've been reading in this
10  case, this emphasis on revenue management has
11  really revved up in, say, the last 20 years;
12  is that fair?
13     A.  I'm not sure I would -- I mean, I
14  think revenue management has always been --
15  well, particularly in the post-deregulation
16  era, so it's different if we were talking
17  about the pre-deregulation era, where fares
18  and routes and entry were really dictated by
19  the Civil Aeronautics Board.  It was a
20  regulated structure.  Then revenue management
21  wasn't really as much of an issue.
22        But at least since 1979, when airlines
23  were given the freedom to price as they saw
24  fit and based off of market forces as opposed
25  to government, essentially cost-based

Page 62

---

1  formulas, a revenue management has been a big
2  part of airlines; and, you know, as computer
3  technology has improved across all
4  industries, revenue management perhaps has
5  gotten more sophisticated, but it's always
6  been something that has been out there.
7     Q.  And your understanding is the
8  revenue management teams for a particular
9  airline, one of their main goals is to
10  maximize profitability, correct?
11     A.  I think all airlines have the goal
12  of maximizing profitability.
13     Q.  And revenue management plays a big
14  part of that, right?
15     A.  Sure.  It does absolutely, for
16  every airline.
17     Q.  And most airlines, to include the
18  American Airlines of the world, have large
19  teams devoted to revenue management, right?
20     A.  I think any airline out there
21  devotes substantial resources to revenue
22  management, including American.
23     Q.  And when you're talking about hub
24  and spoke, are you talking about hub and
25  spoke, the hub being a particular airport or

Page 63

---

1  being a particular city?
2     A.  Well, it depends on the context of
3  the -- what you're looking at.
4     Q.  Let's talk about American Airlines
5  in Dallas Fort Worth.  You understand
6  there're multiple commercial airports in
7  Dallas Fort Worth, right?
8     A.  I do.
9     Q.  When you're referring to the
10  hub-and-spoke system as it relates to the
11  American Airlines, are you referring to all
12  the commercial airports in Dallas or are you
13  just referring to DFW?
14     A.  So when one is looking at
15  American's hub and spoke at Dallas, okay,
16  let's focus in Dallas, American's hub is
17  based at Dallas Fort Worth.  However, that
18  hub at DFW competes with primarily Southwest,
19  as well as a few other carriers' flights in
20  and out of Dallas Love Field.
21     Q.  Well, let me stop you there for a
22  second.
23        In that example, Southwest would
24  have a hub out of Dallas Love Field, just the
25  way we're talking about American having a hub

Page 64

---

1  out of Dallas Fort Worth, correct?
2     A.  Southwest doesn't refer to
3  Southwest as a hub-and-spoke carrier.
4  There're a point-to-point carrier.  But I
5  will tell you that, all right, as I also
6  mention in my report, that even if you have a
7  point-to-point network, when your operations
8  at an airport like Southwest at Love Field or
9  like Southwest at Houston Hobby, reach a
10  certain size, where you're serving multiple
11  destinations with multiple flights per day,
12  they will flow passengers over Love Field.  I
13  don't think Southwest would ever characterize
14  itself as a hub-and-spoke carrier.  But there
15  are people -- there are numerous passengers,
16  particularly at places like Love Field or at
17  Hobby, that do make connections.
18     Q.  But Southwest does dominate the
19  market at Dallas Love Field, right?  I mean,
20  they have over 80 percent of the gates there,
21  correct?
22     A.  I'm not sure I would use the term
23  "dominate" the same way you do.  But they do
24  have the majority of flights out of there
25  because of kind of the multiparty agreement

Page 65

---

17 (Pages 62 - 65)

App'x 109

CONFIDENTIAL

1  that was between the City of Dallas and
2  various folks.  It's a very unique airport in
3  that there's a very finite number of gates,
4  and because of that, Southwest operates the
5  most flights out of Dallas Love Field.
6      Q.  Just the way American operates
7  most of the flights out of Dallas Fort Worth,
8  right?
9      A.  American has a hub at Dallas Fort
10 Worth, and they are the largest carrier,
11 Dallas Fort Worth.  Dallas is a hugely
12 competitive market.
13     Q.  Do you -- so who is highly
14 competitive in the Dallas market other than
15 Southwest Airlines and Dallas Fort -- and
16 American Airlines?
17     A.  It depends on where you're
18 traveling.
19     Q.  Let's say domestically.
20     A.  Yeah, yeah.  I mean, again,
21 depends on the city you're referring to.  But
22 just, for example, in my report, I think
23 it's -- I can't remember if it's Exhibit 7 or
24 something like that -- I was looking at the
25 same city pairs that Dr. Vasigh was looking

Page 66

1  domestically, going in and out of the Dallas
2  Fort Worth International Airport are American
3  Airlines?
4      A.  Again, they have a hub at --
5  American Airlines operates a hub at Dallas,
6  so they operate a large number of flights to
7  serve a large number of both domestic and
8  international destinations, but I think you
9  might be confusing operating a hub with
10 somehow -- or maybe you're not but certainly
11 Dr. Vasigh is -- confusing operating a hub
12 with somehow that hub conferring some type of
13 market power, which I absolutely don't agree
14 with.
15         MR. TOBIN:  Objection,
16     nonresponsive.
17 BY MR. TOBIN:
18     Q.  Do you know the percentage of
19 flights coming out of Dallas Fort Worth
20 International Airport that are operated by
21 American or its affiliates?
22     A.  I don't know the precise number
23 offhand, but it is -- they operate it as a
24 substantial number.  They're the hub carrier
25 there.

Page 68

1  at, and I describe all of the competition on
2  all of the different city pairs that he was
3  looking at, and Spirit is on a large number
4  of the popular routes out of Dallas.  United
5  flies to multiple places out of Dallas.
6  Frontier does.  Delta does.  So there's a lot
7  of competition in Dallas.  It's highly
8  competitive.
9      Q.  How many gates are there at Dallas
10 Fort Worth International Airport?
11     A.  I don't know offhand, but it's
12 well over a hundred.
13     Q.  And what percentage of the gates
14 does American have at Dallas Fort Worth
15 International Airport?
16     A.  I don't know offhand, but it's as
17 a hub-and-spoke carrier, it operates out of
18 numerous gates, but that doesn't prevent, in
19 any way, shape or form, other carriers from
20 entering or expanding at Dallas Fort Worth,
21 as Spirit has.  I mean, you can just look at
22 what Spirit has done in Dallas over the last
23 five to ten years.  It's grown enormously at
24 Dallas.
25     Q.  What percentage of flights,

Page 67

1      Q.  Do you believe it's over 50
2  percent of the flights?
3      A.  Yes, it's probably -- and that's
4  not uncommon at all, at a hub airport for the
5  hub carrier to offer over 50 percent, that's
6  not uncommon.
7      Q.  And you believe it's over 70
8  percent of the flights?
9      A.  It could be.  But, again, that's
10 not uncommon.
11     Q.  So it's not uncommon, for
12 instance, Delta to operate over 70 percent of
13 the flights going out of Atlanta Hartsfield
14 International Airport?
15     A.  That is not uncommon that a hub
16 carrier operates in that range, I don't know
17 if it's 70 percent, of that -- of flights out
18 of one airport, yeah.
19     Q.  When you say a hub carrier to
20 operate out of a -- out of one airport, I
21 mean we are talking about at least a large
22 percentage of the flights that that hub
23 carrier typically operates out of that hub
24 airport, correct?
25     A.  Yeah, it depends.  I mean,

Page 69

18 (Pages 66 - 69)

App'x 110

1    airports like Chicago O'Hare, which has two
2    hub carriers, both American and United, or
3    there's airports like LAX, which has, like, I
4    guess three hub carriers plus service from
5    other carriers as well.  So it varies.
6        Q.   So what would the three hub
7    carriers be at LAX?
8        A.   Delta, American and United.
9        Q.   But combined, those three hub
10   carriers at LAX or the two hub carriers being
11   American and United at Chicago O'Hare, by far
12   operate a large percentage of the flights
13   going out of -- in and out of those airports,
14   correct?
15       A.   I would agree that combined they
16   do.  I would also -- you know, if you're
17   looking at competition out of Chicago, of
18   course you have to consider the service out
19   of Midway.  If you're looking at competition
20   out of the LAX, you also have to consider
21   other airports in the LA-based area that all
22   kind of compete for the LA traffic market.
23   But yeah, I don't disagree with the notion
24   that at many airports the hub carriers
25   collectively offer the most number of

Page 70

1    flights, just in the same way that at other
2    airports where Southwest is the largest
3    carrier might operate the largest number of
4    flights.
5        Q.   And when you said -- earlier you
6    referred to, I believe, DOT.  You're
7    referring to the U.S. Department of
8    Transportation?  Just so the record is clear.
9        A.   Yes.
10       Q.   And DOT keeps stats on all of
11   this, right?  In fact, you cited a number of
12   DOT stats in your report, right?
13       A.   DOT keep stats on what,
14   specifically?
15       Q.   The amount of flights going in and
16   out of airports where a hub carrier is
17   present?
18       A.   Yeah, I mean, the DOT has access
19   to a lot of data, and so I suppose -- I mean
20   some of the stats that DOT looks at, which
21   would have that type of -- they would have
22   access to that information through the DOT
23   100 database, through the ops database.  I
24   often look at OAG, which is not a DOT
25   database, but certainly DOT has data on

Page 71

1    airport -- on airline operations at airports.
2        Q.   I'm sorry.  Did you say OIG or
3    OAG?
4        A.   OAG.
5        Q.   Which stands for?
6        A.   The Official Airline Guide.
7        Q.   But whether it's DOT or OAG, you
8    obviously would agree those are credible
9    sources for statistics on, you know, consumer
10   air traffic carrier?
11       A.   They are statistics -- well, when
12   you say "statistics," I don't know if you're
13   referring to statistics or data but --
14       Q.   Better word is "data."  You're
15   right.
16       A.   -- they have data.
17       Q.   Let me -- sorry.  Let me rephrase
18   my question.
19            Whether it's OAG or DOT, you would
20   agree with me that the data they keep is
21   reliable data for experts like yourself to
22   review and rely on in the airline industry?
23       A.   I rely on DOT data in much of what
24   I do, as well as other sources.
25       Q.   Including O- --

Page 72

1        A.   OAG.
2        Q.   -- data from --
3        A.   OAG, that's correct.
4        Q.   And just let's make sure -- look,
5    I know exactly what you're saying, and you
6    where I'm going and I'm from Texas and a very
7    deliberate slow speaker, but because we got a
8    court reporter it's really hard for her to
9    take things down if we talk over each other,
10   and I'm just as guilty of that today, but
11   let's try to be conscious of it.
12       A.   Understood.
13       Q.   I think you would at least agree
14   with me that gate and landing slot
15   opportunities are difficult to obtain at
16   Atlanta Hartsfield Airport unless you're
17   Delta Airlines, right?
18       A.   I would disagree with that.
19       Q.   Well, I mean, don't they have a
20   contract that allows them to control a
21   certain -- doesn't Delta have a contract with
22   Atlanta Hartsfield that allows them to
23   operate and control a certain number of gates
24   at Atlanta Hartsfield?
25       A.   Well, I just want to break down

Page 73

19 (Pages 70 - 73)

1  your question.  So you mentioned two things.
2  You mentioned gates and slots.
3      Q.  Okay.  Let's take them separately.
4  Let's start with gates first.
5      A.  So repeat your question.
6      Q.  Sure.  You understand -- it's at
7  least your understanding that Delta has an
8  agreement with Atlanta Hartsfield to operate
9  a certain number of gates at Atlanta
10  Hartsfield Airport?
11      A.  Yeah, and, again, that's not
12  uncommon for hub carriers that make large
13  investments at hub airports to have preferred
14  access to a certain number of gates, that's
15  correct.
16      Q.  And just like American Airlines
17  has similar preferred air access at Dallas
18  Fort Worth International Airport, correct?
19      A.  They do.  But just, you know,
20  importantly that does not imply that there
21  are not other gates available to carriers
22  that want access to the airport.
23      Q.  Who at Dallas Fort Worth
24  International Airport had, to your
25  understanding, has preferred access to gates
Page 74

1  agreement with DFW International for a
2  carrier other than American Airlines for
3  multiple gates?
4      A.  Again, I'd have to -- I'd have to
5  go and look to see exactly what they do.  But
6  I'm certain that other airlines that operate
7  at DFW have gates that they've been using for
8  many years and plan to use for many years in
9  the future, and if they wanted to expand
10  their operations, they could find additional
11  gates.
12          MR. TOBIN:  Objection,
13      nonresponsive.
14  BY MR. TOBIN:
15      Q.  Are you aware of anybody that has
16  preferred access at Dallas Fort Worth
17  International Airport, as you used the term
18  earlier, other than American Airlines?
19      A.  I would just have to look to see
20  which other carriers have those types of
21  agreements --
22          THE STENOGRAPHER:  I'm sorry.
23      What was the end of that?
24          THE WITNESS:  I said I would need
25      to investigate which airlines have
Page 76

1  other than American Airlines?
2      A.  I would need to look at the
3  different agreements, but I'm not aware of
4  any carrier that has -- wants to fly out of
5  DFW and that there isn't sufficient gate
6  availability for them to do that.
7      Q.  Well, you just used the term
8  "preferred access" as it related to Delta and
9  Atlanta, and you agreed with me that American
10  Airlines has that same arrangement at Dallas
11  Fort Worth International Airport, right?
12      A.  Yeah, there's multiple concourses
13  at large hub airports where the hub
14  carriers -- what may be referred to as, like,
15  a signatory tenant or whatever of that
16  concourse, but there's other concourses that
17  are common use -- you know, have common use
18  gates and that are not -- where there's not a
19  long-term lease agreement between the airport
20  and that airline for access to those gates.
21  I mean, that's, again, not uncommon in the
22  industry at all.
23      Q.  Who do you understand at Dallas
24  Fort Worth International Airport has
25  preferred access or a long-term lease
Page 75

1  agreements for kind of long-term gate
2  leases.
3  BY MR. TOBIN:
4      Q.  So as we sit here today, without
5  consulting those materials, you're not aware
6  of any other carrier -- U.S. carrier that has
7  preferred access at Dallas Fort Worth
8  International Airport other than American
9  Airlines?
10      A.  I think that numerous airlines are
11  almost certainly to have long-term gate
12  agreements with DFW, for obviously a smaller
13  number of gates because they don't operate
14  hubs, they don't operate a hub at that
15  airport.  But, again, I mean, ultimately,
16  really the key question is, could airlines,
17  to the extent they wanted to expand their
18  operations at DFW, have access to gates in --
19  a hundred percent I believe they could, as
20  we've seen with, for example, Spirit.
21          MR. TOBIN:  Objection,
22      nonresponsive.
23  BY MR. TOBIN:
24      Q.  Do you believe that American
25  Airlines has an arrangement with Dallas Fort
Page 77

20 (Pages 74 - 77)

App'x 112

1 Worth International Airport that other
2 carriers could not get?
3     A.  I don't think so.  I mean, if, for
4 example, hypothetically, another carrier made
5 a decision to open a hub at DFW, I am sure
6 that DFW would welcome those discussions.
7     Q.  That would -- as you understand
8 DFW to be constructed right now, I mean, if
9 another carrier wanted to control 30 or more
10 gates at Dallas Fort Worth International
11 Airport, that would probably require
12 significant construction at the airport.
13 Wouldn't you agree?
14     A.  I would need to look at the
15 current level of gate utilization.  It's a
16 very large airport, and there's a lot of
17 gates there, and, you know, it's possible
18 that things could be shuffled around; but,
19 again, I would say that if an airline were
20 interested in opening a hub at DFW, that DFW
21 Airport would welcome those discussions.
22 Just in the same way, for example, that, you
23 know, that Delta decided to open a hub in
24 Seattle.  Like -- you know, that was an
25 Alaska Airlines hub.  Delta decided to make

Page 78

1 is slot controlled.  And then there's --
2 there's another airport with, you know,
3 Liberty in Newark, which is not formally slot
4 controlled, but that the FAA put certain
5 operational limits on it.
6     Q.  And do the major airline carriers
7 in the U.S. bargain with somebody to get a
8 certain number of slots that they're entitled
9 to at these airports that are slot
10 controlled?
11         In other words, do they have, as
12 part of their agreement, where they get to
13 have a certain number of slots in the
14 day-to-day running of that airport?
15     A.  Slots are allocated at those
16 airports.
17     Q.  How are they allocated?
18     A.  I mean that's a long --
19     Q.  Are they allocated by contractual
20 agreement?
21     A.  They are allocated kind of by -- I
22 mean, some of them have been acquired over
23 time, right?  So, you know, if one were to
24 kind of go back in time, you know, why does
25 American have proportionally more slots at

Page 80

1 it a hub.  They've grown their operations
2 there substantially.
3     Q.  We've used the term "landing slot"
4 during this deposition.  What do you
5 understand that term to mean?
6     A.  Well, a slot is a specified period
7 of time where an airline can perform an
8 operation.  An operation being either a
9 departure or a takeoff, and there's only a
10 very small number of airports in the United
11 States that are slot controlled.
12     Q.  And are the airports in the United
13 States that are slot controlled hub airports?
14     A.  So JFK is slot controlled, and so
15 that's a hub for -- primarily Delta.
16 American has a much smaller presence,
17 although they do operate kind of an
18 international hub out of JFK, but Delta is a
19 much, much larger carrier.  So JFK is slot
20 controlled.  LaGuardia is slot controlled.
21 And, again, that's really a Delta hub.
22         American has a smaller presence
23 again at LGA.  I should have mentioned
24 JetBlue being a hub carrier at JFK, and then
25 DC airport, where American does have a hub,

Page 79

1 DCA right now is because they had exchanged
2 slots -- actually, it was US Air that
3 exchanged slots with Delta.  You know, they
4 did what was known as the slot swap back in
5 2011.  And so over time they have acquired
6 them through commercial transactions and the
7 such.
8     Q.  So that example you just listed
9 where American did a slot swap with Delta,
10 American got additional slots at DC airport,
11 correct?
12     A.  It was actually US Airways.
13     Q.  But US Airways has now merged with
14 American, right?
15     A.  That is correct.
16     Q.  So American is the beneficiary of
17 those slots, right?
18     A.  They now are in possession of
19 those slots.
20     Q.  So that slot swap that you were
21 talking about in 2011 with US Air and Delta,
22 what did Delta get in exchange for those
23 slots?
24     A.  They got slots at LaGuardia.
25     Q.  So they divvied up different slots

Page 81

21 (Pages 78 - 81)

1 at different major U.S. hubs?
2    A. I'm not sure they divvied up.
3 They entered into a trade for some slots.
4    Q. And Delta is a major carrier at
5 LaGuardia as we sit here today, right?
6    A. It is, I think, the largest
7 carrier at LaGuardia, although many airlines
8 also serve LaGuardia.
9    Q. And American is the largest
10 carrier at DC -- Washington DC Airport,
11 correct?
12    A. They're the largest carrier at
13 Reagan National Airport. Obviously DC is
14 served by both DCA, as well as IAD and BWI
15 airports, but at DCA American is the largest
16 carrier. At IAD United is the largest
17 carrier, and at BWI Southwest is the largest
18 carrier.
19    Q. Of all the Washington airports, if
20 you combine them together, does American have
21 the most landing slots?
22    A. Well, that's kind of -- as I
23 mentioned the other airports are not slot --
24 there are no slots at IAD and BWI. So kind
25 of definitionally, because DCA is the only

Page 82

1 slot-controlled airport of those three and
2 because American happens to be the largest
3 carrier at DCA, they have the largest number
4 of slots.
5        I can't tell you at this moment
6 sitting here right now if they actually
7 operate the largest number of operations when
8 you look at the combined three airports in
9 the DC area. It would be probably close with
10 United.
11    Q. Do you believe or do you have an
12 opinion on whether brand loyalty has
13 increased or decreased since the entrance of
14 low-cost carriers into the market?
15    A. Well, I haven't conducted a formal
16 study of that, but what I would say is that
17 over the period of time, as I show, I think
18 it's in maybe Exhibit 1 of my report, the
19 share of domestic-only passengers traveling
20 on the -- what are now the GNC, says decline
21 significantly over time. So to the extent
22 there's brand loyalty, I think that's a very
23 individual question.
24    Q. When you say "individual
25 question," you mean individual to the

Page 83

1 individual consumer?
2    A. Yes. Yes.
3    Q. Okay.
4    A. And -- but when one looks at the
5 data kind of in the aggregate, what one sees
6 that if you go back to -- point to Exhibit 1
7 in my report, so we can talk about it in the
8 nonabstract. If you're to look at this long
9 period of time since deregulation, when
10 lower-cost carriers had expanded, you can see
11 that the large network carrier share has gone
12 from 89 percent down to 52 percent. So that
13 would suggest that many passengers have
14 developed brand loyalty to some of the
15 lower-cost carriers as well.
16    Q. Or it could suggest that people
17 are just trying to find the lowest price
18 flight as well, right?
19    A. Absolutely. People often -- price
20 is an important factor in the decision of
21 many consumers.
22    Q. And so do you believe that, as we
23 sit here today in 2024 compared to 1994, when
24 your percentages look like in Exhibit 1 start
25 escalating, that people are more likely today

Page 84

1 to choose a flight based on price than back
2 then?
3    A. I think it really depends on the
4 individual. I can't generalize one way or
5 another to all individuals. I think the
6 decision -- the travel decision is highly
7 individualized.
8    Q. So if I understand your point, is
9 that to one customer at a particular point in
10 time, a $50 fare difference might be
11 significant and another person, a hundred
12 dollar fare difference might not be
13 significant for that same flight at that same
14 time? It's individualized.
15    A. It's individualized, and it would
16 even depend on the purpose of the trip. You
17 know, if you have to fly to a meeting and you
18 need to be there at a certain time, you may
19 be willing to pay a little bit more for a
20 flight that gets you exactly where you want
21 to be at the right time, maybe not having to
22 make a connection.
23        You may be someone who wants a
24 little extra leg room or something like that.
25 You know, there's a lot of factors that go

Page 85

1   into the decision of which particular ticket
2   you're going to buy.
3       Q.   Are you familiar with -- I'm
4   definitely going to butcher these names --
5   the Herfindahl-Hirschman Index?
6       A.   I am, yes.
7       Q.   It's also sometimes referred to as
8   the HHI index?
9       A.   I am, yes.
10      Q.   May I please refer to it as that
11  during this deposition?
12      A.   Absolutely.
13      Q.   What is the HHI index?
14      A.   It is a measure of what is
15  referred to by some as concentration, and it
16  is computed as the sum of squared market
17  shares of -- once you've defined whatever
18  market you're looking at, you would take the
19  market shares of each of the individual
20  participants, you would square them and you'd
21  sum them.  So it's a number between, you
22  know, one and 10,000.
23      Q.   Okay.  Do you believe that it's a
24  credible industry source for experts like
25  yourself?

Page 86

1   instrument.
2       Q.   And why do you believe it's blunt?
3       A.   Because it doesn't capture the
4   nature of competition, and so when you have
5   carriers or different competitors that have
6   vastly different cost structures -- you know,
7   HHI treats every competitor equally, and when
8   you have carriers that have much, much lower
9   costs than others or firms that have much,
10  much lower costs than others, they need not
11  have a large market share to have a
12  substantial influence on prices in that
13  market.
14      Q.   Okay.  Have you ever used the HHI
15  index in your efforts in consulting in the
16  airline industry?
17      A.   Have I used the HHI?  I may have
18  used the HHI.  I know that I have computed
19  HHIs before -- often in response to maybe
20  someone else has computed an HHI.  But, yeah,
21  I don't discount the fact that -- as I say,
22  it's a measure.  It's not like it's out of
23  left field.  It's a measure that's often used
24  or sometimes used, and I think it's kind of a
25  blunter instrument because it's not as

Page 88

1       A.   I don't know what you mean by
2   "source."  It's not a source.  It's a
3   calculation.
4       Q.   It's a credible industry tool that
5   experts like yourself use in the industry?
6       A.   You know, I think there is debate
7   amongst economists as to the usefulness of
8   HHI as it applies to the airline industry.
9       Q.   But you do, you see it as a tool
10  that is commonly used in -- for experts like
11  yourself in its industry?
12      A.   In this industry?
13           You know, I think it's -- it's
14  less common in, I think, airline than other
15  industries.  You know, I know that there are
16  guidelines as to HHI that are used by the DOT
17  -- sorry -- the DOJ and the FTC and the
18  Horizontal Merger Guidelines, but as it's
19  applied to the airline industry, I think many
20  economists believe that it is kind of a
21  limited utility in the airline industry.
22      Q.   And what is your belief about its
23  utility in the airline industry?
24      A.   I mean, it's one piece of
25  information, but I think it's a pretty blunt

Page 87

1   nuanced as being able to actually understand
2   the nature of competition.
3       Q.   Okay.  Are you aware that one of
4   the experts in this case actually used the
5   HHI index in its analysis -- in the expert's
6   analysis?
7       A.   I -- so I've looked at two
8   reports.  I've looked at -- I've only been
9   asked to look at two reports, and those are
10  Dr. Vasigh and Dr. Phiroz.  And if any of the
11  two of them was to look at the HHI, I suspect
12  it would have been Dr. Vasigh, given his
13  claims.  But I don't recall.  I could be
14  mistaken.  I'd have to go back and look
15  through it.  But I don't recall seeing
16  specifically an HHI calculation in this
17  report.  But I could be -- I could have
18  missed it.
19      Q.   So, as we sit here today, you
20  don't have any reason to criticize the use of
21  a HHI by either Dr. Vasigh or Dr. Phiroz in
22  this case?
23      A.   Well, I would need to see what
24  they computed.  Like if someone were to
25  say -- was to compute an HHI at Dallas Fort

Page 89

23 (Pages 86 - 89)

1    Worth based off departures, for example -- I
2    wouldn't actually think that's a particularly
3    meaningful statistic because, you know, like
4    that's -- that's -- that's -- what would be
5    more, you know, useful -- not to suggest I
6    endorse it in any, way shape or form the use
7    of HHI, but, like, you often see people
8    misusing HHI by applying it to the wrong
9    metric.
10       Q.   But you don't have any reason to
11   believe that's happened in this case,
12   correct?
13       A.   I haven't -- I don't recall, as I
14   sit here right now, seeing an HHI calculation
15   by one of the other experts that I've been
16   asked to look at, at least as I sit here
17   right now.
18       Q.   So therefore you would have no
19   reason to criticize the use of HHI in this
20   case, as you sit here right now, based on
21   what you know right now?
22       A.   Well, if you're asking me to -- to
23   ask whether or not I would criticize a
24   hypothetical HHI calculation, which I haven't
25   seen, what I would say is that I would -- I

Page 90

1    can't offer a specific criticism to it, as I
2    sit here right now, but I would certainly
3    reserve the right to offer my opinions about
4    it after I've seen it.  I wouldn't -- I
5    wouldn't -- I certainly wouldn't endorse it
6    at this juncture.
7            MR. MUYSKENS:  When you have time
8        to break, give me 30 seconds to grab
9        some allergy medicine?
10           MR. TOBIN:  Let's do it right now.
11       No, go ahead.  Do what you need to
12       do.
13           THE VIDEOGRAPHER:  The time is
14       11:04.  We're off the record.
15   (Recess taken at 11:04 a.m. to 11:07 a.m.)
16           THE VIDEOGRAPHER:  We're back on
17       the record.  The time is 11:07.
18   BY MR. TOBIN:
19       Q.   Would you agree that flights
20   today -- commercial air flights today have a
21   higher occupancy rate than ten years ago?
22       A.   Than ten years ago.  Probably a
23   little bit more than ten years ago, yes.  The
24   load factors have trended up over time but
25   they've kind of started to largely plateau.

Page 91

1        Q.   Did you say "load factor"?
2        A.   I did, yes.
3        Q.   When you say "load factor," what
4    do you mean?
5        A.   Load factor is a term in the
6    industry which is formally defined as revenue
7    passenger miles divided by available seat
8    miles, RPMs over ASMs.
9            You probably need me to define
10   those as well.
11       Q.   Yeah, I have no idea what you just
12   said.
13       A.   So we can look at it in kind of a
14   simple term.  So seat factor, which often is
15   what people think about, is the percentage of
16   seats that are filled on flights, and so when
17   you say occupancy, you may be thinking of
18   kind of, like, a seat factor.  The statistics
19   that are reported by airlines are calculated
20   slightly differently, in that each seat is
21   weighted by the number of miles that has been
22   flown.
23           And so the denominator of a load
24   factor calculation is what are known as
25   available seat miles, ASMs.  Available seat

Page 92

1    miles are computed as the number of seats
2    times the number of miles they've flown, and
3    the numerator, RPMs, is what is known as
4    revenue passenger miles, which are the number
5    of miles flown by paying passengers.  So
6    that -- and divide one into the other, you
7    get what is known as load factor.
8        Q.   So in that numerator, and I
9    promise we're not going in any further into
10   math than that because I'll be in trouble,
11   but in that numerator, it sounds like there's
12   certain passengers that are on an airline
13   flight that could be excluded from that
14   number, like, for instance, American Airlines
15   employees who are flying for free.  Is that
16   fair or is that accurate?
17       A.  .  So the non-revs, what are
18   called in the industry, are airline employees
19   typically, that are -- would be excluded from
20   a load factor calculation.
21       Q.   But without question, American
22   Airlines does get a benefit from being able
23   to transport its employees from one location
24   to the other to help it run its business,
25   right?

Page 93

24 (Pages 90 - 93)

1    A.  Sure.  Yeah.
2    Q.  And, generally, on the major
3  carriers, it's at least fair to say that
4  flights are generally full these days?
5    A.  I don't know what you mean by
6  "generally full."  Depends on the night
7  you're taking it, it depends on the day
8  you're flying.  It really depends.  I mean,
9  if you were to travel to Europe in February,
10  you would find more seats empty than full,
11  depending on the day you travel.  So if you
12  fly over the 4th of July weekend, it was a
13  pretty busy weekend, so it really depends.
14    Q.  When was the last time you were on
15  an American, United or Delta flight in the
16  U.S. that wasn't substantially full?
17    A.  I mean, I don't wander the cabin
18  to see how many seats are full, but I will
19  grant -- I will admit that load factors
20  industry-wide are, you know, hovering in the
21  mid 80 percent range, which means that 15
22  percent of flights on average are not taken.
23  But, yeah, capacity is utilized, there's no
24  doubt.
25    Q.  In that 80 percent mark, if I'm

Page 94

1  understanding the math -- and please check me
2  because there's a really good chance I'm
3  not -- but the 80 percent mark, that number
4  would actually be higher if you were counting
5  non-revenue passengers who were also flying
6  on those flights, correct?
7    A.  It can.  The thing to keep in mind
8  is that many employees that fly on -- for
9  company business, for example, are jumpseat
10  eligible.  So some of them would fly -- like
11  if you have pilot -- you often see a pilot
12  come on to an airplane and he or she might be
13  non-revving or dead-heading or whatever they
14  might be doing, and they often go into the
15  cockpit and sit in the jumpseat.  So it
16  depends.
17    But yes, if there's non-revs that
18  could add, you know, a percentage point or
19  two, whatever it might be depending on the
20  flight.  And you'll also see sometimes flight
21  attendants who are traveling on a non-rev
22  basis sitting in the jumpseat as well, a
23  flight attendant jumpseat.
24    Q.  And when you use the short form
25  "rev," obviously you're referring to revenue,

Page 95

1  right?
2    A.  I am, yes.
3    Q.  So there's been some discussion in
4  your report and in the reports in this case
5  about the situation where somebody books a
6  flight -- for instance, let's use your Boston
7  to DFW to San Antonio example -- and they
8  book the flight Boston to San Antonio but
9  they get off the flight in Dallas Fort Worth,
10  you're aware that that scenario is a major
11  issue in this case, correct?
12    A.  I am, yes.
13    Q.  Okay.  And so in that scenario,
14  it's at least your understanding, from having
15  vast knowledge in the industry, that when
16  that happens, American Airlines does
17  everything it can to try to fill that seat
18  from Dallas to San Antonio by either letting
19  a non-rev person fly in the seat or by
20  letting a standby passenger fly in the seat,
21  that's the general practice of carriers like
22  American, correct?
23    A.  There is a standby list, so that
24  if it turns out that there's no-shows and
25  this could be no-shows for reasons other than

Page 96

1  obviously people who buy hidden-city tickets,
2  they can -- people that are on the standby
3  list can stand by for that seat.
4    Q.  And in your hypothetical, Boston
5  to San Antonio, through Dallas Fort Worth, if
6  someone were on that flight using a
7  hidden-city ticket practice and exits the
8  flight at DFW and does not take the second
9  leg, American would try to fill those seats
10  however it could?
11    A.  Well, I guess what I'm -- you seem
12  to be maybe implicitly assuming that that
13  happens to be the last available seat; but,
14  you know, again, if flights are flying 85
15  percent full, then seat may have gone empty
16  anyhow.  So it really just depends on the
17  situation.
18    Q.  So it may or may not have
19  mattered, I guess is your point?
20    A.  Yeah, it may not have mattered.
21    Q.  But if American is able to fill
22  that seat, with either a standby passenger or
23  somebody else that -- a non-rev passenger
24  that it gets a benefit from, from
25  transferring that person from Dallas to San

Page 97

25 (Pages 94 - 97)

| | |
|---|---|
| 1 Antonio, it's your understanding that the | 1 factors. |
| 2 Americans of the world certain endeavor to do | 2    Q.  Okay.  Because one less person is |
| 3 that, right? | 3 on it and possibly even less luggage or |
| 4    A.  They would -- if there's people | 4 baggage is on it, right? |
| 5 that are flying standby, they will -- and | 5    A.  Well, definitely one less person. |
| 6 there's available seats, they'll try to put | 6 As I understand how Skiplagged tries to |
| 7 them on the flight. | 7 educate or inform passengers, they |
| 8    Q.  And it's common in the airline | 8 essentially tell them not to bring luggage |
| 9 industry, especially with large carriers like | 9 other than a knapsack, but to the extent that |
| 10 American, that flights get overbooked, right? | 10 that knapsack weighs a couple pounds, sure. |
| 11    A.  You know, I think overbooking is | 11    Q.  Okay.  And that could actually |
| 12 less common than it used to be because of the | 12 reduce fuel cost, hypothetically, on that leg |
| 13 denied boarding rules and the penalties on | 13 from Dallas Fort Worth to San Antonio, |
| 14 denied boardings are -- I think it's less | 14 correct? |
| 15 common than it used to be because of the | 15    A.  It could.  I'm not sure the |
| 16 denied boarding rules and the amount of | 16 relevance of the question, but yeah, |
| 17 compensation that airlines sometimes now have | 17 hypothetically it could. |
| 18 to pay when flights are oversold if a person | 18    Q.  Are you familiar with █████ |
| 19 is involuntarily bumped. | 19 ███████████████████████████████ |
| 20    And, so you know, you read of | 20 ██████████████ |
| 21 these stories and hear of these stories of | 21    A.  ██████████████ |
| 22 sometimes an airline having to pay $10,000 to | 22 █ |
| 23 a passenger who was denied boarding or | 23 █████████████████████████████████ |
| 24 something like that, which is obviously a | 24 ██████████████████████████ |
| 25 huge penalty. | 25 █ |
| <div align="right">Page 98</div> | <div align="right">Page 100</div> |

| | |
|---|---|
| 1    So I'm not saying that it doesn't | 1    Q.  Okay. |
| 2 happen, but I can't tell you, as I sit here | 2    A.  I remember ████████████████ |
| 3 right now, how frequently American overbooks | 3 ███████████████████ |
| 4 its flights.  But my impression is that it's | 4    Q.  ███████████████████████ |
| 5 less of an issue than it may have been some | 5    THE STENOGRAPHER:  Hold on.  We |
| 6 years ago. | 6 need one at a time. |
| 7    Q.  Okay.  Going back to your | 7 █ █████████ |
| 8 hypothetical, Boston to San Antonio through | 8 █ |
| 9 DFW, if hypothetically that DFW to San | 9    A.  Like, but this was -- again, back |
| 10 Antonio leg was oversold, overbooked and a | 10 in, like, ████████████ |
| 11 passenger gets off at Dallas Fort Worth | 11 █████████████.  I remember something -- I |
| 12 through using a hidden-city ticketing method, | 12 don't think the ██████████████ |
| 13 that helps the airline actually reduce the | 13 ██████████████ |
| 14 amounts that that second leg was overbooked, | 14    Q.  No, but you remember the point was |
| 15 correct? | 15 that American figured out if they took olives |
| 16    A.  Hypothetically, it's possible that | 16 off the salad it would save them a bunch of |
| 17 it could, yes. | 17 money? |
| 18    Q.  Okay.  And hypothetically going | 18    A.  I do remember a story involving |
| 19 for the other scenario, where the flight is | 19 ████████████████████████, but, |
| 20 not overbooked and there are actually excess | 20 you know, there's a lot of stories in the |
| 21 seats in that second leg from Dallas Fort | 21 airline industry. |
| 22 Worth to San Antonio, if one less person | 22    Q.  Do you remember the point of that |
| 23 flies on that flight, it reduces the weight | 23 story being ███████████████████████ |
| 24 of the flight, correct? | 24 █ |
| 25    A.  A reduced weight from lower load | 25 █████████ |
| <div align="right">Page 99</div> | <div align="right">Page 101</div> |

<div align="right">26 (Pages 98 - 101)</div>

1    A.  I remember there was ████
2    ████████████████████████████
3    ████████████
4    Q.  Okay.  We were talking a little
5  bit about this earlier, but I believe, if I
6  understand, you know, part of the general
7  points of your report, it's that -- and your
8  opinions in this case, it's that if
9  hidden-city tickets and hidden-city ticketing
10  facilitators are not around, that doesn't
11  necessarily lead to the conclusion that the
12  consumers of those hidden-city ticketing
13  services would automatically buy the direct
14  flight, in your example, from Boston to
15  Dallas Fort Worth, at the higher price,
16  right?
17    A.  I'm not sure I understand your
18  question.  Could I have it read back or?
19    Q.  Let's at least talk about the
20  assumptions in your hypothetical.  Okay?
21  And the hypothetical is where somebody
22  uses a hidden-city ticket practice from going
23  from Boston to San Antonio, but they
24  actually -- there's an intermediate leg where
25  they get off the flight in Dallas Fort Worth?

Page 102

1    We've talked about that so far,
2  right?
3    A.  Yes.
4    Q.  And if there's a hidden-city
5  ticket consumer involved in that scenario,
6  the assumption is, and you pointed out in
7  your report, this is not always the case, but
8  the assumption is they decided to take on
9  that hidden-city ticket fare because they
10  could save money over just buying another
11  option of buying an American Airlines flight
12  directly from Boston to Dallas, correct?
13    A.  Well, I think -- you might be
14  mischaracterizing my report a little bit.  I
15  think one of the big thrust of my report is
16  that often these are promoted as fare
17  savings, but when one actually adds in, for
18  example, a service fee that may be associated
19  with the hidden-city ticket or when one
20  actually looks at other tickets that were
21  available, that, for example, in this case,
22  that Skiplagged didn't offer to me that
23  that -- I am, as a consumer, misled into
24  thinking I am buying a lower price fare when,
25  in fact, I'm actually having to pay more,

Page 103

1  because I was -- that Skiplagged wasn't being
2  transparent about it.
3    That's kind of really, I think,
4  the thrust of my report or one of the big
5  thrusts of my report.  So I just want to make
6  sure kind of when we talk about these, we
7  understand that central, I think, to my
8  opinions, is that Skiplagged isn't being
9  particularly transparent and honest to the
10  consumer as to what they're getting.
11    MR. TOBIN:  Objection,
12    nonresponsive.
13  BY MR. TOBIN:
14    Q.  I understand what you described in
15  your report.  We'll get into that scenario in
16  a minute.
17    But let's stick with this
18  hypothetical, and I'm going to add some facts
19  to the hypothetical.  Okay?
20    Let's say that this particular
21  consumer bought this fare that you're talking
22  about from Boston to San Antonio through
23  Dallas Fort Worth for $300, okay, and let's
24  assume at the exact same time they bought
25  that fare there was, on the same flight, a

Page 104

1  fare offered from American Airlines that
2  terminates in Dallas Fort Worth from Boston
3  to Dallas Fort Worth for $500.  Okay.
4    You with me so far?
5    A.  I am, yes.
6    Q.  You would admit, at least in that
7  scenario, the hidden-city ticket consumer had
8  an option to save money by going through --
9  and let's say there was a $30 service fee on
10  it, so net it was 330 to the consumer.  You
11  would admit under that hypothetical that
12  there was a savings opportunity for the
13  consumer by purchasing the facilitated
14  hidden-city ticket fare, correct?
15    A.  If the passenger was willing to
16  fraudulently purchase a ticket that violated
17  American's contract of carriage and was
18  willing to forgo other benefits that come
19  with buying a nonfraudulent ticket, there is
20  a money savings in that hypothetical, again,
21  and I'm accepting only as a hypothetical
22  because my own experience has been when
23  exploring Skiplagged, that it's not
24  particularly transparent or accurate in terms
25  of the prices that were available.

Page 105

27 (Pages 102 - 105)

1      But for your -- purposes of this
2  hypothetical, subject to that passenger
3  willing to fraudulently represent what their
4  intentions were, then they could realize that
5  savings.
6      Q.   Are you a lawyer, Dr. Lee?
7      A.   I'm not a lawyer, no.
8      Q.   Are you an expert on what
9  constitutes fraud or doesn't constitute
10  fraud?
11      A.   I'm not using the term "fraud" in
12  any type of legal framework.  I'm merely
13  saying that I know that when I purchase a
14  ticket, I'm entering into a contract with
15  carriage with an airline, and one of the
16  things that the contract of carriage at
17  American Airlines, and I think most other
18  airlines, prohibitively -- specifically
19  prohibit -- specifically prohibit hidden-city
20  ticketing, using hidden-city tickets.
21      Q.   Have you been aware of whether
22  fraud is an allegation in this lawsuit or
23  not?
24      A.   Again, I'm not using fraud --
25      Q.   Sir, are you aware of whether

Page 106

1  fraud is an allegation in this lawsuit or
2  not?
3      A.   I think I've seen in the Complaint
4  the use of the term "fraud," and I'm not
5  using it, to be perfectly clear, in a legal
6  definition.  I'm just saying -- I'm
7  misrepresenting to American Airlines if I do
8  that, and my intentions.
9      Q.   So what I'm trying to get back to
10  is what I understand one of the points that I
11  believe you made in your report, is that if
12  the person didn't -- in this hypothetical,
13  did not have the hidden-city option, okay,
14  and did not have someone like my client
15  Skiplagged facilitating a hidden-city ticket
16  and it chose not to practice the hidden-city
17  practice, it didn't necessarily have to buy
18  the ticket for $500 to Dallas, right, it
19  would have other options, like you've
20  described in your report, such as low-cost
21  carriers or maybe trying to buy a different
22  time and ticket, correct?
23      A.   There are a multitude of options
24  to get from here to Dallas.
25      Q.   So you would agree that the

Page 107

1  customer in that hypothetical would have
2  those options and would not be obligated to
3  buy the $500 ticket to Dallas, correct?
4      A.   I don't think any consumer is
5  obligated to buy any particular ticket.
6      Q.   I think we've covered this, but
7  this hidden-city ticket practice, you're
8  obviously aware that there are instances
9  where consumers just do this on their own
10  without being facilitated by any service such
11  as what my client offers?
12      A.   I would agree with that.
13      Q.   In fact, did American share with
14  you that ████████████████████████
██ ████████████████████████████████████
██ ██████████████████████████████████
██ ████████████████████████████████████████
██ ████████████████████
20      A.   I haven't received any of that
21  information, no.
22      Q.   Do you believe that American,
23  Delta and United have over 50 percent of the
24  market share of U.S. domestic flights
25  combined between the three of them?

Page 108

1      A.   Probably.  They probably do, yeah.
2  I mean, you know, as you can see in
3  Exhibit 1, they have 52 percent share of
4  domestic-only passengers, and their average
5  gauge tends to be lower than the remaining
6  carriers, so it would stand to reason that
7  they probably do.
8      Q.   What do you mean by "gauge"?
9      A.   The number of seats on an
10  aircraft.
11      Q.   Now, if we look at Exhibit 5 on
12  page 13 of your report.
13      A.   Okay.
14      Q.   Now, this exhibit talks about --
15  it, in part at least shows low-cost carriers'
16  share of the market in hub cities, right?
17      A.   It's their share of domestic O&D
18  passengers.
19      Q.   Are there any large hubs in the
20  U.S. that are not listed on this graph?
21      And I say "hubs."  I'm sorry, I
22  mean hub cities.
23      A.   Actually, now that I look at this,
24  Seattle I think would now classify as a large
25  hub city, as Delta is there.

Page 109

28 (Pages 106 - 109)

1    Q.  Anyone else?
2    A.  I mean, I think with the exception
3  of Seattle, this is generally pretty
4  complete.  I could be missing one, but I
5  think this is largely complete.
6    Q.  Now, my understanding of your
7  Exhibit 5 is, for instance, when you list New
8  York, you're not just talking about New York
9  LaGuardia, you're talking about multiple
10  airports within New York, right?
11    A.  For New York, yeah.  This would
12  be, as it says in the footnote, both JFK, New
13  York and LaGuardia.
14    Q.  Okay.  And so why is -- I don't
15  know if this is terribly important, but I'm
16  curious.  Why is, like, is it Icelip or
17  Islip?
18    A.  Islip.
19    Q.  Yeah, why is Islip not included in
20  New York?
21    A.  So that gets into a whole question
22  of geographic market definition, and Islip,
23  while there is -- you know, it certainly
24  serves the parts of Long Island, it tends to
25  be a little bit further out, so it's not

1    Q.  I understand your distinction on
2  New York.  But I think you understand my
3  question as it relates to most markets, like,
4  for example, Dallas, you'd at least agree
5  that DFW is the most significant airport or
6  port in the DFW area compared to Dallas Love
7  Field, correct, as far as commercial airline
8  travel.
9    A.  Well, I'm not quite sure I would
10  agree.  DFW is a larger airport.  It is also
11  an international airport.
12    Q.  It's got a much more -- it's got a
13  much higher volume of flights going in and
14  out of DFW than Dallas Love, right?
15    A.  It absolutely does, but it would
16  be a huge mistake to look at -- particularly
17  if we're looking at domestic competition.  I
18  mean, it would be a fatal mistake to look
19  only at DFW and not consider Dallas Love
20  field, because Southwest has such a huge
21  competitive impact on competition airfares in
22  the Dallas area and to disregard all of their
23  service because it happens to be a different
24  airport and one that's actually much closer
25  to downtown Dallas than DFW, that would be a

1  generally thought of as being one of the
2  primary New York City airports.  Like in the
3  same way that maybe Stewart is as well.
4    Q.  So when you say Washington, you're
5  considering all three major airports within
6  the Washington-Baltimore area including BWI,
7  Dulles and Reagan?
8    A.  I am.
9    Q.  What is within LA when you say Los
10  Angeles in this exhibit?
11    A.  That would be LAX, Long Beach and
12  Burbank.
13    Q.  And so if you analyze this same
14  data and only the largest, most significant
15  airport in each of these hub cities, the
16  percentage of low-cost carriers' share of
17  domestic O&D passengers would go down,
18  correct?
19    A.  Well, not sure what you mean by
20  the largest and most significant airport.
21  For example, in New York.
22    You know, are you referring to,
23  like, Newark, is that less significant than
24  the LaGuardia or JFK, I mean, these are all
25  very large airports.

1  huge mistake in my opinion.
2    Q.  Granted, you're telling me that my
3  hypothetical is fatal, but indulge me for a
4  minute.
5    Let's say we made, in your words,
6  this fatal mistake and only counted the
7  largest airport with the most traffic in that
8  particular city, then these percentages on
9  your graph in Exhibit 5 would go down
10  significantly, correct?
11    A.  Some would go down.
12    Q.  Most would go down, wouldn't they?
13    A.  I'm not so sure that -- there's a
14  lot of service at LAX by lower-cost carriers.
15  So I'm not sure that would have a meaningful
16  impact.  And I'm not sure what would happen
17  in New York, because, for example, if one
18  were to look at JFK, JetBlue -- you know, the
19  focus of their operations in New York is at
20  JFK.
21    So, again, I don't accept your
22  general proposition.  I'm not saying that at
23  some places, like, for example, Phoenix, I'm
24  not sure it would make a difference there.
25  At DFW, at Dallas I think it would make a



**Page 114**

1  difference because you would be excluding, as
2  I said, you'd be making this fatal error of
3  excluding Southwest.
4  Q.  So if I'm understanding this
5  graph, and I understand you say it excludes
6  Seattle, which should be included, but if I'm
7  understanding this graph, this is showing
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮
11
12 A.  That's incorrect, because, as we
13 talked about, many low-cost carriers are
14 major --
15 THE STENOGRAPHER:  Keep your voice
16 up.  Major what?
17 THE WITNESS:  Are major airlines.
18 BY MR. TOBIN:
19 Q.  Let me rephrase my question, then.
20 You understand I'm talking about
21 Delta, United and American, right?  I mean
22 Delta, United and American are ▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮  correct?
24 A.  Well, I didn't -- your question
25 was unclear.  Maybe if you rephrase the

**Page 115**

1  question, I can provide the answer you're
2  looking for.
3  But as you phrased your last
4  question and referred to major airlines, I
5  disagreed with your proposition.
6  Q.  Okay.  But let me make sure I can
7  built a predicate here.
8  So Delta, American and United are
9  ▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮; is that correct?
11 A.  ▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮
13 Q.  Okay.  Your Exhibit says ▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮  correct?
16 A.  It does.
17 Q.  So I assume what you're trying to
18 depict is ▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮?
20 A.  That's correct.
21 Q.  And we've established that
22 American, United and Delta are not low-cost
23 carriers, correct?
24 A.  That is correct.
25 Q.  So by extrapolation, ▮▮▮▮▮

**Page 116**

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮, correct?
5  A.  Could you just repeat the
6  question?
7  Q.  That ▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮
11 right?
12 A.  That's not correct, because ▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 Q.  Okay.  Well, ▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮
16 percent, you would agree with me, right?
17 A.  I would agree with that, of
18 domestic-only passengers.
19 Q.  Now, on that same page, at the top
20 of the page, you see the ▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮  sentence?
22 A.  Yes, I do.
23 Q.  And it goes on to say, ▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮

**Page 117**

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮
4  THE STENOGRAPHER:  Three rounds?
5  BY MR. TOBIN:
6  Q.  ▮▮▮▮▮▮▮▮▮▮▮  I
7  apologize.
8  What's your basis for that
9  statement?
10 A.  You mean beyond Exhibit 5?
11 Q.  Yeah.  Well, I guess you're saying
12 Exhibit 5 is your basis for that statement.
13 Is there anything else that you have that --
14 as evidence?
15 A.  I think -- I mean, Exhibit 5 is my
16 basis for that statement.  But, you know,
17 I've been studying this industry for the last
18 26 years, or whatever it is, and I've
19 witnessed it firsthand, and all of the data
20 reflects that.
21 Q.  Now, you've made the point, I
22 believe in your report, that airlines
23 generally have relatively thin profit
24 margins, correct?
25 A.  That -- yeah, airlines compared to

1  other industries tend to have thinner profit
2  margins. I would agree with that statement,
3  yes.
4      Q.  Okay. But that's been the case
5  since deregulation, right? I mean, that's
6  nothing new in the past five, ten years,
7  correct?
8      A.  Yeah, I mean, it is a really,
9  really tough business.
10     Q.  So they've always had thin profit
11 margins, at least since deregulation?
12     A.  You know, there's some years that
13 are better than others. But, yeah, they have
14 not been amongst the most profitable by any
15 stretch of the imagination, parts of kind of
16 the broader U.S. economy. It's a very
17 competitive business.
18     Q.  I guess the point is, they had
19 thin profit margins even before low-cost
20 carriers started taking a larger percentage
21 of the market as your Exhibit 5 tries to
22 argue, right?
23     A.  I wouldn't quite agree with that.
24 I think that prior to the expansion of
25 low-cost carriers, airlines were doing -- the

Page 118

1      A.  It's a lot tougher now than it was
2  back then. But it's a tough business.
3      Q.  And was then? I mean, if we're to
4  agree with what you say, you would agree it
5  was tough back then as well, right?
6      A.  I mean, yeah, there's degrees of
7  toughness, I guess is what I'd say, but it
8  has become extremely competitive.
9      Q.  Right. But you were the one that
10 compared it to the profit margins to other
11 industries, and the profit margins even
12 before the low-cost carriers started making a
13 significant impact ███████████████,
14 were still lower than these other industries
15 you're talking about, right?
16     A.  There's actually an exhibit we can
17 look at if you'd like. It's a tough
18 business. I mean, there's a lot of
19 pressures. There's fuel price volatility,
20 there's geopolitical risks. It's highly
21 cyclical. It's a tough business.
22     Q.  And those pressures that you just
23 described all existed before low-cost
24 carriers started taking a significant -- a
25 more significant portion of the market as

Page 120

1  large network carriers such as American,
2  Delta and United, and of course, going back
3  in time now to include the predecessor
4  carriers, you know, they -- they -- they --
5  there was less downward pressure on prices
6  back then and their profits tended to be a
7  little bit higher.
8      Q.  Okay. But you just made the
9  observation that the airline industry
10 currently has thinner profit margins than
11 other industries you could compare it to,
12 correct? Do you remember that testimony?
13     A.  I do, yes.
14     Q.  And that was the same before the
15 low-cost carriers started taking a
16 significant market share, the profit margins
17 may have been larger but they were still
18 thinner compared to other industries,
19 correct?
20     A.  There's no doubt that the growth
21 of low-cost carriers has pressured profits,
22 but airlines are a very tough business, yes.
23     Q.  Even before the low-cost carriers
24 started making this pressure that you just
25 described, correct?

Page 119

1  ███████████████, correct?
2      A.  There have been -- yes, those are
3  factors that have always -- have made the
4  airline business challenging.
5          MR. TOBIN:  I'm going to need a
6      short break.
7          THE VIDEOGRAPHER:  The time is
8      11:48. We're going off the record.
9  (Recess taken at 11:48 a.m. to 12:26 p.m.)
10         THE VIDEOGRAPHER:  We're back on
11     the record. The time is 12:26.
12 BY MR. TOBIN:
13     Q.  Okay. Dr. Lee, let me just make
14 sure I understand. You have not conducted an
15 analysis of what American Airlines' share is
16 at any particular airport, correct?
17     A.  As part of my report here?
18     Q.  Correct.
19     A.  Not as part of this report, no.
20     Q.  Okay. For instance, I believe
21 Dr. Vasigh had, and I remember the exact
22 number, but I believe he had calculated a
23 percentage of American's share -- market
24 share at Dallas Fort Worth.
25         As part of your retention here,

Page 121

31 (Pages 118 - 121)

| | |
|---|---|
| 1  you don't have any reason to either agree or | 1  clear, at least from the way it's been quoted |
| 2  disagree with that number, right? | 2  here, what that 84 percent is computed on. |
| 3     A.  I'm not sure actually that | 3     Q.  Let's pick each and every one of |
| 4  Dr. Vasigh has calculated anything.  If you | 4  those that you just listed. |
| 5  point me towards the part of his report, | 5        Do you have reason to believe that |
| 6  maybe you could refresh my memory.  I saw him | 6  American does not currently have 84 percent |
| 7  maybe cite some statistic that was someone | 7  of the market share in any one of those |
| 8  else's statistic, but I don't think I saw any | 8  categories? |
| 9  calculations that Dr. Vasigh performed. | 9     A.  I would have to do the calculation |
| 10    Q.  Okay.  Maybe calculation was a | 10  myself to determine what it is.  Again, it's |
| 11  poor chose of word. | 11  just -- he's quoting an Airport World |
| 12       But you saw where he cited | 12  article, looking at Footnote 8, and, so, |
| 13  percentage of market share at specific | 13  again, I would just need to independently |
| 14  airports, correct? | 14  verify it. |
| 15    A.  Maybe you can point me to his -- | 15    Q.  Okay.  I'll tell you what, give me |
| 16  part of his report, specifically, because... | 16  every single reason and piece of evidence |
| 17  (Exhibit 2, Hidden-city travel and its | 17  that you have to disagree with the statement |
| 18  impact on passengers, implications for the | 18  in Dr. Vasigh's report that "American |
| 19  traveling public, Dr. Bijan Vasigh, marked | 19  currently has about 84% of the market share |
| 20  for identification.) | 20  at DFW, making it the largest carrier at the |
| 21  BY MR. TOBIN: | 21  airport." |
| 22    Q.  I've handed you Exhibit 2. | 22    A.  I don't disagree with the |
| 23       Do you recognize that as | 23  proposition that American is the largest |
| 24  Dr. Vasigh's report that you reviewed in this | 24  carrier at DFW.  But all I'm saying, and I |
| 25  case? | 25  think you're asking if I agreed with the 84 |
| Page 122 | Page 124 |

| | |
|---|---|
| 1     A.  I do, yes. | 1  percent number, I said I don't know from what |
| 2     Q.  Okay.  If you could turn to page | 2  is written here how that is calculated.  So |
| 3  10 of the report. | 3  maybe it's 81.  Maybe it's 85.  I'm just |
| 4        You see in the first full | 4  not -- I'd have to go back and independently |
| 5  paragraph, last sentence, "American currently | 5  verify what it is. |
| 6  has about 84% of the market share at DFW, | 6     Q.  Yeah.  But my question is, do you |
| 7  making it the largest carrier at the | 7  have any evidence or reason to disagree with |
| 8  airport"?  I guess he cites to this Airport | 8  this statement? |
| 9  World. | 9     A.  Well, I'm neither agreeing or |
| 10       You don't have any reason to | 10  disagreeing.  I'm just telling you that it is |
| 11  disagree with that sentence, correct? | 11  not defined how that -- what that market |
| 12    A.  Well, only in the sense that I | 12  share is of. |
| 13  haven't validated the statistic, and it's not | 13    MR. TOBIN:  Objection, |
| 14  a hundred percent clear from at least the | 14  nonresponsive. |
| 15  quote here what this market share is | 15  BY MR. TOBIN: |
| 16  referring to.  It just says "market share." | 16    Q.  Are you going to answer my |
| 17  It doesn't say what the market share was. | 17  question.  My question is, do you have any |
| 18    Q.  It says "market share at DFW." | 18  evidence -- because I can get a judge to make |
| 19       You understand DFW to be DFW | 19  you answer my question. |
| 20  International Airport, right? | 20       Do you have any evidence that |
| 21    A.  I understand that, but it doesn't | 21  supports you disagreeing with that statement |
| 22  say what the 84 percent is of.  Is it of | 22  that we've just been talking about? |
| 23  daily departures?  Is it of destinations?  Is | 23    A.  I said I'm neither agreeing or |
| 24  it of seats?  Is it of O&D passengers?  Is it | 24  disagreeing.  What I'm telling you is that if |
| 25  of domestic-only passenger?  It's just not | 25  someone tells me that a market share is 84 |
| Page 123 | Page 125 |

32 (Pages 122 - 125)



**Page 126**

1  percent, my question is going to be market
2  share of what?
3      Q.  Do you have any evidence to
4  disagree with this statement, supports
5  disagreement with that statement?
6      A.  I'm not --
7      Q.  Yes or no?
8      A.  I'm neither agreeing or
9  disagreeing.  All I'm telling you is that as
10  a person who spends their life analyzing
11  airline data, I want to be a little bit more
12  precise and understand what this market share
13  calculation is of.
14      Q.  Have you ever heard the term "hub
15  premium"?
16      A.  I have heard that term.
17      Q.  Is that an industry term of art?
18      A.  It's a term that has been used in
19  the airline industry.
20      Q.  What do you believe it means?
21      A.  Hub premium -- you know, different
22  people have used it different ways.  I tend
23  to think of hub premium as for a carrier that
24  operates a hub, whether or not they charge
25  higher prices -- I would say probably per

**Page 127**

1  mile -- for passengers traveling to and from
2  the hub, as opposed to passengers that are
3  traveling over or through the hub.
4      Q.  Okay.  Do you believe American
5  currently does that practice?
6      A.  Well, as I've shown in my report,
7  there is no evidence of hub premium, and I
8  could happily point you to the exhibit, if
9  you'd like to talk --
10      Q.   Are you talking about the one on
11  page 9.  Oh, no, sorry, that was a --
12      A.  I think it's -- I think it's page
13  16, Exhibit 7.
14      Q.  I think your point is, the data
15  that you analyze -- let me just make sure I
16  understand your point.
17
18
19
20
21      A.  That's correct.  Is that the --
22  you know, if anything, if I -- you know,
23
24
25

**Page 128**

1
2
3
4
5
6
7      Q.
8      A.
9
10      Q.  Would you agree with Dr. Phiroz's
11  statement, at least to the extent that
12  airlines at their hubs receive less
13  competition than at a nonhub?
14      A.  Not at all.  As I've shown in my
15  report, you know, I think I have another
16  exhibit, I'm happy to explain.  But, for
17  example, Exhibit 9 of my report shows
18
19
20
21
22
23
24
25      Q.  So, for instance, you do not

**Page 129**

1  believe that American faces less competition
2  in Dallas than it does in Salt Lake City?
3      A.  Well, I think Dallas is incredibly
4  competitive.  As you can see from Exhibit 9,
5
6
7                    .  I haven't looked at Salt
8  Lake City, but Salt Lake City would be
9                    , with respect to
10  people traveling from Salt Lake City via DFW
11  to other parts on American's network.
12      Q.  Give me the name of an American
13  hub city?
14      A.  Dallas.
15      Q.  Give me the name of an American
16  nonhub city, where American actually has at
17  least a portion of the market share?
18      A.  We can go with Salt Lake City.
19      Q.  Okay.  So do you believe that
20  American is every bit as competitive -- or I
21  should say other airlines are every bit as
22  able to compete with American in Dallas as
23  they are in Salt Lake City?
24      A.  Dallas is intensively competitive.
25      Q.  Yes or no, to my question.  I can

33 (Pages 126 - 129)

1  have the court reporter read my question
2  back.  It was a simple yes-or-no question.
3       Could you please read it back.
4       THE STENOGRAPHER:  I'll have to
5  check it.
6  BY MR. TOBIN:
7       Q.  Let me ask the question, then.
8       Do you believe that other carriers
9  have -- are every bit as competitive with
10  American in Dallas just as they are in Salt
11  Lake City?
12       A.  It would depend on the place
13  you're going to from Salt Lake City, but
14  yeah, I would think that, you know, Dallas is
15  super competitive.  You know, you're in
16  Southwest's backyard as well, and there's a
17  lot of low-cost competition there.  Probably
18  more in Dallas than there might be in Salt
19  Lake City.
20       Q.  So you believe the answer to my
21  question is yes?
22       A.  I believe that American faces
23  intense competition at Dallas, and they face
24  intense competition in Salt Lake City.
25       Q.  Okay.  Now, for instance, Section

1  I think that in his report he is almost
2  taking it at face value that these
3  hidden-city tickets that are being sold are
4  actually providing consumers with a fare
5  savings where, at least in my experience from
6  spending some time on the Skiplagged website,
7  my experience was that because of the
8  misleading practices, it wasn't providing the
9  lowest fair.
10       Q.  Same question as to Section B,
11  [redacted]
12  [redacted]  It's a bit of a tongue
13  twister.  But that section, would you agree,
14  it's not a direct critique on either
15  Dr. Vasigh or Dr. Phiroz's opinions?
16       A.  I'm not sure I would fully agree
17  with that.  I'm not sure I would agree with
18  that.  I think that this is a response to
19  them.  As you can see from the cited
20  footnotes.  You know, just at the first
21  paragraph of Footnote 24, I'm explaining --
22  like there's a predicate assumption in their
23  reports, that the reason for the existence of
24  Skiplagged and hidden-city tickets is to kind
25  of circumvent these monopoly positions, as

1  C in your report, it talks about
2  [redacted]
3  [redacted]  is that fair?
4       MR. MUYSKENS:  Are you on 30?
5       MR. TOBIN:  Yes, I am.
6       A.  That's correct.
7  BY MR. TOBIN:
8       Q.  Now, generally, I'm understanding
9  that that section is not a critique of
10  Dr. Vasigh's or Dr. Phiroz's reports but
11  rather something in addition that you're
12  offering about the case; is that correct?
13       A.  Well, I do think that -- that --
14  that Dr. Vasigh, when he speaks at
15  hidden-city tickets is not really looking at
16  the full picture, and what I'm explaining
17  here is that when one actually looks at the
18  complete picture of, you know, the products
19  that Skiplagged is putting out there in the
20  marketplace, if passengers were actually
21  fully aware -- or consumers were fully aware
22  of how misleading they can be, then it really
23  changes the whole calculus, I think, that
24  he's performing in his report.
25       So it's not a direct critique, but

1  they say that -- how airlines have their hub
2  airports.  And what this is describing is no,
3  there's actually a much more innocuous reason
4  why these exist, and so it's kind of
5  providing a counterargument to Dr. Vasigh.
6       But I would disagree with your
7  statement.
8       Q.  Okay.  Well, let's go to page 27
9  in Section B.  And you're talking about the
10  evidence reflects [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16       A.  Yes.
17       Q.  I'm sorry if I wasn't completely
18  following that, and I see your footnote, but
19  it directs me to other footnotes.
20       So if you can just tell me, what
21  is the basis for that statement or the
22  evidence that you're relying on for that
23  statement?
24       A.  Are you talking about the sentence
25  that begins --

CONFIDENTIAL

| | |
|---|---|
| 1      Q. With "rather"? | 1    lower prices than it otherwise would if it |

1      Q. With "rather"?
2      A. "Rather, they reflect"?
3      Q. Correct.
4      A. Well, I think I describe -- in
5 that particular thing I'm referring you back
6 to the earlier analysis in paragraph 19 of
7 Footnote 42, where I was actually analyzing
8 the city pairs or the markets that Dr. Vasigh
9 was looking at, and I think one of the
10 markets in particular I think I was looking
11 at there was, if I recall -- was it New
12 Orleans to Austin? And, you know, he has in
13 his, whatever it was, Exhibit D to his, he
14 kind of holds up that as being a hidden-city
15 opportunity and that that's a reflection of
16 some type of market power.
17      And I said, wait, like listen, if
18 you're traveling from New Orleans to Austin,
19 Southwest is flying -- I don't know what is
20 it? -- five flights a day or four flights a
21 day between -- nonstop between Austin and New
22 Orleans; whereas American has to -- for them
23 to take you between New Orleans and Austin,
24 you have to make a connection at DFW and that
25 adds -- you know, I could point you to the

Page 134

1 parts of my report where it describes the
2 added time, making a connection.
3      So, yeah, so American sometimes
4 prices that very aggressively in order to
5 compete with Southwest nonstop service. So
6 it's competition that's driving on that O&D,
7 that lower fare. It has nothing to do with
8 market power.
9      Q. If they could lower the Austin to
10 Dallas flight as well, right, it's the direct
11 flight that's offered from Austin to Dallas,
12 that could be lowered, right?
13      A. They base -- what is it? Like ten
14 flights a day, competition from Southwest on
15 that. That is a competitive route. What I'm
16 saying is that they're flying head to head
17 against Southwest between Dallas and Austin.
18 Those two carriers are just battling it out,
19 day in and day out, okay, with the premium at
20 low-cost carrier, right?
21      On Austin to New Orleans, American
22 is at a disadvantage, right, because it has
23 to connect people over Dallas, and so it
24 comes as no surprise to me that sometimes
25 American will offer -- have to -- offer even

Page 135

1 lower prices than it otherwise would if it
2 served New Orleans to Austin nonstop, because
3 it has to not over over -- it has to overcome
4 the fact that, you know, you're going to add
5 another two hours to this journey, which is
6 not a particularly long journey.
7      So that is competition. That's
8 vigorous competition. And what Dr. Vasigh is
9 trying to contort that into is some kind of
10 notion that American is exercising some kind
11 of market power between Dallas and Austin,
12 and how can that be when Southwest offers,
13 you know, eight or nine or ten flights a day
14 in that market.
15      Q. But both those legs right, Dallas
16 to New Orleans and Dallas to Austin, have
17 multiple flights from both carriers, right?
18      A. On the two components of Austin to
19 New Orleans, they do, yes.
20      Q. Okay. So, I mean, under your
21 logic, they're not both competitive, right?
22      A. No, but you're -- but you're --
23 I'm sorry. Please ask your question. I
24 interrupted.
25      Q. Under your logic, both legs are

Page 136

1 competitive, right?
2      A. Those two legs are highly
3 competitive, but where the hidden-city
4 opportunity exist that he identifies, one of
5 them is Austin to New Orleans, and then
6 Austin to New Orleans, that is a city pair in
7 which American doesn't serve nonstop, okay,
8 but Southwest does.
9      So now Southwest has this other
10 advantage, putting aside its cost advantage,
11 it has yet another advantage, which is it
12 flies, a document in my report, I don't know,
13 it's like three or four daily nonstop
14 flights. And American, the only way it can
15 take people between New Orleans and Austin is
16 by connecting them over DFW. I mean, you can
17 connect in other places as well but that
18 would be the primary way.
19      So to me it is not surprising at
20 all, that on occasion, in order to better
21 compete against Southwest, which offers this
22 nonstop product versus American's connecting
23 product, it has to cut -- it has to be even
24 more aggressive on pricing to try to woo some
25 of these passengers who can fly nonstop.

Page 137

35 (Pages 134 - 137)

1     Q.  So you're admitting both legs are
2  competitive, but you just believe that the
3  Austin to New Orleans leg -- or flight is
4  hypercompetitive because Southwest offers a
5  direct flight from Austin to New Orleans?
6     A.  What I'm saying is that American
7  is competing against -- whereas on the
8  component legs, okay, on an O&D basis,
9  they're going head to head with nonstop
10  service.
11        On these other routes, these
12  connecting routes, which is for American a
13  connecting route but for Southwest a nonstop
14  route, okay, that puts American -- you know,
15  it needs to do something in order to convince
16  people that would otherwise fly Southwest to
17  fly on American, notwithstanding the fact you
18  have to make a connection; it's going to take
19  you a couple hours longer because of that
20  connection or 90 minutes longer.
21        And so, yeah, one the things it
22  does to compete against that is to offer even
23  more aggressive pricing.
24     Q.  But that's an argument you're
25  making.  You don't have written evidence of
                                      Page 138

1  that.  In other words, you didn't review
2  materials from American that says this is the
3  way we do our pricing and this is why we even
4  lower our pricing even more on this
5  particular Austin to New Orleans ultimate
6  destination because of the reasons you're
7  articulating, right?
8     A.  Well, I know that carriers out
9  there are doing everything they can to
10  compete with lower-cost carriers day in and
11  out, and they price on an O&D basis.
12     Q.  But you didn't interview anybody
13  at American?  You didn't review any materials
14  that reflected what their pricing strategy
15  was on any of these routes, right, this is
16  just your general knowledge in the industry
17  that you're relying on, correct?
18     A.  Well, I did not interview anyone
19  at American.  I know from studying and having
20  worked in this industry for 26 years that
21  every day that American and other large
22  network carriers go into the marketplace and
23  are battling it out for every customer.
24     Q.  This particular New Orleans to
25  Austin -- is it Austin to New Orleans or New
                                      Page 139

1  Orleans to Austin?  I can't remember.
2     A.  I mean, it really doesn't matter.
3     Q.  If it doesn't matter, New Orleans
4  to Austin, right, you didn't review any
5  actual evidence or data or documents as to
6  why American's pricing that route the way
7  it's pricing it, correct?
8     A.  I mean, I think what you need to
9  do is keep in mind that what I'm doing, in
10  this particular analysis and much in my
11  report --
12     Q.  Dr. Lee, I'm sorry -- I'm sorry
13  to interrupt you.  But you have got to answer
14  a yes-or-no question, or we are going to have
15  to get the judge to make you do that.
16        So yes or no, did you review any
17  documents, evidence, data, or did you talk to
18  any American personnel as to how they price
19  that particular route?
20     A.  I think I've already answered that
21  question, which is that I've spoken to no
22  American individuals, and if I -- what I was
23  saying is that I am responding to an exhibit
24  of Dr. Vasigh, where he holds that out as
25  being a hidden city -- you know, a hub
                                      Page 140

1  premium, as he calls it, I think, and I'm
2  explaining the reason for what he's observing
3  is being driven by American's attempt to be
4  competitive on a route where they don't offer
5  nonstop service against Southwest, which
6  does.
7     Q.  Do you have anything else to add
8  to that answer to my question?
9     A.  No, I think I'm satisfied with my
10  answer.
11     Q.  Now, if we go to Section C, we
12  were there a minute ago, I think it was on
13  page 34, maybe example 15 -- excuse me --
14  Exhibit 15.
15     A.  Okay.
16     Q.  Now, I agree that the copy quality
17  of that chart is not great.
18        But do you remember the particular
19  route this is describing?
20     A.  Well, the one part I can't see
21  here and recall is this is from Boston to
22  Dallas.
23     Q.  And that's actually --
24     A.  That you can see that, yeah.
25     Q.  Now, you didn't run an analysis --
                                      Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

1 you brought this one example up, but you
2 didn't run an analysis to see how often this
3 situation happens where the total net cost to
4 the customer through Skiplagged facilitating
5 a transaction ends up to be higher than what
6 the quote was from American Airlines, right?
7      A.  I was not asked to perform that
8 analysis, no.
9      Q.  This was just a spot example,
10 correct?
11     A.  This is an example of what
12 happened when I did it, yeah.
13     Q.  Okay.  And were you told to go to
14 that particular route our did you pick that
15 route on your own?
16     A.  No, it's a route that I picked it
17 on my own.  I mean, I'm -- obviously I live
18 in Boston and Dallas was featured prominently
19 Dr. Vasigh's report so I thought it would be
20 a good route to look at.
21     Q.  Okay.  And you particularly call
22 out -- now, what was the difference in time
23 between looking at the two situations, the
24 quote through American versus the quote
25 through Skiplagged?

Page 142

1      A.  Sorry.  Are you now referring to
2 paragraph 36 or are you still -- there's two
3 examples, right, there's two examples done on
4 different days.  They both use Boston to
5 Dallas, but I just want to make sure we're
6 talking about the same example.
7      Q.  Okay.  Well, either example --
8      A.  Yeah.
9      Q.  -- because I couldn't understand
10 from your report --
11     A.  Yeah.
12     Q.  -- how close in proximity and time
13 you were obtaining these quotes.
14     A.  I was doing it in real-time on
15 both.
16     Q.  Okay.  So you got a quote from
17 Skiplagged --
18     A.  Yeah.
19     Q.  -- and then immediately went and
20 got that same quote, or on the same leg, I
21 should say --
22     A.  Yeah.
23     Q.  -- from the American website?
24     A.  Correct.
25     Q.  Now, particularly, you call out

Page 143

1 the statement in American -- or, excuse me,
2 in Skiplagged's menus that apparently you
3 went through where apparently it said you're
4 saving $21 compared to other websites,
5 correct?
6      A.  Ah, yes, that is correct.
7      Q.  And you try to describe that as --
8 generally as misleading, correct?
9      A.  , I felt it was quite misleading.
10     Q.  But you're familiar with -- that
11 American does offer its fares through
12 multiple different vendors, right, it's not
13 just the American Airlines website, right?
14     A.  That is correct.
15     Q.  So it's possible that there was a
16 $21 savings compared to that flight being
17 offered, let's say, through Expedia or
18 another vendor that American uses, correct?
19     A.  Well, it's always possible, but I
20 think what I'm pointing out in this example,
21 which is really why I wanted to ask you which
22 example we were looking at, is that the $21
23 fare savings that purported to exist was with
24 the first price that Skiplagged offered to me
25 in the process.  So then I pulled out my

Page 144

1 credit card, I entered all my information.  I
2 actually purchased the ticket.
3      And from the time that I was first
4 informed that I had been saving $21 to the
5 time that I entered in my information, my
6 credit card information and went to purchase
7 it, Skiplagged increased the price twice.
8 Okay.  So the price went up twice, and they
9 continued to tell me that I was saving $21,
10 even though within this, like, couple-minute
11 period the price went up twice.  And then
12 after I went and purchased the ticket, with
13 the price having gone up twice, I then went
14 back to American's website, okay, and I could
15 have got the price for lower.
16     Q.  Let me make sure I understand the
17 process you went through.
18     When you were navigating the
19 Skiplagged website, it informed you of the
20 increase in price before you actually
21 purchased the ticket?
22     A.  Yes, I went to purchase -- I think
23 I just describe it quite clearly in my
24 report.
25     But I initially went to hit

Page 145

37 (Pages 142 - 145)

1    purchase.  They said, oh -- the price has
2    gone up, and it said the price has gone up
3    by, you know, the first time it said it went
4    up by -- I think it was like up to 177, they
5    said please hit refresh, sorry for the
6    inconvenience, and then at the next step it
7    actually increased it again, and then I
8    purchased the ticket.
9         I got an email confirmation like a
10   minute later and that email confirmation
11   continued to tell me that I had saved $21,
12   even though the $21 was based off the initial
13   price, which was, like, $40 less.
14       Q.  But both -- I want to make sure I
15   understand.
16        Both situations you or the
17   consumer had the opportunity not to purchase
18   the price with -- purchase the ticket, I
19   should say, with the knowledge that the fare
20   had actually gone up, right?
21       A.  Yeah, I was never charged -- it
22   wasn't as though, like, I go get my credit
23   card statement and it was more than I had
24   agreed to pay.  I'm not suggesting that they
25   charged my credit card for more than I was

Page 146

1    fly by offering me this fare at the first
2    surge of whatever it was, 153, or whatever,
3    telling me at that moment in time that's the
4    lowest fare.  So I hit yeah.  I would go and
5    get that.
6         I entered my credit card
7    information.  The fare goes up twice.  It's
8    still telling me I'm saving $21, that that
9    $21 save has never changed on any part of the
10   Skiplagged communication to me.  But what
11   Skiplagged wasn't doing, was saying, well,
12   wait, maybe, actually, because that fare had
13   gone up on the hidden city, like, why not
14   check actually Boston to Dallas, which is
15   really where this person is trying to go to,
16   and see whether or not it's offering the
17   savings.
18        It didn't do that, and because of
19   that I paid more than I would have had to pay
20   if I just gone ahead and bought the ticket on
21   American or on another website, an
22   unauthorized agent of American, and gotten
23   that ticket, the nonstop flight, could
24   have got my AAdvantage miles, could have
25   brought a carry-on bag, didn't have to

Page 148

1    told.
2        Q.  Okay.  And that was -- as we
3    talked about with dynamic pricing, that is
4    possible in American's revenue management
5    cycle, the way they ultimately price tickets
6    is fares change day to day and even sometimes
7    minute to minute, correct?
8        A.  Yeah, but the problem here, as I
9    describe in my report, is because Skiplagged
10   never went back -- it was like looking at
11   this hidden-city opportunity, you know, I had
12   a price at one moment in time, and yeah,
13   maybe that moment in time did exist and maybe
14   hypothetically, in the moment between that
15   initial quote and the time I entered in my
16   credit information, maybe the price on the
17   hidden-city ticket went up.  Okay.
18        But it never goes back then and
19   compared it to just, oh, what if I bought the
20   nonstop flight, and that is the flight that
21   didn't go up.  That stayed the same.  So what
22   I really want to do, the Skiplagged
23   passenger -- I'm sorry -- customer, here I'm
24   a Skiplagged customer, I just want to fly
25   from Boston to Dallas.  And it entices me to

Page 147

1    violate American's contract of carriage, so
2    that, to me, I felt like I had been
3    bait-and-switched.
4        Q.  That's your own personal reaction?
5        A.  I mean, I travel a lot.
6        Q.  Well, if you travel a lot, you've
7    been on -- you've certainly been on
8    American's website before where you've
9    tried -- do you book your own flights?
10       A.  Often I do, yes.
11       Q.  So you've certainly been on
12   American's website, I would assume, where
13   you've gone to book a flight on a particular
14   class of seat to a particular location and it
15   interrupts somewhere through process and
16   says, well, that fare or that seat is no
17   longer available, right, and it's a new fare?
18       A.  I mean, quite honestly, I have not
19   personally had that experience on American,
20   and keep in mind, while I was always -- while
21   I was doing these Skiplagged searches, I had
22   a separate American window going on as well.
23   That did not happen to me.
24       Q.  Ever?
25       A.  Well, during these searches it

Page 149

38 (Pages 146 - 149)

1   hadn't.
2       Q.   That wasn't my question, during
3   these searches.
4           My question was, certainly you've
5   been on American's website trying to book a
6   flight where somewhere through the process it
7   stops and says that seat at that price is
8   no long available, right?
9       A.   I do not recall having a situation
10  where once I got to the point where I was
11  entering in credit card information, that the
12  fare had changed.  I have certainly been
13  shopping for airfares where I check on
14  Tuesday or I check -- you know, during the
15  day, see what the prices look like, figure I
16  want to wait until I get home, talk to my
17  wife, figure out if those days work, and then
18  yeah, the fares have changed.  Sometimes
19  they're higher.  Sometimes they're lower.  I
20  put it off for a day, whatever, and the fares
21  changed.  That's happened to me.
22          I can't tell you, as I sit here
23  right now, that I've had a situation where I
24  have got to the point where I am just
25  entering in credit card information and the

Page 150

1   fare has changed.
2       Q.   But you're not disagreeing with
3   Skiplagged's practice of alerting the
4   customer before it buys the ticket from
5   American.  I mean, you realize they're buying
6   this ticket from American, these are
7   American's prices, right?
8       A.   I agree with you these are
9   American's prices, but what I'm telling you,
10  and I think what the crux of this -- of the
11  problem was in this example, was that it
12  is -- once you've chosen that ticket and
13  you're going down the path of buying the
14  hidden-city ticket, and if the price of that
15  hidden-city ticket goes up, because, for
16  example, American had raised its price, it
17  was the last seat and certain inventory was
18  sold and now you're continuing the inventory,
19  it would stand to reason that if I really
20  just want go from Boston to Dallas, that what
21  it should be doing is comparing what the
22  actual prices are on Boston to Dallas at that
23  time, if it's going to represent to me that I
24  am saving $21, because I was by no means
25  saving $21, given that the fare had gone up

Page 151

1   twice.
2       Q.   And this is just what you
3   observed, right?
4           I mean you talk a number of times
5   in your report about Skiplagged's intent, and
6   they intentionally do this or that.  You
7   don't really have evidence or knowledge of
8   what Skiplagged's intent was when it was
9   programming its program and creating its
10  algorithm, right, you're just talking about
11  what you observed in navigating the
12  Skiplagged website, correct?
13      A.   Well, I'm not sure what you mean
14  by "intent."  I know the intent of
15  Skiplagged, as I understand this case and as
16  I understand their business, is to offer
17  hidden-city ticket opportunities.  Okay?  So
18  that I believe is their intent.
19          Do I believe that they foresaw
20  what happened to me and, you know,
21  intentionally programmed it in, I don't know
22  one way or another.  I'm just -- I'm
23  explaining what happened to me, and I'm
24  explaining why the proposition that is
25  really, I think, foundational to Dr. Vasigh's

Page 152

1   opinions that Skiplagged is affording people
2   these lower fares, is not necessarily true
3   because, in my own experience, it was telling
4   me it was a lower fare, when, in fact, it
5   wasn't.
6       Q.   Starting on page 37, going with
7   Exhibit 17, and I think going on into
8   paragraph 38, which continues on to page 38,
9   you're talking about examples or attributes
10  to the American product that are being -- I
11  believe you used the word "degrading."
12          You remember that part of your
13  report?
14      A.   I do, yes.
15      Q.   Okay.  I just want to make sure I
16  understand.  That's your personal opinion,
17  you didn't actually do any analysis?  Like
18  you're not here to offer any type of damage
19  testimony or put any type of valuation on
20  what this alleged degrading ultimately
21  resulted in, correct?
22      A.   I have not been asked to render
23  any opinions on damages.
24      Q.   So this is just an observation
25  you're making.  It is not part of an analysis

Page 153

39 (Pages 150 - 153)

1  to try and quantify or put an order of
2  magnitude on this alleged degrading, correct?
3      A.   I have not been asked to quantify
4  the degree of degrading.  What I'm pointing
5  out here is that as a nonauthorized -- as a
6  nonagent of American, they're not an
7  authorized agent, they are intentionally
8  degrading the product.
9      Q.   Intentionally.  You have knowledge
10 of their intent?
11     A.   Well, they say it.  I mean, I
12 don't know what's in the minds of whoever
13 wrote the code, but what I'm telling you is
14 that throughout the process, Skiplagged told
15 me only -- backpack only.  Do not attempt to
16 bring a piece of carry-on luggage after I
17 bought the ticket.  Skiplagged sent me an
18 email telling me, do not associate my
19 frequent flyer miles.  So that is their
20 intent, is to degrade the product.
21     Q.   What other evidence, other than
22 what you just described, do you have that
23 Skiplagged intentionally attempted to degrade
24 American's products?
25     A.   I mean, that I think is -- they

Page 154

1  are -- they told me, that's what they told
2  me.
3      Q.   I know you said that.  But I asked
4  what other evidence do you have of
5  Skiplagged's intent to intentionally degrade
6  American's product?
7      A.   I don't think I need any more than
8  that.  I mean, they are instructing me to
9  forgo AAdvantage miles.  They're instructing
10 me to not take a carry-on bag if I want to.
11 That is a degradation of the product that
12 American offers.  It's an important part of
13 American's -- of value proposition to
14 consumers, is the fact that they offer
15 AAdvantage miles; the fact that their basic
16 economy tickets allow passengers to bring a
17 carry-on bag, whereas Spirit and Allegiant
18 and Frontier don't, without a fee.  That's an
19 integral part of the value proposition that
20 American offers into the marketplace, and
21 Skiplagged is saying I can't do that or I
22 shouldn't do that or warning me against doing
23 it.
24     Q.   But, Of course, in this example
25 where you were, at least theoretically, the

Page 155

1  potential customer, you would have seen those
2  warnings and had the options to decide where
3  you take the carry-on bag or not, whether you
4  insert your frequent flyer mileage or not,
5  right, the consumer has the option, after
6  getting that information from Skiplagged, to
7  make that decision, correct?
8      A.   Yeah, I certainly have the option,
9  but it comes with risks and Skiplagged
10 informs me of those risks.  So yes, if I
11 decide I want to enter my frequent flyer
12 number and if I'm willing to bear the risk of
13 having my bank of AAdvantage miles taken away
14 or my status revoked, sure, but that to me is
15 a degradation of the product.
16     Q.   Are you aware that American has ███
17 ███████████████████████████████████████
18 ███████████████████████████████████████
19 ███████████████████████████████████████
20 ███████████████████████████████████████
21 █████████████████████████
22     A.   Not -- I don't have specific
23 knowledge.  I understand just from being
24 around the industry that that can happen.
25     Q.   Are you aware that they have

Page 156

1  ███████████████████████████████████████
2  ███████████████████████████████████████
3  ██████████████████████████
4      A.   Again, as part of this analysis, I
5  haven't had any specific conversations with
6  people at American.  But I've been working in
7  this industry for a long time, and I
8  understand that that's one of the things that
9  has been done.
10     Q.   And you would at least agree that
11 it's possible that in this hidden-city
12 ticketing application, that American could
13 gain more revenue than if there wasn't a
14 hidden-city ticket application, correct?
15     A.   I'm not sure what you mean by that
16 question.  Could you --
17     Q.   Well, there's at least a scenario
18 where somebody gets off on a hidden city and
19 American is able then to sell that second leg
20 for more than the difference between a direct
21 flight and a hidden-city ticket, right?
22     A.   Again, can you -- I'm having a
23 little trouble because of the temporal aspect
24 of what you're suggesting.  So could you
25 maybe ask the question again.  I just want to

Page 157

40 (Pages 154 - 157)

Page 158

1   mare sure I understand.
2     Q.  So there's a possibility that
3   consumer A buys a hidden-city ticket from
4   Boston to San Antonio, going through Dallas
5   Fort Worth, and there's a price for a Boston
6   to Dallas direct flight that's slightly
7   higher, let's say hypothetically.  Okay?
8     A.  Okay.
9     Q.  The consumer purchases Boston to
10  San Antonio through Dallas, flies to Dallas
11  and gets off the flight.
12     A.  Yeah.
13     Q.  American then hypothetically is
14  able to maybe put a passenger on the Dallas
15  to San Antonio flight that could give them
16  more value than what was the difference in
17  ticketing between the direct flight from
18  Boston to Dallas and the hidden city fare,
19  correct?
20     A.  So are you thinking about a
21  scenario -- I just want to make sure I
22  understand where in the period of time
23  between which that person lands in Dallas and
24  walks out the terminal but before it's known
25  to American that he's a no-show, because he

Page 159

1   doesn't notify, I mean they're holding up
2   that seat, they're holding that seat, that
3   someone magically shows up at the airport
4   when the gate is closing, and they realize
5   that this person is no longer there and they
6   sell that seat.  Is that what you're --
7     Q.  That's a possibility or possibly
8   even somebody is sitting on standby, and
9   let's say the difference in fare was only 20
10  bucks.  Okay?
11     A.  Standby --
12     Q.  Hang on.  Let me finish my
13  example.
14     So the difference in fare is only
15  20 bucks, and the person on standby then gets
16  to go on the flight from Dallas to San
17  Antonio but he checks a bag and it costs him
18  $25.  There's a scenario where American could
19  gain more revenue by allowing the hidden-city
20  ticket to happen and then putting another
21  passenger on that second leg.  That scenario
22  at least exists, right?
23     A.  I don't understand the scenario,
24  because that person that's sitting there is
25  at the gate and the bag, you check the bag at

Page 160

1   the counter, and so I don't understand that.
2     Like, you can't have a bag that --
3   I -- I -- I don't understand your scenario.
4   I mean, like that -- that -- that -- the fact
5   of the matter is that American doesn't know
6   that the person is no-showing for that flight
7   until it's kind of too late to actually sell
8   that ticket to someone.
9     Q.  Do you know that for sure?  Are
10  you aware of situations where American has
11   ██████████████████████████
12   ████████████████████████████████
13   █████████████████████████████
14   ██████████████████████████
15   ████████████████████
16   █████████████████████████████
17   ██████████████
18   ████████████████████
19   ███
20     A.  ████
21     Q.  ██████
22     A.  Yeah.
23     Q.  Are you aware that that's
24  happened, that scenario has happened, █████
25   ████████████████████

Page 161

1     A.  I'm not aware one way or another
2   that that's happened, but I'll take that as a
3   hypothetical.
4     But now you're -- I think I'm
5   trying to explain the situation as I
6   understand it, where a person buys a ticket,
7   a Skiplagged ticket for a hidden city, is
8   ████████████████████████████████;
9   so now I've got, like, a no-show on Boston to
10  Dallas, I've got a no-show on Dallas to San
11  Antonio, had I known that -- it's a confusing
12  example.
13     And you're saying that later that
14  day they zero out that itinerary and all of a
15  sudden there's a new seat in inventory and
16  that someone then walks up to the airport in
17  Dallas, wanting to buy a seat at the ticket
18  counter later in the day, and now there's a
19  seat for them.
20     Is that what you're suggesting?
21     Q.  Well, there are a number of
22  scenarios there, right?  I mean, we don't
23  know ████████████████████████████████
24   ████████████████████████████████
25   ██████████████████████████

Veritext Legal Solutions
800-336-4000

App'x 133

1 [REDACTED]
2 [REDACTED]
3 [REDACTED]
4 [REDACTED]
5 [REDACTED]
6 [REDACTED]
7    A.  Well, I just don't understand what
8 your counterfactual is. [REDACTED]
9 [REDACTED]
10 [REDACTED]
11 [REDACTED]
12      So, I mean, sure, you can conjure up
13 any example you want, but that doesn't alter
14 the fact that these are tickets that, you
15 know, are not compliant with the contract of
16 carriage, and that in the kind of the but-for
17 world where it didn't exist, American would
18 have that inventory to sell to someone else
19 as well as.
20    Q.  But, again, you're saying didn't
21 comply with the contract to carriage just as
22 a lay observation.  You're not a lawyer that
23 did any legal analysis on that, correct?
24    A.  Well, I -- again, I've read the
25 contract of carriage.  It specifically

Page 162

1 prohibits the use of hidden-city tickets.
2      So I'm not making a legal
3 conclusion, but I'm just saying that I've
4 seen seeing the contract of carriage and I've
5 seen that it explicitly prohibits these
6 hidden-city tickets.
7      MR. TOBIN:  Let's take a
8 five-minute break.
9      THE VIDEOGRAPHER:  The time is
10 1:22.  We're going off the record.
11 (Recess taken at 1:22 p.m. to 1:33 p.m.)
12      THE VIDEOGRAPHER:  We're back on
13 the record.  The time is 1:33.
14 BY MR. TOBIN:
15    Q.  Dr. Lee, if you'll turn to page 43
16 of your report, and in particular I'd like
17 you to look at paragraph 42, the first
18 sentence, please.
19    A.  Yes, I see that.
20    Q.  Just so the record is clear, I
21 think I know what you mean, but just so the
22 record is clear.  What do you mean by
23 "beyond-hub segment"?
24    A.  Well, it would be in the example
25 that we've been talking about frequently.  It

Page 163

1 would be the Dallas-San Antonio segment.
2    Q.  So the sentence reads, [REDACTED]
3 [REDACTED]
4 [REDACTED]
5 [REDACTED]
6      What evidence do you have that on
7 American flights, when there are hidden-city
8 tickets, that [REDACTED]
9 [REDACTED]
10    A.  Well, based off my knowledge of
11 the industry and of American and of their
12 load factors, most flights go up with at
13 least some empty seats.
14    Q.  Have you reviewed any data on
15 instances where a hidden-city ticket method
16 is employed and that [REDACTED]
17 [REDACTED]
18    A.  I haven't performed any specific
19 analysis because I wouldn't -- I didn't have
20 access to -- like if I had Skiplagged data
21 for something like that, I could try and do
22 that analysis.  I don't have Skiplagged --
23 all the Skiplagged tickets where people had
24 purchased hidden-city tickets.
25      I'm making just a general

Page 164

1 observation that, based off my knowledge and
2 experience of the airline industry generally
3 and American in particular, that the
4 majority -- beyond the majority of flights
5 have at least one empty seat when they
6 depart.
7      MR. TOBIN:  At times, I believe
8 that Dr. Lee has been unnecessarily
9 evasive in this deposition.  So I'm
10 going to reserve my right to recall him
11 or compel him to be here and answer my
12 questions, but subject to that, I pass
13 the witness at this time.
14      MR. MUYSKENS:  I'm going to
15 respectfully disagree, but we're done.
16 Thank you very much.
17      THE VIDEOGRAPHER:  The time is
18 1:36.  We're going off the record.  This
19 is the end of today's deposition of
20 Darin Lee, Ph.D.
21      THE STENOGRAPHER:  Mr. Tobin,
22 you're ordering the original?
23      MR. TOBIN:  Yes.
24      THE STENOGRAPHER:  Mr. Muyskens,
25 are you ordering a copy?

Page 165

42 (Pages 162 - 165)

**Page 166**

1    MR. MUYSKENS:  Expedited, please.
2    THE STENOGRAPHER:   When for?
3    MR. MUYSKENS:  As soon as you can.
4    THE STENOGRAPHER:  Did you want
5  expedited also?
6    MR. TOBIN:  Yeah, if they're going
7  to get it, I guess we'll go ahead.
8  (Deposition suspended at 1:37 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 168**

1    SIGNATURE PAGE
2  AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,
3    INC. LTD.
4
5    I, the undersigned, declare under penalty
6  of perjury that I have read the foregoing
7  transcript, and I have made any corrections,
8  additions or deletions that I was desirous of
9  making; that the foregoing is a true and
10  correct transcript of my testimony contained
11  therein.
12
13    Executed this_____day of
14    _____.
15
16  at_____, _____.
17    (CITY)      (STATE)
18
19    ---------------------------
20    DARIN N. LEE, PH.D.
21
22
23
24
25

**Page 167**

1  COMMONWEALTH OF MASSACHUSETTS
2  SUFFOLK. SS.
3
4    I, Sandra A. Deschaine, Registered
  Professional Reporter and Notary Public
5  within and for the Commonwealth of
  Massachusetts at large, do hereby certify
6  that the deposition of Darin N. Lee, Ph.D, in
  the matter of American Airlines, Inc. versus
7  Skiplagged, Inc., at the offices Greenberg
  Traurig, One International Place, Boston,
8  Massachusetts, on July 11, 2024, taken and
  transcribed by me; that the witness provided
9  satisfactory evidence of identification as
  prescribed by Executive Order 455 (03-13)
10  issued by the Governor of the Commonwealth of
  Massachusetts; that the transcript produced
11  by me is a true record of the proceedings to
  the best of my ability; that the witness is
12  reading and signing; that I am neither
  counsel for, related to, nor employed by any
13  of the parties to the action in which this
  deposition was taken, and further that I am
14  not a relative or employee of any attorney or
  counsel employed by the parties thereto, nor
15  financially or otherwise interested in the
  outcome of the action, on this 15th of July
16  2024.
17
18
19
20    _____
    Registered Professional Reporter
21
22
23
24  My Commission Expires:
  July 5, 2024
25

**Page 169**

1    ERRATA SHEET
2  AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,
3    INC. LTD.,
4    DARIN N. LEE, PH.D. - JULY 11, 2024
5
6  Page| Line| Change/Correction
7  ____|____|_____
8  ____|____|_____
9  ____|____|_____
10  ____|____|_____
11  ____|____|_____
12  ____|____|_____
13  ____|____|_____
14  ____|____|_____
15  ____|____|_____
16  ____|____|_____
17  ____|____|_____
18  ____|____|_____
19  ____|____|_____
20  ____|____|_____
21  ____|____|_____
22  ____|____|_____
23  ____|____|_____
24  ____|____|_____
25

43 (Pages 166 - 169)

CONFIDENTIAL

```
 1  nathan.muyskens@gtlaw.com
 2              July 15, 2024
 3  RE: American Airlines, Inc. v. Skiplagged, Inc.
 4  DEPOSITION OF: Darin N. Lee , PhD (# 6782850)
 5     The above-referenced witness transcript is
 6  available for read and sign.
 7     Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
```

Page 170

Veritext Legal Solutions
800-336-4000

App'x 136

1              SIGNATURE PAGE

2      AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

3                  INC. LTD.

4

5          I, the undersigned, declare under penalty

6      of perjury that I have read the foregoing

7      transcript, and I have made any corrections,

8      additions or deletions that I was desirous of

9      making; that the foregoing is a true and

10     correct transcript of my testimony contained

11     therein.

12

13     Executed this____14th.____day of

14     _August 2024__,

15

16     at____Boston____, ____MA____.

17          (CITY)              (STATE)

18

19

20     -----------------------------------

21          DARIN N. LEE, PH.D.

22

23

24          Sarah P. Pontbriand
           NOTARY PUBLIC
25     Commonwealth of
           Massachusetts
       My Commission Expires
           5/11/2029

                                 Page 168

1               ERRATA SHEET

2     AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

3                 INC. LTD.,

4        DARIN N. LEE, PH.D. - JULY 11, 2024

5

6    | Page | Line | Change/Correction |
|------|------|-------------------|
| 9    | 11   | "first date of appointment" to "first data point" |
| 10   | 11-12| "that I might assume" to "that it assumes" |
| 12   | 6    | "lower cost and network" to "lower cost network" |
| 13   | 9    | "is needed" to "isn't needed" |
| 19   | 21   | "in my direct" to "under my direct" |
| 19   | 22   | "in my report" to "on my report" |
| 20   | 22   | "Well, see," to "Well, let's see" |
| 22   | 1    | "earlier May" to "early May" |
| 22   | 19   | "off my heart" to "off by heart" |
| 32   | 17   | "--" to "of" |
| 36   | 6    | "per" to "per se" |
| 38   | 10   | "-- I had a" to "IATA" |
| 40   | 11   | "was DOT, with" to "was a DOT route" |
| 44   | 22   | "in millions" with "in the millions" |
| 47   | 16   | "him" to "them" |
| 53   | 12   | "liability" with "reliability" |
| 57   | 2    | "has the name" with "as the name" |
| 57   | 17   | "because of" with "because" |

25

Page 169

App'x 138

```
 1                    ERRATA SHEET

 2        AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

 3                       INC. LTD.,

 4            DARIN N. LEE, PH.D. - JULY 11, 2024

 5

 6     Page|  Line|  Change/Correction

 7       61  | 2      | "in one of" to "it's one of"

 8       65  | 3      | "Southwest" to "itself"

 9       65  | 4      | "There're" to "They're"

10       71  | 3      | "carrier might" to "carrier, it might"

11       71  | 23     | "100 database" to "T-100 database"

12       79  | 25     | "DC airport" to "DCA airport"

13       83  | 19     | "domestic-only" with "domestic O&D"

14       83  | 20     | "says decline" to "has declined"

15       94  | 6      | "the night" to "the flight"

16       97  | 15     | "then seat" with "then the seat"

17      100  | 25     | "mistaking" to "mistaken"

18      109  | 4      | "domestic-only" with "domestic O&D"

19      110  | 12-13  | "both JFK, New York"  to "both JFK, Newark,"

20      112  | 21     | "competition airfares" to "competition and airfares"

21      116  | 18     | "domestic-only" with "domestic O&D"

22      123  | 25     | "domestic-only passenger" with "domestic O&D passengers"

23      125  | 23     | "or" with "nor"

24      126  | 8      | "or" with "nor"

25
```

Page 170

```
1                        ERRATA SHEET

2        AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

3                         INC. LTD.,

4             DARIN N. LEE, PH.D. - JULY 11, 2024

5

6      Page|  Line|  Change/Correction

7      128  | 20    | "from hub" with "from their hubs"

8      132  | 9     | "fair" wtih "fare"

9      132  | 20-21 | "first paragraph of Footnote 24" to "footnotes of paragraph 24"

10     135  | 19    | "premium at" to "pre-eminent"

11     136  | 3     | "not over over" to "not only over"

12     137  | 12    | "a document" to "as I document"

13     138  | 20    | "or 90 minutes" to "of 90 minutes or"

14     148  | 2     | "surge" to "search"

15     151  | 17    | "last seat and" to "last seat in a"

16     151  | 17    | "inventory was" to "inventory and was"

17     151  | 18    | "inventory" to "purchase"

18     164  | 12    | "go up" with "go out"

19     ____|_____|_____

20     ____|_____|_____

21     ____|_____|_____

22     ____|_____|_____

23     ____|_____|_____

24     ____|_____|_____

25
```

Page 171

# Exhibit A-5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANT SKIPLAGGED, INC.'S THIRD AMENDED OBJECTIONS AND**
**RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, Judge Ray's December 19, 2023

Order [Dkt. 53], and the parties' Confidentiality Agreement, Defendant Skiplagged, Inc.

("Skiplagged") hereby serves this, its Third Amended Objections and Responses to Plaintiff

American Airlines, Inc.'s First Set of Interrogatories.

Dated:  January 12, 2024

Respectfully submitted,

/s/*William L. Kirkman*_____
William L. Kirkman
State Bar No. 11518700
billk@kirkmanlawfirm.com
Preston B. Sawyer
State Bar No. 24102465
prestons@kirkmanlawfirm.com
**KIRKMAN LAW FIRM, PLLC**
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone: (817) 336-2800
Facsimile:  (817) 877-1863

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are
designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 142

*/s/ Abigail R.S. Campbell*
Aaron Z. Tobin,
Texas Bar No. 24028045
atobin@condontobin.com
Kendal B. Reed
Texas Bar No. 24048755
kreed@condontobin.com
Abigail R.S. Campbell
acampbell@condontobin.com
**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311

***ATTORNEYS FOR DEFENDANT SKIPLAGGED, INC.***

## CERTIFICATE OF SERVICE

It is hereby certified that on January 12, 2024, a copy of the foregoing was served via e-mail as to all parties who have entered an appearance in this proceeding.

*/s/ Abigail R.S. Campbell*
Abigail R.S. Campbell

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

## THIRD AMENDED OBJECTIONS AND RESPONSES
## <u>TO FIRST SET OF INTERROGATORIES</u>

To comply with Judge Ray's December 19, 2023 Order, Skiplagged makes the following amended objections and responses to Plaintiff's First Set of Interrogatories but does not waive its previously asserted objections.

**INTERROGATORY NO. 1:**   Identify Skiplagged's annual, monthly, and quarterly number of American Bookings, and the resulting revenue generated from such bookings, from January 1, 2020 to the present.

**RESPONSE:**



**INTERROGATORY NO. 2:**   Identify and describe in detail each way that Skiplagged has accessed, obtained, collected, received, scraped, cached or harvested American's Content, including but not limited to when and how Skiplagged collected or otherwise obtained the content/information, and including information obtained by Skiplagged from any third party or other source other than American or AA.com.

**RESPONSE:**



Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 144



**INTERROGATORY NO. 3:**   Identify and describe all types of data, information, and content relating to American flights, fares, products, or services that Skiplagged has collected or used (whether from or through AA.com, an API of AA.com, or some other source), and the process used by Skiplagged to obtain and use such data, information, or content.

**RESPONSE:**



**INTERROGATORY NO. 4:**   Identify and describe in detail each way that Skiplagged has purchased, booked, ticketed, sold, resold, brokered, facilitated, acted as a conduit, or made a reservation for customers on American flights, whether purchased or booked on AA.com, through another third party, or by some other means. Your ANSWER should include, without limitation, the names/identities of each and every third party whose data, services, or platform Skiplagged has used or relied on to facilitate the sale of American flights.

**RESPONSE:**

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

4



**INTERROGATORY NO. 5:**    Describe in detail, from the time a user submits her information and payment on Skiplagged.com to the time Skiplagged completes the booking on AA.com on behalf of the passenger, the process by which Skiplagged purchases and completes a customer's reservation on AA.com, including but not limited to each step of the process, how the passenger's personal, contact, and payment information is submitted on AA.com (i.e., manually or by an automated technological means), and the specific location (both physical and IP address) of the computers or servers from which Skiplagged inputs the passenger's information on AA.com.

**RESPONSE:**



**INTERROGATORY NO. 6:**    Identify and describe all agreements and/or business relationships that Skiplagged has with other Travel Agencies, travel metasearch engines, airfare consolidators, global distribution systems, or any other third party that provides, enables, facilitates, or otherwise participates in the distribution, display, marketing, brokering, booking, ticketing or sale of flights. Your answer should include the nature of the relationship, any agreements relating to such relationships, and the details, dates, and amounts of any payments or monetary compensation that Skiplagged has paid to or received from such third parties.

**RESPONSE:**



Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 146



**INTERROGATORY NO. 7:**   Identify all other websites to which Skiplagged.com has provided customers a link or otherwise re-directed customers to complete a booking or purchase of American flights.

**RESPONSE:**



**INTERROGATORY NO. 8:**   Identify all instances in which a person has booked, ticketed or purchased a ticket on an American-marketed flight through or facilitated by Skiplagged.com, including by providing, without limitation, the purchasers' name/identity, location, all PNR Data, any other personal identifying information, flight/itinerary information, reservation numbers, amounts paid by the customer, dates of purchase, and dates of travel.

**RESPONSE:** In response to this interrogatory and pursuant to Judge Ray's Order, Skiplagged states that while it has information regarding the number of bookings facilitated through its "Book Now" feature, the number of bookings facilitated by redirecting users to online travel agencies is unknown. Thus, the number of instances in which Skiplagged facilitated the booking of an American flight from August 1, 2018, to August 17, 2023 and according to Google Analytics is 1,376,927. Because of the magnitude of the information requested, pursuant to Fed. R. Civ. P. 33(d), Skiplagged refers Plaintiff to documents being produced by Skiplagged that reflect responsive information.

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 147

**INTERROGATORY NO. 9:** Identify all IP addresses, names, email addresses, accounts, computers, and any other identifying information that Skiplagged, or anyone acting under Skiplagged's instruction or direction, has used in connection with booking, ticketing, purchasing and/or selling of tickets on American-marketed flights.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not book, ticket, purchase, or sell tickets for American-marketed flights. Skiplagged is unable to identify the requested IP addresses, as Skiplagged uses Google Cloud to host Skiplagged.com, which uses dynamic addresses.

**INTERROGATORY NO. 10:** Identify each and every instance where an American-Skiplagged Customer requested a refund, partial or full, for a ticket on an American-marketed flight or where Skiplagged received a refund from American for a flight booked for an American-Skiplagged Customer, and for each instance, identify the reservation number, date of the request, date of the refund, the amount refunded by American, if any, and whether Skiplagged issued a refund back to the customer (and if so, how much of the amount refunded by American was paid back to the customer).

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not provide or receive refunds from American for any flights because Skiplagged does not charge users for flight tickets nor does Skiplagged purchase flight tickets. Users pay American for their flight tickets. In response to Skiplagged users who request flight refunds, Skiplagged informs them that that refunds must be requested from and issued by American.  In certain instances, Skiplagged  has refunded service fees. Pursuant to Fed. R. Civ. P. 33(d), Skiplagged refers Plaintiff to documents being produced that reflect customer requests for refunds of American flights.

**INTERROGATORY NO. 11:** From the time Skiplagged began its operations, identify and describe any/all other lawsuits, claims, charges, allegations, arbitration, threatened litigation, administrative complaints, or other proceedings against Skiplagged, whether in the United States or any other country, relating to Skiplagged's marketing or sale of flights or other travel services, including the status of any such proceedings.

**RESPONSE:** In response to this interrogatory, Skiplagged identifies the following lawsuits filed against it, the allegations of which are publicly available:

1. United Airlines, Inc., Orbitz Worldwide, LLC, and Orbitz, LLC v. Zaman, Case No. 1:14-cv-09214 (N.D. Ill.); and
2. Southwest Airlines, Inc. v. Skiplagged, Inc., Skybooker.com LTD, Case No. 3:21-cv-01722-E (N.D. Tex.).

Both cases have been resolved and are terminated. The following "claims, charges, and allegations" have also been made:

1. A demand letter from counsel for Delta Air Lines, Inc. dated July 19, 2018, to which Skiplagged responded through counsel on July 26, 2018; and

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

2. A demand letter from Fareportal on behalf of Cheapoair dated February 11, 2015, which was resolved on February 27, 2015.

**INTERROGATORY NO. 12**: Identify the number of bookings Skiplagged has made for or on behalf of consumers with a Texas address through Skiplagged.com's "Book Now" feature, as described in paragraph 12 of Zaman's Declaration.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target, or keep separate in its records, persons with a Texas address. The reference made by Mr. Zaman in his Declaration is to Skiplagged's general operations, which are used by all persons everywhere and not just Texans. Skiplagged provides information to persons who come to its website to find information about airfares, air travel, and online travel offerings so they may book fares or tickets through other travel resources and Skiplagged does not "book" tickets or airfares, but rather facilitates persons booking flights. With this understanding, from August 1, 2018, through August 17, 2023, and according to Google Analytics, 59,426,399 persons accessed Skiplagged's site through 209,618,689 sessions, which resulted in 434,534 bookings reflecting Texas addresses through Skiplagged's "Book Now" feature. Accordingly, bookings with Texas addresses made through Skiplagged's Book Now feature represents approximately 00.207 percent of all sessions on Skiplagged.com during the identified period.

**INTERROGATORY NO. 13**: Identify the number of bookings Skiplagged has made for or on behalf of consumers for flights to, from, or within Texas through Skiplagged.com's "Book Now" feature, as described in paragraph 12 of Zaman's Declaration.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target, or keep separate in its records, persons with a Texas address. The reference made by Mr. Zaman in his Declaration is to Skiplagged's general operations, which are used by all persons everywhere and not just Texans. Skiplagged provides information to persons who come to its website to find information about airfares, air travel, and online travel offerings so they may book fares or tickets through other travel resources and Skiplagged does not "book" tickets or airfares, but rather facilitates persons booking flights. With this understanding, from August 1, 2018, through August 17, 2023, and according to Google Analytics, 59,426,399 persons accessed Skiplagged's site through 209,618,689 sessions, which resulted in 854,317 bookings for flights that originated and/or terminated in Texas through Skiplagged's "Book Now" feature. Accordingly, such bookings made through Skiplagged's Book Now feature represent approximately 00.408 percent of all sessions on Skiplagged.com during the identified period.

**INTERROGATORY NO. 14**: Identify all "online travel agencies, global distribution systems, and other travel metasearch engines" and any of the other "variety of sources" from whom "Skiplagged obtains American flight and fare information" (as described in paragraphs 10 and 11 of Zaman's Declaration) and describe the technical means and process by which Skiplagged obtains such information.

**RESPONSE:** █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 149



**INTERROGATORY NO. 15**: Identify the total number of bookings for which Skiplagged has received commission payments or other financial compensation from other Travel Agencies, and the total amount of such payments, for purchases made by consumers with a Texas address that Skiplagged.com redirected to such other Travel Agency.

**RESPONSE:** In response to this interrogatory, Skiplagged states it does not direct, target, or keep separate in its records, persons with a Texas address.  Skiplagged is not a Travel Agency, so use of the term "other Travel Agencies" is incorrect. With that understanding, from August 1, 2018, through August 17, 2023, Skiplagged is unaware of the total number of bookings through Travel Agencies made by persons referred by Skiplagged. Skiplagged commissions on redirected bookings to Travel Agencies are paid on two models (1) cost per click or "CPC" (*i.e.*, intent to book), the standard advertising revenue model, or (2) cost per action or "CPA" (*i.e.*, successful booking). However, Skiplagged does not collect the requested information with respect to Texas addresses or anywhere else.

**INTERROGATORY NO. 16**: Identify the total number of bookings for which Skiplagged has received commission payments or other financial compensation from other Travel Agencies, and the total amount of such payments, for purchases of flights to, from, or within Texas made by users that Skiplagged.com redirected to such other Travel Agency.

**RESPONSE:** In response to this interrogatory, Skiplagged states it does not direct, target, or keep separate in its records, persons with a Texas address. Skiplagged is not a Travel Agency, so use of the term "other Travel Agencies" is incorrect. With that understanding, from August 1, 2018, through August 17, 2023, Skiplagged is unaware of the total number of bookings through Travel Agencies made by persons referred by Skiplagged. Skiplagged commissions on redirected bookings to Travel Agencies are paid on two models (1) cost per click or "CPC" (*i.e.*, intent to book), the standard advertising revenue model, or (2) cost per action or "CPA" (*i.e.*, successful booking). However, Skiplagged does not collect the requested information with respect to routing for bookings made by Travel Agencies.

**INTERROGATORY NO. 17**:  Identify the number of persons who have signed up for the Skiplagged.com "newsletter" or email subscriber service by entering a "home airport" located in Texas, as prompted on https://skiplagged.com/signup.\

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

App'x 150

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target or keeps separate in its records, persons with a Texas address or a "home airport" located in Texas as such. Despite that, zero persons "signed up" for such newsletter or e-mail subscriber service from August 1, 2018, to August 17, 2023, by entering a "home airport" located in Texas. This is because Skiplagged launched the newsletter sign-up page on August 28, 2023, which was after American Airlines filed the Complaint in this action.

**INTERROGATORY NO. 18**: Identify the number of times Skiplagged.com has redirected a user to another Travel Agency to complete a booking for a flight to, from, or within Texas.

**RESPONSE:** In response to this interrogatory, Skiplagged states that it does not direct, target, or keeps separate in its records, persons who fly to, from, or within Texas. Skiplagged is not a Travel Agency, so the use of the term "another Travel Agency" is incorrect. With that understanding, Skiplagged has redirected persons 966,655 times to a Travel Agency (not "another" Travel Agency, as Skiplagged is not a "Travel Agency") to potentially "complete" a booking for a flight to from or within Texas from August 1, 2018, to August 17, 2023, understanding that Skiplagged interprets this Interrogatory to ask for the number of times that Skiplagged.com has redirected persons to an online Travel Agency to complete a booking for a flight involving Texas. Skiplagged does not have information as to how many such referrals resulted in the purchase of airline tickets for flights involving Texas. Each identified booking involves two cities, not necessarily in the same state or country, and "involving Texas" refers to bookings where the trip starts and/or ends in Texas.

**INTERROGATORY NO. 19**: Describe in detail how and from what sources Skiplagged "obtained … the alleged 'American Marks' from [sources other than] American's website" as alleged in paragraph 10 of Zaman's Declaration and at page 13 of Skiplagged's Motion to Dismiss.

**RESPONSE:** In response to this interrogatory, Skiplagged states that paragraph 10 of the Zaman Declaration does not reference American Marks and page 13 of Skiplagged's Motion to Dismiss erroneously cites Zaman Declaration paragraph 10 instead of paragraph 11 for this proposition. Subject to this correction, Skiplagged states that on May 23, 2017, a former employee obtained the American icon from the API response of a Skiplagged advertiser, which Skiplagged understood to be allowed to use and distribute the American icon. Skiplagged's former employee then edited the image to make the background transparent and slightly enlarge the logo. The result is what Skiplagged has been using: https://skiplagged.com/img/airlines-favicon/AA.png.

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

28191315v2 99460.002.00

**28 U.S.C. § 1746 DECLARATION VERIFYING INTERROGATORY ANSWERS**

"I declare and verify under penalty of perjury that the foregoing responses to Interrogatories are true and correct. Executed on the 12th day of January 2024, in New York City, New York."

_____
Aktarer Zaman
Chief Executive Officer
Skiplagged, Inc.

Pursuant to the parties' Confidentiality Agreement, Skiplagged's Responses to Interrogatory Nos. 1-7, and 14 are designated CONFIDENTIAL.

11

28191315v2 99460.002.00

App'x 152