IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

---

**APPENDIX TO PLAINTIFF AMERICAN AIRLINES, INC.'S MOTION TO EXCLUDE
EXPERT OPINIONS AND TESTIMONY OF BIJAN VASIGH, PHD
AND BRIEF IN SUPPORT**

---

In support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert

Opinions and Testimony of Bijan Vasigh, PhD and Brief in Support, American submits the

following materials:

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A | Declaration of Julia G. Wisenberg | App'x 001–03 |
| A-1 | Expert Report of Bijan Vasigh, PhD, served by Defendant Skiplagged, Inc. on April 23, 2024 | App'x 004–70 |
| A-2 | Transcript of the deposition of Bijan Vasigh, PhD, taken on June 6, 2024 | App'x 071–96 |
| A-3 | Expert Rebuttal Report of Darin N. Lee, PhD, served by American on May 31, 2024 (Confidential) | App'x 097–161 |
| A-4 | Transcript of the deposition of Darin N. Lee, PhD, taken on July 11, 2024 (Partially Confidential) | App'x 162–210 |

Dated: August 26, 2024                   Respectfully submitted,

                                         */s/ Dee J. Kelly, Jr.*
                                         Dee J. Kelly, Jr.
                                         State Bar No. 11217250
                                         dee.kelly@kellyhart.com
                                         Julia G. Wisenberg
                                         State Bar No. 24099146
                                         julia.wisenberg@kellyhart.com
                                         KELLY HART & HALLMAN LLP
                                         201 Main Street, Suite 2500
                                         Fort Worth, Texas 76102
                                         (817) 332-2500

                                         R. Paul Yetter
                                         State Bar No. 22154200
                                         pyetter@yettercoleman.com
                                         YETTER COLEMAN LLP
                                         811 Main Street, Suite 4100
                                         Houston, Texas 77002
                                         (713) 632-8003

                                         Cameron M. Nelson
                                         nelsonc@gtlaw.com
                                         GREENBERG TRAURIG LLP
                                         77 West Wacker Drive, Suite 3100
                                         Chicago, Illinois 60601
                                         Telephone: (312) 456-6590

                                         Nathan J. Muyskens
                                         nathan.muyskens@gtlaw.com
                                         GREENBERG TRAURIG LLP
                                         2101 L Street, N.W., Suite 1000
                                         Washington, DC 20037
                                         Telephone: (202) 331-3100

                                         **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on August 26, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

                                         */s/ Dee J. Kelly, Jr.*
                                         Dee J. Kelly, Jr.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JULIA G. WISENBERG

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

1.      My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

2.      I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Motion to Exclude Expert Opinions and Testimony of Bijan Vasigh, PhD and Brief in Support.

3.      Attached as Exhibit A-1 is a true and correct copy of the Expert Report of Bijan Vasigh, PhD, served by Defendant Skiplagged, Inc. on April 23, 2024.

4.      Attached as Exhibit A-2 is a true and correct copy of the transcript of the deposition of Bijan Vasigh, PhD, taken on June 6, 2024.

1

5.     Attached as Exhibit A-3 is a true and correct copy of the Expert Rebuttal Report of Darin N. Lee, PhD, served by American on May 31, 2024.

6.     Attached as Exhibit A-4 is a true and correct copy of the transcript of the deposition of Darin N. Lee, PhD, taken on July 11, 2024.

7.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2024.

Julia G. Wisenberg

# Exhibit A-1

# Hidden city travel and its impact upon passengers

Implications for the traveling public

Dr. Bijan Vasigh, Professor

## INTRODUCTION OF DR. VASIGH

Professor Bijan Vasigh is currently a Professor of Economics and Finance in the College of Business at Embry-Riddle Aeronautical University, Daytona Beach, Florida, and the President and Founder of Aviation Consulting Group. He has an extensive history and résumé with the airline industry. His extensive qualifications and curriculum are attached.

Professor Vasigh has focused his consulting and teaching on the theory, modeling, application of financial instruments in transport finance, and provides expert opinion in court cases. He is the author of North America's leading aviation textbooks, including *An Introduction to Air Transport Economics: From Theory to Application*, *Foundation of Airline Finance: Methodology and Practices*, and *Aircraft Valuation in Volatile Market Condition*.

Professor Vasigh's work has led to formal collaborations with multiple domestic government agencies and foreign governments, such as the International Civil Aviation Organization ("ICAO"), the Association of Unmanned Vehicle Systems International ("AUVSI"), the International Air Transport Association ("IATA") Learning Center, and NASA on a grant on "Determination of Statewide Economic Benefits of the Small Aircraft Transportation System ("SATS"). Professor Vasigh diligently served as a key member of a three-person task force appointed by the Prime Minister of Trinidad and Tobago. The primary objective of the task force was to conduct a comprehensive investigation into the slot valuation procedures at London Heathrow Airport.

He has been interviewed and quoted by national and international news media, including *The Washington Post*, *Wall Street Journal*, NBC News, CBS News, *USA Today*, *Forbes*, Bloomberg Business, National Public Radio ("NPR") Marketplace, Voice of Russia, El Pais (Spain), Rzeczpospolita (Poland), Trinidad Express, Cuba News, and *The Guardian* (United Kingdom), among others. Professor Vasigh's résumé is attached to this report as Ex. A.

App'x 006

## REPORT

I.    **TASK**

I have been asked by William L. Kirkman, an attorney in a pending lawsuit instituted by American Airlines against Skiplagged, Inc., to provide an expert opinion relating to hidden-city ticketing and Skiplagged, Inc.'s business operations related thereto based on my knowledge and expertise of the airline industry and of the concept of hidden-city ticketing.

I have set out in Ex. B, the material I have received from Mr. Kirkman and which I have reviewed. I have also prepared this report in the form of an Executive Summary and then the report itself.

II.    **EXECUTIVE SUMMARY**

Before 1978 and during the regulated era, the Civil Aeronautics Board (CAB) had full power to regulate all domestic interstate air transportation as a public utility and set routes, fares, and schedules. The CAB strived to keep fares reasonably low for public welfare while ensuring reasonable profit for airlines. The CAB's approach, which was mostly cost-based, often results in higher fares for longer trips (to some extent subsidized short-hauls through higher fares on long-hauls). The airlines had a virtual guarantee of profitability and protected markets to support that. The inefficiency of this system, along with passenger dissatisfaction due to rising prices, set the stage for the abolition of rigid regulation in favor of open market competition where the primary role of government is focused on safety (e.g., through FAA) and ensuring fair market competition (e.g., anti-trust law to support unrestricted market entry and prevent market concentration). The regulated era ended with the Airline Deregulation Act of 1978, which immediately resulted in the start of new airlines and fierce competition in airline fares.

The free-market foundation that fueled deregulation quickly resulted in lower competitive fares and the advent of new, innovative approaches to airline management. Leaving the coast-based approach behind, airlines adopted value-based fare pricing, which seeks to capture the highest return that can be demanded based on customers' willingness to pay. In other words, the price elasticity of demand drives the fare rather than the cost (which often closely correlates with distance). This enabled airlines to exploit high-demand markets for much higher fares and profit

App'x 007

margins. Consequently, an unprofitable route would be abandoned over time and perhaps picked up by a more competitive airline whose cost structure enables them to operate the route with a positive return, given the passengers' willingness to pay. Low-Cost Carriers (LCC) seem to fill this role, especially in smaller markets, which are feared to be subjected to service erosion due to lower demand and higher price sensitivity.

Aside from value-based pricing, deregulation facilitated the creation of the hub-and-spoke system by network carriers. Demand from smaller markets can be aggregated at a hub for final destinations, thus taking advantage of the economy of scale and resource aggregation, among other benefits. This practice resulted in cost savings for the airline but came at the cost of losing direct flights for the passengers (direct flights, however, were offered by LCC, although perhaps via secondary airports).

Subsequently, airlines expanded their focus and presence at a subset of airports, often distinct from one airline to another, and soon controlled a significant majority of the market at those selected hubs and focus cities. The term "fortress hubs" was coined in the 80s to highlight the significant market dominance of an airline in a hub airport, which inevitably comes with non-competitive and rather monopolistic routes to and from said hub. Even though anti-trust laws forbid it, hubs are naturally less hospitable to the entry of new airlines, which may pose serious challenges to Hubs' airlines. Such a market concentration that defies competition was not the intent of deregulation but appears as its consequence.

The Hidden City Ticketing (HCT) came into existence as a result of the aforementioned evolution in airline fare pricing post-deregulation. HCT is also referred to as "point beyond ticketing", cross-border ticketing", and "skiplagging." Simply put, HCT is the practice of purchasing a multi-segment flight itinerary with the intention of only using the first segment(s) of the itinerary because the fare of the extended itinerary is (significantly) cheaper than the fare of the intended first segment(s) alone[1]. In other words, the customer is paying for a bundle of products with the intention of only using part of the purchase and foregoing the reminder. Figure 1 below illustrates a typical HCT.

---

[1] In theory, HTC may also cover a scenario that passenger extended their itinerary by adding a segment before the intended segment. However, in practice, airline will cancel the entire itinerary if the passenger does not show up for the first segment. Thus, this scenario has is inapplicable and ignored in this document.

App'x 008



**Figure 1**. Under HCT, a passenger purchases the itinerary for A to C with a connection at B at a price cheaper than the A to B itinerary, which is their intended itinerary. The passenger plans to only use the A to B segment and forego the B to C segment.

The HCT opportunity often only exists when the first segment (the intended segment) ends at a hub, and the final purchased itinerary destination is a non-hub of the operating airline. The exitance of HCT is not guaranteed, and in fact, on a given route, it may dynamically appear and disappear over time. Nevertheless, various studies confirm the existence of HCT opportunities in the network of all major US carriers[2].

The HCT opportunities, however, come at a cost and are not always available to passengers. Passengers who use HCT are often forced not to have checked-in luggage as they cannot retrieve their bags at a connecting airport. The fear of the airline's retaliation also deters passengers from using their frequent flyer program, and notable (or regular) use of HCT may place the passenger on the airlines' banned travelers list. Moreover, passengers accept the entire risk of delays and misconnections. Not to mention that HCT could only be used on one-way tickets or the return segment of two-way tickets, as airlines will cancel all future flights on an itinerary suspicious of practicing HCT. Given these consequences, the HCT price deviation with direct booking must be significant enough to justify the risk and limitations.

The primary reason for the existence of HCT is the value-based pricing of airline fares and the significant advantage such provides to the flying consumer public. Often, an airline faces

---

[2] According to the US General Accounting Office (GAO) about 17 percent of itineraries offered by major US airlines during their investigation exhibit HCT opportunities of $100 for high-fare class or $50 for low-fare classes (Hecker 2001).

App'x 009

limited competition at its hub, which allows it to *exploit the opportunity* to demand higher fares with less fear of competition interference. On the other hand, a non-hub destination more closely resembles a free-market scenario for an airline where the thread of response from a competitor shall be considered carefully. In such markets, passengers could choose between competitors. Thus, the fare a passenger accepts is not capped by their willingness to pay but determined by the best price offered, which may be significantly lower than the passenger's willingness to pay. Indeed, cost-based pricing that determines the fare by distance traveled will never allow for the existence of HCT opportunities.

On the routes prone to offer an HCT opportunity, we often see the opportunities occur closer to the departure day. It is a common practice in the airline industry to raise the price as the departure day of a given flight approaches. Passengers who purchase their tickets late are often the ones who realize the need to travel late, a need that may be accompanied by an urgency that raises the passengers' willingness to pay. So, airlines tend to exploit this urgent need of travelers to demand a higher price for their remaining seats closer to the departure. This rise in price, of course, will be affected by competition and airlines' understanding of price elasticity in a market.

The HCT is undesirable to airlines as it prevents them from *exploiting the market,* and demanding higher prices that they claim to be entitled to by leveraging their market dominance and lower competition.

Moreover, an unused flight may result in an empty seat without significant advanced notice to the airline; this means that the given airline lost the opportunity to make money from the seat a passenger purchased but chose not to use. However, this outcome highly depends on the airline's overbooking practice and only applies to a scenario in which all seats on the unused flight are sold out.

Indeed, airlines can easily eliminate all HCT opportunities since they set the fares. However, this practice means forgoing the opportunity to demand higher fares in less competitive markets and losing passengers to other airlines with lower fares in more competitive markets. Overall, the loss from this approach is expected to outweigh the potential savings of disallowing HCT.

The ability to profile passengers in a market and estimate their willingness to pay and their price elasticity is a critical capability that aids airlines in maximizing their profit. Airlines have the complete power to set prices and benefit from the availability of big data. In contrast, passengers often have less access to data and only have the power to choose when meaningful competing options are available. However, under the HCT, throwaway ticketing[3], back-to-back ticketing[4], and similar practices, passengers avoid the power imbalance by purchasing products that do not match the profile airlines expect from them. That provides a significant advantage to the flying consumer public and, in my opinion, is justified in the consumer marketplace. Hence, Skiplagged's business practice is justifiable.

## III.   <u>INTRODUCTION</u>

Before the Airline Deregulation Act of 1978 in the United States, airlines operated under a regulatory framework that imposed strict control over various aspects of their operations, especially fares. The government had authority over routes, schedules, and fares for commercial air travel. However, the Airline Deregulation Act of 1978 fundamentally changed the regulatory landscape for the airline industry in the United States. Deregulation reduced government intervention by removing many of the regulatory constraints that had previously governed airlines.

One of the byproducts of deregulation in the airline industry was the emergence of hub-and-spoke network (H&S).[5] Figure 2 below illustrates a typical hub and spoke network. Deregulation allowed airlines greater freedom in selecting their routes and ticket prices. In this new network structure, airlines designate certain airports as hubs where they concentrate a large number of flights, connecting passengers from various origins to their final destinations through these central points. Major U.S. hub airports serve as the headquarters for numerous Fortune 500 companies, and these airports primarily cater to business travelers. These travelers typically

---

[3] Throwaway ticketing is a special case of HCT where a round trip ends up to be cheaper than the one way ticket. Thus, a passenger benefit from buying the round trip with no intention of using the return ticket.

[4] Back-to-back ticketing is also known as bracketing, nested ticketing, and cross-ticketing. An example of this practice is where a passenger purchased two cheaper tickets with minimum stay and weekend stay but use them out of sequence as two more expensive mid-week return tickets.

[5] Airline hubs are airports that serve as central points for airlines, facilitating the efficient transfer of passengers between connecting flights. Airline hubs are often situated in major cities or regions with high passenger demand.

App'x 011

exhibit a low-price elasticity of demand, meaning they are less sensitive to changes in ticket prices. Many major hub airports around the world are characterized by the dominance of one or two airlines, which command a lion's share of the air traffic.[6] Hereafter, airlines can leverage this monopoly to command higher ticket prices due to the reduced sensitivity of business travelers to price fluctuations.



Figure 2: Hub and Spoke Network

As a result of deregulation, airlines gained the ability to implement dynamic pricing models, such as revenue management systems, which enabled airlines to adjust fares in real-time based on factors such as demand, competition, and inventory levels. Airline revenue management (RM), as we understand it today, is indeed considered a spinoff of deregulation, particularly in the United States. RM involves analyzing market demand, setting prices dynamically, and controlling the availability of fares across different booking classes. Revenue management systems help airlines allocate their limited capacity to the most profitable market segments (mainly from HUB) while balancing factors such as demand, and competition.

In this market environment, airlines have incentives to both reject passengers who are not willing to pay higher fares, in order to save inventory for higher value passengers, as well as to accept those lower-valued passengers, in order not to have inventory be unused. Hence, the objective of RM in the airline is to maximize revenue by selling the right product to the right

---

[6] This dominance can give the airline considerable pricing power and control over routes, making it difficult for competitors to enter the market.

App'x 012

customer at the right time and for higher prices. Airlines employ sophisticated revenue management systems to optimize their profits by selling tickets at various prices to different types of passengers. This practice often involves a form of price discrimination, where passengers are charged different prices based on their willingness to pay. One common method is to charge higher prices for less price-sensitive passengers while offering discounts to more price-sensitive ones. Effectively, passengers flying in and out of hub airports often exhibit lower price elasticity of demand compared to those flying on non-hub routes. This strategy allows airlines to maximize revenue by capturing as much value as possible from each passenger segment. (Wandelt and Zhang, 2023).

Upon reviewing the attached Exhibit C it is evidence that there are fluctuations in ticket prices across different cities in Texas when flying via Dallas. Notably, the existence of hub premiums in certain markets adds an interesting dimension to this case.

Indeed, there are numerous travel websites and online platforms dedicated to helping passengers find the best deals on flights by offering various tools and features to compare prices and optimize travel itineraries. Skiplagged is one of these. These sites, including Skiplagged, leverage technology and data analysis to provide users with options to save money, including changing their itinerary to lower costs. Here's how these travel sites typically operate: Flight comparison tools, multi-city itineraries, price alerts, and flexible date searches. By leveraging these features and functionalities, passengers can use travel websites to explore various options and potentially find cheaper flights by adjusting their itinerary, being flexible with their travel dates, or taking advantage of special deals and promotions.

## IV.    HIDDEN-CITY TICKETING (HCT)

Major airports around the world serve as hubs for airlines, acting as central points where flights converge, and passengers transfer between different routes. These hubs are typically located in large cities and serve as primary points of departure and arrival for many flights. Hub carriers tend to charge higher fares to their passengers at their hubs, this may be called hub premium. The hub premium relates to higher fares for flights leaving from a carrier's hub airport. That is, all other things being equal, the fare is higher than it would have been if the departure

airport had not been the carrier's hub. The term 'hub premium' was introduced by Berry, Carnall and Spiller (1996), but the first to introduce the concept in general was Levine (1987).

The pricing of individual airline tickets has not been based on the cost of offering that exact seat, but it has always been based on how much airlines *can charge different passengers*. So, some tickets are sold at incredibly expensive ticket prices, while other tickets are sold at a very low price, sometimes below what it costs the airline to operate that seat.

HCT is an interesting airline ticket-pricing practice and occurs when an itinerary connecting at an intermediate city is less expensive than a ticket from the origin to the intermediate city. Hidden city ticketing (HCT) is a strategy used by some passengers to save money on airfare by booking a flight with a layover at their intended destination, and then intentionally skipping the connecting flight to stay at the layover city. HCT takes advantage of pricing disparities in airline ticketing, where sometimes flying from point A to point B with a layover at point C can be cheaper than a direct flight from A to B.

Airlines employ pricing strategies, where ticket prices fluctuate based on factors such as demand, monopoly power, and availability. This can lead to situations where indirect flights with layovers are priced lower than direct flights to certain destinations. Airlines often charge higher fares for flights that originate from or terminate at these major hub airports compared to flights between non-hub airports. This is because airlines have significant monopoly power, higher demand, offer greater connectivity, more flight options, and allow airlines to command higher prices for tickets.

With the advent of the internet and online booking platforms in the late 1990s and early 2000s, consumers gained unprecedented access to flight information and booking options. This accessibility empowered travelers to compare prices, explore different itineraries, and discover potential loopholes in airline pricing structures. Skiplagging, also known as hidden city ticketing, is a practice where a passenger purchases a ticket with a layover at the passenger's actual destination, intending to disembark at the layover airport instead of the final destination. The history of skiplagging can be traced back to the 1990s when the internet revolutionized the way

App'x 014

people searched for and booked flights.[7] With the emergence of online travel agencies and flight comparison websites, consumers gained access to a wealth of information and options for finding cheaper airfare. Passengers, seeking to save money or find more convenient routes, may have exploited the structure of airline pricing and routing. However, with the growth of the Internet, it is becoming easier for passengers to find such opportunities.

The level of concentration within an airline's hub-and-spoke network is a key driver of HCT. For example, the Dallas Fort Worth International Airport ("DFW") is currently served by 28 airlines that between them operate around 865 daily departures to 261 destinations across the US and the globe. American currently has about 84% of the market share at DFW, making it the largest carrier at the airport.[8]

HCT is an interesting airline ticket-pricing practice and occurs when an itinerary connecting at an intermediate city is less expensive than a ticket from the origin to the intermediate city. In such a case, passengers traveling to the intermediate city have an incentive to pretend to be traveling to the final destination, deplane at the connection point, and forgo the unused portion of the ticket. Hidden-city opportunities are not uncommon nowadays. *When the passenger skip the next leg of the flight, it can indeed create an opportunity for the airline to sell the empty seat at a premium price to last-minute travelers or those in urgent need of a flight.*

## V.  WHY HIDDEN CITY TICKETING EXISTS

In a H&S network, airlines carry their passengers from an origin to their hub, and then from the hub to a destination. It is suggested that for airlines with higher market power and more dominated at an airport, the airlines could charge a higher fare to its passengers, compared with others (Yuen, 2017). Hidden city ticketing is typically done to save money, as direct flights to certain destinations can be more expensive than flights with layovers. According to a study conducted by Hopper using big data, hidden city fares are observed in 26% of domestic routes searched by consumers and are on average 21% less in price than simply buying the same direct flight. The same study also shows that "hidden city fares are highly concentrated on major hub

---

[7] Online travel communities and forums played a significant role in popularizing skiplagging. These platforms provided a forum for travelers to share tips, strategies, and success stories related to hidden city ticketing, thereby raising awareness and interest in the practice.

[8] Airport World. March 6, 2023.

App'x 015

destinations spread across many origins: 47% of all hidden city routes fly to one of top 10 hubs" Hoppor Research (2015).

Let's say you want to fly from Tuson (TSU) to Dallas/Fort Worth (DFW) by American Airlines, but the direct flight from TSU to DFW is expensive. There's far higher demand for flights to DFW, pushing fares up. For example, if a flight from TSU to DFW costs $600, and a flight from TSU to Fargo (FAR) with a stop in DFW costs $300, you could book the cheaper ticket to FAR and leave the airport when your plane lands in DFW. By doing this, you save money on your ticket.



Figure 1: Example of Hidden-City Ticketing

Why would American charge you less than half as much to fly more than twice as far? Well, because American knows that if you're going to fly from TSU to FAR, you'll want to do so nonstop, and are probably willing to pay for it. Meanwhile if you're connecting to DFW, there's more competition in that market, so pricing will reflect that.

## VI.  WHY ARE THERE DIFFERENT PRICING TO FLY TO AND FROM HUB

The majority of larger hub cities are often situated at crossroads of international air routes, making them convenient stopover points for connecting flights between continents. Major hub cities often serve as important business centers, and many Fortune 500 companies are headquartered or have significant operations in these cities. These companies may rely on the connectivity provided by airlines serving these airports for their business travel needs. Some hub cities are also major financial and commercial centers, attracting corporations from various industries. A good portion of passengers flying in and out of hub airports are business travelers with an inelastic demand. Inelastic demand implies that changes in price have a relatively small effect on the quantity demanded. Chicago is served by O'Hare International Airport (ORD), one

App'x 016

of the busiest airports globally. Chicago is a major business hub, particularly in industries such as finance, transportation, and manufacturing. Several Fortune 500 companies, including Boeing, United Airlines Holdings, and Archer Daniels Midland, are headquartered in the Chicago metropolitan area. At many large hub airports, such as those serving major business centers like Atlanta, New York City, London, or Tokyo, the primary demographic of travelers consists mainly of business travelers. These travelers typically prioritize convenience, efficiency, and time-saving measures, making non-stop flights highly desirable. Unlike leisure travelers who may be more sensitive to price fluctuations and willing to consider connecting flights to save money, business travelers often prioritize direct routes to minimize travel time and maximize productivity.

This means that even if airlines were to adjust ticket prices for non-stop flights, business travelers would still be willing to pay premium fares to secure direct routes due to the time-sensitive nature of their travel needs.

Flights to and from airport hubs often experience higher demand due to the monopoly of the airlines, convenience of connecting flights and the availability of more routes. Airlines may adjust prices based on demand and competition on these popular routes. Airlines may charge a premium for flights to and from their hubs due to concentration of business travelers, headquarters of Fortune 500 corporations, the convenience they offer to passengers connecting to other destinations. Hub airports typically offer a wide range of flight options and connections, making them desirable for travelers. Airlines may capitalize on this convenience by pricing their hub flights slightly higher.

Business travelers are typically characterized as time-sensitive travelers who prioritize convenience and efficiency in their travel arrangements over price considerations. Given their need for flexibility and promptness, they are less price-sensitive compared to leisure travelers. Therefore, airlines often adjust pricing strategies for flights catering to business travelers accordingly.  This could result in higher ticket prices for flights to and from hubs, as airlines aim to capture the value perceived by business travelers in terms of time savings, lack of competition, market monopoly, schedule flexibility, and access to a wide network of destinations for connecting flights.

App'x 017

## VII. <u>CONCLUSIONS</u>

Hidden city ticketing (HCT) exists primarily due to pricing disparities in the airline industry. Generally, passengers at airports dominated by big airlines tend to exhibit less price elasticity, meaning they are less sensitive to changes in ticket prices. This is often attributed to the limited competition and lack of alternative options available at these airports. With fewer airlines operating routes and offering flights, passengers have fewer choices and may feel compelled to accept the prices set by the dominant carriers. Additionally, passengers traveling for business purposes, especially those whose expenses are covered by their employers, are typically less price-sensitive and more willing to pay higher prices for the convenience, reliability, and amenities offered by established airlines. As a result, big businesses that dominate these airports can effectively set higher prices without experiencing a significant loss in demand.

Hidden city ticketing can offer a valuable opportunity for passengers with limited incomes to travel to their desired destinations more affordably and hence often plays a major role in driving consumer action. By taking advantage of pricing discrepancies and booking flights with layovers in their intended destinations, these passengers can often secure lower fares than they would with traditional booking methods, which provides a substantial justification for its existence.

Skiplagged's business and its providing of information relative to HCT can indeed provide passengers with a means to *circumvent the monopoly positions* that airlines often hold at certain hub airports. When airlines dominate a particular airport, they can *wield significant pricing power*, leading to higher fares and limited options for travelers. In such cases, hidden city ticketing *helps passengers* to bypass the high prices associated with direct flights to the hub airport's destination by booking flights with layovers at the hub. This provides a significant justification for its existence in the marketplace in my opinion.

Bijan Vasigh, Ph.D.

April 23, 2024

**REFERENCES:**

Hecker, J. Z. (2001). *Aviation competition: challenges in enhancing competition in dominated markets* (No. GAO/01-518T). United States. General Accounting Office.

S. Berry, M. Carnall, P.T. Spiller
Airline hubs: costs, markups, and the implications of customer heterogeneity, NBER Working paper (1996), p. 5561

Hoppor Research K. Hidden city ticket opportunities are more common than you think (2015

M.E. Levine. Airline competition in deregulated markets: theory, firm strategy, and public policy Yale Journal on Regulation, 4 (2) (1987), pp. 393-494

Yuen, Andrew Chi Lok, Zheng Lei, Clement Kong Wing Chow, and Michael Ka Yiu Fung. "Could market power explain hub premiums?" *Journal of Air Transport Management* 64 (2017): 55-59.

Sun, X., Wandelt, S., & Zhang, A. (2023). Price discrimination through hidden city options? A data-driven study on the extent and evolution of skiplaggability in the global aviation system. *Journal of Air Transport Management.*

App'x 019

# EXHIBIT A

# BIJAN VASIGH, PHD

Curriculum Vitae

*114 SHADOW CREEK WAY ORMOND BEACH, FL 32174*
*Telephone: (386) 615-7667*
*vasighb@erau.edu*

***ACADEMIC DEGREES:***

- Ph.D., Economics, State University of New York at Binghamton. Specialization: Applied Economic, Finance, and Quantitative Methods.

- M.A., Economics, University of Detroit, Detroit, Michigan.  Specialization: Financial Economics, and Mathematical Economics.



**PRESENT APPOINTMENTS:**

- Professor and Tenured: August 1998 - Present: College of Business: Department of Economics, Finance and Accounting.
Embry-Riddle Aeronautical University, Daytona Beach, Florida.

- Founder and President, Aviation Consulting Group, LLC, Ormond Beach, FL.  2002 to Present).

- Fellow Airneth. Airneth is the worldwide scientific network for aviation research and policy, based in the Netherlands. Airneth is financed by the Netherlands Directorate-General for Civil Aviation and Maritime Affairs (2006 to present).
- Jet Perfect Foundation, member of the Board of Directors
- Amirate Aviation University, a Member of Technical Committee,  International Aviation Management Conference (IAMC), 2024.

**PAST APPOINTMENTS**

- Visiting Professor, the University of the West Indies., St. Augustine, Trinidad. Faculty of Social Sciences, 2007 - 2015.
- Visiting Professor, Danube University Krems, Professional MBA Aviation, Krems, Austria. January 2015.
- August 1996-August 1998: Graduate Program Chair, Department of Business Administration,
Embry -Riddle Aeronautical University.
- August 1993 - August 1998: Associate Professor, Department of Business Administration,

Embry-Riddle Aeronautical University.

- June 1990- July 1993: Assistant Professor, Department of Business Administration, Embry-Riddle Aeronautical University.

- July 1989- May 1990: Assistant Professor of Finance, Department of Finance, School of Business, Indiana University of Pennsylvania, Indiana, Pennsylvania.

- September 1985-December 1987: Chairman, Department of Business Administration, Webber College, Babson Park, Florida.

- August 1984-August 1985: Assistant Professor, Department of Business Administration, Webber College, Babson Park, Florida.

***EXPERIENCE, RECENT CONSULTING:***

- Evolink Law Group, Burnaby, British Columbia, Expert Witness, contract violation 2022-Present.
- Morgan ad Morgan, USA, Expert Witness, Copy right violation, 2023.
- Unmanned Aircraft Systems Gulf of Mexico Center of Excellence, Economic Impact Analysis: January-October 2021.
- Studies of Airport Slots at Brazilian Airport, with collaboration of PEZCO Consulting, February 2021.
- Evaluating the Traveler's Perspective to Improve the Airport Customer Experience. Airport Cooperative Research Program (ACRP), in collaboration with IOS Partners 2019.
- New Istanbul Airport Project, Economic Impact Analysis (Technical Memorandum), Cignus Consulting and Jeppesen Sanderson, 2019.
- Market forecasting and financial analysis for airborne satellite services, QB Technologies, 2018-19.
- Air Nostrum, Líneas Aéreas del Mediterráneo, S.A., is a regional airline based in Valencia, Spain. Representing the company to expand its market in another country (2017-18).
- Government of Pakistan, National Aviation Policy, A catalyst for nation's socio-economic well-being. Co-Principal Investigator, 2015.
- Turkish Airlines, Aviation Academy. Provide training and consultancy services to companies in the area of Airline Finance, Airline Revenue Management, and the Source and Use of Funds, 2015.
- Association of Unmanned Vehicle Systems International (AUVSI). The Economic Impact of

App'x 023

Unmanned Aircraft Systems in the United States.  The study commissioned by *AUVSI* the trade group representing the unmanned systems and robotics, 2014.

- Savi Airlines, Special Advisor and Financial planner, Savi is a U.S. based Low Cost Airline with a unique market niche of serving the needs of Canadian travelers by offering lower cost, high value air travel and vacation packages to high demand U.S., Mexican and Caribbean destinations. (2012-Present).

- Piarco International Airport, Trinidad and Tobago (POS). Provided technical assistance on the airport efficiency study, 2013.

-  Integra Click Corporation, Economic Impacts Integra Click on Sarasota County, Florida, 2012.

- Future Flyer Inc., Startup Aviation Company, Johannesburg, South Africa, 2012.

- United Nations, Department of Safety & Security (UNDSS). Performance and safety measurement of African Airlines, 2012.

- Piarco International Airport, Trinidad and Tobago (POS). Provided technical assistance on the land side facilities, 2012.

- The Republic of Trinidad and Tobago. As a member of the Prime Minster of Trinidad and Tobago Task Force, investigated the sale of seven British West Indies Airlines (BWIA) slots at Heathrow Airport, 2011-12.

- Law Office of Joseph E. Ching. Economic Impacts Analysis of the Restaurant Industry on New Orleans, 2011.

- Carney Williams, Bates Pulliam & Bowman, PLLC. Provided comprehensive analysis of airlines delay at several major European airports, 2011.

- Turkish Airlines, Turkey, Istanbul. Provided technical assistance on revenue management, 2011.

- Nature Airlines, based in San José, Costa Rica.  Provided technical assistance on revenue management, 2011.

- Provided Technical Information and Assistance on Business Development and Regulatory Issues, Micro Motion Solution (MICROMO), Clearwater, FL, 2010.

- Provided Technical Information and Assistance on the Air Transport Industry' <u>Weiss Multi-Strategy Advisors</u> (2008).

- Air Malta, National Airlines of Malta. Provided technical assistance on cost-rebalancing and cost reduction strategies to <u>*Air Malta*</u> (2008).

App'x 024

- Provided Technical Assistance for Airport Improvements and Airspace Optimization in the Central

  Zone of Country of Chile (2007).
- Consultant for an airline's creditors, hired to analyze the possible deepening insolvency and violation of fiduciary responsibilities by the management (2006).
- American Airlines. Investigate the validity of a previous study distributed by Southwest Airlines and The Campbell-Hill Aviation Group. Southwest Airlines commissioned The Campbell-Hill Aviation Group in an effort to support its proposition that repeal of the Wright Amendment will result in lower airfares (2005).
- Kenny Nachwalter, P.A., provided a comprehensive strategic examination of U.S. airline industry and identify the factors affecting defunct airlines. The result of the report was used to defend a client airline in Federal Court. (2004-2005).
- Consultant for a Pittsburg based startup airlines (Direct Jet), hired to develop a multi-year strategic business plan aimed at finding potential partners and investors in the United States. (2002 to 2006).
- Consultant for a Florida Based air taxi company, hired to develop a business plan looking for capital investors to finance the commercialization of their service in the North American market. (2002 to present).
- Consultant with the International Civil Aviation Organization (ICAO); provided assistance on the evaluation of aeronautical charge structure for the Brazilian Institute of Civil Aviation (IAC).
- Worked on a NASA Research Grant, entitled, "Determination of Statewide Economics Impacts of the Small Aircraft Transportation System (SATS)." 2001 and 2003.
- Economic Feasibility Analysis of the Commercial Airline Pilot Training (CAPT) Program: Strategic- Economic Framework of Airline Qualification Training Program for a Florida based Flight School, 2003.

***EXECUTIVE EDUCATUION:***

- Financial Analysis of Aircraft Leasing, Aeroclass, Customized aviation training solutions, August 28, 29, and 30, 2023.
- Financial Analysis of Aircraft Leasing, Aeroclass, Customized aviation training solutions, June 27, 28, and 29, 2023.
- Airline Pricing and Revenue Management, Turkish Airlines Academy, May 15-19, 2023.

- Airline Pricing and Revenue Management, Turkish Airlines Academy, June 23-26, 2022.
- Airline Pricing and Revenue Management, Turkish Airlines Academy, October 6-8, 2021.
- Innovating Financing Practices for Airline Managers. China Air Transport Association (CATA), December 16-20, 2019.
- Airline Revenue Management, International Air Transport Association (IATA), Montreal, Canada August 14-18, 2017.
- Airline Finance, Sun Express Airlines, Antalya, Turkey. December 11-15, 2016.
- Strategic Financial Management, International Air Transport Association (IATA), Singapore, June 22-26, 2015.
- Dynamic Pricing and Revenue Management, Embry-Riddle Aeronautical University (ERAU), Miami, Florida, April 2, 3 2015.
- Aircraft Leasing & Financing, Embry-Riddle Aeronautical University (ERAU), Miami, Florida, February 11-13, 2015.
- Airline Revenue Management, *International Air Transport Association* (IATA), Montreal, Canada October 14-17, 2014.
- Airline Financial Management, TAAG Angola Airlines, Lisbon, Portugal, August 4-8, 2014.
- Airline Revenue Management and Dynamic Pricing Policy, ERAU, College of Business, Miami, Florida, February 13-14, 2014.
- Airline Revenue Management and Dynamic Pricing Policy, IATA, *Montreal, Canada*, November 6-9, 2013.
- Airline Revenue Management, Airline Tariff Publishing Company, *Dulles, VA*. August 19-20, 2013.
- Strategic Finance, Executive Management Development Training, Pratt and Whitney, *Beijing, China*. July 23-24, 2013.
- Advanced Air Transportation Economics, University of West Indies, *Trinidad, Port of Spain.* June 3-7, 2013
- Airline Revenue Management, IATA- TALMA, *Lima, Peru*, May 12-17, 2013.
- Strategic Finance, Executive Management Development Training, Pratt and Whitney, *Beijing, China*. May 28, June 1, 2012.
- Strategic Financial Management, International Air Transport Association (IATA), Miami, Florida, May 9-17, 2012.
- Strategic Financial Management, International Air Transport Association (IATA), Miami,

Florida, May 10-16, 2011.

- Advanced Air Transportation Economics, University of West Indies, _Trinidad, Port of Spain._ May 23-29, 2011

- Strategic Financial Management, _International Air Transport Association_, Montreal, Quebec, May December 18, 2010.

- Dynamic Pricing Practices and Revenue Management, _AeroPodium_, Wyndham Hotel, Miami, Fl., September 30, 2010.

- Strategic Finance, Executive Management Development Training, Pratt and Whitney, _Beijing, China_. August 2-6, 2010.

- Strategic Financial Management, International Air Transport Association, Miami, Florida,

- May 23-29, 2010.

- Aviation Strategy & Aircraft Finance, _Kuwait City, Kuwait_. June 27, July 1, 2010.

- Advanced Air Transportation Economics, University of West Indies, Trinidad, Port of Spain. May 23-29, 2010.

- Airport Revenue Development, Singapore Aviation Academy (SAA), _Singapore_. June 8-12, 2009.

- Advanced Air Transportation Economics, University of West Indies, _Trinidad, Port of Spain._ May 23-29, 2009.

- Airline Finance and Accounting Management, International Air Transport Association, _Miami, Florida._ April 27- May 1, 2009.

- Airline Finance Management, Accounting Center for China Airline (ACCA), _Beijing, China._ December 15-19, 2008.

- Airline Finance and Accounting Management, International Air Transport Association, _Singapore._ December 09-13, 2008.

- Airline Transport Industry: Challenges and Opportunities, for China Eastern Airlines, Pratt and Whitney, _Hartford, CT_. October 26, 27, 2008.

- Finance and Accounting Management, International Air Transport Association, _Miami, Florida_. August 18-22, 2008.

- Advanced Aviation Economics, University of West Indies, _Trinidad, Port of Spain_. May 23-24, 2008.

- Airlines Cost Reduction Strategies, Arab Air Carrier Organization (AACO), _Amman, Jordan._ November 12-15, 2007.

App'x 027

- Airline Finance and Accounting Management, Abu-Dhabi Accountability Administration, IATA, Abu-*Dhabi, United Arab Emirates*. September 9-13, 2007.
- Airline Finance and Accounting Management, International Air Transport Association, *Miami, Florida*. August 20-24, 2007.
- Advanced Aviation Economics, University of West Indies, *Trinidad, Port of Spain*. March 17-24, 2007.
- Airline Finance and Accounting Management, International Air Transport Association, *Singapore,* December 11-15, 2006.
- Airline Finance and Accounting Management, International Air Transport Association, *Miami, Florida,* August 21-25, 2006.
- Airline Finance and Accounting Management, International Air Transport Association, *Singapore.* December 12-16, 2005.
- Airline Finance and Accounting Management, International Air Transport Association, *Miami, Florida*.  September 12-16, 2005.
- Airline Finance and Accounting Management, International Air Transport Association, *Miami, Florida*. August 9-13, 2004.
- Airline Finance and Accounting Management, International Air Transport Association, Miami, Florida. October *13-17*, 2003.
- Airline Finance and Accounting Management, International Air Transport Association, *New Delhi, India*, June 23-27, 2003.
- Airline Finance and Accounting Management, International Air Transport Association, *Miami, Florida*, June 24-28, 2002.
- Airline Finance and Accounting Management, International Air Transport Association, *Beijing, China,* November 19-23, 2001.
- Airline Finance and Accounting Management, International Air Transport Association, *Geneva, Switzerland*, October 22 – 26, 2001.
- Airline Finance and Accounting Management, International Air Transport Association, *Miami, Florida.* May 21-25, 2001.
- Airline Finance and Accounting Management, International Air Transport Association, *Geneva, Switzerland*, October 23 – 27, 2000.
- Operations Research, Executive Master of Business Administration (EMBA), Embry-Riddle Aeronautical University, 1999.

- Operations Research, Master of Technical Management, Grumman Corporation, _Melbourne, Florida_, January 1994- April 1994.
- Corporate Finance, Master of Technical Management Program, Lockheed Corporation, _Kennedy Space Center_, January 1993- April 1993.
- Managerial Accounting, Master of Technical Management, Grumman Corporation, _Kennedy Space Cente_r, January 1993- April 1993.
- Airline Operations Research, Master of Technical Management Program, Lockheed Corporation, _Kennedy Space Center_, July 1992 - October 1992.

**_REFEREED PUBLICATIONS:_**

- Bijan Vasigh and Farshid Azadian, Methodologies and Techniques for Determining the Value of an Aircraft. Transportation Research Record: Journal of the Transportation Research Board. November 12, 2020.
- Farshid Azadian, and Bijan Vasigh, The blurring lines between full-service network carriers and low-cost carriers: A financial perspective on business model convergence. Transportation Policy, 2019, 75 19-16.
- Bijan Vasigh, and G. Rod Erfani, the Impact of the Global Financial Crisis on Profitability of the Banking Industry: A Comparative Analysis. Economies 2018, 6(4).
- F. Kuyucak, and B. Vasigh, an assessment of airport governance policies with a stakeholder perspective. Developments in Corporate Governance and Responsibility, Volume 14, 191-208, Emerald Publishing Limited, 2018.
- R. Chaudhuri, B. Vasigh, Estimation of Fair Rate of Return on Equity for Delhi International Airport Limited, Journal of Airport Management (9)1, 2015.
- Bijan Vasigh and Chunyan Yu, Slot premium: London Heathrow vs. London Gatwick, International Journal of Aviation Management, May 2015.
- Bijan Vasigh, and G. Rod Erfani, Airport Performance and Ownership Structure: Evidence from the United Kingdom, United States, and Latin America, Journal of Aviation Technology and Engineering 4:1 (2014) 40–49.
- Unmanned Aerial Systems (UAS): Prospects, Challenges and Opportunities, Airneth, November 2013.
- Vasigh, B. and C. Howard, Evaluating airport and seaport privatization: a synthesis of the effects of the forms of ownership on performance, _Journal of Transport Literature_, 6(1), 2012.

- Ferhan Kuyucak and B. Vasigh, Privatization and Regulation: "A Review of Industry Practices." Journal of Global Business Development. 3(2), 78-83, 2011.
- Vasigh, B. and J. Gorjidooz. "Aircraft Valuation in Dynamic Air Transportation Industry." Journal of Business and Economic Research. 8(7), July 2010.

- Vasigh, B. and Jorge M. Herrera. "A Basic Analysis of Aging Aircraft, Region of the World, And Accidents." Journal of Business & Economics Research 7(5), 121-132, May 2009
- Vasigh, B. "The Role of International Organizations to Liberalize Air Transport Services." Journal of Transport Research, The Korea Transport Institute, 16(1), 97-112, March 2009.
- Vasigh, B., and Javad Gorjidooz, "The Maquiladora Industry: Recent Downturn and Future Prospects." International Business and Economic Research Journal, 8(3), 47-58, March 2009.
- Yen, Ke and Vasigh, B. "Allocating the number of slots among scheduled air routes: A social perspective" Airport Management, 2(4), 2008.
- B. Vasigh, and Jorge M. Herrera, "Corporate Social Responsibility, Finance and Aviation Safety: An Empirical Investigation" The International Journal of Applied Management and Technology, 5(1), 45-59. May 2007.
- Vasigh, B., and Javad Gorjidooz, "Productivity Analysis of Public and Private Airports: A Causal Investigation," Journal of Air Transportation, V.11, No3, 142-62, 2006.
- Siva Sivasundaram and B. Vasigh, "Unified approach to continuous and discrete models in economics," Journal of Nonlinear Studies, 13(1), 53-73, 2006.
- R. Hamzaee and B. Vasigh, "A Collective Airport-Airline Efficiency Strategic Model" The International Journal of Applied Management Technology, 4(1), 67-78, May 2006.
- Vasigh, B., and Kenneth Fleming, "A Total Factor Productivity Based for Tactical Cluster Assessment: Empirical Investigation in the Airline Industry" Journal of Air Transportation, PP 4-199, V. 10, No 1, November 2005. (*Winner: Sorenson Best Paper Award)*
- Vasigh, B. and G. Erfani, "*Aircraft Value, Global* Economy and Volatility" Aerlines Magazine, PP 1-4, 28, December 2004.
- Vasigh, B. John Owens and Kwang Yoo, "*A Price Forecasting Model for Predicting Value of Commercial Airports: A Case of Three Korean Airports.*" International Journal of Transport Management, V. 1, 225-236, 2004.
- Vasigh, B. and R. Hamzaee, "*Testing Sensitivity of Student Enrollment with Respect to Tuition at an Institution of Higher Education*" International Advances in Economic Research, V. 10, No.

2, 133-149, 2004.

- Massoud B. and Vasigh, B. *"Size versus Efficiency: A Case Study of US Commercial Airports."* Journal of Air Transport Management, V. 9, Issue 3, PP 187-194, 2003.

- Vasigh, B. and M. Haririan, "An Empirical Investigation of Financial and Operational Efficiency of Private versus Public Airport." *Journal of Air Transportation*, V. 8, No. 1, 2003, 91-110. 2003.

- Vasigh, B. and S. Helmsky, "An Empirical Examination of Airframe Manufactures' Safety Performance: Boeing versus Airbus." *Journal of Public Works Management and Policy*, V. 5, Number 2, 147-156, October 2000.

- R. Hamzaee and Vasigh, B. "A Simple Revenue Cost Perspective on US Airport Operations," Journal of Transportation Management, V. 6, Issue 1, 61-64. January 2000.

- Vasigh, B. and S. Helmsky, "An Evaluation of Regional Airline Safety in the New Regulatory Environment," Journal of Transportation Quarterly, 54(2), 59-76. Spring, 2000.

- Vasigh, B. and R. Hamzaee, "A Comparative Analysis of Economic Performance of US Commercial Airports," Journal of Air Transport Management, V. 4, Issue 4, 209-216, 1998.

- Vasigh, B. and M. Haririan, "The Impact of Airport Use Agreement on Airport Profitability and Efficiency," Proceedings Transportation Research Forum, 39th Annual Meeting, 220-234, October 1997.

- Hamzaee, R. and Vasigh, B., an Applied Model of Airline Revenue Management, Journal of Travel Research, 35(4), 64-68. Spring 1997.

- Vasigh, B. and M. Haririan, Airport Privatization: A Simple Welfare Analysis. Journal of Economic and Finance, V. 20, 89-99, Fall 1996.

- Vasigh, B. and R. Hamzaee, "Airline Revenue Management: Review and Analysis," The Kentucky Journal of Economics, V. 15, 97-112, Fall 1996.

- Vasigh, B. T. Tacker, and M. Haririan, "Talking Privatization: As Europe Takes the Lead, the Effort Gets Mixed Reviews in the U.S.," Airport Business Magazine, March 1996.

- Vasigh, B. Kevin T. Greiner, and M. Haririan, "Calculating Economic Damage Award: The Elusive Search for Accuracy and Equity." Pennsylvania Journal of Economic and Finance, V. 4, 51-57, Fall 1995.

- Vasigh, B. and A. Harraf "Start-Up Airlines: A Counter-Cyclical Phenomenon." Proceedings Transportation Research Forum, 36th Annual Meeting, 595-602, November 1994.

- Haririan M., and Bijan Vasigh, "Airport Privatization: Procedures and Methods."

<u>Transportation Quarterly</u>, V.68, 393-403, autumn 1994.

- Hamzaee, R., and Bijan Vasigh, "Economic Jurisprudence: A Fair Compensation for a Wrongful Death." <u>Regional Business Review</u>, V.12, May 1993.

- Vasigh, B. and R. Hamzaee, "Calculating the Value of Life." <u>Money World</u>, 36-38, August 1990.

- Vasigh, B. and R. Hamzaee, "Risk and Return for Leverage-Inherent Securities: The Case of Option Market." <u>Money World</u>, November 1989.

- Vasigh, B. "The Future of the World Oil Market." <u>Money World</u>, February 1989.

**BOOKS AND CHAPTERS:**

- <u>Aircraft Valuation in Volatile Market Conditions: Guiding Toward Profitability and Prosperity</u>. Springer, 2022.

- <u>Drone Economics: Succeeding with the World's Newest Form of Transportation</u>, With Darryl Jenkins, Drone Economic Publishing Company, 2021.

- <u>Foundation of Airline Finance: Methodology and Practice</u>, 3rd Edition, B. Vasigh, Zane. C. Rowe, Rutledge Publishing, England, 2020.

- <u>Introduction to Air Transport Economics: From Theory to Applications"</u> 3rd edition, Bijan Vasigh, and Kenneth Fleming, Rutledge Publishing, England, 2019.

- <u>Engineering Economics for Aviation and Aerospace. Bijan Vasigh, and Javad Gorjidooz</u>, Rutledge Publishing, England, November 2017.

- <u>Introduction to Air Transport Economics: From Theory to Applications" 2nd Edition, Bijan Vasigh, Kenneth Fleming and Thomas Tacker, Rutledge Publishing, England, 2016.</u>

- <u>Foundation of Airline Finance: Methodology and Practice</u>, 2nd Edition, B. Vasigh, K., Fleming, and B., Humphries, Rutledge Publishing, England, November 2014.

- <u>Introduction to Air Transport Economics: From Theory to Applications"</u> Second Edition, Bijan Vasigh, Kenneth Fleming and Thomas Tacker, Rutledge Publishing, England, 2013.

- <u>"Aircraft Finance: Strategies for Managing Capital Costs in a Turbulent Industry."</u> J. Ross Publishing, Fort Lauderdale, FL USA. 2012.

- "Encyclopedia of Global Studies" Civil Aviation, Ferhan Kuyucak and Bijan Vasigh, SAGE Publications, Inc, 2012.

- "<u>Foundation of Airline Finance: Methodology and Practice</u>" Bijan Vasigh, Liam Mackay and Kenneth Fleming, Ashgate Publishing, England, 2010.

- "Introduction to Air Transport Economics: From Theory to Applications" Bijan Vasigh, Kenneth Fleming and Thomas Tacker, Ashgate Publishing, Gower House Croft Rd Aldershot, England, 2008, 2010.
- "Airline Finance & Accounting Management" edited, IATA, Training and Development Institute, Edited, 2006.
- Bijan Vasigh and Shawn Helmsky, "Airline Safety: An Application of Empirical Methods to Determine Fatality." Handbook of Airline Economics, Second Edition, PP 501-512, McGraw-Hill Company, 2002.
- R. G. Hamzaee and Bijan Vasigh, "Total Factor Productivity Index (TFP) for Airport Efficiency." Handbook of Airline Economics, Second Edition, 469-476, McGraw- Hill Company, 2002.

**OTHER PUBLICATIONS:**

- Forecast of the commercial UAS Package Delivery, D. Jenkins, B. Vasigh, C. Oster, and Larsen, T., 2018.
- Market poised to take off, *Harvard Business Review*, November 2015.
- Foundation for aircraft selection: Technical, Operational; and Financial Analysis. *Saber Airline Solution*, A magazine for airline executives, No. 2, 2014.
- Financial Analyses "Unmanned Aerial Systems (UAS): Prospects, Challenges and Opportunities" Airneth, October 2013.
- "Evaluation of Airport Performance: Public versus Private Ownership" University of Bucharest, the Faculty of Business and Administration, 286-302, November 2009.
- "Air Transport Liberalization." Negotiating Strategies for Creating a Liberalized Air Transport Bloc in North Asia. The Korea Transport Institute, and East West Center, Special Report. 2008.
- "Productivity Analysis of Public and Private Airports: A Causal Investigation," National Aeronautics and Space Administration (NASA), Scientific and Technical Aerospace Reports, abstract, 45(15), Pages 3-4. August 2007.
- "Aviation Safety: New Concerns by Airline Travelers." *de la Asociación Latinoamericana de Transporte Aéreo*, Pages 7 and 24, 1(7), 2006.
- "Airport Industry: Challenges and Opportunities." Instituto Brasileiro de Estudos Estratégicos ede Políticas, PP 1-3, September 2006.

- "A Total Factor Productivity Based for Tactical Cluster Assessment: Empirical Investigation in the Airline Industry" National Aeronautics and Space Administration (NASA), Scientific and Technical Aerospace Reports, abstract, V 45, no 15, P 13. July 2005.
- "An Evaluation of Commercial Airline Safety: Assessment of Major, National and Regional Airlines Safety." National Aeronautics and Space Administration (NASA), Scientific and Technical Aerospace Reports, abstract, V 43, no 14, P 13. April 2005.
- R. G. Hamzaee and Bijan Vasigh, "Productivity Analysis of Public and Private Airports: Developing Measures of Merit." *Avmark Aviation Economist*, V 18, no 2, pp. 10-13. March 2001.
- "It's Time to Privatize Our Airports," The Leader, Embry-Riddle Aeronautical University, 20-21, spring 1998.
- "Privatization: Trends in Aviation," Airport Business Magazine, February 1996.

**THESES AT PH.D. LEVEL:**

- Wolfgang Dupeyrat, Airport Privatization Strategies of the Member Countries of the Pacific Alliance. College of Business, Embry-Riddle Aeronautical University (Committee member, 2022-Present).
- Mohamed Badr, Air Cargo Solution and management. College of Business, Embry-Riddle Aeronautical University (Committee member 2022-Present).
- Muhammad Ashraf bin Abdullah. Impact of outsourcing and economic development on productivity and technical efficiency of airlines. University of Malaya Kuala Lumpur (2017-Present).
- Johnny Chamata, Investigating the socio-economic aspects of integrating UAS into the Malaysian industry, Ph.D. Dissertation, *Curtin University, Sarawak Malaysia* (2016).
- Anna Siembida. How to Buy a Business Jet? *Danube University Krems*, Vienna, (2015).
- Kim Daniel Hinrichs, the Air Transport Industry in China: Between Government Regulation and Market Liberalization, *Danube University Krems, Vienna* (2015).
- Hashem Salarzadeh, Dimensioning Performance Estimation of the Airline Industry: Path-Analysis Based Modeling, *University Malaya, Kuala Lumpur, Malaysia*, (May 2013).
- Parang Oweissi, Runway Capacity Constraint and its Impact on Airport Operating Performance, *Paris Sorbonne University*, (May 2011).

***TELEVISION, RADIO, AND NEWSPAPER INTERVIEWS:***

- Why Thai Airways is selling its fleet of Airbus A380 planes. New Yoro Post, Oct. 14, 2023,
- Are There Enough Pilots? Blue Sky News, August 28, 2023. New York Post, October 14, 2023.
- Extreme Heat Can Cause Flight Delays. Here's Why. Bloomberg, July 14, 2023.
- Air Travel Woes Ease Even as Demand Continues to Soar, Blue Sky News, July 31, 2023.
- An airline took away your favorite flight. Here's how airlines decide where to fly, when to leave. USA Today, March 2, 2023.
- JetBlue mounts full-court press for Spirit buyout approval, Sun Sentinel, February 2, 2023.
- JetBlue May Need to Give Up American Airlines Alliance to Win Spirit Merger Approval. Airline Weekly, February 13, 2023.
- Russian Jet Catches Fire Days After Planes Declared Safe Despite Sanctions. Business lend, February 7, 2023.
- Will Labor Strife Led by Pilots Become the Airline Industry's Next Big Obstacle? The Dallas Morning News. December 27, 2022.
- Higher airport fees could mean higher fares for travelers, Sun Sentinel, September 3, 2022.
- Aircraft lease rate, RTVI Television, August 30, 2022.
- Nobody likes JetBlue's deal for Spirit. What if it works? Forbes, August 3, 2022.
- JetBlue Buys Spirit—What That Means for Pittsburgh. Blue Sky New, July 28, 2022.
- What would a recession mean for aviation? Flying News, June 23, 2022.
- Crashes, bankruptcy litter Iran's Runway for Passenger-Plane Production, Radio Free Europe. June 22, 2022.
- In Russia, Western planes are falling apart. Wired. June 22, 2022.
- Heavy bookings point to faster pandemic. Blue Sky News, May 27, 2022.
- What will the airline industry's New Normal look like? Blue Sky News, May 16, 2022.
- Extreme heat already disrupts air travel. With climate change, it's going to get worse. USA Today, March 28, 2022.
- Under sanctions, Russian airlines in race against time to secure parts, The Japan Times, March 14, 2022.
- U.S. to close airspace to Russian planes, further weakening its aviation industry, The

Washington Post, Match 1, 2022.

- Rising oil prices amid Russia-Ukraine was complicates airlines' pandemic recovery and could also hike U, S. airfares. Wall Street Journal, Market Watch, February 28, 2022.

- Qatar Airways and Airbus- a dispute with no way out? Airliners.de, February 11, 2022.

- 5 ways COVID-19 has changed airport design and construction, Construction Dive, February 1, 2022.

- Just cause for fear of flying in Iran, Asia Times, January 20, 2022. Blue Sky News, January 3, 2022.

- Aviation Outlook for 2022: Trending Up, Can Supersonic Air Travel Fly Again?  The New York Times, November 6, 2021.

- 20 Years after 9-11: A Stronger Airline Industry? Blue Sky News, September 6, 2021.

- MIA has been trying to lure low-cost carriers for 20 years. It is finally taking off. Miami Herald. August 6, 2021.

- Drone Delivery Startup Poised to Expand U.S. Operations with New Funding. Bloomberg, March 17, 2021.

- How a Fortunate Few Airlines Profit in a Pandemic: Lots of Cargo. The Wall Street Journal. September 22, 2020.

- BBC News: Ukraine International Airlines Flight 752. August 10, 2020.

- Airlines in crisis: The cost of COVID-19 on the industry. Skies, July 21, 2020.

- CBS 58 Investigates: Future of flying, May 25, 2020.

- Market Place: Boeing is in line for a bailout under "too big to fail" theory. March 20, 2020.

- Boeing and Airbus made huge mistakes, but their dominance is under no threat. CNN News, June 25, 2019.

- The Tribune-Review: Billion-Dollar Overhaul of Pittsburgh International on Pause amid Pandemic, Greensburg. May 13th, 2020.

- National Public Radio (NPR), Market Place: Airlines waiting on Boeing's 737 Max have few choices. April 09, 2019.

- Can Stewart attract another international airline? Times-Herald-Record, August 14, 2019.

- Boeing 737 MAX-8 may have deeper flaws than previously thought. Radio interview with

Loud and Clear.  June 21, 2019.

- Boeing in Trouble after Second Fatal Crash with Nearly 200 Deaths, Radio interview with Loud and Clear. March 12, 2019.

- Time: A Big Question Mark.' Is the Boeing 737 MAX 8 Safe? March 18, 2019.

- The World's Biggest Passenger Plane, the A380, Is Dead. Here's What Killed It, Time, February 14, 2019

- Times Herald-Record: $354M cash infusion for Norwegian Air. February 3, 2019.

- Lion Air: Some are looking where to place the blame, others wonder if their pilot can fly their plane, Chronicle. November 19, 2018.

- Delta asks for approval to merge Virgin Atlantic, SkyTeam joint ventures. Atlanta Business Chronic. July 26, 2018.

- Government and Pilots Disagree: How Much Training Does a New Pilot Need? The Points Guy. June 12, 2018.

- United Airlines' #BumpGate: One Year Later. The Points Guy. April 9, 2018.

- Naples charter flight operator adds Orlando, Punta Gorda to its scheduled service menu. Naples Daily News. January 13, 2018.

- Did OneJet benefit from cozy relationship with airport authority? December 14, 2017. The Pittsburg Tribune-Review, December 14, 2017.

- RSW airport's north side attracts developer, longtime Chicago-O'Hare construction czar, USA Today, October 19, 2017.

- Colleges Are Marketing Drone Pilot Courses, but the Career Opportunities Are Murky, Massachusetts Institute of Technology (MIT) Review, October 4, 2017.

-  Airport bogged down more ways than one, *Mexico New Daily*, September 14, 2017.

- In Mexico City Mud, Pena Nieto's $13 billion airport project bogs down, *Bloomberg,* September 13, 2017.

- Summer flight delayed. Don't assume it's a storm, *The New York Times*, August 7, 2017.

- Soaring totals unlikely to score Daytona new destinations, *The News Journal*, August 7, 2017.

- Looking to grow its airport, Pittsburgh invests $3M in startup OneJet, *Pittsburg Tribune,*

May 30, 2017.

- After United incident, police say they're not 'the muscle' for airlines. *Pittsburg Tribune*, April 10, 2017.

- Delta computers crash, causing delays and cancellations. Experts say it shouldn't have happened. *The Washington Post*, August 8, 2016.

- How airline mergers are playing a role in technology crashes stranding passengers, the *Dallas Morning News,* August 8, 2016.ity, *Los Angeles Times*, August 8, 2016.

- RSW airport terminal expansion aims to ease clogged checkpoints, *News-Press*, June 30, 2016.

- Flying through lines: TSA woes help sell convenience of airports like Daytona, *News-Journal,* May 31, 2016.

- Holding Pattern: Six-Year-old airline still waiting to be cleared for takeoff, *San Diego Business Journal*, April 18-24, 2016.

- JetBlue strengthens its footprint Caribbean, *USA Today*. December 17, 2015.

- Bond Team for $13 Billion Mexico City Airport U.S. *Bloomberg Business.* September 29, 2015.

- Airlines say Persian Gulf carriers taking big slice of international pie. *The Washington Post.* August 26, 2015.

- The challenges ahead for Emirates Airlines, *National Public Radio, Market Place*. August 13, 2015

- Justice Dept. investigating potential airline price collusion. *The Washington Post*. July 1, 2015

- Industry forecast: Summer travel will be all-time high. *Orlando Sentinel*, May 19, 2015.

- U.S. airlines seek federal help in dogfight with Persian Gulf carriers. The Washington Post. May 11, 2015.

- Lessors show support for newcomers. *Air finance Journal*. Issue 376. April 2015.

- Airlines Keep Fuel Savings for Themselves. *Time*, March 26, 2015.

- Pittsburg International Airport leader strives to inject Pittsburg flavor into airport, *Pittsburg Tribune*. March 30, 2015.

- Airfares drop with fuel prices, but future's unclear. *Orlando Sentinel*, March 11, 2015.

- Lower gasoline prices fail to spur consumer spending. *Treble*, Nov. 26, 2014.

- Passenger traffic beginning to climb at Pittsburgh International Airport. *TribLive*, Nov. 13, 2014.

- What Will Happen to Malaysia Airlines Jets If Company Goes Bust? *NBC News*, August 29, 2014.

- $4M floor project at Pittsburgh International Airport to replace drab gray, clickety-clack tile. *The Pittsburgh Tribune-Review*, August 20, 2014.

- Allegheny County Airport Authority still employs at heyday level. *Trib Live*, *May 4, 2014*.

- Openings Sky-high in Avionics. *The Pittsburgh Tribune-Review*, March 27, 2014.

- Allegheny County Airport Authority boots longtime leader. *Tribune News*, March 14, 2014.

- Airport tower partly funded, prerequisite before second runway can be added. *New-Press*, February 6, 2014.

- Pittsburgh Airport Looks to Emirates Air and Lower Fees to Halt Falling Traffic. *The Pittsburgh Tribune-Review*, February 02, 2014.

- Set Jet Offers a Path Around Air-Travel Hassles. *San Diego Business Journal*, October 21, 2013.

- Holiday airfares to go up soon. *USA Today*, September 24, 2013.

- Airfare Reality Check: Are Five Major Airlines Really Better than Four. *Yahoo Finance*, August 15, 2013.

- How economy and first class are growing even farther apart. *NBC News*, Travel August 15, 2013.

- Merger between American Airlines and US Airways Challenged by DOJ. *Voice of Russia*, August 14, 2013.

- A Boon to the Profession; Point of Beginning. June 27, 2013.

- Los 'drones' regarán las cosechas del futuro. *El Pais*, Spain, June 13, 2013.

- Drones: A big industry waiting to be born, CBS News, May 16, 2013.

- OIA moves ahead with $172M parking garage despite empty spaces. *Orlando Sentinel*, May 10, 2013.

- Niche Service Is New Airline's 'Flight Plan' California Pacific On 'Fast-Track' for FAA OK. *San Diego Business Journal*, April 22, 2013.

- *Airport may expand despite closed, lightly used gates. Orlando Sentinel*, March 16, 2013.

- *Airlines' airfare hikes not faring well in 2013. USA Today*, February 17, 2013.

- American-US Airways merger creates OIA's second-busiest carrier. *Orlando Sentinel*, February 14, 2013.

- Allegheny Airport Authority will shake up leadership roles. *Pittsburgh Tribune*, February 11, 2013.

- US Airways, American Airlines to merge soon, *KJZZ Blumberg Radio*, February 7, 2013.

- American, US Airways may marry out of need. *National Public Radio (NPR), Marketplace*, February 7, 2013.

- Orlando among hottest of U.S. hot spots for international travel. *Orlando Sentinel*, October 26, 2012.

- Audit finds T&T did not get value in sale of BWIA's London Heathrow slots for £5m. *Trinidad Express*, October 21, 2012.

- PEMCO World Air Services Restructure for Comeback after Bankruptcy. *The Lakeland Ledger September 24, 2012.*

- After massive layoffs, Tampa aviation company CEO vows to bring them back. *Tampa Bay Times*, September 22, 2012.

- United's dominance at Newark Liberty International Airport brings conveniences and higher fares. *The Star-Ledger*, May 20, 2012.

- Hobby international: Would taxpayers fare as well as fliers? *Houston Chronicle*, April 9, 2012.

- Direct Air's woes cast doubt on future of commercial flight in Worcester. *Worcester Business Journal*, April 4, 2012.

- Feds ask if Mullin had help on essay. *The Detroit News*, March 6, 2012.

- Traffic slow to rebound at BHM airport. *Birmingham Business Journal*, February 17, 2012.

- How Boeing, Airbus and Comic's jet shape up. *China Economic Review*, February 2012.

- PA $hocks it to 'em. Hiked fees to cover shortfalls. *New York Post*, December 15, 2011.

- Live interview with Bill Carroll, *KFI-AM 640*, Los Angeles. American Airlines' Bankruptcy. December 6, 2011.

- American Airlines' Bankruptcy: Who Loses? *Forbes*. November 29, 2011.

- For United Continental, Latin America represents a growing market. *The New Jersey Star*-Ledger. November 27, 2011.

- Flights of fancy: Pittsburgh Airport's rebound a source of inspiration, *Pittsburgh Tribune-Review*. November 27, 2011.

- Captain Saved 231 lives. *Rzeczpospolita*, Poland National Newspaper. November 3, 2011.

- Hub premiums cost Delta fliers big-time at Metro Airport, *Detroit Free Press*. September-26, 2011.

- Re-engined 737 will create pricing challenges for existing fleets, *ASCEND - Aviation Exchange*. September 9, 2011.
- Many small cities in danger of losing air service. *USA Today*, August 18, 2011.
- Airlines at Lambert seek more fuel control. *St. Louis Dispatcher*, August 8, 2011.
- Shared Jet Sales Soar as Rich Fliers Avoid Airline Hassles. Bloomberg *Business Week*, August 8, 2011.
- Airport eyes direct international flights. *Birmingham Business Journal*, Friday, July 15, 2011.
- Southwest Effect' may be mixed in AirTran deal. *The Atlanta Journal-Constitution*. April 27, 2011.
- Can we stick the landing? *Cleveland Business*, February 28, 2011.
- Airline Flying High. *Airport Revenue News*, Pages 32-39, January 2011.
- Waiting for Takeoff. *San Diego Business Journal*. November 29, 2010.
- Experts debate airworthiness of Cuban passenger fleet. Cuba News, V 18 (11), December 2010.
- Southwest poised to become Pittsburgh's major airline, *Pittsburg Tribune*, Tuesday, September 28, 2010.
- Lambert cautious over Southwest-AirTran deal. *St. Louis Dispatcher*, September 28, 2010.
- Global airline industry poised to soar in coming decades. *International Business Times*, September 20, 2010.
- Emirates auf grosser Einkaufstour Airport. *Nueu Zurcher Zeiyung* AG, Swiss, July 25, 2010.
- Jobs Benefit as Travel Recover: *The Wall Street Journal*. July 10, 2010.
- Prepare for some turbulence Experts: Unions, shareholders can make bumpy road to new airline. *The Star Ledger, New Jersey.* May 04, 2010.
- United and Continental Airlines Announce Merge. *WTOP Public Radio, 103.5, Washington, D.C.*, May 3, 2010.
- US-based United and Continental Airlines Announce Merger, Creating World's Largest Airline. *Voice of America News, VOA*, Washington, D.C., May 3, 2010.
- Do Not Expenses Much Changes at Atlanta Hartsfield International Airport. *WABE 90.1 FM National Public Radios, NPR.* May 3, 2009.
- UAL, Continental Said to Move Closer on Merger Value. *Bloomsburg*, April 28, 2010.
- Southwest Airlines has a surprise. *Tampa Bay Business Journal*. Thursday, April 22, 2010.
- Possible merger of Continental and United airlines not a positive for Cleveland. National Public *Radio, 89.7 WKSU*, Wednesday, April 21, 2010.
- OIA workers exempt from liquid rules. *Orlando Sentinel*, April 12, 2010.

- AIRLINES: Entrepreneur plans airline based at McClellan-Palomar Airport. *North County Times.* Thursday, March 25, 2010.

- The Minneapolis airport lockdown: A million-dollar mistake. *Minnesota City Pages*, January 11, 2010.

- Mesa Air Group in bankruptcy. *The Maui News.* January 6, 2010.

- Failed plot caps 'abysmal' 12 months in aviation. *The Toronto Star*. December 29, 2009.

- Airport restrictions denounced as 'security theatre.' *Globe and Mail*. December 28, 2009.

- Las Vegas has first increase in air passengers in 21 months. *Los Angeles Times*. December 26, 2009.

- Are Some Airlines Just Too Dangerous to Fly? *Miller-McCune.* September 21, 2009.

- Discount carriers jockey for position at BWI with new routes plans. *The Daily Record.* Septembre 4, 2009.

- Southwest's Bid: Analyst says prices wont' go up. But are you buying it? *Denver Post.* July 31, 2009.

- Modelo único não é o melhor. *Gazeta Mercantil*, Sao Paulo, April 27, 2009.

- Privatização dos aeroportos: modelo único não é o melhor, *Abrapva,* Sao Paulo, April 27, 2009.

- Flight Plan, Memphis Appears to be Sitting Pretty as the Delta-Northwest Merger is Forged. *The Memphis News*, 18, 2(8), February 25- March 3, 2009.

- Singapore Airlines réussit à contre-courant. *Les Affaires*, Canada, Septembre 20, 2008.

- United Airlines pilots want CEO's head. *Guardian,* U.K, August 12, 2008.

- Time for US airlines to fly off into the sunset. *Guardian,* U.K, Thursday May 29 2008.

- Delta fuel surcharge. *National Public Radio (NPR).* WKABE, 90.1, Atlanta, April, 29, 2008.

- Bombardier tax credits may get grounded. *Kansas City Business Journal.* April 25, 2008.

- How Delta-Northwest merger will affect you. *Newsweek.* April 18, 2008.

- Portland hopes air pact is direct route to dollars. *Airport Business.*   April 1, 2008.

- Portland hopes Open Skies opens wallets. *the Oregonian.* March 32, 2008.

- Impact on area of a Delta, US Airways merger uncertain. *Gainesville Sun*. November 17, 2006.

- Stewart loses Operator: National Express opts to drop its lease. *Times Herald-Record*. September 29, 2006.

- Pan Am Workers Get Payday, *The Associated Press*. September 22, 2006.

- Pan Am to Pay Ex-Workers After 15 Years, *Foxnews.Com,* Thursday, September 21, 2006.

- Delta's challenge: Doing first class cheap, *Orlando Sentinel.* October 29, 2005.

- American Airlines Response to Southwest Airline Petition. *Forbes.* October 18, 2005.

- New Study Disputes Southwest Airlines Economic Benefit Claims, *CNN Money.* October 18, 2005.

- Southwest's $130 million plan for Boeing Field, *Seattle Post- Intelligencer*. Page A6. July 21, 2005.

- Financial officer leaves Delta; earnings due out today. *Orlando Sentinel*. Page C2, July 22, 2005.

- Experts wary of inflation. The *News Journal*, Page 01B. January 15, 2005.

- Privatization Debate Escalates. Airport Retail News, Pages 49-52. October 2001.

- BAA Sues over Lost Contract. *Newsday-Queens Edition*, A3, and A12. July 9, 2001.

- Far Horizons for Air Service from Daytona. *The News Journal*, Page 5, June 24, 2001.

- Harrisburg Officials Dissatisfied. *Newsday-Queens Edition*, Page A7, June 4, 2001.

- British Choice Concerns Activists. March 25, 2001, Newsday-Queens Edition, Page A3.

- Green Traffic Could Double. Providence Business News. Front page. November 27-December 3, 2000.

- Air Travel Gains Nearly Grounded in Daytona. *The News Journal*, Front page. May 23, 1999.

- The Comeback Plane. *The Virginia Pilot*, front page. October 26, 1998.

- The Future of Flying. *Time, Asia* V. 151, NO.24. June 22, 1988.

- Northwest-Continental link: higher fares? *The New York Times*, February 22, 1998.

- Business Travel; Proposed alliance between Continental and Northwest is expected to push airfares    higher. *The New York Times,* January 28, 1998.

- Priced to Sell. *The Leader,* Cover story, 12-14. 1998.

- Local Bank Flying High in Aircraft Industry. *Delaware State News*, pp. 1-6. June 16, 1996.

**HONOR AND AWARDS:**

- Joseph R. Martin, Distinguished Professor of Aviation Management. Embry-Riddle University, College of Business, 2017.

- Editor in Chief, Journal of Airline and Airport Management, 2017.

- Grant from National Science Council (NSC) in Taiwan, on International Cooperation Program, Kainan University, Taiwan, October 12, 2010.

- Outstanding Faculty Awards, College of Business Administration, Embry-Riddle Aeronautical University, 2006.

- Faculty Member of the Year Nominee, Fall 2005.

- Journal of Air Transportation, Sorenson Best Paper Award, 2005.
  This award gives recognition to the author(s) with the best literary and scholarly contributions to the field of air transportation.
- Embry- Riddle University, Vice President's Funds for Development, 1999.
- Embry- Riddle University, Vice President's Funds for Development, 1996.
- Outstanding Faculty Awards, Department of Business Administration, Embry-Riddle Aeronautical University, 1995.
- Embry- Riddle University, Vice President's Funds for Development, 1995.
- Dissertation Fellowship Award, State University of New York, 1981-82.

### *EDITORIAL BOARDS:*

- Journal of Transportation Management.
- Journal of Air Transportation.
- Transportation Journal.
- Journal of Airport Management (JAM).
- International Journal of Aviation Management (IJAM).
- The International Journal of Applied Management and Technology.
- Journal of Air Transport Studies.
- Revista de Literatura dos Transportes, The Review of Transportation Literature (RELIT).
- International Journal of Aviation Technology, Engineering and Management (IJATEM).

### *PRESENTATION AT NATIONAL AND INTERNATIONAL REFEREED CONFERENCES:*

- The 4th International Aviation Management Conference (IAMC). The Future of Aviation: COVID-19 Pandemic and the Challenges (Keynote Speaker, and Presenter). Dubai, UAE. November 21-22, 2022.
- Global Financial Crisis and Performance of the Banking Industry: An Empirical Analysis. Co-authored with G. Rod Erfani from Transylvania University. The International Academic Conference on Management, Economics and Marketing in Vienna, Austria, in August 5-6, 2022.
- The Keynote Speaker, International Congress on Aviation Management, Istanbul Turkey,

App'x 044

December 10-11, 2021.

- The Keynote Speaker, the 5th International Aviation Management Conference (INTAVIC). The Economics of Disruptive Technology, Ankara-Turkey, November 18-19, 2021.
- The economics of unmanned aircraft system under deregulation market environment", Forum Global Conference, November 4-7, 2020.
- The mitigating human errors in aviation accidents and incidents. The 23rd Air Transport Research Society (ATRS) World Conference, Amsterdam, the Netherlands, July 2- 5, 2019.
- Methodologies and techniques for determining the value of an aircraft. The 14[th] International Academic Conference, Prague, Czech Republic, April 19 - 21, 2019.
- The Impact of training in reducing aviation accidents. The 27[th] International Conference on Innovations in Business, Economics, Management, Social Sciences. The Kuala Lumpur, Malaysia December 17-18, 2018.
- Aircraft Value: Under Operating Cost Shocks. The 22[nd] ATRS World Conference, Seoul, Republic of Korea, July 2- 8, 2018.
- Airline industry: Challenges and Chances of Legacy Airlines. International Academic Conference on Management, Economics and Marketing, Budapest March 16 - 17, 2018.
- The Impact of the Global Financial Crisis on Profitability of the Banking Industry: A Comparative Analysis. International Academic Conference on Management, Economics and Marketing, Budapest March 16 - 17, 2018.
- Full service vs. low-cost airlines: Are the business practices converging overtime. The 21[st] ATRS World Conference, Antwerp, Belgium, July 5 - 8, 2017.
  Demand for unmanned aircraft: Challenges, opportunities and operational restrictions. Western Regional Science Association, Santa Fe, New Mexico, February 15–18, 2017.
- Unmanned Aircraft Systems: Opportunities, Obstacles and Growth. The 20[th] ATRS World Conference, Rhodes, Greece June 23-26, 2016.
- Financial crisis and banking sector: A comparative analysis. International Atlantic Economic Conference, Lisbon, Portugal, March 16-19, 2016.
- Gerson Lehrman Group (GLG) Webcast, Air Transport Economics, Outlook for 2016, February 26, 2016.
- The impact of the global financial crisis on financial performance of Islamic banks. G. Rod Erfani, Transylvania University, and Bijan Vasigh. At 79th International Atlantic Economic Conference,

Milan, Italy, 11-14 March 2015.

- Sustainable Airline Management. Panel Chair, special panel on sustainability and aviation. Trakya Üniversitesi. Edrine. Turkey, September 23-26, 2014.

- Impact of Bird Strikes on Aircraft Operation and Prevention Methods Case Study. Presented at 16th Air Transport Research Society Conference, Bordeaux, France. July 17-20, 2014.

- The Determinants of the World Price of Crude Oil: An Empirical Analysis, International conference of Institute for Advanced International Studies; Laval University, Quebec, Canada. November 20-23, 2013.

- Comparison of Multilateration system (MLAT) with Secondary surveillance system (SSR) Case study: SDG, CQD and IIL airports, with M. Saffarzadeh and S. Bagheri. Presented at 17th International Air Transport Research Society Conference, Bergamo, Italy. June 26-30, 2013.

- Quality of Service Index Factors and Passenger Perspective, with I. Kovacic and R. Babic. Presented at 17th International Air Transport Research Society Conference, Bergamo, Italy. June 26-30, 2013.

- Value of Slots at London Heathrow Airport, Presented at 16th Air Transport Research Society Conference, Tainan, Taiwan. June 26-30, 2012.

- Assessing the Current State of Air Cargo, AFCA - Aircraft Finance & Commercial Aviation Conference, Barcelona, Spain. April23-26, 2012.

- Financing the Future Transportation System, 53RD Annual Transportation Research Forum, Tampa, Florida. March 14-16, 2012.

- Government Failure, Market Failure and Public Interest: An Assessment of Airport Governance Policies with a Stakeholder Perspective. Presented at 15th *Air Transport Research Society (ATRS)* Conference, Sydney, Australia. June 29- July 1, 2011.

- The Economic Impact of Privative Institutions, presented at *International Conference on Operation Research and Statistics*, Penang, Malaysia, April 5-7, 2011.

  - Privatization and Regulation; A Review of Airport Industry, 14th Global Business Development International Conference, Las Vegas, Nevada, March 20-23, 2011.

  - Methods and Strategies in Commercial Aircraft Valuation. The 14th Air Transport Research Society World Conference. Porto, Portugal, July 6-9, 2010.

  - Dynamic Changes of the Air Transport Industry. Aviation Information Technology in Engineering and Management (AITEM), New Orleans, Louisiana. March 22-24, 2010.

  - Public Ownership and Private Operation: A Case of Commercial Airports. The International

Conference on Economics and Administration (ICEA-FAA). University of Bucharest, Romania. November 14-15, 2009.

- Determination of Statewide Economic Benefits of Civil and Commercial Airports in Arizona, Thirteenth Air Transport Research Society World Conference, Abu Dhabi, United Arab Emirates, June 27-30, 2009.

- Air Transport Liberalization: Challenges and Opportunities, International Business Economic Research Conference, Las Vegas, Nevada.  September 29-October 2, 2008.

- "Statistical Analysis of Aging Aircraft, Region of the World and Airline Accidents" Presented at 12th Air Transport Research Society (ATRS) Conference, Athens, Greece. July 6-10, 2008.

- "The Maquiladora Industry: Recent Downturn and Future Prospects" International Applied Business Research Conference, San Juan, Puerto Rico. March 17-20, 2008.

- "An Empirical Investigation of the Relationship Between Market Conditions and Value of Commercial Aircraft," Presented at 11th Air Transport Research Society (ATRS) Conference, University of California, Berkeley. June 21-23, 2007.

- "Statistical Methodology to Assess Correlation Between Aircraft Safety, Age and International Regulation," Presented at the 10th Joint DoD/NASA/FAA Conference on Aging Aircraft Conference, Palm Springs, California. April 16-19, 2007.

- "The Methodology of Bank Valuation." Co-authored with R. Hamzaee, Presented at the 63rd International Atlantic Economic Conference, Madrid, Spain. March 14-18 2007.

- "Asset Valuation in Dynamic Markets." A Discounted Cash Flow Approach, third Annual Meeting of Applied Business and Entrepreneurship Association International, Waikoloa Beach Resort, Kona Island, Hawaii. November 16-20, 2006.

- "Statistical Analysis of Airline Safety." 69th Annual Meeting of the Institute of Mathematical Statistics, and the 5th International Symposium on Probability and its Applications, Rio de Janeiro. Brazil July 30–August 2, 2006.

- "Corporate Responsibility, Finance and Aviation Safety: Empirical Evidence." Presented at 10th Air Transport Research Society (ATRS) Conference, Nagoya, Japan. May 26-28, 2006.

- "An Application of Total Factor Productivity (TFP) to Measure the Efficiency of Commercial Airports" International Applied Business Research Conference, Cancun, Mexico. March 20-24, 2006.

- "Economic Impact of Institutions of Higher Education on Local Economy." Presented at 45th

App'x 047

Annual Meeting of Western Regional Science Association, Santa Fe, New Mexico. February 22-25, 2006.

- "A Collective Airport Airline Efficiency Strategic Model." With R. G. Hamzaee, presented at 9th Air Transport Research Society (ATRS) World Conference, Rio de Janeiro, Brazil. July 3-6, 2005.

- "Foreign Direct Investment and Economic Growth." With G. Rod Erfani, Presented at 14th Annual Congress of Global Awareness Society International, Rome, Italy. May 27-29, 2005.

- "A Productivity Analysis of U.S. Regional and Major Airlines." Presented at 44th Annual Meeting of Western Regional Science Association, San Diego, CA. February 23-26, 2005.

- "Globalization, Foreign Direct Investment and Privatization." With Mehdi Haririan, G. Rod Erfani, Presented at Second annual Conference of Association for Global Business and Social Sciences, Cancun, Mexico. November 18-21, 2004.

- "Airport Privatization: Issues for the Western Europe," With G. Rod Erfani, presented at 3rd Annual Conference of European Economics and Finance Society, Gdansk, Poland.  May 13 - 16, 2004.

- "Economic Impact of the Small Aircraft Transportation System (SATS)" presented at 57th Annual Conference of International Atlantic Economic Conference, Lisbon, Portugal. March 10-14, 2004.

- "Efficiency, Productivity and Scope of Operation: A Case Study on US Commercial Airports." Presented at Aviation in the 21st Century, Organized by National Aviation University, Kyiv, Ukraine. September 14-16, 2003.

- "An Evaluation of Commercial Airline Safety: Assessment of Major, National and Regional Airlines Safety." With Rod Erfani, and F. Halldorsson, presented at the 7th Annual Conference of Air Transportation Research Society, Toulouse, France. July 10 - 12, 2003.

- "Sensitivity of Student Enrollment with Respect to Tuition." With R. Hamzaee, presented at 55th Annual Conference of International Atlantic Economic Conference, Vienna, Austria. March 12-16, 2003.

- "A DEA Approach to Study the Size and Efficiency of U.S. Commercial Airports." With Massoud Bazargan presented at the 6th Annual Conference of Air Transportation Research Seattle. Washington, July 12-18, 2002.

- "An Analytical Approach to Aviation Safety."  With R. ERFANI, and M. Haririan, presented at 53rd Annual Conference of International Atlantic Economic Conference, Paris, France. March

12, 17, 2002.

- "Testing Sensitivity of Student Enrollment with Respect to Tuition at Institution of Higher Education."   Presented at the 40th Conference of Western Regional Science Association Conference, Monterey, CA. February 17-20, 2002.

- "An Empirical Analysis of Financial and operational efficiency of Privatized Airports." With Mehdi Haririan, presented at the 5th Annual Conference of Air Transportation Research Group, Jeju Island, Korea. July 19-22, 2001.

- "Effects of Marketization and Privatization on Investment and Saving," With M. Haririan, Rod Erfani, presented at 51st Annual Conference of International Atlantic Economic Conference, Athens, Greece. March 13-20, 2001.

- "Financial and Operational Performances of the U.S. Major Hub Airports," With R. Hamzaee, the 40th Conference of Western Regional Science Association Conference, Palm Springs, California. February 25 - 28, 2001.

- "Airport Efficiency: An Empirical Analysis of the US Commercial Airports," Presented at the 4th Annual Conference of Air Transport Research Group, Amsterdam, the Netherlands. July 2nd-5th, 2000.

- A Comparative Analysis of Regional Airline Safety in the New Regulatory Environment Presented at the 49th Annual Conference of International Atlantic Economic Association, Munich, Germany. March 16-23, 2000.

- "A Revenue Cost Perspective to U.S. Airport Operations," With R. Hamzaee, Presented at the 39th Annual Meeting of the Western Regional Science Association Conference, Kauai, Hawaii. February 26-28, 2000.

- "Financial Distress and Pricing Behavior in the Airline Industry," Presented at the 47th Annual Conference of International Atlantic Economic Association, Vienna, Austria. March 16-23, 1999.

- "An Empirical Analysis of Airline Safety: The Case of Regional Airlines," Presented at the 38th Annual Meeting of the Western Regional Science Association Conference, Ojai, CA. February 18-22, 1999.

- "The Economic Impact of Commercial Airports on the Local Economy," Presented at the 45th North American Meetings Regional Science Association International, Santa Fe, New Mexico. November 11-14, 1998.

- "Airline Safety: Prospect and Retrospect," With M. Haririan, Presented at the Forty-Fifth

Annual Conference of International Atlantic Economic Association, Rome, Italy. March 15-22, 1998.

- "The U.S. Airline Industry: How Are the Low Cost Air Carriers Doing?" With M. Haririan, Presented at the 37th Annual Meeting of the Western Regional Science Association Conference, Monterey, CA. February 18-22, 1998.

- "Non-Oil Export Promotion," With M. Haririan, Presented at the 67th Annual Meeting of the Southern Economic Association, Atlanta, Georgia. November 21-23, 1997.

- "The Impact of Airport Use Agreement on Airport Profitability and Efficiency," Bijan Vasigh, and M. Haririan, Presented at the 39th Annual Meeting of the Transportation Research Forum, Montreal, Canada. October 16-18, 1997.

- "Privatization and Public Choice in Education," Presented at the 22nd Annual Convention of Eastern Economic Association, Washington, D.C. April 3-6, 1997.

- "An Application of Probabilistic Inventory Analysis: A case of Airline Industry," Presented at the 36th Annual Meeting of the Western Regional Science Association Conference, Big Island, Hawaii, February 23-27, 1997.

- "Pattern of Transition," with M. Haririan, Presented at the 66th Annual Conference of Southern Economic Association, Washington, DC. November 23-25, 1996.

- "The Economic Impact of Privatization: The Case of Air Carrier Airports," Presented at the 35th Annual Meeting of Western Science Association Conference, Napa, California. February 25-29, 1996.

- "Impact of Airport User Charge Strategies on Airport Productivity," Presented at the 65th Annual Convention of Southern Economic Association, New Orleans, Louisiana. November 18-20, 1995.

- "Airline's Reservation Strategies." With R. Hamzaee, Presented at the 21st Annual Convention of Eastern Economic Association, New York City, New York. March 17-19, 1995.

- "Airport Privatization: A Simple Welfare Analysis." With M. Haririan, Presented at the Western Regional Science Association Conference, San Diego, California. February 22-25, 1995.

- "Airport Privatization and the Pricing of Airport Services." With Tom Tacker, and Ken Fleming, Presented at the 64th Annual Conference of Southern Economic Association, Lake Buene Vista, Florida, November 20-22, 1994.

- "Start-Up Airlines: A Counter-Cyclical Phenomenon." With A. Harraf, Presented at Thirty-Sixth Annual Transportation Research Forum Conference, Daytona Beach, Florida, November 3-5,

1994.

- "Interaction Between Traditional and Nontraditional Approach to Airport Financing." by Bijan Vasigh, M. Haririan, and A. Harraf, Presented at Thirty-Eight International Atlantic Economic Conference, Montreal, Canada. October 6-9, 1994.

- "Resurgence of New Airlines: Healthy Deregulation or Deja Vu All Over Again." With A. Harraf, the 20th Annual Convention of the Eastern Economic Association, Boston, Massachusetts. March 18-20, 1994.

- "Airline Seat Inventory Management." The 63rd Annual of the Southern Economic Association, New Orleans, Louisiana. November 21-23, 1993.

- "Airport Privatization: Procedures and Methods." With M. Haririan, the Sixty-Eight Annual Conference of Western Economic Association, Lake Tahoe, Nevada. June 20-24, 1993.

- "Aircraft Leasing Companies: What is the Future?" With H. Malden, the 35th Annual Conference of Western Social Science Association, Corpus Christie, Texas. April 21-24, 1993.

- "Privatization: The Challenge of the 1990's In Eastern Europe." With M. Haririan, the Sixty Second Annual Conference of the Southern Economic Association Conference, Washington, D.C. November 22-24, 1992.

- "The U.S. Airline Industry: An Empirical Analysis of the Decision to Buy or Lease Aircraft." by Bijan Vasigh, Hoyt Maulden, and Linda Block, the 34th Annual Conference of the Western Social Science Association, Denver, Colorado, April 22-25, 1992.

- "Issues and Problems in Airport Privatization." With M. Haririan, the Eighteenth Annual Conference of the Eastern Economic Association, New York, N.Y.  March 27-29, 1992.

- "Estimating Lost Future Earnings Capacity: When the Individual Has no Earnings History." The Sixty First Annual Conference of Southern Economic Association, Nashville, Tennessee, November 24-26, 1991.

- "The Impact of the Energy Crisis on the Airline Industry."  The Seventeenth Annual Conference of the Eastern Economic Association, Pittsburgh, Pennsylvania, March 15-17, 1991.

- "An Alternative Approach to Annuity Analysis: A Case of Stock Pricing Model." the Thirtieth International Atlantic Economic Conference, Williamsburg, Virginia, October 11-14, 1990.

- "The Total Offset Method in Present Value Calculation: A Review, a Criticism, and Recommendation."  Conference of the Southern Economic Association, Orlando, Florida, November 1989.

- "An International Comparison of Wages and Prices." the conference of Western Economic Association, Lake Tahoe, June 1989.
- "The World Oil Market and western Dependence on OPEC." the Conference of the Eastern Economic Association. Baltimore, Maryland. March 1989.
- "Gasoline Price and the Demand for Automobile." the Eastern Economic Association Conference, New York, NY.  March 1984.


***INVITED GOVERNMENT/INDUSTRY/ACADEMIC PRESENTATIONS:***
- Federal Bureau of Investigation (FBI). 2019 Air Carrier Security Directors (ACSD) Forum. Orlando, Florida, August 6-7, 2019.
- China Air Transport Association (CATA). Air transport financial Management.  Beijing, China. November 20-24, 2017.
- Federal Aviation Administration and Transportation Research Board.  Future of Unmanned Aircraft Systems, National Academies of Sciences, Washington, D.C. October 25-26, 2016.
- The 3rd International Civil Aviation Organization (ICAO), Air Transport Symposium (IATS). Aviation specific safeguards for competition, Montreal, Canada, March 30-31, 2016.
- American International Group (AIG) Client Summit, Unmanned Aircraft Systems (UAS) – Ready for Take Off, JW Marriott Scottsdale Camelback Inn, Phoenix, Arizona. October 20, 2015.
- Association of South Pacific Airlines (ASPA), Dynamic Pricing and Airline Revenue Management, Nadi, Fiji, June 10-14, 2015.
- Vietnam Airlines, Airline Pricing Structure, Hani, Vietnam, June 6-10, 2015.
- Second International Civil Aviation Organization (ICAO) Air Transport Symposium, the Impact of Levies on Air Transport Sustainability. ICAO Headquarters, Montréal, Canada. May 7-8, 2014.
- IATS 2014 Benchmarking Made Easy, AAAE/Southeast Chapter, Airport Finance and Administration Conference, Orlando Florida, January 26-28, 2014.
- Asia Pacific market sees stronger growth in low-cost airlines, Kainan University, Taoyuan, Taiwan, December 10-12, 2013.
- The Future Prospects of the Air Transport Industry within the Context of the Turbulent Economic Times, *Small Hotels & Business Development Conference*, United States Virgin Island, St. Thomas.

November 12-17, 2013.

- Legacy Airlines: The Fight for Survival, Tainan University of Technology, Tainan, Taiwan, December 8, 2013.

- Future of Regional Aircraft *"Airline Engine and Maintenance Conference,"* San Francisco, CA., October 30 to November 1, 2012.

- Strategies and Tools for Sustainable Air Transport, ICAO Air Transport Symposium, Montréal, April 18 – 20, 2012.

- Considering the impact that the introduction of new aircraft will have on the residual value of existing fleets, "*Airline Engine, Finance and Leasing Conference*," Las Vegas, Nevada, October 1, 212.

- Raising yields with optimal revenue management and pricing strategies, "*Low Cost Airlines World Conference."* Miami, Florida, May 3-4, 2011.

- Airline Revenue management, "*Seminar on Aircraft Repossession Summit*," Wyndham Miami Airport, June 24, 2010.

- Dynamic Changes of the Air Transport Market and Airline Networks of ASEAN and India: Strategic Challenges for the Proposed "New Airport in Southeastern Korea". Seoul, Korea, December 8-10, 2009.

- Aviation Industry:  Challenges and Opportunities. CENTRA, Arlington, VA, August 7, 2009.

- Airport privatization in Latin America, Conferência Internacional Sobre Capital Privado em Aeroportos, FIESP-CIESP, Sao Paulo, Brazil April 22-23, 2009.

- Airport Ownership and Performance at the *Airport Economics and Finance Symposium,* Department of Transport Studies, University of Westminster, March 30 – April 4, 2009.

- Future Prospects of Air Transport Industry.  Transportation Research Forum, 50Th Annual Conference, Portland, Oregon, March 15-18, 2009.

- Financial and Operational Efficiency of Private and Public Airports. CIBER Multidisciplinary Research Workshop. College of Business, University of Florida, Gainesville, Florida, February 13, 2009.

- Latin American Air Transport Industry: Challenges and Opportunities. 12Th Annual Latin America   and Caribbean Airline Engineering & maintenance, Miami, FL, November 11-12, 2008.

- Negotiating Strategies for Creating a Liberalized Air Transport Bloc in Northeast ASIA. The Korea Transport Institute and East West Center (KOTI-EWC) Conference, Honolulu, Hawaii,

August 15-16, 2008.

- The Airline Industry: Opportunities and Challenges, the <u>International Aviation Credit</u> Group, Ft Lauderdale, FL., March 14, 2008.

- Airport Privatization in Latin America, the Seventeenth *Airport Council International (ACI),* World Annual General Assembly, Buenos Aires, Argentina, November 4-7, 2007.

- The Aviation Industry Strategies in the First Decade of the Twenty-First Century, Taiwan Air Transportation Symposium, Taipei, Taiwan, June 2-3, 2006.

- An Economic Framework for Airport Productivity, Speaker and Panelist, the 12th <u>Annual Global Airport Development Forum (AGD)</u>, *Paris* 15-18, 2005.

- Future of Start-up and Low-Cost Airlines, the Conference of Air Transport Industry in the next Millennium, *Tehran*, Iran August 29-30, 2005.

- "Analyzing the Advantages/Disadvantages of Different Debt Restructuring Options Applicable to the Airlines" A chairman, speaker and panelist, <u>Aircraft Finance & Commercial Aviation 2004</u>, Geneva, *Switzerland* 24-27 Feb 2004.

- "Cost Benefit of Air Safety," speaker and panelist, <u>The Eight Annual MRO Regulations, Quality & Safety Conference</u>, London, *England.* 17 October 2001.

- "Aircraft Quality and safety," speaker and panelist, <u>Seventh Annual Aircraft Quality and Safety Conformance</u>, Brussels, *Belgium.* September 12-15, 2000.

- "Privatization of Airports and Airport Functions," speaker and panelist, the Thirty-Fourth Annual Airport Management Short Course Seminar, Sponsored by Arizona State University and <u>Southwest Chapter American Association of Airport Executives (AAAE)</u>, Monterey, California, January 5-7, 1994.

***GRANTS:***

- Evaluating the Traveler's Perspective to Improve the Airport Customer Experience. Airport Cooperative Research Program (ACRP 01-40), $500,000, 2019.

- QB Technologies Competitor Analysis, QB Technology Partners, LLC. $25,000, 2018.

- Evaluation of the New Security Rules for Cargo on Inbound Flights. Faculty Development Funds, ERAU, 2010.

- Determination of Statewide Economic Benefits of Civil Aviation in Arizona. Faculty Development Funds, ERAU, 2010.

- Government of Korea, Dynamic Changes of the Air Transport Market and Airline Networks of ASEAN and India: Strategic Challenges for the Proposed "New Airport in Southeastern Korea".  2009 KFP International Conference on Korea's New Engines of Growth: Airlines and Maritime Logistics Services, Seoul, Korea, December 8-10, 2009.
- The Center for International Business Education and Research (Vietnam FDIB 2009), the Global Research/Curriculum Development Program, Ho Chi Minh City, January 04-09 and Hanoi, January 9-14, 2009.
- Co-Principal Investigator, Aircraft Valuation in Dynamic Air Transport Industry, Office of Vice President for Research and Federal Programs, ERAU, $5,714, 2008.
- Co- Principal Investigator. Technical Assistance for Airport Improvements and Airspace Optimization in the Central Zone of Chile (2006-2007). A United States Trade and Development (USTDA) grant that was awarded to Embry Riddle University. The project involved a detailed econometric analysis of the demand for air travel in Chile and the requirements for air space and airport updates to accommodate any increase in demand, $375,000.
- "Florida Department of Transportation (FDOT), Small Aircraft Transportation System (SATS): Economic Impacts Analysis, $25,000, 2005-2006.
- "Strategic- Economic Framework of Airline Qualification Training Program."  Sponsored by ERAU, the office of Aviation and Space Technology Academy (ASTA), January-April 2002, $15,000.
- Embry-Riddle Aeronautical University, The Office of Institutional Research, July-August 2001,
  "Testing Sensitivity of Student Enrollment with Respect to Tuition Increase."
- Associate Provost for Graduate Programs and Research, March 2000: "Airport Operating Performance: Importance of Measuring Airport Efficiency."  $5000.
- Dean of Graduate Programs and Research, summer of 1999, "A Statistical Model of Airline Safety," $2,000.
- Vice President's Funds for Professional Development, spring, 1999, "Financial Distress and Pricing Behavior in U.S. Airline Industry," $2500.
- Vice President's Funds for Professional Development, Spring of 1997, $2190.

### EDITORIAL WORK ON BOOKS:

- *Managerial Economics: Foundations of Business Analysis and Strategy*, 11th edition, by Christopher R. Thomas and S. Charles Maurice, McGraw-Hill/Irwin, 2012.
- *Managerial Economics: Foundations of Business Analysis and Strategy*, 10th edition, by Christopher R. Thomas and S. Charles Maurice, McGraw-Hill/Irwin, 2010.
- *Airline Finance*, P. Morrell, Ashgate Publishing Limited, 3rd Edition. Transportation Journal, Volume 47 (2), Spring 2008.
- *Managerial Economics*, W. Boyes, Houghton Mifflin Company, Second Edition, 2008.
- *Managerial Economics,* Applications, Strategy, and Tactics, J. McGuigan, C. Moyer, and F. Harris, South-Western, 11th Edition 2006.
- *Macroeconomics,* R. Barro, Thomson/South-Western College Publishing, Sixth Edition 2005.
- Introduction to Management Science, Bernard W. Taylor Prentice Hall, 7th Edition, 2004.
- *Managerial Economics, 8th* Edition, Truett and Truett, John Wiley & Sons, Inc, 2003.
- *Introduction to Management Science*, 6th edition, Taylor, Prentice Hall Publishing Company, 2000.
- *Operations Management for the Twenty-First Century*, Michael Showalter, M. Brusco, and D. Cradit, Addison Wesley Longman Publishing Company, 1998.
- *Economics*, Byrns and Stone, Addison Wesley Longman Publishing company, 1997.
- *Managerial Economics,* McCormick, Prentice Hall Publishing Company, 1993.

### TECHNICAL REPORTS:

- Airport Benchmarking Report: Global Standards for Airport Excellence, 2008. Volumes 1, 2 and 3, Air Transport Research Society Benchmarking Team.
- Airport Benchmarking Report: Global Standards for Airport Excellence, 2007. Volumes 1, 2 and 3, the report produced by Air Transport Research Society Benchmarking Team.

App'x 056

***ACADEMIC AFFILIATION AND SERVICES:***

- Senate member of Executive Committee, Embry Riddle Senator, 2023
- Embry Riddle Senator, 2021-2022
- University Grievance Committee.
- Dean of Graduate Program Research Fund Awards: A member of proposal Evaluation Committee.
- Dean of Graduate Program Research Fund Awards: A member of proposal evaluation committee.
- Dean of Graduate Program Search Committee.
- University Promotion and Evaluation Committee.
- University Research Committee.
- Faculty Search Committee
- Chair, Thesis and Research Committee.
- Undergraduate Curriculum Committee.
- Graduate Committee.
- University Library Committee, Chairman, Webber College, Expanded Library collection during chairmanship, developed computer-based retrieval system.

***UNIVERSITY SERVICES:***

- Coordinator of MBAA Colloquium, invite nationally and internationally recognized speakers to attend and deliver speeches at the College of Business Administration Colloquiums. The colloquium provides our students with opportunities to interact with the leaders of the aviation industry, 1992-2008.

***PROFESSIONAL AFFILIATION:***

- Honorary member of "The Brazilian Institute of Strategic Studies and Public Policies in Air Transport."
- Air Transport Research Society (ATRS):
- Board of Advisors, Applied Business and Entrepreneurship Association International (ABEAI).
- Western Regional Science Association (WRSA).
- The Airline Group of the International Federation of Operational Research Societies,

AGIFORS (1999-2003).

- American Association of Airport Executives, Academic Member (1999-2002).
- Eastern Economic Association, Area Representative (1989-1997).

**COURSES TAUGHT:**

- Advanced Aviation Economics
- Corporate Finance
- Engineering Economics
- International Finance
- Operations Research
- Operations Management
- Managerial Economics
- Managerial Accounting

**Bill Kirkman**

| | |
|---|---|
| **From:** | bijan vasigh <bijan.vasigh@gmail.com> |
| **Sent:** | Wednesday, February 21, 2024 9:28 AM |
| **To:** | Bill Kirkman |
| **Subject:** | Follow-up: February 21, 2024 |

Dear Mr. Kirkman:

I wanted to inform you that I have received the following five files related to the case.

1. Master File No. 96-74711

2. Master File no. 1:90-cv-2485

3. Case No. 96-74711

4. American Airlines v. Skiplagged

5. Appendix I. Federal Rules of Civil

Thank you for providing them promptly.

To ensure I focus on the most pertinent aspects of the case, could you please specify if there are particular points or documents within the files that require immediate attention? Additionally, if there are any specific instructions or priorities you'd like me to consider while reviewing the materials, please let me know.

I'll begin reviewing the files promptly and await your guidance on how to proceed.

Thank you for the opportunity to assist with your case.

Best regards,

Bijan

App'x 059

# EXHIBIT B

App'x 060

## Materials Presented to and Reviewed by Dr. Bijan Vasigh, Professor

1.  *Declarations of Aktarar Zamen*, dated October 22, 2023 and December 15, 2023

2.  *First Amended Complaint of American Airlines*, filed August 17, 2023

3.  *Hidden City travel and its impact on airfare*, February 2022
    https://www.sciencedirect.com/science/article/abs/pii/S0191261521002290

4.  *American Airlines Suing Skiplagged*, September 4, 2023 (Video)
    https://www.2news.com/news/american-airlines-suing-skiplagged/video_22c7ac7b-f3a9-5cbf-9efb-b4f629005c2a.html

5.  *American Airlines barred a 17-year-old from flying with the airline for 3 years because he tried to use a 'skiplagging' ticket, the teen's father says*, July 17, 2023
    https://www.insider.com/skiplagging-american-airlines-banned-teenager-hidden-city-ticket-canceled-2023-7

6.  *Judge throws out United Airlines lawsuit against 22-year-old*, May 1, 2015
    https://money.cnn.com/2015/05/01/investing/united-airlines-lawsuit-skiplagged/index.html

7.  *What is skiplagging? Everything about the controversial air travel hack airlines hate*, July 23, 2023
    https://www.usatoday.com/story/travel/airline-news/2023/07/23/what-is-skiplagging-hidden-city-ticketing/70438246007/

8.  *What is 'skiplagging' and why do the airlines hate when you do it?* August 23, 2023
    https://www.npr.org/2023/08/23/1194998452/skiplagging-airfare-flying-skiplagged-american-airlines

9.  *American Airlines sues a travel site to crack down on consumers who use this trick to save money*, August 18, 2023
    https://apnews.com/article/american-airlines-lawsuit-skiplagging-tickets-905acda8ac5fe302238cefd63ac864e3

10. *What is skiplagging? All about the travel hack airlines hate.* July 14, 2023

https://www.washingtonpost.com/travel/tips/skiplagging-flights-airlines-policy/

11.    *American Airlines is suing Skiplagged, accusing the travel site of being a 'classic bait and switch'*, August 17, 2023
https://www.businessinsider.com/american-airlines-sues-skiplagged-deception-fares-copyright-infringement-2023-8

12.    *Whether You Call It 'Skiplagging' or 'Hidden-City Travel,' It's Contentious*, September 9, 2023
https://www.nytimes.com/2023/08/08/travel/skiplagging-hidden-city-travel-layover.html

13.    *American Airlines sues travel website Skiplagged over ticket price 'loophole'*, August 19, 2023
https://www.theguardian.com/business/2023/aug/19/american-airlines-sues-skiplagged-ticket-price-loophole

14.    *Skiplagging Isn't Likely to Stop Anytime Soon, Even if Airlines Fight It*, September 5, 2023
https://www.phocuswire.com/american-airlines-skiplagging-airfares-united-airlines

15.    *American Airlines Sues Skiplagged*, August 30, 2023
https://www.nerdwallet.com/article/travel/american-airlines-sues-skiplagged

16.    *Why American Airlines Is Suing A Popular Website That Finds Cheap Airfares*, August 22, 2023
https://www.forbes.com/sites/suzannerowankelleher/2023/08/22/american-airlines-lawsuit-skiplagged/?sh=1dbde3f93a5e

17.    *American Airlines Sues Airfare Site Skiplagged*, August 20, 2023
https://onemileatatime.com/news/american-airlines-sues-skiplagged/

18.    *American Airlines files lawsuit against Skiplagged*, August 22, 2023
https://www.goodmorningamerica.com/travel/story/american-airlines-files-lawsuit-skiplagged-102422969

19.  *American Airlines sues skiplagging site, claiming it tricks passengers*,
     August 21, 2023
     https://www.washingtonpost.com/nation/2023/08/21/american-airlines-
     skiplagged-lawsuit/

20.  *What to know about skiplagging, the controversial tactic to save money on
     flights*, August 21, 2023
     https://www.today.com/life/travel/skiplagging-explainer-rcna100923

21.  *American Airlines Sues Skiplagged, Alleging False Savings Promises and
     Deceptive Practices*, August 24, 2023
     https://skift.com/2023/08/24/american-airlines-sues-skiplagged-alleging-
     false-savings-promises-and-deceptive-practices/

22.  *American Airlines Becomes Latest Airline To Sue Skiplagged*, August 19,
     2024
     https://simpleflying.com/american-airlines-skiplagged-lawsuit/

23.  *American Airlines Becomes Latest Airline To Sue Skiplagged*, January 11,
     2024
     https://www.nerdwallet.com/article/travel/skiplagged-flights-guide

24.  *5th Circuit Calls Out Judge's Sanction as Abuse of Discretion, Again*,
     November 7, 2023
     https://www.law.com/nationallawjournal/2023/11/07/5th-circuit-calls-out-
     judges-sanction-against-lawyer-as-abuse-of-discretion-
     again/?slreturn=20240322155412

25.  *Skiplagging: Why some flyers love it and why airlines hate it*, November 24,
     2023
     https://www.cnn.com/travel/skiplagging-hidden-city-explainer/index.html

26.  *Don't persecute skiplaggers*, November 22, 2023
     https://www.dallasnews.com/opinion/editorials/2023/11/22/airlines-stop-
     persecuting-skiplaggers/

# EXHIBIT C

| From | To | Date | departure time |
|---|---|---|---|
| New Orleans | Dallas | 7-Mar | 7.00am |
| Tuscon | Dallas | 7-Mar | 6.15am |
| Denver | Dallas | 7-Mar | 7.17am |
| Nashvile | Dallas | 7-Mar | 8.00am |
| Las Vegas | Dallas | 7-Mar | 6.45am |
| Austin | Dallas | 7-Mar | 8.15am |
| san francisco | Dallas | 7-Mar | 7.53am |

| From | Through | To | Date |
|---|---|---|---|
| New Orleans | DFW | Tuscon | 7-Mar |
| New Orleans | DFW | Denver | 7-Mar |
| New Orleans | DFW | Nashvile | 7-Mar |
| New Orleans | DFW | Las vegas | 7-Mar |
| New Orleans | DFW | Austin | 7-Mar |
| New Orleans | DFW | San francisco | 7-Mar |

| From | Through | To | Date |
|---|---|---|---|
| Tuscon | DFW | New Orleans | 7-Mar |
| Tuscon | DFW | Denver | 7-Mar |
| Tuscon | DFW | Nashvile | 7-Mar |
| Tuscon | DFW | Las vegas | 7-Mar |
| Tuscon | DFW | Austin | 7-Mar |
| Tuscon | DFW | San francisco | 7-Mar |

| From | Through | To | Date |
|---|---|---|---|
| Denver | DFW | New Orleans | 7-Mar |
| Denver | DFW | Tuscon | 7-Mar |
| Denver | DFW | Nashvile | 7-Mar |
| Denver | DFW | Las vegas | 7-Mar |
| Denver | DFW | Austin | 7-Mar |
| Denver | DFW | San francisco | 7-Mar |

| From | Through | To | Date |
|---|---|---|---|
| Nashvile | DFW | New Orleans | 7-Mar |
| Nashvile | DFW | Tuscon | 7-Mar |
| Nashvile | DFW | Denver | 7-Mar |
| Nashvile | DFW | Las vegas | 7-Mar |
| Nashvile | DFW | Austin | 7-Mar |
| Nashvile | DFW | San francisco | 7-Mar |

| From | Through | To | Date |
|---|---|---|---|
| Las Vegas | DFW | New Orleans | 7-Mar |
| Las Vegas | DFW | Tuscon | 7-Mar |
| Las Vegas | DFW | Denver | 7-Mar |

| Las Vegas | DFW | Nashvile | 7-Mar |
| Las Vegas | DFW | Austin | 7-Mar |
| Las Vegas | DFW | San francisco | 7-Mar |

| From | Through | To | Date |
|---|---|---|---|
| Austin | DFW | New Orleans | 7-Mar |
| Austin | DFW | Tuscon | 7-Mar |
| Austin | DFW | Denver | 7-Mar |
| Austin | DFW | Nashvile | 7-Mar |
| Austin | DFW | Las Vegas | 7-Mar |
| Austin | DFW | San francisco | 7-Mar |

| From | Through | To | Date |
|---|---|---|---|
| San francisco | DFW | New Orleans | 7-Mar |
| San francisco | DFW | Tuscon | 7-Mar |
| San francisco | DFW | Denver | 7-Mar |
| San francisco | DFW | Nashvile | 7-Mar |
| San francisco | DFW | Las Vegas | 7-Mar |
| San francisco | DFW | Austin | 7-Mar |

| Ticket price |
|---|
| $162 |
| $316 |
| $155 |
| $194 |
| $199 |
| $758 |
| $221 |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|---|---|---|---|---|
| 7.00am | $263 | $162 | $101 | no |
| 7.00am | $241 | $162 | $79 | no |
| 7.00am | $189 | $162 | $27 | no |
| 7.00am | $269 | $162 | $107 | no |
| 7.00am | $149 | $162 | -$13 | yes |
| 7.00am | $159 | $162 | -$3 | no |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|---|---|---|---|---|
| 6.15am | $263 | $316 | -53 | yes |
| 6.15am | $504 | $316 | 188 | no |
| 6.15am | $284 | $316 | -32 | yes |
| 6.15am | x | $316 | x | x |
| 6.15am | $226 | $316 | -90 | yes |
| 6.15am | x | 316 | x | x |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|---|---|---|---|---|
| 7.17am | $241 | $155 | $86 | no |
| 7.17am | $504 | $155 | $349 | no |
| 7.17am | $241 | $155 | $86 | no |
| 7.17am | $475 | $155 | $320 | no |
| 7.17am | $203 | $155 | $48 | no |
| 7.17am | $375 | $155 | $220 | no |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|---|---|---|---|---|
| 8.00am | $189 | $194 | -$5 | yes |
| 8.00am | $284 | $194 | $90 | no |
| 8.00am | $241 | $194 | $47 | no |
| 8.00am | $238 | $194 | $44 | no |
| 8.00am | $164 | $194 | -$30 | yes |
| 8.00am | $168 | $194 | -$26 | yes |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|---|---|---|---|---|
| 6.45am | $269 | $199 | $70 | no |
| 6.45am | x | $199 | x | x |
| 6.45am | $386 | $199 | $187 | no |

App'x 067

| 6.45am | $238 | $199 | $39 | no |
|--------|------|------|-----|-----|
| 6.45am | $199 | $199 | $0 | same |
| 6.45am | x | $199 | x | x |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|----------------|--------------|-----------|-----------------|-------------|
| 8.15am | $592 | $758 | -$166 | yes |
| 8.15am | $549 | $758 | -$209 | yes |
| 8.15am | $479 | $758 | -$279 | yes |
| 8.15am | $458 | $758 | -$300 | yes |
| 8.15am | x | 758 | x | x |
| 8.15am | x | 758 | x | x |

| departure time | Ticket price | hub price | price diffrence | hub premium |
|----------------|--------------|-----------|-----------------|-------------|
| 7.53am | $159 | $221 | -$62 | yes |
| 7.53am | $555 | $221 | $334 | no |
| 7.53am | $375 | $221 | $154 | no |
| 7.53am | $168 | $221 | -$53 | yes |
| 7.53am | x | $221 | x | x |
| 7.53am | $252 | $221 | $31 | no |

data from 2/22

data from 2/22

| From | To | Date | departure time | Ticket price |
|---|---|---|---|---|
| New Orleans | Dallas | 7-Mar | 7:00am | $162 |
| Tuscon | Dallas | 7-Mar | 6:15am | $316 |
| Denver | Dallas | 7-Mar | 7:17am | $155 |
| Nashville | Dallas | 7-Mar | 8:00am | $194 |
| Las Vegas | Dallas | 7-Mar | 6:45am | $199 |
| Austin | Dallas | 7-Mar | 8:15am | $758 |
| san francisco | Dallas | 7-Mar | 7:53am | $221 |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| New Orleans | DFW | New Orleans | 7-Mar | 7:00am | $263 | $162 | $101 | no |
| New Orleans | DFW | Tuscon | 7-Mar | 7:00am | $241 | $162 | $79 | no |
| New Orleans | DFW | Denver | 7-Mar | 7:00am | $189 | $162 | $27 | no |
| New Orleans | DFW | Nashville | 7-Mar | 7:00am | $269 | $162 | $107 | no |
| New Orleans | DFW | Las vegas | 7-Mar | 7:00am | $245 | $162 | $83 | yes |
| New Orleans | DFW | Austin | 7-Mar | 7:00am | $758 | $162 | $1 | yes |
| New Orleans | DFW | San francisco | 7-Mar | 7:00am | $159 | $162 | $1 | yes |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| Tuscon | DFW | New Orleans | 7-Mar | 6:15am | $269 | $316 | $3 | yes |
| Tuscon | DFW | Tuscon | 7-Mar | 6:15am | $504 | $316 | 188 | no |
| Tuscon | DFW | Denver | 7-Mar | 6:15am | $504 | $316 | 188 | no |
| Tuscon | DFW | Nashville | 7-Mar | 6:15am | $269 | $316 | | no |
| Tuscon | DFW | Las vegas | 7-Mar | 6:15am | x | $316 | x | no |
| Tuscon | DFW | Austin | 7-Mar | 6:15am | $526 | $336 | 90 | yes |
| Tuscon | DFW | San francisco | 7-Mar | 6:15am | | 316 | | yes |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| Denver | DFW | New Orleans | 7-Mar | 7:17am | $241 | $155 | $86 | no |
| Denver | DFW | Tuscon | 7-Mar | 7:17am | $504 | $155 | $349 | no |
| Denver | DFW | Denver | 7-Mar | 7:17am | $241 | $155 | $86 | no |
| Denver | DFW | Nashville | 7-Mar | 7:17am | $475 | $155 | $320 | no |
| Denver | DFW | Las vegas | 7-Mar | 7:17am | $203 | $155 | $48 | no |
| Denver | DFW | Austin | 7-Mar | 7:17am | $375 | $155 | $220 | no |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| Nashville | DFW | New Orleans | 7-Mar | 8:00am | $189 | $194 | $5 | yes |
| Nashville | DFW | Tuscon | 7-Mar | 8:00am | $284 | $194 | $90 | no |
| Nashville | DFW | Denver | 7-Mar | 8:00am | $241 | $194 | $47 | no |
| Nashville | DFW | Nashville | 7-Mar | 8:00am | $238 | $194 | $44 | no |
| Nashville | DFW | Las vegas | 7-Mar | 8:00am | $164 | $194 | $30 | yes |
| Nashville | DFW | Austin | 7-Mar | 8:00am | $168 | $194 | $26 | yes |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| Las Vegas | DFW | New Orleans | 7-Mar | 6:45am | $269 | $199 | $70 | no |
| Las Vegas | DFW | Tuscon | 7-Mar | 6:45am | x | $199 | x | no |
| Las Vegas | DFW | Denver | 7-Mar | 6:45am | $386 | $199 | $187 | no |
| Las Vegas | DFW | Nashville | 7-Mar | 6:45am | $238 | $199 | $39 | no |
| Las Vegas | DFW | Austin | 7-Mar | 6:45am | $199 | $199 | $0 | same |
| Las Vegas | DFW | San francisco | 7-Mar | 6:45am | x | $199 | x | x |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| Austin | DFW | New Orleans | 7-Mar | 8:15am | $562 | $758 | $196 | yes |
| Austin | DFW | Tuscon | 7-Mar | 8:15am | $549 | $758 | $209 | yes |
| Austin | DFW | Denver | 7-Mar | 8:15am | $479 | $758 | $279 | yes |
| Austin | DFW | Nashville | 7-Mar | 8:15am | $458 | $758 | $300 | yes |
| Austin | DFW | Las Vegas | 7-Mar | 8:15am | 758 | 758 | $0 | same |
| Austin | DFW | San francisco | 7-Mar | 8:15am | x | 758 | x | x |

| From | Through | To | Date | departure time | Ticket price | hub price | price difference | hub premium |
|---|---|---|---|---|---|---|---|---|
| San francisco | DFW | New Orleans | 7-Mar | 7:53am | $169 | $221 | $52 | yes |
| San francisco | DFW | Tuscon | 7-Mar | 7:53am | $555 | $221 | $384 | no |
| San francisco | DFW | Denver | 7-Mar | 7:53am | $375 | $221 | $154 | no |
| San francisco | DFW | Nashville | 7-Mar | 7:53am | $168 | $221 | $53 | yes |
| San francisco | DFW | Las Vegas | 7-Mar | 7:53am | x | $221 | x | x |
| San francisco | DFW | Austin | 7-Mar | 7:53am | $252 | $221 | $31 | no |

App'x 070

# Exhibit A-2

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE NORTHERN DISTRICT OF TEXAS

3                              FORT WORTH DIVISION

4          _____

5      AMERICAN AIRLINES, INC.,

6               Plaintiff,

7         v.                                    Civil Action

8      SKIPLAGGED, INC.,                        No. 4:23-cv-

9               Defendant.                      00860-P

10         _____

11                       VIDEOTAPED DEPOSITION OF

12                        BIJAN VASIGH, PHD

13     DATE:           Thursday, June 6, 2024

14     TIME:           12:30 p.m.

15     LOCATION:       Kirkman Law Firm, PLLC

16                     201 Main Street, Suite 1160

17                     Fort Worth, TX 76102

18     OFFICIATED BY: Maggie Berry

19     JOB NO.:        6746333

20

21

22

23

24

25

                                                    Page 1

| | |
|---|---|
| 1         A P P E A R A N C E S | 1         P R O C E E D I N G S |

1            A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF AMERICAN AIRLINES, INC.:
3        ALYSSA ORTIZ JOHNSTON, ESQUIRE
4        BINA PALNITKAR, ESQUIRE
5        Greenberg Traurig LLP
6        2200 Ross Avenue, Suite 5200
7        Dallas, TX 75201
8        johnstona@gtlaw.com
9        palnitkarb@gtlaw.com
10       (214) 665-3732
11       (214) 665-3727
12
13   ON BEHALF OF DEFENDANT SKIPLAGGED, INC.:
14       WILLIAM L. KIRKMAN, ESQUIRE
15       Kirkman Law Firm, PLLC
16       201 Main Street, Suite 1160
17       Fort Worth, TX 76102
18       billk@kirkmanlawfirm.com
19       (817) 336-2800
20
21   ALSO PRESENT:
22       Don Harris, Videographer
23
24
25

**Page 4 (right column):**

1            P R O C E E D I N G S
2        THE VIDEOGRAPHER:  On the record at
3    12:30 p.m.
4        THE OFFICER:  Good afternoon, everyone.
5    My name is Maggie Berry; I'm the reporter assigned by
6    Veritext to take a record of this proceeding.  We are
7    now on the record.  The time is 12:31 p.m.
8        This is the deposition of Dr. Bijan
9    Vasigh taken in the matter of American Airlines,
10   Incorporated vs. Skiplagged, Incorporated.  Today's
11   date is June 6, 2024.  We are located at 201 Main
12   Street, Suite number 1160, Fort Worth, Texas 76102.
13       I am a notary authorized to take
14   acknowledgments and administer oaths in Texas.
15       Additionally, absent any objection on
16   the record before the witness is sworn, all parties
17   and the witness understand and agree that any
18   certified transcript produced from the recording of
19   this proceeding:
20       - is intended for all uses permitted
21           under applicable procedural and
22           evidentiary rules and laws in the
23           same manner as a deposition recorded
24           by stenographic means; and
25       - shall constitute written stipulation

1            I N D E X
2    EXAMINATION:                              PAGE
3        By Ms. Johnston              6
4        By Mr. Kirkman               79
5        By Ms. Johnston              83
6
7            E X H I B I T S
8    NO.        DESCRIPTION            PAGE
9    Exhibit 1    Report By Dr. Bijan Vasigh:
10       "Hidden City Travel And Its
11       Impact Upon Passengers,
12       Implications For The
13       Traveling Public"            9
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5 (right column):**

1        of such.
2        The proceeding will be recorded via
3    video technology by Mr. Don Harris.
4        At this time will everyone in
5    attendance please identify yourself for the record,
6    beginning here with Dr. Vasigh.
7        DR. VASIGH:  My name is Bijan Vasigh.
8        THE OFFICER:  Okay.  Counsel?
9        MR. KIRKMAN:  My name is Bill Kirkman.
10   I am a lawyer for Skiplagged, Inc.
11       I want the record to reflect that we
12   have been here since 10 a.m., ready to go for this
13   deposition, which was noticed at that time.  And now,
14   we're starting at 12:30 for reasons that I understand
15   because neither a court reporter or a videographer was
16   engaged.
17       MS. JOHNSTON:  Alyssa Ortiz Johnston
18   and Bina Palnitkar on behalf of American Airlines.
19       THE OFFICER:  Thank you.
20       Hearing no objection, I'll now swear in
21   the witness.
22       Dr. Vasigh, if you'll please raise your
23   right hand?  Thank you -- thank you, sir.
24   //
25   //

2 (Pages 2 - 5)

1    WHEREUPON,
2         BIJAN VASIGH, PHD,
3    called as a witness and having been first duly sworn
4    to tell the truth, the whole truth, and nothing but
5    the truth, was examined and testified as follows:
6         THE OFFICER:  And before we get
7    started, that just brings up -- whenever she's asking
8    a question, even if you know what she's going to ask,
9    if you'll let her get her whole question out, please.
10         THE WITNESS:  Absolutely.
11         THE OFFICER:  Thank you.
12         Counsel, you may proceed.
13         EXAMINATION
14   BY MS. JOHNSTON:
15     Q   Please state your name for the record.
16     A   Bijan Vasigh.
17     Q   Dr. Vasigh, what's your occupation?
18     A   I'm a professor, I'm a writer, I'm a
19   consultant, and a speaker.
20     Q   And my understanding is that you were hired
21   by Skiplagged or its attorney to serve as an expert in
22   this case; is that correct?
23     A   Yes.
24     Q   When were you first contacted by Skiplagged
25   or its attorney to serve as an expert?

Page 6

1     A   I don't know exactly, probably five or six
2    months ago, four -- I don't recollect, but should be
3    about several months ago.
4     Q   And was it Skiplagged's counsel that
5    contacted you, or was it somebody from Skiplagged?
6     A   No, I believe from the office here.
7     Q   From Skiplagged's attorney's office?
8     A   Yes -- yes, from the -- yes.
9     Q   Okay.  And you have an engagement agreement
10   with Mr. Kirman's office?
11     A   Yes.  Unofficial, yes, that's right.  Yes,
12   yes, we do.
13     Q   You said unofficial?
14     A   Yes.  I -- yes, we do.  Yes.
15     Q   Okay.  And you said about five months ago
16   you were hired, approximately?
17     A   About, yes.
18     Q   Is that the first time that they reached out
19   to you, about five months ago?
20     A   About, yes --
21     Q   And then shortly thereafter, you were
22   engaged?
23     A   Yes -- yes.
24     Q   Okay.  What is your hourly rate in this
25   case?

Page 7

1     A   $450 per hour.
2     Q   And how much have you billed to this case so
3    far?
4     A   Like, about 30 hours or something, I'm not
5    sure.  I can give you later an exactly, but I don't
6    check that much money.
7     Q   Do you keep track of the time that you've
8    spent?
9     A   Of course.
10     Q   How much have you been paid to date for your
11   engagement?
12     A   I don't have full recollection of that.
13   About ten or something.
14     Q   I'm sorry, can you repeat that?
15     A   I don't have a full recollection of that.
16   It's about, I don't know, ten-something or --
17     Q   Do you have a different rate for testifying
18   than you do for writing a report?
19     A   No.
20     Q   Okay.  What documents have you reviewed in
21   this case?
22     A   Several documents.  Many documents.
23     Q   Can you go ahead and share those with me?
24         MR. KIRKMAN:  The report would show
25   those.

Page 8

1    BY MS. JOHNSTON:
2     Q   We'll get to that later.  Do you recall,
3    like, any -- well, I'll just go ahead and mark it.
4    We'll mark Exhibit 1 Dr. Vasigh's report in this
5    matter.
6         (Exhibit 1 was marked for
7          identification.)
8         And Dr. Vasigh, looking at -- now that you
9    have your report in your hand, do you recognize this
10   document?
11     A   Yes, I do.
12     Q   And is this your expert report in this case?
13     A   Yes.
14     Q   Okay.  Will you point us to the documents
15   that you've reviewed in this case?
16     A   I reviewed many, and I believe that it has
17   been put on the back of the report.
18     Q   And so I think that's Exhibit B of your
19   report; is that correct?
20     A   Please allow me to -- that's Exhibit A --
21   yes, I'll go to Exhibit B.
22     Q   And looking at this list, are these the only
23   documents that you've reviewed related to this case
24   and in preparation for preparing your report?
25     A   Yes.  These are the document, yes.

Page 9

3 (Pages 6 - 9)

App'x 074

1    Q    Is there anything that is not on this list
2    that you have reviewed?
3    A    I don't remember, no.  No, I didn't.
4    Q    Okay.  And so the first one up here is the
5    Declarations of Aktarar Zamen, and it looks like you
6    reviewed two of those declarations; is that correct?
7    A    Uh-huh.
8    Q    And I believe that it should be October 2nd
9    is the date of the declaration on October 22nd, and
10   then December 15th.  Do you recall reviewing these two
11   declarations?
12   A    You're looking at the item number 1 and 2?
13   Q    That's correct.
14   A    Yes.  I have reviewed many document.
15   Specifically, if you ask me what page, I don't have a
16   recall.  Yes, I have reviewed that.  Yes.
17   Q    And did anything in -- what was the purpose
18   of reviewing those declarations?
19   A    To get more information regarding that,
20   the -- the hidden city ticketing, what are the pros,
21   what are the cons, and what are the impacts.
22   Q    Prior to this lawsuit, were you aware of
23   what hidden city ticketing was?
24   A    Yes, I do.
25   Q    Did you find these two declarations, then,

1    official to you at all?
2    A    Yes.
3    Q    In what way?
4    A    I'm a professor of economics and
5    transportation.  I teach economics, and always this
6    subject of hidden city ticketing comes to my students.
7    Many of them, especially when they don't have money
8    and so forth, they have taken this advantage.
9    Therefore, we discuss, look at the what is the pros
10   and what are the cons, and so forth.
11   Q    And so upon reviewing these two
12   declarations, is there anything that you learned in
13   those declarations that you did not know prior to --
14   A    No.
15   Q    -- reading them?
16   A    I knew.
17        MR. KIRKMAN:  Let her finish first.
18        THE WITNESS:  I'm -- I'm sorry.  I
19   apologize.  I apologize.
20   BY MS. JOHNSTON:
21   Q    Is there anything in these declarations that
22   served as the basis for any of your opinions in your
23   report?
24        MR. KIRKMAN:  Form.
25   A    No.

1    Q    And then, the second document on that
2    Exhibit B is the live pleading in this matter; is that
3    correct?  It's the complaint; right?
4    A    Okay.  Which one?
5    Q    Number 2.
6    A    Okay.
7    Q    And so you reviewed the complaint in this
8    matter?
9    A    Please remember, I read many of them,
10   glanced through.  And based on that, I tried to
11   understand what are the pros and what are the cons,
12   what are the pitfall and what are the application.  I
13   don't have the full recollection of the article at
14   this time, but I know I have read that, yes.
15   Q    Are you saying "that article"?
16   A    This -- yes.  You are talking about the --
17   an item number 2, First Amended Complaint of American?
18   Yes.
19   Q    Right.  That is the lawsuit.
20   A    That's -- yes.
21   Q    Okay.  And so you you don't remember if you
22   completely read that document?
23   A    Yes, I read that, but I don't have a full
24   recollection at this time.  Yes.
25   Q    Okay.  And then, the remaining items on

1    here, I think it's about 24 articles; is that correct?
2    A    Yes.
3    Q    Who provided these to you?  Or did you
4    gather these yourself?
5    A    Few of them was provided by Dr. Kirkman
6    [sic].  And the few other, you know, I'm a professor;
7    I searched different site.  It's done both.
8    Q    Did you ask Skiplagged's counsel to provide
9    you with articles related to skiplagging in general or
10   this case?
11   A    I believe they provided couple of articles,
12   yes.
13   Q    Okay.  And so looking at this Exhibit B, in
14   preparing your report, these are the only documents
15   that you reviewed?
16   A    Continuously, I review.  Yes.  Maybe few
17   other, too.  Yes, but these are the one that I have
18   reviewed.  Yes.
19   Q    What would the few other ones be?
20   A    For example, today, I read the report with
21   New York Times regarding a skip lag.  They were
22   talking about a student of -- he was 17 years old.  He
23   wanted to go see his family, but prevented by American
24   Airline because they thought that he wants to go to
25   Charlotte; he want not to New York.  Therefore, yes.

| | Page 14 | | Page 16 |
|---|---|---|---|

**Page 14**

1  I continuously read material, yes.
2    Q   But in terms of the information that you
3  used to prepare your report, the information that
4  serves as the basis for your opinions in your report,
5  are the documents on Exhibit B the only documents that
6  you used?
7    A   Yes -- yes.
8    Q   Okay.  Have you reviewed any deposition
9  testimony in this matter?
10   A   No.
11   Q   Turning briefly to your CV, which is Exhibit
12  A to your report.
13   A   Uh-huh.
14   Q   I just want to go over a few things in here.
15  Let me know, are you there?
16   A   Yes.
17       MR. KIRKMAN:  Let him find it.  Hold
18  on.
19       MS. JOHNSTON:  Yep.
20       MR. KIRKMAN:  It's about maybe a third
21  of the way through.
22       THE WITNESS:  Under what?
23       MR. KIRKMAN:  Here, I'll help you find
24  it.
25       THE WITNESS:  Thank you.

**Page 15**

1        MR. KIRKMAN:  We'll save some time
2  here.
3        MS. JOHNSTON:  It's just right after
4  the report.
5        THE WITNESS:  Yes.  Exhibit A is my CV,
6  yes.
7  BY MS. JOHNSTON:
8    Q   And you have a master's and a PhD in
9  economics; is that right?
10   A   Yes.
11   Q   Where did you -- did you receive any --
12  well, where did you receive your education prior to
13  that master's program?
14   A   I got from Iran.
15   Q   Where?
16   A   Iran.
17   Q   Where in Iran?
18   A   National University of Iran.
19   Q   And what degree was that?
20   A   Economics.
21   Q   And you currently teach economics, finance,
22  and accounting at Embry-Riddle Aeronautical
23  University?
24   A   Yes.
25   Q   What courses do you teach?

**Page 16**

1    A   Advanced air transport economics.
2    Q   Anything else?
3    A   Engineering economics -- engineering
4  economics.
5    Q   How long have you been teaching those
6  courses?
7    A   About 30 years.
8    Q   Are there any other courses that you've
9  taught in the past few years other than those two?
10   A   Yes.  Air transport finance, which has a
11  published book on that area, too.
12   Q   What else?
13   A   That's good.
14   Q   So these are your three main rotating
15  courses?
16   A   That's right -- yes.
17   Q   Okay.  Also, it looks like you're the
18  founder and president of Aviation Consulting Group,
19  and you reference that you're a consultant.  What does
20  this company do?  What kind of consulting do you do?
21   A   Generally, regarding consulting airline
22  economics and finance.  Anything related to cases on
23  economics and finance, of course, on aviation air
24  transportation.
25   Q   And when you say "cases," what do you mean

**Page 17**

1  by cases?
2    A   Similar to this, there's a dispute between
3  two parties.
4    Q   Have you previously served as an expert in a
5  litigation matter before?
6    A   I've been consultant, yes.
7    Q   Have you been designated as an expert --
8    A   No.
9    Q   -- before?
10       MR. KIRKMAN:  Make sure she finishes
11  her question.
12       THE WITNESS:  Well, I -- I apologize.
13  Yes.
14       MR. KIRKMAN:  Thank you.
15  BY MS. JOHNSTON:
16   Q   You have consulted in other litigation
17  matters, but you have not been designated as an
18  expert?
19   A   Yes.
20   Q   Have you given any sort of testimony in a
21  litigation matter?
22   A   No.
23   Q   You live in Florida; is that correct?
24   A   Yes.
25   Q   Was there a case back in 2016 where you

1 served as an expert in a tax-related matter?
2    A   2016?
3    Q   Uh-huh.
4    A   I don't have that recollection.
5    Q   Okay.  You're a Fellow Airneth; is that
6 right?
7    A   Yes.
8    Q   What is Airneth?
9    A   Association of European Aviation Economist.
10    Q   And what do you do in this capacity as a
11 fellow?
12    A   Organizing conferences, inviting speakers.
13    Q   So you help coordinate the events?
14    A   In front of the members.
15    Q   Do you provide any substantive contribution
16 to the conference?
17    A   No.
18    Q   And then, Jet Perfect Foundation; what is
19 this?
20    A   There is a company -- there is a group that
21 they are trying to promote sustainable aviation fuel.
22           THE OFFICER:  I'm sorry, what kind of
23 fuel?
24           THE WITNESS:  Sustainable aviation
25 fuel.

Page 18

1           THE OFFICER:  Sustainable.  Thank you.
2           THE WITNESS:  SAF; sustainable aviation
3 fuel.
4 BY MS. JOHNSTON:
5    Q   And you're on the board of directors?
6    A   Yes.
7    Q   How long have you been serving in that
8 capacity?
9    A   A year and half or two years.
10    Q   And then, what is the International Aviation
11 Management Conference?
12    A   There's several of them.  Which one do you
13 mean?
14    Q   Well, on your CV, it says you're "A member
15 of the Technical Committee, International Aviation
16 Management Conference."
17    A   Oh.  That is a Dubai, inter-- there's a
18 university in Dubai of -- Dubai Aviation University.
19    Q   Okay.  And you said as a member of the
20 technical committee on that?
21    A   That's right.
22    Q   And what do you do as a member of a
23 technical committee?
24    A   They are organizing conferences annually;
25 I'm most of the time the speaker of that conference,

Page 19

1 and selecting paper for presentation.
2    Q   What topics do you speak at at these
3 conferences, at the International Aviation Management
4 Conference?
5    A   Topics related to aviation and economics and
6 finance.
7    Q   Are those separately listed in your CV?
8    A   Yes.  That's right, yes.
9    Q   Okay.  And then, it looks like you have past
10 appointments.  You're a visiting professor at a few
11 different universities.  Were the three courses that
12 we talked about earlier, are those the same courses
13 that you teach at these universities, as well, or are
14 there different courses?
15    A   Yes, ma'am.  The same.
16    Q   The same?  Okay.  And then your recent
17 consulting experience, it looks like there's a lot of
18 international consulting that you do; is that correct?
19    A   Yes; what various.
20    Q   I just want to focus on a couple of them.  I
21 want to look at the domestic ones.  On the -- those
22 aren't page-numbered, so it's a little challenging.
23 In 2004 and 2005, you prepared a comprehensive
24 strategic examination of the U.S. airline industry.
25 That's the fourth page of your CV, and it's the fourth

Page 20

1 bullet point down.  It starts with "Kenny Nachwalter,
2 P.A."
3    A   Yes.
4    Q   Do you see that?
5    A   Yes.
6    Q   Okay.  What kind of strategic examination
7 did you perform?  What is this?
8    A   I don't know if I'm allowed to talk.  That
9 was a -- that was a case IRS sued an airline for tax
10 evasion, apparently, and I was examining the finance
11 of that company.
12    Q   So it was as to a particular company?
13    A   That's right.
14    Q   So when you say "a comprehensive strategic
15 examination of U.S. airline industry," did you look at
16 the U.S. airline industry, as well?
17    A   I look at U.S. airline industry, as well as
18 the company called Arrow Air.  I was looking,
19 comparing to see that if there's a disparity of
20 expenses, disparity of income, and so forth.  Yes.
21    Q   Okay.  Is there -- strike that.  And then,
22 the second from the bottom on this same page, right
23 before Executive Education, the second bullet point up
24 from that, you worked as a NASA research grant on a
25 grant entitled "Determination of Statewide Economic

Page 21

6 (Pages 18 - 21)

1   Impacts of Small Aircraft Transportation Systems." Do
2   you see that?
3       A   I'm sorry, that same page?
4       Q   Correct, yep. Just two up from "Executive
5   Education."
6       A   Oh, yes.
7       Q   What is small aircraft transportation
8   systems?
9       A   At that time, NASA envisioning that to have
10  small aircraft, like a car, to fly from home in order
11  to open up the space for cars that really act as a
12  aircraft in order to expedite traffic.
13      Q   Okay. And then, looking briefly at your
14  executive education -- again, there's a lot of
15  international work here. I just want to ask you; it
16  looks like there are --
17          Well, there are a few that relate to airline
18  revenue management, it looks like for IATA, the
19  Airline Tariff Publishing Company. Does that -- do
20  you see those? It's hard because they're not
21  numbered, but --
22          MR. KIRKMAN: What's the first entry on
23  the page, and we'll find it. Is it "Airline Pricing
24  and" --
25          MS. JOHNSTON: Well, let's see. It's

Page 22

1   page number 5 of his CV, and it's -- I'm just looking
2   at --
3           MR. KIRKMAN: What's the first entry
4   say?
5           MS. JOHNSTON: "Airline Pricing and
6   Revenue Management."
7           MR. KIRKMAN: Okay. We got it.
8           THE WITNESS: Yes.
9           MS. JOHNSTON: Yep. Okay.
10  BY MS. JOHNSTON:
11      Q   So are these, with
12  "Executive education," are you going into companies
13  and you're training them?
14      A   Yes.
15      Q   Okay. And so these "Airline Pricing and
16  Revenue Management," these are -- are these, like, the
17  same course that you're modifying for the particular
18  company, or are all of these different lessons?
19      A   Let me correct.
20      Q   Uh-huh.
21      A   These are both training and actual courses
22  to grant MBA. Both training and actual courses to get
23  degree of MBA, Master of Business Administration,
24  Aviation.
25      Q   Okay. And so are these courses or training,

Page 23

1   are these generally the same curriculum that you use,
2   or are they different?
3       A   No -- yes. They are the same.
4       Q   So when it says "Airline Revenue Management"
5   or "Dynamic Pricing Policy" in different places,
6   that's the same thing?
7       A   Yes.
8       Q   Okay. And "Airline Revenue Management,"
9   that course or that training, what is that about?
10      A   As we know, it was around 1970, '80,
11  American Airline started to have revenue management.
12  Revenue management is based on the fact that airlines
13  try to identify passengers with different price-
14  elasticity of demand in order to charge higher prices
15  to the passenger which they have lower elasticity, and
16  lower price to higher elasticity.
17          Therefore, try to extract the maximum amount
18  of revenue from their passenger, they call airline
19  revenue management. It's a part of price escalation
20  we teach. Price escalation means that charging
21  different prices to different customers.
22          Therefore, if the customers are not price
23  elastic, airline charging the high prices. If the
24  passenger are price elastic, they will charge lower
25  price. This called -- nutshell, but is revenue

Page 24

1   management.
2       Q   So that is what you understand as revenue
3   management?
4       A   That's right.
5       Q   Okay. And that, generally, is what you go
6   into these companies or classrooms and teach in these
7   instances?
8       A   Yes.
9       Q   Okay. Do you have, like, a curriculum that
10  you use?
11      A   Yes.
12      Q   You have literature that you hand out?
13      A   Yes. Both my book, and also, there are
14  series of lecture notes, assignment, game theory, and
15  so forth.
16      Q   Is there a difference between "Airline
17  Revenue Management" and "Airline Finance and
18  Accounting Management"?
19      A   Absolutely, yes.
20      Q   What is the difference between the two?
21      A   Finance is generally managing how much is
22  your investment, what you invest. For example,
23  leasing an aircraft or buying an aircraft; therefore,
24  short lease. These all goes to finance.
25          Revenue management is something talks simply

Page 25

7 (Pages 22 - 25)

1  about management of pricing; how to change your prices
2  in order to maximize aircraft revenue.
3      Q   Okay.  And then, down in your referred [sic]
4  publications, the second one down, it looks like, you
5  co-authored this article entitled "The Blurring Lines
6  Between Full-Service Network Carriers and Low-Cost
7  Carriers."  Do you see that one?
8      A   The next pages, yes?  I --
9      Q   I'm sorry.
10     A   Should be next page, I believe.
11     Q   It's "Referred [sic] Publications," so it's
12  page 8.
13          MR. KIRKMAN:  What's at the top?
14          MS. JOHNSTON:  "Referred [sic]
15  Publications" is the next section.
16          MR. KIRKMAN:  Oh.
17          THE WITNESS:  Referred publications?
18          MS. JOHNSTON:  And then, the second one
19  down is the one that I just referenced.  It's entitled
20  "The Blurring Lines Between Full-Service Network
21  Carriers and Low-Cost Carriers."  Do you see that?
22          MR. KIRKMAN:  Second one down.
23          THE WITNESS:  Oh, yes.  I'm sorry.
24  BY MS. JOHNSTON:
25     Q   What is a full-service network carrier?

*Page 26*

1  co- -- full -- the airlines, they are getting lower
2  and lower, becoming similar to low-cost carrier
3  nickeling and diming the passenger, charging for the
4  seat, charging for, for example, bags.
5          We had that distinction between full-service
6  carrier and low-cost carrier many years ago.  But that
7  distinction is disappearing; both becoming, like, the
8  same, you know?  But the name is different.
9      Q   Why is it becoming the same?  I assume
10  that's what you talk about in this article.
11     A   It is totally wrong by -- for carrier
12  following that, you know, there's no distinction; they
13  lose customer loyalty.  Generally, earlier, there was
14  a distinction between full-service carrier and low-
15  cost carrier.
16          Right now, there's no loyalty; passenger
17  would switch based on five or ten dollar off
18  difference.  I believe a full carrier, in order to
19  compete with the low-cost carrier, it's possible they
20  are coming down, sending the ticket price similar to
21  each other.
22     Q   So you think it's based on competition that
23  the hub-and-spoke carriers have to be able to start
24  competing with or lowering their prices in order to
25  compete with the low-cost carriers?

*Page 28*

1      A   There are -- from my point of view, there
2  are three full-service carrier in U.S.:  American,
3  Delta, United.  They are providing service
4  domestically; they are internationally.
5          They are totally depending on different
6  business model than, for example, other airline, like
7  short -- low-cost airline, they are doing, basically,
8  a special part of U.S.
9      Q   And so there are -- what, would this also be
10  called hub-and-spoke carriers?
11     A   Absolutely.
12     Q   All right.  So we have hub-and-spoke
13  carriers, and then low-cost carriers; right?
14     A   Yes.
15     Q   And then there are some ultra-low-cost
16  carriers, as well?
17     A   Yes.
18     Q   And so this article in 2019 when you talk
19  about blurring the lines between a full service
20  carrier and a low cost carrier, what was the general
21  gist of this article?
22     A   That's very interesting question.  We had,
23  really, a distinction between low-cost carrier and
24  full-service carrier in the service.
25          But what -- recognize that service of full-

*Page 27*

1      A   On -- on a special route.  On a special
2  route.
3      Q   What are those special routes that you've
4  identified?
5      A   Route that they are not initiated from hub,
6  not ending at hub.
7      Q   Okay.
8      A   May I add something?  Airline, they have a
9  strong presence in hub, and they have a very high
10  degree of monopoly power and market concentration.
11     Q   And we will certainly get into that.  And
12  then, the next -- Dr. Vasigh, you would categorize
13  yourself as an economic expert in the airline
14  industry; right?
15     A   I don't do it myself.  I don't know if
16  they -- someone want to categorize me, that's okay.
17  But I know, yes.
18     Q   But you're an economist?
19     A   Absolutely.
20     Q   For how many years?
21     A   I got my Ph.D. on 1984, 40 years ago.
22     Q   Okay.  And prior to that, you got your
23  master's in economics, and then prior to that, you got
24  your undergrad -- or bachelor's, whatever the
25  equivalent is in Iran -- in economics, as well; right?

*Page 29*

8 (Pages 26 - 29)

1    A   Yes.

2    Q   Okay.  And so you focus on the airline

3  industry; is that correct?

4    A   Yes.

5    Q   Okay.  Do you focus on any other industry?

6    A   Yes.

7    Q   What?

8    A   Aircraft manufacturing.

9    Q   Anything else?

10    A   Leasing companies -- aircraft leasing

11  companies.  Airports.

12    Q   All related to the aeronautical realm;

13  right?

14    A   Yes.  If I may add, I'm a professor at

15  Embry-Riddle Aeronautical University.  Our focus of

16  university in air transportation industry.

17    Q   Okay.  What data sources are routinely used

18  by economists in the airline industry?

19    A   There are several public.  I believe that --

20  DOT has one.  FAA has one.  There are some we are

21  subscribe; they call that D-O-D-I-I-O [sic].  D-O

22  [sic] provide leg-based ticket price, number of

23  passengers, and so forth.

24    Q   Did you --

25    A   D-O-D-I-I-O [sic], yes.

Page 30

1    Q   I-O?

2    A   D-I-I-O, yes.

3    Q   Okay.  And is that a particular database

4  of --

5    A   Generally, is all of the airline average

6  ticket price, number of passenger, available seat

7  mine, revenue passenger mine, and so forth.

8    Q   Okay.  Is that the same as the DB1B

9  database?

10    A   Yes, yes -- yes.

11    Q   Okay.  And --

12        THE OFFICER:  I'm sorry, what was that

13  full question?  Because he answered over it.

14        MS. JOHNSTON:  Is that the same as the

15  DB1B database?

16        THE OFFICER:  Okay.  Thank you.

17  BY MS. JOHNSTON:

18    Q   So you said the DOT, the FAA; is that

19  correct?

20    A   Yes.

21    Q   Does the FAA have a database that's publicly

22  available?

23    A   Department Transportation has, yes;

24  TranStats -- TranStats.  They provide data.  Depending

25  on your project, could be compiled from many, many

Page 31

1  different sources.  Each source provide special data.

2    Q   What about the Government Accountability

3  Office, the GAO?

4    A   I have not used that.  That's ...

5    Q   Have you heard of the Government

6  Accountability Office?

7    A   Yes, I ...

8    Q   But you have not used that as a source of

9  data in the history of your work?

10    A   No.

11    Q   Okay.  Have you used the Department of

12  Transportation?

13    A   Yes.

14    Q   In what instances?

15    A   Writing papers, doing research, doing

16  consulting.  Yes.

17    Q   What circumstances would lead you to the

18  Department of Transportation for information?

19    A   Anytime that I felt necessary to use special

20  data, depending on the case; case by case.

21    Q   Can you give an example of a case where you

22  felt the need to have data from the DOT, from this

23  database that the DOT hosts?

24    A   For example:  Delay, cancellation, consumer

25  complaint, and so forth.  FAA, DOT.

Page 32

1    Q   Okay.  Are there any other data sources that

2  you're aware of that economists routinely use in the

3  airline industry?

4    A   No.

5    Q   Okay.  And so the FAA and the DOT are the

6  only two that you routinely consult; is that correct?

7    A   And D-O-D-I-I-O [sic].

8    Q   Okay.  And so we don't talk past ourselves

9  today, I want to make sure -- so when I say DOT, is

10  that different than the D-O-T-I-O-O [sic]?

11    A   No.  That is D-I-O [sic].  That's a private

12  company.  It is not related to government; private

13  company.  They share and they say data on airline

14  ticket prices, number of passengers sold,

15  destinations, which airlines come to a destination,

16  which airline is leaving.

17        That's a private company.  They are selling

18  data for money.  It is not government.

19    Q   Okay.  So that data is not publicly

20  available?

21    A   Not.

22    Q   And that is different than the DB1B database

23  that the DOT hosts?

24    A   I believe.  I may be -- they collect those

25  data, and they siphon -- making some sort of more

Page 33

9 (Pages 30 - 33)

1  manageable data, and sell it.
2    Q   Okay. So you have purchased data from this
3  D-I-O-O [sic] database?
4    A   Yes -- yes.
5    Q   Have you obtained data that was publicly
6  available from the DOT?
7    A   I have used in my research numerous time the
8  data from DOT. That's right.
9    Q   Okay. And so I just want to make sure as we
10 go forward today that when I refer to the DOT and the
11 DB1B database, I think that's different than what
12 you're talking about, the D-I-O-O [sic] database?
13   A   Yes -- yes.
14   Q   Okay. Dr. Vasigh, who prepared this report?
15   A   Which one?
16   Q   The report, Exhibit 1, in front of you.
17   A   Me.
18   Q   Did you have any assistance in preparing the
19 report?
20   A   No.
21   Q   How much time have you spent preparing that
22 report? Or how long did it take to prepare that
23 report?
24   A   I have written -- I don't have any
25 recollection on that.

Page 34

1    Q   Can you estimate?
2    A   Thirty to forty hours, fifty hours. Yes.
3    Q   I know you prepared the report. Did anyone
4  provide input on the report?
5    A   No.
6    Q   Anyone provide any edits to the report?
7    A   I -- I -- no.
8    Q   Nobody edited this report?
9    A   I send it to the -- Mr. Kirkman; maybe they
10 did some editing. No. That is mine. Yes.
11   Q   Did you receive a copy back with any edits
12 on it?
13   A   Yes, I received a copy back. Yes.
14   Q   Was it different than the version that you
15 had originally sent?
16   A   No, not at all.
17   Q   How do you know that?
18   A   Comparison.
19   Q   So you ran a comparison on it?
20   A   Yes, of course.
21   Q   Why did you --
22   A   You know -- generally, you know, when you
23 get something, you naturally -- you know, when I write
24 a book I send to someone, "Do something," I would go
25 to a Word document and compare to -- is it -- they can

Page 35

1  compare to.
2    Q   Do you know why you received a document back
3  if there were no edits to it?
4    A   I don't know.
5    Q   Okay. This Exhibit 1, does this report
6  contain all your opinions and conclusions in this
7  case?
8    A   At this point, yes.
9    Q   Based on all the information available to
10 you?
11   A   Yes.
12   Q   And does this report contain all the
13 opinions and conclusions that you intend to offer at
14 trial?
15       MR. KIRKMAN: Object to that. That's a
16 decision that I will make.
17   A   I think that -- I don't know the -- I
18 continuously read, I continuously search, and so
19 forth. But that is my best opinion at this time, yes.
20   Q   As we sit here today?
21   A   [No audible response.]
22   Q   Okay. Dr. Vasigh, in preparing this report,
23 did you gather any information or data from
24 Skiplagged?
25   A   May I add something to my previous?

Page 36

1    Q   Sure.
2    A   Every day that passes, I feel more strongly
3  on this case, you know. Therefore, that is, yes, my
4  feeling become more and more stronger as I read more
5  and I recognize. Yes, please. I'm sorry.
6        MS. JOHNSTON: I'm going to object to
7  that as non-responsive. Thank you.
8  BY MS. JOHNSTON:
9    Q   I'll ask my question. Did you gather any
10 data or information from Skiplagged in preparing this
11 report other than the Exhibit B materials that we
12 looked at?
13   A   No. Just got few information at the
14 beginning. Couple of, yes.
15   Q   Like what?
16   A   It is there.
17   Q   In the Exhibit B?
18   A   Yes.
19   Q   Okay. Did you gather or inspect any
20 information or data from or related to American
21 Airlines in preparing your report?
22   A   No.
23   Q   So it would be fair to say that you did not
24 rely on any data or information from Skiplagged or
25 American Airlines in preparing this report; is that

Page 37

10 (Pages 34 - 37)

1  correct?

2  A  Yes.

3  Q  Had you heard of Skiplagged -- not

4  skiplagging, but Skiplagged as a company -- prior to

5  being engaged as an expert in this lawsuit?

6  A  Not the company specific, but I knew about

7  this many -- yes.  I didn't know -- hear about the

8  company, per se, but the practice, yes.

9  Q  Okay.  Prior to -- well, have you ever been

10  on skiplagged.com?

11  A  No.

12  Q  Dr. Vasigh, in this report, correct me if

13  I'm wrong, but my understanding is that you conclude

14  that because airlines like American dominate the

15  market, engage in monopolistic conduct and

16  exploitation, that hidden city is justified because it

17  allows the passenger to bypass high prices.  Is that

18  accurate?

19  A  Absolutely, yes.

20  Q  Okay.  I want to look at a few specific

21  opinions that you make in your report.  Direct you to

22  page 3.  I believe these are numbered; your report is

23  page-numbered.  I want to look at page 3.

24  A  Page 3?

25  Q  Yes.  Are you there?

Page 38

1  A  Yes.

2  Q  Okay.  Second full paragraph, it begins with

3  "Subsequently."  Do you see it?

4  A  Yes.

5  Q  Okay.  And I'm going to go to the second

6  sentence.  You say "The term 'fortress hubs' was

7  coined in the 80s to highlight the significant market

8  dominance of an airline in a hub airport, which

9  inevitably comes with non-competitive and rather

10  monopolistic routes to and from said hub."  Do you see

11  that?

12  A  Yes.

13  Q  In making this statement, what support do

14  you have that airlines do not offer competitive routes

15  at hub airports?

16  A  After consolidation of 2010, we had roughly

17  about 11 net full carrier; right now, we have four.

18  Airlines decided to not to compete head-to-head and

19  divide the market.

20  For example, if I'm not mistaken, roughly

21  between 75 to 80 percent of the flight from DFW is

22  American Airline; roughly about 80 percent of that.

23  Therefore, they're not competing with each other.  In

24  Atlanta, about 75 percent dominated by Delta.

25  Therefore, in reality, there's no competition at hub.

Page 39

1  Q  There's no competition?

2  A  Practical -- I live in Daytona Beach.  If I

3  want to go from Atlanta, I need to go Daytona Beach,

4  the only airline I can take is Delta because other

5  airline moving you around.  Therefore, competition is,

6  I don't say zero; competition is minimal.

7  Q  And as you're giving these percentages --

8  A  Yes.

9  Q  -- is there data to back this?

10  A  Of course, of course.  Yes.  The data --

11  MR. KIRKMAN:  Let her finish her

12  question.

13  THE WITNESS:  Oh -- oh.  I'm sorry.

14  BY MS. JOHNSTON:

15  Q  Where would this data be held?

16  A  Government.

17  Q  Is this the DOT?

18  A  That's right.

19  Q  Okay.  Is there -- did you cite to that in

20  your report?

21  A  Unfortunately, no.  I didn't notice that

22  detail.  Otherwise, I would have done that.

23  Q  And so this statement here that airline hubs

24  do not offer competitive routes is purely just your

25  opinion without evidence in this report?

Page 40

1  MR. KIRKMAN:  Form.

2  BY MS. JOHNSTON:

3  Q  Is that correct?

4  A  There's evidence, but I did not source that

5  in that when I didn't know that would be that

6  detailed.

7  Q  There is not evidence in this report cited

8  to?

9  A  Yes.

10  Q  Okay.  You say, also, that there are rather

11  monopolistic routes.  Is that different than non-

12  competitive routes?

13  A  According to Justice Department, we have

14  something called Herfindahl-Hirschman Index that shows

15  the market concentration.  If market concentration is

16  more than 1800, they said no competition.

17  Based on my analysis, Herfindahl-Hirschman

18  Index is something about 6,000, 7,000 in U.S. airport;

19  means that lack of competition at major hob in U.S.

20  Herfindahl-Hirschman Index is something between zero

21  and 10,000.

22  Based on Justice Department, if Herfindahl-

23  Hirschman Index is above 1500 or 1600, they call that

24  the market is not experiencing competition.  An

25  airport like here, I'm sure that Herfindahl-Hirschman

Page 41

11 (Pages 38 - 41)

App'x 082

1    should be something about 6,000; in Atlanta something
2    about --
3        We have major concentration at the U.S.
4    hubs, means that airlines are -- they are not absolute
5    monopoly of one, but they are acting as a monopolist.
6        Q    Dr. Vasigh, you're citing these sources, but
7    there is nothing in your report that references those;
8    is that correct?
9        A    You are absolutely correct.
10       Q    And we looked at Exhibit B, which was the
11   materials presented to you as you prepared your
12   report; right?  And that included two declarations
13   from the CEO of Skiplagged, the complaint in this
14   matter, and then 24 news articles about skiplagging in
15   general and Skiplagged, American, and this lawsuit; is
16   that correct?
17       A    Uh-huh -- uh-huh.
18       Q    So based on Exhibit B, which you confirmed
19   was all that you reviewed in preparation and in
20   preparing for this report, these statements in your
21   report are not supported by any other data; is that
22   correct?
23            MR. KIRKMAN:  Form.
24       A    Supported it 40 years of my experience in
25   this field.

Page 42

1        Q    And so because you're an expert in this
2    field, it should be something that we take as true
3    without any data to support it?
4            MR. KIRKMAN:  Form.
5        A    Not necessarily.  I can provide data.
6        Q    But we agree that there is nothing in this
7    report; right?
8            MR. KIRKMAN:  Form.
9        A    Yes.
10       Q    And the Exhibit B materials does not
11   reference or cite to any other source of information
12   that you used in preparing this report other than the
13   items in Exhibit B.
14           MR. KIRKMAN:  Form.
15   BY MS. JOHNSTON:
16       Q    So, like, this index that you're talking
17   about and the database that we referenced a moment
18   ago, that was not listed as an item that you reviewed
19   or consulted in preparing this report; is that
20   correct?
21       A    My opinion didn't come from those only.  My
22   opinion based on my knowledge I acquired earlier.
23   Those are something that helped me.  But some of those
24   are my opinion, based on my experience, based on my
25   knowledge.

Page 43

1        Q    Why were those items not listed in materials
2    that you reviewed in Exhibit B?
3        A    Practically, I think it's -- it might not
4    necessary, and I didn't know that document should
5    be highly referenced.
6        Q    You didn't know that you had to reference
7    data in an expert report?
8        A    Yes -- yes.
9        Q    Okay.  So you believe that if this is
10   presented to a jury, that they should just believe you
11   because you say this is true; is that correct?
12           MR. KIRKMAN:  Form.
13       A    At that time, I can provide more data.
14           MS. JOHNSTON:  Objection, non-
15   responsive.
16   BY MS. JOHNSTON:
17       Q    If this is presented to a jury, this report
18   is presented to a jury and your testimony is presented
19   to a jury, are you saying that they should believe you
20   because of your experience in the field, and that that
21   is enough; that you do not have to have data to back
22   the statements that you make?  Evidence?
23           MR. KIRKMAN:  Form.
24       A    I don't have any comment on that.  I don't
25   know.

Page 44

1        Q    You don't know?
2        A    Yes.
3        Q    Do you want me to rephrase the question?
4        A    You are asking if they believe me or not?
5        Q    I'm asking you, if your opinion is presented
6    to the jury without any data, without any evidence,
7    without any citations to anything, that you are asking
8    the jury to believe you because of your experience in
9    the field; is that correct?
10       A    Yes.
11       Q    Okay.
12           THE OFFICER:  Counsel, could you pull
13   the mic closer to you so I can hear your objections?
14   Thank you.
15   BY MS. JOHNSTON:
16       Q    Going back to this page 3, Dr. Vasigh.  The
17   third full sentence, it says "Even though anti-trust
18   laws forbid it, hubs are naturally less hospitable to
19   the entry of new airlines."  Do you see that?
20       A    Page 3 of 14?
21       Q    That's correct.
22       A    Yes.
23       Q    The same paragraph that we were just
24   reading.  It's the third sentence.
25       A    Yes.  I have it.  Thank you, ma'am.

Page 45

12 (Pages 42 - 45)

1    Q   Well, let me ask you -- let me go back real
2  quick.  Why is it an inevitability that airport hubs
3  put out non-competitive and monopolistic routes?  Why
4  is that inevitable?
5    A   Practically, don't want lots competition.
6  Therefore, from my point -- my understanding airlines
7  these days, they have divided the market.  They don't
8  want to compete head-to-head.  Competing head-to-head
9  force them to compete based on prices.
10        Therefore, in reality, they have divided the
11  market.  Each airline has power at a special airport.
12  As I mentioned that Atlanta dominated by Delta,
13  Chicago, American, and United; DFW with American.
14        Therefore, in that respect, they are very
15  comfortable of not competing.  By competing, they need
16  to reduce average ticket price, offer more
17  frequencies.  I'm sure that with travel a lot in the
18  last ten years, what's happening:  Aircraft are
19  becoming more seats, legroom is smaller, frequency.
20  Therefore, that's the reason.
21        You know, you compete not only based on
22  price, you compete based on what quality.  If there is
23  no competition, you are not concerned about
24  competition, you are able to jack up the price and
25  reduce what quality of service.

Page 46

1    Q   Are you aware of American's introduction of
2  the Basic Economy seat?
3    A   Yes.
4    Q   And what is your understanding of why
5  American introduced that seat option for passengers?
6    A   Passenger demand.  We have different type of
7  passengers; some of them they are price-sensitive,
8  some of them they are time-sensitive, some of them
9  they are quality-sensitive.  That lower price is
10  American trying to bring those passenger that they are
11  price-sensitive, rather than taking buses or car, they
12  try to take airlines.
13    Q   So you believe that American created the
14  Basic Economy seat because, otherwise, passengers
15  would have to take a bus or a train?
16    A   Or low-cost carrier if they're competing.
17    Q   Right.
18    A   Low-cost carrier if that route they're
19  competing, yes.
20    Q   And there are low-cost carriers at hub
21  airports; is that correct?
22    A   Not necessarily -- I should say not
23  necessarily.  Recently, for example, you see
24  Southwest; Southwest was only flying to secondary
25  airport.  But recent, Southwest, after they bought the

Page 47

1  aircraft, they go to Atlanta.  But most of them, they
2  are flying from secondary airport they don't want to
3  compete with.  Yes.
4    Q   What was the last phrase?  Because --
5    A   Go to the secondary airport, not the major
6  hub.  In major hub, you would see only limited number
7  of low-cost carriers.
8    Q   But there are low-cost carriers?
9    A   Of course, of course.  When I say "of
10  course," I need to correct myself.  You see that again
11  I bring a statistics.  In Atlanta, 70 percent of the
12  market is enjoyed by Delta Airline.  The rest 30, by
13  many other airline.
14        Here, roughly about 80 percent of the market
15  is dominated by American Airline.  Therefore, when we
16  see that, yes, there are.  I didn't say pure monopoly,
17  but they have monopoly powers.
18    Q   Okay.  Where is that data?
19    A   I can send it to you today or tomorrow.
20    Q   But it is not in this report; correct?
21    A   Yes.  I -- I said that several times.  You
22  are correct.  It is not in that report.  You are
23  absolutely correct.
24    Q   Okay.  You go onto say -- well, let me ask
25  you.  When you say that hubs are naturally less

Page 48

1  hospitable to the entry of new airlines, what support
2  or what data do you have to support the statement that
3  hub airports are less hospitable to the entry of new
4  airlines?
5    A   Practically, if you want to fly from
6  Chicago, you can fly to any part of the world with
7  American and United because of network.  But if you
8  have a low-cost carrier, they have limited flight.
9  They cannot compete.  Therefore, is not -- the hub is
10  not hospitable to a small and low-cost airline.
11    Q   But why are airport hubs less hospitable?
12    A   For example, access to gates could be
13  limited.  Access to departing and arriving slot would
14  be limited because majority of them are used by hub
15  airline.  For example, say, Delta Airline in Atlanta;
16  Chicago, American and United.  Access to gate, access
17  to landing slot, that are limited.
18    Q   But as you just said, there are low-cost
19  carriers that are in these airports; right?  In these
20  hub airports?
21    A   Absolutely.
22    Q   And like you said at the beginning, there is
23  a blurring of the lines between the hub-and-spoke and
24  the low-cost carrier because of the competitive
25  demand; right?

Page 49

13 (Pages 46 - 49)

1    A   Yes.
2    Q   And so are airport hubs really less
3   hospitable if there are other airlines coming in and
4   competing with them?
5    A   Let me repeat my answer.  Access to gate
6   limited, access to landing slot are limited, the
7   network is limited.  Let me add something.  Many years
8   ago, Boeing moved its headquarter from Seattle to
9   Chicago for one reason:  Because Chicago was dominated
10   by two airlines.  They had massive network.  Network
11   is one of them makes really less hospitable to, what,
12   low-cost airline.
13        Anyone wants to fly from Chicago, they have
14   two choices:  American or United.  Therefore, if
15   you're a small airline, you do not have any chance of
16   competing with those.  That's the reason Southwest is
17   flying from the other airport from Chicago, not
18   Chicago Heathrow.
19    Q   But the airlines do not control the gate
20   availability at airports; is that correct?
21    A   No, airlines are controlling.
22    Q   The airlines control the gate availability?
23    A   Please remember, in reality, Delta is the
24   major customer at Atlanta, and they are dividing it.
25   I had a picture I took when I was in Charlotte, all of

Page 50

1   the gate was used by American Airline.  All of them.
2   Therefore, if another airline wants to come to that --
3   you know, I have a picture of that.
4        Therefore, in that respect, as I mentioned,
5   that availability of the gate, availability of landing
6   slot, is really one thing that prevent low-cost
7   airline to enter the big hub.
8    Q   So what evidence is there that airlines are
9   less hospitable to the entry of new airlines?
10        MR. KIRKMAN:  Form.
11    A   The fact that you don't see a rush of low-
12   cost airline to major hub.  That's the most important
13   reason.  You don't see that.
14    Q   In this report, when you say limited
15   competition -- I mean, we can go to page 5.  Well, I
16   guess the sentence begins at the top.  It's the first
17   paragraph, but the sentence begins on page 4.  "Often,
18   an airline faces limited competition at its hub."  Do
19   you see that?  The bottom of page 4, going onto page
20   5.
21    A   Yes, the primary reason.  You said the 4 --
22   is 4 out of 14, you mean?
23    Q   That's right.  That paragraph, but the
24   second sentence that leads onto the next page.
25    A   Yes -- yes.  Yes, ma'am.

Page 51

1    Q   "Often, airlines face limited competition at
2   its hub"; is that right?  That's what I read?
3    A   Yes.
4    Q   And we clearly have been talking about this
5   limited competition.  What is limited competition?
6   How do you quantify limited competition?  Is it three
7   other airlines, five other airlines?
8    A   I refer you to Department of Justice HHI
9   Index, Herfindahl-Hirschman Index.  If HHI is more
10   than 1800, that's the definition of limited
11   competition.  That's not my definition; that's the
12   Department of Justice anti- -- Antitrust Division of
13   Justice Department.  HHI is greater than 1800.  That's
14   the definition.
15    Q   And then, in that same sentence, you go onto
16   say "which allows it," the airline, "to exploit the
17   opportunity to demand higher fares with less fear of
18   competition interference."
19    A   Yes.
20    Q   In making that statement, did you conduct
21   any comparative analysis of a hub versus a non-hub in
22   the fares?
23    A   There are slew of article talks about this
24   element, that airlines are having the higher ticket
25   prices from hub than non-hub.  That is lots of

Page 52

1   research that have been done in that respect, yes.
2    Q   But in preparing this report, you did not
3   consult any of those resources?
4    A   Yes, few of them, yes.  It should be the
5   back.  Whatever I did, that is the reference there.
6    Q   On Exhibit B?
7    A   Yes, what -- yes.
8    Q   Okay.  So those news articles are what you
9   referenced in making this statement that airlines
10   exploit the opportunity to demand higher fares with
11   less fear of competition interference?
12    A   There are some academic articles that they
13   look at that front, too.
14    Q   And are those listed as materials reviewed
15   in your Exhibit B?
16    A   I'm sorry, I don't have the recollection.  I
17   don't remember whatever I put that, because they are a
18   lot.
19    Q   I mean, we can look at Exhibit B together.
20   And if you can point me to those academic articles,
21   that would be helpful.
22    A   I'm sorry, I'm reading one by one --
23    Q   That's fine.  Take your time.  Take your
24   time.
25    A   No.  I don't have it here.

Page 53

14 (Pages 50 - 53)

Page 54

1    Q   While you're back there, I want to look at
2  Exhibit C real quick, as well.  And this is Exhibit C
3  to your report.  Let me know when you're there.
4    A   Yes.
5    Q   Okay.  Do you need a chance to review this
6  exhibit?
7    A   Yes.
8    Q   Okay.
9    A   Yes.
10   Q   Okay.  Have you reviewed it?
11   A   Yes -- yes.
12   Q   Okay.  Who --
13   A   I didn't go one by one, but I know what you
14  mean.  Yes.
15   Q   Who prepared this exhibit?
16   A   I tried to see that -- the whole element of
17  hidden city, I want to know that, does it exist across
18  the board, or that is occasional?  Therefore, I tried
19  to check myself to see that are there any type of
20  potential for that.
21   Q   So you prepared this --
22   A   Yes.
23   Q   -- this document?
24   A   Yes.
25       MR. KIRKMAN:  Let her finish first.  I

Page 55

1  know it's hard, but just let her finish.
2  BY MS. JOHNSTON:
3    Q   When did you prepare this?
4    A   I don't have the right recollection of that.
5  I'm sorry.
6    Q   Was it this year in 2024?
7    A   Maybe.  Because continuously, I'm working on
8  that.  Maybe, yes.
9    Q   Because when we look at this, like, when you
10  look at these columns on the first two pages, there's
11  not a year on these dates of "March 7th."  Do you see
12  that?
13   A   Yes.
14   Q   But these were flight itineraries that you
15  personally pulled, you believe, this year?
16   A   Yes.
17   Q   Okay.  And looking back at your report, I
18  think it's on page 8, the first full paragraph that
19  starts with "Upon reviewing."  Do you see that?
20   A   Yes, please.  Yes.
21   Q   Okay.  You say "Upon reviewing the attached
22  Exhibit C, it is evidence that there are fluctuations
23  in ticket prices across different cities in Texas when
24  flying via Dallas."  My understanding is that this is
25  your example, your demonstration, of a hub premium;

Page 56

1  is that correct?
2       MR. KIRKMAN:  Form.
3    A   Please remember that when we talk about
4  revenue management dynamic pricing, airline
5  continuously adjusting their capacity by ticket price.
6  Sometimes, ticket price could be cheaper; sometimes,
7  could be more.  But overall, from the hub, average
8  ticket price is more.
9    Q   Is Exhibit C your analysis of a hub premium?
10   A   Anecdotal evidence, yes.
11   Q   Hub premiums are -- I mean, it's a common
12  topic in an airline economy; right?  Is that accurate?
13   A   Yes.
14   Q   And there's a lot of literature out there
15  about hub premiums; is that accurate?
16   A   Yes, depending.  Sometimes, there are some
17  research that, at a special hub, they recognize
18  there's no hub premium.  But general understanding is
19  that -- do you know why we have hub premium?
20       If you don't -- the reason:  Hub airport
21  generally dominated by a lot of business traveler.
22  Business traveler, they try to fly there without
23  notice.  They are not price-sensitive.  Therefore,
24  airline recognize that.
25       I don't want to use the word "taking

Page 57

1  advantage"; airline know that my passenger from hub,
2  majority of them, they are business traveler, they are
3  not paying from their own money.
4       Therefore, they are not price-sensitive, we
5  can charge them higher prices.  Therefore, in reality,
6  that's the reason it's creating hub premium.  Hub
7  dominated by majority of -- by Fortune 500 companies.
8       MS. JOHNSTON:  I'm going to object to
9  non-responsive.
10      What was my question?
11      THE OFFICER:  Stand by for readback.
12      MR. KIRKMAN:  She can object like that.
13  That doesn't mean she's right.  She's got the
14  opportunity to do that, so just because she objects
15  like that doesn't mean she's correct.  She has that
16  right.
17      (The officer repeated the record as
18      requested.)
19  BY MS. JOHNSTON:
20   Q   In preparing this report and in putting
21  together your Exhibit C, did you consult any of the
22  literature about hub premiums that is out in the
23  market?
24   A   No.
25   Q   And so throughout your report when you

1 reference hub premiums, like, for example, go back to
2 page 8, that same paragraph where you reference
3 Exhibit C. Are you there?
4    A   Yes.
5    Q   Okay. The second sentence says "Notably,
6 the existence of hub premiums in certain markets adds
7 an interesting dimension to this case." What do you
8 mean by "an interesting dimension"? What does that
9 sentence mean?
10    A   The same thing we have; the difference of
11 airfare. If you're traveling a longer dimension --
12 distance, if you're paying less, that create another
13 dimension for that. If I flying from point A to B, if
14 I pay more than from A to B from B to C, create a new,
15 really, dimension; what's going on?
16    Q   And Exhibit C is your attempt to demonstrate
17 that point?
18    A   Yes.
19        MS. JOHNSTON: Okay.
20        MR. KIRKMAN: How about a short break,
21 guys?
22        MS. JOHNSTON: That works.
23        THE VIDEOGRAPHER: Off the record at
24 1:43 p.m.
25        (Off the record.)

Page 58

1        THE VIDEOGRAPHER: On the record at
2 1:57 p.m.
3 BY MS. JOHNSTON:
4    Q   Dr. Vasigh, I won't belabor this, but I just
5 want to go through a few other statements in your
6 report.
7    A   Please.
8    Q   Going to page 5. Are you there?
9    A   Yes.
10    Q   Okay. It's the third paragraph, the second
11 full paragraph, about in the middle of the page. It
12 starts with "The HCT is undesirable." Do you see
13 that?
14    A   Yes.
15    Q   And HCT is defined in your report as hidden
16 city ticketing; is that right?
17    A   Yes.
18    Q   Is that correct?
19    A   Yes.
20    Q   Okay. And you say "The hidden city
21 ticketing, the HCT, is undesirable to airlines as it
22 prevents them from exploiting the market, and
23 demanding higher prices that they claim to be entitled
24 to by leveraging their market dominance and lower
25 competition." Did I read that correctly?

Page 59

1    A   Yes.
2    Q   Okay. What evidence is there in this report
3 that airlines like American Airlines are exploiting
4 the market?
5    A   The existence of hidden city ticketing is a
6 good example.
7        MS. JOHNSTON: I'm going to object to
8 non-responsive.
9 BY MS. JOHNSTON:
10    Q   Is there evidence in this report, do you
11 cite to anything in making this statement that
12 airlines exploit the market?
13        MR. KIRKMAN: Again, she can take the
14 position something's non-responsive, but she's not the
15 judge. So you make your own decision.
16        MS. JOHNSTON: I object as it's non-
17 responsive because it does not answer the question.
18        MR. KIRKMAN: It did answer the
19 question. You're entitled to your opinion, I'm
20 entitled to mine, and he's entitled to his. The point
21 is, just because you object doesn't mean it's so.
22 That's all I'm trying to say.
23 BY MS. JOHNSTON:
24    Q   Is there any data or evidence in this report
25 that demonstrates that American Airlines exploits the

Page 60

1 market?
2        MR. KIRKMAN: Form.
3    A   Existence of disparity of ticket price.
4 Higher ticket price from hub to the spoke and network,
5 that is example of exploiting. If you are paying more
6 for the shorter distance than the longer distance,
7 that's example of exploitation. That's example.
8        Generally speaking, if you are flying a
9 longer distance, you should be paying shorter
10 distance. But doesn't have any rational reason. You
11 are flying a shorter distance; you pay more than
12 longer distance. That is exploitation.
13    Q   Okay. So your opinion that American
14 Airlines exploits the market is based on the existence
15 of hidden city ticketing opportunities?
16    A   Not only American Airline. Most of the
17 airline that they are operating from hub-and-spoke
18 network, they have hub premium. They are charging
19 higher ticket prices from hub to other destination.
20 That is what I meant.
21    Q   And this Exhibit C that you prepared is your
22 demonstration of -- that's the evidence that you
23 have --
24    A   That my previous --
25        MR. KIRKMAN: Well, no, don't

Page 61

16 (Pages 58 - 61)

1  interrupt.
2        Go ahead.  It's very difficult for the
3  court reporter to get you both talking, so go ahead.
4  BY MS. JOHNSTON:
5     Q   Exhibit C to this report is your attempt to
6  evidence or demonstrate the exploitation of the
7  market?
8     A   And my experience.
9     Q   Okay.  But you'll agree with me that, as
10 looking at this paragraph, there is no data cited or
11 referenced when you claim that airlines exploit the
12 market?
13    A   Please allow me --
14    Q   We're on page 5.
15    A   No.
16    Q   You agree with me that there is none?
17    A   No.  You are right.
18    Q   Okay.  On page 9, this section -- the page
19 is indented over with a paragraph, it looks like a
20 statement to the right.  Do you see that?
21    A   Yes, I see it.
22    Q   Where is this from?  Is this a quotation?
23    A   This is general definition of hidden city
24 ticketing.
25    Q   Is this cited from somewhere?

Page 62

1     Q   So because you said it is, it is?
2        MR. KIRKMAN:  Form --
3     A   Yes.
4        MR. KIRKMAN:  Excuse me.  Form.
5        THE OFFICER:  I'm sorry.  Your answer
6  was yes?
7        THE WITNESS:  Yes.
8        THE OFFICER:  Okay.
9        THE WITNESS:  I apologize.
10 BY MS. JOHNSTON:
11    Q   Turning to page 13.
12    A   Yes, ma'am.
13    Q   The top paragraph right under "Conclusions,"
14 you say "Hidden city ticketing" -- well, I don't want
15 to read that whole first sentence.  I'm going to go to
16 the second sentence.  It says "This is often
17 attributed" -- and can we agree that when you say
18 "this," it means hidden city ticketing?
19    A   "Hidden city ticketing can offer a valuable
20 opportunity for passenger with limited income to
21 travel to their destination"?
22        MR. KIRKMAN:  No.  It's actually the
23 third sentence of the first paragraph, not the second.
24        THE WITNESS:  Oh.
25        MS. JOHNSTON:  Oh, I'm sorry.  I didn't

Page 64

1     A   I don't think so.
2     Q   So you came up with this?
3     A   Yes.  Or general, this is -- if you see
4  that, that's a general definition of hidden city
5  ticketing.  That's maybe a little bit different
6  verbiage.
7     Q   Okay.  If we go to the paragraph right below
8  that, in the middle of that paragraph, it says
9  "Airlines often charge higher fares for flights that
10 originate from or terminate at these major hub
11 airports, compared to flights between non-hub
12 airports."  Do you see that?
13    A   Yes.
14    Q   In making this opinion, there is no evidence
15 or data cited to this; is that correct?
16    A   Evidence, we are sitting here.
17    Q   Right.  As we're sitting here, in your
18 report.
19    A   Yes -- yes.
20    Q   And as you made this opinion in preparing
21 this report, you did not consult any data or
22 evidentiary authority; is that correct?
23    A   Ten years of looking at this hidden city
24 ticketing, and my previous information, knowledge, and
25 gathering.

Page 63

1  see that.
2        MR. KIRKMAN:  Beginning "This is
3  often."
4        MS. JOHNSTON:  That's correct.
5        THE WITNESS:  Oh, okay.  The first
6  paragraph.  Sorry.
7  BY MS. JOHNSTON:
8     Q   You say "This is often attributed to the
9  limited competition and lack of alternative options
10 available at these airports."  Do you see that?
11    A   Yes -- yes, ma'am.
12    Q   Okay.  And again, in making this statement,
13 did you consult any data or make any independent
14 analysis, a comparative analysis of some sort, to make
15 this statement?
16    A   That's my gathered for so many years.  I'm
17 look at that data regularly.  I see more and more
18 concentration of major airline at hub.  The market
19 share is getting higher and higher.  And this is, for
20 example, two plus two equal four; you don't need to
21 have data for that.
22        That is generally what I have seen for many
23 years.  Market share of three airlines are getting
24 bigger and bigger at major hubs.  That's a common
25 knowledge.

Page 65

17 (Pages 62 - 65)

1    Q    Okay.  So again, because you say it's so,
2   it's so?
3        MR. KIRKMAN:  Form.
4   BY MS. JOHNSTON:
5    Q    Is that correct?  There's no data here or
6   evidence.
7        MR. KIRKMAN:  Form.
8    A    Evidence, as I mentioned that the evidence
9   of -- I have many years of experience.  I look at,
10  every day, the data.  But I have not put in this one.
11  I mentioned that at the beginning that could be the
12  case, but I have the data fully support this.
13   Q    Okay.  And going to the last paragraph on
14  this page 13, the first sentence says "Skiplagged's
15  business and its providing of information relative to
16  hidden city ticketing, HCT, can indeed provide
17  passengers with the means to circumvent the monopoly
18  positions that airlines often hold at certain airport
19  hubs."  You see that?
20   A    Yes, ma'am.
21   Q    Okay.  When you say "certain airport hubs,"
22  what airport hubs are you talking about?
23   A    Generally speaking, top ten or top seven
24  major hub in U.S.  For example, here is the fourth
25  largest hub, Atlanta is the biggest hub, Chicago is

Page 66

1   the second major hub airport in U.S.  Atlanta,
2   Chicago, New York, New York City JFK, Los Angeles,
3   DFW.
4    Q    And when you say "Skiplagged's business and
5   its providing of information relative to HCT," how do
6   you know about Skiplagged's business?
7    A    All of the document I read.
8    Q    Which --
9    A    That they are providing information to
10  people that you can take this one or the other one.
11   Q    So those articles that you read?
12   A    The document that are provided, yes.  And
13  the article I read, yes.  I believe I mentioned that
14  what they are doing, they are disseminating
15  information and provide choice for passenger.  Is it
16  Choice A or Choice B?  That's up to you.
17   Q    Okay.  So when you say "circumvent the
18  monopoly positions that airlines often hold at certain
19  hub airports," do you believe that circumventing a
20  rule is wrong?
21       MR. KIRKMAN:  Form.
22   A    What do you mean by rule?  I don't know.
23  Can you explain what do you mean by rule?
24   Q    Yeah.  Let me back up.  So do you believe
25  that skiplagging or hidden city ticketing harms the

Page 67

1   airline at all?
2        MR. KIRKMAN:  Form.
3    A    I don't think -- since it is believe they
4   are harming, that's we are sitting here; otherwise, we
5   don't sit here, if there's not.  But the issue is that
6   this harming, if you look at the what are -- are they
7   doing anything against, really, the free competition?
8        Our country's based on free competition,
9   free flow of information.  Dissemination of
10  information is not illegal.  Dissemination of
11  information just try accommodate some people; they
12  don't know this is your option.
13       For sure, a airline may not be able to
14  charge that high prices.  In that respect, they could
15  not like it, and they don't like it.
16   Q    Does skipping a segment on a plane cause
17  harm to an airline?
18       MR. KIRKMAN:  Form.
19   A    You are asking my opinion?  I think no.
20  Because we are flying regularly; you see always an
21  airline overbooking.  Therefore, if someone doesn't
22  take the other seat, airline has the opportunity of
23  filling the overbooked passenger.
24       In reality, I don't think their complaint is
25  right.  He's not flying, there's an empty seat, and

Page 68

1   they fill it up with what?  Overbooked passenger.  How
2   could that hurt?  They get two ticket price:  One, the
3   guy that paid at the beginning, another when they are
4   filling up the aircraft with overbooked passenger.
5    Q    Do you believe that it expends resources or
6   causes challenges when somebody skips a leg or a
7   segment on their flight?
8        MR. KIRKMAN:  Form.
9    A    I'm not really aware of any type of really
10  cost or harm.  I'm not aware of that.
11   Q    What about any extreme challenge?
12   A    Similar to what?  I'm sorry.
13   Q    An extreme -- do you think airlines
14  experience an extreme challenge when somebody misses a
15  flight or skips a leg?
16       MR. KIRKMAN:  Form.
17   A    Please remember that if you -- 15 minutes
18  before the flight, if you are not there, they will
19  give your seat to someone else.  Therefore -- are you
20  following?
21       You have about 15 minutes to get to the
22  aircraft.  If within 15 minutes you are not there,
23  your seat is given to someone else.  Therefore, they
24  are filling up the aircraft with overbooked passenger.
25       MS. JOHNSTON:  I'm going to object as

Page 69

18 (Pages 66 - 69)

1    non-responsive.
2    BY MS. JOHNSTON:
3        Q   Dr. Vasigh, in your example of when you
4    believe it wouldn't harm the airline, that is when
5    there are passengers that are waiting to get on the
6    plane; is that correct?
7            MR. KIRKMAN:  Form.
8    BY MS. JOHNSTON:
9        Q   Like, an overbooked flight, in your example?
10           MR. KIRKMAN:  Form.
11       A   If that's a -- if I understood your question
12   correctly, if the gentleman or lady doesn't show up,
13   that seat is allocated to those people that they are
14   overbooked for the flight.
15       Q   And what if they're not overbooked?  What if
16   the airline does not overbook?
17       A   Airline would save money because of they are
18   using less fuel.  You know that the majority of fuel
19   of the aircraft is used by, you know, the weight of
20   the aircraft.
21       Q   So a hundred-and-twenty pound person would
22   make the aircraft use more fuel?
23       A   Yes -- oh.
24           MR. KIRKMAN:  Oh, no, no, no.  Go
25   ahead.

Page 70

1            THE WITNESS:  Apparently, American
2    Airline did the research many years ago with taking
3    one olive from champagne would save them about ten
4    million dollars, something, you know?  Therefore, I
5    want to -- you said hundred-twenty pounds, I'm talking
6    about the, really, one olive.
7    BY MS. JOHNSTON:
8        Q   Dr. Vasigh, are you saying, with that olive
9    example, that when somebody skips a leg, misses their
10   flight, they're saving the airline money?
11       A   You have to look at both side, you know, to
12   be fair with American.  You know, one benefit, as I
13   said, that -- there are a couple of benefits.  One
14   benefit is that seat is just given to a overbooked
15   passenger, and that would improve the quality of the
16   airline, and so forth and so on.
17           Even that seat goes empty, that seat of
18   empty would have less cost.  But again, could create,
19   I don't know, some type of logistic problem and so
20   forth.  That, I would see that minimum, as far as I
21   concern.
22       Q   But that --
23       A   Could be, yes.
24       Q   -- could be a challenge?
25           MR. KIRKMAN:  Let her finish.

Page 71

1    BY MS. JOHNSTON:
2        Q   Correct?
3        A   Yes.
4        Q   Dr. Vasigh, in this report, you make pretty
5    bold statements about the state of the airline
6    industry, and hub-and-spoke carriers like American, in
7    calling them "monopolists" or "engaging monopolistic
8    practices, dominating a market, and exploiting
9    opportunities."  As an economist, you understand what
10   these terms mean; right?
11       A   Yes.
12       Q   And would you agree with me that they are
13   severe or bold statements?
14       A   Depending how you define bold statement.
15   But really, if you are looking at the last ten years,
16   the way that we have experienced significant
17   consolidation on the airline, quality of service -- of
18   course, quality has many different definition.
19           Quality of service has been relatively
20   diminished.  Many years ago, when you were flying, the
21   aircraft had about 60 to 70 percent load factor.  Load
22   factor means the number of passengers in the aircraft,
23   respect to the seat.  Seventy percent load factor
24   means thirty percent seat are empty.
25           Right now, majority of aircraft are about 90

Page 72

1    percent load factor, seat are smaller, more seat in
2    the aircraft, aircraft more fuller.  Therefore, you
3    are losing the quality.
4            Airlines, again, because they don't have
5    significant competition, they have been able to, what?
6    Reduce the service that they had before.  Again,
7    service could be -- safety; I'm not talking about
8    safety.
9            But in the case of, really, cabin amenities;
10   cabin amenities gone.  You know, many years ago, if
11   you remember, you were served food in the aircraft.
12   Right now, they are nickeling and diming you for
13   everything, you know.
14           I paid round-trip ticket from Daytona Beach
15   to here; unbelievable, eleven-hundred-dollar.  And
16   they charged me $50 for a seat, for the luggage.
17           Therefore, that is what we say that service
18   quality has been hurt in the past ten years.  Because
19   of the only correlation you -- is what?
20   Consolidation, lack of competition.
21           MS. JOHNSTON:  I'm going to object to
22   non-responsive.
23   BY MS. JOHNSTON:
24       Q   Would you agree with me that accusations or
25   claims that an airline is operating a monopolistic

Page 73

19 (Pages 70 - 73)

1 company, or they are exploiting the consumer or the
2 opportunity, that those are strong statements?
3     A   I don't know how to make it milder, but that
4 is what I see.  That is what I feel.  The fact that,
5 you know, again, the base on experience of as a
6 passenger, regular traveler, I see significant drop in
7 service.
8         When I was flying from here to Europe, Delta
9 Airline was providing all the domestic connection.
10 Right now, because of consolidation, you know, you
11 have to change, you know, your aircraft.
12         Aircraft all seat are smaller, quality of
13 service is bad.  That's my personal observation based
14 on my experience, both as a passenger, both as a
15 writer, both as a teacher, based on the consultant.
16         MS. JOHNSTON:  And I appreciate that,
17 but I'm going to object as non-responsive.
18 BY MS. JOHNSTON:
19     Q   These terms that you're using to describe
20 the state of the airline industry and hub-and-spoke
21 carriers like American are strong statements, aren't
22 they?
23         MR. KIRKMAN:  Form, repetitive, asked
24 and answered.
25 //

Page 74

1         MR. KIRKMAN:  Form.
2         Go ahead.
3         THE WITNESS:  I appreciate your
4 question.  I believe you asked me several times, more
5 than five or six times.  And I mentioned that I have a
6 data; unfortunately, I didn't put that one.  Yes.  You
7 asked me couple of times, I remember.  More than
8 couples of -- yes.  But that's a fact.  That fact, I
9 can provide you with the data.
10 BY MS. JOHNSTON:
11     Q   Okay.  Do you believe that your report, as
12 we've reviewed today and as you've submitted in this
13 case, is a reliable source?
14     A   Absolutely, yes.
15         MR. KIRKMAN:  Objection to form.
16 BY MS. JOHNSON:
17     Q   Is a reliable source in opining that
18 skiplagging is justified?
19     A   If you're asking my opinion, absolutely yes,
20 but I leave it up to you guys.
21     Q   In your world, when you read an article or a
22 publication that does not have any citations or
23 references to data or evidence, would you consider
24 that to be a reliable source?
25     A   You are absolutely correct.  Not, no.

Page 76

1 BY MS. JOHNSTON:
2     Q   You can answer.
3     A   Could you repeat one more time?
4     Q   Uh-huh.  I'll ask it a different way.  For a
5 layperson, not an economist, not an academic, if a
6 layperson were to hear the word "exploitation" or
7 "monopolistic practices" or "dominance of a market,"
8 do you believe that those terms would cause an
9 inflammatory reaction?
10         MR. KIRKMAN:  Form.
11     A   We cannot deny they have monopolistic power
12 as, you know, you have to see what -- you cannot deny
13 they don't have monopolistic power at the hub airport.
14 It is bad or good?  I leave it up to the people to
15 think that is good or bad.  Good for the airline, bad
16 for the customer.
17     Q   But you have not offered any evidence in
18 this report where you make those conclusions --
19         MR. KIRKMAN:  Form -- excuse me.
20 BY MS. JOHNSTON:
21     Q   -- that airlines run a monopoly or that they
22 dominate the market or they leverage their dominance
23 to exploit --
24         MR. KIRKMAN:  Form.
25     A   I appreciate your --

Page 75

1 Actually, I admonish my student for that.  Thank you
2 very much.  You're absolutely correct.
3     Q   Do you believe that your opinion that
4 skiplagging is justified is relevant to this case?
5         MR. KIRKMAN:  Form.
6     A   Justified to what case?
7     Q   So you're serving as an expert in this case.
8     A   Yes.
9     Q   And so I'm assuming that you understand what
10 this case is about?
11     A   Of course, yes.
12     Q   Okay.  And so my question is whether you
13 believe that your report and your testimony is
14 relevant to the issues in this case.
15         MR. KIRKMAN:  Form.
16     A   I think so.
17     Q   In what way?
18     A   Legitimacy of this skip lag ticketing,
19 again, depends.  You are sitting against me because
20 you are protecting American Airline.  I
21 understandable.  My position is based on general
22 public.
23         I read one article a 17 years-old kid
24 prevented to fly and to see his parent because the
25 airline recognize that he's going to miss another.

Page 77

20 (Pages 74 - 77)

1  This is, generally, from my point of view, is helping
2  those people. They don't have that much money, and
3  they cannot afford to pay very high price to the hub
4  airport to get and see their family.
5         You, me, and him is not going to
6  skiplagging. We are businessman, we are paying the
7  full price. This is really catering for those people
8  with the limited income. They take chances. You
9  cannot take your luggage. You can get kick off the
10  aircraft.
11        This is -- I believe that the core of this
12  situation. Bottom of my heart, I believe in it. I
13  don't accept many cases because I don't believe in it.
14  I accepted this because I believe in it.
15        MS. JOHNSTON: Can we take five
16  minutes?
17        MR. KIRKMAN: Okay.
18        THE VIDEOGRAPHER: Off the record at
19  2:24 p.m.
20        (Off the record.)
21        THE VIDEOGRAPHER: On the record at
22  2:27 p.m.
23        MS. JOHNSTON: Dr. Vasigh, thank you
24  for your time today.
25        THE WITNESS: You're welcome.

Page 78

1         MS. JOHNSTON: I'll pass the witness.
2         MR. KIRKMAN: I will reserve my
3  questions, except I do want to ask a couple of
4  logistical questions.
5         MS. JOHNSTON: On the record?
6         MR. KIRKMAN: Yes.
7         MS. JOHNSTON: Okay.
8              EXAMINATION
9  BY MR. KIRKMAN:
10    Q   If you would turn to Exhibit A, which is the
11  page after your picture, where it says "Experience,
12  Recent Consulting." Do you see that? Go to the next
13  page after your picture. You see where it says
14  "Experience, Recent Consulting"?
15    A   Yes.
16    Q   And there are a number of bullet points
17  listed. What are those?
18    A   Yes.
19    Q   What are those, just generally?
20    A   Do you want the second one, you mean?
21    Q   No. Just all of the bullet points under
22  "Experience, recent consulting," what are those?
23    A   That's -- I don't know I'm able to tell was
24  a lawsuit. A lawyer brought a legal lawsuit against
25  one of the airline. I representing the defendant.

Page 79

1    Q   Are these experiences that you had in
2  consulting? You, personally?
3    A   Yes -- yes. That's -- yes. Yes.
4    Q   Okay. And go to the section called
5  "Referred [sic] Publications."
6    A   Yes, sir.
7    Q   And what are those? What are the referred
8  [sic] publications?
9    A   All of them, they are referred.
10    Q   Are those --
11    A   Referee -- that's --
12        THE OFFICER: Okay. One at a time. Go
13  ahead.
14        THE WITNESS: All of them, they are
15  referee publication.
16  BY MR. KIRKMAN:
17    Q   Are they publications that you wrote or
18  reviewed?
19    A   No. That is written. There is a paper
20  written by me and Dr. Azadian, methodology and
21  technical determining the value of an aircraft. It
22  was published in Journal of Transportation Research.
23  That was published on November 12, 2020.
24    Q   Okay. And all the rest of these, what are
25  those?

Page 80

1    A   Except -- yes. The other one is -- the
2  second one --
3    Q   I don't want them individually. Just
4  generally, what are they?
5    A   All of them, they are publish in academic
6  refereed publication.
7    Q   And that you were involved in?
8    A   That's right, yes. All of -- each of them
9  are my papers, co-author or alone, in referee
10  publication.
11    Q   And do they contain your analysis of data
12  and information that you analyzed in the cases where
13  you wanted to prepare these reports?
14    A   Yes -- yes. Absolutely, yes. When we say
15  referee publication, is not something you write in the
16  New York Times. That goes to series of evaluation.
17  They check your data. They check your methodology.
18  They reject or they publish.
19    Q   Okay. Then go to the section a little
20  further in that says "Other Publications."
21    A   After "Books and Chapters"? Yes, I got
22  that.
23    Q   And what are those? Just generally, what
24  are all of those other publications that you've
25  listed?

Page 81

21 (Pages 78 - 81)

**Page 82**

1    A   Please remember, this highlighted "Market
2    post of [sic] take off," it was published to Harvard
3    Business Review.  "Foundation of Aircraft" [sic] is
4    published on Airline Solution [sic].
5         Those are the -- they are published in non-
6    academic, not referee.  Those are journal.  For
7    example, Harvard Business Review is not referee
8    journal.  This published there.
9    Q   Are these publications that you were
10   involved with?
11   A   Yes.  That's my publication.  Some of them
12   are solely, some of them with my co-author.
13   Q   And the next page, "Theses at Ph.D. Level."
14   A   Yes.
15   Q   Are these theses that you wrote and were
16   involved in?
17   A   My Ph.D. student, they are taking -- they
18   write their thesis.  I'm a supervisor.  I'm the
19   director of thesis.  That's right.
20   Q   Okay.  And in your business, is it normal,
21   is it standard, for you to review, rely, and
22   essentially understand various data?
23   A   Yes.
24   Q   And do you keep that data within your
25   experience and knowledge?

**Page 83**

1    A   Yes.
2    Q   And do you use that data and your experience
3    and your knowledge when you prepare opinions?
4    A   Yes.
5    Q   And do you use that data and experience and
6    knowledge when you prepared this opinion?
7    A   Yes.
8        MR. KIRKMAN:  I will reserve the
9    balance of my questions until trial.
10       MS. JOHNSTON:  I just have one follow-
11   up.
12           EXAMINATION
13   BY MS. JOHNSTON:
14   Q   Dr. Vasigh, this list that Mr. Kirkman just
15   went through of different publications or journals
16   that you've written in, in preparing this report, did
17   you refer to any of those in particular?
18   A   As I mentioned that when I prepared and
19   wrote report, I'm using 40 years of experience of
20   writing, going on TV interview, and so forth and so
21   on.  It is not just taking something.  That's
22   culmination of my knowledge gathered for 40 years.
23   Q   Have you -- in any of these publications or
24   speaking engagements, are any of these related to
25   hidden city ticketing?

**Page 84**

1    A   No.
2        MS. JOHNSTON:  I'll pass the witness.
3        THE WITNESS:  Okay.
4        THE OFFICER:  Before we go off the
5    record, will this witness read and sign?  I know he's
6    a expert, but --
7        MR. KIRKMAN:  Yeah.  Read and sign, and
8    send it to me.
9        THE OFFICER:  Okay.
10       MR. KIRKMAN:  And I'll give you my
11   card, if you want to --
12       THE OFFICER:  Okay.  Great.
13       And then, Ms. Johnston, would you like
14   a copy of the transcript?
15       MS. JOHNSTON:  Please.
16       THE OFFICER:  Okay.
17       Mr. Harris, you want to get your
18   orders?
19       THE VIDEOGRAPHER:  Do you need a video?
20       MR. KIRKMAN:  I do not.
21       THE VIDEOGRAPHER:  Okay.
22       THE OFFICER:  Okay.  We can go off the
23   record.
24       THE VIDEOGRAPHER:  Off the record at
25   2:34 p.m.

**Page 85**

1        (Signature reserved.)
2        (Whereupon, at 2:34 p.m., the
3        proceeding was concluded.)

22 (Pages 82 - 85)

CERTIFICATE OF DEPOSITION OFFICER

1           CERTIFICATE OF DEPOSITION OFFICER
2      I, MAGGIE BERRY, the officer before whom the
3   foregoing proceedings were taken, do hereby certify
4   that any witness(es) in the foregoing proceedings,
5   prior to testifying, were duly sworn; that the
6   proceedings were recorded by me and thereafter reduced
7   to typewriting by a qualified transcriptionist; that
8   said digital audio recording of said proceedings are a
9   true and accurate record to the best of my knowledge,
10  skills, and ability; that I am neither counsel for,
11  related to, nor employed by any of the parties to the
12  action in which this was taken; and, further, that I
13  am not a relative or employee of any counsel or
14  attorney employed by the parties hereto, nor
15  financially or otherwise interested in the outcome of
16  this action.
17  Dated: June 21, 2024
18
                 *[signature]*
19               MAGGIE BERRY
20         Notary Public in and for the
21           State of Texas
22
23  [X] Review of the transcript was requested.
24
25
                                     Page 86

1  William L. Kirkman
2  billk@kirkmanlawfirm.com
3         June 21, 2024
4  RE:American Airlines, Inc. v. Skiplagged Inc.
5    6/6/2024, Bijan Vasigh, Ph.D. (#6746333)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16  Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25
                                       Page 88

1          CERTIFICATE OF TRANSCRIBER
2      I, KIMBERLY BRISCOE, do hereby certify that
3  this transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13  Dated: June 21, 2024
14
                 *[signature]*
15           KIMBERLY BRISCOE
16
17
18
19
20
21
22
23
24
25
                                     Page 87

1  American Airlines, Inc. v. Skiplagged Inc.
2  Bijan Vasigh, Ph.D. (#6746333)
3     E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Bijan Vasigh, Ph.D.        Date
25
                                       Page 89

                                   23 (Pages 86 - 89)

1  American Airlines, Inc. v. Skiplagged Inc.

2  Bijan Vasigh, Ph.D. (#6746333)

3          ACKNOWLEDGEMENT OF DEPONENT

4   I, Bijan Vasigh, Ph.D., do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Bijan Vasigh, Ph.D.          Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Page 90

24 (Page 90)

```
 1              ***NOTIFICATION RE RETURN OF ORIGINAL***
 2      ----------------------------------------------------
                  DEPOSITION OF BIJAN VASIGH PhD
 3                        Volume 1 of 1
                          June 6, 2024
 4      ----------------------------------------------------
 5          The original deposition was not returned to
 6      the deposition officer by 7/22/2024;
 7          If returned, the attached Changes and Signature
 8      page contains any changes and the reasons therefor;
 9          If returned, the original deposition was sent to
10      Julia Wisenberg, Custodial Attorney;
11          That $_N/A____ is the deposition officer's charges
12      to the PLAINTIFF for preparing the original
13      deposition transcript and any copies of exhibits.
14          That a copy of this notification was sent to all
15      parties shown herein this 2nd day of August,
16      2024.
17
18
19                      Sincerely,
                        Veritext Legal Solutions
20                      Veritext Registration No. 571
                        300 Throckmorton Street, Suite 1600
21                      Fort Worth, Texas 76102
                        (800) 336-4000
22
23
24
25
                                              Page 1
```

# Exhibit A-3

Withheld Due to Confidential Information
Pending Motion for Leave to File Under Seal

# Exhibit A-4

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT NORTHERN DISTRICT OF TEXAS
 3                    FORT WORTH DIVISION
 4

 5

           --------------------------------
 6                                         )
       AMERICAN AIRLINES, INC.,            )
 7                      )
                   Plaintiff              )
 8                                         )
       vs.          ) C.A. No. 4:23-CV-00860-P
 9                                         )
       SKIPLAGGED, INC.,                   )
10                                         )
                   Defendant              )
11                                         )
           --------------------------------
12
13                    CONFIDENTIAL
14          DEPOSITION OF DARIN LEE, PH.D.
15             THURSDAY, JULY 11, 2024
16              9:04 A.M. - 1:37 P.M.
17             GREENBERG TRAURIG LLP
18             ONE INTERNATIONAL PLACE
19              BOSTON, MASSACHUSETTS
20
21
22
23       REPORTED BY:  Sandra A. Deschaine, CSR, RPR,
24       CLR, RSA
25       Job No. TX6782850
```

                                                    Page 1

1  APPEARANCES:

2

3  ON BEHALF OF THE PLAINTIFF AND THE WITNESS:

4  GREENBERG TRAURIG LLP

5    Nathan Muyskens, Esquire

6    2101 L Street, N.W.

7    Washington, DC 20037

8    202.331.3164

9    nathan.muyskens@gtlaw.com

10

11  ON BEHALF OF DEFENDANT:

12  CONDON TOBIN SLADEK THORNTON NERENBERG PLLC

13    Aaron Z. Tobin, Esquire

14    8080 Park Lane, Suite 700

15    Dallas, Texas 75231

16    214.265.3851

17    atobin@condontobin.com

18

19  Also Present:  Gayle Ashton, videographer

20         Jeremy Ballew, Esquire

21         in-house counsel for American

22         Airlines

23

24

25

Page 2

---

1               JULY 11, 2024

2

3             9:04 a.m.

4

5            Deposition of Darin N. Lee,

6  Ph.D., held at Greenberg Traurig LLP, One

7  International Place, Boston, Massachusetts,

8  pursuant to Notice, before Sandra A.

9  Deschaine, a Shorthand Reporter, Registered

10 Professional Reporter, Certified LiveNote

11 Reporter, and Notary Public in and for the

12 Commonwealth of Massachusetts.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

---

1              INDEX

2  EXAMINATION                    PAGE

3  Darin N. Lee, Ph.D.

4    By Mr. Tobin ....................... 6

5

6            EXHIBITS

7

   EXHIBIT       DESCRIPTION       PAGE

8

   Exhibit 1     Expert Rebuttal Report   6

9            of Darin N. Lee, Ph.D.

10 Exhibit 2     Hidden city travel and  122

             its impact on

11           passengers, implications

             for the traveling

12           public, Dr. Bija Vasigh

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

---

1          P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good morning.

3  We are now on the record.  This is the

4  videographer speaking, Gayle Ashton,

5  with Veritext Legal Solutions.  Today's

6  date is July 11, 2024, and the time is

7  9:03 a.m.  We are here at Greenberg

8  Traurig, 1 International Place, Boston,

9  Massachusetts, to take the video

10 deposition of Darin N. Lee, Ph.D., in

11 the matter of American Airlines, Inc.,

12 versus Skiplagged, Inc.

13          Would counsel please introduce

14 themselves for the record.

15          MR. TOBIN:  Aaron Tobin for

16 Defendant Skiplagged.

17          MR. MUYSKENS:  Nathan Muyskens for

18 American Airlines.

19          THE VIDEOGRAPHER:  Would the court

20 reporter, Sandra Deschaine, please swear

21 in the witness.

22          DARIN N. LEE, PH.D., deponent,

23 having first been satisfactorily identified

24 by the production of his Massachusetts

25 driver's license and duly sworn by the Notary

Page 5

---

1 Public, was examined and testified as
2 follows:
3 (Exhibit 1, Expert Rebuttal Report of Darin
4 N. Lee, Ph.D., marked for identification.)
5 　　　　EXAMINATION
6 BY MR. TOBIN:
7 　　Q.　Please state your full legal name?
8 　　A.　Darin, D-a-r-i-n, Norman, L-e-e.
9 　　Q.　Dr. Lee, my name is Aaron Tobin.
10 You understand I represent the defendant
11 Skiplagged in this lawsuit that American
12 Airlines has brought?
13 　　A.　I do.
14 　　Q.　Okay.　And I believe today was the
15 first time we had a chance to meet; is that
16 correct?
17 　　A.　That's correct.
18 　　Q.　I assume -- I've reviewed your
19 report and your resumé and your CV, and it
20 sounds like you're experienced in this.　I
21 assume you've had your deposition taken a
22 number of times?
23 　　A.　I have, yes.
24 　　Q.　And do you need me to go over any
25 of the rules or you kind of understand the

Page 6

1 format of what's going to happen today?
2 　　A.　I understand the rules as I've
3 been deposed in the past.
4 　　Q.　Okay.　Great.
5 　　　　One thing I'll tell you, because
6 all lawyers are different, I am very lax
7 about breaks.　If you want to take a break
8 for any time, any reason, you just let me
9 know and we'll do it.
10 　　　　The only thing I would ask if I've
11 got a question on the table, just please
12 finish answering the question and then we're
13 good to go.　Okay?
14 　　A.　Sounds good.
15 　　Q.　Same thing about lunch.　I'm
16 really at your discretion.　If you want to
17 work through lunch -- I don't anticipate
18 we're going to be here all day, but if you
19 want to work through lunch or grab a quick
20 lunch or take a longer, more leisurely lunch,
21 your preference.　I really don't care.
22 　　A.　Sounds good.
23 　　Q.　So I placed in front of you
24 Exhibit 1.　Does that appear to be a true and
25 accurate copy of your report that you've

Page 7

1 issued in this case along with the appendix
2 that's attached to the report?
3 　　A.　It does.　I would say that the
4 quality of the printing on some of the
5 exhibits is a little hard to read, but yeah,
6 it is.
7 　　Q.　Okay.　If you have trouble reading
8 anything or figuring it out today, let me
9 know and we'll stop and try to see if we can
10 fix that for you.　Okay?
11 　　A.　Okay.
12 　　Q.　Does that contain all of the
13 opinions that you intend to offer in this
14 case?
15 　　A.　As I sit here currently, yes.
16 　　Q.　Okay.　Are you planning on
17 offering any opinions that are not contained
18 in that exhibit as you sit here today?
19 　　A.　I don't expect to, but I haven't
20 had any discussions as to what I'm going to
21 be asked to testify at trial, if I'm asked to
22 testify.
23 　　Q.　Okay.　Are there any corrections
24 or omissions or mistakes in your report that
25 you need to address right now?

Page 8

1 　　A.　Actually, I saw one typo last
2 night as I was reading the report.　It was
3 just very, very minor, but on paragraph 11, I
4 think it was --
5 　　Q.　Paragraph 11, you said?
6 　　A.　I think it was paragraph 11 where
7 it said "20 years ago."　So it's on the
8 second line of the paragraph 11, it says, "As
9 shown in Exhibit 2, 20 years ago," that
10 should say 30 years ago.　It's referring to
11 the first date of appointment, which is 1993,
12 2023 to 1993.　30 years not 20 years.
13 　　Q.　That's helpful.　Thank you.
14 　　　　Are there any other corrections,
15 mistakes or omissions that need to be made to
16 your report?
17 　　A.　Not that I'm aware of, no.
18 　　Q.　I want to -- and we'll get into
19 more of the details of your report.　But I
20 want to just, at a high level, kind of make
21 sure I understand where you're coming from
22 and of course my client doesn't necessarily
23 agree with everything you're saying, but I at
24 least want to understand what your opinions
25 are.　So we'll just take it at high level

Page 9

3 (Pages 6 - 9)

1    first.  Okay?
2        A.   Sure.
3        Q.   If I understand some of the points
4    you're making in your opinion, is that if my
5    client were to go away and not exist, you do
6    not believe that that would lead the market
7    to being any more susceptible to monopoly or
8    monopolistic behaviors by American Airlines;
9    is that fair?
10       A.   Well, I'm not sure I agree with
11   the premise of your question, in that I might
12   assume that they already have some type of
13   monopolistic power.  You know, so as I state
14   fairly clearly in my report, my report is
15   only responding to primarily the report of
16   Dr. Vasigh, and I think he makes some
17   incorrect assumptions about how the airline
18   industry operates and the competitive state
19   of it, and for the reasons I outline in my
20   report, I think those assumptions are
21   incorrect.
22       Q.   Okay.
23           MR. TOBIN:  Objection,
24       nonresponsive.
25   BY MR. TOBIN:

Page 10

1        Q.   My question, though, is just
2    generally  -- let me ask you, if Skiplagged
3    were not to exist, do you believe that that
4    could lead the market to being more
5    susceptible to monopolistic-type behavior?
6        A.   I don't think so, no.
7        Q.   Okay.  And if I understand in your
8    report kind of some of the basis for what
9    you're saying, it's because you believe the
10   industry has become more competitive over the
11   years; is that fair?
12       A.   Well, I -- the data demonstrated
13   that it has been.  So, I mean, all of the
14   indicia of competition in terms of things
15   like prices, output, the industry has become
16   incredibly competitive, that's correct.
17       Q.   You highlight part of the reason I
18   think you believe that the industry has
19   become more competitive is because you
20   believe these low-cost carriers and these --
21   I'm sorry -- what's the term? -- ultra low
22   cost, or -- there's another level of low-cost
23   carriers behind just the low-cost --
24       A.   There's a --
25       Q.   -- carriers?

Page 11

1        A.   There's a whole set of what I
2    refer to as lower-cost carriers --
3        Q.   Okay.
4        A.   -- which includes low-cost
5    carriers, ultra-low-cost carriers as well as
6    lower cost and network carriers.
7        Q.   Okay.  And you believe the
8    entrance of the market of those types of
9    carriers has made the industry more
10   competitive.
11           Am I understanding that
12   correctly?
13       A.   Well, it's a combination of the
14   expansion of those carriers, of the entry of
15   those carriers, the addition of new carriers,
16   and the competitive response they've elicited
17   from network carriers.
18       Q.   And you believe all those things
19   has made the industry more competitive over
20   the years?
21       A.   Oh, that definitely is a huge part
22   of it, yes.
23       Q.   Okay.  And so, I think if I
24   understand your point, is that if the
25   hidden-city ticketing is not around, the

Page 12

1    consumer has a number of options.
2           Is that one of the points you're
3    trying to make?
4        A.   You know, again, I would defer to
5    my report, and my report is responding to
6    some claims about the nature of competition
7    in Dr. Vasigh's report, and I don't think --
8    he didn't see -- the availability of
9    hidden-city ticketing is needed to ensure
10   that the industry is competitive.
11       Q.   Okay.  And I understand.  I've
12   read your report.  I promise I have.
13           But this is my chance to kind
14   understand and discover what you might be
15   talking about at trial.  So I'm going to ask
16   you some questions that deal with your
17   report, but, you know, not everything is
18   going to come verbatim from your report so I
19   need to understand what you're going to say
20   at trial.  Is that fair?
21       A.   I understand.
22   (Jeremy Ballew entered the deposition.)
23   BY MR. TOBIN:
24       Q.   So you say that all of these
25   things you talked about has led to the

Page 13

4 (Pages 10 - 13)

1  industry becoming more competitive, and I
2  just want to make sure I understand because
3  that -- you believe that gives the consumer
4  choices, right?
5      A.  Choices are an important part of
6  competition.
7      Q.  And you believe, as we sit here
8  right now, the consumer does have choices?
9      A.  Yes, they have choices.
10     Q.  And so if hidden-city ticketing
11 options are not around, if I understand, part
12 of your point is that the consumer could
13 choose to fly on a low-cost carrier, correct?
14     A.  Consumers have the option to fly
15 on low-cost carriers, that's correct.
16     Q.  Okay.  Or they can fly on an
17 ultra-low-cost carrier, right?
18     A.  They can fly on a ultra-low-cost
19 carrier.
20     Q.  They could shop the market and
21 possibly fly on another carrier, another
22 major carrier other than American Airlines,
23 right?
24     A.  There's many choices, yes.
25     Q.  Okay.  They could try to time the

Page 14

1  market because ticketing prices even for a
2  specific carrier vary day-to-day or
3  month-to-month, correct?
4      A.  They vary, that's correct.
5      Q.  So they can try to time the market
6  if they wanted to, right?
7      A.  I suppose they could.
8      Q.  And they don't have to fly, they
9  could take another mode of transportation or
10 just choose not to fly all together.  Is that
11 part of the choices that you believe the
12 consumer has?
13     A.  Not flying is always an option.
14     Q.  And I think, from your years of
15 experience, you at least understand that, you
16 know, that's a consumer-specific decision,
17 depending on what's going on in their life,
18 the timing of their events or the budget that
19 they're on, it's very individualistic as to
20 how each of those consumers would go through
21 that decision-making process.  Fair?
22     A.  I would generally agree that many
23 travel choices are made at the individual
24 level.
25     Q.  And so I think you would agree

Page 15

1  that it's impossible for you or impossible
2  for me to predict how each of those consumers
3  would react or what choices they would make
4  if hidden-city ticketing is not around,
5  correct?
6      A.  Well, I think that if you were
7  asking me if I could tell you what each
8  individual would do, I can't put myself in
9  the shoes of each individual.  I can tell you
10 what I would do, and I can tell you what a
11 lot of people that travel would do.  But I
12 can't sit here and tell you that I know what
13 each individual person would choose.
14     Q.  Okay.  Now, I want to make sure I
15 understand kind of the breadth of your
16 opinion and how far you are going, so to
17 speak.
18         I don't think you're opining on
19 whether there is actually a market for
20 hidden-city ticketing or not; is that
21 correct?
22     A.  Are you referring to, like, a
23 relevant market and antitrust framework, is
24 that what you're --
25     Q.  Well, I'm -- not in a legal sense,

Page 16

1  just in a lay sense.
2         Maybe I'll just ask you.
3         Do you believe -- I mean, you've
4  seen that my client actually has sales,
5  right?
6      A.  I purchased a ticket myself, so
7  they do have sales, yes.
8      Q.  All right.  And hidden-city
9  ticketing is not something that's brand new.
10 It's been around for a long time, the concept
11 at least, right?
12     A.  That is correct, it's been around
13 for a while.
14     Q.  Okay.  And if I represent to you
15 that my client didn't even start doing
16 business of any form until 2013, is at least
17 your understanding that hidden-city ticketing
18 or the practice has been around before my
19 client started doing business in 2013?
20     A.  I understand that hidden-city
21 ticketing has been around since prior to
22 2013.
23     Q.  Okay.  And you understand that my
24 client is not the only one in the market of
25 hidden-city ticketing, there are other

Page 17

5 (Pages 14 - 17)

| | |
|---|---|
| 1  businesses that practice -- either similar | 1      THE WITNESS:  And I chatted with |
| 2  practices or akin practices to what my client | 2  him for a few minutes. |
| 3  does.  You understand that at least? | 3  BY MR. TOBIN: |
| 4      A.  I'm aware of at least one other | 4      Q.  Who was that? |
| 5  website that promotes hidden-city ticketing, | 5      A.  Eric Amel. |
| 6  though I don't think they do on American | 6      Q.  How do you spell the last name? |
| 7  anymore. | 7      A.  A-m-e-l. |
| 8      Q.  So at least you understand, you | 8      Q.  Is Mr. Amel in your office? |
| 9  may not agree with the practice, but you at | 9      A.  He is, yes. |
| 10  least understand there's a market out there | 10      Q.  And were you individually retained |
| 11  for hidden-city ticketing? | 11  to give a report or was a business or a firm |
| 12      A.  I just don't know what you mean | 12  that you work with retained? |
| 13  when you refer to it as a market.  I know | 13      A.  Compass Lexecon, which is my |
| 14  that there's websites out there that promote | 14  employer, was retained. |
| 15  hidden-city ticketing, so I would agree with | 15      Q.  Did you meet or discuss |
| 16  the point that there are -- you're not the | 16  preparations for your deposition with anyone |
| 17  only one out there that's doing it. | 17  else besides Mr. Amel and your counsel? |
| 18      Q.  And you'd at least agree that | 18      A.  No, I did not. |
| 19  there are consumers out there that are | 19      Q.  How long did you spend reviewing |
| 20  consuming hidden-city ticketing services | 20  documents to prepare for your deposition |
| 21  provided by my client and others? | 21  today? |
| 22      A.  Yes, there are consumers who have | 22      A.  Well, see, today is what -- today |
| 23  purchased hidden-city ticketing, yes. | 23  is Thursday.  I spent maybe 20 hours in |
| 24      Q.  What did you do to prepare for | 24  total, Monday, Tuesday, Wednesday. |
| 25  your deposition today? | 25      Q.  How long have you been with |
| Page 18 | Page 20 |

| | |
|---|---|
| 1      A.  I reviewed my report.  I read | 1  Compass Lexecon? |
| 2  Dr. Vasigh's report, Dr. Phiroz's report, and | 2      A.  I believe I joined Compass Lexecon |
| 3  I met with counsel yesterday for maybe 90 | 3  in February of 2011. |
| 4  minutes. | 4      Q.  And pardon these questions, but I |
| 5      Q.  Did you review any other documents | 5  ask of every witness I ever depose. |
| 6  or data for your preparation of your | 6          Have you ever filed for bankruptcy |
| 7  deposition today? | 7  or any type of insolvency proceeding? |
| 8      A.  I looked at the Complaint.  I, you | 8      A.  I have not. |
| 9  know, I went through my report and looked at, | 9      Q.  Have you ever been charged, |
| 10  you know, the exhibits and some of the | 10  arrested or convicted of a crime other than a |
| 11  underlying information. | 11  minor traffic offense? |
| 12      Q.  Okay.  Anything else? | 12      A.  I have not. |
| 13      A.  I think that, as I sit here right | 13      Q.  Are you on any medications or do |
| 14  now, that's pretty much -- I reviewed my | 14  you have any conditions today that would |
| 15  report and the materials I relied upon. | 15  affect your ability to give truthful |
| 16      Q.  Now, I don't want to know anything | 16  testimony? |
| 17  you talked to with your counsel.  But other | 17      A.  I'm not. |
| 18  than that, did you talk to anybody else in | 18      Q.  Are you on any medications or do |
| 19  preparing for your deposition today? | 19  you have any conditions that would affect |
| 20      A.  I have one individual that | 20  your memory at all? |
| 21  assisted me in my direct -- worked under my | 21      A.  I take a statin, but that's it. |
| 22  direction in my report and I chatted -- | 22      Q.  And it doesn't affect your recall? |
| 23      THE STENOGRAPHER:  Sir, you're | 23      A.  Not that I -- not that I know of. |
| 24  kind of dying out at the end. | 24      Q.  When were you retained? |
| 25      "And I chatted with"? | 25      A.  To the best of my recollection, as |
| Page 19 | Page 21 |

1   I sit here today, sometime in earlier May.
2       Q.   And were you retained by a law
3   firm or by American Airlines?    When I say
4   "you," you understand I'm talking about the
5   Compass?
6       A.   I believe our retention letter is
7   with American Airlines, but it -- you know,
8   largely the reach out came from the
9   attorneys.
10      Q.   Okay.  Was that Greenberg Traurig
11  or Kelly Hart?
12      A.   Could have been both.  I mean, it
13  could have been -- I think the initial call
14  had both Kelly Hart and Greenberg.
15      Q.   What is your rate?
16      A.   $1040 per hour.
17      Q.   What is Mr. Amel's rate?
18           I'm sorry.  Yeah, Mr. Amel.
19      A.   I don't know it off my heart, but
20  I suspect it is in the maybe 750-ish range
21  per hour.
22      Q.   Did anyone work on this project
23  that you're here to testify other than you
24  and Mr. Amel?
25      A.   No, we were the only two.

Page 22

1       Q.   How much have you billed so far?
2       A.   I don't know, as I sit here right
3   now.
4       Q.   Do you know how much you collected
5   so far?
6       A.   I don't know as I here today right
7   now.
8       Q.   Is it over $50,000?
9       A.   Collected?
10      Q.   I'm sorry.  Charged.
11      A.   Over 50,000.  I suspect it is,
12  yes.
13      Q.   Is it over a hundred thousand
14  dollars?
15      A.   Probably.
16      Q.   Is it over $250,000?
17      A.   I don't think so.
18      Q.   Do your rates change at all
19  depending on whether you give testimony or is
20  the rate static?
21      A.   My rate is the same regardless of
22  testimony or not.
23      Q.   Okay.  Now, you've been retained
24  by American Airlines -- you or your firm have
25  been retained by American Airlines before,

Page 23

1   correct?
2       A.   That is correct.
3       Q.   And how many times have you been
4   retained by American Airlines?
5       A.   Over what period of time?
6       Q.   Ever since you started doing this?
7       A.   I couldn't tell you sitting here
8   right now.  I'd defer to my CV, which lists
9   all of the engagements I provided testimony
10  in.  But I've been retained by American on
11  multiple occasions, as with other airlines.
12      Q.   More than ten times?
13      A.   Over the course of my career?
14      Q.   Yes.
15      A.   Yes.
16      Q.   More than 25 times?
17      A.   I would need to go and count, but
18  it's possible.
19      Q.   Your CV is attached as -- or is
20  attached to Exhibit 1, correct?
21      A.   It is.
22      Q.   And your prior expert retention is
23  part of that, correct?
24      A.   It is.
25      Q.   So every time you've been retained

Page 24

1   by American Airlines, you or someone you're
2   working on behalf of is reflected in
3   Exhibit 1; is that fair?
4       A.   Well, I think Exhibit 1 lists
5   testimony, and so there are instances where I
6   may have been retained by a client to provide
7   nontestifying consulting, but in terms of
8   engagements where I've offered expert
9   testimony, my CV is quite complete, I
10  believe.
11      Q.   I'm looking at page A-6, which is
12  Appendix Exhibit 1.
13           Do you see that?
14      A.   A-6?
15      Q.   Yes.
16      A.   Yes.  Yes, I do see that, yeah.
17      Q.   Okay.  Like, for instance, about
18  two-thirds of the way down the page, you see
19  where expert report in a matter between a
20  U.S. carrier, that bullet point?
21      A.   Hold on.  Page A-6, expert report.
22  Yes, I do see that, yes.
23      Q.   Okay.  That seems to indicate to
24  me that there may not have been any testimony
25  and that was just a report in that particular

Page 25

7 (Pages 22 - 25)

1 case.
2     A. In that particular instance -- I'm
3 just trying to recall why I had to not
4 disclose -- the client in that matter asked
5 me not to disclose the name, their name, and
6 I filed an expert report, but I was neither
7 deposed nor was I asked to provide live
8 testimony in court.
9     Q. Okay. And it seems like there are
10 a couple of instances in there where -- at
11 least in this section A attached to your
12 report, where testimony is not listed.
13 That's why I thought this might have been
14 every retention as opposed to just every
15 retention that involves testimony.
16     A. So when you refer to testimony,
17 you're referring to, like, live oral
18 testimony?
19     Q. Yes. Either in a deposition or a
20 court proceeding or at trial or an
21 arbitration?
22     A. Okay. Yeah. So this would
23 include all of the above, all of the live
24 testimony, as you just described, as well as
25 expert reports.

Page 26

1     Q. Okay. Got it.
2     So if you'd been retained by
3 American Airlines, regardless of who you were
4 working for, if you had been retained as an
5 expert witness, regardless of whether you
6 gave testimony, if you at least gave a
7 report, it is identified in Appendix A to
8 your report; is that fair?
9     A. To the best of my knowledge, I try
10 to keep this complete, yes.
11     Q. Okay. I mean, since we're there,
12 let's go ahead and talk about this section.
13 Bear with me for a minute.
14 So let's go back to A-6, that
15 bullet point we were talking about.
16     A. A-6. Okay.
17     Q. The same bullet point where it
18 says, "Expert report in a matter between a
19 U.S. carrier and one of its represented
20 employee groups." (as read)
21 Do you see that bullet point?
22     A. I do see that, yeah.
23     Q. Okay. Can you at least tell me if
24 that U.S. carrier that you referred to was
25 American Airlines or any of its affiliates?

Page 27

1     A. It was not.
2     Q. Okay. If we look at page A-9,
3 five bullet points up where it says, "Provide
4 expert consulting services to several major
5 U.S. mainline and regional airlines."
6 Do you see that bullet point?
7     A. I do, yes.
8     Q. When you say "U.S. mainline and
9 regional airlines," was American Airlines or
10 any of its affiliates part of that
11 representation?
12     A. It would be included, as would
13 most other carriers that went through Chapter
14 11 and Delta, Northwest, United, US Airways,
15 Comair, Pinnacle. There's a whole set of
16 airlines throughout the decade after 9/11
17 that went bankrupt, and I was working --
18 providing consulting to a number of them.
19     Q. And American was one of those?
20     A. They were one of them, yeah.
21     Q. And that was in connection with
22 American or its affiliates' Chapter 11
23 bankruptcy proceeding?
24     A. That's correct.
25     Q. And then a couple more bullet

Page 28

1 points down, where it says, "Analysis of
2 industry, economic and antitrust issues of
3 three major U.S. airlines," was American one
4 of those?
5     A. No, I don't believe they were,
6 actually.
7     Q. At the bottom it says, "Provided
8 valuation "of a major carrier's U.S. slot
9 holdings."
10 Would that major carrier have been
11 American or any of its affiliates?
12     A. I do not believe that American was
13 that carrier, no.
14     Q. Moving on on the next page, A-10,
15 it says, "Analysis of industry and economic
16 and antitrust issues," third bullet point
17 down, of a major U.S. airline. (as read)
18 Would that major U.S. airline have
19 been American?
20     A. No.
21     Q. Moving a few more bullet points
22 down to "Industry analysis for a major
23 airline in connection with post-9/11
24 workforce reductions," would that major
25 airline have been American or any of its

Page 29

8 (Pages 26 - 29)

App'x 170

1    affiliates?
2        A.   No, it was not.
3        Q.   I've got a few bullet points I'm
4    going to ask --
5        A.   Sure.
6        Q.   -- the same question on.
7            So I would move down to the bullet
8    point that starts, "Authored whitepaper on
9    behalf of major U.S. airline."
10       A.   Sorry.  What page are you on, sir?
11       Q.   I'm still on A-10.
12       A.   A-10.  Okay.  "Authored"?
13       Q.   Whitepaper on behalf --
14       A.   Oh, I see that, yeah.
15       Q.   Was that American Airlines or any
16   of its affiliates?
17       A.   I believe that was one, yes.
18       Q.   Moving down, I believe, the fourth
19   bullet point from the bottom, as well as the
20   third bullet point from the bottom, also talk
21   about "Analysis" and -- "of industry and
22   economic issues for a major U.S. airline."
23           The major U.S. airline referred to
24   in either of those bullet points, was that
25   American or any of its affiliates?

Page 30

1        A.   So are you talking about the third
2    from the bottom and the second from the
3    bottom?
4        Q.    It depends -- you see there's a
5    bullet point under "impact of COVID-19," so
6    whether you count -- if you count that one,
7    I'm talking about the fourth and the third
8    from the bottom.
9        A.   On A-10?
10       Q.   On A-10?
11       A.   On A-10, third and fourth.  So the
12   one that says, "Analysis of industry and
13   economic issues for a major airline in a
14   predatory pricing suit"?
15       Q.   Correct.
16       A.   That was not American Airlines,
17   no.
18       Q.   What about the next one that is
19   related to and responsive allegations of hub
20   dominance?
21       A.   No, that was not American.
22       Q.   Who was that for?
23       A.   I think that was, if I recall,
24   part of my CV is dating back to probably the
25   late '90s or the early 2000s, I think it was

Page 31

1    Northwest Airlines.
2        Q.   And what do you mean when you say
3    "hub dominance"?
4        A.   Allegations of hub dominance?
5        Q.   Yes.
6        A.   Well, as I discuss in my report,
7    back many years ago, the -- there were --
8    there was a pretty lively debate amongst
9    those that studied the airline industry about
10   hub pricing, you know, the pricing that
11   airlines paid -- I'm sorry -- the prices that
12   airlines would charge in hubs versus a
13   non-hub.
14       Q.   When you say "hub," what do you
15   mean?
16       A.   Well, a hub as I describe in my
17   report is a central part -- a hub-and-spoke
18   carriers' network, so there's kind of a
19   network architecture that's used by some
20   carriers known as hub-and-spoke networks.
21   And the hub is essentially the central focal
22   point where flights are funneled into the hub
23   so that people can make connections to other
24   places.
25       Q.   And when was this analysis done

Page 32

1    that you refer to in this bullet point on
2    page A-10 on your report?
3        A.   I can't tell you precisely as I
4    sit here right now, but my suspicion,
5    especially given where this sits on my CV,
6    which is generally organized chronologically,
7    is in the, as I said, the late '90s or early
8    2000s.
9        Q.   And have you testified on hub
10   dominance before, other than this analysis
11   that you identify?
12       A.   Have I testified on hub dominance?
13   I'm just trying to think because I've
14   testified many times.  I'm just trying to
15   think if there's a time specifically where
16   that topic came up.  I don't know if I've
17   specifically testified -- I've testified
18   numerous times on the competitive state of
19   the industry; and as I describe in my report
20   and as we discussed this morning, at points
21   in time in the industry's evolution,
22   economists debated whether or not there was,
23   you know, the exercise of any type of market
24   power at hubs.  That's a debate that was
25   occurring many decades ago.  So it's possible

Page 33

9 (Pages 30 - 33)

1    that in some of my testimony I've recounted
2    kind of the evolution of the industry, and
3    that's a part of the evolution of the
4    industry.
5        Q.  Okay.  Same question but as to
6    expert reports.  Have you given any expert
7    reports on hub dominance or hub competitive
8    activities, other than the one that you're
9    testifying on here today?
10       A.  Define what you mean by "hub
11   competitive activities."  I'm not quite sure
12   what you mean by that.
13       Q.  I thought that's what you were
14   describing in your testimony.  Competitive
15   market forces at hubs in the airline
16   industry, is that a fair term?  Do you
17   understand what I'm saying when I say that?
18       A.  Why don't you describe what you
19   mean by that.
20       Q.  Well you're the expert.  I'm
21   trying to figure out what you believe are the
22   issues as it relates to competitive forces at
23   these hubs you've been talking about.  You
24   tell me.
25       A.  Well, as I've just told you, over

Page 34

1    the course of the industry's evolution, after
2    deregulation, when hub-and-spoke networks
3    became a more centralized part of a certain
4    carrier's airline networks --
5        Q.  What point in time are you
6    referring?
7        A.  Well, deregulation occurred in
8    1978, and after 1978, there was a period of
9    time where the hub-and-spoke networks of
10   certain carriers, the trunk carriers, as they
11   were known at the time expanded --
12       Q.  To include American?
13       A.  American was one of them, yes.
14       Q.  Go ahead.
15       A.  And over a period of years and
16   so -- I think kind of the hub -- kind of the
17   hub debate and, you know, when economists
18   were most focused on it was probably in the
19   late '80s, into the 1990s, into maybe the
20   early part of 2000s.
21       Again, so prior to essentially the
22   growth of an expansion of low-cost carriers,
23   there was a vigorous debate as to whether or
24   not hubs conferred certain types of pricing
25   advantages to hub carriers, but it was a

Page 35

1    debate amongst scholars and amongst those
2    that were following the industry.
3        Q.  Congress was interested in it as
4    well, right?
5        A.  It was a vigorous debate.  I'm not
6    sure if Congress per but certainly DOT
7    weighed in on it and others did as well.
8        Q.  So getting back to A-10, if we
9    look at the last bullet point on A-10, that's
10   these above "Impact of COVID-19," where it
11   says, "Analysis of industry, regulatory and
12   economic issues for a major U.S. airline,"
13   would that major U.S. airline have been
14   American Airlines or any of its affiliates?
15       A.  Oh, gosh, let me think.
16       And this is stretching my memory
17   because this is now probably 27 years ago or
18   26 years.  So I think American may have been
19   the carrier that was looking at some kind of
20   joint ownership agreement with a Canadian
21   holding company, but I think there could have
22   been; but, again, I don't want to say a
23   hundred percent was American, but I think it
24   could have been American.
25       Q.  If we turn the page to A-11, the

Page 36

1    last bullet point in the first section on
2    that page says, "For a major U.S. carrier,
3    analysis of the impact of COVID-19."  I
4    assume that that analysis was done somewhat
5    recently?
6        A.  Yes, it was, yes.
7        Q.  Okay.  And when was that done?
8        A.  Well, 2000, I think, generally, in
9    that time period, 2000, 2001.  I mean, it was
10   kind of post-COVID period.
11       Q.  You sure it was 2000 or 2001?
12       A.  I'm sorry.  2020.
13       Q.  2020 or 2021?
14       A.  2020, 2021.  Yeah.  Sorry.
15       Q.  And would that have been for
16   American Airlines?
17       A.  We did work for American Airlines
18   as well as other airlines on COVID-related
19   issues, but we did certainly work with
20   American Airlines.
21       Q.  If I'm looking at A-12, the second
22   bullet point under "Conferences and Other
23   Invited Presentations" it talks about
24   "Georgetown Center for Business and Public
25   Policy."

Page 37

10 (Pages 34 - 37)

1        Do you see that one?
2        A.  I do, yes.
3        Q.  Airline Competition Conference,
4    what did you speak about, if anything, at
5    that conference?
6        A.  I believe I spoke -- let me think.
7        So my recollection -- and I just
8    need to -- my recollection is that I was --
9    you know, I may be confusing it with what I
10   spoke about at the -- I had a legal symposium
11   just before that.  It's one of two things or
12   it may have been an amalgamation of a couple
13   of things.
14       But I recall having completed a
15   whitepaper for Air New Zealand, where we were
16   looking at -- we, when I say "we," my
17   coauthors and I, at the joint venture that
18   they had with a variety of carriers in Asia,
19   and they had given us access to their
20   ticketing data that allowed us to do things
21   that -- and control for things that some of
22   the economic literature that relies on public
23   data wasn't able to control for, and I recall
24   that we had some nice results or interesting
25   results.

Page 38

1        I do recall speaking about that at
2    the IATA Legal Symposium, and I suspect
3    that -- because that talk was well received
4    at the IATA conference, I may have also
5    spoken about that and other issues at the
6    Georgetown one as well.
7        Q.  You list quite a number of
8    retentions dealing with the airline industry
9    in Exhibit A, where you were retained as an
10   expert -- excuse me -- Appendix A, where you
11   were retained as a expert.  I did not see any
12   where you were adverse to American Airlines;
13   is that correct?
14       A.  So I have been -- I mean, it
15   depends on how you think of "adverse to."  I
16   have certainly worked on matters for other
17   carriers, where the -- kind of the goals of
18   that carrier were adverse to the interest of
19   American Airlines, so.
20       Q.  Was that ever in a court case?
21       A.  I need to think about that.
22       So American has never been the
23   adverse party of a case where I've testified
24   in.  But, again, as I just said, there's been
25   cases certainly where I may have been, for

Page 39

1    example, working on a matter for United in
2    which United and American were competing for
3    the same thing.
4        The one that I can think of most
5    recently would be in the most recent DOT
6    allocation for slots at Haneda, and American
7    and United were the two carriers that were
8    competing for the initial daytime slot at
9    Haneda, and I was working with United.
10       Q.  Was that a court case?
11       A.  It was -- no, it was DOT, with
12   authority preceding.
13       Q.  Any other times you can -- it
14   sounds like you're telling me that you've
15   never testified adverse -- or given an expert
16   report adverse to American Airlines in a
17   court case; is that fair?
18       A.  I don't think I've been asked to,
19   no.
20       Q.  Okay.  Have you ever been --
21   testified on behalf of a party that was an
22   adverse party to a major U.S. airline carrier
23   in any type of court case or tribunal?
24       A.  Not to the best of my recollection
25   as I sit here right now.

Page 40

1        Q.  I notice in a number of places on
2    a number of bullet points you say, "major
3    U.S. airlines."  You use that terminology.
4        When you say "major U.S.
5    airlines," which airlines are you referring
6    to?
7        A.  Can you just point me to --
8        Q.  Sure.  Like, for instance, on page
9    A-9, and it's the third bullet point down,
10   and it says -- this is one instance where you
11   use the term "major U.S. airlines"?
12       A.  For several U.S. major airlines?
13       Q.  Yeah.  And I'm trying to figure
14   out, in your head, when you're saying "major
15   carriers" or "major U.S. airlines," what is
16   the universe you're talking about?
17       A.  Well, so the DOT has a
18   classification system of airlines and majors
19   are those that, I think over the trailing
20   four quarters, have revenues over a billion
21   dollars.
22       Q.  Okay.  So this decade, in the
23   United States, which carriers would fall
24   under that category?
25       A.  This decade in the United States,

Page 41

11 (Pages 38 - 41)

1  well it's grown obviously, but -- so
2  American, Delta, United, Southwest, Alaska,
3  JetBlue, Spirit would be a major airline by
4  this point. I think Frontier would be a
5  major airline by this point, and Hawaiian
6  would be a major airline at this point, and I
7  believe, I'd have to check to see whether or
8  not Allegiant is, for example. I don't
9  think, for example, Breeze or Avelo at this
10  juncture would be a major airline.
11         And, actually, I would add that
12  some of the regional carriers meet the
13  threshold -- the revenue threshold that DOT
14  would use to classify a major airline, so I
15  think SkyWest for sure.
16      Q.  So in your Appendix A, when you
17  are referring to major U.S. airlines, you
18  would be referring to carriers at the time of
19  that specific retention that at least had
20  over -- what did you say, a billion
21  dollars of --
22      A.  A billion dollars of revenue, yes.
23      Q.  Annual. Trailing 12 months?
24      A.  I think four quarters probably.
25      Q.  Okay. What percentage of your

1  income is derived from -- or your billings, I
2  should say, is derived from either litigation
3  consulting or being retained as an expert as
4  it relates to the airline industry?
5      A.  Over what period of time?
6      Q.  Let's say the last five years.
7      A.  So as being retained as an expert
8  or all the other --
9      Q.   Or providing services for either
10  consulting or expert services for the airline
11  industry.
12      A.  And would you be including in that
13  all types of carriers: passenger, cargo,
14  private?
15      Q.  Sure.
16      A.  It's fairly high. It's -- you
17  know, there's cases where I'm retained by --
18  for example, I'm working on a matter right
19  now where the client is a maintenance service
20  provider, so that's -- I'm not sure you would
21  put that in there, that's not an airline.
22  There the adverse party is actually an
23  airline. But I would say it's over 90
24  percent.
25      Q.  Okay. And of the cases in the

1  last five years where you've been retained,
2  actual court cases or arbitrations or
3  proceedings where there are adverse parties,
4  what percentage of your work has dealt with
5  the airline industry?
6      A.  It's very high. It's north of 90
7  percent.
8      Q.  How much money has American
9  Airlines paid for your services over the last
10  five years?
11      A.  I couldn't tell you as I sit here
12  right now.
13      Q.  Do you think it's hundreds of
14  thousands of dollars or millions of dollars?
15      A.  You're saying for the billings to
16  me personally or of my billings or for all
17  the work of the entire team that's working on
18  a case?
19      Q.  The entire team that you were
20  involved with.
21      A.  Over the last five years, it's
22  probably been in millions.
23      Q.  North of $10 million?
24      A.  No.
25      Q.  North of $5 million?

1      A.  I couldn't tell you as I sit here
2  right now.
3      Q.  Somewhere between 1 and $10
4  million is your estimate?
5      A.  It is definitely above one. I
6  can't tell you whether or not it's -- it's
7  certainly not ten. I don't think. It's
8  somewhere between that, I would suspect.
9      Q.  Exhibit 1, who drafted that?
10      A.  I wrote every word of this report.
11      Q.  Were there multiple drafts?
12      A.  I'm not sure what you mean. I've
13  worked on this report. So at different
14  points in time it was at different states of
15  completion.
16      Q.  Was there any point in time where
17  you passed a draft of the report that was not
18  final to somebody outside of your firm?
19      A.  I think I sent one near-complete
20  version of the report to counsel for their
21  review.
22      Q.  And did you retain that version of
23  your report?
24      A.  Perhaps. I mean, it's -- it may
25  be sitting someplace.

App'x 174

1    Q.  Have you produced your entire work
2  file or your team's entire work file on this
3  project to your counsel?
4    A.  Yes, I have.
5    Q.  Including any notes or work papers
6  you had?
7    A.  I didn't have any notes or work
8  papers.
9    Q.  Okay.  Did your team have any
10  notes or work papers on this project?
11    A.  Not that I know of.
12    Q.  I know, obviously, you've had
13  discussions with your counsel, which, again,
14  I don't want to know about, but have you had
15  discussions with American personnel directly
16  about this particular project that you've
17  undertaken in this case?
18    A.  On the first kickoff call, just to
19  discuss the issues that were involved in this
20  case and whether or not I could participate,
21  there was an attorney from American on the
22  call.
23    Q.  Okay.  Other than that call, have
24  you had any discussions with American
25  Airlines' personnel as it relates to this

Page 46

1  case?
2    A.  I have not.
3    Q.  Other than those calls, have you
4  had any written communications with American
5  Airlines' personnel regarding this case?
6    A.  I have not.
7    Q.  Are you aware of your team having
8  any communications, written or oral, with
9  American Airlines related to this case, other
10  than what you've already told me about?
11    A.  Not that I'm aware of.
12    Q.  Did you help American Airlines
13  personnel prepare for any other depositions?
14    A.  I had just one call prior to
15  Dr. Vasigh's deposition.  I wouldn't
16  necessarily characterize it as helping him
17  prepare, but they more or less wanted to
18  understand what was in my report, you know,
19  walk through my report with me.
20    Q.  And was that call with the lawyers
21  or was it with American Airlines personnel?
22    A.  It was with attorneys.
23  (Beeping noise.)
24    A.  It was telling me to be more
25  active.  Sorry.

Page 47

BY MR. TOBIN:
2    Q.  It's probably a reflection on me
3  somehow?
4       So in your report you identified
5  the materials you reviewed to help you with
6  the project in this case.
7       Are there any materials you
8  reviewed for this project in this lawsuit
9  other than what's identified in your report,
10  Exhibit 1?
11    A.  I mean, not specifically.  What I
12  would tell you is that every project I work
13  on, every report that I write, you know, I
14  also rely upon my knowledge of the industry,
15  my 25-plus years of doing both academic
16  research and other consulting work of the
17  airline industry, and so that kind of
18  accumulated knowledge of the industry and how
19  it works and -- all filters down into all of
20  my thinking, but what's listed in Appendix --
21  is it A?
22    Q.  I think it's B.
23    A.  B, are all of the documents and
24  data that I specifically relied upon in this
25  report.

Page 48

1    Q.  Okay.  Other than your general
2  accumulation of information from being in the
3  industry for many years, are there any
4  reports, data or documents that you reviewed
5  or relied on to prepare your report that are
6  not listed in Appendix B?
7    A.  Not that I know of.  If there
8  were, it would an omission by -- an
9  oversight.
10    Q.  What about specifically any types
11  of authoritative text, treatises, industry
12  papers, any type of written authority that
13  you reviewed or relied on specifically to do
14  your work in this case?
15    A.  Are they -- I mean, I think the
16  data on the documents, maybe the documents I
17  cite, but particularly the data, I'm a very
18  data-driven person, the data speaks for
19  itself, and I've cited and documented the
20  data that I used in this report.
21    Q.  Anything else?
22    A.  As I said, Appendix B contains a
23  list of all of the data and documents that I
24  specifically relied upon in forming my
25  opinions in this report, obviously

Page 49

13 (Pages 46 - 49)

1 supplemented my 25 years of experience.
2    Q.   And all those data and documents
3 you did turn over to your lawyers in this
4 case?
5    A.   Yes, we did.
6    Q.   Have you ever been retained by
7 Kelly Hart -- or a case where Kelly Hart were
8 the lawyers for the party that you were
9 working for, other than this case?
10   A.   Kelly Hart was cocounsel, I
11 believe, in a matter that I testified to --
12 testified in in 2019, I believe.
13   Q.   And who did you offer opinions on
14 behalf of in that case?
15   A.   That would have been American
16 Airlines.
17   Q.   And which case was that?
18   A.   That would have been -- pardon
19 me -- in the TWU/IAM Association slowdown
20 matter in Fort Worth.
21   Q.   Is that matter reflected in your
22 report in the appendix?
23   A.   It is.  I gave testimony before a
24 Judge McBride, the late Judge McBride.
25   Q.   Same question for Greenberg

Page 50

1    Q.   And what jurisdiction was that in?
2    A.   That was across the street.
3        MR. MUYSKENS:  Right over there.
4    A.   That was the Justice Department,
5 U.S. -- United States of America versus
6 JetBlue and American.
7 BY MR. TOBIN:
8    Q.   Who were you representing in this
9 case?
10   A.   JetBlue and American.  I wasn't
11 representing.  I'll just take that back.  I
12 wasn't representing anyone.  I was offering
13 testimony on behalf of.
14   Q.   Who were you retained by?
15   A.   American and JetBlue.
16   Q.   And was that a published opinion?
17   A.   Was it a published opinion?
18   Q.   Yes.
19   A.   I believe it was a published
20 opinion, yes.
21   Q.   And I'm sorry, when again was
22 that?
23   A.   The decision came down, what, a
24 year ago maybe.  It's under appeal currently.
25   Q.   And that case is listed in your

Page 52

1 Traurig, have you ever been retained by them
2 in an airlines case before?
3    A.   Not to the best of my
4 recollection.
5    Q.   Have you ever been retained by
6 Greenberg Traurig before for any
7 representation?
8    A.   Not to the best of my
9 recollection.
10   Q.   Have any of your opinions ever
11 been criticized, disregarded or excluded by a
12 court or any type of tribunal or authority?
13   A.   Could you repeat the question?
14   Q.   Sure.  Have any of your opinions
15 ever been criticized, disregarded or excluded
16 by a court, tribunal or any type of
17 authority?
18   A.   Sure.  Yes.
19   Q.   Okay.  How many times has that
20 happened?
21   A.   So the ones that I'm thinking of,
22 Judge Sorokin, whose opinion, actually to
23 this day, I very much disagree with,
24 criticized my opinions in the
25 JetBlue/American NEA trial.

Page 51

1 Appendix in the report?
2    A.   It is, yes.
3    Q.   Any other times this has happened,
4 where you've been criticized, disregarded --
5 your opinions have been criticized,
6 disregarded or excluded by a court, tribunal
7 or authority?
8    A.   So there's one case back in, I
9 think it's like 2008, where the judge
10 excluded multiple experts' opinions with
11 regards to one aspect of the report, and it
12 wasn't due to methodical or any liability
13 issues.  He had just decided, as a matter of
14 law, that one of the things I was asked to
15 study and opine on wasn't relevant as a
16 matter of law.
17   Q.   And which case was that?
18   A.   That was the Delta, AirTran bag
19 fee litigation.
20   Q.   And what court was that in?
21   A.   It was in Georgia, I believe.
22   Q.   Federal or state court?
23   A.   Federal court, I believe.  But,
24 again, it was not -- he excluded testimony
25 from multiple experts just as a matter of

Page 53

14 (Pages 50 - 53)

1  law.
2      Q.  Do you recall who the judge was?
3      A.  I don't recall.
4      Q.  Do you remember who retained you?
5      A.  Boies Schiller.
6      Q.  What was the party you were
7  working for?
8      A.  Delta Airlines.
9      Q.  Okay.  Any other instances where
10  your opinions have been criticized,
11  disregarded or excluded by a court, tribunal
12  or authority.
13      A.  So, I mean, are you asking if I've
14  offered testimony in a matter and the judge
15  or finder of fact decided, you know, ruled --
16  ruled against the party that I was retained
17  by?  Is that what you are asking?
18      Q.  No, that's not my question.
19          My question is whether your
20  opinions have either been criticized,
21  disregarded or excluded from a
22  court proceeding by a judge?
23      A.  No.  Other than to -- and they
24  weren't struck in the NEA trial.  They were
25  just -- he didn't find it compelling, for

1  reasons I don't quite understand, but no.
2          I can -- there's many opinions
3  that spoke quite favorably of my opinions,
4  including Judge McBride, if you wanted to
5  read that one.
6      Q.  All right.  It sounds like
7  decades, but how long have you been
8  consulting in the airline industry?
9      A.  Since 1998.
10      Q.  At a transition point, do you need
11  a break or do you want to keep going?
12      A.  I mean, I'm fine.  If you want
13  to -- stretch my legs.
14      Q.  Let's take a five-minute break?
15          THE VIDEOGRAPHER:  The time is
16      10:09.  We're going off the record.
17  (Recess taken at 10:09 a.m. to 10:18 a.m.)
18          THE VIDEOGRAPHER:  We are back on
19      the record.  The time is 10:18.
20  BY MR. TOBIN:
21      Q.  So, Dr. Lee, I think I may have
22  found the case you were talking about.  Was
23  it United States versus American Airlines
24  Group here in the District of Massachusetts
25  last year?

1      A.  Yeah, I think -- was it -- and
2  JetBlue, I just want to make sure you're
3  looking at the right one.  I think it would
4  have been both -- against United
5  States versus JetBlue -- American and
6  JetBlue, right?
7      Q.  If you just want to identify which
8  bullet point it is on your Appendix A.
9      A.  Yeah.  It's on A-4, the third
10  bullet.
11      Q.  Thanks.
12          So in reading all these reports,
13  I've seen some acronyms and what appear to be
14  industry terms of art that I wasn't
15  necessarily familiar with until I got into
16  this case.  So I want to go over a few of
17  them just to make sure you and I are on the
18  same page while we're talking about things.
19          Have you seen the acronym GNC
20  before?
21      A.  Yes, I have.
22      Q.  What does that mean to you?
23      A.  Global network carrier.
24      Q.  And what is a global network
25  carrier?

1      A.  Well, a global network carrier is
2  a carrier that kind of has the name -- tries
3  to explain -- has a global reach in nature
4  and operates a set of hub-and-spoke --
5  hub-and-spoke network usually with multiple
6  hubs, you know, with a global reach.
7      Q.  Is American a global network
8  carrier?
9      A.  Yes, American, Delta and United
10  are the three U.S. global network carriers.
11      Q.  And what is the acronym or term
12  O&D to you?
13      A.  It means origin and destination.
14      Q.  And if you'd explain what you
15  believe that means or what you understand it
16  to mean.
17      A.  So the term O&D -- so because of
18  passengers who travel by air often make
19  connections, not always but often make
20  connections, the term O&D refers to the
21  origin and the destination of that city
22  pairs, often looked at as a city pair with a
23  metropolitan area on both ends, kind of
24  irrespective of whether there's a connection
25  in between.

1    So as I describe in my report, a
2 passenger that's traveling between Boston and
3 San Antonio is a -- and suppose I make that
4 connection via DFW, an O&D passenger between
5 Boston and San Antonio, and I'm not an O&D
6 passenger between Boston and Dallas, nor
7 between Dallas and San Antonio.
8    Q.  Okay.  So in the example you just
9 gave, is city pair synonymous with O&D?
10    A.  It's not synonymous because
11 sometimes -- and I generally don't think it's
12 the best practice, but sometimes people think
13 of O&D as airport pairs, and in the case of
14 Boston to San Antonio, because there's only
15 one airport in both the Boston and San
16 Antonio, those two would be the same.  But if
17 you were looking at, for example, Washington
18 DC to Miami, Fort Lauderdale, there are, you
19 know, airport pairs within that city pair,
20 and so they wouldn't -- I mean, I would treat
21 the two as synonymous, but some people might,
22 for certain reasons, look at the various O&D
23 airport pairs within that city pair.
24    Q.  Now, you mentioned earlier in your
25 testimony the term "hub and spoke."  Hub and
Page 58

1 spoke still exists as we sit here today,
2 right?
3    A.  Absolutely.
4    Q.  Okay.  So when you use the term
5 "hub and spoke," what do you mean?
6    A.  As I described earlier, it's a
7 network architecture that focuses around a
8 number of hub airports, for example, American
9 has hubs in Dallas Fort Worth and Charlotte,
10 Philadelphia, JFK, others as well, Chicago
11 O'Hare.  And the network is designed to bring
12 travelers from multiple spokes into the hub
13 airport and to facilitate convenient
14 connections to multiple destinations, and
15 it's just -- it's one type of network
16 structure, and the other one is known as
17 point to point.
18    Q.  Are you familiar with the term
19 "dynamic pricing" as it relates to the
20 airline industry?
21    A.  I've heard the term used.  I
22 believe it's a term that either Dr. Vasigh or
23 Mr. Phiroz uses.  I don't know if it's
24 necessarily a term of art, but I certainly --
25 I think I understand what they mean when they
Page 59

1 refer to it.
2    Q.  What do you believe it means?
3 When it's been referred to in this case.
4    A.  Dynamic pricing, I think is
5 referring to essentially the temporal element
6 of prices or airfares and how they're kind of
7 constantly evolving over time.
8    Q.  Okay.  So -- and we talked a
9 little bit about this earlier, that, for
10 instance, your example, Boston to San Antonio
11 through DFW, you may have looked for that
12 flight on American Airlines today and that
13 price, based on American's dynamic pricing,
14 could be different tomorrow or even three
15 days from now or a week from now.  Is that
16 fair to say?
17    A.  .  As inventory is sold, pricing
18 can change.
19    Q.  And quite often it does, right?
20    A.  It can, yes.
21    Q.  Are you familiar with the term
22 "revenue management" as it relates to the
23 airline industry?
24    A.  I am, yes.
25    Q.  What does that term mean to you?
Page 60

1    A.  Well, it's a pretty broad term;
2 but, essentially it means, in one of the
3 goals of all airlines, is to kind of manage
4 their inventory of seats.  They're perishable
5 products, and one of the goals of airlines is
6 to try to maximize the revenue from those
7 available seats, and they have to do it
8 taking into account a lot of different
9 things.
10    The evolution of demand,
11 competitive activities on markets and so
12 revenue management is kind of like a broad
13 part of airline pricing that is -- kind of
14 captures the entire way that airlines are
15 trying to, you know, price all of the
16 different O&Ds within their network.
17    Q.  And it's your understanding, based
18 on your experience in the industry, that the
19 United States GNCs, the three major carriers
20 you're talking about, devote a lot of time
21 and resources to management; is that fair?
22    A.  Well, I don't think that there's
23 an airline out there that doesn't devote a
24 lot of time to revenue management.  I mean,
25 that's half of the equation of whether or not
Page 61

16 (Pages 58 - 61)

1  you're hoping to generate a profit from
2  operating flights.
3        So revenue management is not
4  something that is limited to GNCs. Every
5  carrier, as I describe in my report, uses
6  revenue management.
7      Q.  But this is, as far as this, you
8  know, emphasis on revenue management, if I
9  understand what I've been reading in this
10  case, this emphasis on revenue management has
11  really revved up in, say, the last 20 years;
12  is that fair?
13      A.  I'm not sure I would -- I mean, I
14  think revenue management has always been --
15  well, particularly in the post-deregulation
16  era, so it's different if we were talking
17  about the pre-deregulation era, where fares
18  and routes and entry were really dictated by
19  the Civil Aeronautics Board. It was a
20  regulated structure. Then revenue management
21  wasn't really as much of an issue.
22        But at least since 1979, when airlines
23  were given the freedom to price as they saw
24  fit and based off of market forces as opposed
25  to government, essentially cost-based

Page 62

1  formulas, a revenue management has been a big
2  part of airlines; and, you know, as computer
3  technology has improved across all
4  industries, revenue management perhaps has
5  gotten more sophisticated, but it's always
6  been something that has been out there.
7      Q.  And your understanding is the
8  revenue management teams for a particular
9  airline, one of their main goals is to
10  maximize profitability, correct?
11      A.  I think all airlines have the goal
12  of maximizing profitability.
13      Q.  And revenue management plays a big
14  part of that, right?
15      A.  Sure.  It does absolutely, for
16  every airline.
17      Q.  And most airlines, to include the
18  American Airlines of the world, have large
19  teams devoted to revenue management, right?
20      A.  I think any airline out there
21  devotes substantial resources to revenue
22  management, including American.
23      Q.  And when you're talking about hub
24  and spoke, are you talking about hub and
25  spoke, the hub being a particular airport or

Page 63

1  being a particular city?
2      A.  Well, it depends on the context of
3  the -- what you're looking at.
4      Q.  Let's talk about American Airlines
5  in Dallas Fort Worth.  You understand
6  there're multiple commercial airports in
7  Dallas Fort Worth, right?
8      A.  I do.
9      Q.  When you're referring to the
10  hub-and-spoke system as it relates to the
11  American Airlines, are you referring to all
12  the commercial airports in Dallas or are you
13  just referring to DFW?
14      A.  So when one is looking at
15  American's hub and spoke at Dallas, okay,
16  let's focus in Dallas, American's hub is
17  based at Dallas Fort Worth. However, that
18  hub at DFW competes with primarily Southwest,
19  as well as a few other carriers' flights in
20  and out of Dallas Love Field.
21      Q.  Well, let me stop you there for a
22  second.
23        In that example, Southwest would
24  have a hub out of Dallas Love Field, just the
25  way we're talking about American having a hub

Page 64

1  out of Dallas Fort Worth, correct?
2      A.  Southwest doesn't refer to
3  Southwest as a hub-and-spoke carrier.
4  There're a point-to-point carrier.  But I
5  will tell you that, all right, as I also
6  mention in my report, that even if you have a
7  point-to-point network, when your operations
8  at an airport like Southwest at Love Field or
9  like Southwest at Houston Hobby, reach a
10  certain size, where you're serving multiple
11  destinations with multiple flights per day,
12  they will flow passengers over Love Field.  I
13  don't think Southwest would ever characterize
14  itself as a hub-and-spoke carrier.  But there
15  are people -- there are numerous passengers,
16  particularly at places like Love Field or at
17  Hobby, that do make connections.
18      Q.  But Southwest does dominate the
19  market at Dallas Love Field, right?  I mean,
20  they have over 80 percent of the gates there,
21  correct?
22      A.  I'm not sure I would use the term
23  "dominate" the same way you do.  But they do
24  have the majority of flights out of there
25  because of kind of the multiparty agreement

Page 65

17 (Pages 62 - 65)

1    that was between the City of Dallas and
2    various folks.  It's a very unique airport in
3    that there's a very finite number of gates,
4    and because of that, Southwest operates the
5    most flights out of Dallas Love Field.
6        Q.   Just the way American operates
7    most of the flights out of Dallas Fort Worth,
8    right?
9        A.   American has a hub at Dallas Fort
10   Worth, and they are the largest carrier,
11   Dallas Fort Worth.  Dallas is a hugely
12   competitive market.
13       Q.   Do you -- so who is highly
14   competitive in the Dallas market other than
15   Southwest Airlines and Dallas Fort -- and
16   American Airlines?
17       A.   It depends on where you're
18   traveling.
19       Q.   Let's say domestically.
20       A.   Yeah, yeah.  I mean, again,
21   depends on the city you're referring to.  But
22   just, for example, in my report, I think
23   it's -- I can't remember if it's Exhibit 7 or
24   something like that -- I was looking at the
25   same city pairs that Dr. Vasigh was looking

*Page 66*

1    at, and I describe all of the competition on
2    all of the different city pairs that he was
3    looking at, and Spirit is on a large number
4    of the popular routes out of Dallas.  United
5    flies to multiple places out of Dallas.
6    Frontier does.  Delta does.  So there's a lot
7    of competition in Dallas.  It's highly
8    competitive.
9        Q.   How many gates are there at Dallas
10   Fort Worth International Airport?
11       A.   I don't know offhand, but it's
12   well over a hundred.
13       Q.   And what percentage of the gates
14   does American have at Dallas Fort Worth
15   International Airport?
16       A.   I don't know offhand, but it's as
17   a hub-and-spoke carrier, it operates out of
18   numerous gates, but that doesn't prevent, in
19   any way, shape or form, other carriers from
20   entering or expanding at Dallas Fort Worth,
21   as Spirit has.  I mean, you can just look at
22   what Spirit has done in Dallas over the last
23   five to ten years.  It's grown enormously at
24   Dallas.
25       Q.   What percentage of flights,

*Page 67*

1    domestically, going in and out of the Dallas
2    Fort Worth International Airport are American
3    Airlines?
4        A.   Again, they have a hub at --
5    American Airlines operates a hub at Dallas,
6    so they operate a large number of flights to
7    serve a large number of both domestic and
8    international destinations, but I think you
9    might be confusing operating a hub with
10   somehow -- or maybe you're not but certainly
11   Dr. Vasigh is -- confusing operating a hub
12   with somehow that hub conferring some type of
13   market power, which I absolutely don't agree
14   with.
15           MR. TOBIN:  Objection,
16       nonresponsive.
17   BY MR. TOBIN:
18       Q.   Do you know the percentage of
19   flights coming out of Dallas Fort Worth
20   International Airport that are operated by
21   American or its affiliates?
22       A.   I don't know the precise number
23   offhand, but it is -- they operate it as a
24   substantial number.  They're the hub carrier
25   there.

*Page 68*

1        Q.   Do you believe it's over 50
2    percent of the flights?
3        A.   Yes, it's probably -- and that's
4    not uncommon at all, at a hub airport for the
5    hub carrier to offer over 50 percent, that's
6    not uncommon.
7        Q.   And you believe it's over 70
8    percent of the flights?
9        A.   It could be.  But, again, that's
10   not uncommon.
11       Q.   So it's not uncommon, for
12   instance, Delta to operate over 70 percent of
13   the flights going out of Atlanta Hartsfield
14   International Airport?
15       A.   That is not uncommon that a hub
16   carrier operates in that range, I don't know
17   if it's 70 percent, of that -- of flights out
18   of one airport, yeah.
19       Q.   When you say a hub carrier to
20   operate out of a -- out of one airport, I
21   mean we are talking about at least a large
22   percentage of the flights that that hub
23   carrier typically operates out of that hub
24   airport, correct?
25       A.   Yeah, it depends.  I mean,

*Page 69*

18 (Pages 66 - 69)

1    airports like Chicago O'Hare, which has two
2    hub carriers, both American and United, or
3    there's airports like LAX, which has, like, I
4    guess three hub carriers plus service from
5    other carriers as well. So it varies.
6        Q. So what would the three hub
7    carriers be at LAX?
8        A. Delta, American and United.
9        Q. But combined, those three hub
10   carriers at LAX or the two hub carriers being
11   American and United at Chicago O'Hare, by far
12   operate a large percentage of the flights
13   going out of -- in and out of those airports,
14   correct?
15       A. I would agree that combined they
16   do. I would also -- you know, if you're
17   looking at competition out of Chicago, of
18   course you have to consider the service out
19   of Midway. If you're looking at competition
20   out of the LAX, you also have to consider
21   other airports in the LA-based area that all
22   kind of compete for the LA traffic market.
23   But yeah, I don't disagree with the notion
24   that at many airports the hub carriers
25   collectively offer the most number of

Page 70

1    flights, just in the same way that at other
2    airports where Southwest is the largest
3    carrier might operate the largest number of
4    flights.
5        Q. And when you said -- earlier you
6    referred to, I believe, DOT. You're
7    referring to the U.S. Department of
8    Transportation? Just so the record is clear.
9        A. Yes.
10       Q. And DOT keeps stats on all of
11   this, right? In fact, you cited a number of
12   DOT stats in your report, right?
13       A. DOT keep stats on what,
14   specifically?
15       Q. The amount of flights going in and
16   out of airports where a hub carrier is
17   present?
18       A. Yeah, I mean, the DOT has access
19   to a lot of data, and so I suppose -- I mean
20   some of the stats that DOT looks at, which
21   would have that type of -- they would have
22   access to that information through the DOT
23   100 database, through the ops database. I
24   often look at OAG, which is not a DOT
25   database, but certainly DOT has data on

Page 71

1    airport -- on airline operations at airports.
2        Q. I'm sorry. Did you say OIG or
3    OAG?
4        A. OAG.
5        Q. Which stands for?
6        A. The Official Airline Guide.
7        Q. But whether it's DOT or OAG, you
8    obviously would agree those are credible
9    sources for statistics on, you know, consumer
10   air traffic carrier?
11       A. They are statistics -- well, when
12   you say "statistics," I don't know if you're
13   referring to statistics or data but --
14       Q. Better word is "data." You're
15   right.
16       A. -- they have data.
17       Q. Let me -- sorry. Let me rephrase
18   my question.
19           Whether it's OAG or DOT, you would
20   agree with me that the data they keep is
21   reliable data for experts like yourself to
22   review and rely on in the airline industry?
23       A. I rely on DOT data in much of what
24   I do, as well as other sources.
25       Q. Including O- --

Page 72

1        A. OAG.
2        Q. -- data from --
3        A. OAG, that's correct.
4        Q. And just let's make sure -- look,
5    I know exactly what you're saying, and you
6    where I'm going and I'm from Texas and a very
7    deliberate slow speaker, but because we got a
8    court reporter it's really hard for her to
9    take things down if we talk over each other,
10   and I'm just as guilty of that today, but
11   let's try to be conscious of it.
12       A. Understood.
13       Q. I think you would at least agree
14   with me that gate and landing slot
15   opportunities are difficult to obtain at
16   Atlanta Hartsfield Airport unless you're
17   Delta Airlines, right?
18       A. I would disagree with that.
19       Q. Well, I mean, don't they have a
20   contract that allows them to control a
21   certain -- doesn't Delta have a contract with
22   Atlanta Hartsfield that allows them to
23   operate and control a certain number of gates
24   at Atlanta Hartsfield?
25       A. Well, I just want to break down

Page 73

19 (Pages 70 - 73)

1   your question.  So you mentioned two things.
2   You mentioned gates and slots.
3       Q.  Okay.  Let's take them separately.
4   Let's start with gates first.
5       A.  So repeat your question.
6       Q.  Sure.  You understand -- it's at
7   least your understanding that Delta has an
8   agreement with Atlanta Hartsfield to operate
9   a certain number of gates at Atlanta
10  Hartsfield Airport?
11      A.  Yeah, and, again, that's not
12  uncommon for hub carriers that make large
13  investments at hub airports to have preferred
14  access to a certain number of gates, that's
15  correct.
16      Q.  And just like American Airlines
17  has similar preferred air access at Dallas
18  Fort Worth International Airport, correct?
19      A.  They do.  But just, you know,
20  importantly that does not imply that there
21  are not other gates available to carriers
22  that want access to the airport.
23      Q.  Who at Dallas Fort Worth
24  International Airport had, to your
25  understanding, has preferred access to gates

Page 74

1   agreement with DFW International for a
2   carrier other than American Airlines for
3   multiple gates?
4       A.  Again, I'd have to -- I'd have to
5   go and look to see exactly what they do.  But
6   I'm certain that other airlines that operate
7   at DFW have gates that they've been using for
8   many years and plan to use for many years in
9   the future, and if they wanted to expand
10  their operations, they could find additional
11  gates.
12          MR. TOBIN:  Objection,
13      nonresponsive.
14  BY MR. TOBIN:
15      Q.  Are you aware of anybody that has
16  preferred access at Dallas Fort Worth
17  International Airport, as you used the term
18  earlier, other than American Airlines?
19      A.  I would just have to look to see
20  which other carriers have those types of
21  agreements --
22          THE STENOGRAPHER:  I'm sorry.
23      What was the end of that?
24          THE WITNESS:  I said I would need
25      to investigate which airlines have

Page 76

1   other than American Airlines?
2       A.  I would need to look at the
3   different agreements, but I'm not aware of
4   any carrier that has -- wants to fly out of
5   DFW and that there isn't sufficient gate
6   availability for them to do that.
7       Q.  Well, you just used the term
8   "preferred access" as it related to Delta and
9   Atlanta, and you agreed with me that American
10  Airlines has that same arrangement at Dallas
11  Fort Worth International Airport, right?
12      A.  Yeah, there's multiple concourses
13  at large hub airports where the hub
14  carriers -- what may be referred to as, like,
15  a signatory tenant or whatever of that
16  concourse, but there's other concourses that
17  are common use -- you know, have common use
18  gates and that are not -- where there's not a
19  long-term lease agreement between the airport
20  and that airline for access to those gates.
21  I mean, that's, again, not uncommon in the
22  industry at all.
23      Q.  Who do you understand at Dallas
24  Fort Worth International Airport has
25  preferred access or a long-term lease

Page 75

1   agreements for kind of long-term gate
2   leases.
3   BY MR. TOBIN:
4       Q.  So as we sit here today, without
5   consulting those materials, you're not aware
6   of any other carrier -- U.S. carrier that has
7   preferred access at Dallas Fort Worth
8   International Airport other than American
9   Airlines?
10      A.  I think that numerous airlines are
11  almost certainly to have long-term gate
12  agreements with DFW, for obviously a smaller
13  number of gates because they don't operate a
14  hubs, they don't operate a hub at that
15  airport.  But, again, I mean, ultimately,
16  really the key question is, could airlines,
17  to the extent they wanted to expand their
18  operations at DFW, have access to gates in --
19  a hundred percent I believe they could, as
20  we've seen with, for example, Spirit.
21          MR. TOBIN:  Objection,
22      nonresponsive.
23  BY MR. TOBIN:
24      Q.  Do you believe that American
25  Airlines has an arrangement with Dallas Fort

Page 77

20 (Pages 74 - 77)

1  Worth International Airport that other
2  carriers could not get?
3      A.  I don't think so.  I mean, if, for
4  example, hypothetically, another carrier made
5  a decision to open a hub at DFW, I am sure
6  that DFW would welcome those discussions.
7      Q.  That would -- as you understand
8  DFW to be constructed right now, I mean, if
9  another carrier wanted to control 30 or more
10 gates at Dallas Fort Worth International
11 Airport, that would probably require
12 significant construction at the airport.
13 Wouldn't you agree?
14     A.  I would need to look at the
15 current level of gate utilization.  It's a
16 very large airport, and there's a lot of
17 gates there, and, you know, it's possible
18 that things could be shuffled around; but,
19 again, I would say that if an airline were
20 interested in opening a hub at DFW, that DFW
21 Airport would welcome those discussions.
22 Just in the same way, for example, that, you
23 know, that Delta decided to open a hub in
24 Seattle.  Like -- you know, that was an
25 Alaska Airlines hub.  Delta decided to make

Page 78

1  is slot controlled.  And then there's --
2  there's another airport with, you know,
3  Liberty in Newark, which is not formally slot
4  controlled, but that the FAA put certain
5  operational limits on it.
6      Q.  And do the major airline carriers
7  in the U.S. bargain with somebody to get a
8  certain number of slots that they're entitled
9  to at these airports that are slot
10 controlled?
11         In other words, do they have, as
12 part of their agreement, where they get to
13 have a certain number of slots in the
14 day-to-day running of that airport?
15     A.  Slots are allocated at those
16 airports.
17     Q.  How are they allocated?
18     A.  I mean that's a long --
19     Q.  Are they allocated by contractual
20 agreement?
21     A.  They are allocated kind of by -- I
22 mean, some of them have been acquired over
23 time, right?  So, you know, if one were to
24 kind of go back in time, you know, why does
25 American have proportionally more slots at

Page 80

1  it a hub.  They've grown their operations
2  there substantially.
3      Q.  We've used the term "landing slot"
4  during this deposition.  What do you
5  understand that term to mean?
6      A.  Well, a slot is a specified period
7  of time where an airline can perform an
8  operation.  An operation being either a
9  departure or a takeoff, and there's only a
10 very small number of airports in the United
11 States that are slot controlled.
12     Q.  And are the airports in the United
13 States that are slot controlled hub airports?
14     A.  So JFK is slot controlled, and so
15 that's a hub for -- primarily Delta.
16 American has a much smaller presence,
17 although they do operate kind of an
18 international hub out of JFK, but Delta is a
19 much, much larger carrier.  So JFK is slot
20 controlled.  LaGuardia is slot controlled.
21 And, again, that's really a Delta hub.
22         American has a smaller presence
23 again at LGA.  I should have mentioned
24 JetBlue being a hub carrier at JFK, and then
25 DC airport, where American does have a hub,

Page 79

1  DCA right now is because they had exchanged
2  slots -- actually, it was US Air that
3  exchanged slots with Delta.  You know, they
4  did what was known as the slot swap back in
5  2011.  And so over time they have acquired
6  them through commercial transactions and the
7  such.
8      Q.  So that example you just listed
9  where American did a slot swap with Delta,
10 American got additional slots at DC airport,
11 correct?
12     A.  It was actually US Airways.
13     Q.  But US Airways has now merged with
14 American, right?
15     A.  That is correct.
16     Q.  So American is the beneficiary of
17 those slots, right?
18     A.  They now are in possession of
19 those slots.
20     Q.  So that slot swap that you were
21 talking about in 2011 with US Air and Delta,
22 what did Delta get in exchange for those
23 slots?
24     A.  They got slots at LaGuardia.
25     Q.  So they divvied up different slots

Page 81

21 (Pages 78 - 81)

1  at different major U.S. hubs?
2      A.  I'm not sure they divvied up.
3  They entered into a trade for some slots.
4      Q.  And Delta is a major carrier at
5  LaGuardia as we sit here today, right?
6      A.  It is, I think, the largest
7  carrier at LaGuardia, although many airlines
8  also serve LaGuardia.
9      Q.  And American is the largest
10 carrier at DC -- Washington DC Airport,
11 correct?
12     A.  They're the largest carrier at
13 Reagan National Airport.  Obviously DC is
14 served by both DCA, as well as IAD and BWI
15 airports, but at DCA American is the largest
16 carrier.  At IAD United is the largest
17 carrier, and at BWI Southwest is the largest
18 carrier.
19     Q.  Of all the Washington airports, if
20 you combine them together, does American have
21 the most landing slots?
22     A.  Well, that's kind of -- as I
23 mentioned the other airports are not slot --
24 there are no slots at IAD and BWI.  So kind
25 of definitionally, because DCA is the only

Page 82

1  slot-controlled airport of those three and
2  because American happens to be the largest
3  carrier at DCA, they have the largest number
4  of slots.
5          I can't tell you at this moment
6  sitting here right now if they actually
7  operate the largest number of operations when
8  you look at the combined three airports in
9  the DC area.  It would be probably close with
10 United.
11     Q.  Do you believe or do you have an
12 opinion on whether brand loyalty has
13 increased or decreased since the entrance of
14 low-cost carriers into the market?
15     A.  Well, I haven't conducted a formal
16 study of that, but what I would say is that
17 over the period of time, as I show, I think
18 it's in maybe Exhibit 1 of my report, the
19 share of domestic-only passengers traveling
20 on the -- what are now the GNC, says decline
21 significantly over time.  So to the extent
22 there's brand loyalty, I think that's a very
23 individual question.
24     Q.  When you say "individual
25 question," you mean individual to the

Page 83

1  individual consumer?
2      A.  Yes.  Yes.
3      Q.  Okay.
4      A.  And -- but when one looks at the
5  data kind of in the aggregate, what one sees
6  that if you go back to -- point to Exhibit 1
7  in my report, so we can talk about it in the
8  nonabstract.  If you're to look at this long
9  period of time since deregulation, when
10 lower-cost carriers had expanded, you can see
11 that the large network carrier share has gone
12 from 89 percent down to 52 percent.  So that
13 would suggest that many passengers have
14 developed brand loyalty to some of the
15 lower-cost carriers as well.
16     Q.  Or it could suggest that people
17 are just trying to find the lowest price
18 flight as well, right?
19     A.  Absolutely.  People often -- price
20 is an important factor in the decision of
21 many consumers.
22     Q.  And so do you believe that, as we
23 sit here today in 2024 compared to 1994, when
24 your percentages look like in Exhibit 1 start
25 escalating, that people are more likely today

Page 84

1  to choose a flight based on price than back
2  then?
3      A.  I think it really depends on the
4  individual.  I can't generalize one way or
5  another to all individuals.  I think the
6  decision -- the travel decision is highly
7  individualized.
8      Q.  So if I understand your point, is
9  that to one customer at a particular point in
10 time, a $50 fare difference might be
11 significant and another person, a hundred
12 dollar fare difference might not be
13 significant for that same flight at that same
14 time?  It's individualized.
15     A.  It's individualized, and it would
16 even depend on the purpose of the trip.  You
17 know, if you have to fly to a meeting and you
18 need to be there at a certain time, you may
19 be willing to pay a little bit more for a
20 flight that gets you exactly where you want
21 to be at the right time, maybe not having to
22 make a connection.
23          You may be someone who wants a
24 little extra leg room or something like that.
25 You know, there's a lot of factors that go

Page 85

22 (Pages 82 - 85)

1    into the decision of which particular ticket
2    you're going to buy.
3        Q.   Are you familiar with -- I'm
4    definitely going to butcher these names --
5    the Herfindahl-Hirschman Index?
6        A.   I am, yes.
7        Q.   It's also sometimes referred to as
8    the HHI index?
9        A.   I am, yes.
10       Q.   May I please refer to it as that
11   during this deposition?
12       A.   Absolutely.
13       Q.   What is the HHI index?
14       A.   It is a measure of what is
15   referred to by some as concentration, and it
16   is computed as the sum of squared market
17   shares of -- once you've defined whatever
18   market you're looking at, you would take the
19   market shares of each of the individual
20   participants, you would square them and you'd
21   sum them.  So it's a number between, you
22   know, one and 10,000.
23       Q.   Okay.  Do you believe that it's a
24   credible industry source for experts like
25   yourself?

Page 86

1        A.   I don't know what you mean by
2    "source."  It's not a source.  It's a
3    calculation.
4        Q.   It's a credible industry tool that
5    experts like yourself use in the industry?
6        A.   You know, I think there is debate
7    amongst economists as to the usefulness of
8    HHI as it applies to the airline industry.
9        Q.   But you do, you see it as a tool
10   that is commonly used in -- for experts like
11   yourself in its industry?
12       A.   In this industry?
13            You know, I think it's -- it's
14   less common in, I think, airline than other
15   industries.  You know, I know that there are
16   guidelines as to HHI that are used by the DOT
17   -- sorry -- the DOJ and the FTC and the
18   Horizontal Merger Guidelines, but as it's
19   applied to the airline industry, I think many
20   economists believe that it is kind of a
21   limited utility in the airline industry.
22       Q.   And what is your belief about its
23   utility in the airline industry?
24       A.   I mean, it's one piece of
25   information, but I think it's a pretty blunt

Page 87

1    instrument.
2        Q.   And why do you believe it's blunt?
3        A.   Because it doesn't capture the
4    nature of competition, and so when you have
5    carriers or different competitors that have
6    vastly different cost structures -- you know,
7    HHI treats every competitor equally, and when
8    you have carriers that have much, much lower
9    costs than others or firms that have much,
10   much lower costs than others, they need not
11   have a large market share to have a
12   substantial influence on prices in that
13   market.
14       Q.   Okay.  Have you ever used the HHI
15   index in your efforts in consulting in the
16   airline industry?
17       A.   Have I used the HHI?  I may have
18   used the HHI.  I know that I have computed
19   HHIs before -- often in response to maybe
20   someone else has computed an HHI.  But, yeah,
21   I don't discount the fact that -- as I say,
22   it's a measure.  It's not like it's out of
23   left field.  It's a measure that's often used
24   or sometimes used, and I think it's kind of a
25   blunter instrument because it's not as

Page 88

1    nuanced as being able to actually understand
2    the nature of competition.
3        Q.   Okay.  Are you aware that one of
4    the experts in this case actually used the
5    HHI index in its analysis -- in the expert's
6    analysis?
7        A.   I -- so I've looked at two
8    reports.  I've looked at -- I've only been
9    asked to look at two reports, and those are
10   Dr. Vasigh and Dr. Phiroz.  And if any of the
11   two of them was to look at the HHI, I suspect
12   it would have been Dr. Vasigh, given his
13   claims.  But I don't recall.  I could be
14   mistaken.  I'd have to go back and look
15   through it.  But I don't recall seeing
16   specifically an HHI calculation in this
17   report.  But I could be -- I could have
18   missed it.
19       Q.   So, as we sit here today, you
20   don't have any reason to criticize the use of
21   a HHI by either Dr. Vasigh or Dr. Phiroz in
22   this case?
23       A.   Well, I would need to see what
24   they computed.  Like if someone were to
25   say -- was to compute an HHI at Dallas Fort

Page 89

23 (Pages 86 - 89)

1   Worth based off departures, for example -- I
2   wouldn't actually think that's a particularly
3   meaningful statistic because, you know, like
4   that's -- that's -- that's -- what would be
5   more, you know, useful -- not to suggest I
6   endorse it in any, way shape or form the use
7   of HHI, but, like, you often see people
8   misusing HHI by applying it to the wrong
9   metric.
10      Q.   But you don't have any reason to
11  believe that's happened in this case,
12  correct?
13      A.   I haven't -- I don't recall, as I
14  sit here right now, seeing an HHI calculation
15  by one of the other experts that I've been
16  asked to look at, at least as I sit here
17  right now.
18      Q.   So therefore you would have no
19  reason to criticize the use of HHI in this
20  case, as you sit here right now, based on
21  what you know right now?
22      A.   Well, if you're asking me to -- to
23  ask whether or not I would criticize a
24  hypothetical HHI calculation, which I haven't
25  seen, what I would say is that I would -- I

Page 90

1   can't offer a specific criticism to it, as I
2   sit here right now, but I would certainly
3   reserve the right to offer my opinions about
4   it after I've seen it.  I wouldn't -- I
5   wouldn't -- I certainly wouldn't endorse it
6   at this juncture.
7          MR. MUYSKENS:  When you have time
8       to break, give me 30 seconds to grab
9       some allergy medicine?
10         MR. TOBIN:  Let's do it right now.
11      No, go ahead.  Do what you need to
12      do.
13         THE VIDEOGRAPHER:  The time is
14      11:04.  We're off the record.
15  (Recess taken at 11:04 a.m. to 11:07 a.m.)
16         THE VIDEOGRAPHER:  We're back on
17      the record.  The time is 11:07.
18  BY MR. TOBIN:
19      Q.   Would you agree that flights
20  today -- commercial air flights today have a
21  higher occupancy rate than ten years ago?
22      A.   Than ten years ago.  Probably a
23  little bit more than ten years ago, yes.  The
24  load factors have trended up over time but
25  they've kind of started to largely plateau.

Page 91

1       Q.   Did you say "load factor"?
2       A.   I did, yes.
3       Q.   When you say "load factor," what
4   do you mean?
5       A.   Load factor is a term in the
6   industry which is formally defined as revenue
7   passenger miles divided by available seat
8   miles, RPMs over ASMs.
9          You probably need me to define
10  those as well.
11      Q.   Yeah, I have no idea what you just
12  said.
13      A.   So we can look at it in kind of a
14  simple term.  So seat factor, which often is
15  what people think about, is the percentage of
16  seats that are filled on flights, and so when
17  you say occupancy, you may be thinking of
18  kind of, like, a seat factor.  The statistics
19  that are reported by airlines are calculated
20  slightly differently, in that each seat is
21  weighted by the number of miles that has been
22  flown.
23         And so the denominator of a load
24  factor calculation is what are known as
25  available seat miles, ASMs.  Available seat

Page 92

1   miles are computed as the number of seats
2   times the number of miles they've flown, and
3   the numerator, RPMs, is what is known as
4   revenue passenger miles, which are the number
5   of miles flown by paying passengers.  So
6   that -- and divide one into the other, you
7   get what is known as load factor.
8       Q.   So in that numerator, and I
9   promise we're not going in any further into
10  math than that because I'll be in trouble,
11  but in that numerator, it sounds like there's
12  certain passengers that are on an airline
13  flight that could be excluded from that
14  number, like, for instance, American Airlines
15  employees who are flying for free.  Is that
16  fair or is that accurate?
17      A.   .  So the non-revs, what are
18  called in the industry, are airline employees
19  typically, that are -- would be excluded from
20  a load factor calculation.
21      Q.   But without question, American
22  Airlines does get a benefit from being able
23  to transport its employees from one location
24  to the other to help it run its business,
25  right?

Page 93

24 (Pages 90 - 93)

1    A.   Sure.  Yeah.
2    Q.   And, generally, on the major
3   carriers, it's at least fair to say that
4   flights are generally full these days?
5    A.   I don't know what you mean by
6   "generally full."  Depends on the night
7   you're taking it, it depends on the day
8   you're flying.  It really depends.  I mean,
9   if you were to travel to Europe in February,
10   you would find more seats empty than full,
11   depending on the day you travel.  So if you
12   fly over the 4th of July weekend, it was a
13   pretty busy weekend, so it really depends.
14    Q.   When was the last time you were on
15   an American, United or Delta flight in the
16   U.S. that wasn't substantially full?
17    A.   I mean, I don't wander the cabin
18   to see how many seats are full, but I will
19   grant -- I will admit that load factors
20   industry-wide are, you know, hovering in the
21   mid 80 percent range, which means that 15
22   percent of flights on average are not taken.
23   But, yeah, capacity is utilized, there's no
24   doubt.
25    Q.   In that 80 percent mark, if I'm

Page 94

1   understanding the math -- and please check me
2   because there's a really good chance I'm
3   not -- but the 80 percent mark, that number
4   would actually be higher if you were counting
5   non-revenue passengers who were also flying
6   on those flights, correct?
7    A.   It can.  The thing to keep in mind
8   is that many employees that fly on -- for
9   company business, for example, are jumpseat
10   eligible.  So some of them would fly -- like
11   if you have pilot -- you often see a pilot
12   come on to an airplane and he or she might be
13   non-revving or dead-heading or whatever they
14   might be doing, and they often go into the
15   cockpit and sit in the jumpseat.  So it
16   depends.
17        But yes, if there's non-revs that
18   could add, you know, a percentage point or
19   two, whatever it might be depending on the
20   flight.  And you'll also see sometimes flight
21   attendants who are traveling on a non-rev
22   basis sitting in the jumpseat as well, a
23   flight attendant jumpseat.
24    Q.   And when you use the short form
25   "rev," obviously you're referring to revenue,

Page 95

1   right?
2    A.   I am, yes.
3    Q.   So there's been some discussion in
4   your report and in the reports in this case
5   about the situation where somebody books a
6   flight -- for instance, let's use your Boston
7   to DFW to San Antonio example -- and they
8   book the flight Boston to San Antonio but
9   they get off the flight in Dallas Fort Worth,
10   you're aware that that scenario is a major
11   issue in this case, correct?
12    A.   I am, yes.
13    Q.   Okay.  And so in that scenario,
14   it's at least your understanding, from having
15   vast knowledge in the industry, that when
16   that happens, American Airlines does
17   everything it can to try to fill that seat
18   from Dallas to San Antonio by either letting
19   a non-rev person fly in the seat or by
20   letting a standby passenger fly in the seat,
21   that's the general practice of carriers like
22   American, correct?
23    A.   There is a standby list, so that
24   if it turns out that there's no-shows and
25   this could be no-shows for reasons other than

Page 96

1   obviously people who buy hidden-city tickets,
2   they can -- people that are on the standby
3   list can stand by for that seat.
4    Q.   And in your hypothetical, Boston
5   to San Antonio, through Dallas Fort Worth, if
6   someone were on that flight using a
7   hidden-city ticket practice and exits the
8   flight at DFW and does not take the second
9   leg, American would try to fill those seats
10   however it could?
11    A.   Well, I guess what I'm -- you seem
12   to be maybe implicitly assuming that that
13   happens to be the last available seat; but,
14   you know, again, if flights are flying 85
15   percent full, then seat may have gone empty
16   anyhow.  So it really just depends on the
17   situation.
18    Q.   So it may or may not have
19   mattered, I guess is your point?
20    A.   Yeah, it may not have mattered.
21    Q.   But if American is able to fill
22   that seat, with either a standby passenger or
23   somebody else that -- a non-rev passenger
24   that it gets a benefit from, from
25   transferring that person from Dallas to San

Page 97

25 (Pages 94 - 97)

Page 98:

```
 1   Antonio, it's your understanding that the
 2   Americans of the world certain endeavor to do
 3   that, right?
 4       A.   They would -- if there's people
 5   that are flying standby, they will -- and
 6   there's available seats, they'll try to put
 7   them on the flight.
 8       Q.   And it's common in the airline
 9   industry, especially with large carriers like
10   American, that flights get overbooked, right?
11       A.   You know, I think overbooking is
12   less common than it used to be because of the
13   denied boarding rules and the penalties on
14   denied boardings are -- I think it's less
15   common than it used to be because of the
16   denied boarding rules and the amount of
17   compensation that airlines sometimes now have
18   to pay when flights are oversold if a person
19   is involuntarily bumped.
20           And, so you know, you read of
21   these stories and hear of these stories of
22   sometimes an airline having to pay $10,000 to
23   a passenger who was denied boarding or
24   something like that, which is obviously a
25   huge penalty.
```

Page 99:

```
 1           So I'm not saying that it doesn't
 2   happen, but I can't tell you, as I sit here
 3   right now, how frequently American overbooks
 4   its flights.  But my impression is that it's
 5   less of an issue than it may have been some
 6   years ago.
 7       Q.   Okay.  Going back to your
 8   hypothetical, Boston to San Antonio through
 9   DFW, if hypothetically that DFW to San
10   Antonio leg was oversold, overbooked and a
11   passenger gets off at Dallas Fort Worth
12   through using a hidden-city ticketing method,
13   that helps the airline actually reduce the
14   amounts that that second leg was overbooked,
15   correct?
16       A.   Hypothetically, it's possible that
17   it could, yes.
18       Q.   Okay.  And hypothetically going
19   for the other scenario, where the flight is
20   not overbooked and there are actually excess
21   seats in that second leg from Dallas Fort
22   Worth to San Antonio, if one less person
23   flies on that flight, it reduces the weight
24   of the flight, correct?
25       A.   A reduced weight from lower load
```

Page 100:

```
 1   factors.
 2       Q.   Okay.  Because one less person is
 3   on it and possibly even less luggage or
 4   baggage is on it, right?
 5       A.   Well, definitely one less person.
 6   As I understand how Skiplagged tries to
 7   educate or inform passengers, they
 8   essentially tell them not to bring luggage
 9   other than a knapsack, but to the extent that
10   that knapsack weighs a couple pounds, sure.
11       Q.   Okay.  And that could actually
12   reduce fuel cost, hypothetically, on that leg
13   from Dallas Fort Worth to San Antonio,
14   correct?
15       A.   It could.  I'm not sure the
16   relevance of the question, but yeah,
17   hypothetically it could.
18       Q.   Are you familiar with ███████
19   ███████████████████████████████████████
21       A.   ███████████████████████████████
     ███████████████████████████████████████
     ███████████████████████████████████████
     ███████████████████████████████████████
```

Page 101:

```
 1       Q.   Okay.
 2       A.   I remember ████████████████████
     ████████████████████████
 4       Q.   ██████████████████████████████
 5           THE STENOGRAPHER:  Hold on.  We
 6   need one at a time.
 7           ████████████████
 9       A.   Like, but this was -- again, back
10   in, like, ██████████████████████
     ██████████████.  I remember something -- I
12   don't think the ███████████████████████
     █████████████████
14       Q.   No, but you remember the point was
15   that American figured out if they took olives
16   off the salad it would save them a bunch of
17   money?
18       A.   I do remember a story involving
19   ████████████████████████████, but,
20   you know, there's a lot of stories in the
21   airline industry.
22       Q.   Do you remember the point of that
23   story being ██████████████████████████
     ██████████████████████████████████████
```

26 (Pages 98 - 101)

```
 1       A.  I remember there was ████
 2    ████████████████████████████
 3    ████████████████
 4       Q.  Okay.  We were talking a little
 5    bit about this earlier, but I believe, if I
 6    understand, you know, part of the general
 7    points of your report, it's that -- and your
 8    opinions in this case, it's that if
 9    hidden-city tickets and hidden-city ticketing
10    facilitators are not around, that doesn't
11    necessarily lead to the conclusion that the
12    consumers of those hidden-city ticketing
13    services would automatically buy the direct
14    flight, in your example, from Boston to
15    Dallas Fort Worth, at the higher price,
16    right?
17       A.  I'm not sure I understand your
18    question.  Could I have it read back or?
19       Q.  Let's at least talk about the
20    assumptions in your hypothetical.  Okay?
21    And the hypothetical being where somebody
22    uses a hidden-city ticket practice from going
23    from Boston to San Antonio, but they
24    actually -- there's an intermediate leg where
25    they get off the flight in Dallas Fort Worth?
                                         Page 102
```

```
 1       We've talked about that so far,
 2    right?
 3       A.  Yes.
 4       Q.  And if there's a hidden-city
 5    ticket consumer involved in that scenario,
 6    the assumption is, and you pointed out in
 7    your report, this is not always the case, but
 8    the assumption is they decided to take on
 9    that hidden-city ticket fare because they
10    could save money over just buying another
11    option of buying an American Airlines flight
12    directly from Boston to Dallas, correct?
13       A.  Well, I think -- you might be
14    mischaracterizing my report a little bit.  I
15    think one of the big thrust of my report is
16    that often these are promoted as fare
17    savings, but when one actually adds in, for
18    example, a service fee that may be associated
19    with the hidden-city ticket or when one
20    actually looks at other tickets that were
21    available, that, for example, in this case,
22    that Skiplagged didn't offer to me that
23    that -- I am, as a consumer, misled into
24    thinking I am buying a lower price fare when,
25    in fact, I'm actually having to pay more,
                                         Page 103
```

```
 1    because I was -- that Skiplagged wasn't being
 2    transparent about it.
 3          That's kind of really, I think,
 4    the thrust of my report or one of the big
 5    thrusts of my report.  So I just want to make
 6    sure kind of when we talk about these, we
 7    understand that central, I think, to my
 8    opinions, is that Skiplagged isn't being
 9    particularly transparent and honest to the
10    consumer as to what they're getting.
11          MR. TOBIN:  Objection,
12       nonresponsive.
13    BY MR. TOBIN:
14       Q.  I understand what you described in
15    your report.  We'll get into that scenario in
16    a minute.
17          But let's stick with this
18    hypothetical, and I'm going to add some facts
19    to the hypothetical.  Okay?
20          Let's say that this particular
21    consumer bought this fare that you're talking
22    about from Boston to San Antonio through
23    Dallas Fort Worth for $300, okay, and let's
24    assume at the exact same time they bought
25    that fare there was, on the same flight, a
                                         Page 104
```

```
 1    fare offered from American Airlines that
 2    terminates in Dallas Fort Worth from Boston
 3    to Dallas Fort Worth for $500.  Okay.
 4          You with me so far?
 5       A.  I am, yes.
 6       Q.  You would admit, at least in that
 7    scenario, the hidden-city ticket consumer had
 8    an option to save money by going through --
 9    and let's say there was a $30 service fee on
10    it, so net it was 330 to the consumer.  You
11    would admit under that hypothetical that
12    there was a savings opportunity for the
13    consumer by purchasing the facilitated
14    hidden-city ticket fare, correct?
15       A.  If the passenger was willing to
16    fraudulently purchase a ticket that violated
17    American's contract of carriage and was
18    willing to forgo other benefits that come
19    with buying a nonfraudulent ticket, there is
20    a money savings in that hypothetical, again,
21    and I'm accepting only as a hypothetical
22    because my own experience has been when
23    exploring Skiplagged, that it's not
24    particularly transparent or accurate in terms
25    of the prices that were available.
                                         Page 105
```

27 (Pages 102 - 105)

1    But for your -- purposes of this
2  hypothetical, subject to that passenger
3  willing to fraudulently represent what their
4  intentions were, then they could realize that
5  savings.
6    Q.   Are you a lawyer, Dr. Lee?
7    A.   I'm not a lawyer, no.
8    Q.   Are you an expert on what
9  constitutes fraud or doesn't constitute
10  fraud?
11    A.   I'm not using the term "fraud" in
12  any type of legal framework.  I'm merely
13  saying that I know that when I purchase a
14  ticket, I'm entering into a contract with
15  carriage with an airline, and one of the
16  things that the contract of carriage at
17  American Airlines, and I think most other
18  airlines, prohibitively -- specifically
19  prohibit -- specifically prohibit hidden-city
20  ticketing, using hidden-city tickets.
21    Q.   Have you been aware of whether
22  fraud is an allegation in this lawsuit or
23  not?
24    A.   Again, I'm not using fraud --
25    Q.   Sir, are you aware of whether

Page 106

1  fraud is an allegation in this lawsuit or
2  not?
3    A.   I think I've seen in the Complaint
4  the use of the term "fraud," and I'm not
5  using it, to be perfectly clear, in a legal
6  definition.  I'm just saying -- I'm
7  misrepresenting to American Airlines if I do
8  that, and my intentions.
9    Q.   So what I'm trying to get back to
10  is what I understand one of the points that I
11  believe you made in your report, is that if
12  the person didn't -- in this hypothetical,
13  did not have the hidden-city option, okay,
14  and did not have someone like my client
15  Skiplagged facilitating a hidden-city ticket
16  and it chose not to practice the hidden-city
17  practice, it didn't necessarily have to buy
18  the ticket for $500 to Dallas, right, it
19  would have other options, like you've
20  described in your report, such as low-cost
21  carriers or maybe trying to buy a different
22  time and ticket, correct?
23    A.   There are a multitude of options
24  to get from here to Dallas.
25    Q.   So you would agree that the

Page 107

1  customer in that hypothetical would have
2  those options and would not be obligated to
3  buy the $500 ticket to Dallas, correct?
4    A.   I don't think any consumer is
5  obligated to buy any particular ticket.
6    Q.   I think we've covered this, but
7  this hidden-city ticket practice, you're
8  obviously aware that there are instances
9  where consumers just do this on their own
10  without being facilitated by any service such
11  as what my client offers?
12    A.   I would agree with that.
13    Q.   In fact, did American share with
14  you that ███████████████████████
██ ████████████████████████████████████████
██ ████████████████████████████████████
██ ███████████████████████████████████████████
██ ████████████████████████████
20    A.   I haven't received any of that
21  information, no.
22    Q.   Do you believe that American,
23  Delta and United have over 50 percent of the
24  market share of U.S. domestic flights
25  combined between the three of them?

Page 108

1    A.   Probably.  They probably do, yeah.
2  I mean, you know, as you can see in
3  Exhibit 1, they have 52 percent share of
4  domestic-only passengers, and their average
5  gauge tends to be lower than the remaining
6  carriers, so it would stand to reason that
7  they probably do.
8    Q.   What do you mean by "gauge"?
9    A.   The number of seats on an
10  aircraft.
11    Q.   Now, if we look at Exhibit 5 on
12  page 13 of your report.
13    A.   Okay.
14    Q.   Now, this exhibit talks about --
15  it, in part at least shows low-cost carriers'
16  share of the market in hub cities, right?
17    A.   It's their share of domestic O&D
18  passengers.
19    Q.   Are there any large hubs in the
20  U.S. that are not listed on this graph?
21    And I say "hubs."  I'm sorry, I
22  mean hub cities.
23    A.   Actually, now that I look at this,
24  Seattle I think would now classify as a large
25  hub city, as Delta is there.

Page 109

28 (Pages 106 - 109)

1    Q.   Anyone else?
2    A.   I mean, I think with the exception
3  of Seattle, this is generally pretty
4  complete.  I could be missing one, but I
5  think this is largely complete.
6    Q.   Now, my understanding of your
7  Exhibit 5 is, for instance, when you list New
8  York, you're not just talking about New York
9  LaGuardia, you're talking about multiple
10  airports within New York, right?
11    A.   For New York, yeah.  This would
12  be, as it says in the footnote, both JFK, New
13  York and LaGuardia.
14    Q.   Okay.  And so why is -- I don't
15  know if this is terribly important, but I'm
16  curious.  Why is, like, is it Icelip or
17  Islip?
18    A.   Islip.
19    Q.   Yeah, why is Islip not included in
20  New York?
21    A.   So that gets into a whole question
22  of geographic market definition, and Islip,
23  while there is -- you know, it certainly
24  serves the parts of Long Island, it tends to
25  be a little bit further out, so it's not

Page 110

1  generally thought of as being one of the
2  primary New York City airports.  Like in the
3  same way that maybe Stewart is as well.
4    Q.   So when you say Washington, you're
5  considering all three major airports within
6  the Washington-Baltimore area including BWI,
7  Dulles and Reagan?
8    A.   I am.
9    Q.   What is within LA when you say Los
10  Angeles in this exhibit?
11    A.   That would be LAX, Long Beach and
12  Burbank.
13    Q.   And so if you analyze this same
14  data and only the largest, most significant
15  airport in each of these hub cities, the
16  percentage of low-cost carriers' share of
17  domestic O&D passengers would go down,
18  correct?
19    A.   Well, not sure what you mean by
20  the largest and most significant airport.
21  For example, in New York.
22      You know, are you referring to,
23  like, Newark, is that less significant than
24  the LaGuardia or JFK, I mean, these are all
25  very large airports.

Page 111

1    Q.   I understand your distinction on
2  New York.  But I think you understand my
3  question as it relates to most markets, like,
4  for example, Dallas, you'd at least agree
5  that DFW is the most significant airport or
6  port in the DFW area compared to Dallas Love
7  Field, correct, as far as commercial airline
8  travel.
9    A.   Well, I'm not quite sure I would
10  agree.  DFW is a larger airport.  It is also
11  an international airport.
12    Q.   It's got a much more -- it's got a
13  much higher volume of flights going in and
14  out of DFW than Dallas Love, right?
15    A.   It absolutely does, but it would
16  be a huge mistake to look at -- particularly
17  if we're looking at domestic competition.  I
18  mean, it would be a fatal mistake to look
19  only at DFW and not consider Dallas Love
20  field, because Southwest has such a huge
21  competitive impact on competition airfares in
22  the Dallas area and to disregard all of their
23  service because it happens to be a different
24  airport and one that's actually much closer
25  to downtown Dallas than DFW, that would be a

Page 112

1  huge mistake in my opinion.
2    Q.   Granted, you're telling me that my
3  hypothetical is fatal, but indulge me for a
4  minute.
5      Let's say we made, in your words,
6  this fatal mistake and only counted the
7  largest airport with the most traffic in that
8  particular city, then these percentages on
9  your graph in Exhibit 5 would go down
10  significantly, correct?
11    A.   Some would go down.
12    Q.   Most would go down, wouldn't they?
13    A.   I'm not so sure that -- there's a
14  lot of service at LAX by lower-cost carriers.
15  So I'm not sure that would have a meaningful
16  impact.  And I'm not sure what would happen
17  in New York, because, for example, if one
18  were to look at JFK, JetBlue -- you know, the
19  focus of their operations in New York is at
20  JFK.
21      So, again, I don't accept your
22  general proposition.  I'm not saying that at
23  some places, like, for example, Phoenix, I'm
24  not sure it would make a difference there.
25  At DFW, at Dallas I think it would make a

Page 113

29 (Pages 110 - 113)



**Page 114**

1  difference because you would be excluding, as
2  I said, you'd be making this fatal error of
3  excluding Southwest.
4      Q.  So if I'm understanding this
5  graph, and I understand you say it excludes
6  Seattle, which should be included, but if I'm
7  understanding this graph, this is showing
8  ██████████████████████████████████
   ██████████████████████████████████████
   ████████████████████████████
12     A.  That's incorrect, because, as we
13  talked about, many low-cost carriers are
14  major --
15         THE STENOGRAPHER:  Keep your voice
16  up.  Major what?
17         THE WITNESS:  Are major airlines.
18  BY MR. TOBIN:
19     Q.  Let me rephrase my question, then.
20      You understand I'm talking about
21  Delta, United and American, right?  I mean
22  Delta, United and American are ████████████
   █████████████████  correct?
24     A.  Well, I didn't -- your question
25  was unclear.  Maybe if you rephrase the

**Page 115**

1  question, I can provide the answer you're
2  looking for.
3         But as you phrased your last
4  question and referred to major airlines, I
5  disagreed with your proposition.
6      Q.  Okay.  But let me make sure I can
7  built a predicate here.
8         So Delta, American and United are
9  ████████████████████████████████
   ██████████████████; is that correct?
11     A.  ███████████████████████
   █████████████████████████████
13     Q.  Okay.  Your Exhibit says
   ██████████████████████████████
   ████████████████████  correct?
16     A.  It does.
17     Q.  So I assume what you're trying to
18  depict is ████████████████████████████
   █████████████████████████████?
20     A.  That's correct.
21     Q.  And we've established that
22  American, United and Delta are not low-cost
23  carriers, correct?
24     A.  That is correct.
25     Q.  So by extrapolation, ████████████

**Page 116**

1  ████████████████████████████████████
   ███████████████████████████████
   █████████████████████████
   ██████████, correct?
5      A.  Could you just repeat the
6  question?
7      Q.  That ██████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
11  right?
12     A.  That's not correct, because ██████
   ██████████████████████████████████████
14     Q.  Okay.  Well, ████████████████
   ████████████████████████████
16  percent, you would agree with me, right?
17     A.  I would agree with that, of
18  domestic-only passengers.
19     Q.  Now, on that same page, at the top
20  of the page, you see the ████████████████
   ████████████████████████  sentence?
22     A.  Yes, I do.
23     Q.  And it goes on to say, ██████████
   ████████████████████████████████████

**Page 117**

1  ████████████████████████████████████
   ████████████████████████████
4         THE STENOGRAPHER:  Three rounds?
5  BY MR. TOBIN:
6      Q.  ████████████████████████  I
7  apologize.
8         What's your basis for that
9  statement?
10     A.  You mean beyond Exhibit 5?
11     Q.  Yeah.  Well, I guess you're saying
12  Exhibit 5 is your basis for that statement.
13  Is there anything else that you have that --
14  as evidence?
15     A.  I think -- I mean, Exhibit 5 is my
16  basis for that statement.  But, you know,
17  I've been studying this industry for the last
18  26 years, or whatever it is, and I've
19  witnessed it firsthand, and all of the data
20  reflects that.
21     Q.  Now, you've made the point, I
22  believe in your report, that airlines
23  generally have relatively thin profit
24  margins, correct?
25     A.  That -- yeah, airlines compared to

30 (Pages 114 - 117)

1   other industries tend to have thinner profit
2   margins.  I would agree with that statement,
3   yes.
4         Q.   Okay.  But that's been the case
5   since deregulation, right?  I mean, that's
6   nothing new in the past five, ten years,
7   correct?
8         A.   Yeah, I mean, it is a really,
9   really tough business.
10        Q.   So they've always had thin profit
11  margins, at least since deregulation?
12        A.   You know, there's some years that
13  are better than others.  But, yeah, they have
14  not been amongst the most profitable by any
15  stretch of the imagination, parts of kind of
16  the broader U.S. economy.  It's a very
17  competitive business.
18        Q.   I guess the point is, they had
19  thin profit margins even before low-cost
20  carriers started taking a larger percentage
21  of the market as your Exhibit 5 tries to
22  argue, right?
23        A.   I wouldn't quite agree with that.
24  I think that prior to the expansion of
25  low-cost carriers, airlines were doing -- the

Page 118

1         A.   It's a lot tougher now than it was
2   back then.  But it's a tough business.
3         Q.   And was then?  I mean, if we're to
4   agree with what you say, you would agree it
5   was tough back then as well, right?
6         A.   I mean, yeah, there's degrees of
7   toughness, I guess is what I'd say, but it
8   has become extremely competitive.
9         Q.   Right.  But you were the one that
10  compared it to the profit margins to other
11  industries, and the profit margins even
12  before the low-cost carriers started making a
13  significant impact ████████████████,
14  were still lower than these other industries
15  you're talking about, right?
16        A.   There's actually an exhibit we can
17  look at if you'd like.  It's a tough
18  business.  I mean, there's a lot of
19  pressures.  There's fuel price volatility,
20  there's geopolitical risks.  It's highly
21  cyclical.  It's a tough business.
22        Q.   And those pressures that you just
23  described all existed before low-cost
24  carriers started taking a significant -- a
25  more significant portion of the market as

Page 120

1   large network carriers such as American,
2   Delta and United, and of course, going back
3   in time now to include the predecessor
4   carriers, you know, they -- they -- they --
5   there was less downward pressure on prices
6   back then and their profits tended to be a
7   little bit higher.
8         Q.   Okay.  But you just made the
9   observation that the airline industry
10  currently has thinner profit margins than
11  other industries you could compare it to,
12  correct?  Do you remember that testimony?
13        A.   I do, yes.
14        Q.   And that was the same before the
15  low-cost carriers started taking a
16  significant market share, the profit margins
17  may have been larger but they were still
18  thinner compared to other industries,
19  correct?
20        A.   There's no doubt that the growth
21  of low-cost carriers has pressured profits,
22  but airlines are a very tough business, yes.
23        Q.   Even before the low-cost carriers
24  started making this pressure that you just
25  described, correct?

Page 119

1   ████████████████, correct?
2         A.   There have been -- yes, those are
3   factors that have always -- have made the
4   airline business challenging.
5              MR. TOBIN:  I'm going to need a
6         short break.
7              THE VIDEOGRAPHER:  The time is
8         11:48.  We're going off the record.
9   (Recess taken at 11:48 a.m. to 12:26 p.m.)
10             THE VIDEOGRAPHER:  We're back on
11        the record.  The time is 12:26.
12  BY MR. TOBIN:
13        Q.   Okay.  Dr. Lee, let me just make
14  sure I understand.  You have not conducted an
15  analysis of what American Airlines' share is
16  at any particular airport, correct?
17        A.   As part of my report here?
18        Q.   Correct.
19        A.   Not as part of this report, no.
20        Q.   Okay.  For instance, I believe
21  Dr. Vasigh had, and I remember the exact
22  number, but I believe he had calculated a
23  percentage of American's share -- market
24  share at Dallas Fort Worth.
25             As part of your retention here,

Page 121

31 (Pages 118 - 121)

1  you don't have any reason to either agree or
2  disagree with that number, right?
3      A.  I'm not sure actually that
4  Dr. Vasigh has calculated anything.  If you
5  point me towards the part of his report,
6  maybe you could refresh my memory.  I saw him
7  maybe cite some statistic that was someone
8  else's statistic, but I don't think I saw any
9  calculations that Dr. Vasigh performed.
10     Q.  Okay.  Maybe calculation was a
11 poor chose of word.
12         But you saw where he cited
13 percentage of market share at specific
14 airports, correct?
15     A.  Maybe you can point me to his --
16 part of his report, specifically, because...
17 (Exhibit 2, Hidden-city travel and its
18 impact on passengers, implications for the
19 traveling public, Dr. Bijan Vasigh, marked
20 for identification.)
21 BY MR. TOBIN:
22     Q.  I've handed you Exhibit 2.
23         Do you recognize that as
24 Dr. Vasigh's report that you reviewed in this
25 case?

Page 122

1  clear, at least from the way it's been quoted
2  here, what that 84 percent is computed on.
3      Q.  Let's pick each and every one of
4  those that you just listed.
5          Do you have reason to believe that
6  American does not currently have 84 percent
7  of the market share in any one of those
8  categories?
9      A.  I would have to do the calculation
10 myself to determine what it is.  Again, it's
11 just -- he's quoting an Airport World
12 article, looking at Footnote 8, and, so,
13 again, I would just need to independently
14 verify it.
15     Q.  Okay.  I'll tell you what, give me
16 every single reason and piece of evidence
17 that you have to disagree with the statement
18 in Dr. Vasigh's report that "American
19 currently has about 84% of the market share
20 at DFW, making it the largest carrier at the
21 airport."
22     A.  I don't disagree with the
23 proposition that American is the largest
24 carrier at DFW.  But all I'm saying, and I
25 think you're asking if I agreed with the 84

Page 124

1      A.  I do, yes.
2      Q.  Okay.  If you could turn to page
3  10 of the report.
4          You see in the first full
5  paragraph, last sentence, "American currently
6  has about 84% of the market share at DFW,
7  making it the largest carrier at the
8  airport"?  I guess he cites to this Airport
9  World.
10         You don't have any reason to
11 disagree with that sentence, correct?
12     A.  Well, only in the sense that I
13 haven't validated the statistic, and it's not
14 a hundred percent clear from at least the
15 quote here what this market share is
16 referring to.  It just says "market share."
17 It doesn't say what the market share was.
18     Q.  It says "market share at DFW."
19         You understand DFW to be DFW
20 International Airport, right?
21     A.  I understand that, but it doesn't
22 say what the 84 percent is of.  Is it of
23 daily departures?  Is it of destinations?  Is
24 it of seats?  Is it of O&D passengers?  Is it
25 of domestic-only passenger?  It's just not

Page 123

1  percent number, I said I don't know from what
2  is written here how that is calculated.  So
3  maybe it's 81.  Maybe it's 85.  I'm just
4  not -- I'd have to go back and independently
5  verify what it is.
6      Q.  Yeah.  But my question is, do you
7  have any evidence or reason to disagree with
8  this statement?
9      A.  Well, I'm neither agreeing or
10 disagreeing.  I'm just telling you that it is
11 not defined how that -- what that market
12 share is of.
13         MR. TOBIN:  Objection,
14 nonresponsive.
15 BY MR. TOBIN:
16     Q.  Are you going to answer my
17 question.  My question is, do you have any
18 evidence -- because I can get a judge to make
19 you answer my question.
20         Do you have any evidence that
21 supports you disagreeing with that statement
22 that we've just been talking about?
23     A.  I said I'm neither agreeing or
24 disagreeing.  What I'm telling you is that if
25 someone tells me that a market share is 84

Page 125

32 (Pages 122 - 125)



**Page 126**

```
1   percent, my question is going to be market
2   share of what?
3       Q.  Do you have any evidence to
4   disagree with this statement, supports
5   disagreement with that statement?
6       A.  I'm not --
7       Q.  Yes or no?
8       A.  I'm neither agreeing or
9   disagreeing.  All I'm telling you is that as
10  a person who spends their life analyzing
11  airline data, I want to be a little bit more
12  precise and understand what this market share
13  calculation is of.
14      Q.  Have you ever heard the term "hub
15  premium"?
16      A.  I have heard that term.
17      Q.  Is that an industry term of art?
18      A.  It's a term that has been used in
19  the airline industry.
20      Q.  What do you believe it means?
21      A.  Hub premium -- you know, different
22  people have used it different ways.  I tend
23  to think of hub premium as for a carrier that
24  operates a hub, whether or not they charge
25  higher prices -- I would say probably per
```

**Page 127**

```
1   mile -- for passengers traveling to and from
2   the hub, as opposed to passengers that are
3   traveling over or through the hub.
4       Q.  Okay.  Do you believe American
5   currently does that practice?
6       A.  Well, as I've shown in my report,
7   there is no evidence of hub premium, and I
8   could happily point you to the exhibit, if
9   you'd like to talk --
10      Q.   Are you talking about the one on
11  page 9.  Oh, no, sorry, that was a --
12      A.  I think it's -- I think it's page
13  16, Exhibit 7.
14      Q.  I think your point is, the data
15  that you analyze -- let me just make sure I
16  understand your point.
17
18
19
20
21      A.  That's correct.  Is that the --
22  you know, if anything, if I -- you know,
23
24
25
```

**Page 128**

```
1
2
3
4
5
6
7       Q.
8       A.
9
10      Q.  Would you agree with Dr. Phiroz's
11  statement, at least to the extent that
12  airlines at their hubs receive less
13  competition than at a nonhub?
14      A.  Not at all.  As I've shown in my
15  report, you know, I think I have another
16  exhibit, I'm happy to explain.  But, for
17  example, Exhibit 9 of my report shows
18
19
20
21
22
23
24
25      Q.  So, for instance, you do not
```

**Page 129**

```
1   believe that American faces less competition
2   in Dallas than it does in Salt Lake City?
3       A.  Well, I think Dallas is incredibly
4   competitive.  As you can see from Exhibit 9,
5
6
7                             .  I haven't looked at Salt
8   Lake City, but Salt Lake City would be
9                          , with respect to
10  people traveling from Salt Lake City via DFW
11  to other parts on American's network.
12      Q.  Give me the name of an American
13  hub city?
14      A.  Dallas.
15      Q.  Give me the name of an American
16  nonhub city, where American actually has at
17  least a portion of the market share?
18      A.  We can go with Salt Lake City.
19      Q.  Okay.  So do you believe that
20  American is every bit as competitive -- or I
21  should say other airlines are every bit as
22  able to compete with American in Dallas as
23  they are in Salt Lake City?
24      A.  Dallas is intensively competitive.
25      Q.  Yes or no, to my question.  I can
```

33 (Pages 126 - 129)

1  have the court reporter read my question
2  back.  It was a simple yes-or-no question.
3       Could you please read it back.
4       THE STENOGRAPHER:  I'll have to
5  check it.
6  BY MR. TOBIN:
7    Q.  Let me ask the question, then.
8       Do you believe that other carriers
9  have -- are every bit as competitive with
10  American in Dallas just as they are in Salt
11  Lake City?
12    A.  It would depend on the place
13  you're going to from Salt Lake City, but
14  yeah, I would think that, you know, Dallas is
15  super competitive.  You know, you're in
16  Southwest's backyard as well, and there's a
17  lot of low-cost competition there.  Probably
18  more in Dallas than there might be in Salt
19  Lake City.
20    Q.  So you believe the answer to my
21  question is yes?
22    A.  I believe that American faces
23  intense competition at Dallas, and they face
24  intense competition in Salt Lake City.
25    Q.  Okay.  Now, for instance, Section

Page 130

1  I think that in his report he is almost
2  taking it at face value that these
3  hidden-city tickets that are being sold are
4  actually providing consumers with a fare
5  savings where, at least in my experience from
6  spending some time on the Skiplagged website,
7  my experience was that because of the
8  misleading practices, it wasn't providing the
9  lowest fair.
10    Q.  Same question as to Section B,
11  ███████████████████████████████
12  ████████████████  It's a bit of a tongue
13  twister.  But that section, would you agree,
14  it's not a direct critique on either
15  Dr. Vasigh or Dr. Phiroz's opinions?
16    A.  I'm not sure I would fully agree
17  with that.  I'm not sure I would agree with
18  that.  I think that this is a response to
19  them.  As you can see from the cited
20  footnotes.  You know, just at the first
21  paragraph of Footnote 24, I'm explaining --
22  like there's a predicate assumption in their
23  reports, that the reason for the existence of
24  Skiplagged and hidden-city tickets is to kind
25  of circumvent these monopoly positions, as

Page 132

1  C in your report, it talks about
2  ████████████████████████████████████████
3  ███████████████████████  is that fair?
4       MR. MUYSKENS:  Are you on 30?
5       MR. TOBIN:  Yes, I am.
6    A.  That's correct.
7  BY MR. TOBIN:
8    Q.  Now, generally, I'm understanding
9  that that section is not a critique of
10  Dr. Vasigh's or Dr. Phiroz's reports but
11  rather something in addition that you're
12  offering about the case; is that correct?
13    A.  Well, I do think that -- that --
14  that Dr. Vasigh, when he speaks at
15  hidden-city tickets is not really looking at
16  the full picture, and what I'm explaining
17  here is that when one actually looks at the
18  complete picture of, you know, the products
19  that Skiplagged is putting out there in the
20  marketplace, if passengers were actually
21  fully aware -- or consumers were fully aware
22  of how misleading they can be, then it really
23  changes the whole calculus, I think, that
24  he's performing in his report.
25       So it's not a direct critique, but

Page 131

1  they say that -- how airlines have their hub
2  airports.  And what this is describing is no,
3  there's actually a much more innocuous reason
4  why these exist, and so it's kind of
5  providing a counterargument to Dr. Vasigh.
6       But I would disagree with your
7  statement.
8    Q.  Okay.  Well, let's go to page 27
9  in Section B.  And you're talking about the
10  evidence reflects ████████████████████████
11  ███████████████████████████████████████████
12  ██████████████████████████████████████████
13  ████████████████████████████████████████████
14  ████████████████████████████████████████
15  ████████████████████████████████████
16    A.  Yes.
17    Q.  I'm sorry if I wasn't completely
18  following that, and I see your footnote, but
19  it directs me to other footnotes.
20       So if you can just tell me, what
21  is the basis for that statement or the
22  evidence that you're relying on for that
23  statement?
24    A.  Are you talking about the sentence
25  that begins --

Page 133

34 (Pages 130 - 133)

1  Q.  With "rather"?
2  A.  "Rather, they reflect"?
3  Q.  Correct.
4  A.  Well, I think I describe -- in
5  that particular thing I'm referring you back
6  to the earlier analysis in paragraph 19 of
7  Footnote 42, where I was actually analyzing
8  the city pairs or the markets that Dr. Vasigh
9  was looking at, and I think one of the
10  markets in particular I think I was looking
11  at there was, if I recall -- was it New
12  Orleans to Austin?  And, you know, he has in
13  his, whatever it was, Exhibit D to his, he
14  kind of holds up that as being a hidden-city
15  opportunity and that that's a reflection of
16  some type of market power.
17      And I said, wait, like listen, if
18  you're traveling from New Orleans to Austin,
19  Southwest is flying -- I don't know what is
20  it? -- five flights a day or four flights a
21  day between -- nonstop between Austin and New
22  Orleans; whereas American has to -- for them
23  to take you between New Orleans and Austin,
24  you have to make a connection at DFW and that
25  adds -- you know, I could point you to the

*Page 134*

1  parts of my report where it describes the
2  added time, making a connection.
3      So, yeah, so American sometimes
4  prices that very aggressively in order to
5  compete with Southwest nonstop service.  So
6  it's competition that's driving on that O&D,
7  that lower fare.  It has nothing to do with
8  market power.
9  Q.  If they could lower the Austin to
10  Dallas flight as well, right, it's the direct
11  flight that's offered from Austin to Dallas,
12  that could be lowered, right?
13  A.  They base -- what is it?  Like ten
14  flights a day, competition from Southwest on
15  that.  That is a competitive route.  What I'm
16  saying is that they're flying head to head
17  against Southwest between Dallas and Austin.
18  Those two carriers are just battling it out,
19  day in and day out, okay, with the premium at
20  low-cost carrier, right?
21      On Austin to New Orleans, American
22  is at a disadvantage, right, because it has
23  to connect people over Dallas, and so it
24  comes as no surprise to me that sometimes
25  American will offer -- have to -- offer even

*Page 135*

1  lower prices than it otherwise would if it
2  served New Orleans to Austin nonstop, because
3  it has to not over over -- it has to overcome
4  the fact that, you know, you're going to add
5  another two hours to this journey, which is
6  not a particularly long journey.
7      So that is competition.  That's
8  vigorous competition.  And what Dr. Vasigh is
9  trying to contort that into is some kind of
10  notion that American is exercising some kind
11  of market power between Dallas and Austin,
12  and how can that be when Southwest offers,
13  you know, eight or nine or ten flights a day
14  in that market.
15  Q.  But both those legs right, Dallas
16  to New Orleans and Dallas to Austin, have
17  multiple flights from both carriers, right?
18  A.  On the two components of Austin to
19  New Orleans, they do, yes.
20  Q.  Okay.  So, I mean, under your
21  logic, they're not both competitive, right?
22  A.  No, but you're -- but you're --
23  I'm sorry.  Please ask your question.  I
24  interrupted.
25  Q.  Under your logic, both legs are

*Page 136*

1  competitive, right?
2  A.  Those two legs are highly
3  competitive, but where the hidden-city
4  opportunity exist that he identifies, one of
5  them is Austin to New Orleans, and then
6  Austin to New Orleans, that is a city pair in
7  which American doesn't serve nonstop, okay,
8  but Southwest does.
9      So now Southwest has this other
10  advantage, putting aside its cost advantage,
11  it has yet another advantage, which is it
12  flies, a document in my report, I don't know,
13  it's like three or four daily nonstop
14  flights.  And American, the only way it can
15  take people between New Orleans and Austin is
16  by connecting them over DFW.  I mean, you can
17  connect in other places as well but that
18  would be the primary way.
19      So to me it is not surprising at
20  all, that on occasion, in order to better
21  compete against Southwest, which offers this
22  nonstop product versus American's connecting
23  product, it has to cut -- it has to be even
24  more aggressive on pricing to try to woo some
25  of these passengers who can fly nonstop.

*Page 137*

35 (Pages 134 - 137)

1    Q.   So you're admitting both legs are
2   competitive, but you just believe that the
3   Austin to New Orleans leg -- or flight is
4   hypercompetitive because Southwest offers a
5   direct flight from Austin to New Orleans?
6    A.   What I'm saying is that American
7   is competing against -- whereas on the
8   component legs, okay, on an O&D basis,
9   they're going head to head with nonstop
10  service.
11         On these other routes, these
12  connecting routes, which is for American a
13  connecting route but for Southwest a nonstop
14  route, okay, that puts American -- you know,
15  it needs to do something in order to convince
16  people that would otherwise fly Southwest to
17  fly on American, notwithstanding the fact you
18  have to make a connection; it's going to take
19  you a couple hours longer because of that
20  connection or 90 minutes longer.
21         And so, yeah, one the things it
22  does to compete against that is to offer even
23  more aggressive pricing.
24    Q.   But that's an argument you're
25  making.  You don't have written evidence of

Page 138

1   that.  In other words, you didn't review
2   materials from American that says this is the
3   way we do our pricing and this is why we even
4   lower our pricing even more on this
5   particular Austin to New Orleans ultimate
6   destination because of the reasons you're
7   articulating, right?
8    A.   Well, I know that carriers out
9   there are doing everything they can to
10  compete with lower-cost carriers day in and
11  out, and they price on an O&D basis.
12    Q.   But you didn't interview anybody
13  at American?  You didn't review any materials
14  that reflected what their pricing strategy
15  was on any of these routes, right, this is
16  just your general knowledge in the industry
17  that you're relying on, correct?
18    A.   Well, I did not interview anyone
19  at American.  I know from studying and having
20  worked in this industry for 26 years that
21  every day that American and other large
22  network carriers go into the marketplace and
23  are battling it out for every customer.
24    Q.   This particular New Orleans to
25  Austin -- is it Austin to New Orleans or New

Page 139

1   Orleans to Austin?  I can't remember.
2    A.   I mean, it really doesn't matter.
3    Q.   If it doesn't matter, New Orleans
4   to Austin, right, you didn't review any
5   actual evidence or data or documents as to
6   why American's pricing that route the way
7   it's pricing it, correct?
8    A.   I mean, I think what you need to
9   do is keep in mind that what I'm doing, in
10  this particular analysis and much in my
11  report --
12    Q.   Dr. Lee, I'm sorry -- I'm sorry
13  to interrupt you.  But you have got to answer
14  a yes-or-no question, or we are going to have
15  to get the judge to make you do that.
16         So yes or no, did you review any
17  documents, evidence, data, or did you talk to
18  any American personnel as to how they price
19  that particular route?
20    A.   I think I've already answered that
21  question, which is that I've spoken to no
22  American individuals, and if I -- what I was
23  saying is that I am responding to an exhibit
24  of Dr. Vasigh, where he holds that out as
25  being a hidden city -- you know, a hub

Page 140

1   premium, as he calls it, I think, and I'm
2   explaining the reason for what he's observing
3   is being driven by American's attempt to be
4   competitive on a route where they don't offer
5   nonstop service against Southwest, which
6   does.
7    Q.   Do you have anything else to add
8   to that answer to my question?
9    A.   No, I think I'm satisfied with my
10  answer.
11    Q.   Now, if we go to Section C, we
12  were there a minute ago, I think it was on
13  page 34, maybe example 15 -- excuse me --
14  Exhibit 15.
15    A.   Okay.
16    Q.   Now, I agree that the copy quality
17  of that chart is not great.
18         But do you remember the particular
19  route this is describing?
20    A.   Well, the one part I can't see
21  here and recall is this is from Boston to
22  Dallas.
23    Q.   And that's actually --
24    A.   That you can see that, yeah.
25    Q.   Now, you didn't run an analysis --

Page 141

36 (Pages 138 - 141)

App'x 198

1   you brought this one example up, but you
2   didn't run an analysis to see how often this
3   situation happens where the total net cost to
4   the customer through Skiplagged facilitating
5   a transaction ends up to be higher than what
6   the quote was from American Airlines, right?
7       A.  I was not asked to perform that
8   analysis, no.
9       Q.  This was just a spot example,
10  correct?
11      A.  This is an example of what
12  happened when I did it, yeah.
13      Q.  Okay.  And were you told to go to
14  that particular route our did you pick that
15  route on your own?
16      A.  No, it's a route that I picked it
17  on my own.  I mean, I'm -- obviously I live
18  in Boston and Dallas was featured prominently
19  Dr. Vasigh's report so I thought it would be
20  a good route to look at.
21      Q.  Okay.  And you particularly call
22  out -- now, what was the difference in time
23  between looking at the two situations, the
24  quote through American versus the quote
25  through Skiplagged?

                                    Page 142

1       A.  Sorry.  Are you now referring to
2   paragraph 36 or are you still -- there's two
3   examples, right, there's two examples done on
4   different days.  They both use Boston to
5   Dallas, but I just want to make sure we're
6   talking about the same example.
7       Q.  Okay.  Well, either example --
8       A.  Yeah.
9       Q.  -- because I couldn't understand
10  from your report --
11      A.  Yeah.
12      Q.  -- how close in proximity and time
13  you were obtaining these quotes.
14      A.  I was doing it in real-time on
15  both.
16      Q.  Okay.  So you got a quote from
17  Skiplagged --
18      A.  Yeah.
19      Q.  -- and then immediately went and
20  got that same quote, or on the same leg, I
21  should say --
22      A.  Yeah.
23      Q.  -- from the American website?
24      A.  Correct.
25      Q.  Now, particularly, you call out

                                    Page 143

1   the statement in American -- or, excuse me,
2   in Skiplagged's menus that apparently you
3   went through where apparently it said you're
4   saving $21 compared to other websites,
5   correct?
6       A.  Ah, yes, that is correct.
7       Q.  And you try to describe that as --
8   generally as misleading, correct?
9       A.  , I felt it was quite misleading.
10      Q.  But you're familiar with -- that
11  American does offer its fares through
12  multiple different vendors, right, it's not
13  just the American Airlines website, right?
14      A.  That is correct.
15      Q.  So it's possible that there was a
16  $21 savings compared to that flight being
17  offered, let's say, through Expedia or
18  another vendor that American uses, correct?
19      A.  Well, it's always possible, but I
20  think what I'm pointing out in this example,
21  which is really why I wanted to ask you which
22  example we were looking at, is that the $21
23  fare savings that purported to exist was with
24  the first price that Skiplagged offered to me
25  in the process.  So then I pulled out my

                                    Page 144

1   credit card, I entered all my information.  I
2   actually purchased the ticket.
3       And from the time that I was first
4   informed that I had been saving $21 to the
5   time that I entered in my information, my
6   credit card information and went to purchase
7   it, Skiplagged increased the price twice.
8   Okay.  So the price went up twice, and they
9   continued to tell me that I was saving $21,
10  even though within this, like, couple-minute
11  period the price went up twice.  And then
12  after I went and purchased the ticket, with
13  the price having gone up twice, I then went
14  back to American's website, okay, and I could
15  have got the price for lower.
16      Q.  Let me make sure I understand the
17  process you went through.
18      When you were navigating the
19  Skiplagged website, it informed you of the
20  increase in price before you actually
21  purchased the ticket?
22      A.  Yes, I went to purchase -- I think
23  I just describe it quite clearly in my
24  report.
25      But I initially went to hit

                                    Page 145

                                    37 (Pages 142 - 145)

1  purchase.  They said, oh -- the price has
2  gone up, and it said the price has gone up
3  by, you know, the first time it said it went
4  up by -- I think it was like up to 177, they
5  said please hit refresh, sorry for the
6  inconvenience, and then at the next step it
7  actually increased it again, and then I
8  purchased the ticket.
9      I got an email confirmation like a
10 minute later and that email confirmation
11 continued to tell me that I had saved $21,
12 even though the $21 was based off the initial
13 price, which was, like, $40 less.
14     Q.  But both -- I want to make sure I
15 understand.
16     Both situations you or the
17 consumer had the opportunity not to purchase
18 the price with -- purchase the ticket, I
19 should say, with the knowledge that the fare
20 had actually gone up, right?
21     A.  Yeah, I was never charged -- it
22 wasn't as though, like, I go get my credit
23 card statement and it was more than I had
24 agreed to pay.  I'm not suggesting that they
25 charged my credit card for more than I was

Page 146

1  fly by offering me this fare at the first
2  surge of whatever it was, 153, or whatever,
3  telling me at that moment in time that's the
4  lowest fare.  So I hit yeah.  I would go and
5  get that.
6      I entered my credit card
7  information.  The fare goes up twice.  It's
8  still telling me I'm saving $21, that that
9  $21 save has never changed on any part of the
10 Skiplagged communication to me.  But what
11 Skiplagged wasn't doing, was saying, well,
12 wait, maybe, actually, because that fare had
13 gone up on the hidden city, like, why not
14 check actually Boston to Dallas, which is
15 really where this person is trying to go to,
16 and see whether or not it's offering the
17 savings.
18     It didn't do that, and because of
19 that I paid more than I would have had to pay
20 if I just gone ahead and bought the ticket on
21 American or on another website, an
22 unauthorized agent of American, and gotten
23 that ticket, the nonstop flight, could
24 have got my AAdvantage miles, could have
25 brought a carry-on bag, didn't have to

Page 148

1  told.
2      Q.  Okay.  And that was -- as we
3  talked about with dynamic pricing, that is
4  possible in American's revenue management
5  cycle, the way they ultimately price tickets
6  is fares change day to day and even sometimes
7  minute to minute, correct?
8      A.  Yeah, but the problem here, as I
9  describe in my report, is because Skiplagged
10 never went back -- it was like looking at
11 this hidden-city opportunity, you know, I had
12 a price at one moment in time, and yeah,
13 maybe that moment in time did exist and maybe
14 hypothetically, in the moment between that
15 initial quote and the time I entered in my
16 credit information, maybe the price on the
17 hidden-city ticket went up.  Okay.
18     But it never goes back then and
19 compared it to just, oh, what if I bought the
20 nonstop flight, and that is the flight that
21 didn't go up.  That stayed the same.  So what
22 I really want to do, the Skiplagged
23 passenger -- I'm sorry -- customer, here I'm
24 a Skiplagged customer, I just want to fly
25 from Boston to Dallas.  And it entices me to

Page 147

1  violate American's contract of carriage, so
2  that, to me, I felt like I had been
3  bait-and-switched.
4      Q.  That's your own personal reaction?
5      A.  I mean, I travel a lot.
6      Q.  Well, if you travel a lot, you've
7  been on -- you've certainly been on
8  American's website before where you've
9  tried -- do you book your own flights?
10     A.  Often I do, yes.
11     Q.  So you've certainly been on
12 American's website, I would assume, where
13 you've gone to book a flight on a particular
14 class of seat to a particular location and it
15 interrupts somewhere through process and
16 says, well, that fare or that seat is no
17 longer available, right, and it's a new fare?
18     A.  I mean, quite honestly, I have not
19 personally had that experience on American,
20 and keep in mind, while I was always -- while
21 I was doing these Skiplagged searches, I had
22 a separate American window going on as well.
23 That did not happen to me.
24     Q.  Ever?
25     A.  Well, during these searches it

Page 149

1  hadn't.
2      Q.   That wasn't my question, during
3  these searches.
4          My question was, certainly you've
5  been on American's website trying to book a
6  flight where somewhere through the process it
7  stops and says that seat at that price is
8  no long available, right?
9      A.   I do not recall having a situation
10  where once I got to the point where I was
11  entering in credit card information, that the
12  fare had changed.  I have certainly been
13  shopping for airfares where I check on
14  Tuesday or I check -- you know, during the
15  day, see what the prices look like, figure I
16  want to wait until I get home, talk to my
17  wife, figure out if those days work, and then
18  yeah, the fares have changed.  Sometimes
19  they're higher.  Sometimes they're lower.  I
20  put it off for a day, whatever, and the fares
21  changed.  That's happened to me.
22          I can't tell you, as I sit here
23  right now, that I've had a situation where I
24  have got to the point where I am just
25  entering in credit card information and the
Page 150

1  twice.
2      Q.   And this is just what you
3  observed, right?
4          I mean you talk a number of times
5  in your report about Skiplagged's intent, and
6  they intentionally do this or that.  You
7  don't really have evidence or knowledge of
8  what Skiplagged's intent was when it was
9  programming its program and creating its
10  algorithm, right, you're just talking about
11  what you observed in navigating the
12  Skiplagged website, correct?
13      A.   Well, I'm not sure what you mean
14  by "intent."  I know the intent of
15  Skiplagged, as I understand this case and as
16  I understand their business, is to offer
17  hidden-city ticket opportunities.  Okay?  So
18  that I believe is their intent.
19          Do I believe that they foresaw
20  what happened to me and, you know,
21  intentionally programmed it in, I don't know
22  one way or another.  I'm just -- I'm
23  explaining what happened to me, and I'm
24  explaining why the proposition that is
25  really, I think, foundational to Dr. Vasigh's
Page 152

1  fare has changed.
2      Q.   But you're not disagreeing with
3  Skiplagged's practice of alerting the
4  customer before it buys the ticket from
5  American.  I mean, you realize they're buying
6  this ticket from American, these are
7  American's prices, right?
8      A.   I agree with you these are
9  American's prices, but what I'm telling you,
10  and I think what the crux of this -- of the
11  problem was in this example, was that it
12  is -- once you've chosen that ticket and
13  you're going down the path of buying the
14  hidden-city ticket, and if the price of that
15  hidden-city ticket goes up, because, for
16  example, American had raised its price, it
17  was the last seat and certain inventory was
18  sold and now you're continuing the inventory,
19  it would stand to reason that if I really
20  just want go from Boston to Dallas, that what
21  it should be doing is comparing what the
22  actual prices are on Boston to Dallas at that
23  time, if it's going to represent to me that I
24  am saving $21, because I was by no means
25  saving $21, given that the fare had gone up
Page 151

1  opinions that Skiplagged is affording people
2  these lower fares, is not necessarily true
3  because, in my own experience, it was telling
4  me it was a lower fare, when, in fact, it
5  wasn't.
6      Q.   Starting on page 37, going with
7  Exhibit 17, and I think going on into
8  paragraph 38, which continues on to page 38,
9  you're talking about examples or attributes
10  to the American product that are being -- I
11  believe you used the word "degrading."
12          You remember that part of your
13  report?
14      A.   I do, yes.
15      Q.   Okay.  I just want to make sure I
16  understand.  That's your personal opinion,
17  you didn't actually do any analysis?  Like
18  you're not here to offer any type of damage
19  testimony or put any type of valuation on
20  what this alleged degrading ultimately
21  resulted in, correct?
22      A.   I have not been asked to render
23  any opinions on damages.
24      Q.   So this is just an observation
25  you're making.  It is not part of an analysis
Page 153

39 (Pages 150 - 153)

1   to try and quantify or put an order of
2   magnitude on this alleged degrading, correct?
3     A.   I have not been asked to quantify
4   the degree of degrading.  What I'm pointing
5   out here is that as a nonauthorized -- as a
6   nonagent of American, they're not an
7   authorized agent, they are intentionally
8   degrading the product.
9     Q.   Intentionally.  You have knowledge
10  of their intent?
11     A.   Well, they say it.  I mean, I
12  don't know what's in the minds of whoever
13  wrote the code, but what I'm telling you is
14  that throughout the process, Skiplagged told
15  me only -- backpack only.  Do not attempt to
16  bring a piece of carry-on luggage after I
17  bought the ticket.  Skiplagged sent me an
18  email telling me, do not associate my
19  frequent flyer miles.  So that is their
20  intent, is to degrade the product.
21     Q.   What other evidence, other than
22  what you just described, do you have that
23  Skiplagged intentionally attempted to degrade
24  American's products?
25     A.   I mean, that I think is -- they

Page 154

1   are -- they told me, that's what they told
2  me.
3     Q.   I know you said that.  But I asked
4  what other evidence do you have of
5  Skiplagged's intent to intentionally degrade
6  American's product?
7     A.   I don't think I need any more than
8  that.  I mean, they are instructing me to
9  forgo AAdvantage miles.  They're instructing
10  me to not take a carry-on bag if I want to.
11  That is a degradation of the product that
12  American offers.  It's an important part of
13  American's -- of value proposition to
14  consumers, is the fact that they offer
15  AAdvantage miles; the fact that their basic
16  economy tickets allow passengers to bring a
17  carry-on bag, whereas Spirit and Allegiant
18  and Frontier don't, without a fee.  That's an
19  integral part of the value proposition that
20  American offers into the marketplace, and
21  Skiplagged is saying I can't do that or I
22  shouldn't do that or warning me against doing
23  it.
24     Q.   But, Of course, in this example
25  where you were, at least theoretically, the

Page 155

1   potential customer, you would have seen those
2  warnings and had the options to decide where
3  you take the carry-on bag or not, whether you
4  insert your frequent flyer mileage or not,
5  right, the consumer has the option, after
6  getting that information from Skiplagged, to
7  make that decision, correct?
8     A.   Yeah, I certainly have the option,
9  but it comes with risks and Skiplagged
10  informs me of those risks.  So yes, if I
11  decide I want to enter my frequent flyer
12  number and if I'm willing to bear the risk of
13  having my bank of AAdvantage miles taken away
14  or my status revoked, sure, but that to me is
15  a degradation of the product.
16     Q.   Are you aware that American has ███
17  ███████████████████████████████
18  ███████████████████████████████
19  ███████████████████████████████
20  ███████████████████
21
22     A.   Not -- I don't have specific
23  knowledge.  I understand just from being
24  around the industry that that can happen.
25     Q.   Are you aware that they have

Page 156

1  ███████████████████████████████
2  ███████████████████████████
3  ███████████████
4     A.   Again, as part of this analysis, I
5  haven't had any specific conversations with
6  people at American.  But I've been working in
7  this industry for a long time, and I
8  understand that that's one of the things that
9  has been done.
10     Q.   And you would at least agree that
11  it's possible that in this hidden-city
12  ticketing application, that American could
13  gain more revenue than if there wasn't a
14  hidden-city ticket application, correct?
15     A.   I'm not sure what you mean by that
16  question.  Could you --
17     Q.   Well, there's at least a scenario
18  where somebody gets off on a hidden city and
19  American is able then to sell that second leg
20  for more than the difference between a direct
21  flight and a hidden-city ticket, right?
22     A.   Again, can you -- I'm having a
23  little trouble because of the temporal aspect
24  of what you're suggesting.  So could you
25  maybe ask the question again.  I just want to

Page 157

40 (Pages 154 - 157)

App'x 202



**Page 158**

1 mare sure I understand.
2    Q.   So there's a possibility that
3 consumer A buys a hidden-city ticket from
4 Boston to San Antonio, going through Dallas
5 Fort Worth, and there's a price for a Boston
6 to Dallas direct flight that's slightly
7 higher, let's say hypothetically.  Okay?
8    A.   Okay.
9    Q.   The consumer purchases Boston to
10 San Antonio through Dallas, flies to Dallas
11 and gets off the flight.
12    A.   Yeah.
13    Q.   American then hypothetically is
14 able to maybe put a passenger on the Dallas
15 to San Antonio flight that could give them
16 more value than what was the difference in
17 ticketing between the direct flight from
18 Boston to Dallas and the hidden city fare,
19 correct?
20    A.   So are you thinking about a
21 scenario -- I just want to make sure I
22 understand where in the period of time
23 between which that person lands in Dallas and
24 walks out the terminal but before it's known
25 to American that he's a no-show, because he

**Page 159**

1 doesn't notify, I mean they're holding up
2 that seat, they're holding that seat, that
3 someone magically shows up at the airport
4 when the gate is closing, and they realize
5 that this person is no longer there and they
6 sell that seat.  Is that what you're --
7    Q.   That's a possibility or possibly
8 even somebody is sitting on standby, and
9 let's say the difference in fare was only 20
10 bucks.  Okay?
11    A.   Standby --
12    Q.   Hang on.  Let me finish my
13 example.
14        So the difference in fare is only
15 20 bucks, and the person on standby then gets
16 to go on the flight from Dallas to San
17 Antonio but he checks a bag and it costs him
18 $25.  There's a scenario where American could
19 gain more revenue by allowing the hidden-city
20 ticket to happen and then putting another
21 passenger on that second leg.  That scenario
22 at least exists, right?
23    A.   I don't understand the scenario,
24 because that person that's sitting there is
25 at the gate and the bag, you check the bag at

**Page 160**

1 the counter, and so I don't understand that.
2        Like, you can't have a bag that --
3 I -- I -- I don't understand your scenario.
4 I mean, like that -- that -- that -- the fact
5 of the matter is that American doesn't know
6 that the person is no-showing for that flight
7 until it's kind of too late to actually sell
8 that ticket to someone.
9    Q.   Do you know that for sure?  Are
10 you aware of situations where American has
11 ████████████████████████████
12 ████████████████████████████████
13 ███████████████████████████
14 ██████████████████████████
15 ██████████████████████████
16 ████████████████████████████
17 ██████████████████████
18 ███████████████
19    A.   ████████
20    Q.   ████████
21    A.   Yeah.
22    Q.   Are you aware that that's
23 happened, that scenario has happened,
24 ██████████████████████████████

**Page 161**

1    A.   I'm not aware one way or another
2 that that's happened, but I'll take that as a
3 hypothetical.
4        But now you're -- I think I'm
5 trying to explain the situation as I
6 understand it, where a person buys a ticket,
7 a Skiplagged ticket for hidden city, is
8 ███████████████████████████████;
9 so now I've got, like, a no-show on Boston to
10 Dallas, I've got a no-show on Dallas to San
11 Antonio, had I known that -- it's a confusing
12 example.
13        And you're saying that later that
14 day they zero out that itinerary and all of a
15 sudden there's a new seat in inventory and
16 that someone then walks up to the airport in
17 Dallas, wanting to buy a seat at the ticket
18 counter later in the day, and now there's a
19 seat for them.
20        Is that what you're suggesting?
21    Q.   Well, there are a number of
22 scenarios there, right?  I mean, we don't
23 know ████████████████████████████
24 ██████████████████████████████
25 ███████████████████████

1   ██████████████████████████████
2   ██████████████████████████████
3   ██████████████████████████████
4   ██████████████████████████████
5   ██
6   ██
7        A.   Well, I just don't understand what
8   your counterfactual is. ████████████████
9   ██ ███████████████████████████████████
10  ██ ███████████████████████████████████
11  ██
12  ██    So, I mean, sure, you can conjure up
13  any example you want, but that doesn't alter
14  the fact that these are tickets that, you
15  know, are not compliant with the contract of
16  carriage, and that in the kind of the but-for
17  world where it didn't exist, American would
18  have that inventory to sell to someone else
19  as well as.
20       Q.   But, again, you're saying didn't
21  comply with the contract to carriage just as
22  a lay observation.  You're not a lawyer that
23  did any legal analysis on that, correct?
24       A.   Well, I -- again, I've read the
25  contract of carriage.  It specifically

Page 162

1   prohibits the use of hidden-city tickets.
2        So I'm not making a legal
3   conclusion, but I'm just saying that I've
4   seen seeing the contract of carriage and I've
5   seen that it explicitly prohibits these
6   hidden-city tickets.
7        MR. TOBIN:  Let's take a
8   five-minute break.
9        THE VIDEOGRAPHER:  The time is
10  1:22.  We're going off the record.
11  (Recess taken at 1:22 p.m. to 1:33 p.m.)
12       THE VIDEOGRAPHER:  We're back on
13  the record.  The time is 1:33.
14  BY MR. TOBIN:
15       Q.   Dr. Lee, if you'll turn to page 43
16  of your report, and in particular I'd like
17  you to look at paragraph 42, the first
18  sentence, please.
19       A.   Yes, I see that.
20       Q.   Just so the record is clear, I
21  think I know what you mean, but just so the
22  record is clear.  What do you mean by
23  "beyond-hub segment"?
24       A.   Well, it would be in the example
25  that we've been talking about frequently.  It

Page 163

1   would be the Dallas-San Antonio segment.
2        Q.   So the sentence reads, ██████████
3   ██████████████████████████████████
4   ██████████████████████████████████
5   ██████████████████████
6        What evidence do you have that on
7   American flights, when there are hidden-city
8   tickets, that ███████████████████████
9   ██
10       A.   Well, ████ based off my knowledge of
11  the industry and of American and of their
12  load factors, most flights go up with at
13  least some empty seats.
14       Q.   Have you reviewed any data on
15  instances where a hidden-city ticket method
16  is employed and that ████████████████████
17  ████████████████████
18       A.   I haven't performed any specific
19  analysis because I wouldn't -- I didn't have
20  access to -- like if I had Skiplagged data
21  for something like that, I could try and do
22  that analysis.  I don't have Skiplagged --
23  all the Skiplagged tickets where people had
24  purchased hidden-city tickets.
25       I'm making just a general

Page 164

1   observation that, based off my knowledge and
2   experience of the airline industry generally
3   and American in particular, that the
4   majority -- beyond the majority of flights
5   have at least one empty seat when they
6   depart.
7        MR. TOBIN:  At times, I believe
8   that Dr. Lee has been unnecessarily
9   evasive in this deposition.  So I'm
10  going to reserve my right to recall him
11  or compel him to be here and answer my
12  questions, but subject to that, I pass
13  the witness at this time.
14       MR. MUYSKENS:  I'm going to
15  respectfully disagree, but we're done.
16  Thank you very much.
17       THE VIDEOGRAPHER:  The time is
18  1:36.  We're going off the record.  This
19  is the end of today's deposition of
20  Darin Lee, Ph.D.
21       THE STENOGRAPHER:  Mr. Tobin,
22  you're ordering the original?
23       MR. TOBIN:  Yes.
24       THE STENOGRAPHER:  Mr. Muyskens,
25  are you ordering a copy?

Page 165

42 (Pages 162 - 165)

| 1 | MR. MUYSKENS: Expedited, please. |
|---|---|
| 2 | THE STENOGRAPHER: When for? |
| 3 | MR. MUYSKENS: As soon as you can. |
| 4 | THE STENOGRAPHER: Did you want |
| 5 | expedited also? |
| 6 | MR. TOBIN: Yeah, if they're going |
| 7 | to get it, I guess we'll go ahead. |
| 8 | (Deposition suspended at 1:37 p.m.) |

Page 166

SIGNATURE PAGE

AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED, INC. LTD.

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

Executed this _____ day of _____.

at _____, _____.
(CITY)        (STATE)

----------------------------------
DARIN N. LEE, PH.D.

Page 168

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Sandra A. Deschaine, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts at large, do hereby certify that the deposition of Darin N. Lee, Ph.D, in the matter of American Airlines, Inc. versus Skiplagged, Inc., at the offices Greenberg Traurig, One International Place, Boston, Massachusetts, on July 11, 2024, taken and transcribed by me; that the witness provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts; that the transcript produced by me is a true record of the proceedings to the best of my ability; that the witness is reading and signing, that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action, on this 15th of July 2024.

Registered Professional Reporter

My Commission Expires:
July 5, 2024

Page 167

ERRATA SHEET

AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED, INC. LTD.,

DARIN N. LEE, PH.D. - JULY 11, 2024

Page| Line| Change/Correction

Page 169

43 (Pages 166 - 169)

1  nathan.muyskens@gtlaw.com
2          July 15, 2024
3  RE: American Airlines, Inc. v. Skiplagged, Inc.
4  DEPOSITION OF: Darin N. Lee , PhD (# 6782850)
5     The above-referenced witness transcript is
6  available for read and sign.
7     Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18          Yours,
19          Veritext Legal Solutions
20
21
22
23
24
25
                                    Page 170

```
 1                    SIGNATURE PAGE

 2        AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

 3                      INC. LTD.

 4

 5          I, the undersigned, declare under penalty

 6      of perjury that I have read the foregoing

 7      transcript, and I have made any corrections,

 8      additions or deletions that I was desirous of

 9      making; that the foregoing is a true and

10      correct transcript of my testimony contained

11      therein.

12
                                    14 th.
13          Executed this_____day of

14      August 2024 ,

15
                    Boston          MA
16      at_____, _____.

17            (CITY)              (STATE)

18

19
        -------------------------------
20

21            DARIN N. LEE, PH.D.

22

23

24

25
```

Sarah P. Pontbriand
NOTARY PUBLIC
Commonwealth of
Massachusetts
My Commission Expires
5/11/2029

Page 168

```
 1                        ERRATA SHEET

 2        AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

 3                        INC. LTD.,

 4            DARIN N. LEE, PH.D. - JULY 11, 2024

 5
```

| Page | Line | Change/Correction |
|------|------|-------------------|
| 9 | 11 | "first date of appointment" to "first data point" |
| 10 | 11-12 | "that I might assume" to "that it assumes" |
| 12 | 6 | "lower cost and network" to "lower cost network" |
| 13 | 9 | "is needed" to "isn't needed" |
| 19 | 21 | "in my direct" to "under my direct" |
| 19 | 22 | "in my report" to "on my report" |
| 20 | 22 | "Well, see," to "Well, let's see" |
| 22 | 1 | "earlier May" to "early May" |
| 22 | 19 | "off my heart" to "off by heart" |
| 32 | 17 | "--" to "of" |
| 36 | 6 | "per" to "per se" |
| 38 | 10 | "-- I had a" to "IATA" |
| 40 | 11 | "was DOT, with" to "was a DOT route" |
| 44 | 22 | "in millions" with "in the millions" |
| 47 | 16 | "him" to "them" |
| 53 | 12 | "liability" with "reliability" |
| 57 | 2 | "has the name" with "as the name" |
| 57 | 17 | "because of" with "because" |

```
25
```

Page 169

```
1                      ERRATA SHEET

2        AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

3                         INC. LTD.,

4            DARIN N. LEE, PH.D. - JULY 11, 2024

5

6      Page | Line | Change/Correction

7       61  | 2    | "in one of" to "it's one of"

8       65  | 3    | "Southwest" to "itself"

9       65  | 4    | "There're" to "They're"

10      71  | 3    | "carrier might" to "carrier, it might"

11      71  | 23   | "100 database" to "T-100 database"

12      79  | 25   | "DC airport" to "DCA airport"

13      83  | 19   | "domestic-only" with "domestic O&D"

14      83  | 20   | "says decline" to "has declined"

15      94  | 6    | "the night" to "the flight"

16      97  | 15   | "then seat" with "then the seat"

17      100 | 25   | "mistaking" to "mistaken"

18      109 | 4    | "domestic-only" with "domestic O&D"

19      110 | 12-13| "both JFK, New York" to "both JFK, Newark,"

20      112 | 21   | "competition airfares" to "competition and airfares"

21      116 | 18   | "domestic-only" with "domestic O&D"

22      123 | 25   | "domestic-only passenger" with "domestic O&D passengers"

23      125 | 23   | "or" with "nor"

24      126 | 8    | "or" with "nor"

25
```

Veritext Legal Solutions
800-336-4000

App'x 209

```
 1                        ERRATA SHEET

 2          AMERICAN AIRLINES, INC. VERSUS SKIPLAGGED,

 3                         INC. LTD.,

 4             DARIN N. LEE, PH.D. - JULY 11, 2024

 5

 6      Page| Line|  Change/Correction

 7      128  | 20   | "from hub" with "from their hubs"

 8      132  | 9    | "fair" wtih "fare"

 9      132  | 20-21| "first paragraph of Footnote 24" to "footnotes of paragraph 24"

10      135  | 19   | "premium at" to "pre-eminent"

11      136  | 3    | "not over over" to "not only over"

12      137  | 12   | "a document" to "as I document"

13      138  | 20   | "or 90 minutes" to "of 90 minutes or"

14      148  | 2    | "surge" to "search"

15      151  | 17   | "last seat and" to "last seat in a"

16      151  | 17   | "inventory was" to "inventory and was"

17      151  | 18   | "inventory" to "purchase"

18      164  | 12   | "go up" with "go out"

19      ____ |_____ |_____

20      ____ |_____ |_____

21      ____ |_____ |_____

22      ____ |_____ |_____

23      ____ |_____ |_____

24      ____ |_____ |_____

25
```

Page 171

App'x 210