**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANT SKIPLAGGED, INC.'S RESPONSE IN**
**OPPOSITION TO PLAINTIFF AMERICAN AIRLINES, INC.'S**
**MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY**
**OF GEORGE JOHN, PhD AND BRIEF IN SUPPORT**

William L. Kirkman
State Bar No. 11518700
billk@kirkmanlawfirm.com
Preston B. Sawyer
State Bar No. 24102465
prestons@kirkmanlawfirm.com
KIRKMAN LAW FIRM, PLLC
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone:    (817) 336-2800
Facsimile:    (817) 877-1863

Darin M. Klemchuk
State Bar No. 24002418
Darin.klemchuk@klemchuk.com
KLEMCHUK PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone:    (214) 367-6000
Facsimile:    (214) 367-6001

Aaron Z. Tobin
State Bar No. 24028045
atobin@condontobin.com
Kendal B. Reed
State Bar No. 24048755
kreed@condontobin.com
Abigail R.S. Campbell
State Bar No. 24098759
acampbell@condontobin.com
CONDON TOBIN SLADEK THORNTON
 NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone:    (214) 265-3800
Facsimile:    (214) 691-6311

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS........................................................... ii

INDEX OF AUTHORITIES....................................................... iv

I.      Summary of Response......................................................... 1

II.     Legal Standard................................................................ 3

III.    Arguments and Authorities.................................................. 4

        A.      Dr. John Is Qualified to Rebut Dr. Wind's Methodologies, Analyses,
                and Opinions.......................................................... 4

                1.      Summary of Dr. John's Qualifications............................ 4

                2.      AA's Contentions That Dr. John Is Not Qualified Are Without Merit.... 5

        B.      AA's Contention That Dr. John Purportedly Contradicts Established Case
                Law and Methodology Regarding Consumer Surveys Is Without Merit......... 7

        C.      Dr. John's Opinions Are Relevant, Will Assist the Jury, and Are Not
                Conclusory............................................................ 8

                1.      Dr. John's Report and Testimony Demonstrating How the Wind
                        Experiment Fails to Resemble the Real-World Consumers' Journeys
                        at Skiplagged's Website Are Relevant and Will Assist the Jury......... 8

                        a.      The Wind Report Experiment Grossly Underrepresents the
                                Large Number of Flights Across Multiple Airlines Presented
                                to the Consumer at Skiplagged.com........................... 9

                        b.      The Wind Report Experiment Fails to Include Other Elements
                                of a Consumers' Real-World Journey at Skiplagged.com........ 10

                2.      Dr. John's Opinions Regarding "Educating Consumers" Are Also
                        Relevant........................................................ 12

                3.      Dr. John's Report and Testimony Are Not Conclusory................ 13

        D.      Dr. John's Report and Testimony Are Reliable......................... 14

                1.      Dr. John's "Measurement of Subjective Concepts" Analyses Are
                        Reliable........................................................ 14

2.      Dr. John's Analyses and Opinions Demonstrating the Flaws With
        How the Wind Report Experiment Coded Open-Ended Responses
        Are Accurate and Reliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3.      Dr. John's Opinion That Skiplagged.com Does Not Shroud
        Hidden-City Ticket Details Is Reliable. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4.      Dr. John's Report Addressing the Wind Report's Analysis and
        Opinion Regarding Whether Skiplagged Deceives Consumers About
        Relative Prices of Non-Hidden-City Tickets on Skiplagged.com Relative
        to AA.com Is Reliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5.      Dr. John's Report and Testimony Exposing Additional Flaws With
        Dr. Wind's Methodology, Report, and Opinions Regarding
        Confusion Among Participants As to An Affiliation Between Skiplagged
        and AA Are Reliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6.      Dr. John's Report and Testimony That the Wind Report's
        Consumer Complaint Data Does Not Support Its Confusion Opinions
        Is Not Conclusory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

E.      Dr. John Should Not Be Excluded Under Rule 403. . . . . . . . . . . . . . . . . . . . . . 21

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## <u>INDEX OF AUTHORITIES</u>

<u>Page</u>

**CASES:**

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*,
  173 F. Supp.3d 363 (N.D. Tex. 2016), *aff'd as modified and remanded*,
  725 F. App'x 256 (5th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Madison v. Courtney*,
  No. 4:18-CV-00671-O, 2019 WL 8263428 (N.D. Tex. Jan. 26, 2019). . . . . . . . . . . . . . . 4

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Yeti Coolers, LLC v. RTIC Coolers, LLC*,
  No. A-15-CV-597-RP, 2017 WL 429250 (W.D. Tex. Jan. 28, 2017). . . . . . . . . . . . . . 7, 8

**RULES:**

FED. R. EVID. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

FED. R. EVID. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

DEFENDANT SKIPLAGGED, INC.'S RESPONSE IN
OPPOSITION TO PLAINTIFF AMERICAN AIRLINES, INC.'S
MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY
OF GEORGE JOHN, PhD AND BRIEF IN SUPPORT

**TO THE HONORABLE MARK T. PITTMAN, UNITED STATES DISTRICT JUDGE:**

NOW COMES Defendant herein, Skiplagged, Inc. ("Skiplagged"), and files this *Response in Opposition to Plaintiff American Airlines, Inc.'s Motion to Exclude Expert Opinions and Testimony of George John, PhD and Brief in Support*, and would respectfully show the Court as follows:

**I.**

SUMMARY OF RESPONSE

Jerry Wind ("Dr. Wind") was engaged by American Airlines ("AA") as a potential expert witness to conduct experimental surveys of proposed airline travel customers. These surveys were supposed to support AA's then-existing claims against Skiplagged, which were breach of contract, tortious interference, and copyright and trademark infringement. The first two claims were based on AA's assertions of impropriety as respects hidden-city ticketing. The trademark and copyright claims are not so based.

1

Dr. Wind showed each person in his "experiment" sample screenshots of a pair of hypothetical website search results: screenshot pages of a Skiplagged.com webpage or an Expedia hypothetical flight search result followed by screenshot pages of an AA.com hypothetical flight search result. Based thereon, Dr. Wind put forth three opinions in his report, the first two of which dealt with AA's claims of breach of contract and tortious interference and the related hidden-city ticketing issue. The third opinion purported to deal with AA's trademark claims. Specifically, Dr. Wind opined that:

(1)    "Skiplagged deceives consumers of hidden-city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden-city tickets";

(2)    "Skiplagged deceives consumers into believing that purchasing a regular, non-hidden-city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly"; and

(3)    "Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American (either as an authorized travel agent for American or as having some other relationship with American)."

Skiplagged respectfully submits that given the Court's *Order* on the *Summary Judgment Motions*, Dr. Wind's first two conclusions are not relevant, as they do not relate to the federal claims in this case. That leaves the third opinion.

Professor George John, PhD ("Dr. John") was engaged by Skiplagged to respond to Dr. Wind's Report. Dr. John is a nationally recognized expert in the field of marketing research with significant experience in consumer internet searches in digital channel research and the design, development, and analysis of surveys related thereto. After reviewing and analyzing Dr. Wind's Report, Dr. John opined that:

(1)    Dr. Wind is mistaken when he concludes that his data from his experiment show that "Skiplagged deceives consumers of hidden-city tickets by not effectively disclosing to them all of the serious risks and/or consequences imposed by airlines in connection with hidden-city tickets";

    (2)      Dr. Wind is mistaken when he concludes that his data from his experiment show that "Skiplagged deceives consumers into believing that purchasing a regular, non-hidden-city ticket on Skiplagged.com is cheaper than purchasing the same flight(s) from American directly"; and

    (3)      Dr. Wind is mistaken when he concludes that his data from his experiment show that "Skiplagged confuses consumers into believing that Skiplagged is associated with or authorized by American…."

While Dr. John's counterpoints to numbers (1) and (2) above are appropriate, the third opinion addresses the only remaining relevant inquiry in this case.

Against this backdrop, Dr. John's analysis challenges the legitimacy of Dr. Wind's third opinion as to the alleged "confusion" of potential airline customers purportedly submitted in support of AA's trademark claim. In that regard, based on Dr. John's report, it can be seen that Dr. John: (1) is qualified to opine on Dr. Wind's methodology which he used in his experiments and the conclusions Dr. Wind reaches; (2) has applied accepted methods associated with analyzing the propriety of Dr. Wind's experiments; (3) has put forth accepted and reliable methods of challenging the legitimacy of Dr. Wind's technique of conducting the experiment; and (4) has provided numerous educational references to his report which substantiate and corroborate his opinion. Based thereon, Dr. John has demonstrated the fallacies of the "survey" Dr. Wind conducted, shown how Dr. Wind failed to resemble the real world of customer computer internet journeys, such as are conducted on Skiplagged.com, pointed out the scientific inappropriateness of the design of Dr. Wind's experiments, and highlighted other significant problems with Dr. Wind's survey, all as demonstrated below. AA's *Motion* must be denied accordingly.

## II.

### LEGAL STANDARD

The Court has broad discretion in making the preliminary determination regarding the admissibility of expert testimony pursuant to its "gatekeeping function that filters the evidence the

trier of fact will deliberate." *Madison v. Courtney*, No. 4:18-CV-00671-O, 2019 WL 8263428, at *1 (N.D. Tex. Jan. 26, 2019); *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). However, "the rejection of expert testimony is the exception rather than the rule." *See* FED. R. EVID. 702 advisory committee note. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. In exercising its gatekeeping role, the Court must, therefore, "evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case." *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp.3d 363, 408 (N.D. Tex. 2016), *aff'd as modified and remanded*, 725 F. App'x 256 (5th Cir. 2018) (citing *Daubert*, 509 U.S. at 592–98).

### III.

#### ARGUMENTS AND AUTHORITIES

**A.** **Dr. John Is Qualified to Rebut Dr. Wind's Methodologies, Analyses, and Opinions**

Dr. Wind's third "core opinion" in his April 23, 2024 Expert Report ("Dr. Wind's Report" or the "Wind Report")[1] is based primarily on consumer survey experiments (the "Wind Report Experiment"). Contrary to AA's contentions, Dr. John's education, training, experience, and expertise qualify him to expose the fallacies with the Wind Report Experiment's flawed methodology and conclusions, and otherwise rebut Dr. Wind's opinions.

**1.** **Summary of Dr. John's Qualifications**

Dr. John's qualifications are extensive to qualify him to rebut Dr. Wind. *See* Dkt. 244, pp. 2–3 (App'x 097–098); *see also* highlighted portions of App'x 009, 013–024; 032–050 (John Depo.,

---

[1] *See* Ex. 2 to Skiplagged's *Brief In Support of Defendant's Motion to Strike Testimony and Report of Plaintiff's Expert, Dr. Jerry Wind* at Dkt. 221, App'x 0019–0108.

5:20–24; 13:2–24:15; 33:4–34:13; 36:11–18; 38:22–42:6; 44:25–46:25; 50:12–21; 51:14–52:14; 60:20–64:3). He is currently the Marketing Chair at the Carlson School of Management at the University of Minnesota, where he has been a member of the faculty since 1987. *Id*. Dr. John's teaching, research, and experience span the general field of marketing. *Id.* Within this field, Dr. John currently focuses on distribution systems, including researching customer journeys and consumer internet search in digital channels. *Id*. He has also been published widely in academic journals on these topics; his publications have been cited more than 20,000 times; and he is listed in *Thompson Reuters*' "Highly Cited Researchers in Economics/Business," which includes fewer than the top one percent (1%) of all researchers globally in the economics/business field. *Id*. Dr. John's training, teaching, and research also includes the design, development, and analysis of surveys. *Id*. Moreover, Dr. John's dissertation was based on survey data; many of his published research articles have used his surveys and experimental stimuli; he has taught classes in Marketing Research methodology to Undergraduate, Masters, and PhD students; and has consulted on many topics closely related to the issues involved in this case. *Id*. Dr. John has also testified at trial in a federal case involving brand confusion. *See* App'x 040–042 (John Depo., 44:25–46:25).

**2.      AA's Contentions That Dr. John Is Not Qualified Are Without Merit**

Despite Dr. John's extensive qualifications in the marketing field directly relating to consumer surveys, journeys, and searches in digital channels, AA contends that Dr. John is not qualified because he purportedly lacks sufficient experience with what AA characterizes as "likelihood of confusion surveys." *See* Dkt. 229, p. 4. AA's contentions are without merit.

Dr. John is not required to have personally conducted or consulted specifically on legal "likelihood of confusion" consumer surveys to be qualified to expose the Wind Report Experiment's flaws. AA's attempt to myopically confine the qualification analysis to purported "likelihood of

confusion" consumer surveys in a legal context impermissibly misconstrues and restricts the qualification requirement. AA fails to cite or apply any authority supporting this proposition. *See* Dkt. 229, pp. 4–5. Additionally, AA's *Motion* fails to acknowledge that Dr. John has:

(1)     Conducted and utilized surveys to measure subjective concepts involving confusion and related concepts. *See* App'x 015–018, 046–047 (John Depo., 15:20–16:3; 16:5–11; 17:2–24; 60:21–61:17);

(2)     Taught undergraduate to PhD level classes regarding elements of survey sampling, accepted sampling methodologies, and design/construction of surveys. *See* App'x 022–025, 038–039 (John Depo., 22:4–23:5; 23:16–25:6; 41:15–42:6); and

(3)     Presented on likelihood of confusion, including surveys he designed and conducted, at a roundtable program. *See* App'x 035–036, 046–047 (John Depo., 38:22–39:16; 60:20–61:17).

AA also argues that Dr. John should be disqualified because, according to AA, he does not know the legal definition of likelihood of confusion. *See* Dkt. 229, p. 4. This is also unavailing. Dr. John is not required to know this legal definition to expose the flaws with the Wind Report Experiment. The definition of "likelihood of confusion" in the context of trademark infringement claim is a legal question. The Court will instruct the jury regarding this definition and the associated factors the jury should consider. Additionally, Dr. John has been involved in likelihood of confusion issues in the past, and he testified the legal factors presented to him in his deposition look very similar to things he has seen before. *See* App'x 033–034 (John Depo., 34:8–13; 36:11–18).

Finally, AA asserts that whether the consumer surveys used in the Wind Report Experiment are sufficiently reliable to scholars such as Dr. John, and whether scholarly literature would accept the methodology implemented by Dr. Wind, "is not a relevant inquiry for the jury." *See* Dkt. 229, p. 4. AA is again incorrect. Dr. John's opinions that Dr. Wind's experimental consumer survey methodology is unreliable will assist the jury in understanding and evaluating the probative value of the Wind Report Experiment, if any. It is also relevant for the jury to consider whether Dr. Wind's

analyses are sufficiently reliable to satisfy scholastic standards. This will also assist the jury in evaluating the evidence and determining fact issues related to AA's trademark infringement claim. Skiplagged would be severely and unfairly prejudiced if AA were permitted to present Dr. Wind's Report and testimony to the jury without providing Skiplagged the opportunity to proffer Dr. John's Report and testimony in rebuttal.

**B.**    **AA's Contention That Dr. John Purportedly Contradicts Established Case Law and Methodology Regarding Consumer Surveys Is Without Merit**

Dr. John's Report discusses how "confusion" is a "subjective concept" that is not directly observable. *See* Dkt. 244, p. 16 (App'x 111). Accordingly, the fields of marketing and psychology have developed a generally accepted method to attempt to measure subjective concepts. *Id*. Dr. John sets forth "three important elements to developing methodologically acceptable measures of a subjective concept like…confusion," which the Wind Report lacks. *See* Dkt. 244, pp. 16–20. As part of this analysis, Dr. John explains how and why "closed-ended questions are preferred over open-ended responses" when using surveys to attempt to measure subjective concepts, like confusion. *See* Dkt. 244, pp. 19–20. AA argues that Dr. John's opinion "contradicts established methodology for likelihood of confusion surveys." *See* Dkt. 229, p. 5. AA's contention is without merit and does not constitute a valid basis to exclude Dr. John.

In purported support for its position, AA cites to *Yeti Coolers, LLC v. RTIC Coolers, LLC*, No. A-15-CV-597-RP, 2017 WL 429250, at *1–2 (W.D. Tex. Jan. 28, 2017). However, the *Yeti* opinion is readily distinguishable and does not support exclusion of Dr. John. In that case, Yeti moved to exclude RTIC's rebuttal expert based on its position that the expert used an untested and unrecognized "aided *Eveready* survey." *Id.*. While the District Court stated that the expert used "open-ended questions employed by *Eveready*," that was not specifically at issue. *Id*. *Yeti* also acknowledges that *Eveready* is "not the exclusive means of proving the likelihood of confusion." *Id*.

The District Court denied Yeti's motion because "Yeti's criticisms of [RTIC's rebuttal expert] are proper topics for cross-examination at trial." *Id*. Dr. John's opinion that open-ended questions "suboptimal" does not contradict this case law. The fact that surveys involving open-ended questions have not been excluded in certain, distinguishable cases does not support the exclusion of Dr. John's Report and testimony. AA's contention conflates the exclusion of Dr. Wind's survey methodology with exclusion of Dr. John's criticisms of that methodology.

Finally, AA claims that Dr. John "does not offer any treatise, academic publication, or other study supporting his position; it is merely *ipse dixit*." *See* Dkt. 229, p. 5. AA is again incorrect. Dr. John's Report specifically cites to a foundational study, which has been cited over 26,000 times according to Google scholar citations. *See* Dkt. 244, p. 16, n.5 (App'x 111). Additionally, Dr. John is permitted to rely on his experience, education, skill, training, and knowledge in formulating his opinion that utilization of close-ended questions result in more reliable data from consumer surveys relative to use of open-ended questions. Thus, AA's contention that this portion of Dr. John's opinions should be excluded is without merit and should be denied.

**C.      Dr. John's Opinions Are Relevant, Will Assist the Jury, and Are Not Conclusory**

**1.      Dr. John's Report and Testimony Demonstrating How the Wind Experiment Fails to Resemble the Real-World Consumers' Journeys at Skiplagged's Website Are Relevant and Will Assist the Jury**

Dr. John's Report provides that Dr. Wind's opinions are incorrect, in part, because the Wind Report Experiment fails to resemble the real-world consumers' journeys occurring at Skiplagged.com. *See* Dkt. 244, p. 7–15 (App'x 102–110); App'x 044–045, 048–050 (John Depo., 51:24–52:14; 62:20–64:3; 89:22–90:7; 92:6–24; 109:15–110:22; 111:17–21). This portion of Dr. John's Report consists of his opinions that the Wind experiment: (1) grossly underrepresents the large number of flights returned in the real-world customer journey at Skiplagged.com; and (2) fails to include several

8

other elements of the real-world customer journey at Skiplagged.com. *Id.* AA contends that these portions of Dr. John's Report are "irrelevant." *See* Dkt. 229, p. 6. AA's arguments misconstrue the import of Dr. John's opinions and are otherwise unavailing.

> ### a. The Wind Report Experiment Grossly Underrepresents the Large Number of Flights Across Multiple Airlines Presented to the Consumer at Skiplagged.com

Dr. John contrasts the small number of flights on Skiplagged's website that were shown to participants in the Wind Report Experiment (*See* Wind Report, Appendix C-2 and C-4)[2] with the flights returned in Dr. John's real-world search at Skiplagged.com. *See* Dkt. 244, pp. 8–12 (App'x 103–107). Dr. John's search replicates an actual consumer's journey when interacting with Skiplagged.com. *Id.* Dr. John's Report demonstrates that the images shown to the survey participants are not representative of the substantial number of flights spanning numerous airlines that a person browsing Skiplagged.com would actually be presented. The Wind Report Experiment (which only showed participants a screenshot consisting of seven flights[3]) grossly underrepresents the over 200 flights across six airlines returned when Dr. John entered the consumer's actual journey. *See* Dkt. 244, pp. 8–12 (App'x 104–107). Dr. John reasons this "seriously jeopardizes [his] confidence in generalizing data from the Wind experiment to the real-world customer journey actually occurring at Skiplagged.com." *See* Dkt. 244, p. 12 (App'x 107); App'x 064–065, 067–070 (John Depo., 122:8–123:20; 131:3–11; 132:10–14; 135:16–23; 136:7–18).

Dr. John's analyses and opinions are directly relevant to rebut the Wind Report Experiment. AA believes this experimental survey "demonstrates that consumers exposed to screenshots of Skiplagged's website, which show the process of purchasing an [AA] ticket from Skiplagged,

---

[2] *See* Dkt. 221 at App'x 0288–0291, 0367.

[3] *See* Wind's Report at Appendix C-2 and C-4. *See* Dkt. 221 at App'x 0288–0291, 0367.

incorrectly believe Skiplagged is an authorized agent of [AA]." *See* Dkt. 229, p. 7. However, Dr. John exposes one of the many serious flaws in the survey methodology implemented by Dr. Wind. This will assist the trier of fact in evaluating this purported evidence. The large number of search results for flights offered by numerous airline providers actually returned on Skiplagged.com is probative of a lack of "confusion" among consumers that there is an affiliation between Skiplagged and AA allegedly caused by Skiplagged's display of AA's trademark information. A consumer presented with over 200 flights from six different airline providers is less likely to be confused, and Skiplagged respectfully submits would not be confused, that Skiplagged has an affiliation with all such airline providers, including American. Dr. Wind's failure to replicate or account for the significant number of flights across multiple airline providers returned at Skiplagged.com jeopardizes the probative value of Dr. Wind's surveys. Thus, Dr. John will assist the jury in understanding these flaws with Dr. Wind's survey methodology and resulting opinions.

> **b.      The Wind Report Experiment Fails to Include Other Elements of a Consumers' Real-World Journey at Skiplagged.com**

This portion of Dr. John's Report also analyzes how Dr. Wind's methodology also fails to account for the multiple prompts on Skiplagged's website requiring the consumer to affirmatively check multiple boxes acknowledging the customer has "read and understood" the important information provided by Skiplagged upon selecting a hidden-city ticket. *See* Dkt. 244, pp. 12–15. (App'x 107–110); App'x 059–064, 072–074 (John Depo., 113:3–115:10; 118:6–21; 121:3–7; 121:19–23; 152:15–153:14; 156:17–24). These required affirmative acknowledgments are completely missing from the Wind experiment, which purports to resemble the customer journey for online ticket searches." *Id. See also* Dkt. 244, p. 15 (App'x 110). The Wind Report Experiment merely showed participants a single static image of this important information page from Skiplagged's website, which

already had both of the affirmative acknowledgment boxes checked. *Id*.[4] A comparison of the images

shown to the survey participants in the Wind Report Experiment (*see* "Appendix C–2" to Dr. Wind's

Report at Dkt. 221, App'x 0288–0291) with the actual consumer journey analyzed by Dr. John (*see*

Dkt. 244, pp. 12–15 (App'x 107–110)), demonstrates that the survey participants:

(1)     did not go through the interactive process of being required to affirmatively check the box acknowledging that they read and understood Skiplagged's "Backpack Only" warning, which informed consumers that they could not check a bag and they should only bring a backpack that can fit under the seat;

(2)     did not go through the subsequent interactive process of being required to affirmatively check another box acknowledging that they read and understood Skiplagged's "Bad Weather" warning (informing consumers that, in the event of irregular operations such as bad weather, their itinerary may change at the discretion of the airline), and Skiplagged's "Angry Airlines" warning (warning consumers that the airlines do not like when you miss flights to save money so do not do this often); and

(3)     did not interact dynamically with Skiplagged's website, but instead were simply shown four (4) images purporting to be representative of a consumers online experience when using Skiplagged.com to book a hidden-city ticket. *Id*.

AA's *Motion to Exclude* generally asserts that Dr. John's criticisms of the Wind Report

Experiment are "irrelevant." *See* Dkt. 229, pp. 6–7. However, these aspects of Dr. John's Report and

testimony are relevant because they demonstrate the unreliability of Dr. Wind's methodology.

Consumers are substantially less likely to be confused, and Skiplagged respectfully submits are not

confused, as to any affiliation between Skiplagged and AA when they are required to affirmatively

acknowledge that they have read and understood these warnings. *See* Dkt. 231–1, p. 14 (App'x 109).

As the stimuli used in the Wind Report Experiment failed to adequately replicate these aspects of the

consumer's real-world journey, Dr. John will assist the jury in understanding the flawed nature of Dr.

Wind's consumer survey methodology. As Dr. John's Report states, these failures "make[] it

---

[4]*See also* "Appendix C–2" to Dr. Wind's Report at Dkt. 221(App'x 0288–0291).

improbable that data from [the Wind Report Experiment] can tell us about the real-world journeys occurring at Skiplagged.com," and he "questions whether survey respondents would have changed their responsive entries, which entries Wind inappropriately interpreted as evidence of deception, had the survey respondents seen these additional pages with required acknowledgments of the disclosed 'Important Information.'" *See* Dkt. 244, p. 15 (App'x 110). Dr. John's analysis is also relevant and necessary to rebut AA's position that consumers purportedly do not read these warnings. This will help the jury evaluate the reliability, or unreliability, of Dr. Wind's opinions regarding "likelihood of confusion."

### 2.    Dr. John's Opinions Regarding "Educating Consumers" Are Also Relevant

AA next seeks to exclude the following italicized statement contained in Dr. John's Report, "When you consider matters from this lens, *Skiplagged's website is at least thematically providing customers or potential customers with more information about prices and consumer options, enabling consumer choice—rather than limiting choice*." *See* Dkt. 229, p. 8 (emphasis added), citing to Dkt. 231–1, p. 11 (App'x 106). Contrary to AA's contentions, this statement is relevant. Dr. John provides this statement in connection with his analysis of how the Wind Report Experiment fails to replicate the real-world customer journey on Skiplagged.com. *See* Dkt. 231–1, pp. 8–12 (App'x 103–107). Accordingly, Dr. John's opinion mitigates against any actual confusion or substantial likelihood of confusion. Consumers who interact with Skiplagged.com are less likely to believe there is an affiliation between Skiplagged and American because Skiplagged.com presents itself as providing the consumer with information about numerous airlines, prices, and options. Dr. John's statement is therefore relevant to Dr. Wind's methodology, and to assist the jury in understanding Skiplagged's website.

### 3. Dr. John's Report and Testimony Are Not Conclusory

AA also asserts that Dr. John's Report and testimony on these issues are conclusory. *See* Dkt. 229, pp. 5–8. However, AA is incorrect. Dr. John's analysis and opinions are based on facts and data acquired through his research, investigation, testing, and experience with Skiplagged.com. Dr. John contrasts this reality with AA.com and the stimuli used in the Wind Report Experiment. Dr. John also bases his analysis on his review of Dr. Wind's methodology, data, and analysis. This satisfies Rule 702's requirement that an expert's opinion be based on sufficient facts or data acquired through reliable principles and methods. *See* FED. R. EVID. 702.

The fact that Dr. John's criticisms of the methodology used in the Wind Report Experiment "is not based on actual research of consumers who visit Skiplagged.com" (other than his own visits to Skiplagged.com) does not merit exclusion of Dr. John's opinions. *See* Dkt. 229, pp. 7, 8. This is because such is not necessary. Dr. John is not required to offer consumer data and is entitled to rely on the facts and data he personally observed and experienced when analyzing Skiplagged.com relative to AA.com. Dr. John acted as a consumer in interacting with Skiplagged's website for the purpose of booking a hidden-city ticket from/to the same location used in the Wind Report Experiment. *See* Dkt. 244, pp. 12–15 (App'x 107–110). AA may cross-examine Dr. John regarding these aspects of his Report, but its contentions do not merit exclusion.

Finally, Dr. John's statement regarding Skiplagged.com providing consumers with more information relative to AA.com is not constitute a legal conclusion. It also does not invade the province of the jury. Rather, Dr. John's statement, as with the other aspects of his Report, is within the purview of proper expert testimony and will assist the jury.

13

**D.**      **Dr. John's Report and Testimony Are Reliable**

**1.**      **Dr. John's "Measurement of Subjective Concepts" Analyses Are Reliable**

Dr. John's Report includes his analysis showing that the Wind Report Experiment's measurement of subjective concepts, like confusion, does not resemble accepted practice and methodology. *See* Dkt. 231–1, pp. 16–20 (App'x 111–115). AA contends Dr. John "manufactures his own, entirely new test for assessing survey reliability…." *See* Dkt. 229, p. 10. AA's position misses the mark. Dr. John's Report cites to and relies on a foundational study cited over 26,000 times according to Google scholar citations. *See* Dkt. 231–1, p. 16, n.5 (App'x 111); App'x 024–028, 075–077 (John Depo., 24:24–26:25; 27:20–28:1; 28:15–16; 167:21–169:1). Dr. John is also entitled to rely on his own experience, education, training, research, and expertise in the field of marketing in analyzing and critiquing the methodology used by the Wind Report Experiment. *Id.* These are reliable bases for his analyses and opinions showing that the Wind Report Experiment does not satisfy the three important elements to developing a methodologically acceptable measure of a subjective concept, such as "confusion." *See* Dkt. 231–1, pp. 16–20 (App'x 111–115).

First, Dr. John's Report highlights the importance of initially defining the subjective concept one is attempting to measure. *See* Dkt. 231–1, pp. 16–19 (App'x 111–114); *see also* App'x 024–026, 028, 030–032, 038–039 (John Depo., 24:24–26:2; 28:15–16; 31:20–32:2; 41:15–42:6). Dr. John demonstrates how Dr. Wind fails to define the subjective concept of "confusion." *See* Dkt. 244, pp. 18–19 (App'x 113–114). Therefore, Dr. John concludes that the survey participants' responses are not a reliable indication of confusion. *Id*. at p. 28 (App'x 123). Dr. John also points out that Dr. Wind's Report does not advise whether the coders of the text responses were provided with any such definitions. *Id*. These are fundamental flaws in Dr. Wind's methodology and data, which Dr. John is entitled to rebut. AA attempts to argue that Dr. John's criticism of Dr. Wind's failure is "unreliable"

14

because "deception and confusion" are purportedly "well defined and well established." *See* Dkt. 229, p. 10. AA misconstrues Dr. John's contentions and fails to establish they are unreliable. *See* App'x 077–079 (John Depo., 169:12–17; 170:9–171:9).

Second, Dr. John discusses his analysis and opinion that closed-ended questions are preferred over open-ended questions when attempting to measure subjective concepts, such as confusion. *See* Dkt. 231–1, pp. 19–20 (App'x 114–115); App'x 054–055, 082–083 (John Depo., 100:15–101:17; 174:12–175:4). Dr. John explains his reasoning that open-ended responses introduce more variations and meaning across respondents. *Id.* at p. 19 (App'x 114). AA's contentions that Dr. John's Report and testimony are "conclusory statements" allegedly contradicting case law on consumer surveys are without merit. *See* Section III. B., pp. 7–8, *supra*.

Third, Dr. John discusses the importance of ascertaining the stability of the measure of subjective concepts like confusion. *See* Dkt. 231–1, p. 20 (App'x 115). Contrary to AA's positions, Dr. John's Report explains this concept, its meaning, and its application to Dr. Wind's Report. *Id.* at p. 20 (App'x 115); *see also* App'x 080–081 (John Depo., 172:10–11; 172:18–21; 173:8–12). Dr. John's Report reasons that the stability of the measure of subjective concepts is "extremely important to judge the acceptability of a measure." *Id.* Stability is demonstrated when "multiple ways of measuring the concept…correlate to an acceptable degree." *Id.* The Wind Report does not report any stability evidence. *Id.* Accordingly, Dr. John questions "how much agreement was there between the two coders and how were conflicts resolved?" *Id.* Dr. John further provides his opinion that there almost certainly were significant issues of this variety in the Wind Report Experiment, especially in the absence of a definition of confusion. *Id.* This further supports Dr. John's opinion that the method developed by Dr. Wind is unreliable.

2.      **Dr. John's Analyses and Opinions Demonstrating the Flaws With How the Wind Report Experiment Coded Open-Ended Responses Are Accurate and Reliable**

The portion of Dr. John's Report addressing the measurement of subjective concepts issues also includes Dr. John's analysis and opinions regarding flaws in how Dr. Wind coded the open-ended responses from the participants in th Wind Report Experiment. *See* Dkt. 231–1, pp. 17–20 (App'x 112–115); *see* App'x 054–055, 086–087 (John Depo., 100:15–101:17; 180:1–4; 180:23–181:17). Dr. John is once again appropriately exposing flaws in the methodology used by Dr. Wind, which undermines the reliability of Dr. Wind's experimental study and opinions. Dr. John's Report states as follows:

> In the suboptimal situation in which an open-ended question is decided upon, the standard practice to convert these into categories is for the experimenter and coders to first develop a coding scheme through an iterative process where the coder and experimenter agree as to which types of responses fit the definition of deception.

*Id*. at p. 19 (App'x 114). From this statement, Dr. John proceeds to conclude that, "[N]o such coding scheme development procedure is reported in the Wind Report." *Id*. (emphasis added). AA's contention that Dr. John "falsely states that no coding scheme is reported in the Wind Report" is incorrect. *See* Dkt. 229, p. 12 (emphasis added).

AA sets forth three bullet points regarding its purported "coding scheme," which AA erroneously contends Dr. John "ignores." *See* Dkt. 229, p. 12. Dr. John addressed the first bullet point and reasons that such is insufficient because it merely alludes to a "procedure" involving "two independent coders who were not familiar with the objectives of the study or its sponsors" and "a procedure for resolving conflicts between the two coders." *See* Dkt. 231–1, pp. 19–20 (App'x 114–115). Dr. John concludes there is a lack of indication from Dr. Wind's Report as to how much agreement there was (or was not) between the two coders, and how conflicts between the two coders were resolved. *Id*. *See also* App'x 088 (John Depo., 182:11–23; 182:3–5; 182:17–22). AA's second

16

bullet point contends that Dr. Wind's Report provides the definitions provided to the coders. *See* Dkt. 229, p. 12 (citing Dr. Wind's Report at Dkt. 221, App'x 0047–0048)). However, AA does not specify what definitions the coders were purportedly provided. And, there is no indication that the coders of the text responses from survey participants were provided with the definition of "confusion." *See* Dkt. 231–1, p. 18 (App'x 113). Rather, the portion of Dr. Wind's Report cited by AA in its second bullet point involves definitions that supposedly analyzed "consumer complaints to AA about Skiplagged." *See* Dkt. 229, p. 12 (citing Dr. Wind's Report at Dkt. 221, App'x 0047–0048). Finally, AA's third bullet point did not deal with "confusion," but rather with somehow coding survey participants' responses to Question 14a[5] into "negative, positive, neutral, or don't know." *See* Dkt. 221, App'x 0051–0052, 0056.

### 3. Dr. John's Opinion That Skiplagged.com Does Not Shroud Hidden-City Ticket Details Is Reliable

Dr. John's Report also demonstrates that Skiplagged does not shroud hidden-city ticket warnings from consumers. *See* Dkt. 231–1, pp. 21–22, 26 (App'x 117–119, 121). Rather, Skiplagged requires consumers to affirmatively respond to multiple prompts indicating that they have read and understood Skiplagged's warnings. *Id*. Dr. John's analyses and conclusions contrasting the real-world consumer journey with the stimuli used in Dr. Wind's experiment exposes the Wind Report Experiment's flawed methodology. *See* Section III.C.1(*b*), *supra*. Contrary to AA's contentions,[6] Dr. John rebuts Dr. Wind's methodology and calls into serious question his purported conclusion that the

---

[5]Question 14a states, "reflecting on the Skiplagged (Expedia) offering and everything you know about them how do you feel about buying your next airline ticket from them?"

[6]*See* Dkt. 229, p. 13. AA makes similar arguments in Section III.D.6 of its *Motion to Exclude* Dr. John. *Id*. at p. 16. However, these contentions fail for the same or similar reasons addressed here.

"survey demonstrates… that Skiplagged's warnings…are not effective in apprising consumers of these risks." *See* Section III.C.1(*b*), *supra*.

**4. Dr. John's Report Addressing the Wind Report's Analysis and Opinion Regarding Whether Skiplagged Deceives Consumers About Relative Prices of Non-Hidden-City Tickets on Skiplagged.com Relative to AA.com Is Reliable**

Dr. John proceeds to rebut Dr. Wind's opinion that "Skiplagged deceives consumers into believing that…a regular non-hidden-city ticket on Skiplagged.com is cheaper…" than a corresponding ticket from AA.com. *See* Dkt. 231–1, pp. 22–24 (App'x 117–119). It does not appear to Skiplagged that this portion of Dr. Wind's Report has any relevance to the issues the jury will be asked to decide regarding AA's trademark claim. Nevertheless, AA's contentions that this portion of Dr. John's Report is "unreliable" are without merit. Dr. John explains the fundamental flaws present in the Wind Report Experiment's survey methodology and associated data. *Id*.

Additionally, Dr. John's Report at pp. 23–24 analyzes Skiplagged's main landing page ("Find flights the airlines don't want you to see. We're exposing loopholes in airfare pricing to save you money."). *See* Dkt. 231–1, pp. 23–24 (App'x 118–119). Dr. John's analysis is reliable and relevant to rebutting the Wind Report Experiment's methodology because this page was not shown to the survey participants. AA's contention that this is merely the "*ipse dixit*" of Dr. John is also without merit. Such is based on Dr. John's personal investigation of Skiplagged.com.

**5. Dr. John's Report and Testimony Exposing Additional Flaws With Dr. Wind's Methodology, Report, and Opinions Regarding Confusion Among Participants As to An Affiliation Between Skiplagged and AA Are Reliable**

Dr. John provides additional analyses and opinions rebutting Dr. Wind's opinion that Skiplagged.com purportedly "confuses customers that (it) is associated with or authorized by American…." *See* Dkt. 231–1, pp. 24–26 (App'x 119–121). Dr. John's Report identifies several additional flaws in the Wind Report Experiment's methodology.

18

First, Question 2 from the survey was phrased as "Does the company that operates this website [*i.e.*, Skiplagged] have a business connection or association <u>with another company</u>, or do you not know?" *Id.* (emphasis added). Yet, Dr. Wind impermissibly converts this to "Associated or connected with <u>airline</u>" in Exhibit 4 to his Report. *See* Dkt. 221, App'x 0037–0038, 0057. AA does not specifically challenge or address this aspect of Dr. John's Report.

Second, Dr. John analyzes how the terms "associated," "affiliated," and "authorized agent" are not defined in Dr. Wind's Report and were not provided to the survey participants. *Id. See also* App'x 092–096 (John Depo., 206:6–207:14; 208:7–25; 209:10–210:17). AA's contentions that this is somehow "unreliable" because these terms are "commonly used in likelihood of confusion surveys" is unavailing. *See* Dkt. 229, p. 15. This contention is only relevant to the potential admissibility of Dr. Wind's Report; it does not establish that Dr. John's analyses and opinions are "unreliable." AA's contention that survey respondents were allowed to select "don't know" if they did not understand a question fairs no better. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility").

Third, Dr. John explains how the terms "associated," "affiliated," and "authorized agent" are not defined in the Wind Report Experiment. Rather, they are typically defined in lengthy business agreements, to which neither consumers or the survey participants are privy. *See* Dkt. 231–1, pp. 25–26, 29 (App'x 120–121, 124). AA argues that this portion of Dr. John's Report is unreliable based on its position that there is no contract between AA and Skiplagged and Skiplagged is not a franchisee of AA. *See* Dkt. 229, pp. 15–16. Again, this is not a valid basis to exclude Dr. John's Report as "unreliable." To the contrary, Dr. John's opinion is based on reliable principles regarding acceptable

19

survey methodologies. *See* Dkt. 231–1, pp. 25–26, 29 (App'x 120–121, 124). Dr. John also analogizes to McDonald's outlets and cell phone outlets to further elucidate this point, and to highlight that consumers care more about price attributes than the business-to-business contracts and arrangements between the parties, if any. *Id*. Dr. John concludes that Skiplagged's display of a large number of flight options across numerous airlines provides valuable transparency to consumers. *Id*. None of these opinions and analyses are "*ipse dixit*." And, all of these opinions serve to rebut Dr. Wind's opinions.

### 6.      Dr. John's Report and Testimony That the Wind Report's Consumer Complaint Data Does Not Support Its Confusion Opinions Is Not Conclusory

Finally, AA attempts to exclude Dr. John's analysis and opinions rebutting the consumer complaint data the Wind Report incorrectly concludes is corroborative of Dr. Wind's opinions from the Wind Report Experiment. *See* Dkt. 229, pp. 17–18. AA contends Dr. John's Report is "conclusory" in this regard. *Id*. AA is incorrect.

Regarding AA's database, Dr. John's Report addresses the "88 complaints" cited by Dr. Wind that contain the terms "Skiplagged" or "Skiplag" during the time period from 1/1/2018–3/6/2024, eighty of which purportedly "dealt with hidden-city tickets." *See* Dkt. 231–1, pp. 26–27 (App'x 121–122). Dr. John investigated the total number of AA passengers during this time period (673,239,761), and calculated that the "88 complaints" is a "vanishingly small fraction (0.00000013%)" of the passengers that were flown by AA during this period. *Id*. Turning to the Skiplagged.com database, Dr. John reasons that the magnitude of 12,000 of the 30,658 e-mails to Skiplagged.com's customer support e-mails, which the Wind Report describes as reflecting "confusion," cannot be interpreted without knowing the number of tickets booked on Skiplagged.com. *Id*. However, Dr. John concludes, based on the millions of customers flown by AA, "even this number appears very small." *Id*.

Dr. John's analyses and opinions are reliable because they are supported by reliable principles and methods (*i.e.*, his investigation into the number of AA passengers as reported by the US Transportation Department and his mathematical calculations using the alleged complaints cited in Dr. Wind's Report). Contrary to AA's contentions, the fact that Dr. Wind claims he was "not concerned with the total number of complaints," but only their "content," does not render Dr. John's analyses and opinions unreliable.

Finally, AA asserts that, "The content of the [consumer] complaints…confirm[s] that consumers incorrectly affiliated Skiplagged with AA…just as Dr. Wind's survey predicts." *See* Dkt. 229, p. 17. AA further contends that Dr. John says nothing about "whether the complaints are consistent or inconsistent with the survey." *Id*. at p. 17. AA is incorrect on both counts. The consumer complaint evidence cited by AA does not demonstrate confusion as to an affiliation between Skiplagged and AA caused by Skiplagged's display of AA's marks on Skiplagged.com. And, Dr. John expressed an opinion about whether the customer complaint evidence relied on by Dr. Wind is consistent or inconsistent with Dr. Wind's conclusions from the surveys. He concludes, "the small evidence I have considered does not indicate to me that… confusion associated with Skiplagged.com booking generates any material number of customer complaints to AA.com." *See* Dkt. 231–1, p. 27 (App'x 122); App'x 051, 097–101 (John Depo., 77:13–22; 213:1–21; 214:22–25; 215:21–217:222).

**E.      Dr. John Should Not Be Excluded Under Rule 403**

AA's final position is that Dr. John should be excluded under Rule 403. *See* Dkt. 229, p. 18. AA contends that the probative value of Dr. John's testimony is "substantially outweighed by the danger that the evidence will confuse the issues or mislead the jury" because Dr. John's Report supposedly "confuses the claims in controversy by providing prejudicial opinions on non-issues" and is "based on no evidence." *Id*.; *see also* FED. R. EVID. 403. AA's positions are unavailing. On the one

21

hand, Dr. John's Report and testimony are exceedingly relevant and probative to rebut the methodologies, analyses, and opinions of Dr. Wind regarding AA's trademark infringement claim. On the other hand, Dr. John's Report and testimony do not confuse the issues and are the product of reliable principles and methods for the reasons set forth *supra*. Dr. John will assist the jury in understanding Dr. Wind's testimony, the flaws with the Wind Report Experiment, and the erroneous nature of Dr. Wind's analyses and opinions. AA will not be unduly prejudiced by Dr. John's expert testimony. Tot he contrary, if AA were permitted to offer Dr. Wind's Report and testimony to the jury without affording the jury the benefit of considering Dr. John's rebuttal Report and testimony, it is Skiplagged who would be severely and unfairly prejudiced.

## **PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Skiplagged respectfully requests that this Court deny American's *Motion to Exclude Expert Opinions and Testimony of George John, PhD*; and for such other relief, at law or in equity, to which Skiplagged may show itself justly entitled.

Respectfully submitted,

By:     /s/*William L. Kirkman*
William L. Kirkman
State Bar No. 11518700
billk@kirkmanlawfirm.com
Preston B. Sawyer
State Bar No. 24102465
prestons@kirkmanlawfirm.com
KIRKMAN LAW FIRM, PLLC
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone:     (817) 336-2800
Facsimile:     (817) 877-1863

/s/*Aaron Z. Tobin*
Aaron Z. Tobin
State Bar No. 24028045
atobin@condontobin.com
Kendal B. Reed
State Bar No. 24048755
kreed@contontobin.com
Abigail R.S. Campbell
State Bar No. 24098759
acampbell@condontobin.com
CONDON TOBIN SLADEK THORNTON
  NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone:    (214) 265-3800
Facsimile:    (214) 691-6311

/s/*Darin M. Klemchuk*
Darin M. Klemchuk
State Bar No. 24002418
Darin.klemchuk@klemchuk.com
KLEMCHUK PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone:    (214) 367-6000
Facsimile:    (214) 367-6001

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 3, 2024, a true and correct copy of the foregoing

was served via the Court's ECF system upon all counsel of record as indicated:

Messrs. Dee J. Kelly, Jr., Lars L. Berg,
  J. Austin Franklin, and Ms. Julia G. Wisenberg
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Mr. R. Paul Yetter
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

23

Mr. Cameron M. Nelson
Greenberg Traurig LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601

Mr. Nathan J. Muyskens
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037

Ms. Bina Palnitkar
Greenberg Traurig LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

*/s/William L. Kirkman*
William L. Kirkman