**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

**APPENDIX IN SUPPORT OF DEFENDANT SKIPLAGGED, INC.'S
RESPONSE IN OPPOSITION TO PLAINTIFF AMERICAN
AIRLINES, INC.'S MOTION TO EXCLUDE EXPERT OPINIONS
AND TESTIMONY OF GEORGE JOHN, PhD AND BRIEF IN SUPPORT**

William L. Kirkman
State Bar No. 11518700
billk@kirkmanlawfirm.com
Preston B. Sawyer
State Bar No. 24102465
prestons@kirkmanlawfirm.com
KIRKMAN LAW FIRM, PLLC
201 Main Street, Suite 1160
Fort Worth, Texas 76102
Telephone:     (817) 336-2800
Facsimile:     (817) 877-1863

Darin M. Klemchuk
State Bar No. 24002418
Darin.klemchuk@klemchuk.com
KLEMCHUK PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone:     (214) 367-6000
Facsimile:     (214) 367-6001

Aaron Z. Tobin
State Bar No. 24028045
atobin@condontobin.com
Kendal B. Reed
State Bar No. 24048755
kreed@condontobin.com
Abigail R.S. Campbell
State Bar No. 24098759
acampbell@condontobin.com
CONDON TOBIN SLADEK THORNTON
  NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone:     (214) 265-3800
Facsimile:     (214) 691-6311

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

1

**INDEX**

| **Exhibits:** | | **Page** |
|---|---|---|
| A | Affidavit of Preston B. Sawyer | APP'X 001–003 |
| A-1 | Excerpts from the deposition of George John, PhD taken on July 9, 2024 | APP'X 004–106 |

Respectfully submitted,

By:     /s/*William L. Kirkman*
        William L. Kirkman
        State Bar No. 11518700
        billk@kirkmanlawfirm.com
        Preston B. Sawyer
        State Bar No. 24102465
        prestons@kirkmanlawfirm.com
        KIRKMAN LAW FIRM, PLLC
        201 Main Street, Suite 1160
        Fort Worth, Texas 76102
        Telephone:     (817) 336-2800
        Facsimile:      (817) 877-1863

        /s/*Aaron Z. Tobin*
        Aaron Z. Tobin
        State Bar No. 24028045
        atobin@condontobin.com
        Kendal B. Reed
        State Bar No. 24048755
        kreed@condontobin.com
        Abigail R.S. Campbell
        State Bar No. 24098959
        acampbell@condontobin.com
        CONDON TOBIN SLADEK THORNTON
          NERENBERG PLLC
        8080 Park Lane, Suite 700
        Dallas, Texas 75231
        Telephone:     (214) 265-3800
        Facsimile:      (214) 691-6311

/s/*Darin M. Klemchuk*
Darin M. Klemchuk
State Bar No. 24002418
Darin.klemchuk@klemchuk.com
KLEMCHUK PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone:     (214) 367-6000
Facsimile:     (214) 367-6001

ATTORNEYS FOR DEFENDANT,
SKIPLAGGED, INC.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 3, 2024, a true and correct copy of the foregoing

was served via the Court's ECF system upon all counsel of record as indicated:

Messrs. Dee J. Kelly, Jr., Lars L. Berg,
  J. Austin Franklin, and Ms. Julia G. Wisenberg
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Mr. R. Paul Yetter
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002

Mr. Cameron M. Nelson
Greenberg Traurig LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601

Mr. Nathan J. Muyskens
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037

3

Ms. Bina Palnitkar
Greenberg Traurig LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

*/s/William L. Kirkman*
William L. Kirkman

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Civil Action No. 4:23-cv-00860-P** |
| | § | |
| **SKIPLAGGED, INC.,** | § | |
| | § | |
| *Defendant.* | § | |

## AFFIDAVIT OF PRESTON B. SAWYER

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF TARRANT** | § |

**BEFORE ME**, the undersigned authority, on this day personally appeared Preston B. Sawyer, who, being first by me duly sworn, on his oath, stated as follows:

1.    My name is Preston B. Sawyer. I am over twenty-one years of age and am competent to make this Affidavit. I have personal knowledge of the facts stated herein, which are true and correct.

2.    I am an attorney of record for Skiplagged, Inc., the Defendant in the above-captioned matter. I make this Affidavit in support of *Defendant Skiplagged, Inc.'s Brief in Opposition to Plaintiff American Airlines, Inc.'s Motion to Exclude Expert Opinions and Testimony of George John, PhD and Brief in Support.*

1

3.     Attached as Exhibit A-1 is a true and correct copy of excerpts from the deposition transcript of George John, PhD, which was taken on July 9, 2024, in the above-captioned matter.

Further, affiant sayeth not.

Preston B. Sawyer

**SWORN TO AND SUBSCRIBED BEFORE ME**, the undersigned Notary Public, on the 3rd day of September, 2024, to certify which witness my hand and seal.

JULIA B. GEGENHEIMER
ID #1433078
My Commission Expires
December 14, 2026

Notary Public, State of Texas

2

APP'X 003

# EXHIBIT A-1

```
 1               IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                    FORT WORTH DIVISION
 3   AMERICAN AIRLINES, INC.,       )
           Plaintiff,              )
 4                                  )
                                    )
 5   V.                             ) Civil Action No. 4:23-cv-00860-P
                                    )
 6                                  )
     SKIPLAGGED, INC.,              )
 7         Defendant.               )
 8
 9
10       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11         ORAL AND VIDEOTAPED DEPOSITION OF GEORGE JOHN, Ph.D.
12       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
13
14
15
16
17        ORAL AND VIDEOTAPED DEPOSITION OF GEORGE JOHN, PhD, being
18   produced as a witness at the instance of the Plaintiff, taken
19   in the above-styled and numbered cause on the 9th day of July,
20   2024, from 9:37 a.m. to 3:43 p.m., before Rhonda Jacks,
21   Certified Shorthand Reporter in and for the State of Texas, by
22   machine shorthand, at the offices of Kirkman Law Firm, PLLC,
23   201 Main Street, Suite 1160, Fort Worth, Texas, in accordance
24   with the Federal Rules of Civil Procedure and the agreements
25   hereinafter set forth:
```

Page 1

APP'X 005

```
 1                    A P P E A R A N C E S
 2   APPEARING ON BEHALF OF THE PLAINTIFF:
         MS. BINA PALNITKAR
 3       palnitkarb@gtlaw.com
         MR. CAMERON NELSON (via Zoom)
 4       GREENBERG TRAURIG, LLP
         2200 Ross Avenue
 5       Suite 5200
         Dallas, TX 75201
 6       214-665-3600
 7       MR. JEREMY BALLEW (via Zoom)
         AMERICAN AIRLINES IN-HOUSE COUNSEL
 8       1 Skyview Drive
         Fort Worth, TX 76155
 9       817-967-1036
10
11   APPEARING ON BEHALF OF THE DEFENDANT:
         MR. WILLIAM KIRKMAN
12       billk@kirkmanlawfirm.com
         KIRKMAN LAW FIRM, PLLC
13       201 Main Street
         Suite 1160
14       Fort Worth, TX 76102
         817-336-2800
15
16
17   Also present:
18       Don Harris - Videographer
19       Maddie Gerrald - summer intern
20
21
22
23
24
25
                                          Page  2
```

```
 1                    I N D E X
 2   WITNESS:                                      PAGE
 3   GEORGE JOHN, PhD
 4        Examination by Ms. Palnitkar ....................  5
 5        Change and Correction Sheet .................... 219
          Witness Signature Page ......................... 220
 6        Reporter's Certificate ......................... 221
 7

 8                    EXHIBITS
 9   NUMBER & DESCRIPTION
10        Exhibit 1 .......................................  8
             Plaintiff's Notice of Deposition of
11           George John, PhD
12        Exhibit 2 .......................................  8
             Expert Report of Professor George John in
13           Response to the Expert Report of
             Professor Yoram (Jerry) Wind
14
          Exhibit 3 ....................................... 34
15           United States Court of Appeals, Fifth Circuit
             Viacom International v. IJR Capital
16           Investments, LLC
17        Exhibit 4 ....................................... 127
             Appendix 2:  The Stimuli
18
          Exhibit 5 ....................................... 175
19           Competitive Edge, Inc. v. Staples, Inc.
20        Exhibit 6 ....................................... 177
             Healthpoint, Ltd. v. Ethex Corp.
21
22
23
24
25
                                             Page 3
```

APP'X 007

```
 1                (Deposition commenced at 9:37 a.m.)

 2                THE VIDEOGRAPHER:  On the record at 9:37 a.m.

 3     My name is Don Harris representing Veritext.  The date is

 4     June -- July 9th, 2024.  Please note that the microphones are

 5     sensitive and may pick up whispering and private conversations.

 6     Please mute your phones at this time.  Audio and video

 7     recording will continue to take place unless all parties agree

 8     to go off the record.  This is the video recorded deposition of

 9     George John, Ph.D. taken by counsel for the Plaintiff in the

10     matter of American Airlines, Inc. and Skiplagged, Inc. filed in

11     the United States District for the Northern District of Texas,

12     Fort Worth Division, Case Number 4:23-CV-00860-P.  The

13     location of this deposition is Kirkman Law Firm in Fort Worth,

14     Texas.  Attorneys, please state your appearances.

15                MS. PALNITKAR:  Bina Palnitkar of Greenberg

16     Traurig for the Plaintiff.

17                MS. GERRALD:  Maddie Gerrald of Greenberg

18     Traurig for the Plaintiff.

19                MS. PALNITKAR:  Maddie is a summer law clerk,

20     not an attorney.

21                MR. KIRKMAN:  I am Bill Kirkman.  I am here in

22     person on behalf of Skiplagged.

23                THE REPORTER:  Any attorneys on-line make an

24     appearance.

25                MR. NELSON:  Cameron Nelson from Greenberg
```

Page 4

APP'X 008

```
 1    Traurig on behalf of American, and with me is Jeremy Ballew,

 2    counsel for American.

 3                    THE REPORTER:  Mr. John, will you raise your

 4    right hand.  Do you swear to tell the truth, the whole truth

 5    and nothing but the truth so help you God?

 6                    MR. JOHN:  I do.

 7                    THE REPORTER:  Okay.  Thank you.

 8                         GEORGE JOHN, PhD,

 9    having being first duly sworn, testified as follows:

10                         EXAMINATION

11   BY MS. PALNITKAR:

12        Q    Hello and good morning.

13        A    Good morning.

14        Q    Will you please state your name for the record?

15        A    George John.

16        Q    May I call you Dr. George?

17        A    John is the last name.

18        Q    Oh, sorry.  Dr. John.  Thank you.  What is your

19   occupation?

20        A    I am a professor of marketing at the University of

21   Minnesota.

22        Q    And how long have you been there?

23        A    Let's see.  I started in 1987.  So that makes it -- I

24   can't calculate.  30 -- 30 -- What is that?  37 years.

25        Q    Okay.  Have you ever been deposed before?
```

Page 5

APP'X 009

1    Q    Okay.  And what documents did you review in order to

2    prepare this report?

3    A    Basically my general knowledge and research and

4    things that I have already done, plus the Jerry Wind report

5    which is very long.  So I stuck to the -- the main body of the

6    report, not the incredible number of attachments to it.

7    Q    So you reviewed the body of Jerry Wind's report, but

8    not the appendices.  Correct?

9    A    Skimmed them.  Didn't really look at it to develop my

10   report.  I just relied on what he is reporting in the body of

11   the report.

12   Q    Okay.  So you didn't go and review the lengthy data

13   that he cites to in the report?

14   A    I -- Some of these exhibits come from those -- those

15   documents.

16   Q    Right.

17   A    So yes, I know what's in those exhibits, and I would

18   go back to make sure I understood what he is saying in an

19   exhibit, but that's what I did.  I didn't go through the set of

20   attachments page by page if that's what you're asking me.

21   Q    Could you give me an example of some of the lengthier

22   materials that you did not go through?

23   A    I don't know what I did not go through.  What I did

24   was I started with the report, and if I was unsure about

25   anything in the report, I would just go make sure that I

Page 10

1    understood what was going on, and if necessary, I go back to

2    those attachments, but I didn't do that very many times.

3        Q    Okay.  Very good.  How many times do you think you --

4    you went to go verify or look at things?

5        A    Honestly I can't even remember in depth any

6    particular instance.  It was sufficient for me to look at the

7    report and see how they -- It was pretty detailed how the

8    questions are laid out and what the analysis was.  So I -- I

9    really stuck to this -- to this report.

10       Q    Okay.  So other than your personal knowledge about

11   various marketing theories, I want to say, and tell me if I am

12   wrong, and this report, you didn't look at any other documents

13   to prepare this?  And by this report, excuse me, I mean Jerry

14   Wind's report.

15       A    Well, I -- You know, obviously I have to go back and

16   look at some research materials that I cite in my own report

17   just to refresh my memory as to what I said in those things.

18   So the footnotes that I have in my report tell you what I did

19   look at closely in order to develop it.

20       Q    Okay.  So if you look at the very last page of your

21   report which is Exhibit 2 -- You probably don't need that

22   deposition notice anymore.  Do you want to put it up there?

23   Yeah.

24              THE REPORTER:  I have to keep it at the end.

25              THE WITNESS:  Oh, sorry.

                                        Page 11

APP'X 011

1          MR. KIRKMAN:  It's an important document.

2          THE WITNESS:  Yes.

3     Q     Please look at the last page.  Yes.

4     A     Yeah.

5     Q     So these are the documents that you have listed that

6  you reviewed in order to create your expert report.  Correct?

7     A     Yes.

8     Q     And that is the expert report of Jerry Wind that I

9  think we spoke that it was mainly the body of his report as

10 opposed to the exhibits.  Correct?

11    A     That's not true because the body of the report has a

12 lot of exhibits.

13    Q     Uh-huh.

14    A     So I did look at those exhibits very carefully.

15    Q     You're right.  Excuse me.  Let me re -- re-ask that

16 question.  I think we spoke that you mainly reviewed the body

17 of the report as opposed to the appendices that were attached.

18 Correct?

19    A     That's fair.

20    Q     Thank you.  I am going to start with a little bit of

21 your background.

22    A     Sure.

23    Q     You have so many accomplishments that I will go

24 through that.  So let's turn to your CV.  It's on page 30.  Did

25 you find it?

                                              Page 12

APP'X 012

```
 1        A    I did.

 2        Q    Very good.  So let's talk a little bit about your

 3   education.  Where did you get your bachelor's?

 4        A    At the Indian Institute of Technology in Madras,

 5   India.

 6        Q    And that was in aeronautical engineering?

 7        A    Yes.

 8        Q    Did you -- and I am assuming that's a hard science.

 9   Correct?

10        A    Yes.

11        Q    IIT is known for the hard sciences.  Correct?

12        A    Yes.

13        Q    All right.  And then you came to America.

14        A    Yes.

15        Q    Is that right?  And where did you pursue your

16   further --

17        A    I got an MBA at the University of Illinois.

18        Q    And what was the M -- the MBA?  Was it just a -- Did

19   it have a focus is my question?

20        A    There was some electives, but we didn't have tracks

21   if that's what you're asking.

22        Q    So this is general business, a master's in just

23   general business?

24        A    Correct.

25        Q    And then from there did you take some time to work?
```

                                                            Page 13

APP'X 013

```
 1        A    No.  I went straight into the Ph.D. program.

 2        Q    Okay.  And I forgot to ask, but between your

 3   bachelor's degree and your MBA did you have any jobs?

 4        A    No.  I went straight to the MBA program.

 5        Q    Okay.  So is it fair to say that until 1981 when you

 6   got your Ph.D. you had not had a typical job?  You were kind of

 7   on the education track the whole way?

 8        A    Yes.

 9        Q    So when you went to get your Ph.D. you got that from

10   Northwestern University?

11        A    Yes.

12        Q    And what was your Ph.D. in?

13        A    So it's in marketing as I indicate on the CV.  Yeah.

14        Q    Thank you.  What was your dissertation about?

15        A    It was about distribution channels, particularly

16   about the -- the way oil companies distribute petroleum

17   products.

18        Q    Can you tell me what you were proving or defending in

19   that thesis?

20        A    So basically it's a question of how the oil

21   companies, particularly Amoco in that instance, dealt with its

22   franchise dealers, and there are several kinds of dealers, but

23   I will just use the word dealers, relationships between the

24   dealers and the oil company on various issues of whether Amoco

25   is fair to them, how they react, things like that.
```

Page 14

1     Q    And did you come up with a theory in that

2     dissertation?

3     A    So generally speaking you're looking for empirical

4     evidence to either support or disprove a theory.  And -- and at

5     that time the -- the big topic of the day was how do you -- how

6     do you address vertical relationships and antitrust.  And one

7     of those issues there was opportunistic behavior by the more

8     powerful actors.  So that's -- that's essentially what my

9     dissertation was about and whether in fact it was -- It would

10    be accurate to say that the powerful actor, in this case the

11    oil company, essentially could do whatever they wanted to to

12    dealers.

13    Q    So it was -- Is it safe to say it was a test of

14    monopolistic power?

15    A    It was -- So all of Williamson's formulation of

16    what's called transaction cost economics is a foundational

17    theory there, yes.

18    Q    Okay.  Cost economics?

19    A    Transaction cost economics.

20    Q    Thank you.  How did you ascertain your empirical

21    evidence?

22    A    Through surveys.

23    Q    Tell me about those.

24    A    So the surveys were filled out by the dealers.  And I

25    reached a sample of these dealers and did my initial field work

                                                Page 15

APP'X 015

1    with what are called territory sales managers of Amoco, and

2    then I pre-tested those survey questionnaires and then sent it

3    out to them and then analyzed the data.

4         Q    Okay.  So were -- there was confusion or unfair

5    competition -- Sorry.  Let me take -- strike that.  So were you

6    testing any kinds of confusion within that survey?

7         A    There's something very close to that.  I was testing

8    something about opportunism which is close to deception.  So --

9    And in this particular report deception and confusion in the

10   Wind report are conflated with each other.  So it's connected

11   in that sense.

12             MS. PALNITKAR:  I am going to object to that as

13   being nonresponsive.

14        Q    My question here was did you -- did you test for any

15   confusion within that survey that you sent?  I am not asking

16   how it relates to this report.  I'm just asking independently.

17             MR. KIRKMAN:  Dr. John, she is entitled to make

18   objections.  It's not necessarily correct, but she is entitled

19   to make them.  So you are obligated to answer a question only

20   once.  If you feel you have answered the question, then simply

21   tell the lawyer that.  Go ahead.

22        Q    Let me repeat my question.  When you collected your

23   empirical evidence for your dissertation did you test for

24   theories relating to a confusion of elements?

25        A    So I would like you to define confusion of elements

Veritext Legal Solutions
800-336-4000

APP'X 016

1    for me.

2         Q    Are you testing whether the dealers are confused

3    about anything?

4         A    Yes.

5         Q    What was that?

6         A    Whether they actually give you reliable data.  So

7    if -- if I ask you a question and you're confused by the

8    meaning of that question, that's confusion methodologically.

9    So obviously my pre-test had to ascertain whether or not my

10   questionnaires were actually confusing to the dealers who were

11   supposed to answer them.

12        Q    So you tested if they were confused about the meaning

13   of the question?

14        A    Methodlogically yes.

15        Q    Thank you.  So after you got your Ph.D. where did you

16   go?

17        A    My first job was at -- Well, let me back up.  I did

18   teach for a year as lecturer at Northwestern in '79 to '80, but

19   that was before I finished my Ph.D.  My first job after my -- I

20   actually started at the University of Wisconsin before I

21   finished my Ph.D. also.  So in -- in 1981 I finished my Ph.D.,

22   but I started at Wisconsin in 1980.

23        Q    Okay.  And then you went on to the Twin Cities.

24   Correct?

25        A    In 1987, yes.

1    Q     Okay.  And you were -- It says here you were

2    responsible for the budget, hiring, promotion of the Carlson

3    School of Management.

4    A     Not at that time.  I mean I was in charge of the

5    budget and so on and so forth when I was in the position of

6    senior associate dean.

7    Q     Okay.  And you were in the marketing department at

8    the Carlson School of Management between 2007 to 2015.

9    Correct?

10   A     From 1987 through today.

11   Q     Okay.  Ah, yes.  I see that.  Thank you.  All right.

12   What courses do you currently teach?

13   A     So I teach the intro marketing class to undergrads in

14   the honors section.  I teach the intro marketing class to

15   the -- to the executive MBAs.  Just last year taught it to the

16   day MBAs as well.  I teach different non-degree classes to --

17   in the executive program.  I have taught channels of

18   distribution as well, and I teach a Ph.D. seminar on channels

19   of distribution.

20   Q     What is channels of distribution?

21   A     So a company produces a product, like American

22   Airlines produces air travel, and it has to somehow distribute

23   its product or service.  And often times it engages outsiders

24   or third parties.  Sometimes it does some of it by itself.  All

25   of those things are part and parcel of channels of

APP'X 018

1    distribution.

2         Q    Okay.  And the marketing class, this is the main --

3    main thing you teach I think to the executive MBAs, the day

4    MBAs and your -- and your undergraduate class.  Correct?

5         A    I don't know if I would describe it as the main

6    thing.  We -- You have a portfolio of classes.  I have to teach

7    ten credits here.  So that -- that menu of ten credits

8    changes --

9         Q    Okay.

10        A    -- over time.

11        Q    If you had to say the general course description of

12   some of these classes as it relates to marketing, what -- what

13   would that entail?

14        A    Well, obviously the introductory class covers the

15   water front.  The Ph.D. class covers, you know, highly

16   technical material closely related to my expertise and

17   research.  I can go into more details, but --

18        Q    I will go into your research in a minute.

19        A    Okay.

20        Q    Thank you for that.  It says your research interests

21   here on page 31 at the bottom is digital channels, sales force

22   contests, supply networks and technology -- technology

23   marketing.  Is that correct?

24        A    Are the current areas.

25        Q    Current areas.  And what are -- And I think we

                                                        Page 19

```
 1    went -- Well, what are sales force contests?

 2        A    It's pretty straight forward.  Let's say we are all

 3    sales people and say, hey, whoever sells the most this month is

 4    going to get an award.  That's simply put a sales contest.

 5        Q    Okay.  And supply networks?

 6        A    So what's the best example?  So think about how this

 7    bottle of water got here.  It came out of a spring somewhere,

 8    Ozarka I think.  I don't know where that is, but somewhere in

 9    Texas I assume or Arkansas or someplace like that.  It -- it

10    gets processed to the point of extraction.  Then it gets

11    refined somewhere else.  And then it gets distributed by some

12    distributor and finally winds up at HEB or something.  And

13    that's the retailer.  And that entire thing would be called a

14    supply chain.

15        Q    Okay.  So supply network is like a supply chain?

16        A    It's -- it's more complicated than a supply chain.

17    So a supply chain is part of a supply network.

18        Q    Understood.  And technology marketing?

19        A    So that's -- For example, we have laptops, but today

20    I -- I don't know if that gentleman's laptop is actually using

21    cloud servers or whether he's got all the programs loaded on

22    locally.  So that separation would be an example of technology

23    marketing.  How I would -- how I would market a subscription to

24    cloud servers for let's say Windows would be different from how

25    I would sell Windows for that laptop locally.
```

                                                        Page 20

1      Q    Understood.  What about digital channels?

2      A    So that's ubiquitous today.  When you buy something

3   from Amazon, that's an example of a digital channel.

4      Q    So I am engaging in digital channels everyday then.

5      A    Pretty much.  Yeah.  I think it's -- it's a little

6   bit of a fallacy to think you're only engaging in digital

7   channels because the person who delivers the product to your

8   house, that's non-digital.

9      Q    Right.

10     A    So there's a combination.

11     Q    So on-line purchasing perhaps?

12     A    The elements that are on-line would be the digital

13   part of it.

14     Q    Okay.  When you -- When we spoke about the courses

15   that you taught or that you teach -- excuse me -- in your

16   various credits, do you teach distribution channels?

17     A    Yes.

18     Q    Do you teach the technology marketing?

19     A    Yes.

20     Q    And you teach supply chain or supply networks?

21   Excuse me.

22     A    Both.  Supply chains and supply networks is an

23   extension of it.

24     Q    Do you teach any trademark or brand protection survey

25   sampling?

                                                    Page 21

APP'X 021

```
 1        A    There's a lot in that question, so let me see if I

 2   can take it piece by piece.   Certain branding is certainly part

 3   of it.

 4        Q    No.   It was all together.   It was trademark survey

 5   sampling.   Do you teach that?

 6        A    I don't teach trademark survey sampling.   There's

 7   nothing unique about trademark survey sampling that would make

 8   it a class.   So do we teach elements of it, yes.

 9        Q    What elements do you teach?

10        A    I teach branding.   I teach sampling.   And I certainly

11   don't teach the legal aspects of trademarks.

12        Q    When you say you teach sampling, could you give me an

13   example of sampling methodologies?

14        A    Virtually everything -- I would say 90 percent of the

15   research I have done is empirical.   Every empirical study is at

16   some point how do you get the data, or if you don't get the

17   data yourself, what's the source of the data, and therefore

18   what are the properties of that data.   And one of the most

19   important properties is the sampling property.

20        Q    Okay.   Do you talk about constructing these surveys?

21        A    If you're asking me if I have ever taught

22   constructing surveys across all the different classes I have

23   taught, sure, in some classes, but in other classes not so.

24        Q    What parts of constructing surveys do you -- do you

25   teach?
```

                                                            Page 22

APP'X 022

1          A     For example, if you go back to what I have taught in

2     the past and what is covered in my seminar, we talk about

3     marketing research, how do you collect data.  And that includes

4     surveys.  It includes experiments.  It includes observational

5     data.  So you would start from A to Z on each of those things.

6          Q     And you are saying these are marketing surveys?  I'm

7     sorry.  You said marketing in there.  I forgot what you said.

8          A     I forgot also.

9          Q     We were talking about constructing surveys, and you

10    were saying marketing data --

11         A     Yes.

12         Q     -- I believe.  So what do you use -- What kind of --

13    sorry.  When you are using a survey with marketing data,

14    what -- what kind of evidence do you get from marketing data?

15    What are some examples of the data?

16         A     I think I collect the surveys to get the data.  I

17    don't have the data to formulate a survey.  So, for example, in

18    the sales force contest we would survey sales people about what

19    they intend to do or what they have done or how they feel about

20    the -- the -- the prices they could win, things like that.

21         Q     Uh-huh.  Okay.  Do you have -- Are there any specific

22    sampling methodologies that you -- like accepted sampling

23    methodologies that you teach?

24         A     That's a huge set of issues, and I try to cover them

25    at the level of the class I teach.  So if I am teaching an

```
 1    undergraduate class, I will teach at a much lower level of

 2    sophistication.   So there are several issues of sampling on

 3    several types of samples that we would get into in detail if

 4    you're teaching a higher level class.

 5         Q    Do you teach the standards for likelihood of

 6    confusion sampling?

 7         A    I'm sorry?

 8         Q    Do you teach any of the accepted methodologies for

 9    likelihood of confusion sampling?

10         A    So I think I am not sure I understand the question.

11    Sampling is a methodology.   Likelihood of confusion is a

12    conceptual issue.   So I am not sure there is a -- a sampling

13    methodology that is specific to likelihood of confusion as

14    opposed to sampling methodology per say.   So I teach sampling

15    methodology per say.   I don't teach -- In any class we try to

16    teach things as broadly as possible.   So you don't teach how to

17    answer a particular client's question.   When you do projects

18    you do that.   So I am not sure how to answer your question.

19         Q    Let me ask a better question then.   When you're

20    constructing a survey to test for likelihood of confusion are

21    you familiar with the factors that are involved with

22    constructing that type of survey?

23         A    It would depend on the definition of likelihood of

24    confusion.   So there is a general methodology, and I make a

25    note of that in my report as to how you would develop an
```

Page 24

1    instrument and then implement that instrument in a sample to

2    get at a conceptual subjective concept like likelihood of

3    confusion or deception of any of these kinds of things.  So

4    yes, I do teach how to develop marketing instrument --

5    instruments to measure marketing which are mostly subjective

6    concepts like confusion and like deception, yes.

7         Q    Can you tell me about that methodology?

8         A    Sure.  You first have to define -- I actually say

9    that in my report.  I can go to that and sort of --

10        Q    We can go to that.  I'm -- I'm looking for the steps

11   in which you construct a survey for likelihood of confusion.

12        A    Certainly.  So starting on page 18.  So there are

13   three acceptable elements of developing a measure.  We haven't

14   even got to the sampling yet.  So I want to make sure that we

15   understand each other.  So the first thing is you have to

16   define it, and I go through that on page 18.

17        Q    Okay.  Show me where you are.

18        A    Middle of page 18, there's a Subsection A.  There's

19   no definition of deception or confusion.  So the --

20        Q    Okay.  Is it the first -- the first sentence that

21   says the accepted practice is to first provide a definition of

22   the two concepts?

23        A    Of any concept or any subjective concept.  I apply it

24   to these two in this case.

25        Q    Okay.  Where -- where is this -- Where is the

                                                        Page 25

1   accepted practice?  What are you referring to?

2       A    So I cite footnote five on page 16.

3       Q    I wouldn't know that because there's no cite here

4   that refers to that.

5       A    I have it on page 16.  I don't know --

6            MR. KIRKMAN:  I am not sure what relevance it is

7   if you wouldn't know.  So --

8            MS. PALNITKAR:  I am reading his report, and I

9   don't see the cite for the first sentence of the accepted

10  practice.  There's several citations.  I don't know which one

11  that sentence is referring to.

12           MR. KIRKMAN:  He just gave you an answer.

13           MS. PALNITKAR:  Right.  Objection to your

14  sidebar.

15      Q    Remind me -- Say it again.  Which --

16      A    On page 16 I give you the foundational citation to

17  developing a measure.  And then I apply that -- that framework

18  to the Wind report's measures of deception and confusion.

19      Q    And this is a -- a foundational study that is a

20  paradigm for developing better measures of marketing

21  constructs?

22      A    That's right.

23      Q    Okay.  And that is what you base the accepted

24  practice on.  Correct?

25      A    Yes.

1        Q     Okay.  It says -- The literature provides a

2    definition of both these concepts.  And that literature is

3    again the footnote five?

4        A     I'm -- I'm sorry.  What's the question again?

5        Q     The second sentence here is the literature provided

6    definitions of both -- excuse me.  The literature provides

7    definitions of both these concepts.

8        A     Which page are you reading?

9        Q     The same page 18.

10       A     Okay.  Hold on a second.

11       Q     Sorry about that.  Okay.  Page 18 under Subsection A

12   it says -- We just spoke about the accepted practice is to

13   first provide a definition of the two concepts.  Correct?

14       A     Yes.

15       Q     And that -- You are saying that accepted practice is

16   what you're quoting in footnote five?

17       A     I think we are confusing matters.  Footnote five

18   talks about how to do something.  It does not include

19   definitions of deceptions or any construct.  It's a methodology

20   for developing a measure of any subjective construct, two of

21   which would be deception and confusion.

22       Q     Right.  I am asking about the word -- the phrase

23   accepted practice.  I am trying to find out where I can find

24   this accepted practice.  And I am just confirming with you that

25   that was in footnote five.

                                                        Page 27

1       A     That's right.

2       Q     Okay.  Then I go on to the second sentence that says

3    the literature provides definitions of both these concepts.

4    And I am asking if that -- by you referring to literature does

5    that also refer to footnote five?

6       A     No, it doesn't.  Just general literature.

7       Q     Where can I find that general literature?

8       A     I was not asked to provide these definitions, but you

9    can easily find them.  Deception and confusion have been

10   studied in hundreds of studies.

11            MS. PALNITKAR:  Objection; nonresponsive.

12      Q     I am not asking about the -- the definitions.  I am

13   asking about the literature.

14      A     The literature, I do not cite the definitions of

15   these concepts.  I am pointing out the Wind report does not

16   provide a definition of the concept.

17      Q     Right.  And I am just asking you what literature are

18   you talking about?

19      A     Marketing literature.

20      Q     That's my question to you.

21      A     Thank you.

22      Q     So what I am asking what literature are you talking

23   about, you are just saying general marketing literature?

24      A     That's right.

25      Q     And that's not cited in this report?

                                              Page 28

```
 1        A    No.  So can I add something here?

 2        Q    No.  Just a minute.  I have a question.

 3        A    I want to add to my answer.

 4             MR. KIRKMAN:  You have the ability to correct or

 5   amend your answer.

 6        A    So you asked me about literature.  I provide an

 7   example of confusion in footnote seven.  Okay.  That provides

 8   an example of a definition of confusion.  All right.  That's

 9   one definition.

10        Q    I don't see that definition anywhere.

11        A    I don't know what else I can say.  It's footnote

12   seven, Barbara Loken, Barsalou and Chris Joiner, Categorization

13   Theory and Research in Consumer Psychology.

14        Q    I understand, but there's -- that's -- You're

15   quoting -- You're quoting a large document.  I don't see a

16   definition for deception or confusion.

17        A    You will find it in it.

18        Q    Okay.  Do you understand that definitions of

19   confusion in a legal sense are different than definitions of

20   confusion in a marketing sense?

21        A    It may well be.  I wasn't asked to look into that.  I

22   have nothing to say about the legal definitions of anything.

23        Q    Right.  And when you have certain definitions that

24   you're referring to here, that may not be the acceptable legal

25   definition of what the same term is.  Correct?
```

```
 1          Q    You haven't seen the definition of what confusion is
 2     in a likelihood of confusion survey?
 3                    MR. KIRKMAN:  Form.
 4          A    In the legal context?
 5          Q    Yes.
 6          A    I have not.
 7          Q    Okay.  Have you reviewed any case law that deals with
 8     likelihood of confusion surveys?
 9          A    I have read them, but I don't have any strong
10     opinions about the -- the legal -- legal definitions of any of
11     these concepts.  I am not offering any opinions about it.
12          Q    Okay.  You are not offering any opinions about the
13     definition of confusion in a likelihood of confusion survey?
14                    MR. KIRKMAN:  Form.
15          Q    I'm sorry.  In a likelihood of confusion analysis.
16                    MR. KIRKMAN:  Form.
17          A    All I am saying here is that I don't see a definition
18     provided.  Are there definitions in the literature?  To be
19     sure.
20          Q    Why -- What are you basing your opinion on that a
21     definition needs to be provided in a survey?
22          A    I have already said it.  It's the methodology by
23     which we have -- we develop any measure of any subjective
24     construct.
25          Q    And that is a marketing methodology?
```

Page 31

1        A      That is a scientific methodology used in psychology

2    used in marketing in almost every empirical social science.

3        Q      Is it using any of the legal -- legally accepted

4    methodologies for likelihood of confusion surveys?

5        A      If you show me an example, I will tell you whether it

6    does.

7        Q      Are you familiar with the examples that go into

8    likelihood of confusion survey analysis?

9        A      I don't want to hazard a guess.  If you show me an

10   example, I will tell you whether it fits what I'm thinking.

11       Q      Well, that was not my question.  My question is are

12   you familiar with any of the factors that go into likelihood of

13   confusion analysis?

14              MR. KIRKMAN:  Excuse me.  Form.

15       A      You know, I -- I have seen it.  I haven't memorized

16   them, and I haven't seen them recently.  So I don't want to

17   hazard a guess as to what these definitions are.

18       Q      They are not definitions.  They are standards.  Have

19   you seen those?

20              MR. KIRKMAN:  Hey, now wait a minute.  Wait a

21   minute.  You are not here to lecture him.  Ask a question.  He

22   will answer it.

23       Q      I asked have you seen those?

24              MR. KIRKMAN:  And he answered -- Wait a minute.

25   He answered that question.

                                                        Page 32

```
 1        Q    What have you seen?

 2        A    I have seen a lot of things.  I don't know what

 3   you're asking me what I have seen.

 4        Q    Have you seen case law on the standards that go into

 5   a likelihood of confusion analysis?

 6        A    I have seen it in the past, but I don't know --

 7   There's a lot of case law, and I don't know what you're

 8   referring to.  So I don't want to say I have seen whatever it

 9   is you think I'm referring to.

10        Q    Have you ever seen the seven or eight factors that go

11   into establishing a likelihood of confusion?

12             MR. KIRKMAN:  Form.

13        A    I may have seen it.  I couldn't tell you whether it's

14   the one that you have in mind.

15        Q    Have you ever seen a likelihood of confusion survey?

16        A    I have seen a lot of surveys.  I may have seen one,

17   but I don't know which one you're referring to.

18        Q    No.  I am just saying in general, a likelihood of

19   confusion survey.

20        A    I have seen a lot of surveys, and I am sure that some

21   of those surveys measure confusion just like some of those

22   surveys measure deception.  So I've probably seen them.  I

23   don't know which one -- which specific one you're referring to.

24        Q    I am not referring to a specific one.  I understand

25   you have seen a lot of surveys, but my question is have you
```

Page 33

1    seen a likelihood of confusion survey specifically?

2         A    Again, I have seen likelihood of confusion measured

3    in surveys.  I don't know if it's a legal one.  I don't know if

4    it's a -- something else.  I don't know the context.  I don't

5    do that kind of research.  Excuse me.  I don't do that kind of

6    consulting work.  So I don't know what kind of surveys you're

7    referring to.

8         Q    Okay.  So if you say you haven't done that kind of

9    consulting work, is it safe to say you have not conducted a

10   likelihood of confusion survey in a legal case?

11             MR. KIRKMAN:  Form.

12        A    I -- I actually have been involved in likelihood of

13   confusion a long time ago in the 80s, but nothing recently.  So

14   I don't know what the current standards are as to what factors

15   you're talking about.

16        Q    Okay.  Have you ever conducted -- I understand you

17   have seen -- Have you ever conducted a likelihood of confusion

18   survey in a legal case?

19        A    No.

20        Q    I am going to show you this.  I am going to mark this

21   as -- as Exhibit 3.

22             (Exhibit 3 was marked for identification.)

23        Q    And if you could turn to the part that is

24   highlighted.  This is on page 11.

25             MR. KIRKMAN:  I have nothing highlighted on page

                                                        Page 34

```
 1        A    I have no idea what research this is based on.  So I

 2   don't have an opinion about it.

 3        Q    Okay.  This is a legal standard set forth by the

 4   courts in the United States on testing for likelihood of

 5   confusion factors.  Are you familiar with that?

 6                  MR. KIRKMAN:  I am going to object.  You are not

 7   here to lecture him and tell him.  You're here to ask him

 8   questions.

 9        Q    Go ahead.

10        A    What was the question?

11        Q    This is -- This case has a legal standard set forth

12   for likelihood of confusion factors.  Are you familiar with

13   this standard that is set forth here?

14                  MR. KIRKMAN:  Form.

15        A    I have seen these -- these sorts of factors or

16   indicia or whatever they are called.  I am not familiar with

17   the particular one called digits of confusion, but they look

18   very similar to the things I have seen before.

19        Q    Okay.  Is this the -- the factors that you use when

20   you are evaluating a likelihood of confusion survey?

21        A    I think I have already said I have not conducted a

22   likelihood of confusion survey.  So I wouldn't have had any

23   occasion to use or not use these factors.

24        Q    Understood.  Let's go through some of your

25   publications here on your CV.  I am looking at page 32.
```

                                                                Page 36

APP'X 034

1    conference proceedings on page 35.  Correct?

2        A    It's more likely that a conference proceeding which

3    is a lower level of -- of -- of quality would be -- could

4    include more consulting type work.

5        Q    What do you mean a lower level of quality?

6        A    It's not a stringent -- So, for example, these

7    general publications, the likelihood of getting published in my

8    discipline is probably about two or three percent.  So about

9    100 papers submitted, two or three get published.  Conference

10   proceedings, probably about 20 percent get in.  So it's a lot

11   less competitive.  So you will get a lot more different topics

12   in it.

13       Q    So are you -- I'm sorry.  I'm not understanding.  So

14   are you saying that you can put -- It's less likely that you

15   would put -- you would publish on likelihood of confusion

16   surveys?

17       A    So a likelihood of confusion survey is a very

18   specific thing.  It would not have enough generalizable

19   scholarly content to merit publishing in a -- in a top level

20   journal.  So it's more likely to be in a conference proceeding

21   or a non peer-reviewed proceeding.

22       Q    Okay.  Do any of these eight conference proceedings

23   deal with any kind of surveys on likelihood of confusion?

24       A    You know, honestly I can't remember.  I would have to

25   go through each one.  I can tell you one that does.  So if you

                                                    Page 38

1    go to page 17, you can see number seven, Consumer Confusion in

2    the Marketplace.

3         Q    I'm sorry.  Page 35?

4         A    I'm sorry.  Page 37.

5         Q    Oh, okay.

6         A    Point number -- I mean item number seven.  You can

7    see that's a -- that's a presentation.  So I didn't have a

8    paper on it, but I presented it at a round table program in

9    consumer confusion.  So --

10        Q    In 1986?

11        A    Yes.

12        Q    Is that the last time you presented on consumer

13   confusion -- sorry -- likelihood of confusion?

14        A    So yes and no.  I've -- I've -- I've looked at the

15   literature, but I haven't done my own research on it since

16   then.

17        Q    Okay.  So that takes us all the way to page 42 where

18   it ends that section, correct, of presentations?

19        A    I believe so.  Let me just double check that.

20   Presentations, the top of page 42, yes.

21        Q    Okay.  And then your dissertation committees.  So

22   this is a -- Is this for students who are coming up for their

23   Ph.D.?

24        A    Not coming up.  These are the people -- The first

25   subsection labeled Advisor/Co-Advisor are the people whom I

Page 39

APP'X 036

```
 1    have advised as a chair or as a co-chair.

 2         Q    Okay.  Very good.

 3         A    They have all graduated.

 4         Q    And do any of -- I am looking through these 18, and I

 5    don't see any -- And I know you are -- you are just the

 6    advisor.  So you are not coming up with the topic because the

 7    Ph.D. candidates are coming up with the topics.  Correct?

 8         A    With my approval.

 9         Q    Okay.

10         A    Yes.

11         Q    Understood.  And I don't -- As I see this, I don't

12    think any of these relate to likelihood of confusion or

13    sampling studies.  Correct?

14         A    Many of them do.  Sampling is -- Again, sampling is

15    the general methodology.  Most of these dissertations involve

16    primary data that's been collected, and many of them are

17    collected via surveys.  So sampling is involved in the

18    methodology of many of these dissertations.

19         Q    You're right.  You're right.  I -- I cannot

20    generalize the two.  So sampling is separate from likelihood of

21    confusion survey construction.  So my better question should be

22    these -- do any of these 18 dissertation committees have -- or

23    sorry -- these dissertation subjects have to do with likelihood

24    of confusion surveys?

25                   MR. KIRKMAN:  Form.
```

Page 40

APP'X 037

```
 1        A    Not the likelihood of confusion survey.

 2        Q    Okay.  And then moving on to the committee members,

 3   what does this mean?

 4        A    That means I am a member of the committee, but I am

 5   not the -- the primary advisor.

 6        Q    Okay.  And I see these have a lot to do with channels

 7   of distribution, marketing practices and channels.  Do any of

 8   these relate to likelihood of confusion surveys?

 9             MR. KIRKMAN:  Form.

10        A    They -- they do, but not confusion -- likelihood of

11   confusion surveys.  For example, just take the first

12   dissertation, Recognition and Measure of Learning.  So what's

13   fundamental to developing a measure is to make sure that the --

14   the measure is actually measuring what you want it to measure.

15   So it's again part of the general methodology.  So confusion,

16   like any other topic, has to be measured in a proper way.  So

17   the proper measurement of many of these things would involve

18   that same methodology I talked about.  Do any of them have a

19   likelihood of confusion focus, no.

20        Q    Okay.  So these are relating in some way perhaps to

21   confusion as a general marketing theory and how it's used in a

22   marketing construct?

23        A    Let me -- let me -- let me repeat what I said.

24   Confusion, deception are all subjective constructs.  Many of

25   these dissertations, if not all actually, involve subjective
```

Veritext Legal Solutions
800-336-4000

1    constructs.  There's a particular methodology to go out and

2    measure subjective constructs including deception and including

3    confusion, including opportunism and many others including

4    personality traits, all of those things.  And -- and these

5    dissertations have always used accepted methodologies to

6    measure these subjective constructs.  Have any of them used

7    that particular methodology to measure likelihood of confusion,

8    no.

9         Q    Are you familiar with the survey methodologies that

10   the Courts have approved for demonstrating confusion?

11        A    I -- There are many many elements of these surveys.

12   So I am not sure what you're referring to.  If you show me

13   something that you are interested in, I can happily respond.

14             MS. PALNITKAR:  Well -- Objection;

15   nonresponsive.

16        Q    My question was are you familiar with the survey --

17   survey methodologies, the methods of conducting a likelihood of

18   confusion survey that -- that have been accepted within the

19   Courts?

20             MR. KIRKMAN:  Now, wait a minute.  I object;

21   form.  He's answered the question.  Just because you object to

22   the responsiveness of the answer doesn't mean he didn't

23   respond.  So, Dr. John, if you believe you have responded to

24   the question, you can simply tell this lawyer that.

25        A    I have lost track of the question.

                                                    Page 42

1    accepted by a court?

2              MR. KIRKMAN:  Form.

3        A    I think courts make up their own minds.  I can tell

4    you whether I would accept it as a scholar and whether the

5    scholarly literature would accept it.

6        Q    And by that you mean the marketing literature?

7        A    Generally social science literature.

8        Q    Okay.  Would you be able to tell me if a likelihood

9    of confusion survey methodology would be rejected by a court?

10             MR. KIRKMAN:  Form.

11       A    Same thing.  I would hope that the courts follow the

12   science.  And -- and I can tell you whether it would be

13   acceptable or rejected by a journal, if I am reviewing it

14   whether I would accept it or reject it.  But it's very hard for

15   me to speak as to what the Court would reject.

16       Q    Thank you for getting through that with me.  Sorry it

17   was not clear.  All right.  Just to round out your CV here, I

18   see professional service.  You're a board member of several

19   journals, correct, and a reviewer as well on page 44?

20       A    Let me just check that.  Yes, but I want to make

21   clear that those dates are important.  I am not claiming that I

22   am a reviewer currently and everything, so --

23       Q    Sure.

24       A    Just make sure that --

25       Q    Oh, well, thank you for that.  And let's look at your

                                                    Page 44

1    testifying history in the last five years if we will.  How

2    many -- Forget the last five years, but just in the last -- In

3    your career do you recall how many -- approximately how many

4    times you have testified?

5         A    Maybe a dozen times.

6         Q    Is that in court?

7         A    Very few in court.  I would say, for example, none of

8    these four have reached a trial stage.  Probably two or three

9    times at trial, maybe around that number.  No more than that.

10   I don't know how to include arbitration proceedings and

11   commission hearing proceedings.  So if you throw all of that

12   in, maybe about four or five times.

13        Q    Okay.  Thank you.  And by the four you were referring

14   to, you mean the four cases that are listed on page 45.

15   Correct?

16        A    That's right.

17        Q    And two to three times at trial, do you recall what

18   those -- what you were testifying about at those trials?

19        A    Yes, very much so.  The -- the one that sticks out is

20   Axciom v. Axiom.  I'm going to get the spelling wrong.

21   A-x-c-i-o-m v. A-x-i-o-m.  That was a confusion case about

22   whether one brand name was being confused with another.  That

23   was a federal case.

24        Q    Okay.  Did you -- I think you already said you didn't

25   conduct the survey for it, but -- because you haven't

                                                          Page 45

APP'X 041

1    constructed a survey, but did you opine as to the confusion in

2    that matter?

3         A    I did.

4         Q    And what were your opinions there?

5         A    That's a long time ago.  Let me see if I can

6    reconstruct it.

7         Q    When was it, do you remember?

8         A    Sometime this millennium --

9         Q    Okay.

10        A    -- is the best I can tell you.

11        Q    Okay.  So tell me about that.  I'm sorry I

12   interrupted you.

13        A    So it's -- It was quite an interesting case.

14   Normally consumer confusion cases rest on individual consumers

15   being confused between Brand A and Brand B.  They think that

16   Brand B came from Brand A.  So this case involved a business

17   setting where they are writing, you know, million dollar

18   checks.  So the question is who would ever be confused at your

19   million dollar check was going to this company versus this

20   company.  So I was opining about the fact that the way

21   businesses buy products still allows for this type of confusion

22   when somebody gets their foot in the door to tell their story

23   because the customer may have thought it came -- the person

24   came from the other company.  That's the gist of what we are

25   talking about.

                                              Page 46

1   firm.  Is that correct?

2        A    That's right.

3        Q    And so this has to do with using information from

4   Employer A in Employer B?

5        A    Generally speaking.  There are lots of issues there,

6   but I was just asked to talk about what was the nature of the

7   information and -- and so on and so forth, not -- not the other

8   issues.  There are a lot of issues.

9        Q    Were there any surveys involved in this case or in

10  your opinion of this case?

11       A    Not in my opinion.

12       Q    Number two, Johnson Controls, you're an expert

13  witness in connection with an IRS issue.

14       A    That's right.  Yeah.

15       Q    Okay.  Are there any surveys involved in this case?

16       A    Again, not surveys that I conducted, but surveys that

17  were conducted by other people.

18       Q    Are you giving an expert opinion as to the validity

19  of those surveys?

20       A    You know, that matter is still ongoing.  I don't know

21  what my ability is to speak to those things.

22            MR. KIRKMAN:  Don't -- don't do that if you feel

23  uncomfortable.

24       A    Yeah.  I would rather not get into the details.

25       Q    Okay.  Well, it's just going on what you have said

Page 50

```
1    here.  I filed a report that assessed whether JCI's brands were

2    more appropriately considered as having a finite useful

3    remaining life.  What does that mean?

4         A    So this is a hot topic in brands.  Do brands last

5    forever or do brands slowly lose their relevance over time and

6    depreciate.  That's sort of the two sides of that -- that

7    argument.

8         Q    So would that -- It would be fair to say the

9    longevity of a brand --

10        A    Yes.

11        Q    -- is similar to what you're talking about?

12        A    Longevity is implicitly infinite if you take one

13   position, and it is finite if you take the other position.

14        Q    That's interesting.  Number three, Furniture

15   Dealer.NE Inc. versus Amazon.  It says here that you were an

16   expert witness for the defendant.

17        A    Yes.

18        Q    And filed a report about influences and on-line

19   customer marketing journeys.  Is that correct?

20        A    That's right.

21        Q    You assess the impact of product information elements

22   on a consumer's propensity to purchase.  Is that correct?

23        A    Yes.

24        Q    What is a consumer journey?

25        A    I actually describe it in my report for this case as
```

                                                    Page 51

1    well.  So let's say you are going to buy an airline ticket.

2    So, you know, your first -- the first stage is, hey, I need to

3    travel.  And there may be a variety of reasons why that is.

4    Then I go to the next step.  And there are five or six steps

5    that I detail.  I can go through each one or --

6        Q    We will go through it in your report when we get to

7    your report.

8        A    Okay.  So --

9        Q    No.  I am just asking in general what is a consumer

10   journey?

11       A    It's the steps we go through from initiation of I

12   need to do something to the final culmination of yes, I

13   purchased it or I didn't purchase it.  It's that -- It's that

14   series of steps.

15       Q    So the -- Is it safe to say it's a -- it's some of

16   the psychology or what a -- what a customer goes through in

17   order from inception to actually making the purchase?

18       A    Or not making the purchase for one.

19       Q    Right.  Okay.

20       A    A lot of us will drop out.  And it's not just

21   psychology.  It's just -- It applies to businesses.  It applies

22   to consumers.  It's just the steps that anybody goes through.

23       Q    Uh-huh.  And it's all related to the consumer side.

24   Correct?

25       A    It applies to businesses as well.  If a business is

Page 52

1    ticket.  The second one is deceiving customers into the price

2    of a non-hidden city ticket.  So there's multiple elements

3    involved there.

4         Q    Okay.  And let's go to the third core opinion.  Could

5    you tell me what that is about?

6         A    Again --

7              MR. KIRKMAN:  Form.

8         A    -- Dr. Wind's words are confusion.  So Skiplagged

9    confuses consumers into believing -- and I can read the rest of

10   the sentence, but if you want me to, I can do that.

11        Q    Go ahead.

12        A    That Skiplagged is associated with or authorized by

13   American either as an authorized travel agent for American or

14   as having some other direct relationship with American.

15        Q    Okay.  So these are the three core opinions that you

16   said you reviewed or you focused on when you were creating this

17   report.  Correct?

18        A    That's right.

19        Q    Okay.  Let's go to page two.  I think we covered most

20   of that.  Okay.  So let's go to page three here.  The second

21   paragraph you say my training, teaching and research includes

22   the design, development and analysis of surveys.  I think we

23   already established that you have not designed a likelihood of

24   confusion survey.  Correct?

25              MR. KIRKMAN:  Form.

                                                      Page 60

APP'X 046

1     A     I have designed many surveys.  I have not done any

2  consulting engagements on likelihood of confusion.

3     Q     I believe your testimony also said that you have not

4  designed a likelihood of confusion survey.  Correct?

5     A     That is not quite true because remember, I did a

6  presentation.  I don't have a written document based on that,

7  but that presentation did involve likelihood of confusion.

8     Q     A survey?

9     A     Yes.

10    Q     That you designed?

11    A     Yes.

12    Q     And you conducted?

13    A     Yeah.  I mean I survey and conduct my own things, but

14  I don't have a document.  I want to impress that on -- on you

15  because that was just a presentation.

16    Q     Okay.  So you -- And that was in 1980.

17    A     A long time ago.

18    Q     But since then you have not conducted a likelihood of

19  confusion survey.  Correct?

20    A     That's right.

21    Q     The next paragraph says I have also consulted on many

22  topics closely related to the issues in this case.  Do you

23  consider the -- the issues in this case to be the three core

24  opinions we just spoke about?

25    A     I think you view them differently from me.  I think

Page 61

1    of it as deception and confusion.  And then the subject matter,

2    the deception and confusion would be hidden city tickets,

3    pricing and the relationship to American Airlines.

4         Q    Okay.  And the last paragraph there just above roman

5    numeral three says my work on customer journeys and search and

6    digital channels is closely related to the issues I have been

7    asked to address on this case.  Correct?

8         A    Yes.

9         Q    How are customer journeys related to determining

10   whether Skiplagged is affiliated with American Airlines?

11                   MR. KIRKMAN:  Form.

12        A    I am not sure I understand the question.  The

13   customer journey of an American Airlines' customer, is that

14   what you're asking me?

15        Q    Well, you said the issues in this case relate to

16   those -- relate to deception, confusion and affiliation.

17   Correct?

18        A    I use different words, but yes, that's essentially

19   the same point, yeah.

20        Q    Okay.  And so I am asking you just taking that third

21   prong of the three that you just enumerated, my work on

22   customer journeys is closely related to the issues I have been

23   asked to address in this case.  So my question to you is how

24   does a customer journey relate to whether Skiplagged is

25   affiliated with American Airlines?

Veritext Legal Solutions
800-336-4000

APP'X 048

1       A     In many many ways.  So let's -- let's start from the

2   beginning.  What are digital customer journeys?  It's search.

3   Let's just start there, okay, on-line search.  So when I get

4   the results of an on-line search, that's one step.  It's the

5   first step of the -- the journey, as I said, is need

6   recognition which is really not relevant here.  So the first

7   meaningful step would be I do a search, and I may choose the

8   site to go to.  I may choose Skiplagged.  I may choose American

9   Airlines.  So right there we have a question of where I start

10  my search.  So that's -- that's -- that's the connection to the

11  issue here because it clearly speaks to deception and

12  confusion.  If I go to Skiplagged and I think I am going to

13  American Airlines, that's clearly confusion.  So there are many

14  many places where the -- the way somebody searches on-line and

15  the steps they take are connected to these issues of deception

16  and -- and confusion.  The information I get back is -- is an

17  opportunity to be deceived or confused.  So there's another

18  connection.  And the steps I take after I get the results back

19  is another place where I get confused -- could be confused and

20  take a step that I would not have taken had I known something

21  else.  So there are many many connections.

22      Q     Thank you.  Is Dr. Wind's survey testing for steps of

23  the consumer journey?

24            MR. KIRKMAN:  Form.

25      A     Not in the way that I -- I describe in my report why

                                                        Page 63

1    the design of his experiments do not faithfully represent a

2    realistic picture of the customer journey that an American

3    Airlines' customer would take.

4        Q    My question to you though is are his -- is his survey

5    testing for a consumer journey?

6                    MR. KIRKMAN:   Form.

7        Q    Is it testing elements of a consumer journey?

8                    MR. KIRKMAN:   Excuse me.   Form.   Asked and

9    answered.

10       A    I am not sure how to answer the question because the

11   issues here, one cannot be deceived or confused without a

12   customer journey.   So yes, the issues that he's testing are

13   part and parcel of a customer journey.   You can't have one

14   without the other.

15       Q    Could you elaborate?

16       A    Okay.   I cannot be deceived if I am not undertaking a

17   journey.   I cannot be confused if I am not undertaking a

18   journey.   So you can't -- you can't separate the issues of

19   deception and confusion from the presence of a customer

20   journey.   It's -- it's an integral part of the customer

21   purchase.   And to speak about being -- being confused or being

22   deceived by another actor only occurs in the context of a

23   journey.

24       Q    So a customer journey as you have put it before is to

25   decide if someone is going to -- how they come to a purchase

Page 64

1    people have booked American Airlines tickets through this time

2    period via Skiplagged?

3       A    My engagement was to respond to the Wind report.  And

4    that's what I did.

5       Q    Yeah.  But your -- you responded by saying -- by

6    making a calculation here of 88 Skiplagged complaints over the

7    entirety of the universe of American Airlines' passengers

8    whether or not that corresponds to Skiplagged booked

9    passengers.  Correct?

10               MR. KIRKMAN:  Form.

11      A    I don't make that -- I do not make that conclusion.

12      Q    I agree.  I agree.  I think that --

13      A    In this next statement, the next sentence says this

14   tiny fraction indicates there's not a material issue of

15   complaints to American Airlines emanating from Skiplagged or

16   Skiplagged bookings.  That's all I say.  That it's a very small

17   number in relation to the total number of people who fly

18   American Airlines.  We can conjecture from that that the number

19   of people who book through Skiplagged is either very very small

20   or that the people who book through Skiplagged don't complain,

21   either one.  I make no assertion as to which of those two might

22   be the possibilities it had.

23      Q    Or maybe one more theory in that they booked -- they

24   complained to Skiplagged directly?

25      A    That's your complaint.  That's your theory, not

                                                        Page 77

 1          A     Middle of that whole second bulleted paragraph, I

 2     said this stage is the central focus of the current case.  So

 3     everything here revolves around the actions surrounding the

 4     stages of searching for information on-line, looking at the

 5     results, making inferences about the results, taking the next

 6     step and so on and so forth.  So that information search stage

 7     is the -- is the key phase here.

 8          Q     Did Dr. Wind's report ask its survey respondents to

 9     search for information?

10          A     The -- He shows them the results of what would have

11     happened had they searched.  It's different from asking someone

12     to do their own search.  In fact, that's my criticism of it.

13          Q     I -- I agree.  He did show them the -- He did not ask

14     them to do the search.

15          A     I am glad you agree with my criticism.

16          Q     I do.  I do.  Because he is -- Is Dr. Wind testing to

17     see how a consumer would select certain things in his

18     experiments?

19          A     So again, back to this question of are you asking me

20     what he did do, which I respond to in my report, or are you

21     asking me what he should have done?

22          Q     I am asking you what he did do in his -- You're --

23     You're opining as to his survey.  Correct?

24          A     Yes.

25          Q     I am not asking you what he should have done because

```
 1        Q     And have you ever seen a likelihood of confusion

 2   survey where the survey respondents were told to search for a

 3   product?

 4        A     I have not seen any likelihood of confusion surveys

 5   of late one way or the other.

 6        Q     Okay.  So my question is how is the information stage

 7   relevant to a likelihood of confusion survey?

 8        A     So I described that here at the bottom of page five

 9   and continuing onto six.  So what I tried to say here is that

10   on-line searches are very different from off-line searches.

11   And I try to go through in detail as to why that is.  I am

12   happy to expand on that if you wish.

13        Q     Is Dr. Wind's experiments -- are his experiments

14   on-line?

15        A     It was executed on-line, but it doesn't reflect an

16   on-line search.

17        Q     Okay.  Are they -- Is it -- Are they given static

18   stimuli to review?

19        A     Essentially.  Given a sequence of stimuli.

20        Q     So they are not completing a customer journey in

21   order to select the stimuli they will ultimately view?

22        A     So the heart of my statement here on page five and

23   six is that on-line searches are very different from off-line

24   searches.  It's very different from showing you a picture of an

25   HEB aisle with cereal products and asking you, you know, which
```

Page 92

1        Q    So is Jerry Wind's experiments -- are they -- are

2    they concerned with the inferences that you make as a

3    prospective traveler?

4        A    So deception and confusion is all about I believe

5    something that is inaccurate or I believe something that is --

6    should be something else, or I shouldn't believe what I see.

7    All of those are inferences about attributes that I make in an

8    incorrect manner or in a -- in a confused manner based on the

9    degree of deception and confusion.

10       Q    I am not asking about deception and confusion.  I am

11   just asking are Jerry Wind's experiments concerned with the

12   inferences that a prospective traveler would make when deciding

13   whether or not to purchase a ticket?

14            MR. KIRKMAN:  Form.

15       A    You know, I am not sure because he's presenting data

16   on responses to open-ended questions.  How would you describe

17   this offer, for example.  That's one of his primary questions.

18   And then he starts coding it.  So I don't even know why he asks

19   that open-ended question.  That's -- It's sort of a bizarre

20   question as far as I am concerned, but it certainly gets to

21   inferences.  What do you -- How would you describe this offer

22   to somebody.  I believe those are his exact words, close to his

23   exact words.  So yes, it's -- it's -- it's all about

24   inferences, what did the consumer make of the stimulus, and

25   therefore how did they answer those questions or how did they

Page 100

1   respond to that open-ended query.

2       Q    And are you of the belief that open-ended questions

3   are not acceptable in --

4       A    They are --

5       Q    -- in surveying?

6            MR. KIRKMAN:  Let -- let her finish.  Go ahead.

7       A    In an experiment of the type that Jerry is conducting

8   here, open-ended questions introduce more noise into the

9   system.  So -- And I describe why it introduces more noise.

10  You have to provide a definition to those coders.  Those coders

11  then have to agree with themselves.  And actually none of those

12  details are provided to us or to me at least.  So that's why

13  generally people prefer not to ask -- generally would prefer to

14  ask close-ended questions that have been pre-tested so you kind

15  of know what that person is making of the words you're using.

16  Here we have to guess what that person is saying and the

17  meaning of the words that they are using.

18      Q    Okay.  I am just going to go through the -- the rest

19  of these two prongs, and then we will take a break.  Is that

20  all right?  Here on the price -- Let's see.  The fourth prong,

21  the purchase stage, this is concerned with the manner in which

22  a prospective traveler actually purchases the -- the chosen

23  alternative.  Correct?

24      A    That's right.

25      Q    And here you say the Wind report offers no conclusion

Page 101

1        Q    If there are certain elements as to what's

2    appropriate for a consumer survey to be admissible in court,

3    would that be something for -- would that be a legal

4    standard --

5               MR. KIRKMAN:  Form.

6        Q    -- as you're referencing it?

7               MR. KIRKMAN:  Form.

8        A    I just don't know what a legal standard is.  I think

9    what you're asking me is that how would I design a survey.  And

10    I think that would depend on -- on the objectives of the

11    survey.  I was not asked to design a survey here.  So it's hard

12    for me to answer that in the abstract.  But I would assume that

13    if somebody told me that the legal standard requires X, I try

14    my best to make sure that my design meets X.

15        Q    Okay.  And what specific information do you think

16    that -- do you think is missing in the stimuli that Dr. Wind

17    used?

18        A    That's a big question.  I can go through several

19    things, but I think one big part of it is that it doesn't

20    fairly represent or even accurately represent the actual

21    process of searching for information on-line.  And that's the

22    hallmark of a good research design, that it mirrors the

23    phenomenon and it -- it represents the phenomenon that you wish

24    to actually speak to.  So if you're -- if you're talking about

25    how people search for and -- and have feelings and evaluations

1    for airline tickets, your research design should mirror that.

2    So that to me is the biggest weakness of this -- this report.

3         Q    Is that it didn't show the adventure that the

4    customer took when coming to its decision?

5                   MR. KIRKMAN:  Form.

6         A    There are many elements, but to summarize it, I would

7    say on-line searching is a dynamic process.  And nowhere in

8    that design -- the research design of the experiments is there

9    any sense of a dynamic setting where the customer -- the

10   subject I should say -- is proceeding through stages.

11        Q    But you have never seen a likelihood of confusion

12   survey where they have an on-line search that is dynamic like

13   that, have you?

14        A    I have seen many -- I have actually taught classes

15   where my students have to do surveys.  I have seen industry

16   surveys done where they all replicate the process that we are

17   trying to simulate in the lab.  So you have the real world, and

18   you have the lab.  And your lab has to mirror what the real

19   world is doing.  And so yes, I have seen many many surveys.  I

20   wouldn't even call them surveys.  Just call them experiments

21   where you put people through the same series of steps that they

22   would have done in the real world.

23                   MS. PALNITKAR:  Objection; nonresponsive.  Can

24   you read back my last question please?

25                   THE REPORTER:  But you have never seen a

                                               Page 110

1   likelihood of confusion survey where they have an on-line

2   search that is dynamic like that, have you?

3       A   So I have seen dynamic experiments designed to mirror

4   on-line searches.  Was the objective of that study to study

5   likelihood of confusion?  No, I haven't seen those.

6       Q   So we will go through here on page seven.  And I

7   think that is what we are discussing here is that you are

8   saying -- You talk about the selection process.  And then you

9   say on the middle of page eight the key data used in the Wind

10   report to arrive at the deception conclusion are the responses

11   to the set of questions, Q1a in the Wind report, immediately

12   following the first set of screenshots.  Correct?

13       A   Yes.

14       Q   Do you -- Do you agree with that data used or that

15   data?

16               MR. KIRKMAN:  Let her finish first.  Go ahead.

17       Q   Let me strike that last question.  Do you have any

18   issue with how that data was ascertained?

19       A   I go through that, and yes, I have issues with the

20   uses to which that -- that -- those responses are -- are used

21   in the Wind report.

22       Q   If someone wanted to control or standardize their

23   survey, would -- so that everyone looks at the same stimuli,

24   would you not have to show them screenshots of that material?

25       A   What's the -- I would like to know what the purpose

Page 111

1       A    They all involve screenshots.  In fact, screenshots

2   are nothing but an end point capture of what the person is

3   seeing at that point in time.  My problem with it is that it's

4   a static screenshot, not screenshots off -- I can take

5   screenshots as a person goes along.  And we don't have that

6   kind of a dynamic process represented in the design.  That's my

7   problem with it.

8       Q    Do you have any evidence to show that that dynamic

9   process would alter the results of Dr. Wind's experiments?

10      A    Oh, certainly.

11      Q    Where is that at?

12      A    There's a ton of literature showing that any time you

13  have a static design you are not going to get the same results

14  as you faithfully represent the dynamic process of -- of what a

15  subject is doing.  This goes back as far as the mid 80s.  An

16  assessor would be a classic example of putting a person through

17  the assessor package or -- or procedure is probably the -- the

18  first well-known approach out there in the literature which

19  puts people through the sequence of steps they would take.  So

20  it's been there for a long time.

21      Q    Do you cite to any of those sources in this report?

22      A    I do not cite the assessor report, no.  It's just a

23  logical argument that I cite to how people make searches

24  on-line.  It's a dynamic process.  It's an easy way to get to

25  the next step.  So it's not well represented by the static

Page 113

1    response to the response -- by the response to a static

2    screenshot.

3        Q    So -- so that's just a logical way of responding.  I

4    am not sure where the -- the sources lie for that statement

5    that you just made.

6                MR. KIRKMAN:  Form.

7        A    So --

8                MR. KIRKMAN:  Excuse me.  Form.

9        A    Yeah.  I think -- I think I point out that the goal

10   of the study is -- So if you look at page seven, Section V-A,

11   the headline is my conclusion, and then I go into the details.

12   The design does not resemble the real world customer journeys

13   occurring at Skiplagged.com.  So if we back out, what are we

14   trying to get at here?  We're trying to make some inferences

15   about confusion and deception that occurs as people buy airline

16   tickets involving Skiplagged.com.  And in order to do that, you

17   have to recreate in the lab what is happening in the real

18   world.  And the design of the Wind experiment does not

19   sufficiently recreate or even -- even resemble what people do

20   in the real world when they buy tickets on-line on American

21   Airlines or through Skiplagged.com.  That's the point I am

22   making.

23       Q    Do you have data or analysis to support your opinions

24   that it does not resemble it?

25       A    Of course.

                                              Page 114

1          Q    Where is that data?

2          A    The documents that he shows, the static shots that he

3     provides.   I don't see any sequence of shots that he provides.

4     So he's done static screenshots and asked people their

5     opinions.   That is not a dynamic design.   And that's my basis

6     for saying that it doesn't resemble the actual journeys people

7     make.   And my source for pointing out how people make on-line

8     journeys are footnoted in the source that I cite, footnote

9     three, among other things.   If you want to look at the

10    literature, it's cited in that source.

11         Q    Well, footnote three assigns a search cost to

12    consumers.   Correct?

13         A    There's a lot more than that.

14         Q    But that's part of it.   Right?

15         A    A small part of it.

16         Q    Yeah.   And a consumer that searches just on Amazon

17    would have a lower or a zero search cost.   Right?

18         A    Among other things.   That's not the point of the

19    paper.

20         Q    Well, that's --

21         A    I don't know what you want me to --

22         Q    That's the footnote you're citing to back up what you

23    are saying right now, and I am showing how that is --

24         A    Let me read the footnote.   For more information --

25         Q    May I finish my question please?

                                                    Page 115

1    I said there.

2         Q    Well, I guess my issue here is I don't know in that

3    paper that discusses several different things what part of that

4    paper is backing up your opinion that you have put in your

5    expert report.

6         A    Fair enough.  And the answer is that it models a

7    dynamic process.  And the dynamic process is nowhere

8    implemented in the research and design used by Wind.

9         Q    But the parts of your -- Does that talk about

10   confusion?  Does your paper talk about confusion?

11        A    I -- I think we have gone over this ground before.

12   The paper is not about confusion.  The paper is about how

13   on-line searches differ from off-line searches.  And this is

14   trying -- This -- These experiments in the Wind report are

15   trying to gather inferences about on-line searches.  And my

16   point is that the on-line searches and their characteristics

17   are nowhere represented properly in the Wind experiments.

18        Q    Okay.  But do you agree that your paper is about

19   consumer searching across different websites of retailers?

20        A    It's about on-line searching and the dynamics of

21   on-line searching.  That's what it's about.

22        Q    Okay.  Is it -- So it's not about searching for a

23   single brand, a single product, is it?

24        A    Among other things it is.

25        Q    It is?  Because when I read it I understood it to be

                                                      Page 118

APP'X 062

 1    something about the real world.

 2              MS. PALNITKAR:  No.  Objection; nonresponsive.

 3         Q    I am not asking that.  I am asking do you have data

 4    that you have gathered and analyzed that shows that a dynamic

 5    search would have rendered different results than the

 6    experiments that Jerry Wind carried out?

 7         A    That is exactly what we prove in our paper.

 8         Q    But I am not asking about the paper because the paper

 9    was written before you started looking at this case.  Correct?

10         A    Yes.

11         Q    So I am not asking about the paper.  I am asking

12    about as it relates to this case do you have data that you

13    analyzed that shows that a dynamic search of these products

14    would render a different outcome than the experiments that

15    Jerry Wind conducted?

16              MR. KIRKMAN:  Form.

17         A    I do.

18         Q    Where is it?

19         A    It's in the report.  I show you that his exhibits do

20    not lead to the conclusions that he makes from those exhibits.

21    That's my analysis.  Now if you're asking me did I collect my

22    own data, no, I was -- I did not do any surveys with respect to

23    this case.

24         Q    And so you have no -- you have no data that you have

25    collected or analyzed on your own outside of the Wind report

                                                       Page 121

1   that will show that a dynamic search for any products will

2   render a different conclusion than what Dr. Wind has

3   ascertained in his experiments.   Correct?

4        A    So I want to make sure that I am answering the

5   question you asked.   If you're asking me have I collected any

6   data of any kind on my own other than looking in the U.S. DOT

7   statistics, the answer is no.

8        Q    Okay.   So let's get to -- Let's turn here to your

9   page eight where you say the Wind experiment design grossly

10  under-represents the large number of flights returned in the

11  real world customer journey at Skiplagged.com.   Do you see

12  that?

13       A    I do.

14       Q    So here am I correct that you are saying the Wind

15  report shows seven flights, but when you did your search on

16  your own you -- you looked at 200 flights or you had a return

17  of 200 flights?

18       A    So I would have to look through it carefully whether

19  those numbers are right, but the gist of it is essentially

20  correct that the static screenshot that is shown to the

21  respondents in the experiment grossly understates the large

22  number of flights that I found in my search.

23       Q    And why is that relevant here?

24       A    Because my response to a static screenshot is

25  dependent on the information I see in that screenshot.   That

Page 122

1    means the quality of information.  That means the amount of

2    information and the relevance of the information.  And what is

3    key in the search is the number of alternatives.  And here

4    you're asking me to respond to -- If I were a subject, you're

5    asking me to respond to a screenshot of a limited number of

6    flights which is completely different from my response to the

7    large number of flights.  And as long as we are talking about

8    the differences, let me also point out that when you do your

9    own search you can reorder those flights any which way you

10   want.  You can reorder them by price.  You can reorder them by

11   number of stops, all kinds of things.  You don't have any of

12   that there.  So not only do you have a smaller number, you

13   don't have the ability to format it the way you want to format

14   it.  So those are two big differences.

15       Q    Why are you looking at 200 flights which include

16   Alaska, Delta, Frontier and Spirit when we are searching for

17   American flights?

18             MR. KIRKMAN:   Form.

19       A    I did not search for an American flight.  I am

20   searching for a flight for the city pair.

21             THE REPORTER:  For the what?

22             THE WITNESS:  For the city pair.

23             MR. KIRKMAN:  P-a-i-r.

24             THE WITNESS:  P-a-i-r.

25       Q    Why are you not searching for an American flight?

Veritext Legal Solutions
800-336-4000

APP'X 065

```
 1                    MR. KIRKMAN:  Form.
 2        A    I told you what I did.  I searched for a city pair
 3   which are the same city pairs that he searched for in his
 4   design.
 5        Q    But you understand that this is a lawsuit brought by
 6   American as it relates to American flights.  Correct?
 7        A    I don't know that.  I don't know what the basis and
 8   scope of the lawsuit is.
 9        Q    Okay.  Well, I can represent to you that this is in
10   fact a -- I represent American Airlines.  We brought this
11   lawsuit against Skiplagged as it relates to American Airlines
12   flights.
13                    MR. KIRKMAN:  There are other factors involved
14   than just American flights.  So your representation is not
15   entirely accurate.
16                    MS. PALNITKAR:  Objection to the sidebar.
17                    MR. KIRKMAN:  Well, if you're going to make
18   representations, so am I.
19                    MS. PALNITKAR:  This has to do with Delta
20   flights?
21                    MR. KIRKMAN:  It has to do with all flights.
22                    MS. PALNITKAR:  All right.  I will leave that
23   there.  Objection to all that sidebar as well.
24        Q    So is it -- is it reasonable to conduct a survey to
25   consumers and show a list of 200 flights?
```

Veritext Legal Solutions
800-336-4000

APP'X 066

```
 1        A    No.

 2        Q    Okay.  Please tell me how I am wrong.

 3        A    I am critiquing his study -- his survey because he's

 4   only showing part of the results that would come from a

 5   consumer search.  So remember what the stimuli is supposed to

 6   be.  Let me read to you his instructions there.  Imagine that

 7   you wanted to book a round trip flight from Santa Anna to

 8   Miami, and you decided to use the Skiplagged website to book

 9   flights.  Below is the output you received when checking for

10   available flights.  That's my critique.  This is not the

11   output.  There's a lot more to it.

12        Q    Okay.  So it's an under-counting because it doesn't

13   show the flights across six airlines.  Is that part of the

14   sentence -- this last sentence on page nine?

15        A    He doesn't show the results.

16        Q    But am I correct that you are saying this is a gross

17   under-counting of the reality of the 200 plus flights across

18   six airlines returned in my actual customer journey?

19        A    It's -- it's an under-counting based on what I found.

20   I don't know what he originally found.

21        Q    Okay.  I am not asking about what he found anymore.

22   I am asking about what you found.

23        A    Okay.

24        Q    So you found 200 flights across six airlines.

25   Correct?
```

Page 131

1     A    That's right.

2     Q    For the city pair.  Is that right?

3     A    Right.  200 plus.  I don't know the exact number.

4     Q    Okay.  And because you found that volume of flights,

5  you say that his stimuli is a gross under-counting.  Is that

6  correct?

7     A    His stimuli is not a gross under-counting.

8     Q    His output.

9     A    The representation that that is the output -- Let me

10  read his words to you.  The instruction to the subjects are,

11  below is the output you received when checking for available

12  flights.  That is simply not represented by this.

13     Q    Okay.

14     A    That's my problem with it.

15     Q    So do you think a likelihood of confusion survey is

16  about how consumers would make choices amongst different

17  airlines?

18     A    It could be.  It doesn't have to be.  It could be

19  confusion about many things.  The possibility you cited is one

20  possible likelihood of confusion survey.

21     Q    Is that the survey that you understand Dr. Wind was

22  trying to run?

23     A    What survey?

24     Q    A likelihood of conversion -- confusion survey about

25  how consumers would make a choice amongst different airlines.

                                              Page 132

APP'X 068

1 minutes after I run the first search -- I assume you have

2 traveled by air before -- you would not get the same results.

3 You are going to get a huge variation of results.  15 minutes

4 after you book the flight the prices are going to be different.

5 The schedule is going to be different.  Airline traffic is so

6 heterogeneous and so variable.  You are not going to get the

7 same results.  But what I am saying is that you're going to get

8 many more results than the limited number of flights he shows

9 on this page.  That's what I am saying.

10  Q But you don't have data to show that more -- the

11 viewing of more results will result in a different outcome from

12 his experiments, do you?

13  A In all likelihood -- Sorry.

14   MR. KIRKMAN:  Form.  Go ahead.

15  A In all likelihood it would.

16  Q Do you have data to show that?

17  A Yes.

18  Q Besides in all likelihood?

19  A I have data that dynamic searches by customers are

20 dependent on the information they get.  The information they

21 get here is a truncated set of information.  Therefore, the

22 results are not generalizable to what they actually do in

23 practice.

24  Q That's great in theory.  I understand what you are

25 saying, but that's not my question.  My question is do you have

Page 135

1    data to show that in this situation an output of -- a viewing

2    of 200 plus flights across six airlines would create a

3    different outcome from the experiments that Jerry Wind had?  Do

4    you have that data and that analysis to show them?

5                    MR. KIRKMAN:  Excuse me.  Form.  Go ahead.

6         A    I don't know -- I have said many times I don't have

7    any data other than what I show you here.  <u>For me it is -- it</u>

8    <u>is a no brainer that if my choice set is 200 plus airlines</u>

9    <u>versus my choice set being one, two, three, four, five, six,</u>

10   <u>seven flights and two airlines, the results are going to be</u>

11   <u>different.</u>

12        Q    But that's to you it's a no brainer.

13        A    Yes.

14        Q    But there's no evidence to support that no brainer

15   theory.

16        A    <u>There's a lot of academic evidence showing that the</u>

17   <u>choice set presented to a customer has a profound effect on</u>

18   <u>their choices.</u>

19                    MS. PALNITKAR:  Objection; nonresponsive.

20        Q    I am talking here do you have data to show that this

21   viewing of 200 plus flights across six airlines spits out a

22   different outcome than Jerry Wind's report?

23                    MR. KIRKMAN:  Form.

24        Q    You don't have that data, do you?

25                    MR. KIRKMAN:  Form.

Veritext Legal Solutions
800-336-4000

APP'X 070

```
 1                    MR. KIRKMAN:   Form.
 2        A    So again, I don't choose the ones I -- I -- I am
 3   going to show.  I let the survey -- I let the -- the computer
 4   or the site that I am searching at tell me what my options are.
 5   And that's what I would do.  And if the options invariably are
 6   going to include multiple airlines, that's what will happen.
 7        Q    Okay.  So I am going to turn to page 11 of your
 8   report.  And if I am correct, you go to an American Airlines
 9   web page at this point in your -- in your experiment.  Is that
10   correct?
11        A    I wouldn't call mine as an experiment, but yes, I
12   went to the AA.com website.
13        Q    What should I term this -- this adventure you did?
14        A    My -- my little validation of what he's done.
15        Q    Okay.  In your validation the next step was that you
16   went to an American Airlines website.  Correct?
17        A    That's right.
18        Q    Okay.  And this is what came up.  Is that right?
19        A    That's right.
20        Q    When you searched for Santa Anna to Miami on the same
21   date, August 3rd, 2024?
22        A    It's not the only things that turned up.  You can see
23   I say the corresponding first page is shown below.  So that's
24   just the first page.
25        Q    Okay.  And in the text below that you write the
```

                                                    Page 140

```
 1        Q     Okay.  So the price at this point in your journey
 2   you're seeing that the price is $168 for the Skiplagged ticket.
 3   Is that correct?
 4        A     For a hidden city ticket, yes.
 5        Q     Yes.  Okay.  And then you go on to click -- Now I am
 6   on page 12.  You go to this screenshot.  And you said you
 7   clicked it.  You clicked on this book now.  Is that correct?
 8        A     Excuse me.  Yes.
 9        Q     Okay.
10        A     So I got to this page when I first selected the
11   flight.
12        Q     Okay.
13        A     And then you go to the next page if you click that
14   book now ticket.
15        Q     Okay.  Now we are going to page 13.  And it looks
16   like you got this pop-up box on your --
17        A     Correct.
18        Q     -- on your screen.  Correct?
19        A     Yes.
20        Q     Did you get this pop-up box the first time you went
21   through this journey when you were trying to book a ticket on
22   Skiplagged?
23        A     So my recollection is that every time you click on a
24   hidden city ticket you get taken to this page.  So to the -- So
25   once you -- once you click the book now box on a hidden city
```

Page 152

APP'X 072

1   ticket, you get to this page about important information of

2   your flight --

3       Q    Okay.

4       A    -- every single time.

5       Q    Do you recall if this is the first or second time

6   you -- you -- you tried to go down this path?

7       A    I tried different city pairs just out of curiosity,

8   and it always comes up with this -- this box.

9       Q    Even the first time you clicked book now this pop-up

10  box came?

11      A    I don't remember the sequence, but in every city

12  pair, if you click a hidden city ticket, you get this -- this.

13  And it's more than a pop-up box.  It's almost the entire

14  screen.

15      Q    If I told you that when I did it myself, the first

16  time I went through I did not get a pop-up screen, would that

17  surprise you or do you have something to --

18      A    I don't know.  I just don't know what -- how often

19  they present it.  My experience is that they seem to present it

20  very visibly and make you click through a couple of pages.

21      Q    Okay.  So again, I don't know when -- what date you

22  took these screenshots.  I haven't seen any dates listed here.

23      A    So, as I said, they were taken in May.  I believe it

24  would be May.  I thought URL had the -- the -- the date at the

25  top, but evidently it does not.  I can go back and look at

Page 153

1      Q    Do you know when that was changed from the former

2    pop-up box that appeared?

3              MR. KIRKMAN:  Form.

4      A    I only know what I see here.  I don't know of any

5    previous pop-up boxes and stuff.

6      Q    So if this pop-up box, two steps that you encountered

7    here was different than the one that was in place during the

8    time that Wind was conducting his experiments, would that

9    surprise you?

10              MR. KIRKMAN:  Form.

11      A    Nothing surprises me about airlines and airline

12    ticketing.  It's like trying to buy fish in a Persian fish

13    market.  But I would be surprised if there were no pop-ups

14    whatsoever.

15      Q    Okay.

16      A    So --

17      Q    That's good to know.  Okay.  So then you -- you

18    clicked it, and then this bad weather and angry airlines.  So

19    what -- what does this pop-up box -- What did you understand

20    this to mean?

21      A    Exactly what they write here.  They don't like you to

22    do this.

23      Q    Who doesn't like you to do this?

24      A    The airline.

25      Q    Do you know why?

                                                    Page 156

1    methodology are you referring to?

2        A    I have said this many times before.  It's laid out in

3    footnote five.

4        Q    So this is the first time we are talking about this

5    page, so I haven't asked you this question before.

6        A    I meant --

7                MR. KIRKMAN:  That is not accurate.  You have

8    talked about this page before.  Don't make statements, ma'am.

9    Just ask questions.

10               MS. PALNITKAR:  Objection to the sidebar.

11   Bill --

12               MR. KIRKMAN:  I am telling you if you don't stop

13   making statements, we are going to quit.  Ask questions.  You

14   just made a statement that's not true.

15               MS. PALNITKAR:  I am asking from -- from

16   sub-heading B what accepted practice and methodologies are you

17   referring to.  Do you have an objection?

18               MR. KIRKMAN:  It wasn't what I objected to.  He

19   answered that question.  Then you made a statement that was

20   incorrect.  Now if you have questions, ask them.

21       Q    My question is what accepted practice and methodology

22   are you referring to on page 16 where you say the measurement

23   of subjective concepts like deception and confusion in the Wind

24   experiment does not resemble accepted practice and methodology?

25               MR. KIRKMAN:  Objection; form.  Asked and

                                              Page 167

1   answered.

2        A    I think I have answered it before.  I will repeat it.

3   It's described in footnote five.

4        Q    Okay.  And does -- Footnote five is a paradigm for

5   developing better measures of marketing constructs.  Correct?

6        A    That's what the title of the paper is, yes.

7        Q    What does the paper discuss?

8        A    I tell you what the -- the relevance of the paper is

9   to this case in the next sentence, the three important

10  elements.  And then I describe what they are.

11       Q    My question is what does this paper discuss, not the

12  relevance.

13       A    It discusses exactly how to develop a decent measure.

14       Q    Of what?

15       A    Of a subjective concept.

16       Q    In a likelihood of confusion survey?

17       A    In any subjective concept.

18       Q    Does it cover likelihood of confusion surveys in the

19  paper?  I didn't see it.

20            MR. KIRKMAN:  Form.  Excuse me.  Form.

21       A    Confusion is the construct here.  So confusion is a

22  subjective concept.  Subjective concepts include personality

23  traits, attitudes, any of those things, deception, confusion,

24  opportunism, all of those things.  And they're all under this

25  headline of this foundational study.  The -- the applicability

1    of the study is broad and would certainly include confusion.

2         Q    But does it include likelihood of confusion surveys

3    as they are conducted to offer --

4                   MR. KIRKMAN:  Sorry.  Go ahead.  Let her

5    finish.

6         Q    -- as they are conducted to offer into evidence into

7    court?

8                   MR. KIRKMAN:  Form.

9         A    If you show me a likelihood of confusion survey, I

10   can show you how it follows this procedure.  And if it doesn't

11   follow the procedure, I would think it's a bad survey.

12        Q    I did show you one.  It's the Wind survey.

13        A    Oh, that's not doing it properly, as I said many

14   times in this study.

15        Q    Why not?  Why is that lacking accepted practice and

16   methodology?

17        A    Sure.  Let's start with the first item.  It never

18   defines the concept.

19        Q    Okay.  You understand that -- Oh, is there a legal

20   definition that you have reviewed that is the definition of

21   confusion or deception?

22        A    No.

23        Q    Okay.  So you're relying on marketing definitions of

24   deception and confusion?

25        A    No.

                                                    Page 169

APP'X 077

```
 1        Q    What -- Where are you getting your definition of

 2   deception and --

 3        A    I don't offer a definition.

 4        Q    But you want Wind to offer a definition?

 5        A    Yes.

 6        Q    Do you have the appropriate definition he should have

 7   offered?

 8        A    No.  I -- I would like to see the definition he is

 9   using.  The point is anybody who sets out and measures

10   something should start with a definition.  So that's what I am

11   looking for, and it's not present here.

12        Q    Why is a definition important to offer to your survey

13   respondents?

14        A    Because the foundational practice as described in

15   that paper and done tens of thousands of times since that paper

16   was published always starts with a definition of a concept.

17   Without defining a concept we would be going on in circles as

18   to the meaning of what we are trying to measure.

19        Q    If you ask a consumer if they think that Skiplagged

20   is affiliated with American Airlines and they answer yes, have

21   you not just witnessed confusion?

22        A    No.

23        Q    Why not?

24        A    Because that's not an acceptable way to measure

25   confusion.
```

1      Q      It's not acceptable to ask a consumer if they think

2      Skiplagged is affiliated with American Airlines and then

3      understand their response as to indicate whether or not that

4      respondent was confused?

5      A      I just said that.

6      Q      Sorry?

7      A      I just said that.  That would not be a right --

8      proper way following accepted practice to measure confusion.

9      That's right.

10     Q      You understand that these questions have been asked

11     in countless amounts of surveys that have been accepted by the

12     Court and are deemed acceptable uses?

13                    MR. KIRKMAN:  Now, wait a minute.

14     Q      Do you understand that?  Do you know that for sure?

15                    MR. KIRKMAN:  I am going to object.  You're

16     stating again.  Form.

17     A      If you want to show me a survey, I will be happy to

18     give you my opinion on it.  I don't have any generalized

19     opinions about the quality of surveys done in the litigation in

20     cases.

21     Q      Okay.  Okay.  Let's continue.  There are three

22     important elements to developing method -- methodologically

23     acceptable measures of a subjective construct like deception or

24     confusion.  The concept must be properly defined.  Actually let

25     me strike that question.  I am just going to move on.  The last

Page 171

1    sentence of page 16 says I assess whether the Wind report

2    follows these practice elements.  What are you using to assess

3    whether he is following the elements?

4         A    Just my eyes.  I can read the report and see there's

5    a definition.  I can see there are multiple questions developed

6    to create a scale.  And I can see if there's any evidence of a

7    stability.  There's none of those three.

8         Q    And do you have any data to show that if done another

9    way stability would result?

10        A    I know how you get stability.  I know the right way

11   to do it.  I was not asked to do any survey, and I have said

12   many many times I have not collected any data on my own.

13        Q    So you don't know if doing it on your own would have

14   created a different result, do you?

15        A    I do know that.

16        Q    Oh, and that's because of the footnote three

17   literature?

18        A    It's because of the generalized notions of how you go

19   about developing a decent measure of a subjective construct.

20   And this does not match any of those things on those three

21   elements.

22        Q    And the -- I am going to go back to footnote three.

23   That's the data that you state generally governs this.

24   Correct?

25                  MR. KIRKMAN:  Form.

                                                   Page 172

APP'X 080

```
 1          A     No.

 2          Q     On page six?

 3          A     No.

 4          Q     Okay.  How is that different from your understanding

 5     of how to conduct the subjective construct study?

 6          A     So the --

 7               MR. KIRKMAN:  Form.

 8          A     So footnote three speaks about how people behave

 9     on-line.  It's about the dynamic process that you now have to

10     simulate in your experiment or that you now have to create in

11     your lab.  Footnote five talks about how you go about measuring

12     a subjective construct.

13          Q     Okay.

14          A     Let me just double check and make sure it is indeed

15     footnote five.

16               MR. KIRKMAN:  Footnote five is on page 16.

17          A     Yes.  Thank you.  So footnote five is about the

18     methodology.  And footnote three is about dynamic process.

19     While we are at it, so footnote four actually tells you when I

20     accessed those flights.  It's May 19th, 2024.

21          Q     What page is footnote four on?

22          A     Page --

23               MR. KIRKMAN:  Eight.

24          A     Eight.  Yeah.

25          Q     May 19th, 2024?
```

1          A    Correct.

2          Q    Okay.  Thank you.  Okay.  So footnote three relates

3    to the on-line dynamic journey.  Is that correct?

4          A    That's right.

5          Q    And footnote five relates to a methodology for

6    measuring subjective marketing constructs.  Is that correct?

7          A    Subjective concepts regardless of the field.

8          Q    Okay.  Subjective concepts.  And here in the last

9    sentence, part B --

10                MR. KIRKMAN:  What page are you on?

11                MS. PALNITKAR:  16.

12         Q    You say there are three important elements to

13   developing -- and I have said this already.  I'm sorry.  Three

14   important elements to developing methodologically acceptable

15   measures of a subjective construct like deception or confusion.

16   A, the concept must be properly defined.  We discussed that.

17         A    Yes.

18         Q    B, based on this definition a scale preferably

19   comprised of multiple close-ended question statements is

20   developed.  And C, evidence of its stability is reported.  So

21   let's look at B for a moment.  Why are -- Why is it a

22   preference to have closed-ended questions in a likelihood of

23   confusion survey?

24                MR. KIRKMAN:  Form.

25         A    It's not confined to likelihood of confusion surveys,

                                                   Page 174

1    first of all.   When you're measuring any subjective concept,

2    open-ended questions as opposed to close-ended questions give

3    you a lot more instability in originating responses.   It is

4    much less stability with close-ended questions.

5         Q    I understand.  But my question is tailored to

6    likelihood of confusion surveys, and that's what I am asking

7    about.  So it is defined when I am asking my question.  I am

8    asking why is a close-ended question preferable in a likelihood

9    of confusion survey?

10              MR. KIRKMAN:  Form.  Asked and answered.

11        A    For the same reasons as I just stated before, because

12   it will give you more stable answers and less noise in the

13   system.

14        Q    Have you reviewed any case law when it comes to the

15   admissibility of open-ended questions in a likelihood of

16   confusion survey?

17        A    I have not.

18        Q    Let's go through one.  I am going to mark number 5.

19             (Exhibit 5 was marked for identification.)

20        Q    Are you familiar with courts preferring open-ended

21   questions to likelihood of confusion surveys?

22              MR. KIRKMAN:  Form.

23        A    I have no idea what they prefer.

24        Q    So you don't know in a likelihood of confusion survey

25   if it is preferable to have close-ended or open-ended

                                                    Page 175

Veritext Legal Solutions
800-336-4000

APP'X 083

 1    this.  I don't care what you purport to represent to him.  I

 2    mean --

 3              MS. PALNITKAR:  Are you making an objection

 4    right now?

 5              MR. KIRKMAN:  Yes.

 6              MS. PALNITKAR:  State it for the record.

 7              MR. KIRKMAN:  Form.  It -- it involves a matter

 8    that has nothing to do with this case.  You're asking him to

 9    comment on some judge's statement as to the law --

10              MS. PALNITKAR:  Okay.  You're --

11              MR. KIRKMAN:  -- and admissibility.

12              MS. PALNITKAR:  Objection to the sidebar.  You

13    are just now directing your client in how to answer without

14    making proper objections under the Federal Rules of Evidence.

15    That's not a proper objection, and you know it.

16              MR. KIRKMAN:  If you started by asking a

17    question that was proper under the Federal Rules of Evidence, I

18    wouldn't have to make that objection.

19              MS. PALNITKAR:  I am about to ask the question.

20        Q    Does this -- Does this change your mind on whether

21    open-ended questions are considered acceptable in a legal

22    likelihood of confusion survey?

23              MR. KIRKMAN:  Form.

24        A    So my objection -- My -- my critique of the Wind

25    report is on several points.  If I read what is written here,

                                                    Page 178

1    it looks like the Court is open to close-ended questions, open

2    to open-ended questions, and that's what I read.   It doesn't

3    change my opinion as to which one offers more reliable evidence

4    of any subjective concept.

5        Q    Right.   Not just related -- Your opinion is not just

6    related to likelihood of confusion surveys.   Correct?

7        A    That's right.

8        Q    Okay.   Let's go on.   I am going to page 19.

9        A    Okay.

10       Q    In B you say instead of the preferred close-ended

11   responses, comma, the Wind report employs open-ended responses,

12   comma, but there is no systematic procedure reported that was

13   used to convert the open-ended textual responses into

14   categories.   Just taking the first part of that phrase, the

15   Wind report employs open-ended responses, do you have -- do you

16   take issue with the Wind report using open-ended responses?

17       A    Exactly as I say, it's preferable to use close-ended

18   responses, yes.

19       Q    And is using open-ended responses something that

20   makes the survey invalid?

21            MR. KIRKMAN:   Form.

22       A    Nothing makes a survey invalid or valid in -- in --

23   by picking out one element.   It's the totality of everything we

24   talked about here.   So what I write here is that I would prefer

25   to use close-ended responses based on the literature.   But if

                                              Page 179

1   you're going to use open-ended responses, what I -- what is

2   distressing to me is that there's no systematic procedure

3   reported that converts the open-ended responses into numerical

4   categories, countable categories.

5       Q    And where is the data cited that says it is better to

6   convert open-ended responses into categories?

7       A    He reports counts.

8       Q    What data do you have to make that assertion?

9       A    I am looking at his counts.  How does he come up with

10  those counts?  You can't have counts without having converted

11  text into numbers, categories.  So that's what my point is.

12  That the procedure by which he comes up with those results is

13  not reported.

14      Q    And that is your observation.  Correct?

15      A    That is my observation, yes.

16      Q    And so you are saying that there's no systematic

17  procedure reported that was used to convert responses into

18  categories.  And that's because you say so?

19           MR. KIRKMAN:  Convert open-ended textual

20  responses into categories.

21           MS. PALNITKAR:  Agreed.  Let me strike that last

22  question.

23      Q    So you are saying there is no systematic procedure

24  reported that was used to convert the open-ended textual

25  responses into categories.  And that is a flaw in his --

                                          Page 180

1          A     One of the many flaws, but I expand on that.  On the

2    bottom of page 19 I tell you what my particular problem with it

3    is.  It says no such coding scheme development procedure is

4    reported in the Wind report.  Instead the brief description

5    provided in the report on page 26 alludes to the procedure

6    involving two independent coders, and that's quoting from the

7    report, who are not familiar with the objective study or

8    responses and a procedure for resolving conflicts of two

9    coders.  We are not told what the procedure looks like.  We are

10   not told what the degree of agreement is.  We are not told how

11   they resolve the conflicts.

12         Q     Do you have any literature or data that supports that

13   you must be told the coding scheme for an open-ended question?

14         A     Of course.

15         Q     Where is that?

16         A     In any academic journal you would never get passed

17   the desk reject setting if you don't tell people what you do.

18         Q     But have you put that citation into this report?

19         A     I don't need to put a citation.  That would be true

20   of any academic.  It would also tell you that if you did

21   something, you took text and you converted it to numbers, you

22   would have to show me how you did it.  And that is not done

23   here.

24         Q     So there's no cite to --

25         A     It's not a citation.  It's a procedure.  It's just

                                                      Page 181

1    simply telling you what did you do.

2        Q    So that's because -- This is because you say so then.

3    You -- you are saying that someone needs to write a coding

4    procedure?

5              MR. KIRKMAN:  Form.

6        A    I hope my entire report is what I am saying.  So yes,

7    I'm the one saying it.

8        Q    Right.  Well, I am looking for some kind of outside,

9    not you literature, that shows that a coding scheme has to be

10   developed.

11       A    And I am telling you that there is no academic person

12   of any respectability who would tell you that I can go and

13   convert textual responses into categories without telling you

14   how he did it.

15       Q    Okay.  But you don't have any of that external data

16   here in this report?

17       A    That's like asking me if I have two eyes.  Do I?

18       Q    I don't know.  Only you know.  One might not work.

19       A    That's called inter-subjectivity, but anyway.

20       Q    Okay.  So you are saying that this is a flaw because

21   there's no coding scheme reported.  Correct?

22       A    One of the many flaws.

23       Q    And that a coding scheme must be present because in

24   your expertise it should be present.  Correct?

25       A    I tell you why in point C.

                                                    Page 182

1      Q    But my question is is it because it's in your

2    expertise that it should be present?  Is that correct?

3      A    No.  It's because you cannot judge the reliability of

4    a measure without seeing how it was developed.  It's as simple

5    as that.

6      Q    I understand, but there's no -- there are citations

7    in here that refer to where other literature says that.  Right

8    now it's just you saying that.  Correct?

9                MR. KIRKMAN:  Form.  Asked and answered three

10   times.

11     A    I will repeat myself.  I am saying it because that --

12   that would be the position of any academic who develops

13   measures of subjective concepts.

14     Q    But no other academics are listed here.  So again, I

15   am asking is this right now as it is on this paper because you

16   say so?

17     A    You know, this is the equivalent if you ask me if the

18   earth is flat.  Okay.  So that's what's going on here.  What I

19   am saying is that this is such a commonly known thing that if

20   you want to go back into stability of measures, you can go back

21   to footnote five and see how the procedure works, and that

22   would tell you why you would want to have evidence of

23   reliability and how you develop evidence of reliability.  So

24   the details are there, and that's a foundational paper.  And I

25   don't cite to anything else besides that foundational paper.

Page 183

1                    MS. PALNITKAR:  Objection; nonresponsive.

2      Q    I am asking if the only back-up to your assertion

3   that a coding scheme must be proffered by Jerry Wind, is the

4   only back-up to that your opinion as we sit here today?

5                    MR. KIRKMAN:  That's the fifth time you've asked

6   that.  Don't answer that question.

7                    MS. PALNITKAR:  He hasn't answered.

8                    MR. KIRKMAN:  I have had it.  You have asked

9   that five times, ma'am.  And he's given you five times answers.

10                   MS. PALNITKAR:  I have objected that that last

11  answer was nonresponsive.  I am entitled to ask the question.

12                   MR. KIRKMAN:  You are entitled to get an answer,

13  and he's answered it five times.

14     Q    Do you cite any literature in here that states that a

15  coding scheme must be stated in a survey?

16     A    The way you develop a survey is established in

17  footnote five.  The details are there.  I do not cite every --

18  I don't cite papers for every single element of every step of a

19  procedure.  It's common sense that if you have a bunch of text,

20  to make it into numerical categories you have to tell me how

21  you went from the words to numbers, and it's not done here.

22  That's all I am saying.

23     Q    If you have a Ph.D. who's writing a thesis and they

24  make numerous assertions which are not supported by citations,

25  would you consider that to be reliable?

                                                    Page 184

```
 1          Q     Right.

 2          A     So essentially they're saying that those flights

 3    which exploit loopholes are going to be cheaper than the

 4    flights that don't.

 5          Q     So the flights on a Skiplagged's website will be

 6    cheaper than the flights on another website?

 7                MR. KIRKMAN:   Form.  Asked and answered.

 8          Q     Is that what that is saying?

 9                MR. KIRKMAN:   Form.

10          A     No.  What it's saying as I read it is that it's

11    saying, hey, our website shows you these hidden city tickets,

12    if you want to think of it that way.  Those prices are going --

13    are not available in other websites.  And those are going to be

14    cheaper.  It's going to save you money.

15          Q     On Skiplagged?

16                MR. KIRKMAN:   Form.

17          A     On -- Yeah.  They're talking about their site, yes.

18          Q     Okay.  And on the last -- Well, I think we have done

19    that.  Going on to page 24, the third paragraph down that

20    starts with to sum up.

21          A     Okay.

22          Q     On the second sentence it says from my short testing

23    I did not find that Skiplagged made any claim about expected

24    price differences.

25          A     Yes.
```

Page 202

```
 1        A    Hang on for a second.  Let me just -- I have got
 2   Exhibit 2.  Yes.  Go ahead.
 3        Q    So Dr. Wind -- Does Dr. Wind ask if -- in his
 4   experiments if the consumers believe American is affiliated
 5   with Skiplagged?
 6        A    So on page 25 I reproduced the question number two
 7   that he asks after people see the -- the screenshots.  And it
 8   says does the company that operates this website have a
 9   business connection or association with another company or do
10   you not know.
11        Q    So yes, he does ask that?
12             MR. KIRKMAN:  Form.
13        A    That's the question he asks, yes.
14        Q    Okay.  And you say there is a flaw in this.  Correct?
15        A    Well, that's overly broad.  What I basically say --
16   My problem with the interpretation of the response is that I
17   don't know what these words mean and what they -- how he,
18   Professor Wind, proposes to define them.  And I don't know how
19   consumers define them.  I -- I think it's pretty telling that
20   the largest response is I don't know because they probably have
21   no idea what these words mean.
22        Q    But the words business -- They don't know what the
23   words business connection or association means?
24        A    So again, the problem is that it goes from that
25   statement to these terms called as -- either as an authorized
```

Page 206

 1    travel agent or having some other direct relationship with

 2    American and -- or authorized buy.  That's -- that's what he

 3    says in a summary.  And it's a long way to go from the response

 4    to that question, open-ended I might add.  I think -- I believe

 5    it was open-ended where the largest single response was don't

 6    know.  Let me just back up for a second.  I am not sure if

 7    that's open-ended or close-ended, but we do know that don't

 8    know is one of the responses.  So that -- that's my response

 9    that these terms are not commonly known to consumers.  So

10    asking a question like this is -- is asking a very, you know,

11    difficult question.  And the answers that come back are going

12    to reflect their lack of knowledge.  Nothing more.  Nothing

13    less.

14        Q    You -- Is the purpose of the survey to test

15    consumers' perceptions on a given question?

16              MR. KIRKMAN:  Form.

17        A    All I know is the conclusion of the survey or the

18    experiments is that it can -- and let me read.  Skiplagged

19    confuses consumers into believing that Skiplagged is associated

20    with or authorized by American.  And I leave off the stuff in

21    parentheses.  So confusion is part of it.  A belief that is

22    apparently inaccurate is part of it.  And -- and the element

23    that it's involved with, the belief and the confusion is about

24    the nature of the relationship between between Amazon -- Amazon

25    -- American and Skiplagged.

Veritext Legal Solutions
800-336-4000

APP'X 093

```
 1                MS. PALNITKAR:  Objection; nonresponsive.

 2        Q    I am asking you if you understand that the surveys --

 3   these questions are posed to test consumers' perceptions?

 4                MR. KIRKMAN:  Form.

 5        A    I don't know what the survey's purpose is.  I do know

 6   what the conclusions are and what the stimulus is.

 7        Q    But when you're asking a question to a survey

 8   respondent does this -- does the company that operates this

 9   website have a business connection or association with another

10   company or do you not know, this is testing what they believe.

11   Correct?  What the consumer believes, the respondent believes.

12        A    It is trying to do that, but I don't think it does

13   that.

14        Q    But I am not asking if it's trying.  I am saying is

15   that what it's asking?  It's asking for their perceptions.

16                MR. KIRKMAN:  Form.

17        A    I don't know what it's asking because I don't know

18   what the responses mean.  I don't know how they interpret this

19   question.  The question is so ambiguous about the association

20   and business connection.  I have no idea what those responses

21   are.  It's a poorly-worded question, and the responses tell me

22   nothing about their beliefs other than they don't know.

23        Q    So you're telling me you don't understand what this

24   question means?

25        A    Yes.
```

Page  208

APP'X 094

1     Q    Several consumers understood it because they made a

2    response.

3     A    Please show me how they understood it.

4     Q    It's all in Jerry Wind's report.  You --

5     A    If you can point one to me.  I told you a minute ago

6    I accept the don't know responses.  That tells me something.

7    And I point out it's unsurprising that the don't know response

8    is the largest single category of response.  The other

9    responses are just a confused mess.  They don't know what --

10   what these responses -- They meaning Wind doesn't know what

11   these responses mean because people don't know what business

12   connection or association means.

13        Q    So normal people don't know what association means?

14        A    That's right.  A business association, not an

15   association between two people.  These are business

16   associations.  They have no idea what their contract and

17   obligation or agreements between any airline -- any of these

18   websites is.

19        Q    But you understand we are not asking them to evaluate

20   a legal relationship.  We are asking them if they believe there

21   is an association between two businesses.

22              MR. KIRKMAN:  Form.

23        A    I can see what you're asking them, and I am telling

24   you that you cannot interpret the responses because this is a

25   very ambiguous question.

Page 209

1      Q      It's ambiguous because the word association is not

2    defined?

3      A      Because business connection and association are not

4    terms that are available to an ordinary consumer, especially

5    when it talks about the connection between two companies.  They

6    never see it.  They don't see these documents.  They don't know

7    how it works.  I couldn't tell you how Expedia makes its money.

8    I would have to go find out from Expedia.  And that's part of

9    its business relationship with whoever they deal with.

10     Q      But this question isn't asking about how people --

11   how businesses make their money.  They are asking if there is a

12   connection between two businesses.  And you are saying

13   that's -- that's something that's over the heads of a normal

14   consumer?

15     A      No.  It's not over the heads.  You are going to get a

16   variety of interpretations.  That's what I am saying.  It's an

17   ambiguous question.

18     Q      And is that what -- Okay.  And is that what the

19   survey was trying to find out is what their interpretations

20   were?

21                 MR. KIRKMAN:  Form.

22     A      I don't think so.  I don't think we would interpret a

23   business connection as what a customer thinks.  I think

24   business connection is an objective thing that can be

25   ascertained by looking in the documents.

Page 210

1      Q     The last line.   There is no data in the Wind report

2  that customers' lack of knowledge about the AA Skiplagged.com

3  business relationship has any negative impact on customers.   Do

4  you still believe that sentence to be true?

5      A     Absolutely.

6      Q     Why?

7      A     I mean there's -- there's the lack of data.   That's

8  number one.   There's no data in the report that any negative

9  impact is arising from their lack of knowledge.   So you have

10 two consents there, lack of knowledge and negative impact.   I

11 see no data actually on either one.   So there's no way you can

12 make a conclusion about a negative impact.   I write that

13 statement because normally generally if I don't know about

14 something, I usually have a modest expectation or maybe even a

15 negative expectation about a company I have never heard about,

16 about a product I have never seen, those kinds of things.   So

17 it's useful and very important to show that in fact that --

18 that the negative view I have of a company can be traced to my

19 lack of knowledge of it.   That's -- that's a very common

20 business problem.   I don't see any of that, any data speaking

21 to that here.

22      Q     Do you think that if a consumer thought -- or let me

23 scratch that.   If you thought that American Airlines and

24 Skiplagged had a business relationship, would you believe that

25 a ticket you bought on Skiplagged would be valid?

Veritext Legal Solutions
800-336-4000

```
 1                    MR. KIRKMAN:  Form.
 2        A    I think that's an overreach.  I don't think you
 3   can -- you can go to it's valid from a connection.  I think
 4   it's a lot more complicated than that.  It's the question of my
 5   expectation that the ticket is valid because it's, you know,
 6   the credit card is charged by American Airlines.  There are
 7   many many elements that go into it.  So I would be hard-pressed
 8   to say that I can conclude that something is valid or not
 9   valid, a binary outcome based on whether somebody has a
10   business relationship or not a business relationship.
11        Q    Is it possible that someone would think the ticket
12   they are buying on Skiplagged is valid?
13        A    Of course.
14        Q    Is it possible to think that someone would think a
15   ticket they're buying on Skiplagged is valid because Skiplagged
16   and American have a business relationship together?
17                    MR. KIRKMAN:  Form.
18        A    Anything is possible.  I just don't see any evidence
19   that the lack of knowledge which I -- which I infer from the
20   don't know being the most common response has anything to do
21   with their undisclosed negative effects on their -- on their
22   customers.  I don't see any evidence of any of this stuff.  So
23   all I am saying here is that there's no evidence of a negative
24   impact on consumers.  There's no evidence of lack of knowledge
25   leading to the negative impact.  And that's -- that's all I am
```

Page 214

1   saying.

2        Q    Okay.  Let's go to page 26.  Under number two, the

3   second paragraph that starts with in sum, do you see that?

4        A    Yes.

5        Q    I will read it to you.  In sum, comma, regardless of

6   whether customers are aware of the exact contractual details

7   between Skiplagged.com and American Airlines, comma, there is

8   no evidence that Skiplagged is deceptively creating consumer

9   confusion about the conditions of hidden city travel, period.

10  Do you still believe that sentence to be true?

11       A    Yes.

12       Q    Did you read the complaints, any of the content of

13  the various complaints that have been sent to Skiplagged.com?

14       A    I have glanced at some of those things, the

15  illustrative examples he provides.  I have not gone through

16  the -- the 88 complaints or however many there were in any --

17  any detail.

18       Q    The 12,000 complaints produced by Skiplagged?

19       A    If there are 12,000.

20            MR. KIRKMAN:  Wait.  Let her finish.  Form.

21       Q    There were 12,000 complaints produced by Skiplagged

22  in this case that Skiplagged received from customers.  Did you

23  have access to any of those?

24       A    I believe there were 12,000 e-mails coded as

25  complaints.  I have no idea how they were coded.  Those are --

                                                    Page 215

1    So I would have -- I don't -- I don't know the details of how

2    those data were produced or calculated to be 12,000.  What the

3    coding scheme -- Again, we come back to coding scheme.  So I

4    don't have any opinion on that.

5         Q    That data was produced by Skiplagged.com as -- when

6    we asked them for their customer complaints.

7         A    And I have had no contact with Skiplagged.com.  So I

8    can't vouch for what they have produced to you.

9         Q    Okay.  So you -- you can't say that there's no

10   evidence that Skiplagged is deceptively creating customer

11   confusion because you haven't seen the customer complaints,

12   have you?

13        A    I've --

14             MR. KIRKMAN:  Form.

15             THE WITNESS:  Sorry.

16        A    I have seen the illustrative examples cited in the

17   Wind report, and I have seen the data produced saying that

18   there's 12,000 complaints.  And I see no evidence that those

19   are connected to consumer confusion that -- created by

20   deception on Skiplagged's part.  That's what I'm saying.

21        Q    Because you haven't read those 12,000 complaints, you

22   don't know that there's evidence or not.  Right?

23        A    Reading those complaints would not improve or change

24   my opinion in this matter.  You have to do an analysis of who

25   was complaining about deception and whether in fact they

Page 216

 1    were -- they were confused and what the source of deception

 2    was.  There's a lot of -- There's a lot of links there in that

 3    causal chain.  And without investigating each link in the

 4    causal chain, I am not going to change my opinion that there is

 5    no evidence.

 6        Q    So you are saying there's no evidence because you

 7    haven't done the analysis?

 8                MR. KIRKMAN:  Form.

 9        A    No.  There's no evidence because none has been

10    presented to me, and I was -- I have told you several times I

11    have done -- produced no data or looked at any data and done

12    any data analysis on my own.

13        Q    Because it wasn't presented to you?

14                MR. KIRKMAN:  Form.

15        Q    And that's why there's no evidence.  Correct?

16                MR. KIRKMAN:  Form.  Form.

17        A    There is no evidence in the Wind report to start

18    with, which is the bulk of what I am relying on.  And there's

19    no evidence in the complaint data that is also contained in the

20    Wind report that such a conclusion that there is evidence

21    connecting consumer confusion about hidden city travel to

22    deception on the part of Skiplagged.  That's what I am saying.

23                MS. PALNITKAR:  I will pass the witness.

24                MR. KIRKMAN:  We shall reserve our questions

25    until the time of trial.

                                                    Page  217

```
1                        CHANGES AND SIGNATURE

2      PAGE      LINE      CHANGE                        REASON _

3      ___97_____4___"sites" to "cites"_____sounds alike

4      __113____16___"assessor" to "ASSESSOR"_____proper noun

5      __113____22___"assessor" to "ASSESSOR"_____proper noun

6      __146____24___"was asked" to "was not asked"__responded incorrectly

7      __175____4___"less"_to "more" _____responded incorrectly

8      __206____2___"buy" to"by"_____sounds alike

9      __213___10__"consents" to "concepts" _____sounds alike

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24

25     Job No. TX6791874
```

Page 219

1    I, GEORGE JOHN, PhD, have read the foregoing deposition

2    and hereby affix my signature that same is true and correct,

3    except as noted above.

4

5    _____

         GEORGE JOHN, PhD

6

7    THE STATE OF   _MN_   *

                           *

8    THE COUNTY OF _Hennepin_ *

9    BEFORE ME _George John_ , on this day

10   personally appeared GEORGE JOHN, PhD, known to be (or proved

11   to me under oath or through _MN Drivers Lic_ )

12   (description of identity card or other document) to be the

13   person whose name is subscribed to the foregoing instrument and

14   acknowledged to me that they executed the same for the purposes

15   and consideration therein expressed.

16   GIVEN UNDER MY HAND AND SEAL OF OFFICE this _10th_

17   day of _August_ , _2024_ .

18   _Seema Bhargava_

19

     NOTARY PUBLIC IN AND FOR

20   THE STATE OF MINNESOTA

21

22

23

24

25

                                                    Page 220

APP'X 103

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                       FORT WORTH DIVISION
 3    AMERICAN AIRLINES, INC.,      )
           Plaintiff,              )
 4                                 )
                                   )
 5    V.                           ) Civil Action No. 4:23-cv-00860-P
                                   )
 6                                 )
      SKIPLAGGED, INC.,            )
 7         Defendant.              )
 8
 9
10
11                     REPORTER'S CERTIFICATION
                  DEPOSITION OF GEORGE JOHN, PhD
12                    TAKEN ON JULY 9, 2024
13
14
15
16
17        I, RHONDA JACKS, Certified Shorthand Reporter in and for
18    the State of Texas, certify to the following:
19        That the witness, GEORGE JOHN, PhD, was duly sworn by the
20    officer and that the transcript of the oral deposition is a
21    true record of the testimony given by the witness;
22        That the amount of time used by each party at the
23    deposition is as follows:
24        MS. BINA PALNITKAR, 4 hours, 35 minutes.
25        MR. WILLIAM KIRKMAN, 0 hours, 0 minutes.
```

Page 221

APP'X 104

1          That pursuant to the information made available to me at

2     the time said deposition was taken, the following includes all

3     parties of record:

4          MS. BINA PALNITKAR, Attorney for the Plaintiff

5          MR. WILLIAM KIRKMAN, Attorney for the Defendant

6          That before the conclusion of the deposition, the witness,

7     GEORGE JOHN, PhD, did request a review of this transcript

8     pursuant to Rule 30(e)(1).

9          I further certify that I am neither counsel for,

10    related to, nor employed by any of the parties or attorneys in

11    the action in which this proceeding was taken, and further that

12    I am not financially or otherwise interested in the outcome of

13    the action.

14

15          Certified to by me, this 15th day of July, 2024.

16

17

18

19

20

21          RHONDA JACKS, CSR #3665

            Expiration Date:  10-31-2025

22          VERITEXT LEGAL SOLUTIONS

            Firm Registration No. 571

23          300 Throckmorton Street

            Suite 1600

24          Fort Worth, TX 76102

            817-336-3042

25

                                                 Page 222

1   William L. Kirkman - billk@kirkmanlawfirm.com

2                    July 15, 2024

3   RE: American Airlines, Inc. v. Skiplagged, Inc

4   DEPOSITION OF: George John , PhD (# 6791874)

5        The above-referenced witness transcript is

6   available for read and sign.

7        Within the applicable timeframe, the witness

8   should read the testimony to verify its accuracy. If

9   there are any changes, the witness should note those

10  on the attached Errata Sheet.

11       The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                          Yours,

19                          Veritext Legal Solutions

20

21

22

23

24

25

                                        Page  223