IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

**AMERICAN AIRLINES, INC.'S RESPONSE AND BRIEF IN OPPOSITION TO
SKIPLAGGED, INC.'S MOTION TO STRIKE TESTIMONY AND REPORT OF
PLAINTIFF'S EXPERT, DR. JERRY WIND**

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................................................ 1

II.   SURVEY BACKGROUND ................................................................................ 1

      A.    Dr. Wind's Qualifications ..................................................................... 1

      B.    Dr. Wind's Consumer Experiments and Report ................................... 3

            1.    Dr. Wind's Methodology ........................................................... 4

            2.    The Universe and Sample ........................................................... 9

            3.    The Results and Dr. Wind's Conclusions ................................... 9

III.  ARGUMENT AND AUTHORITIES ............................................................... 10

      A.    Legal Standard .................................................................................... 10

      B.    Dr. Wind's Report and Opinions Are Unquestionably Relevant to American's
            Trademark Claims and Copyright Damages......................................... 12

      C.    Skiplagged's Criticisms of the Reliability of Dr. Wind's Report and Opinions
            Are Not Only Meritless, But They Go Strictly to Weight, Not Admissibility. ... 14

            1.    Dr. Wind is Beyond Qualified—and Skiplagged's Argument to the
                  Contrary is Unbelievable. ......................................................... 14

            2.    Skiplagged Fails to Identify Any Deficiencies in Dr. Wind's
                  Methodology. ............................................................................ 16

            3.    Skiplagged's Argument that Dr. Wind's Survey Design "Was Unrelated
                  to the Trademarks" is Demonstrably False. .............................. 18

            4.    Dr. Wind's Use of Expedia as a Control Was Entirely Appropriate and
                  Only Validates the Reliability of His Report. .......................... 19

            5.    Dr. Wind's Opinions Are Based Directly on the Consumer Survey Data. 23

IV.   CONCLUSION................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                    PAGE(S)

*Am. Airlines, Inc. v. Delta Air Lines, Inc.*,
    No. 4:19-cv-1053-O, 2021 WL 3629735 (N.D. Tex. May 18, 2021)............................2, 11, 16

*Anheuser-Busch Inc. v. Stroh Brewery Co.*,
    587 F. Supp. 330 (E.D. Mo. 1984)...................................................................15, 16

*Anheuser-Busch Inc. v. Stroh Brewery Co.*,
    750 F.2d 631 (8th Cir. 1984) .............................................................................16

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)...........................................................................................12

*E.E.O.C. v. S&B Indus., Inc.*,
    No. 3:15-cv-0641-D, 2017 WL 345641 (N.D. Tex. Jan. 24, 2017)........................10

*Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*,
    754 F.2d 591 (5th Cir. 1985) .............................................................................13

*Hodgdon Power Co., Inc. v. Alliant Techsystems, Inc.*
    512 F.Supp.2d 1178 (D. Kansas. 2007) .............................................................19

*Holiday Inns, Inc. v. Holiday Out in Am.*,
    481 F.2d 445 (5th Cir. 1973) .............................................................................14

*Honestech, Inc. v. Sonic Sols.*,
    430 Fed. Appx. 359 (5th Cir. 2011)...................................................................14

*Jim S. Adler, P.C. v. McNeil Consultants, LLC*,
    No. 3:19-CV-2025-K-BN, 2023 WL 5600128 (N.D. Tex. July 27, 2023),
    *report and recommendation adopted*, No. 3:19-CV-2025-K-BN, 2023 WL
    5604169 (N.D. Tex. Aug. 28, 2023) ..................................................................10

*Knight v. Kirby Inland Marine Inc.*,
    482 F.3d 347 (5th Cir. 2007) .............................................................................12

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*,
    No. 08 C 242, 2010 WL 3397358 (N.D. Ill. Aug. 24, 2010)................................16

*Luckenbach Tex., Inc. v. Engel*,
    No. A-19-cv-00567-DH, 2022 WL 16857410 (W.D. Tex. Oct. 13, 2022) ...............11, 12, 16

*Miramax Films Corp. v. Columbia Pictures Ent., Inc.*,
    996 F. Supp. 294 (S.D.N.Y. 1998) ....................................................................16

*PBM Prods. LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) .................................................................................11

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) .................................................................................12

*Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc.*,
   No. 1:19-cv-00696-RP, 2022 WL 21739895 (W.D. Tex. May 18, 2022), *aff'd
   in part, rev'd in part on other grounds*, 80 F.4th 607 (5th Cir. 2023) .....................18

*Reynolds Consumer Prods., Inc. v. Handi-Foil Corp.*,
   No. 13-cv-214, 2014 WL 794277 (E.D. Va. Feb. 27, 2014) ...................................11

*Scott Fetzer Co. v. House of Vacuums Inc.*,
   381 F.3d 477 (5th Cir. 2004) ...........................................................................11, 14

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ...............................................................................11

*SunAmerica Corp. v. Sun Life Assur. Co. of Canada*,
   890 F. Supp. 1559 (N.D. Ga. 1994) ......................................................................16

*United States v. Valencia*,
   600 F.3d 389 (5th Cir. 2010) .................................................................................10

*YETI Coolers, LLC v. RTIC Coolers, LLC*,
   No. A-15-cv-597-RP, 2017 WL 11679718 (W.D. Tex. Jan. 27, 2017)...................16

### RULES

FED. R. EVID. 702......................................................................................................10

Plaintiff American Airlines, Inc. ("American") files this Response and Brief in Opposition to Defendant Skiplagged, Inc.'s ("Skiplagged") Motion to Strike Testimony and Report of Plaintiff's Expert, Dr. Jerry Wind and Brief in Support thereof [Dkt. Nos. 219, 220, 221] (the "Motion"), and respectfully shows the Court as follows:

## I.      INTRODUCTION

American retained Dr. Yoram (Jerry) Wind ("Dr. Wind") in this case to test whether Skiplagged's use of American's trademarks and registered flight symbol (the "American Marks") has caused or is likely to cause confusion in the marketplace. The data and results from Dr. Wind's surveys showed a high degree of confusion, so it is unsurprising that Skiplagged now seeks to exclude Dr. Wind's report and opinions. However, Skiplagged offers no valid basis to do so.

Skiplagged attacks Dr. Wind's report on three grounds. First, notwithstanding decades of experience, dozens of engagements to testify on this precise issue in courts across the country, and a host of well-cited publications, Skiplagged argues that Dr. Wind lacks relevant expertise and qualifications. This argument is frivolous. Second, Skiplagged argues Dr. Wind's survey is "not relevant." This also is meritless, as the survey tested Skiplagged's own website, which is littered with American's trademarks and copyrighted flight symbol, to determine whether consumers are likely to be confused—which is a contested fact at the heart of this litigation. Third, Skiplagged argues Dr. Wind's survey is not reliable. But Dr. Wind's survey meets all of the standards for reliability set out in the extensive body of case law relating to consumer surveys.

## II.      SURVEY BACKGROUND

### A.      Dr. Wind's Qualifications

Dr. Wind is one of the most prominent and accomplished marketing and consumer research experts in the country. [App'x 010–12, 148–154, 217–19 (Wind Report at 5–7, and Appendix A)]. A simple Westlaw search shows Dr. Wind referenced in no less than 62 court orders, opinions, or

judgments.[1] Dr. Wind has been retained and qualified by federal courts across the country as an expert witness in dozens of litigation matters involving trademark disputes—and his accomplishments are so impressive that his qualifications are rarely even challenged. In fact, he was recently admitted as an expert on likelihood of confusion surveys in the Northern District of Texas (Fort Worth Division). *See Am. Airlines, Inc. v. Delta Air Lines, Inc.*, No. 4:19-cv-1053-O, 2021 WL 3629735 (N.D. Tex. May 18, 2021). Throughout his academic and consulting career, he has designed and evaluated hundreds of likelihood of confusion surveys. He has also designed, conducted, and evaluated thousands of consumer research studies, including for use by businesses and lawyers.

It is difficult to conceive of anyone more qualified to design, implement, and testify on a consumer confusion survey than Dr. Wind.[2] Dr. Wind joined the Wharton School of the University of Pennsylvania in 1967 after receiving his doctorate in Marketing from Stanford. He presently serves as the Lauder Professor Emeritus and Professor of Marketing at Wharton. He also founded the Wharton Think Tank – The SEI Center for Advanced Studies in management and ran it for three decades. He has published 30 books and over 300 papers and articles on topics covering marketing strategy, marketing research, consumer behavior, buying behavior, advertising, and international marketing. Dr. Wind served as the editor-in-chief of the *Journal of Marketing*, has been an editor of special issues of many major marketing journals, including *Marketing Science* and *Journal of Market Research*, and has served on the policy board of the *Journal of Consumer Research and Marketing Science*. Throughout his long career, he has received numerous awards for his work, including the four major awards in the field of marketing: (i) MIT's Buck Weaver

---

[1] Westlaw Search: Yoram /2 Wind (Search Type: Boolean T&C; Content: Cases; Jurisdiction: All State & Federal.)

[2] The information contained in this summary is set forth in Dr. Wind's Report and Appendix A thereto. [App'x 010–12 (Wind Report at 5-7, and Appendix A)].

Award; (ii) the Charles Coolidge Parlin Award; (iii) the Paul D. Converse Award; and (iv) the AMA/Irwin Distinguished Educator Award. In 2003, he received the Elsevier Science Distinguished Scholar Award of the *Society for Marketing Advances*. He was also selected as one of the ten grand Auteurs in Marketing and was selected as one of the original Legends of Marketing in 2010, with an 8-volume anthology published by Sage in 2014. In 2017, he was one of four people inducted into the Marketing Hall of Fame.

In addition, Dr. Wind has taught MBAs, Ph.D.'s, and executive development courses on a wide range of marketing topics, led the creation of the Wharton Executive MBA Program, and was the founding director of the Wharton Future of Advertising Program. Beyond his academic work, Professor Wind has consulted extensively for over 100 companies and sits on the advisory boards of various companies and nonprofit organizations.

**B.      Dr. Wind's Consumer Experiments and Report**

As Dr. Wind described in his report, his objective in this case was "to assess whether, and to what extent, Skiplagged's published content and offerings on Skiplagged.com relating to American flights has generated confusion and deception in the marketplace, including as it relates to Skiplagged's perceived association with and/or authorization or sponsorship from American." [App'x 009 (Wind Report at 4)]. In pursuing this objective, he "considered whether Skiplagged's uses of the American Marks and data were likely to cause, or have caused, confusion amongst consumers who have booked airline tickets using a third party website in the past year, or who plan to do so." [*Id.*]. To that end, Dr. Wind "designed multiple consumer survey experiments to evaluate (1) the likelihood and degree of confusion among consumers as to Skiplagged's affiliation, connection, or association with American and/or as to American's sponsorship, approval, or authorization of Skiplagged's services in offering and facilitating the sale of American flights; and (2) the degree of consumer deception associated with Skiplagged's offerings." [*Id.*].

Ultimately, Dr. Wind found, "based on my analysis of the results of these consumer surveys, I have concluded with a reasonable degree of expert certainty that Skiplagged's activities (1) have generated confusion in the marketplace regarding Skiplagged's affiliation, connection, or association with American and American's sponsorship, approval, or authorization of Skiplagged's services, and (2) deceive consumers about the risks associated with its products/services." [*Id.*].

## 1.    Dr. Wind's Methodology

Dr. Wind designed and implemented two consumer experiments and validated them against other independent data, including consumer complaints to American and Skiplagged, consumer posts on social media, and marketing and consumer behavior theories and findings [App'x 013 (Wind Report at 8)]. "Because Skiplagged has two different airfare offerings—regular flight tickets and 'hidden city' tickets—[he] designed two related experiments, one for each type of offering," both of which were designed to test "whether consumers (a) perceive Skiplagged as an authorized agent of American or having some other association with American, and (b) are deceived by Skiplagged's advertising messages and offerings." [*Id.*]. In each of the experiments, the test groups "saw a Skiplagged.com web site offering for either a hidden city flight or non-hidden city ticket," and the "control groups saw a corresponding ticket offered on Expedia.com." [App'x 012 (Wind Report at 7)]. As shown below, the Skiplagged offerings shown to the test groups prominently displayed American's Marks in the same way Skiplagged customers encounter them.

### i.   *The Design*

To ensure the validity and reliability of the survey, "the research design relied heavily on responses to open-ended questions." [App'x 013 (Wind Report at 8)]. The questionnaire for both experiments contained the same parts and questions, adapted slightly to correspond with the

respective stimuli. First, the survey "show[ed] the respondents in the test group the Skiplagged flight offering and show[ed] the respondents in the control group the Expedia flight offering (see the Stimuli)." [*Id.*]. The test groups were shown, among others, the below stimuli of screenshots of Skiplagged's website showing its use of American's Marks—i.e., depicting/simulating how the consumer would encounter Skiplagged's use of the American Marks under actual, real-world conditions:

Test Group 1 – Skiplagged Regular (Non-Hidden City) Ticket Offering:

[App'x 231 (Wind Report, Appendix C-2)].[3] The control group for this experiment was shown the same flight offering on Expedia, which, unlike Skiplagged, is an authorized agent of American. [App'x 233-34 (Wind Report, Appendix C-2)]

Test Group 2 – Skiplagged Hidden City Ticket Offering:



[3] The enlarged images in the blue dotted boxes on this page and the next page are solely for the Court's reference in light of certain arguments made by Skiplagged in its Motion; such images were not called out in this manner when shown to the survey participants.



[App'x 222–224 (Wind Report, Appx. C-2)]. The control group for this experiment was shown the ticket offering for a corresponding flight to the intended destination on Expedia, which, in contrast to Skiplagged, is an authorized agent of American. [App'x 225–26 (Wind Report, Appx. C-2)].

Next, respondents were asked open-ended questions, followed by "the typical confusion questions regarding connection or association [] and permission or authorization [], with follow up probes of the reasons for their response." [App'x 013–14 (Wind Report at 8–9)]. For example:

- Q2: "Does the company that operates this website have a business connection or association with another company, or do you not know?"
  - Q3a [If respondent answered Yes to Q2]: "Which other company does the company operating this website have a business connection or association with?"
- Q4: "Does the company that operates this website require permission or authorization from any other company, or do you not know?"
  - Q5a [If respondent answered Yes to Q4]: "From which company is permission or authorization required?"

[App'x 024–25 (Wind Report at 19–20)]. Additionally, to further assure that the survey accurately captured respondents' beliefs/perceptions, they were also asked:

- Q7a: "What do you believe is the relationship between Skiplagged [or Expedia] and the airline?

    ☐ Skiplagged [or Expedia] is an authorized agent of the airline
    ☐ Skiplagged [or Expedia] is not an authorized agent of the airline
    ☐ There is some other relationship between Skiplagged [or Expedia] and the airline
    ☐ Don't know"

- Q11a: "Based on your understanding of the Skiplagged [or Expedia] offerings, please select the option you believe is correct or you 'Don't know.'

    ☐ Skiplagged [or Expedia] is an authorized travel agency with access to fares I could not access via the airline

    ☐ Skiplagged [or Expedia] is not an authorized travel agency and does not have access to fares I could access via the airline

    ☐ Don't know if Skiplagged [or Expedia] are an authorized travel agency

    ☐ Don't know if Skiplagged [or Expedia] have or do not have access to fares I could not access via the airline"

[App'x 025–28 (Wind Report at 20–23)]. Respondents were then asked a series of questions about, *inter alia*, their beliefs and feelings regarding the Skiplagged (or Expedia) offerings and the reasons for such beliefs/feelings. [App'x 014 (Wind Report at 9)]. Finally, the respondents were shown the offering on AA.com for the same/corresponding flight ticket and asked about their reactions after having this information to compare to the Skiplagged (or Expedia) offering. [*Id.*].

Expedia was chosen as a control to show what consumers' responses would be as to an *authorized agent* of American. [App'x 014 (Wind Report at 9)]. As Dr. Wind explained, the "interpretation of the difference between the test and control groups is that the closer the results for Skiplagged are to those of Expedia the greater the perceived confusion and deception. [*Id.*].

In addition, to validate the findings of his consumer experiments, Dr. Wind also reviewed and analyzed four independent sets of relevant data: (1) actual complaints to American; (2) actual complaints to Skiplagged (produced in discovery); (3) consumer posts on social networks; and (4) insights from consumer behavior and marketing theories and findings." [App'x 012 (Wind Report at 7)].

8

2.     **The Universe and Sample**

The universe for each study included U.S. consumers who (a) booked a flight in the past 12 months and/or intended to do so in the next 12 months, and (b) booked or intend to book their tickets through an online ticket website. [App'x 012 (Wind Report at 7)]. The sample was drawn to match the census data on gender, age, race, and geography to assure fair representativeness, and was further screened based on the relevant study criteria. [App'x 014–015 (*Id.* at 9–10)]. The total sample size was 600 participants:

| | Test | Control | Test | Control |
|---|---|---|---|---|
| | Skiplagged Ticket | Expedia Ticket | Skiplagged Hidden City Ticket | Expedia Ticket |
| Sample Size | 146 | 155 | 144 | 155 |

3.     **The Results and Dr. Wind's Conclusions**

Among the two test groups that were shown the Skiplagged ticket offerings, roughly 58% of respondents believed Skiplagged was either an authorized agent of, or otherwise associated with, "the airline" (American) (43% believed Skiplagged was an authorized agent and 15% believed it had some other relationship with American). [App'x 044 (Wind Report at 39)]. When combining the data of all relevant questions used to determine whether, based on the stimuli, respondents perceived that Skiplagged was authorized by or had some other relationship or association with the airline (American), between 73-76% of the test groups believed Skiplagged was associated with or authorized by American, which was just slightly below the 81-86% in the control groups who held the same beliefs as to Expedia. [App'x 047 (Wind Report at 42)]. Dr. Wind testified that this was "clearly [a] huge percentage of confusion among the highest levels in any study that I've done over the years." [App'x 244 (Wind Depo. at 246:17–20)].

It is worth noting that in the field of consumer surveys this is a *massive* amount of confusion; courts have found that surveys showing *15%* confusion were admissible as evidence of confusion. "Consumer surveys qualify as evidence of actual confusion, and the Fifth Circuit has

found a survey showing a 15% confusion rate to be 'strong evidence indicating a likelihood of confusion.'" *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, No. 3:19-CV-2025-K-BN, 2023 WL 5600128, at *9 (N.D. Tex. July 27, 2023), *report and recommendation adopted*, No. 3:19-CV-2025-K-BN, 2023 WL 5604169 (N.D. Tex. Aug. 28, 2023) (citing *Viacom Int'l v. IJR Cap. Inv., LLC*, 891 F.3d 178, 197 (5th Cir. 2018) and *Exxon Corp. v. Texas Motor Exch. of Houston, Inc*., 628 F.2d 500, 507 (5th Cir. 1980)).

After analyzing the data and results from the experiments, Dr. Wind concluded that, among other things, "Skiplagged's non-hidden city and hidden city ticket offerings deceive consumers to believe that Skiplagged is an authorized agent of or otherwise associated with American. [App'x 092 (Wind Report at 87)].

## III.    ARGUMENT AND AUTHORITIES

### A.    Legal Standard

For expert testimony to be relevant and admissible, it must (1) be offered by a qualified expert; (2) assist the trier of fact in understanding the evidence or determining a factual issue in the case; (3) be based on sufficient facts or data; (4) be based on reliable principles and methods; and (5) reliably apply these principles and methods to the facts of the case. FED. R. EVID. 702. More simply, expert testimony should be admitted if "(1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S&B Indus., Inc*., No. 3:15-cv-0641-D, 2017 WL 345641, at *2 (N.D. Tex. Jan. 24, 2017). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

"The Court's starting point in deciding the admissibility of the expert opinions and reports here are two foundational evidentiary principles" courts in this District recognize: (1) "the Rules of Evidence favor admission rather than exclusion"; and (2) "[v]igorous cross-examination,

10

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Am. Airlines*, 2021 WL 3629735, at *7 (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993)). And "[w]hen it comes to consumer perception surveys in trademark infringement cases, courts hold a clear preference for admissibility." *Reynolds Consumer Prods., Inc. v. Handi-Foil Corp*., No. 13-cv-214, 2014 WL 794277, at *6 (E.D. Va. Feb. 27, 2014); *see also PBM Prods. LLC v. Mead Johnson & Co*., 639 F.3d 111, 123 (4th Cir. 2011) ("[O]bjections based on flaws in the survey's methodology are properly addressed by the trier of fact."); *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) ("[A] jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value."). As Thomas McCarthy, a noted trademark law scholar, explains:

> The usual rule is that a professionally conducted survey that is relevant to the facts in issue will be admitted into evidence, with any deficiencies or shortcomings serving to reduce the weight the survey is given. . . .  Ordinarily, evidence from a professionally conducted survey should be found sufficiently reliable and admissible under the gatekeeping test of the Supreme Court's Daubert precedent.

5 MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs & Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 32:170 (5th ed. 2024) ("McCarthy").

Courts exclude surveys "[o]nly when 'serious flaws in a survey will make any reliance on that survey unreasonable' and 'no reasonable jury could view the proffered survey as evidence of confusion among relevant consumers.'" *Luckenbach Tex., Inc. v. Engel*, No. A-19-cv-00567-DH, 2022 WL 16857410, at *6 (W.D. Tex. Oct. 13, 2022)[4] (quoting *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 705 (S.D. Tex. 2009)); *Scott Fetzer Co. v. House of Vacuums*

---

[4] Notably, in *Luckenbach*—as in this case—defendant moved "to Exclude Survey Evidence and Opinion Testimony of Plaintiff's Expert **Dr. Yoram (Jerry) Wind**," where "Wind designed and conducted a survey to measure the consumer confusion, if any, caused by [defendant]'s use of the Luckenbach mark." *Id.* at *1-2. The court rejected each of the defendant's arguments/objections, denied the motion in its entirety, and found Dr. Wind's survey and opinions relevant, reliable, and admissible. *Id.* at *5-7.

*Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). Thus, "[i]t is routine to admit a relevant survey; any technical unreliability goes to weight, not admissibility." *Luckenbach*, 2022 WL 16857410, at *6 ("***Wind's survey is relevant and admissible***.") (emphasis added).

**B.    Dr. Wind's Report and Opinions Are Unquestionably Relevant to American's Trademark Claims and Copyright Damages.**

Skiplagged argues Dr. Wind's opinions are irrelevant because his "experiments and report did not specifically address AA's trademarks or their effect on consumers." [Dkt. 220 at 5]. This argument has no merit; Dr. Wind's surveys were purposely designed to show Skiplagged's *exact* use of American Marks to respondents to specifically measure the effect on consumers' perception.

To be relevant, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002); *Daubert*, 509 U.S. at 591. Relevance depends on "whether [the expert's] reasoning or methodology properly can be applied to the facts." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). Dr. Wind's report and opinions unquestionably meet these criteria.

Dr. Wind's survey and report assess whether and if Skiplagged's published content and offerings on Skiplagged.com relating to American flights has generated confusion and deception in the marketplace, including as it relates to Skiplagged's perceived association with and/or authorization or sponsorship from American. "To accomplish this objective, [he] considered whether Skiplagged's uses of the American Marks and data were likely to cause, or have caused, confusion amongst consumers." [App'x 009 (Wind Report at 4)]. Dr. Wind's survey used stimuli showing participants screenshots from Skiplagged's website of Skiplagged using American's Marks in connection with the sale of American flights, and then asked questions to assess their reactions. [*See* supra, pp. 5–7; App'x 013–14, 024–28 (Wind Report at 8–9, 19–23)].  In other words, the very purpose of Dr. Wind's survey and opinions were to assess likelihood of confusion,

which is "the central issue in any suit for trademark infringement." *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 594 (5th Cir. 1985).

Skiplagged also complains that the survey "focused on Skiplagged's 'offerings'" as opposed to "AA's trademarks." [Dkt. 220 at 6]. This is not a serious argument. Skiplagged's "offerings" presented in the survey *included the unauthorized American Marks* being used and displayed by Skiplagged:



[App'x 221–22 (Wind Report, Appendix C-2); *see also* supra, pp. 5–7]. Skiplagged's offerings shown to participants demonstrated Skiplagged's use of American's Marks, and the survey asked relevant questions about such stimuli designed to test the degree of consumer confusion resulting from such use. This necessarily and directly addressed the effects of Skiplagged's use of American's Marks.

Moreover, as to Skiplagged's suggestion that Dr. Wind's survey should have focused on and specifically asked about American's Marks themselves, those are the very type of leading questions that surveys must avoid. *See* McCarthy, § 32:172.

13

**C.    Skiplagged's Criticisms of the Reliability of Dr. Wind's Report and Opinions Are Not Only Meritless, But They Go Strictly to Weight, Not Admissibility.**

In assessing the reliability of a consumer survey, the Fifth Circuit looks "to two factors: first, the manner of conducting the survey, including especially the adequacy of the universe; and second, the way in which participants are questioned." *Scott Fetzer*, 381 F.3d at 487. Notably, Skiplagged does *not* directly challenge Dr. Wind's manner of conducting the survey, the adequacy of the universe, or the way participants were questioned. In any event, a survey will be excluded only if it is "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *Id.* at 488. Skiplagged's Motion comes nowhere close to making such a showing.

Moreover, alleged "methodological flaws in a survey" are generally not grounds for exclusion, but instead "bear on the weight the survey should receive, not the survey's admissibility." *Honestech, Inc. v. Sonic Sols.*, 430 Fed. Appx. 359, 361 (5th Cir. 2011); *see also Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("[T]he district court properly admitted the survey evidence in this case, leaving . . . the manner of conducting the survey for consideration as to the weight of this evidence."). Setting aside that the purported "flaws" Skiplagged argues are not actual flaws, Skiplagged's arguments are relevant only to the weight of Dr. Wind's opinions, not their admissibility.

**1.    Dr. Wind is Beyond Qualified—and Skiplagged's Argument to the Contrary is Unbelievable.**

Without any factual basis, Skiplagged argues that "Wind lack[s] experience in conducting consumer surveys." [Dkt. No. 220 at 6]. This argument is absurd.

Dr. Wind's report explains just how well-qualified he is: "In [his] teaching, research, consulting, editorial, and university positions, [he] ha[s] designed, conducted, and evaluated ***thousands of marketing and consumer research studies.***" [App'x 011 (Wind Report at 6)

14

(emphasis added)]. Dr. Wind's CV lists several *pages* of experience testifying in court on surveys, likelihood of confusion and related issues. [App'x 148–154, 217–219 (Wind Report, Appendix A)]. These facts alone are sufficient to dispose of this argument.

Skiplagged even acknowledged Dr. Wind's vast experience in designing and conducting likelihood of confusion studies. When asked by Skiplagged's counsel about "the process of designing your experiments" and "the requirements for designing a consumer experiment," Wind testified that he has "***conducted thousands of studies***, evaluated tens of thousands of studies," "know[s] how to design studies" and "a straightforward study to assess confusion and to determine if there is any deception," and that he "wrote the books on the topic." [App'x 242 (Wind Depo., 67:5–19)]. In response, Skiplagged's counsel acknowledged, "I understand you've done it for quite some time." [App'x 242 (Wind Depo., 67:20–21)]. Indeed, Dr. Wind has been conducting likelihood of confusion studies and serving as an expert in trademark cases for over 40 years. *See, e.g.*, *Anheuser-Busch Inc. v. Stroh Brewery Co.*, 587 F. Supp. 330, 336-37 (E.D. Mo. 1984); [App'x 148–154, 217–219 (Wind Report, Appendix A)].

Dr. Wind has "conducted and evaluated . . . consumer research for use in litigation, ha[s] been qualified as a marketing and survey research expert in court proceedings, and ha[s] testified at . . . trial in federal courts." [App'x 011 (Wind Report at 6)]. In just the last *six* years alone, Dr. Wind has served as an expert in at least **29 legal proceedings**, nearly all of them involving trademark-related claims and consumer studies. [App'x 217–219 (Wind Report, Appendix A, "Trial and/or Deposition Testimony 2018-2024")]. And that does not even include the countless trademark cases ***dating back to the 1980s*** in which Dr. Wind has testified as an expert and conducted and presented consumer surveys to assess consumer confusion, and in which courts found he was qualified and his surveys and opinions were relevant, reliable, and admissible. *See,*

*e.g.*, *Anheuser-Busch Inc. v. Stroh Brewery Co*., 750 F.2d 631, 639-40 (8th Cir. 1984); *Anheuser-Busch*, 587 F. Supp. 330, 336-37, n.8; *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 890 F. Supp. 1559, 1571-74 (N.D. Ga. 1994); *Miramax Films Corp. v. Columbia Pictures Ent., Inc*., 996 F. Supp. 294, 299 (S.D.N.Y. 1998); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *11, 15 (N.D. Ill. Aug. 24, 2010) ("Wind is a consumer survey expert . . . Wind's Opinion Regarding Consumer Confusion Is Admissible . . . In reaching his opinions, Dr. Wind applies his extensive expertise in the area of consumer research"); *Am. Airlines*, 2021 WL 3629735, at *5-7 (denying motion to exclude Wind's consumer confusion survey and opinions); *YETI Coolers, LLC v. RTIC Coolers, LLC*, No. A-15-cv-597-RP, 2017 WL 11679718, at *2 (W.D. Tex. Jan. 27, 2017); *Luckenbach*, 2022 WL 16857410, at *5-7.[5]

Skiplagged's brazen assertion that Dr. Wind's "experience with consumer surveys is confined to part of one chapter he wrote, with the help of co-authors, addressing consumer confusion" is simply not true. [Dkt. No. 220 at 7]. In view of his extensive CV, it is difficult to conceive of a good faith basis for this argument.  The Court should reject it entirely.

### 2.    Skiplagged Fails to Identify Any Deficiencies in Dr. Wind's Methodology.

Skiplagged argues that the methodology applied by Dr. Wind was "undermined" based on "mistaken assumptions" in the background section of the report. [Dkt. No. 220 at 7]. Yet, Skiplagged fails to actually identify any of the purportedly mistaken assumptions. Instead, it simply states—incorrectly, confusingly, and in purely conclusory fashion—that "sponsorship, approval, or authorization . . . were not analyzed in the context of analyzing Skiplagged's inclusion of the trademarks and its effect on AA." [*Id.* at 8]. As previously noted, Dr. Wind's report focuses on, and the stimuli presented to the survey participants prominently include, the American Marks

---

[5] These are but a few select examples; there are many, many more.

16

being used by Skiplagged on its website in connection with facilitating the purchase of American flights. It focuses on the American Marks in the context of Skiplagged's website because that is what this case is about.

Based upon that stimuli showing Skiplagged's use of American's Marks, the survey then asked respondents questions specifically designed to assess confusion or deception as to "sponsorship, approval, or authorization," including:

- Q2: "Does the company that operates this website have a business connection or association with another company, or do you not know?"

  - Q3a [If respondent answered Yes to Q2]: "Which other company does the company operating this website have a business connection or association with?"

- Q4: "Does the company that operates this website require permission or authorization from any other company, or do you not know?"

  - Q5a [If respondent answered Yes to Q4]: "From which company is permission or authorization required?"

- Q7a: "What do you believe is the relationship between Skiplagged [or Expedia] and the airline?

  - ☐ Skiplagged [or Expedia] is an authorized agent of the airline
  - ☐ Skiplagged [or Expedia] is not an authorized agent of the airline
  - ☐ There is some other relationship between Skiplagged [or Expedia] and the airline
  - ☐ Don't know"

[App'x 024–26 (Wind Report at 19–21)].

Skiplagged then criticizes the fact that participants were not "asked about any of the AA trademarks." [Dkt. No. 220 at 8], which as we have shown, is blatantly untrue. [*See* supra, pp. 5–7].[6] The stimuli show American's Marks being used and displayed on Skiplagged's website; in that context, asking respondents specifically about American or its logo/Marks being used on another company's website would have been improperly calling attention to the marks, a form of

---

[6] To the extent Skiplagged is arguing that a likelihood of confusion survey should include questions about American's trademarks specifically, that argument is in direct conflict on the extensive body of law surrounding consumer surveys. *See generally*, McCarthy § 32.172 (addressing slanted or leading questions in surveys).

leading respondents, which proper surveys intentionally avoid in order to ensure reliability. *See* McCarthy, § 32:172.

Lastly, Skiplagged's biggest criticism is that Dr. Wind considered "whether Skiplagged's uses of the American Marks *and data* were likely to cause, or have caused, confusion amongst consumers" and "failed to separate the marks from the 'data.'" [Dkt. No. 220 at 8 (emphasis in original)]. It is unclear what exactly Skiplagged is arguing here. In any event, it is well-recognized that the stimuli in a consumer survey should replicate how a consumer would encounter the use of the mark in real-world conditions, and Dr. Wind's use of screenshots directly from Skiplagged's website shows American's Marks alongside its flight data, just as it appears on Skiplagged.com. *See, e.g.*, *Rex Real Est. I, L.P. v. Rex Real Est. Exch. Inc*., No. 1:19-cv-00696-RP, 2022 WL 21739895, at *10 (W.D. Tex. May 18, 2022), *aff'd in part, rev'd in part on other grounds*, 80 F.4th 607 (5th Cir. 2023) (finding survey "unreliable" where the marks "would not be seen by consumers in the manner shown by the Stec survey," thus "survey did not approximate real world conditions).

### 3. Skiplagged's Argument that Dr. Wind's Survey Design "Was Unrelated to the Trademarks" is Demonstrably False.

Skiplagged contends that Dr. Wind's "experiments were irrelevant to trademarks or copyrights." [Dkt. No. 220 at 9]. Skiplagged repeats the now familiar refrain, arguing again that Dr. Wind (1) "discusses the survey participant's response to various 'stimuli'" but "[n]either of these stimuli concerned AA's trademarks"; and (2) "did not use the stimuli to question participants on AA's trademarks." [*Id.*].[7] This relevance argument still remains wrong when reasserted again in this context. As noted above, the stimuli to which participants were responding clearly showed Skiplagged using American's Marks, and the survey questions were designed specifically to assess

---

[7] As an initial matter, again, this argument pertains to the relevance —not the reliability —of Dr. Wind's report, and is simply a recitation of the same arguments made in Section B of Skiplagged's Motion (which American addresses in Section III.B. above).

consumers' perceptions after seeing such stimuli for purposes of evaluating their potential confusion or deception. [*See* supra, pp. 5–7]. And, again, as already discussed, the type of questioning Skiplagged appears to be proposing in (2) is precisely what would make a consumer confusion survey unreliable. *See* McCarthy, § 32:172 (Tests of properly conducted survey—Slanted or leading questions—Avoiding leading questions).

### 4.   Dr. Wind's Use of Expedia as a Control Was Entirely Appropriate and Only Validates the Reliability of His Report.

Skiplagged fails to understand the necessity of a control group in a survey. Skiplagged alleges that the use of Expedia, an agent of American's, was inappropriate because (1) respondents are already familiar with Expedia; (2) survey respondents already knew Expedia was an agent of American's; and because (3) survey respondents did not look at the use of similar trademarks.

First, the fact that survey respondents are familiar with a company used as a control does not render a survey invalid. Skiplagged's citation to *Hodgdon Power Co., Inc. v. Alliant Techsystems, Inc.* 512 F.Supp.2d 1178 (D. Kansas. 2007), is misleading, incorrectly stating a likelihood of confusion survey was stricken because the respondents were "already familiar" with the company who alleged trademark infringement. *Hodgdon* involved a gunpowder company who alleged trademark infringement against another company and used a survey as evidence. But in *Hodgdon*, the universe of survey participants was biased, consisting solely of people who visited the plaintiff's promotional booth at one shooting tournament. Here, the universe of participants was carefully selected and Skiplagged has identified no issues with the selection criteria. The *Hodgdon* survey was further flawed in many more ways Skiplagged fails to mention. There, plaintiff's own employees distributed their survey while wearing shirts and hats affiliated with plaintiff, amidst a great display of other signs and promotional materials. Nor was the survey in *Hogdon* properly designed—it was conceived by plaintiff's attorneys rather than a survey expert.

19

All these factors together—the underinclusive universe, the biased and flawed design and execution of the survey, and the fact that the survey was designed by plaintiff's attorneys—led to its exclusion. None of those problems are present here.

Second, Skiplagged misunderstands the concept of Expedia as a control group necessary to establish the reliability of a trademark survey. One of the primary purposes of the test was to determine whether a survey respondent would believe a company (either Skiplagged, not an authorized agent, or Expedia, an authorized agent) would be perceived to be affiliated with American Airlines. Because the survey was designed to examine whether respondents believed Skiplagged was affiliated with American, Dr. Wind needed a control—an example of a website that is *actually* affiliated with American—to compare the Skiplagged results against. This approach is directly in line with well-established principles explained by courts and legal scholars regarding proper survey methods. *See* McCarthy, § 32:187, The Need for a Survey Control ("*A Properly Conducted Survey Should Have a 'Control.'* ... [J]udges have come to expect that a proper survey will have a control" and "often recognize the absence of a control as a fatal weakness.").

Here, Dr. Wind used Expedia as the control group. This means that one set of survey respondents only looked at the Skiplagged stimuli and then gave their answers as to whether they believed Skiplagged was affiliated with American.[8] 43% of those respondents believed Skiplagged was affiliated with or an agent of American's. Because Skiplagged is not in fact an agent of American's – the very fact that was to be tested – this 43% is "confused" as to what they perceived. To test whether this 43% is a significant number in terms of confusion, Dr. Wind simultaneously tested an entirely different set of respondents only with Expedia stimuli. In the Expedia control group, 56% of those respondents believed Expedia was affiliated with or an agent of American's.

---

[8] At times Skiplagged's arguments seem to suggest that survey respondents saw *both* the Skiplagged and control (Expedia) stimuli. They did not. Respondents were selected at random to view one or the other.

Because Expedia *is* an agent of American, and a perception of an affiliation would *not* be confusion, it was a necessary control metric to determine the statistical significance of the difference between the test and control group responses. To be clear, at no point in the survey were respondents ever told that Expedia is, or that Skiplagged is not, an authorized agent of American.

The control data from those respondents who saw the Expedia stimuli provides important context for interpreting the data. For example, it demonstrates that even though Expedia *is* an authorized agent of American, some respondents still do not think that it is, even though it is using American's trademarks. This information then informs us how to weight the Skiplagged data; the Expedia data demonstrates that a small number of respondents will not affiliate a website using American's trademarks with American no matter what.

Third, Skiplagged's claim that the survey participants did not look at the use of similar trademarks is false. There is only one American flight logo, and it is used on both Skiplagged and Expedia websites – and as a result, it is shown on the stimuli pages. These stimuli are taken from actual screenshots of the Skiplagged and Expedia websites.

The American Mark was shown to survey respondents in the Skiplagged stimuli below:



The identical mark was also shown to survey respondents in the Expedia stimuli:



The use of Expedia as a control group—a third-party company who was actually an agent of American's—increases the reliability of the survey's results.

### 5.    Dr. Wind's Opinions Are Based Directly on the Consumer Survey Data.

Skiplagged argues there was "too great an analytical gap between the data and Wind's opinion," but the only basis it provides for this argument are three inconsequential examples—one that misrepresents the report, another that is verifiably incorrect, and a third that was simply an inadvertent technical/administrative error that occurred when generating the final PDF of the report for production (*which Skiplagged was specifically made aware of during Dr. Wind's deposition*).[9] [Dkt. No. 220 at 11–12].

Skiplagged's first point is that Dr. Wind engaged in an "analysis of the price difference between flights facilitated by Skiplagged versus purchased on AA.com," which is irrelevant to the issues and to his engagement, and which "assumed that the consumer only looked at AA flights and not those on other airlines." [*Id.* at 12]. Skiplagged clearly misread the report. What Skiplagged is referring to is Section IV.A.3. of Dr. Wind's report, the *sole purpose* of which was to explain the process used "to determine the particular booking[s] that would provide the most realistic and representative stimuli for the survey." [App'x 015–16 (Wind Report at 10–11)]. That is, the only purpose of the price differential analysis was to disclose how and why the specific bookings presented to the respondents were chosen as "the stimuli selected for the survey." [*Id.*]. The price differences were not part of—and had no bearing on—Dr. Wind's substantive opinions.

Skiplagged also argues that Exhibit 17 to Dr. Wind's report—showing "Complaints to Skiplagged evidencing confusion as to its association with AA"—did "not support Wind's

---

[9] Specifically, Skiplagged refers to a link to a social media post that went to a different post than what was quoted. [*See* Dkt. 220 at 12]. As is evident by the fact that the number of the quoted post (1.) did not align with the number of the referenced URL (immediately preceding 6.), and the fact that there was an entire blank page between the post and the URL Skiplagged is pointing to, the inconsistency Skiplagged complains of was nothing more than an inadvertent technical error that occurred when the PDF of the report was generated/processed for production. In fact, Dr. Wind even explained this to Skiplagged's counsel at his deposition when asked about the very complaints referenced in Skiplagged's Motion. [App'x 243 (Wind Depo., 212:16–20) (explaining "Some, like this, might have been lost in the production of the document.")].

conclusions" because "many of these complaints did not mention Skiplagged or were requests for a refund that did not show any confusion." [Dkt. No. 220 at 12]. Again, Skiplagged misses the mark. First, that some of the quoted complaints did not explicitly mention Skiplagged is immaterial, because the complaints in this set were *sent **to Skiplagged***. Second, Dr. Wind clearly explained how customer complaints directed to Skiplagged show confusion: "any complaint about role, authority, or relationship of Skiplagged vis a vis the airline, . . . includ[ing] any complaint suggesting the customer misunderstood what Skiplagged could and could not do to support a customer after purchase," including "where the customer expected Skiplagged to . . . refund flight price." [App'x 034 (Wind Report at 29), *see also id.* at 30 (incorporating the definition of "Consumer Confusion" as set forth on p. 29, for purposes of categorizing "Consumer complaints to Skiplagged re confusion")].

Finally, Skiplagged claims "Wind admitted that his background information, *which formed the basis for his entire report*, came from AA's counsel." [Dkt. No. 220 at 12 (citing Wind Depo. 56:15-16) (emphasis added)]. This mischaracterizes and distorts Dr. Wind's testimony. In the testimony Skiplagged cites, Dr. Wind simply stated he was told by counsel the matters set forth in *the background section of his report* (except the last paragraph). [App'x 241 (Wind Depo., 56:15–16; *see also* 58:18–59:17, 60:9–10)]. To imply that he admitted the information provided by counsel "formed the basis for his entire report" is simply wrong.

Dr. Wind's conclusions and opinions are based on the data and results from his carefully designed survey, as well as his analysis of various actual customer complaints. Skiplagged does not and could not show otherwise.

## IV.   CONCLUSION

For the foregoing reasons, American respectfully requests that the Court deny Skiplagged's motion to exclude the report and opinions of Dr. Wind.

Dated: September 3, 2024                    Respectfully submitted,

                                            */s/ Dee J. Kelly, Jr.*
                                            Dee J. Kelly, Jr.
                                            State Bar No. 11217250
                                            dee.kelly@kellyhart.com
                                            Julia G. Wisenberg
                                            State Bar No. 24099146
                                            julia.wisenberg@kellyhart.com
                                            KELLY HART & HALLMAN LLP
                                            201 Main Street, Suite 2500
                                            Fort Worth, Texas 76102
                                            (817) 332-2500

                                            R. Paul Yetter
                                            State Bar No. 22154200
                                            pyetter@yettercoleman.com
                                            YETTER COLEMAN LLP
                                            811 Main Street, Suite 4100
                                            Houston, Texas 77002
                                            (713) 632-8003

                                            Cameron M. Nelson
                                            nelsonc@gtlaw.com
                                            GREENBERG TRAURIG LLP
                                            77 West Wacker Drive, Suite 3100
                                            Chicago, Illinois 60601
                                            Telephone: (312) 456-6590

                                            Nathan J. Muyskens
                                            nathan.muyskens@gtlaw.com
                                            GREENBERG TRAURIG LLP
                                            2101 L Street, N.W., Suite 1000
                                            Washington, DC 20037
                                            Telephone: (202) 331-3100

                                            **ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I certify that on September 3, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Dee J. Kelly, Jr.*_____
Dee J. Kelly, Jr.

26