IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

**APPENDIX TO AMERICAN AIRLINES, INC.'S RESPONSE AND BRIEF IN OPPOSITION TO SKIPLAGGED, INC.'S MOTION TO STRIKE AND EXCLUDE PLAINTIFF AMERICAN AIRLINES, INC.'S EXPERT DAVID FULLER**

In support of Plaintiff American Airlines, Inc.'s ("American") Response and Brief in Opposition to Skiplagged, Inc.'s Motion to Strike and Exclude Plaintiff American Airlines, Inc.'s Expert David Fuller, American submits the following materials:

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A | Declaration of Julia G. Wisenberg | App'x 001–03 |
| A-1 | Expert Report of David Fuller, served by American on May 31, 2024 (Confidential) | App'x 004–33 |
| A-2 | Supplemental Expert Report of David Fuller, served by American on August 2, 2024 (Confidential) | App'x 034–55 |
| A-3 | Transcript of the deposition of David Fuller, taken on June 27, 2024 (Partially Confidential) | App'x 056–84 |
| A-4 | Transcript of the deposition of Daniel Gellert, taken on November 30, 2023 (Confidential) | App'x 085–145 |

Dated: September 3, 2024

Respectfully submitted,

*/s/ Dee J. Kelly, Jr.*

Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 332-2500

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8003

Cameron M. Nelson
nelsonc@gtlaw.com
GREENBERG TRAURIG LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-6590

Nathan J. Muyskens
nathan.muyskens@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
Telephone: (202) 331-3100

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on September 3, 2024, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Dee J. Kelly, Jr.*

Dee J. Kelly, Jr.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-00860-P |
| | § | |
| SKIPLAGGED, INC., | § | |
| | § | |
| Defendant. | § | |

**DECLARATION OF JULIA G. WISENBERG**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

1. My name is Julia G. Wisenberg. I am over the age of 21 and competent to make this declaration as authorized under 28 U.S.C. § 1746. My business address is 201 Main Street, Suite 2500, Fort Worth, Texas 76102.

2. I make this declaration in support of Plaintiff American Airlines, Inc.'s ("American") Response and Brief in Opposition to Skiplagged, Inc.'s Motion to Strike and Exclude Plaintiff American Airlines, Inc.'s Expert David Fuller.

3. Attached as Exhibit A-1 is a true and correct copy of the Expert Report of David Fuller, served by American on May 31, 2024.

4. Attached as Exhibit A-2 is a true and correct copy of the Supplemental Expert Report of David Fuller, served by American on August 2, 2024.

5. Attached as Exhibit A-3 is a true and correct copy of the transcript of the deposition of David Fuller, taken on June 27, 2024.

6. Attached as Exhibit A-4 is a true and correct copy of the transcript of the deposition of Daniel Gellert, taken on November 30, 2023.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 3, 2024.

Julia G. Wisenberg

# Exhibit A-1

**Withheld Due to Confidential Information**

**Pending Motion for Leave to File Under Seal**

# Exhibit A-2

**Withheld Due to Confidential Information**

**Pending Motion for Leave to File Under Seal**

# Exhibit A-3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC., )
)
Plaintiff, )
)
v. ) Civil Action No.
) 4:23-cv-00860-P
SKIPLAGGED, INC., )
)
Defendants. )

*****************************************************

ORAL DEPOSITION OF
DAVID N. FULLER
JUNE 27, 2024

*****************************************************

ORAL DEPOSITION OF DAVID N. FULLER, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 27th day of June, 2024, from 8:25 a.m. to 11:30 a.m., before Julie C. Brandt, RMR, CRR, and CSR in and for the State of Texas, reported by machine shorthand at Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

FOR THE PLAINTIFF:

Lars L. Berg
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
lars.berg@kellyhart.com

FOR THE DEFENDANT:

Aaron Z. Tobin
CONDON TOBIN SLADEK THORNTON NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
atobin@condontobin.com

-and-

Darin M. Klemchuk
KLEMCHUK PLLC
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
darin.klemchuk@klemchuk.com

INDEX

PAGE
Appearances.................................... 2
Proceedings.................................... 4

DAVID N. FULLER
Examination by Mr. Tobin.................. 4

Signature and Changes.......................... 92
Reporter's Certificate......................... 94

| DEPOSITION EXHIBITS | | IDENTIFIED |
|---|---|---|
| Exhibit 1 | Expert Report of David N. Fuller, CFA, ASA, CFE | 7 |
| Exhibit 2 | Oct./Nov. 2021 email string SKP00053764 - 00053767 | 49 |
| Exhibit 3 | Declaration of Aktarer Zaman App 0001 - 0004 | 61 |
| Exhibit 4 | PowerPoint presentation "Hidden City Busters" | 75 |

P R O C E E D I N G S

DAVID N. FULLER,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. TOBIN:

Q. Please state your full legal name.
A. David Neil Fuller.
Q. Mr. Fuller, my name is Aaron Tobin. Do you understand I represent the defendant Skiplagged here today?
A. I do.
Q. Okay. And I don't believe we've ever met before. Is that your recollection as well?
A. I'd agree.
Q. Okay. What did you do to prepare for your deposition today?
A. I went through my work file that relates to the report that I prepared in this case.
Q. Okay. Did you give your complete work file over to your attorneys?
A. No.
Q. Okay. What parts of your work file did you not give to your attorneys?
A. Well, I haven't been asked to produce anything. In this particular instance, all the

information that I relied on was provided by them to me. This isn't an instance where I did a bunch of independent research and gathered documents that were not part of the production. So as I sit here right now, nothing comes to mind that's in the work file that didn't come from them in the first place.
Q. Do you have any workpapers or work product at all on the file that's included in your work file?
A. And there's the -- some backup documents that show the formulas associated with the calculations that are contained within the report. There's no schedules to that report. But other than just the calculations for the numbers that appear in the text, I wouldn't say there's any workpapers.
Q. Okay. So what is in your work file then since it hasn't been given over to your lawyers?
A. A copy of my report, a bunch of documents that would be just sort of the legal folder, you know, the pleadings, interrogatories, responses. There's

[redacted]

There are other documents

produced in the litigation that are [redacted] Mr. Gutzler's report. There's some correspondence between the lawyers. There may be a few other documents, but I think that generally covers the waterfront.

Q. Do you keep this file as a hard copy, or is this an electronic file you're keeping?

A. It's both.

Q. Okay. Are you aware of any documents in that file that were not either filed in the litigation or produced in the litigation?

A. No.

Q. But you probably couldn't say for sure. Would you say your lawyers are a better source on that?

A. My lawyers -- American's lawyers are probably a better source. Everything that I received either looked like it was, you know, a legal document, like, you know, titled interrogatories, second responses, you know, something like that. Or it was a data file or -- you know, either a native or a PDF, and my recollection is those were Bates numbered.

Q. Okay. Is everything in your file that you

reviewed -- strike that.

Is everything in your file identified in your report? I have a copy if you want to take a look at it. Would that be helpful?

A. Yes, it would.

Q. Okay.

MR. TOBIN: Can we just mark this as Fuller 1, please.

(Exhibit 1 marked.)

MR. BERG: Thank you, sir.

MR. TOBIN: Sure.

A. To answer your question, there are some items that are listed on page 2 that are sometimes a specific reference, like the First Amended Complaint, sometimes a general reference, like [redacted] And then all of the files that I had received at the time I prepared the report are listed by their file names in the documents reviewed that's attached as Attachment B. This wouldn't include the Gutzler report. It wouldn't include some of the correspondence since -- since I prepared my report. It wouldn't include the more recently produced [redacted]

Q. (BY MR. TOBIN) Okay. Are there any other documents that are in your file that are not listed or categorized in Exhibit 1?

A. Not that I can identify as I sit here right now.

Q. And which documents that are not categorized in Exhibit 1 did you actually review in preparation for your deposition today?

A. That are not categorized in Exhibit 1?

Q. That are not identified in Exhibit 1.

A. The documents that I received subsequent to preparing my report.

Q. Which are?

A. Which are Mr. Gutzler's report. There's an email from you to Mr. Berg. There's a letter from Mr. Kirkman that have to do with [redacted] That's all that comes to mind that kind of falls into that category of materials that I was provided after preparing this report that wouldn't be listed in either the list on the bullets on page 2 or the Attachment B.

Q. Okay. So I read through those bullets in your report. Let me ask you. The one that seems pretty broad is the last one that says [redacted] previously produced in this matter. Can you be more specific of what you're referring to there, please?

A. I guess the way I would describe that is that

it's a catch-all, and all that is being caught is the things that are listed in Attachment B that aren't listed in some other bullet on page 2.

Q. Okay. Anything else you did to prepare for your deposition other than what you've already described today?

A. I don't believe so.

Q. Did you --

A. Well, I did discuss preparing for my deposition with Mr. Berg.

Q. Okay. Other than Mr. Berg, did you discuss your deposition or prepare for your deposition with anybody else?

A. No.

Q. Okay. And how long -- I don't want you to tell me what you spoke to Mr. Berg about, but how long did you meet with Mr. Berg?

A. 30, 45 minutes.

Q. Did you text or email anybody about your deposition today substantively?

A. No. If by substantively, you mean anything other than logistics, what time we start, here is the notice, no.

Q. That's exactly what I meant. So the answer is "no"?

A. That's true.
Q. Okay. All right. And I assume you're still employed with your own company as you listed on the date of your report?
A. Yes.
Q. Okay. Help me understand how much of your work is expert testimony work these days.
A. Depends on the day. The percentage varies day to day, week to week, month to month. It's probably somewhere between 40 and 50 percent of my work and my firm's work, but the other category having to do with transactional work, tax work and financial reporting work.
Q. Okay. And how about you personally? Is that -- would you say that's roughly the same percentage of your personal monthly work?
A. As far as client-facing work, because I also have all of the administrative aspects of what I do; but yes, I'd say it's approximately the same breakout for me as it is my firm overall.
Q. Okay. And for you personally, of that percentage of work that you do that's litigation or expert testimony driven, how much of that is valuation versus economic damages?
A. I don't know. Both issues come up very

frequently. There are times when a particular report contains both types of opinions. So it's not something that I attempt to track, and I wouldn't have a percentage based on that.
Q. Okay. How long have you been giving expert or consulting testimony on litigation matters?
A. 30 plus years.
Q. Okay. In the last five years, how many times have you been deposed or given some sort of oral testimony, be it at trial or in front of a tribunal?
A. There's 35 or so times that are listed on the testimony list that's attached to my report which covers the last four years. I think you could probably just estimate 10 or 12 times a year. And so if it's five years, it would be 50 or 60 times.
Q. Okay. Out of those 35 times that you've testified in the last four years, how many of those was your testimony primarily focused on economic damages?
And Mr. Fuller, you understand my question? I am trying to pinpoint --
A. I do.
Q. -- the times that you've testified about economic damages versus testimony about valuation or some other substantive area.
A. I could sort of tabulate that if I had a piece

of paper and a pen and go through and do a specific job. Just, you know, having looked at the first couple of pages, I would say about 60 percent of them have to do with economic damages. There's a couple of these where, as I said, it was both a valuation and a damages question. So there would be sort of three categories that I could create: One's pure valuation disputes, one is pure damages disputes, another would be disputes where there were a blend of issues.
Q. Have your opinions ever been successfully challenged, struck or criticized by a court or an arbitration or some sort of tribunal?
A. There have been a small number of situations where some opinions have been limited, and there's been a small number of cases where there's been an opinion that was critical of opinions that were not limited and were offered, so.
Q. Well, let's start with have you ever had an opinion completely struck?
A. Yes.
Q. How many times has that happened?
A. Three or five, something like that, over the last 30 years.
Q. Which cases were those?
A. There was a case called Wartburg,

W-A-R-T-B-U-R-G.
There was a drug case --
Q. Let me ask you -- before you go to the next one, let me ask you about Wartburg. Where was that case pending?
A. It was in Houston.
Q. State or federal court?
A. I would guess it was state.
Q. Okay. And your client was Wartburg?
A. Yes.
Q. Okay. And who were the lawyers on that?
A. I don't remember.
Q. When was the case?
A. 20 plus years ago.
Q. Okay. Sorry. Go to the next one.
A. There was one that was a drug case that was -- the only way I remember it, it's style was it was In Re: Hormone Therapy, and in that instance, the opinion was struck for a relevance objection.
In Wartburg, it had to do with relevance as well because of a ruling on a motion for summary judgment that came out before the trial.
Q. The In Re: Hormone Therapy case, where was it pending?
A. It was in federal court somewhere. I'm not

sure.
Q. In Texas?
A. I'm not sure.
Q. Okay. Who were the lawyers on it?
A. There's a bunch of lawyers. I worked with some Philly lawyers at the Schiffrin Barroway firm.
Q. Who was your client?
A. It was a class.
Q. Okay. All right. Any other cases?
A. There was an oilfield service company case where my opinion was excluded because of the assumptions I was given to make by the client were determined to be speculative by the court.
Q. Which court was that?
A. I don't recall.
Q. When was this?
A. Probably ten years ago.
Q. How long ago was the In Re: Hormone case?
A. 20ish.
Q. This oilfield service or survey case, who was your client?
A. I don't remember the name of the client. It was a company that was going to be a provider of sulfuric acid to the clients in the oilfield, but I don't remember their name.

Page 14

Q. Where was that case pending?
A. I believe it was in federal court in Fort Worth, but I can't remember whose court.
Q. Any other cases where your opinions were either partially or fully struck or criticized by a court or tribunal?
A. Well, those are two completely different things. Struck --
Q. Well, let's start with struck, either partially or fully?
A. I don't recall any other case where an opinion's been struck.
Q. Or disregarded?
MR. BERG: Objection. It calls for speculation. He can't possibly testify about what was in somebody's mind.
A. When you ask about opinions being limited or excluded, I'm thinking of the outcome of motions to exclude or those kinds of formal motions before the court. When you say disregarded, that sounds like you're asking me what weight a court gave my opinions in the outcome of the case, and I can't comment on that.
Q. (BY MR. TOBIN) Okay. What about criticized? Have your opinions ever been criticized by a court and to include an appellate court?

Page 15

A. There have been some decisions that have commented on my opinions and have said things that -- or identified elements of my opinions that they didn't agree with.
Q. Okay. And which cases are those?
A. I don't know. I don't have a list that I walk around with.
Q. Okay. Could you find those cases and --
A. I've been involved in thousands of cases, so I wouldn't take on the request and say, I'll go and research what all opinions that have ever been written say. There's a couple that I've been asked about in other depositions that I could come up with.
Q. Which ones are those?
A. There's a case called IIC versus somebody that's a Delaware Chancery Court case where the opinion basically split the difference between my opinion and the opposing expert, and it said some negative things about both of us and came up with a number that was in the middle.
There's an appellate decision in a case called AZZ versus Morgan, where the appellate court said that assumptions that I relied on in my report were speculative.
So I've gotten asked about those two cases

Page 16

from time to time.
Q. Any others you can think of or you've been asked about before about potentially criticizing your work?
A. Not as I sit here just right now.
Q. All right. These cases where your opinions were either struck partially or in full, could you get us the exact style of the case? Is that attainable in your files?
MR. BERG: Objection. You don't have to agree to go do additional work.
A. I'll respond to a request if a request is made. I'm not going to take to-do items as part of the deposition transcript.
Q. (BY MR. TOBIN) I'm just asking if you could. Could you find that information in your files, if needed?
A. I don't know, in that some of the cases that we've mentioned go back to predecessor firms, and so I don't know what I have.
Q. When you say predecessor firms, predecessor firms you worked at?
A. Yes.
Q. How long have you had your own firm?
A. Since 2000.

Page 17

Q. Okay. Any other cases where your opinions were criticized -- excuse me -- were struck by a court or a tribunal, either partially or in full, other than the ones you've told me about?
A. None come to mind right now.
Q. Okay. Forgive these. These are just a couple standard questions I always ask.
Have you ever filed for bankruptcy or any type of insolvency proceeding?
A. No.
Q. Have you ever been charged or arrested or convicted of a crime other than a minor traffic offense?
A. No.
Q. Are you on any medications or have any conditions that would affect your ability to give truthful testimony or to recall events or relevant testimony?
A. No.
Q. Who hired you for this case?
A. American Airlines through its counsel Kelly Hart.
Q. So your retention agreement is with Kelly Hart?
A. Yes.
Q. And who specifically at Kelly Hart is your

Page 18

contact?
A. Mr. Berg.
Q. Have you ever been employed or retained by American Airlines before on any other cases?
A. I don't recall any others as I sit here right now.
Q. So how sure are you that American hasn't retained you on another matter?
A. Pretty sure, but I've been involved in a lot of projects.
Q. How about the Kelly Hart firm, have they retained you on other matters?
A. Yes.
Q. How many times in the last five years?
A. I don't know. I've worked both with and opposite Kelly Hart lawyers with some frequency. In the last five years, I don't know, maybe three or four times against, 10 or 12 times with, something like that.
Q. And of those 10 or 12 times, how many times have either Mr. Berg or Mr. Kelly been involved in that case?
A. In the last five years, I don't think there were any other cases that I worked on with Mr. Berg. Maybe one. I don't recall working with Mr. Kelly on any prior cases in the last five years.

Page 19

Q. On this case when were you retained?
A. Early this year.
Q. In '24?
A. I believe so.
Q. Are there any mistakes or omissions in that report that's Exhibit 1?
A. I don't know what would be an omission. There are -- there's one typo in the report [redacted]
And other than -- other, you know, grammatical or typographical error that somebody might point out, I'm not aware of anything that affects the actual numbers or conclusions.
Q. Okay. So other than that change in the number on page 10, are there any substantive mistakes or errors in your report that you're aware of?
A. No.
Q. Is there anything in the report that you believe needs to be changed, explained or modified?
A. There's nothing in the report that I would

Page 20

say needs to be changed, explained or modified. I clearly reserved, in terms of anticipating that I would supplement based on additional opinions, based on continuing discovery; and so I expect there will be additional opinions and modified opinions based on the booking information when it's produced in a usable form.
Q. I forgot to ask you about Greenberg Traurig. Are you familiar with that firm?
A. I am.
Q. Okay. Have you worked with any of those lawyers on this case?
A. I haven't worked -- I have worked with the Greenberg Traurig firm on a number of occasions elsewhere, other offices, other professionals. I have not worked with any of the professionals that are involved in this case previously.
Q. Did anyone at your firm, other than you, help you or assist you with the matters you were retained for on this case?
A. One member of my consulting staff has collaborated with me on this project. His name is Harry Whiting.
Q. How do you spell his last name, please?
A. W-H-I-T-I-N-G.

Page 21

1    Q.   What was Mr. Whiting's role in forming your
2  conclusions?
3    A.   He just generally assisted me with the
4  project.  So he and I collaborated on the analysis, the
5  drafting of the report, organization of the files, those
6  types of things.
7    Q.   Did he do any of the actual analysis or
8  mathematics in the report?
9    A.   I wouldn't say he did them to the extent that
10  that infers he did them independently.  He and I
11  collaborated on the report.  So we did -- what work he
12  did on the report, we did together.
13    Q.   Okay.  So would you say that you -- at least
14  if you didn't perform the work yourself, you at least
15  verified all the conclusions, numbers and calculations
16  that are in the report?
17    A.   Yes.
18    Q.   Anybody else that helped you on this report
19  other than Mr. Whiting?
20    A.   No.
21    Q.   And what is his position with your firm?
22    A.   He's an analyst, a member of my consulting
23  staff.
24    Q.   So he reports to you?
25    A.   He does.

Page 22

1  reviewed in your file?
2    A.   We talked ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
11    Q.   And when you say ███████████████
████████████████████████████████████████
████████████████████
14    A.   No.  ████████████████████████████
████████████████████████████████████████
████████████████████████████
18    Q.   Other than what you just testified about, is
19  there any other information that the American Airlines
20  personnel provided you on these calls or in these
21  meetings outside of the information that's identified on
22  your report?
23    A.   Not that I recall.
24    Q.   Did all of these meetings occur or calls occur
25  before you issued your report?

Page 24

1    Q.   Now have you communicated or interacted with
2  any of the American Airlines personnel in doing your
3  work or coming to your conclusions on this case?
4    A.   American Airlines folks have been involved in
5  a couple of conversations.
6    Q.   Okay.  And who were those people?
7    A.   Dan Broadfield is somebody that I spoke with.
8  There were some other folks that were involved in some
9  of the discussions as boxes on a Zoom call, but I don't
10  recall other names without looking at my notes.
11    Q.   Okay.  And how many calls or meetings did you
12  have with the American Airlines personnel?
13    A.   Two or three meetings probably that involved
14  someone who was there from American.
15    Q.   And was Mr. Broadfield involved in all those?
16    A.   No.
17    Q.   Do you remember any of the other people that
18  were involved from American Airlines?
19    A.   Not without referring to my notes.
20    Q.   Okay.  And were those meetings you called
21  because you needed information from American?
22    A.   Not necessarily.
23    Q.   Okay.  What information was provided to you by
24  that American Airlines personnel that is not in the
25  documents that you've already testified about that you

Page 23

1    A.   Generally, yes.  There may have been an
2  American person on a subsequent call talking about ████
████████████████████████████.  Actually, I don't think
4  there was, so I would agree those were before my report.
5    Q.   Just to close the loop here, did American
6  Airlines personnel ever text or email or communicate
7  with you in written or electronic form?
8    A.   I don't believe so.
9    Q.   Have you helped prepare any of the American
10  Airlines personnel for their depositions?
11    A.   No.
12    Q.   Is there anything else other than what is
13  listed in your report or contained in your file or that
14  you gathered in these meetings with American Airlines
15  that you're relying on in forming your conclusions and
16  opinions in this case?
17    A.   I can't think of anything that would meet that
18  description.
19    Q.   How about any authoritative texts or treatises
20  or industry white papers, et cetera, that you're relying
21  on for forming the basis of your conclusions or opinions
22  in this case?
23    A.   I don't believe so.
24    Q.   If you would, turn on your report starting on
25  page 3, the section that begins "Background of the

Page 25

7 (Pages 22 - 25)



Situation."
A. Yes.
Q. And it goes all the way through paragraph 19 contained on page 5. You're familiar with that portion of your report?
A. I am.
Q. Okay. And is it fair to say that there are no independent opinions or conclusions by you in that section of your report, and anything listed in that section of the report [redacted]
A. I wouldn't put it quite that way. I would say that anything that's in that set of paragraphs from 10 through 19 is -- is my understanding of the factual background, and I wouldn't characterize what's contained there as any expert opinions I intend to offer.
Q. Okay. Did you do [redacted]

[redacted]
Q. Okay. Anything else that is your independent analysis or work or investigation in paragraphs 10 through 19 other than what you just quoted to me or testified to?
A. I don't think so.
Q. And the stuff from [redacted]
A. Yes, [redacted]
Q. So just, for example, let's look at paragraph 14.
A. All right. I'm there.
Q. And if you look about halfway through the paragraph, you see where there's a quote; and then after the quote, the text reads [redacted]

A. Yes.
Q. Okay. So I guess what I'm trying to find out is do [redacted]
A. [redacted]
Q. Okay. So you're [redacted]
A. I agree.
Q. The same thing, just to spot-check a couple of these. Let's look at paragraph 17. It's on page 5.
A. I see it.
Q. Okay. And where you said that -- [redacted] Do you see that?
A. I do.
Q. [redacted]

A. [redacted]
Q. Okay. But I guess to be more precise, that statement is not your professional opinion, correct?
A. That's true.
Q. Let's look at paragraph 18.
A. Yeah.
Q. It says, [redacted] See that?
A. I do.
Q. Okay. It would be the same question. That's not your professional opinion, right; [redacted]
A. Paragraph 21 I said, [redacted]. And I think that applies to paragraph 18 and the other paragraphs in that section of I'm not giving expert opinion about those fact issues. I understand [redacted]

[REDACTED]
[REDACTED]

Q. Okay. And I guess, likewise, if we look at the next -- or, I guess, two sections down in page 6, the [REDACTED]" do you see that section?

A. Yes.

Q. And I assume everything in paragraph 23 are, just as you state, [REDACTED] You're not stating that anything in paragraph 23 and the corresponding bullet points are actually your opinions; [REDACTED] [REDACTED] Correct?

A. That's true.

Q. Who actually wrote this report? Did you draft it yourself?

A. Mr. Whiting and I worked together on it and wrote it from a template that was -- that existed on my server from prior projects. So there's some content that carried over without much -- without many changes, and then there's things that I personally wrote, things that Mr. Whiting wrote that I edited.

Q. Okay. How many drafts of the report were made before you came to the final draft or version?

A. I don't know. It depends on how you define draft.

Page 30

Q. Well, did you circulate any previous drafts between you and Mr. Whiting or you and anybody else? I'm not talking about just going in and editing your own work and that makes a different draft. I'm talking about did you finish a work product, a draft, and then circulate it to somebody else?

A. Internally, I can't say how many times it was either printed or edited on screen. As it evolved, you know, to your point, every time you hit a keystroke, it's technically a different document. But over a period of about a week, probably that happened on numerous occasions. I don't recall in this case having circulated a draft outside of my firm prior to publishing it.

Q. But your file would reflect that, whether there were different versions that were circulated outside your firm?

A. Generally, I don't retain any -- any copies of drafts that are different versions of the report as it evolves within the firm. They just get overwritten and saved serially until it's a final report. Generally, I would -- if there was a report that was sent to a client, I would have a record of what that version was.

Q. But you're not recalling of any such versions in this case, is that right, that were sent to a client or circulated outside your firm?

Page 31

A. That's true.

Q. Anyone other than you and Mr. Whiting assist with the actual drafting of this report?

A. It's our practice to have someone not involved in the project proof a report just for fresh eyes, grammar, that kind of thing. So it's likely someone else read through the report and redlined it as part of our QC process. But it wouldn't have been substantive input; it would have just been reading for grammar and that kind of thing.

Q. But this is someone within your firm?

A. Yes.

Q. And do you know who it was on this particular case?

A. No, I don't.

Q. Did you reach any conclusions that actually did not make it into your report in this case?

A. I don't believe so.

Q. Were you ever asked to give an opinion on any subject matter that is not included in your report?

A. I don't recall having been asked to perform analysis or form opinions on any topics other than those that are reflected in the report.

Q. Okay. So your report contains the totality of

Page 32

your opinions that you're prepared to give in this case?

A. It addresses all the topics and conclusions that I've reached. When you say the totality of my opinions, that doesn't necessarily say that the report contains 100 percent of my knowledge and understanding and, therefore, you know, if it's not specifically stated in the report, I couldn't answer a question. But all of the topics and ultimate conclusions I believe are listed.

Q. Okay. But if there are any opinions that you are prepared to or planning on giving in this case that are not listed in this report, I would like to know what those are right now, please.

A. Well, I don't know of any other --

MR. BERG: Objection, calls for speculation. How can he possibly know what he's going to testify about [REDACTED] [REDACTED] So if that's where you were headed, then let's just --

MR. TOBIN: Lars, we don't need speaking objections. You can just object to the form if you've got an objection, and then he can answer the question.

Q. (BY MR. TOBIN) I'm wanting to know if you have, as we sit here today, any opinions that you plan to testify about at trial or that you formed in this

Page 33



case that are not contained in Exhibit 1?
A. I don't think there's opinions on any other topics that -- any other damages, theories or components that -- other than the things that are discussed here. There's the continuing discussion about [REDACTED] these are the conclusions I've reached.
Q. Okay. So you mentioned these [REDACTED] Has that led to any additional opinions that you have in this case other than what's listed in Exhibit 1?
A. Well, there's nothing in Exhibit 1 about [REDACTED]
Q. Okay. What are those opinions and observations?
A. Generally, [REDACTED]

Page 34

[REDACTED]
Q. Okay. But those opinions [REDACTED]
A. I don't know if I agree with that. [REDACTED]
Q. Have you condensed these observations or opinions to any type of written form?
A. [REDACTED]

Page 35

[REDACTED]
Q. Any other written product that you've prepared or begun to prepare as it relates to additional opinions or observations that are not contained in Exhibit 1?
A. Not that I can think of right now.
Q. Are there any opinions or observations that you've made that are not contained in Exhibit 1 other than this issue that you just testified about [REDACTED]
A. Well, I have reviewed Mr. Gutzler's report and have some [REDACTED]
Q. What are your observations or opinions related to that, Mr. Gutzler's work?
A. Well, I would say [REDACTED]

Page 36

[REDACTED]
Q. When you say he made, are you talking about Mr. Gutzler?
A. Yes, in Mr. Gutzler's report. [REDACTED]
Q. Any other observations or opinions you have as it relates to Mr. Gutzler's work?
A. I think those points generally cover the topics.
Q. And those points you would describe of critiques you have of Mr. Gutzler's work?
A. I wouldn't disagree with that characterization.
Q. Any other critiques you have or criticisms you have of Mr. Gutzler's work other than what you've already testified about?
A. None come to mind right now.
Q. Do you anticipate developing any other opinions or observations to offer in this case other

Page 37



than what you've already told me about?
A.

MR. TOBIN: All right. Let's take a quick break.
THE WITNESS: Okay.
(Break from 9:24 a.m. to 9:34 a.m.)
Q. (BY MR. TOBIN) Okay. Mr. Fuller, I'm looking at your actual damage opinions in your report now.
A. Okay.
Q. I'm on page 8. And ultimately, I'm dealing with what I believe is a conclusion of yours,
A. Yes.
Q.
A. I am.
Q. Okay. Now I'll tell you, you're going to have to go slow with me when it comes to math. I became a lawyer for a reason. But this one I think I understand.

Is that correct?
A. Yes.
Q. Okay. , correct?
A. Yes.
Q. . Is that generally accurate?
A. It is.
Q. Okay. , correct?
MR. BERG: Objection, calls for speculation.
A.

Q. (BY MR. TOBIN) Okay. I mean, you would agree with that, right?
A. I agree with your statement.
Q. You don't -- fair enough. Touché. Touché.
A. I also agree with that.
Q. Okay. Is that a fair characterization?
A. There's some more to it than that, but, yes,
Q. Okay. So in other words, if we go back to page 8, right?

A. I agree.
Q. And if I understand your analysis or your report, Correct?
A. I agree.
Q. Okay. And then you Is that fair?
A.
Q. Okay. Well, let's just take an example. For



instance, on page 30 you [redacted] --
A. Paragraph 30.
Q. I'm sorry, paragraph 30. Thank you.
Paragraph 30 on page 9 --
A. Right.
Q. [redacted], right?
A. That's true.
Q. But in paragraph 30, [redacted] correct?
A. Yes.
Q. And you [redacted], right?
A. True.
Q. [redacted]
A. [redacted]

[redacted]
Q. Okay. So I think I'm with you, but let me make sure I understand. [redacted] right?
A. That's true.
Q. And you [redacted] Is that accurate?
A. It is.
Q. Okay. And that would be [redacted] Is that fair?
A. It is.
Q. Okay. So if we fast-forward to paragraph 38, do you see the sentence that says, [redacted]

A. I do.
Q. [redacted]
A. Yes.
Q. [redacted]
A. I don't believe so.
Q. All right. Okay. [redacted], correct?
A. [redacted]
Q. Okay. I'm just trying to identify -- at least [redacted]

[redacted] Is that correct?
A. I don't think I would put it quite that way [redacted].
Q. Okay.
MR. TOBIN: Before we get there, Lars, my understanding of the testimony is that [redacted]
MR. BERG: We'll consider the request.
MR. TOBIN: When do you believe you'll be able to tell me whether [redacted]
MR. BERG: I don't know that.
Q. (BY MR. TOBIN) All right. Let's go to paragraph 33.
A. All right.
Q. Now if I understand your analysis [redacted]



. Is that fair?

A.

Q. Okay. Let me make sure I understand, because my understanding of your report is

A. , that's true.

Q. Okay. So that's what you were relying on

A. I did.

Q.

A.

Q. Okay. All right. But I am just drilling

Page 46

down right now on

correct?

A. Agreed.

Q. Okay.

A.

Q. Okay. And so which -- which source

A.

Q. Let me stop you there for a second. Do you

Page 47

understand under

A. I don't have an understanding of

Q. Okay. Well, why don't for purposes of my question, if you would please, sir, just assume that that's correct.

A. Okay.

Q. And then I would ask you

MR. BERG: Objection, calls for speculation.

A. I can't give you an opinion about

Page 48

Q. (BY MR. TOBIN) So but just to close the loop on this,

A. I think so.

Q. Now -- and I can pull it out if we need to, I'm happy to do that, but do you remember

A. I don't recall that without having -- without looking at the document.

Q. Okay.

MR. TOBIN: Mark this as Exhibit 2.

(Exhibit 2 marked.)

A. Thank you.

Q. (BY MR. TOBIN)

A. Yes,

Q. Okay. And if you look on the second page of

A. Yes.

Q. Again, this is

Page 49



[redacted]. Do you see [redacted]
A. I do.
Q. [redacted] right?
A. [redacted]
Q. [redacted]
MR. BERG: Objection, calls for

speculation.
A. [redacted]
Q. (BY MR. TOBIN) Yeah, but you understand [redacted] right?
A. Yes.
Q. Okay. And here in this exhibit [redacted], right?
A. He says [redacted]
Q. Okay. So if you were going to perform analysis based on assuming [redacted], right?
MR. BERG: Objection, calls for speculation, multiple questions.
A. [redacted]

[redacted]
Q. (BY MR. TOBIN) And you understand that [redacted]
A. I do.
Q. Okay. [redacted] correct?
A. Well, there's discussion, [redacted]
Q. Okay. But if you had that information that

you just described, [redacted]
MR. BERG: Objection, calls for speculation, calls -- improperly calls for a legal conclusion.
A. It might be. [redacted]
Q. (BY MR. TOBIN) And of the analysis that we've discussed so far on your damage opinions, [redacted]
A. [redacted]
Q. And other than the [redacted] are you basing that assumption on anything else?
A. [redacted].
Q. Okay. Anything else you're basing that assumption on?
A. No.
Q. Okay. Go ahead. I'm sorry, I didn't mean to



interrupt you.
A. [redacted]
Q. Okay. So other than what you just described, [redacted]
A. Well, you say other than what I've described. [redacted]
Q. Okay. Just to make sure I close the loop on [redacted]

[redacted] Is that fair?
A. I believe so.
Q. Okay. And, again, those -- at least that portion of your analysis, [redacted] Would you agree with that?
A. [redacted], I would agree with that.
Q. Let's move on and talk about page 12 of your report, starting on page 12, which is a new heading. It says [redacted]
A. Yes.
Q. If I understand -- just to make a breaking point here, if I understand, everything that we've been discussing before as far as your actual damage opinions, starting before paragraph 40 relates to what's [redacted] Is that fair?
A. Generally, yes.
Q. Okay. And then starting on page 40 is where you [redacted] correct?
A. Yes.
Q. Okay. And if I understand your calculation,

[redacted] Is that accurate?
A. It is.
Q. Okay. [redacted] Is that correct?
A. [redacted]
Q. So you don't know if [redacted] Is that what you're saying?
A. [redacted]
Q. But your analysis, [redacted] correct?
A. [redacted]
Q. [redacted]

[redacted]
A. Agreed.
Q. Okay. And are you aware that my client has stated that [redacted]
MR. BERG: Objection, calls for speculation.
A. I'm not aware of [redacted]
Q. (BY MR. TOBIN) Have you reviewed [redacted]?
A. No, I haven't.
Q. Have you reviewed [redacted]
A. I have not reviewed [redacted] that meets the description you've just made.
Q. Okay. Would you agree with me, though, that [redacted]
MR. BERG: Objection, calls for



speculation.
A. I wouldn't know without [redacted]
Q. (BY MR. TOBIN) Let's say [redacted]
MR. BERG: Objection, vague and calls for speculation.
A. [redacted]
Q. (BY MR. TOBIN) In essence, you would [redacted] Is that fair?
MR. BERG: Objection, calls for

speculation.
A. If I were provided some other information, then I would look at it and see if it differed and what the new information would indicate if I were to rely on it instead.
Q. (BY MR. TOBIN) Okay. So I see that you -- in that paragraph contained on page 13, top portion of the page, you [redacted] Do you see where I'm referencing?
A. Yes.
Q. Okay. [redacted]
A. [redacted]
Q. Okay. And I believe you testified that you've [redacted] right?
A. Yes.

Q. And you reviewed [redacted]
A. Yes.
Q. Okay. And is there anything in that [redacted]
A. I don't think so. [redacted]
Q. But that's related to -- [redacted] correct?
A. [redacted]
Q. Okay. But my question relates specifically to [redacted] right?

A. I do.
Q. Okay. And so based on [redacted] is there anything that you would want to change or alter on your opinions or conclusions?
A. Not that comes to mind right now.
Q. Okay. I hand you what's been marked as Exhibit 3.
(Exhibit 3 marked.)
MR. BERG: Thank you.
Q. (BY MR. TOBIN) I believe you reference in your report [redacted]
A. I believe I've seen this, yes.
Q. Okay. Is there anything in this document that would lead you to want to change or alter your analysis or your damage opinions given in Exhibit 1?
A. [redacted]



Q. And did you consider

A. I understood the

Q. Okay. But for purposes of your analysis on

A.

Page 62

Q. Okay. But you're

A. Yes.

Q.

Page 63

Q. But your analysis

A. I think it does.

Q. Okay. , correct?

A.

Q. Okay. So to this noneconomics guy, if you wouldn't mind, please explain

A.

Page 64

MR. BERG: Objection, calls for speculation.

Page 65



MR. BERG: Objection, calls for speculation, vague.

Page 66

Q. Okay. And that very well -- I mean, your analysis

A.

MR. BERG: Objection, calls for speculation.

Page 67

MR. BERG: Objection, calls for speculation.

Page 68

Q. Okay. All right. So -- but my point is you would

Page 69

[REDACTED], right?

MR. BERG: Objection, calls for speculation, argumentative.

A. [REDACTED]

Page 70

[REDACTED]

MR. BERG: Objection, calls for speculation, argumentative.

Q. (BY MR. TOBIN) It's a possibility, isn't it?

MR. BERG: Objection, calls for speculation.

A. [REDACTED]

Page 71

[REDACTED]

Q. And you're assuming [REDACTED], correct?

MR. BERG: Objection, calls for speculation, it's vague.

A. [REDACTED]

(Sotto voce discussion.)

Q. (BY MR. TOBIN) [REDACTED], correct?

A. I think so.

Q. Okay. [REDACTED]

A. [REDACTED]

Page 72

[REDACTED]

MR. BERG: Aaron, I literally did not hear what you -- [REDACTED] what?

MR. TOBIN: I'm sorry, [REDACTED]

Q. (BY MR. TOBIN) Have you ever heard the term?

A. I've read the term. I don't know if I've heard it.

Q. Where did you read it?

A. [REDACTED]

Q. Okay. And did you consider [REDACTED]

A. I considered it [REDACTED]

Page 73



Q. Okay.

THE REPORTER: 4.

(Exhibit 4 marked.)
Q. (BY MR. TOBIN) Is this ?
A. It appears to be.
Q. And did you review this before formulating your report that's Exhibit 1?
A. Yes.
Q. And you understand this to be
A. Yes.
Q. If you look at -- sorry, the pages are not numbered, but the backside of the third physical page of the exhibit.
A. All right. I see that.
Q. And if you see down at the bottom where there's
A.
Q. Okay. , correct?
A.
Q. And it references Do you see that?

A. I see where it says that.
Q. Okay.
A. Well, I don't think so.

Q. But what's your understanding of, based on your review of the materials in this presentation, of
A.
Q.
MR. BERG: Objection, calls for speculation, multiple questions in there, and it's also vague.
Q. (BY MR. TOBIN) Isn't that your understanding
MR. BERG: Same objections.
A. My understanding is



Q. (BY MR. TOBIN)

Q. Is there anything -- let me just make sure I understand your testimony.

Page 78

Is that correct?

A. It's true

Q. Did you consider

MR. BERG: Objection, calls for speculation.

A.

Page 79

Page 80

Q. Do you understand

A. I understand that

Q. , correct?

Page 81



A. Yes.

Q. And you understand that

A. Yes.

Q. Okay. And it's at least your understanding

Q.

correct?

A. Yes.

Q. Are you aware

A. No, not specifically.

Q. Okay. So you didn't

A. No, I didn't.

Q. Well, let me make sure I understand your analysis

Are you with me so far?

A. I am.

Q. Okay. If a court were to decide that, or a jury were to decide, that American is entitled to the actual damages that you've outlined in your analysis, then

right?

A. I'm not sure if I would say it quite that way.

Q. And just to be clear,

, correct?

A.

MR. TOBIN: Take a quick break?

MR. BERG: You bet.

(Break from 10:58 a.m. to 11:16 a.m.)

Q. (BY MR. TOBIN) Mr. Fuller, I want to talk to you a little bit about

for a minute if you don't mind.

A. Okay.

Q. So I'm looking at page 14 of your report, paragraph 45 --



A. All right.
Q. -- where you're talking about
A. Yes.
Q. Okay. So I want to make sure I'm understanding you correctly. You're basically saying correct?
A. , yes.
Q. Okay. right?
A. I believe so.
Q. Okay. , right?
A. I think that's probably right.

Page 86

A. That's my understanding.
Q. Okay. Did you the take any steps in developing your opinion
A.
Q. Okay. But anything else?
A. I don't believe so.
Q. Just -- I think I closed this loop, but just to be clear, your opinion correct?
A. I think that's true.

Page 87

Q. Okay. And you have no opinion correct?
A. When you mean -- when you say that, do you mean that I don't have opinions regarding
Q. Correct.
A. That's true.
Q. And you're not going to offer opinion and you have not offered an opinion as to correct?
A.

Page 88

Q. Okay. , correct?
A. I agree.
Q. So is it your opinion that --
A. No, I'm not offering opinions on that topic.
Q.

Page 89

[redacted]
Q. How much have you paid by American Airlines for your services so far?
A. [redacted]
Q. That's how much you've charged, or that's how much you've been paid?
A. [redacted]
Q. How much time did you spend reviewing documents to prepare for this deposition?
A. To prepare for the deposition, two or three hours.
Q. And for purposes of your opinions -- I believe you state in this your report. But for purposes of your opinion, [redacted], correct?
A. Yes.
MR. TOBIN: Let's go off the record.
MR. BERG: You bet.
MR. TOBIN: Sorry to take a break again so quickly, but I may be done. I would just like to

Page 90

confer with Darin real quickly.
(Break from 11:26 a.m. to 11:30 a.m.)
(Proceedings ended at 11:30 a.m)

Page 91

CHANGES AND SIGNATURE
WITNESS NAME: DAVID N. FULLER
DATE OF DEPOSITION: JUNE 27, 2024
PAGE LINE CHANGE REASON
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

Job No. TX6757398

Page 92

I, DAVID N. FULLER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_________________________________
DAVID N. FULLER

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared DAVID N. FULLER, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

_________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ____________________
COMMISSION EXPIRES: _______________

Page 93

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of Texas does hereby certify:

I am authorized to administer oaths or affirmations, and prior to being examined, the witness was duly administered an oath by me.

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

I am the deposition officer who stenographically recorded the testimony in the foregoing deposition, and the foregoing transcript is a true record of the testimony given by the witness.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

In witness whereof, I have subscribed my name this 5th day of July, 2024.

Julie C. Brandt

Julie C. Brandt, CSR, RMR, CRR
TX CSR No. 4018, Exp. 10/31/25

Page 94

lars.berg@kellyhart.com

July 5, 2024

RE: American Airlines, Inc. v. Skiplagged, Inc.
DEPOSITION OF: David N. Fuller (# 6757398)

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 95

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit A-4

**Withheld Due to Confidential Information**

**Pending Motion for Leave to File Under Seal**